**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| **BRENDAN DASSEY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **No. 14-cv-1310** |
| | ) | |
| **BRIAN FOSTER, Warden,** | ) | |
| **Green Bay Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Brendan Dassey, by counsel, respectfully submits this memorandum in support of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Petitioner Brendan Dassey is in custody pursuant to a state-court judgment of conviction. His conviction, sentence, and confinement are unlawful and were unconstitutionally obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights. In particular, this federal habeas petition asserts two claims. The first claim asserts that Brendan Dassey's Sixth Amendment right to the effective assistance of counsel was violated when his pre-trial attorney breached his duty of loyalty by working with the prosecution to secure Brendan's conviction. The second claim asserts that Brendan's Fifth and Fourteenth Amendment rights to due process were violated by the admission of his involuntary confession.

*Statement of Facts*

The charges against sixteen-year-old Brendan Dassey arose in connection with the October 31, 2005 disappearance of Teresa Halbach, who had last been seen at an automobile salvage yard near Manitowoc, Wisconsin, that was owned by Brendan's family. (Tr. 4/16/07 at 105-06.)[1]  The salvage yard also housed several trailers in which Brendan, his mother and brothers, and his extended family lived, including his uncle Steven Avery.  Avery had recently been exonerated and released from prison after DNA testing showed that he had been wrongfully incarcerated for rape for 17 years. (PC Ex. 15.)

Several police searches at the salvage yard revealed charred human bone fragments in a bonfire pit near Avery's trailer. (Tr. 4/17/07 at 158.) Those bone fragments were later identified as Halbach's remains. (Tr. 4/18/07 at 69-72.) Police also discovered Halbach's SUV in the salvage yard, the key to the SUV inside Avery's trailer, and small amounts of Avery's blood inside the SUV. (Tr. 4/16/07 at 145-46; 4/17/07 at 106; 4/18/07 at 42-59.)  Based on this evidence, Avery was arrested and charged with Halbach's murder.

Several months later, police decided to question Avery's nephew, sixteen-year-old Brendan Dassey, in part because Brendan had earlier stated that he had helped Avery build a bonfire on the date of Halbach's disappearance and had noticed nothing strange. (Tr. 4/23/07 at 29-39.)  Over the course of two recorded police interrogations on February 27, 2006, Brendan

---

[1] Citations to the trial transcript appear as (Tr. [date] at [page number]).   Citations to the State's trial exhibits appear as (St. Tr. Ex. [number] at [page number]).  Citations to the post-conviction hearing transcript appear as (PC Hrg. [date] at [page number]).  Citations to post-conviction exhibits appear as (PC Ex. [number] at [page number]). Citations to the Wisconsin Court of Appeals' opinion appear as (Wis. Ct. App. Op. at [page number]).   The trial court's oral ruling as to voluntariness is attached hereto as Exhibit 1. The trial court's order denying post-conviction relief is attached hereto as Exhibit 2. The Wisconsin Court of Appeals' opinion affirming Dassey's convictions is attached hereto as Exhibit 3.  The Wisconsin Supreme Court's order denying Dassey's petition for review is attached hereto as Exhibit 4.  Unpublished opinions cited in this Memorandum are attached hereto as Exhibits 5-9, as identified in subsequent footnotes.

eventually provided a different story in which he agreed that he had seen body parts in the bonfire. (St. Tr. Ex. 215 at 451-42.) That night, police arranged for Brendan and his mother to stay in a local hotel under police guard, where they again questioned Brendan for an unknown period of time. (PC Ex. 11 at 513.) Brendan was released on February 28, but on the following day – March 1, 2006 – he was removed from his high school and interrogated on videotape by two officers at the Manitowoc Police Station. As a result of that interrogation, he stated that he had helped his uncle rape and murder Halbach and incinerate her remains. (St. Tr. Ex. 216.)

At the time of his interrogations, Brendan was sixteen years old; his I.Q. of 74 fell in the borderline to below-average range; he was enrolled in some special education classes; psychological tests indicated that he was "highly suggestible"; and he had no criminal or juvenile record. (Tr. 5/4/06 at 82-90; 4/24/07 at 32-56.) The videotaped interrogation of March 1 was the fourth time police had questioned him during a 48-hour period. No interested adult was present on March 1; instead, his interrogators had told Brendan during earlier interactions that "we're cops, we're investigators and stuff like that, but I'm not right now. I'm a father that has a kid your age too. I wanna be here for you." (St. Tr. Ex. 215 at 443.) On March 1, police told Brendan, among other things, that "honesty is the only thing that will set you free" and that even if he made "statements…against your own interest," then "I'm thinkin' you're all right. OK, you don't have to worry about things." (St. Tr. Ex. 216 at 540-41.) Brendan eventually did confess, but he was unable to provide many basic facts about the crime until his interrogators fed him that information, including the manner of death. (St. Tr. Ex. 216 at 587.) After confessing to rape and murder, he asked police "Am I going to be [back] at school before school ends?" and "What time will this be done?" (St. Tr. Ex. 216 at 667.) Instead of being returned to school, Brendan was arrested, tried, and convicted of first-degree intentional homicide, second-degree sexual

assault, and mutilation of a corpse, with the March 1 confession serving as the centerpiece of the State's case against him. Unlike Avery, no physical evidence ever linked Brendan to Halbach's murder, despite the largest investigation in Wisconsin state history.

Attorney Len Kachinsky was appointed to represent Brendan, who repeatedly and consistently told Kachinsky that he was innocent and had falsely confessed. (PC Hrg. 1/15/10 at 137-38.) Because he thought Brendan should plead guilty, however, Kachinsky directed his private investigator, Michael O'Kelly, to visit Brendan in jail and compel him to confess again. (PC Ex. 353; PC Hrg. 1/21/10 at 50, 91, 104.) Over e-mail, Kachinsky and O'Kelly agreed that O'Kelly would interrogate Brendan on May 12, 2006 – the same day on which Kachinsky expected to lose his motion to suppress Brendan's March 1 confession – because the blow of loss would render Brendan more vulnerable. (PC Hrg. 1/15/10 at 244; 1/21/10 at 104.) O'Kelly and Kachinsky also agreed that Kachinsky would cancel his upcoming visit with Brendan to make him feel more "alone." (PC Hrg. 1/21/10 at 87-88.) Kachinsky made these plans despite receiving a previous e-mail in which O'Kelly called Brendan's family "truly where the devil resides in comfort. I can find no good in any member. These people are pure evil…A friend of mind suggested '*This is a one branch family tree. Cut this tree down. We need to end the gene pool here.*'" (PC Ex. 66 (italics in original).)

