

CIRCUIT COURT BRANCH III

**MANITOWOC COUNTY COURTHOUSE**
**1010 SOUTH 8TH STREET, P.O. BOX 2000**
**MANITOWOC, WISCONSIN 54221-2000**

**MARY ZELLNER**
*Judicial Assistant* **Phone: (920) 683-4022**

**JENNIFER K. HAU**
*Court Reporter* **Phone: (920) 683-4084**

**FAX: (920) 683-2780**

December 13, 2010

Attorney Thomas J. Fallon
Assistant Attorney General
17 W. Main Street
P.O. Box 7857
Madison, WI 53707-7857

    -and-

Attorney Robert Dvorak
320 E. Buffalo Street, Suite 700
Milwaukee, WI 53202

Gentlemen:

RE:    STATE OF WISCONSIN –vs- BRENDAN R. DASSEY
       Case No. 06 CF 88

I enclose the trial court's decision in *State of Wisconsin vs. Brendan R. Dassey.*

Sincerely yours,

Jerome L. Fox
Circuit Judge

JLF/mz

cc:    Attorney Steven Drizin
       Attorney Joshua A. Tepfer
       Attorney Thomas Geraghty
       Attorney Laura H. Nirider
       Attorney Norman A. Gahn
       Calumet County District Attorney's Office

STATE OF WISCONSIN      CIRCUIT COURT      MANITOWOC COUNTY

STATE OF WISCONSIN,      Plaintiff

MEMORANDUM DECISION
AND ORDER

-vs-

Case No. 06 CF 88

BRENDAN R. DASSEY,      Defendant

---

## **INTRODUCTION**

The defendant, Brendan Dassey (Dassey) was charged on March 3, 2006, with being party to the crimes of first degree intentional homicide, second degree sexual assault, and mutilation of a corpse. The victim in all three charges was Teresa Halbach, who was murdered on October 30, 2005, in Manitowoc County. In a separate trial, Dassey's uncle, Steven Avery, was convicted on March 18, 2007, of being a party to the crime of Teresa Halbach's first degree murder, and being a felon in possession of firearms. Jury selection for Dassey took place over a day-and-a-half period in Dane County. The court ordered Dassey's jury sequestered in Manitowoc and his trial began on April 16, 2007. It concluded on April 25, 2007, when the jury returned guilty verdicts to all three charges.

On August 2, 2007, this court sentenced Dassey on the intentional homicide conviction to life in prison with the possibility of release to extended supervision on November 1, 2048; additional concurrent sentences were given for the other two convictions.

Dassey filed a motion under Wis. Stats. §809.30, on August 25, 2009, seeking post-conviction relief. Specifically, Dassey is seeking a new trial or a new suppression hearing. He

1

alleges he is entitled to this because his trial counsel, Mark Fremgen and Ray Edelstein and Attorney Leonard Kachinsky, who represented him immediately before trial counsel was appointed, were ineffective in their representation of him. He also requests a new trial in the interest of justice because, he alleges, the real controversy was not fully tried and his conviction represented a miscarriage of justice. Lastly, Dassey asks for a new hearing on the suppression of his March 1, 2006, confession. A motion to suppress those statements was originally heard by this court on May 4, 2006, and denied in a decision given May 12, 2006. Subsequently, a motion to reopen the hearing to suppress statements was filed by successor trial counsel; the court denied that motion on December 15, 2006.

Dassey's post-conviction motions were heard by this court over a five-day period beginning January 15, 2010, and ending January 22, 2010. No hearings were held on Martin Luther King Day, January 19, 2010. Following the close of defendant's post-conviction case, the State waived its right to call witnesses on its behalf. The court ordered a briefing schedule for the parties and those briefs have been completed and received. The court's decision follows.

### STANDARD OF REVIEW
### Ineffective Assistance of Counsel

Dassey was represented by Attorney Len Kachinsky from March 8, 2006, until August 25, 2006, when this court found his performance as counsel for Dassey to be "deficient" as a result of his failure to attend a police interview with his client which Kachinsky had arranged. Attorney Mark Fremgen was appointed successor counsel on August 29, 2006; Attorney Ray Edelstein

2

joined Fremgen as co-counsel for Dassey. All counsel were appointed through the Wisconsin State Public Defender's Office. Dassey's post-conviction motions allege each counsel ineffectively assisted him, either singly or collectively, and their deficient performance entitles him to the relief he is seeking.

To establish an ineffective assistance of counsel claim, Dassey must show that counsel made errors so serious that counsel was "not functioning as the counsel 'guaranteed' the defendant by the Sixth Amendment…[and]…that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." **Strickland v. Washington**, 466 US 668, 687 (1984). The court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. **Id.** at 697.

Deficient performance requires a showing "that counsel's representation fell below an objective standard of reasonableness" **Id.** at 688. The court reviews the attorney's performance with great deference and the burden is placed on the defendant to overcome the strong presumption that counsel acted reasonably within professional norms. **State v. Johnson**, 153 Wis. 2d 121, 127, 449 NW 2d 845 (1990). An attorney's performance "need not be perfect, nor even very good, to be constitutionally adequate." **State v. Carter**, 2010 WI 40, §22, 324 Wis. 2d 640, 782 NW 2d 695. When evaluating effectiveness, the court grants "a heavy measure of deference to counsel's judgments." **Id.**, §23. A defendant that can demonstrate counsel's performance was deficient must also show a reasonable probability that the deficient performance had an adverse effect on the outcome. **Id.**, §37.

3

Generally, when a defendant accepts counsel, the defendant delegates to counsel those tactical decisions an attorney must make at trial. To show prejudice, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." **Strickland** at 694. The burden of proof is on the defendant to show by clear and convincing evidence that both components of the ineffective assistance of counsel test have been met. **State v. Lukasik**, 115 Wis. 2d 134, 140, 340 NW 2d 62 (Court App. 1983).

