# *State v. Wells*

Court of Appeals of Wisconsin, District One

April 1, 2008, Decided; April 1, 2008, Filed

Appeal No. 2007AP801-CR

**Reporter**

2008 Wisc. App. LEXIS 255; 2008 WI App 83; 312 Wis. 2d 481; 751 N.W.2d 903

STATE OF WISCONSIN, PLAINTIFF-RESPONDENT, v. WARREN JAMAAL WELLS, DEFENDANT-APPELLANT.

**Notice:** PURSUANT TO RULE 809.23 OF APPELLATE PROCEDURE, AN UNPUBLISHED OPINION IS OF NO PRECEDENTIAL VALUE AND FOR THIS REASON MAY NOT BE CITED IN ANY COURT OF THIS STATE AS PRECEDENT OR AUTHORITY EXCEPT TO SUPPORT A CLAIM OF RES JUDICATA, COLLATERAL ESTOPPEL OR LAW OF THE CASE.

**Subsequent History:** Review dismissed by *State v. Wells, 2009 WI 23, 315 Wis. 2d 724, 764 N.W.2d 533, 2009 Wisc. LEXIS 130 (2009)*
Post-conviction relief denied at *State v. Wells, 2013 Wisc. App. LEXIS 455 (Wis. Ct. App., May 29, 2013)*

**Prior History:** [*1] APPEAL from a judgment of the circuit court for Milwaukee County: ELSA C. LAMELAS, Judge. Cir. Ct. No. 2004CF1178.

**Disposition:** Affirmed.

## Case Summary

**Procedural Posture**
Defendant was convicted by a jury in the Circuit Court for Milwaukee County (Wisconsin) of one count of first-degree intentional homicide while using a dangerous weapon, as a party to the crime, contrary to *Wis. Stat. §§ 940.01(1)(a)*, *939.63* (amended Feb. 1, 2003), and 939.05 (2001-02). Defendant appealed, arguing that his motion to suppress his confession to police should have been granted because the confession was involuntary.

**Overview**
Police officers found the victim shot to death in front of his residence. Three eyewitnesses identified defendant as the shooter. Defendant was arrested and was interviewed four times from the time of his arrest to the time of his confession. He was interviewed for 24 of his 77 hours in custody. During the fourth interview, defendant admitted to shooting the victim. Defendant claimed that police had coerced him by speaking of Jesus Christ and the movie The Passion of the Christ, showing him a picture of his pregnant fiancee, repeatedly telling him they did not believe him, and repeatedly telling him he was guilty. Defendant was 20 years old, had a tenth grade education, and had been arrested six times, with two adult convictions. The four interviews were separated by breaks of four, 12, and 40 hours. Defendant ate regular meals and slept in a private cell. He was given sandwiches, sodas, water, and bathroom breaks. The court found that the length and physical conditions of the interviews did not show coercive tactics. Defendant's act of signing some portions of his statement, but not others, showed that he was not broken down by undue police pressure.

**Outcome**
Defendant's conviction was affirmed.

**Judges:** Before Curley, P.J., Wedemeyer and Kessler, JJ.

**Opinion by:** CURLEY

## Opinion

P1 CURLEY, P.J. Warren Jamaal Wells appeals from a judgment of conviction entered after a jury found him guilty of one count of first-degree intentional homicide while using a dangerous weapon, as a party to the crime, contrary to *WIS. STAT. §§ 940.01(1)(a)*, *939.63* (amended Feb. 1, 2003), and *939.05* (2001-02). [1] Wells seeks a new trial, contending that his confession was improperly entered into evidence when his pretrial motion to suppress was denied. He claims that his confession was not voluntary because it was elicited by coercive acts and undue pressure from police. We conclude that under the totality of the circumstances surrounding Wells' interrogation, the police were neither coercive nor applied undue pressure to overpower his ability to resist. Because Wells' confession to police was voluntary and properly admitted into evidence, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.

LAURA NIRIDER
Case 1:14-cv-01310-WED    Filed 10/20/14    Page 1 of 5    Document 1-9

## I. BACKGROUND.

P2 On February 27, 2004, Milwaukee police officers responded [*2] to a call and found Christopher Blucher shot to death in front of his residence. The State Crime Lab determined that Blucher had been shot with four .25-caliber bullets, all fired from the same semi-automatic gun. Three eyewitnesses identified Wells as the shooter. They claimed Wells walked up alongside Blucher's porch from a connecting alley and shot Blucher multiple times with a black handgun. Wells was arrested on February 29, 2004.

