**RECEIVED**

**12-01-2011**

**CLERK OF COURT OF APPEALS OF WISCONSIN**

STATE OF WISCONSIN

C O U R T   O F   A P P E A L S

DISTRICT II

Case No. 2010AP3105 CR

---

STATE OF WISCONSIN,

          Plaintiff-Respondent,

v.

BRENDAN R. DASSEY,

          Defendant-Appellant.

---

**On Appeal from Judgment of Conviction and an Order Denying Postconviction Relief Entered in the Manitowoc County Circuit Court, The Honorable Jerome L. Fox, Presiding**

---

**BRIEF OF
DEFENDANT-APPELLANT**

---

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

LAURA H. NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)
THOMAS F. GERAGHTY (IL Bar No. 0937436)

JOSHUA A. TEPFER (IL Bar No. 6294120)
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue, 8th Floor
Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977
E-mail: l-nirider@law.northwestern.edu
        tgeraghty@law.northwestern.edu
        s-drizin@law.northwestern.edu
        j-tepfer@law.northwestern.edu

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

Page(s)

ISSUES PRESENTED .................................................. 1

POSITION ON ORAL ARGUMENT AND
PUBLICATION............................................................. 1

STATEMENT OF THE CASE ................................... 2

STATEMENT OF FACTS .......................................... 4

ARGUMENT............................................................ 48

I. The Disloyalty Of Brendan's Pre-Trial Attorney,
Who Generated Evidence Against His Own Client
That Was Used At Trial, Constitutes Ineffective
Assistance Of Counsel That Warrants a New Trial Or,
At The Least, A New Suppression Hearing............... 48

A. The *Cuyler-Kaye-Love* ineffective assistance of
counsel standard governs Kachinsky's breach of
his duty of loyalty to his client. ............................ 49

B. Attorney Kachinsky was burdened by an "actual
conflict" when he breached his duty of loyalty to
Brendan by providing incriminating evidence to the
State................................................................... 54

C. Brendan is entitled to relief in the form of a new
trial because the fruit of Attorney Kachinsky's
actual conflict – an audio-recorded confession to
Brendan's mother – was used against him
at trial................................................................. 63

D. At minimum, Len Kachinsky's conflict of interest
entitles Brendan to relief in the form of a new
suppression hearing ............................................. 71

II. Sixteen-Year-Old Brendan Dassey's March 1, 2006
Confession Was Involuntary Because The

i

Psychological Interrogation Methods Used By Police, Including Repeated Promises Of Leniency And Intensive Fact-Feeding, Overbore His Will.............. 72

A. Brendan's March 1 confession must be suppressed as involuntary if the tactics used to obtain it exceeded his own personal ability to resist those tactics.................................................................. 73

B. The March 1 statement of sixteen-year old, mentally limited Brendan Dassey, which was extracted after repeated fact-feeding and over thirty promises of leniency, was involuntary because those interrogation tactics compromised his ability to rationally decide to confess............................. 77

   1. Brendan was a sixteen-year-old, mentally limited boy with an unusually high degree of suggestibility and no meaningful prior experience with law enforcement. ....................................... 78

   2. The subtle pressures, sophisticated tricks, and promises` of leniency that induced Brendan to confess on March 1 were so psychologically coercive that they overbore his will to resist..... 79

      i. Brendan's March 1 statement was the product of four interrogations over a period of fewer than 48 hours. ....................................... 80

      ii. Brendan was unfairly denied the presence of a friendly adult when officers misrepresented the nature of their interrogation to Brendan's mother……. .................................................. 81

      iii. Brendan was not informed of his *Miranda* rights at a time that presented him with a meaningful choice as to whether to waive them.................................................... 82

      iv. The police's repeated promises of leniency on February 27 and March 1 rose to the level of

psychological coercion by altering Brendan's perceptions of the consequences of confessing. ...................................................... 84

v. Brendan's interrogators fed him details about the crime by using leading questions, compelling him to repeat a confession narrative that was not his own. ...................................... 87

III. Trial Counsel Provided Ineffective Assistance By Failing To Present Substantial Evidence Indicating That Brendan's March 1 Confession Was Unreliable..…..…....................................................... 88

A. Trial counsel's ineffective assistance is measured under *Strickland v. Washington*, which focuses on whether counsel's performance affected the reliability of the proceedings................................ 89

B. Brendan's trial counsel failed to introduce readily available evidence of his confession's unreliability. ........................................................ 90

C. Instead of introducing evidence of the confession's unreliability, trial counsel bolstered its credibility by unauthorizedly conceding the mutilation charge during closing argument....................................... 98

D. Taken cumulatively, counsel's failure to challenge the confession's unreliability prejudiced Brendan………….. ........................................ 100

IV. Because The Jury Never Heard Abundant Evidence Of The Unreliability Of Brendan's March 1, 2006 Confession, The Real Controversy Was Not Fully Tried And A New Trial Is Warranted...................... 103

CONCLUSION...................................................... 104

CERTIFICATION AS TO FORM/LENGTH ......... 106

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 5 of 118    Document 19-4

CERTIFICATE OF COMPLIANCE WITH RULE
809.19(12)................................................................. 107

APPENDIX............................................filed separately

CERTIFICATION AS TO
APPENDIX...................filed separately with Appendix

## **CASES CITED**

*A.M. v. Butler*,
  360 F.3d 787 (7th Cir. 2004)........................... 78, 82

*Bell v. Miller*,
  500 F.3d 149 (2d Cir. 2007)................................. 96

*Cuyler v. Sullivan*,
  446 U.S. 335 (1980) ........................................... 50

*Gallegos v. Colorado*,
  370 U.S. 49 (1962)........................................ 75, 78

*Garcia v. State*,
  73 Wis.2d 651, 245 N.W.2d 654 (1976)............ 103

*In re Gault*,
  387 U.S. 1 (1967).......................................... 75, 78

*Haley v. Ohio*,
  332 U.S. 596 (1948)...................................... 75, 78

*Hart v. Attorney General*,
  323 F.3d 884 (11th Cir. 2003)............................... 84

*Henderson v. Frank*,
  155 F.3d 159 (3rd Cir. 1998)................................. 67

*J.D.B. v. North Carolina*,
  131 S. Ct. 2394 (2011) ........................................ 76

*Johnson v. Trigg*,

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 6 of 118    Document 19-4

28 F.3d 639 (7th Cir. 1994)................................... 77

*Jones v. Barnes*,
   463 U.S. 745 (1983) ............................................ 61

*Lopez v. Scully*,
   58 F.3d 38 (2d Cir. 1994).................................... 68

*Missouri v. Seibert*,
   542 U.S. 600 (2004) ............................................ 83

*Office of Lawyer Regulation v. Schoenecker*,
   2011 WI 76 ................................................................ 102

*Osborn v. Shillinger*,
   861 F.2d 612 (10th Cir. 1988)............................... 54

*Sands v. Menard*,
   2010 WI 96, 328 Wis.2d 647, 787 N.W.2d 384 .. 49

*Spreitzer v. Peters*,
   114 F.3d 1435 (7th Cir. 1997)......................... 52, 53

*State v. Armstrong*,
   223 Wis.2d 331, 588 N.W.2d 606 (1999)............ 84

*State v. Burns*,
   2011 WI 22, 332 Wis.2d 730,
   798 N.W.2d 166 ................................................. 103

*State v. Cuyler*,
   110 Wis.2d 133, 327 N.W.2d 662 (1983).......... 103

*State v. Dadas*,
   190 Wis.2d 339, 526 N.W.2d 818 (Ct. App.
   1994)............................................................. 62, 68

*State v. Franklin*,
   111 Wis.2d 681, 331 N.W.2d 633 (Ct.
   App. 1983).......................................................... 68

*State v. Gordon*,

2003 WI 69, 262 Wis.2d 380,
663 N.W.2d 765 ................................................... 99

*State v. Harrell*,
40 Wis.2d 536, 162 N.W.2d 590 (1968) .............. 80

*State v. Henley*,
2010 WI 97, 328 Wis.2d 544, 787 N.W.2d 350  103

*State v. Hoppe*,
2003 WI 43, 261 Wis.2d 294,
661 N.W.2d 407 ...................................... 73, 74, 79

*State v. Jerrell C.J.*,
2005 WI 105, 283 Wis.2d 145,
699 N.W.2d 110 ..................................... 73, passim

*State v. Kalk*,
2000 WI App 62, 234 Wis.2d 98,
608 N.W.2d 428 .................................................. 49

*State v. Kaye*,
106 Wis.2d 1, 315 N.W.2d 337 (1982) .......... 50, 68

*State v. Kiekhefer*,
212 Wis.2d 460, 569 N.W.2d 316 (Ct. App. 1997) ... 80

*State v. Love*,
227 Wis.2d 60, 594 N.W.2d 806 (1999) .. 49, 51, 62

*State v. Maloney*,
2004 WI App 141, 275 Wis.2d 557,
685 N.W.2d 620 .................................................. 96

*State v. Mosher*,
221 Wis.2d 203, 584 N.W.2d 553
(Ct. App. 1998) .................................................... 82

*State v. Randle*,
366 S.E.2d 750 (W. Va. 1988) ............................ 75

*State v. Rettenberger*,
984 P.2d 1009 (Utah 1999) ........................... 75, 88

vi

*State v. Samuel*,
    2002 WI 34, 252 Wis.2d 26, 643 N.W.2d 423..... 75

*State v. Santiago*,
    206 Wis.2d 3, 556 N.W.2d 687 (1996) ............... 84

*State v. Silva*,
    2003 WI App 191, 266 Wis.2d 906,
    670 N.W.2d 385 .................................................. 99

*State v. Thiel*,
    2003 WI 111, 264 Wis.2d 571,
    665 N.W.2d 305 ............................................ 89, 90

*State v. Van Buren*,
    2008 WI App 26, 307 Wis.2d 447,
    746 N.W.2d 545 .................................................. 95

*State v. Ward*,
    2009 WI 60, 318 Wis.2d 301, 767 N.W.2d 236 .. 77

*Strickland v. Washington*,
    466 U.S. 668 (1984) ........................... 49, 50, 83, 90

*Theriault v. State*,
    66 Wis.2d 33, 223 N.W.2d 850 (1974) ............... 81

*Triplett v. State*,
    65 Wis.2d 365, 222 N.W.2d 689 (1974) ............. 74

*U.S. v. Cronic*,
    466 U.S. 648 (1984) ............................................ 52

*U.S. v. Davis*,
    239 F.3d 283 (2d Cir. 2001) ................................ 62

*U.S. v. Ellison*,
    798 F.2d 1102 (7th Cir. 1986) ........................ 49, 68

*U.S. v. Hurt*,
    543 F.2d 162 (D.C. Cir. 1976) ............................ 52

vii

***U.S. v. Marshank***,
    777 F. Supp. 1507 (N.D. Cal. 1991) .............. 60, 61

***U.S. v. Montgomery***,
    555 F.3d 623 (7th Cir. 2009)................................. 86

***U.S. v. Swanson***,
    943 F.2d 1070 (9th Cir. 1991).............................. 54

***U.S. v. Tatum***,
    943 F.2d 370 (4th Cir. 1991)........................... 67, 69

***Von Moltke v. Gillies***,
    332 U.S. 708 (1948) ............................................ 49

***Woods v. Clusen***,
    794 F.2d 293 (7th Cir. 1986)................................ 81

## UNPUBLISHED DECISIONS
## AND ORDERS CITED

***Commonwealth v. Rios***,
    2011 WL 4089553 (Mass.
    Super. Ct. 2011) (App. 562-66) ........................... 88

***Commonwealth v. Truong***,
    2011 Mass. Super. LEXIS 61 (Mass.
    Super. Ct. 2011) (App. 567-86) ........................... 87

***State v. Gainey***,
    No. 98 CRS 3143 (N.C. Sup. Ct. June 11, 2009)
    (App. 587-623)..................................................... 96

***Taylor v. Rednour***,
    No. 11-3212 (7th Cir. Oct. 25, 2011)
    (App. 624-26)..................................................... 77

***Thomas v. McLemore***,
    2001 U.S. Dist. LEXIS 6763 (E.D.
    Mich. Mar. 30, 2001) (App. 551-61) ............. 54, 60

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 10 of 118    Document 19-4

# CONSTITUTIONAL PROVISIONS
# AND STATUTES CITED

United States Constitution

Sixth Amendment ................................................. 49, 90

Fourteenth Amendment ....................................... 73, 90


Wisconsin Constitution

Article I, §7 ................................................................ 90

Article I, §8 ................................................................ 73


Wisconsin Statutes

752.35 ..................................................................... 103

## OTHER AUTHORITIES CITED

Danielle E. Chojnacki et al.,
    *An Empirical Basis for the Admission of Expert
    Testimony on False Confessions*, 40 Ariz. St. L.J. 1
    (2008) ................................................................. 93

Steven A. Drizin & Richard Leo,
    *The Problem of False Confessions in the Post-DNA
    World*, 82 N.C. L. Rev. 891 (2004)...................... 76

Saul M. Kassin et al.,
    *Police-Induced Confessions: Risk Factors and
    Recommendations*, 34 L. & Hum. Behav. 3
    (2010) ................................................................. 95

## ISSUES PRESENTED

I.  Does the disloyalty of Brendan's pre-trial attorney, who generated evidence against his own client that was used at trial, constitute ineffective assistance of counsel that warrants a new trial or, at the least, a new suppression hearing?

The trial court answered: No.

II. Where the police used psychologically coercive interrogation methods, including repeated promises of leniency and intensive fact-feeding that overbore sixteen-year-old Brendan Dassey's will, must his March 1, 2006 confession be deemed involuntary?

The trial court answered: No.

III. Did trial counsel provide ineffective assistance by failing to present substantial evidence indicating that the primary piece of evidence against Brendan Dassey – his March 1 confession – was unreliable?

The trial court answered: No.

IV. Should this Court grant a discretionary reversal in the interests of justice, where the jury never heard abundant evidence of the unreliability of Brendan Dassey's March 1, 2006 confession such that the real controversy was not fully tried?

The trial court answered: No.

## POSITION ON ORAL ARGUMENT AND PUBLICATION

Pursuant to Wis. Stat. Rule 809.22 (2009-10), Appellant requests oral argument to facilitate review of the complex legal issues raised herein, some of which are believed to be of first impression.  Pursuant to Wis. Stat. Rule 809.23 (2009-10), publication is warranted because the case is of interest to the public and raises issues believed to be of first impression.

1

## **STATEMENT OF THE CASE**

This is an appeal of a judgment of conviction and order denying postconviction relief in Manitowoc County, the Honorable Jerome L. Fox presiding.

On March 3, 2006, in Manitowoc County, the State filed a criminal complaint charging sixteen-year-old Brendan Dassey with being party to the crimes of first-degree intentional homicide, mutilation of a corpse, and second-degree sexual assault. (R.2.) The other charged defendant was Brendan's uncle, Steven Avery. The criminal complaint against Brendan alleged that these crimes had been committed against Teresa Halbach, a photographer who had come to the family-owned Avery Salvage Yard to photograph a car for sale. (R.2.)

Trial commenced on April 16, 2007, before the Honorable Jerome L. Fox. (R.113.) A jury convicted Dassey of first-degree intentional homicide, mutilation of a corpse, and second-degree sexual assault on April 25, 2007. (R.87; R.88; R.89; R.121.)

The court sentenced Dassey to life imprisonment with extended supervision ("ES") eligibility in 2048, along with concurrent sentences of 6 years (4 years confinement and 2 years ES) for the mutilation of a corpse and 14 years (10 years confinement and 4 years ES) for the second-degree sexual assault. (R.99; R.100.) (App. 536, 537.)

Dassey filed a notice of intent to pursue postconviction relief on August 6, 2007 and requested the State Public Defender's Office ("SPD") to appoint counsel. (R.102.) The SPD appointed Attorney Bob Dvorak on October 17, 2007. Attorneys Steven Drizin, Thomas Geraghty, Laura Nirider, and Joshua

Tepfer of Northwestern University's Bluhm Legal Clinic have since joined the case *pro bono*.

Dassey subsequently filed a motion for postconviction relief, seeking a new trial and a new suppression hearing. (R.149; R.150.) The court held a five-day evidentiary hearing on the postconviction motion from January 15 to January 22, 2010. (R.189-193.) On December 13, 2010, the court denied postconviction relief in a written order. (R.206.) Dassey filed a timely notice of appeal. (R.207.)

3

## STATEMENT OF FACTS

On October 31, 2005, Teresa Halbach, a twenty-five-year-old photographer who worked for *AutoTrader* magazine, went missing. (R.116:187.)[1] She had last been seen photographing a van for sale at the Avery Salvage Yard, a forty-acre parcel of property near Two Rivers. (R.113:105-06.) The property housed not only the Avery family's junkyard business, but also several trailers, including one that was home to Steven Avery. (R.113:105-06.) Avery was well-known in Wisconsin, as he had recently been exonerated by DNA after serving eighteen years in prison for sexual assault. (R.113:31.) Another trailer on the property was home to his sister Barb Janda and three of her sons, including her youngest: sixteen-year-old special education student Brendan Dassey. (R.119:12-16.)

On November 5, searchers found Halbach's abandoned Toyota RAV4 near the salvage yard's tree-lined perimeter. (R.113:145-46; R.78:9.) Its battery had been disconnected, and it had been partially obscured by branches, plywood, and an old vehicle hood. (R.78:9; R.113:146-48; R:115-142.) This discovery – and the implication that Steven Avery might have been involved in Halbach's disappearance – propelled the Halbach story into the local and national media spotlight. (R.191:202; R.171:101-173; R.172:174-204, 239; R.173:240-305.)

From November 5 through 12, police conducted several searches at the Avery Salvage Yard. In Steven

---

[1] Citations to the record on appeal appear with the document number before the colon and the page number after the colon. A citation to R.116:187, for instance, refers this Court to page 187 of document 116. Citations to different documents in the record are separated by semicolons. Where available, parallel citations to the Appendix appear in separate parentheticals after the citations to the record.

4

Avery's trailer, they discovered a copy of *AutoTrader Magazine*, an *AutoTrader* bill of sale, handcuffs and leg irons, and a semi-automatic .22-caliber rifle mounted on his bedroom wall. (R.114:9-11, 17-18, 101-02; R.78:30; R.78:36.) They also found eleven spent .22-caliber casings on the floor of his detached garage. (R.114:93-101; R.78:49.) And during their sixth search of Avery's trailer, police found a previously undetected Toyota key lying on his bedroom floor. (R.114:106.) Analysts would later determine that the key operated Halbach's RAV4 and that Avery's DNA was present on it. (R.115:57-59.)

As the police continued to search the property, they found charred tooth and bone fragments in a burn pit behind Steven Avery's garage. (R.114:158.) Subsequent DNA and dental testing revealed that those fragments were the remains of Teresa Halbach. (R.115:69-72, 231.) State analysts noted that two fragments from the left side of Halbach's skull had defects resembling bullet entry wounds and sent the fragments to the State Crime Lab for confirmation. (R.116:78-88; R.78:55; R.78:70-71.)

In addition to Halbach's remains, police discovered various charred debris in the burn pit: wires from several radial tires (R.116:24); the frame of a bench-style car seat (R.116:26); and several small metal rivets stamped with the words "Daisy Fuentes." (R.114:55.) Halbach's sister later testified that Teresa had owned a pair of Daisy Fuentes brand jeans that featured identical rivets. (R.113:126.) In a burn barrel near Avery's home, police also found charred pieces of a digital camera, cellular telephone, and Palm PDA later determined to have been Halbach's. (R.114:46; R.78:3, 40; R.79:1-7.)

Meanwhile, State technicians determined that a small amount of Steven Avery's blood was present on the RAV4's ignition cylinder. (R.115:42-54.) They also determined that a saucer-sized bloodstain in the RAV4's rear cargo area belonged to Halbach and had

5

been created by bloody hair. (R.115:61-67, 134-35.) As for the RAV4's license plates, police found them in a junked station wagon in the salvage yard. (R.113:169; R.78:19.)

Police arrested Steven Avery on November 9, 2005, at which time they observed a cut on Avery's right middle finger. (R.114:22; R.169:29.) Six days later, Special Prosecutor Kenneth Kratz charged him with first-degree intentional homicide and mutilating a corpse in connection with Halbach's disappearance. (R.169:13.)

Avery's arrest only heightened the media's interest in Halbach's murder. Almost every investigative development was trumpeted in the press, with a few exceptions: the fact that the RAV4's battery had been disconnected and that Halbach had likely been shot in the head were kept private. (R.191:202; R.171:101-173; R.172:174-204, 239; R.173:240-305.) Like many others, Avery's relatives followed the news avidly – perhaps unsurprisingly, since the story centered on their family and business. (R.193:150-53.) Sixteen-year-old Brendan, in particular, not only followed the news himself, but he was also often present during family conversations about the media's portrayal of the crime and investigation. (R.193:152-53.) Even months after Avery's arrest, the media coverage had not relented. Investigator Mark Wiegert testified that as of February 2006, the media's coverage of the Halbach case was still a "frenzy." (R.193:68.)

In November 2005, police interviewed Brendan and other Avery relatives, sometimes repeatedly. On November 6, Marinette County detectives interviewed Brendan for approximately one hour in the back seat of their police car. (R.116:107-09.) During this interview, Brendan explained that he had never seen Halbach or her vehicle except on television, and he did not know what had happened to her. (R.79:23:2, 11-

6

12.)[2]  Detective O'Neill replied: "You remember that girl taking that picture.  You're gettin' off the bus, it's a beautiful day, it's daylight and everybody sees her, you do too.  Do you remember seeing that girl there taking a picture?...Brendan, you're not going to disappoint any of us.  Think about that girl, was that girl standing there taking a picture that day?" (R.79:23:17-18.)  After responding "I don't know" and "maybe," Brendan eventually agreed that he had seen Halbach photographing the van when he got off the school bus.  (R.79:23:17-18.)

During a second interview on November 10, Brendan told police that he had attended a bonfire in Steven's yard around November 1.  (R.169:12.)  He stated that he and Steven had burned branches, wood, a few old tires, and a junked car seat – but he had seen no sign of Halbach while he was there.  (R.169:12; 78:5.)  Brendan had been at the fire for only an hour or two and had left when it was still burning steadily. (R.119:37-39; R.169:12.)

After these interviews, investigators left Brendan alone for several months.  On February 20, 2006, however, Calumet County Investigators Mark Wiegert and Wendy Baldwin interviewed Kayla Avery, Brendan's fifteen-year-old cousin. (R.116:189.)  Kayla told Wiegert that Brendan had recently lost weight, acted withdrawn, and sometimes cried uncontrollably.  (R.116:189-90.)  Based on Kayla's statement, Wiegert decided to question Brendan again.  (R.116:190.)

