# STATE OF WISCONSIN

# COURT OF APPEALS

## DISTRICT II

## Case No. 2010AP3105 CR

---

STATE OF WISCONSIN,

Plaintiff-Respondent,

v.

BRENDAN R. DASSEY,

Defendant-Appellant.

---

**On Appeal from Judgment of Conviction and an Order Denying Postconviction Relief Entered in the Manitowoc County Circuit Court, The Honorable Jerome L. Fox, Presiding**

---

## APPENDIX OF DEFENDANT-APPELLANT

---

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

LAURA H. NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)
THOMAS F. GERAGHTY (IL Bar No. 0937436)

JOSHUA A. TEPFER (IL Bar No. 6294120)
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue, 8th Floor
Chicago, IL 60611
Telephone: 312-503-8576
Facsimile: 312-503-8977
E-mail: l-nirider@law.northwestern.edu
        tgeraghty@law.northwestern.edu
        s-drizin@law.northwestern.edu
        j-tepfer@law.northwestern.edu

Attorneys for Defendant-Appellant

# INDEX
# TO
# APPENDIX

Pages

Decision and Order on Defendant's
Motion for Postconviction Relief
(R:206)..............................................201-232

State Trial Exhibit No. 216 (Transcript of
March 1, 2006 Interrogation of Brendan Dassey)
(R:79:34)............................................233-372

Transcript of May 4, 2006 Hearing on
Defendant's Motion to Suppress Statements
(R:45)................................................373-486

Post-Conviction Exhibit 338 (May 5, 2006
E-Mail from Len Kachinsky to Mark Wiegert,
CC: Ken Kratz and Michael O'Kelly)
(R:173:338)..............................................487

Post-Conviction Exhibit 66 (May 7-10, 2006
E-Mail Exchange Between Len Kachinsky
and Michael O'Kelly)
(R:170:66)............................................488-491

Transcript of May 12, 2006 Oral Ruling
Denying Defendant's Motion to Suppress Statements
(R:46)................................................492-512

May 12, 2006 Order Denying Defendant's
Motion to Suppress Statements
(R:26)....................................................513

Transcript of May 12, 2006 Meeting Between
Michael O'Kelly and Brendan Dassey
(R:194)................................................514-535

Judgments of Conviction
(R:99-100)............................................536-537

Summary of Contamination in
March 1, 2006 Confession.........................538-542

List of "We Already Know" Statements By Police on
March 1, 2006.............…..................…...543-545

List of Promises of Leniency on
March 1, 2006.............…...................…...546-550

*Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763
(E.D. Mich. Mar. 30, 2001) ……..................…...551-561

*Commonwealth v. Rios*, 2011 WL 4089553 (Mass.
Super. Ct. 2011) ……..................…...562-566

*Commonwealth v. Truong*, 2011 Mass. Super. LEXIS
61 (Mass. Super. Ct. 2011) ….......................567-586

*State v. Gainey*, No. 98 CRS 3143 (N.C. Sup. Ct. June
11, 2009)................................................587-623

*Taylor v. Rednour*, No. 11-3212 (7th Cir. Oct. 25,
2011)....................................................624-626

## CERTIFICATION AS TO APPENDIX

I hereby certify that filed with this brief, either as a separate document or as a part of this brief, is an appendix that complies with § 809.19(2)(a) and that contains, at a minimum: (1) a table of contents; (2) the findings or opinion of the circuit court; and (3) portions of the record essential to an understanding of the issues raised, including oral or written rulings or decisions showing the circuit court's reasoning regarding those issues.

I further certify that if this appeal is taken from a circuit court order or judgment entered in a judicial review of an administrative decision, the appendix contains the findings of fact and conclusions of law, if any, and final decision of the administrative agency.

I further certify that if the record is required by law to be confidential, the portions of the record included in the appendix are reproduced using first names and list initials instead of full names of persons, specifically including juveniles and parents of juveniles, with a notation that the portions of the record have been so reproduced to preserve confidentiality and with appropriate references to the record.

Dated this 29th day of November, 2011.

Signed:

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

LAURA H. NIRIDER (IL Bar No. 6297299)
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977
E-mail:  l-nirider@law.northwestern.edu

Attorneys for Defendant-Appellant

STATE OF WISCONSIN      CIRCUIT COURT      MANITOWOC COUNTY

STATE OF WISCONSIN,      Plaintiff

                                   MEMORANDUM DECISION
     -vs-                                AND ORDER

                                   Case No. 06 CF 88

BRENDAN R. DASSEY,      Defendant

---

## INTRODUCTION

    The defendant, Brendan Dassey (Dassey) was charged on March 3, 2006, with being party to the crimes of first degree intentional homicide, second degree sexual assault, and mutilation of a corpse. The victim in all three charges was Teresa Halbach, who was murdered on October 30, 2005, in Manitowoc County. In a separate trial, Dassey's uncle, Steven Avery, was convicted on March 18, 2007, of being a party to the crime of Teresa Halbach's first degree murder, and being a felon in possession of firearms. Jury selection for Dassey took place over a day-and-a-half period in Dane County. The court ordered Dassey's jury sequestered in Manitowoc and his trial began on April 16, 2007. It concluded on April 25, 2007, when the jury returned guilty verdicts to all three charges.

    On August 2, 2007, this court sentenced Dassey on the intentional homicide conviction to life in prison with the possibility of release to extended supervision on November 1, 2048; additional concurrent sentences were given for the other two convictions.

    Dassey filed a motion under Wis. Stats. §809.30, on August 25, 2009, seeking post-conviction relief. Specifically, Dassey is seeking a new trial or a new suppression hearing. He

1

APP-000201

alleges he is entitled to this because his trial counsel, Mark Fremgen and Ray Edelstein and Attorney Leonard Kachinsky, who represented him immediately before trial counsel was appointed, were ineffective in their representation of him. He also requests a new trial in the interest of justice because, he alleges, the real controversy was not fully tried and his conviction represented a miscarriage of justice. Lastly, Dassey asks for a new hearing on the suppression of his March 1, 2006, confession. A motion to suppress those statements was originally heard by this court on May 4, 2006, and denied in a decision given May 12, 2006. Subsequently, a motion to reopen the hearing to suppress statements was filed by successor trial counsel; the court denied that motion on December 15, 2006.

Dassey's post-conviction motions were heard by this court over a five-day period beginning January 15, 2010, and ending January 22, 2010. No hearings were held on Martin Luther King Day, January 19, 2010. Following the close of defendant's post-conviction case, the State waived its right to call witnesses on its behalf. The court ordered a briefing schedule for the parties and those briefs have been completed and received. The court's decision follows.

## STANDARD OF REVIEW
### Ineffective Assistance of Counsel

Dassey was represented by Attorney Len Kachinsky from March 8, 2006, until August 25, 2006, when this court found his performance as counsel for Dassey to be "deficient" as a result of his failure to attend a police interview with his client which Kachinsky had arranged. Attorney Mark Fremgen was appointed successor counsel on August 29, 2006; Attorney Ray Edelstein

2

APP-000202

joined Fremgen as co-counsel for Dassey. All counsel were appointed through the Wisconsin State Public Defender's Office. Dassey's post-conviction motions allege each counsel ineffectively assisted him, either singly or collectively, and their deficient performance entitles him to the relief he is seeking.

To establish an ineffective assistance of counsel claim, Dassey must show that counsel made errors so serious that counsel was "not functioning as the counsel 'guaranteed' the defendant by the Sixth Amendment...[and]...that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." **Strickland v. Washington**, 466 US 668, 687 (1984). The court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. **Id.** at 697.

Deficient performance requires a showing "that counsel's representation fell below an objective standard of reasonableness" **Id.** at 688. The court reviews the attorney's performance with great deference and the burden is placed on the defendant to overcome the strong presumption that counsel acted reasonably within professional norms. **State v. Johnson**, 153 Wis. 2d 121, 127, 449 NW 2d 845 (1990). An attorney's performance "need not be perfect, nor even very good, to be constitutionally adequate." **State v. Carter**, 2010 WI 40, §22, 324 Wis. 2d 640, 782 NW 2d 695. When evaluating effectiveness, the court grants "a heavy measure of deference to counsel's judgments." **Id.**, §23. A defendant that can demonstrate counsel's performance was deficient must also show a reasonable probability that the deficient performance had an adverse effect on the outcome. **Id.**, §37.

3

APP-000203

Generally, when a defendant accepts counsel, the defendant delegates to counsel those tactical decisions an attorney must make at trial. To show prejudice, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." **Strickland** at 694. The burden of proof is on the defendant to show by clear and convincing evidence that both components of the ineffective assistance of counsel test have been met. **State v. Lukasik**, 115 Wis. 2d 134, 140, 340 NW 2d 62 (Court App. 1983).

## I. Attorney Len Kachinsky's Ineffective Assistance of Counsel.

### A. His breach of loyalty to his client.

Dassey urges this court to find that Kachinsky's actions on behalf of his client constituted disloyalty to the client and amounted to a conflict of interest. He sets forth in his brief a series of things Kachinsky did or that were done at his direction which Dassey says justify his claim that Kachinsky was disloyal and furnished him ineffective assistance of counsel. He starts with statements Kachinsky made to media even before meeting Dassey in which Kachinsky seemed to imply that Dassey may have had some involvement in the Halbach matter. (Def. Br. at 2; PC Exs. 317, 374.) This brief notes other instances of remarks made by Kachinsky to the press which again implied that Dassey had some involvement in the crime for which his uncle, Steven Avery, was also charged. In his post-conviction testimony, Kachinsky admitted talking to the press about his client's possible involvement in the crime but said he did it in part to blame Steven Avery and

4

in part to send a message to the family that Dassey might have to take a "legal option that they don't like". (Tr. 1-19-10 at 134, L. 13 to 25; at 136, L. 24-25, at 137, L.1 to 9.)

Dassey goes on to cite what he believes are additional instances of Kachinsky's disloyalty. Chief among them is a confession extracted from Dassey on March 12, 2006, by Michael O'Kelley, an investigator employed by Kachinsky. The admissions made by Dassey followed a "lie detector" test administered to Dassey by O'Kelley and which O'Kelley told Dassey he failed because the test showed a 98% probability of deception. (PC Ex. 97 at 1). After some prefatory prodding and cajoling by O'Kelley, Dassey went on to make a series of incriminating admissions and created a number of drawings depicting events that he was describing. (PC Ex. 97 at 5 to 19).

Dassey also points to Kachinsky's direction of O'Kelley to gather additional evidence from the Avery salvage yard bolstering the State's case against Steven Avery even though that evidence would further implicate Dassey. (Def. Br. at 3-4). Kachinsky's actions, according to Dassey, even if motivated by a benign intent to secure a favorable plea deal for his client, were neither authorized nor supported by Dassey who continued to maintain to Kachinsky that he was innocent of any wrongdoing. Dassey argues that Kachinsky's acts were disloyal and represented a conflict of interest as that term is defined in **Cuyler v. Sullivan**, 446 US 335 (1980). Furthermore, once an actual conflict of interest is shown prejudice is automatic. **State v. Kaye**, 106 Wis. 2d 1, 8-16, 315 NW 2d 337 (1982).

The State counters Dassey's position by saying that Kachinsky was trying to get the best deal for Dassey and some of his actions were simply push-back against family members who were fearful that Dassey would testify against Steven Avery. (St. Br. at 8 & 9). The State characterizes

5

APP-000205

Dassey's May 13th statement given to Fassbender and Wiegert in Sheboygan County without Kachinsky present as a "proffer" which could result in a plea agreement. (St. Br. at 9).

In **Cuyler v. Sullivan**, 446 US 335 (1980), two privately retained lawyers represented three defendants charged with first degree murders of two victims. **Id**. at 446. The three were tried at separate trials and Sullivan was convicted while his co-defendants were acquitted. His appeal, on grounds that his counsel had impermissible conflicts of interest with the multiple representation, was denied by the state courts but ultimately his conviction was reversed by the Federal Court of Appeals on his Writ of Habeas Corpus. In vacating and remanding for further proceedings, the Supreme Court held that the defendant "who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief". 446 US at 349-350.

The Wisconsin Supreme Court, in **State v. Kaye**, 106 Wis. 2d 1, 315 NW 337 (1982) adopted the holding of **Sullivan** in a case where the defendant claimed ineffective assistance of counsel because he and his co-defendant had been represented by the same attorney. While it denied the defendant's claim of ineffective assistance of counsel, the language of the opinion suggested that it viewed any representation of multiple defendants by a single lawyer or law firm as problematic and it prospectively required trial courts to make an inquiry on the record whenever that situation arose. **Kaye** at 13-14. The **Kaye** holding was amplified in **State v. Dadas**, 190 Wis. 2d 339, 526 NW 2d 818 (Ct. App. 1994) where the court ruled that "specific prejudice need not be shown if the defendant demonstrates by clear and convincing evidence that trial counsel actively represented a conflicting interest". **Id**. at 344. Counsel in **Dadas** undertook

6

APP-000206

the representation of two defendants who were charged with commercial gambling. His clients waived in writing any potential conflict of interest and then entered guilty pleas after which they were sentenced. Their attorney, who represented both of them throughout, urged them to cooperate with law enforcement so that they might avoid federal charges. **Dadas** at 345-346. The court found an actual conflict of interest to exist when an attorney has one client voluntarily supply incriminating information to be used against another client. **Dadas** at 346-347.

Dassey believes that the sum effect of what he refers to as Kachinsky's "multiple, concrete acts of disloyalty" warrant a finding by this court that an actual conflict of interest existed which entitles him to a new trial. (Def. Br. at 10). Additionally, he contends Kachinsky's acts are egregious enough so that the court should use them to presume prejudice, a presumption which makes unnecessary any inquiry into trial counsel's performance. **U.S. v. Cronic**, 466 US 648, 662 (1984).

He cites as support for his actual conflict argument **State v. Love**, 227 Wis. 2d 60, 594 N.W. 2d 806 (1999) where the Supreme Court reiterated the holding in **Kaye** while at the same time reversing a court of appeals' decision which had found on a per se rule an attorney to have provided ineffective assistance of counsel when she represented the state at the defendant's original sentencing, and then months later working as a public defender she represented the same defendant at his sentencing after revocation of probation. The court defined an actual conflict of interest as occurring "when the defendant's attorney was actively representing a conflicting interest, so that the attorney's performance was adversely affected." **Love** at 71. No showing of prejudice need be made because prejudice is presumed and counsel is considered per se

7

APP-000207

ineffective. **Love** at 71. The defendant in **Love** argued that the per se rule should be extended to cases of serial representation. The court declined to do so and found that on the facts of the case no clear and convincing evidence was adduced to prove an actual conflict of interest. **Love** at 82.

Unquestionably, Wisconsin courts have recognized that in certain instances a presumption of prejudice will attach to counsel's representation of a defendant. A number of the instances in which prejudice is presumed are set out in **State v. Erickson**, 227 Wis. 2d 758, 770, 596 NW 2d 749 (1999). The **Erickson** court opines that these instances are rare and in the absence of a presumption of prejudice a defendant must make a showing of actual prejudice and that the actual prejudice created a reasonable probability that the result of the trial would have been different. **Erickson** at 773 citing **Strickland**, 466 US at 694.

Dassey relies on **Kaye**, **Dadas**, **Cuyler**, and **Love** to support his claim that the court should use the per se rule to find Kachinsky ineffective and grant Dassey a new trial. (Reply Br. at 3 to 7). There are distinct factual differences between Dassey's situation and the conduct complained of in the cases on which he relies. All except **Love** are instances in which an attorney or attorneys jointly represented more than one client being charged on the same set of facts. Moreover, the lawyer or lawyers involved in the joint representation cases, represented their clients from the onset of the case through the plea or trial stage. The court has previously alluded to the factual background in **Love** and those facts do not parallel any of Dassey's complaints about Kachinsky's representation nor do the facts in **State v. Franklin**, 111 Wis. 2d 681, 331 NW 2d 633 (Ct. Apps. 1983), another case Dassey cites in support for his per se argument. The **Franklin** court found that the defendant's attorney who had represented the defendant throughout

8

APP-000208

her proceeding, had placed himself in an "actual conflict of interest" with his client when he placed his financial interest before his allegiance to his client. **Franklin** at 688-689.

Kachinsky's representation of Dassey ceased on August 25, 2006, after this court found that his failure to personally appear with his client at a May 13, 2006, interview with Investigators Wiegert and Fassbender constituted deficient performance. (Tr. 8-25-06 at 21 to 24). This was some seven months before the actual trial began with the selection of the jury in Dane County on April 12, 2007. Regardless of how the conduct of Kachinsky and his agent, O'Kelley, is characterized as it relates to the events of May 12th and May 13, 2006, Dassey "must establish that an actual conflict of interest adversely affected his lawyer's performance". **Cuyler** at 350. By the time a jury was selected and Dassey was tried Kachinsky was long gone from the case. Nothing from O'Kelley's May 12th interview in which he had Dassey incriminate himself found its way into the trial record. Other than a brief audio clip of a portion of a phone conversation between Dassey and his mother, which the State played without objection in its cross-examination of the defendant, and several questions asked on the cross-examination of Dr. Robert Gordon, nothing from May 13th was introduced at trial. (Tr. 4-23-07 at 50-51; Tr. 4-24-07 at 121-122). And, the State made little more than passing reference to the May 13th phone call in its closing to the jury. (Tr. 4-25-07 at 57, L. 1 to 3; at 80, L. 1 to 3).

To successfully sustain a challenge absent a showing of actual prejudice, Dassey must show that the reliability of the trial process itself was somehow negatively affected by Kachinsky's conduct or the conduct of his agent, O'Kelley. **Cronic** at 658. On this record, in this case, this court cannot find that Kachinsky's conduct constituted an actual conflict of interest that

9

APP-000209

somehow affected the reliability of a trial which was held seven months after his departure from the case.

### B. **Kachinsky's deficient performance at the May 4, 2006, suppression hearing.**

Dassey also claims to be entitled to a new suppression hearing because Kachinsky's performance at the May 4, 2006, hearing was inflected by his conflict of interest and this deficient performance unfairly prejudiced his offense. (Def. Br. at 15 to 17). As proof of this claimed deficient performance, Dassey points to Kachinsky's failure to effectively cross-examine the State's witnesses as well as his concession that there were no Miranda issues concerning Dassey's March 1, 2006, statement to Investigators Mark Wiegert and Thomas Fassbender.

Kachinsky filed on April 19, 2006, a motion to suppress the use of any statements made by Dassey to law enforcement agents on February 27, 2006 and March 1, 2006. His motion came in the form of a ten page statement of facts coupled with a written argument citing what he believed to be the relevant law as it related to those facts. (4-19-06 Motion to Suppress). The State responded with a memorandum of law setting forth its position on the legal issues it believed were implicated in the suppression hearing. (5-1-06 State's Memorandum in Response). Kachinsky filed a reply to the State's memorandum in which he argued that the video-recorded March 1, 2006, statement given by Dassey to Wiegert and Fassbender contained inculpatory statements made by Dassey as a direct or indirect result of misrepresentations made to him by his interviewers. (5-3-06 at 1 to 5).

10

APP-000210

At the suppression hearing, Investigator Wiegert testified how he and Special Agent Fassbender had elicited Brendan Dassey's admission to his involvement in the Teresa Halbach murder at their March 1, 2006, interview of him. Kachinsky cross-examined Wiegert and following the completion of Wiegert's testimony he called Dassey's mother, Barbara Janda, and Kris Schoenenberger-Gross, the Mishicot School District psychologist, as his witnesses. (Tr. 5-4-06 at 64 to 80; at 81 to 100).

In his brief Dassey criticizes Kachinsky by accusing him of a conflict of interest at the suppression hearing which compromised his ability to faithfully proceed on his client's behalf. (Def. Br. at 15). He also scores Kachinsky for failing to call a police interrogation expert and doing a poor job of cross-examining Investigator Wiegert. (Def. Br. at 16-17). Lastly, he faults Kachinsky for conceding that the Miranda warnings were not an issue by stipulating to that fact at the outset of the hearing. (Tr. 5-4-06 at 6-7). According to Dassey, Kachinsky's failure to argue that the March 1st statement should be suppressed for its violation of Miranda guidelines is, in and of itself, an example of his deficient performance. (Def. Br. at 28).

On May 12, 2006, this court issued findings of fact and conclusions of law finding that the State had met its burden of showing by a preponderance of the evidence that the Dassey statements given to Wiegert and Fassbender on March 1, 2006, "were the product of Brendan Dassey's free and unconstrained will reflecting deliberateness of choice. In short, they were voluntary statements." (Tr. 5-12-06 at 11). The court has heard or seen nothing that was introduced at the Machner hearing or in the briefings which would cause it to recede from its May 12, 2006, decision. Moreover, the court believes that Kachinsky, at the hearing and in his

11

prehearing briefs, adequately represented Dassey's interests and cannot be said to have provided ineffective assistance of counsel. Nothing raised in Dassey's post-conviction briefs, either by way of new or different witnesses, or more rigorous cross-examination of Wiegert, comes close to showing that Kachinsky's representation at the hearing fell below an objective standard of reasonableness. Wiegert acknowledged both at the May 4, 2006, suppression hearing and the post-conviction motion hearing that initially he did not regard the interview of Dassey as a suspect interview, but rather a witness interview. (Tr. 5-4-06 at 23; Tr. 1-22-10 at 139). Nonetheless, Dassey was given written Miranda warnings on March 1, 2006, before arriving at the Manitowoc County Sheriff's Office and was reminded of those warnings shortly after getting to the interview room at the sheriff's department. (5-4-06 Hearing Exhibit 2; Tr. 5-4-06 at 28, and Tr. 1-22-10 at 138-139). Despite the fact that the officers interviewing Dassey on March 1, 2006, considered him a witness rather than a suspect, they furnished him written Miranda warnings. It became evident as the interview progressed that Dassey was much more than a witness to the events that culminated in Teresa Halbach's death. The court believes that the initial segment of the interview qualified as a noncustodial interview when viewed under the totality of the circumstances standard set out in **State v. Gruen,** 218 Wis. 2d 581, 594 to 596, 582 NW 2d 728 (1998).

   The fact that it became a custodial interrogation after Dassey made inculpatory admissions, does not mean that it was necessary for the interrogators to revivify the previously given Miranda warnings. **State v. Grady,** 2009 WI 47, 317 Wis. 2d 344, 766 NW 2d 729, a case discussed by the State in its brief, held that there is no bright line rule requiring a readministration of Miranda rights after a noncustodial interview becomes a custodial interrogation. **Grady** at

§§19 & 20. Instead, the court found that the sufficiency of the timing of the Miranda warnings must be determined under a totality of the circumstances test. <u>Grady</u> at §31. The purpose of Miranda warnings is to make a defendant aware of his or her rights during any kind of questioning. Here, Dassey had received the written warnings which he signed and initialed on the morning of March 1, 2006. He was reminded of those warnings not many minutes later when he arrived at the Manitowoc County Sheriff's Department. There is nothing in the videotape of his interview that suggests he was either physically or emotionally exhausted. The length of time elapsing between his receipt of the warnings and his inculpatory statements belie any notion that he had forgotten them. Indeed, at his trial, he testified on direct examination:

> "Q    Okay. Brendan, I want to talk about that video a little bit with you, okay?
> A    Okay.
> Q    You-- you know it was being videotaped that day?
> A    Yes.
> Q    And-- and the officers explained to you your rights; is that right?
> A    Yes.
> Q    Did you understand them?
> A    Yes."
> (Tr. 4-23-07 at 42, L. 7 to 14).

This court concludes that neither Kachinsky's conduct of the suppression hearing nor his concession on the Miranda issues constituted ineffective assistance of counsel.


**II. Attorneys Mark Fremgen and Raymond Edelstein's Ineffective Assistance of Counsel.**

   **A. Failure to call the appropriate expert was ineffective assistance.**


13

APP-000213

Dassey raises a number of instances in his post-conviction brief which he contends show that Kachinsky's successor counsel, Attorneys Mark Fremgen and Ray Edelstein ineffectively assisted him at and before his trial. Chief among them is his assertion that while these defense counsel called Dr. Robert Gordon as an expert witness on the issue of false confession, they should have called, in addition to Gordon, one or more expert witnesses to show the jury that Dassey's confession was produced by coercive police questioning. These additional experts were necessary because Gordon lacked the requisite expert qualifications to opine on coercive police interrogation tactics. (Def. Br. at 23 to 26).

Dassey's defense counsel elicited a substantial amount of testimony at the post-conviction motion hearing attempting to show that Dassey's confession may have been a false confession. Dr. Richard Leo, an associate professor of law at the University of San Francisco, testified at length on behalf of the defendant. His area of professional expertise includes the social psychology of police interrogations and how unreliable confessions can be produced by coercive police interrogation tactics. (Tr. 1-19-10 at 91). In his direct examination testimony, Dr. Leo reviewed the statements Dassey had given to police, as well as his confession, and pointed out areas that he believed were examples of psychologically coercive interrogation tactics employed by the police who questioned Dassey. He said in looking at the videos in the case he observed some psychologically coercive tactics being used by those who questioned Brendan Dassey; even tactics which are not psychologically coercive, if repeated over and over again, can become psychologically coercive, according to his testimony. (Tr. 1-19-10 at 149).

14

He said Investigators Fassbender and Wiegert provided Dassey with "systemic inducements" when they talked to him about interceding with the district attorney on his behalf or going "to bat" for him if he was honest with them. (Tr. 1-19-10 at 160). The defense claims that these inducements couched as promises to help him out with law enforcement, the justice system or his family, were tactics designed to undermine his will and get him to confess. According to Dr. Leo, the investigators repeatedly used what he referred to as the "superior knowledge ploy" in which they pretended to know far more about what occurred than in fact they did. (Tr. 1-19-10, at 168-169). These, and a number of other stratagems Dr. Leo said investigators used in questioning Dassey could have pushed him into implicating himself in a crime in which he was not involved.

Under police questioning, Dassey was able to identify the fact that Teresa Halbach was shot in the left side of her head when questioned by the investigators, a fact the state believed tied him to the crime. Dr. Leo said this was not truly corroborative of his confession because the information about the head shot was supplied by the investigators and the side location was a fact that could be arrived at by a chance guess. (Tr. 1-19-10 at 220 to 222). When asked about evidence the police found in the Avery garage which they searched as a result of Dassey's confession, Dr. Leo denied that this was evidence of corroboration and said this occurred because the police had planted the garage suggestion in Dassey's mind and he simply was repeating it back to them. (Tr. 1-19-10 at 224-225). Certain police interrogation techniques, many of which he described as being used on Dassey, can lead to false confessions and as a social scientist he could have educated the jury "about these counterintuitive and not popularly known phenomena in their

15

APP-000215

effects and why they're significant in understanding how false confessions come about". (Tr. 1-19-10 at 237 to 239).

Testimony similar to that offered by Dr. Leo was furnished in affidavit form by Dr. Lawrence White, a professor of psychology and legal studies at Beloit College. (PC Exhibit 80). In Dr. White's affidavit, he reviews Dassey's confession to Investigators Wiegert and Fassbender along with his February 27th interviews at Mishicot High School and the Two Rivers Police Department with the same two investigators. (PC Exhibit 80, at 9 to 19). His affidavit testimony makes many of the same points as Dr. Leo's testimony about the police interrogation tactics and Dassey's vulnerability. Dr. White concludes his affidavit testimony by saying that there are reasons to believe that Dassey's "statements may not be wholly reliable or truly voluntary." (PC Exhibit 80, at 20). Dr. White's affidavit was used as his direct examination at the post-conviction motion hearing but he appeared personally and was subject to cross-examination by the State. On his cross-examination he said he had received an email request from Attorney Mark Fremgen to testify on the defendant's behalf at the Dassey trial. (Tr. 1-21-10 at 189). The Fremgen request concerned testimony Dr. White might give about the police interrogation tactics used on Dassey and how those techniques may have affected the reliability for voluntariness of the defendant's statements. (Tr. 1-21-10 at 190, 191.) Dr. White said he would have testified had he been asked to by Attorney Fremgen but Fremgen did not make that request of him.

Dassey contends that Attorneys Fremgen and Edelstein rendered ineffective assistance of counsel by their failure to supplement Dr. Gordon's testimony on the personality factors which may make a suspect more suggestible or vulnerable to suggestion when being questioned by the

16

APP-000216

police, with an expert like Dr. Leo or Dr. White who could testify about the psychology of interrogation, coercion and false confessions. Dr. Leo testified that he thought the suggestibility expert such as Dr. Gordon could not adequately educate a jury on the social science research and phenomena of false confessions. (Tr. 1-19-10 at 237 to 239). Dassey believes that only through testimony from experts like Dr. White or Dr. Leo could the jury learn how contaminated was his March 1st confession. (Def. Br. at 27 to 29). Under the circumstances of this case Dassey argues that trial counsel's "failure to call such an expert was manifestly unreasonable and constitutes deficient performance." (Def. Br. at 30).

In its brief the State questions whether the type of testimony discussed by Dr. Leo and Dr. White would have been admissible in Wisconsin since it might be opinion testimony which invades the fact-finding role of the jury by opining on the truthfulness of Dassey's statements. **State v. Haseltine**, 120 Wis. 2d 92, 96, 352 NW 2d 673 (Ct. App. 1984). The State also points to cases from other jurisdictions that have barred Dr. Leo's testimony as invading the province of the jury, citing two cases, one from Kansas and the other from Missouri. (St. Br. at 21). This court believes that both Dr. Leo and Dr. White would have qualified as expert witnesses at Dassey's trial and in all likelihood some, and maybe much of their testimony, at least as they outlined it in the post-conviction motion, would have been admissible. **State v. Walstad**, 119 Wis. 2d 483,

17

APP-000217

515-516, 351 NW 2d 469 (1984).[1]  With that said, the fact that the testimony may have been admissible and that trial counsel failed to procure it for trial does not mean that they acted deficiently.

In **State v. VanBuren**, 2008 WI App. 26, 307 Wis. 2d 447, 746 NW 2d 545, a case decided *after* the Dassey trial, our Court of Appeals faced a similar claim when post-conviction counsel challenged as ineffective assistance trial counsel's failure to offer evidence from a false confession expert at trial. **Id**. at §17 to 19.  The court concluded, given the dearth of published or unpublished cases in Wisconsin in which false confession expert testimony was introduced, it could not find that failing to offer that kind of testimony constituted ineffective assistance of counsel. **Id** at §19.  At the time this court granted defense counsel's motion to permit Dr. Gordon to testify it noted that it was unable to find a reported or published Wisconsin case discussing the admissibility of false confession testimony. (Tr. 4-5-07 at 7-8).  Even if the holding in **VanBuren** is outdated or not applicable to Dassey, this court cannot and will not find that absence of testimony from a social scientist who could talk about the psychology of interrogation and confession constituted deficient performance by trial counsel.

Attorney Edelstein explained at some length in the post-conviction motion hearing how trial counsel considered, but rejected, another expert who could have offered testimony on

---

[1] The subject of false confessions has been treated in a number of law review pieces but articles about false confessions are not confined to law journals and academic literature.  Two recent examples appearing in general circulation media:  John Schwartz, *"Confessing to Crime but Innocent,"* **New York Times Online**, September 13, 2010, www.nytimes.com/2010/09/14/us/14confess.html;  Robert Kolker, *"I Did It"*, **New York**, October 11, 2010, at 22, 89.  Interestingly, Kolker says at one point in his article: "To prevent false confessions, interrogation critics say there's a solution so simple that it's remarkable it hasn't happened already: videotaping every minute of every police interrogation".  At 90.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 24 of 211    Document 19-5    APP-000218

Dassey's confession. (Tr. 1-21-10 at 266 to 269). Referring to Dr. Gordon, he said: "We had an expert who we best believed was appropriate for the defense in this case." (Tr. 1-21-10 at 266-269). Later, he went on:

> "To muddy the waters with another expert, irregardless (sic) of whether the State presented one, sometimes, and can, I believe, in the eyes of jurors, look like a desperate attempt by an accused to turn it into a battle of the experts without focusing on both the facts and, most importantly in this case in the defense of Brendan, the humanization of Brendan as a young, easily manipulated individual." (Tr. 1-21-10 at 267, L. 15 to 23).