On May 12, 2006 – after the trial court did, in fact, deny the motion to suppress Brendan's March 1 confession – O'Kelly visited Brendan in jail. (PC Exs. 95, 97.) With videocamera rolling, he falsely told Brendan that he had failed a polygraph. (PC Ex. 97 at 1.) O'Kelly also told Brendan repeatedly that he would receive no help from his lawyer and would get life in prison unless he confessed again, in which case he would receive "twenty years" and get out of prison in time to "have a family" – a made-up number, since no plea offer was or ever

4

had been on the table.  (PC Ex. 97 at 5, 21; PC Hrg. 1/15/10 at 42, 66, 80.)  Under these

influences, Brendan eventually did confess again. (PC Ex. 97 at 5-16.) O'Kelly notified

Kachinsky, whereupon Kachinsky immediately arranged for Brendan to undergo a second police

interrogation the next day – May 13, 2006 – which Kachinsky did not attend.  (PC Ex. 356;

1/22/10 at 213-17.)  No immunity arrangements, plea offers, or other safeguards were in place

prior to this uncounseled police interrogation; to the contrary, Kachinsky had explicitly agreed

with the State that "no consideration" would be provided in exchange for Brendan's second

confession. (PC Hrg. 1/15/10 at 80; 1/19/10 at 34-38.) During that interrogation, police directed

Brendan to admit guilt to his mother over the recorded prison telephones.  As instructed,

Brendan did call his mother Barb Tadych that same day, after he was returned to his cell.  (PC

Ex. 238.)  The following exchange ensued:

> BRENDAN: Mike [O'Kelly] and Mark [Wiegert, one of Brendan's interrogators]
> came up one day and took another interview with me and said because they think
> I was lying but…I would have to go to jail for 90 years.
> BARB: What?
> BRENDAN: Ya. But if I came out with it I would probably get I dunno like 20 or
> less….They asked me if I wanted to be out to have a family later on…
> BARB: …How did you answer the phone at 6 o'clock [on the day of the murder]
> when [alibi witness] Mike [Kornely] called then? …What about when I got home
> at 5:00 you were here [at home].
> BRENDAN: Ya.
> BARB: Ya. When did you go over there [to Avery's trailer, the alleged location of
> the murder]?
> BRENDAN: I went over there earlier and then came home before you did.
> BARB: Why didn't you say something to me then?
> BRENDAN: I dunno, I was too scared.
> BARB: You wouldn't have had to been scared because I would have called 911
> and you wouldn't be going back over there. If you would have been here maybe
> she would have been alive yet. So in those statements you did all that to her too?
> BRENDAN: Some of it.

(PC Ex. 70.)

Within a few weeks, the trial court learned that Kachinsky had allowed his client to be interrogated by police on May 13 outside the presence of counsel. On that basis alone, it removed Kachinsky, appointed successor counsel, and found Kachinsky's performance deficient under *Strickland v. Washington*. (Tr. 8/25/06 at 22.) The rest of Kachinsky's actions went undiscovered until the post-conviction evidentiary hearing, at which the above facts were established. It was also established at the hearing that Kachinsky had sent an e-mail on May 5, 2006 to police and prosecutors indicating where he thought the murder weapon was hidden, without informing Brendan or obtaining his consent. (PC Ex. 338; PC Hrg. 1/15/10 at 236-38.) The ensuing police search, however, turned up nothing. (PC Hrg. 1/22/10 at 88.) It was also established that Kachinsky had made numerous pre-trial statements to the local and national media indicating that his client was guilty, including that Brendan – who, again, had done nothing but protest his innocence – was "remorseful" and that "there is, quite frankly, no defense." (PC Ex. 321.)

At trial, the State introduced Brendan's videotaped March 1 confession to police, which had not been suppressed. Brendan's trial counsel argued that his March 1 confession was coerced and false. In support, trial counsel presented Brendan's own testimony and the testimony of expert psychologist Dr. Robert Gordon, who had evaluated Brendan and found him to be highly suggestible. (Tr. 4/24/07 at 54-56.) The defense also presented alibi witness Mike Kornely to testify that he had called Brendan's home phone on October 31, 2005 at 6:00 PM – during the time when the murder was supposedly happening at Brendan's uncle's trailer – and had spoken with Brendan. (Tr. 4/21/07 at 128-134.)

The State also introduced Brendan's recorded May 13 telephone call to his mother at trial. During its cross-examination of both Brendan and Dr. Gordon, it used the call to show that

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 6 of 30   Document 1-2

Brendan had admitted guilt in the apparent absence of coercion or suggestion. (Tr. 1/22/10 at 162-64; Tr. 4/24/07 at 123.)  During closing argument, the State also relied solely on the May 13 telephone call to construct a timeline of the crime that accounted for Brendan's alibi.  (Tr. 4/25/07 at 56-57.) At the post-conviction hearing, Brendan's trial counsel testified that the May 13 telephone call was "damning" evidence that they "couldn't really come up with any way to defend against."  (PC Hrg. 1/20/10 at 141.)

### *Procedural History*

On March 3, 2006, in Manitowoc County, the State of Wisconsin filed a criminal complaint charging Brendan Dassey with being party to the crimes of first-degree intentional homicide, mutilation of a corpse, and second-degree sexual assault.  On April 19, 2006, Attorney Len Kachinsky, who had been appointed to represent Brendan, filed a motion to suppress Brendan's March 1 confession to police.  After a hearing, the circuit court issued an oral ruling denying the motion to suppress on May 12, 2006.  On August 25, 2006, Kachinsky was removed from the case and subsequently replaced by Attorneys Ray Edelstein and Mark Fremgen. Following a nine-day jury trial, Brendan was convicted of first-degree intentional homicide, second-degree sexual assault, and mutilation of a corpse on April 25, 2007.  Avery, whose sexual assault charge was dropped before trial, was convicted in a separate trial of first-degree homicide and being a felon in possession of a firearm but was acquitted of mutilation of a corpse.  The circuit court, Hon. Jerome Fox presiding, sentenced Brendan to life imprisonment with extended supervision eligibility in 2048.

Following a five-day evidentiary hearing, the circuit court issued a written order on December 13, 2010 denying Brendan's post-conviction motion, which had raised claims including ineffective assistance of counsel.  Brendan appealed both the pre-trial voluntariness

ruling and the post-trial ineffective assistance ruling to the Wisconsin Court of Appeals, which

affirmed both issues on the merits in a written decision on January 30, 2013. The Wisconsin

Supreme Court denied Brendan's timely Petition for Review by Order dated August 1, 2013.

## STANDARD OF REVIEW

Under § 2254(d) of the Anti-Terrorism and Effective Death Penalty Act, a writ of habeas

corpus may be granted when the state court's adjudication of the petitioner's claim on the merits:

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Under § 2254(d)(1), a state-court decision is contrary to clearly

established federal law "if the state court applies a rule different from the governing law set forth

in [U.S. Supreme Court] cases" – in other words, if it applied the wrong legal standard. *Premo v.