## I. Attorney Len Kachinsky's Ineffective Assistance of Counsel.

### A. His breach of loyalty to his client.

Dassey urges this court to find that Kachinsky's actions on behalf of his client constituted disloyalty to the client and amounted to a conflict of interest. He sets forth in his brief a series of things Kachinsky did or that were done at his direction which Dassey says justify his claim that Kachinsky was disloyal and furnished him ineffective assistance of counsel. He starts with statements Kachinsky made to media even before meeting Dassey in which Kachinsky seemed to imply that Dassey may have had some involvement in the Halbach matter. (Def. Br. at 2; PC Exs. 317, 374.) This brief notes other instances of remarks made by Kachinsky to the press which again implied that Dassey had some involvement in the crime for which his uncle, Steven Avery, was also charged. In his post-conviction testimony, Kachinsky admitted talking to the press about his client's possible involvement in the crime but said he did it in part to blame Steven Avery and

4

in part to send a message to the family that Dassey might have to take a "legal option that they don't like". (Tr. 1-19-10 at 134, L. 13 to 25; at 136, L. 24-25, at 137, L.1 to 9.)

Dassey goes on to cite what he believes are additional instances of Kachinsky's disloyalty. Chief among them is a confession extracted from Dassey on March 12, 2006, by Michael O'Kelley, an investigator employed by Kachinsky. The admissions made by Dassey followed a "lie detector" test administered to Dassey by O'Kelley and which O'Kelley told Dassey he failed because the test showed a 98% probability of deception. (PC Ex. 97 at 1). After some prefatory prodding and cajoling by O'Kelley, Dassey went on to make a series of incriminating admissions and created a number of drawings depicting events that he was describing. (PC Ex. 97 at 5 to 19).

Dassey also points to Kachinsky's direction of O'Kelley to gather additional evidence from the Avery salvage yard bolstering the State's case against Steven Avery even though that evidence would further implicate Dassey. (Def. Br. at 3-4). Kachinsky's actions, according to Dassey, even if motivated by a benign intent to secure a favorable plea deal for his client, were neither authorized nor supported by Dassey who continued to maintain to Kachinsky that he was innocent of any wrongdoing. Dassey argues that Kachinsky's acts were disloyal and represented a conflict of interest as that term is defined in **Cuyler v. Sullivan**, 446 US 335 (1980). Furthermore, once an actual conflict of interest is shown prejudice is automatic. **State v. Kaye**, 106 Wis. 2d 1, 8-16, 315 NW 2d 337 (1982).

The State counters Dassey's position by saying that Kachinsky was trying to get the best deal for Dassey and some of his actions were simply push-back against family members who were fearful that Dassey would testify against Steven Avery. (St. Br. at 8 & 9). The State characterizes

5

Dassey's May 13th statement given to Fassbender and Wiegert in Sheboygan County without Kachinsky present as a "proffer" which could result in a plea agreement. (St. Br. at 9).

In **Cuyler v. Sullivan**, 446 US 335 (1980), two privately retained lawyers represented three defendants charged with first degree murders of two victims. **Id**. at 446. The three were tried at separate trials and Sullivan was convicted while his co-defendants were acquitted. His appeal, on grounds that his counsel had impermissible conflicts of interest with the multiple representation, was denied by the state courts but ultimately his conviction was reversed by the Federal Court of Appeals on his Writ of Habeas Corpus. In vacating and remanding for further proceedings, the Supreme Court held that the defendant "who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief". 446 US at 349-350.

The Wisconsin Supreme Court, in **State v. Kaye**, 106 Wis. 2d 1, 315 NW 337 (1982) adopted the holding of **Sullivan** in a case where the defendant claimed ineffective assistance of counsel because he and his co-defendant had been represented by the same attorney. While it denied the defendant's claim of ineffective assistance of counsel, the language of the opinion suggested that it viewed any representation of multiple defendants by a single lawyer or law firm as problematic and it prospectively required trial courts to make an inquiry on the record whenever that situation arose. **Kaye** at 13-14. The **Kaye** holding was amplified in **State v. Dadas**, 190 Wis. 2d 339, 526 NW 2d 818 (Ct. App. 1994) where the court ruled that "specific prejudice need not be shown if the defendant demonstrates by clear and convincing evidence that trial counsel actively represented a conflicting interest". **Id**. at 344. Counsel in **Dadas** undertook

6

the representation of two defendants who were charged with commercial gambling. His clients waived in writing any potential conflict of interest and then entered guilty pleas after which they were sentenced. Their attorney, who represented both of them throughout, urged them to cooperate with law enforcement so that they might avoid federal charges. **Dadas** at 345-346. The court found an actual conflict of interest to exist when an attorney has one client voluntarily supply incriminating information to be used against another client. **Dadas** at 346-347.

Dassey believes that the sum effect of what he refers to as Kachinsky's "multiple, concrete acts of disloyalty" warrant a finding by this court that an actual conflict of interest existed which entitles him to a new trial. (Def. Br. at 10). Additionally, he contends Kachinsky's acts are egregious enough so that the court should use them to presume prejudice, a presumption which makes unnecessary any inquiry into trial counsel's performance. **U.S. v. Cronic**, 466 US 648, 662 (1984).

He cites as support for his actual conflict argument **State v. Love**, 227 Wis. 2d 60, 594 N.W. 2d 806 (1999) where the Supreme Court reiterated the holding in **Kaye** while at the same time reversing a court of appeals' decision which had found on a per se rule an attorney to have provided ineffective assistance of counsel when she represented the state at the defendant's original sentencing, and then months later working as a public defender she represented the same defendant at his sentencing after revocation of probation. The court defined an actual conflict of interest as occurring "when the defendant's attorney was actively representing a conflicting interest, so that the attorney's performance was adversely affected." **Love** at 71. No showing of prejudice need be made because prejudice is presumed and counsel is considered per se

7

ineffective. **Love** at 71. The defendant in **Love** argued that the per se rule should be extended to cases of serial representation. The court declined to do so and found that on the facts of the case no clear and convincing evidence was adduced to prove an actual conflict of interest. **Love** at 82.

Unquestionably, Wisconsin courts have recognized that in certain instances a presumption of prejudice will attach to counsel's representation of a defendant. A number of the instances in which prejudice is presumed are set out in **State v. Erickson**, 227 Wis. 2d 758, 770, 596 NW 2d 749 (1999). The **Erickson** court opines that these instances are rare and in the absence of a presumption of prejudice a defendant must make a showing of actual prejudice and that the actual prejudice created a reasonable probability that the result of the trial would have been different. **Erickson** at 773 citing **Strickland**, 466 US at 694.