P3 Beginning on the night he was arrested and continuing for the next three days, Wells was interviewed by police four times. He was provided his *Miranda* rights before each interview, but waived them each time. [2] The first interview lasted from 10:47 p.m. until 3:37 a.m. the next morning, approximately five hours. Wells told police that he was at his girlfriend's house and then a friend's house on the evening of the shooting, that he only knew of the shooting through television reports, and that he did not know any of the various people shown to him in police photos. He signed a written statement of the first interview.

P4 The second interview of Wells occurred approximately four hours after the first on March 1, 2004. It began at approximately 7:30 a.m. and ended at 3:30 p.m., lasting approximately eight hours, during which there were several breaks. During the interview, Wells refused to state the addresses of the residences he claimed to be at on the evening of the shooting and again denied having any part in the shooting. He refused to sign a written statement of the second interview.

P5 Wells' third interview with police occurred twelve hours after the second interview and lasted for approximately fifty minutes. It took place from 3:59 a.m. to 4:47 a.m. on March 2, 2004. Wells continued to refuse to identify his friend's home address. He declined to sign a written statement of the third interview.

P6 Wells was interviewed by police a fourth time, for approximately ten hours, from 8:42 p.m. on March 3, 2004, until 6:40 a.m. on the morning of March 4, 2004. This interview occurred forty hours after the third interview. During this interview, Wells admitted to shooting Blucher using "a black .25 caliber semiautomatic handgun with six bullets in the clip." [*4] He also acknowledged recognizing the three eyewitnesses who identified him. Wells claimed that he had actually been firing his gun at the three witnesses because he had heard they were trying to kill him, and that Blucher "must have been walking off the porch, and walked into the gunfire." He apologized to the police for waiting so long to admit to shooting Blucher. Wells signed three of the six pages of the written statement of the interview; declining to sign any page with his admissions to the shooting. Later that day, Wells was charged with first-degree intentional homicide while using a dangerous weapon, as a party to the crime.

P7 In a pretrial motion, Wells sought to suppress his statement to police made in the fourth interview in which he admitted to shooting Blucher. He claimed that police had extracted a false statement from him through coercion by speaking of Jesus Christ and the movie *The Passion of the Christ,* showing him a picture of his pregnant fiancee and telling him he would never see her again, repeatedly telling him they did not believe him, and repeatedly telling him he was guilty.

P8 The court denied the motion after an evidentiary hearing, finding that Wells evidenced [*5] that he did not feel undue pressure to confess because he had the ability to decline signing portions of his written statements, he was provided with sufficient breaks and creature comforts, he was advised of his *Miranda* rights and chose to waive them, and his act of crying during the final interview was "entirely consistent with coming to grips with incriminating one's self with such a serious crime."

P9 A jury found Wells guilty of first-degree intentional homicide while using a dangerous weapon, as a party to a crime. He was sentenced to life imprisonment with eligibility for extended supervision after forty-five years. Wells now appeals based on the denial of his motion to suppress his statement to police made during the fourth interview.

## II. ANALYSIS.

P10 Our standard for reviewing a motion to suppress an inculpatory statement involves mixed questions of fact and law. *State v. Backstrom, 2006 WI App 114, P9, 293 Wis. 2d 809, 718 N.W.2d 246*. "We review a motion to suppress applying a two-step standard of review." *State v. Sloan, 2007 WI App 146, P7, 303 Wis. 2d 438, 736 N.W.2d 189*. First, "[w]e will uphold the trial court's factual findings unless they are clearly erroneous." *State v Kelley, 2005 WI App 199, P8, 285 Wis. 2d 756, 704 N.W.2d 377*. [*6] Then,

---

2 *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Wells does not dispute that he was given *Miranda* [*3] rights prior to each of the four interviews.

"we review the application of constitutional principles to those facts *de novo*." *State v. Eason, 2001 WI 98, P9, 245 Wis. 2d 206, 629 N.W.2d 625*.

P11 If Wells' confession was not voluntary, then, under the *due process clause of the Fourteenth Amendment*, his confession would not be admissible. *State v. Agnello, 2004 WI App 2, P8, 269 Wis. 2d 260, 674 N.W.2d 594*. However, his confession will only be held involuntary if it was "compelled by coercive means or improper police practices." *State v. Franklin, 228 Wis. 2d 408, 413, 596 N.W.2d 855 (Ct. App. 1999)*. In order to determine whether his confession "was procured by coercive means or was the product of improper pressures exercised by the police," we will look "at the totality of the circumstances surrounding the confession and balanc[e] the personal characteristics of the defendant against the pressures imposed by the police to induce the defendant to respond to the questioning." *Agnello, 2004 WI App 2, 269 Wis. 2d 260, P9, 674 N.W.2d 594*.