---

[2] When three numbers appear in a citation to the record, the first number represents the document number; the second number represents the subdocument number; and the third number represents the specific page of the subdocument.  Citation to R.79:23:2, for instance, refers to page 2 of pocket file 23, which is part of document 79 (a binder containing pocket files).

### *The February 27, 2006 Interrogations*

On February 27, 2006, Wiegert and Department of Justice Special Agent Tom Fassbender went to Mishicot High School to question Brendan. (R.79:33:439.) Before doing so, the officers did not notify Brendan's parents, although they had his mother's contact information. (R.193:20.) At the school, the officers had the principal summon Brendan to a room in the front office. (R.193:19-20.) The officers then questioned him alone for one hour and forty-five minutes, recording the meeting on a poor-quality audiotape. (R.79:33; R.193:21-22.) They did not Mirandize him, although they told him he was free to leave. (R.79:33:440.)

The investigators began by telling Brendan that "we know that, that Halloween and stuff you were with [Steven] and, and helped him tend to a fire and stuff like that behind the garage and stuff and, anything that you saw that night that's been bothering ya? And if you built the fire, and we believe that's, that's where Teresa was cooked."[3] (R.79:33:441.) After Brendan explained that he was upset because his uncle was "gone and I can't see him" (R.79:33:441), the investigators informed Brendan that he could be "facing charges" related to Halbach's disappearance:

> FASSBENDER: You know if you think you saw something in the fire, and it's […] starting to bother you, or you're feelin' bad about it, the only way it's ever gonna end is if you talk about it. I, I gotta believe you did see something in the fire […] We want to know, a lot, a lot of the reason that

---

[3] Counsel has reproduced the spelling and punctuation of the police interrogation transcripts. Ellipses that appear without brackets appear in the original transcripts and apparently indicate either a pause or an inaudible portion of the recording. Counsel has added ellipses in brackets where words have been omitted from the original quote.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 19 of 118    Document 19-4

we're doing this is because, how old are you 16, 17? You're a kid, you know and we got, we've got people back at the sheriff's dept., district attorney's office, and their lookin' at this now saying there's no way that Brendan Dassey was out there and didn't see something. They're talking about trying to link Brendan Dassey with this event. They're not saying that Brendan did it, they're saying that Brendan had something to do with it or the cover up of it which would mean Brendan Dassey could potentially be facing charges for that. And Mark & I are both going well ah he's a kid, he had nothing to do with this, and whether Steve got him out there to help build a fire and he inadvertently saw some things that's what it would be, it wouldn't be that Brendan act-actually helped him dispose of this body. And I'm looking at you Brendan and I know you saw something and that's what's killing you more than anything else, knowing that Steven did this, it hurts.

(R.79:33:442.)

  Brendan then offered that he had seen some garbage bags in the fire, at which point the officers responded:

<u>FASSBENDER</u>: Yeah, I know how hard this is, you know that you saw him put some garbage bags on, but I can look, I can't see in your eye, but by your look I can tell you know of something [...] We wouldn't be here bothering you if we didn't know that. We've gotten a lot of information and you know some people don't care, some people back there say no we'll just charge him. We said no, let us talk to him, give him the opportunity to come forward with the information that he has, and get it off of his chest. Now make it look, you can make it look however you want, … […] Mark and I, yeah we're cops, we're investigators and stuff like that, but I'm not right now. I'm a father that has a kid your age too. I wanna be here for you. There's nothing I'd like more than to come over and give you a hug cuz I know you're hurtin'. […] Talk about it, we're not just going to let you high and dry, we're gonna talk to your mom after this and we'll deal

with this, the best we can for your good OK?  I promise I
will not let you high and dry.  I'll stand behind you.

WIEGERT: We both will Brendan.  We're here to help ya.

(R.79:33:443.)  At the later *Machner* hearing, Wiegert
agreed that the statement that "some people back
there" wanted to "charge" Brendan if he did not "come
forward with the information he has" meant that
Brendan was facing criminal liability.  (R.193:26.)

As Brendan continued to deny any knowledge
of Halbach's disappearance, the investigators kept
rejecting his denials and started to suggest that he saw
body parts in the fire:

WIEGERT:  I know you and [Steven] knew what was going
on there. It's really important that you be honest here OK?
Everybody gets an opportunity with Tom and I OK, and we
want to give you that opportunity to be honest.  We want to
help you through this.  Obviously it's bothering you, this
whole thing is bothering you and the rest of your family, but
you'll never ever get over it unless you're honest about it,
cuz this will bug you 'til the day that you die, unless you're
honest about it.  But we wanna go back and tell people that,
you know, Brendan told us what he knew.  We wanna be
able to tell people that Brendan was honest, he's not like
Steve, he's honest, he's a good guy.  He's gonna go places in
this life.  But in order for us to do that, you need to be honest
with us and so far you're not being 100 percent honest. […]
Our experience and knowledge in this job tells us that you're
not being totally honest with us and there's no way that
you're going to get over this and move on in your life
without being honest. […] I find it quite difficult to believe
that if there was a body in that Brendan that you wouldn't
have seen something like a hand, or a foot, a head, hair,
something.  OK. We know you saw something.

(R.79:33:446-47.)  After further denials by Brendan,
the officers continued:

10

FASSBENDER: I know you saw something….Mark and I both can go back to the district attorney and say, ah, …Dassey…came forward and finally told us. Can imagine how this was weighing on him? They'll understand that.

WIEGERT: We'll go to bat for ya, but you have to be honest with us […] It's OK to tell us.

FASSBENDER: It's OK, it's a big step…a step toward feeling better about yourself, to recovery, to not crying at night because of this stuff happening…what you saw. I promise you I'll not let you hang out there alone, but we've gotta have the truth. The truth is gonna be terrible…

WIEGERT: We're not gonna run back and tell your grandma and grandpa what you told us or anything like that. OK.

FASSBENDER: …Talk to us Brendan if you want this resolved.

(R.79:33:448.)

At this point, the close-to-inaudible tape of the conversation reveals that Brendan said, "[inaudible] some clothes like a blue shirt, some pants." (R.79:33:448.) The officers immediately pursued this small opening:

WIEGERT: Was there blood on those clothes? Be honest Brendan. We know. We already know you know. Help us out. Think of yourself here. Help that family out.

FASSBENDER: It's gonna be all right, OK.

WIEGERT: Was there blood on those clothes?

BRENDAN: A little bit […]

WIEGERT: Where did he tell you those clothes came from?

BRENDAN: He said that they were…[…]

WIEGERT: You now know better, they were girl clothes, weren't they?

FASSBENDER: Were they in a bag or anything?

BRENDAN: They were…bag.

FASSBENDER: Got a feelin' that you saw something in the fire that you're trying to just…

WIEGERT: It's not your fault. Remember that.

11

FASSBENDER: Yeah, it's not your fault … Like I said, Mark and I are not going to leave you high and dry. I got a very, very important appointment at 3:00 today. Well I ain't leaving for the appointment until I'm sure you're taken care of…telling the truth … get this off your chest and get it out in the open…so go ahead and talk to us about what you saw in the fire are killin' you right now … what you see. Go ahead, go ahead. … You've got to do this for yourself. I know you feel that it's gonna hurt Steven, but it's actually, actually gonna help Steven come to grips with what he needs to do. More important, this could help you. How long you thing … are going to put up with this … You know we found some flesh in that fire too. We know you saw some flesh. We found it after all that burned. I know you saw it. … Tell us. You don't have to worry about … you won't have to prove that in court. Tell us what you saw. You saw some body parts. You're shaking your head. Tell us what you saw.

BRENDAN: …

FASSBENDER: You all right? You all right? What other parts did you see?

BRENDAN: Toes

(R.79:33:449-51.) The next portions of the audiotape are largely inaudible, but approximately a minute later, the following exchange can be heard:

FASSBENDER: Let's go over th—the parts that you mentioned, OK, so you mentioned toes, fingers, parts of hand and feet and then what you thought maybe was stomach area or midsection or torso. Did you see any parts of the legs…parts of the legs or arms. You sure you didn't see her, her, now this is very hard, it's eas, not easy but it easier to say your saw a toe or a finger, but when you start saying to me or I saw a head or a face or hair or you know stuff like that, that's when it hurts though but I find it very hard that you didn't see a skull or the head. Did you see part of the head or face or skull?

BRENDAN: …somewhat.

12

FASSBENDER: Somewhat?

WIEGERT: I know this is hard Brendan, but can you describe what you saw when you mean somewhat?

BRENDAN: Like her forehead […]

FASSBENDER: Have you told this to anyone? And is that what's been bothering you a lot?

BRENDAN: Yes.

FASSBENDER: And, and I understand that, that's normal because you've done nothing wrong.

WIEGERT: Brendan, I'm going to ask you a difficult question, OK? Did you help him put that body in the fire? If you did it's OK.

BRENDAN: …

(R.79:33:452-53.) After Brendan gave the investigators a written statement describing the body in the fire, he was allowed to return to class. At this point, Wiegert thought Brendan might have been involved in the criminal disposal of Halbach's corpse. (R.193:38.)

Forty-five minutes later, Fassbender and Wiegert again had Brendan's principal remove him from class. During that interval, the officers had contacted D.A. Kratz, who advised memorializing Brendan's statement on videotape at the Two Rivers Police Station. (R.193:37.) They also had contacted Brendan's mother Barb, from whom they now sought permission to interview Brendan. (R.193:35.) In seeking this permission, the officers did not tell Barb that they suspected that her son might be guilty of a crime. (R.193:43.) All Barb knew was that the officers wanted to interview Brendan because he might be a witness against Steven Avery. (R.193:43.)

After being contacted by the officers, Barb drove to the school; upon her arrival, Wiegert and Fassbender drove her and Brendan to the Two Rivers Police Station in Fassbender's unmarked police vehicle. (R.193:35-7.) Once at the station, the officers questioned Brendan alone while Barb waited outside

13

the interrogation room. (R.193:155.) Under Wiegert and Fassbender's questioning, Brendan repeated on video the same story that he had told at his high school. (R.170:90:484; R.79:32.) The officers repeatedly asked him if he helped Steven kill Halbach; each time, he replied "no." (R.170:90:494, 497.)

After this interrogation concluded, the police arranged for Brendan, Barb, and one of his brothers to spend the night at the Fox Hills Resort at the government's expense. (R.193:52-53.) At about 10:50 PM, Fassbender came to their hotel room, where – without administering the *Miranda* rights or recording the conversation – he questioned Brendan further. (R.113:221; R.117:11-12.) Brendan told Fassbender that on October 31, he had stained his jeans with bleach while helping Steven clean up spilled automotive fluid on the garage floor. (R.113:194, 221.) The next morning, Brendan and his family were permitted to leave the hotel.

### The March 1, 2006 Interrogation

On February 28, Wiegert received a State Crime Lab report confirming that Halbach had been shot in the head. (R.114:230-34.) Although most investigative details had been publicized far and wide, this information still remained private. (R.45:40-41.) (App. 412-13.) Because it was known only to police and Halbach's killer, Wiegert therefore considered this information to be "important." (R.193:56.) After receiving the report, he and Fassbender decided to question Brendan again.

At 10:00 AM on March 1, Wiegert and Fassbender returned to Brendan's school and again removed him from class. (R.193:59.) Before doing so, the officers had called Barb to get permission to bring him to the Manitowoc County Sheriff's Department for further questioning (R.193:57), although this time they did not say she could

14

accompany her son. (R.193:60, 156.) Barb gave the officers permission to question Brendan "as long as they bring him back to the high school." (R.193:156.) She had no idea that the officers were going to accuse Brendan of involvement and would have not allowed him to be questioned alone had she known that. (R.193:157.) The officers placed Brendan in the back of their police car, Mirandized him, and obtained a signed waiver. (R.172:209:526.) Wiegert then told Brendan that they were going to the Manitowoc Sheriff's Department and "if you play it right, who knows, maybe we'll get you back as soon as we can." (R.172:209:527.) Throughout the forty-five-minute drive to the police station, the officers repeatedly attempted to engage Brendan in small talk about school, girls, and the weather. (R.172:209:529-35.) At no point did the officers tell Brendan that he was free to leave.

At the Manitowoc Sheriff's Department, Brendan was told to sit on a couch in a "soft" interrogation room. (R.117:19-20.) The room's closed door was behind him and to his right. (R.172:210.) The officers sat in two chairs immediately in front of Brendan such that they blocked his path to the door. (R.172:210.)

At about 10:45, Wiegert began the videotaped interrogation by asking Brendan "real quick" whether he remembered his *Miranda* rights. (R.172:209:526, 539.) (App. 234.) After Brendan replied "yeah," Wiegert and Fassbender began a series of long monologues:

> FASSBENDER: We, we feel that, that maybe, I think Mark and I both feel that maybe there's a, some more that you could tell us, um, that you may have held back for whatever reasons and I wanna assure you that Mark and I both are in your corner, we're on your side, and you did tell us yourself that one of the reasons you hadn't come forward yet was because you're afraid, you're scared, and, and one of the

15

reasons you were scared was that you would be implicated in this, or people would say that you helped or did this (Brendan nods "yes")

<u>BRENDAN</u>: mm huh. (nods "yes")

<u>FASSBENDER</u>: OK, and that you might get arrested and stuff like that. OK? And we understand that. One of the best ways to, ta prove to us or more importantly, you know, the courts and stuff is that you tell the whole truth, don't leave anything out, don't make anything up because you're trying to cover something up, a little, um, and even if those statements are against your own interest, you know what I mean, that, then makes you might, i – it might make you look a little bad or make you look like you were more involved than you wanna be, ahh, looked at, um, it's hard to do but it's good from that vantage point to say hey, there's no doubt you're telling the truth because you've now given the whole story you've even given points where it didn't look real good for you either an, and I don't know if I, if you, your understanding what I'm saying (Brendan nods "yes").

<u>BRENDAN</u>: mm huh (nods "yes")

<u>FASSBENDER</u>: and, and that's why we kinda came here, to let you talk a little, maybe get some stuff off your mind or chest if you need to and then to tell us the whole truth, to take us through this whole thing that happened on Monday, not leaving anything out, not adding anything in, because if our guy looked at, looked at the tapes, looked at the notes, it's real obvious there's some places where some things were left out or maybe changed just a bit ta, to maybe lookin' at yourself to protect yourself a little. Um, from what I'm seeing, even if I filled those in, I'm thinkin' you're all right. OK, you don't have to worry about things. Um, w, we're there for ya, um. And I, and, and we know what Steven did an, and, and we know kinda what happened to you when he did, we just need to hear the whole story from you. As soon as we get that and we're comfortable with that, I think you're gonna be a lot more comfortable with that. It's going to be a lot easier on you down the road, ah, if this goes to trial and stuff like that. We need to know that, because it's

16

probably going to come out […] So ya, you know that you get my drift. I'm a, I know Mark has some, so I'm just going to give you an opportunity to talk to us now and, and kinda fill in those gaps for us. (Brendan nods "yes")

WIEGERT: Honesty here Brendan is the thing that's gonna help you. OK, no matter what you did, we can work through that. OK. We can't make any promises but we'll stand behind you no matter what you did. OK. Because you're being the good guy here. You're the one that's saying you know what? Maybe I made some mistakes but here's what I did. The other guy involved in this doesn't want to help himself. All he wants to do is blame everybody else. OK. And by you talking with us, it's, it's helping you. OK? Because the honest person is the one who's gonna get the better deal out of everything. You know how that works. (Brendan nods "yes")

BRENDAN: mm hm (nods "yes")

WIEGERT: You know. Honesty is the only thing that will set you free. Right? And we know, like Tom said we know, we reviewed those tapes. We know there's some things you left out and we know there's some things that maybe weren't quite correct that you told us. OK. We've done, we've been investigating this a long time. We pretty much know everything that's why we're to talking to you again today. We really need you to be honest this time with everything, OK. If, in fact, you did somethings, which we believe, somethings may have happened that you didn't want to tell us about. It's OK. As long as you can, as long as you can be honest with us, it's OK. If you lie about it that's gonna be problems. OK. Does that sound fair? (Brendan nods "yes")

BRENDAN: mm hm (nods "yes")

(R.79:34:540-41.) (App. 235-36.) At this point, Brendan began recounting his day on October 31, but the officers soon interrupted him:

WIEGERT: Come on Brendan. Be honest. I told you before that's the only thing that's gonna help ya here. We already know what happened. OK. (Brendan nods "yes")

17

FASSBENDER: We don't get honesty here, I'm your friend right now, but I but I gotta I gotta believe in you and if I don't believe in you, I can't go to bat for you. OK. You're noddin', tell us what happened. (Brendan nods "yes")

WIEGERT: Your mom said you'd be honest with us. (Brendan nods "yes")

FASSBENDER: And she's behind you a hundred percent no matter what happens here.

WIEGERT: Yep, that's what she said, cuz she thinks you know more too.

FASSBENDER: We're in your corner. (Brendan nods "yes")

WIEGERT: We already know what happened now tell us exactly. Don't lie.

FASSBENDER: We can't say it for you Brendan, OK.

(R.79:34:547-48.) (App. 242-43.) Brendan then told the officers that he saw a Suzuki "jeep" in Steven's garage, to which the officers replied:

FASSBENDER: Who's car was in the garage? Tell me the truth.

WIEGERT: We already know. Just tell us. It's OK.

(R.79:34:548.) (App. 243.) Brendan responded, "Her jeep," to which the officers replied "That's right" and "Her jeep was in the garage wasn't it?" (R.79:34:548.) (App. 243.) Wiegert then said, "Where was she? Come on we know this already. Be honest." Brendan replied, "In the back of the jeep." (R.79:34:550.) (App. 245.) At that point, Wiegert told Brendan:

WIEGERT: How did she get in the back of the jeep? Tell us that.

BRENDAN: I don't know.

WIEGERT: Did you help him?

BRENDAN: No. (shakes head "no")

WIEGERT: Let's be honest here Brendan. If you helped him, it's OK, because he was telling you to do it. You didn't do it on your own. (Brendan shakes head "no")

18

> BRENDAN: I didn't, I didn't touch her.

(R.79:34:552.) (App. 247.)

As the interrogation continued, Brendan eventually said that on October 31, Steven had told him that he had raped and stabbed Halbach. (R.79:34:560.) (App. 255.) Brendan also said that Halbach was dead before her body was placed into the back of the "jeep" and that he had helped Steven move her body from the "jeep" into the fire using a creeper. (R.79:34:557, 561.) (App. 252, 256.) At that point, Wiegert stated: "Brendan, were you there when this happened? We already know Brendan. We already know. Come on. Be honest with us. Be honest with us. We already know, it's OK? We gonna help you through this, alright?" (R.79:34:561.) (App. 256.) Brendan nodded "yes" and then said that, after arriving home from school on October 31, he had ridden his bicycle to fetch his family's mail at 4:00 or 4:30 PM and had heard screaming as he rode past Steven's trailer. (R.79:34:561-62.) (App. 256-57.) He did not stop riding or approach the trailer; instead, he went back home. (R.79:34:562-63.) (App. 257-58.) At that point, the officers expressed disbelief:

> FASSBENDER: There's somethin' in here we're missin'. You heard her, I have a feelin' he saw you, you saw him somethin' in here that we're missin' […]
> WIEGERT: It's OK Brendan. We already know.
> FASSBENDER: I think you went over to his house and then he asked [you] to get his mail somethin' in here is missing.
> BRENDAN: Well, when I got the mail there was like an envelope in there with his name on it.
> FASSBENDER: All right.
> WIEGERT: OK, now we're goin' so what did you do?
> BRENDAN: I knocked on the door and he answered it.
> WIEGERT: Yeah, and then what?
> BRENDAN: I gave it to him and then I left.

19

WIEGERT: […] Be honest.  You went inside, didn't you? (Brendan nods "yes")

FASSBENDER: Yeah.

WIEGERT: You went in the trailer?

BRENDAN:  Mm huh. (nods "yes")

FASSBENDER:  You're noddin'.

WIEGERT:  OK.  Did he invite you in?

BRENDAN: Yeah.

WIEGERT:  OK and where was she?

BRENDAN: In his room.

(R.79:34:565-66.) (App. 260-61.)

Over the next ten minutes, Brendan stated that after he entered the trailer, his uncle told him that he had sexually assaulted Halbach.   The investigators pressed on:

WIEGERT:   OK.   What happens next?   Remember, we already know, but we need to hear it from you, it's OK.  It's not your fault.  What happens next?

BRENDAN: [….] That he said that if I wanted to I could go get some but not right now.

WIEGERT:  Come on, be honest, you went back in that room.

FASSBENDER: Tell us now Brendan.

WIEGERT: We know you were back there.

(R.79:34:571-72.) (App. 266-67.)

Brendan agreed that he had gone into Steven's bedroom, where Halbach was nude and handcuffed to the headboard of Steven's bed.  (R.79:34:572.)  (App. 267.) At 11:45, the following exchange then occurred:

WIEGERT: So you, he, he brings you back there and he shows you her (Brendan nods "yes") and what do you do? Honestly.  Because we think

FASSBENDER: Very important.

WIEGERT: We know happened.

FASSBENDER: It's hard to be truthful.

20

WIEGERT: We know what happened, it's OK. (pause) What did you do?

BRENDAN: I didn't do nothin'.

WIEGERT: Brendan, Br-Brendan, come on. What did you do?

FASSBENDER: What does Steven make you do?

WIEGERT: It's not your fault, he makes you do it.

BRENDAN: He told me ta do her.

(79:34:574.) (App. 269.) When the officers asked Brendan to describe the assault, he said that he had taken off all his clothing and "stuck it in her" for "five minutes." (R.79:34:575.) (App. 270.)

    After this statement, the officers began probing whether Brendan could produce one of the only nonpublic pieces of information about the crime: the fact that Halbach had been shot in the head.

WIEGERT: Brendan, be honest. You were there when she died and we know that. Don't start lying now. We know you were there. What happened?

FASSBENDER: He ain't gonna lie to you, hey we know that okay.

WIEGERT: We already know, don't lie to us now, OK, come on. What happens next?

FASSBENDER: You're just hurting yourself if you lie now.

BRENDAN: Then he went in, back in there and he stabbed her.

WIEGERT: You were with him? (Brendan nods "yes") Yes?

BRENDAN: Yeah […]

WIEGERT: We know he did something else to her, what else did he do to her?

BRENDAN: He choked her […]

WIEGERT: What else did he do to her? We know something else was done. Tell us, and what else did he do? Come on. Something with the head. Brendan?

BRENDAN: Huh? […]

WIEGERT: What else did you guys do, come on.

21

FASSBENDER: What he made you do, Brendan, we know he made you do somethin' else.

WIEGERT: What was it? (pause) What was it?