It is clear that Dassey's trial counsel made a strategic choice to use Dr. Gordon as their expert witness and not supplement him with another expert or other experts. They were also aware that the state was prepared to call Joseph Buckley, an expert on the Reid method of interrogation if the defense produced its own interrogation expert. (Tr. 1-21-10 at 259-260). It was their considered opinion that the trial focus should be Dassey and his cognitive limitations and suggestibility, not interrogation techniques. (Tr. 1-21-10 at 260 and 266 to 269).

The court finds this not to be deficient performance but a trial decision rationally based on the facts and the law. **State v. Elm**, 201 Wis. 2d 452, 464-465, 476 NW 2d 471 (Ct. App. 1996).

**B. The State's trial testimony and Dassey's own trial testimony nullified anything additional defense experts could have said.**

Dassey's March 1, 2006, videotaped confession was the centerpiece of the trial and the State's case against him. Our Supreme Court, in **State v. Jerrell**, C. J., 205 WI 105, 283 Wis. 2d 145, 674 NW 2d 607 adopted a rule requiring electronic recording of all questioning of a juvenile

19

APP-000219

when it occurs at a place of detention. **Id**. at §58. Here, the jury had the opportunity as the finder of fact to view the questioning of Brendan Dassey by Investigators Wiegert and Fassbender. It heard and saw how Dassey responded to the questions asked of him and his admissions of his participation in the charged crimes.

While his confession may have been the pivotal piece of evidence against Dassey, it was by no means the only testimony implicating him heard by the jury. Jurors had an opportunity to watch and listen to Dassey testify in his own defense at trial. They heard him admit to being with his uncle, Steven Avery, on the evening of Teresa Halbach's murder (Tr. 4-23-07 at 29 to 31). They heard him say he helped his uncle clean up a three foot by three foot stain on the garage floor with gas, paint thinner, and bleach. (Tr. 4-23-07 at 32, L. 13 to 25 and at 33, L. 1 to 10). Jurors heard his counsel ask Dassey:

> Q     "Why did you tell those two investigators that you
>         participated in killing and-- raping Teresa Halbach?
> A     I don't know.
> Q     You have no idea why you would say that?
> A     No."
>         (Tr. 4-23-07 at 42, L. 1 to 6).

When asked on cross-examination how he was able to tell Fassbender and Wiegert so much detail about what happened to Teresa he responded first by saying "I don't know" and then answering a follow-up question said "I could have got it out of books". (Tr. 4-23-07 at 65, L. 12 to 19). Pressed on cross-examination about the name of the book he would have read that had events such as he described to the police, he said "I believe it was called *Kiss the Girls*". (Tr. 4-23-07 at 67, L. 17 to 21). The jurors had a chance to weigh Dassey's credibility based, not only

20

APP-000220

on his video-taped confession but upon his testimony in open court. That testimony, with its evasive answers to questions, frequent " I-don't-knows", and closing with what jurors may have felt was an outlandish explanation for the origin of the story he gave the police in his March 1st confession gave them a firsthand opportunity to evaluate his credibility.

Jurors also heard a much less equivocal Dassey in an audio interview played during the trial testimony of Marinette County Sheriff's Department Detective Anthony O'Neill. (Tr. 4-19-07 at 113; Tr. Ex. 201). O'Neill and other Marinette County officers stopped a car in which Dassey was a passenger late in the morning of November 6, 2005. (Tr. Ex. 202). Marinette County police had been asked to assist because Dassey's uncle, Steven Avery, and other family members were staying on property owned by Steven Avery's parents (Dassey's grandparents) in Marinette County. The Marinette police stopped a car registered to Steven Avery but occupied by his nephews, Bryan and Brendan Dassey. (Tr. Ex. 202). They removed Brendan to another vehicle and questioned him extensively. (Transcript of Interview, Tr. Ex. 203). The jury heard the aggressive and sometimes confrontational questioning of Dassey during which he adamantly resisted any suggestion that he knew where Teresa Halbach went. (Tr. Ex. 203, at 32-33, at 40-41).

The jury heard testimony from Susan Brandt, who interned at Mishicot High School from January of 2006 to May of 2006, while pursuing a master's degree in educational counseling, that she had contact with Kayla Avery who came to the counseling office because she said she was feeling scared. (Tr. 4-18-07 at 168). Kayla said she was scared because her uncle, Steve Avery, had asked one of her cousins to help move a body. (Tr. 4-18-07 at 169). In her trial testimony,

21

APP-000221

Kayla Avery, who was Dassey's first cousin, said Brendan appeared to change between October 31, 2005, and the end of February, 2006. And she described that change as Brendan losing weight and being a little bit more upset. (Tr. 4-18-07 at 7). At a birthday party in November she said that she observed Brendan crying. (Tr. 4-18-07 at 8- 9). While at trial she claimed not to have talked at that time with Brendan about Steven, she admitted telling the school counselors and Officers Wiegert and Fassbender about her conversation with Brendan at the party. (Tr. 4-18-07 at 10). Investigator Mark Wiegert testified that the Mishicot school counselors had notified the police about their contact with Kayla Avery and what she had told them. Following that contact, Wiegert and Fassbender interviewed Kayla in the presence of her mother and she told them that Brendan had told her about hearing screaming from Steven Avery's residence and seeing body parts in the fire behind Steven Avery's residence. (Tr. 4-19-07 at 193-194). Kayla also gave them a written statement. (Trial Ex. 163).

Even if this court were to conclude that trial counsel committed unprofessional errors by failing to call an expert on police interrogation tactics, the quality and quantity of evidence against Dassey is such that there is no reasonable probability that the proceeding would have turned out differently.

**C. Trial counsel's failure to deconstruct the March 1st confession as ineffective assistance of counsel.**

In his brief, Dassey reprises the contaminated confession argument that he raised with Dr. Leo's post-conviction testimony when he claims as deficient trial counsel's failure "to

22

APP-000222

systematically deconstruct Brendan's March 1st confession so that the jury would understand that each corroborated 'fact in the confession' was a product of external contamination." (Def. Br. at 30). He claims that each of nineteen details in his confession that the State represented to the jury as corroborated by physical evidence should have been deconstructed by counsel at trial because each of those so-called facts could be traced to either Dassey's innocent knowledge of events or his acquaintance with the news media reports or arose from contamination introduced by the investigators who questioned Dassey on March 1st. (Def. Br. at 30 to 33).

In short, the jury heard testimony about purportedly corroborated evidence that actually emanated from noninculpatory sources and trial counsel was deficient by not forcefully bringing this to the jury's attention. The State responds to this by pointing out that there is no proof in the record that Dassey obtained the information he now calls contaminated from other than his own personal experience. Additionally, it discusses some of the post-conviction testimony of trial counsel who asked Dassey where he got the information that he used in his confession and why he falsely confessed. (St.'s Br. at 28-29).

According to that testimony, Dassey never adequately explained to either Attorney Fremgen or Attorney Edelstein the source of the details in his confession or why he might have falsely confessed. The two attorneys said in their post-conviction motion testimony that Dassey told them he might have dreamt it or gotten it out of a book. (Tr. 1-20-10 at 226; Tr. 1-21-10 at 256).

The appropriate measure of attorney performance within professional norms is reasonableness under the circumstances of the case. **State v. Brooks**, 124 Wis. 2d 349, 352, 369

23

APP-000223

NW 2d 183 (Ct. App. 1985). Dassey provided little or nothing to his trial counsel that they could have used to deconstruct his March 1st confession. His trial testimony, both on direct and cross-examination, provided no evidentiary platform on which trial counsel could construct a plausible contamination attack. Instead, it created through Dassey's own words an explanation for his March 1st confession which lacked any credibility and added to the negative weight of his original admissions. Moreover, much of what Dassey maintains about the deconstruction of his confession by either Dr. Leo, another interrogation expert or trial counsel, comes at a remove of more than two plus years from the trial itself and rests entirely upon assumptions as to what testimony would or might have been and how that testimony would have played out to the jury. The court considers much of the post-conviction testimony on deconstructing Dassey's confession through either defense counsel or an expert more speculative than convincing. The court finds trial counsel's performance with respect to these matters to be within the realm of reasonableness, considering the circumstances of the case.

### D. Video clips of Dassey's "recantation".

Dassey's post-conviction motion faults trial counsel as being deficient for their failure to insist upon the admission at trial of several video clips from the March 1, 2006, confession. The clips, which post-conviction counsel categorize as a "recantation" of Dassey's confession to police occurred after the end of police questioning while Dassey was speaking with his mother, Barbara Janda. The text of the video clip reads:

24

> "Brendan:    What'd happen if he [Steven Avery] says something
>              his story's different?  Wh- he says he, he admits to
>              doing it?
> Barb Janda:  What do you mean?
> Brendan:     Like if his story's like different, like I never did
>              nothin' or somethin'.
> Barb Janda:  Did you?  Huh?
> Brendan:     Not really.
> Barb Janda:  What do you mean, not really?
> Brendan:     They got to my head."
> (Post-conviction Exhibit 209 at 672).

Post-conviction counsel seizes on the phrases "not really" and "they got to my head" as being Dassey's recantation of the confession he had just given to the police investigators. (Def. Br. at 33-34).

Testimony at the post-conviction motion hearing showed trial counsel differed on showing this video clip to the jury. Attorney Edelstein thought the jury should see it while Attorney Fremgen did not. (Tr. 1-21-10 at 236; Tr. 1-20-10 at 195). As lead counsel, Attorney Fremgen made the strategic decision not to play the portion of the tape because he thought it depicted a mother coming in to see her son and realizing he had just done something serious and would go to jail. (Tr. 1-20-10 at 195). This was not deficient performance. Counsel made a rational decision based on an evaluation of the information and emotion the video clip would convey to the jury.

Apart from that, to suggest as post-conviction counsel do that these remarks somehow constituted an unequivocal recantation of Dassey's previous confession is a dubious proposition. At best, the terms "not really" and "they got to my head" are, in the context of the conversation between Dassey and his mother, ambiguous. At worst, the words can be viewed as substantiating the confession he previously gave to the police.

25

APP-000225

## E. Trial Counsel's Claim Deficient Performance in Closing Argument.

Post-conviction counsel frame as concessions of guilt two statements that Attorney Edelstein made in his closing. The first statement made by Attorney Edelstein which counsel says represents a concession appears to do so at least as defense counsel excerpts Attorney Edelstein's remarks in the post-conviction brief. (Def. Br. at 34). However, when removed from the isolated context, post-conviction counsel gives it, it appears to concede nothing other than to depict Dassey as being pushed by investigators to say things he truly didn't believe. Edelstein argued:

> "But the truth of the matter is, a couple of times, when they weren't specific about who they're even talking about, he gives an answer, such as a number. And it changes. It bounces back and forth. He was confused. He was scared.
> And let's just briefly touch upon that. Ask yourselves, how probing were they when he told them, I seen it. And he said, he told, he seen me see it, so he told me not to say something or else it will—he threatened me a little bit. He made it clear to them early on. And they had no reason to doubt it. They just didn't like the answers. They didn't like what he said. But they never explored the potential truth and alternative that this young man walked over there and did see something in a fire, and that something was Teresa Halbach.
> They go through this scenario, and they start—once he tells them, I seen it, and Steve knew it, and he said, don't say anything, that's when it becomes, you saw this, you saw that." ·
> (Tr. 4-25-07 at 124, L. 25, at 125, L. 1 to 20).

The second part of Edelstein's argument which Dassey labels a concession begins where Edelstein talks about the Halloween bonfire and how Dassey went about picking things up for the fire "and eventually they start throwing stuff in there, and he probably did see something. Pretty traumatic." (Tr. 4-25-07 at 128, L. 2 to 5).

26

APP-000226

Dassey acknowledged in his testimony at trial that he had been at the bonfire and helped his uncle put things on the fire including tires and the seat from Teresa Halbach's RAV4 automobile. (Tr. 4-23-07 at 64-65.) Edelstein's remarks in closing draw on Dassey's own admissions at trial but in no way suggest that Dassey committed either element necessary for conviction of mutilating a corpse as a party to a crime. (Wis. JI-CR 1193). Even if this court concluded that Edelstein's discussion of Dassey's appearance at the bonfire was a concession, it would not be ineffective assistance of counsel. **State v. Silva**, 2003 WI App. 191, 266 Wis. 2d 906, 670 NW 2d 385, and **State v. Gordon**, 2003 WI App. 69, 262 Wis. 2d 380, 663 NW 2d 765, both of which Dassey cites in his brief, give counsel leeway to concede on a count if counsel's decision is tactically reasonable. (**Silva** at §15 to §20 and **Gordon** at §28).

At the post-conviction motion hearing, Attorney Edelstein did not recall making any frank admission of Dassey's direct involvement in the corpse mutilation, the charge that carried the least significant penalty, but he did acknowledge making an argument "which was intended to provide that as an option to the jury." (Tr. 1-21-10 at 236, L. 23-24 and at 237). The court believes this falls within conduct permitted under **Silva** and **Gordon**.

### F. Trial counsel's alleged deficiency in failing to get Dassey's February 27, 2006, and May 13, 2006, statements admitted into evidence.

Defense trial counsel sought to have admitted at trial all or portions of Dassey's February 27, 2006, interview at Mishicot High School with Wiegert and Fassbender. Dassey's March 1, 2006, interview with the two investigators had been heard by the jury and that interview as well

27

APP-000227

as some trial testimony that had made mention of a discussion with the defendant on February 27th. (Tr. 4-20-07 at 55-56). After hearing argument from counsel, this court, citing **State v. Pepin**, 110 Wis. 2d 431, 328 NW 2d 898 (1982), and Wis. Stats. §908.01(4)(b)1, ruled that the state could use any inculpatory statements made by Dassey since they constituted an exception of the hearsay rule. The defense could not, however, use exculpatory material from the February 27th interview unless it was intertwined with the inculpatory statements and bore the same guarantee of trustworthiness. (Tr. 4-20-07 at 62). Dassey now says that trial counsel performed deficiently by failing to cite the right evidentiary rule for the admission of the February 27th and May 13th statements. His trial counsel, he says, should have urged the court to admit the statements because they weren't being offered to prove the truth of the matter asserted, but rather as examples of Dassey's suggestibility. (Def. Br. at 36). This court finds nothing in Dassey's post-conviction argument that would cause it to rule any differently than it did at the time the matter was initially argued and the court determined the statements to be inadmissible hearsay. Even if the statements were admitted as requested by trial counsel, the weight of the evidence against Dassey was such that there is no reasonable probability that the outcome would have been different.

Post-conviction counsel also contend the statement's admissibility should have been argued by trial counsel under the completeness rule codified at Wis. Stat. §901.07. This court understands that statute to permit the admission of otherwise hearsay evidence if it is necessary to provide context and prevent distortion. **State v. Eugenio**, 219 Wis. 2d 391, 412, 579 NW 2d 642 (1998). Neither the February 27th nor the May 13th interview of Dassey was necessary to

28

APP-000228

complete or fairly balance other trial evidence. Trial counsel did not perform deficiently by failing to use the rule of completeness as a basis for the admission of the February 27th and May 13th statements.

Dassey closes that portion of his brief dealing with the deficient performance of his trial counsel, by asserting that the five instances of trial counsel's deficient performance cumulatively as well as individually prejudiced him and he is entitled to a new trial. (Def. Br. at 37-38). And he again raises as ineffective assistance of counsel the failure of Kachinsky and trial counsel to seek the suppression of his March 1st statement as the fruit of an illegal arrest. This court believes it has dealt sufficiently with the claim of an illegal arrest in an earlier portion of this decision. As to the five areas Dassey articulates as constituting deficient performance of trial counsel, this court has found trial counsel not to have performed deficiently in these instances. **State v. Felton**, 110 Wis. 2d 485, 505-506.

Even assuming that one or more of the complained of acts was wrong, none of them, either singly or collectively, was "so serious that the defendant was deprived of a fair trial and a reliable outcome." **Strickland v. Washington**, 466 U.S. 668, 687 (1984). Withal, this court has neither seen nor heard anything which creates a reasonable probability sufficient to undermine its confidence in the outcome of Dassey's trial. **Id**. 466 U.S. at 694.

### G. Dassey's claim to be entitled to a new trial in the interests of justice.

Wisconsin Stat. §805.50(1) empowers the trial court to set aside a verdict and order a new trial "in the interest of justice." Dassey urges the court to affirmatively exercise that power in his

29

APP-000229

case "because his trial counsel failed to fairly explore the unreliability of his confession and therefore deprived the jury of trying his case on an informed basis." (Def. Br. at 39.) The failure of trial counsel to deconstruct his confession or call an expert to deconstruct his confession has resulted in a miscarriage of justice entitling him to another trial or at least another suppression hearing. (Def. Br. at 40).

This court has examined the cases Dassey cites in his brief and can find nothing in any of them which lend support to his claim for a new trial in the interest of justice. **State v. Hicks**, 202 Wis. 2d 150, 549 NW 2d 435 (1996) which he cites in support of his request was a case in which newly discovered DNA evidence excluding the convicted defendant was received at a post-conviction evidentiary hearing. **Id**. at 156. The State had used at trial a hair sample to help convict a defendant but no DNA test had been done of that sample. Our Supreme Court reasoned that the real controversy was not tried because the evidence excluding the defendant as the origin of one of the hair samples was relevant to the issue of identification and it was not heard by the jury. **Id**. at 158. Likewise, the defendant in **State v. Jeffrey**, 2010 WI App. 29, 323 Wis. 2d 541, 780 NW 2d 231 introduced post-conviction testimony that showed he did not have herpes in a case in which the victim claimed her case of herpes originally stemmed from sexual contact the defendant had with her when she was three years of age. **Id**. at §1 and §2. On appeal, the court reversed because it believed that the post-conviction evidence could have had a "great impact on the credibility battle between the prosecutor and the defendant, had it been presented." **Id**. at §20.

Both **Hicks** and **Jeffrey** were reversed because the respective courts decided that each jury should have had an opportunity to hear the critical, material, and relevant scientific evidence that

30

APP-000230

was not disclosed until a post-conviction evidentiary hearing. Dassey seeks to have us believe that expert testimony from academic police interrogation experts or trial counsel's deconstructing cross-examination exposing the contaminated parts of Dassey's confession would have the same qualitative trustworthiness as the scientific tests referenced in **Hicks** and **Jeffrey**.

Questions of its admissibility aside, the proposed testimony of experts such as Drs. Leo or White would not present any exculpatory evidence for the jury to consider. Rather, it would simply allow the expert to offer an opinion about the reliability of Dassey's confession. Opinion testimony and deconstructing cross-examination are a far cry from the evidence in **Hicks** and **Jeffrey** which triggered their reversals. This court cannot find that Dassey's trial represents a miscarriage of justice nor can this court find that the real controversy was not fully tried. **Lock v. State**, 31 Wis. 2d 110, 118, 142 NW 2d 183 (1966). He is not entitled to a new trial nor should he have another suppression hearing.

## CONCLUSION

In his post-conviction motions, Brendan Dassey has claimed that counsel who represented him at and prior to trial were ineffective and performed deficiently on his behalf. Because of counsel's various failures to effectively pursue his defense, Dassey says he is entitled to a new trial in which his inculpatory admissions are suppressed or, alternatively, a new hearing to suppress his self-incriminating statements. This court has examined Dassey's arguments on the issues raised in his post-conviction motions. Based on that examination, the court has concluded for the reasons set forth in the body of this opinion, that nothing done by his pretrial or trial

31

APP-000231

counsel has rendered the result of Dassey's trial unreliable or the proceeding fundamentally unfair.

Accordingly, the court denies Dassey's motions for a new trial and a new suppression hearing.

The state is directed to draft the order reflecting the court's decision.

Dated this 13th day of December, 2010.

BY THE COURT,

JEROME L. FOX
Circuit Judge

APP-000232

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
538
File Number

REMIKER:        Good.  Come on in.

(pause)

WIEGERT:        This door Dave?

VOICE:          Yup, take right.  Up the stairs.

(pause and background voices)

WIEGERT:        Mornin'

VOICE:          Mornin'

VOICE:          Mornin'

VOICE:          Mark Anderson would like to chat with you if you had a chance.

WIEGERT:        Sure, absolutely.

UNKNOWN
VOICE:          Mornin', good to see ya.

WIEGERT:        Why don't you just, just you have a seat Brendan.  Tom and I just gotta stop out for a minute and then we'll be right in, OK?

BRENDAN:        (nods "yes") OK.

INV. WIEGERT:   All right.

(door open & closes)

(pause)



Background Voice:  You guys want coffee or anything?  Water?

FASSBENDER:     Soda? Water? (Brendan shakes head "no") You sure?

BRENDAN:        Well water maybe (nods "yes").

FASSBENDER:     OK.

Complaint No.
05-0157-955

---

(background voices)

(long pause)

WIEGERT:      All right. How you doin' buddy?

BRENDAN:      Good

FASSBENDER:      Brendan, Brendan. Here you go.

WIEGERT:      I'm just gonna shut this audio off, be-OK, 'cuz there's audio in the room (Brendan nods "yes") here

BRENDAN:      Yeah.

WIEGERT:      Just so you know. OK. Um, I just wanted to just, just go over this real quick again. Do you remember these rights, your Miranda Rights that I read to you? (Brendan nods "yes")

BRENDAN:      Yeah. (nods "yes")

WIEGERT:      Um, you still want to talk to us.

BRENDAN:      Yeah. (nods "yes")

WIEGERT:      OK. Just wanted to make sure of that. (Brendan nods "yes")

FASSBENDER:      Brendan, I want you ta, to relax. OK. Um, a little more comfortable here and stuff and what we'd like, you had a couple days since we last talked now which was Monday and you had a chance to reflect and breathe, I imagine, this and (Brendan nods "yes")

WIEGERT:      You have a pen on you?

FASSBENDER:      We, um

WIEGERT:      I seem to have lost mine. Is this your only one. I

FASSBENDER:      I got more here.

WIEGERT:      OK.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
540
File Number

Complaint No.
05-0157-955

FASSBENDER: and ah, I kinda call it, it's a sense to breathe being in a way, and I'll just let you talk to us a little and um, and, and we've had also a chance for two days now to look at what you said and, and listen to the to tapes a little and stuff like that and, and we look at that and we say, well you know, Brendan gave us, honestly gave us this information, this information and that information, maybe I'll call them dots or whatever and some of the dots when we look at it say well, I think we need some matching up here, just a little tightening up or something. We, we feel that, that maybe, I think Mark and I both feel that maybe there's a, some more that you could tell us, um, that you may have held back for whatever reasons and I wanna assure you that Mark and I both are in your corner, we're on your side, and you did tell us yourself that one of the reasons you hadn't come forward yet was because you're afraid, you're scared, and, and one of the reasons you were scared was that you would be implicated in this, or people would say that you helped or did this (Brendan nods "yes")

BRENDAN: mm huh. (nods "yes")

FASSBENDER: OK, and that you might get arrested and stuff like that. OK? And we understand that. One of the best ways to, ta prove to us and importantly, you know, the courts and stuff is that you tell the whole truth, don't leave anything out, don't make anything up because you're trying to cover something up, a little, um, and even if those statements are against your own interest, you know what I mean, that, then makes you might, i-it might make you look a little bad or make you look like you were more involved than you wanna be, aah, looked at, um, it's hard to do but it's good from that vantage point to say hey, there's no doubt you're telling the truth because you've now given the whole story you've even given points where it didn't look real good for you either, an, and I don't know if I, if you, your understanding what I'm saying (Brendan nods "yes")

BRENDAN: mm huh. (nods "yes")

FASSBENDER: and, and that's why we kinda came here, to let you talk a little, maybe get some stuff off your mind or chest if you need to and then to tell us the whole truth, to take us through this whole thing that happened on Monday, not leaving anything out, not adding anything in, because if our guy looked at, looked at the tapes, looked at the notes, it's real obvious there's some places where some things were left out or maybe changed just a bit ta, to maybe lookin' at yourself to protect yourself a little. Um, from what I'm seeing, even if I filled those in, I'm thinkin' you're all right. OK, you don't have to worry about things. Um, w, were there for ya, um, and I, and, and we know what Steven did an, and, and we know kinda what happened to you when he did, we just need to hear the whole story from you. As soon as we get that and we're comfortable with that, I think you're gonna be a lot more comfortable with that. It's going to be a lot easier on you down the road, ah, if this goes to trial and stuff like that. We need to know that, because it's probably going to come out. Think of Steven for a second, Steven is already starting to say some things and eventually he is gonna potentially lay some crap on you and try and make it look like you are the bad person here. Um, and we don't want that,

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
541

Complaint No.
05-0157-955

File Number

we want everything out in front so we can say yeah we knew that Steven. He told us that. So, ya, you know that you get my drift. I'm a, I know Mark has some, so I'm just going to give you an opportunity to talk to us now and, and kinda fill in those gaps for us. (Brendan nods "yes")

WIEGERT: Honesty here Brendan is the thing that's gonna help you. OK, no matter what you did, we can work through that. OK. We can't make any promises but we'll stand behind you no matter what you did. OK. Because you're being the good guy here. You're the one that's saying you know what? Maybe I made some mistakes but here's what I did. The other guy involved in this doesn't want to help himself. All he wants to do is blame everybody else. OK. And by you talking with us, it's, it's helping you. OK? Because the honest person is the one who's gonna get a better deal out of everything. You know how that works. (Brendan nods "yes")

BRENDAN: mm hm. (nods "yes")

WIEGERT: You know. Honesty is the only thing that will set you free. Right? And we know, like Tom said we know, we reviewed those tapes. We know there's some things you left out and we know there's some things that maybe weren't quite correct that you told us. OK. We've done; we've been investigating this a long time. We pretty much know everything that's why we're to talking to you again today. We really need you to be honest this time with everything, OK. If, in fact, you did somethings, which we believe, somethings may have happened that you didn't wanna tell us about. It's OK. As long as you can, as long as you be honest with us, it's OK. If you lie about it that's gonna be problems. OK. Does that sound fair? (Brendan nods "yes")

BRENDAN: mm hum (nods "yes")

WIEGERT: All right. Should we just go through that whole day again on the 31st or how do you wanna do it?

FASSBENDER: We can that a...... try to give him a chance to just talk to us and

WIEGERT: Sure.

FASSBENDER: if he wants to go through the whole day, if he wants to fill in the pieces, that's, that's up to Brendan right now.

WIEGERT: What would you rather do?

FASSBENDER: Just wanna to talk to us and tell us and startin' with that day and how you actually came to know what happened and stuff. Cuz, I already know you were in the garage and stuff apparently cleaning up and stuff so tell us about that. (Brendan nods "yes")

BRENDAN:     Well he was working on his car and like he did something wrong and then like he poked a hole in like somethin' and then it started leaking. And then later on when cuz I was helping him before I went over there a little bit

FASSBENDER:     Yeah, I know

BRENDAN:     and later on he needed help, I helped him move the car outta there and cleaned it up and I went back home and then that I later on I got a call from him and he wanted me to come over.

WIEGERT:     Let's go back a little bit, OK. When did you first go over by Steve? (Brendan nods "yes")

BRENDAN:     At like 9:00.

WIEGERT:     But you said you were over in the garage helping him.

BRENDAN:     Yeah.

WIEGERT:     When was that?

BRENDAN:     Like six, six-thirty.

WIEGERT:     OK. So let's go back OK. Let's go back to around that time. You get home off the bus at about three forty-five? (Brendan nods "yes")

BRENDAN:     Yeah. (nods "yes")

WIEGERT:     And what do you do? Now you gotta be honest here.

BRENDAN:     I walked home …….. and I go into my house.

WIEGERT:     OK.

BRENDAN:     and ….

WIEGERT:     What did you see at that time?

BRENDAN:     That she was talkin' er, her car was over there.

FASSBENDER:     Where was her car?

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
543
File Number

Complaint No.
05-0157-955

BRENDAN:     Like on the other side of the you know where you drove by our house

FASSBENDER:     Uh huh.

BRENDAN:     Where you turn there it was like on the other side of the road there, by the trees.

WIEGERT:     And you just told, you just said something, you said she was talking

BRENDAN:     Yeah.

WIEGERT:     And you stopped now remember this is very important cuz we already know what happened that day, OK. Let's just be honest here OK, Brendan. (Brendan nods "yes")

BRENDAN:     Uh huh. (nods "yes")

WIEGERT:     Let's get this out.

FASSBENDER:     Use your memory, not what Steven told ya, not what anyone else told you, be honest, cuz we're gonna, we're gonna be able to tell when you're not being honest. I-I'm telling ya right now so. You're walkin' down the road and let's pick it up again. OK. (Brendan nods "yes")

BRENDAN:     I seen him talkin' to her on his porch and that and I seen her, her jeep there and I walked in the house.

WIEGERT:     So she's standing meaning she is Teresa?

BRENDAN:     Uh huh. (nods "yes")

WIEGERT:     Did you recognize her?

BRENDAN:     Not at first.

WIEGERT:     You just knew it later on when this all came out?

BRENDAN:     Yeah. (nods "yes")

WIEGERT:     So she's standing on his porch?

**CALUMET COUNTY SHERIFF'S DEPARTMENT**

Complaint No.
05-0157-955

Page
544
File Number

BRENDAN:           Uh huh. (nods "yes")

FASSBENDER:      Did Blaine see that?

BRENDAN:           (shakes head "no") I don't think.

FASSBENDER:      And you're sure you saw that, you sure it wasn't another time or anything like that (Brendan shakes head "no"), it was Halloween this year.

BRENDAN:           (nods "yes")Yeah.

FASSBENDER:      This last year? On the front porch the area?

BRENDAN:           (nods "yes")Yeah.

FASSBENDER:      Do you remember what she was wearing? I know it's a long time ago, don't guess, if you remember, you can say it.

BRENDAN:           (shakes head "no") I don't remember.

FASSBENDER:      Do you remember how he was dressed?

BRENDAN:           I think he, er ah, white short, er, white shirt with like red shorts or somethin' like that.

FASSBENDER:      OK. Anytime you don't remember you say that all right? (Brendan nods "yes")

WIEGERT:           Yep, don't make anything up. You don't know it, you don't know it. (Brendan nods "yes")

FASSBENDER:      So then did what happened, you saw her and him on the porch and they were what? (Brendan nods "yes")

BRENDAN:           They were talking.

FASSBENDER:      And then what did you do?

BRENDAN:           I walked in my house.

FASSBENDER:      And they were just talking, were they doing anything else? Were they screaming, fighting, talking, pushing, anything?

BRENDAN:        (shakes head "no") Just talking.

FASSBENDER:     OK. You went in your house and this is about quarter to four.

BRENDAN:        (nods "yes") mm huh.

FASSBENDER:     And then what did you do in your house. Be honest so we don't have ta go though this eight times.

BRENDAN:        I went into my room and cuz my mom told me I had ta clean my room. I cleaned it a little bit and then played Playstation 2 for a little bit and it was about like 5:00 and my, my brother was on the phone with his friend.

FASSBENDER:     Blaine?

BRENDAN:        (nods "yes")Yeah.

FASSBENDER:     OK.

BRENDAN:        And he was talking about going trick or treating with 'em and that Jason will pick him up at like seven.

FASSBENDER:     And then?

BRENDAN:        And then I ate and then went into the living room at and like I was like eating in the living room and watchin' TV.

FASSBENDER:     And what did ya see?

WIEGERT:        Honest.

BRENDAN:        Like what?

FASSBENDER:     Like what happened?

BRENDAN:        Well then, then he called and said that he wanted help on his his car.

WIEGERT:        OK, did he call you or did he come over?

BRENDAN:        He called me.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
546
File Number

Complaint No.
05-0157-955

WIEGERT:        Wh-on your cell phone or on, on the house phone?

BRENDAN:        The house phone.

WIEGERT:        He calls your house phone?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:     And this is about what time now?

BRENDAN:        'bout six, six-thirty

FASSBENDER:     OK. And what does he say to you?

BRENDAN:        He says do you wanna help me with the ta fix the car because he said that that if I would help him on his cars, he would like help me find a car.

FASSBENDER:     OK.

BRENDAN:        And so I did and then that's when he like cut somethin' and then it was leaking on the floor.

WIEGERT:        Let's stop right there, so you he called you and asked you to help fix a car

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        And you go over to this house?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        And where do you go?

BRENDAN:        Into the garage

WIEGERT:        And what's in the garage?

BRENDAN:        His Monte.

WIEGERT:        His Monte. (Brendan nods "yes") Where's that Suzuki?

BRENDAN:        On the side.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
547
File Number

FASSBENDER:      Is the big garage door open?

BRENDAN:      (nods "yes") mm huh.

FASSBENDER:      So you walk in there and there and this is Halloween (Brendan nods "yes") OK, and what's he doing?