Moore*, 131 S.Ct. 733, 743 (2011); *Conner v. McBride,* 375 F.3d 643, 649 (7th Cir. 2004) (a

state-court decision is contrary to clearly established federal law "if the state court incorrectly

laid out governing Supreme Court precedent"). A state court's decision involves an

unreasonable application of clearly established federal law "if the state court identifies the

correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts

of the particular state prisoner's case." *Williams v. Taylor*, 120 S.Ct. 1495, 1520 (2000).

Under § 2254(d)(2), a state court's decision "involves an unreasonable determination of the facts

if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Ward

v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003).

While it is true that AEDPA mandates a degree of deference to the state courts, such

"deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 8 of 30   Document 1-2

(2003). Instead, federal courts have an "independent obligation to say what the law is." *Williams*,

120 S. Ct. at 1517 (O'Connor, J., concurring). AEDPA "directs federal courts to attend to every

state-court judgment with utmost care, but it does not require them to defer to the opinion of

every reasonable state-court judge on the content of federal law. If, after carefully weighing the

all the reasons for accepting a state court's judgment, a federal court is convinced that a

prisoner's custody . . . violates the Constitution, that independent judgment should prevail." *Id.* at

1511 (Maj. Op.).

Following the U.S. Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388

(2011), a federal district court considering a habeas petition under § 2254 must engage in a two-

step analysis. *Mosley v. Atchison*, 689 F.3d 838, 849-51 (7th Cir. 2012) (describing this analysis);

*Pidgeon v. Smith*, 2013 U.S. Dist. LEXIS 174629 (W.D. Wis. Dec. 13, 2013) (following the

analysis set out in *Mosley*).[2] First, it must examine whether the state court acted unreasonably

under § 2254(d)(1) or (d)(2) on the basis of the record as developed in state court. If that

standard is met, the federal court must then conduct an independent, *de novo* review of the

constitutional issues to determine whether relief is warranted under § 2254(a). To aid its §

2254(a) analysis, the federal court may conduct an evidentiary hearing.

## § 2254(d) ARGUMENT: INEFFECTIVE ASSISTANCE OF COUNSEL

I.      **The Wisconsin Court of Appeals' decision was contrary to clearly established
        federal law because it applied the wrong rule of law – the Fifth Amendment
        *Miranda* impeachment rule outlined in *Harris v. New York* – to assess Brendan's
        Sixth Amendment ineffective assistance of counsel claim.**

In the Wisconsin state courts, Brendan raised Attorney Kachinsky's disloyalty as a Sixth

Amendment claim of ineffective assistance of counsel due to a conflict of interest under *Cuyler*

---

[2] *Pidgeon v. Smith*, 2013 U.S. Dist. LEXIS 174629 (W.D. Wis. Dec. 13, 2013) is attached hereto
as Exhibit 5.

*v. Sullivan*, 446 U.S. 335 (1980), and its progeny. In *Sullivan*, the U.S. Supreme Court established that a defendant who was represented by a conflicted attorney is entitled to relief if "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. The Seventh Circuit Court of Appeals has clarified that the *Sullivan* standard requires a defendant to "show that but for the attorney's conflict…his performance would have been different, and the forgone performance was detrimental to [the defendant's] interests." *Michener v. U.S.*, 499 Fed. Appx. 574, 578 (7ᵗʰ Cir. 2012).

While *Sullivan* is most often applied to cases in which an attorney represented multiple co-defendants, it also governs cases involving attorneys who breach the duty of loyalty. *See, e.g.*, *Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763, at *31 (E.D. Mich. Mar. 30, 2001) (an "obvious" conflict of interest arises when a defense attorney "abandons his or her duty of loyalty to the client and joins the prosecution in an effort to obtain a conviction") (citing *Dixson v. Quarles*, 627 F.Supp. 50, 53 (E.D. Mich. 1985) (discussing *Sullivan* standard)).[3]

Brendan argued in the Wisconsin state courts that Kachinsky's conflict met the standard set out in *Cuyler v. Sullivan*. He argued there, as he does here, that no loyal attorney would have engaged in the course of conduct that Kachinsky did, which included compelling his juvenile client to confess to murder – despite his protestations of innocence – and then to submit to uncounseled police interrogation with no protections in place. Rather, a loyal defense attorney would have acted to protect his client and refrained from generating incriminating evidence. Brendan further argued that Kachinsky's performance adversely affected Brendan's interests at trial, insofar as the recorded May 13 telephone call between Brendan and his mother, which

---

[3] *Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763 (E.D. Mich. Mar. 30, 2001) is attached hereto as Exhibit 6.

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 10 of 30   Document 1-2

would never have come into existence but for Kachinsky's disloyalty, was relied upon the State at trial.

The Wisconsin Court of Appeals rejected Brendan's arguments concerning the State's use of the May 13 telephone call. In so doing, however, it applied the wrong legal standard. In a written order, the Court recited the *Sullivan* standard, but it then concluded that the State's use of the May 13 telephone call did not adversely affect Brendan's trial because "[v]oluntary statements obtained even without proper *Miranda* warnings are available to the State for the limited purposes of impeachment and rebuttal." (Wis. Ct. App. Op. at 6.) This principle of law is drawn from *Harris v. New York*, 401 U.S. 222 (1971), not *Sullivan* and its progeny. But *Harris* addressed an entirely different legal issue: whether, under the due process clause of the Fifth Amendment, non-Mirandized statements are admissible during a rebuttal case. Brendan has never raised Fifth Amendment due process arguments concerning the admissibility of the May 13 telephone call under *Miranda*; rather, the sole question concerning the call is and always has been whether, as the fruit of ineffective assistance of counsel, its introduction constituted a detriment to Brendan's interests at trial such that his Sixth Amendment right to effective counsel was violated. Under no possible line of reasoning is the *Harris* standard relevant to whether the State's use of this phone call constituted such a detriment. By applying the wrong legal standard, the Wisconsin Court of Appeals acted contrary to clearly established federal law under § 2254(d)(1).

II.    **In the alternative, the Wisconsin Court of Appeals' decision was an unreasonable application of clearly established federal law when it concluded that Attorney Kachinsky did not labor under an "actual conflict" and that any conflict of interest did not "adversely affect" trial.**

If this Court were to conclude that the Wisconsin Court of Appeals did apply the correct legal standard under *Sullivan*, then such application was unreasonable under § 2254(d)(1).

11

*Sullivan*, again, requires a defendant to show that "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. Without discussing whether Kachinsky labored under an actual conflict of interest – and without attempting to defend his actions – the Wisconsin Court of Appeals simply concluded that "Dassey has not convinced us that Kachinsky's actions amounted to an actual conflict." (Wis. Ct. App. Op. at 7.) Additionally, in assessing whether Kachinsky's disloyalty adversely affected Dassey's trial, the Wisconsin Court of Appeals acknowledged that the jury heard "Dassey's post-interview telephone conversation with his mother," but then went on to find that "Kachinsky was long gone before Dassey's trial or sentencing. Dassey has not convinced us that … Kachinsky's advocacy was adversely affected, such that it was detrimental to Dassey's interests." (Wis. Ct. App. Op. at 6-7.) Both applications of the *Sullivan* standard are unreasonable.