Dassey relies on **Kaye, Dadas, Cuyler**, and **Love** to support his claim that the court should use the per se rule to find Kachinsky ineffective and grant Dassey a new trial. (Reply Br. at 3 to 7). There are distinct factual differences between Dassey's situation and the conduct complained of in the cases on which he relies. All except **Love** are instances in which an attorney or attorneys jointly represented more than one client being charged on the same set of facts. Moreover, the lawyer or lawyers involved in the joint representation cases, represented their clients from the onset of the case through the plea or trial stage. The court has previously alluded to the factual background in **Love** and those facts do not parallel any of Dassey's complaints about Kachinsky's representation nor do the facts in **State v. Franklin**, 111 Wis. 2d 681, 331 NW 2d 633 (Ct. Apps. 1983), another case Dassey cites in support for his per se argument. The **Franklin** court found that the defendant's attorney who had represented the defendant throughout

8

her proceeding, had placed himself in an "actual conflict of interest" with his client when he placed his financial interest before his allegiance to his client. **Franklin** at 688-689.

Kachinsky's representation of Dassey ceased on August 25, 2006, after this court found that his failure to personally appear with his client at a May 13, 2006, interview with Investigators Wiegert and Fassbender constituted deficient performance. (Tr. 8-25-06 at 21 to 24). This was some seven months before the actual trial began with the selection of the jury in Dane County on April 12, 2007. Regardless of how the conduct of Kachinsky and his agent, O'Kelley, is characterized as it relates to the events of May 12th and May 13, 2006, Dassey "must establish that an actual conflict of interest adversely affected his lawyer's performance". **Cuyler** at 350. By the time a jury was selected and Dassey was tried Kachinsky was long gone from the case. Nothing from O'Kelley's May 12th interview in which he had Dassey incriminate himself found its way into the trial record. Other than a brief audio clip of a portion of a phone conversation between Dassey and his mother, which the State played without objection in its cross-examination of the defendant, and several questions asked on the cross-examination of Dr. Robert Gordon, nothing from May 13th was introduced at trial. (Tr. 4-23-07 at 50-51; Tr. 4-24-07 at 121-122). And, the State made little more than passing reference to the May 13th phone call in its closing to the jury. (Tr. 4-25-07 at 57, L. 1 to 3; at 80, L. 1 to 3).

To successfully sustain a challenge absent a showing of actual prejudice, Dassey must show that the reliability of the trial process itself was somehow negatively affected by Kachinsky's conduct or the conduct of his agent, O'Kelley. **Cronic** at 658. On this record, in this case, this court cannot find that Kachinsky's conduct constituted an actual conflict of interest that

9

somehow affected the reliability of a trial which was held seven months after his departure from the case.

**B. Kachinsky's deficient performance at the May 4, 2006, suppression hearing.**

Dassey also claims to be entitled to a new suppression hearing because Kachinsky's performance at the May 4, 2006, hearing was inflected by his conflict of interest and this deficient performance unfairly prejudiced his offense. (Def. Br. at 15 to 17). As proof of this claimed deficient performance, Dassey points to Kachinsky's failure to effectively cross-examine the State's witnesses as well as his concession that there were no Miranda issues concerning Dassey's March 1, 2006, statement to Investigators Mark Wiegert and Thomas Fassbender.

Kachinsky filed on April 19, 2006, a motion to suppress the use of any statements made by Dassey to law enforcement agents on February 27, 2006 and March 1, 2006. His motion came in the form of a ten page statement of facts coupled with a written argument citing what he believed to be the relevant law as it related to those facts. (4-19-06 Motion to Suppress). The State responded with a memorandum of law setting forth its position on the legal issues it believed were implicated in the suppression hearing. (5-1-06 State's Memorandum in Response). Kachinsky filed a reply to the State's memorandum in which he argued that the video-recorded March 1, 2006, statement given by Dassey to Wiegert and Fassbender contained inculpatory statements made by Dassey as a direct or indirect result of misrepresentations made to him by his interviewers. (5-3-06 at 1 to 5).

At the suppression hearing, Investigator Wiegert testified how he and Special Agent Fassbender had elicited Brendan Dassey's admission to his involvement in the Teresa Halbach murder at their March 1, 2006, interview of him. Kachinsky cross-examined Wiegert and following the completion of Wiegert's testimony he called Dassey's mother, Barbara Janda, and Kris Schoenenberger-Gross, the Mishicot School District psychologist, as his witnesses. (Tr. 5-4-06 at 64 to 80; at 81 to 100).

In his brief Dassey criticizes Kachinsky by accusing him of a conflict of interest at the suppression hearing which compromised his ability to faithfully proceed on his client's behalf. (Def. Br. at 15). He also scores Kachinsky for failing to call a police interrogation expert and doing a poor job of cross-examining Investigator Wiegert. (Def. Br. at 16-17). Lastly, he faults Kachinsky for conceding that the Miranda warnings were not an issue by stipulating to that fact at the outset of the hearing. (Tr. 5-4-06 at 6-7). According to Dassey, Kachinsky's failure to argue that the March 1st statement should be suppressed for its violation of Miranda guidelines is, in and of itself, an example of his deficient performance. (Def. Br. at 28).

On May 12, 2006, this court issued findings of fact and conclusions of law finding that the State had met its burden of showing by a preponderance of the evidence that the Dassey statements given to Wiegert and Fassbender on March 1, 2006, "were the product of Brendan Dassey's free and unconstrained will reflecting deliberateness of choice. In short, they were voluntary statements." (Tr. 5-12-06 at 11). The court has heard or seen nothing that was introduced at the Machner hearing or in the briefings which would cause it to recede from its May 12, 2006, decision. Moreover, the court believes that Kachinsky, at the hearing and in his

11

prehearing briefs, adequately represented Dassey's interests and cannot be said to have provided ineffective assistance of counsel. Nothing raised in Dassey's post-conviction briefs, either by way of new or different witnesses, or more rigorous cross-examination of Wiegert, comes close to showing that Kachinsky's representation at the hearing fell below an objective standard of reasonableness. Wiegert acknowledged both at the May 4, 2006, suppression hearing and the post-conviction motion hearing that initially he did not regard the interview of Dassey as a suspect interview, but rather a witness interview. (Tr. 5-4-06 at 23; Tr. 1-22-10 at 139). Nonetheless, Dassey was given written Miranda warnings on March 1, 2006, before arriving at the Manitowoc County Sheriff's Office and was reminded of those warnings shortly after getting to the interview room at the sheriff's department. (5-4-06 Hearing Exhibit 2; Tr. 5-4-06 at 28, and Tr. 1-22-10 at 138-139). Despite the fact that the officers interviewing Dassey on March 1, 2006, considered him a witness rather than a suspect, they furnished him written Miranda warnings. It became evident as the interview progressed that Dassey was much more than a witness to the events that culminated in Teresa Halbach's death. The court believes that the initial segment of the interview qualified as a noncustodial interview when viewed under the totality of the circumstances standard set out in **State v. Gruen,** 218 Wis. 2d 581, 594 to 596, 582 NW 2d 728 (1998).