> The personal characteristics to be considered may include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with police. These must be balanced against police pressures [*7] and tactics used to induce admission, such as the duration of the questioning, the general conditions under which the confession took place, any excessive physical or psychological pressure brought to bear on the [defendant], any inducements, threats, or other methods used to compel a response, and whether the defendant was informed of his right to counsel and right against self-incrimination.

*Id.* (citations omitted).

P12 Based on the standard above, in order to determine whether Wells' confession was voluntary, we must analyze and balance his personal characteristics against the police pressures used to induce his admission.

*A. Wells' Personal Characteristics*

P13 Wells claims that because he was only twenty years old, was uneducated, had a minor criminal record, and had no experience with police interrogations, he was highly susceptible to giving in to police pressures. However, his personal characteristics do not place him in the category of being "uncommonly susceptible to police pressures." *State v. Hoppe, 2003 WI 43, P46, 261 Wis. 2d 294, 661 N.W.2d 407*. As the Wisconsin Supreme Court has stated regarding police pressure, "'[w]hat is overpowering to a weak mind or

first offender may [*8] be ineffectual against an experienced criminal.'" *McAdoo v. State, 65 Wis. 2d 596, 607, 223 N.W.2d 521 (1974)* (alteration in *McAdoo;* citation omitted).

P14 The record shows no evidence of Wells having a "weak mind." At the time of the interviews, Wells was twenty years old, which was sufficient to categorize him as an adult for police purposes of investigating his possible involvement in the homicide of Blucher. See *WIS. STAT. § 938.02(1)*. He had acquired a tenth-grade education and was able to read and write, with nothing suggesting that he was of diminished intelligence.

P15 What the record does show is that he had a lengthy criminal history and familiarity with his rights. Even one prior arrest and conviction has been shown to be enough to characterize a person as an "experienced criminal." *McAdoo, 65 Wis. 2d at 607*. Wells surpassed that threshold as he had been arrested six prior times, with two adult convictions. He admitted that he was aware of his *Miranda* rights from television, and an interviewing detective testified that Wells told him that he was aware of, and understood, his *Miranda* rights because he had heard them before. These facts show that Wells had knowledge of his rights [*9] when he spoke to police during the interviews.

P16 We find that Wells' personal characteristics and prior contacts with police were sufficient to characterize him as an experienced criminal, and that he therefore evidenced an ability to resist pressure from police.

*B. Police Pressures Used to Induce Admission*

P17 In addition to analyzing the personal characteristics of the defendant, we must review the police pressures applied to induce an admission. *Agnello, 2004 WI App 2, 269 Wis. 2d 260, P9, 674 N.W.2d 594*. Wells contends that police conduct during the interviews exhibited features of coercion. He claims that six officers "went at [him] at all hours of the day and night for twenty-four hours in total" and overpowered his ability to resist confessing.

P18 Wells was interviewed four times from the time of his arrest to the time of his confession. He was interviewed for twenty-four of the seventy-seven hours in which he was in custody during that time. While those are both significant amounts of time, "the length of interrogation and custody, while certainly relevant to the discussion of voluntariness, simply is not dispositive in and of itself." *State v. Turner, 136 Wis. 2d 333, 364, 401 N.W.2d 827 (1987)*. We must [*10] look to how those twenty-four hours of interrogation were executed. The four interviews were non-consecutive

and were separated by breaks of four, twelve, and forty hours. During these breaks, Wells was free to eat regular meals and sleep in a private cell. Additionally, Wells was allowed to make requests for smaller breaks and creature comforts during the interview sessions. When requested, he was given sandwiches, sodas, water, and allowed time for bathroom breaks, some of which were "rather lengthy." The length and physical conditions of Wells' interviews were not sufficient to show coercive tactics by police.

P19 As stated before, Wells was provided his **Miranda** rights at the beginning of each interview session, which he waived each time. These multiple reminders were more than sufficient to allow someone with Wells' prior police experience to understand his rights. *See **Backstrom, 2006 WI App 114, 293 Wis. 2d 809, PP10-11, 718 N.W.2d 246***. Wells was fully informed of his rights when he chose to talk to police during the interrogations.