FASSBENDER: We have the evidence Brendan, we just need you ta, ta be honest with us.

BRENDAN: That he cut off her hair. [...]

WIEGERT: OK, What else?

FASSBENDER: What else was done to her head?

BRENDAN: That he punched her.

WIEGERT: What else? (pause) What else?

FASSBENDER: He made you do somethin' to her, didn't he? So he – he would feel better about not bein' the only person, right? (Brendan nods "yes") Yeah.

WIEGERT: Mm huh.

FASSBENDER: What did he make you do to her?

WIEGERT: What did he make you do Brendan? It's OK, what did he make you do?

BRENDAN: Cut her.

WIEGERT: Cut her where?

BRENDAN: On her throat….

WIEGERT: So Steve stabs her first and then you cut her neck? (Brendan nods "yes") What else happens to her in her head?

FASSBENDER: It's extremely, extremely important you tell us this, for us to believe you.

WIEGERT: Come on Brendan, what else? (pause)

FASSBENDER: We know, we just need you to tell us.

BRENDAN: That's all I can remember.

WIEGERT: All right, I'm just gonna come out and ask you. Who shot her in the head?

BRENDAN: He did.

FASSBENDER: Then why didn't you tell us that?

BRENDAN: Cuz I couldn't think of it.

(R.79:34:578-87.) (App. 273-82.) Following this exchange, the interrogators asked Brendan: "Do you know what side of the head?" and he replied "No." (79:34:592.) (App. 287.) Much later in the interrogation, Fassbender asked Brendan, "Tell me

22

where in the head. What sides?" to which he replied "Like the left side I think it was." (R.79:34:630.) (App. 325.)

Wiegert and Fassbender then began to focus their questioning on what happened in the Avery garage and in the RAV4:

> FASSBENDER: We know there's...some things that...you're not tellin' us. We need to get the accuracy about the garage and stuff like that and the car...Again, w-we have, we know that some things happened in that garage, and in that car, we know that. You need to tell us about this so we can know you're tellin' us the truth.

(R.79:34:593, 595.) (App. 288, 290.) Brendan responded by telling the officers that after the shooting, Steven had placed Halbach's body in the RAV4 for a moment before taking it back out. (79:34:599.) (App. 294.) Probing for information about where the shooting took place, the officers then stated:

> FASSBENDER: Tell us where she was shot?
> BRENDAN: In the head.
> FASSBENDER: No, I mean where, in the garage
> BRENDAN: Oh.
> FASSBENDER: Outside, in the house?
> BRENDAN: In the garage.
> FASSBENDER: OK.
> WEIGERT: Was she in the garage floor or in the truck?
> BRENDAN: Innn the truck.
> WIEGERT: Ah huh, come on, now where was she shot? Be honest here.
> FASBENDER: The truth.
> BRENDAN: In the garage.
> WIEGERT: Before she was put in the truck or after?
> BRENDAN: After.
> FASSBENDER: So she's in the truck and that's when he shoots her? (Brendan nods "yes") How many times?

23

> (pause) Remember weeee got a number of shell casings that we found in that garage. I'm not gonna tell ya how many but you need to tell me how many times, about that she was shot.

(R.79:34:596-97.) (App. 291-92.) Before this exchange, Brendan had stated that Steven had shot Halbach two or three times (R.79:34:589) (App. 284); but after this exchange, he said that Steven had shot her "about ten" times. (R.79:34:597.) (App. 292.)

As the interrogation continued, Brendan responded to police questions by indicating that he had helped Steven carry Halbach's body on a creeper from the garage to the bonfire. (R.79:34:557.) (App. 252.) Subsequently, he said that he and Steven had placed tires, a junked van seat, and tree branches from the yard on the fire, along with Halbach's clothing. (R.79:34:607-08, 663.) (App. 302-03, 358.) He also said that he and Steven had driven Halbach's "jeep" "back by the trees," where they covered it with branches and an old car hood. (R.79:34:600-01.) (App. 295-96.) At that point, the investigators began exploring whether Brendan could produce the other nonpublic fact about the crime – the fact that the RAV4's battery cables had been disconnected:

> WIEGERT: OK. After [Steven] put the car there, what do you do next?
> BRENDAN: We walk out.
> WIEGERT: With, how's, the license plates were taken off the car, who did that?
> BRENDAN: I don't know.
> WIEGERT: Did you do that?
> BRENDAN: (shakes head "no") No.
> WIEGERT: Did Steve do that?
> BRENDAN: Yeah.
> WIEGERT: Well then why'd you say you don't know? Did Steve take the license plates off the car?
> BRENDAN: Yeah [….]

24

FASSBENDER: Go ba, I wanna back ya just a bit, you're down at the car, and you're hiding the car, right? (Brendan nods "yes") Do you recall him taking the plates off?

BRENDAN: Yeah.

FASSBENDER: OK, what else did he do, he did somethin' else, you need to tell us what he did, after that car is parked there. It's extremely important. (pause) Before you guys leave that car.

BRENDAN: That he left the gun in the car.

FASSBENDER: That's not what I'm thinkin' about. He did something to that car. He took the plates and he, I believe he did something else in that car. (pause)

BRENDAN: I don't know.

FASSBENDER: OK. Did he, did he, did he go and look at the engine, did he raise the hood at all or anything like that? To do something to that car?

BRENDAN: Yeah.

FASSBENDER: What was that? (pause)

WIEGERT: What did he do, Brendan?

WIEGERT: It's OK, what did he do?

FASSBENDER: What did he do under the hood, if that's what he did? (pause)

BRENDAN: I don't know what he did, but I know he went under.

(R.79:34:601-03.) (App. 296-98.)

Fassbender next raised the topic of Halbach's possessions, which had been burned in a barrel in Steven's yard. On February 27, Brendan had told the officers that he didn't know whether anything had been burned in the barrel. On March 1, accordingly, Fassbender asked Brendan:

FASSBENDER: [D]o you remember anything about that burn barrel? [….] [Y]ou might want to be a little more truthful about [it] now [….] Did you put some things in that burn barrel that night?

BRENDAN: (shakes head "no") No.

25

FASSBENDER: What happened to Teresa's other personal effects? I mean ah a woman usually has a purse right? (Brendan nods "yes") Tell us what happened ta that?

BRENDAN: I don't know what happened to it.

FASSBENDER: What happened ta her ah, her cell phone? (short pause) Don't try ta ta think of somethin' just.

BRENDAN: I don't know.

FASSBENDER: Did Steven did you see whether ah a cell phone of hers?

BRENDAN: (shakes head "no") No.

FASSBENDER: Do you know whether she had a camera?

BRENDAN: (shakes head "no") No.

FASSBENDER: Did Steven tell ya what he did with those things?

BRENDAN: (shakes head "no") No.

FASSBENDER: I need ya to tell us the truth.

BRENDAN: Yeah.

FASSBENDER: What did he do with her […] possessions?

BRENDAN: I don't know.

WIEGERT: Brendan, it's OK to tell us OK […] If you know what happened to a cell phone or a camera or her purse, you need to tell us […].

BRENDAN: He burnt 'em.

WIEGERT: How do you know?

BRENDAN: Because when I passed it there was like a purse in there and stuff […] buried underneath ah, garbage, a garbage bag. […]

WIEGERT: You could see underneath it? (Brendan nods "yes") What did you see?

BRENDAN: Like a cell phone, camera, purse

WIEGERT: Are you being honest with us?

BRENDAN: (nods "yes") Yeah.

WIEGERT: Did you actually see those items?

BRENDAN: (nods "yes") Yeah.

(R.79:34:619-23.) (App. 314-18.)

  At approximately 2:30 PM, after admitting to sexual assault and murder on videotape, Brendan

26

began asking his interrogators when he was going to return to school:

> BRENDAN:  Am I gonna be at school before school ends?
> FASSBENDER: Probably not.  I mean we're at two thirty already, and school's over at what, three?  (Brendan nods "yes")
> BRENDAN: 3:05
> FASSBENDER: 3:05 yeah.  No.
> BRENDAN: What time will this be done?
> FASSBENDER:  Well, we're pretty, we're pretty much done.  We have a couple follow up things ta ask ya, but it's pretty much done.

(R.79:34:667.)  (App. 362.) Minutes later, however, Fassbender told Brendan, "You know obviously that we're police officers.  OK.  And be because of what you told us, we're gonna have ta arrest you." (R.79:34:668.)  (App. 363.)  Stunned, Brendan responded, "Is it only for one day or?"  (R.79:34:668.) (App. 363.)

At that point, Wiegert and Fassbender allowed Barb, who had arrived at the station during the interrogation, to speak alone with Brendan.  The interrogation room's videocamera captured the following exchange between mother and son:

> BRENDAN: Where am I going?
> BARB: Where do you think you're going?
> BRENDAN: I don't know?
> BARB: You're goin' to juvie, that's where you're going, to a juvie jail.  About 45 minutes away.
> BRENDAN: Yeh but I gotta question?
> BARB: What's that?
> BRENDAN: What'd happen if [Steven] says something his story's different?  Wh—he says he, he admits to doing it?
> BARB: What do you mean?
> BRENDAN: Like if his story's like different, like I never did nothin' or somethin'.

27

BARB: Did you?  Huh?
BRENDAN: Not really.
BARB: What do you mean not really?
BRENDAN: They got to my head.

(R.79:34:671-72.)  (App. 366-67.)  As soon as these words came out of Brendan's mouth, Wiegert re-entered the interrogation room.  (R.79:34:672.)  (App. 367.)  Barb immediately confronted Wiegert: "Were you pressuring him?"  (R.79:34:672.)  (App. 367.)  Wiegert replied, "No […] [w]e've been doing this job a long time Barbara and we can tell when people aren't telling the truth."  (R.79:34:673.)  (App. 368.)

In the days following Brendan's arrest, police launched a new wave of searches across the Avery property, gathering almost one thousand pieces of evidence in an effort to substantiate Brendan's story.  (R.118:15.)  On March 1 and 2, police discovered fragments of two .22-caliber bullets in Steven's garage that had somehow gone undetected during multiple previous searches.  One of the bullets tested positive for Halbach's DNA.  (R.114:62-66, 74-76.)  On March 1, police also seized a red and black creeper from Steven's garage. (R.114:60.)  Despite Brendan's claim that it had been used to move Halbach's body after she had been shot, it tested negative for blood.  (R.115:83-84.)  State technicians also ran tests on Steven's handcuffs and leg irons, which Brendan claimed were used to restrain Halbach and which he said he had handled; while Steven's DNA was on those items, no trace of DNA or fingerprints from either Brendan or Halbach could be found.  (R.113:215; R.118:16.)

State technicians also examined many other items from Steven's bedroom, including his mattress; despite Brendan's claim that Halbach had been stabbed and her throat cut on the bed, they found no blood on the mattress or anywhere else.  (R.118:10.)  None of Steven's knives tested positive for blood.  (R.114:19; R.115:54-56, 102.)  Brendan's jeans also contained no

28

traces of blood. (R.113:218-19.) And while Brendan claimed that Halbach's hair had been cut, not a single Halbach hair was found anywhere, including in Steven's vacuum. In short, despite a mammoth search effort, not a single piece of physical evidence linked Brendan to Halbach's death.

### Len Kachinsky's Representation of Brendan Dassey

On March 3, 2006, Brendan was charged with and pled not guilty to being party to the crimes of first-degree intentional homicide, first-degree sexual assault, and mutilation of a corpse. (R.12:5-6.) A few days later, his court-appointed attorney, Ralph Sczygelski, withdrew from the case after learning that Halbach was a distant relative. (R:8; R:9.)

On March 7, attorney Len Kachinsky was appointed to replace Sczygelski – and found himself in the midst of a media frenzy. (R.11.) On the first evening of his representation – days before he actually met Brendan – he told television reporters that "we have a 16 year old who while morally and legally responsible was heavily influenced by someone that can only be described as something close to evil incarnate." (R.173:317; R.187:374.) At the *Machner* hearing, Kachinsky denied making this statement and testified that such a statement was "bothersome" because it "would, in effect, admit guilt." (R.189:118.) A television news recording revealed, however, that Kachinsky had made the statement. (R.193:228-29.)

Kachinsky first met Brendan on March 10, at which time Brendan told him that he was innocent. (R.189:123, 130, 137-38.) Nonetheless, Kachinsky told reporters waiting on the jailhouse steps that Brendan was "remorseful" (R.173:321; R.189:133), another statement that he later admitted carried an "implication of guilt." (R.189:131-33.) Kachinsky also told the press that Brendan could be "easily led into the offenses he allegedly committed" (R.173:321;

29

R.189:135-36) and downplayed Brendan's not guilty plea as intended "simply to keep his options open." (R.173:321.) On March 17, similarly, Kachinsky stated on CNN's *Nancy Grace* that "if [Brendan's videotaped statement] is accurate, an accurate recollection of what occurred, there is, quite frankly, no defense." (R.189:142-43.) And in early April, he told the press that "it didn't appear to me that [the police] were putting words in his mouth." (R.173:325; R.189:175-76.) By making these public statements, Kachinsky intended to "send a message" to Brendan's family and to "Brendan himself" that he might "take a legal option that they don't like" – i.e., that he might change his plea to guilty. (R.190:65.) The State Public Defender eventually refused to pay Kachinsky for 13.8 hours he spent being interviewed, stating that "We are willing to pay for an attorney's professional time. That professional time may include some media contact if it is done strategically to protect the client's interests. That does not appear to be what you did in this case." (R.170:57.)

Brendan, meanwhile, continued to tell Kachinsky that he was innocent, that the police "put words in my head," and that he wanted a lie detector test. (R.190:57, 59.) On April 3, accordingly, Kachinsky hired a polygrapher named Michael O'Kelly. (R.189:188.) On April 16, O'Kelly polygraphed Brendan at the Sheboygan County Juvenile Detention facility, during which Brendan denied involvement in Halbach's murder. (R.192:13; R.170:63, 94.) At the *Machner* hearing, Kachinsky testified that O'Kelly told him on April 16 that the polygraph results were inconclusive. (R.189:210.)

Following the polygraph, Kachinsky retained O'Kelly as defense investigator. (R.192:27.) On or before April 22, Kachinsky tasked O'Kelly with "securing information for a plea bargain process," as specifically opposed to gathering "defense information." (R.192:45-46.) Kachinsky accordingly

30

instructed O'Kelly to gather "anything that would further the State's case against Steven Avery…even if that evidence tends to inculpate Brendan Dassey." (R.192:46-47.) On April 23, furthermore, Kachinsky instructed O'Kelly not only to obtain incriminating evidence, but also "to get Brendan to confess." (R.192:47, 50; R.173:353.) No plea discussions had taken place between Kachinsky and the State to date. (R.189:42, 66, 80.) Brendan, meanwhile, continued to tell his attorney that he was innocent. (R.189:237; R.190:11.)

On April 23 and 24, O'Kelly began preparing to obtain a confession from Brendan by collecting interrogation props, including a printout of the Halbach memorial website, a photograph of a "Dead End" sign near the Avery Salvage Yard, and a blue ribbon that O'Kelly bought from a florist and photographed hanging outside Halbach's church to make it look like part of a memorial. (R.173:353; R.192:49-52, 91, 104, 115, 125.)

On April 27, O'Kelly told Kachinsky that he had identified two vehicles at the Avery Salvage Yard that the defense should "protect…for the prosecution in Avery's case." (R.170:64; R.192:43.) He thought one of those vehicles contained the knife that had been used to attack Halbach and reasoned that "this [evidence] will only serve to bolster the prosecution…it will corroborate [Brendan's] testimony and color him truthful." (R.170:64; R.192:42, 47.) On May 5, without informing Brendan or obtaining his permission, Kachinsky sent an e-mail to D.A. Kratz and Wiegert offering them information on the whereabouts of two vehicles "which may contain some evidence useful in this case." (R.189:237; R.190:11; R.181; R.173:338.) (App. 487.) He told them that the information "may go a long way toward getting you…PC for another search of the Avery salvage yard" but requested to "stay unnamed in any affidavit for a search warrant if at all possible." (R.173:338;

31

R.181.) (App. 487.) D.A. Kratz later testified that he knew that Kachinsky believed that the vehicles contained the knife used to attack Halbach. (R.189:70.) The State sent investigators out to the salvage yard, but no knife or other evidence was found. (R.193:88.) Throughout this time period, meanwhile, Brendan was still unflaggingly asserting his innocence; moreover, no plea deal had yet been extended by the State. (R.189:237; R.190:11.)

On May 4, the trial court held a hearing on Kachinsky's motion to suppress Brendan's February 27 and March 1 statements. (R.45.) Kachinsky expected to lose that motion. (R.189:252.) After the hearing, Kachinsky and O'Kelly decided that O'Kelly should interrogate Brendan on Friday, May 12 – the same day that the trial court would rule on the motion – because the blow of losing would leave Brendan maximally vulnerable. (R.189:244; R.192:104.) Kachinsky offered to visit Brendan on May 10 and "talk to him about giving a complete statement to [O'Kelly] on Friday," but O'Kelly told Kachinsky not to meet with his client before May 12 and not to accompany O'Kelly on that date. (R.170:66.) (App. 489.) By O'Kelly's reasoning, Brendan would be more easily influenced if he were made to feel "alone" before the interrogation. (R.192:87-88.) (App. 488.) Further, he reasoned, a visit from Kachinsky could be "counterproductive" in that Brendan might "become more entrenched" in an "illogical position" – that of his own innocence – that "will take me longer to undo if I can even without your visit." (R.170:66; R.192:82.) (App. 488.) The two accordingly agreed that Kachinsky would stay away from his client until after May 12; and Kachinsky cancelled the visit he had planned for May 10. (R.192:88; R.170:66.) (App. 488.)

On Saturday, May 6, O'Kelly continued preparing for the May 12 interrogation by meeting with Fassbender and Calumet County Investigator

32

Dedering to review crime scene photographs. (R.192:62; R.193:205.) At that meeting, the officers made clear that they understood that O'Kelly needed those materials in order to obtain an admission from Brendan, who was "denying involvement." (R.192:101-02; R.193:91, 203.) On May 7, O'Kelly requested additional interrogation props from D.A. Kratz, Dedering, and Fassbender, including more crime scene photographs, witness interview reports, extensive amounts of electronic discovery, and a copy of the Halbach missing person flyer. (R.170:65; R.192:67-68.) Kachinsky later testified that as May 12 approached, he began to feel that O'Kelly was "doing the prosecutor's work for him." (R.189:241.) He did not, however, request that O'Kelly cease his activities. (R.189:243.)

On May 9, O'Kelly sent Kachinsky an e-mail detailing his opinions about the Avery family. (R.170:66.) (App. 488-89.) In it, he stated: "These are criminals…This is truly where the devil resides in comfort. I can find no good in any member. These people are pure evil. This is where one would eat their young to satisfy/justify a control issue where none previously existed. A friend of mine suggested '*This is a one branch family tree. Cut this tree down. We need to end the gene pool here.*'" (R.170:66 (italics in original).) (App. 488.) At the *Machner* hearing, O'Kelly tearfully testified that this case had always been "pretty emotional" for him and that his emotions sided with what happened to Halbach. (R.192:95-96.)

On May 12, the trial court denied Kachinsky's motion to suppress Brendan's February 27 and March 1 statements. (R.26; R.46:11.) (App. 502, 513.) Hours later, O'Kelly conducted a one-on-one videotaped interrogation of Brendan in a classroom at the Sheboygan County Jail. (R.170:95; R.194.) He began by sitting Brendan down at a table covered with interrogation props and told him for the first time that his polygraph indicated a 98% probability of

33

deception. (R.170:95; R.194:1.) (App. 514.) When Brendan protested his innocence and explained that on March 1 he had been merely "guessing" and agreeing to "whatever [the police] said," O'Kelly refused to listen. (R.194:5.) (App. 518.) He told Brendan that if he confessed again, then "I'll help you through this process and you will not be doing life in prison." (R.194:5.) (App. 518.) In that event, he said, Brendan could "get out and have a family" in as soon as "20 years" (R.194:4, 21) (App. 517, 534) – even though no plea offer was or had yet been on the table. (R.189:42, 66, 80.) On the other hand, O'Kelly told him that "if you lie to me, guess what I have to do? I have to stand up, put everything away, and leave. Because that means that you want to go to prison for the rest of your life. If you want to go to prison for the rest of your life because you're going to hang onto some lies, then I can't help you." (R.194:3.) (App. 516.) All told, he instructed Brendan that he would face life in prison "if you lie to me" no fewer than ten times. (R.170:95; R.194:2, 3, 4, 5.) (App. 515, 516, 517, 518.)

After approximately forty minutes, Brendan began making admissions for the first time since his March 1 police interrogation. (R.194:5-16.) (App. 518-29.) Under O'Kelly's direction, he eventually wrote a confession, and after O'Kelly told him that he wanted Brendan to repeat his confession to the police, he agreed to do so. (R.194:18.) (App. 531.) O'Kelly telephoned Kachinsky to inform him that he had secured Brendan's confession, at which time the two agreed that O'Kelly should call Fassbender to offer him both another chance to interrogate Brendan and a copy of Brendan's written confession. (R.194:18-19.) (App. 531-32.) Not only did O'Kelly immediately do just that, but at Kachinsky's direction, he also gave Fassbender a verbal preview of the admissions Brendan had just made, much to the officer's discomfort. (R.192:153; R.193:213-14; R.175.) At about the same time, Kachinsky e-mailed Fassbender,

34

Wiegert, and D.A. Kratz to confirm both that the police would get a second chance to freely interrogate Brendan and that O'Kelly would be available to brief them before the interrogation commenced. (R.173:356; R.193:216-17.)

The next morning, on Saturday, May 13, Wiegert and Fassbender met O'Kelly at the Sheboygan County Jail, at which point O'Kelly offered to tell them what Brendan had said the previous night in what Wiegert recognized was a breach of the attorney-client privilege. (R.193:103.) The officers then met with Brendan in an interrogation room at the jail. Kachinsky, who was previously scheduled to attend a National Guard practice, did not attend the interrogation at all; O'Kelly monitored it from another room via closed circuit video. (R.193:104.) As of May 13, the State had neither extended a plea offer nor requested a proffer (R.189:42, 66, 80); in fact, Kachinsky had explicitly agreed with D.A. Kratz the previous night that the State would offer "no consideration" for Brendan's statement on May 13. (R.173:356; R.189:80; R.190:34.) Kachinsky had obtained no immunity for Brendan and had not discussed with the State whether any new inculpatory statements would later be used against Brendan. (R.190:36-38.)