BRENDAN:      He's workin' on his Monte.

FASSBENDER:      What about the fire?

BRENDAN:      Do you mean if it was started or somethin'? No it wasn't. (shakes head "no")

FASSBENDER:      OK. We're not gonna go any further in this cuz we need to get the truth out now. We know the fire was going. We know that he had already had his altercation with Teresa. We don't believe there's a Monte in there. I talked to ya the other night and you said nothing about Monte you said nothing about something getting punctured and leaking out. We talked about cleaning somethin' up in that garage. You told me that you thought thinking back now there was blood. It was red in color plus you're at your house. You said six, six-thirty, I'll go that far with ya it might even been earlier. What's goin' on? Let's take it through honestly now. (Brendan nods "yes")

WIEGERT:      Come on Brendan. Be honest. I told you before that's the only thing that's gonna help ya here. We already know what happened. OK. (Brendan nods "yes")

FASSBENDER:      We don't get honesty here, I'm your friend right now, but I but I gotta I gotta believe in you and if I don't believe in you, I can't go to bat for you. OK. You're noddin', tell us what happened. (Brendan nods "yes")

WIEGERT:      Your mom said you'd be honest with us. (Brendan nods "yes")

FASSBENDER:      And she's behind you a hundred percent no matter what happens here.

WIEGERT:      Yep, that's what she said, cuz she thinks you know more too.

FASSBENDER:      We're in your corner. (Brendan nods "yes")

WIEGERT:      We already know what happened now tell us exactly. Don't lie.

FASSBENDER:      We can't say it for you Brendan, OK.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
548

Complaint No.
05-0157-955

File Number

BRENDAN:     Well that that morning he said that if he wanted me ta come over like at six-thirty and he had the fire started cuz he wanted to bu, ah, to burn some tires

FASSBENDER:     Uh huh

BRENDAN:     So he had it started and the jeep was still in there.

WIEGERT:     Who's jeep?

BRENDAN:     The Suzuki

WIEGERT:     It was still in where?

BRENDAN:     In the garage

FASSBENDER:     So the Monte's not in there. (Brendan shakes head "no")

WIEGERT:     OK.

FASSBENDER:     Who's car was in the garage? Tell me the truth.

WIEGERT:     We already know. Just tell us. It's OK.

FASSBENDER:     The truth, that's its so easy to tell the truth. It's hard ta make things up.

BRENDAN:     Her jeep.

FASSBENDER:     That's right.

WIEGERT:     Her jeep was in the ga-garage wasn't it? (Brendan nods "yes")

FASSBENDER:     And you, you tell me if I'm wrong but when you were at the house, you just went over there cuz you had talked about it in the morning. Is that correct?

BRENDAN:     (nods "yes") mm huh.

FASSBENDER:     There was no call from Steven asking you to come over was there? And you went over, was the big door closed? (Brendan shakes head "no")

BRENDAN:     (shakes head "no") mm uh.

FASSBENDER:     You sure about that?

Complaint No.
05-0157-955

BRENDAN:        (nods "yes") Yeah.

WIEGERT:        So the big door is open and her truck is in there when you get over there?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:     By her truck, who are we talkin' about?

BRENDAN:        Well if I wanted ta come over later.

FASSBENDER:     No, whose truck?

WIEGERT:        Who's truck?

FASSBENDER:     Is in there?

BRENDAN:        Oh, the the truck?

FASSBENDER:     Yeah.

BRENDAN:        Her jeep.

FASSBENDER:     Who's her?

BRENDAN:        Teresa's

FASSBENDER:     OK and that jeep is a what? Do you remember?

BRENDAN:        Like what color?

FASSBENDER:     Color or make?

BRENDAN:        green like a greenish blue

FASSBENDER:     OK.

WIEGERT:        Is it drove in or is it backed into the garage?

BRENDAN:        It's backed in.

WIEGERT:        OK.

CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

WIEGERT:     Now, let's be honest. What did he tell you? What did he show you?

FASSBENDER:     What did you see and what did he tell you?

BRENDAN:     He showed me the knife and the rope.

WIEGERT:     Where was she? Come on we know this already. Be honest.

BRENDAN:     In the back of the jeep.

WIEGERT:     She was in the back of the jeep? (Brendan nods "yes") Was she alive or
dead at that time?

BRENDAN:     Dead

FASSBENDER:     Are you sure? (Brendan nods "yes") OK. What did you see in the back,
now this is hard, but what did you see in the back of the jeep?

BRENDAN:     That she was laying there with like a small blanket over her.

FASSBENDER:     Do you remember where her head was?

BRENDAN:     (shakes head "no") Not really.

FASSBENDER:     Did she have clothes on?

BRENDAN:     Yeah (nods "yes").

FASSBENDER:     She was clothed.

BRENDAN:     (nods "yes") Yeah.

WIEGERT:     Was she tied up already? Or did you help him do that? (Brendan shakes
head "no")

BRENDAN:     She was tied up already.

FASSBENDER:     Where? Tell me how she was tied up.

BRENDAN:     Like the rope was right here around her body.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
551
File Number

Complaint No.
05-0157-955

FASSBENDER:      Are you sure? (Brendan nods "yes")

WIEGERT:        Did Steve have any blood on him at that time?

BRENDAN:        On his finger.

WIEGERT:        What about on his body and his clothes?

BRENDAN:        (shakes head "no") Not that I know of.

WIEGERT:        Where did you see blood?

BRENDAN:        Like, like right here.

WIEGERT:        Where else in the garage?

BRENDAN:        On the floor.

WIEGERT:        A lot?

BRENDAN:        Like drips.

WIEGERT:        Where was it dripping from?

BRENDAN:        I don't know.

WIEGERT:        What did he tell you he did to her?

BRENDAN:        That he stabbed her.

FASSBENDER:     Let's, stop there for a second now, OK. I want to back up just a bit. I didn't mean to interrupt. That you sayin' like what time actually did you get over there now? About?

BRENDAN:        Like quarter ta seven.

FASSBENDER:     So it still about that same time, quarter to seven? (Brendan nods "yes") Are you sure?

BRENDAN:        (nods "yes") mmm hum.

FASSBENDER:     OK, did you really see those two talking on the on the porch?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
552
File Number

Complaint No.
05-0157-955

BRENDAN:        Yeah. (nods "yes")

FASSBENDER:     You did? (Brendan nods "yes")  You're 100% on that?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:     OK.

WIEGERT:        How did she get in the back of the jeep?  Tell us that.

BRENDAN:        I don't know.

WIEGERT:        Did you help him?

BRENDAN:        No. (shakes head "no")

WIEGERT:        Let's be honest here Brendan.  If you helped him, it's OK, because he was telling you to do it.  You didn't do it on your own (Brendan shakes head "no").

BRENDAN:        I didn't, I didn't touch her.

WIEGERT:        So you get over into the garage and the garage door is open, her truck is in the garage.  Right?

BRENDAN:        (nods "yes")Yeah.

WIEGERT:        And what does he say to you?

FASSBENDER:     Think about it and be honest.

WIEGERT:        It's OK.  What does he say to you?

BRENDAN:        That's when he threatened me, that if I would say anything, that he like trusted me or somethin'.

WIEGERT:        Why did he, why did he have you come over there?  Did he need help with something?  Remember we already know, but we need to hear it from you.  Why did he have you come over there?  He needed help, didn't he?  (Brendan nods "yes")  What did he need help with?  Go ahead and tell us.

BRENDAN:        Probably to get rid of the body.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
553

Complaint No.
05-0157-955

File Number

WIEGERT:        Yeah.

FASSBENDER:     So, what Mark's sayin' is, did he call you or did he come to the door and say Brendan I need you. What, what did he do?

WIEGERT:        He came over.

FASSBENDER:     Tell us what he told or asked you to do?

BRENDAN:        He said hey, Brendan, do you wanna help me do somethin'?

FASSBENDER:     And, keep goin'.

BRENDAN:        And, I said for what? And he is like fer somethin' to do in my garage.

FASSBENDER:     OK, keep going.

BRENDAN:        And, I said sure and then later I came over there and

WIEGERT:        What time did he come to your house?

BRENDAN:        'bout, (pause) I can't remember.

WIEGERT:        OK, but you, he comes to your house and asks you if you wanna do something, help him with something?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        Tell me that again.

BRENDAN:        That he wanted me to come over there and help him move somethin'

WIEGERT:        OK. Did he tell you what?

BRENDAN:        (shakes head "no") No.

WIEGERT:        Did you go over right away?

BRENDAN:        No, I waited ten minutes.

WIEGERT:        OK. So then you walk over and the garage door is open

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
554
File Number

Complaint No.
05-0157-955

BRENDAN:      (nods "yes") Yeah.

WIEGERT:      And what do you see again?

BRENDAN:      Her jeep.

WIEGERT:      OK.

FASSBENDER:   And you're sure the big garage door is open?  You didn't go in the little
door.

BRENDAN:      (shakes head "no") No.

WIEGERT:      So you see her jeep and then what happens?  Does he what?

BRENDAN:      He opens the back door.

WIEGERT:      OK and what does he say?

BRENDAN:      And told me to help him.

WIEGERT:      Da, do you ask him a question who is this, or, what?

BRENDAN:      Yeah.

WIEGERT:      OK.  Tell me what he said.

BRENDAN:      He said that it's a girl that he was kinda pee'd off at.

WIEGERT:      Did he say, who, who it was?

BRENDAN:      Teresa Halbach.

WIEGERT:      Why was he pee'd off at her?

BRENDAN:      I don't know.

WIEGERT:      I think he probably told ya.  So just be honest.  We already know.

FASSBENDER:   He's obviously not holding anything back from you.  He had you come ta
see this.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
555
File Number

Complaint No.
05-0157-955

WIEGERT:        We already know.

FASSBENDER:        He used you for this. So bring us into the garage again. You mentioned earlier that's when he threatened you. Tell us that.

BRENDAN:        That he threatened me that if I would say anything that he would stab me like she, he did ta her and that, that um, he was pissed off at her because of he wanted to get his his Blazer in the thing that like that last time she was there and he couldn't.

WIEGERT:        OK. So he opens the back door of her truck (Brendan nods "yes") and tell me what you see.

BRENDAN:        Her body laying there.

WIEGERT:        What could you see of her?

FASSBENDER:        The truth now. As hard as it tell us the truth.

BRENDAN:        Her head, her body, her feet

WIEGERT:        So she was not covered up? (Brendan shakes head "no") No. I didn't think so. See we already knew that. (Brendan nods "yes")

FASSBENDER:        Did she have clothes on? Now be honest. If she did, she did, and if she didn't, she didn't.

BRENDAN:        Sort of.

FASSBENDER:        OK. What did she have on?

BRENDAN:        Like a white T-shirt and that, pants

WIEGERT:        What do you mean sort of? Either she had clothes on or she didn't. It's, was some of it on some of it off? What?

BRENDAN:        It was like ripped.

WIEGERT:        It was ripped. (Brendan nods "yes") Where was it ripped?

BRENDAN:        Like right here.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
556
File Number

Complaint No.
05-0157-955

WIEGERT:      Was it a T-shirt or button up shirt or what kind of shirt?

BRENDAN:      A button up one.

WIEGERT:      What color?

BRENDAN:      Like a black one.

WIEGERT:      OK, before you just said there was a white T-shirt. She had that on too?

BRENDAN:      (nods "yes") mm huh.

WIEGERT:      Underneath that shirt?

BRENDAN:      Yeah. (nods "yes")

WIEGERT:      OK, and in the other interview you said it was blue. Do you remember what color it was? If you don't remember, say you don't remember.

BRENDAN:      I don't remember.

WIEGERT:      OK. So he threatens you and what does he say to you?

BRENDAN:      That, ta help him get rid of the body.

WIEGERT:      OK.

FASSBENDER:      Before you mentioned trust, that he said something about trust. Tell us about that. What did he say about that?

BRENDAN:      That he really likes me much and that he trusts me that I won't say nothin'.

WIEGERT:      OK. So what happens next?

BRENDAN:      That he told me to grab her feet so I did and

WIEGERT:      mm huh.

BRENDAN:      So we took her out in the back and put her in the fire pit.

WIEGERT:      Was the fire burning already?

APP-000251

Complaint No.
05-0157-955

---

BRENDAN: Yeah.

FASSBENDER: Tell us did you carry her out there or did you use somethin' to get her back there?

BRENDAN: Well, we lifted her out of the jeep and put her on like a, like a wheeled thing.

FASSBENDER: A wheel thing, what's that?

BRENDAN: Like the things where you get under the car.

WIEGERT: A creeper?

BRENDAN: Yeah. (nods "yes")

WIEGERT: OK.

FASSBENDER: And is that creeper always kept in his garage?

BRENDAN: Well he was borrowing it from the yard or somethin' like that.

WIEGERT: What's that creeper say on it? Do you remember? (Brendan shakes head "no") What color is it?

BRENDAN: Like black and red.

WIEGERT: Black and red, OK. So you guys lift her out of the truck,

BRENDAN: mm huh. (nods "yes")

WIEGERT: And you got which part of her again?

BRENDAN: Her feet.

WIEGERT: And what is Steve carrying?

BRENDAN: Her head and her shoulders.

WIEGERT: And you put her on the creeper?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
558
File Number

BRENDAN:      Yeah. (nods "yes")

FASSBENDER:   Does she have shoes on?

BRENDAN:      (shakes head "no") No.

WIEGERT:      Does she have, did you take her clothes off then?

BRENDAN:      uh  uh. (shakes head "no")

WIEGERT:      Was she tied up?

BRENDAN:      Yeah.

FASSBENDER:   Describe that again how she was tied up, and again make it easy on yourself, just tell us the truth the first time.

WIEGERT:      The hard part's over.

BRENDAN:      That it was like wrapped around her like three, four times.

WIEGERT:      Wrapped around where?  Show us where on your body.

BRENDAN:      Like, like right here.

WIEGERT:      OK.  What about her feet?

BRENDAN:      Yeah. (nods "yes")

WIEGERT:      Yeah, what?

BRENDAN:      They were tied up.

WIEGERT:      What were they tied up with?

BRENDAN:      Rope.

WIEGERT:      What kinda rope?

BRENDAN:      Like, ah, like that round.

WIEGERT:      Something you'd use for clothesline?  That type of thing?

Complaint No.
05-0157-955

| | |
|---|---|
| BRENDAN: | Yeah. (nods "yes") |
| WIEGERT: | What color was it? |
| BRENDAN: | Like white and blue |
| WIEGERT: | OK. |
| FASSBENDER: | What about her hands? |
| BRENDAN: | (shakes head "no") I don't remember. |
| WIEGERT: | Where did you see injuries on her? |
| BRENDAN: | Her stomach. |
| WIEGERT: | Her stomach. What did it look like? |
| BRENDAN: | Like she was stabbed. |
| FASSBENDER: | I don't necessary, I gonna tell you I don't know what it looks like when someone stabbed. OK, you gotta talk to someone that doesn't realize this. Tell us what you saw. |
| BRENDAN: | Like it was all bleeding and that. |
| WIEGERT: | Show me where and on you that would be. |
| BRENDAN: | Like right here. |
| FASSBENDER: | How much blood? Was the, show me on you the extent of the stain or the blood that you saw. |
| BRENDAN: | Like right there. |
| FASSBENDER: | That whole area. (Brendan nods "yes") Was it pretty wet yet or dry? |
| BRENDAN: | Like damp. |
| FASSBENDER: | Damp. (Brendan nods "yes") Could you see flesh or just shirt? |
| BRENDAN: | A little bit of flesh. |

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
560
File Number

FASSBENDER: How many times did he say he stabbed her?

BRENDAN: Once.

WIEGERT: What else did he do ta her? We already know, be honest.

FASSBENDER: We've got enough of her to know some things that happened to her. So tell us the truth.

WIEGERT: What else did he do ta her?

BRENDAN: Raped her.

WIEGERT: Did he tell you that? (Brendan nods "yes")

FASSBENDER: Tell us about that. And where he did it.

BRENDAN: I don't know where he did but

WIEGERT: What did he say he did in his words? What did he tell you? You can, you can swear, you can use any of his language you want. Tell us exactly what he told you he did to her.

BRENDAN: That he ripped off her clothes and she refused and she tried to get away but he, he wa, he was too strong for her (pause) and he did it.

WIEGERT: He did what?

BRENDAN: Raped her

FASSBENDER: What did he say? Did he use those words? (Brendan nods "yes")

WIEGERT: Are you sure (Brendan nods yes") cuz its usu, not usually the words he uses? Are, are if you're sure, that's OK.

BRENDAN: (nods "yes") Yeah.

WIEGERT: Where did that happen?

BRENDAN: I don't know.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
561
File Number

Complaint No.
05-0157-955

WIEGERT:    And she tried to get away (Brendan nods yes) but he was too strong.

BRENDAN:    Yeah

WIEGERT:    And then what did he do to her?

BRENDAN:    Well after he was done, that's when he put her back in the jeep in the back.

FASSBENDER:    Was she dead then yet or not?

WIEGERT:    Brendan, were you there when this happened?

BRENDAN:    No. (shakes head "no")

WIEGERT:    OK. Was she dead there then or not?

BRENDAN:    Yeah. (nods "yes")

FASSBENDER:    How do you know that? I have a feelin' I know how you know that.

WIEGERT:    We already know Brendan. We already know. Come on. Be honest with us. Be honest with us. We already know, it's, OK? We gonna help you through this, alright? (Brendan nods "yes") Tell us, how do you know that?

BRENDAN:    I was outside riding my bike

WIEGERT:    mm huh.

BRENDAN:    And I could hear it.

WIEGERT:    What could you hear?

BRENDAN:    Screaming.

WIEGERT:    OK. Was the door closed at that time?

BRENDAN:    mm huh. (nods "yes")

WIEGERT:    Did he know you were out there?

BRENDAN:    No. (shakes head "no")

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
562
File Number

Complaint No.
05-0157-955

WIEGERT:     What was the screaming like? What was she saying?

BRENDAN:     Like help me.

WIEGERT:     Did you know what was going on?

BRENDAN:     (shakes head "no") No.

WIEGERT:     What did you do?

BRENDAN:     Well, I was going up to the, the driveway and get the mail.

WIEGERT:     What time was that?

BRENDAN:     'bout four, four thirty

FASSBENDER:  Was it light out?

BRENDAN:     Yeah. (nods "yes")

FASSBENDER:  OK.

WIEGERT:     So you go out on your bike and you hear screaming coming from where?

BRENDAN:     His house.

WIEGERT:     Whose house?

BRENDAN:     Steven's.

WIEGERT:     The house or the garage?

BRENDAN:     The house.

WIEGERT:     From the house.

FASSBENDER:  All right. Then what do you do?

BRENDAN:     I just went to go get the mail and went in the house.

WIEGERT:     So you go get the mail and you go in the house and then what?

*(handwritten margin note: 4-4:30 / Get more / from screaming)*

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
563
File Number

Complaint No.
05-0157-955

BRENDAN: Sat down and watched TV.

WIEGERT: OK.

FASSBENDER: OK Brendan, you're doing a good job. Let's go back to when you go outside to get your bike and you gotta go get the mail and you said you heard screaming. Anymore, tell us more about what you heard. That you said help me. Was a female screaming?

BRENDAN: (nods "yes") Yeah.

FASSBENDER: What else did you hear her say if anything?

BRENDAN: That's all I heard.

FASSBENDER: OK. Was her vehicle still there?

BRENDAN: Yeah. (nods "yes")

WIEGERT: Where is the vehicle at that time?

BRENDAN: By the big trees.

WIEGERT: OK.

FASSBENDER: Did that scare you when you heard that screaming?

BRENDAN: Sort of.

FASSBENDER: Did you go over to his house then?

BRENDAN: uh uh. (shakes head "no")

FASSBENDER: Are you sure?

BRENDAN: Yeah. (nods "yes")

FASSBENDER: And you said you rode your bike down to get the mail?

BRENDAN: (nods "yes") Yeah.

**CALUMET COUNTY SHERIFF'S DEPARTMENT**

Page
564
File Number

Complaint No.
05-0157-955

FASSBENDER: Came back and then what'd you do? Honestly. You went over to his house?

BRENDAN: (shakes head "no") No.

FASSBENDER: What'd you do?

BRENDAN: I went in ta our garage and put the bike away.

FASSBENDER: mm huh

BRENDAN: And Bryan was in there workin' on his car.

FASSBENDER: Yeah.

BRENDAN: I he, I asked him if he wants any help and he said no, that if he wanted help, he would come in and get me or somethin' so I went in the house and I sat down.

WIEGERT: Did Bryan hear the screaming too?

BRENDAN: No, he had the radio going.

WIEGERT: OK.

FASSBENDER: Did you tell Bryan?

BRENDAN: (shakes head "no") No.

FASSBENDER: OK, you went in the house and sat down, and then?

BRENDAN: I waited and then I, I watched TV for a little bit and my mom came home.

FASSBENDER: And she comes home at about what time?

BRENDAN: 'bout four thirty, five

FASSBENDER: OK.

WIEGERT: And then what happens?

BRENDAN: She asked me if anybody got the mail. I'm like yeah, I did and watched TV more and he came over and asked if she wanted help.

WIEGERT:        He came over and asked you what?

BRENDAN:        If I could help him move somethin'.

WIEGERT:        OK.

FASSBENDER:     OK, let's, to this point now, I think we're pretty close to the truth. How close are we Brendan?

BRENDAN:        Pretty close.

FASSBENDER:     OK, then give us the little parts that we don't have yet up ta that point. Does Steven? There's somethin' in there we're missin'. You heard her, I have a feelin' he saw you, you saw him somethin' in here that we're missin' cuz you know we're not idiots, I don't see him comin' over to the house and asking you to help him unless you knows you know somethin' so tell us what you knew that he knew.

WIEGERT:        It's OK Brendan. We already know.

FASSBENDER:     I think you went over to his house and then he asked him to get his mail somethin' in here is missing.

BRENDAN:        Well, when I got the mail there was like a envelope in there with his name on it.

FASSBENDER:     All right.

WIEGERT:        OK, now we're goin' so what did you do?

BRENDAN:        I knocked on the door and he answered it.

WIEGERT:        Yeah, and then what?

BRENDAN:        I gave it to him and then I left.

WIEGERT:        Come on now. You just heard screaming over there.

FASSBENDER:     You're making this hard on us and yourself.

WIEGERT:        Be honest. You went inside, didn't you? (Brendan nods "yes")

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
566
File Number

Complaint No.
05-0157-955

FASSBENDER:     Yeah.

WIEGERT:     You went in the trailer?

BRENDAN:     mm huh. (nods "yes")

FASSBENDER:     You're noddin'.

WIEGERT:     OK. Did he invite you in?

BRENDAN:     Yeah.

WIEGERT:     OK and where was she?

BRENDAN:     In his room.

WIEGERT:     OK, did you go back there and look?

BRENDAN:     No. (shakes head "no")

WIEGERT:     Brendan, be honest.

BRENDAN:     I didn't.

WIEGERT:     How do you know she was in his room?

BRENDAN:     The door was open.

WIEGERT:     Could you see her?

BRENDAN:     (nods "yes")Yeah.

WIEGERT:     Was she alive?

BRENDAN:     Well she was handcuffed to a, the thing.

WIEGERT:     She was handcuffed to what?

BRENDAN:     The bed.

WIEGERT:     Was she naked? (Brendan nods "yes")  Was she alive?

Complaint No.
05-0157-955

BRENDAN: Yeah.

WIEGERT: How do you know?

BRENDAN: Cuz she was moving around.

WIEGERT: Was she making any noise?

(pause)

FASSBENDER: It's alright bud.

BRENDAN: Yeah.

FASSBENDER: What was she sayin'?

BRENDAN: Screaming for help.

WIEGERT: What was handcuffed? Her hands or her legs or both?

BRENDAN: Both.

WIEGERT: And what were they handcuffed to?

BRENDAN: Like the hand like there is round poles on each side.

WIEGERT: OK.

FASSBENDER: Of his bed? (Brendan nods "yes") And you, your, your gettin' there OK. Lets back up again and did you go get the mail?

BRENDAN: Yeah.

FASSBENDER: When you went to get the mail with your bike did you hear somethin' at that time or did it happen when you came back with the mail?

(pause)

FASSBENDER: You can do it. Just tell us the truth.

BRENDAN: When I came back.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
568
File Number

Complaint No.
05-0157-955

FASSBENDER: I gotta believe this is in your in your mind right now like a picture. (Brendan nods "yes") There's a video in your mind, this whole thing and you're trying to get it out and the only way you can get it out is by talking about it right now. So you came back, did you have a letter for Steven?

BRENDAN: Yeah.

FASSBENDER: Did you go ta his trailer?

BRENDAN: Yeah.

FASSBENDER: Did you hear screaming coming from inside the trailer?

BRENDAN: Yeah.

FASSBENDER: What did you do then? You had to, are you at the door or where are you? When you first hear the screaming where are you?

BRENDAN: Like by the other camper that we passed.

FASSBENDER: Way down there?

BRENDAN: mm huh.

FASSBENDER: You hear screaming half, halfway or a quarter way down that frontage road, your driveway road?

BRENDAN: (nods "yes")Yeah.

FASSBENDER: Do you are you able to make out any of the words?

BRENDAN: (shakes head "no") No.

FASSBENDER: OK. Take me from there and be honest so we don't have ta keep backing up here. Cuz, we, we know but we need it in your words. I can't, I can't say it.

WIEGERT: Brendan, I already know. You know we know. OK. Come on buddy. Let's get this out, OK?

FASSBENDER: You're coming back with the mail, take us through it. It's the video in your head, play it for us.

WIEGERT: You come back with the mail. What happens?

BRENDAN: Well I stopped and I seen if there was any mail for me so and I seen Steven's so I went over there right away ta bring it over by 'em and I knocked like three times and then he finally came.

FASSBENDER: Are you hearing anything coming from the other side of the trailer at this time?

BRENDAN: Yeah.

FASSBENDER: What?

BRENDAN: The words, help me.

FASSBENDER: OK. That's gotta be pretty devastating, right? (Brendan nods "yes") But you still knock.

BRENDAN: mm huh.

WIEGERT: You went into the trailer then? (Brendan nods "yes")

FASSBENDER: You knock and he comes to the door. What's he look like? Is he dressed, has he got anything on him, what-what's he look like?

BRENDAN: He's got a white shirt on with red shorts and all sweaty.

FASSBENDER: He's all sweaty. (Brendan nods "yes") Any blood, at this time?

BRENDAN: (shakes head "no") No.

FASSBENDER: All right.

WIEGERT: Does he let you in the trailer?

BRENDAN: He asks me in the kitchen.

WIEGERT: He what?

BRENDAN: He walks me into the kitchen.

FASSBENDER: What does he say to you?

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
570

Complaint No.
05-0157-955

File Number

BRENDAN:        If I want a soda.

FASSBENDER:     Does he know you've heard anything?  Is she still saying stuff?

BRENDAN:        Yeah.

FASSBENDER:     Then he walks you into the kitchen. (Brendan nods "yes")  OK, play the video for us Bud, tell us what's happenin'.

WIEGERT:        It's OK, tell us what happened.  What did he say to you?

BRENDAN:        That he never got some of that stuff so he wanted to get some.

FASSBENDER:     Never got what?

BRENDAN:        A girl.

WIEGERT:        OK.

FASSBENDER:     What'd you say just a second ago though?

WIEGERT:        Repeat what you said.

BRENDAN:        That he wanted to get some.

FASSBENDER:     Some what?

BRENDAN:        Pussy.

WIEGERT:        That's what he said to you? (Brendan nods "yes")  OK.

FASSBENDER:     Now I can start believing you, OK? (Brendan nods "yes")

WIEGERT:        So do you have a soda?

BRENDAN:        mm huh. (Brendan nods "yes")

WIEGERT:        Ands then what happens next?

BRENDAN:        I open it and drank some.

Complaint No.
05-0157-955

FASSBENDER: What's he sayin' to you? (pause) It's all right. You are doing the right thing.

WIEGERT: Come on, what's he sayin'?

BRENDAN: That he wants to keep on doing it.

WIEGERT: OK.

FASSBENDER: Doing what?

BRENDAN: Raping her.

FASSBENDER: What kind of words is he use, using though? You can say those words here.

BRENDAN: That he wanted to fuck her so hard.

FASSBENDER: Yeah.

WIEGERT: Could you see her at this time?

BRENDAN: (shakes head "no") No.

WIEGERT: OK. What happens next? Remember, we already know, but we need to hear it from you, it's OK. It's not your fault. What happens next?

FASSBENDER: Does he ask you?

WIEGERT: He does, doesn't he?

FASSBENDER: We know.

WIEGERT: He asks you doesn't he? (Brendan nods "yes") What does he ask you?

BRENDAN: That if I wanted the girlfriend.

FASSBENDER: Tell us how he said it.

BRENDAN: That if, if he wanted me to have to get some pussy.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
572
File Number

Complaint No.
05-0157-955

FASSBENDER:       Yeah, OK.

WIEGERT:          And then what happens next?

BRENDAN:          That he said that if I wanted to I could go get some but not right now..

WIEGERT:          Come on, be honest, you went back in that room.

FASSBENDER:       Tell us now Brendan.

WIEGERT:          We know you were back there.  Let's get it all out today and this will be
all over with.

FAASSBENDER:      He asked if you want some, right? (Brendan nods "yes") That's what you
told us.

BRENDAN:          Um huh.

FASSBENDER:       If you want some pussy,

WIEGERT:          Wha

FASSBENDER:       What did you tell him?

BRENDAN:          I said I wasn't aged and so he took me back there and showed me some.

WIEGERT:          What did he show you?

BRENDAN:          Her naked body.

WIEGERT:          OK, was she alive?

BRENDAN:          Yeah.

WIEGERT:          Is she talking?

BRENDAN:          Yeah.

WIEGERT:          What'd she say? (pause)  What'd she sayin'?  I know it's hard but you
gotta tell us, what'd she say?

FASSBENDER:       The video will never go away unless you can talk to us about it.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

WIEGERT:        Go ahead, what'd she say?

BRENDAN:        She's asking Steven why he would do something like that.

FASSBENDER:     Did she say anything to you? She see, does she see you?

BRENDAN:        Yeah.

FASSBENDER:     Does she say something to you?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     Describe again, were you accurate when you described how she was on the bed, how is she attached, where is she, tell us that and be truthful again.

BRENDAN:        That she was chained up to the bed and, 'er she's faced up.

FASSBENDER:     Face up, no clothes on?

BRENDAN:        (shakes head "no") Uh uh.

WIEGERT:        What do you mean she's chained up, explain that.

BRENDAN:        Like some handcuffs.

WIEGERT:        Where are the handcuffs? On her arms or on her legs, or where?

BRENDAN:        Both.

WIEGERT:        OK.

FASSBENDER:     Do you remember the color of the handcuffs? And the leg irons? (shakes head "no")

BRENDAN:        Like regular ones.

FASSBENDER:     Which would be what color?

BRENDAN:        Silver.

FASSBENDER:     OK.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
574

Complaint No.
05-0157-955

File Number

WIEGERT: Now are her legs spread apart or are they together or tell us how it looks?

BRENDAN: Like spread apart a little bit.

WIEGERT: So you, he, he brings you back there and he shows you her (Brendan nods "yes") and what do you do? Honestly. Because we think

FASSBENDER: Very important.

WIEGERT: We know happened.

FASSBENDER: It's hard to be truthful.

WIEGERT: We know what happened, it's OK. (pause) What did you do?

BRENDAN: I didn't do nothin'.

BRENDAN: Brendan, Br-Brendan, come on. What did you do?

FASSBENDER: What does Steven make you do?

WIEGERT: It's not your fault, he makes you do it.

BRENDAN: He told me ta do her.

WIEGERT: OK. What does that mean to you?

BRENDAN: Ta screw her.

WIEGERT: OK. Did you do that? Honestly?

BRENDAN: Yeah.

WIEGERT: OK.

FASSBENDER: All right, take a breath Bren, take a breath, that's very hard to admit to. Did he watch?

BRENDAN: Yeah.

FASSBENDER: You said you, tell us what you did, you take your clothes off?

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
575
File Number

Complaint No.
05-0157-955

BRENDAN:        Yeah.

FASSBENDER:     And you had intercourse with her? (Brendan nods "yes")

WIEGERT:        What does intercourse mean to you?

BRENDAN:        That you stuck it in her.