First, there can be no doubt that Kachinsky labored under an "actual conflict." The law is clearly established that a conflict of interest is "actual" if it "affected the counsel's performance, as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 122 S. Ct. 1237, 1243 (2002); *see also Sullivan*, 100 S.Ct. at 1719 ("We hold that the *possibility* of conflict is insufficient to impugn a criminal conviction…[A] defendant must establish that an *actual* conflict of interest adversely affected his lawyer's performance") (emphasis added). Kachinsky's conflict has never been merely theoretical or possible. Instead, as set out above, Kachinsky took actual, real, and concrete steps to help the State and weaken his own client's defense, including directing his investigator to coerce his client into confessing and then arranging for his client to undergo another round of uncounseled police interrogation with no protections in place. No loyal defense attorney would have taken such repeated and extreme steps towards the conviction of his own client. *See U.S. v. Swanson*, 943 F.2d 1070, 1075 (9th

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 12 of 30   Document 1-2

Cir. 1991) (an attorney's "abandonment of his duty of loyalty to his client by assisting the prosecutor also created a conflict of interest"); *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988) (attorney who acted "apparently with the intention to weaken his client's case" suffered from a "conflict in loyalty"). Indeed, a lawyer may advise a client that it is in his best interest to cooperate with the State; but he may not force a client who is asserting his innocence to confess or submit to uncounseled interrogation. *See, e.g.*, *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (the decision to plead guilty belongs only to the accused). Such actions both aid the State and harm the client's position. They are not and cannot be consistent with the Sixth Amendment guarantee that every defendant receive "counsel whose undivided loyalties lie with his client." *U.S. v. Ellison*, 798 F.2d 1102, 1106 (7th Cir. 1986). In concluding that Kachinsky did not labor under an actual conflict, the state court unreasonably applied *Sullivan* under § 2254(d)(1).

Second, it is clear that Brendan did experience an "adverse effect" at trial that flowed directly from Kachinsky's disloyalty, regardless of Kachinsky's pre-trial withdrawal. Under clearly established federal law, a *Sullivan* "adverse effect" exists when counsel's conflict causes the defendant to experience any identifiable "detriment." *Michener*, 499 Fed. Appx. at 578. A defendant who meets this standard "need not demonstrate prejudice in order to obtain relief." *Sullivan*, 446 U.S. at 349-50. Indeed, "demonstrating an adverse effect under *Sullivan* is significantly easier than showing prejudice" under *Strickland v. Washington*. *Hall v. U.S.*, 371 F.3d 969, 973 (7th Cir. 2004) (internal quotations omitted); *see also Ellison*, 798 F.2d at 1107 (refusing to engage in "nice calculations of prejudice" once an actual conflict has been shown).

The required detriment, importantly, need not occur during the conflicted representation itself. Rather, courts who have examined the issue have consistently concluded that a *Sullivan* detriment can arise even after conflicted counsel has been removed from the case. A defendant

13

may experience an adverse effect or detriment at trial, for example, even when conflicted counsel withdrew before trial. *See U.S. v. Tatum*, 943 F.2d 370, 379 (4th Cir. 1991) (granting a new trial under *Sullivan* because, even though a conflicted attorney withdrew prior to trial, the trial was still "infected" by the conflict); *Rubin v. Gee*, 292 F.3d 396, 399 (4th Cir. 2002) (granting a new trial under *Sullivan*, even under AEDPA's deferential standard of review, because "a conflicted attorney can taint trial counsel and render trial counsel's performance ineffective"). Under this well-settled federal law – the validity of which was disputed by neither party to the state-court proceedings – the Wisconsin Court of Appeals was unreasonable to conclude that Brendan could not have experienced a detriment simply because Kachinsky was "long gone" before trial. (Wis. Ct. App. Op. at 7.)

In fact, Brendan did experience a detriment from Kachinsky's disloyalty at trial, despite Kachinsky's pre-trial withdrawal. This detriment occurred when the State repeatedly introduced the May 13 telephone call – in which Brendan told his mother that he had done "some of it" and provided a timeline that appeared to explain away his alibi -- at trial. As an initial matter, there can be no doubt that the May 13 telephone call itself is a product of Kachinsky's disloyalty. The call would not exist but for the sequence of events that Kachinsky put into place, beginning with O'Kelly's interrogation of Brendan on May 12, 2006 and the subsequent production of Brendan to the State for further unprotected interrogation, during which he was told to call his mother and confess. In fact, the transcript of the telephone call itself confirms that Brendan was admitting to the crime because of pressure from his *defense team*. At the beginning of the call, Brendan told his mother that "Mike [O'Kelly] and Mark [Wiegert]…think I was lying," running defense investigator and police officer together in his speech as if they were an indistinguishable unit. (PC Ex. 70 at 2.) Echoing what *O'Kelly* had said the previous day, Brendan then told his mother

14

that if he "came out with it," he would only face "twenty or less" years in prison. (PC Ex. 70 at 2.) He added that "[t]hey asked me if I wanted to be out to have a family later on," again referencing not what the police had said, but what *O'Kelly* had said on May 12. (PC Ex. 70 at 5.) As Brendan's own words show, the May 13 telephone call would never have come into existence but for the actions of Kachinsky and O'Kelly on May 12, 2006.

The State used this call three times at trial.[4] Perhaps most significantly, the State's closing argument expressly relied on the call to establish a timeline that undermined the testimony of Brendan's alibi witness, Mike Kornely. During Brendan's defense case, Kornely testified that he had called Brendan's home phone and spoken with Brendan on October 31, 2006 at 6:00 PM – about the same time that, according to the March 1 confession, Brendan was supposedly at Avery's trailer participating in a lengthy and brutal crime. (Tr. 4/21/07 at 128-134.) Indeed, during the May 13 telephone call, Brendan's mother similarly stated that she had seen him at home at 5:00 PM. But on that call, Brendan responded by stating that he had seen Halbach at Avery's trailer earlier in the afternoon, went home to see his mother, and then returned to Avery's trailer afterwards. (PC Ex. 70.) In closing argument, the State seized on this timeline to argue that Kornely's supposed alibi was irrelevant: "[Brendan] goes home and he has dinner with his brother. He talks to his brother. And his mother comes home and he talks to his

---

[4] The Wisconsin Court of Appeals unreasonably found, as a factual matter, that the call was only used at trial to cross-examine Brendan: "Significantly, though, the State properly introduced it only to rebut Dassey's testimony on direct that acts to which he had admitted 'didn't really happen' and that his confession was 'made up.'" This finding of fact – which was "significant" to the Court of Appeals' decision – is unreasonable and can be refuted by a straightforward review of the trial transcript, which indicates that the State used the call three times, including during closing argument. Because the Court was operating under an unreasonable misapprehension of the facts concerning the phone call's use at trial, it could not properly evaluate the extent to which Kachinsky's disloyalty affected trial, as required by *Sullivan*. This unreasonable finding of fact is presented in section III of this Memorandum as an independent basis for relief under § 2254(d)(1).

mother…He gets a call from Mike Kornely...and Brendan clearly did talk to Mike Kornely, we have no dispute about that. But he leaves [home] and goes back [to Avery's trailer]. We know he goes back. We know he goes back because he tells the police he goes back. *We know he goes back because he tells his mother in those phone conversations, ten weeks later on May 13...that he went back.* That he was there." (Tr. 4/25/07 at 56-57 (emphasis added).)