The fact that it became a custodial interrogation after Dassey made inculpatory admissions, does not mean that it was necessary for the interrogators to revivify the previously given Miranda warnings. **State v. Grady**, 2009 WI 47, 317 Wis. 2d 344, 766 NW 2d 729, a case discussed by the State in its brief, held that there is no bright line rule requiring a readministration of Miranda rights after a noncustodial interview becomes a custodial interrogation. **Grady** at

§§19 & 20. Instead, the court found that the sufficiency of the timing of the Miranda warnings must be determined under a totality of the circumstances test. **Grady** at §31. The purpose of Miranda warnings is to make a defendant aware of his or her rights during any kind of questioning. Here, Dassey had received the written warnings which he signed and initialed on the morning of March 1, 2006. He was reminded of those warnings not many minutes later when he arrived at the Manitowoc County Sheriff's Department. There is nothing in the videotape of his interview that suggests he was either physically or emotionally exhausted. The length of time elapsing between his receipt of the warnings and his inculpatory statements belie any notion that he had forgotten them. Indeed, at his trial, he testified on direct examination:

> "Q     Okay. Brendan, I want to talk about that video a little bit with you, okay?
> A     Okay.
> Q     You-- you know it was being videotaped that day?
> A     Yes.
> Q     And-- and the officers explained to you your rights; is that right?
> A     Yes.
> Q     Did you understand them?
> A     Yes."
> (Tr. 4-23-07 at 42, L. 7 to 14).

This court concludes that neither Kachinsky's conduct of the suppression hearing nor his concession on the Miranda issues constituted ineffective assistance of counsel.

## II. Attorneys Mark Fremgen and Raymond Edelstein's Ineffective Assistance of Counsel.

### A. Failure to call the appropriate expert was ineffective assistance.

13

Dassey raises a number of instances in his post-conviction brief which he contends show that Kachinsky's successor counsel, Attorneys Mark Fremgen and Ray Edelstein ineffectively assisted him at and before his trial. Chief among them is his assertion that while these defense counsel called Dr. Robert Gordon as an expert witness on the issue of false confession, they should have called, in addition to Gordon, one or more expert witnesses to show the jury that Dassey's confession was produced by coercive police questioning. These additional experts were necessary because Gordon lacked the requisite expert qualifications to opine on coercive police interrogation tactics. (Def. Br. at 23 to 26).

Dassey's defense counsel elicited a substantial amount of testimony at the post-conviction motion hearing attempting to show that Dassey's confession may have been a false confession. Dr. Richard Leo, an associate professor of law at the University of San Francisco, testified at length on behalf of the defendant. His area of professional expertise includes the social psychology of police interrogations and how unreliable confessions can be produced by coercive police interrogation tactics. (Tr. 1-19-10 at 91). In his direct examination testimony, Dr. Leo reviewed the statements Dassey had given to police, as well as his confession, and pointed out areas that he believed were examples of psychologically coercive interrogation tactics employed by the police who questioned Dassey. He said in looking at the videos in the case he observed some psychologically coercive tactics being used by those who questioned Brendan Dassey; even tactics which are not psychologically coercive, if repeated over and over again, can become psychologically coercive, according to his testimony. (Tr. 1-19-10 at 149).

14

He said Investigators Fassbender and Wiegert provided Dassey with "systemic inducements" when they talked to him about interceding with the district attorney on his behalf or going "to bat" for him if he was honest with them. (Tr. 1-19-10 at 160). The defense claims that these inducements couched as promises to help him out with law enforcement, the justice system or his family, were tactics designed to undermine his will and get him to confess. According to Dr. Leo, the investigators repeatedly used what he referred to as the "superior knowledge ploy" in which they pretended to know far more about what occurred than in fact they did. (Tr. 1-19-10, at 168-169). These, and a number of other stratagems Dr. Leo said investigators used in questioning Dassey could have pushed him into implicating himself in a crime in which he was not involved.

Under police questioning, Dassey was able to identify the fact that Teresa Halbach was shot in the left side of her head when questioned by the investigators, a fact the state believed tied him to the crime. Dr. Leo said this was not truly corroborative of his confession because the information about the head shot was supplied by the investigators and the side location was a fact that could be arrived at by a chance guess. (Tr. 1-19-10 at 220 to 222). When asked about evidence the police found in the Avery garage which they searched as a result of Dassey's confession, Dr. Leo denied that this was evidence of corroboration and said this occurred because the police had planted the garage suggestion in Dassey's mind and he simply was repeating it back to them. (Tr. 1-19-10 at 224-225). Certain police interrogation techniques, many of which he described as being used on Dassey, can lead to false confessions and as a social scientist he could have educated the jury "about these counterintuitive and not popularly known phenomena in their

effects and why they're significant in understanding how false confessions come about". (Tr. 1-19-10 at 237 to 239).

Testimony similar to that offered by Dr. Leo was furnished in affidavit form by Dr. Lawrence White, a professor of psychology and legal studies at Beloit College. (PC Exhibit 80). In Dr. White's affidavit, he reviews Dassey's confession to Investigators Wiegert and Fassbender along with his February 27th interviews at Mishicot High School and the Two Rivers Police Department with the same two investigators. (PC Exhibit 80, at 9 to 19). His affidavit testimony makes many of the same points as Dr. Leo's testimony about the police interrogation tactics and Dassey's vulnerability. Dr. White concludes his affidavit testimony by saying that there are reasons to believe that Dassey's "statements may not be wholly reliable or truly voluntary." (PC Exhibit 80, at 20). Dr. White's affidavit was used as his direct examination at the post-conviction motion hearing but he appeared personally and was subject to cross-examination by the State. On his cross-examination he said he had received an email request from Attorney Mark Fremgen to testify on the defendant's behalf at the Dassey trial. (Tr. 1-21-10 at 189). The Fremgen request concerned testimony Dr. White might give about the police interrogation tactics used on Dassey and how those techniques may have affected the reliability for voluntariness of the defendant's statements. (Tr. 1-21-10 at 190, 191.) Dr. White said he would have testified had he been asked to by Attorney Fremgen but Fremgen did not make that request of him.