P20 Wells claims that police put undue psychological pressure on him by speaking of Jesus Christ and the movie *The Passion of the Christ,* showing him photographs of the persons they [*11] claimed identified him, showing him a photograph of the victim, showing him a picture of his pregnant fiancee and telling him he would never see her again, repeatedly telling him they did not believe him, and repeatedly telling him he was guilty. Wells does not claim that detectives made threats or promises to elicit his admission or that he was ever told he could not contact family or friends while in custody.

P21 Police officers told Wells that they did not believe his denial of involvement in the shooting. Police interviewers are not obligated to accept a suspect's denial of wrongdoing, and telling an arrestee that he knows more than he is admitting is not unfairly coercive. *See **State v. Owen, 202 Wis. 2d 620, 641-42, 551 N.W.2d 50 (Ct. App. 1996)***. In light of the fact that there were eyewitnesses to the shooting who claimed Wells was the person who shot Blucher, it was reasonable for police not to believe Wells when he said he did not do it.

P22 Wells objects to being shown pictures of sensitive photographs relating to the shooting. However, "[t]he confrontation of [a] defendant with information against him[,] 'whatever that may be, does not amount to the utilization of overwhelming [*12] force or psychology.'" ***Barrera v. State, 99 Wis. 2d 269, 292, 298 N.W.2d 820 (1980)*** (citation omitted). In Wells' case, the police merely showed him booking photos of Blucher, of the eyewitnesses against him, and of Wells' alleged companion in order to test the credibility of his denials. There is no mention in the record of detectives showing Wells any gruesome photographs of Blucher from the crime scene.

P23 In addition, Wells contends that police mentioned his pregnant girlfriend and Jesus Christ to apply undue pressure on him. He fails, however, to present an argument as to why the mention of either would unduly cause him to falsely confess to the shooting of Blucher. Even if police told Wells that his girlfriend would testify against him, that would not constitute an unfair police practice. *See **State v. Deets, 187 Wis. 2d 630, 637, 523 N.W.2d 180 (Ct. App. 1994)***. Regarding Jesus Christ, Wells has never claimed that the police mentioned him to appeal to Wells' moral sensibilities. The detective who participated in the questioning testified that he had simply mentioned to his partner that he had seen the movie *The Passion of the Christ* in order to build a rapport with Wells as a [*13] predicate to talking about the shooting.

P24 Finally, Wells claims that the trial court incorrectly found that because he signed portions of his statements from the fourth interview, but not others, he was under no pressure. Wells points to his testimony at the suppression hearing where he said all of the written statements of his fourth interview with police in which he confessed to shooting Blucher were untrue, even though he signed the portions he believed did not incriminate him, and where he clearly stated that he was under pressure during the entire interrogation process.

P25 However, the court did not find that Wells was under no pressure, but rather that he was not subjected to undue pressure and that he showed the ability to resist the pressure that was present. It is not unusual that an individual being questioned by police in a similar manner to Wells would feel pressure. In order to find undue pressure we must be persuaded that there was "excessive physical or psychological pressure brought to bear on the [defendant]" or "inducements, threats, or other methods used to compel a response." ***Agnello, 2004 WI App 2, 269 Wis. 2d 260, P9, 674 N.W.2d 594***. The record does not show that to be the case here. Wells [*14] evidenced that even though he felt pressure during the interviews, it was not so great that he lost the ability to resist signing the portions of his statements that he knew incriminated him.

P26 The trial court found that Wells physically signed those portions of his statement that were not incriminating to him. The trial court's finding in this regard is supported by the record. Therefore, despite Wells' self-serving testimony that he was pressured throughout the process and that the entire statement was untrue, we conclude that his act of signing

some portions of his statement, but not others, showed that Wells was not ″broken down″ by undue police pressure and not coerced into giving an involuntary admission. *See Eason, 2001 WI 98, 245 Wis. 2d 206, P9, 629 N.W.2d 625*.

P27 After considering the totality of the circumstances surrounding the interrogation of Wells and balancing his personal characteristics with the pressures applied by police in securing his confession, we conclude that Wells' statements to police were voluntary. Wells has failed to show that the police were coercive or applied undue pressure to overpower his ability to resist. Because the trial court properly denied Wells' motion to suppress, **[*15]** we affirm.

*By the Court.*--Judgment affirmed.

Not recommended for publication in the official reports.

LAURA NIRIDER