Alone in the interrogation room, Brendan gave police another hours-long, videotaped statement implicating himself and Steven Avery in the rape and murder of Halbach. (R.189:97; R.172:211.) Much of this rambling confession was significantly inconsistent with his March 1 story. (R.170:69; R.79:34.) When pressed by the officers about these inconsistencies, Brendan repeatedly explained that on March 1, he had been "nervous" and "just guessing" about many details. (R.170:69:779, 813, 788, 852.) These inconsistencies led D.A. Kratz later to refer to Brendan's May 13 statement as a "fiasco." (R.189:97.)

In the midst of the interrogation, Fassbender

35

told Brendan that he and Wiegert were going to "give you another chance to go over a few of these details and make us believers that you're telling the truth, not what we wanna hear, or not what you think we wanna hear." (R.170:69:829-30.) The officers then left the interrogation room and asked O'Kelly, "Hey, I thought you said he was going to confess? What's going on?" (R.192:163.) O'Kelly advised Wiegert to take the lead during questioning because Brendan "plain doesn't like" Fassbender, whereas he "love[d]" Wiegert and thought he "walks on water." (R.192:164.) Accordingly, the two officers traded seats and resumed questioning, with Wiegert now taking the lead. As the interrogation went on, Wiegert began advising Brendan to confess to his mother over the prison telephones:

> WIEGERT: When you gonna tell your mom about [your involvement in Halbach's murder]?
> BRENDAN: Probably the next time I see her.
> WIEGERT: Cuz you're lied to her so far, right? Don't you think you should call her and tell her?
> BRENDAN: Yeah.
> WIEGERT: When are you going to do that?
> BRENDAN: Probably tonight.
> WIEGERT: Don't ya think she has the right to know?
> BRENDAN: Yeah.
> WIEGERT Yeah. I think she'd like to hear it coming from you rather than from me.
> BRENDAN: And if she has any questions cuz I'm seeing her tomorrow.
> WIEGERT: OK. She's coming here tomorrow?
> BRENDAN: Mm huh.
> WIEGERT: Then maybe it would be a good idea to call her and tell her before she gets here tonight. That's what I would do. Cuz, otherwise, she's gonna be really mad here tomorrow. Better on the phone, isn't it?
> BRENDAN: Mm huh.

36

(R.170:69:822-23.)  Wiegert repeated this suggestion several times throughout the rest of the interrogation. (R.170:69:861-63.)

After the interrogation ended, Brendan telephoned his mother that same day.  At the beginning of the recorded call, he told her that "Mike [O'Kelly] and Mark [Wiegert] …think I was lying." (R.170:70:2.)  Echoing what O'Kelly had said the previous day, Brendan explained that if he "came out with it," he would only face "twenty or less" years in prison; again echoing O'Kelly, he added that "[t]hey asked me if I wanted to be out to have a family later on."  (R.170:70:2, 5.)  When Brendan began to repeat his confession to her, however, Barb interrupted and protested that Brendan's story could not be true, because she had seen Brendan at home at 5:00 on October 31 – the same time that, according to Brendan's confession, the crime was occurring. (R.170:70:5.)  Brendan gave her the following explanation:

> BARB: What about when I got home at 5:00 you were here.
> BRENDAN: Ya.
> BARB: Ya.  When did you go over there [to Steven's trailer]?
> BRENDAN: I went over there earlier and then came home before you did.
> BARB: Why didn't you say something to me then?
> BRENDAN: I dunno, I was to scared.
> BARB: You wouldn't have had to been scared because I would have called 911 and you wouldn't be going back over there.  If you would have been here maybe she would have been alive yet.  So in those statements you did all that to her too?
> BRENDAN: Some of it.

(R.170:70:5.)

### *The May 4, 2006 Suppression Hearing*

In the midst of these machinations, Kachinsky litigated a motion to suppress Brendan's February 27 and March 1 statements. A *Miranda-Goodchild* hearing was held on May 4, 2006. (R.45.) At that hearing, Kachinsky stipulated that Brendan had not been in custody on either date, thus forgoing *Miranda* arguments. (R.45:6-7.) (App. 378-79.)

At the hearing, the State called Wiegert as its only witness. Wiegert testified that until about halfway through the March 1 interrogation, he had considered Brendan only a witness, not a suspect. (R.45:15.) (App. 387.) He also testified that Brendan was advised on March 1 that he was free to leave. (R.45:25.) (App. 397.) Wiegert denied making any promises to Brendan on March 1 that would have encouraged his cooperation. (R.45:37-38.) (App. 409-410.) He admitted, however, that he had "agreed" during the interrogation that if Brendan was honest, then he would "go to bat" for him. (R.45:38-39.) (App. 410-11.) Wiegert further testified that his questions to Brendan on March 1 were not framed so as to suggest certain answers and that "the detail came from Brendan." (R.45:48, 63.) (App. 420, 435.)

In response, Kachinsky presented brief testimony from Brendan's mother Barb, whom he believed was the best-qualified witness in the world to testify about Brendan's suggestibility. (R.189:234.) Despite this belief, he did not prepare her before the hearing; indeed, she did not understand the purpose of the hearing or why she was being called to testify. (R.189:235-36; R.193:158-59.) At the hearing itself, he elicited testimony from her that Brendan was enrolled in some special education classes and received "really, really bad" grades. (R.45:66.) (App. 438.) Kachinsky admittedly found her testimony "nonresponsive," but he did not question her further about Brendan's

38

suggestibility, instead deciding to "quit while I was ahead." (R.189:235.)

Kachinsky also presented the testimony of school counselor Kris Schoenenberger-Gross, who testified that Brendan had a "borderline to below average" I.Q. with "difficulties expressing himself, verbally, using his words, as well as understanding some aspects of language." (R.45:89, 90.) (App. 461-62.) She brought a number of school records with her, but Kachinsky declined to introduce most of them into evidence. (R.45:100.) (App. 472.) At the close of the hearing, Kachinsky stated that the interrogations involved no "suggestive questioning" and asked the court to suppress Brendan's statements due to the existence of "much subtler" pressures. (R.45:110.) (App. 482.) He never informed the court that Brendan had told his mother on March 1 that he was "not really" guilty and that the police had "got to my head." (R.189:168.)

On May 12, the trial court ruled that Brendan's February 27 and March 1 confessions were voluntary and admissible. (R.26; R.46:11.) (App. 502, 513.) It concluded that when officers told Brendan that "honesty here is the thing that's going to help you," "honesty is the only thing that will set you free," and "come on Brendan, be honest. I told you before that's the only thing that's going to help ya here," they were simply reminding him that "he had a moral duty to tell the truth." (R.46:9.) (App. 500.) Similarly, it ruled that statements like "we'll stand behind you no matter what you did," "if I don't believe in you, I can't go to bat for you," and "Mark and I are in both in your corner. We're on your side" represented attempts to "convince him that a truthful account of events would be in his best interest" and "did not interfere with Brendan Dassey's power to make rational choices." (R.46:10-11.) (App. 501-02.) It also found that when the police presented Brendan with facts about the crime "in order to draw information from him," such

39

tactics were "neither improper nor coercive." (R.46:9-10.) (App. 500-501.) Finally, the trial court added that even if Kachinsky had not stipulated that the interviews were noncustodial, it believed that the appropriate *Miranda* warnings had been given. (R.46:12.) (App. 503.)

### Len Kachinsky Withdraws as Counsel

At some time before August 25, 2006, the trial court learned that Kachinsky had not attended Brendan's May 13 police interrogation and that the State Public Defender had subsequently removed Kachinsky from its Class A felony certification list because it found such a failure "indefensible." (R.49:4, 8.) It thus permitted Kachinsky to withdraw as counsel, reasoning that his "failure to be present while his client gave a statement to investigators, a statement which, according to the special prosecutor's petition filed May 17 supporting his motion to increase bail provided new information to authorities on the crimes charged here, I believe that constituted deficient performance on Attorney Kachinsky's part...This is not the kind of assistance of counsel a defendant should have." (R.49:22.)

After Kachinsky withdrew, he turned over his files to successor counsel Mark Fremgen. Missing from the files, however, was all documentation relating to the events of May 12, as well as the May 5 e-mail in which Kachinsky had offered to lead the State to what he thought was the murder weapon. (R.190:133; R.191:135; R.192:226.) At the *Machner* hearing, Fremgen testified that if he had known about those materials, he would have turned them over to the court as evidence that Kachinsky had been "working for the State." (R.192:225.) Those materials never came to light until postconviction counsel obtained them well after trial from O'Kelly and from the State, respectively.

40

*Mark Fremgen and Raymond Edelstein Represent*
*Brendan at Trial*

On August 29, 2006, Mark Fremgen was appointed to replace Kachinsky. (R.47.) He enlisted Raymond Edelstein as co-counsel and assigned him to handle Brendan's confessions. (R.192:206-07.) During their meetings with Brendan, it was "not uncommon" for him to tell them that he got much of the information in his confession from the news. (R.192:255.) As one of their first acts, Fremgen and Edelstein also filed a motion to reopen the suppression hearing on the basis of ineffective assistance of counsel. (R.52; R.53.) That motion was denied on December 15, 2006. (R.110.)

In October 2006, Fremgen and Edelstein retained forensic psychologist Dr. Robert Gordon to testify about Brendan's suggestibility and the interrogation tactics that police had used on him. (R.191:113-14, 162.) On April 5, 2007, however, the trial court barred Dr. Gordon from testifying on police interrogation tactics – just two weeks before trial was to begin – because Dr. Gordon admitted during a pre-trial deposition that he was "not an expert regarding police interrogations…That would be Dr. Richard Leo." (R.68:23; R.191:170, 176.) At about the same time, Fremgen learned that the State had retained Mr. Joseph Buckley, head of the firm that markets the commonly used Reid interrogation technique, as its own interrogation tactics expert. (R.191:179.)

On April 10, Fremgen asked Beloit psychologist Dr. Lawrence White to testify about the interrogation tactics used on Brendan. (R.170:79.) Fremgen had known about Dr. White since January 17, 2007, when Steven Avery's attorney Jerome Buting informed him that he had retained Dr. White to analyze Brendan's statements. (R.170:73.) As Buting had told Fremgen, Dr. White found "many instances of

41

pressure by the interrogators… leading questions, repeated questions (which often lead to changed answers), questions which 'leak' information and suggest certain responses," and other interrogation techniques that "increas[e] the likelihood of…false or unreliable statements." (R.170:73.) Two months later, on March 22, Buting had reminded Fremgen that Dr. White was an "excellent witness" who was available to testify in the Dassey case and who "will not cost the SPD much because part of his work was already on our tab." (R.170:74.) Yet again on April 6, just a day after Dr. Gordon's testimony was limited by the trial court, Buting e-mailed Fremgen to reiterate that Dr. White was prepared, available and willing to testify about interrogation tactics in the Dassey case. (R.170:77.) After Fremgen finally contacted Dr. White, he agreed to testify on Brendan's behalf because Brendan "deserves to have an expert"; he also recommended Dr. Leo as an alternative. (R.170:79.) As soon as Dr. White agreed to testify, however, Fremgen never contacted him again and proceeded to trial with no interrogation expert at all.

### *Brendan's Trial*

Brendan's trial began on April 16, 2007. (R.113.) The State's case was based squarely on Brendan's March 1 videotaped statement, which was played for the jury almost in its entirety – Brendan's counsel agreed to stop it before the final segment in which Brendan told his mother that he did "not really" do anything and that the police "got to my head." (R.191:194.) Throughout its case, the State repeatedly argued that the March 1 statement was credible because it contained nineteen details that matched the physical evidence. (R.191:198.) For instance, it argued in closing that the jury should "believe the things that the defendant has told us" because Brendan had said on March 1 that Halbach had been shot in the head – a

42

claim that matched the holes in her skull. (R.121:61, 63-64.) During cross-examination of the State's witnesses, however, defense counsel failed to establish – as could have been done – that Brendan's knowledge of every one of those facts could be attributed to fact-feeding by his interrogators, his exposure to media coverage, or his own innocent familiarity with the salvage yard. (R.170:87.)

Beyond the March 1 statement, the State's case-in-chief included the testimony of Brendan's fifteen-year-old cousin Kayla, who testified that Brendan had been losing weight and acting upset between October 31, 2005 and the time of his arrest. (R.115:7.) Kayla further stated that although she had told officers that Brendan said that he had seen body parts in Steven's fire and Halbach "alive and pinned up" in a chair, she had "made up" that story after Brendan's arrest and was "sorry" for doing so. (R.115:13-14; R.116:190-94.) School counselor Susan Brandt testified that at some point prior to Brendan's arrest, Kayla had told her that Steven Avery had asked one of her cousins for help moving a body. (R.115:169.) Finally, the State played an audiotape of Brendan's November 6, 2005 police interview – in which he said he did not know what happened to Halbach – for the jury. (R.116:113; R.79:21.)

During its case-in-chief, the defense called Brendan to testify. He stated that on October 31, 2005, at about 7:00 in the evening, he went over to Steven's back yard, helped him tend an already-burning bonfire by placing castoff tires and a junked van seat on it, cleaned an unknown substance off Steven's garage floor with bleach, and then went home. (R.119:28-29, 32-34, 38-39.) Although at times Brendan struggled to articulate himself, he stated plainly that he never saw Halbach or her body during the entire evening. (R.119:41.) He testified repeatedly that his confession was "made up" and "didn't really happen," and that he "didn't really do it." (R.119:51, 53, 54, 64, 76.) When

43

claim that matched the holes in her skull. (R.121:61, 63-64.) During cross-examination of the State's witnesses, however, defense counsel failed to establish – as could have been done – that Brendan's knowledge of every one of those facts could be attributed to fact-feeding by his interrogators, his exposure to media coverage, or his own innocent familiarity with the salvage yard. (R.170:87.)

Beyond the March 1 statement, the State's case-in-chief included the testimony of Brendan's fifteen-year-old cousin Kayla, who testified that Brendan had been losing weight and acting upset between October 31, 2005 and the time of his arrest. (R.115:7.) Kayla further stated that although she had told officers that Brendan said that he had seen body parts in Steven's fire and Halbach "alive and pinned up" in a chair, she had "made up" that story after Brendan's arrest and was "sorry" for doing so. (R.115:13-14; R.116:190-94.) School counselor Susan Brandt testified that at some point prior to Brendan's arrest, Kayla had told her that Steven Avery had asked one of her cousins for help moving a body. (R.115:169.) Finally, the State played an audiotape of Brendan's November 6, 2005 police interview – in which he said he did not know what happened to Halbach – for the jury. (R.116:113; R.79:21.)

During its case-in-chief, the defense called Brendan to testify. He stated that on October 31, 2005, at about 7:00 in the evening, he went over to Steven's back yard, helped him tend an already-burning bonfire by placing castoff tires and a junked van seat on it, cleaned an unknown substance off Steven's garage floor with bleach, and then went home. (R.119:28-29, 32-34, 38-39.) Although at times Brendan struggled to articulate himself, he stated plainly that he never saw Halbach or her body during the entire evening. (R.119:41.) He testified repeatedly that his confession was "made up" and "didn't really happen," and that he "didn't really do it." (R.119:51, 53, 54, 64, 76.) When

43

asked about his interrogations, he explained that he understood the officers to have promised him "that I won't go away for life." (R.119:43.) He also stated that when the officers told him that what happened wasn't his fault, he understood them to mean that "no matter what" he said, "I wouldn't be taken away from my family and put in jail." (R.119:77.) As for the details of his confession, Brendan testified that he patterned some of them after the best-selling crime novel *Kiss the Girls*, which describes a rape in which the victim is restrained with handcuffs and in which the rapist takes locks of hair from his victims as souvenirs. (R.119:67.)

On cross-examination, however, the State neutralized Brendan's claims of innocence by playing part of the May 13 audio-recorded telephone call between Brendan and his mother, during which Brendan said that he had gone to Avery's trailer after school, saw Halbach there, returned home to see his mother at 5:00, and then went back to Steven's trailer, where he did "some of it." (R.170:70:5; R.193:163-64.) At the *Machner* hearing, Fremgen and Edelstein testified that they "couldn't really come up with any way to defend against" the State's "damning" use of the May 13 telephone call. (R.191:141.)

The defense also called Dr. Gordon to testify that Brendan had received a high score on the psychological test known as the Gudjonsson Suggestibility Scale. (R.120:32-39, 51-56.) On cross-examination, however, the State again played the same segment of the May 13 telephone call to imply that Brendan had confessed a second time in the absence of any suggestion or pressure. (R.120:123.)

Finally, the defense called alibi witness Mike Kornely, who was the supervisor of Brendan's next-oldest brother Blaine. Kornely testified that on October 31, 2005, he called the Dassey residence sometime between about 5:30 and 6:00 PM looking for Blaine, and Brendan answered the phone. (R.118:128-

44

134.) Brendan told Kornely that Blaine was out trick-or-treating and could not come to the phone. (R.118:130.)

Closing arguments in Brendan's case were presented on April 25, 2007. Emphasizing that Brendan knew nineteen correct details about the crime, the State argued that false confessions simply do not happen: "People who are innocent don't confess. The defendant confessed because he was guilty. Because he did it. An innocent person is…not going to admit to this." (R.121:144.) The State also offered a new timeline of the crime that accommodated Kornely's alibi testimony: Brendan must have gone over to Steven Avery's trailer between 4:00 and 4:30 PM on October 31, the State argued, where he saw Halbach imprisoned; he then went back home in time to answer Kornely's telephone call at 5:30 or 6:00 PM, after which he returned to Steven's trailer to participate in Halbach's sexual assault and murder during the evening hours. (R.121:56.) This timeline contradicted Brendan's March 1 confession, in which Brendan claimed that he went to Steven's trailer at about 4:00 PM and stayed there through the late evening. (R.79:34:561-62.) Instead, the State's new timeline was taken directly from Brendan's May 13 statement to police and his May 13 telephone call to his mother: "But he leaves and goes back. We know he goes back. We know he goes back because he tells the police he goes back. We know he goes back because he tells his mother in those phone conversations, ten weeks later on May 13 and May 15, that he went back. That he was there." (R.121:56-57.)

During the defense's closing argument, Edelstein told the jury that "it's more likely" that "when [Brendan] walked over there expecting a Halloween bonfire, and went around with the little cart, and picked up all the stuff, and eventually they start throwing stuff in [the fire], and he probably did see something. Pretty traumatic." (R.121:127-28.)

45

Edelstein had never discussed the possibility of conceding the mutilation of a corpse charge with Brendan. (R.192:253.)

The jury found Brendan guilty of mutilating a corpse, second-degree sexual assault, and first-degree intentional homicide. (R.121:158-60.) On August 2, 2007, Brendan was sentenced to six years imprisonment for the mutilation charge and fourteen years for the sexual assault charge; he received life in prison for the homicide. (R.103:35-36.) Brendan will not become eligible for parole until 2048. (R.103:35-36.)

Counsel filed a postconviction motion on behalf of Brendan on August 25, 2009, requesting a new suppression hearing and a new trial on the basis of ineffective assistance of counsel and in the interests of justice. (R.149; R.150.) The postconviction claims centered primarily on Kachinsky's disloyalty; his failure to adequately conduct the suppression hearing; trial counsel's failure to call a police interrogations expert; and trial counsel's failure to take the basic steps needed to demonstrate the unreliability of Brendan's statements.

A *Machner* hearing was held over a five-day period between January 15 and January 22, 2010. (R.189-193.) At that hearing, police interrogations expert Dr. Richard Leo testified about Brendan's February 27 and March 1 confessions. He explained that police are trained to interrogate suspects using techniques that "psychologically manipulat[e] a suspect to perceive that it's in their self-interest to make incriminating statements." (R.190:124.) In accordance with this training, police begin an interrogation by convincing a suspect that it is "futile to deny" involvement because no one will believe him. (R.190:127-28.) This is accomplished by refusing to listen to the suspect's denials and, if possible, confronting him with evidence of guilt, whether real or fake. (R.190:127.) After the suspect is reduced to

46

hopelessness, interrogators influence him to "see it as in [his] self-interest to confess," using a variety of inducements. (R.190:128.) These inducements can include moral or religious appeals; "minimization," in which the interrogator implies that the suspect is less culpable because the crime was understandable or justifiable; and promises of leniency. (R.190:129.) As a result, the suspect is made to believe that confessing actually offers a way out of his hopeless predicament. Dr. Leo testified that these psychological techniques are so effective that they can cause even the innocent to confess. (R.190:101, 139.) He stated that hundreds of confessions have been proven false, and many more have been shown to be unreliable. (R.190:102-03.)

As for Brendan's confessions in particular, Dr. Leo identified nearly twenty occasions during the February 27 and March 1 interrogations of Brendan Dassey when officers used inducements so powerful that the interrogations became psychologically coercive, including many instances in which quid pro quos were clearly implied. (R.190:176.) He also explained the concept of "contamination," which occurs when interrogators inadvertently provide a suspect with crime scene details through the use of leading questions (R.190:136), or when a suspect learns crime scene facts from the media or by overhearing others talk about the crime. (R.190:136-37.) Dr. Leo testified that Brendan's March 1 confession is highly contaminated and therefore unreliable; in particular, he found that not once did Brendan demonstrate "unique, non-public knowledge that only the true perpetrator could have known and couldn't have been guessed by chance." (R.190:210.)

The trial court denied relief in an opinion dated December 13, 2010. (R.206.) This appeal timely followed.

47

## ARGUMENT

**I. The disloyalty of Brendan's pre-trial attorney, who generated evidence against his own client that was used at trial, constitutes ineffective assistance of counsel that warrants a new trial or, at the least, a new suppression hearing.**

Brendan's attorney, Len Kachinsky, repeatedly breached the duty of loyalty that he owed Brendan in April and May 2006. During the entirety of Kachinsky's representation, Brendan consistently told him that he was innocent and that he had falsely confessed. Nonetheless, Kachinsky unauthorizedly led the State to what he thought was the murder weapon in an effort to portray his client's confession as truthful; and he permitted his agent, private investigator Michael O'Kelly, to use highly coercive interrogation techniques – including falsifying polygraph results, threatening life in prison, and threatening to withdraw legal assistance – to compel Brendan to admit guilt to the police a second time. The fruits of these disloyal efforts were later used against Brendan at trial. Taken together, Kachinsky's extraordinary actions constitute ineffective assistance of counsel such that both a new suppression hearing and a new trial are warranted.

The trial court found that Brendan was not entitled to a new trial because (1) it found that the "actual conflict" standard set out in *Cuyler, Kaye,* and *Love* did not apply to Kachinsky's disloyalty; and (2) it concluded that Kachinsky's behavior did not prejudice Brendan's trial to a sufficient degree. As for Brendan's request for a new suppression hearing, the trial court rejected it by finding, without more, that Kachinsky "adequately represented Dassey's interests" at the hearing. (R.206:7-8, 12.) (App. 207-08, 212.)