WIEGERT:        Stuck what in her?  It's OK.

BRENDAN:        My penis.

WIEGERT:        An where did you stick it?

BRENDAN:        In her vagina.

WIEGERT:        OK.  (pause).  How many times did you do that?  How long did it take?

BRENDAN:        Five minutes.

WIEGERT:        OK.  What did you do after that?

BRENDAN:        Put my clothes back on.

WIEGERT:        OK.  Where is Steve at this time.

BRENDAN:        Standing by the door.

WIEGERT:        What does Steve do then?

BRENDAN:        Told me I di, I did a good job.

FASSBENDER:     Was she saying anything, while you were doing this? (Brendan shakes
head "no")  Why?

BRENDAN:        I don't know.

FASSBENDER:     Was, did she have anything over her mouth or was it clear?  Tell us the
truth.

BRENDAN:        It was clear.

FASSBENDER:     There was nothin' covering her mouth?  (Brendan shakes head "no")  Did she ask you not to do this to her?

BRENDAN:     Yeah.

FASSBENDER:     Tell me what she said.

BRENDAN:     She told me not to do it so and told me not, to do the right thing.

FASSBENDER:     Which was what?

BRENDAN:     Not, not to do it and tell Steven to knock it off.

FASSBENDER:     Did she ask you to do anything else for her?

BRENDAN:     Ta uncuff her.

FASSBENDER:     Go ahead.  Anything else? (Brendan shakes head "no")  (pause)  Were these things she was saying to you while you were doing this act?

BRENDAN:     Yeah

FASSBENDER:     Was she kinda sayin' it softly or loud enough or what?

BRENDAN:     Well she was cryin' an.

FASSBENDER:     OK.

WIEGERT:     After you're done and you put your clothes on, what happens next?

BRENDAN:     He told me I did a good job and then he closed the door.

WIEGERT:     OK.

BRENDAN:     Took me in the living room, watched a little TV.

WIEGERT:     Both of you did? (Brendan nods "yes")

FASSBENDER:     He didn't stay in the bedroom or go back in there?

BRENDAN:     (shakes head "no") Uh uh.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
577

Complaint No.
05-0157-955

File Number

WIEGERT:       How long did you watch TV?

BRENDAN:       'bout 15 minutes.

WIEGERT:       And then what happens?

FASSBENDER:    And what's he sayin' while you're watching TV? Are you discussing this situation now?

BRENDAN:       Yeah.

FASSBENDER:    What's he say, what did he sayin'? (pause) As hard as this is, you gotta tell us what he's sayin'.

BRENDAN:       He told me that's how you do it and

WIEGERT:       What else?

BRENDAN:       That feels, he asked me if it felt good.

WIEGERT:       Then what did you talk about, what else did you talk about?

BRENDAN:       That how he was going to get rid of it.

WIEGERT:       And what did he tell you?

BRENDAN:       That he was going to burn her.

FASSBENDER:    When you say get rid of it, what do you mean?

BRENDAN:       Get rid of her body.

FASSBENDER:    OK.

WIEGERT:       And he says what?

BRENDAN:       That he was going to burn her body after that happened.

WIEGERT:       Was there anything else that you guys talk about?

BRENDAN:       (shakes head "no") No.

Complaint No.
05-0157-955

| | |
|---|---|
| WIEGERT: | Then what happens after that? |
| FASSBENDER: | Is she alive yet? |
| BRENDAN: | Yeah. |
| FASSBENDER: | OK. |
| WIEGERT: | What happens after you were done watching TV for 15 minutes. |
| BRENDAN: | I told him I had to leave cuz I had ta call Travis. |
| WIEGERT: | Brendan, be honest. You were there when she died and we know that. Don't start lying now. We know you were there. What happened? |
| FASSBENDER: | He ain't gonna lie to you, hey we know that OK. |
| WIEGERT: | We already know, don't lie to us now, OK, come on. What happens next? |
| FASSBENDER: | You're just hurting yourself if you lie now. |
| BRENDAN: | Then he went in, back in there and he stabbed her. |
| WIEGERT: | You were with him? (Brendan nods "yes") Yes? |
| BRENDAN: | Yeah. |
| WIEGERT: | Where did he stab her? |
| BRENDAN: | In the stomach. |
| WIEGERT: (pause) What else? | What else did he do to her? (pause) He did something else, we know that. |
| BRENDAN: | So he tried, she, he tied her up. |
| WIEGERT: | What do you mean he tied her up? |
| BRENDAN: | So he could take her out there. |
| WIEGERT: | Before or after he stabbed her? |

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
579

Complaint No.
05-0157-955

File Number

BRENDAN:     After.

WIEGERT:     When he stabbed her, did she scream or what?

BRENDAN:     Yeah.

WIEGERT:     How many times did he stab her?

BRENDAN:     Once.

WIEGERT:     Then show me where.

BRENDAN:     Right here.

WIEGERT:     We know he did something else to her, what else did he do to her?

BRENDAN:     He choked her.

WIEGERT:     How did he do that?  Tell me how he did it.

BRENDAN:     With his hands.

WIEGERT:     Was he on top of her?

BRENDAN:     Yeah.

WIEGERT:     And did he choke her until what, did she go unconscious, what, tell me.

BRENDAN:     That she couldn't breathe anymore.

WIEGERT:     Yeah.  Did she fall asleep, go unconscious?

BRENDAN:     Go unconscious.

WIEGERT:     Is that before of after he stabbed her?

BRENDAN:     After.

WIEGERT:     So he stabs her, show me what he does.  Just demonstrate for me.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
580
File Number

Complaint No.
05-0157-955

FASSBENDER: Yeah, let's, you-you co-come down the roo, the hallway, he , you go with him?

BRENDAN: Yeah.

FASSBENDER: What does he tell you he's going to do at, this time, you're goin' back to the bedroom?

BRENDAN: That he was gonna tie her up, stab her and then choke like, choke her and that.

FASSBENDER: He told you this?

BRENDAN: Yeah.

FASSBENDER: And you went with him.

BRENDAN: (nods "yes")

FASSBENDER: He went into the bedroom, what does he do? Again the video, you see it, I know you see it, what does he do?

BRENDAN: That he gr, he grabs the rope that was on the side of the bed, tied her up, stabbed her like this and jumped on her and started choking her.

FASSBENDER: Is she fighting at this time?

BRENDAN: She's trying ta move away.

FASSBENDER: Is she saying anything?

BRENDAN: Screaming.

WIEGERT: You helped to tie her up though, didn't you? (pause) Brendan, cuz he couldn't tie her up alone, there's no way. Did you help him tie her up?

BRENDAN: Yeah.

WIEGERT: OK. Tell me what you did.

(pause)

Complaint No.
05-0157-955

---

FASSBENDER:     Go ahead Bud.

BRENDAN:     That he was on the other side and, we had ta unhook the ch, the, the hands
and tied her up.

WIEGERT:     So you helped unhook her hands? And what exactly did you do? Tell me
exactly what you did.

BRENDAN:     I got the key for the lock and unlocked it and after a, I grabbed her arm,
put it on the side and tied her up.

WIEGERT:     What arm?

BRENDAN:     Her le, right one.

WIEGERT:     So you grab her right arm and you do what with it?

BRENDAN:     Put it on the side like this. I put the rope right here.

FASSBENDER:     Did you tie her up in front or behind? Did you tie her, I guess I want to
say did you tie her hands up?

BRENDAN:     Yeah.

FASSBENDER:     In front or behind her body?

BRENDAN:     In front.

FASSBENDER:     How? Like this or like or like this, show us.

BRENDAN:     Like this.

FASSBENDER:     OK. What is she saying at this time? Or is Steven telling her something?
What's he telling her?

BRENDAN:     She was saying to stop doing what he was.

FASSBENDER:     And what's he saying?

BRENDAN:     That he wouldn't.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
582
File Number

Complaint No.
05-0157-955

---

WIEGERT: What's he saying though, I mean what's words is he using? Is he swearing at her, what is he saying?

BRENDAN: He told her to shut her mouth up.

FASSBENDER: Is he telling her that he's gonna kill her, is he telling her he's gonna let her go, what's he telling her?

BRENDAN: That he was gonna kill her.

WIEGERT: So you tie her up, then what happens?

BRENDAN: Then we get the other rope and tie her legs up.

WIEGERT: How'd you do that?

BRENDAN: Around the bottom, like where the

WIEGERT: Show me on you where he does that, where you guys do that?

BRENDAN: Right here.

WIEGERT: Who ties her legs up?

BRENDAN: He does.

WIEGERT: Do you help? Otherwise she's gonna kick.

BRENDAN: Yeah.

WIEGERT: Did you help or not, yes or no?

BRENDAN: (nods "yes") Yeah.

WIEGERT: OK, tell me how you did that.

BRENDAN: I held, I held her feet down.

WIEGERT: Held her feet down. (Brendan nods "yes") And what did Steve do?

BRENDAN: He tied her legs up.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
583
File Number

Complaint No.
05-0157-955

---

FASSBENDER:     Is this on the bed?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        Then what happens?

BRENDAN:        He told me to grab her feet and we took her outside.

FASSBENDER:     Is she still alive?

BRENDAN:        No, she was unconscious er

FASSBENDER:     OK, OK, you got her tied up, she's, when you're getting her tied up, is she, is she alive or has he choked her already?

BRENDAN:        He choked her already.

FASSBENDER:     Did he choke her when she had the handcuffs on?

BRENDAN:        Yeah.

FASSBENDER:     OK.

WIEGERT:        When did he stab her?

BRENDAN:        When, before he choked her.

FASSBENDER:     Are you sure about that? (Brendan nods "yes")

WIEGERT:        So she's laying there, handcuffs on, and that's when Steve stabs her?

BRENDAN:        mm huh. (nods "yes")

WIEGERT:        And then, then he chokes her after that?

BRENDAN:        Yeah.

WIEGERT:        Are you sure? (Brendan nods "yes")

FASSBENDER:     Where exactly did he stab her again?

BRENDAN:        In the stomach.

**CALUMET COUNTY SHERIFF'S DEPARTMENT**

Complaint No.
05-0157-955

Page
584
File Number

FASSBENDER:    Was it the chest or the stomach?

BRENDAN:    Well sort of in the ribs.

FASSBENDER:    An what did he use to stab her?

BRENDAN:    A knife.

FASSBENDER:    Where did he get the knife from?

BRENDAN:    From the kitchen.

FASSBENDER:    And what, how big was the knife, show us.

BRENDAN:    'bout like that.

FASSBENDER:    About that big and he got it out of the kitchen. When he went in there, did he threaten her with the knife, did he just go right and do it, what did he do?

BRENDAN:    That he threatened her.

FASSBENDER:    Tell us what he said.

BRENDAN:    That he was gonna kill her by stabbing her and not lettin' her go.

WIEGERT:    What else did he do to her? We know something else was done. Tell us, and what else did you do? Come on. Something with the head. Brendan?

BRENDAN:    Huh?

FASSBENDER:    ....can't

WIEGERT:    What else did you guys do, come on.

FASSBENDER:    What he made you do Brendan, we know he made you do somethin' else.

WIEGERT:    What was it?   (pause)   What was it?

FASSBENDER:    We have the evidence Brendan, we just need you ta, ta be honest with us.

BRENDAN:    That he cut off her hair.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
585
File Number

Complaint No.
05-0157-955

WIEGERT:    He cut off her hair?  In the house?

BRENDAN:    mm huh.

WIEGERT:    Why did he do that?  Was she alive?

BRENDAN:    No.

WIEGERT:    What did he do with the hair?

BRENDAN:    He set it down on the counter.

WIEGERT:    The counter where?

BRENDAN:    Like a dresser.

FASSBENDER:    What did he use to cut the hair off with?

BRENDAN:    The knife.

FASSBENDER:    Was she alive?  (Brendan shakes head "no")

FASSBENDER:    Did he say why he did that?

BRENDAN:    No.

WIEGERT:    OK, what else?

FASSBENDER:    What else was done to her head?

BRENDAN:    That he punched her.

WIEGERT:    What else? (pause)  What else?

FASSBENDER:    He made you do somethin' to her, didn't he?  So he-he would feel better about not bein' the only person, right? (Brendan nods "yes") Yeah.

WIEGERT:    mm huh.

FASSBENDER:    What did he make you do to her?

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
586
File Number

Complaint No.
05-0157-955

(pause)

WIEGERT:     What did he make you do Brendan? It's OK, what did he make you do?

BRENDAN:     Cut her.

WIEGERT:     Cut her where?

BRENDAN:     On her throat.

WIEGERT:     Cut her throat? Te-when did that happen?

BRENDAN:     Before he picked her off the bed?

WIEGERT:     So she was alive yet right? (Brendan nods "yes")

WIEGERT:     So she's alive and you cut her throat?

BRENDAN:     mm huh.

WIEGERT:     Was that before or after Steve stabbed her?

BRENDAN:     After.

WIEGERT:     It was after Steve stabbed her?

BRENDAN:     (nods "yes") mm-huh.

WIEGERT:     Was she a-how do you know she was alive? (pause) Tell me. When you cut her throat, how do you know she was alive?

BRENDAN:     She was breathing a little bit.

WIEGERT:     She was breathing a little bit. Did Steve tell you to do that?

BRENDAN:     Yeah.

(Fassbender and Wiegert speaking at the same time- cannot understand)

FASSBENDER:  How'd he tell you to do, how'd he tell you to do that? What'd he say?

BRENDAN:     To go across her throat and pull it back.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
587

Complaint No.
05-0157-955

File Number

FASSBENDER:     Did he say why he wanted you to do that?

BRENDAN:        No. (shakes head "no")

WIEGERT:        Which knife did you use?

BRENDAN:        The same one he stabbed her with.

FASASBENDER:    And how many times did he stab her again?

BRENDAN:        Once.

FASSBENDER:     Are you sure about that? (Brendan nods "yes")

WIEGERT:        So Steve stabs her first and then you cut her neck? (Brendan nods "yes")
What else happens to her in her head?

FASSBENDER:     It's extremely, extremely important you tell us this, for us to believe you.

WIEGERT:        Come on Brendan, what else?

(pause)

FASSBENDER:     We know, we just need you to tell us.

BRENDAN:        That's all I can remember.

WIEGERT:        All right, I'm just gonna come out and ask you.  Who shot her in the head?

BRENDAN:        He did.

FASSBENDER:     Then why didn't you tell us that?

BRENDAN:        Cuz I couldn't think of it.

FASSBENDER:     Now you remember it?  (Brendan nods "yes") Tell us about that then.

BRENDAN:        That he shot her with his .22.

WIEGERT:        You were there though?

Complaint No.
05-0157-955

---

| | |
|---|---|
| BRENDAN: | Yeah. |
| WIEGERT: | Where did this happen? |
| BRENDAN: | Outside. |
| WIEGERT: | Ouside? Before? Tell me when it happened? |
| BRENDAN: | When we brung her outside ta throw her in the fire. |
| WIEGERT: | OK. So let's back up, OK? So I wanna go through this OK. So he stabs her (Brendan nods "yes") and chokes her? |
| BRENDAN: | mm huh. |
| WIEGERT: | And then you do what? |
| BRENDAN: | I help tie her up. |
| WIEGERT: | OK. And then what? |
| BRENDAN: | Then we |
| WIEGERT: | You cut her throat somewhere in there? |
| BRENDAN: | Yeah. |
| WIEGERT? | Yes? |
| BRENDAN: | Yeah. |
| WIEGERT: | And then what? |
| BRENDAN: | Cut off 'er, some of her hair. |
| WIEGERT: | OK. |
| BRENDAN: | Then we brung her outside and shot her. |
| WIEGERT: | Was she alive when you shot her? |
| BRENDAN: | I don't know. |

Complaint No.
05-0157-955

| | |
|---|---|
| WIEGERT: | Where did you shoot her? |
| BRENDAN: | In the head. |
| WIEGERT: | Who shot her? |
| BRENDAN: | He did. |
| FASSBENDER: | How many times? |
| BRENDAN: | Twice. |
| FASSBENDER: | In her body too or where else? (pause) How many times do you shoot her Brendan? |
| BRENDAN: | Twice. |
| FASSBENDER: | Total? Not just in the head. (pause) Do you shoot her elsewhere? Honestly? |
| BRENDAN: | In the stomach. |
| FASSBENDER: | How many times did you shoot her when he handed you the gun? |
| BRENDAN: | Zero. |
| WIEGERT: | Where did? |
| BRENDAN: | Cuz I couldn't shoot no more. |
| WIEGERT: | What do you mean couldn't shoot no more? |
| BRENDAN: | Cuz we used to have a cat that was like somethin' was wrong with 'em and we had to shoot 'em because we didn't want to pay for the bills. |
| WIEGERT: | mm huh. |
| BRENDAN: | And my mom told me not to watch when hers nows ex-boyfriend |
| WIEGERT: | mm huh. |

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
590
File Number

Complaint No.
05-0157-955

---

**BRENDAN:** Shot it, shot 'em and I couldn't watch.

**WIEGERT:** mm huh.

**FASSBENDER:** Brendan, we're in the bedroom yet, OK? (Brendan nods "yes") She's handcuffed yet right? (Brendan nods "yes") And you're tellin' me if, obviously correct me if I'm wrong, what we heard. (Brendan nods "yes") While she's handcuffed and alive, he stabs her.

**BRENDAN:** (nods "yes") mm huh.

**FASSBENDER:** Chokes her? Right? (Brendan nods "yes") Is that right?

**BRENDAN:** (nods "yes") mm huh.

**FASSBENDER:** And then he has you cut her neck?

**BRENDAN:** Yeah.

**FASSBENDER:** And then you cut some hair off. (Brendan nods "yes") Is it after that, that she, does she look like she's dead then? Or is she not dead?

**BRENDAN:** It looks like she's dead.

**FASSBENDER:** You don't, do you see any breathing left?

**BRENDAN:** (shakes his head "no") No.

**FASSBENDER:** Is it then that you take the handcuffs off, and tie her up?

**BRENDAN:** Yeah.

**FASSBENDER:** You can remember. So you think after she, she looks like she's dead then you, you guys tie her up? (Brendan nods "yes") Then what do you do? How do you get her outside? Is this when you carry her? (Brendan nods "yes") When you say you carried her?

**BRENDAN:** Yeah.

**FASSBENDER:** What part of her body did you carry?

**BRENDAN:** The feet.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
591
File Number

Complaint No.
05-0157-955

| | |
|---|---|
| FASSBENDER: | And Steven did what? |
| BRENDAN: | He carried the head. |
| FASSBENDER: | And what door did you go out of? |
| BRENDAN: | That one where the cement a stairs are. |
| FASSBENDER: | And that's located in proximity to what inside, is it near his bedroom, far away? |
| BRENDAN: | Near. |
| FASSBENDER: | Is the bathroom near there? |
| BRENDAN: | Yeah, straight across. |
| FASSBENDER: | Straight across from that door? (Brendan nods "yes") |
| WIEGERT: | Where did you take her then? |
| BRENDAN: | Take her outside on the side of the garage and shoot her. |
| WIEGERT: | Take her outside of the garage and shoot her? |
| BRENDAN: | On the side of it, yeah. |
| WIEGERT: | OK, and then what do you do with her? |
| FASSBENDER: | Is it dark out? |
| BRENDAN: | Like a little bit. |
| WIEGERT: | What'd you do then? |
| BRENDAN: | Then we, he puts the gun on the ground and we carry her into the fire. |
| WIEGERT: | How many times did you shoot her? (pause) Tell me again, how many times did you shoot her? |
| BRENDAN: | Three. |

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

WIEGERT:        And where, where did he shoot her?

BRENDAN:        In the head, stomach, and the heart.

WIEGERT:        Do you know what side of the head?

BRENDAN:        (shakes head "no") No.

WIEGERT:        So you take her out of that house by the cement steps, you carry her to the
side of the garage?

BRENDAN:        mm huh. (nods "yes")

WIEGERT:        Was she ever in the garage?

BRENDAN:        No. (shakes head "no")

WIEGERT:        OK, so you carry her to the side of the garage (Brendan nods "yes") and
you guys shoot 'er, and Steve shoots her or you shoot her?

BRENDAN:        He does.

WIEGERT:        Who's he?

BRENDAN:        Steven.

WIEGERT:        And who does Steven shoot?

BRENDAN:        Her.

WIEGERT:        What's her name?

BRENDAN:        Teresa.

WIEGERT:        OK.  And he shoots her three times (Brendan nods "yes") and then what
do you do?

BRENDAN:        We carry her to the fire.

WIEGERT:        OK, what time is it about?

BRENDAN:        About 6:00, 6:30.

APP-000287

**CALUMET COUNTY SHERIFF'S DEPARTMENT**

Page
593
File Number

Complaint No.
05-0157-955

| | |
|---|---|
| WIEGERT: | OK. |
| FASSBENDER: | Did he say, w-what did he say while he was shooting her? Or just before |
| he shot her? | |
| BRENDAN: | That we had to hurry up before he had some people coming over. |
| FASSBENDER: | Was the car still out front? |
| BRENDAN: | Yeah |

FASSBENDER: OK, we're gonna take ya where Mark just took ya and we know there's some, some things that you're, you're not tellin' us. We need to get the accuracy about the garage and stuff like that and the car.

| | |
|---|---|
| WIEGERT: | How does the car get in the garage? |
| BRENDAN: | He drives it in there. |
| WIEGERT: | After he puts her on the fire or before? |
| BRENDAN: | After. |

WIEGERT: OK, so lets go back to outside, you carry her over, she's naked, right? (Brendan nods "yes") And you put her on the fire?

| | |
|---|---|
| BRENDAN: | mm huh. |
| WIEGERT: | And what do you do when she's on the fire? |
| BRENDAN: | We threw some tires on top of her and some branches. |
| WIEGERT: | You threw tires and branches on her (Brendan nods "yes"), and then what? |
| BRENDAN: | We just let it burn. |
| WIEGERT: | Well who started the fire? |
| BRENDAN: | He did. |
| WIEGERT: | Who's he? |

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
594
File Number

Complaint No.
05-0157-955

BRENDAN:     Steven.

WIEGERT:     What did he start it with?

BRENDAN:     Some gas.

FASSBENDER:  When did he start it?

BRENDAN:     Before I got there.

FASSBENDER:  OK.

WIEGERT:     Wh-wh-what do you mean, before you got there? You carry her out, is the fire burning already when you carried her out?

BRENDAN:     Yeah. (nods "yes")

WIEGERT:     So you throw her on top of the fire?

BRENDAN:     (nods "yes") mm huh.

FASSBENDER:  This fire is going when you go knock on the door?

BRENDAN:     Yeah.

FASSBENDER:  That's what you mean by before you got there?

BRENDAN:     (nods "yes") mm huh.

WIEGERT:     Does he say why the fire's burning?

BRENDAN:     (shakes head "no") No.

WIEGERT:     So, you when you carried her out of the house, and you put 'er by the garage, and Steve shoots her, then you put her on top of the fire that's already going?

BRENDAN:     mm huh. (nods "yes")

WIEGERT:     OK, and then what do you do from there, go ahead.

BRENDAN:     That, he wanted me ta

WIEGERT:        He wanted you to what?

BRENDAN:        Go in the garage and help him move um, move the jeep down into the pit.

WIEGERT:        OK, so she's there burning, what do you put on top of her or do you put something on top of her in the fire?

BRENDAN:        Just the branches and the tires.

WIEGERT:        Branches and the tires. Let's go back a few minutes. Where did you get the gun from, or where did Steven get the gun from?

BRENDAN:        From out of his room.

WIEGERT:        Of his, what room?

BRENDAN:        The bedroom.

WIEGERT:        Where does he get the shells from, do you know?

BRENDAN:        (shakes head "no") Uh uh.

WIEGERT:        OK, and which gun was it?

BRENDAN:        The .22.

WIEGERT:        OK.

FASSBENDER:     OK Brendan, we gotta, I think, I think you're doin' a real good job up to this point of ah coming forward and stuff, but you bring her out of the house, you just said that ah, after you put her on the, on the fire, then, then you wanted to get the car, help get the car out of the garage and stuff. (Brendan nods "yes") Again, we have, w-we know that some things happened in that garage, and in that car, we know that. You need to tell us about this so we know you're tellin' us the truth. I'm not gonna tell you what to say, you need to tell us.

BRENDAN:        That he, he was gonna put

WIEGERT:        Do not sign it, do not serve it.

BRENDAN:        He was gonna put her in the je-in the back of the jeep

Complaint No.
05-0157-955

WIEGERT:     Do not sign it, do not serve it.

BRENDAN:     An we were gonna take her down in the pit and throw 'er in that water.

FASSBENDER:     OK.

BRENDAN"     We, he came up with burning her. So he set her back on the floor and then, that's when he threw her in the fire.

FASSBENDER:     OK, now let's back up, so M-Mark can hear this too. You bring her out of the house, you, you're gonna take, you took her in the garage? (Brendan nods "yes") Tell me what happened again so Mark can hear this.

BRENDAN:     Well he put her in the back of the jeep and he said he was gonna go down in the pit and throw her in the water in the pond and that's when he came up with burning her.

WIEGERT:     Who?

FASSBENDER:     Earlier you said this fire was going already.

BRENDAN:     Yeah. (nods "yes")

FASSBENDER:     It was? (Brendan nods "yes")

WIEGERT:     So you take her, when is she shot then?

FASSBENDER:     Tell us where she was shot?

BRENDAN:     In the head.

FASSBENDER:     No, I mean where, in the garage

BRENDAN:     Oh.

FASSBENDER:     Outside, in the house?

BRENDAN:     In the garage.

FASSBENDER:     OK.

WIEGERT:     Was she on the garage floor or was she in the truck?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
597
File Number

Complaint No.
05-0157-955

BRENDAN:        Innn the truck.

WIEGERT:        Ah huh, come on, now where was she shot? Be honest here.

FASSBENDER:     The truth.

BRENDAN:        In the garage.

WIEGERT:        Before she was put in the truck or after?

BRENDAN:        After.

FASSBENDER:     So she's in the truck and that's when he shoots her? (Brendan nods "yes") How many times? (pause) Remember weeee got a number of shell casings that we found in that garage. I'm not gonna tell ya how many but you need to tell me how many times, about, that she was shot.

WIEGERT:        We know you shot her too. Is that right? (Brendan shakes head "no") Then who did?

BRENDAN:        I don't know.

WIEGERT:        Who shot her?

BRENDAN:        I didn't even touch the gun.

WIEGERT:        OK. How many times did Steven shoot her?

BRENDAN:        About ten.

FASSBENDER:     And she was in the back of the truck or the SUV that whole time that he shot her?

BRENDAN:        She was on the, the garage floor.

WIEGERT:        She was on the garage floor, OK.

FASSBENDER:     All right.

WIEGERT:        That makes sense. Now we believe you.

FASSBENDER:     Yeah.  So you bring her out of the ca-or the trailer, right? (Brendan nods
"yes")  And do you take her right into the garage?

BRENDAN:        mm huh.

FASSBENDER:     And where you place her, where'd you set her down?

BRENDAN:        Down on the floor where the lawn mower was sittin' a little bit.

FASSBENDER:     Is the jeep in there already or not?

BRENDAN:        Yeah.

FASSBENDER:     When did he take that or go out and put that in there?

BRENDAN:        Whe-he, where'd he put the, the jeep?

FASSBENDER:     Yeah, when did he put her vehicle in the garage?

BRENDAN:        Beeefore.

FASSBENDER:     The truth, (pause) the truth.  Was the jeep in there already before you
even went to her house, or his house?

BRENDAN:        No.

FASSBENDER:     No.  (Brendan shakes head "no")  OK, so when did he do it?

BRENDAN:        When he set her down on the, the ground, 'er in the garage.

WIEGERT:        So you bring her into the garage, you set her on the garage floor?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        And then what happens?

BRENDAN:        He backs up the jeep and we put her in the back.  Then he says that he
knows a better way, that he would burn 'er.

WIEGERT:        OK, then what?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
599
File Number

Complaint No.
05-0157-955

| | |
|---|---|
| BRENDAN: | We set 'er on the floor and he shoots her ten times maybe. Go put her on the fire. |
| FASSBENDER: | Did he say why he shot her again? |
| BRENDAN: | (shakes head "no") No. |
| FASSBENDER: | Was he mad at this time? |
| BRENDAN: | Yeah. |
| WIEGERT: | So let me just back up again, so you bring her into the garage, you put her in the truck initially? |
| BRENDAN: | (nods "yes") mm huh. |
| WIEGERT: | Then you take her out of the truck? |
| BRENDAN: | (nods "yes") mm huh. |
| WIEGERT: | And then he shoots her? (Brendan nods "yes") And then what? |
| BRENDAN: | We grab her and we put her in and take her over the fire and throw her on. |
| WIEGERT: | And the fires already burning? |
| BRENDAN: | (nods "yes") mm huh. |
| WIEGERT: | And after you put her in the fire, what do you do with the fire? |
| BRENDAN: | We threw some tires and some more branches on. |
| WIEGERT: | OK. |
| FASSBENDER: | How did you get her to the fire again. |
| BRENDAN: | We a, used that a thing. |
| FASSBENDER: | Ah, what's a thing? |
| BRENDAN: | The thing we used ta get un-under the car? |

Complaint No.
05-0157-955

---

FASSBENDER: You did use that. (Brendan nods "yes") You didn't carry her out there.

BRENDAN: (shakes head "no") mm uh.

WIEGERT: So you loaded her on the creeper? (Brendan nods "yes") Is that what it's called?

BRENDAN: Yeah.

WIEGERT: And you slid that out to where?

BRENDAN: Ta the fire.

WIEGERT: OK. And then you threw her in the fire.

BRENDAN: (nods "yes") uh huh.

WIEGERT: And then what did you do with the creeper? (pause) It's OK, what'd you do with it?

BRENDAN: Put it back in the garage.

WIEGERT: Is that in the garage now you think?

BRENDAN: I don't know.

WIEGERT: OK.

FASSBENDER: And that was what color again?

BRENDAN: Black and red.

WIEGERT: After she's in the fire, what do you guys do next?

BRENDAN: Go take the jeep down in the pit.

FASSBENDER: Tell us how.

BRENDAN: He drove it down there and

FASSBENDER: Were you in the jeep with him?

APP-000295

Complaint No.
05-0157-955

---

BRENDAN: ( nods "yes") mm huh.

FASSBENDER: OK, tell us how you got down there.

BRENDAN: He drove.

FASSBENDER: Truthfully.

BRENDAN: He drove down there and he put it back by the trees and covered it with branches and a hood.

FASSBENDER: How did you get down there? What route did you take?

BRENDAN: Past Chuckie's house.

FASSBENDER: You did go past Chuckie's?

BRENDAN: (nods "yes") mm huh.

FASSBENDER: Did Chuckie see you guys?

BRENDAN: (shakes head "no") I don't know.

FASSBENDER: OK.

WIEGERT: Who put the stuff on the car?

BRENDAN: We both did.

WIEGERT: Who put the hood on the car?

BRENDAN: He had one side and I had the other.

WIEGERT: OK. After he put the car there, what do you do next?

BRENDAN: We walk out.

WIEGERT: With, how's, the license plates were taken off the car, who did that?

BRENDAN: I don't know.

WIEGERT: Did you do that?

Complaint No.
05-0157-955

BRENDAN:        (shakes head "no") No.

WIEGERT:        Did Steve do that?

BRENDAN:        Yeah.

WIEGERT:        Well then why'd you say you don't know?  Did Steve take the license
plates off the car?.

BRENDAN:        (nods "yes") Yeah.

WIEGERT:        And which way do you walk back?

BRENDAN:        The long way.

WIEGERT:        Which is which way?

BRENDAN:        We were, were like right to the pond and you keep on going and then you
take a right and you go up the hill.

WIEGERT:        Whose got the key for the vehicle at that time?

BRENDAN:        He did.

WIEGERT:        OK, where do you go when you get back up by his house, where do you
go?

BRENDAN:        Back into his house.

WIEGERT:        And what does he do with the key?

BRENDAN:        Puts it in his, his room.

WIEGERT:        Where in his room does he put it?

BRENDAN:        Like under his dresser or somethin'.

WIEGERT:        Where did you see him put it?

BRENDAN:        In his dresser drawer.

Complaint No.
05-0157-955

---

WIEGERT: In his dresser drawer, can you explain where that is?

BRENDAN: Like the second one down, like in the middle row.

WIEGERT: In the drawer?

BRENDAN: (nods "yes") mm huh.