That call was not only used to discredit Brendan's alibi, but it was also used to undermine his false confession defense. The State played it during cross-examination of Brendan himself, after Brendan testified that his March 1 confession was "made up" and that he had confessed only because police had made him believe that "no matter what" he said, he "wouldn't be taken away from my family and put in jail." (PC Hrg. 1/22/10 at 162-64.) The State also played it during cross-examination of Brendan's only expert witness, Dr. Robert Gordon, who had testified that Brendan was highly suggestible. (Tr. 4/24/07 at 123) Both times, the State's use of the call appeared to establish that Brendan had freely confessed to his mother absent any pressure or suggestion from police.

The State's trifold reliance on the May 13 telephone call certainly is sufficient to show that Brendan experienced an identifiable detriment at trial and thus, under *Sullivan*, that he was adversely affected at trial by Kachinsky's conflict. Indeed, the State's use of the call was more than detrimental. Brendan's trial counsel testified at the state-court post-conviction hearing that the call was "damning" because it entirely undercut their false confession argument. (PC Hrg. 1/20/10 at 141.) For that reason, trial counsel testified that the call was something that they "couldn't really come up with any way to defend against." *See Tatum*, 943 F.2d at 378-79 (relying on trial counsel's opinion regarding the degree to which conflicted pre-trial counsel's actions affected trial and granting relief).

16

Relief has been granted under AEDPA even when the conflict affected trial far less than in this case. In *Rubin v. Gee*, for example, pre-trial counsel suffered from a conflict of interest. Pre-trial counsel advised Rubin who to hire as trial counsel and "continued to collect a fee from Rubin, even though they did not sit at counsel table during her trial." 292 F.3d 396, 399 (4th Cir. 2002). Pre-trial counsel did not enter an appearance on Rubin's behalf in the trial court, though they did meet with her in the period before her trial. The state court found that pre-trial counsel "were not responsible for deciding upon or for carrying out Mrs. Rubin's trial strategy," a finding not disturbed by the federal habeas court. *Id.* Nonetheless, the Fourth Circuit Court of Appeals granted relief under AEDPA, deeming even this relatively minimal involvement by pre-trial counsel sufficient to have adversely affected trial. *Id.* at 406.

It is plain that the way in which Kachinsky affected Brendan's trial – by taking actions that led to the introduction of "damning" evidence against his own client – represents a far more fundamental breakdown of the adversarial process than the adverse effect in *Rubin*. *See, e.g.*, *Rubin*, 292 F.3d at 402 (a conflict of interest "represents a breakdown in the adversarial process fundamental to our system of justice"). Kachinsky's conflicted loyalties resulted in the production of detrimental evidence that was used at trial against his own client. His conflict both hindered Dassey's defense and materially aided the State. It is hard to imagine a more troubling way in which a conflicted attorney's actions could have adversely affected a defendant's interests at trial. In concluding otherwise, the Wisconsin Court of Appeals unreasonably applied *Sullivan* under § 2254(d)(1).

**III.    The Wisconsin Court of Appeals made an unreasonable determination of fact under § 2254(d)(2) when it found that the State had used the May 13 telephone call during trial only to cross-examine Brendan, when the transcript plainly indicates that the State used the call at least three times, including during closing argument to neutralize Brendan's alibi.**

The Wisconsin Court of Appeals found, as a factual matter, that the May 13 telephone call was only used at trial to cross-examine Brendan: "Significantly, though, the State properly introduced it only to rebut Dassey's testimony on direct that acts to which he had admitted 'didn't really happen' and that his confession was 'made up.'"  (Wis. Ct. App. Op. at 6.)  This finding of fact is unreasonable under § 2254(d)(2).  In fact, as argued above, the trial transcript plainly shows that the May 13 telephone call was used three times at trial: to cross-examine Brendan, to cross-examine the defense's suggestibility expert, and during closing argument to neutralize the testimony of Brendan's sole alibi witness.  The testimony at the state post-conviction only confirmed this trifold use of the call.  (PC Hrg. 1/22/10 at 162-64.)  This argument has already been presented in section II and, to avoid repetition, is incorporated herein.

The Wisconsin Court of Appeals stated that it was "significant" that the call had only been used to cross-examine Brendan. (Wis. Ct. App. Op. at 6.)  Its error is equally significant.  Without an accurate factual appreciation of the ways in which the May 13 telephone call was used to Brendan's detriment at trial, the Wisconsin Court of Appeals was unable to reasonably apply the *Sullivan* standard, which required it to identify whether Brendan experienced any "adverse effect" at trial due to Kachinsky's conflicted representation.  If the state court had fully understood the degree to which the State actually relied on the telephone call, it would have been compelled to conclude that Kachinsky's conflict unquestionably caused an "adverse effect" at trial and granted relief under *Sullivan*.

## § 2254(d) ARGUMENT: VOLUNTARINESS

**IV.**      **The Wisconsin Court of Appeals made an unreasonable determination of fact under § 2254(d)(2) when it found that during Brendan's March 1, 2006 interrogation, the officers were merely "professing to know facts they actually did not have," when the video shows the officers repeatedly feeding Brendan facts about the crime that they knew were true.**

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 18 of 30   Document 1-2

Before the Wisconsin state courts, Brendan argued that his March 1, 2006 videotaped confession was involuntary under the due process clauses of the Fifth and Fourteenth Amendments because, among other reasons, his interrogators repeatedly fed him information about the crime that he was compelled to adopt and repeat. In rejecting this claim, the Wisconsin Court of Appeals appears to have made a factual determination that the interrogators were merely "professing to know facts they actually did not have." (Wis. Ct. App. Op. at 4.) Any review of the videotape of this interrogation, however, reveals that this factual finding is unreasonable under § 2254(d)(2).