Dassey contends that Attorneys Fremgen and Edelstein rendered ineffective assistance of counsel by their failure to supplement Dr. Gordon's testimony on the personality factors which may make a suspect more suggestible or vulnerable to suggestion when being questioned by the

police, with an expert like Dr. Leo or Dr. White who could testify about the psychology of interrogation, coercion and false confessions. Dr. Leo testified that he thought the suggestibility expert such as Dr. Gordon could not adequately educate a jury on the social science research and phenomena of false confessions. (Tr. 1-19-10 at 237 to 239). Dassey believes that only through testimony from experts like Dr. White or Dr. Leo could the jury learn how contaminated was his March 1st confession. (Def. Br. at 27 to 29). Under the circumstances of this case Dassey argues that trial counsel's "failure to call such an expert was manifestly unreasonable and constitutes deficient performance." (Def. Br. at 30).

In its brief the State questions whether the type of testimony discussed by Dr. Leo and Dr. White would have been admissible in Wisconsin since it might be opinion testimony which invades the fact-finding role of the jury by opining on the truthfulness of Dassey's statements. **State v. Haseltine**, 120 Wis. 2d 92, 96, 352 NW 2d 673 (Ct. App. 1984). The State also points to cases from other jurisdictions that have barred Dr. Leo's testimony as invading the province of the jury, citing two cases, one from Kansas and the other from Missouri. (St. Br. at 21). This court believes that both Dr. Leo and Dr. White would have qualified as expert witnesses at Dassey's trial and in all likelihood some, and maybe much of their testimony, at least as they outlined it in the post-conviction motion, would have been admissible. **State v. Walstad**, 119 Wis. 2d 483,

17

515-516, 351 NW 2d 469 (1984).[1]  With that said, the fact that the testimony may have been admissible and that trial counsel failed to procure it for trial does not mean that they acted deficiently.

In **State v. VanBuren**, 2008 WI App. 26, 307 Wis. 2d 447, 746 NW 2d 545, a case decided *after* the Dassey trial, our Court of Appeals faced a similar claim when post-conviction counsel challenged as ineffective assistance trial counsel's failure to offer evidence from a false confession expert at trial.  **Id**. at §17 to 19.  The court concluded, given the dearth of published or unpublished cases in Wisconsin in which false confession expert testimony was introduced, it could not find that failing to offer that kind of testimony constituted ineffective assistance of counsel.  **Id** at §19.  At the time this court granted defense counsel's motion to permit Dr. Gordon to testify it noted that it was unable to find a reported or published Wisconsin case discussing the admissibility of false confession testimony.  (Tr. 4-5-07 at 7-8).  Even if the holding in **VanBuren** is outdated or not applicable to Dassey, this court cannot and will not find that absence of testimony from a social scientist who could talk about the psychology of interrogation and confession constituted deficient performance by trial counsel.

Attorney Edelstein explained at some length in the post-conviction motion hearing how trial counsel considered, but rejected, another expert who could have offered testimony on

---

[1] The subject of false confessions has been treated in a number of law review pieces but articles about false confessions are not confined to law journals and academic literature.  Two recent examples appearing in general circulation media:  John Schwartz, "*Confessing to Crime but Innocent*," **New York Times Online**, September 13, 2010, www.nytimes.com/2010/09/14/us/14confess.html;  Robert Kolker, "*I Did It*", **New York,** October 11, 2010, at 22, 89.  Interestingly, Kolker says at one point in his article: "To prevent false confessions, interrogation critics say there's a solution so simple that it's remarkable it hasn't happened already: videotaping every minute of every police interrogation".  At 90.

Dassey's confession. (Tr. 1-21-10 at 266 to 269). Referring to Dr. Gordon, he said: "We had an expert who we best believed was appropriate for the defense in this case." (Tr. 1-21-10 at 266-269). Later, he went on:

> "To muddy the waters with another expert, irregardless (sic) of whether the State presented one, sometimes, and can, I believe, in the eyes of jurors, look like a desperate attempt by an accused to turn it into a battle of the experts without focusing on both the facts and, most importantly in this case in the defense of Brendan, the humanization of Brendan as a young, easily manipulated individual." (Tr. 1-21-10 at 267, L. 15 to 23).

It is clear that Dassey's trial counsel made a strategic choice to use Dr. Gordon as their expert witness and not supplement him with another expert or other experts. They were also aware that the state was prepared to call Joseph Buckley, an expert on the Reid method of interrogation if the defense produced its own interrogation expert. (Tr. 1-21-10 at 259-260). It was their considered opinion that the trial focus should be Dassey and his cognitive limitations and suggestibility, not interrogation techniques. (Tr. 1-21-10 at 260 and 266 to 269).

The court finds this not to be deficient performance but a trial decision rationally based on the facts and the law. **State v. Elm**, 201 Wis. 2d 452, 464-465, 476 NW 2d 471 (Ct. App. 1996).

### B. The State's trial testimony and Dassey's own trial testimony nullified anything additional defense experts could have said.

Dassey's March 1, 2006, videotaped confession was the centerpiece of the trial and the State's case against him. Our Supreme Court, in **State v. Jerrell**, C. J., 205 WI 105, 283 Wis. 2d 145, 674 NW 2d 607 adopted a rule requiring electronic recording of all questioning of a juvenile

when it occurs at a place of detention. **Id**. at §58. Here, the jury had the opportunity as the finder of fact to view the questioning of Brendan Dassey by Investigators Wiegert and Fassbender. It heard and saw how Dassey responded to the questions asked of him and his admissions of his participation in the charged crimes.