The standard governing this Court's review is twofold. To the extent that this Court considers the trial court to have made findings of fact concerning

48

Kachinsky's actions, this Court may overturn those findings if they are clearly erroneous. *State v. Love*, 227 Wis. 2d 60, 67, 594 N.W.2d 806 (1999). In contrast, this Court may review the trial court's conclusions of law, including whether an actual conflict of interest existed, without any deference. *State v. Kalk*, 2000 WI App 62, ¶13, 234 Wis. 2d 98, 608 N.W.2d 428.

## A. The *Cuyler-Kaye-Love* ineffective assistance of counsel standard governs Kachinsky's breach of his duty of loyalty to his client.

Under the Sixth Amendment to the United States Constitution, every criminal defendant is entitled to "counsel whose undivided loyalties lie with his client." *U.S. v. Ellison*, 798 F.2d 1102, 1106 (7th Cir. 1986). Indeed, an attorney's duty of loyalty to his client is "perhaps the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *see also Sands v. Menard*, 2010 WI 96, ¶ 2, 328 Wis. 2d 647, 787 N.W.2d 384 ("An attorney owes a fiduciary duty of loyalty to her clients, a duty so replete in our cases and in the Rules of Professional Conduct as to be axiomatic. Such a duty is deeply rooted in our laws and embodies the strong public policy of the State of Wisconsin"). This tie of loyalty is the bedrock principle on which rests the Constitution's sacred guarantee of counsel and, indeed, our adversarial system of justice. *See Von Moltke v. Gillies*, 332 U.S. 708, 725 (1948) ("Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision").

An attorney who acts under a conflict of interest, however, breaches this duty of loyalty. *See, e.g.*, *Strickland*, 466 U.S. at 692. It is unsurprising, therefore, that when an attorney is burdened by a

49

conflict of interest, his actions are necessarily repugnant to the Constitutional guarantee of loyal counsel such that they constitute ineffective assistance. *See id.*; *State v. Kaye*, 106 Wis. 2d 1, 9, 315 N.W.2d 337 (1982) ("A defendant's constitutional right to the effective assistance of counsel certainly includes the guarantee that his counsel not proceed when there appears to be an actual conflict of interest").

Unlike most ineffective assistance of counsel claims, claims of ineffectiveness based on conflicts of interest are not measured under the usual performance and prejudice test set out in *Strickland v. Washington*. Rather, they are measured under the ineffectiveness standard set out in *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *See Strickland*, 466 U.S. at 692 (when defense counsel "breaches the duty of loyalty," he "operates under a conflict of interest" governed by *Cuyler*).

*Cuyler* establishes that when a defendant bases a claim of ineffectiveness on a conflict of interest, he is entitled to relief upon showing that "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. The Wisconsin Supreme Court first interpreted *Cuyler*'s language in *State v. Kaye*, 106 Wis. 2d 1, 8, 315 N.W.2d 337 (1982):

> In order to establish that he was denied effective representation by counsel, [defendant] must establish by clear and convincing evidence that an actual conflict of interest existed. It is not sufficient that he show that a mere possibility or suspicion of a conflict could arise under hypothetical circumstances. However, [defendant] does not have to show actual prejudice; once he shows an actual conflict he is entitled to relief.

*Kaye*, 106 Wis. 2d at 8. The *Kaye* court emphasized that *Cuyler* did not require that "a defendant must first show an actual conflict and then prove that some kind of specific adverse effect or harm resulted from this

50

conflict…this seems to be a nearly impossible burden to meet." *Id.* at 8-9. Instead, "the harm to a defendant necessarily follows once it has been demonstrated that his lawyer actively represented a conflicting interest." *Id.* at 9.

Seventeen years later, the Wisconsin Supreme Court reaffirmed the *Cuyler-Kaye* standard in *State v. Love*, 227 Wis. 2d 60, 594 N.W.2d 806 (1999):

> In order to establish a Sixth Amendment violation on the basis of a conflict of interest, a defendant who did not raise an objection at trial must demonstrate by clear and convincing evidence that his or her counsel had an actual conflict of interest…An actual conflict of interest exists when the defendant's attorney was actively representing a conflicting interest, so that the attorney's performance was adversely affected. Once an actual conflict of interest has been established, the defendant need not make a showing of prejudice because prejudice is presumed. Counsel is considered per se ineffective once an actual conflict of interest has been shown.

*Love,* 227 Wis. 2d at 71. It reiterated that to show an "actual conflict," a defendant must point to "some deficiency in the attorney's performance either in what was done or in what was not done," rather than simply identifying "a mere possibility or suspicion of a conflict [that] could arise under hypothetical circumstances." *Love,* 227 Wis. 2d at 69-70, 71. Taken together, *Kaye* and *Love* make clear that once a defendant shows that his attorney was burdened by an "actual conflict," then he is entitled to relief. *Love*, 227 Wis. 2d at 70.

The trial court denied relief in part because it declined to apply the *Cuyler-Kaye-Love* actual conflict standard to the conflict inherent in Kachinsky's efforts to assist the State's prosecution of his own client. (R.206:7-9.) (App. 207-09.) It reasoned that most *Cuyler-Kaye-Love* cases involve conflicts arising from

51

counsel's dual representation of codefendants, not conflicts arising from counsel's provision of aid to the State. The trial court further interpreted *Love* as declining to extend what it called a "per se rule" of prejudice beyond dual representation cases. After rejecting the *Cuyler-Kaye-Love* actual conflict standard, the trial court applied a novel hybrid of the *Cuyler* standard and the standard set out in *U.S. v. Cronic*, 466 U.S. 648 (1984). (R.206:9 (discussing whether Kachinsky's conduct constituted an actual conflict of interest, but citing *Cronic* for the proposition that Dassey had to "show that the reliability of the trial process itself was somehow negatively affected").) (App. 209.) Under this hybrid standard, the trial court concluded that Kachinsky's actions did not warrant relief.[4]

Contrary to the trial court's view, the *Cuyler-Kaye-Love* standard clearly applies to many different types of conflicts of interest. While most conflicts admittedly arise out of a lawyer's dual representation of codefendants, *Cuyler*'s "constitutional principle is not narrowly confined to instances of that type." *U.S. v. Hurt*, 543 F.2d 162, 166 (D.C. Cir. 1976) (applying *Cuyler* to a case involving a conflict between an attorney's personal interests and the interests of his client); *Spreitzer v. Peters*, 114 F.3d 1435, 1451 n.7 (7th Cir. 1997) (holding that "we have routinely applied…the *Cuyler*…standard to conflict of interest cases which are not multiple representation cases, and we do so here," where a defense attorney had previously worked as a prosecutor on the same case).

When the trial court suggested that the *Love* court had declined to extend the *Cuyler-Kaye* actual conflict standard beyond dual representation cases, it

---

[4] While the trial court characterized Appellant as having relied on *U.S. v. Cronic*, Appellant did not cite *Cronic* in his Post-Conviction Motion or post-hearing Brief in Support of Post-Conviction Motion at all. (R.206:7.) (App. 207.)

52

misconstrued the holding of *Love*. In fact, *Love* is a perfect example of the applicability of the *Cuyler-Kaye-Love* "actual conflict" standard to different types of conflicts. The issue in *Love* was not dual representation but serial representation, which occurs "when an attorney represents one party in a case, then switches sides to represent the other party in the same proceeding or in an unrelated case." 227 Wis. 2d at 73. The defendant argued that while the *Cuyler-Kaye* "actual conflict" standard applied to dual representation cases, an automatic rule of "per se" prejudice should govern cases of serial representation – a rule that would have erased *Kaye*'s threshold requirement that an "actual conflict" must be shown before prejudice is presumed. *Id*. at 78. It was this particular "per se" rule that the *Love* court rejected; instead, it held that the *Cuyler-Kaye* "actual conflict" standard applies not only to dual representation cases but also to serial representation cases. *Id*. at 79. It cannot reasonably be disputed, therefore, that the *Cuyler-Kaye-Love* "actual conflict" standard applies to different kinds of conflicts, not just dual representation cases. The trial court's contrary conclusion – as well as its flawed reading of *Love* – was an error of law.

Even further, *Love* demonstrates that the *Cuyler-Kaye-Love* "actual conflict" standard applies to the specific conflict present in the instant case: namely, the conflict inherent in a defense attorney's efforts to assist the prosecution. In *Love,* the serial representation issue involved a defense attorney who had formerly served as a prosecutor in the same case. In concluding that the *Cuyler-Kaye-Love* "actual conflict" standard applies to such a conflict, the *Love* court established that it governs "side-switching" scenarios in which a defense lawyer harbors loyalties to the State. 227 Wis. 2d at 79; *see also Spreitzer*, 114 F.3d at 1451 n.7 (applying the *Cuyler* "actual conflict" standard when a defense attorney's loyalties to his client were in question because he had previously

53

worked as a prosecutor on the same case). Kachinsky's efforts to assist the prosecution of his own client amount to a closely related – albeit more egregious – variant on the *Love* fact pattern.

Other jurisdictions, moreover, have already concluded that an "obvious" conflict of interest of the type governed by *Cuyler* is present in those blessedly rare cases in which a defense attorney shows loyalty to the prosecution. *See Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763, at *31 (E.D. Mich. Mar. 30, 2001) (an "obvious" conflict of interest arises when a defense attorney "abandons his or her duty of loyalty to the client and joins the prosecution in an effort to obtain a conviction") (citing *Dixson v. Quarles*, 627 F.Supp. 50, 53 (E.D. Mich. 1985) (discussing *Cuyler* standard)) (App. 551-61); *U.S. v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991) (an attorney's "abandonment of his duty of loyalty to his client by assisting the prosecutor also created a conflict of interest"); *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988) (attorney who publicly stated that client could not be rehabilitated and acted "apparently with the intention to weaken his client's case" suffered from a "conflict in loyalty"). Even *Strickland* itself establishes that when defense counsel "breaches the duty of loyalty" – as Kachinsky unquestionably did here – then he "operates under a conflict of interest" governed by *Cuyler*. 466 U.S. at 692. In short, these cases all demonstrate that Kachinsky's breach of the duty of loyalty is governed by *Cuyler* and, in Wisconsin, its progeny in the form of *Kaye* and *Love*. Because Kachinsky's actions meet the *Cuyler-Kaye-Love* "actual conflict" standard, moreover, Appellant is now entitled to relief.

**B. Attorney Kachinsky was burdened by an "actual conflict" when he breached his duty of loyalty to Brendan by providing incriminating evidence to the State.**

54

Attorney Kachinsky's disloyalty to his client stemmed from two basic facts: Brendan repeatedly told Kachinsky that he was innocent, yet Kachinsky sought to compel him to cooperate with the State and plead guilty. Indeed, in an effort to induce both his client and the State to enter into a plea deal, Kachinsky went so far as to provide evidence that he thought incriminated his client to the State without Brendan's permission or knowledge. Such concrete instances of disloyalty violate every basic principle of the attorney-client relationship and prove the existence of an actual – not merely a hypothetical – conflict of interest.

Throughout his representation, Kachinsky apparently planned to resolve the case by having his client plead guilty and testify against Steven Avery in exchange for leniency. His earliest remarks to the media foreshadowed this plan; on the same day he was appointed, for instance, he told the press that Brendan was "morally and legally responsible." (R.173:317, 374.) Kachinsky made this remark, which he later conceded was an admission of Brendan's guilt (R.193:228-29), before he had even met his client or discussed his plea idea with him.

There were, however, two obstacles to Kachinsky's guilty plea strategy. First, the State had extended no plea offer – and would not do so until two months later. (R.189:42, 66, 80.) Second, when Kachinsky met his client, Brendan told him that he was innocent and that he had falsely confessed. (R.189:137-38, 237, 250; 190:11.) Rather than being dissuaded by these obstacles, however, Kachinsky embarked on a two-front campaign designed both to convince Brendan to plead guilty and to convince the State to view Brendan as a cooperative defendant who deserved a plea deal. Viewed – as it must be – against the reality that Brendan was insisting on his innocence, this campaign soon ran terribly afoul of the Constitutional guarantee of loyal counsel.

To convince the State to view Brendan in a

55

"positive light," Kachinsky took several concrete steps that trespassed far beyond standard plea negotiation practices. (R.189:47; 190:69; 192:174.)  In April 2006, he hired Michael O'Kelly, a so-called defense investigator. (R.189:187-89.)  Instead of directing him to locate and interview defense witnesses, however, Kachinsky tasked O'Kelly with gathering physical evidence supporting the State's case against Avery – even if that evidence also inculpated Brendan.[5] (R.192:44, 46-47, 53.)  O'Kelly soon developed information indicating that a knife – which he believed was one of the murder weapons – was hidden on the Avery Salvage Yard. (R.192:42.)  In an email dated April 27, he asked Kachinsky to "protect" that evidence "for the prosecution in Avery's case" because it could "corroborate [Brendan's] testimony and color him truthful." (R.192:43-47; R.170:64.)  Kachinsky e-mailed this information directly to D.A. Kratz and Wiegert on May 5 – adding, moreover, that O'Kelly's information "may go a long way toward getting you…PC for another search of the Avery salvage yard." (R.173:338; R.189:237; R.190:11; R.181.) (App. 487.)  Crucially, Kachinsky disclosed this information to the State without his client's knowledge or consent. (R.189:237.)  And while he did it without apparent concern for the fact that Brendan was claiming his innocence, he was concerned enough about his own role to request that he "stay unnamed in

---

[5] O'Kelly was the perfect man for the job.  His contemporaneous e-mails to Kachinsky reveal that he nurtured a robust hatred of the Avery family: "These are criminals…This is truly where the devil resides in comfort.  I can find no good in any member.  These people are pure evil…A friend of mine suggested '*This is a one branch family tree.  Cut this tree down.  We need to end the gene pool here.*'" (R.170: 66 (italics in original).)  At the *Machner* hearing, furthermore, O'Kelly tearfully admitted that his emotions sided with Halbach rather than with his own client. (R.192:95-96.)

56

any affidavit for a search warrant." (R.181; R.173:338.) (App. 487.) Brendan, of course, had described handling a knife in his March 1 confession (R.79:34:586-87) (App. 281-82); thus, had it existed, that knife could have yielded damning fingerprint or DNA evidence. Fortunately, O'Kelly's hunch was wrong; the State's investigators went straight to the salvage yard but found no knife at all. (R.193:88.)

While using his defense investigator to build the State's case against Avery – and, incidentally, against Brendan – Kachinsky was also lobbying Brendan to plead guilty. But rather than use traditional client counseling methods, he repeatedly made public statements that, in his own words, were intended to send a "message" to Brendan's family and, importantly, to "Brendan himself" that he "might take a legal option that they don't like." (R.189:137.) After visiting Brendan in jail and hearing his claims of innocence, Kachinsky falsely told the press that his client was "remorseful" (R.189:133); that he could be "easily led into the offenses he allegedly committed" (R.189:135-36); that Brendan's not guilty plea was intended "simply to keep [his] options open" (R.173:321); that "it didn't appear to me that [his interrogators] were putting words in his mouth" (R.173:325; R.189:175-76); and that he hadn't "ruled out negotiating a plea deal." (R.189:132.) Despite all these public "messages" from his own attorney, however, Brendan continued to insist on his innocence.

To shore up his efforts, Kachinsky formulated a new plan: on or before April 23, he decided to send O'Kelly to interrogate Brendan in order "to get Brendan to confess." (R.192:47, 50; R.173:353.) To execute this plan, O'Kelly undertook weeks of preparation – much of it done with the knowing assistance of the State. In early May, for instance, O'Kelly met with the State to obtain crime scene photographs that everyone present knew he intended to use to interrogate his own client. (R.170:65; R.192:67-

57

68.) Kachinsky later testified that at this time, even he recognized that O'Kelly was "doing the prosecutor's work for him" – but he allowed him to continue unchecked. (R.189:241, 243.)

As for the date, Kachinsky directed O'Kelly to interrogate Brendan on May 12, 2006 – the same day that the trial court was expected to rule on Kachinsky's then-pending motion to suppress Brendan's February 27 and March 1 statements. Kachinsky believed that the anticipated loss of that motion would leave Brendan maximally vulnerable that day. (R.189:244; R.192:104.) To fully capitalize on this opportunity, O'Kelly and Kachinsky also agreed that Kachinsky would stay away from his client until May 12 so that Brendan would feel "alone" and view O'Kelly's visit as a "source of relief." (R.170:66; R.192:88.) (App. 488.) Kachinsky even cancelled a visit he had planned for May 10. (R.170:66; R.192:88.) (App. 488.)

On May 12, just hours after the trial court denied Kachinsky's motion to suppress, O'Kelly conducted a videotaped interrogation of Brendan. (R.170:95.) He began by sitting Brendan down at a table covered with his interrogation props and confronting him with the results of a polygraph that O'Kelly had given him a month earlier. (R.170:95, R.194:1.) (App. 514.) Although O'Kelly had earlier told Kachinsky that Brendan's results were inconclusive (R.189:210), he now told Brendan that his score indicated a 98% probability of deception. (R.194:1.) (App. 514.) When Brendan told O'Kelly that he was innocent and explained that on March 1 he had been merely "guessing" and agreeing to "whatever [the police] said," O'Kelly refused to listen. (R.194:5.) (App. 519.) He promised that if Brendan confessed again, then "I'll help you through this process and you will not be doing life in prison." (R.194:5.) (App. 519.) In that event, he said, Brendan could "get out and have a family" in as soon as "twenty years" – a made-up number, since no plea

58

offer had yet been extended. (R.194:21; R.189:42, 66, 80.) (App. 534.) If Brendan denied involvement, on the other hand, O'Kelly told him that his defense team would do nothing to help him escape a frightening fate: "[I]f you lie to me, guess what I have to do? I have to stand up, put everything away, and leave. Because that means that you want to go to prison for the rest of your life. If you want to go to prison for the rest of your life because you're going to hang onto some lies, then I can't help you." (R.194:3.) (App. 517.) Pleading not guilty, it seemed, was no longer an option for Brendan.

In the wake of these direct threats and promises, Brendan eventually began making admissions for the first time since his March 1 police interrogation. (R.194:5-16.) (App. 518-29.) Under O'Kelly's watchful eye, he gradually wrote out a full confession, and after O'Kelly told him that he wanted Brendan to repeat his confession to the police, he yielded to that suggestion too. (R.194:18.) (App. 531.) After O'Kelly informed him of these developments, Kachinsky quickly arranged a meeting between Brendan, Wiegert, and Fassbender for the following morning, May 13, 2006. (R. 194:16-19; R.173:356.) (App. 529-32.) Thus, on May 13 – alone in the interrogation room, with neither Kachinsky nor O'Kelly by his side – Brendan gave police an hours-long, videotaped confession to the rape and murder of Ms. Halbach. (R.172:211.) While much of this confession was a rambling, inconsistent "fiasco," it did include some new damaging facts, including that the attack on Halbach had been planned in advance. (R.189:97; R.170:69:796-99.)

The pile of incriminating evidence that had been generated as a direct result of Kachinsky and O'Kelly's machinations, however, was not yet complete. In the midst of the May 13 interrogation, the officers proposed a new idea to Brendan: "[T]ell your mother the truth about this…before we tell her."

59

(R.170:69:822-23, 861-63.) Brendan agreed to confess to his mother during her next visit, but the officers insisted that he not wait to see his mother in person. Instead, they specifically redirected him to confess to her over the recorded prison telephones. (R.170:69:822-23.) O'Kelly, who was monitoring the interrogation from another room via closed circuit video (R.193:104), claimed he did not notice the police repeatedly instructing Brendan to call his mother and confess (R.192:166); for his part, Kachinsky did not attend the interrogation at all and had no idea what the police were putting into his client's head. (R.190:43-45.) After the police allowed him to return to his cell, Brendan did as he was told. Later that day, he called his mother and tearfully told her over the recorded prison telephones that Steven had made him do "some of it." (R.172:238.)

Attorney Kachinsky's actions during the course of his representation of Brendan Dassey are largely unprecedented in the state of Wisconsin. His misguided efforts to maneuver Brendan into a plea deal resulted in the coercion of his own client, the creation of multiple taped confessions, and the attempted turnover of the supposed murder weapon to the State – all despite Brendan's long-held claims of innocence. (R.189:250.) These actions cannot be understood as the efforts of loyal counsel. They are the actions of an attorney who "abandons [his] duty of loyalty and joins the prosecution in an effort to obtain a conviction" – a conviction that, in this case, would have taken the form of a guilty plea. *Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763, at *31 (E.D. Mich. Mar. 30, 2001) (App. 551-61); *see also U.S. v. Marshank*, 777 F. Supp. 1507, 1520 (N.D. Cal. 1991) (finding that defense counsel's representation of Marshank "was rendered completely ineffectual" when he "essentially turned Marshank over to the government in an effort to force him to cooperate" and "attempt[ed] to worsen Marshank's position vis-a-vis

60

the government in order to ensure that Marshank would cooperate").

At the *Machner* hearing, Kachinsky testified that his actions should be excused because they were motivated by a benign desire to induce the State to extend a plea offer. [6] (R.190:67-68, 224.) Even if this is true, it cannot justify his actions. It is axiomatic that the decision to plead guilty belongs only to the accused. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The decision to deal with the State was not Kachinsky's to make – or to force onto his client – no matter how badly he wanted a deal to be reached.

Furthermore, even if Kachinsky meant well, his intentions cannot alter the fact that he and his agent, Michael O'Kelly, forced Brendan to incriminate himself without any protections in place whatsoever. (R.190:8.) *See Marshank*, 777 F. Supp. at 1520 (calling representation "completely ineffectual" when an attorney advised his client to "provide [law enforcement] with incriminating information on the record and with no protections as a 'sign of good faith'"). As of May 13, 2006, the State had neither extended a plea offer nor requested a proffer (R.189:42, 66, 80); in fact, Kachinsky had explicitly agreed with D.A. Kratz on May 12 that the State was offering "no consideration" for Brendan's confession on May 13. (R.173:356; R.189:80; R.190:34.) Kachinsky had obtained no immunity for Brendan and did not discuss with the State in advance whether Brendan's new inculpatory statements would later be used against him. (R.190:36-38.) He did not attend the May 13 interrogation and had established no

---

[6] Kachinsky's testimony cannot credibly be viewed as evidence of his loyalty to Brendan: "[I]t is highly unlikely that an attorney would testify that he was laboring under a conflict of interest; this would be an admission of a violation of his ethical duties to his clients. Thus,…evidence of a conflict must be found in the record." *Kaye*, 106 Wis.2d at 13-14.

61

ground rules for his client's protection. (R.172:211; R.173:356; R.190:22, 29, 38.) Even if Kachinsky's motivations were benevolent in the abstract, that does not change the reality of what he did: "An attorney's good intentions [when providing incriminating information to the State] do not change the nature of this incriminating information." *State v. Dadas*, 190 Wis. 2d 339, 346-47, 526 N.W.2d 818 (Ct. App. 1994) (granting relief under the *Cuyler-Kaye* "actual conflict" standard where an attorney's conflict of interest led to the provision of incriminating information to the State, despite the attorney's good intentions).