WIEGERT: OK. OK.

FASSBENDER: Go ba, I wanna back ya just a bit, you're down at the car, and you're hiding the car, right? (Brendan nods "yes") Do you recall him taking the plates off?

BRENDAN: Yeah.

FASSBENDER: OK, what else did he do, he did somethin' else, you need to tell us what he did, after that car is parked there. It's extremely important. (pause) Before you guys leave that car.

BRENDAN: That he left the gun in the car.

FASSBENDER: That's not what I'm thinkin' about. He did something to that car. He took the plates and he, I believe he did something else in that car. (pause).

BRENDAN: I don't know.

FASSBENDER: OK. Did he, did he, did he go and look at the engine, did he raise the hood at all or anything like that? To do something to that car?

BRENDAN: Yeah.

FASSBENDER: What was that? (pause)

WIEGERT: What did he do, Brendan?

WIEGERT: It's OK, what did he do?

FASSBENDER: What did he do under the hood, if that's what he did? (pause)

BRENDAN: I don't know what he did, but I know he went under.

FASSBENDER: He did raise the hood? (Brendan nods "yes") You remember that?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
604
File Number

Complaint No.
05-0157-955

BRENDAN: Yeah.

WIEGERT: While he was raising the hood, did you take that license plates off?

BRENDAN: (shakes head "no") No.

WIEGERT: Who did?

BRENDAN: He did.

WIEGERT: OK.

FASSBENDER: What did he do with the license plates after that?

BRENDAN: I don't know.

WIEGERT: But you were with him, what did you guys do with 'em?

BRENDAN: He took 'em off...

WIEGERT: And where did he put 'em?

BRENDAN: He had 'em in his house but I don't know after where he put 'em.

WIEGERT: You saw him put 'em in the house? (Brendan nods "yes") And you also saw him do what? Put the key

BRENDAN: Yeah

WIEGERT: Where'd

BRENDAN: In his dresser

WIEGERT: He put the key?

BRENDAN: In his dresser.

WIEGERT: In his dresser. Where was the knife that he used, 'er you used. Where'd that knife go?

BRENDAN: He left it in the jeep.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
605
File Number

WIEGERT:        He what?

BRENDAN:        He left it in the jeep.

WIEGERT:        It's not in the jeep now, where do you think it might be?

BRENDAN:        I sure it was.

WIEGERT:        Did you see it in the jeep?

BRENDAN:        Yeah, cuz he set it on the floor.

WIEGERT:        Where on the floor did he set it?

BRENDAN:        In the middle of the seats.

WIEGERT:        OK.

FASSBENDER:     At anytime, er wh-what time during this whole thing did a, did you get
hurt?

BRENDAN:        (shakes head "no") mm uh.

FASSBENDER:     Or did he get hurt? Or injured?

BRENDAN:        While we were moving the car or somethin'?

WIEGERT:        Anytime during this, did he get injured?

BRENDAN:        Just that scratch, that's all I know.

WIEGERT:        What scratch?

BRENDAN:        On his finger.

WIEGERT:        Which finger was it on, do you remember?

BRENDAN:        mmm, probably this one.

FASSBENDER:     Was it bleeding?

BRENDAN:        It was just bleeding a little bit.

WIEGERT:        How'd he get that scratch?

(pause)

BRENDAN:        Probably when he was under the hood.

WIEGERT:        So after you come up to his house, you go back into the trailer, is that right?

BRENDAN:        Yeah.

WIEGERT:        And then what happens when you get in the trailer?

BRENDAN:        He wanted to talk to me about, about her.

WIEGERT:        OK, what did he talk about?

FASSBENDER:     And be honest, tell us everything he said.

WIEGERT:        What did he say?

BRENDAN:        That (pause) he was glad that I helped him and that.

WIEGERT:        Did he give you anything for helping?

BRENDAN:        (shakes head "no") No.

WIEGERT:        So he said that he's glad that you helped. (Brendan nods "yes") Did he talk about Teresa at all?

BRENDAN:        Not really. (shakes head "no")

WIEGERT:        Um, when, when you get the bleach on you, let's talk about that, he thanks you for helping him and then what do you guys do?

BRENDAN:        Well that's when my mom called.

WEIGERT:        Where did your mom call?

BRENDAN:        From the house.

| | |
|---|---|
| WIEGERT: | From your house, (Brendan nods "yes") to where? |
| BRENDAN: | Ta on a cell phone. |
| WIEGERT: | OK. And what did she want? |
| BRENDAN: | That I had to be home by ten. |
| WIEGERT: | OK. What time is it when he, when your mom calls? |
| BRENDAN: | Like 9:30. |
| WIEGERT: | OK, so what do you do between 9:30 and ten. |
| BRENDAN: | We watch TV a little bit, talked, about that he was glad that I helped him cuz he couldn't do it by his self. |
| WIEGERT: | When do you clean the place up? |
| BRENDAN: | Like at 9:50. |
| WIEGERT: | Tell me what you do? |
| BRENDAN: | He took the, the bedsheets, took 'em outside and he burnt 'em. |
| WIEGERT: | Took the bedsheets outside and he burnt 'em. (Brendan nods "yes") OK. |
| FASSBENDER: | W-was there blood on the bedsheets? |
| BRENDAN: | Yeah. |
| FASSBENDER: | Was it a lot of blood? |
| BRENDAN: | 'bout a stain like that big. |
| FASSBENDER: | OK. |
| WIEGERT: | What else did he do? |
| BRENDAN: | He hid the, that's when he hid the key and then |

Complaint No.
05-0157-955

| | |
|---|---|
| WIEGERT: | And where'd he hide the key? |
| BRENDAN: | In the dresser. |
| WIEGERT: | OK. And that was the key for what? |
| BRENDAN: | The jeep. |
| WIEGERT: | Whose jeep? |
| BRENDAN: | Teresa's. |
| WIEGERT: | OK. And what else did you guys do? |

(pause)

| | |
|---|---|
| FASSBENDER: | Where's her clothes at this time? |
| BRENDAN: | In the garage. |
| FASSBENDER: | So how'd they get out in the garage? |
| BRENDAN: | When we went out there ta clean up that, the blood. |
| WIEGERT: | When did you do that? |
| BRENDAN: | Like at 9:50. |
| FASSBENDER: | So you and Steven do what at 9:50 then? |
| BRENDAN: | We cleaned that up and then he told me to go throw that on the fire. |
| WIEGERT: | Throw what on the fire? |
| BRENDAN: | The clothes, that's full of, the st, the blood that was like cleaned up. |
| WIEGERT: | What did the clothes look like? (pause) Start with the pants, you remember what color the pants were? |
| BRENDAN: | (shakes head "no") mm uh |
| WIEGERT: | OK, wh-what about the shirt, what color was the shirt? |

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
609
File Number

Complaint No.
05-0157-955

BRENDAN:     Black.

WIEGERT:     What about did you have 'er bra and panties too?

BRENDAN:     (shakes head "no") mm uh.

WIEGERT:     Where were those?

BRENDAN:     I don't know.

WIEGERT:     So you took it outside and threw it on the fire.

BRENDAN:     Yeah. (nods "yes")

WIEGERT:     OK.

FASSBENDER:     Now the shirt, earlier you told us the shirt had blood on it, had a hole in it, was that not true then?

BRENDAN:     No.

FASSBENDER:     So that wasn't true? (Brendan shakes head "no") (pause) So what'd ya do in the ki-garage now? What kind of cleaning, what do you do, how do you do it?

BRENDAN:     We threw gas on it so he could get it off. Then he tried paint thinner and then he went to bleach to get it off and like, he like, probably like, he went like he was spraying it like. I thought he got it on the floor and it splashed up on my pants or somethin'.

WIEGERT:     How much bleach, no let me go back. How much blood was there on the floor, quite a bit?

BRENDAN:     (nods "yes") mm huh.

WIEGERT:     Where would it have been?

BRENDAN:     Like by the lawn mower and where the jeeps' tire was.

WIEGERT:     So if you had to say, some dimensions like 2 x 2, 2 feet by 2 feet, 10 X 10, how much blood do you think was there?

BRENDAN:     By 2 x 2.

Complaint No.
05-0157-955

WIEGERT:        2 x 2 (Brendan nods "yes")

FASSBENDER:     By the rear wheel of the jeep you said?

BRENDAN:        Yeah. (nods "yes")

WIEGERT:        And the jeep was backed in?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        By the rear wheel of the jeep. OK

FASSBENDER:     Were there multiple spots that you cleaned in the garage or just one?

BRENDAN:        Two.

FASSBENDER:     If we took you to that garage, would you be able to show us where?

BRENDAN:        Yeah.

FASSBENDER:     OK.

WIEGERT:        Where'd you get the bleach from?

BRENDAN:        In his house by, in his bathroom.

WIEGERT:        Were you there when his girlfriend called, Jodi?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     Was Steven bleeding?

BRENDAN:        On his finger, that's it.

FASSBENDER:     Did Steven know he was bleeding?

BRENDAN:        Yeah.

FASSBENDER:     Did he make any comments about that?

Complaint No.
05-0157-955

| | |
|---|---|
| BRENDAN: | Well he just went in the bathroom, he got a band-aid, when he went in to |
| get the bleach. | |
| FASSBENDER: | What did Steven say he was gonna do with her car? |
| BRENDAN: | That he was gonna crush it. |
| FASSBENDER: | Did he say when he was gonna try and do that? |
| BRENDAN: | (shakes head "no") No. He said he woulda, actually the sooner, he said |
| the sooner the better. | |
| WIEGERT: | You need a break, any soda or somthin'? |
| BRENDAN: | I got water here. |
| WIEGERT: | OK. We can get you a soda if you want one. Would you like one? |
| (Brendan nods "yes") | What kind? |
| BRENDAN: | Coke. |
| WIEGERT: | Coke OK. |
| FASSBENDER: | Before we get that, does anyone else know this? |
| BRENDAN: | (shakes head "no") No. |
| FASSBENDER: | Has Steven told you that someone else knows? |
| BRENDAN: | (shakes head "no") Not that I know of. |
| WIEGERT: | How about Chuck? (Brendan shakes head "no") Does Chuck know? |
| BRENDAN: | (shakes head "no") No. |
| WIEGERT: | OK, we'll take a little break. |
| FASSBENDER: | And take a breath. |
| WIEGERT: | We'll be right back, OK? |

(pause) (door opens & closes)

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
612
File Number

FASSBENDER:     We got some food up here, sandwich or anything, you want somethin'? (Brendan shakes head "no") Are you sure? (Brendan nods "yes") Bathroom? (Brendan shakes head "no") Nothin'. Just a soda? (Brendan nods "yes")   All right Bud, hang in there.

(door opens & closes)

(pause - break)

(long pause) (door opens)

FASSBENDER:     Here you go bud.

BRENDAN:        Thank you.

(door closes) (long pause)

(door opens)

FASSBENDER:     Would you like ta ah have a sandwich or anything? (Brendan shakes head "no")   You sure?

BRENDAN:        Not hungry.

FASSBENDER:     OK, (Brendan nods "yes") if you want something, just let somebody know.

BRENDAN:        (nods "yes") OK.

(door closes) (long pause)

(door opens)

FASSBENDER:     Doing OK? (Brendan nods "yes")  Need anything? (Brendan shakes head "no")  Need to go to the bathroom?

BRENDAN:        (shakes head "no") mh uh

FASSBENDER:     Got your soda? (Brendan nods "yes")

BRENDAN:        uh huh

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
613
File Number

Complaint No.
05-0157-955

FASSBENDER:     Want somethin' to eat?  (Brendan shakes head "no")  You sure?

BRENDAN:     Ain't hungry.

FASSBENDER:     No.  Anything at all?

BRENDAN:     (shakes head "no") mh uh

FASSBENDER:     You all right?  (Brendan nods "yes") OK.

(door closes)  (long pause)

(door opens)

WIEGERT:     Hey, Brendan, you need ta use the bathroom or anything? (Brendan shakes head "no")  You sure? (Brendan shakes head "no") Need anything else?

BRENDAN:     (shakes head "no") mh uh

WIEGERT:     Sandwich or anything?  (Brendan shakes head "no") Did ya get your soda?

BRENDAN:     (nods "yes")Yeah.

WIEGERT:     OK. We'll be in about two minutes, OK?

BRENDAN:     I gotta question though.

WIEGERT:     Sure.

BRENDAN:     How long is this gonna take?

WIEGERT:     It shouldn't take a whole lot longer.

BRENDAN:     Do you think I can get there before one twenty-nine?

WIEGERT:     Um, probably not.

BRENDAN:     Oh.

WIEGERT:     What's at one twenty-nine?

BRENDAN:     Well, I have a project due in sixth hour.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
614
File Number

WIEGERT:      OK.  We'll worry about that later, OK?  (Brendan nods "yes")  All right.
I'll be back in a few minutes, OK?

·BRENDAN:      OK.

(door closes)  (long pause)

(door opens)

WIEGERT:      So do you need to use the bathroom or anything?  (Brendan shakes head
"no")  No.  Your good?  (Brendan nods "yes")  OK.

FASSBENDER:      How ya feeling Brendan?

BRENDAN:      (nods "yes") Pretty good.

FASSBENDER:      Pretty good. (Brendan nods "yes") Got a lot of stuff off your chest, huh.

BRENDAN:      (nods "yes") uh huh

FASSBENDER:      A lot more stuff a lot of the truth. (Brendan nods "yes")  Ah, what we do
when, when we leave the room we kinda talk about stuff to make sure that we think we're we're
all in the same page and that, that we're gettin' it you know the truth, the whole truth (Brendan
nods "yes") and, and then we, we you know we think you're doin' pretty good so far but there's
some areas that we have ta revisit, OK, (Brendan nods "yes") and then some other questions.
And and again don't make us work so hard for this, don't make yourself work so hard for this,
just get the truth out right away, cuz again we, we have a pretty good knowledge of what
happened there. (Brendan nods "yes") All right?

BRENDAN:      (nods "yes") mh huh

FASSBENDER:      I wanna revisit when you went when you got home from school. (Brendan
nods "yes") OK?  You were with Blaine, is that correct?

BRENDAN:      (nods "yes") Yeah.

FASSBENDER:      OK, and you said you walked down th the road to your house, (Brendan
nods "yes") and you said that you saw Steven on the porch.

BRENDAN:      (nods "yes") uh huh

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
615
File Number

Complaint No.
05-0157-955

FASSBENDER: Mark and I are havin' a problem with that. Now if, I'm not, I'm not sayin' that I'm gonna put words in your mouth so we're havin' a problem with that. You know Blaine not seeing it and stuff like that and and the time period cuz its quarter to four and and we're real familiar with time periods here and when she got there and stuff. Is there somethin' you need to tell us about that? When you got home what did you see before you went into your house? Did you even go in your house or did ya go over to Steven's. (cough) Talk to us about what happened there cuz the time periods aren't addin' up bud.

BRENDAN: Well I don't know if Blaine seen it but I never asked him about it. So I don't know if he seen it or not.

FASSBENDER: Again, er, whether Blaine saw it or not, the time periods aren't adding up. They're not equaling out. We know when Teresa got there. (Brendan nods "yes") Um, and, and I know I guarantee ya Teresa's not standing on that porch when you come home from school. I ju I don't see that. Um, I don't even ya I have a problem with the car sittin' out front yet at this time either. That cars sittin' out front other people er at would have seen that car, you know. Somethin' is not adding up here and you need to tell us the truth. Did this all start right when you came home from school? You need to tell me, you need to be honest with me. I can't tell ya, I I can't tell you these things. I can tell ya we don't believe you because there's some things that are wrong but you've gotta tell me the truth. This is you know gettin' serious here now, OK? (Brendan nods "yes") Tell me what happened when you got home.

BRENDAN: I got off the bus. I walked down the road and when I got to that thing, ah, the other house I just sittin' there for nothin'. I could see her jeep in the garage just sittin' there and I didn't see Steven and her on the the porch.

WIEGERT: You, you did or you didn't?

BRENDAN: I didn't.

FASSBENDER: Did not, OK.

BRENDAN: And I just walked up to the house

FASSBENDER: Ta who's house?

BRENDAN: Mine and Blaine's, went into the garage to get the key to open the door cuz we always lock it when we, we leave and we went in and Blaine grabbed the phone right away and I waited for like 30 minutes waited for him to get off the phone with Jason so I can call Travis ta see what he was doing that night and I waited so I watched TV and that's when I went out to get the mail.

CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

FASSBENDER:     OK. So I'm gonna take you through this now that you've said it, you got off the bus, came down the road and you said you saw Teresa's vehicle in Steven's garage?

BRENDAN:     (nods "yes") uh huh

FASSBENDER:     How did you see that?

BRENDAN:     With the front end of the the door.

FASSBENDER:     With what?

BRENDAN:     The front end was outta the door. (nods "yes")

FASSBENDER:     The front end was outta the door. So the big door was open I take it?

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     OK and you did not see Teresa or Steven?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     OK and then you said you went into your house.

BRENDAN:     (nods "yes") uh huh

FASSBENDER:     Did you, did you go over to Steven's at that time?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     And you went over to your house and the the way you were telling me you about twenty minutes half hour yet away because Blaine used the phone?

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     And so then you went down and got the mail?

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     So you're in your house for about ah twenty minutes a half hour?

BRENDAN:     (nods "yes") Yeah.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
617
File Number

Complaint No.
05-0157-955

FASSBENDER: And you went down ta get the mail? (Brendan nods "yes")

BRENDAN: Well I called Travis first.

FASSBENDER: You called Travis first. (Brendan nods "yes") OK. How long did ya talk to Travis?

BRENDAN: 'bout ten, fifteen minutes

FASSBENDER: And after you're done talkin' to Travis, what did you do?

BRENDAN: Went out to go get the mail

FASSBENDER: And did you take a bike like you said?

BRENDAN: (nods "yes") Yeah.

FASSBENDER: And then you're coming back from the mail, is is that when you, tell me what happened then again?

BRENDAN: That's when I went to get the mail and I came back, I was lookin' at it when I was riding the bike and I seen Steven's mail in there and I went over by him and I knocked on the door.

FASSBENDER: OK and you heard stuff coming from there?

BRENDAN: (nods "yes") mm huh

FASSBENDER: Again, what did you hear coming from there?

BRENDAN: Screaming like help me and that

FASSBENDER: OK and then you said before you knocked on his door.

BRENDAN: (nods "yes") uh huh

FASSBENDER: And you said you had ta knock

BRENDAN: three times (nods "yes")

FASSBENDER: three times and it took how long for Steven to get to the door about?

Complaint No.
05-0157-955

BRENDAN:        about five minutes

FASSBENDER:     about five minutes. While you were standing at the door, did you continue to hear things comin' from the inside?

BRENDAN:        Yeah. (nods "yes")

FASSBENDER:     Steven came ta the door and took you into the kitchen you said right?

BRENDAN:        Yeah. (nods "yes")

FASSBENDER:     OK. About what time do ya think this is? Thinkin' back now on your time periods when you got home how long it took for these phone calls and stuff.

BRENDAN:        About five, five-thirty

FASSBENDER:     OK, when you knock when you actually knock on Steven's door was the big garage door still open? Do you remember?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     You don't remember (Brendan shakes head "no") or it wasn't open?

BRENDAN:        I don't remember.

FASSBENDER:     OK. Was Teresa Halbach's vehicle sittin' out in the driveway when you knocked on the door?

BRENDAN:        No.

FASSBENDER:     OK. So that's a little different than what you initially told us, is that right?

BRENDAN:        (nods "yes")Yeah.

FASSBENDER:     All right. Do you do you remember Steven making any phone calls or getting any phone calls during this evening? During that evening?

BRENDAN:        Like one or two of 'em.

FASSBENDER:     He made or he got?

BRENDAN:        He got.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
619
File Number

Complaint No.
05-0157-955

FASSBENDER:     Who were they from?

BRENDAN:     Jodi.

FASSBENDER:     OK. What, can you tell me what the context your side of the conversation was?· What did you hear?

BRENDAN:     He was like saying that he cares about her and that.

FASSBENDER:     So you said maybe a couple of phone calls, when did the first call happen about?

BRENDAN:     'bout five thirty, five

FASSBENDER:     About five, five-thirty, is that what you're saying? (Brendan nods "yes") And what phone did he talk on?

BRENDAN:     His cell phone.

FASSBENDER:     OK and then when did the second call happen?

BRENDAN:     'bout ten minutes after that.

FASSBENDER:     OK and then who was that call from do you think?

BRENDAN:     Jodi again.

FASSBENDER:     You think so. (Brendan nods "yes") OK. Do you recall if um, Steve called anyone?

BRENDAN:     (shakes head "no") uh uh

FASSBENDER:     OK. We talked last er Monday we talked a little about some things a burn barrel out front do you remember anything about that burn barrel? It's ah you might wanna be a little more truthful about now.

BRENDAN:     That it was full of stuff.

FASSBENDER:     Was it burning?

BRENDAN:     Yeah.

FASSBENDER:     Did you put some things in that burn barrel that night?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     What happened to Teresa's other personal effects? I mean ah a woman usually has a purse right? (Brendan nods "yes") Tell us what happened ta that?

BRENDAN:     I don't know what happened to it.

FASSBENDER:     What happened ta her ah, her cell phone? (short pause) Don't try ta ta think of somethin' just.

BRENDAN:     I don't know.

FASSBENDER:     Did Steven did you see whether ah a cell phone of hers?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     Do you know whether she had a camera?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     Did Steven tell ya what he did with those things?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     I need ya to tell us the truth.

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     What did he do with her her possessions?

BRENDAN:     I don't know.

WIEGERT:     Brendan, it's OK to tell us OK. It's really important that you continue being honest with us. OK, don't start lying now. If you know what happened to a cell phone or a camera or her purse, you need to tell us. OK? (Brendan nods "yes") The hard parts over. Do you know what happened ta those items?

BRENDAN:     He burnt 'em.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
621
File Number

Complaint No.
05-0157-955

WIEGERT:          How do you know?

BRENDAN:          Because when I passed it there was like like a purse in there and stuff.

WIEGERT:          When you passed what?

BRENDAN:          The burning barrel.

WIEGERT:          Did ya look inside?  (Brendan nods "yes") Why did ya look inside?

BRENDAN:          Cuz it was full.

WIEGERT:          What else was in there?

BRENDAN:          Like garbage bags, some

WIEGERT:          Did you put those things in the burning barrel?

BRENDAN:          (shakes head "no") No.

WIEGERT:          Did you actually see those items in the burning barrel?

BRENDAN:          (nods "yes")Yeah.

WIEGERT:          Tell me what you saw in there exactly.

BRENDAN:          Like they were buried underneath ah, garbage, a garbage bag that was

WIEGERT:          How do you know, or how could you see them if they were underneath a
garbage bag?

BRENDAN:          Because the garbage bag was like on top like that far off the top.

WIEGERT:          OK, so we have the barrel, (Brendan nods "yes") OK.  Why don't you
look at me for a second, OK.  We've got the barrel.

BRENDAN:          (nods "yes") mm huh

WIEGERT:          OK. and here's is the top of the barrel (Brendan nods "yes") and the
garbage bag is on top?

BRENDAN:          (nods "yes") Yeah.

Complaint No.
05-0157-955

---

WIEGERT: And where are those items you said you saw?

BRENDAN: Like right underneath there.

WIEGERT: Underneath the bag?

BRENDAN: (nods "yes")Yeah.

WIEGERT: Well, how would you see that?

BRENDAN: Well, if the bags like that far off the you know the top of the thing you can see though underneath it.

WIEGERT: You could see underneath it? (Brendan nods "yes") What did you see?

BRENDAN: like a cell phone, camera, purse

WIEGERT: Are you being honest with us?

BRENDAN: (nods "yes")Yeah.

WIEGERT: Did you actually see those items?

BRENDAN: (nods "yes")Yeah.

WIEGERT: When did you see them?

BRENDAN: When I came over there with the mail.

WIEGERT: Before you went into the house (Brendan nods "yes") or after you went into the house?

BRENDAN: Before I went into the house.

WIEGERT: Why did you look in there?

BRENDAN: Because it was full and it usually ain't.

WIEGERT: OK.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
623
File Number

Complaint No.
05-0157-955

FASSBENDER:     Did you see Steven, when you came home from school or at anytime up until the point you went in ta Steven's house, did you see him go to the burning barrel with anything?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     Are you sure?

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     After you went into the house, did Steven go to the burning barrel at any time?

BRENDAN:     (shakes head "no") Not that I know of.

WIEGERT/
FASSBENDER:     ....sorry..................use this one..........thanks.

FASSBENDER:     All right. Now we got, we got some other points that we're gonna talk about here. You go there, you get into Steven's house. Now I don't want you to hold back any language or how he told you anything or how he presented himself to you when this stuff happened when he took ya into the kitchen, just kinda tell me what he told you again and how he told you.

BRENDAN:     He asked me if I wanted ta fuck the girl and if I wanted to try it. I said ta that I ain't old enough that ta have a kid yet so he said yeah, do you wanna try it though? I'm like not right now and he just kept on egging me on.

FASSBENDER:     OK and, and did he say anything else to you while he was egging you on? How did he egg you on?

BRENDAN:     He's like come on try it for me.

FASSBENDER:     And had you been back in the bedroom area yet at this time or no?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     What, what ah, tell me again what he told you was back there? Who or what?

BRENDAN:     That Teresa Halbach was back there. That she was on the bed naked with she was chained up ta the bed.

FASSBENDER:     Could you hear her back there yet?

BRENDAN:        Yeah.

FASSBENDER:     And what kinda things was she saying again?

BRENDAN:        Like help me and not ta tell Steven not ta do this anymore.

FASSBENDER:     Did Steven say that he had already done that or not?

BRENDAN:        Yeah.

FASSBENDER:     What did he say he did to her?

BRENDAN:        That he had sex with her.

FASSBENDER:     How did he say it?

BRENDAN:        That he fucked her.

FASSBENDER:     At anytime that night, did you see Steven have sex with her?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     Are you sure about that?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:     Because we know now that you did and he watched while you did it. Did you watch once or while he did it?

BRENDAN:        (shakes head "no") No.

WIEGERT:        Did he do anything else ta her sexually?

BRENDAN:        (shakes head "no") No.

WIEGERT:        Stick anything in her anything like that?

BRENDAN:        (shakes head "no") No.

Complaint No.
05-0157-955

WIEGERT:          OK.

FASSBENDER:     OK. You told us about going in there and having sex with her that she
was handcuffed and, and chained, OK? Ultimately and then you said you left the bedroom for a
period of time and, and he talked ta you in the living room, right?

BRENDAN:          Yeah.

FASSBENDER:     Again just ta remind us what kinda things was he saying ta you out in the
living room?

BRENDAN:          That, that he was saying that I did a good job and that he was proud of me.

FASSBENDER:     OK, how long were you in the living room about?

BRENDAN:          About five minutes, five, ten.

FASSBENDER:     And then after you're in the living room, where did ya go?

BRENDAN:          Back in there.

FASSBENDER:     OK and tell me and think, think about the video in your head OK. You
went back in the bedroom and go through what happened again.

BRENDAN:          We went in there, we tied her up and he stabbed her and he told me ta cut
her throat and cut her hair off and then when we were done like that we took off the handcuffs
and we took her outside ta the jeep, stuck her in the back, he said he would rather burn her than
stick her back in there and we put her on the floor and then he shot her ten times and then we
threw her in the fire.

FASSBENDER:     OK, we'll there's some points that we're gonna go over there on that, OK?
(Brendan nods "yes") In the ah, well in the bedroom, and he had you cut the hair off you said
right?

BRENDAN:          (nods "yes") mm huh

FASSBENDER:     Where did ya put the hair?

BRENDAN:          On the dresser.

FASSBENDER:     Again tell us why he wanted you to do that?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
626
File Number

Complaint No.
05-0157-955

BRENDAN: I don't know.

FASSBENDER: What happened ta the hair after?

BRENDAN: I never touched it.

FASSBENDER: Do you know where it went?

BRENDAN: (shakes head "no") No.

FASSBENDER: Has he ever told you what he did with that hair?

BRENDAN: (shakes head "no") No.

FASSBENDER: Brendan, you sure?

BRENDAN: (nods "yes") Yeah.

WIEGERT: Do you have any of that hair at home?

BRENDAN: (shakes head "no") No.

WIEGERT: Are you sure?

BRENDAN: (nods "yes") Yeah.

WIEGERT: Cuz you know we'll find it if you do. (Brendan nods "yes")

FASSBENDER: And that would not be good for you. If we find you're lying or find things that you don't tell us about, I can't believe you then. If you tell me you're sorry this happened, then I won't believe you. ......

BRENDAN: I don't got none of the hair.

FASSBENDER: Pardon?

BRENDAN: I don't got none of the hair. (shakes head "no")

WIEGERT: Don't got none of the hair. Did you get any blood on you?

BRENDAN: (shakes head "no") No.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
627

Complaint No.
05-0157-955

File Number

FASSBENDER:     OK, so you tie her up (Brendan nods "yes") and you told us before you think she's dead at this time (Brendan nods "yes") and you guys, you and Steven carry her out that back door and into the garage.  (Brendan nods "yes") When you're in the garage where do you place her immediately?

BRENDAN:     In the jeep

FASSBENDER:     Right into the jeep or did you set her on the floor or

BRENDAN:     Right in the jeep.

FASSBENDER:     Right into the jeep.  (Brendan nods "yes") How does Steven get the rifle?

BRENDAN:     When he set her down, when we set her down on, on the ground, he went into the house and grabbed it.

WIEGERT:     Was it a rifle or was it a handgun?

BRENDAN:     It was a rifle.

WIEGERT:     And where did he find that rifle, do you know?

BRENDAN:     In his ro, his bedroom.

FASSBENDER:     Where was it in the bedroom?

BRENDAN:     Hanging on the wall.

FASSBENDER:     What wall?

BRENDAN:     Like where the door is there's like a, like a gun rack up there.

FASSBENDER:     OK, in relation to his bed where would it be?

BRENDAN:     like on the le-left side wall

FASSBENDER:     If I'm laying in his bed, where is the where are the where is his gun?

BRENDAN:     Like, say like this is his bedroom and his bed was like right here, it would be on that wall.

FASSBENDER:     Let's say his bed is your bed or his bed there on the couch

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
628
File Number

Complaint No.
05-0157-955

BRENDAN:     Yeah.

FASSBENDER:     and you're sleeping what way?

BRENDAN:     You'd you fa your feet would face that way

FASSBENDER:     Oh

BRENDAN:     and your the guns would be right on that side.

WIEGERT:     If I asked you to draw me a few pictures, do you think you could do that?

BRENDAN:     (nods "yes") Yeah.

WIEGERT:     As to what the bedroom if you'd put things in the bedroom (Brendan nods "yes") and like put her on the bed how she was, could you do that?

BRENDAN:     (nods "yes") Yeah.

WIEGERT:     OK, .......

FASSBENDER:     Now we gotta get some other papers um around.

WIEGERT:     ......I'll grab some papers, OK?  (Brendan nods "yes") All right?

FASSBENDER:     A clipboard or somethin'

(door closes)

(pause)

(door opens)

REMIKER:     .......

WIEGERT:     Yeah.

(door opens and closes)

(pause)

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
629

Complaint No.
05-0157-955

File Number

---

(door opens and closes)

WIEGERT:     Could you draw some pictures? Is that OK or are there some things you wanna talk

FASSBENDER:     We'll talk for a bit.

WIEGERT:     OK.

FASSBENDER:     Then we'll get ta those pictures.

WIEGERT:     All right.

FASSBENDER:     If that's all right?

WIEGERT:     That's fine.

FASSBENDER:     Um, Brendan, when you guys got her into the ga the garage you said that you placed her right into the back of the, the her vehicle right?

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     And then he said that he, how did it come about that he wanted ta do what he wanted to do? Tell me that.

BRENDAN:     He told me that he was gonna throw her in the, the pond and he said that he would rather burn her because it's a lot faster to get rid of all the evidence.

FASSBENDER:     And earlier you said that the fire was going on at this time?

BRENDAN:     (nods "yes") mh huh

FASSBENDER:     Mark and I have a little trouble understanding why he's got this big fire going if he was actually talking about putting her into the pond.

BRENDAN:     Cuz that night me and Blaine were gonna invite some friends over for ah a bonfire and he was probably gettin' it ready and then that day I got a call from Travis that said that he couldn't come and Blaine got a call from his friend that he that they couldn't come.