During Brendan's videotaped interrogation, it is clear that the police were not simply "professing" to know facts; rather, the officers were repeatedly feeding Brendan specific details about the crime, including the results of their own investigation. The most striking example of fact-feeding occurred when his interrogators, Agent Tom Fassbender and Investigator Mark Wiegert, were asking Brendan about Halbach's manner of death. After Brendan provided a series of answers that were totally inconsistent with the physical evidence, the investigators outright told Brendan that Halbach was killed by a gunshot to the head:

> WIEGERT: Brendan, be honest. You were there when she died and we know that. Don't start lying now. We know you were there. What happened? […]
> FASSBENDER: […]You're just hurting yourself if you lie now.
> BRENDAN: Then he went in, back in there and he stabbed her….
> WIEGERT: […]We know he did something else to her, what else did he do to her?
> BRENDAN: He choked her […]
> WIEGERT: What else did he do to her? We know something else was done. Tell us, and what else did he do? Come on. Something with the head. Brendan?
> BRENDAN: Huh? […]
> FASSBENDER: We have the evidence Brendan, we just need you ta, ta be honest with us.
> BRENDAN: That he cut off her hair. […]
> WIEGERT: OK, What else?
> FASSBENDER: What else was done to her head?
> BRENDAN: That he punched her.
> WIEGERT: What else? (pause) What else?
> FASSBENDER: He made you do somethin' to her, didn't he? So he – he would feel better about not bein' the only person, right? (Brendan nods "yes") Yeah.
> WIEGERT: Mm huh.

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 19 of 30   Document 1-2

> FASSBENDER: What did he make you do to her?
> WIEGERT: What did he make you do Brendan? It's OK, what did he make you do?
> BRENDAN: Cut her.
> WIEGERT: Cut her where?
> BRENDAN: On her throat….
> WIEGERT: So Steve stabs her first and then you cut her neck? (Brendan nods "yes") What else happens to her in her head? […]
> BRENDAN: That's all I can remember.
> WIEGERT: All right, I'm just gonna come out and ask you. ***Who shot her in the head***?
> BRENDAN: He did.
> FASSBENDER: Then why didn't you tell us that?
> BRENDAN: Cuz I couldn't think of it.

(PC Ex. 209 at 578-87 (emphasis added)). This excerpt does not reveal mere "professing"; it reveals fact-feeding. And moreover, the officers were not feeding Brendan information that "they actually did not have" (Wis. Ct. App. Op. at 4); instead, the officers were pressing Brendan to reveal the manner of death precisely because they *had* determined the previous day – based on a state forensic crime laboratory report dated February 28, 2006 – that Halbach had, in fact, been shot in the side of the head. (PC Ex. 91.)

The same can be said with respect to other facts that were fed to Brendan. The videotape of the interrogation reveals that the investigators also had to explicitly lead Brendan into saying that Halbach's body was placed in the rear cargo area of her vehicle; that her body and clothing had been burned in Avery's bonfire pit; that the license plates had been removed from Halbach's vehicle; and that Halbach's cellular telephone, camera, and purse were burned separately in a barrel, among other things. (PC Ex. 87.) All of this information was known to police long before Brendan's interrogation. In the months between the crime and Brendan's interrogation, repeated police searches of the salvage yard revealed Halbach's blood in the rear cargo area of her SUV (Tr. 4/18/07 at 61-65); her remains and rivets from her jeans in Avery's bonfire pit (Tr. 4/17/07 at 55; Tr. 4/18/07 at 69-72); her license plates in a junked car (Tr. 4/16/07 at 169); and the charred remnants of her phone, camera, and purse in a burn barrel (Tr. 4/17/07 at 46). Police

were armed with all of this information when they interrogated Brendan, and they provided all these details to him, one by one, on videotape. In sum, the Wisconsin Court of Appeals was unreasonable under § 2254(d)(2) – and, indeed, had absolutely no basis in the record – to find that the officers were merely "professing to know facts they actually did not have."

V. **The Wisconsin Court of Appeals made an unreasonable finding of fact when it found that during Brendan's March 1, 2006 interrogation, the officers did not promise leniency but rather merely reminded Brendan of his "moral duty to tell the truth," tried to "achieve a rapport" with him, and "convince[d] him that being truthful would be in his best interest."**

Before the Wisconsin Court of Appeals, Brendan argued that his March 1 confession was involuntary under the due process clauses of the Fifth and Fourteenth Amendments because, among other reasons, the officers induced him to confess by making no fewer than twenty-one promises of leniency. Those promises of leniency – all of which were captured on tape – included a promise that even if Brendan made "statements…against your own interest," then "from what I'm seeing…I'm thinkin' you're all right. OK, you don't have to worry about things." (St. Tr. Ex. 216 at 540.) He was also told that "by you talking with us, it's, it's helping you" and – while he was detained in a police interrogation room – that "honesty is the only thing that will set you free." (St. Tr. Ex. 216 at 541.) There can be no doubt that these statements were understood by Brendan as promises: even after confessing to rape and murder, Brendan asked his interrogators, "Am I going to be [back] at school before school ends?" and "What time will this be done?" (St. Tr. Ex. 216 at 667.) He plainly believed that since he had held up his end of the bargain by confessing, the officers would hold up theirs by releasing him. When he was told that he was being placed under arrest, moreover, he immediately recanted, telling his mother that the police had "got to my head." (St. Tr. Ex. 216 at 672.)

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 21 of 30   Document 1-2

In rejecting Brendan's voluntariness claim, the Wisconsin Court of Appeals adopted the trial court's determination that such statements were nothing more than vague assertions that "being truthful would be in [Brendan's] best interest" and served only to "achieve a rapport" with Brendan and "remind[ him] of his moral duty to tell the truth." (Wis. Ct. App. Op. at 4.) These factual determinations, which ignore the plain meaning of the words in question, are unreasonable under § 2254(d)(2).

It is fictional to suggest that these statements do not amount to promises of leniency. By their own terms, these statements indicate with a high degree of specificity that if Brendan provided "statements against his interest," then he would be "all right," wouldn't have to "worry," and would be "set…free." Any reasonable person would interpret such words as a guarantee that confessing would not be harmful. Indeed, renowned psychologist Richard Leo, an expert in police interrogations, testified at the post-conviction hearing that these statements unmistakably conveyed that Brendan would receive leniency if he confessed and punishment if he did not. (PC Hrg. 1/19/10 at 156.)

It is similarly fictional to suggest that these statements merely reminded Brendan of his "moral duty" to confess.  Courts have found that police were referring to a moral duty to confess when – unsurprisingly – the interrogation included explicit references to morality, such as "do the right thing here" (*People v. Kronenberger*, 2014 IL App (1st) 110231 at P 47) or "[confessing] is the Christian thing to do" (*Lacy v. State*, 345 Ark. 63, 78 (2001)).  These statements are quite different than the statements at issue here, which explicitly reference concrete benefits like being "helped" and "set free."

And finally, it is fictional to suggest that these statements were merely an exercise in rapport-building.  Examples of rapport-building during interrogation abound in the caselaw,

including chatting about movies (*State v. Wells*, 2008 Wisc. App. LEXIS 255 (Wis. Ct. App.