While his confession may have been the pivotal piece of evidence against Dassey, it was by no means the only testimony implicating him heard by the jury. Jurors had an opportunity to watch and listen to Dassey testify in his own defense at trial. They heard him admit to being with his uncle, Steven Avery, on the evening of Teresa Halbach's murder (Tr. 4-23-07 at 29 to 31). They heard him say he helped his uncle clean up a three foot by three foot stain on the garage floor with gas, paint thinner, and bleach. (Tr. 4-23-07 at 32, L. 13 to 25 and at 33, L. 1 to 10). Jurors heard his counsel ask Dassey:

> Q     "Why did you tell those two investigators that you
>         participated in killing and-- raping Teresa Halbach?
> A     I don't know.
> Q     You have no idea why you would say that?
> A     No."
>         (Tr. 4-23-07 at 42, L. 1 to 6).

When asked on cross-examination how he was able to tell Fassbender and Wiegert so much detail about what happened to Teresa he responded first by saying "I don't know" and then answering a follow-up question said "I could have got it out of books". (Tr. 4-23-07 at 65, L. 12 to 19). Pressed on cross-examination about the name of the book he would have read that had events such as he described to the police, he said "I believe it was called *Kiss the Girls*". (Tr. 4-23-07 at 67, L. 17 to 21). The jurors had a chance to weigh Dassey's credibility based, not only

20

on his video-taped confession but upon his testimony in open court. That testimony, with its evasive answers to questions, frequent " I-don't-knows", and closing with what jurors may have felt was an outlandish explanation for the origin of the story he gave the police in his March 1st confession gave them a firsthand opportunity to evaluate his credibility.

Jurors also heard a much less equivocal Dassey in an audio interview played during the trial testimony of Marinette County Sheriff's Department Detective Anthony O'Neill. (Tr. 4-19-07 at 113; Tr. Ex. 201). O'Neill and other Marinette County officers stopped a car in which Dassey was a passenger late in the morning of November 6, 2005. (Tr. Ex. 202). Marinette County police had been asked to assist because Dassey's uncle, Steven Avery, and other family members were staying on property owned by Steven Avery's parents (Dassey's grandparents) in Marinette County. The Marinette police stopped a car registered to Steven Avery but occupied by his nephews, Bryan and Brendan Dassey. (Tr. Ex. 202). They removed Brendan to another vehicle and questioned him extensively. (Transcript of Interview, Tr. Ex. 203). The jury heard the aggressive and sometimes confrontational questioning of Dassey during which he adamantly resisted any suggestion that he knew where Teresa Halbach went. (Tr. Ex. 203, at 32-33, at 40-41).

The jury heard testimony from Susan Brandt, who interned at Mishicot High School from January of 2006 to May of 2006, while pursuing a master's degree in educational counseling, that she had contact with Kayla Avery who came to the counseling office because she said she was feeling scared. (Tr. 4-18-07 at 168). Kayla said she was scared because her uncle, Steve Avery, had asked one of her cousins to help move a body. (Tr. 4-18-07 at 169). In her trial testimony,

21

Kayla Avery, who was Dassey's first cousin, said Brendan appeared to change between October 31, 2005, and the end of February, 2006. And she described that change as Brendan losing weight and being a little bit more upset. (Tr. 4-18-07 at 7). At a birthday party in November she said that she observed Brendan crying. (Tr. 4-18-07 at 8-9). While at trial she claimed not to have talked at that time with Brendan about Steven, she admitted telling the school counselors and Officers Wiegert and Fassbender about her conversation with Brendan at the party. (Tr. 4-18-07 at 10). Investigator Mark Wiegert testified that the Mishicot school counselors had notified the police about their contact with Kayla Avery and what she had told them. Following that contact, Wiegert and Fassbender interviewed Kayla in the presence of her mother and she told them that Brendan had told her about hearing screaming from Steven Avery's residence and seeing body parts in the fire behind Steven Avery's residence. (Tr. 4-19-07 at 193-194). Kayla also gave them a written statement. (Trial Ex. 163).

Even if this court were to conclude that trial counsel committed unprofessional errors by failing to call an expert on police interrogation tactics, the quality and quantity of evidence against Dassey is such that there is no reasonable probability that the proceeding would have turned out differently.

**C. Trial counsel's failure to deconstruct the March 1st confession as ineffective assistance of counsel.**

In his brief, Dassey reprises the contaminated confession argument that he raised with Dr. Leo's post-conviction testimony when he claims as deficient trial counsel's failure "to

systematically deconstruct Brendan's March 1st confession so that the jury would understand that each corroborated 'fact in the confession' was a product of external contamination." (Def. Br. at 30). He claims that each of nineteen details in his confession that the State represented to the jury as corroborated by physical evidence should have been deconstructed by counsel at trial because each of those so-called facts could be traced to either Dassey's innocent knowledge of events or his acquaintance with the news media reports or arose from contamination introduced by the investigators who questioned Dassey on March 1st. (Def. Br. at 30 to 33).

In short, the jury heard testimony about purportedly corroborated evidence that actually emanated from noninculpatory sources and trial counsel was deficient by not forcefully bringing this to the jury's attention. The State responds to this by pointing out that there is no proof in the record that Dassey obtained the information he now calls contaminated from other than his own personal experience. Additionally, it discusses some of the post-conviction testimony of trial counsel who asked Dassey where he got the information that he used in his confession and why he falsely confessed. (St.'s Br. at 28-29).

According to that testimony, Dassey never adequately explained to either Attorney Fremgen or Attorney Edelstein the source of the details in his confession or why he might have falsely confessed. The two attorneys said in their post-conviction motion testimony that Dassey told them he might have dreamt it or gotten it out of a book. (Tr. 1-20-10 at 226; Tr. 1-21-10 at 256).

The appropriate measure of attorney performance within professional norms is reasonableness under the circumstances of the case. **State v. Brooks**, 124 Wis. 2d 349, 352, 369

23

NW 2d 183 (Ct. App. 1985). Dassey provided little or nothing to his trial counsel that they could have used to deconstruct his March 1st confession. His trial testimony, both on direct and cross-examination, provided no evidentiary platform on which trial counsel could construct a plausible contamination attack. Instead, it created through Dassey's own words an explanation for his March 1st confession which lacked any credibility and added to the negative weight of his original admissions. Moreover, much of what Dassey maintains about the deconstruction of his confession by either Dr. Leo, another interrogation expert or trial counsel, comes at a remove of more than two plus years from the trial itself and rests entirely upon assumptions as to what testimony would or might have been and how that testimony would have played out to the jury. The court considers much of the post-conviction testimony on deconstructing Dassey's confession through either defense counsel or an expert more speculative than convincing. The court finds trial counsel's performance with respect to these matters to be within the realm of reasonableness, considering the circumstances of the case.