Kachinsky's multiple, concrete acts of disloyalty satisfy *Kaye* and *Love*'s requirement that an "actual" conflict exist. Indeed, his disloyalty progressed far beyond the realm of the merely possible or hypothetical. *See Love,* 227 Wis. 2d at 69-70, 71 (an actual conflict exists when there is "some deficiency in the attorney's performance either in what was done or in what was not done," as opposed to "a mere possibility or suspicion of a conflict [that] could arise under hypothetical circumstances"). In fact, Wisconsin courts have already concluded that when a conflict of interest induces an attorney to provide incriminating information to law enforcement, those actions are enough to prove the existence of an actual conflict. *See Dadas*, 190 Wis. 2d at 346-47 (finding that the act of providing incriminating information to the State satisfies the "actual conflict" standard and granting relief); *see also U.S. v. Davis*, 239 F.3d 283, 287 (2d. Cir. 2001) (allegations that counsel "had threatened not to investigate [defendant's] case and not to file pre-trial motions if [defendant] did not accept the plea" were "sufficient to create an actual conflict of interest"). Because Attorney Kachinsky plainly labored under an actual conflict of interest, his actions constitute ineffective assistance and entitle Brendan to relief. *Love*, 227 Wis. 2d at 70.

62

**C. Brendan is entitled to relief in the form of a new trial because the fruit of Attorney Kachinsky's actual conflict – an audio-recorded confession to Brendan's mother – was used against him at trial.**

Despite this troubling factual backdrop, the trial court denied Brendan's request for a new trial because Kachinsky withdrew in August 2006 before trial began. (R.206:9.) (App. 209.) That withdrawal occurred after the trial court learned only that Kachinsky had failed to attend the May 13 police interrogation of his client.[7] Based on its knowledge of that single misdeed, the trial court concluded that his performance had been deficient.[8] (R.49:22.) In rejecting Brendan's later, fully developed postconviction request for a new trial, the trial court determined that the lasting effects of Kachinsky's misdeeds on trial had not been prejudicial enough to warrant retrial. (R.206:9.) (App. 209.)

Appellant does not contest that Kachinsky withdrew from his case before trial. But when the trial court denied Brendan relief, it failed to understand that removing Kachinsky from the case was only a partial remedy for the harm Brendan suffered from the months-long denial of loyal counsel. While Kachinsky's withdrawal prevented his disloyalty from continuing, it did nothing to contain the effects of his disloyalty or to prevent it from tainting the trial. And taint the trial it did: the State used the fruits of Kachinsky's disloyalty – specifically, the recorded

---

[7] Most of the other facts surrounding Kachinsky's provision of incriminating information to the State were developed by postconviction counsel.

[8] The Wisconsin Public Defender also removed Kachinsky's felony certification after learning that he failed to attend Brendan's May 13, 2006 police interrogation. (R.170:58.) At the time, it too did not know of Kachinsky's other misdeeds.

63

admissions that Brendan made during his May 13, 2006 telephone call to his mother – during cross-examination of Brendan himself, during cross-examination of Brendan's expert witness, and during closing argument as a means of neutralizing Brendan's alibi.

First, the State played the climactic moment of the May 13 telephone call – when Brendan told his mother that Steven made him do "some of it" – during its cross-examination of Brendan himself. (R.193:162-64; R.119:50.) The impact of that telephone call cannot be underestimated. The heart of Brendan's defense, after all, was that he was a naïve, suggestible teen who had falsely confessed on March 1 because police pressured him and told him what to say. When Brendan took the witness stand, his testimony matched his defense: he never saw Halbach on the day she disappeared, he told the jury (R.119:41); his confession was "made up" and "didn't really happen" (R.119:51, 53, 54, 64, 76); and he had only confessed on March 1 because his interrogators made him believe that "no matter what" he said, he "wouldn't be taken away from my family and put in jail." (R.119:77.)

To put it bluntly, Brendan's false confession defense was eviscerated by the State's use of the May 13 telephone call on cross-examination. Just as Brendan finished telling the jury that he had falsely confessed because the police had pressured him, the State confronted him with a second confession – one that, it appeared, he had given his mother freely during what seemed to be a casual telephone conversation.[9] Brendan's trial counsel found the State's use of the May 13 telephone call "damning." (R.191:141.) That telephone call cut so sharply against trial counsel's

_____

[9] The May 13 videotaped police interrogation, during which Wiegert and Fassbender repeatedly instructed Brendan to call his mother and confess, was not introduced at trial.

64

false confession defense, in fact, that they "couldn't really come up with any way to defend against" it. (R.191:141.)

Prosecutors also used the same portion of the May 13 call to devastating effect during their cross-examination of psychologist Dr. Robert Gordon. (R.120:123.) Dr. Gordon testified that Brendan had scored in the ninety-fifth percentile on the psychiatric test known as the Gudjohnsson Suggestibility Scale – lending support to the defense's theory that on March 1, Brendan was simply repeating what the police led him to say. (R.120:51-56.) Again, however, the State played the May 13 telephone call during cross-examination of Dr. Gordon to show the jury that Brendan had confessed a second time absent any apparent suggestion. In this way, the May 13 call allowed the State to render Dr. Gordon's testimony irrelevant: It simply did not matter if the March 1 confession was a product of suggestion, the State implied, because any resulting concerns about its unreliability could be quieted by the existence of the May 13 telephone call.

Finally, the State expressly relied on the May 13 telephone call during closing to construct a timeline of the crime that accounted for Brendan's alibi. (R.121:56-57.) On March 1, Brendan had told the police that he and Avery attacked Halbach after Brendan came home from school, in the late afternoon and early evening hours of October 31. But the defense proved this part of the March 1 confession false, at least, by offering the testimony of Mike Kornely, the supervisor of Brendan's brother. Kornely testified that he called the Dassey residence around 5:30 or 6:00 PM on October 31 and spoke to Brendan at that time. (R.118:129-30.) His testimony implied that if the timeline Brendan gave police on March 1 was false, then perhaps other things he said that day were false too.

If the State had no other evidence besides the

65

March 1 confession, this implication would have remained intact and unchallenged. However, the State was able to solve the problem of Mike Kornely's alibi for one reason: because it possessed that May 13 telephone call. In closing argument, it reminded the jurors of what Brendan had said during the May 13 telephone call:

> BARB: What about when I got home at 5:00 you were here.
>
> BRENDAN: Ya.
>
> BARB: Ya. When did you go over there [to Steven's trailer]?
>
> BRENDAN: I went over there earlier and then came home before you did.

(R.170:5.) Relying on that call, the State argued that Brendan must have gone to Avery's house after school, gone home around 5:00 to see his mother and to take Kornely's call, and then returned to Avery's house to participate in Halbach's murder: "But he leaves and goes back. We know he goes back. We know he goes back because he tells the police he goes back. We know he goes back because he tells his mother in those phone conversations, ten weeks later on May 13 and May 15, that he went back. That he was there."[10] (R.121:56-57.) Very plainly, Mike Kornely's alibi could not have been explained away if the May 13 telephone call had never come into existence.

Indeed, the May 13 telephone call would never have come into existence but for the disloyal actions of Attorney Kachinsky. Kachinsky dispatched O'Kelly to interrogate Brendan until he confessed; after Brendan broke under O'Kelly's questioning,

---

[10] Moreover, the State's assertion that "[w]e know he goes back because he tells the police he goes back" is a reference to the (unintroduced) May 13 police interrogation – which, of course, is also a product of Kachinsky's disloyalty.

66

Kachinsky arranged the May 13, 2006 police interrogation (and decided not to attend it); and it was during that police interrogation that Wiegert, after being told by O'Kelly that Brendan liked and trusted him, instructed an uncounseled Brendan to call his mother on the recorded prison telephones that very day – "before I do" – and tell her of his guilt. (R.170:69:829.) Even the substance of the May 13 call itself shows the lasting influence of Brendan's disloyal defense team on his decision to confess to his mother. At the beginning of the call, Brendan told his mother that "Mike [O'Kelly] and Mark [Wiegert]…think I was lying," running defense investigator and police officer together in his speech as if they were an indistinguishable unit. (R.170:70:2.) Echoing exactly what O'Kelly had said the previous day, Brendan then told his mother why he was confessing: if he "came out with it," he would only face "twenty or less" years in prison. (R.170:70:2.) He added that "[t]hey asked me if I wanted to be out to have a family later on," again referencing not what the police had said, but what *O'Kelly* had said on May 12. (R.170:70:5.) As his own words show, that May 13 telephone call would never have come into being but for the actions of Kachinsky and O'Kelly on May 12, 2006.

Because the fruits of Kachinsky's disloyalty were allowed to influence Brendan's trial in these ways, it matters not that he withdrew before trial. *See U.S. v. Tatum*, 943 F.2d 370, 379 (4th Cir. 1991) (granting a new trial where, even though a conflicted attorney was removed prior to trial, the trial was still "infected"); *cf. Henderson v. Frank*, 155 F.3d 159, 170 (3rd Cir. 1998) (the denial of a defendant's right to counsel pre-trial necessarily impacts trial). To fully remedy Kachinsky's disloyalty before trial, the trial court would have had to exclude the May 13 telephone confession and otherwise ensure that his misconduct did not adversely affect Brendan's trial. Since that remedy was not issued, the only available cure at the

current stage is a new trial.

This would still be true even if the May 13 telephone call were far less damaging evidence. The trial court's denied relief because the State's use of the May 13 telephone call was not sufficiently prejudicial; but the availability of relief under *Cuyler* has never depended on "nice calculations of prejudice." *Ellison*, 798 F.2d at 1107 (quoting *Cuyler*, 446 U.S. at 349); *Lopez v. Scully*, 58 F.3d 38, 43 (2d Cir. 1994) (explaining that "harmless error analysis is inappropriate" in the context of a *Cuyler* claim); *Love*, 227 Wis. 2d at 71 ("Once an actual conflict of interest has been established, the defendant need not make a showing of prejudice because prejudice is presumed"). Indeed, the Wisconsin courts have consistently refused to assess degrees of prejudice in *Cuyler-Kaye-Love* cases once an actual conflict has been detected. *See, e.g.*, *Dadas*, 190 Wis. 2d at 346-47 (noting that the incriminating evidence generated by a conflicted attorney constituted some unspecified "portion" of the total evidence used against the defendant); *State v. Franklin*, 111 Wis. 2d 681, 689 n.2, 331 N.W.2d 633 (Ct. App. 1983) ("Because the record shows Hetzel actually represented conflicting interests, the trial judge's statement that he had made up his mind to impose the five-year term prior to the sentencing hearing is of no consequence for, if an actual conflict is demonstrated, the defendant does not have to show he was prejudiced thereby"). The courts have refused to parse degrees of prejudice precisely because it is too difficult to identify and quantify all the adverse effects that flow from an attorney's disloyalty. *See Kaye*, 106 Wis. 2d at 9 (stating that requiring a defendant to identify a "specific adverse effect or harm" flowing from an actual conflict is a "nearly…impossible burden to meet"); *Ellison*, 798 F.2d at 1107 (explaining that the *Cuyler* "presumption of prejudice is necessary because a true conflict of interest forecloses the use of certain strategies and thus the

68

effect is difficult if not impossible to measure"). In this way, the trial court's ruling directly contradicts the well-established principle that *Cuyler* claims will not be denied simply because the defendant has not shown sufficient prejudice.

It is worth noting that in this case, the trial court could not have granted a complete remedy before trial, because it did not know then that the May 13 telephone call was a product of Kachinsky's disloyalty. Until the postconviction stage, almost none of the facts concerning Kachinsky's disloyalty were known either to defense counsel or to the court. This lack of knowledge is largely attributable to the fact that Kachinsky kept his successors, Mark Fremgen and Ray Edelstein, in the dark about many of his efforts. He never gave Fremgen or Edelstein the videotape of O'Kelly's May 12 interrogation of Brendan, for example, which Fremgen testified he would have turned over to the court as evidence that Kachinsky was "working for the State." (R.190:133; R.192:225.) Neither did Kachinsky give them the May 5 e-mail in which he had offered to lead the State to what he thought was the murder weapon. (R.191:135; R.192:226.) Because of these omissions, Fremgen and Edelstein did not know the full extent of Kachinsky's disloyalty and could not have alerted the court to it.

The State was also silent, though perhaps better informed, regarding Kachinsky's behavior. *See Tatum*, 943 F.2d at 279-80 (noting that "when a conflict situation becomes apparent to the government, the government has a duty to bring the issue to the court's attention and, if necessary, move for disqualification of counsel"). As a recipient of Kachinsky's May 5 e-mail alerting the State to the supposed location of the knife, D. A. Kratz admitted at the *Machner* hearing that he knew that Kachinsky was trying to turn over the murder weapon to the State, and that such evidence could have been used against Brendan. (R.181; R.173:338; R.189:69-70.) (App.

69

487.) His officers were also aware throughout early May 2006 that the defense team was planning to obtain another admission from Brendan, even though, as Fassbender testified, he was "now denying involvement." (R.193:91, 203.) In fact, while reviewing crime scene photographs with O'Kelly in early May, Investigator Dedering made clear that he understood that O'Kelly's mission was to "elicit" an "admission" from an unwilling Brendan, sympathetically telling him "I wouldn't want to be in your shoes." (R.192:60, 64, 101-02.) Even further, both Fassbender and Wiegert witnessed O'Kelly's disloyalty firsthand. Not only did he offer them a verbal preview of Brendan's admissions on the morning of May 13 in what Wiegert recognized as an apparent breach of the attorney-client privilege (R.193:103), but during a break in their May 13 interrogation of Brendan, O'Kelly also advised the two officers that they would be more likely to get a confession out of Brendan if they switched seats and roles – advice that they followed and that eventually led to a confession. (R.192:163-64; R.193:106, 218-19.) Despite these red flags of disloyalty, however, the State never raised the issue before the trial court.

Regardless of who should have alerted the trial court to its existence, the fact that the court was not informed of Kachinsky's conflict of interest in time to prevent its fruits from tainting trial makes the final analysis simple. Because Kachinsky's actual conflict of interest influenced Brendan's trial, Brendan is entitled to a new one. To hold otherwise would be to sanction a scenario in which "damning" evidence that would not have existed absent a defense attorney's disloyalty was freely used to send a defendant to prison for life. Such an outcome cannot be acceptable in a state whose Supreme Court has held that "it is not satisfactory to condemn relationships which are labeled as 'actual conflicts of interest,' then disregard them." *Love*, 227 Wis. 2d at 83. For these reasons,

70

Brendan Dassey respectfully requests that this Court reverse the trial court's judgment and grant him a new trial.

**D. At minimum, Len Kachinsky's conflict of interest entitles Brendan to relief in the form of a new suppression hearing.**

Even if this Court does not grant Brendan a new trial, he is surely entitled to a new suppression hearing. Kachinsky represented Brendan during the all-important May 4, 2006, hearing on the motion to suppress Brendan's February 27 and March 1 statements. After he lost the motion, the March 1 statement went on to become the centerpiece of the State's case.

As described extensively *supra*, it is plain that Kachinsky was laboring under an actual conflict of interest at least as of April 23, 2006, when he and O'Kelly began planning to gather evidence favorable to the State and to extract a confession from Brendan against his will. (R.192:45, 50.) O'Kelly and Kachinsky took actions to further that disloyal plan throughout late April and early May and finally implemented their plan on May 12 and 13, 2006 – even using the trial court's denial of Kachinsky's motion to suppress as an incentive for Brendan to comply with their plan. In short, the May 4, 2006 suppression hearing fell squarely in the midst of Kachinsky's disloyal activities. As such, this Court can have no confidence that Brendan was represented by undividedly loyal counsel during that hearing, as the Constitution requires. Indeed, this Court can never know whether Kachinsky's curious decisions at the hearing – such as conceding that his client was not in *Miranda* custody on February 27 or March 1 (R.45:6-7) (App. 378-79); stating that Brendan's interrogations involved no suggestive questioning (R.45:110) (App. 482) despite tape-recorded evidence to the contrary;

71

and failing to prepare his witnesses (R.189:235-36; R.193:158-59) – were actually part of his plan to induce Brendan to plead guilty and repeat the substance of his March 1 statement at Avery's trial.

The existence of Kachinsky's actual conflict entitles Brendan, at bare minimum, to re-litigate those proceedings that took place during Kachinsky's representation. The trial court, however, scarcely addressed Brendan's request for a new suppression hearing in its order denying relief. Instead, it noted only that Kachinsky "adequately represented Dassey's interests" at the hearing and thus "cannot be said to have provided ineffective assistance of counsel." (R.206:12.) (App. 212.) But whether Kachinsky "adequately represented Dassey's interests" at the hearing is simply not relevant to a *Cuyler-Love-Kaye* analysis. Brendan need not pinpoint some specific harm he suffered during the suppression hearing itself as a prerequisite for relief. *Love,* 227 Wis. 2d at 70-71; *Kaye*, 106 Wis. 2d at 8. Instead, "[t]he harm to a defendant necessarily follows once it has been demonstrated that his lawyer actively represented a conflicting interest." *Kaye*, 106 Wis. 2d at 9. It must therefore be presumed that Brendan suffered harm at the pre-trial suppression hearing, so long as it is first shown that Kachinsky was laboring under an actual conflict of interest – and relief must accordingly be granted. Because Kachinsky's actual conflict of interest throughout the time of the suppression hearing has been abundantly shown *supra*, the trial court's denial of Brendan's request for a new suppression hearing was an error. Therefore, Brendan now requests that this Court grant him the new suppression hearing to which he is entitled under the law.

**II. Sixteen-year-old Brendan Dassey's March 1, 2006 confession was involuntary because the psychological interrogation methods used by police,**

**including repeated promises of leniency and intensive fact-feeding, overbore his will.**

Brendan's March 1 confession was the culmination of four rounds of police questioning that occurred over a period of fewer than 48 hours. During these questioning sessions, Brendan – an inexperienced, highly suggestible, and mentally limited sixteen-year-old – was isolated from any adult support, confronted with repeated threats of criminal liability and promises of leniency, and spoon-fed facts about the crime so that he could construct a plausible confession. These tactics steamrolled Brendan's will such that his resulting confession was involuntary. Because his March 1 confession went on to become the centerpiece of his trial, Brendan now requests that his convictions be reversed.

**A) Brendan's March 1 confession must be suppressed as involuntary if the tactics used to obtain it exceeded his own personal ability to resist those tactics.**

The admission of an involuntary confession violates a defendant's due process rights under both the Fourteenth Amendment of the U.S. Constitution and Article I, Section 8 of the Wisconsin Constitution. *State v. Jerrell C.J.*, 2005 WI 105, ¶ 17, 283 Wis. 2d 145, 699 N.W.2d 110. A defendant's statements are voluntary only if "they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *State v. Hoppe*, 2003 WI 43, ¶ 36, 261 Wis. 2d 294, 661 N.W.2d 407 (internal citations omitted). While improper police conduct is a "necessary prerequisite" to a finding of involuntariness, such improper conduct

73

need not be outrageous in order to be coercive. Rather, even subtle pressures are considered to be coercive if they "exceed the defendant's ability to resist." *Jerrell C.J.*, 283 Wis. 2d 145, ¶ 19 (internal citations omitted). In this way, coercion is flexibly defined as a function of each defendant's particular vulnerabilities: "[P]ressures that are not coercive in one set of circumstances may be coercive in another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures." *Hoppe*, 261 Wis. 2d 294, ¶ 46.

Under this defendant-focused approach, courts reviewing a confession's voluntariness examine the totality of the circumstances surrounding that confession. *Jerrell C.J.*, 283 Wis. 2d 145, ¶ 20. This test balances the personal characteristics of the defendant against the tactics used by law enforcement officers. *Hoppe*, 261 Wis. 2d 294, ¶ 38. Relevant personal characteristics of the defendant include his or her age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. These characteristics are to be balanced against "the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods, or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination." *Id.*, ¶ 39.

One particularly troubling "strategy used by the police to compel a response" occurs when police feed facts about the crime to the suspect during interrogation, thereby enabling the defendant to repeat those facts back to the police – a phenomenon known as contamination. The presence of contamination is, like any relevant fact, part of the "totality of the circumstances" surrounding any interrogation. *See, e.g.*, *Triplett v. State*, 65 Wis.2d 365, 368, 222 N.W.2d

74

689 (1974) (the totality test encompasses "*all* the facts and circumstances") (emphasis added). Indeed, the presence of significant fact-feeding by police strongly weighs against voluntariness. *See State v. Rettenberger*, 984 P.2d 1009, ¶ 40 (Utah 1999) (confession is involuntary when it "contains little information that was not first provided or suggested by the interrogating officers"); *State v. Randle*, 366 S.E.2d 750 (W. Va. 1988) (confession was involuntary when police used suggestive questioning to propose how the crime could have occurred to the suspect); *cf. State v. Samuel*, 2002 WI 34, ¶ 31, 252 Wis. 2d 26, 643 N.W.2d 423 (when deciding whether to admit witness statements obtained during police questioning, courts examine "whether a witness was coached on what to say" and "whether investigating authorities asked questions blatantly tailored to extract a particular answer").

While certain police interrogation tactics – including contamination – may create a coercive atmosphere during any interrogation, the risks are heightened when the subject of custodial interrogation is a juvenile. The U.S. Supreme Court has long expressed special concern for the voluntariness of statements given by youths. *See Haley v. Ohio*, 332 U.S. 596, 599-600 (1948) (suppressing youth's confession because "that which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens"); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) (finding that 14-year-old's confession had been taken in violation of due process because a teen is "not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and…is unable to know how to protect his own interests"); *In re Gault*, 387 U.S. 1, 48, 52-54 (1967) (calling it "imperative" to question juveniles' confessions because "authoritative opinion has cast formidable

75

doubt upon the reliability and trustworthiness of 'confessions' by children").

The current Supreme Court continues to recognize that these prescripts of old are just as critical to the existence of meaningful juvenile due process rights today as when they were first written. Indeed, today's Court has squarely reaffirmed these principles in *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2397 (2011). There, the Court cited empirical studies of modern-day DNA exonerations – including one authored by undersigned counsel – to conclude that "the pressure of custodial interrogation is so immense that it can induce a frighteningly high percentage of people to confess to crimes they never committed. That risk is all the more troubling – and recent studies suggest, all the more acute – when the subject of custodial interrogation is a juvenile." *Id.* (citing Steven A. Drizin & Richard Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 906-07 (2004); Brief for Center on Wrongful Convictions of Youth et al. as Amici Curiae 21-22). This proposition has become so widely accepted that it was even acknowledged in dissent by the Honorable Justice Alito: "I do not dispute that many suspects who are under 18 will be more susceptible to police pressure than the average adult." *Id.* at 2413 (Alito, J., dissenting).