FASSBENDER:     Are you telling me that it wasn't until you guys were in the garage that he said that he was gonna burn her?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:     And you're sure that, are you sure about that?

BRENDAN:        (nods "yes") uh huh

FASSBENDER:     OK, then you said that you took her outta the, the of the back of the ah her
vehicle. (Brendan nods "yes") Did you help him do that?

BRENDAN:        (nods "yes") mh huh

FASSBENDER:     And then you said that he went and got the a gun. Right?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:     And he came back in? (Brendan nods "yes") What did he do?

BRENDAN:        He shot her ten times.

FASSBENDER:     Tell me where he shot her.

BRENDAN:        Like in the head and some in the belly and the stomach.

FASSBENDER:     How many times did he shoot her in the head?

BRENDAN:        Like three times.

FASSBENDER:     Tell me where in the head. What sides?

BRENDAN:        Like the left side I think it was.

FASSBENDER:     The left side of her head (Brendan nods "yes") and the when he shot her in
the body, where in the body again?

BRENDAN:        Like right here.

FASSBENDER:     OK, what was he saying when he was doing this if anything? What was
his demeanor? Was he calm, was he, what, what was he doing?

BRENDAN:        He was calm.

FASSBENDER:     What was he saying to you?

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
631
File Number

BRENDAN:       That he, he was sorry for me ta see that stuff.

FASSBENDER:    Did he ask you to shoot her too or did he tell you ta shoot her?

BRENDAN:       No.

FASSBENDER:    You're sure about that?

BRENDAN:       (nods "yes") Yeah.

FASSBENDER:    When you got home from school, do you remember if a fire was going
then?

BRENDAN:       (shakes head "no") uh uh, I didn't look.

FASSBENDER:    When you knocked on the door to go in, was the fire going then?

BRENDAN:       eh eh, yeah. (nods "yes")

FASSBENDER:    OK.  When you knocked on the door to go into Steven's trailer, was it still
light out?

BRENDAN:       Yeah. (nods "yes")

FASSBENDER:    OK.  You mentioned then you took her, her back out, you shot her, did
anything else happen in this garage that, that is noteworthy cuz remember, remember we've,
we've seen the garage we've got the evidence from the garage, um, did you guys do anything
else with her out in the garage?

BRENDAN:       (shakes head "no") No.

FASSBENDER:    Anything with those ropes or bindings or anything like that?

BRENDAN:       (shakes head "no") No.

FASSBENDER:    You took her out ta the fire and you're sure you used this creeper thing,
right?

BRENDAN:       Yeah. (nods "yes")

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
632
File Number

Complaint No.
05-0157-955

FASSBENDER: That's what you said. (Brendan nods "yes") Did you carry her on that creeper thing or did you actually push it out there, you guys? Do you know what I mean?

BRENDAN: (nods "yes") Yeah.

FASSBENDER: You could push someone on there and you can carry that thing or did you actually roll it?

BRENDAN: We carried it.

FASSBENDER: OK. Kinda, what would that be similar to, kinda like a um do you know what I'm thinkin' of?

BRENDAN: The thing that the ambulance.

FASSBENDER: Yeah. (Brendan nods "yes") So you carried it like that?

BRENDAN: (nods "yes") Yeah.

FASSBENDER: And was she still unclothed at that time?

BRENDAN: (nods "yes") Yeah.

FASSBENDER: OK.

WIEGERT: Like what time was that?

BRENDAN: 'bout five thirty.

WIEGERT: Was it light out or dark out?

BRENDAN: Light.

FASSBENDER: And then you put her on the fire you said, (Brendan nods "yes") and you put other stuff over that over her you said.

BRENDAN: (nods "yes") Yeah.

FASSBENDER: Did you help Steven start that fire?

BRENDAN: (shakes head "no") No.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

FASSBENDER:     Are you tellin' us the truth?

BRENDAN:        (nods "yes")Yes.

FASSBENDER:     Is it at this time that, what do you do after you put her on the on the fire?

BRENDAN:        We put the tires on there and the branches.

FASSBENDER:     Where'd that stuff come from?

BRENDAN:        He had it there already.

FASSBENDER:     He did. (Brendan nods "yes") OK, now the fires going, she's on there, tell, tell, tell me what you're gonna what you're doin' now or what you guys do. I mean it's only five thirty right now, what are you guys doin'.

BRENDAN:        After we put the tires and the branches on, we went to the house and went in there for a little bit and we went out and he was gonna take the jeep down in the pit so he did and that's when we covered it with branches and the hood.

FASSBENDER:     Did you guys go out by the fire some more that night?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     Where did this, this car seat come from?

(pause)

BRENDAN:        We got that.

FASSBENDER:     Tell me how you guys got that.

BRENDAN:        I went over to my house and got the, the golf cart and got, he went to go pick 'em up and we went over to get the car seat, and we put it by the fire, and waited for it to burn down, and we threw it on there, and we went to, to the jeep.

FASSBENDER:     OK so you, you went and got this car seat. Did you get anything else wh-when you had the golf cart.

BRENDAN:        Well old cabinet.

FASSBENDER:     Where'd you get that from?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
634
File Number

Complaint No.
05-0157-955

BRENDAN: Frommm in the back of our garage.

FASSBENDER: Whose garage?

BRENDAN: Ours. Cuz we were using it to put it in the garage.

FASSBENDER: Anything else that you went and gathered up with the golf cart?

BRENDAN: Just the tires and the wood, and the seat and the

FASSBENDER: OK, so, so you got more tires?

BRENDAN: Yeah. (nods "yes")

FASSBENDER: And more wood?

BRENDAN: mm huh. (nods "yes")

FASSBENDER: And w-what did you do with all that stuff?

BRENDAN: We put it in the fire.

FASSBENDER: OK. Last night you mentioned, or Monday you mentioned, um, Steven gettin' some other things out of the garage. What were those things again?

BRENDAN; The clothes.

FASSBENDER: But I mean somethings that you might use to

BRENDAN: Oh the shovel and the rake? (nods "yes")

FASSBENDER: Right. Did he get anything else like that outta the garage?

BRENDAN: (shakes head "no") No just them two.

FASSBENDER: And what did he use those for?

BRENDAN: To like pile, so he can get it smooth so he can fit the, the rest of the stuff in there.

FASSBENDER: Did you help him with that? Did you use the rake and the shovel at all?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     Are you sure about that?

BRENDAN:        (nods "yes") Yeah.

WIEGERT:        Tell me again what he was doing with the rake.

BRENDAN:        He was like pushing the stuff around so he can put more stuff on it so it's even.

WIEGERT:        Show me what he was doing, you showed me the other day. Can you show me again?

BRENDAN:        Like going like this.

WIEGERT:        Going like that? What kinda stuff was he pushing around?

BRENDAN:        Like the wood and that.

WIEGERT:        Was he pushing her around at all?

BRENDAN:        (shakes head "no") uh uh. ..............we're .... a cabinet.

FASSBENDER:     Were you able to see her in the fire?

BRENDAN:        Just the forehead and the hands and the feet and a little bit of belly.

FASSBENDER:     OK. Sometime during that evening, um, did someone come down to Steven's trailer or in that area?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     You don't you remember seeing, do you remember seeing anyone come down there, an-an-and talk to Steven for a bit?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     Do you know if anyone else saw anything?

BRENDAN:        (shakes head "no") No.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
636
File Number

Complaint No.
05-0157-955

FASSBENDER:     How much time did you think it took from when you cut her on the neck to the time you guys got her out in the garage?

BRENDAN:     'bout ten minutes.

FASSBENDER:     After, after the fire was, and she was put in fire, what time did you go home to your place that night?

BRENDAN:     About 9:30.

FASSBENDER:     Did you come back out at all that night?

BRENDAN:     (shakes head "no") uh uh.

FASSBENDER:     Was Steven out there when you went home?

BRENDAN:     Yeah.  Cuz he said he was gonna watch the fire until it burnt down a little bit more.

FASSBENDER:     What did you guys do with Teresa's body after that, after it was burned?

BRENDAN:     I don't know, I didn't, I didn't do nothin' with it.

FASSBENDER:     Did Steven do anything with it?

BRENDAN:     Yeah, but I don't know what.

FASSBENDER:     How do you, what do you mean by yes, but you don't know what?

BRENDAN:     Like he tried to bury it or somethin'.

FASSBENDER:     How'd he do that?

BRENDAN:     With the shovel.

FASSBENDER:     Did he take some of her body out of that fire pit?

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     He did.  How tell me how he did that.

Complaint No.
05-0157-955

---

BRENDAN: Like when the bones were left behind, he would like try to take the shovel and try to break the bones apart and he would bury 'em, like right in front of the fire almost.

WIEGERT: What do you mean he'd bury them right by the fire?

BRENDAN: Like he dug a hole and he'd put the bones in there and he buried it.

WIEGERT: Where in relation to the fire?

BRENDAN: Like two, three feet away.

WIEGERT: Which way from the fire?

BRENDAN: Like towards the garage.

WIEGERT: OK.

FASSBENDER: Did you see him do that?

BRENDAN: (shakes head "no") I just heard that.

FASSBENDER: Heard it from who?

BRENDAN: Him.

FASSBENDER: Oh. So he told you that he used the shovel to break up bones?

BRENDAN: Yeah. (nods "yes")

FASSBENDER: And then buried some of the bones? (Brendan nods "yes") Did he take some of her bones some, anywhere else?

BRENDAN: On the other side of the, like that, there was like in the back of the yard, there was like this steep hill there, like in the pit, there was some there that he threw there.

FASSBENDER: OK, we're gonna, we're in a little bit, we're gonna have you draw on some sketches and stuff and we're a, we're gonna wanna these places. How do you know that there were some bones there?

BRENDAN: He told me that he threw some there.

FASSBENDER: Did he tell you how he did that?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
638
File Number

Complaint No.
05-0157-955

**BRENDAN:**     He had 'em in a bucket.

**FASSBENDER:**     And what I'm understanding is then in the back of both your yards or his yards, down toward into the pit, over that area?

**BRENDAN:**     In like Radandt's pit.

**FASSBENDER:**     Oh, Radandt's pit, (Brendan nods "yes") not into your ah, (Brendan shakes head "no") the salvage yard area? (Brendan shakes head "no") You think you'll be able to show us that?

**BRENDAN:**     (nods "yes") Yeah.

**FASSBENDER:**     Anything else that you did with the bones (Brendan shakes head "no") that he told you or that you helped him, di-did you help him do any of this?

**BRENDAN:**     (shakes head "no") No.

**FASSBENDER:**     Did he have anymore fires that week?

**BRENDAN:**     (shakes head "no") Not that I know of.

**FASSBENDER:**     We talked about Monday night about, um, bad smells and stuff, do you remember any smells coming from that fire, after she was put on there?

**BRENDAN:**     Just that it smelled bad.

**FASSBENDER:**     You remember that? (Brendan nods "yes")·

**FASSBENDER:**     Did Steve call Chuck that night? Do you recall?

**BRENDAN:**     (shakes head "no") I don't know.

**FASSBENDER:**     Did Steve make any other phone calls? I know I asked this once before, but

**BRENDAN:**     (shakes head "no") No.

**FASSBENDER:**     Or tell you about making any other phone calls.

**BRENDAN:**     Just that someone called him.

---

FASSBENDER:     OK

WIEGERT:        What was Steve wearing when you, you first got to his house?

BRENDAN:        A white shirt and red shorts.

WIEGERT:        OK. You told us before that Jodi called a couple times, right?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        What were you doing when Jodi called?

BRENDAN:        Sittin' on the couch watching TV.

WIEGERT:        What was Steve doing?

BRENDAN:        Sittin' on the computer chair.

WIEGERT:        Was that before of after you had sex with Teresa?

BRENDAN:        After.

WIEGERT:        Was Teresa still alive when Jodi called?

BRENDAN:        (shakes head "no") N-no.

WIEGERT:        No. (Brendan shakes head "no") So Jodi calls, you had already killed
Teresa? Is that correct?

BRENDAN:        (nods "yes") Yeah.

WIEGERT:        Do you remember what time Jodi called about?

BRENDAN:        (shakes head "no") uh uh.

WIEGERT:        Why did you guys cut her hair?

BRENDAN:        I don't know.

WIEGERT:        Did Steve ever say why he wanted you to do that?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
640

Complaint No.
05-0157-955

File Number

BRENDAN:      (shakes head "no") No.

WIEGERT:      Do you know if he kept any of it?

BRENDAN:      I don't know.

WIEGERT:      Where was her underwear?

BRENDAN:      (shakes head "no") I don't know.

WIEGERT:      Brendan, it's important, you've been honest so far, you need to be honest all the way through here, OK?

BRENDAN:      I don't know where they are.

WIEGERT:      You don't know where the underwear are?  I mean, do you have it?  If a you do, it's OK.  We understand that.

BRENDAN:      I don't got it.

WIEGERT:      Did Steve have it?

BRENDAN:      I don't know.

WIEGERT:      Do you think he might have kept it?

BRENDAN:      Yeah.

WIEGERT:      Why do you think that? (pause)  Did he tell you that?

BRENDAN:      No.

WIEGERT:      You said that you had cut her throat.  (Brendan nods "yes") Here's the thing Brendan, when you cut somebody's throat, they bleed a lot, (Brendan nods "yes") OK?  Am I right?

BRENDAN:      (nods "yes") Yeah.

WIEGERT:      She bleed a lot, (Brendan nods "yes") so I know you had blood on ya, it's pretty much impossible not to.  Did you have blood on you?

BRENDAN:      (shakes head "no") No.

Complaint No.
05-0157-955

WIEGERT:        None at all?

BRENDAN:        (shakes head "no") uh uh.

WIEGERT:        What about when you moved her?

BRENDAN:        (shakes head "no") No.

WIEGERT:        What were you wearing at the time?

BRENDAN:        Them pants and a jacket.

WIEGERT:        What jacket?

BRENDAN:        My old blue one.

WIEGERT:        Your old blue jacket?  What does it say anything on it?

BRENDAN:        It ah the Friar Tuck symbol on it.

WIEGERT:        Friar Tuck symbol?

BRENDAN:        mm huh.

WIEGERT:        Where's that jacket now?

BRENDAN:        Probably in the closet when you walk in the house, behind the door.

WIEGERT:        What were you wearing for a shirt?

BRENDAN:        I don't remember. (shakes head "no")

WIEGERT:        What kinda shoes?

BRENDAN:        My o, my old red ones.

WIEGERT:        Were they tenny shoes or what?

BRENDAN:        There just like these but they're red.

WIEGERT:        OK.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
642
File Number

Complaint No.
05-0157-955

| | |
|---|---|
| BRENDAN: | and white |
| WIEGERT: | Do you know what brand they are? |
| BRENDAN: | (shakes head "no") N-no. |
| WIEGERT: | You don't' know that brand name. |
| BRENDAN: | (shakes head "no") uh uh. |
| WIEGERT: | Nike or Adidas, somethin' like that? |
| BRENDAN: | (shakes head "no") No |
| WIEGERT: | OK. |
| BRENDAN: | I think they're Starters. |
| WIEGERT: | You think they're what? |
| BRENDAN: | Starters. |
| WIEGERT: | Starters, OK. (pause) When this is all going on, did Steve say anything about Teresa? |
| BRENDAN: | (shakes head "no") No. |
| WIEGERT: | You told us two days ago that Steve was angry. Was that true? |
| BRENDAN: | No. |
| WIEGERT: | So Steve was not angry? (Brendan shakes head "no") So why do you think he did this to Teresa? |
| BRENDAN: | Maybe because he wanted to go back to jail. |
| WIEGERT: | Did he ever tell you that? |
| BRENDAN: | No, that's what I was thinking. |
| WIEGERT: | OK. |

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
643
File Number

Complaint No.
05-0157-955

BRENDAN:      Too, maybe liked it in there and the real world was probably too noisy for him, or too, too big for him or somethin'.

WIEGERT:      In the garage, in Steve's garage, there were some wires hanging from the rafters, you remember those?

BRENDAN:      Yeah.

WIEGERT:      Did you guys use those for anything?

BRENDAN:      (shakes head "no") No.

WIEGERT:      Are you being honest with me now?

BRENDAN:      . (nods "yes") Yeah.

WIEGERT:      Very important you be honest here.  (Brendan nods "yes") Did you ever use those for anything?

BRENDAN:      (shakes head "no") No.

WIEGERT:      Did you use anything else on Teresa, (Brendan shakes head "no")  other than rope?

BRENDAN:      (shakes head "no") No.

WIEGERT:      OK.  Want to draw me a few pictures?  (Brendan nods "yes") OK.

FASSBENDER:   Brendan, when she's on the bed, was there a lot of blood?

BRENDAN:      (nods "yes")Yeah.

FASSBENDER:   Do you recall when the sheets were taken off the bed and stuff that the blood had soaked through to the mattress pad at all?   Or mattress?

BRENDAN:      I don't know.

FASSBENDER:   You don't know, did you see or not?

BRENDAN:      (shakes head "no") No.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
644
File Number

Complaint No.
05-0157-955

FASSBENDER:     You sure that she wasn't taken out to the garage alive and some of the stuff was done to her out there?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     Hanging from a rafter, 'er anything like that?

BRENDAN:     (shakes head "no") mm uh.

FASSBENDER:     Now the worst is over, you're not gonna shock us or anything by tellin' us if that happened.  Cuz I-I just have a feeling that something may, may be there.  Talk to me.

BRENDAN:     Nothin' happened in there.

FASSBENDER:     It all happened in the bedroom you said.  (Brendan nods "yes") You're positive of that.

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     Keep in mind that you know, Steven's gonna have his time to tell his story too.  Right?

BRENDAN:     (nods "yes") Yeah.

FASSBENDER:     He's not gonna say anything different?

BRENDAN:     (shakes head "no") uh uh.

WIEGERT:     Did you turn the mattress over or anything like that?

BRENDAN:     (shakes head "no") No.

FASSBENDER:     The cleaning of the house, w-ah Brendan, did, did a Steven do some cleaning in the house?

BRENDAN:     I don't know that. (shakes head "no")

FASSBENDER:     You know what I mean by cleaning in the house. Right?

BRENDAN:     Yeah.

FASSBENDER:     Did he vacuum?

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

Page
645
File Number

BRENDAN: Not while I was there.

FASSBENDER: He didn't? Did he wipe anything down?

BRENDAN: Not that I know of. (shakes head "no")

FASSBENDER: Did he do any laundry? Did he wash some clothes?

BRENDAN: I don't know.

WIEGERT: Wn-What about the knife, where is the knife, be honest with me, where's the knife? It's OK, we need to get that OK? Help us out, where's the knife?

BRENDAN: Probably in the drawer.

WIEGERT: In which drawer?

BRENDAN: His knife drawer.

WIEGERT: And where's that?

BRENDAN: In the kitchen.

WIEGERT: Is it probably in there, or do you know it's in there.

BRENDAN: That's where I think it is.

WIEGERT: Why do you think it's in there?

BRENDAN: Cuz he wouldn't let that knife go.

WIEGERT: Cuz he wouldn't let the knife go. How do you know that?

BRENDAN: Cuz it was a pretty nice knife.

WIEGERT: Did he tell you that? (Brendan nods "yes")

WIEGERT: Did he wash it off or anything or wipe it off or what did he do with the knife?

BRENDAN: He wiped it off.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
646

Complaint No.
05-0157-955

File Number

WIEGERT:        What did he use to do that with?

BRENDAN:        Paper towel.

WIEGERT:        What happened to the paper towel?

BRENDAN:        He burnt it.

WIEGERT:        Can you describe the knife for us?

BRENDAN:        Well it was like that long.

WIEGERT:        OK.

BRENDAN:        Big head on it like that.

WIEGERT:        Big head on it. (Brendan nods "yes") What kinda, I mean was it like a, a steak knife or like something you'd use for a deer?

BRENDAN:        Somethin' like that like a deer.

WIEGERT:        OK, what color was the handle?

BRENDAN:        Black.

WIEGERT:        Black. And it was a, could you draw that? You think you could draw the knife?

BRENDAN:        (nods "yes") Yeah.

WIEGERT:        Why don't you do that, draw me the knife.

(pause)

(door opens)

FASSBENDER:        Thank you.

(door closes)

(pause)

Complaint No.
05-0157-955

BRENDAN:        .......like that.

WIEGERT:        OK, the handle was just like this.

BRENDAN:        Yeah.

WIEGERT:        OK, and this was black. (Brendan nods "yes")

BRENDAN:        mm huh.

WIEGERT:        OK, why don't you sign your name to that.

BRENDAN:        The whole thing?

WIEGERT:        Sure. Actually, write it. OK. Um, put the date on there too. It's one, correction 3/1/03, '06, um, I'm all mixed up with dates today, aren't I? (Brendan nods "yes"). Um the time is ah 1:44 p.m. OK. I'm gonna ask you if you'd be would you be willing to draw the bedroom out for us?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        OK.

FASSBENDER:     If you saw the knife again, would you be able to identify it?

BRENDAN:        (nods "yes")Yeah.

WIEGERT:        Why don't you draw out the bedroom, put the bed on there and show me where the dresser and everything was, the best that you can, and where the door was and all that.

BRENDAN:        It's kinda like the door was like right here.

WIEGERT:        OK. Why

BRENDAN:        Should I label it?

WIEGERT:        Why don't you label it, yep.

FASSBENDER:     While you're doin' that Brendan, anything else unique about that knife?

BRENDAN:        (shakes head "no") No.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
648
File Number

Complaint No.
05-0157-955

WIEGERT:        Draw her on the bed.

BRENDAN:        Should I draw the pillows?

WIEGERT:        mm huh.

(pause)

WIEGERT:        You can do a stick person, that's fine, and how she was laying on there.
(pause)  OK and where were the handcuffs?

BRENDAN:        Like, they were like that.

WIEGERT:        And we have some leg cuffs too you said?

BRENDAN:        Yeah.

WIEGERT:        OK.  Where else, w-what other things are in the bedroom, draw what else
was in there.  (pause) OK.  Anything else you remember?  (pause)  And that's a closet? And
that's a dresser?

BRENDAN:        (nods "yes") mm huh.

WIEGERT:        OK, anything else?

BRENDAN:        And like the gu, the gun holder thing was like right here on the wall.

WIEGERT:        OK.  Why don't ya label that in.  Gun rack maybe or.

BRENDAN:        How do you spell rack?

WIEGERT:        R-A C-K.  OK.  Anything else?  (Brendan shakes head "no") Wh-where
was the key, where'd you put the key, or where did Steven put the key?

BRENDAN:        In that middle a drawer.

WIEGERT:        OK.  Why don't you put the key there.    Anything else you remember in
there? (Brendan shakes head "no")

BRENDAN:        Well I think there was like a nightstand right there so.

Complaint No.
05-0157-955

WIEGERT:       OK, why don't you draw that.

BRENDAN:       With a lamp on it.

WIEGERT:       OK. Why don't ya label that. (pause) OK, um, anything else? (Brendan shakes head "no") Where'd you put her hair?

BRENDAN:       Like right here.

WIEGERT:       OK, why don't you label that. How much hair do you think you cut off of her?

BRENDAN:       About three inches.

WIEGERT:       Three inches. What part of the, of her hair?

BRENDAN:       The back.

WIEGERT:       OK. Anything else in there? (Brendan shakes head "no") OK, why don't you sign it, sign your name. (pause) And we'll date it and time it again. (pause) Ah, let see 1:48. OK, and there's one more thing I'm gonna have you draw would be the um, the garage. (Brendan nods "yes") OK. Why don't you draw the garage out. (pause) OK, where's the big door?

BRENDAN:       Right here.

WIEGERT:       OK, you wanna label that? Was there a small entry door in there? OK, where, where was her truck parked?

BRENDAN:       Like that area.

WIEGERT:       OK, and it was sticking out the door you said? (Brendan nods "yes") When you brought 'er outside which door did you bring her through?

BRENDAN:       Right here, this little crack.

WIEGERT:       And you said you put her in the truck first, (Brendan nods "yes") is that correct? (Brendan nods "yes")

WIEGERT:       And then what did you do after that?

BRENDAN:       We set her down, like right here.

WIEGERT:          OK, why don't you draw her body in the area you set her down. OK, um, is that where, what'd you do to her when you put her there? Or what did Steven do?

BRENDAN:          He went in the house?

WIEGERT:          Who went in th house?

BRENDAN:          He did and got the gun.

WIEGERT:          OK, and then he did what?

BRENDAN:          Shot her.

WIEGERT:          OK. Do you know where the empty casings were?

BRENDAN:          (shakes head "no") mm uh

WIEGERT:          Why don't ya label some other things in there, like a, what else was in that garage. (pause) OK, was there a snowmobile anywhere in there?

BRENDAN:          Yeah, there was one here.

WIEGERT:          OK, wanna label that?

FASSBENDER:       Brendan, I don't know if we asked ya, the gun was, you said it was a .22, was that a single shot or what type of gun was it, do you remember?

BRENDAN:          Yeah, single. (nods "yes")

FASSBENDER:       It was a single shot, not a semi-automatic?

BRENDAN:          (shakes head "no") mm uh

WIEGERT:          Why don't you draw where the blood stains would have been.

BRENDAN:          Like right here, about.

WIEGERT:          And what did those blood stains come from? Like when she was laying there or

BRENDAN:          Yeah, while she was laying there.

Complaint No.
05-0157-955

| | |
|---|---|
| WIEGERT: | You know did he, when he shot her you said how many times. |
| BRENDAN: | Ten. |
| WIEGERT: | Do you know did he hit her every time? |
| BRENDAN: | (shakes head "no") I don't know. |
| WIEGERT: | OK. Did he hit anything else in the garage at all? |
| BRENDAN: | (shakes head "no") uh uh |
| FASSBENDER: | Where was he standing when he shot her? |
| BRENDAN: | Right here. |
| WIEGERT: | Why don't you put an X there and put his initials there. And where were you standing? |
| BRENDAN: | Right over here. |
| WIEGERT: | OK put your initials there. Was there blood anywhere else? |
| BRENDAN: | (shakes head "no") No. |
| WIEGERT: | What about behind the vehicle or anything like that? |
| BRENDAN: | (shakes head "no") No. |
| WIEGERT: | No? All right, why don't you sign it. (door opens) (pause) (door closes) And put the time in. 1:51 looks like. OK. Um, looks good to me. |
| FASSBENDER: | All right, but, did you want him ta maybe draw the fire pit, or sketch of the fire pit in the back |
| WIEGERT: | Yeah that's a good idea. |
| FASSBENDER: | …………………….. |
| WIEGERT: | Can you do that? (Brendan nods "yes") We did it the other day so let's, let's try that. Give that back ta ya. |

BRENDAN:        So like, should I draw like the garage you think there a little bit

WIEGERT:        Ya put a little bit of the garage.

BRENDAN:        There's that little area

WIEGERT:        mm huh.

BRENDAN:        It's open.

WIEGERT:        How long has that fire pit been there?

BRENDAN:        'bout four or five months.

WIEGERT:        OK. And where did you put her body?

BRENDAN:        Right here.

WIEGERT:        Draw it in there. (pause) OK. Um, was there, was the dog there yet at that time?

BRENDAN:        Yeah, a, the dog was like right over here.

WIEGERT:        Dr-draw the doghouse then, where the doghouse was. And label that too. OK why don't you label what that was.

BRENDAN:        How do you spell garage?

WIEGERT:        G-A-R-

BRENDAN:        Yeah

WIEGERT:        A-G-E. OK, um, where'd you get the brush from?

BRENDAN:        From the field.

WIEGERT:        OK. You said that he had taken some bones (Brendan nods "yes") and put them in a five gallon pail then he dumped 'em.

BRENDAN:        Yeah.

Complaint No.
05-0157-955

---

WIEGERT: Where would that be? Which way?

BRENDAN: Probably like, his house was like be a little bit right here

WIEGERT: mm huh.

BRENDAN: It would be like over here somewhere.

WIEGERT: OK. Did you actually see him do that?

BRENDAN: (shakes head "no") uh uh.

WIEGERT: How do you know he did that?

BRENDAN: He told me that he put 'em I a bucket and he p-threw 'em over there.

WIEGERT: OK. OK, anything else you wanna add in there? (Brendan shakes head "no") OK, why don't you sign that. (pause)

BRENDAN: Well when we got the seat, we put it right, we set it down right like here.

WIEGERT: Did you sit there and watch the fire burn or anything like that?

BRENDAN: (shakes head "no") uh uh

WIEGERT: You just set it there?

BRENDAN: 53?

WIEGERT: That's pretty good. OK.

FASSBENDER: Brendan, gots a few more questions to cover here, (Brendan nods "yes") then the worst is over, as far as um the questions. Can you describe Steven's house for me? The color and stuff like that.

BRENDAN: It's like a red and the top is like silver and the bottom is like cement.

FASSBENDER: OK, and where's his house located in relation to say your house.

BRENDAN: Like how far away from ours?

FASSBENDER: How far away, what direction if you know.

**CALUMET COUNTY SHERIFF'S DEPARTMENT**

Page
654
File Number

Complaint No.
05-0157-955

BRENDAN:     I don't know what direction, but it's about little like 'bout 350 feet away.

FASSBENDER:     OK.  If you come out your front door, that you can't get into now cuz its not shoveled, what direction would be left, right straight, back?

BRENDAN:     Left.  (nods "yes")

FASSBENDER:     To the left.  OK, and then his garage, how would you describe his garage?

BRENDAN:     The same red and the top was black.

FASSBENDER:     OK and how many garage doors are on it?

BRENDAN:     One

FASSBENDER:     Big garage doors.

BRENDAN:     There's only one big one and one small one.

FASSBENDER:     OK.

BRENDAN:     And there's like three windows.

FASSBENDER:     OK.  Any of those windows facing your house?

BRENDAN:     Just one.

FASSBENDER:     OK, and then the location, and now you drew it here so it's pretty obvious, (Brendan nods "yes") that the location of the burn pit is, is where?  In relation to the garage and his house, etc?

BRENDAN:     In-n-n like where he used to park his car, like

FASSBENDER:     The burn pit, we-where

BRENDAN:     Oh the burn pit?

FASSBENDER:     Yeah, what you drew here.  Where is that in relation to the garage?

BRENDAN:     Straight back from the garage, like in the back o-by the window.

FASSBENDER:        OK. Um, we've got the, we've got the gun, (Brendan nods "yes") now is there any reason that your DNA or fingerprints would be on that gun?

BRENDAN:        (shakes head "no") mm uh, I never touched it.

FASSBENDER:        Can you tell me why, i-if Teresa was, was dead when she was in the garage, why you would shoot or, why he would shoot a dead body.

BRENDAN:        I don't know. Probably to make sure she's dead or somethin'.

FASSBENDER:        Did he say anything, why he shot her?

BRENDAN:        (shakes head "no") No.

FASSBENDER:        You're just sayin', yo-your guess is that to make sure was dead.

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:        You sure he didn't say anything?

BRENDAN:        (shakes head "no") uh uh.

FASSBENDER:        Was he pretty calm about this?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:        Just gonna revisit one thing, when you're in the bedroom, an-an-and you cut her throat, (Brendan nods "yes") previously you said that you thought she was alive. (Brendan nods "yes") Is that still your thought on that?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:        And why was that?

BRENDAN:        Cuz she was breathing a little bit. She was like trying ta, ta not tryin' to breathe as hard as she could, from screamin', screaming a lot.

WIEGERT:        She was screaming a lot or wasn't?

BRENDAN:        She was.

FASSBENDER:        When you cut her throat, was she screaming?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
656
File Number

Complaint No.
05-0157-955

BRENDAN:        mm uh  (shakes head "no")

FASSBENDER:     No.  When you cut her throat.

BRENDAN:        Cuz when you scream a lot, you like, your, your breathing goes up or
somethin'.

WIEGERT:        ......explain that a little bit, you said she was screaming a lot.  When was
she screaming a lot?

BRENDAN:        Like

WIEGERT:        While you doing it, after you were doing it, before you did it?

BRENDAN:        Before.

FASSBENDER:     When you cut her throat, what was she doing?  If anything?

BRENDAN:        Like screaming for help and crying.

FASSBENDER:     I wanna-wanna get that straight, she was screaming for help and crying
when you cut her throat?

BRENDAN:        (nods "yes") Yeah.

FASSBENDER:     When did Steven choke her?  Or strangle her?

BRENDAN:        Like a little bit after that.