2008))[5]; engaging in "small talk" (*U.S. v. Thoma*, 726 F.2d 1191 (7th Cir. 1984)); and being

respectful and polite (*State v. Robinson*, 2009 Wisc. App. LEXIS 646 (Wis. Ct. App. 2009)).[6]

The statements at issue here are hardly small talk; instead, they clearly communicate that a

benefit will result from confession. The Wisconsin Court of Appeals was unreasonable under §

2254(d)(2) when it closed its eyes to the plain meaning of these promises of leniency and

determined that they were not promises at all.

> **VI. The state court acted contrary to federal law or, alternatively, it unreasonably applied clearly established federal law when it concluded that Brendan's March 1, 2006 confession was voluntary without considering Brendan's age or its impact on the interrogation.**

Before the Wisconsin Court of Appeals, Brendan argued that his March 1, 2006

confession was involuntary under the Fifth and Fourteenth Amendments to the United States

Constitution. He argued that under clearly established U.S. Supreme Court precedent, a court

determining the voluntariness of a confession must "take into consideration the totality of all the

surrounding circumstances – both the characteristics of the accused and the details of the

interrogation." *Dickerson v. U.S.*, 530 U.S. 428, 434 (2000). In so arguing, Brendan emphasized

that courts must use "special care in scrutinizing the record" in cases involving juvenile

confessions, under a clearly established line of U.S. Supreme Court caselaw that expresses

concern for the voluntariness of statements obtained through interrogation of youths. *See Haley*

*v. Ohio*, 332 U.S. 596, 599-600 (1948) (suppressing fifteen-year-old's confession because "that

which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early

---

[5] *State v. Wells*, 2008 Wisc. App. LEXIS 255 (Wis. Ct. App. 2008) is attached hereto as Exhibit 7.
[6] *State v. Robinson*, 2009 Wisc. App. LEXIS 646 (Wis. Ct. App. 2009) is attached hereto as Exhibit 8.

teens"); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) (finding that fourteen-year-old's

confession had been taken in violation of due process because a teen is "not equal to the police in

knowledge and understanding of the consequences of the questions and answers being recorded

and…is unable to know how to protect his own interests"); *In re Gault*, 387 U.S. 1, 48, 52-54

(1967) (deeming it "imperative" to question juveniles' confessions because "authoritative

opinion has cast formidable doubt upon the reliability and trustworthiness of 'confessions' by

children"). Indeed, the *Haley-Gallegos-Gault* line of cases has been recognized as "clearly

established" law for AEDPA purposes on multiple occasions. *See Doody v. Ryan*, 649 F.3d 986,

1008 (9th Cir. 2011) (concluding that the *Haley-Gallegos-Gault* line of decisions clearly

establishes that "the fact that Doody was a juvenile is of critical importance in determining the

voluntariness of his confession" and reversing denial of writ of habeas corpus on voluntariness

and *Miranda* grounds); *Hardaway v. Young*, 302 F. 757 (7th Cir. 2002) (recognizing that the

*Haley-Gallegos-Gault* line of decisions represents a clearly established line of U.S. Supreme

Court caselaw requiring "special caution when assessing the voluntariness of a juvenile

confession," but denying relief under AEDPA in an "extremely close" case because the state

courts had expressly cited and discussed *Haley-Gallegos-Gault*).

The Wisconsin Court of Appeals applied the totality of the circumstances test to

Brendan's March 1, 2006 confession and concluded that it was voluntary – but it did so without

any mention of the special care or scrutiny required by *Haley-Gallegos-Gault*. (Wis. Ct. App.

Op. at 2-4.) In fact, nowhere in its voluntariness analysis did the state court even mention that

Brendan was only sixteen when he was interrogated. Such a glaring failure cannot withstand

review under § 2254(d)(1), regardless of whether the Wisconsin courts' failure to apply the

*Haley-Gallegos-Gault* standard is treated as a decision contrary to existing U.S. Supreme Court

law or, alternatively, whether its application of the totality of the circumstances test without reference to age is treated as an unreasonable application of federal law.

By ignoring Brendan's youthfulness, the Wisconsin Court of Appeals could not have properly examined the way in which his age impacted the other circumstances surrounding the interrogation. In particular, it is well-established that youthfulness makes a defendant more vulnerable to commonly used police interrogation tactics. *See J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2397 (2011) (noting that the "pressure of custodial interrogation" is greater "when the subject of custodial interrogation is a juvenile") (Maj. Op.); *J.D.B.*, 131 S. Ct. at 2413 ("I do not dispute that many suspects who are under 18 will be more susceptible to police pressure than the average adult") (Alito, J., dissenting); *Johnson v. Trigg*, 28 F.3d 639, 643 (7th Cir. 1994) ("Police tactics that might be unexceptionable when employed on an adult may cross the line when employed against the less developed reason of a child"). Yet any consideration of whether Brendan's age made him "more susceptible to police pressure," or whether police interrogation tactics "crossed the line" given his age, is absent from the Wisconsin courts' decisions.

If the Wisconsin Court of Appeals had considered Brendan's age, it would have concluded that his March 1 confession was involuntary. Brendan was sixteen, but in many ways he thought and acted like a younger child. His I.Q. of 74 fell in the borderline to below-average range; he was enrolled in some special education classes; and psychological tests indicated that he was more suggestible than 95% of the population. (Tr. 5/4/2006 at 88-90; Tr. 4/24/2007 at 32-39, 51-56.) Moreover, Brendan's only prior experience with police consisted of three separate interrogations during the 48 hours immediately preceding his March 1, 2006 interrogation, a prolonged ordeal that surely left him wondering "if and when the inquisition would ever cease." *Woods v. Clusen*, 794 F.2d 293, 298 (7th Cir. 1986). Notably, on each of the

25

three previous occasions, Brendan was released after telling the interrogators what they wanted to hear. He had no reason to expect anything different on March 1.

There can be no doubt that Brendan's interrogators exploited his youthfulness and naiveté in order to get his confession. Indeed, during an earlier interrogation on February 27, 2006, his interrogators had portrayed themselves as protective parents, telling Brendan that "we're cops, we're investigators and stuff like that, but I'm not right now. I'm a father that has a kid your age too. I wanna be here for you…There's nothing I'd like more than to come over and give you a hug cuz I know you're hurtin'." (PC Ex. 206 at 443.) On March 1, however, no actual parent, guardian, or interested adult was in the interrogation room with Brendan; instead, he was alone with his interrogators.

These assurances – that the interrogators were more like parents than police – made their subsequent false promises of leniency all the more potent. Over and over on March 1, Brendan's interrogators assured him – just as a parent would – that they would "help you through this," that they were "in his corner," and that they would "go to bat" for him if he confessed. They further made blatantly false promises, as recounted above in greater detail, that he would be "okay" if he confessed and that confessing would "set you free." There can be no doubt that these repeated promises – which totaled no fewer than twenty-one on March 1 alone – were false. In fact, the opposite was true: because no witness or shred of physical evidence had ever linked Brendan to Halbach's murder, Brendan was safe from legal jeopardy *unless* he confessed.