### D. Video clips of Dassey's "recantation".

Dassey's post-conviction motion faults trial counsel as being deficient for their failure to insist upon the admission at trial of several video clips from the March 1, 2006, confession. The clips, which post-conviction counsel categorize as a "recantation" of Dassey's confession to police occurred after the end of police questioning while Dassey was speaking with his mother, Barbara Janda. The text of the video clip reads:

24

> "Brendan:     What'd happen if he [Steven Avery] says something
>                   his story's different? Wh- he says he, he admits to
>                   doing it?
> Barb Janda:  What do you mean?
> Brendan:     Like if his story's like different, like I never did
>                   nothin' or somethin'.
> Barb Janda:  Did you? Huh?
> Brendan:     Not really.
> Barb Janda:  What do you mean, not really?
> Brendan:     They got to my head."
> (Post-conviction Exhibit 209 at 672).

Post-conviction counsel seizes on the phrases "not really" and "they got to my head" as being Dassey's recantation of the confession he had just given to the police investigators. (Def. Br. at 33-34).

Testimony at the post-conviction motion hearing showed trial counsel differed on showing this video clip to the jury. Attorney Edelstein thought the jury should see it while Attorney Fremgen did not. (Tr. 1-21-10 at 236; Tr. 1-20-10 at 195). As lead counsel, Attorney Fremgen made the strategic decision not to play the portion of the tape because he thought it depicted a mother coming in to see her son and realizing he had just done something serious and would go to jail. (Tr. 1-20-10 at 195). This was not deficient performance. Counsel made a rational decision based on an evaluation of the information and emotion the video clip would convey to the jury.

Apart from that, to suggest as post-conviction counsel do that these remarks somehow constituted an unequivocal recantation of Dassey's previous confession is a dubious proposition. At best, the terms "not really" and "they got to my head" are, in the context of the conversation between Dassey and his mother, ambiguous. At worst, the words can be viewed as substantiating the confession he previously gave to the police.

### E. Trial Counsel's Claim Deficient Performance in Closing Argument.

Post-conviction counsel frame as concessions of guilt two statements that Attorney Edelstein made in his closing. The first statement made by Attorney Edelstein which counsel says represents a concession appears to do so at least as defense counsel excerpts Attorney Edelstein's remarks in the post-conviction brief. (Def. Br. at 34). However, when removed from the isolated context, post-conviction counsel gives it, it appears to concede nothing other than to depict Dassey as being pushed by investigators to say things he truly didn't believe. Edelstein argued:

> "But the truth of the matter is, a couple of times, when they weren't specific about who they're even talking about, he gives an answer, such as a number. And it changes. It bounces back and forth. He was confused. He was scared.
> And let's just briefly touch upon that. Ask yourselves, how probing were they when he told them, I seen it. And he said, he told, he seen me see it, so he told me not to say something or else it will—he threatened me a little bit. He made it clear to them early on. And they had no reason to doubt it. They just didn't like the answers. They didn't like what he said. But they never explored the potential truth and alternative that this young man walked over there and did see something in a fire, and that something was Teresa Halbach.
> They go through this scenario, and they start—once he tells them, I seen it, and Steve knew it, and he said, don't say anything, that's when it becomes, you saw this, you saw that."
> (Tr. 4-25-07 at 124, L. 25, at 125, L. 1 to 20).

The second part of Edelstein's argument which Dassey labels a concession begins where Edelstein talks about the Halloween bonfire and how Dassey went about picking things up for the fire "and eventually they start throwing stuff in there, and he probably did see something. Pretty traumatic." (Tr. 4-25-07 at 128, L. 2 to 5).

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 27 of 34   Document 1-4

Dassey acknowledged in his testimony at trial that he had been at the bonfire and helped his uncle put things on the fire including tires and the seat from Teresa Halbach's RAV4 automobile. (Tr. 4-23-07 at 64-65.) Edelstein's remarks in closing draw on Dassey's own admissions at trial but in no way suggest that Dassey committed either element necessary for conviction of mutilating a corpse as a party to a crime. (Wis. JI-CR 1193). Even if this court concluded that Edelstein's discussion of Dassey's appearance at the bonfire was a concession, it would not be ineffective assistance of counsel. **State v. Silva**, 2003 WI App. 191, 266 Wis. 2d 906, 670 NW 2d 385, and **State v. Gordon**, 2003 WI App. 69, 262 Wis. 2d 380, 663 NW 2d 765, both of which Dassey cites in his brief, give counsel leeway to concede on a count if counsel's decision is tactically reasonable. (**Silva** at §15 to §20 and **Gordon** at §28).

At the post-conviction motion hearing, Attorney Edelstein did not recall making any frank admission of Dassey's direct involvement in the corpse mutilation, the charge that carried the least significant penalty, but he did acknowledge making an argument "which was intended to provide that as an option to the jury." (Tr. 1-21-10 at 236, L. 23-24 and at 237). The court believes this falls within conduct permitted under **Silva** and **Gordon**.

### F. Trial counsel's alleged deficiency in failing to get Dassey's February 27, 2006, and May 13, 2006, statements admitted into evidence.

Defense trial counsel sought to have admitted at trial all or portions of Dassey's February 27, 2006, interview at Mishicot High School with Wiegert and Fassbender. Dassey's March 1, 2006, interview with the two investigators had been heard by the jury and that interview as well

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 28 of 34   Document 1-4

as some trial testimony that had made mention of a discussion with the defendant on February 27th. (Tr. 4-20-07 at 55-56). After hearing argument from counsel, this court, citing **State v. Pepin**, 110 Wis. 2d 431, 328 NW 2d 898 (1982), and Wis. Stats. §908.01(4)(b)1, ruled that the state could use any inculpatory statements made by Dassey since they constituted an exception of the hearsay rule. The defense could not, however, use exculpatory material from the February 27th interview unless it was intertwined with the inculpatory statements and bore the same guarantee of trustworthiness. (Tr. 4-20-07 at 62). Dassey now says that trial counsel performed deficiently by failing to cite the right evidentiary rule for the admission of the February 27th and May 13th statements. His trial counsel, he says, should have urged the court to admit the statements because they weren't being offered to prove the truth of the matter asserted, but rather as examples of Dassey's suggestibility. (Def. Br. at 36). This court finds nothing in Dassey's post-conviction argument that would cause it to rule any differently than it did at the time the matter was initially argued and the court determined the statements to be inadmissible hearsay. Even if the statements were admitted as requested by trial counsel, the weight of the evidence against Dassey was such that there is no reasonable probability that the outcome would have been different.