The Wisconsin Supreme Court has embraced these principles, too, finding that youth are "uncommonly susceptible to police pressures." *Jerrell C.J.*, 283 Wis. 2d 145, ¶ 26. It has instructed Wisconsin courts to "exercise special caution when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult." *Jerrell C.J.*, 283 Wis. 2d 145, ¶ 21 (internal citations omitted). And the Seventh Circuit has similarly warned that "police tactics that might be

76

unexceptionable when employed on an adult may cross the line when employed against the less developed reason of a child." *Johnson v. Trigg*, 28 F.3d 639, 643 (7th Cir. 1994); *see also Taylor v. Rednour*, No. 11-3212 (7th Cir. Oct. 25, 2011) ("Considerable empirical research shows that the potential for false confessions increases markedly when the defendant is a juvenile"). (App. 624-26.)   In short, a chorus of authorities spanning jurisdictions and decades has firmly established that courts must scrutinize a confession with special care when the voice making that confession belongs to a child.   To so scrutinize juvenile confessions – to imagine what it must be like, as a child, to face the inquisitorial power of the State alone and unaided – is to deliver on the constitutional promise of due process.

**B) The March 1 statement of sixteen-year-old, mentally limited Brendan Dassey, which was extracted after repeated fact-feeding and over thirty promises of leniency, was involuntary because those interrogation tactics compromised his ability to rationally decide to confess.**

On May 4, 2006, the trial court held a hearing to determine whether sixteen-year-old Brendan's statements to police officers on February 27 and March 1, 2006 were voluntary.   During the hearing, Attorney Kachinsky stipulated that Brendan had not been in police custody during either statement.   Eight days later, on May 12, 2006, the trial court denied Brendan's motion to suppress.   (R.26; R.46:11.) (App. 502, 513.)   Its ruling is summarized in the Statement of Facts *supra.*   (App. 500-03.)   In reviewing the trial court's denial, this Court may overturn its findings of fact if they are clearly erroneous; but it must "independently review the application of constitutional principles to those facts" de novo. *State v. Ward*, 2009 WI 60, ¶ 17, 318 Wis. 2d 301, 767 N.W.2d 236.

77

**1) Brendan was a sixteen-year-old, mentally limited boy with an unusually high degree of suggestibility and no meaningful prior experience with law enforcement.**

This Court must begin its voluntariness review by considering Brendan's personal characteristics. First, Brendan was sixteen years old at the time of his confession. (R.46:3.) (App. 494.) His age alone triggers this Court's duty to review his confession with special care. *See, e.g., Haley*, 332 U.S. at 599; *Gallegos*, 370 U.S. at 54; *In re Gault*, 387 U.S. at 48; *Jerrell C.J.*, 283 Wis. 2d 145, ¶ 25-26.

Moreover, Brendan was developmentally slow. With an IQ of 74, his intelligence fell in the borderline to below-average range, warranting special education classes. (R.45:3,86.) (App. 458, 494.) *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 27 (IQ of 84 evidenced juvenile's vulnerability during interrogation). Psychological tests also showed that Brendan's tendency to "give in and go along with leading questions" and to "shift his answers due to pressure" made him "highly suggestible" such that only five people out of one hundred would be more suggestible than him. (R.120:54-56.)

Finally, Brendan lacked prior experience with law enforcement; indeed, he was hardly a "seasoned juvenile delinquent." *See A.M. v. Butler*, 360 F.3d 787, 797-801 (7th Cir. 2004) (suppressing juvenile's statements because his lack of law enforcement experience made him vulnerable to interrogation tactics). Before February 27, 2006, he had only been questioned briefly by police on November 6 and November 10, 2005. (R.79:23; R.169:12.) On neither occasion did police Mirandize him; and on both occasions, he was released after cooperating. (R.79:23; R.169:12.) Neither of those occasions prepared him for the grilling he would face on March

78

1. Indeed, his primary knowledge of law enforcement before his own arrest related to his uncle's wrongful rape conviction – which, as he told detectives on November 6, made him acutely afraid of the police. (R.79:23:32, 33, 36.)

In short, Brendan's personal vulnerabilities warrant considerable attention from this Court. Coercion, after all, is defined subjectively by reference to the degree of pressure needed to overbear Brendan's particular will. *See Hoppe*, 261 Wis. 2d 294, ¶ 46. Given Brendan's rare combination of traits, the degree of coercion needed to overbear his will was unusually low.

**2) The subtle pressures, sophisticated tricks, and promises of leniency that induced Brendan to confess on March 1 were so psychologically coercive that they overbore his will to resist.**

As this Court evaluates the coercive pressures that bore on Brendan, it must examine not only the interrogation techniques used by Fassbender and Wiegert on March 1, but also the techniques they used during the immediately preceding 48-hour period. Wiegert and Fassbender first met Brendan behind the closed doors of his high school principal's office at 12:30 PM on February 27, 2006. (R.46:4.) (App. 495.) They questioned him for one hour and forty-five minutes and released him back to class at 2:14 PM. (R.46:5.) (App. 496.) Less than an hour later, however, the officers again summoned Brendan to the principal's office and drove him and his mother to the Two Rivers Police Department for further questioning, which was done outside his mother's presence. (R.79:33:482.) The officers then drove Brendan to the Fox Hills Resort, where he stayed overnight with his mother and brother under police guard. (R.79:33:483.) At approximately 10:50 PM, Fassbender began questioning Brendan a third time in his hotel room for

79

an unknown length of time. (R.113:221; R.117:11-12.) Brendan was released on February 28, only to be pulled out of class again by Fassbender and Wiegert at 10:05 the next morning – March 1 – and brought to the Manitowoc Police Department for three more hours of questioning. (R.193:59.) The March 1 interrogation was thus Brendan's fourth questioning session within a period of fewer than 48 hours.

Any suggestion that on March 1 Brendan was operating utterly independent of the suggestions and pressures applied by the same officers over the prior 48-hour period is absurd. *See State v. Kiekhefer*, 212 Wis. 2d 460, 471-74, 569 N.W.2d 316 (Ct. App. 1997) (defendant's statement deemed involuntary in light of earlier interviews with police); *State v. Harrell*, 40 Wis. 2d 536, 542-43, 162 N.W.2d 590 (1968) (psychological pressure applied by law enforcement prior to defendant's interrogation was relevant to totality of the circumstances). In fact, as Dr. Leo testified at the *Machner* hearing, interrogation tactics' coercive effects can become magnified if the tactics are repeated over multiple interrogations. (R.190:149.) This Court must therefore consider the tactics used on February 27 and on March 1 when evaluating the voluntariness of Brendan's March 1 confession.

**i. Brendan's March 1 statement was the product of four interrogations over a period of fewer than 48 hours.**

As outlined above, Wiegert and Fassbender questioned Brendan four different times during the forty-eight-hour period between February 27 and March 1, 2006. All but one of these interrogations involved transporting Brendan to unfamiliar settings, such as police stations or the Fox Hills Resort, that were under police guard or control. (R.79:33:483.) For a sixteen-year-old boy who had no experience with law enforcement, this repeated questioning surely left

80

him wondering "if and when the inquisition would ever cease." *Woods v. Clusen*, 794 F.2d 293, 298 (7th Cir. 1986).

### ii. Brendan was unfairly denied the presence of a friendly adult when officers misrepresented the nature of their interrogation to Brendan's mother.

On March 1, Brendan was interrogated without any friendly adult present. Fassbender and Wiegert called Barb that morning to obtain permission to question him alone at the Manitowoc Police Station – but they never told her that they viewed Brendan as a suspect, rather than as a witness against Steven Avery. (R.193:57.) Indeed, they never told her that they already suspected Brendan of committing mutilation of a corpse, at minimum. (R.193:38.) Based on this misinformation, Barb agreed to the officers' plan "as long as they bring him back to the high school." (R.193:156.) She had no reason to believe that this interview would be different from the three "catch-and-release" interviews that Brendan underwent during the previous 48 hours. Barb would not have given permission if she had known that the officers thought Brendan was involved in the cover-up of Halbach's death. (R.193:158.)

By failing to inform Barb of the nature of the interrogation, the police ensured that they could question Brendan alone and unhindered. Indeed, Wiegert testified that he prefers to question children alone without a parent present. (R.193:44.) By doing so, however, the police sidestepped Wisconsin's strong policy in favor of parental notification. *See Theriault v. State*, 66 Wis. 2d 33, 48, 223 N.W.2d 850 (1974) (police's failure to call juvenile's parents before questioning was "strong evidence that coercive tactics were used to elicit the incriminating statements"); *Jerrell C.J.*, 283 Wis. 2d 145, ¶ 31 ("We are troubled by this tactic [of interrogating juveniles without a

81

parent present], as parents are often the very people children turn to for advice"). Unless this parental notification policy is to lose all meaning, this Court should require police to make a good-faith attempt to apprise a juvenile's parent or guardian of the nature, foreseeable scope, and potential risks of the planned interrogation before questioning commences. Because such notification did not occur here, this Court should treat the March 1 interrogation as though the police made no attempt to contact Brendan's mother at all.

### iii. Brendan was not informed of his *Miranda* rights at a time that presented him with a meaningful choice as to whether to waive them.

On March 1, Brendan was entitled to be Mirandized because he was in custody. To evaluate custody, this Court must consider whether Brendan initiated contact with the authorities, whether his freedom was restrained, whether he was told that he was free to leave, whether deception was used, and whether the police dominated the atmosphere of questioning. *See State v. Mosher,* 221 Wis. 2d 203, 214, 584 N.W.2d 553 (Ct. App. 1998). On March 1, officers initiated contact with Brendan by pulling him out of his high school class and driving him to the Manitowoc Police Department (R.193:57-59; R.172:209:525-26), where he was marooned alone with no way of returning to school. *See A.M.*, 360 F.3d at 797 (deeming a minor in custody in part because he had no way of leaving). He was questioned behind a closed door in a small room, with his questioners seated such that they blocked Brendan's path to the exit. (R.172:210.) If Brendan had tried to leave, he would have been stopped. (R.193:76-77.) Contrary to Wiegert's testimony at the *Miranda-Goodchild* hearing, Brendan was *not* told that he was free to leave on March 1. (R.45:25; R.79:34.) (App. 397.) Instead, he was subjected to a police-dominated

82

interrogation that included deception (*e.g.* R.79:34:571-72) (App. 266-67), long police monologues (*e.g.* R.79:34:540-41) (App. 235-36), leading questions (*e.g.* R.79:34:565-66) (App. 260-61), suggestions of leniency (*e.g.* R.79:34:541) (App. 236), and rejections of his claims of innocence (*e.g.* R.79:34:572-74) (App. 267-69). Brendan's youthfulness, too, makes it particularly unlikely that he would have felt free to leave the police station. *See J.D.B.*, 131 S. Ct. at 2405 (vacating finding that student questioned in principal's office was not in custody and requiring courts to consider age when evaluating *Miranda* custody). All told, Brendan was in custody on March 1.[11]

Even though he was in custody, the police did not give Brendan a meaningful opportunity to assert his *Miranda* rights. They read him his rights and obtained a waiver at the beginning of the 45-minute-long drive from school to the police station, during which the officers chatted only about girls, school, and other harmless topics. (R.172:209:525-56.) After they arrived at the station, the officers only asked him if he remembered his "Miranda" rights, a technical term that likely meant little to Brendan. (R.79:34:539.) (App. 234.) And once they began actually accusing Brendan of involvement in Halbach's murder, the officers did not read him his rights at all. (R.193:78.) By thus manipulating the context of the warnings, the police deprived Brendan of the "knowledge essential to his ability to understand the nature of the rights and the consequences of abandoning them." *Missouri v. Seibert*, 542 U.S. 600, 621 (2004) (internal quotations

---

[11] Kachinsky's baseless stipulation that Brendan was *not* in custody on March 1 was ineffective. *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). If he had raised the arguments concerning custody, *Miranda*, and voluntariness contained herein, the outcome of the suppression hearing – and, in turn, trial – would have been different.

83

omitted); *see also State v. Armstrong*, 223 Wis. 2d 331, 351-52, 588 N.W.2d 606 (1999) (warnings must be given "at the first moment an individual is subject to custodial interrogation"). A waiver obtained without meaningful context cannot be constitutionally sufficient, particularly when the subject of the interrogation is a sixteen-year-old special education student. *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 25 ("The difficulty a vulnerable child of 14 would have in making a critical decision about waiving his *Miranda* rights…cannot be understated").

Brendan's March 1 waiver is also problematic because the officers' assurances during the interrogation negated the warnings. *Miranda* requires that a defendant be told that police officers are adversaries who will use anything he says against him. *State v. Santiago*, 206 Wis. 2d 3, 19, 556 N.W.2d 687 (1996). Wiegert and Fassbender, however, told Brendan, *inter alia*, that they were "on your side"; that "[h]onesty here Brendan is the thing that's gonna help you"; and that "[i]f in fact you did some things…it's OK. As long as you can, as long as you be honest with us, it's OK." (R.79:34:540-41.) (App. 235-36.) These statements are incompatible with the *Miranda* warning that "anything you say can be used against you in court." *See Hart v. Attorney General*, 323 F.3d 884, 894 (11th Cir. 2003) (vacating conviction where police told youth that "honesty wouldn't hurt him," thus implying "that an incriminating statement would not have detrimental consequences" in contravention of *Miranda*).

**iv. The police's repeated promises of leniency on February 27 and March 1 rose to the level of psychological coercion by altering Brendan's perceptions of the consequences of confessing.**

The February 27 and March 1 interrogations are marked by a crystal-clear, recurring theme: If Brendan

84

admitted guilt, then the police would help him avoid adverse consequences. On February 27, Fassbender introduced this theme by telling Brendan that people "at the sheriff's department, district attorney's office" wanted to charge him with Halbach's murder or its cover-up. (R.79:33:442.) But Fassbender had intervened, he claimed, and was now offering Brendan an "opportunity" to "come forward with the information that he has." (R.79:33:443.) If Brendan came forward, then "Mark and I both can go back to the district attorney and say, ah, Dassey came forward and finally told us. Can you imagine how this was weighing on him? They'll understand that." (R.79:33:448.) As Dr. Leo testified, these statements were, practically speaking, no different than a direct promise of leniency. (R.190:156.) Even Wiegert admitted that this exchange indicated that Brendan was facing criminal liability. (R.193:26.) It is fictional to believe that such a message of leniency did not affect Brendan's decision to talk.

This message was repeated twenty times on February 27, as detailed in the Appendix at 546-48. It was amplified further on March 1, when similar promises of leniency were made *twenty-one* times. (App. 548-50.) On March 1, for instance, Brendan was told that even if he made "statements …against your own interest," then "from what I'm seeing, even if I filled those in, I'm thinkin' you're all right. OK, you don't have to worry about things. We're there for ya." (R.79:34:540.) (App. 235.) Appellant respectfully urges this Court to review the Appendix at 548-550, which contains a list of these promises.

Importantly, these assurances were often given immediately before Brendan's most damning admissions. Right before Brendan said that he heard Halbach screaming inside his uncle's trailer, his interrogators told him, "We already know Brendan. We already know. Come on. Be honest with us. Be honest with us. We already know, it's, OK? We

85

gonna help you through this, alright?" (R.79:34:561.) (App. 256.) Right before Brendan said that he saw Halbach restrained in his uncle's bedroom, his interrogators told him, "We know you went back there. Let's get it all out today and this will be all over with." (R.79:34:572.) (App. 267.) And right before Brendan said that he sexually assaulted Halbach, his interrogators told him that "We know what happened, it's OK…it's not your fault, he makes you do it." (R.79:34:574.) (App. 269.) Plainly, the officers were able to overcome Brendan's reluctance only by assuring him that his admissions would not harm him.

Lest Brendan fear that their promises of leniency were based on some misunderstanding of his culpability, the officers also reassured Brendan five times on February 27 and *thirty-one* times on March 1 that they "already knew" what he had done. (App. 543-545.) Such false assertions of superior knowledge are "particularly influential on individuals who have low IQs, or who are juveniles, who…may be more gullible or easily led or manipulated into confessing as a result of them." (R.190:170.) And the officers' message of leniency was made even more credible when they falsely said on February 27 that they were *not* acting as "cops" but rather as Brendan's allies: "Mark and I, yeah we're cops, we're investigators and stuff like that, but I'm not right now. I'm a father that has a kid your age too. I wanna be here for you…There's nothing I'd like more than to come over and give you a hug cuz I know you're hurtin'." (R.79:33:443.)

By falsely telling Brendan dozens of times that he would escape harm by confessing, Fassbender and Wiegert clouded Brendan's understanding of the consequences of confessing and prevented him from making a rational, knowing decision to confess. These coercive tactics overrode Brendan's will. *See U.S. v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009) (a voluntary confession is "the product of a rational

86

intellect," and an "empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose"). This is particularly true given his age, limited mental functioning, suggestibility, and naiveté regarding the justice system – all factors that were exploited by the officers' promises. *See id.* ("Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him").

There can be no doubt that these promises of leniency hit their mark. Even after confessing to rape and murder, Brendan guilelessly asked Fassbender and Wiegert, "You think I can get [back to school] before 1:29?" "Am I going to be at school before school ends?" and "What time will this be done?" (R.79:34:613, 667.) (App. 308, 362.) He plainly believed that since he had held up his end of the bargain by confessing, the officers would hold up theirs by releasing him. (R.79:34:667.) (App. 362.) Even after he was arrested, Brendan asked the officers "Is it only for one day or?" and had to ask his mother "Where am I going?" (R.79:34:671-72.) (App. 366-67.) *See Commonwealth v. Truong*, 2011 Mass. Super. LEXIS 61, at *22-23 (Mass. Super. Ct. 2011) (suppressing teen's murder confession because she thought she would be placed in foster care as a result of confessing and thus "never understood the implications of her statements"). (App. 567-86.) In sum, the officers' promises of leniency tricked sixteen-year-old Brendan into making a confession that would cost him most of his life's freedom – all without understanding the import of what he was doing. Such a confession cannot be deemed voluntary under the law.

**v. Brendan's interrogators fed him details about the crime by using leading questions, compelling**

**him to repeat a confession narrative that was not his own.**

Throughout the March 1 interrogation, the police used suggestion and leading questions to feed Brendan many facts about the Halbach crime, thus compelling him to adopt a story that was not his own. Indeed, the interrogation transcript makes powerfully clear that Brendan was unable to come up with even the most basic facts about the crime without direct coaching, including the manner of Halbach's death and the way in which her personal effects were destroyed. Appellant respectfully refers this Court to the Appendix at 538-542 for a more detailed presentation of this fact-feeding. Such pervasive contamination renders his confession involuntary, particularly given Brendan's suggestible personality. *See Rettenberger*, 984 P.2d at 1020 (finding confession involuntary because it "contains little information that was not first provided or suggested by the interrogating officers").

In sum, the interrogators' potent combination of fact-feeding and repeated promises of leniency overbore Brendan's will – a conclusion that is underscored by Brendan's youthfulness, inexperience, suggestibility, low IQ, and the absence of any friendly adult. *See Commonwealth v. Rios*, 2011 WL 4089553, at *3 (Mass. Super. Ct. 2011) (finding confession involuntary where "the questions by the police were mostly leading, and at critical moments consisted of efforts to minimize the crime and suggestions that it was advantageous for the defendant to speak"). (App. 562-66.) This Court should find his March 1 confession involuntary and grant reversal.

**III.    Trial counsel provided ineffective assistance by failing to present substantial evidence indicating that Brendan's March 1 confession was unreliable.**

88

Most jurors are unaware that commonly used psychological interrogation tactics can cause innocent people – especially juveniles – to confess to crimes they did not commit. *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 103 (Abrahamson, C.J., concurring) ("It is difficult for many of us to understand what leads an innocent person to confess to a crime, especially a serious felony"). To explain this counterintuitive concept to a jury faced with a confession, defense counsel must introduce all admissible evidence showing the confession's unreliability. Brendan's counsel, however, failed to introduce important evidence of unreliability, including the testimony of an expert who concluded that the March 1 interrogation tactics "increas[ed] the likelihood of…false or unreliable statements" (R.170:73); videotaped proof that Brendan's interrogators fed him basic facts about the crime (R.190:215-218); and Brendan's videotaped recantation to his mother (R.79:34:672). (App. 367.) Instead, trial counsel affirmed the confession's credibility by unauthorizedly conceding facts amounting to mutilation of a corpse – notwithstanding Brendan's contrary testimony. Taken cumulatively, these errors prejudiced Brendan's defense.

The circuit court's denial of this claim may be reversed when its factual findings regarding "the circumstances of the case and counsel's conduct and strategy" are clearly erroneous; questions of law, including whether counsel was ineffective, are reviewed de novo. *See State v. Thiel*, 2003 WI 111, ¶ 21, 264 Wis. 2d 571, 665 N.W.2d 305.

**A. Trial counsel's ineffective assistance is measured under *Strickland v. Washington*, which focuses on whether counsel's performance affected the reliability of the proceedings.**

All criminal defendants are guaranteed the effective assistance of counsel. U.S. Const. Amends.

89

VI, XIV; Wis. Const. Art. I, § 7. To prove ineffective assistance of counsel, a defendant must show that he was prejudiced by his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel is deficient when his conduct is "unreasonable under prevailing professional norms…keep[ing] in mind that counsel's function…is to make the adversarial testing process work." *Id.* at 688-90. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 ("reasonable probability" means a "probability sufficient to undermine confidence in the outcome"); *Thiel*, 2003 WI 111, ¶ 20 (prejudice inquiry focuses on "the reliability of the proceedings"). In weighing prejudice, this Court may consider the cumulative effects of counsel's errors. *Strickland*, 466 U.S. at 695; *Thiel*, 2003 WI 111, ¶ 58.

**B. Brendan's trial counsel failed to introduce readily available evidence of his confession's unreliability.**

At trial, the State's central argument was that Brendan's March 1 confession included nineteen details that matched the physical evidence. (R.191:198.) It emphasized that his knowledge of these corroborated details was the "most important" indicator of guilt: "The richness of the detail provided by the defendant in that confession tells us that it's true. You can't have that rich of a detail unless you were there, unless you experienced it, unless you lived through it." (R.121:71, 73.)