WIEGERT:        Well lets, lets just go back a little bit OK?  Tell us what exactly happened
to her, what order it happened in.  You said there were basically three things prior to you guys
shooting her.  Explain those in, in the order that it happened.

BRENDAN:        Starting with when we got in the room?

FASSBENDER:     OK.

WIEGERT:        Yeah, what you guys did to her.

BRENDAN:        We had sex with her.

Complaint No.
05-0157-955

| | |
|---|---|
| WIEGERT: | OK. |
| BRENDAN: | Then he stabbed her. |
| WIEGERT: | Then who stabbed her? |
| BRENDAN: | He did. |
| WIEGERT: | Who's he? |
| BRENDAN: | Steven. |
| WIEGERT: | OK, and then what? |
| BRENDAN: | Then I cut her throat. |
| WIEGERT: | OK. |
| BRENDAN: | And then he choked her and I cut off her hair. |
| WIEGERT: | OK. So he choked her after you cut her throat? |
| BRENDAN: | (nods "yes") mm huh. |
| WIEGERT: | OK, kinda show me like on your throat where you cut her. |
| BRENDAN: | Like right here. |
| WIEGERT: | How deep? |
| BRENDAN: | Just as long as the knife went through. |
| WIEGERT: | OK. |
| FASSBENDER: | With your finger, show me how deep you went into her throat. |
| BRENDAN: | About that much. |
| FASSBENDER: | I mean like, like this like that, like that, like that. |
| BRENDAN: | Like that. |

Complaint No.
05-0157-955

---

FASSBENDER:     About that far? (nods "yes")

WIEGERT:     When Steven stabbed her, tell me again where he stabbed her.

BRENDAN:     Like right here.

WIEGERT:     How far in did the knife go?

FASSBENDER:     Again with your hands, if you can.

BRENDAN:     About like that.

WIEGERT:     OK. (Brendan nods "yes") And then he, tell me how he choked her. Where was he when he choked her?

BRENDAN:     On the side of the bed.

WIEGERT:     On the side of the bed. (Brendan nods "yes")

FASSBENDER:     With your hands, show me what, pretend that her neck is there whatever, show me how he did it.

BRENDAN:     Like this.

FASSBENDER:     How long?

BRENDAN:     'bout two, three minutes.

WIEGERT:     He must have had a lot of blood on his hands then huh? (Brendan nods "yes") How did he get that off his hands?

BRENDAN:     Washin' it off.

WIEGERT:     Where?

BRENDAN:     In the sink.

WIEGERT:     Which sink?

BRENDAN:     In the bathroom.

WIEGERT:     Did he wipe any blood up with anything? (Brendan shakes head "no")

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
659
File Number

Complaint No.
05-0157-955

BRENDAN:     Just that paper towel that he dried his hands with.

FASSBENDER:     After you cut her throat, was she still alive?

BRENDAN:     Barely.

FASSBENDER:     And how do you know that?

BRENDAN:     Cuz she was breathing like little bit.

WIEGERT:     When do you think she quit breathing?

BRENDAN:     When we were bringing her outside.

WIEGERT:     Outside, what do you mean outside where?

BRENDAN:     Out in the garage.

WIEGERT:     How do you know she quit breathing then?

BRENDAN:     Cuz her belly wasn't moving.

WIEGERT:     Cuz her belly wasn't moving? (Brendan nods "yes") OK.

FASSBENDER:     You talked about getting a car seat and a cabinet. (Brendan nods "yes") Whose idea was that?

BRENDAN:     His.

FASSBENDER:     When you went and got it, put it by the fire, did you throw it on the fire when it was time to throw it on the fire?

BRENDAN:     (nods "yes") uh huh.  With hi-him.

FASSBENDER:     Pardon?

BRENDAN:     He helped me throw it on there.

FASSBENDER:     The car seat?

BRENDAN:     (nods "yes") uh huh.

Complaint No.
05-0157-955

---

FASSBENDER:     Who throw the cabinet on the fire?

BRENDAN:     He did.

FASSBENDER:     Did you throw anything on the fire?

BRENDAN:     Just that wood that we found.

FASSBENDER:     In the, in the um salvage yard, there is a skidsteer, you know what that is?

BRENDAN:     Ah, it's ta flatten cars out.

FASSBENDER:     Not the crusher, but a skidsteer. It's a, it's like a little tractor thing that has a bucket or forks on the front of it.

BRENDAN:     Oh yeah. (nods "yes")

FASSBENDER:     You know where that, you know what that is?

BRENDAN:     Yeah. (nods "yes")

FASSBENDER:     Did you guys or Steven use that at all?

BRENDAN:     (shakes head "no") uh uh.

FASSBENDER:     Did Steven use that to ah dig his fire pit? Do you know?

BRENDAN:     (shakes head "no") Uh I don't know that.

FASSBENDER:     I gotta hard, oh go ahead

WIEGERT:     OK. Did you go up north with everybody after you guys couldn't come back to your house?

BRENDAN:     uh huh. (nods "yes")

WIEGERT:     Did you and Steve talk about this up north?

BRENDAN:     uh uh. (shakes head "no")

WIEGERT:     You sure?

Complaint No.
05-0157-955

---

BRENDAN:        (nods "yes") Yeah.

WIEGERT:        How was Steven acting when you got up north?

BRENDAN:        Like he was trying to runaway, trying ta, trying to figure out when, how to get away from the cops.

WIEGERT:        Did he ever ask you to go with him?

BRENDAN:        No. (shakes head "no")

WIEGERT:        Did he ever make any threats to you?

BRENDAN:        No. (shakes head "no")

WIEGERT:        Did he tell you anything about this as far as, what did he tell you after this?

BRENDAN:        He didn't tell me nothin', (shakes head "no") he was just trying to leave.

WIEGERT:        OK

BRENDAN:        And then grandpa said that if you, you, if you're gonna try to leave, then that means you did it. (pause)  So he sat back down.

FASSBENDER:     Anyone else in the family, up north, say anything to him like that or about that type of stuff?

BRENDAN:        uh uh (shakes head "no")

FASSBENDER:     You said um, (pause)  I-I've got some tough questions for you OK? (Brendan nods "yes") Ah, but just be honest.  I need you to, to the best of your memory, describe Teresa's body to me.

BRENDAN:        Like before we a put her in there, in the fire?

FASSBENDER:     Yes.

FASSBENDER:     Probably when she was alive, did she have any scars, marks, tattoos, stuff like that, that you can remember?

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
662
File Number

Complaint No.
05-0157-955

BRENDAN: I don't remember any tattoos.

FASSBENDER: Any scars you remember?

BRENDAN: (shakes head "no") Not that I seen.

FASSBENDER: Did she have pubic hair?

BRENDAN: Yeah. (nods "yes")

FASSBENDER: Do you remember what color her hair was?

BRENDAN: Brown.

FASSBENDER: Do you remember her breasts? Were they, were they, did she have big breasts, small breasts?

BRENDAN: Medium.

FASSBENDER: Anything peculiar about her breasts?

BRENDAN: No. (shakes head "no")

FASSBENDER: Do you ah, remember what color eyes she had or anything like that?

BRENDAN: uh uh. (shakes head "no")

FASSBENDER: Any piercings, any jewelry on her?

BRENDAN: (shakes head "no") No.

FASSBENDER: You remember any jewelry, earrings, anything like that?

BRENDAN: (shakes head "no") No.

FASSBENDER: Watch? (Brendan shakes head "no") (pause) Any items like that?

WIEGERT: Not other than that no. I just got one thing on the end.

FASSBENDER: OK. (pause) We know that Teresa had a, a tattoo on her stomach, do you remember that?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

| | |
|---|---|
| BRENDAN: | (shakes head "no") uh uh |
| FASSBENDER: | Do you disagree with me when I say that? |
| BRENDAN: | No but I don't know where it was. |
| FASSBENDER: | OK. |
| WIEGERT: | Had you ever seen Teresa before that day. |
| BRENDAN: | uh uh (shakes head "no") |
| FASSBENDER: | I just had my ending …may be sooner than that. |
| WIEGERT: | Probably. Um, Brendan, how do you feel about this now? |
| BRENDAN: | Really sad. |
| WIEGERT: | Tell me why you feel really sad. |
| BRENDAN: | That I helped 'em and I shouldn't of, and sorry for her family that she lost their daughter. |
| WIEGERT: | How does Steven feel about this after, do you know? |
| BRENDAN: | mm uh (shakes head "no") |
| WIEGERT: | If you could change things, what would you change? |
| BRENDAN: | I woulda probably tried to stop 'em. |
| FASSBENDER: | Steven, er Steven. Brendan, look at me. W-Why did you do this? Why did you do your part of it? |
| BRENDAN: | I don't know. |
| FASSBENDER: | I'm giving you the opportunity to tell me why you did this. |
| (pause) | |
| WIEGERT: | Everybody has a reason for doing things. What was your reason for this? |

BRENDAN:        Cuz I wanted ta see how it felt.

WIEGERT:        See how what felt?

BRENDAN:        Sex.

FASSBENDER:     During this whole thing, did you ever think about trying to stop Steven?

BRENDAN:        Yeah.

FASSBENDER:     Why didn't you?

BRENDAN:        Cuz I thought he would try ta like, try ta kill me.

FASSBENDER:     Mark just asked you a little while ago, if he ever threatened you. Now earlier you had said, Monday, you talked about something like that and now you said no. What's the truth?

BRENDAN:        He didn't threaten me, I just thought that he was, he coulda, cuz he's bigger than me, that he could probably beat me up and that.

FASSBENDER:     So you telling us now that he never threatened you?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     And you admit you knew this that you had told us that Monday?

BRENDAN:        Yeah.

FASSBENDER:     But now you sayin' that didn't happen? (Brendan nods "yes") Did Steve say anything else to you, offer you anything for doing this or keeping your mouth shut (Brendan shakes head "no") or anything like that?

BRENDAN:        (shakes head "no") No.

FASSBENDER:     Did he tell you anything about sayin' anything about this to anyone? (Brendan shakes head "no") He just let you go into the, the bed that night and didn't say anything to you like about this?

BRENDAN:        uh uh (shakes head "no")

FAASSBENDER:    Did you ever think about callin' the police?

BRENDAN:        Sometime.

FASSBENDER:     Yeah? (Brendan nods "yes")

WIEGERT:        Did you ever think about us coming over to talk with you? Did you worry about that at all?

BRENDAN:        (nods "yes") Yeah. I was scared the first time I had ta go, a, when I was up north talkin' to them people.

WIEGERT:        mm huh.

BRENDAN:        I was sweating a lot.

FASSBENDER:     Had Steven told you some things to tell, to say to the police?

BRENDAN:        He just told me not to say anything, that a, that his lawyer said not to say anything.

FASSBENDER:     If Steven tells us that you did all of this, that, that yo-you ha-had started it and had killed her and stuff, is that true?

BRENDAN:        (shakes head "no") No.

WIEGERT:        Don't forget your Pepsi down there. (Brendan nods "yes") We're gonna step out for a couple of more minutes OK? (Brendan nods "yes")

FASSBENDER:     Do you need to use the restroom?

BRENDAN:        (shakes head "no") uh uh.

FASSBENDER:     Do you want somethin' to eat?

BRENDAN:        It don't matter.

WIEGERT:        How about a sandwich?

FASSBENDER:     Looks like you're a little hungry.

WIEGERT:        Should we get you a sandwich?

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
666
File Number

Complaint No.
05-0157-955

BRENDAN:        (nods "yes") Yeah.

WIEGERT:        OK

(pause)

(voices speaking in background)

(door opens)

WIEGERT:        Brendan there you go.

BRENDAN:        Thank you.

WIEGERT:        Your welcome.

(door closes)

(pause)

(long pause)

(door opens)

DENNIS JACOBS:   Do you need anything?  No bathroom, no nothin'?  Do you wanna cookie or somethin', another sandwich? (Brendan shakes head "no")

BRENDAN:        No.

DENNIS JACOBS:   OK, they'll be with you shortly. (Brendan nods "yes")

(door closes)

(long pause)

(door opens and closes)

FASSBENDER:      Hey bud, do you need anything?  There's another sandwich out there. You sure?  (Brendan shakes head "no")

BRENDAN:        (nods "yes") mm huh

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Complaint No.
05-0157-955

---

FASSBENDER:     You ate that whole pizza the other night, and you sure you don't want another sandwich? (Brendan shakes head "no")

BRENDAN:     All right.

FASSBENDER:     It's gonna be just a bit, OK?

BRENDAN:     Am I gonna be at school before school ends?

FASSBENDER:     Probably not. I mean we're at two thirty already, and schools over at what, three? (Brendan nods "yes")

BRENDAN:     3:05

FASSBENDER:     3:05 yeah. No.

BRENDAN:     What time will this be done?

FASSBENDER:     Well, we're pretty, we're pretty much done. We have a couple follow up things ta ask ya, but its pretty much done.

BRENDAN:     (nods "yes")Yeah.

FASSBENDER:     .........considering er what we had mentioned earlier we would like ta maybe go out ta the property so you can point out some of these things and where some of this stuff was.

BRENDAN:     (nods "yes")Yeah.

FASSBENDER:     OK?

BRENDAN:     (nods "yes") OK.

(door closes)

(long pause)

(door opens and closes)

FASSBENDER:     Brendan,

WIEGERT:     Go ahead.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
668

Complaint No.
05-0157-955

File Number

FASSBENDER: What do you think's gonna happen? What do you think should happen right now?

BRENDAN: I don't know.

FASSBENDER: You know obviously that we're police officers. OK. (Brendan nods "yes") And be because of what you told us, we're gonna have ta arrest you. Did you kinda figure that was coming? For for what you did we we can't let you go right now. The law will not let us. And so you're not gonna be able to go home tonight. All right?

BRENDAN: Does my mom know?

FASSBENDER: Your mom knows.

WIEGERT: Your mom is here, OK? (Brendan nods "yes") Would you like ta talk to her?

BRENDAN: Yeah.

FASSBENDER: Do you have .... before we bring her in, do you have any other questions right now? (Brendan shakes head "no") You do understand that you're under arrest now? (Brendan nods "yes")

BRENDAN: So could I call my girlfriend and tell her that I couldn't come today?

FASSBENDER: We'll give ya an opportunity ta ta do that, OK? (Brendan nods "yes") Did you kinda, and be honestly the after telling us what you told us you kinda figured this was coming? (Brendan nods "yes") Yeah? (Brendan nods "yes")

BRENDAN: Is it only for one day or?

WIEGERT: We don't know that at this time, but let me tell ya something Brendan, you did the right thing. OK. (Brendan nods "yes") By being honest, you can at least sleep at night right now. Cuz, I'm sure you've had some difficulty with that. (Brendan nods "yes") So you did the right thing here, by telling us what happened. OK. (Brendan nods "yes") Just remember that in the future, OK, you need to be honest. (Brendan nods "yes")

FASSBENDER: Your cooperation and help with us is gonna work in your favor. I can't say what its gonna do or where your gonna end up but its gonna work in your favor and we appreciate your continued cooperation. (Brendan nods "yes") We talked to your mom about going out to the house and going in the house and gettin' a few items and about you going out

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
669

Complaint No.
05-0157-955

File Number

there with us and her and um pointing out those areas that we wanted ya to point out. Is that all right? (Brendan nods "yes") OK.

WIEGERT: Do you know where those shoes are that you were wearing that day? The red shoes?

BRENDAN: (nods "yes") I think they're in the closet.

WIEGERT: OK, what about the jacket?

BRENDAN: In the closet.

WIEGERT: OK. All right. We'll have your mom come in for a few minutes, OK? All right.

(door opens and closes)

(pause)

(door opens and closes)

BARB JANDA: Why didn't you tell me? Huh?

FASSBENDER: Barbara give me your coffee, it's in your hands right now.

BARB JANDA: Huh? Did he make you do it? (Brendan nods "yes") I woulda walked out. That's what I woulda did. (crying during pause) Why didn't you just tell 'em, no? Huh?

BRENDAN: I don't know.

BARB JANDA: You knew it was wrong, right? (Brendan nods "yes") (pause) Do you know you can't come home? Do you know where you're going? (pause)

BRENDAN: How long is it though?

BARB JANDA: I don't know. I do not know. (pause) Do I have ta get some him an attorney, or will they do it for me?

FASSBENDER: The court will assign one for him or the state will pay for his attorney if he can't pay for it, but obviously you have a right at any time to try and get him one or get him one.

BARB JANDA:        I tried for a public defender not too long ago and I couldn't get cuz I've got a house.

FASSBENDER:        Well there's different, different ways that they determine you know based on, on what you've been arrested for and stuff like that there's different levels of, of money that you need, you need they, they will determine and I don't know what that is or how they determine that.

(pause)

BARB JANDA:        Are you gonna be OK, are you sure? Huh. Look at me. Why didn't you tell me? Stuff like that is not no secret. I don't care if he told you if he said ta keep it a secret, it's still not a secret. I don't keep secrets from yous. Do I? Don't worry about my belly, I haven't eaten in two days.

FASSBENDER:        I didn't even hear it. Did you want a sandwich, Barb?

BARB JANDA:        No.

FASSBENDER:        We have some here.

BARB JANDA:        No. I'd probably just throw it up anyhow. Am I gonna be able ta see him? Later on after he gets where he's gotta go?

FASSBENDER:        I don't know ah on their policies and when they allow visitation and stuff like that. We can check with Mark, he's gonna know Sheboygan's polices or whatever. With, with juveniles there's probably a good chance but I just don't wanna say right now.

FASSBENDER ON THE PHONE:  Hello, Tom here. Good how are you?

BARB JANDA:        Why.

BRENDAN:           ........

BARB JANDA:        Huh?

FASSBENDER ON THE PHONE:  It's on for tomorrow?

BARB JANDA:        What?

BRENDAN:           ..........

BARB JANDA:        I said why?

FASSBENDER ON THE PHONE:  OK.

BARB JANDA:        mh huh.  What did he do to you to make you do it?

BRENDAN:          Nothin'

BARB JANDA:        Did he force you to do it? (Brendan shakes head "no")

FASSBENDER ON THE PHONE:  All right if, if we go in tomorrow and I think we need
someone, I'll call you.  All right?

BARB JANDA:        mh huh.

FASSBENDER ON THE PHONE:  All right, thanks.  Bye.

BRENDAN:          ...........

BARB JANDA:        mh.

BRENDAN:          You don't want to.

BARB JANDA:        What?

BRENDAN:          I didn't want to.

BARB JANDA:        Ohh.  (door opens and closes) Are you regrettin' it now?  (pause)  You had
a whole life ahead of you Brendan.  Just because he's so demanding, doesn't mean you gotta do
the stuff he says.  Right?

BRENDAN:          Where am I going?

BARB JANDA:        Where do you think you're going?

BRENDAN:          I don't know?

BARB JANDA:        You're goin' to juvie, that's where you're going, to a juvie jail.  About 45
minutes away.

BRENDAN:          Yeh but I gotta question?

Complaint No.
05-0157-955

---

**BARB JANDA:**     What's that?

**BRENDAN:**     What'd happen if he says something his story's different? Wh-he says he, he admits to doing it?

**BARB JANDA:**     What do you mean?

**BRENDAN:**     Like if his story's like different, like I never did nothin' or somethin'.

**BARB JANDA:**     Did you? Huh?

**BRENDAN:**     Not really.

**BARB JANDA:**     What do you mean not really?

**BRENDAN:**     They got to my head.

**BARB JANDA:**     Huh?

**BRENDAN:**     ....say anything.

**BARB JANDA:**     What do you mean by that? (pause) What do you mean by that Brendan? (pause) I have a question for yous two. Is there any way that I can talk to him. Not him, the other one.

**WIEGERT:**     As in Steve you mean?

**BARB JANDA:**     Yes.

**WIEGERT:**     The only way we can have you talk to him is if he calls you or if its, you know, you go there for visiting.

**BARB JANDA:**     I won't go there and visit.

**WIEGERT:**     OK. That's the only way. I-I have no other way of, you know, I-I can't hook you up to him or anything like that. I'm not allowed to do that. If he calls you, you can do what you want or if you go there for visiting, you know that's up to you.

**BARB JANDA:**     Were you pressuring him?

**WIEGERT:**     Who are you talking about?

APP-000367

Complaint No.
05-0157-955

---

BARB JANDA:      Him.

WIEGERT:      What do you mean, pressuring him?

BARB JANDA:      In talking to him.

WIEGERT:      No we told him we needed to know the truth. We've been doing this job a long time Barb and we can tell when people aren't telling the truth. And, in my opinion, he'd never be able to live with himself if he didn't tell somebody. There's no way, he could've live with that. Nobody could live with that. I think Brendan knows that.

WIEGERT:      Brendan, you need to use the bathroom or anything? (Brendan shakes head "no")

BARB JANDA:      When are you going out to my house then?

WIEGERT:      As soon as we can leave here, we'll go out there. I don't think we're gonna bring Brendan out there though. I-I just don't think that's a good idea. I don't think he needs to be exposed to that or be out there anymore. (door opens and closes) It's not gonna do him any good.

BARB JANDA:      So what you're sayin' is if, when he gets out, it wouldn't be a good idea for him to be there, at all.

WIEGERT:      I-You know, I can't tell you where for you guys to live, but what do you think? Do you think it's a good idea for him to next where this stuff occurred?

BARB JANDA:      I-I don't wanna be there, but I can't afford another place.

WIEGERT:      I know.

BARB JANDA:      I mean that's $80,000 I owe yet.

WIEGERT:      I understand.

WIEGERT:      It's a shitty, shitty spot to be in.

BARB JANDA:      And nobody's gonna buy it.

WIEGERT:      You're in a bad spot an-and I wish I had some answers for you. If there's somethin' I can do to help ya, I certainly will. (pause) Maybe you should look into movin' the house.

Complaint No.
05-0157-955

---

BARB JANDA: I can't afford it.

WIEGERT: We-who knows, you don't even know what it'll cost, depends on where you move it.

BARB JANDA: Quite a bit. (pause) An extra $16,000 for another basement. (pause) So what did you all help him with? Can I ask? Will you tell me? Brendan? Did you do it willingly? Huh? (Brendan shakes head "no") ( pause) He did tell me one time, Steven, he told me that probably one or two of my kids would not graduate.

WIEGERT: Steven told you that?

BARB JANDA: Yeah. This was before this all even happened. So he must have had it all planned.

WIEGERT: That's very possible, very possible. (pause)

BARB JANDA: You don't know how much hatred I got right now.

WIEGERT: You're right, I don't. I can only imagine. I-I can't even put myself in your shoes Barb, I can't.

BARB JANDA: My oldest son is gonna flip. I can't even tell him. I can't.

WIEGERT: I think you better because

BARB JANDA: I can't, he's on a heart moniter now.

WIEGERT: This is gonna be on the media tonight.

BARB JANDA: Oh god.

WIEGERT: There's no way to stop it.

BARB JANDA: He's not gonna be on, is he?

WIEGERT: Brendan?

BARB JANDA: Yeah.

WIEGERT: No.

# CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
675
File Number

Complaint No.
05-0157-955

BARB JANDA: Well they can't anyhow.

WIEGERT: No, he's not gonna be on.

BARB JANDA: How long do we have to stay here?

WIEGERT: Well, as soon as you guys are done talkin'.

BARB JANDA: No and he's not talking too much so.

WIEGERT: You know, I can leave you alone but this is all recorded and videotaped, do you understand that?

BARB JANDA: I don't care.

WIEGERT: OK. All right, do you want to be left alone with him for five minutes or it doesn't matter at this point?

BARB JANDA: It doesn't matter.

WIEGERT: OK.

BARB JANDA: I just don't know if I'm really able to handle it.

WIEGERT: You have to. Barb you have to. You've got other children you've gotta worry about.

BARB JANDA: I know.

WIEGERT: And you got Brendan to worry about too. Brendan's gonna need you through this. (pause) OK, let's go. Barb, is this yours?

BARB JANDA: Yeah.

WIEGERT: Let's go in the other room. Brendan, I'll be back OK?

(door opens and closes)

(pause)

(door opens and closes)

FASSBENDER:        Did you want another water Brendan? (Brendan shakes head "no")

(long pause)

(door opens)

WIEGERT:           She wants to give him a hug.

BARB JANDA:        Stand up.

(background voices)

(door opens and closes)

(pause)

(door opens and closes)

JACOBS:            Brendan, my name is Dennis Jacobs and I-I'm a detective with Manitowoc
County. Do you have any weapons or anything on you?

BRENDAN:           Just some stuff that I can give to my mom, like a CD player and that.

JACOBS:            Th-that wouldn't be a weapon though. You have like a little pocket knife
anything like that?

BRENDAN:           (shakes head "no") No.

JACOBS:            Can you stand up, I just want to pat you down, real quick, just to make
sure. Well that's nothing that gonna hurt me an, OK that's fine. OK. There's nothin', nothin'
else in your pockets at all? OK. You have a shirt, you have a pocket up here.

BRENDAN:           No.

JACOBS:            OK, you can have a seat.

BRENDAN:           ......do somethin?

JACOBS:            Yeah, yo-you can put it back in your pockets too if you want, it's up to
you. Whatever you wanna do. Actually if you wanna listen to your headphones, you can go
ahead and do that too.

## CALUMET COUNTY SHERIFF'S DEPARTMENT

Page
677
File Number

Complaint No.
05-0157-955

(door closes)

(music playing in background during pause)

(door opens)

WIEGERT:     Brendan, this what's gonna happen, OK. We're gonna take ya downstairs (door closes) and they're gonna fingerprint ya and stuff here, (Brendan nods "yes") OK, and then you'll be taken over to down to Sheboygan Co. Jail. (Brendan nods "yes") OK? (Brendan nods "yes") So, is that your's?

BRENDAN:     (nods "yes") mm huh

WIEGERT:     Where did ya have it, in your pocket? Holy Christmas. All right. Why don't we go. OK. Bring that along.

FASSBENDER:     ..............,....side or

WIEGERT:     OK...................

FASSBENDER:     Are we going outside?

WIEGERT:     No.

(door closes)

This is the end of the interview with BRENDAN DASSEY at MANITOWOC CO. SHERIFF'S DEPT.

Inv. Mark Wiegert
Calumet Co. Sheriff's Dept.
MW/sk/ds

CC:     District Attorney

STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 3

---

STATE OF WISCONSIN,

                     PLAINTIFF,        MOTION HEARING

vs.                            Case No. 06 CF 88

BRENDAN R. DASSEY,

                     DEFENDANT.

---

**DATE:**    MAY 4, 2006

**BEFORE:**  Hon. Jerome L. Fox
          Circuit Court Judge

**APPEARANCES:**

        KENNETH R. KRATZ
        Special Prosecutor
        On behalf of the State of Wisconsin.

        LEONARD D. KACHINSKY
        Attorney at Law
        On behalf of the Defendant.

        BRENDAN R. DASSEY
        Defendant
        Appeared in person.

                * * * * * * * *

               **TRANSCRIPT OF PROCEEDINGS**

           Reported by Jennifer K. Hau, RPR

             Official Court Reporter

1

**COPY**

APP-000373

```
 1                    I N D E X

 2   WITNESSES                                    PAGE

 3   MARK WIEGERT

 4   Direct Examination by ATTORNEY KRATZ          8-48

 5   Cross-Examination by ATTORNEY KACHINSKY      48-62

 6   Redirect Examination by ATTORNEY KRATZ       62-63

 7

 8   BARBARA JANDA

 9   Direct Examination by ATTORNEY KACHINSKY     64-68

10   Cross-Examination by ATTORNEY KRATZ          68-79

11   Redirect Examination by ATTORNEY KACHINSKY   79-80

12

13   KRIS SCHOENENBERGER-GROSS

14   Direct Examination by ATTORNEY KACHINSKY     81-91

15   Cross-Examination by ATTORNEY KRATZ          91-99

16   Redirect Examination by ATTORNEY KACHINSKY   99-100

17
```

| 18 | EXHIBITS | MARKED | MOVED | ADMITTED |
|----|----------|--------|-------|----------|
| 19 | 1 | 16 | 16-17 | 17 |
| 20 | 2 | 26 | 28 | 28 |
| 21 | 3 | 81 | 91 | 91 |
| 22 | 4 | 83 | 91 | 91 |
| 23 | 5 | 103 | 103 | 103 |

```
24

25

                            2
```

APP-000374

```
1              THE COURT:  Good morning.  Uh, this is the

2    State of Wisconsin vs. Brendan R. Dassey.  It's case

3    No. 06 CF 88.  Appearances, please, counsel?

4              ATTORNEY KRATZ:  The State appears by

5    Calumet County District Attorney Ken Kratz appearing

6    as special prosecutor.  Also appearing this morning

7    on behalf of the State is Tom Fallon from the

8    Department of Justice.

9              ATTORNEY KACHINSKY:  And the defendant

10   appears personally with Attorney Len Kachinsky.

11             THE COURT:  This matter was last in court

12   on March 17, 2006, at which time the defendant's

13   continued arraignment was concluded and he

14   reaffirmed his previously entered not guilty pleas.

15   At that time, the Court set today as the date to

16   hear any motions to suppress any statements given by

17   this defendant.

18             On April 19, defendant filed a motion

19   seeking to suppress certain statements which

20   contend, uh -- he contends that these statements

21   were involuntarily given.  We are here today to

22   hear that motion.

23             While this is the defendant's motion,

24   the State has the burden of proof to show by a

25   preponderance of the evidence that the statements
```

3

1      given were voluntary. The motion that's before

2      the Court today is not directly concerned with

3      the truthfulness or the falsity of the statements

4      given, but, rather, their voluntariness.

5             The Court will render a decision on this

6      motion, uh, May 12 -- Friday, May 12, at

7      9:00 a.m. Gentlemen, any stipulations? The

8      State?

9             ATTORNEY KRATZ: Judge, uh, there are some

10     stipulations that, uh, have been entered into.

11     First of all, the record should reflect that prior

12     to this morning's hearing, the State had transmitted

13     to the Court, uh, several audio and videotapes.

14     They are the subject of the, uh, motions. Although

15     the State is offering the March 1, uh, admission by

16     Mr. Dassey, we've included, uh, those interviews of,

17     uh, February 27, as Mr. Kachinsky included those in,

18     uh, his motion.

19             The, uh, State, uh, is asking, uh -- and

20     I believe the Court has agreed to accept those

21     audio and, uh, videotape, uh, statements -- to

22     have them marked for purposes of this hearing,

23     and to be, uh, placed, uh, in the record at the

24     conclusion of the Court's, uh, decision on May 12

25     to avoid any, uh, possibility of, uh, pretrial

4

```
 1    publicity that, uh, may adversely affect the, uh,
 2    fair trial of this and a related matter.
 3           It's my understanding that the Court,
 4    uh, has decided to have those, uh, matters or,
 5    excuse me, have those, uh, tapes sealed. That
 6    is, uh, remained part of the court record;
 7    however, without, uh, access to the general
 8    public.
 9           THE COURT: Uh, Mr. Kachinsky, is -- is
10    that your understanding as well?
11           ATTORNEY KACHINSKY: Uh, it is, Your Honor,
12    and that applies both to, uh, the, uh -- the tapes,
13    uh, electronically preserved evidence, as well as
14    the written summaries of that evidence which the
15    Court also has.
16           THE COURT: All right. The Court will have
17    those marked as an exhibit. It will use the cover
18    letters; one in the case of, uh -- one from the
19    district attorney -- or one from, uh, Mr. Kratz, uh,
20    as the inventory of the exhibit, and one from you,
21    Mr. Kachinsky, relating to the transcript of the
22    February 27 interview.
23           The Court will review those documents in
24    camera, which means in chambers. They will not
25    be part of the -- the public record. And I
```

5

1   believe that's the understanding we have -- have

2   here. Is that correct, gentlemen?

3         ATTORNEY KRATZ: That is, Judge. It's also

4   my understanding that, as we sit here this morning,

5   uh, certainly the State, uh, and the defense have

6   reviewed the contents of those audio and, uh, video,

7   uh, representations, and I understand the Court has

8   had some opportunity to review those as well.

9         THE COURT: That is correct.

10   Mr. Kachinsky, any further -- any further

11   stipulations?

12         ATTORNEY KACHINSKY: Uh, that is

13   correct, also, and, uh, I think, as we discussed

14   in chambers, based on the review of those tapes,

15   uh, and the transcripts, and also consultations

16   with my client, investigator, and other

17   witnesses, uh, the question of whether or not

18   this is a custodial interrogation is not, uh, at

19   issue in this case. It's not a custodial, uh,

20   interrogation, although, the, uh, giving of the

21   *Miranda* rights, or failure to do the same during

22   portions of the, uh, statements, would be

23   relevant in determining voluntariness.