Importantly, police often gave these false assurances immediately before Brendan's most damning admissions. Right before Brendan told police that he had heard Halbach screaming inside his uncle's trailer, his interrogators told him, "We already know, it's OK. We gonna help you through this, alright?" (St. Tr. Ex. 216 at 561.) Right before Brendan said that he saw

26

Halbach restrained in his uncle's bedroom, his interrogators told him, "We know you went back there. Let's get it all out today and this will be all over with." (St. Tr. Ex. 216 at 572.) And right before Brendan said that he sexually assaulted Halbach, his interrogators told him that "We know what happened, it's OK…it's not your fault, he makes you do it." (St. Tr. Ex. 216 at 574.) Plainly, the officers were able to overcome Brendan's reluctance only by repeatedly assuring him that his admissions would not harm him. And lest Brendan fear that their promises of leniency were based on some misunderstanding of his culpability, the officers also reassured Brendan *thirty-one* times on March 1 that they "already knew" what he had done. Police interrogations expert Dr. Richard Leo testified that such false assertions of superior knowledge are "particularly influential on individuals who have low IQs, or who are juveniles, who…may be more gullible or easily led or manipulated into confessing as a result of them." (PC Hrg. 1/19/2010 at 170.)

    Brendan's admissions themselves, moreover, were frequently the result of coaching and fact-feeding. As demonstrated in greater detail above, his interrogators repeatedly had to give Brendan information when he was unable to provide correct details about how the crime occurred, including details about the most basic subjects like the cause of death. Such fact-feeding has repeatedly been held to be central to the voluntariness analysis. *See, e.g.*, *U.S. v. Preston*, 751 F.3d 1008, 1024 (9th Cir. 2014) (finding intellectually disabled 18-year-old's confession involuntary where, *inter alia*, police "asked him the same questions over and over until he finally assented and adopted the details that the officers posited"); *State v. Rettenberger*, 984 P.2d 1009, ¶ 40 (Utah 1999) (finding confession involuntary when it "contains little information that was not first provided or suggested by the interrogating officers"); *State v. Randle*, 366 S.E.2d 750, 754 (W. Va. 1988) (finding confession involuntary when police used "highly suggestive" questioning to "propose that the killing might have resulted from an aborted

27

robbery"). *Cf. Massachusetts v. Schuler*, 2011 Mass. Super. LEXIS 195, at *12 (Mass. Super. Ct. 2011) (finding confession voluntary where "[t]he defendant's answers appear to be independent of the suggestions made to him by officers, as opposed to someone who simply repeats or restates what is said by the police").[7]

Such fact-feeding, importantly, was particularly effective in this case because of Brendan's youthfulness. It is well-recognized that youth are categorically more suggestible, impulsive, and susceptible to pressure. *See Roper v. Simmons*, 543 U.S. 551, 569 (2005); *Graham v. Florida*, 130 S. Ct. 2011, 2026 (2010); *Miller v. Alabama*, 132 S.Ct. 2455 (2012). *Accord J.D.B.*, 131 S. Ct. at 2403-04. Indeed, even police officers generally recognize that juveniles are particularly suggestible during interrogation. *See* N. Dickon Reppucci, Jessica Meyer, & Jessica Kostelnik, *Custodial Interrogation of Juveniles: Results of a National Survey of Police*, in Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations 67 (G. Daniel Lassiter & Christian A. Meissner eds. 2010). This Court need only watch the videotape of Brendan's interrogation to see his suggestibility manifest itself repeatedly, as he is made to adopt the interrogators' version of events over and over again.

In short, by portraying themselves as protective parents – and then by leveraging their self-professed quasi-parental role to assure Brendan that no harm would come to him if he confessed – the interrogators clouded Brendan's ability to understand the real-world consequences of confessing and prevented him from making a rational, knowing decision to confess. *See U.S. v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009) (a voluntary confession is "the product of a rational intellect," and an "empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under

---

[7] *Massachusetts v. Schuler*, 2011 Mass. Super. LEXIS 195 (Mass. Super. Ct. 2011) is attached hereto as Exhibit 9.

interrogation is being asked to choose"). Instead, they fed him facts about the crime over and over until he assented and adopted them. Taken together, these acts rendered the police tactics coercive and Brendan's confession involuntary. While such promises and fact-feeding may be "unexceptionable" when used on a seasoned adult criminal, these tactics "cross the line" when the suspect is a mentally limited child – particularly when interrogators directly exploit the suspect's youthfulness to get the confession. *Johnson*, 28 F.3d at 643. By failing to assess the ways in which Brendan's youthfulness affected the totality of the circumstances surrounding this interrogation, the Wisconsin Court of Appeals reached an unreasonable decision that cannot withstand review under § 2254(d)(1).

## § 2254(a) ARGUMENT AND REQUEST FOR RELIEF

**VII.    Brendan's ineffective assistance of counsel and voluntariness claims meet the burden set out in § 2254(d), so this Court must conduct an independent review of these constitutional claims under § 2254(a).**

Having shown that the trial court made unreasonable determinations of fact, acted contrary to clearly established federal law, and unreasonably applied clearly established federal law, Brendan's claims survive the threshold review set out in § 2254(d)(1) and (d)(2). The merits of his ineffective assistance of counsel and voluntariness claims must therefore be reviewed under § 2254(a) *de novo*, without any deference to the state courts' decision-making, in order to determine whether a constitutional violation has occurred. *See Mosley v. Atchison*, 689 F.3d 838, 849-51 (7th Cir. 2012) (setting out this two-step analysis).

Brendan hereby incorporates the arguments made above regarding the merits of his ineffective assistance of counsel claim and his voluntariness claim and, on the basis of those arguments and the factual record as developed in state court, respectfully requests that this Court grant him a writ of habeas corpus so that he may be discharged from his unconstitutional

confinement and restraint.  Alternatively, Brendan incorporates those arguments herein and

requests that this Court conduct an evidentiary hearing on both claims.


Respectfully submitted this 20th day of October, 2014.

**s/Laura H. Nirider**
*Counsel for Petitioner Brendan Dassey*

LAURA H. NIRIDER, Esq.
Bluhm Legal Clinic (IL Bar No. 15245)
Northwestern University School of Law
375 East Chicago Avenue, 8th Floor
Chicago, IL 60611
Telephone:  312-503-2204
Facsimile:  312-503-8977
E-mail:  l-nirider@law.northwestern.edu

ROBERT J. DVORAK, Esq.
WI Bar No. 1017212
Halling & Cayo, S.C.
320 E. Buffalo St., Suite 700
Milwaukee, WI 53202
Telephone: 414-273-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com