Post-conviction counsel also contend the statement's admissibility should have been argued by trial counsel under the completeness rule codified at Wis. Stat. §901.07. This court understands that statute to permit the admission of otherwise hearsay evidence if it is necessary to provide context and prevent distortion. **State v. Eugenio**, 219 Wis. 2d 391, 412, 579 NW 2d 642 (1998). Neither the February 27th nor the May 13th interview of Dassey was necessary to

Case 1:14-cv-01310-WED   Filed 10/20/14   Page 29 of 34   Document 1-4

complete or fairly balance other trial evidence. Trial counsel did not perform deficiently by failing to use the rule of completeness as a basis for the admission of the February 27th and May 13th statements.

Dassey closes that portion of his brief dealing with the deficient performance of his trial counsel, by asserting that the five instances of trial counsel's deficient performance cumulatively as well as individually prejudiced him and he is entitled to a new trial. (Def. Br. at 37-38). And he again raises as ineffective assistance of counsel the failure of Kachinsky and trial counsel to seek the suppression of his March 1st statement as the fruit of an illegal arrest. This court believes it has dealt sufficiently with the claim of an illegal arrest in an earlier portion of this decision. As to the five areas Dassey articulates as constituting deficient performance of trial counsel, this court has found trial counsel not to have performed deficiently in these instances. **State v. Felton**, 110 Wis. 2d 485, 505-506.

Even assuming that one or more of the complained of acts was wrong, none of them, either singly or collectively, was "so serious that the defendant was deprived of a fair trial and a reliable outcome." **Strickland v. Washington**, 466 U.S. 668, 687 (1984). Withal, this court has neither seen nor heard anything which creates a reasonable probability sufficient to undermine its confidence in the outcome of Dassey's trial. **Id.** 466 U.S. at 694.


### G. Dassey's claim to be entitled to a new trial in the interests of justice.

Wisconsin Stat. §805.50(1) empowers the trial court to set aside a verdict and order a new trial "in the interest of justice." Dassey urges the court to affirmatively exercise that power in his

29

case "because his trial counsel failed to fairly explore the unreliability of his confession and therefore deprived the jury of trying his case on an informed basis." (Def. Br. at 39.) The failure of trial counsel to deconstruct his confession or call an expert to deconstruct his confession has resulted in a miscarriage of justice entitling him to another trial or at least another suppression hearing. (Def. Br. at 40).

This court has examined the cases Dassey cites in his brief and can find nothing in any of them which lend support to his claim for a new trial in the interest of justice. **State v. Hicks**, 202 Wis. 2d 150, 549 NW 2d 435 (1996) which he cites in support of his request was a case in which newly discovered DNA evidence excluding the convicted defendant was received at a post-conviction evidentiary hearing. **Id**. at 156. The State had used at trial a hair sample to help convict a defendant but no DNA test had been done of that sample. Our Supreme Court reasoned that the real controversy was not tried because the evidence excluding the defendant as the origin of one of the hair samples was relevant to the issue of identification and it was not heard by the jury. **Id**. at 158. Likewise, the defendant in **State v. Jeffrey**, 2010 WI App. 29, 323 Wis. 2d 541, 780 NW 2d 231 introduced post-conviction testimony that showed he did not have herpes in a case in which the victim claimed her case of herpes originally stemmed from sexual contact the defendant had with her when she was three years of age. **Id**. at §1 and §2. On appeal, the court reversed because it believed that the post-conviction evidence could have had a "great impact on the credibility battle between the prosecutor and the defendant, had it been presented." **Id**. at §20.

Both **Hicks** and **Jeffrey** were reversed because the respective courts decided that each jury should have had an opportunity to hear the critical, material, and relevant scientific evidence that

30

was not disclosed until a post-conviction evidentiary hearing. Dassey seeks to have us believe that expert testimony from academic police interrogation experts or trial counsel's deconstructing cross-examination exposing the contaminated parts of Dassey's confession would have the same qualitative trustworthiness as the scientific tests referenced in **Hicks** and **Jeffrey**.

Questions of its admissibility aside, the proposed testimony of experts such as Drs. Leo or White would not present any exculpatory evidence for the jury to consider. Rather, it would simply allow the expert to offer an opinion about the reliability of Dassey's confession. Opinion testimony and deconstructing cross-examination are a far cry from the evidence in **Hicks** and **Jeffrey** which triggered their reversals. This court cannot find that Dassey's trial represents a miscarriage of justice nor can this court find that the real controversy was not fully tried. **Lock v. State**, 31 Wis. 2d 110, 118, 142 NW 2d 183 (1966). He is not entitled to a new trial nor should he have another suppression hearing.


## CONCLUSION

In his post-conviction motions, Brendan Dassey has claimed that counsel who represented him at and prior to trial were ineffective and performed deficiently on his behalf. Because of counsel's various failures to effectively pursue his defense, Dassey says he is entitled to a new trial in which his inculpatory admissions are suppressed or, alternatively, a new hearing to suppress his self-incriminating statements. This court has examined Dassey's arguments on the issues raised in his post-conviction motions. Based on that examination, the court has concluded for the reasons set forth in the body of this opinion, that nothing done by his pretrial or trial

31

counsel has rendered the result of Dassey's trial unreliable or the proceeding fundamentally unfair.

 Accordingly, the court denies Dassey's motions for a new trial and a new suppression hearing.

The state is directed to draft the order reflecting the court's decision.

      Dated this 13th day of December, 2010.

                  BY THE COURT,

                  JEROME L. FOX
                  Circuit Judge

32

Hon. Jerome L. Fox
Circuit Court Branch III
1010 S. 8th Street  Box 2000
Manitowoc, WI  54221-2000



PRESORTED
FIRST CLASS



RECEIVED
DEC 17 2010
BLUHM LEGAL CLINIC

Attorney Steven Drizin
Bluhm Legal Clinic
375 E. Chicago Avenue
Chicago, IL  60611-3069