Brendan's trial counsel could have neutralized this argument by showing that Brendan's knowledge of all nineteen details can be attributed to contamination. As the videotaped interrogation shows, many of those nineteen details were fed to him

90

by police.[12]   Others had been widely publicized in news reports about Avery's arrest – reports that Brendan and his family naturally watched and discussed.   The rest were products of Brendan's familiarity with his family's property and his innocent activity on October 31.   Appellant respectfully refers this Court to the Appendix at 538-542 for a point-by-point analysis of this contamination.  Simply stated, at no time did Brendan demonstrate that he possessed nonpublic knowledge of what actually happened to Halbach.

On those few occasions when Brendan volunteered facts without coaching, moreover, he got them flat wrong.  For instance, he volunteered that he and Avery used a "creeper" to transport Halbach's body to the fire, but the creeper bore no traces of blood indicating that it was so used.  (R.115:83-84.)   This detail is clearly a product of Brendan's frightened fantasy, not a reflection of the reality of Halbach's death.

Unfortunately, trial counsel made only haphazard and incomplete efforts to show the jury that Brendan couldn't get his story right without contamination. Although they intended to show that many facts in Brendan's confession were suggested to him by police (R.192:246), they identified only a few of those instances at trial.  (R.170:87.)  They never argued, furthermore, that much of what Brendan said in his confession was known by most people in the

---

[12] The State's consulting expert, Joseph Buckley – president of the firm that provides the "leading source of instruction for law enforcement personnel in the country on proper interviewing and interrogation techniques" – emphasized in his report that "[i]t is critical that interrogators do not disclose to the suspect all of the important details of the crime so that they can assess the trustworthiness of a confession by the suspect's ability to accurately provide those undisclosed details." (R.170:81:1, 4.)

state, due to saturated news coverage. (R.169:17-39; R.170:87; R.171:101-173; R.172:174-204, 239; R.173:240-305.) By trial's end, in fact, counsel had attacked only a handful of the State's nineteen details as contaminated, thereby implying that the others were unassailable.

Trial counsel's failures cannot be attributed to an absence of favorable evidence. Although they had a copy of the videotaped March 1 confession, they never played a single instance of police prompting for the jury, which would have concededly been a "more effective" strategy. (R.191:248.) As for media contamination, trial counsel had gathered hundreds of news reports in support of their pre-trial venue change motion (R.191:202; R.171:101-173; R.172:174-204, 239; R.173:240-305), but they failed to show that those reports contained much of the information that later turned up in Brendan's confession. (R.192:250.) And they did not call Brendan's family members to explain that the entire family closely followed and regularly discussed case-related news, including on many occasions when Brendan was present. (R.193:152-53.)

In rejecting this claim, the trial court found that "Dassey provided little or nothing to his trial counsel that they could have used to deconstruct his March 1st confession." (R.206:24.) (App. 224.) This finding is erroneous. As Edelstein testified, it was "not uncommon" for Brendan to tell his lawyers that he got some of the facts in his confession from the news. (R.192:255.) Moreover, Edelstein did not need to be told that the police had fed facts to Brendan; he testified that he independently "notice[d] that there were facts in Brendan's confession that had been suggested to him first by police officers." (R.192:245.) His failure to call the jury's attention to this contamination, therefore, can hardly be attributed to Brendan.

Trial counsel's failures could have been

92

mitigated if they had called an expert in police interrogations to testify about interrogation tactics and contamination. *See* Danielle E. Chojnacki et. al, *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 Ariz. St. L.J. 1 (2008) ("Expert testimony on false confessions may be a defendant's strongest piece of evidence" in a confession case). Indeed, trial counsel recognized the need for such an expert in October 2006, when they retained psychologist Dr. Robert Gordon to testify about Brendan's suggestibility and the March 1 interrogation tactics. (R.170:72; R.191:114, 162.) In Fremgen's words, "I knew I needed an expert. I wasn't going to simply walk in with a…book and say I want to use this to cross-examine the officers" concerning their interrogation tactics. (R.191:161.)

The defense's longstanding plan to retain a police interrogation expert, however, fell apart. Gordon was barred from testifying about interrogation tactics on April 5, 2007 after he admitted in a pre-trial deposition that he was not an expert on that subject (which was evidently news to Brendan's attorneys). (R.191:170, 176.) At about the same time, moreover, Fremgen learned that the State had retained Joseph Buckley, president of Reid & Associates, as its own interrogation expert. (R.191:179.) Learning of Buckley only heightened Fremgen's resolve to find an expert of his own. (R.191:179.)

At the repeated urging of Avery's attorney Jerome Buting, Fremgen contacted Beloit psychologist Dr. Lawrence White on April 10 and asked him to take Gordon's place as Brendan's interrogation expert at trial – then slated to begin in less than two weeks. (R.170:79.) White had already analyzed Brendan's confession for the Avery case, finding that Brendan's interrogations contained "many instances of pressure by the interrogators… leading questions, repeated questions (which often lead to changed answers), questions which 'leak' information and suggest certain

93

responses," and other interrogation techniques that "increas[e] the likelihood of…false or unreliable statements." (R.170:73.) His analysis, moreover, had already been paid for by Avery's attorneys. (R.170:74.) Despite the short notice, White agreed to serve as Brendan's expert (R.170:79) – thus salvaging Fremgen's long-held plan to present expert testimony on interrogation tactics.

As soon as White agreed to testify in Brendan's case, however, Fremgen hit the brakes. Inexplicably, he never contacted White again and proceeded to trial with no interrogation expert at all. Such a failure cannot be construed as the effective assistance of counsel.

As trial counsel long recognized, an interrogations expert would have been invaluable to Brendan's defense. As an initial matter, such an expert would have explained to jurors that police interrogators are trained to use techniques that "psychologically manipulat[e] a suspect to perceive that it's in their self-interest to make incriminating statements." (R.190:124.) Police are trained to begin an interrogation by convincing a suspect that it is "futile to deny" involvement because no one will believe him. (R.190:127-28.) This is accomplished by refusing to listen to the suspect's denials and, if possible, confronting him with evidence of guilt, whether real or fake. (R.190:127.) After the suspect is reduced to hopelessness, interrogators influence him to "see it as in [his] self-interest to confess." (R.190:128.) The suspect is finally made to believe that confessing actually offers a way out of his hopeless predicament.

As an expert could have testified, these psychological techniques are so effective that they can cause even the innocent to confess. (R.190:101, 139.) Hundreds of confessions have been proven false, and many more have been shown to be unreliable. (R.190:102-03.) Clinical studies have proven,

94

moreover, that juveniles and the mentally limited are particularly vulnerable to these tactics. *See, e.g.*, Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 L. & Hum. Behav. 3-38 (2010). Without the benefit of this expertise, however, the only information Brendan's jury heard about false confessions came from the State during closing argument: "People who are innocent don't confess. The defendant confessed because he was guilty. Because he did it. An innocent person is…not going to admit to this." (R.121:144.)

After providing the jury with a framework to analyze police interrogations, such an expert could have examined the particular tactics used during Brendan's interrogations. At the postconviction hearing, Dr. Leo testified that on nearly twenty occasions on February 27 and March 1, Wiegert and Fassbender unmistakably conveyed that Brendan would receive leniency if he confessed and punishment if he did not. (R.190:191.) Many of those inducements are discussed in greater detail *infra* Section II.B.2 and are listed in the Appendix at 546-550. He also testified in great detail concerning the contamination in Brendan's March 1 confession, concluding that Brendan never demonstrated "unique, non-public knowledge that only the true perpetrator could have known and couldn't have been guessed by chance." (R.190:210.) This contamination is set out in accordance with Dr. Leo's testimony in the Appendix at 538-542.

Because trial counsel unreasonably abandoned their plan to call an interrogations expert at the eleventh hour, all of this specialized knowledge about coercion, contamination, and the intricate dynamics of the interrogation process was never presented to the jury. While under ordinary circumstances such a failure is not ineffective, *State v. Van Buren*, 2008 WI App 26, 307 Wis. 2d 447, 746 N.W.2d 545, this case presents extraordinary circumstances. Here, the

95

State's only direct evidence against Brendan was his March 1 confession; the defense had long planned on calling an interrogations expert to discuss the dozens of instances of psychological coercion and contamination in that confession; a qualified and affordable expert was ready, willing, and able to testify; and even the State acknowledged the value of expert testimony on interrogations by hiring their own expert. Under these circumstances, trial counsel's failure to call such an expert was manifestly unreasonable.[13] *See State v. Gainey*, No. 98 CRS 3143, 3144, 3147 (N.C. Sup. Ct. June 11, 2009) (counsel ineffective for failing to consult an available false confession expert when the confession was "crucial to the State's case") (App. 587-623); *Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) (counsel's failure to consult an expert regarding the reliability of an eyewitness identification was ineffective where the identification was the only evidence against the defendant); *State v. Maloney,* 2004 WI App 141, ¶ 23, 275 Wis. 2d 557, 685 N.W.2d 620 (an attorney's trial strategy must be "reasonable").

In denying Brendan's ineffectiveness claim, the circuit court deemed trial counsel's failure to call an interrogation expert a matter of reasonable trial strategy. (R.206:19.) (App. 219.) It argued that the defense wished to avoid a "battle of the experts" and that Edelstein, in particular, believed that expert testimony would have detracted from the "humanization of Brendan as a young, easily manipulated individual." (R.206:19.) (App. 219.) But trial counsel had long planned on calling exactly such an expert – a fact that makes this post-hoc

---

[13] The trial court found that "both Dr. Leo and Dr. White would have qualified as expert witnesses at Dassey's trial and in all likelihood some and maybe much of their testimony, at least as they outlined it in the post-conviction motion, would have been admissible." (R.206:17.) (App. 217.)

96

rationalization implausible. A defense team that was concerned about a battle of the experts would not have continued to hunt for an interrogations expert after it learned that the State had retained its own expert. And a defense team that believed that expert testimony would have somehow "dehumanized" their client would never have pursued such testimony at all.

In addition to their failure to argue contamination and to call a police interrogation expert, trial counsel also failed to play Brendan's videotaped recantation for the jury. Minutes after police finished questioning on March 1, Brendan spontaneously told his mother – as caught on the interrogation room's video – that he did "not really" harm Halbach and that he confessed only because the police "got to my head." (R.79:34:672.) (App. 367.) Incredibly, trial counsel stipulated to the exclusion of this powerful evidence of coercion and innocence. (R.191:194.)

At the *Machner* hearing, Fremgen explained that he did not play the recantation because he thought the video showed Brendan's mother believing that her son had committed the crime. (R.191:195.) Edelstein disagreed, but Fremgen's opinion prevailed. (R.192:236.) In its decision denying relief, the trial court adopted Fremgen's view and categorized his decision not to play the recantation as a matter of reasonable trial strategy. (R.206:25.) (App. 225.)

Fremgen's view, however, is patently unreasonable. While the first few moments of the unplayed video show Brendan's mother proceeding under the belief that her son had confessed to the crime, the next few moments reveal not only that Brendan recanted to her but also that she instantly believed him. Indeed, after Brendan recanted, Barb responded by challenging his interrogators: "Were you pressuring him?" (R.79:34:672.) (App. 367.) If the jury had seen Brendan's recantation and Barb's reaction, it would have understood that Brendan had credibly asserted his innocence immediately after his

interrogation ended. Given the compelling nature of this evidence, Fremgen's decision cannot be considered a matter of reasonable trial strategy.

**C. Instead of introducing evidence of the confession's unreliability, trial counsel bolstered its credibility by unauthorizedly conceding the mutilation charge during closing argument.**

If Brendan's false confession defense was to have any chance of success, trial counsel had to rebut the State's claim that his March 1 confession was believable. During closing argument, however, trial counsel did just the opposite: Edelstein conceded that Brendan was guilty of mutilating a corpse, thereby giving the jury reason to believe that the rest of his confession was similarly true. He told jurors that "the potential truth" was a scenario in which Brendan "walked over [to Steven's house] and did see something in a fire, and that something was Teresa Halbach." (R.121:125.) He added that Brendan "walked over there expecting a Halloween bonfire, and went around with the little cart, and picked up all the stuff, and eventually they start throwing stuff in [the fire], and he probably did see something." (R.121:127-28.) Taken together, these statements constitute a concession of the mutilation charge. At the *Machner* hearing, Edelstein admitted that he "intended to provide" conviction on the mutilation charge "as an option for the jury." (R.192:252.)

This concession is troubling for several reasons. First, Edelstein conceded that charge without seeking Brendan's authorization. (R.192:253.) But even more importantly, this concession directly contradicted Brendan's testimony that he never saw Halbach alive or dead on October 31, 2005. (R.119:41.) Indeed, Edelstein's concession – which was the "functional equivalent of a guilty plea" – signaled to the jury that his own client was lying on the stand, thus giving the

98

jury reason to discredit the rest of Brendan's testimony too. *See State v. Gordon*, 2003 WI 69, ¶¶ 19, 21, 262 Wis. 2d 380, 663 N.W.2d 765 (defense counsel's unauthorized concession was not ineffective because he "did not concede anything that [the defendant] had not admitted as a factual matter on the witness stand"); *State v. Silva*, 2003 WI App 191, ¶¶ 46-48, 266 Wis. 2d 906, 670 N.W.2d 385 (Schudson, J., concurring in part, dissenting in part) (explaining that *Gordon* is distinguishable when defense counsel's concession contradicts a defendant's testimony). By conceding one of the charges against Brendan and intimating that his client's testimony was untruthful, Edelstein rendered deficient performance.

In rejecting this argument, the trial court found that Edelstein's concession "[drew] on" Brendan's testimony that he "helped his uncle put things on the fire including tires and the seat from Teresa Halbach's RAV4 automobile." (R.206:27.) (App. 227.) Brendan, however, said no such thing. He testified that the "van seat" that he put on the fire was from an old "maroon van" that was "out in front of [my] house," not Halbach's green RAV4 (which was found intact). (R.119:30-31.) He also testified that the tires were similar castoffs unrelated to Halbach's vehicle that were "lying around [the] yard." (R.119:30-31.) Because the trial court misstated Brendan's testimony, its findings concerning the concession are clearly erroneous.

Edelstein's concession should, at the very least, lead this Court to reverse Brendan's mutilation conviction. *See Silva*, 266 Wis. 2d 906, ¶¶ 46-48 (Schudson, J., concurring in part, dissenting in part) (in such circumstances, reversal is required). But Edelstein's concession did far greater damage: it undermined the credibility of all of Brendan's testimony, including his denials of the murder and sexual assault charges. Edelstein's concession,

99

accordingly, should result in the reversal of those convictions as well.

**D. Taken cumulatively, counsel's failure to challenge the confession's unreliability prejudiced Brendan.**

As the trial court found, Brendan's March 1 confession was "the pivotal piece of evidence" against him at trial. (R.206:20.) (App. 220.) As such, counsel's failure to introduce strong evidence of that confession's unreliability – as well as their unauthorized concession that some of the confession, at least, was true – prejudiced his defense. *See Thiel*, 2003 WI 111, ¶ 20 (prejudice inquiry focuses on the "reliability of the proceedings"). In weighing prejudice, moreover, Appellant urges this Court to focus on the cumulative impact of these errors. In this case, trial counsel's errors combined to leave the jury with no choice but to believe that Brendan's confession was true and thus to convict on all charges.

Instead of evaluating these errors' cumulative impacts, the trial court focused on the isolated impact of counsel's failure to call an expert witness. Even this limited analysis, however, was flawed. For instance, the trial court argued that Brendan would still have been convicted, despite the assistance of an expert, because he could not explain on the stand why he falsely confessed. (R.206:20 (quoting Brendan as replying "I don't know" when asked why he confessed).) (App. 220.) But Brendan testified not only that his confession was "made up" and that he "didn't really do it," but also that he confessed because the officers told him that "no matter what" he said, "I wouldn't be taken away from my family and put in jail." (R.119:51, 53, 54, 64, 76, 77.) To the extent that this explanation is unsatisfactory, it should be plain that Brendan's limited ability to explain the experience of psychological interrogation was *exactly* why the

100

testimony of an interrogation expert was so desperately needed. As Dr. Leo testified, the young and mentally limited frequently require the help of psychologists before they can explain the complex dynamics – fear, ignorance of the law, misplaced trust, desire to please, and so on – that caused them to confess to crimes they did not commit. (R.120:190.)

The trial court next argued that Brendan was not prejudiced by counsel's failure to call an expert because his jurors heard the November 6, 2005 audiotaped police interview of Brendan, during which "he adamantly resisted any suggestion that he knew where Teresa Halbach went" despite "aggressive and sometimes confrontational questioning." (R.206:21.) (App. 221.) The trial court suggested that this recorded interview would have undercut the testimony of Dr. White or Dr. Leo – but its reading of the interview is factually erroneous. The police summary of the November 6 interview reveals that Brendan buckled under the confrontational pressure of that interview, just as he did later on March 1:

> During the interview Brendan told us…that he had never seen Teresa Halbach nor her Toyota SUV at their property on Avery Rd. When I asked Brendan specifically about seeing either Halbach or her vehicle on Monday October 31st 2005 he again told us that he had not seen either….When I confronted Brendan about seeing Teresa Halbach when he had gotten off the bus with his brother on that Monday, Brendan now said that he had seen Teresa Halbach and her vehicle and that he did not tell us because he did not want to go to jail….When asked again as to if he had seen Teresa out of the vehicle by the van by his and his uncles home Brendan now told us that while he was in his home…Brendan had seen his uncle Steven Avery and the girl taking pictures by the van parked in front of his home.

101

(R.79:23:2-3.)[14]

Finally, the trial court added that the testimony of Brendan's fifteen-year-old cousin Kayla Avery would have undercut any interrogation expert's opinion. To be clear, however, Kayla's testimony in no way implicated Brendan in either the rape or murder of Halbach. The sum total of her testimony was that between November 2005 and February 2006 Brendan lost weight and occasionally acted upset; at some point she told her school counselor that Brendan had been crying; and on March 7 – after Brendan was arrested – she told police that Brendan had told her that he had heard screaming and seen Halbach "pinned up in a chair" in Avery's house. (R.115:7-14.) At trial, moreover, Kayla retracted these claims, explaining that she had made them up based on news coverage of his arrest. (R.115:15-16, 21.) Kayla's testimony was so unpersuasive, in fact, that the State did not refer to it during its chief closing argument. Her incredible testimony would have done nothing to discredit the expert opinion of a qualified police interrogations professional – let alone the combined evidentiary power of such an expert's opinion, Brendan's videotaped recantation, and a systematic demonstration of contamination.[15]

In sum, trial counsel's four major errors – their failure to highlight contamination; their failure to

---

[14] The summarized portions of the interview are set out verbatim at R.79:23:2, 17-20.

[15] The trial court also referred to testimony from Kayla's school counselor, who testified that Kayla had told her that her uncle Steven had asked her cousin to move a body. This Court may take judicial notice that, during Steven Avery's trial, it was made clear that the cousin in question was *not* Brendan but rather his brother Bobby. *See Office of Lawyer Regulation v. Schoenecker*, 2011 WI 76, ¶ 6 n.2 (taking judicial notice of court records in a related case).

102

introduce the testimony of a police interrogation expert; their failure to inform the jury of Brendan's recantation; and their unauthorized concession of the mutilation charge – wrought a cumulatively damning effect on Brendan's defense. Because of this ineffective assistance, Brendan requests that this Court reverse his convictions and grant him a new trial unmarred by such self-defeating representation.

## IV. Because the jury never heard abundant evidence of the unreliability of Brendan's March 1, 2006 confession, the real controversy was not fully tried and a new trial is warranted.

This Court has discretion to grant a new trial in the interests of justice if it finds that the real controversy was not fully tried. Wis. Stat. § 752.35 (2009-10). The real controversy was not fully tried "where the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case." *State v. Henley,* 2010 WI 97, ¶81, 328 Wis. 2d 544, 787 N.W.2d 350; *see also State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983); *Garcia v. State*, 73 Wis. 2d 651, 655, 245 N.W.2d 654 (1976). The trial court's denial of this claim is reviewable by this Court de novo. *State v. Burns*, 2011 WI 22, ¶ 23, 332 Wis. 2d 730, 798 N.W.2d 166.

The real controversy at Brendan's trial was whether his March 1 confession was reliable evidence of his guilt. Because it was extensively contaminated – including blatant fact-feeding by police with respect to the most central facts of the crime, such as the manner by which Halbach was killed – Brendan's March 1 confession is strikingly unreliable. Unfortunately, evidence regarding contamination was never presented to the jury, either by defense counsel or by an interrogations expert. Accordingly, the real controversy was never fully and fairly explored at trial.

103

Brendan requests that this Court grant him a new trial at which all evidence bearing on his confession's unreliability can be fully heard, as justice requires.

## **CONCLUSION**

For the reasons stated herein, Brendan Dassey respectfully requests that this Court grant him one of the following alternative remedies: (1) reverse the judgments of conviction and the order denying postconviction relief and remand for a new trial and a new suppression hearing; (2) reverse the judgments of conviction and the order denying postconviction relief and remand for a new trial; or (3) remand for a new suppression hearing alone.

Dated this 29th day of November, 2011.

Respectfully submitted,

_____

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

_____

LAURA H. NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)
THOMAS F. GERAGHTY (IL Bar No. 0937436)
JOSHUA A. TEPFER (IL Bar No. 6294120)
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue, 8th Floor

104

Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977
E-mail: s-drizin@law.northwestern.edu
          tgeraghty@law.northwestern.edu
          l-nirider@law.northwestern.edu
          j-tepfer@law.northwestern.edu

Attorneys for Defendant-Appellant

## CERTIFICATION AS TO FORM/LENGTH

I certify that this brief meets the form and length requirements of Rule 809.19(8)(b) and (c) in that it is: proportional serif font, minimum printing resolution of 200 dots per inch, 13 point body text, 11 point for quotes and footnotes, leading of minimum 2 points and maximum of 60 characters per line of body text. The length of the brief is 29,957 words as permitted by an Order of this Court dated October 31, 2011.

Dated this 29th day of November, 2011.

Signed:

_____

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin  53202
Telephone:  414-271-3400
Facsimile:  414-271-3841
E-mail:  rjd@hallingcayo.com

_____

LAURA H. NIRIDER (IL Bar No. 6297299)
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977

Attorneys for Defendant-Appellant

106

## CERTIFICATE OF COMPLIANCE
## WITH RULE 809.19(12)

I hereby certify that:

I have submitted an electronic copy of this brief, excluding the appendix, if any, which complies with the requirements of § 809.19(12). I further certify that:

This electronic brief is identical in content and format to the printed form of the brief filed on or after this date.

A copy of this certificate has been served with the paper copies of this brief filed with the court and served on all opposing parties.

Dated this 29th day of November, 2011.

Signed:

_____

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

_____

LAURA H. NIRIDER (IL Bar No. 6297299)
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone: 312-503-8576
Facsimile: 312-503-8977
E-mail: l-nirider@law.northwestern.edu
Attorneys for Defendant-Appellant