24         THE COURT: So, the -- the -- the parties

25   agree that this is not a cus -- uh, custodial

6

```
 1    interview.  And are you referring just to the
 2    March 1 or both dates, February 27 and March 1?
 3                ATTORNEY KACHINSKY:  Both, Your Honor.
 4    Because --
 5                THE COURT:  All right.
 6                ATTORNEY KACHINSKY:  -- it's not
 7    custodial *Miranda*, we're not required to, uh, nor
 8    are --
 9                THE COURT:  So -- so, *Miranda* warnings are
10    not an issue, or Mirandizing is not an issue here,
11    neither is the -- the custodial or noncustodial
12    nature of the -- of the -- of the, uh, interviews.
13    All right.  Any other stipulations or anything else
14    we -- we should do here, gentlemen, before we start?
15                ATTORNEY KRATZ:  Not before the hearing,
16    Judge, no.
17                THE COURT:  From you, Mr. Kachinsky,
18    anything?
19                ATTORNEY KACHINSKY:  No, Your Honor, that's
20    it.
21                THE COURT:  Proceed, Mr. Kratz.
22                ATTORNEY KRATZ:  Thank you, Judge.  The
23    State will call Investigator Mark Wiegert to the
24    stand.
25                THE CLERK:  Raise your right hand.

                            7
```

```
 1                          MARK WIEGERT,

 2              called as a witness herein, having been first duly

 3              sworn, was examined and testified as follows:

 4                   THE CLERK:  Please be seated.  Please state

 5              your name and spell your last name for the record.

 6                   THE WITNESS:  Mark Wiegert, W-i-e-g-e-r-t.

 7                          DIRECT EXAMINATION

 8    BY ATTORNEY KRATZ:

 9    Q    Mr. Wiegert, how are you employed?

10    A    I'm an investigator with the Calumet County Sheriff's

11         Department.

12    Q    How long have you been a police officer?

13    A    About 13-and-a-half years.

14    Q    And how long have you acted in the capacity as

15         and investigator?

16    A    Um, three-and-a-half.

17    Q    What are your general duties as a Calumet County

18         sheriff's investigator?

19    A    To investigate a number of crimes, um, including

20         misdemeanors, felonies, um, and a range from

21         burglaries up to homicides.

22    Q    Investigator Wiegert, uh, were you involved,

23         specifically, with the investigation into the

24         homicide of Teresa Halbach?

25    A    Yes, I was.
```

8

APP-000380

```
 1   Q   Prior to that investigation, have you had
 2       specific training and do you have specific
 3       experience in, uh, interview techniques?  That
 4       is, interviewing witnesses and suspects?
 5   A   Yes, I do.  I've attended, um, numerous classes and
 6       trainings on interviews and interrogations.
 7   Q   How was it that you became involved in this
 8       investigation?
 9   A   Um, I was first notified, I believe it was, on
10       November 3 of '05, of a missing person's report from
11       one of our deputies, and she requested my assistance
12       in, um, the missing person's report.
13               Um, as time went on during that missing
14       person's report, um, after the vehicle was
15       discovered, at that point, um, I was appointed
16       co-lead investigator along with, uh, Special
17       Agent Fassbender from the Department of Justice.
18       Um, after the discovery of the vehicle, I was
19       requested by the Manitowoc County Sheriff's
20       Department to head up the investigation.
21   Q   Now, this vehicle, as I understand, was
22       discovered here in Manitowoc County; is that
23       correct?
24   A   That's correct.
25   Q   And because of at least a perceived conflict that
```

9

```
1        the Manitowoc County Sheriff's Department had,
2        your agency, the Calumet County Sheriff's
3        Department, was named as one of the lead
4        investigating agencies; is that right?
5    A   That's correct.
6    Q   At the scene of the recovery of the vehicle, uh,
7        as we know, at the Avery salvage property, uh,
8        did you assist in the coordination of the
9        execution of several search warrants at that
10       property?
11   A   Yes, I did.
12   Q   After coordinating that search effort, uh, were
13       you involved in directing the collection,
14       processing, uh, and later request for analysis of
15       physical evidence found upon that property?
16   A   Yes, I was.
17   Q   As part of this investigation, also, Investigator
18       Wiegert, were you, uh, involved in
19       decision-making regarding interviews of witnesses
20       and possible suspects, uh, regarding, uh,
21       surrounding criminal activity?
22   A   Yes.
23   Q   On the 9th of November, 2005, were you involved
24       in an arrest of, and subsequent interview of, a
25       gentleman by the name of Steven Avery?
```

10

| | | |
|---|---|---|
| 1 | A | Yes. Myself, along with Agent Fassbender. |
| 2 | Q | And after that interview -- after that arrest |
| 3 | | and, in fact, after several further days of |
| 4 | | investigation, did you become aware of |
| 5 | | Mr. Avery's, um, being charged with offenses, |
| 6 | | including first degree intentional homicide? |
| 7 | A | Yes. |
| 8 | Q | Between November and February, 2006, did this |
| 9 | | investigation continue? |
| 10 | A | The investigation continued, um, with the numerous, |
| 11 | | um, interviews during that time period. We also, um, |
| 12 | | continued with the evidence and, uh, the sending of |
| 13 | | evidence to the crime lab, the analysis of evidence, |
| 14 | | talking to experts about the evidence. |
| 15 | Q | All right. Did you follow up interviews as well? |
| 16 | A | Yes. We had numerous interviews. Follow-up |
| 17 | | interviews. |
| 18 | Q | Are you familiar with, uh, Brendan Dassey? |
| 19 | A | Yes, I am. |
| 20 | Q | Is he in the courtroom here this morning? |
| 21 | A | Yes, he's seated -- |
| 22 | Q | Identify him for the record, please. |
| 23 | A | Seated at the table to your immediate right, um, |
| 24 | | wearing a green jumpsuit, uh, next to his attorney. |
| 25 | | ATTORNEY KRATZ: Judge, would ask that the |

11

```
 1            record reflect Mr. Dassey's identification.

 2                    THE COURT: It will so reflect.

 3   Q    (By Attorney Kratz) In spring of, uh, 2006, were

 4        you aware of Mr. Dassey's age?

 5   A    Yes.  He would have been, uh, I believe,

 6        16-years-old.

 7   Q    The time of the homicide of Ms. Halbach, were you

 8        familiar with where Mr. Dassey lived?

 9   A    Yes.  Um, his exact address, I believe, is 12930-A

10        Avery Road, which would be, um, directly next to, uh,

11        the Steven Avery trailer where Steven Avery was

12        living.

13   Q    Were you familiar with his relationship with

14        Mr. Avery?

15   A    Yes.  It would be, um, Mr. Avery's nephew.

16   Q    Prior to, um, the end of February, 2006, had

17        Mr. Dassey been interviewed by any law

18        enforcement officials regarding this

19        investigation?

20   A    Yes.  He was interviewed, um, initially, in Marinette

21        County by a detective from Marinette County Sheriff's

22        Department.  I believe it was Detective O'Neil.  Um,

23        there was another interview done by Special Agent

24        Skorlinski and Investigator Baldwin, um, after the

25        interview in Marinette County.
```

```
1   Q   I believe the records reflect that the Marinette
2       County interview of Mr. Dassey first occurred
3       on -- I think it's the 6th of November?  On or
4       about the 6th?
5   A   Yes, that's correct.
6   Q   And the follow-up interview with Agent Skorlinski
7       and Deputy Baldwin occurred on the 10th; is that
8       right?
9   A   Yes.
10  Q   Both of these interviews were with Mr. Dassey and
11      law enforcement officials.  Were they of the, uh,
12      subject matter, again, uh, relating to and
13      surrounding the disappearance and subsequent
14      homicide of Miss Halbach?
15  A   Yes.  It was -- They were done to, uh, try to gain
16      more information about that case.
17  Q   On February 27, 2006, did you have occasion to
18      re-interview Mr. Dassey?
19  A   Yes.  Myself and, uh, Agent Fassbender did
20      re-interview Mr. Dassey on the 27th.
21  Q   Where did that occur?
22  A   Um, it occurred at the, uh, Mishicot High School.
23  Q   And what was the purpose of that interview?
24  A   It was, again, a -- a fact finding mission, um, to
25      determine what he knew about the case.  We had
```

13

```
 1         previously learned that he had been, um, near the
 2         fire, um, where bones were discovered, so, we wanted
 3         to see if he knew any other information about it at
 4         that time.
 5   Q     Describe for the Court the difference between a
 6         witness interview and a suspect interview if, in
 7         fact, there are any differences?
 8   A     Well, there's several differences.  A witness
 9         interview, basically, is when a person is not in
10         custody.  They're free to leave.  They can stop
11         answering questions at any time.  Um, they're treated
12         as somebody who may have information about a case.
13         Or a suspect interview, sometimes they're not free to
14         go.  Um, they're sometimes, um, you know more
15         information, you know that they're involved in
16         something, they're treated as that you already know
17         something has occurred and they are involved in it.
18         That's the difference between the two.
19   Q     So, these are -- are different kinds of
20         interviews?
21   A     Yes.
22   Q     They -- They look different?  They feel
23         different?
24   A     Correct.
25   Q     What -- what is, uh, the kind of interview you
```

                                   14

APP-000386

```
 1      performed with Mr. Dassey on the 27th of
 2      February?
 3   A  It was a witness interview.  Um, he was advised that
 4      he did not have to answer any questions.  He was
 5      advised that he could leave at any time.  So, it was
 6      a witness interview, not a suspect interview at that
 7      time.
 8   Q  Now, after receiving some information from
 9      Mr. Dassey at the high school, was it decided to,
10      um, further, electronically, record that
11      interview?
12   A  Uh, yes.  Uh, it was initially audiotaped at the high
13      school, um, and after speaking with Mr. Dassey and
14      him providing us a written statement, we decided that
15      we would do a videotape interview of Mr. Dassey, at
16      which time, uh, we did contact Mr. Dassey's mother,
17      um, and she actually came to the school and rode with
18      us to the Two Rivers Police Department where a
19      videotape interview was done of Mr. Dassey.
20   Q  During the course of, uh -- or prior to either of
21      these interviews, was Mr. Dassey provided with
22      common -- with what's commonly referred to as his
23      *Miranda* warnings?
24   A  Um, prior to the interview that took place at the Two
25      Rivers Police Department, um, Mr. Dassey was given
```

15

```
 1        his **Miranda** warnings.  Correct.

 2    Q   Provided you what's been marked for

 3        identification as Exhibit No. 1.  Could you tell

 4        us what that is, please?

 5    A   Yeah.  It's a copy of the City of Two Rivers Police

 6        Department's, uh, **Miranda** warnings form.

 7    Q   That **Miranda** form in -- instructs an individual,

 8        uh, that you are interviewing that they have a

 9        right not to speak with you.  That they have a

10        right to have a lawyer present.  And those other,

11        uh, rights that are enumerated on that form; is

12        that right?

13    A   That's right.

14    Q   And those were all read to Mr. Dassey?

15    A   Yes.  Mr. Dassey, in fact, signed the, uh, **Miranda**

16        waiver form and also initialed where I read the

17        information to him from that form.

18    Q   Mr. Dassey indicate that he was willing to speak

19        with you?

20    A   Yes, he did.

21    Q   Did that orally and, also, in writing, as shown

22        on Exhibit No. 1; is that correct?

23    A   That's correct.

24              ATTORNEY KRATZ:  For purposes, and to

25        complete the record in this case, Judge, I would ask
```

16

```
 1          the Court receive Exhibit No. 1 at this time.
 2                    THE COURT:  Any objection to that offer?
 3                    ATTORNEY KACHINSKY:  Uh, no, Your Honor.
 4                    THE COURT:   Exhibit is received.
 5    Q    (By Attorney Kratz) Now, you said that not only
 6          did Mr. Dassey agree to being interviewed, but a
 7          discussion was held with his mother on that day;
 8          is that right?
 9    A    Yes, we did discuss it with, uh, Brendan's mother,
10          Barb, um, and she actually came to the school and
11          rode with us down to the Two Rivers Police
12          Department.
13    Q    Did she agree to allow her son to be interviewed?
14    A    Yes.  And we, um, actually offered for her to sit in
15          on that interview at the police department, and she
16          had told us that it was not necessary for her to do
17          that at that point.
18    Q    How long did that interview take at the, uh, Two
19          Rivers Police Department?
20    A    Uh, the best of my recollection, maybe an hour.
21          Somewhere in there.
22    Q    What happened after the interview?
23    A    Um, Mr. Dassey and -- and Barb were transported over
24          to, actually, um, Fox Hills Resort where we had
25          arranged for a room for them to stay for the night.
```

17

```
 1   Q   Tell the Judge why you thought that a hotel room
 2       was necessary for Barb and her son after that
 3       interview?
 4   A   Well, there were several reasons that we had done
 5       that.  Uh, number one, was to protect the integrity
 6       of the investigation.  We wanted to interview the
 7       rest of the people who lived out on Avery Road
 8       property, and we didn't want Brendan or Barb going
 9       back there and giving them information about the
10       previous interview.  We wanted to --
11   Q   Just -- not that we're going into any details
12       about the September -- excuse me -- the, uh,
13       February 27 interview, but, uh, I understand that
14       there were, uh, some specific details provided by
15       Brendan on the 27th that, um, implicated, uh,
16       Steven Avery in not only homicide, but, uh, the
17       mutilation of the corpse of Teresa Halbach; is
18       that correct?
19   A   That's correct.  Yes.
20   Q   And this was information that you had not
21       received up to that point.  In other words, this
22       was new information from, uh, a witness who had
23       now come forward, uh, indicating that he actually
24       saw, uh, some specific, um, things and, uh,
25       relayed some specific evidence to you, again,
```

18

| | |
|---|---|
| 1 | that you hadn't had up to that point; is that |
| 2 | correct? |
| 3 | A   Yes, that's correct. |
| 4 | Q   Can you describe that, um, newly discovered |
| 5 | evidence as significant? |
| 6 | A   Very significant, yes. |
| 7 | Q   And, again, significant enough that you believed |
| 8 | that Brendan shouldn't go back to where he was |
| 9 | previously living; is that right? |
| 10 | A   Yes. |
| 11 | Q   So this Court understands as well, prior to the |
| 12 | 27th of February, had you been aware of, uh, some |
| 13 | attempts -- whether they were veiled or direct |
| 14 | attempts -- by Steven Avery and other Avery |
| 15 | members to discourage or dissuade witnesses from |
| 16 | coming forward with information? |
| 17 | A   Yes. |
| 18 | Q   Did, uh, Brendan's mother and Brendan then agree, |
| 19 | uh, to, uh, be put up in a hotel that night? |
| 20 | A   Yes, they did. |
| 21 | Q   After Brendan's, um, statement, and after your |
| 22 | analysis of the information that he had provided |
| 23 | to you, uh, did you, um, review some of that |
| 24 | information and compare it to some of the |
| 25 | physical evidence that you had obtained in this |

19

APP-000391

| | | |
|---|---|---|
| 1 | | case? |
| 2 | A | Yes. |
| 3 | Q | After reviewing some of the things that Brendan |
| 4 | | told you on the 27th of February, and after |
| 5 | | considering some of the physical evidence, did |
| 6 | | you and Investigator Fassbender decide to |
| 7 | | re-interview Brendan Dassey? |
| 8 | A | We did, yes. |
| 9 | Q | When did that interview occur? |
| 10 | A | That interview occurred on March 1 of 2006. |
| 11 | Q | Could you tell the Court, please, what the |
| 12 | | purpose of that interview was? |
| 13 | A | Well, we had, uh -- After the initial interview that, |
| 14 | | uh, Mr. Fassbender and myself conducted on Brendan, |
| 15 | | there were discrepancies in his story, um, from |
| 16 | | previous interviews as well, and the purpose of that |
| 17 | | interview on the first, again, was to try to, um, |
| 18 | | have Brendan come forth with the truth and tell us |
| 19 | | exactly what he knew.  It appeared that there was |
| 20 | | more things that happened there than -- that Brendan, |
| 21 | | um, admitted to knowing about. |
| 22 | Q | Now, on the 1st of March, would you consider that |
| 23 | | to still be more of a witness interview or was |
| 24 | | that a suspect interview, at least when it began? |
| 25 | A | The -- Based on the information that Brendan had |

```
 1        provided us on the 27th, we still considered him a --
 2        a witness and not a suspect at that time based on the
 3        information which he provided.
 4    Q   As I heard, uh, Investigator Wiegert, there were
 5        some details he provided on the 27th that were
 6        either inconsistent or what you believed were
 7        implausible?  Is that a fair statement?
 8    A   Yes.
 9    Q   Did you intend on the 1st of March to ask Brendan
10        what he had seen on or about the 31st of October?
11    A   Yes.  That was the purpose of talking with him.
12    Q   Did you intend to ask him what he may have been
13        told by Steven Avery regarding Mr. Avery's
14        involvement in the homicide and related charges?
15    A   Yes.
16    Q   You had talked about attempts to dissuade
17        witnesses by Steven Avery and others.  Had
18        Brendan told you at that point what direction his
19        Uncle Steven had specifically given him regarding
20        cooperation with the police?
21    A   Yes.  Um, when speaking with Brendan, he had told us
22        that Steve had told him not to talk to the police.
23        Specifically, not to talk to the police.
24    Q   On March 1, and prior to the interview with
25        Brendan, did you, again, have, uh, contact with
```

21

| | | |
|---|---|---|
| 1 | | Brendan's mother, Barbara? |
| 2 | A | Uh, yes, we did. Um, prior to going to the high |
| 3 | | school on the 1st of March, um, Agent Fassbender had |
| 4 | | contacted Barb, um, and spoke with her and gained her |
| 5 | | permission to speak with Brendan at the school, and, |
| 6 | | also, to take Brendan to the Manitowoc Sheriff's |
| 7 | | Department for another videotaped interview, and she |
| 8 | | did give us permission to do that. |
| 9 | Q | Now, is it your intent, prior to the 1st of March |
| 10 | | and prior to that interview occurring, that |
| 11 | | Brendan would be released or that Barb would be |
| 12 | | able to take Brendan home after that interview? |
| 13 | | ATTORNEY KACHINSKY: I'm going to object. |
| 14 | | I think the officer's subjective intent at that |
| 15 | | point is really not relevant. |
| 16 | | ATTORNEY KRATZ: I -- If I can be heard, |
| 17 | | Judge. Uh, the issue of whether it is a custodial |
| 18 | | interrogation is a factor for this Court to |
| 19 | | consider. When this officer had a conversation with |
| 20 | | Barb Janda that he expected after the interview, |
| 21 | | even, that Brendan was going home, uh, that's as |
| 22 | | clear a indication as we can have that it was a |
| 23 | | noncustodial interrogation. |
| 24 | | THE COURT: Yeah. The objection is |
| 25 | | overruled. You may answer. |

22

```
 1              THE WITNESS:  Yes.  Um, in -- When we
 2       spoke with, um, Barb on the phone, um, Agent
 3       Fassbender informed her that we would bring
 4       Barbara -- excuse me -- bring Brendan back to
 5       her, um, after the interview was concluded.
 6   Q   (By Attorney Kratz)  All right.  So that the
 7       Judge is clear, um, when walking into that
 8       interview on the 1st of March, not only was this
 9       a witness interview rather than a suspect
10       interview, but there were some details, and, as
11       it turns out, some things that developed through
12       this interview that surprised you regarding
13       Brendan's involvement; is that right?
14   A   Oh, absolutely.  Yes.
15   Q   Prior to removing Brendan from school on the 1st
16       of March, did you also have contact with school
17       officials at the Mishicot High School?
18   A   Yes.  After speaking with Barb, um, Brendan's mother,
19       and gaining her permission, uh, we spoke with the
20       dean of students, um, and informed him of our, um,
21       decision to take Brendan to the sheriff's department
22       for the interview.  And we advised the dean of
23       students at that time that, uh, we had gained
24       Brendan's mother's permission to do that.
25   Q   Did you make contact, then, with Brendan on the
```

23

```
1         1st of March?

2    A    Yes, we did.

3    Q    Where did that happen?

4    A    Um, it initially happened, um, at the high school

5         office, and we had asked Brendan at that time if he'd

6         be willing to go with us to the Manitowoc Sheriff's

7         Department to do another interview. And, again, we

8         told him that it was going be a videotaped interview,

9         and he agreed to do that.

10   Q    While in the, um, squad car -- By the way, uh,

11        whose -- whose vehicle did you -- did you take?

12   A    Uh, we had taken, uh, Special Agent Fassbender's

13        unmarked, um, squad car.

14   Q    All right. And we call it a squad car, but does

15        it look like a police car?

16   A    No. It doesn't have any lights on it. Um, it's got

17        regular license plates on it. You can -- You get in

18        the backseat, you can get out of the backseat. The

19        doors are not secured from the inside. Um, it's just

20        like a regular car.

21   Q    While in that regular car, uh, where was Brendan

22        seated?

23   A    Brendan was seated in the backseat of that car.

24   Q    Was Brendan handcuffed or otherwise restrained?

25   A    No, he was not.
```

24

| | | |
|---|---|---|
| 1 | Q | Were the doors locked? |
| 2 | A | No, they were not. |
| 3 | Q | While Brendan, uh, was with you, was he advised |
| 4 | | that he was not in custody and that he, in fact, |
| 5 | | was free to leave? |
| 6 | A | Yes, he was. |
| 7 | Q | Were any guns brandished? In other words, did |
| 8 | | you take out your weapon? Show your weapon to |
| 9 | | Brendan or point your weapon at him? |
| 10 | A | No. As a matter of fact, um, both my weapon, and, I |
| 11 | | believe, Agent Fassbender's weapon, were covered by |
| 12 | | jackets, so -- |
| 13 | Q | Prior to having Brendan, um, step into Special |
| 14 | | Agent Fassbender's vehicle, was he frisked? |
| 15 | A | No, he was not. |
| 16 | Q | What is a frisk? |
| 17 | A | Um, a frisk is when you pat somebody down to check |
| 18 | | them for weapons, um, to make sure that, uh, they're |
| 19 | | don't have -- carrying anything that can harm either |
| 20 | | the officers or the person that we're frisking. Um, |
| 21 | | we generally do that when somebody's in custody. |
| 22 | Q | And just so -- so we're clear as to how this |
| 23 | | looks and feels differently from a suspect |
| 24 | | interview, if you have a suspect and you take him |
| 25 | | into custody and you're putting him in the back |

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 203 of 211    Document 19-5    APP-000397

```
 1        of your squad car, that person frisked?
 2   A    Oh, absolutely.  I mean, uh, anytime you take
 3        somebody into custody, it's -- it's basic police
 4        work.  You always frisk them.  And that was not done
 5        that day.
 6   Q    That didn't happen with Brendan.
 7   A    No.
 8   Q    But in a squad car, uh, you still advised Brendan
 9        of what's commonly referred to as his *Miranda*
10        warnings.  In other words, the same warnings that
11        were provided to him on the 27th; is that
12        correct?
13   A    Yes, we did, um, read him his *Miranda* warnings from
14        our *Miranda* warnings form, um, and that was when we
15        started the audiotape also in the squad car.
16          (Exhibit No. 2 marked for identification.)
17   Q    I showed you what's been marked for
18        identification as Exhibit No. 2.  Could you tell
19        us what that is, please?
20   A    Yes, the Calumet County Sheriff's Department Warning
21        and Waiver of Rights form.
22   Q    And were those the same rights that were read to
23        Brendan on the 1st of March?
24   A    Yes, they were.
25   Q    That document appear to be a true and accurate
```

26

APP-000398

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | document or copy of the same document that you               |
| 2  |   | read to Brendan on the 1st of March?                         |
| 3  | A | Yes, it is.                                                   |
| 4  | Q | Again, informing him that he didn't have to talk             |
| 5  |   | to you, but he had the right to have a lawyer, he            |
| 6  |   | could stop questioning any time, and those other,            |
| 7  |   | um, commonly, uh, given *Miranda* warnings; is that          |
| 8  |   | right?                                                        |
| 9  | A | Yes.                                                         |
| 10 | Q | Brendan seemed to understand those warnings?                 |
| 11 | A | Yes.  Brendan, uh, indicated he understood them, and        |
| 12 |   | he signed the form, and he also initialed where I           |
| 13 |   | read to him from that form.                                  |
| 14 | Q | By the way, either on the 27th or on the 1st, did            |
| 15 |   | Brendan express to you any difficulty in                     |
| 16 |   | understanding either his rights or the questions            |
| 17 |   | that you were asking him?                                     |
| 18 | A | No.  As a matter of fact, um, one of the questions          |
| 19 |   | are:  Do you understand these rights?  And he                |
| 20 |   | indicated he understood them.                                |
| 21 | Q | And, again, on Exhibit No. 2, Brendan waived                 |
| 22 |   | those rights and signed that form; is that right?           |
| 23 | A | Yes, he did.                                                 |
| 24 | Q | He agreed to answer your questions both without             |
| 25 |   | the assistance of an attorney, again in the squad           |

27

1      car, and, also -- I'm fast forwarding just a

2      little bit -- but you renewed or refreshed those

3      rights when you eventually got to the Manitowoc

4      Sheriff's Department; is that right?

5 A    Yes.

6            ATTORNEY KRATZ: And, again, Judge, for

7      purposes of this hearing and to complete the record,

8      I'm asking the Court, uh, accept Exhibit No. 2 at

9      this time.

10          THE COURT: Any objection?

11          ATTORNEY KACHINSKY: No, Your Honor.

12          THE COURT: The offered exhibit is

13      accepted. Received.

14 Q    (By Attorney Kratz) You said that in the squad

15      car you began electronically recording your

16      interview or your meeting with Brendan; is that

17      right?

18 A    That's correct.

19 Q    And it was audiotaped, at least in the beginning,

20      from the squad car?

21 A    It was audiotaped from the point we got in the squad

22      car all the way 'til we, um, got to the sheriff's

23      department. Actually, we made a stop along the way.

24      We stopped at his house to collect some things and

25      then went from his house to the Manitowoc Sheriff's

28

```
 1           Department.  And the entire time, um, it was
 2           audiotaped.
 3    Q      And so that the Court and everybody else is aware
 4           and clear, from the time that you made contact,
 5           then, with Brendan in the squad car until the
 6           entire interview process was completed, this
 7           whole event was electronically recorded; is that
 8           right?
 9    A      Yes, that's correct.
10    Q      There wasn't any break in the action, wasn't any,
11           uh, opportunity for you to discuss or to have
12           conversations with Brendan that weren't
13           electronically recorded; is that right?
14    A      There's one short break in it, and that is where, um,
15           we got to Mr. Dassey's house where he went into the
16           house with Agent Fassbender and retrieved some items
17           and when -- came back to the squad car.  And that
18           lasted, um, probably less than a minute.  That's the
19           only time.  Other than that, everything was recorded.
20    Q      Okay.  And so that everybody else and the Judge
21           is clear, there were -- was there any
22           interrogation, interviewing, or questioning of
23           Brendan that occurred during that time other than
24           as related to picking up -- I think, it was his
25           jeans that you were picking --
```

29

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | -- up; is that right? |
| 3 | A | Yes. |
| 4 | Q | All right.  Now, Investigator Wiegert, while in |
| 5 | | the squad car while traveling both to Brendan's |
| 6 | | house and then, also, to the Manitowoc, uh, |
| 7 | | Sheriff's Department, what kinds of discussions |
| 8 | | and -- and, uh, conversation occurred at that |
| 9 | | time? |
| 10 | A | It was mostly small talk.  As -- as -- What I |
| 11 | | recollect, we had a snowstorm maybe a week prior to |
| 12 | | that.  I know we talked about the snowstorm.  Uh, we |
| 13 | | had talked about whether Brendan had to go to school |
| 14 | | that day of the snowstorm.  I remember him saying |
| 15 | | that he did go to school that day.  That um, Mishicot |
| 16 | | High School was not called off that day.  And it was |
| 17 | | small talk about things like that.  Um -- |
| 18 | Q | Nothing of substance?  Or at least nothing as it |
| 19 | | relates to this investigation -- |
| 20 | A | No. |
| 21 | Q | -- is that correct?  When you, rec -- uh -- when |
| 22 | | you arrived at the, uh, Manitowoc Sheriff's |
| 23 | | Department, could you tell us where you went? |
| 24 | A | Um, when we arrived there, we went up into a |
| 25 | | interview room on the -- I believe it's the second |

30

|     |   |                                                          |
| --- | - | -------------------------------------------------------- |
| 1   |   | floor of the sheriff's department, which is in the       |
| 2   |   | investigator's area. We went into, uh, what's            |
| 3   |   | commonly referred to as a soft interview room.           |
| 4   | Q | What does that mean?                                      |
| 5   | A | Um, a soft interview room -- generally, what you'll       |
| 6   |   | have in there is carpeting, you'll have soft             |
| 7   |   | furniture, couches, um, soft chairs, things like        |
| 8   |   | that. There's two different types of interview          |
| 9   |   | rooms; there's a soft one, there's a hard one. And      |
| 10  |   | we chose to use that soft interview room.               |
| 11. |   | The hard one generally is -- they don't                 |
| 12  |   | have carpeting. You have hard chairs, maybe a           |
| 13  |   | table. Um, but we used the one with the couches         |
| 14  |   | and carpeting in.                                       |
| 15  | Q | And, again, this was a room that was capable of,        |
| 16  |   | uh, supporting a videotaped, uh, statement; is          |
| 17  |   | that right?                                             |
| 18  | A | Yes.                                                    |
| 19  | Q | Again, Brendan was told that the entire interview       |
| 20  |   | was going to be videotaped; is that right?             |
| 21  | A | Yes, he was advised of that.                            |
| 22  | Q | How many officers were involved in this, uh,           |
| 23  |   | interview process?                                      |
| 24  | A | Uh, during the entire, uh, interview, it was just two  |
| 25  |   | of us. Myself and Special Agent Fassbender were the    |

31

| | |
|---|---|
| 1 | only two that were involved in it. |
| 2 | Q So the Court is clear, these were the same two |
| 3 | officers involved in the, um, February 27 |
| 4 | interview; is that correct? |
| 5 | A Yes, that's correct. |
| 6 | Q Brendan had known both of you. And do you |
| 7 | believe on the 27th of February you had gained |
| 8 | some familiarity with each other? Some, at |
| 9 | least, professional rapport with him? |
| 10 | A Yes. Um-hmm. |
| 11 | Q The beginning of the interview with Brendan on |
| 12 | the 1st of March, was Brendan reminded of the |
| 13 | importance to tell the truth? |
| 14 | A Yes, he was reminded of that several times. |
| 15 | Q Was that a common, uh, strategy? Or at least is |
| 16 | that a, uh, common part of, uh, all of your |
| 17 | interviews, whether witnesses or suspects? |
| 18 | A Yes. |
| 19 | Q Seems kind of obvious. Is that the, uh, obvious |
| 20 | statement that you give? In other words, you're |
| 21 | not hoping that you're going to be lied to; is |
| 22 | that right? |
| 23 | ATTORNEY KACHINSKY: Objection. |
| 24 | Argumentative. |
| 25 | THE COURT: Well, I don't know that it's -- |

32

APP-000404

```
 1        I don't know that it's argumentative.  I don't know
 2        that it's relevant either.  Uh, but objection's
 3        sustained.
 4                   ATTORNEY KRATZ:  That's fine.
 5   Q    (By Attorney Kratz)  What was the length of the
 6        interview with Brendan?
 7   A    Um, on the 1st, um, the length of the interview, I
 8        believe -- The interview portion, itself, where we
 9        were actually interviewing, not including the breaks,
10        would have been approximately 2 hours and 52 minutes.
11        Somewhere in there.  Just short of three hours.
12   Q    All right.  You had mentioned breaks.  Were
13        breaks, uh, offered to Brendan during the course
14        of this interview process?
15   A    Yes, um, he was provided with, um, bottled water.  At
16        one point he was provided with a soda.  At one point,
17        um, he was offered to use the bathroom.  Um, he even
18        had a sandwich at one point.
19   Q    So, refreshments were not only offered but
20        received by Brendan during this interview; is
21        that right?
22   A    Yes.
23   Q    And, then, there were also breaks.  In other
24        words, it wasn't a -- a continuous questioning
25        session; is that --
```

33