```
 1    A    No.

 2    Q    -- right?

 3    A    No.

 4    Q    I think we mentioned -- at least we touched on it

 5         briefly -- that, uh, during the initial portions

 6         of the interview, Brendan was reminded of his

 7         Miranda warnings, reminded of his opportunity to

 8         have an attorney present; is that right?

 9    A    Yes.  Uh, when we first got into the interview room

10         at the sheriff's office, um, I did remind him of his

11         Miranda warnings and he agreed at that point to

12         continue talking with us.

13    Q    Now, at some point during this interview process,

14         Brendan was also offered an opportunity to speak

15         with his mother; is that right?

16    A    Yes.

17    Q    And, in fact, that occurred during this

18         interview; didn't it?

19    A    Yes, his brother -- his -- his mother, um, Barb, did,

20         uh, present herself at the sheriff's department, was

21         allowed to speak with Brendan.

22    Q    At anytime during the course of this, uh, 2-hour

23         and 52-minute, uh, interview, were there any

24         instances of violence?  In other words, was

25         Brendan ever, um, struck, or, uh, any violence
```

34

```
 1              that came to Brendan during that time?

 2    A    No.

 3    Q    Any threats of violence by either you or

 4         Investigator Fassbender?

 5    A    No.

 6    Q    Were there any threats at all?  In other words,

 7         was Brendan ever told that if you refuse to talk

 8         to us, or if you don't tell us what we want to

 9         hear, or anything to that effect, that something

10         bad would happen to him?

11    A    No.

12    Q    Any forms of, uh, intimidation used with Brendan?

13         In other words, did you or Agent Fassbender ever

14         raise up out of your chair or become physically

15         intimidating towards him?

16    A    No, there was nothing like that that occurred.  Um,

17         commonly in interviews you'll see the good cop/bad

18         cop roles used.  And that wasn't used either.  There

19         was none of that.

20    Q    Good cops; right?

21    A    Both good cops.

22    Q    No raised voices at all?  At least as far as you

23         can recall?

24    A    No.

25    Q    Now, obviously, those of us that, uh, have
```

35

```
 1         reviewed these, um, tapes -- and -- and,
 2         specifically, now, we're talking about March 1,
 3         uh, videotapes, since that's the, um, interview
 4         that the State's offering in the case, uh, there
 5         were points when Mr. Dassey, um, provided you
 6         with information that you believed was either not
 7         truthful or wasn't the whole truth.  Is that a
 8         fair statement?
 9    A    Yes.
10    Q    Investigator Wiegert, I'm going to ask you to
11         draw a little bit on your experience.  Especially
12         your experience in serious felony investigations.
13         Is it unusual for suspects in serious felony
14         investigations to, perhaps, minimize their
15         involvement or not tell you the complete, um,
16         story or the complete truthful story the first
17         time that you go through that version?
18    A    No.  Pardon me.  No.  It's -- it's common.  And the
19         more serious -- In my experience, the more serious
20         the crime, uh, the more that it takes for them to
21         tell you that.  And, um, they'll give you a lot of
22         untruths, initially.  And, usually, the more serious
23         the crime, the more of that you have.
24    Q    So, interviewing suspects, at least on serious
25         cases, is, uh -- it's a process.  It takes a
```

                                36

```
 1              while; is that right?
 2    A    Yes.
 3    Q    You had talked about the more serious the crime,
 4              the more reluctant suspects may be to, what's
 5              called, inculpate themselves.  What that means is
 6              that they're more reluctant to, um, confess or to
 7              tell you that they were involved; is that right?
 8    A    Yes, that's correct.
 9    Q    The subject matter of this interview included
10              homicide; is that right?
11    A    Yes.
12    Q    It included rape?
13    A    Yes.
14    Q    Included, uh, some very serious -- in fact,
15              perhaps, the most serious charges we have in the
16              state of Wisconsin; is that right?
17    A    Yes, I would say so.
18    Q    Investigator Wiegert, during the course -- or
19              prior to Mr. Dassey's, um, explanation to you
20              about his involvement in these crimes, his
21              involvement, uh, in the homicide and related
22              cases, were there any specific promises made to
23              him to encourage his cooperation?
24    A    No, he was never promised anything.
25    Q    Any promises of leniency?

                              37
```

```
 1   A    No.
 2   Q    Any promises of specific charges he'd be facing
 3        if he made statements to you?
 4   A    No.
 5   Q    Any promises of specific sentencing
 6        recommendations that the D.A.'s office might make
 7        at the conclusion of the case?
 8   A    No.
 9   Q    You did suggest, uh, Investigator Wiegert, at one
10        point, that he'd feel better once he, uh, in
11        essence, got this story off his chest; is that --
12        is that fair?
13   A    That's correct.  Yes.
14   Q    You believe that to be a true statement?
15   A    Yes.
16   Q    One of the, uh, specific statements, and I know
17        that Mr. Kachinsky included this in his motion,
18        uh, was that investigators had agreed, uh, if
19        Brendan was honest, if he was cooperative and
20        truthful with you, that, uh, investigators would,
21        uh, I think, the term was, go to bat for him, uh,
22        during this, uh, process; is that right?
23   A    Yes, we -- we did say that.
24   Q    Was that a truthful statement as well?
25   A    Yes, it was.
```

38

| | | |
|---|---|---|
| 1 | Q | Were you willing to do that at the time? |
| 2 | A | We were and we did. |
| 3 | Q | And, in fact, just so the Court understands, |
| 4 | | after Brendan, uh, indicated his involvement in |
| 5 | | these cases, you and Investigator Fassbender met |
| 6 | | with me; is that right? |
| 7 | A | We did, yes. |
| 8 | Q | To share the details of Brendan's cooperation, |
| 9 | | with me? |
| 10 | A | We did. |
| 11 | Q | Did you advance your opinion to me that Brendan |
| 12 | | should be provided with some credit, at least, as |
| 13 | | compared to, perhaps, other actors in this case |
| 14 | | that haven't taken as much responsibility, that |
| 15 | | he should be given some credit for his honesty |
| 16 | | and his remorse? |
| 17 | A | Yes, we did. |
| 18 | Q | So, the statement that we'll go to bat for you, |
| 19 | | uh, not only was a true statement before the, uh, |
| 20 | | statement was given but, in fact, was fulfilled |
| 21 | | or followed through by investigators; is that |
| 22 | | right? |
| 23 | A | Yes. |
| 24 | Q | Investigator Wiegert, prior to the March 1 |
| 25 | | interview process, uh, you had, I think, |

39

APP-000411

```
1           previously mentioned that some, um, physical
2           evidence had been examined and some findings had
3           been made by some experts in the case; is that
4           right?
5    A      That's correct.  Yes.
6    Q      Had you determined, or did you have a reasonable
7           idea, of who was involved in the homicide and
8           surrounding crimes regarding Teresa Halbach?
9    A      Well, based on the evidence that we had collected and
10          the evidence that we had examined, and in speaking
11          with the experts who were involved with examining
12          that evidence, we kind of had a good idea who was
13          involved and a basic idea of what had occurred, um,
14          on October 31, yes.
15   Q      And just so this Court is, uh -- is aware, and
16          those that might be listening to it, much of the
17          physical evidence that you had obtained at that
18          point had not at that point been made public; is
19          that right?
20   A      That's correct.
21   Q      And --
22   A      And some of it still hasn't been made public.
23   Q      In fact, much of it hasn't yet been made public;
24          is that correct?
25   A      That's correct.  Yes.

                              40
```

```
1   Q   Were you aware at that time, or at least were

2       told by experts as to their opinion, as to the

3       method of homicide?  That is, how -- or at least

4       partially -- how, uh, Teresa Halbach was killed?

5   A   Yes.  At least one of the methods, correct.  Yes.

6   Q   And, again, that hadn't been made public at that

7       time?

8   A   No.

9   Q   Were you familiar, and were you told by experts,

10      as to the place of the homicide?  That is, the --

11      uh, where some specific evidence was found that

12      suggested that this crime may have been committed

13      in that location --

14  A   Um, based --

15  Q   -- or locations?

16  A   Yes.  Yes.

17  Q   One of the charges that, uh, Mr. Avery faced at

18      that point included a crime that's called

19      "mutilation of a corpse."  Has to do with the

20      disposal, uh, of, uh, a body after a homicide,

21      uh, and the hiding of it for purposes of

22      investigations.  Were you given specific

23      information by expert witnesses, uh, as to that

24      particular crime and as to how those things may

25      have occurred?
```

41

APP-000413

| | | |
|---|---|---|
| 1 | A | Yes, we were. |
| 2 | Q | Now, other than the, um, specific physical |
| 3 | | evidence that you had received, were you also in |
| 4 | | a position to draw inferences, not just as an |
| 5 | | investigator but with the assistance of lots of |
| 6 | | experts that you spoke with, uh, as to, uh, what, |
| 7 | | perhaps, motivated this homicide? |
| 8 | A | Uh, yes, we were. |
| 9 | Q | And we know now, and I'm going to ask you, on the |
| 10 | | 1st of March, uh, was it an inference and a |
| 11 | | theory by investigators that this was a, um, |
| 12 | | sexually-motivated homicide? |
| 13 | A | Absolutely, yes. |
| 14 | Q | Consistent with that, Investigator, uh, did you |
| 15 | | believe that there may be, uh, related charges or |
| 16 | | related crimes that occurred, including sexual |
| 17 | | assault, uh, or, uh, being, uh, held against her |
| 18 | | will or other kinds of related matters? |
| 19 | A | Yes. |
| 20 | Q | And those were inferences. Again, not just |
| 21 | | speculation by you, but consistent with the |
| 22 | | physical evidence and with what you knew at the |
| 23 | | time on March 1; is that right? |
| 24 | A | Correct. |
| 25 | Q | Finally, Investigator, did you believe that it |

42

APP-000414

1    was possible, or even likely, that Brendan Dassey
2    had seen more than he had previously told you or
3    may, in fact, have been involved at least at some
4    portion of these particular crimes?
5  A  Based on the interviews that we have done, based on
6    the, um, evidence which was collected, yes, we did
7    believe that.
8  Q  I ask you these questions because during the
9    course of this interview, um, you tell Brendan,
10   or you suggest to Brendan, that, uh, we already
11   know what happened.  Uh, was that an expression
12   of not only the physical evidence that you knew
13   at the time, but also these inferences,
14   connecting the dots, if you will, uh, from what,
15   uh, you'd already learned?
16 A  Yes, both of those.  Um, um, after reviewing and --
17   the evidence which we had collected, and, again,
18   after speaking with the experts about the evidence
19   that was collected, and after they had a chance to
20   examine that evidence, along with the interviews, uh,
21   we had come up with a theory on what had taken place
22   there.
23 Q  During the interview of Brendan, or if you
24   believed that Mr. Dassey was not being totally
25   honest with you, were -- was he reminded to,

43

```
 1              uh -- to remain honest during the -- the
 2              interview?
 3      A       Yeah, he was reminded of that several times.
 4      Q       Now, there were some details that Mr. Dassey
 5              provided you that you didn't know.  Or, I mean,
 6              in all candor, as you sit here, came to somewhat
 7              of a surprise to you; is that right?
 8      A       Yes.
 9      Q       Fair to say that that's purpose of interviews?
10              That is, to find stuff out that you don't know
11              yet?
12      A       Absolutely.  That's why we interview people.
13      Q       Now, Investigator Wiegert, to ensure the accuracy
14              or truthfulness of information you're receiving
15              sometimes from either witnesses or suspects,
16              there's a tactic or a strategy which includes
17              providing deliberately false information.  That
18              is, providing information about the case that you
19              very well know never happened.  That it didn't
20              happen.  Are you familiar with that strategy or
21              tactic?
22      A       Yes.
23      Q       Was that employed in this case?
24      A       Yes, it was.
25      Q       And, uh, could you describe for the Court why
```

44

APP-000416

```
 1          that was used and, uh, what, uh, results you got
 2          therefrom?
 3     A    Well, the reason you do things like that is to, um,
 4          see if the witness is going to go along with the
 5          false statements or if he's going to stop you and
 6          correct you.  Um, and when we did that with
 7          Mr. Dassey, when we gave him false information, he
 8          would deny it, stop us, and he would correct that
 9          information.  And that the purpose is to make sure
10          that he's not just going along with everything we're
11          saying and to see that he is telling us the truth.
12          And we did that.
13     Q    So that would -- could be more specific.  And at
14          least what this Court has to determine what's
15          called, uh, demonstrating a free and
16          unconstrained will.  If it's -- if you tell
17          somebody something that you know didn't happen in
18          this case --
19     A    Uh-hum.
20     Q    -- just so the Court understands, and if there's
21          anything secret about this, you had told Brendan
22          that you believed Teresa had a tattoo on her
23          stomach.  Remember telling him that?
24     A    We did tell him that.
25     Q    You knew that not to be true; isn't that right?

                              45
```

```
 1   A   We knew that not to be true, correct.

 2   Q   Rather than just go along with that or just say,

 3       oh, yeah, I remember that, or that happened,

 4       Brendan told you, I don't remember seeing that --

 5   A   Yes.

 6   Q   -- isn't that correct?

 7   A   That is correct.

 8   Q   That when provided with, on a couple of

 9       occasions, false statements or things that you

10       knew didn't happen, Brendan was able to resist

11       those suggestions or to resist your, um, attempts

12       to just get him to go along with stuff; is that

13       right?

14              ATTORNEY KACHINSKY:  Objection.  Leading

15       question.

16              ATTORNEY KRATZ:  I'm not sure how else to

17       ask it, Judge.

18              THE COURT:  Yeah.  The objection is

19       sustained.  Uh, it -- it -- it's a leading question.

20       Can you reframe it in a nonleading way?

21              ATTORNEY KRATZ:  I can certainly try,

22       Judge.

23   Q   (By Attorney Kratz) Was Mr. Dassey able, or did

24       he demonstrate the ability to resist these

25       suggestions?
```

```
1    A    Yes, he did.
2    Q    At one point you had suggested to Brendan that,
3         we know that, uh, the gun that was used in this
4         case was in your hands. Do you remember
5         suggesting that to him?
6    A    Yes, I do.
7    Q    Was he able to resist that suggestion?
8    A    Yes, he did. He indicated to us that the gun was
9         never in his hand.
10   Q    So, any suggestions, then, that he just went
11        along with whatever it was you were trying to
12        tell him, or that you were putting these words in
13        his mouth, you believe that to be false; is
14        that --
15             ATTORNEY KACHINSKY: Objection.
16        Argumentative. Asks the witness to invade the
17        province of the Court.
18             THE COURT: Well, the questioner is, in
19        effect, testifying here. The objection is
20        sustained. Can we move -- I think I see where
21        you've gone and where you're going. Can we move on?
22             ATTORNEY KRATZ: We certainly can,
23        Judge. I'd be happy to.
24   Q    (By Attorney Kratz) Finally, uh, Investigator
25        Wiegert, at anytime during this interview
```

47

APP-000419

```
 1            process, uh, did you, uh, employ overly leading
 2            questions?  That is, did you suggest answers
 3            within your questions to Brendan?
 4      A     No.
 5                      ATTORNEY KRATZ:  For purposes of this
 6            hearing, Judge, that's all the questions I have of
 7            Investigator Wiegert.
 8                      THE COURT:  All right.  Cross?
 9                          CROSS-EXAMINATION
10      BY ATTORNEY KACHINSKY:
11      Q     Investigator Wiegert, uh, you're aware, as a
12            result of your professional experience, that
13            there was a decision by the Wisconsin Supreme
14            Court in July of last year that required that
15            suspect interviews of, uh, juveniles be recorded
16            electronically; is that correct?
17      A     Yes.
18      Q     And is it correct that, uh, after that decision
19            came down, that, uh, you complied with the
20            decision and you electronically record, uh,
21            questioning of suspects when they're juveniles;
22            correct?
23      A     Yes, we do.
24      Q     Uh, juvenile is defined, for purposes of that
25            particular, uh, decision, as being those, uh,
```

48

|    |   |                                                      |
|----|---|------------------------------------------------------|
| 1  |   | under the age of 18; is that right?                  |
| 2  | A | Yes.                                                 |
| 3  | Q | And I think -- and -- and Mr. Dassey was a -- a       |
| 4  |   | little bit over the age of 16 at the time of the     |
| 5  |   | interviews of February 27 and March 1, 2006; is      |
| 6  |   | that right?                                          |
| 7  | A | Yes.                                                 |
| 8  | Q | Now, it's also not required, however, that           |
| 9  |   | interviews of juveniles, where the juvenile is       |
| 10 |   | simply a witness to someone else committing a        |
| 11 |   | crime, uh, be recorded; is that correct?             |
| 12 | A | That's correct.                                      |
| 13 | Q | Uh, and, in fact, uh, if an interview of a           |
| 14 |   | juvenile occurs, for example, near a crime scene,    |
| 15 |   | or in their home, or something like that, uh, and    |
| 16 |   | they're not, uh, a suspect in an offense, uh,        |
| 17 |   | those typically are still not recorded; is that      |
| 18 |   | correct?                                             |
| 19 | A | I wouldn't say typically, no. Um, we record a lot of |
| 20 |   | interviews whether they're interrogations or not, um, |
| 21 |   | with juveniles now.                                  |
| 22 | Q | And that's just to be cautious so that in case an    |
| 23 |   | interview changes its character that, uh, you're     |
| 24 |   | protected and in compliance with that court          |
| 25 |   | decision; is that right?                             |

49

| | | |
|---|---|---|
| 1 | A | That's correct. Yes. |
| 2 | Q | Now, you've indicated that, uh, between the time |
| 3 | | of Mr. Dassey's, uh, first interview with law |
| 4 | | enforcement regarding this case in November of |
| 5 | | 2005, and, uh, February of 2006, uh, that he was, |
| 6 | | uh, someone that you thought, uh, would be of |
| 7 | | interest and might provide more information than |
| 8 | | he had originally provided; is that right? |
| 9 | A | That's correct. |
| 10 | Q | And, in fact, uh, shortly before the February 27, |
| 11 | | 2006, interview, you had some information that |
| 12 | | Mr. Dassey may have revealed some details |
| 13 | | involving the offense to a relative of his; is |
| 14 | | that right? |
| 15 | A | Yes. |
| 16 | Q | Um, and it was within a day or two of that that |
| 17 | | you arranged this, uh, February 27 interview; is |
| 18 | | that correct? |
| 19 | A | Yes. |
| 20 | Q | Um, now, the information that you had |
| 21 | | specifically from a relative of, uh, |
| 22 | | Mr. Dassey's, was that, uh, he had seen, uh, body |
| 23 | | parts in a bonfire near his, uh, residence; is |
| 24 | | that correct? |
| 25 | A | Um, along with that he had been losing weight and |

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 17 of 212   Document 19-6   APP-000422

1      crying a lot.

2    Q   Sure.  He was emotionally upset, disturbed,

3        something to that effect?

4    A   My understanding.

5    Q   Um, now, knowing that there is some information

6        that Mr. Dassey, uh, was aware of the, um,

7        destruction of a -- a human corpse by fire, uh,

8        led you to at least suspect that he might have

9        been involved, uh, in the, uh, disposal of that

10       corpse, uh, by -- in conjunction with Mr. Avery;

11       is that right?

12   A   Yes.

13   Q   And, in fact, that's the reason why you decided

14       from the beginning of the February 27, uh,

15       interview to, uh, audiotape it; correct?

16   A   Uh, no, I would disagree with that.  It was, um, to

17       protect him, to protect us, um, because of the -- the

18       enormity of the case, um, we did not want to make any

19       mistakes in the case.  And that was the primary

20       reason that we decided to do that.

21   Q   Um, now, during the course of the, uh,

22       February 27, 2006, interview, then, at Mishicot

23       High School, Mr. Dassey, uh, gave information

24       regarding some observations he'd made of, uh,

25       human body parts in a bonfire at or near his,

                           51

```
 1      uh -- his residence, uh, on Avery Road; is that
 2      correct?
 3   A  Near his residence, yes.
 4   Q  And when Mr. Dassey, uh, told you that during the
 5      interview at, uh, Mishicot High School, uh, that
 6      led you to believe that he, at a minimum, might
 7      have been involved in, uh, helping Mr. Avery in
 8      some way dispose of the corpse of Mr. -- of, uh,
 9      Teresa Halbach; is that right?
10   A  Well, led us to believe that he observed, you know,
11      her body in the fire.  Um, we didn't know at that
12      point whether he had anything to do with helping get
13      the body in the fire.
14   Q  But you knew, as a result of your experience,
15      that frequently witnesses, um, to events like
16      that might initially not tell you all the
17      information they knew, and there might be more
18      that, uh, Mr. Dassey knew about the disposal of,
19      uh, body parts than what he had initially
20      provided at the high school; is that correct?
21   A  Yes.
22   Q  And that's the reason why -- one of the reasons
23      why, when you got over to the, uh, Two Rivers
24      Police Department, you read him his *Miranda*
25      rights; is that correct?
```

52

```
1   A   Um, again, because of the enormity of the case is the
2       reason that we read him his Miranda rights and to
3       protect him as well.
4   Q   Um, now, the Miranda rights that you read to
5       Mr. Dassey, uh, did not include any reference as
6       to what offenses, if any, you suspected him of,
7       did -- did they?
8   A   No.
9   Q   And, in fact, the standard Miranda warnings don't
10      contain any sort of, uh, warning to a suspect of
11      the offense that you, uh, believe someone may
12      have committed before you do the interview; is
13      that correct?
14  A   That's correct.
15  Q   Now, after the -- When you did the videotape
16      interview at the Two Rivers, uh, Police
17      Department, um, Mr. Dassey basically told you
18      the -- the same information he'd told you over at
19      the, uh, high school earlier that day; is that
20      correct?
21  A   Uh, essentially the same, yes.
22  Q   Now, you've indicated today that the -- the
23      reason you set up the, um, motel room at the, uh,
24      Mishicot hills resort was because you wanted to
25      protect the integrity of the, uh, investigation;
```

53

```
 1          is that right?
 2    A     As I had started, um, explaining earlier, there were
 3          two reasons.  That was one of them, yes.
 4    Q     Okay.  And there's second reason were you
 5          concerned about Brendan possibly harming himself?
 6    A     Uh, not harming himself as much as maybe somebody,
 7          um, on the Avery property harming him after finding
 8          out that he had told us information.
 9    Q     Had you told, uh, Barb Janda, uh, though, that
10          you were concerned about Brendan possibly harming
11          himself?
12    A     Oh, I'm sure, yes.  I mean, that was, um, an issue,
13          but the -- the bigger issue is we were worried that
14          somebody else would harm him.
15    Q     Now, going to the, uh -- the March 21 -- or,
16          excuse me -- the March 1 interview, part of the
17          interview process, uh, both on March 1 and on
18          February 27, was a period of time at the
19          beginning of the interview when you and
20          Mr. Fassbender, uh, made statements to, uh,
21          Mr. Dassey regarding, uh, the purpose of the
22          interview and stressing the needs why, uh, he
23          should cooperate with you and Mr. Fassbender; is
24          that correct?
25    A     Yes.
```

54

| | | |
|---|---|---|
| 1 | Q | As a standard technique during questioning to |
| 2 | | have kind of an initial pep talk with a -- a |
| 3 | | subject of an interview before going into greater |
| 4 | | detail as to the events you're interviewing him |
| 5 | | about; is that correct? |
| 6 | A | I don't know that I would call it a pep talk, but we |
| 7 | | do, um, talk to them initially to tell them why we |
| 8 | | are talking with them and the importance, um, of them |
| 9 | | being truthful to us. |
| 10 | Q | And one of the techniques that's, uh, used with |
| 11 | | suspects of all ages to try to persuade them to, |
| 12 | | uh, provide you information is to minimize the |
| 13 | | seriousness of the offenses that you, uh, suspect |
| 14 | | them of; is that correct? |
| 15 | A | Yes. |
| 16 | Q | And in this particular case, uh, one example of |
| 17 | | that technique that was used was, uh, |
| 18 | | Mr. Fassbender telling Brendan that he thought, |
| 19 | | uh, Brendan was all right, did not have to worry |
| 20 | | about things; is that correct? |
| 21 | A | Um, I believe that statement was made, yes. |
| 22 | Q | Uh, there was also a statement I believe you made |
| 23 | | to Mr. Dassey that you could work through |
| 24 | | whatever Brendan did; is that right? |
| 25 | A | Yes. |

55

APP-000427

```
 1    Q    You also told him that the honest person's the

 2         one who get the better deal out of everything?

 3    A    Yes.

 4    Q    Um, these were all made on, uh, March 1; is that

 5         right?

 6    A    I believe so, yes.

 7    Q    And you had a chance to prepare for this hearing

 8         today by reviewing the tapes and the transcripts

 9         of the March 1 interview; is that correct?

10    A    I have.

11    Q    Um -- And there was another statement made to

12         Brendan to the effect, um -- and made by you --

13         that honesty was the only thing that could set

14         him free; is that correct?

15    A    Yes, and -- and by that I meant his -- his feelings,

16         um -- He had indicated to us he could not sleep.  Um,

17         we had information he had been losing weight.  Um, by

18         free, getting the weight off his shoulders.  We

19         commonly say that type of thing.  We knew he wasn't

20         going to be able to get through this until he

21         admitted it to somebody.  It was bothering him,

22         obviously.

23    Q    You don't know from your own knowledge, uh, what

24         it -- how it was that Brendan perceived that

25         particular statement, do you?
```

56

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Now, after that, um, statement about honesty, |
| 3 | | concept of the free, Brendan then told you about |
| 4 | | seeing Mr. Avery and Miss Halbach talking on the |
| 5 | | porch; uh, is that correct? |
| 6 | A | Um, it was some time after that. Correct. |
| 7 | Q | Uh, and you had other information that led you to |
| 8 | | believe that, um, Mr. Dassey could not have seen |
| 9 | | Steve Avery and Teresa Halbach talking on the |
| 10 | | porch, correct? |
| 11 | A | Uh, based on the other witness' statements, um, |
| 12 | | people who were there around that time, yes, that's |
| 13 | | correct. |
| 14 | Q | Um, and, initially, back in November of 2005, |
| 15 | | Brendan had made the statement about seeing, uh, |
| 16 | | Steve Avery and Teresa Halbach talking on the |
| 17 | | porch; correct? |
| 18 | A | I really can't answer that question. I'm not sure |
| 19 | | exactly what was all said during that interview. |
| 20 | Q | Uh, at some point early in -- in the |
| 21 | | investigation you'd received information from a |
| 22 | | person that was claimed to be Brendan Dassey's, |
| 23 | | uh, bus driver from school who also claimed to |
| 24 | | have seen, uh, Steve Avery and Teresa Halbach, |
| 25 | | uh, talking on the porch at the time that, uh, |

57

```
 1          Mr. Dassey was let out of the school bus; is that
 2          correct?
 3    A     I don't recall the, uh, bus driver saying that.  I
 4          recall the bus driver telling us how she came down
 5          and dropped the kids off and saw several vehicles.  I
 6          don't recall her saying anything about seeing Steve
 7          and Teresa talking.
 8    Q     Now, at another point during the March 1
 9          interview, uh, there was a discussion about how
10          Teresa Halbach got in the back of the jeep that
11          was, uh, on Steve Avery's property; is that
12          correct?
13    A     Yes.
14    Q     And, uh, during the discussion of that, is it,
15          uh, correct that you told Mr. Dassey that if you
16          helped him, referring to Steve Avery, that it was
17          okay because, uh, he, referring to Steve Avery,
18          was telling you to do it?
19    A     Yes.
20    Q     You also made, uh, assurances to Mr. Dassey that,
21          uh, referring to him as a buddy; is that correct?
22    A     Uh, yes.
23    Q     Now, before Brendan Dassey told you that he had
24          sex with Teresa Halbach, uh, you made a statement
25          to Mr. Dassey, quote, what happens next?  Do you
```

58

```
 1        remember?  We already know, but we need to hear
 2        it from you.  It's okay.  It's not your fault.
 3        What happens next?  Is that -- Did you say
 4        something to that effect before Mr. Dassey
 5        admitted having sex with, uh, Teresa Halbach?
 6   A    Yes.
 7   Q    Um, and -- but, as a matter of fact, is it, uh,
 8        correct that you really, uh, had nothing at that
 9        point, other than a theory, that, uh, Mr. Dassey
10        had, uh, been involved in a sexual assault?
11   A    In regards to the sexual assault portion, yes, that's
12        correct.
13   Q    Now, the videotaped interview of March 1, uh,
14        2006, you say it took place in what's called a
15        soft-type, uh, interview room at the Manitowoc
16        County Sheriff's Department; is that correct?
17   A    That's correct.
18   Q    Um, even though it's a so-called soft, uh,
19        interview room, it's still, essentially, a closed
20        off small area; is that correct?
21   A    It's a smaller room, yes.
22   Q    Uh, during the interview, the door was closed; is
23        that right?
24   A    Yes.
25   Q    During the interview, there were, uh, three of
```

```
1        you in the room; you, Mr. Fassbender, and
2        Mr. Dassey; is that right?
3    A   That's correct.
4    Q   Uh, during your interviews of, uh, Mr. -- Mr.
5        Dassey, uh, did you ever discuss with him how
6        well he was doing in school?
7    A   Um, we -- we discussed school a lot.  I don't know
8        that we specifically asked him how well he was doing
9        in school.  I -- I don't recall that.
10   Q   Uh, did you also check records that were
11       available to you as a law enforcement, uh, person
12       to determine whether or not Mr. Dassey had any
13       prior involvement, uh, with the criminal justice
14       system?
15   A   Uh, we did, yes.
16   Q   And is it correct that, uh, you -- From those law
17       enforcement records, you discovered that Mr.
18       Dassey had never been, uh, arrested or titled for
19       any sort of, uh, offense?
20   A   He was, uh, labeled as a suspect in one offense.
21       However, from reviewing that report, does not appear
22       that he was ever interviewed on that.
23   Q   You've indicated that during the interview, um,
24       of March 1, Brendan was allowed to speak to his
25       mother; is that correct?
```

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 27 of 212    Document 19-2    APP-000482

```
1    A    Yes.
2    Q    Now, the point in time during the interview when
3         that occurred was after Brendan had already made
4         statements implicating himself in the homicide,
5         mutilation of a corpse, and sexual assault; is
6         that right?
7    A    That's correct.
8    Q    And would it be fair to characterize that portion
9         of the interview where Barbara Janda was there as
10        a -- basically a -- a mother saying -- having her
11        last words with her son before he was going to be
12        put into custody?
13   A    It was near the end of the interview.
14   Q    You've indicated that a couple times during the
15        interview you deliberately provided false
16        information to Mr. Dassey to determine whether or
17        not he was simply, uh, saying things that you
18        expected him or wanted him to say; is that
19        correct?
20   A    Yes.
21   Q    And one example you've got -- you gave was
22        whether or not, uh, Teresa Halbach had a tattoo;
23        is that correct?
24   A    That's correct.
25   Q    And the other one was whether or not Mr. Dassey
```

61

```
 1        had ever handled a firearm during the offense; is

 2        that right?

 3   A    Yes.

 4   Q    Were there any other examples, other than that,

 5        where you provided, uh, incorrect information to

 6        Mr. Dassey to determine whether or not, uh, he

 7        was, um, responding to a suggestion or giving you

 8        his honest recollections?

 9   A    Um, those would be the two instances that I can think

10        of.  Um, but we would say certain things, he would

11        say, no, that didn't happen, or, yes, that did

12        happen.

13              ATTORNEY KACHINSKY:  That's all the

14        questions I have, Your Honor.

15              THE COURT:  Any redirect?

16              ATTORNEY KRATZ:  Just a few questions.

17                    REDIRECT EXAMINATION

18   BY ATTORNEY KRATZ:

19   Q    Did Brendan ever ask for an attorney?

20   A    He did not.

21   Q    Brendan ever ask to speak with his mother?  Or

22        was he ever denied the chance to speak with his

23        mother?

24   A    He was not.

25              THE COURT:  That really was two questions;
```

```
 1        Did he ever ask to speak with his mother and --
 2                ATTORNEY KRATZ:  Sorry, Judge.
 3                THE COURT:  Why don't you just ask him
 4        as two simple questions.
 5   Q    (By Attorney Kratz) Did he ever ask to speak to
 6        the mother?
 7   A    No.
 8   Q    Was he ever denied access to his mother?
 9   A    He was not.
10   Q    Finally, the detail of the version of events, who
11        did the detail come from?
12   A    Uh, the detail came from Brendan.
13   Q    That detail include his involvement in the
14        homicide?
15   A    It did, yes.
16   Q    Did it include his involvement in the surrounding
17        crimes as well?
18   A    It did, yes.
19   Q    Did the detail also involve his Uncle Steven
20        Avery's involvement?
21   A    Yes.
22   Q    These weren't suggestions by you where he just
23        had to say the word "yes," right?
24   A    No, it was not.
25                ATTORNEY KRATZ:  All right.  That's all for
```

```
 1     this hearing, Judge.

 2              THE COURT:  Any recross?

 3              ATTORNEY KACHINSKY:  Uh, no, Your Honor.

 4              THE COURT:  You may step down.  Do you have

 5     any further witnesses?

 6              ATTORNEY KRATZ:  Uh, not -- not for, uh,

 7     our case in chief, Judge, no.

 8              THE COURT:  I think we'll take about a

 9     ten-minute break at this time.  We'll be back ten

10     minutes from now.  Then we can proceed with the

11     defendant.

12              (Recess had at 10:20 a.m.)

13              (Reconvened at 10:36 a.m.)

14              THE COURT:  Mr. Kratz, you have no further

15     witnesses?

16              ATTORNEY KRATZ:  I don't, Judge.

17              THE COURT:  Mr. Kachinsky.

18              ATTORNEY KACHINSKY:  Uh, yes, we'd call to

19     the stand, Barbara Janda.

20              THE CLERK:  Would you raise your right

21     hand?

22                    BARBARA JANDA,

23      called as a witness herein, having been first duly

24      sworn, was examined and testified as follows:

25              THE CLERK:  Please be seated.  Please state
```

64

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | your name and spell your last name for the record.       |
| 2  |   | THE WITNESS: Barb Janda, J-a-n-d-a.                      |
| 3  |   | **DIRECT EXAMINATION**                                    |
| 4  |   | BY ATTORNEY KACHINSKY:                                    |
| 5  | Q | Okay. Barb, are you related to the person               |
| 6  |   | that's, uh -- uh, has a hearing here today?             |
| 7  | A | Yeah.                                                    |
| 8  | Q | Uh, and, uh, what's your relationship to, uh,           |
| 9  |   | Brendan Dassey?                                          |
| 10 | A | He's my son.                                             |
| 11 | Q | When was, uh, Brendan Dassey born?                       |
| 12 | A | October 19 of '89.                                       |
| 13 | Q | Uh, as of February 27 and March 1 of 2006, how          |
| 14 |   | old was Brendan?                                         |
| 15 | A | Sixteen.                                                 |
| 16 | Q | Um, what school does Brendan attend?                     |
| 17 | A | Mishicot High School.                                    |
| 18 | Q | How long had Brendan been attending school as of,       |
| 19 |   | uh, February and March of this year?                     |
| 20 | A | In Mishicot?                                             |
| 21 | Q | Right.                                                   |
| 22 | A | Um, I moved out there in 2001. So, it would be 2001.    |
| 23 | Q | Uh, now, as, uh -- Have you always had, uh,             |
| 24 |   | physical placement of, uh, Brendan Dassey?              |
| 25 | A | Yes.                                                     |

65

| | | |
|---|---|---|
| 1 | Q | Uh, uh, were you married at some point to Brendan |
| 2 | | Dassey's father? |
| 3 | A | Yes. |
| 4 | Q | Uh, did that marriage terminate? |
| 5 | A | Yes. |
| 6 | Q | Uh, when did that marriage terminate? |
| 7 | A | Ninety-two. |
| 8 | Q | Now, um, as -- as Brendan's, uh, parent, have you |
| 9 | | been apprised from time to time as to his |
| 10 | | progress in school? |
| 11 | A | Brendan's a very slow learner.  I mean, his grades |
| 12 | | are really, really bad. |
| 13 | Q | Uh, has Brendan been subject to, uh, |
| 14 | | psychological testing in school? |
| 15 | A | Um, he had some testing done. |
| 16 | Q | Uh, is -- is Brendan in regular classes in |
| 17 | | school? |
| 18 | A | Um, some, I think, and some he's in special ed. |
| 19 | Q | Um, now, in connection with, uh, the motion that |
| 20 | | we're bringing in this particular case regarding |
| 21 | | Brendan Dassen's -- Dassey's statements to, uh, |
| 22 | | uh, law enforcement officials, uh, are you aware |
| 23 | | that the issue of his school performance was |
| 24 | | going to be part of the motion? |
| 25 | A | Yes. |

66

| | | |
|---|---|---|
| 1 | Q | In connection with that, did you receive a form |
| 2 | | for transmittal to the, uh, Mishicot School |
| 3 | | District, uh, permitting release of information |
| 4 | | regarding Brendan's, uh, behavioral and, uh, |
| 5 | | other records from the Mishicot School District? |
| 6 | A | Yes. |
| 7 | Q | Did that, uh, authorization for release of |
| 8 | | information include, uh, release of information |
| 9 | | not only to me but also to the Court? |
| 10 | A | Yes. |
| 11 | Q | And, uh, do you reaffirm, uh, your willingness to |
| 12 | | permit that information to be released so that |
| 13 | | this, uh, motion can be fairly decided by the |
| 14 | | Court? |
| 15 | A | Yes. |
| 16 | Q | Um, uh, your observations of Brendan's |
| 17 | | personality, uh, have you been able to, uh, make |
| 18 | | any observation regarding whether or not, uh, |
| 19 | | he's someone that responds readily to suggestions |
| 20 | | from others? |
| 21 | A | Usually he does. Um, he's a very shy boy. Um, he |
| 22 | | doesn't say too much. |
| 23 | Q | Um, have you been able to make any observations |
| 24 | | regarding Brendan's, uh, level, of, uh, |
| 25 | | self-esteem or assertiveness? |

67

```
 1        as well; is that right?
 2    A   Um, I think once.
 3    Q   When officers had sought to interview Brendan or
 4        your other son, Blain, as an example, would you
 5        provide them with permission?  Allow them to
 6        interview your sons?
 7    A   Um, my two older ones, they're old enough to do what
 8        they want.  Um, Blain, they talked to, but I usually
 9        went along, and, with Brendan, they more or less
10        didn't want me in there.
11    Q   My question, though -- My question to you, Barb,
12        is you had, at least up until March 1, attempted
13        to be cooperative with law enforcement efforts to
14        interview not only yourself but other family
15        members; is that right?
16    A   Yes.
17    Q   Now, until March 1, were there any questions of
18        threats or promises or intimidation either to
19        yourself or to your sons that you knew about that
20        made you want to stop, uh, cooperating or stop
21        the interviews with your family?
22    A   No.
23    Q   So, as far as you knew, officers were respectful.
24        I know -- I know the questions were hard and
25        the -- and the topic was difficult to talk about,
```

69

```
 1        uh, but you understood that they were doing their
 2        job and they were trying to be respectful to you
 3        and your family.  Is that -- is that a fair
 4        statement?
 5   A    Yes.
 6   Q    Okay.  And prior to March 1, did Brendan ever
 7        complain to you how he was treated by any police
 8        officers?  Prior to March 1.
 9   A    Not really, no.
10   Q    On March 1, then, that's the subject of -- of --
11        of this hearing, officers asked you for
12        permission to interview Brendan at the sheriff's
13        department in Manitowoc.  Do you remember that?
14   A    Yes.
15   Q    And you gave them permission to transport him
16        from the school to the police station; is that
17        right?
18   A    Yes.
19   Q    Officers invite you to come along?  Did they
20        invite you to the police station as well?
21   A    No.
22   Q    During the interview, itself, were you invited to
23        come to the police station?
24   A    The Manitowoc one or the Two Rivers one?
25   Q    The Manitowoc one.
```

70

```
 1    A    No.
 2    Q    Well, you were there, weren't you?
 3    A    I was there, yes, but that was after it was all done
 4         and over with.
 5    Q    Okay.  How did you get there?
 6    A    I walked over there.
 7    Q    Who --
 8    A    The -- the day that they took him to Manitowoc, I was
 9         at the courthouse because I was getting a divorce
10         that day.
11    Q    Okay.  So, rather than being invited, you just
12         happened to show up at the station; is that
13         right?
14    A    I had called them to see if they were done with
15         Brendan or if they had brung him back to school or
16         not and that's when they told me that they had
17         arrested him.
18    Q    And at that point you were invited to the
19         station?
20    A    Yes.
21    Q    You were allowed to meet with Brendan at the
22         station; is that right?
23    A    Yes.
24    Q    And were you informed at the station, uh, what
25         Brendan had told them?  That is, his involvement
```

·71

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | in these crimes?                                         |
| 2  | A | More or less, yes.                                       |
| 3  | Q | And that Brendan had also implicated his Uncle           |
| 4  |   | Steve in this murder as well; is that right?             |
| 5  |   | Were you told that then?                                 |
| 6  | A | I don't remember.                                        |
| 7  | Q | Okay.  But you knew that Brendan told the                |
| 8  |   | officers that he was involved; right?                    |
| 9  | A | That's what they had told me, that he was involved.      |
| 10 | Q | All right.  After the interview is over and, in          |
| 11 |   | fact, several times since this interview,                |
| 12 |   | officers have invited you to watch the tape,             |
| 13 |   | haven't they?                                            |
| 14 | A | Yes.                                                     |
| 15 | Q | And have you done that?                                  |
| 16 | A | No.                                                      |
| 17 | Q | Barb, the, um, police describe some concerns that        |
| 18 |   | they had after Brendan had implicated Steven in          |
| 19 |   | this homicide.  Concerns about, um, attempts that        |
| 20 |   | some family members might make to get Brendan to         |
| 21 |   | change his story or to not talk.  Do you remember        |
| 22 |   | hearing Investigator Wiegert say that today?             |
| 23 | A | Yes.                                                     |
| 24 | Q | Do you recall having that conversation with              |
| 25 |   | Investigator Wiegert that you also were concerned        |

72

```
 1        about what might happen to Brendan if he went

 2        back home to the Avery compound?

 3   A    On the first?

 4   Q    Before the first.

 5   A    I mean --

 6   Q    The 27th.

 7   A    -- the 27th?

 8   Q    Uh-huh.

 9   A    Um, I had told them that I didn't have to go home.  I

10        had other places that I could go.

11   Q    My question --

12   A    They suggested that I go to Fox Hills.

13   Q    My question is:  Did you also share with them

14        your concern about what might happen to Brendan

15        if he went back home?

16   A    I don't remember.

17   Q    You told investigators that day, on the first,

18        and you've told them after that, that Brendan's a

19        honest kid, that he's a truthful kid.  Do you

20        remember telling them that?

21   A    Yes.

22   Q    In fact, I think you used the words, he doesn't

23        lie.  Remember saying that?

24   A    Yes.

25   Q    And you believed, at least up until March 1, that
```

73

```
1          Brendan was truthful and honest, didn't you?
2     A    Yes.
3     Q    And that when he told people something, when he
4          told authority figures something, he should be
5          believed.  You thought that, didn't you?
6     A    Yes.
7               THE COURT:  Counsel, I'm going to stop you
8          there.  Uh, I understand the purposes of your
9          question, but this is a hearing on voluntariness.
10         We're -- we're not -- the -- the -- the truth -- the
11         factual truth of -- of what was -- what was or
12         wasn't uttered there is not the subject of this
13         hearing, so, where are we going with this line of
14         questioning?
15              ATTONREY KRATZ:  Well, Judge, the
16         suggestion will be that he was threatened, or
17         coerced, or promised to say something, uh, that, uh,
18         he either didn't, um, want to say or that there were
19         problems within that.  The fact that Brendan was
20         truthful and honest, didn't complain about any
21         coercion, or threats, or the like, I think, is
22         relevant.  It isn't for the truth of the -- the
23         underlying statement, Judge.
24              THE COURT:  Well, insofar as it goes to
25         the -- the voluntariness, you can ask a couple of
```

74

```
 1        more questions, but --

 2                ATTONREY KRATZ:  That's all I was going to

 3        ask --

 4                THE COURT:  All right.

 5                ATTORNEY KRATZ:  -- as -- as to that,

 6        Judge.  I appreciate that.

 7   Q    (By Attorney Kratz) You talked about Brendan's,

 8        uh, school, and we'll hear from, I think, members

 9        of the, uh -- the school hereafter, but,

10        basically, Brendan was in regular classes.  You

11        were aware of that, weren't you?

12   A    Some of them, yes.

13   Q    Brendan was in the process of getting his

14        driver's license, wasn't he?

15   A    Yes.

16   Q    You have to answer a little louder, please.

17   A    Yes.

18   Q    And to get your driver's license, you have to

19        take some tests; is that right?

20   A    Yes.

21   Q    And you, I think, if I remember correctly, have

22        to have a parent sign for you that, uh, indicates

23        that this is a person that is smart enough to get

24        their driver's license and makes good enough

25        decisions to get their license.  Did you have to
```

75

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | sign something like that?                                    |
| 2  | A | At -- at the motor vehicle, yes.                            |
| 3  | Q | All right. And you, in fact, thought at that                |
| 4  |   | time, back, uh, in the fall, that Brendan was               |
| 5  |   | mature enough to drive an automobile, didn't you?           |
| 6  | A | Yes.                                                         |
| 7  | Q | You thought he was bright enough, that he was                |
| 8  |   | smart enough to understand what went with driving           |
| 9  |   | an automobile, didn't you?                                  |
| 10 | A | Yes.                                                         |
| 11 | Q | Was Brendan on any kind of medications at the               |
| 12 |   | time?                                                        |
| 13 | A | No.                                                          |
| 14 | Q | To your knowledge, was Brendan intoxicated or               |
| 15 |   | otherwise impaired when he spoke with, uh, law              |
| 16 |   | enforcement officers?                                       |
| 17 | A | No.                                                          |
| 18 | Q | You have a computer at your home; is that right?            |
| 19 | A | Yes.                                                         |
| 20 | Q | Brendan have access to that computer?                       |
| 21 | A | Yes.                                                         |
| 22 | Q | Brendan was able to use that computer, to use the           |
| 23 |   | internet and, uh, otherwise operate that piece of          |
| 24 |   | machinery; is that right?                                   |
| 25 | A | Yes.                                                         |

76

```
 1   Q   Do you know if Brendan had any e-mail accounts?
 2       If he would e -- use the e-mail?
 3   A   I couldn't tell you.
 4   Q   Send messages, or instant messages, or anything
 5       like that?  Did you know --
 6   A   MSN.
 7   Q   -- if he did that or not?
 8   A   That's about it.  MSN.
 9   Q   And send instant messages?
10   A   Yeah, I think that's what it's called, yeah.
11   Q   And that's communicating to other people?  That's
12       actually typing or writing answers to questions
13       and communicating?
14   A   Yes.
15   Q   You're aware of that, aren't you?
16   A   Yes.
17   Q   And Brendan's able to do that; isn't he?
18   A   Yes.
19   Q   You believe Brendan's able to remember things
20       that happened and tell you what happened?  Like
21       when you'd ask what happened at school today,
22       would he answer those questions for you?
23   A   Yes.
24   Q   He was able to observe things, to process them,
25       to understand them, and then to tell you at least
```

77

|    |   |                                                        |
|----|---|--------------------------------------------------------|
| 1  |   | about what happened?  That's all true, isn't it?       |
| 2  | A | Yeah.  It takes him a while, though.                   |
| 3  | Q | Okay.  Well, he's not, um, ever been diagnosed as      |
| 4  |   | being incompetent or not understanding what's          |
| 5  |   | going on in his surroundings, has he?                  |
| 6  | A | No.                                                    |
| 7  | Q | You're aware that Brendan also gave a written          |
| 8  |   | statement to the police about, um, some of his         |
| 9  |   | involvement?  Some of the things that he had seen      |
| 10 |   | in this case?                                          |
| 11 | A | I guess so.                                            |
| 12 | Q | You don't know?                                        |
| 13 | A | Not really.  I don't know too much.                    |
| 14 | Q | All right.  At school, would Brendan have to           |
| 15 |   | write things out, whether it was homework, or          |
| 16 |   | some papers, or theme papers?  Or, at least, um,       |
| 17 |   | homework was in a written form for Brendan; isn't      |
| 18 |   | that right?                                            |
| 19 | A | Yes.                                                   |
| 20 | Q | He was able to do that?                                |
| 21 | A | Honestly, I couldn't really tell you because he never  |
| 22 |   | brung any homework home.                               |
| 23 | Q | Finally, Miss Janda, um, March 1, after the            |
| 24 |   | interview, was it your expectation that Brendan        |
| 25 |   | would be coming home with you?  In other words,        |

78

```
 1            um, did the officers believe that after that

 2            statement was given, you'd be able to take him

 3            home with you?

 4                    ATTORNEY KACHINSKY:  Objection.  That asks,

 5            uh, something that this witness would have no

 6            knowledge as to what the officers believed.  She

 7            might know what the officers told her.

 8                    ATTONREY KRATZ:  I can rephrase that,

 9            Judge.

10                    THE COURT:  Please do.

11    Q    (By Attorney Kratz)  Did the officers tell you

12            that after the interview that Brendan would be

13            going home with you?

14    A    Yes.

15    Q    Did they then also tell you that it was because

16            of his admissions, because the details that he

17            gave that day, that he couldn't go home?  That

18            they weren't going to allow him to go home?

19    A    Yes.

20                    ATTONREY KRATZ:  Thank you, ma'am.  That's

21            all I have, Judge.

22                    THE COURT:  Any redirect?

23                    ATTORNEY KACHINSKY:  Yes.

24                    **REDIRECT EXAMINATION**

25    BY ATTORNEY KACHINSKY:
```

                                79

```
 1   Q   On March 1, had the officers contacted you before
 2       they removed Brendan from Mishicot High School to
 3       take him over to the Manitowoc County Sheriff's
 4       Department for an interview?
 5   A   Yes, they did.
 6   Q   And was that the time when the officers told you
 7       that they expected that Brendan was going to be
 8       coming home after the interview?
 9   A   Yes.
10   Q   And, then, later on, when they contacted you
11       after Brendan had made some admissions regarding
12       involvement in the death of Teresa Halbach, is
13       that when they made the contrary statement that
14       they were going to arrest him and he would not be
15       coming home?
16   A   Yes.
17                ATTORNEY KACHINSKY:  That's all I have,
18       Your Honor.
19                ATTONREY KRATZ:  I have nothing further.
20       Thank you, Judge.
21                THE COURT:  You may step down.
22                ATTORNEY KACHINSKY:  Uh, we call, uh, Kris
23       Schoen -- Schoenenberger-Gross.
24                THE CLERK:  If you would raise your right
25       hand.
```

80

**KRIS SCHOENENBERGER-GROSS,**

2          called as a witness herein, having been first duly

3          sworn, was examined and testified as follows:

4                  THE CLERK:  Please be seated.  Please state

5          your name and spell your last name for the record.

6                  THE WITNESS:  Kris Schoenenberger-Gross,

7          S-c-h-o-e-n-e-n-b-e-r-g-e-r hypen G-r-o-s-s.

8                      **DIRECT EXAMINATION**

9    BY ATTORNEY KACHINSKY:

10   Q    Uh, Kris, by whom are you employed?

11   A    Mishicot School District.

12   Q    What is the nature of your employment there?

13   A    I'm the school psychologist and the coordinator of

14        alternative services.

15   Q    How long have you worked for the Mishicot School

16        District?

17   A    Eight years.

18   Q    Um, have you prepared a resumé of your, uh,

19        educational background and, uh, uh, professional

20        positions?

21   A    Yes.

22        (Exhibit No. 3 marked for identification.)

23                  ATTORNEY KACHINSKY:  May I approach, Your

24        Honor?

25                  THE COURT:  You may.

                              81

| | | |
|---|---|---|
| 1 | Q | (By Attorney Kachinsky) I'll show you here |
| 2 | | what's, uh, been marked as Exhibit No. 3. Is |
| 3 | | that a copy of your, uh -- your resumé? |
| 4 | A | Yes. |
| 5 | Q | And was that prepared for purposes of this |
| 6 | | hearing today? |
| 7 | A | Yes. |
| 8 | Q | Now, in the course of your professional duties as |
| 9 | | a school psychologist for the, uh, Mishicot |
| 10 | | School district, um, have you had occasion to |
| 11 | | deal with, uh, evaluations and, uh, concerns |
| 12 | | regarding the person that's the defendant in this |
| 13 | | case, Brendan Dassey? |
| 14 | A | Yes. |
| 15 | Q | Um, are you also -- Are you the custodian of his, |
| 16 | | uh, records in the Mishicot School District? |
| 17 | A | Yes, I am. |
| 18 | Q | What kind of records does, uh, the Mishicot |
| 19 | | School District, uh, maintain on Brendan Dassey? |
| 20 | A | We have special education records, cumulative |
| 21 | | records, um, behavioral records. |
| 22 | Q | Uh, has Brendan Dassey's, uh, mother, Barbara |
| 23 | | Janda, signed a release permitting those records |
| 24 | | to be released and information regarding those |
| 25 | | records to be released for purposes of this court |

82

```
 1        hearing?

 2   A    Yes, she has.

 3   Q    Um, uh, now, did you have occasion, uh,

 4        personally, to conduct an evaluation of

 5        Mr. Dassey for purposes of his, uh, educational,

 6        uh, placement and progress?

 7   A    Yes, in October of 2002.

 8   Q    Uh, before you I believe is an exhibit, uh,

 9        Exhibit No. 4, uh, is that a copy of the report

10        that you prepared as a result of that, uh,

11        evaluation?

12   A    Yes, it is.

13   Q    Uh, and is everything contained in that report,

14        uh, true and correct to the best of your

15        knowledge and belief?

16   A    It is with one exception.  There was one word omitted

17        in the final typed version.  In the observation

18        section on page 2, the word "eye" was omitted.  It

19        should read "direct eye contact."

20   Q    Uh, now, in preparing this, uh, report, uh, was

21        this -- how did you, uh, go about doing that in

22        terms of obtaining the information regarding

23        Brendan Dassey?

24   A    Um, through the evaluation processes?  Is -- is that

25        your question?
```

83

```
 1   Q   Right.
 2   A   Okay.  Um, it was a reevaluation.  So, we reviewed
 3       the school records to determine what type of testing
 4       was needed, and, um, intelligence testing was one
 5       area that we decided we wanted to look at as far as
 6       his overall intellectual ability and how he processes
 7       information.
 8   Q   According to the records that, uh, were available
 9       to you in preparing that evaluation, was -- when
10       was the first time that Brendan Dassey was
11       evaluated for purposes of a school district?
12   A   Um, his initial evaluation, first time, was in 1996.
13       September of 1996.
14   Q   What sort of tests, uh, were used in evaluating,
15       uh, Mr. Dassey's, um, potential performance in
16       school?
17   A   Um, and my personal evaluation was done in October of
18       2002.  The 1996 and 1999 evaluations were done by
19       other psychologists in the Reedsville School
20       District.  Um, but we did do intelligence testing.
21       Ninety-six and '99 they used the Wechsler
22       Intelligence Scale for Children.
23              THE REPORTER:  Could you slow down,
24       please?
25              THE COURT:  Could you --

                          84
```

```
 1                    ATTORNEY KACHINSKY:  Oops, slow down.
 2                    THE WITNESS:  Sorry.
 3    Q    (By Attorney Kachinsky) Okay.  Sure.  What --
 4         what -- what was -- what was the test that was
 5         used by the, uh, uh -- by the, uh, Reedsville
 6         School District?
 7    A    The Wechsler Intelligence Scale for Children, Third
 8         Edition.
 9    Q    What does that test, in particular, measure?
10    A    It's an intelligence test that measures a student's
11         thinking ability, their ability to problem solve, and
12         reason.
13    Q    Uh, what were the res -- Is there a -- a measure
14         of someone's, uh, intelligence and performance
15         known has IQ?
16    A    Yes.
17    Q    And what does IQ stand for?
18    A    Intelligence quotients.
19    Q    What does that, uh, mean?
20    A    Again, it -- it looks at the student's overall, um,
21         intellectual ability, their ability to think, problem
22         solve, reason, ability to learn.
23    Q    Uh, does that particular measure, uh, compare a
24         given -- child of a given age against, uh, his or
25         her peers?
```

85

```
 1   A   Right.  It is -- is based on age.  Um-hmm.
 2   Q   Um, if you were an average -- had average ability
 3       in school, what would your, uh, IQ score be?
 4   A   Anywhere from a 90 to a 109 is an average range.
 5   Q   Uh, when the tests were conducted of, uh, Brendan
 6       in the Reedsville School District in, uh, 1996,
 7       uh, what -- what did it indicate in terms of
 8       Mr. Dassey's, uh, IQ, uh, verbal performance, and
 9       full scale?
10   A   May I please refer --
11   Q   Sure.
12   A   -- to the record?  In 1996, Brendan's full scale, his
13       overall IQ was a 74, his verbal IQ was a 65, and his
14       performance IQ was an 87.
15   Q   What do those particular measures of Mr. Dassey's
16       IQ indicate in terms of his ability to
17       communicate and to, uh, understand, uh,
18       information?
19   A   Um, the -- the overall score is a little less
20       meaningful, because there is such a big split between
21       his verbal and his performance IQ's.  The verbal is
22       looking at his ability to think with words and to use
23       his words and verbal skills and problem solving, and
24       that was a well below average, um, score.
25               His performance IQ of an 87 is looking
```

86

| | |
|---|---|
| 1 | more at visual kinds of tasks, um, and visual |
| 2 | reasoning types of things. And that was in a |
| 3 | below average to average range. |
| 4 | Q  Uh, was another evaluation performed on |
| 5 | Mr. Dassey in November, 1999, that you were aware |
| 6 | of? |
| 7 | A  Yes. |
| 8 | Q  And by whom was that evaluation conducted? |
| 9 | A  Um, that was done by another psychologist in the |
| 10 | Reedsville School District. |
| 11 | Q  Uh, what were the, uh, scores that were noted |
| 12 | during the 1999 evaluation? |
| 13 | A  Uh, the full scale IQ score was a 73, the verbal IQ |
| 14 | was a 69, the performance IQ was an 82. |
| 15 | Q  Uh, was there any significant change, uh, between |
| 16 | 1996 and 1999? |
| 17 | A  No. The results are consistent. He shows stronger |
| 18 | nonverbal or visual reasoning abilities than his |
| 19 | verbal abilities. |
| 20 | Q  Um, is it, uh, normal for these particular scores |
| 21 | to remain fairly consistent over -- over time |
| 22 | with, uh, someone who's a student? |
| 23 | A  Typically, yes. There -- there can be variability |
| 24 | but, in general, they tend to stay fairly consistent. |
| 25 | Q  Uh, now, did you conduct your own evaluation of |

87

| | | |
|---|---|---|
| 1 | | Mr. Dassey in, uh, October of 2002? |
| 2 | A | Yes, I did. |
| 3 | Q | What test did you use to, uh, evaluate Mr. Dassey |
| 4 | | at that time? |
| 5 | A | I used a test called the Woodcock-Johnson, Third |
| 6 | | Edition, tests of cognitive abilities. |
| 7 | Q | And what, uh, specifically does that test, uh, |
| 8 | | measure? |
| 9 | A | It measures his overall intelligence as well. |
| 10 | Q | Uh, what were the, uh, scores that were obtained |
| 11 | | in that particular test? |
| 12 | A | He obtained a general intellectual ability score of |
| 13 | | 78, a verbal ability score of 81, a thinking ability |
| 14 | | score of 93, and a cognitive efficiency score of 73. |
| 15 | Q | Now, what does the, uh -- Uh, was there a |
| 16 | | percentile ranking for those particular, uh, test |
| 17 | | results? |
| 18 | A | Yes -- |
| 19 | Q | What is a percentile ranking? |
| 20 | A | Um, for example, his general intellectual ability |
| 21 | | percentile rank was a seven. That means that Brendan |
| 22 | | scored as well as or better than seven out of one |
| 23 | | hundred students his age. |
| 24 | Q | Um, so he was in -- could be characterized as |
| 25 | | being in the top 93 percent of his class? |

88

```
 1   A    No.  No.  Um, showing that he has, um, some delays.
 2        That he's, um, on the lower end.
 3   Q    Um, were the results that you obtained from the
 4        Woodstock-Johnson (sic) test that you conducted
 5        in October of 2002, um, significantly different
 6        in any way than the two previous tests that you
 7        testified about from the Reedsville School
 8        District?
 9   A    No.  Generally, results are consistent.
10   Q    Uh, is, uh, there any reason to believe that, uh,
11        there would be significant changes in
12        Mr. Dassey's, uh, intellectual abilities between
13        October, 2002 and February or March of 2006?
14   A    No.
15   Q    Um, from your review of Mr. Dassey's, uh, records
16        from the Mishicot School District, uh, and your
17        own evaluation, do you have, uh, any opinion as
18        to what Mr. Dassey's overall cognitive ability
19        is?
20   A    Um, Brendan has an -- overall, some delays.  Again,
21        it's within a borderline to below average range,
22        intellectually, overall.  He does struggle more with
23        the verbal abilities, um, as well as memory.  He
24        struggles with short-term memory kinds of tasks.
25        Working memory.
```

89

| | |
|---|---|
| 1 | He has strengths in the area of visual |
| 2 | spacial problem solving. For example, solving |
| 3 | puzzles. Um, he had below average to average |
| 4 | score in that range, which is thinking ability. |
| 5 | And he does better there. |
| 6 | There is a range of intelligence with a |
| 7 | cognitive disability being the lowest range, and |
| 8 | that was formally known as mental retardation. |
| 9 | Brendan's scores do not fall within that range. |
| 10 | He is not that low. |
| 11 | He has been identified with a specific |
| 12 | learning disability and, as a result, has needs, |
| 13 | um, and delays in the area of reading, written |
| 14 | expression, and spelling skills related to his |
| 15 | cognitive levels. Um, math is an area of |
| 16 | strength for Brendan. |
| 17 | Q  Based on those scores and your observations of |
| 18 | Brendan, does he have a -- how would you describe |
| 19 | the difficulty he has, if any, in, uh, |
| 20 | communicating information, uh, to others? |
| 21 | A  Brendan has also been identified with a speech and |
| 22 | language impairment, particularly in the area of |
| 23 | language. He has difficulties expressing himself, |
| 24 | verbally, using his words, as well as understanding |
| 25 | some aspects of language. For example, in the school |

90

APP-000462

1    setting, um, understanding some directions, um,

2    without assistance.

3         Um, he also has difficulties in the area

4    of the social aspects of communication, and that

5    would be such as, um, understanding and using

6    nonverbal cues, facial expressions, eye contact,

7    body language, tone of voice.

8         ATTORNEY KACHINSKY:  Um, I have no further

9    questions.  We'd move Exhibits, uh, 3 and 4 into

10   evidence.

11        THE COURT:  Any objection to Exhibits 3 and

12   4?

13        ATTONREY KRATZ:  No.  That's fine, Judge.

14        THE COURT:  Offered and received.  May I

15   have those, please?  Thank you.  Cross.

16                  **CROSS-EXAMINATION**

17   BY ATTORNEY KRATZ:

18   Q    Miss Schoenenberger-Gross, can you describe how

19        children within your school district are

20        identified as qualifying for special ed services?

21   A    Um, initially a referral would need to be made by a

22        parent or a teacher if there are concerns that there

23        might be delays, and then we would go through an

24        evaluation process, which includes interviews, review

25        of school records, um, formal testing, observations,

                              91

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 57 of 212    Document 24-6

```
 1    and then we meet as an IEP team to determine whether
 2    or not the student meets the eligibility criteria  .
 3    that's been set by the state to --
 4             THE REPORTER:  You're going to have to
 5    slow down.
 6             ATTORNEY KRATZ:  Slow down.
 7             THE WITNESS:  Where should I -- Where
 8    should I back up?
 9             THE REPORTER:  Uh, "student meets the
10    eligibility --
11             THE WITNESS:  We determine, as a team,
12    if, um, the student meets the state eligibility
13    criteria for disability, and whether or not the
14    student has a need for special education
15    services.
16  Q   (By Attorney Kratz) Okay.  As I understand,
17       Brendan was identified, prior to coming to
18       Mishicot High School, as qualifying for special
19       ed services; is that right?
20  A    Yes.
21  Q    Now, special ed services, um, is not just you get
22       them or you don't.  It's a whole continuum or a
23       range of services that can be offered to
24       students; is that right?
25  A    Correct.
```

92

```
 1   Q   Some students have such disabilities or deficits
 2       that they can't be in regular classes; is that
 3       true?
 4   A   Correct.
 5   Q   Was Brendan one of those kids?
 6   A   No, he was not.
 7   Q   Some students have such emotional problems that
 8       they are in what's called a self-contained
 9       setting.  Can you tell us what that is?
10   A   Um, that would be if the student is, um, completely
11       in a special education classroom and does not go into
12       the regular education classroom at all.
13            Um, you were referring to some students
14       with behavior problems and -- and those would be
15       because of social and emotional behavioral
16       difficulties --
17            THE COURT:  Again, you're going to have --
18       you're going to have to slow up.
19            THE WITNESS:  Okay.
20   Q   (By Attorney Kratz) You said that those would be
21       some emotional or behavioral problems, uh, in
22       addition to some special ed problems that would
23       require them to be what's called self-contained;
24       is that correct?
25   A   Correct.
```

93

```
1   Q   Was Brendan one of those kids?

2   A   No, he was not.

3   Q   Brendan was in regular classes; is that right?

4   A   He had a combination.  He was primarily in regular

5       education classes with, um, a couple of classes that

6       were in the special education classroom.

7   Q   Is Brendan at all incompetent?

8   A   No.

9   Q   Is Brendan mentally retarded?

10  A   No, he's not.

11  Q   Is Brendan, to your knowledge, psychotic?

12  A   Not to my knowledge.

13  Q   Does Brendan suffer from ADD or ADHD to your

14      knowledge?

15  A   Not to my knowledge.

16  Q   Does Brendan have such deficits that he needs to

17      be medicated to your knowledge?

18  A   Not to my knowledge.

19  Q   Do you have an opinion as to whether Brendan can

20      understand right from wrong?

21  A   In the school setting, um, Brendan is a student who

22      typically follows the school rules.  He does not tend

23      to get in trouble.  Um, so, to me that demonstrates

24      that he does understand right from wrong.

25  Q   All right.  So, in review of your school records
```

94

```
1        he was able to, if he chose to, follow a code of
2        conduct; is that right?
3    A   Yes.
4    Q   Do you have an opinion as to whether Brendan has
5        the ability to observe, and process, and recall,
6        and later describe events?
7    A   Yes.
8    Q   Yes, he -- you have an --
9    A   Yes.
10   Q   -- opinion or, yes, he does.
11   A   Oh, yes.  Yes, I -- Yes, I believe that he can.
12   Q   Okay.
13   A   He does.
14   Q   So, there's nothing about Brendan's deficits or
15       lower than average abilities that affect his
16       ability to tell somebody what happened yesterday;
17       is that right?
18   A   Right.  Correct.
19   Q   You said that Brendan's test scores, at least
20       some of them, fall within simply the below
21       average range.  Is there a, um -- I think you
22       mentioned the continuum of average and below
23       average, but what comes after that?
24   A   As far as with intellectual ability --
25   Q   Yes.
```

95

| 1 | A | -- for example? |
| 2 | Q | Um-hmm. |
| 3 | A | Um, there's an average range.  Then there would be a |
| 4 | | below average range.  A borderline range.  And well |
| 5 | | below average.  Well below average being the area of |
| 6 | | cognitive disability. |
| 7 | Q | Okay.  Is there something below that? |
| 8 | A | No. |
| 9 | Q | Well below average is as low as -- as you go in |
| 10 | | cognitive ability? |
| 11 | A | Um-hmm.  Lower extreme, well below average.  Um-hmm. |
| 12 | Q | As I understand, Brendan was making progress |
| 13 | | through high school in some of these areas. |
| 14 | | Specifically, um, um, socially.  His, uh, social |
| 15 | | skills were improving; is that right? |
| 16 | A | Um-hmm.  He -- as far as he was able to participate |
| 17 | | in primarily regular education classes throughout the |
| 18 | | day with his same-aged peers, and that -- in that |
| 19 | | way, I would say, yes, that he'd made progress.  Yes, |
| 20 | | sir. |
| 21 | Q | And -- and -- and, importantly, what I'm -- I |
| 22 | | need to ask you, Miss -- Miss |
| 23 | | Schoenenberger-Gross, is that he was placed with |
| 24 | | his peers, with other kids.  He was integrated |
| 25 | | with the rest of these kids at school; is that |

96

```
 1        correct?
 2   A    Correct.  Um-hmm.
 3   Q    Not every high school student is average; is --
 4        is that true?
 5   A    That is true.
 6   Q    There's some above average and some below
 7        average; is that right?
 8   A    Correct.
 9   Q    And although Brendan, um, may have been in the
10        below average range, uh, you're not suggesting
11        that he didn't understand things, or his
12        surroundings, or wasn't able to, uh, be
13        responsive; is that fair?
14   A    Yes.  Can I clarify something --
15   Q    Please do.
16   A    -- from a previous question?
17   Q    Sure.  Uh-huh.
18   A    You had asked about, um, whether or not he'd be able
19        to tell you, for example, about his day.  Um, to
20        be -- to be clear, yes, he is able to do that.  But
21        he does have those communication needs which, um, in
22        the school setting, um, he might not look at you.
23        Those social communications just -- you know, aspects
24        would come into play, um, as far as, you know, when
25        talking with him.  But he is capable of remembering
```

97

| | | |
|---|---|---|
| 1 | | what happened and telling you about those things. |
| 2 | Q | My question is, if he chose to communicate |
| 3 | | something to you about what had happened before, |
| 4 | | uh, he would have the ability to do that -- |
| 5 | A | Yes. |
| 6 | Q | -- is that right? |
| 7 | A | Yes. |
| 8 | Q | Now, you haven't watched this videotape? You |
| 9 | | haven't watched the detail in which he provided |
| 10 | | to law enforcement about, uh, things that he was |
| 11 | | involved in, were you? |
| 12 | A | No. |
| 13 | Q | And there were no behavior intervention plans |
| 14 | | with Brendan that were necessary at school, were |
| 15 | | there? |
| 16 | A | No. |
| 17 | Q | This may be something you can or can't answer. |
| 18 | | And if not, just let me know. But as you or |
| 19 | | another teacher would see Brendan interacting at |
| 20 | | school or functioning at school, would he |
| 21 | | function just like a normal high school kid? |
| 22 | A | Um, yes. Um, aside from some of the communication |
| 23 | | differences that you might see. Um, the -- the |
| 24 | | diminished eye contact, for example, where other kids |
| 25 | | are typically making eye contact more frequently. |

98

```
1        But, otherwise, yes.

2    Q   Otherwise looks pretty normal --

3    A   Yes.

4    Q   -- is that right?  Okay.

5            ATTORNEY KRATZ:  That's all I have for

6        this witness, Judge.  Thank you.

7            THE COURT:  Any redirect?

8            ATTORNEY KACHINSKY:  Um, yes.

9                REDIRECT EXAMINATION

10   BY ATTORNEY KACHINSKY:

11   Q   You testified that, uh, Mr. Dassey had problems

12       affecting his short-term memory.  How would that

13       affect him in -- in everyday life in terms of his

14       ability to receive events or to communicate

15       regarding them?

16   A   Um, specifically, you know, looking at the short-term

17       memory, um, you know, I can speak to it in the school

18       setting as to how that can impact his ability to, um,

19       learn to read and remember, um, and identify letters

20       and -- and the sounds that go with those letters,

21       and -- and words, and as far as getting that

22       information into short-term memory.  Um, in everyday

23       life, um, perhaps -- I -- I guess -- I -- I don't

24       want to speak to that.  I can't -- I don't feel

25       comfortable being able to answer that.
```

99

```
 1   Q   And you said that Mr. Dassey had difficulties,
 2       uh, in picking up nonverbal cues. If, uh, he's
 3.      involved in a conversation with a couple of,
 4       uh -- of adults in some sort of setting, uh, how
 5       would that problem affect his ability to
 6       communicate either in terms of, uh, understanding
 7       information or being able to provide it to
 8       others?
 9   A   Um, to some of -- I think it's getting beyond my
10       scope, because I'm not a speech and language
11       pathologist who is the person that would specifically
12       be working with Brendan on those aspects.
13           ATTORNEY KACHINSKY: That's all the
14       questions I have.
15           THE COURT: All right. Any, uh -- any
16       recross?
17           ATTONREY KRATZ: No, Judge. Although, uh,
18       I know that Ms. Schoenenberger-Gross had brought,
19       uh, a volume of records with -- with her. I didn't
20       know if Mr., um, Kachinsky intended to complete the
21       record by having those introduced, and I don't have
22       any -- any objection if he's going to do that.
23           ATTORNEY KACHINSKY: Uh, I don't intend to
24       introduce them, Your Honor.
25           THE COURT: Okay. Uh, you may step down.
```

100

1    You want to give her those records back?

2              ATTORNEY KACHINSKY:  Right.

3              THE COURT:  Yeah, why don't you come back

4    here and pick up the records.  Do you have any

5    further witnesses, Mr. Kachinsky?

6              ATTORNEY KACHINSKY:  No, Your Honor.

7              THE COURT:  Uh, gentlemen, I have

8    received -- Go ahead.

9              ATTORNEY KRATZ:  Judge, the -- at any

10   hearing, especially at a, um, uh, hearing to

11   suppress statements, there would be the

12   opportunity to call the defendant, Brendan, as a

13   witness.  It appears that Mr. Kachinsky is

14   choosing, uh, by a trial strategy or other

15   reason, not to do that.  I'd ask the Court to

16   engage in a brief colloquy with Counsel, and,

17   perhaps, even Mr. Dassey as to their choice not

18   to do that.  I think we have to complete the

19   record.

20             THE COURT:  All right.  Uh, Mr. Kachinsky,

21   you heard what Mr. Kratz said; correct?

22             ATTORNEY KACHINSKY:  Yes, I have, Your

23   Honor.

24             THE COURT:  Yeah.  And you know you have

25   the opportunity to call your client at this point

                          101

1       should you choose?

2               ATTORNEY KACHINSKY:  Uh, yes, I do, and,

3       uh, Mr. Dassey and I have discussed that.

4               THE COURT:  You have had ample opportunity

5       to discuss it with him?

6               ATTORNEY KACHINSKY:  Yes, I have.

7               THE COURT:  He understands that he could

8       offer testimonial information today in this court

9       proceeding?

10              ATTORNEY KACHINSKY:  Yes, he does.

11              THE COURT:  And, uh, I don't want to invade

12      the lawyer/client relationship, but, presumably, for

13      one reason or another, you are choosing, and he is

14      choosing, not to do that.

15              ATTORNEY KACHINSKY:  Correct, Your Honor.

16              THE COURT:  All right.  I -- I'm not going

17      to make an inquiry of the defendant.

18              ATTONREY KRATZ:  That's fine, Judge.

19              THE COURT:  Um, either of you have anything

20      else -- Both of you have submitted a number of,

21      uh -- or submitted in written argument form the

22      various, uh, cases and points of law that you think

23      the Court ought to be relying on here.  I certainly

24      never would try to stop lawyers from arguing at the

25      close of any kind of hearing, but, uh, don't feel

                        102

```
 1     compelled to.  Um, Mr. Kratz?

 2                ATTONREY KRATZ:   Judge, I do have a brief

 3     argument if the Court would -- uh, would entertain

 4     that at this time.  I'm certainly prepared if -- if,

 5     um -- if the Court prefers --

 6                THE COURT:   Sure.

 7                ATTORNEY KRATZ:   -- that we not do that,

 8     I can --

 9                THE COURT:   Well, that's fine, but

10     before -- before you argue, uh, for the record, I'm

11     going to, uh, number as Exhibit No. 5, I think, in

12     this case, we've got four exhibits here, the, uh --

13     the items that we had stipulated to, or that you had

14     stipulated to at the, uh -- at the beginning of this

15     hearing, specifically, Exhibit 5, will consist of

16     the following:

17                A cover letter from Mr. Kratz dated, uh,

18     April 7, 2006.

19                And a cover letter, uh, will be used as

20     an inventory for a number of electronic

21     recordings that accompanied that letter.

22                Uh, additionally, a transcript of --

23     excuse me -- the March 1, 2006, hearing, or -- or

24     interview, rather, with, uh, uh, that transcript,

25     consisted of pages 525 to 677.
```

103

1          Uh, Exhibit 5 will be closed out with a

2     cover letter from Attorney Kachinsky dated, uh,

3     April 28, 2006, with the transcript of the, uh,

4     March -- or of the February 27, 2006, interview

5     bearing pages numbered 439 to 512.  Anything

6     else?

7                ATTONREY KRATZ:  No.

8                THE COURT:  Go ahead.

9                ATTONREY KRATZ:  Thank you, Your Honor.

10    This is a -- a case that includes a very detailed

11    admission by a young man, uh, inculpating himself in

12    some very serious criminal conduct.

13               When this Court considers the

14    voluntariness of those statements, uh, the

15    Wisconsin and U.S., uh, courts that are based,

16    uh, in Wisconsin law, uh, suggest that the Court

17    need first find some improper police conduct, uh,

18    before the Court even does a balancing of the

19    defendant's personal characteristics.

20               And that becomes, uh, uh, important in

21    this case because the State argues there's

22    absolutely no improper police conduct that has

23    been suggested.  Nothing by Mr. Kachinsky in his,

24    brief, uh, or his, uh, response memorandum, nor

25    anything elicited today that would rise to the

                         104

APP-000476

1  level of improper police conduct.

2  The interview on March 1 was clearly a
3  witness interview, not a suspect interview. And
4  it wasn't until, as this Court's reviewed that
5  interview, about halfway through, when Mr.
6  Dassey, himself, starts providing some very, uh,
7  disturbing details about, uh, his involvement and
8  Mr. Avery's involvement, uh, that more questions
9  were asked, uh, about that.

10  Some cases involve confessions and
11  admissions, and especially serious cases, even
12  homicide cases, uh, I don't think it's a stretch
13  to say there isn't any real criminal justice
14  advantage or justification, uh, in making those,
15  uh, confessions. And so when the Court wonders
16  why, or considers why, an individual, uh,
17  inculpates themselves, or confesses, or, uh,
18  tells the police that they were involved in real
19  serious behavior, the motive for those
20  confessions become im -- uh, important to
21  understand.

22  There can, of course, be emotional
23  reasons why people confess. I feel guilty, or
24  I'm going to feel better if I'm truthful and I'm
25  confessing about this. A demonstration of

105

1    remorse.

2              There can be a spiritual or moral reason
3    to confess.  The confession being good for the
4    soul type of thing, or, uh, in a very base sense,
5    the practical reason to confess.  If a person
6    thinks that the police are going to find out
7    anyway, or they already know what happened, they
8    hope to obtain some practical benefit in
9    cooperation or honesty.

10             But that, uh, number of reasons, or
11   combination of reasons, usually is why we're in
12   these circumstances, uh, in deciding, uh, why an
13   individual confesses.  But, again, it's only if
14   those confessions or admissions are the product
15   of improper police pressures, or improper
16   strategies, uh, does the Court need to consider
17   whether that statement should be suppressed as
18   being involuntary.

19             The success in law enforcement's efforts
20   in obtaining truthful versions of events or, in
21   this case, obtaining confessions is what law
22   enforcement does.  They try to get to the bottom,
23   uh, of what happened.

24             And, therefore, appellate courts, and
25   circuit courts before them, recognize and that

                          106

1   society benefits from sanctioning permissible

2   police strategies when encouraging a suspect to

3   take responsibility, or to allow accountability

4   for, uh -- for these acts.

5           When we compare what happened in the

6   Dassey case to other cases in Wisconsin, other

7   cases that have been sanctioned when deceit has

8   been used in those other cases, when suspects

9   have been lied to, when we've got the good cop,

10  bad cop, uh, strategy, when suspect's been

11  confronted with physical evidence, even when it

12  doesn't exist, or when trickery, uh, occurs when,

13  uh, we invite suspects down to the police

14  station, all of those have been deemed to be

15  permissible.  We don't have anything that even

16  approaches those tactics here.

17          When we consider and compare, uh,

18  permissible strategies to what was used here,

19  this is prac -- practically a -- a warm and fuzzy

20  meeting with, uh -- with Mr. Dassey.  And I don't

21  mean at all to diminish the seriousness of -- of

22  what happened, but I'm arguing, Judge, it isn't

23  even close.  It's not even a close call.

24          There were no threats.  There were no

25  violence.  There were no specific promises.  No

                        107

1  promises of leniency. And when Mr. Dassey's
2  expected and told by the officers that he's
3  expected to tell the truth, I think that's just
4  a -- a common statement of what these officers
5  believed would occur.

6         Under all of those circumstances, Judge,
7  when the Court does apply the totality of the
8  circumstances test, again, I believe there isn't
9  any improper police conduct. But should the
10 Court find that there were some subtle pressures
11 used when compared to Mr. Dassey, when compared
12 to his personal characteristics of being almost
13 17, which I would note for the Court in this case
14 includes original adult court jurisdiction, when
15 we consider his education level, his intelligence
16 as being just below average, and, certainly,
17 functioning adequately within a school setting,
18 his physical and emotional condition is not such
19 that, uh, it made anything involuntary.

20        And when he has prior police contacts,
21 when he demonstrates the ability to resist
22 suggestion, when he demonstrates a free and
23 unconstrained will, this Court should and must
24 allow these statements to be admitted. I'm
25 asking the Court deny Mr. Kachinsky's motion to

108

suppress these statements. Thank you, Judge.

2              THE COURT: Any response, Mr. Kachinsky?

3              ATTORNEY KACHINSKY: Um, yes, Your Honor.

4    In determining whether or not Mr. Dassey's statement

5    was voluntary, uh, the Court, as, uh, repeatedly,

6    uh, argued, has to consider the totality of the

7    circumstances and not look at the tactics that were

8    used, uh, in isolation in and of themselves.

9              Uh, certainly under the facts of this

10   case, if the person that was the subject of the

11   interrogation was 43-year-old -- 43 years old

12   instead of, uh, 16 years old, if he had

13   substantial criminal justice, uh, experience

14   instead of having none, uh, if he had average or

15   above average cognitive abilities, uh, instead

16   of, um, below average as documented by school

17   records from Mishicot and the testimony of

18   psychologists, uh, clearly the State would be,

19   uh -- be correct.

20             Of course, the person to meet those

21   opposite characteristics of Mr. Dassey is his

22   uncle, uh, Mr. Avery, but it's not Mr. Avery that

23   was the subject of his interrogation. The

24   subject of the interrogation and the questioning

25   was Brendan Dassey, and the fact that, uh,

                        109

1    Detective Wiegert chooses to characterize this as
2    a witness versus a suspect interview is not at
3    all determinative as to whether or not it was,
4    uh, voluntary or not.
5          Certainly, the Court's, uh, seen the
6    tapes, reviewed the transcripts, knows from its
7    own observations this was not the classic third
8    degree sort of, uh, interview that you'd see on,
9    uh -- on TV shows where someone is isolated in a
10   room with a couple of detectives, where there's
11   spotlights and suggestive questioning, and
12   things, uh, of that nature.  But this is,
13   instead, uh, much subtler, uh, and, uh, from the
14   results, uh, much more effective means, of
15   interrogation of someone.
16         Uh, and I think it's important to listen
17   to specific wording, and the Court has, uh -- has
18   the benefit of the videotape, and I'm sure has
19   reviewed it and can see the context into which
20   those statements were made to Mr. Dassey on a
21   continuum starting with the 27th of -- of
22   February.
23         I think it's clear that when the police
24   decide to interview, uh, Mr. Dassey on the 27th
25   of February they certainly strongly had at least

                          110

APP-000482

```
 1        a theory that he might have been involved in some
 2        respects, and, to some extent, Mr. Dassey
 3        confirmed that on the 27th when he indicated his
 4        observations of seeing body parts in a, uh,
 5        bonfire, which would have, at a minimum, perhaps,
 6        implicated him in the participation in the
 7        burning of a -- burning of a corpse, which is one
 8        of the three charges that he's now, uh -- now
 9        facing.
10             He was -- Uh, the police, both on
11        February 27, and, to an even greater extent on
12        March 1, uh, minimized the seriousness of the
13        trouble that Mr. Dassey, uh, was in, and not
14        having had any criminal justice experience
15        Mr. Dassey, uh, didn't have any reason to, uh,
16        not -- not believe them.  They had -- they said
17        they would be an advocate for him, um, uh, go to
18        bat for him.  Well, what, exactly, did that mean?
19'       And what expectations did that create in Mr.
20        Dassey as to whether or not he'd be facing the
21        sort of trouble that he's facing, uh, at this
22        time?
23             And the Court, then, makes -- or, excuse
24        me, not the Court.  But they make the statement
25        to Mr. Dassey, well, honesty will set you free.
```

111

1        The Court has seen the tape, seen the context
2        into which, uh, that particular statement was
3        made, uh, and it's not at all clear that that's
4        a -- a reference to some sort of psychological
5        or, uh, spiritual freedom as opposed to the
6        physical freedom of not being surrounded by
7        police officers even in a soft, uh, interview
8        room and being subjected to questioning about
9        some of the most serious charges that anybody can
10       face, uh, in state of Wisconsin.
11              Um, so we ask the Court to look at all
12       the circumstances of this.  Both Brendan's
13       characteristics in terms of his age, uh, his lack
14       of experience with the criminal justice system,
15       uh, and, um, intellectual abilities, as well as
16       the unrealistic, uh, impressions that were
17       fostered upon him by continuous, uh, statements
18       made by both detectives and find that, under
19       those circumstances dealing with the suspect of
20       Brendan's characteristics, that those were, uh,
21       improper by giving him far greater expectations
22       of leniency and favorable treatment than he was
23       entitled to receive, find that those statements
24       were involuntary and should not be admissible at
25       the trial in this case.

                          112

```
 1              THE COURT:  Any response?

 2              ATTONREY KRATZ:  No, Judge, nothing.  Thank

 3      you.

 4              THE COURT:  All right.  Uh, the Court will

 5      render a decision on this motion on May 12 at

 6      9:00 a.m.  At that time, or shortly after that, uh,

 7      you have another motion filed here, Mr. Kachinsky,

 8      relating to the property bond, we'll take that up as

 9      well.

10              ATTORNEY KACHINSKY:  Okay.

11              THE COURT:  Uh, any further proceedings

12      today, gentlemen?

13              ATTONREY KRATZ:  Not for today, Judge.

14      Thank you.

15              ATTORNEY KACHINSKY:  No, Your Honor.

16              THE COURT:  All right.  We're adjourned.

17              (PROCEEDINGS CONCLUDED.)

18

19

20

21

22

23

24

25

                              113
```

```
 1   STATE OF WISCONSIN  )
                         )SS.
 2   COUNTY OF MANITOWOC )

 3

 4              I, Jennifer K. Hau, Official Court

 5   Reporter for Circuit Court Branch 3 and the State

 6   of Wisconsin, do hereby certify that I reported

 7   the foregoing matter and that the foregoing

 8   transcript has been carefully prepared by me with

 9   my computerized stenographic notes as taken by me

10   in machine shorthand, and by computer-assisted

11   transcription thereafter transcribed, and that it

12   is a true and correct transcript of the

13   proceedings had in said matter to the best of my

14   knowledge and ability.

15              Dated this 29th day of August, 2006.

16

17

18

19              Jennifer K. Hau, RPR
                Official Court Reporter

20

21

22

23

24

25


                        114
```

**Kratz, Ken**

| | |
|---|---|
| From: | Len Kachinsky [len@sissonlaw.com] |
| Sent: | Friday, May 05, 2006 11:07 AM |
| To: | Mark Wiegert |
| Cc: | conflictome@msn.com; kratz.kenneth@mail.da.state.wi.us |
| Subject: | Avery/Dassey Investigation |

Mark-- Our investigator, Mike O'Kelley, has developed some information in the course of talking to Brendan's relatives (but not Brendan) that might shed some light on the whereabouts of the Suzuki and Barb's van which may contain some evidence useful in this case. You are authorized to talk to him directly at (219) 836-5050 or by e-mail at the address above in the "cc." This appears to me to be insufficient in and of itself to establish PC for another search of the Avery salvage yard. However, it may go a long way toward getting you there.

We would prefer to stay unnamed in any affidavit for a search warrant if at all possible. Mike has not made any direct observations of the subject vehicles. The information he has may just lead you to requestion some witnesses prior to another search warrant application.

Also--Mike may want to take a look at the aerial photos of the Avery property at the Cal Co DA's office. He can call there directly at (920) 849-1438 to see them during business hours.

LEN KACHINSKY
Sisson and Kachinsky Law Offices
103 W. College Avenue #1010
Appleton, WI 54911-5782
Office: (920) 993-7277
Fax: (775) 845-7965
Car: (920) 585-9926
Mobile: (920) 841-6706

"Not for the glory. Not for the rush. Sometimes you just do what you have to do."

APP-000487

Crime Scene & Statement Analysis, Brendan Dassey meeting on May 12th

Wed, 5/10

To: "Crime Scene & Statement Analysis" <dontlietome@msn.com>
From: Len Kachinsky <len@sissonlaw.com>
Subject: Brendan Dassey meeting on May 12th
Cc:
Bcc:
Attached:


Mike-- I will cancel my planned visit for today. I have plenty of other work to do here.

At 10:11 PM 5/9/2006, you wrote:
Len,

I am learning the Avery family history and interactions within and about each member of the Avery family.

These are criminals. There are members engaged in sexual activities with nieces, nephews, cousins, in-laws. Anyone else is fair game to these people. They have a history of stalking females who have no connection to this group.

Customers and/or their relatives unwittingly become victims of their sexual fantasies and thus are stalked. The victims have no idea that they are being victimized.

This is truly where the devil resides in comfort. I can find no good in any member. These people are pure evil. This is where one would eat their young to satisfy/justify a control issue where none previously existed.

A friend of mine suggested *"This is a one branch family tree. Cut this tree down. We need to end the gene pool here"*.

Steve Avery needs to be removed from society. I believe that his male siblings could have a role in Teresa's crime scene.

I believe that Earl may have disposed of evidence and Chuck may have ignored Steve's physical movements during this period of time while he was transporting Teresa's car to the back of the Avery Salvage area. There is no question that Dolores is guiding and directing this behind the scenes.

I think that your visit will be counterproductive to our goals for Brendan. It could have Brendan digging his heels in further. He could become more entrenched in his illogical position and further distort the facts. He has been relying on a story that his family has told him what to say about October 31, 2005 > > thus it will take me longer to undo if I can even without your visit.

We need to separate him from fantasy and bring him to see reality from our perspective. We need to separate him from the unrealistic world that his family resides within.

Brendan needs to be alone. When he sees me this Friday I will be a source of relief. He and I can begin to bond. He needs to trust me and the direction that I steer him into. Brendan needs to provide an explanation that coincides with the facts/evidence.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 82 of 212    Document 19-8    APP-000488

I would like to obtain his confession this Friday. Brendan should provide details of the crime scene and data that has been previously undisclosed that mirrors the crime data.

However, I will follow your lead and adapt to your decision

It has been interesting to read Brendan's evaluations by the school psychologist. Yet, he was able to read each question, respond to, draw pictures of his recollection of the crime scene in my interview form.

Thanks, Mike

----- Original Message -----
**From:** Len Kachinsky
**To:** Crime Scene & Statement Analysis
**Sent:** Tuesday, May 09, 2006 7:20 PM
**Subject:** Brendan Dassey meeting on May 12th

Mike-- I will fax the the Sheboygan County Jail on Wed. morning. It is sitting in my printer at the office. As to the items below, I would suggest calling the Cal Co DA's office and talking to Shirley. Phone: (920) 849-1438. For item 11, I do not believe it exists in any unitary form.

Unless you think it would be a bad idea, I was planning on going to Sheboygan on Wed afternoon for a general pep talk and talk to him about giving a complete statement to you on Friday.

At 06:17 PM 5/7/2006, you wrote:
Sunday May 7, 2006

Len,

Please notify the watch commander of the Sheboygan County Jail facility that I will be meeting with Brendan Dassey on Friday May 12, 2006 when he is returned from the hearing at Manitowoc County Courthouse. I would like to start my meeting with Brendan upon his arrival.

I will be bringing recording devices such as a Sony digital camera and Sony camcorder and a Dictaphone portable audio recorder. I will have accessories such as a tripod and blank recording tapes. I will also be bringing my Toshiba laptop and Canon IP 90 portable printer and paper.

*I am cc'ing Prosecutor Ken Kratz, SA Fassbender and Det. Dedering with this email as they are in possession of the Discovery that I will need in my meeting.*

I will need copies of some of the Discovery such as:

1) Black/White aerial of crime scene (National Guard)

2) Color aerial of crime scene (law enforcement)

3) "For Sale" sign recovered from interior area of Steve Avery mobile home (front & back)

4) Color photos (by law enforcement) of Victims car in position on day of discovery (Nov 5, 2005)

5) Color photos (by Pamela/Nicole Sturm) of Victims car in position at time/day of discovery (Dis pg 58)

6) Recorded/transcribed interviews of the following subjects:
      A) Steve Avery
      B) Earl Avery
      C) Charles Avery
      D) Dolores Avery

7) Anonymous letter (envelope and contents) (Dis pg 224)

8) Photo of Suzuki inside Steve Avery garage (Dis pg 101)

9) Photos of interior of Steve Avery mobile home

10) 8 x 10 "Missing Person - Teresa Halbach" flyer

11) Electronic copy of available Discovery (photos, documents, reports and transcripts)

Thanks, Mike

Michael J. O'Kelly.
Private Investigator
Polygraph Examiner/Linguistic Analyst
1-800-366-8543  1-800-DONT-LIE
Crime Scene & Statement Analysis
Hughes, Dalton & Marcus, Inc

Truth Is But A Chameleon Within Our Words

cc:  Prosecutor Ken Kratz, SA Fassbender, Det. Dedering

**LEN KACHINSKY**
**OFFICE ADDRESS:  103 W. College Avenue #1010**
**Appleton, WI  54911-5782**
**Office: (920)993-7777**
**Fax:  (775) 845-7965**
**Car:  (920) 585-9926**
**Mobile after hours:  (920) 841-6706**
**Law Office e-mail:  len@sissonlaw.com**

**HOME ADDRESS:**
832 Neff Court
Neenah, WI 54956-0310
Home: (920) 725-0645

"Not for the glory. Not for the rush. Sometimes you just do what you have to do."

LEN KACHINSKY

Sisson and Kachinsky Law Offices

103 W. College Avenue #1010

Appleton, WI 54911-5782

Office: (920) 993-7777

Fax: (775) 845-7965

Car: (920) 585-9926

Mobile: (920) 841-6706

"Not for the glory. Not for the rush. Sometimes you just do what you have to do."

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 85 of 212    Document 19-6

APP-000491

1   STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                              BRANCH 3
2

3   ─────────────────────────────────────────────────────

    STATE OF WISCONSIN,
4
                       PLAINTIFF,        DECISION
5
    vs.                                  Case No. 06 CF 88
6
    BRENDAN R. DASSEY,
7
                       DEFENDANT.
8

9   ─────────────────────────────────────────────────────

10  **DATE:**    MAY 12, 2006

11  **BEFORE:**  Hon. Jerome L. Fox
                 Circuit Court Judge
12
    **APPEARANCES:**
13
                 KENNETH R. KRATZ
14               Special Prosecutor
                 On behalf of the State of Wisconsin.
15
                 LEONARD D. KACHINSKY
16               Attorney at Law
                 On behalf of the Defendant.
17
                 BRENDAN R. DASSEY
18               Defendant
                 Appeared in person.
19

20                  *  *  *  *  *  *  *  *

21               **TRANSCRIPT OF PROCEEDINGS**

22             Reported by Jennifer K. Hau, RPR

23                Official Court Reporter

24

25
                             1

```
 1              THE COURT:  Morning, counsel, morning

 2      ladies and gentlemen.  This is 06 CF 88.  State of

 3      Wisconsin vs. Brendan R. Dassey.  Appearances,

 4      please.

 5              ATTORNEY KRATZ:  The State of Wisconsin

 6      appears by Ken Kratz, Calumet County D.A.,

 7      appearing as special prosecutor.

 8              ATTORNEY KRATZ:  The defendant appears

 9      personally and with Attorney Len Kachinsky.

10              THE COURT:  All right.  Um, we are here

11      today for a decision on a motion to suppress.  Uh,

12      the defendant, Brendan Dassey, has brought this

13      motion requesting that the Court suppress statements

14      he made to Investigator Mark Wiegert with the

15      Calumet County Sheriff's Department and Agent Thomas

16      Fassbender of the Wisconsin Department of Justice.

17              The motion brought contends that the

18      statements made by Brendan Dassey were obtained

19      from him involuntarily and should, under the

20      applicable law, be suppressed.  The motion was

21      heard in this courtroom last Thursday, May 4.

22              Court heard testimony from Investigator

23      Wiegert.  It heard testimony from the defendant's

24      mother, Barb Janda, and Kris

25      Schoenenberger-Gross, a school psychologist for
```

2

1   the Mishicot School District.  The Court also
2   received, five exhibits during the course of the
3   hearing.
4           In addition, the Court has read the
5   relevant case law cited by the parties in their
6   briefs as well as a number of other pertinent
7   cases.
8           The Court has also reviewed the DVDs of
9   the interviews, read the transcripts and listened
10  to the audiotapes.  The audiotape in the form of
11  a CD.  Now, these electronic recordings are all
12  part of Exhibit 5.  Based on those exhibits, that
13  testimony, the briefs, and arguments of Counsel,
14  the Court makes the following findings of fact:
15          Number one.  The defendant, Brendan
16  Dassey, was born October 19, 1989, and was, at
17  the time of the police interviews in February and
18  March of 2006, 16 years of age.
19          Number two.  At the time of the police
20  interviews, he was a student at Mishicot High
21  School enrolled in mostly regular classes, but
22  also in some special education classes.  Testing,
23  it disclosed, an IQ level in the low average to
24  borderline range.  There is no evidence that he
25  suffered from any emotional disorder which made

3

1    him unusually susceptible or vulnerable to police
2    pressures.
3            Three.  Prior to his interviews which
4    are the subject of this motion, his only known
5    police contacts were on November 6 and
6    November 10, 2005, when he was questioned in
7    Marinette County about Teresa Halbach.
8            Number four.  The parties have
9    stipulated to the noncustodial nature of the
10   police interviews with Brendan Dassey on
11   February 27, 2006, and March 1, 2006.
12           Hearing Exhibit No. 1 is a **Miranda**
13   warning and waiver signed and initialed by
14   Brendan Dassey on February, uh, 27, 2006, at
15   3:21 p.m.  And Exhibit 2 is a **Miranda** warning and
16   waiver signed and initialed by Brendan Dassey on
17   March 1, 2006, at 10:10 a.m.
18           Number five.  Investigator Wiegert and
19   Agent Fassbender met with Brendan Dassey on
20   February 27, 2006, at Mishicot High School at
21   approximately 12:30 p.m.  He was told by them
22   that he didn't have to answer any questions and
23   he was free to go whenever he wanted.  Exhibit 5,
24   transcript page 440.
25           He was questioned for approximately an

                              4

1    hour and was again told he could stop answering
2    questions and could, quote, walk out anytime, end
3    quote.  Exhibit five, transcript page 467.

4           At the close of that interview, he gave
5    the investigators a written statement.  The
6    investigators both complimented him for giving
7    them a voluntary statement telling him they knew
8    how difficult it was to tell -- tell them the
9    details he divulged.  The interview ended at
10   2:14 p.m.  He returned to his eighth hour class
11   at Mishicot High School.

12          Number six.  At approximately 3:00 p.m.
13   on February 27, 2006, the same day of the earlier
14   interview, Brendan Dassey and his mother, Barb
15   Janda, met with the investigators at Mishicot
16   High School and agreed that Brendan Dassey could
17   do a videotape interview with the Two Rivers
18   Police Department.

19          Ms. Janda was asked if she wanted to be
20   present during the interview.  She said it was
21   not necessary.  And Brendan Dassey said he did
22   not care if his mother was present or not.

23          After he signed and initialed Exhibit 1,
24   the **Miranda** warnings and waiver, the
25   investigators interview Brendan Dassey about

                         5

1    certain events which he claimed occurred on the

2    night of October 31, 2005.

3            The interview lasted approximately 41

4    minutes and was conducted entirely in a

5    conversational tone of voice by the interviewers.

6    At no time during the interview did Brendan

7    Dassey appear visibly stressed or pressured by

8    the questions or conducts -- conduct of the

9    interviewers.

10           Number seven.  On March 1, 2006,

11   Investigators Wiegert and Agent Fassbender sought

12   and received permission from Brendan Dassey's

13   mother, Barb Janda, to speak with Brendan.  She

14   was to pick him up at the conclusion of the

15   interview.  Following her grant of permission,

16   Investigators Wiegert and Fassbender picked up

17   Brendan Dassey at Mishicot High School at

18   approximately 10:05 a.m. and transported him to

19   the Manitowoc County Sheriff's office, stopping

20   on the way at Brendan Dassey's residence so he

21   could retrieve a pair of blue jeans that the

22   investigators wanted for evidentiary purposes.

23           Number eight.  The conversation in the

24   car on the way to the sheriff's office was

25   electronically recorded except for the time spent

6

APP-000497

1    in Brendan Dassey's residence.  The three arrived
2    at the sheriff's office at approximately 10:43
3    a.m. and went to a carpeted interview room
4    equipped with videotaping equipment.
5            Shortly after arriving in the interview
6    room and while the videotape equipment had been
7    activated, Brendan Dassey was asked by
8    Investigator Wiegert whether he remembered his
9    *Miranda* rights that had been read to him and
10   whether he still wanted to talk to the
11   investigators.
12           He responded in the affirmative to both
13   questions by saying, quote, yeah, unquote, and
14   nodding his head.
15           Uh, number nine.  The interview between
16   Brendan Dassey and the two investigators lasted
17   approximately three hours during the course of
18   which Brendan Dassey made a number of inculpatory
19   admissions.  At no time during the interview was
20   Brendan Dassey handcuffed or otherwise physically
21   restrained.
22           On several occasions during the course
23   of the interview the investigators offered soda,
24   water, or food to Brendan Dassey and asked him if
25   he wanted to use the bathroom.  Throughout the

                              7

interview, Brendan Dassey was seated on an
upholstered loveseat.

Number 10. At various times during the
interview the investigators encouraged Brendan
Dassey to provide details to them by appealing to
his sense of honesty. Quote, honesty here is the
thing that's going to help you, end quote.
Exhibit 5, transcript page 541.

Quote, honesty is the only thing that
will set you free, uh, end quote. Exhibit 5, uh,
transcript 5 -- page 541.

Quote, come on Brendan, be honest. I
told you before that's the only thing that's
going to help ya here, end quote. Exhibit 5,
transcript page 547.

Quote, we just need you to be honest
with us. Exhibit 5, transcript page 584.

These are but a few example of
admonitions to be honest made to Brendan Dassey
by the investigators. The entire interview,
including the admonitions, was done by both
investigators in a normal speaking tone with no
raised voices, no hectoring, or threats of any
kind.

Nothing on the videotape visually

8

depicts Brendan Dassey as being agitated, upset,
frightened, or intimidated by the questions of
either investigator.  His demeanor was steady
throughout the actual questioning.

He displayed no difficulty in
understanding the questions asked of him.  At no
time did he ask to stop the interview or request
that his mother or a lawyer be present.  Instead,
he answered the questions put to him.

Sometimes he revised his answers after
being prodded to be truthful or being told by his
questioners that they knew his answer was either
incomplete or untrue and he should be honest.

These appeals to honesty made by the
interviewers were nothing more than a reminder to
Brendan Dassey that he had a moral duty to tell
the truth.

Number 11.  On occasion, the
interviewers purported to know details which, in
fact, were not true or which represented
uncorroborated theories of the crime in which
they presented to Brendan Dassey as factually
accurate in order to draw information from him.
In the context of this interview, the Court finds
that this tactic of misleading Brendan Dassey by

9

1  the interviewers occasionally pretending to know
2  more than they did was neither improper nor
3  coercive because it did not interfere with
4  Brendan Dassey's power to make rational choices.
5      Number 12. No frank promises of
6  leniency were made by the interviews to --
7  interviewers to Brendan Dassey. He was told,
8  quote, we can't make any promises, but we'll
9  stand behind you no matter what you did, end
10  quote. Exhibit 5, transcript page 541.
11      Quote, I want to assure you that Mark
12  and I are both in your corner. We're on your
13  side, end quote. Exhibit 5, uh, transcript page
14  540.
15      Quote, we don't get honesty here. I'm
16  your friend right now, but I gotta -- I gotta
17  believe in you, and if I don't believe in you, I
18  can't go to bat for you, end quote. Exhibit 5,
19  page 547.
20      Quote, we're in your corner, end quote.
21  Exhibit 5, page 547.
22      These and similar statements made by the
23  interviewers were an attempt to achieve a rapport
24  with Brendan Dassey and convince him that a
25  truthful account of events would be in his best

10

```
 1    interest.

 2              Based on those findings of fact, based

 3    on the record, the exhibits in this matter, the

 4    Court concludes, as a matter of law, the

 5    following:

 6              Under a totality of the circumstances

 7    test, which I'm using here, given Brendan

 8    Dassey's relevant personal characteristics as set

 9    forth in the previous findings and on the record

10    in this case, the State has met its burden by

11    showing by a preponderance of the evidence that

12    the statements made by Brendan Dassey to

13    Investigators Wiegert and Fassbender, and which

14    are the subject of this motion, were the product

15    of Brendan Dassey's free and unconstrained will

16    reflecting deliberateness of choice.  In short,

17    they were voluntary statements.

18              Accordingly, the defendant's motion to

19    suppress these statements is denied.  And, I

20    might add as a -- as a footnote or, perhaps, more

21    than a footnote here, the parties stipulated to

22    the fact that this was not -- either of these

23    interviews, the 27th of February, March 1 of

24    2006, were noncustodial interviews.

25              Uh, the Court, after reviewing the
```

11

```
 1    record, has determined that even had they been

 2    custodial interviews, that the appropriate

 3    *Miranda* warnings were given, were understood by

 4    this defendant, and, thus, had they been

 5    custodial -- had they been custodial interviews,

 6    uh, the result, uh, that the statements were

 7    voluntary would remain unchanged.

 8           Now, uh, Exhibit 5, which I've alluded

 9    to in the preface of -- of the findings, as well

10    as during the course of the findings, is, as I

11    noted at the last hearing, uh, an in camera, that

12    means in chambers, uh, exhibit.  The Court is

13    going to seal that exhibit, uh, and it will

14    remain sealed until the trial.

15           The Court believes, given the continuing

16    media scrutiny in this matter, that the

17    dissemination of Exhibit 5, uh, would have,

18    conceivably, a tendency to taint a jury pool.

19    It's my understanding -- And, gentlemen, correct

20    me if I'm wrong.  First you, Mr. Kratz, you have

21    no objection to proceeding in that fashion?

22           ATTORNEY KRATZ:  That's correct, Judge.

23           THE COURT:  Mr. Kachinsky?

24           ATTORNEY KACHINSKY:  I don't object either,

25    Your Honor.
```

12

```
 1          THE COURT:  All right.  Anything else on

 2    this before we move on to -- And I'm going to ask

 3    you, Mr. Kratz, to draft the order.

 4          ATTORNEY KRATZ:  I will -- I will do that,

 5    Judge.  Uh, Your Honor, I -- I know that the Court

 6    was reading from a -- a -- a prepared statement.  Is

 7    it possible that I can get a copy of that to, uh,

 8    amend or attach that to the order, or would the

 9    Court just prefer I indicate in the order, for

10    reasons stated on the record.

11          THE COURT:  Um, why don't you put, for

12    reasons stated on the record.  Or, I suppose, in the

13    alternative, you can ask the already overworked

14    court reporter to -- to type a transcript here.

15          ATTORNEY KRATZ:  I won't do that, Judge.

16    I'll just, uh, draft a generic order.  That's

17    fine.  Thank you.

18          THE COURT:  All right.  Um, the next item,

19    I believe, Mr. Kachinsky, is yours.  It's -- it's a

20    motion.  Do you want to be heard on your motion to,

21    uh, revise the terms of -- of the bail?

22          ATTORNEY KACHINSKY:  Um, yes, Your Honor.

23          ATTORNEY KRATZ:  Judge, before we get into

24    the -- to the merits of that, I --I wonder if I

25    could be heard just -- just briefly on, uh -- on
```

13

```
 1    that, uh -- on that procedure.  Um, because the,
 2    um -- one of the factors on any motion to modify
 3    bond, uh, directs the Court to consider the, uh,
 4    strength of the State's case.  Because of, uh, this
 5    morning's rulings, uh, it is the State's position
 6    that the strength of the State's case has become,
 7    uh, significantly, uh, solidified.
 8         Uh, let me also tell the Court that, um,
 9    and Mr., uh, Kachinsky, uh, is to be, uh, made
10    aware of this, that additional, uh, forensic
11    conclusions were received.  Additional reports
12    were received two days ago in our office which,
13    again, need to be revealed to this Court under
14    seal.
15         Lastly, Judge, the Manitowoc County, uh,
16    Corporation Counsel in a similar request made by
17    Mr. Avery, uh, made their position known, and I
18    don't know in this case if they've been invited
19    to do so.
20         With all of those factors, Judge, and
21    with the, uh, bond modification on the State's
22    part being at least an option, uh, I'm wondering
23    whether the Court would grant the State, uh, an
24    opportunity, perhaps five to seven days, to, uh,
25    file those matters with the Court to include, in
```

14

```
 1        camera, uh, the additional information that, uh,
 2        we have received, uh, and if the Court would be
 3        willing, uh, to allow a, uh, more inclusive bail
 4        modification hearing again in the next five to
 5        seven days.
 6              That seems to, uh, address those matters
 7        that I cannot relay to the Court in open court
 8        today, uh, and would provide this Court an
 9        opportunity to reflect upon, or at least
10        consider, the relative, uh, strength of the
11        State's case in the bail modification motion.
12              THE COURT:  When were the -- the -- When
13        was the forensic evidence of -- of which you make
14        mention received?
15              ATTORNEY KRATZ:  The 10th.  Two days
16        ago, Judge.
17              THE COURT:  All right.  Mr. Kachinsky?
18              ATTORNEY KACHINSKY:  Well, Your Honor, this
19        motion was filed, I believe, on the 24th or 25th
20        of -- of April, 2006.  Uh, State's aware, from
21        having prosecuted the Avery case as well, at least
22        as to, uh, the values of the property that's --
23        that's involved, uh, and, uh, other factors relating
24        to bond other than the recent forensics evidence,
25        uh, as to whether or not the motion would be granted
```

15

```
1     or not.  Um, I don't know if the State's forensic
2     evidence would add that much more to what the
3     Court's already ruled today in terms of the
4     admissibility of Mr. Dassey's statements.
5          So, it would be our -- our preference
6     that the Court, uh, proceed with the motion
7     and -- and make a ruling today.
8          THE COURT:  Well, let me ask you,
9     Mr. Kratz, is it your intention to, in effect,
10    request that -- that, uh, bail be revoked here and
11    no bail be allowed at all?
12         ATTORNEY KRATZ:  No, Judge.  But I am going
13    to be asking that bail be increased, uh, having the
14    Court now consider the relative strength of the
15    State's case.  That's in -- that's information I
16    didn't have until three minutes ago.
17         THE COURT:  All right.  Uh, the -- the
18    Court -- the Court is inclined, uh -- Since the
19    State says it -- it -- it has received some
20    additional information that -- that have -- may have
21    a bearing on the, uh, uh -- on the outcome of the
22    motion, the Court is inclined to -- to, uh -- to
23    adjourn this particular motion today, Mr. Kachinsky,
24    and -- and set, uh, uh -- set a near date for -- for
25    hearing on it.
```

16

APP-000507

```
 1              Uh, I don't have my calendar with me.

 2              ATTORNEY KRATZ:  I can file my motion by

 3      Wednesday, if that's okay, Judge.

 4              THE COURT:  Okay.

 5              ATTORNEY KRATZ:  If the Court can give me

 6      five days to do that, I -- I can certainly have that

 7      to the Court and Mr. Kachinsky.

 8              THE COURT:  So that would be, uh, Wednesday

 9      the 17th.  Um, all right.  Could, um -- Well, I

10      think what we'll -- we'll -- we'll do, uh,

11      following -- uh, following business in this court

12      today is -- is, uh, discuss a motion date in

13      chambers.  I have to, uh -- I have to take a look at

14      the calendar and you, gentlemen, probably do have to

15      look at yours as well, and there's some other

16      matters we should be discussing.

17              So, I am going to, uh, grant the -- the

18      State's motion to adjourn, order that, uh --

19      order that the revised motion or information be

20      filed by Wednesday, May 17.  Um, any other

21      matters to come before the Court today?

22              ATTORNEY KACHINSKY:  Your Honor, perhaps,

23      just to avoid unnecessarily calling, a -- a witness,

24      I don't know if the State disputes at all the value

25      of the property that's involved, I could submit to
```

17

1  the Court, uh, extra copy of the appraisals that
2  were made and, I believe, perhaps, submitted in the
3  Avery case.
4         If that's not the issue, if the issue is
5  this additional evidence regarding the State's
6  case, if that -- at least that portion of the,
7  uh, motion was taken care of, uh, that would,
8  perhaps, facilitate some of the inconvenience
9  that this delay is going to cause us.
10        ATTORNEY KRATZ:  How about if we do this,
11  Judge, I'm willing to share with Mr. Kachinsky my,
12  uh -- my feelings on that after going through the
13  documents and at least alert him whether or not
14  we'll need a witness at that next hearing.
15        THE COURT:  Well, I -- I noticed in his
16  motion -- in Mr. Kachinsky's motion -- he said that
17  he had sent you some documentary, uh, proof as to
18  values that he was claiming in motion.
19        ATTORNEY KRATZ:  He -- he brought some with
20  him today as well.
21        THE COURT:  Yeah.  Well, is there any
22  reason we can't just have those marked and be part
23  of the record?
24        ATTORNEY KRATZ:  No.  That's fine.
25        THE COURT:  Yeah.  Let's do that.  And the

18

APP-000509

```
 1      bailiff was kind enough to bring a calendar here so
 2      let's take a look.  How about Friday?  The
 3      afternoon?  Friday, May 26?
 4              ATTORNEY KRATZ:  State's available, Judge.
 5              ATTORNEY KACHINSKY:  The only thing -- Uh,
 6      I've got something in Chilton, but, perhaps, that
 7      can be, uh, taken care of, Your Honor.
 8              ATTORNEY KRATZ:  I'll see what I can do,
 9      Judge, to --
10              THE COURT:  How about 1:15?
11              ATTORNEY KACHINSKY:  Sure.
12              THE COURT:  Anything else, gentlemen?
13              ATTORNEY KRATZ:  Judge, I have to, uh,
14      place on the record, and receive the Court's
15      acquiescence, as the information that I intend to
16      provide certainly has not been publicly disclosed
17      and would, uh, I believe, be the kind of information
18      that the Court, uh, likely would not want disclosed.
19      May I file my motion to amend under seal as well?
20              THE COURT:  All right.  It -- it will be
21      received as -- as an in camera motion, or at least
22      the exhibits to the motion, and -- and anything in
23      the motion that, uh, would be revelatory will be
24      received as an -- an -- as an in camera motion.
25              ATTORNEY KRATZ:  That's fine, Judge.
```

19

APP-000510

```
 1                    THE COURT:  Anything further?
 2                    ATTORNEY KRATZ:  No.
 3                    ATTORNEY KACHINSKY:  And, Your Honor, the,
 4       uh, appraisal's been marked.  I don't know if we're
 5       going to -- I didn't see what letter you --
 6                    THE CLERK:  One.
 7                    ATTORNEY KACHINSKY:  As Exhibit 1.
 8                    THE COURT:  Okay.  The appraisal will be,
 9       uh, Exhibit 1 and it will be part of the -- the
10       motion, uh, and, uh, Mr. Kratz, do you have any
11       objection to the appraisal?
12                    ATTORNEY KRATZ:  No.
13                    THE COURT:  I mean, you're not --
14                    ATTORNEY KRATZ:  Not to -- not to its
15       receipt for this hearing, Judge.
16                    THE COURT:  All right.  All right.
17       Anything else?
18                    ATTORNEY KRATZ:  No.  Thank you, Judge.
19                    ATTORNEY KACHINSKY:  No.
20                    THE COURT:  Could I see you both in about
21       ten minutes in chambers, please?
22                    ATTORNEY KRATZ:  Yes, Judge.
23                    THE COURT:  Thanks.  We're adjourned.
24                    (PROCEEDINGS CONCLUDED.)
25
```

20

APP-000511

ORIGINAL

| State of Wisconsin | Circuit Court Branch III | Manitowoc County |

STATE OF WISCONSIN

      Plaintiff,

vs.

BRENDAN R. DASSEY,

      Defendant,

ORDER DENYING
DEFENDANT'S MOTION TO
SUPPRESS STATEMENTS

Case No. 06-CF-88

The defendant, having filed a Motion to Suppress Statements in this matter; the State having objected to said motion; and the Court having received evidence and having heard oral arguments on May 4, 2006, as well as considering additional evidence which has been "sealed" and made part of the record;

NOW, THEREFORE, IT IS ORDERED that, for reasons articulated on the record on May 12, 2006, the defendant's Motion to Suppress Statements is denied.

Dated this _____ day of May, 2006.

BY THE COURT:

Jerome L. Fox
Circuit Court Judge, Branch III

MANITOWOC COUNTY
STATE OF WISCONSIN
FILED

MAY 16 2006

CLERK OF CIRCUIT COURT

APP-000513

## Transcript of May 12, 2006 Meeting Between Michael O'Kelly and Brendan Dassey

**BD:** They were trying to do my bail today.

**MOK:** What do you understand is going to happen with your bail?

**BD:** I don't know.

**MOK:** Give me an idea what you think.

**BD:** That they might raise it or something.

**MOK:** They might what?

**BD:** Raise the price.

**MOK:** That's a possibility. Let's do this: I'll show you some things here that I've laid out for you. This is your polygraph. Can you read up here?

**BD:** [Shakes head no.]

**MOK:** You can't see that far? Can you see what color it is?

**BD:** Red.

**MOK:** Okay. I'll read...well, I'll read it for you. It says deception indicated. Probability of deception is point 98. That's 98%.

**BD:** So, what does that mean?

**MOK:** What do you think that means?

**BD:** That I passed it?

**MOK:** It says deception indicated.

**BD:** [pause*] That I failed it.

**MOK:** Yes. That doesn't surprise you. Let me show you some things. This is the original poster for Teresa Halbach. Okay. This is Teresa's website; this is her family. You see them in court right? OK. This is the last thing that Teresa saw. She saw this sign right here. Do you recognize that sign? What does this sign say?

**BD:** Dead end.

**MOK:** OK. It's pretty...it's pretty prophetic, isn't it?

**BD:** [nods yes]

**MOK:** And this right here, what is that picture right there?

**BD:** Our driveway.

**MOK:** And where is it going to?

**BD:** My mom's house, and Steve's house.

**MOK:** OK so, Teresa sees this sign right here that says dead end and she goes down that road, right, and she ends up over here at this red house, right? Whose red house is that?

**BD:** Steven's.

**MOK:** OK, she ends up in the bedroom. Top picture – like that? Before there, she has to go down the hallway, right? [showing pictures] That's right? Okay. Do you recognize this? It's inside Steven's. Can you think where that might be in his house?

**BD:** Never seen it before.

**MOK:** OK. Do you recognize this right here?

**BD:** What I seen on TV, yeah.

**MOK:** OK, what do you think it is?

*In this transcript, a "pause" denotes a silence lasting 15 – 30 seconds. A "long pause" denotes a silence lasting over 30 seconds.

1

MANITOWOC COUNTY
STATE OF WISCONSIN
FILED

MAR 3 1 2010

CLERK OF CIRCUIT COURT

**BD:** The, the stuff that they found on the...[inaudible]
**MOK:** Whose car is that?
**BD:** I don't know.
**MOK:** Whose do you think it is?
**BD:** Teresa's.
**MOK:** Why do you think it's hers?
**BD:** 'Cause they said that it was a Toyota, and on the back it says Toyota.
**MOK:** Recognize this blue ribbon here?
**BD:** Um...I seen it on TV once.
**MOK:** OK. Maybe looks something like this right here?
**BD:** Yeah
**MOK:** You know what building that is right there? That's Teresa's church. [pause]
Now let me tell you this. I know everything I need to know at this stage, except for two
things. There are two things I don't know. OK. What do you think they might be?
**BD:** I don't know.
**MOK:** Think about it. [long pause]
**BD:** [muffled] Maybe if...
**MOK:** You have to put your hands down. I, I can't hear you.
**BD:** Maybe if I'd've helped him or something.
**MOK:** Continue.
**BD:** Or if I helped him with any of this.
**MOK:** Continue.
**BD:** [pause; inaudible]
**MOK:** 'Kay, there're two things I don't know is, and the two things I don't know are you
sorry for what you did and will you promise not to do it again. Those are the two things I
don't know. I know everything else that I need to about this case except for those two
things. So, what I want you to do is make a decision. I want you to read this form, and
then we're going to fill it out. You mark the boxes where you think the boxes should be
marked.
**BD:** [reads form silently]
**MOK:** Are you sorry?
**BD:** I don't know, because I didn't do anything
**MOK:** Brendan, if you're not...look at me. If you're not sorry, I can't help you. What I
don't want you to do is spend the rest of your life in prison. Can you look at me? Do
you want to spend the rest of your life in prison? [BD shakes head no] You did a very
bad thing.
**BD:** Yeah, but I was only there for the fire though.
**MOK:** Brendan, you haven't told me the truth yet. Listen to me very carefully. I want
you to look at me. Brendan? Brendan, look at me please. This is your choice. Listen
very carefully. Somebody is going to cooperate and tell the truth. I'd prefer it's going to
be you. If it's not, because your confession has been admitted, you heard that today.
Right now they're asking for life plus a hundred and...plus seventy-two years. Now
that's your greatest exposure right now. If you tell the complete truth, the complete truth,
not just part of the truth, there's a door open for you. You will still have to serve some
time in prison; you don't get to go home now. Somebody died. But this is your chance
to tell the truth. If Steve Avery decides to get up and lie and testifies against you, then he

2

may get an offer and a deal with the prosecutor's office and that's my concern. 'Cause right now, only the two of you know what happened inside that crime scene. You know what happened, you know why it happened, you know what time it happened. But like I said, I don't know if you're sorry, I don't know if you'll promise not to do this again. Those are the two things I don't know. Steve right now is saying that you're to blame for part of this and so is Bobby. Are you aware of that?

**BD:** [shakes head no]

**MOK:** Is Bobby to blame for any of this?

**BD:** No.

**MOK:** Did he see the girl?

**BD:** Well, he seen her when he left to go bow hunting.

**MOK:** OK. Steve says that, that she and Bobby were together. Is that the truth?

**BD:** No.

**MOK:** How do you know it's not the truth?

**BD:** Because I'm friends with, ah, the guy, the friend's brother, and they said that they go hunting together.

**MOK:** Remember how you told Detective Wiegert – his name is Mark, right? He's a pretty good guy, right?

**BD:** I don't know.

**MOK:** He was nice to you?

**BD:** [slight noncommittal gesture]

**MOK:** Do you remember telling Mark about a bullet? D'you remember that?

**BD:** I never seen the gun that day.

**MOK:** Well, guess what? What you described to Mark and to Special Agent Fassbender turned out to be completely true, because the DNA is from Teresa is on one of the bullets that's in the garage on the floor. [shows picture] That's the bullet. [long pause; eventually BD starts writing on form] What'd you decide to do?

**BD:** Check I am very sorry for what I did.

**MOK:** That's a good beginning. Continue.

**BD:** [writes]

**MOK:** Now, Brendan, stop for a second. The last time you and I were here, what you wrote was not the truth. Do we agree with that?

**BD:** [long pause] Maybe some of it.

**MOK:** Well part of the truth was that you got up that day and went to school, so yes there was some truth. But everything else you said wasn't the truth. And what I don't want you to do now – can you look at me for a second? What I don't want you to do right now is tell me any more lies. 'Kay 'cause if you lie to me, guess what I have to do? I have to stand up, put everything away, and leave. Because that means that you want to go to prison for the rest of your life. If you want to go to prison for the rest of your life because you're going to hang onto some lies, then I can't help you. When you're all through telling the truth tonight, then you and I have to talk about something else. Would you like to know what that is? It's a good thing.

**BD:** Like what?

**MOK:** You get to tell me all about your family history and what got you to this point last October 31 that caused all these problems to happen. I have to unravel all of that and ask the court to consider leniency based upon your family history and what's happened to

3

you. But I can only do all these things if you tell the truth. If you, if you say even one single lie, I cannot help you at all. So, you've got to make a decision before you start writing anything, you're going to write the complete truth, no matter what the truth is, 'cause then Mike can help you. If you write a lie, then Mike can't help you at all. So, the first question you have to ask yourself is, do you want to spend the rest of your life in prison? [inaudible from BD] So is that a yes or a no? I can't hear you.

**BD:** No.

**MOK:** 'Kay, you want me to try and help you? [pause] I specialize in working with folks like yourself. To make sure that you don't go to prison for the rest of your life. Do you want to get out and have a family some day?

**BD:** [nods yes]

**MOK:** That means you have to cooperate with me and have me work with you. And how much you cooperate, how much you help me, will depend upon what happens with you.

**BD:** [writes; long pause]

**MOK:** Do you need more room? Need more paper?

**BD:** [shakes head no]

**MOK:** 'Scuse me. [Picks up BD's statement] Is there anything missing from this statement here?

**BD:** No.

**MOK:** Is Ter...is Teresa in that statement?

**BD:** No.

**MOK:** Well, then it's missing. Then it's not a truthful statement. [Long pause] I want you to read this right here. Out loud.

**BD:** I am very sorry for what I did.

**MOK:** Okay. What does it say down here?

**BD:** I promise I will never do this again.

**MOK:** Are those the truth?

**BD:** [pause]

**MOK:** Are you really sorry? And that's a question. [long pause] If you're not sorry for what you did, I can understand that too. I just need to know which one it is. [pause] If you are sorry, that's one kind of person. If you're not sorry, that's a different kind of person. And of course I can't help the people who aren't sorry. So are you sorry? Is that a yes or no?

**BD:** I don't know.

**MOK:** You don't know if you're sorry or not? [long pause] Would you do this again?

**BD:** [shakes head no]

**MOK:** Why not?

**BD:** 'Cause I didn't do nothing.

**MOK:** That's not true.

**BD:** I was only there for the fire.

**MOK:** Well, I wish that was true.

**BD:** It is.

**MOK:** You were also in the mobile home.

**BD:** Not that day, though.

**MOK:** And you were in the garage.

4

**BD:** Only for a little bit, though.

**MOK:** That's because she was in the garage too.

**BD:** [shakes head no]

**MOK:** Brendan, I want you to understand something. I want you to look at me. So I know you can hear me. [grasps Brendan's arm] Come on, look at me.

**BD:** The only thing that was in the garage was a lawnmower and a, ah, snowmobile.

**MOK:** Brendan, you have the details. You gave the details to the police department.

**BD:** Yeah. They were false.

**MOK:** Well, they turned out to be true.

**BD:** That's 'cause I had too much stuff on my mind. That's why I agreed that whatever they said.

**MOK:** Well you gave them details.

**BD:** Yeah, but they told me that they knew it all what had happened already.

**MOK:** And you gave them information that they didn't already have.

**BD:** That's 'cause I was guessing.

**MOK:** Well you guessed pretty accurately about a whole bunch of details. And you couldn't guess with all those details. That's why the bleach is on your pants. That's why the bullet has Teresa's DNA. Right here in the garage. This is what you can do. Either try and help yourself; you can do what's right; and I'll help you through this process and you will not be doing life in prison. [long pause] And just so you know, just so you're perfectly clear, I want you to testify against Steven Avery and tell the truth. And this is how I can help you. If you decide not to, I want you to understand that your confession is coming in. And when your confession is in, no matter what it is, truth or not truth or anything else, when your confession is in, there's nothing I can do to help you then. So right now we're at the stage that I can help you. But I can't help you with those words that you wrote down. Those words, I can't help you at all. [long pause] If you want to stay in prison the rest of your life, then don't...then let's just take those words and say that's it. Is that what you want to do – prison for the rest of your life?

**BD:** [shakes head no]

**MOK:** Well, now's the chance to help yourself. But you can't help yourself with those words. 'Cause you and I both know that that is not the truth. There's missing information.

**BD:** [writes; long pause]

**MOK:** Here use this one [hands BD a sheet of paper] Finished?

**BD:** [writes]

**MOK:** Go to the next page then.

**BD:** [writes]

**END OF DVD 1**

**BEGIN DVD 2**

[BD writing]

**BD:** What'd happen if that's the only four pictures that I, that I can draw?

**MOK:** OK. What's this right here?

**BD:** Where he's got the gun.

5

**MOK:** He's shooting her there? And where is he stabbing her?

**BD:** He does it before that.

**MOK:** Where?

**BD:** In the garage.

**MOK:** OK. Why don't you draw another picture over here about him stabbing her? [BD draws] OK. And where did you have sex with her at?

**BD:** In the house.

**MOK:** OK. Why don't you draw a picture down here of you having sex with her there? [BD draws] And what do, what do you have right there?

**BD:** Two people on the bed.

**MOK:** And what's that – what's next to it?

**BD:** Steven.

**MOK:** Was he watching?

**BD:** [nods yes]

**MOK:** OK. And where'd you stab her at? And cut her hair? In the house or in the garage?

**BD:** I cut her hair in the house and stabbed her outside.

**MOK:** OK. Was she alive when you stabbed her?

**BD:** No.

**MOK:** Why'd you stab her then?

**BD:** Steve told me to.

**MOK:** Where did she actually die at?

**BD:** In the garage.

**MOK:** So she was alive in the garage when you took her out there?

**BD:** [nods yes]

**MOK:** Was she screaming?

**BD:** Yeah.

**MOK:** What was she saying?

**BD:** [long pause] Like not to do what Steve tells me to do.

**MOK:** What were her exact words?

**BD:** Don't listen to him.

**MOK:** OK. Draw a picture down here of you cutting her hair. [BD draws] And where's this at? [BD writes] Is she in the bedroom, or in the…I mean, in the bed, or where?

**BD:** Lying on the bed.

**MOK:** OK. [BD writes] And how come she didn't get up from – from the bed?

**BD:** Because she was tied down.

**MOK:** What was she tied down with?

**BD:** Like, rope.

**MOK:** And what else?

**BD:** Cuffs.

**MOK:** What kind of cuffs?

**BD:** Leg cuffs.

**MOK:** I'm sorry?

**BD:** Leg cuffs.

**MOK:** I don't know what you mean.

**BD:** Like the ones that they put on their legs.

6

**MOK:** So they had chains?

**BD:** [nods yes]

**MOK:** OK. OK, why don't you do this – why don't you draw a picture of the bed and how she was tied down? But draw – draw a big size so we can see it.

**BD:** [draws] So how should I draw the chains though?

**MOK:** I don't know – I didn't see it so I can't help you.

**BD:** So, circles?

**MOK:** OK. [BD draws] What about her hands – are they chained also?

**BD:** [inaudible]

**MOK:** What do you think was there?

**BD:** Rope.

**MOK:** OK, go ahead and put the rope then.

**BD:** [draws]

**MOK:** Was she wearing clothes at this time?

**BD:** No.

**MOK:** Where were her clothes at?

**BD:** On the floor.

**MOK:** Can you put them where they were?

**BD:** [draws] Should I draw like a t-shirt in there?

**MOK:** Whatever you want to do.

**BD:** [draws]

**MOK:** And what is that?

**BD:** Pants and a shirt.

**MOK:** OK. What about shoes?

**BD:** [draws]

**MOK:** OK. Anything else?

**BD:** No.

**MOK:** OK. Is this the bed that she was tied to? [shows BD photograph of headboard] Where did the rope go to? Can you show me here?

**BD:** Right here [points to photograph of headboard].

**MOK:** OK, why don't you put an X right there then. [BD draws on photograph] And what about the other side? [BD draws on photograph] OK. What was she sayin' when she was tied up like this?

**BD:** Telling Steven to let her go.

**MOK:** And what did Steven say?

**BD:** That he wasn't gonna.

**MOK:** What did he tell her?

**BD:** That he wouldn't let her go cause she would probably go to the police.

**MOK:** What else did he say?

**BD:** That's it.

**MOK:** How long was he planning this?

**BD:** I don't know.

**MOK:** What's your idea?

**BD:** [long pause] I could have a reason why he could have did it.

**MOK:** Go ahead.

**BD:** That I think he wanted to do it because like maybe he wanted to go back to jail.

7

APR-000520

**MOK:** Why do you think that?

**BD:** Because, uh, some days he couldn't control his temper, and so the whole family told him to go see the people that you go talk to about your feelings and that. And he, he got pissed off and he went for a ride.

**MOK:** What time did you go to the trailer that day? The real time.

**BD:** 8:00.

**MOK:** So you were cutting her hair and having sex with her after 8:00? So she was alive until then? How did you know she was in the trailer?

**BD:** He told me to follow him to help.

**MOK:** And what happened next?

**BD:** He showed me her and then told me to have sex with her.

**MOK:** Continue.

**BD:** And I looked at him and I, I was thinking of going home but then I seen that he -- I thought he was too strong for me, so I, I did it.

**MOK:** Continue.

**BD:** Then after I was done I cut off her – he told me to cut some hair off and then when we were done we took her off and we brung her outside into the garage and then he stabbed her and then shot her.

**MOK:** How did she get from the bed to the garage?

**BD:** He carried her.

**MOK:** How?

**BD:** In his hands.

**MOK:** Describe it.

**BD:** Um...[long pause] Like he had her in his hands, like...her legs were right here and her back was right there.

**MOK:** OK.

**BD:** And when he had his hands like this, he had the gun in his hands.

**MOK:** And where'd he get the gun from?

**BD:** In the bedroom.

**MOK:** What kind of a gun was it?

**BD:** Twenty-two.

**MOK:** OK. And what was she saying while this was happening?

**BD:** Saying not to do it and to let her go.

**MOK:** And how come she didn't run away?

**BD:** She was trying to.

**MOK:** What was she doing?

**BD:** Like, squirming, trying to get away from him.

**MOK:** What stopped her from getting away?

**BD:** He was holding her too tight.

**MOK:** And what else?

**BD:** She was tied up.

**MOK:** How was she tied up?

**BD:** Her feet were tied and her hands.

**MOK:** Why don't you draw a picture right here of how she was tied up.

**BD:** [draws]

**MOK:** OK. Was she wearing any clothes?

8

**BD:** No.

**MOK:** What happens next?

**BD:** Then he stabbed her and then he shoots her and then we put her into the fire.

**MOK:** And she was still alive when you put her in the fire?

**BD:** No.

**MOK:** How do you know?

**BD:** 'Cause she wasn't moving.

**MOK:** When did she stop moving?

**BD:** When he shot her.

**MOK:** Where did he shoot her at?

**BD:** In the stomach.

**MOK:** And where else?

**BD:** In the heart.

**MOK:** In where?

**BD:** In the heart.

**MOK:** The heart? And how do you know he shot her in the heart?

**BD:** [pause] I don't know, just guessing because I wasn't even looking.

**MOK:** Did you see him shoot her?

**BD:** No, because I can't look at that stuff.

**MOK:** How do you know he shot her then?

**BD:** Because I heard the gunshots.

**MOK:** Maybe he was shooting at you.

**BD:** [shakes head no; pause]

**MOK:** What was she saying while he was shooting her?

**BD:** To stop.

**MOK:** What did she sound like exactly?

**BD:** [long pause] She was crying and saying to stop what he was doing.

**MOK:** Was there blood in the garage?

**BD:** Yeah.

**MOK:** Whose blood was it?

**BD:** Hers.

**MOK:** And how do you know it was her blood?

**BD:** Because when I cleaned it up, that's where the spot that he shot her was.

**MOK:** How many times do you think he shot her?

**BD:** Five times.

**MOK:** And why do you think five?

**BD:** That's how much shots I heard.

**MOK:** Was the fire already going in the – in the pit?

**BD:** You mean behind the garage?

**MOK:** Yes.

**BD:** Yeah.

**MOK:** Was it a small fire?

**BD:** Not really.

**MOK:** How did she...how did she get in the fire?

**BD:** He carried her.

**MOK:** And where's the knife that he used to stab her?

9

**BD:** I don't know what he did with it.

**MOK:** Where'd you last see it?

**BD:** In the garage.

**MOK:** Where in the garage?

**BD:** Right behind the lawnmower.

**MOK:** Behind the lawnmower? Was it hidden?

**BD:** No, it was just laying on the floor.

**MOK:** Describe the knife to me. Let's draw a picture of the knife, how's that? [hands paper to BD]

**BD:** How big?

**MOK:** The bigger the better so you can have details.

**BD:** [draws] I don't know how to draw the details.

**MOK:** Just draw it how you think it should be.

**BD:** Somethin' like that.

**MOK:** And describe these parts, what they look like.

**BD:** Like the color and that?

**MOK:** Everything. Sure.

**BD:** [draws/writes]

**MOK:** And how long is it?

**BD:** [draws/writes]

**MOK:** Is the whole thing eight inches?

**BD:** [nods yes]

**MOK:** And where'd it come from?

**BD:** In the house.

**MOK:** Where in the house?

**BD:** In the kitchen.

**MOK:** Did you see it?

**BD:** No.

**MOK:** How do you know it came from the kitchen?

**BD:** 'Cause, um, she was still tied up on the bed, he went in the kitchen and got it.

**MOK:** OK. Go ahead and put from the kitchen then.

**BD:** [writes]

**MOK:** Where's the first place that she was stabbed at?

**BD:** In the garage.

**MOK:** OK. When did you know he was going to kill her?

**BD:** [pause] I don't know.

**MOK:** When did he tell you he was going to burn her?

**BD:** That night.

**MOK:** Did she know that he was going to burn her?

**BD:** What do you mean?

**MOK:** Did he tell her? Did she hear him say that he was going to burn her?

**BD:** No.

**MOK:** How many times did he have sex with her?

**BD:** I don't know.

**MOK:** What did he tell you about him having sex with her?

**BD:** He didn't tell me nothing.

10

APP-000523

**MOK:** And did he have sex with her then?

**BD:** I guess, I don't know where though

**MOK:** Did he use any, any sex toys on her?

**BD:** I don't know.

**MOK:** Do you know what a sex toy is?

**BD:** No.

**MOK:** It's something that you put in the girl's vagina. And it vibrates sometimes. Was that used on her that day?

**BD:** Not that I know of.

**MOK:** Was anything used on her at all?

**BD:** No.

**MOK:** OK. Did you see him touch her at all?

**BD:** Just to pick her up off the bed and that.

**MOK** OK, when she was in the garage, where was her car?

**BD:** I don't know, I never seen it.

**MOK:** It wasn't in the garage?

**BD:** No.

**MOK:** What was in the garage besides Teresa, Steve, and you?

**BD:** Just the snowmobile and the lawnmower.

**MOK:** The snowmobile – was it, was the snowmobile, uh, on the trailer?

**BD:** No.

**MOK:** OK, and the lawnmower – is it a riding lawnmower?

**BD:** Mm-hmm.

**MOK:** Let's do this. [hands paper to Brendan] I want you to draw a picture of the garage, where you were, where Teresa was, where Steve was, and where the lawnmower and the snowmobile was. Please.

**BD:** Should I just draw a square?

**MOK:** Sure. But draw a big picture so we can see.

**BD:** Yeah, I mean for the lawnmower.

**MOK:** OK, sure.

**BD:** [draws] Should I say that this door was open?

**MOK:** Whatev...whatever the truth is.

**BD:** That's me there.

**MOK:** That's you? OK. The door's open?

**BD:** [nods yes]

**MOK:** Everybody can see you? [MOK changes cassette tape] So the garage door is open? How about this door right here, is that open?

**BD:** Just a little bit.

**MOK:** OK. And what's happening over here?

**BD:** That's where he set her on the floor and then stabbed her and shot her and that.

**MOK:** OK. And you stabbed her over there too?

**BD:** [nods yes]

**MOK:** How many times?

**BD:** Once.

**MOK:** Where at?

**BD:** In the stomach.

11

**MOK:** And where did he stab her at?

**BD:** In the stomach.

**MOK:** You think she was in a lot of pain?

**BD:** Yeah.

**MOK:** Why do you think she was in a lot of pain?

**BD:** She was telling him that it hurts.

**MOK:** What was she saying?

**BD:** She was crying.

**MOK:** How much?

**BD:** A lot.

**MOK:** What do you call a lot?

**BD:** Her tears were always running down her, one after another.

**MOK:** How long was she crying?

**BD:** Until he shot her

**MOK:** Continue.

**BD:** Then after that he took her outside and put her on the fire.

**MOK:** Continue.

**BD:** Then we were just standing, like, probably 15 feet away from the fire and, and, my mom came home. She went in the house and called Steven on her cell phone and told him that I would have to be home at ten o'clock. And she asked if I had a sweater on.

**MOK:** Continue.

**BD:** That at at nine o'clock about. And so we waited for a little bit and then the fire went down and so...oh, actually we threw some stuff on there and we waited for the fire to go down. Then when we...when it did, it was about like ten o'clock so Steve told me that I should go home and go to bed. So I did and I, when I got home I talked to my mom a little bit, like how her day was and that. And I went to sleep.

**MOK:** Did you sleep pretty good that night.

**BD:** Not really.

**MOK:** Explain.

**BD:** Well, I only got 3 hours of sleep. 'Cause at school I was, I was in my, ah, third hour class and then like in the middle of third hour everybody was laughing because my head was like bobbin', bobbing down like – I don't know how to explain it, where your head goes like bobbing.

**MOK:** What was Steve saying while she was in the fire burning?

**BD:** Not much.

**MOK:** What were his words?

**BD:** That I should keep my mouth shut.

**MOK:** Continue.

**BD:** That's it.

**MOK:** OK. Where was the Suzuki at while this was happening?

**BD:** The, the gray Suzuki?

**MOK:** Yes.

**BD:** On the side of the garage, like right here.

**MOK:** OK. How did he get her car down to – down to the pit?

**BD:** I don't know.

**MOK:** I heard that, ah, that Chuck and Earl knew it was down there.

12

APP-000525

**BD:** I don't know.

**MOK:** Did you hear anything like that?

**BD:** No.

**MOK:** Let me show you – do you, do you know where the car was found?

**BD:** I seen a picture.

**MOK:** Why don't you walk over here, I'll show you.

**BD:** [gets out of seat, moves off camera]

**MOK:** [off camera] You see right there?

**BD:** Yeah.

**MOK:** The car was in the middle of the road facing that way. This is, this is the car. This is his house. How'd he get it over there? Did you, did you see the car any place there at all?

**BD:** No.

**MOK:** You never did?

**BD:** But I know there's a back road that goes [partially inaudible]

**MOK:** Then go…show me how.

**BD:** It would go like…then it goes down here.

**MOK:** 'Kay, and then how, then how?

**BD:** [inaudible]

**MOK:** OK. And drive back here? OK. [MOK and BD return to seats on camera] Let's do this. I want you to take the red pen and… This is the garage? [pointing to BD's drawing] OK, put the word garage there so you know it's the garage. Okay, at what time is she over here?

**BD:** Should I write it down?

**MOK:** Oh yes please.

**BD:** [writes]

**MOK:** And then put the name of the person here and the name of each one of these people here, please.

**BD:** How do you spell Teresa?

**MOK:** However you think it should be spelled.

**BD:** [writes/draws]

**MOK:** OK, good. 'Kay, and then this was the knife that was used to stab her?

**BD:** [nods yes]

**MOK:** Go ahead and write that then so we know what it is.

**BD:** [writes]

**MOK:** And put her name there.

**BD:** [writes]

**MOK:** Okay, and then describe what these things are; please.

**BD:** [writes]

**MOK:** OK, what does that say?

**BD:** Bed where Teresa was roped and chained.

**MOK:** OK. And who's this person here?

**BD:** Teresa.

**MOK:** Go ahead and put – write what everything is, please.

**BD:** [writes]

**MOK:** OK, and what's this down here?

·13

**BD:** [writes]

**MOK:** 'Kay, and what's happening with her?

**BD:** [writes]

**MOK:** And where'd the rope come from?

**BD:** The rope that he used right there?

**MOK:** Yes, where'd this rope come from?

**BD:** In the garage.

**MOK:** Okay, where...can you describe the rope? You can start with what color it is.

**BD:** Like a yellowish.

**MOK:** OK, go ahead and write it down here. [BD writes] And how do you know it came from the garage?

**BD:** Because he had quite a few ropes in the garage that I seen sometimes when I go over there.

**MOK:** And describe what these things over here are, please.

**BD:** [writes]

**MOK:** And whose are these?

**BD:** [writes]

**MOK:** Okay. Teresa's clothes?

**BD:** [writes]

**MOK:** And what happened to them?

**BD:** They ended up in the fire.

**MOK:** And how do you know that?

**BD:** Because that's what we used to clean up the reddish-black stuff.

**MOK:** Explain.

**BD:** Like he would throw that, the bleach in there on the where the spots where the blood was and we'd use the clothes to try to get it cleaned up.

**MOK:** And whose clothes were they using?

**BD:** Hers.

**MOK:** OK. How do you know it was her clothes?

**BD:** He told me to grab them.

**MOK:** And did you?

**BD:** [nods yes]

**MOK:** And where'd you get them from?

**BD:** From right there on the floor.

**MOK:** So, where, where was he when he told you to grab the clothes?

**BD:** He was right here getting, grabbing her.

**MOK:** And what was she doing while he was grabbing her?

**BD:** Trying to get away.

**MOK:** How was she trying to get away?

**BD:** Trying to squirm out of his, his grip.

**MOK:** Were you holding her also?

**BD:** No.

**MOK:** Not even for a minute?

**BD:** [shakes head no]

**MOK:** Why not?

**BD:** I was grabbing the clothes and the shoes.

14

APP-000527

**MOK:** And what was she saying?

**BD:** To let her go.

**MOK:** Was she begging for mercy?

**BD:** Yeah.

**MOK:** What was she saying?

**BD:** To please stop to do and...I don't know what she said. [inaudible]

**MOK:** Was she crying there also?

**BD:** Yeah.

**MOK:** How much?

**BD:** Like, a little bit.

**MOK:** Did she mention God?

**BD:** Huh?

**MOK:** Did she ever mention God?

**BD:** No.

**MOK:** Before she died? Did she mention anybody's names before she died?

**BD:** [shakes head no]

**MOK:** Do you think she knew she was dying?

**BD:** Not that I know of.

**MOK:** OK. And what time is this when you first saw her?

**BD:** [writes]

**MOK:** Now over here you wrote 8:35. Does that sound right?

**BD:** Well, this is when he brung me in there [points to drawing]

**MOK:** OK. What's the first time that you knew that she was in there?

**BD:** When he brung me in there.

**MOK:** And that's what that time was? What'd you do from 5:30 until 8:15?

**BD:** Well, when I came home from school I went into the house and I do what I always do, play Playstation 2. And, I played that until 5:00 and I called my friend, to see if, what he was doing that following weekend. And so after that I watched TV and then I got a phone call like six from Blaine's boss. And at seven I got a phone call from Steven but I didn't go over there right away. And he called again to see where I was and I told him I was getting ready.

**MOK:** Okay, why don't you go ahead and put the times for what these things are – what, what each picture is.

**BD:** What do you mean, like what time this is?

**MOK:** Sure, and also what it is.

**BD:** [writes]

**MOK:** And put also that Steve was watching you if that's true.

**BD:** [writes]

**MOK:** And what was she saying when you were doing that?

**BD:** Should I write it down here?

**MOK:** Um, here, why don't you write it – and use this – right there.

**BD:** [writes]

**MOK:** OK. And describe where she was when you were doing that – while that was happening.

**BD:** [writes]

**MOK:** What did Steve say to you during that week after this happened?

15

**BD:** About this?

**MOK:** Mm-hmm.

**BD:** I don't know.

**MOK:** Why didn't you tell anybody?

**BD:** I was afraid to.

**MOK:** Afraid of what?

**BD:** Afraid that the family wouldn't like me any more.

**MOK:** Which family?

**BD:** My family.

**MOK:** And why wouldn't they like you any more?

**BD:** For listening to Steven.

**MOK:** What was Steven wearing when you, when you first went into to hurt -- in his house?

**BD:** Shorts.

**MOK:** What color?

**BD:** Red.

**MOK:** What color top?

**BD:** Gray.

**MOK:** And what happened to those clothes?

**BD:** I don't know.

**MOK:** Did he burn anything else in the, in the pit besides Teresa and her clothes?

**BD:** Just tires, a cabinet, wood, and a van seat.

**END OF DVD 2**

**START OF DVD 3**

**MOK:** OK, I just asked you what else you think's important that we should know, and what'd you come up with?

**BD:** Nothing else.

**MOK:** Well, I thought you were going to start to tell me something.

**BD:** Huh?

**MOK:** I thought you were going to start to tell me something.

**BD:** No, I said I didn't know anything else.

**MOK:** Oh. [flips through form] Let's see. Here's a page there for you to read please.

**BD:** Should I do it in blue?

**MOK:** Yes please. Just take your time.

**BD:** [writes]

**MOK:** [off camera] Hi, Len? Hi Len, this is Mike O'Kelly. Hi. Um I'm, I'm with Brendan right now, and we're in the G.E.D. room of the facility. Um, and he's given a detailed statement. Um, my next question to you would be that, would you like me to call Special Agent Fassbender and have him interview Brendan at this time? [pause] Oh, quite well. Quite well. Quite well, very well. [pause] Let me get clearance from the jailer – otherwise, otherwise, otherwise I can't give him the phone. Just gimme one second. [pause] Yes, officer, this is Mike O'Kelly. Um, I've got the attorney on my cell phone, and he'd like to talk, uh, to Brendan Dassey. Is that possible? OK. Want to walk

16

down [inaudible]? That sounds fine. It's, it's Brendan Dassey's attorney. I'd also pass the phone to you folks to verify. I will. That's fine. [hangs up] OK, they're going to check with their supervisor and then they're gonna walk down. [pause] Oh, couldn't believe it. The, uh, the driver's side tire split at the rim, by 18 inches, so it was about halfway down the tire. Yeah, $360 for one tire. Couldn't believe it. I'm sorry? Yes, well I have a BMW and and, and all you do is say BMW and they double the price. Yes, they are, yes. [pause] Yes [laughing]. I was fortunate – I was able to get the tires on and get down here now. This is a nice jail facility. [pause] Oh, sure, definitely. [pause] Brendan's doing quite well. Here's somebody now.

**Officer 1:** [opening door] Yes, it's fine.

**MOK:** Do you want to verify it?

**Officer 1:** I don't know how I'm going to verify it.

**Officer 2:** [on phone] Hello, this is Officer Helmer. OK. Thank you, thanks very much. [officers leave]

**MOK:** Brendan, Len wants to talk to you.

**BD:** [takes phone] Hello? [silence for three minutes and fourteen seconds] Let me think about it. OK. OK. OK. [hands phone to MOK]

**MOK:** [off camera] Hi Len. [pause] Does he, does he understand how valuable it can be for him? [pause] Ah, no, and that's my concern. Um, yeah, at this point in time, uh, we can do so much to save him. [pause] That won't do any good, though. That won't do any good, just so you know. [pause] Would you mind if I, if I visited with him a little bit more? And explained to him the value? [pause] And if there's a change, um, I'll call you back, then? That sound fine? Thanks very much. Thanks, Len. Bye.

**BD:** [Filling out form] What do I put for the state?

**MOK:** What's that?

**BD:** What do I put for the state?

**MOK:** What do you mean?

**BD:** It says, declare under penalty of perjury under the laws of the state of.

**MOK:** What state are you in, do you think?

**BD:** Wisconsin.

**MOK:** OK.

**BD:** What time is it?

**MOK:** What's that?

**BD:** What's the time?

**MOK:** [shows Brendan watch]

**BD:** 8:23.

**MOK:** OK. 'Kay, let's talk for a few minutes.

**BD:** What do I do here, or do I have to do anything?

**MOK:** No, you don't have to at all.

**BD:** Just put my name?

**MOK:** Yes, please. [changes cassette tape] OK, let me explain this to you. So you understand. You're writing a truthful story, am I correct?

**BD:** Mmm-hmm.

**MOK:** You're writing a truthful story to help yourself?

**BD:** [nods yes]

**MOK:** 'Kay, you realize that you're not going to go home by writing the truth, right?

17

**BD:** [shakes head no]

**MOK:** OK. You realize that what you did was wrong and you're sorry for it, right?

**BD:** [nods yes]

**MOK:** OK. You realize that you're going to have to go to prison for some period of time, right?

**BD:** [nods yes]

**MOK:** Right, OK. I would also like you to testify against Steve Avery.

**BD:** [pause]

**MOK:** [nods yes]

**BD:** [nods yes]

**MOK:** That's the right thing to do. Do you agree?

**BD:** Yeah.

**MOK:** OK. You've pretty much told me the same story as you told the police, 'kay, and I'd like you to work with the police and tell them the truth [takes cell phone out of pocket]. Who's this – it might be Len. [answers phone] Polygraph, can we help you? [hangs up] Not Len. My concern is for you and I'd like you to cooperate with the police department. They want to interview you also, if you, if you'll let them, and if you work with them, I feel comfortable that the Halbach family will also support you for doing the right thing. This is the time in your life that you can turn around and do as much as you can to right as much as you have wronged. You can't bring Teresa back, but you can certainly do the right thing in her memory. Do you agree?

**BD:** Yes [nods yes].

**MOK:** And if Teresa were alive right now, she'd want you to testify against Avery. Right?

**BD:** [nods yes]

**MOK:** And she'd want you to tell the truth to the police department. And would you like me to be there when you talk to the police?

**BD:** I don't know.

**MOK:** I'm more than willing to be with you when you tell the police the story.

**BD:** When are they doing this?

**MOK:** They might want to come over tonight, if you'll let them.

**BD:** I don't know. But I wanted to watch a show today though, but...

**MOK:** This is pretty important for Teresa.

**BD:** If I don't pick today, will...when will they come up here?

**MOK:** I don't know. How would you feel if we came over in the morning?

**BD:** [noncommittal gesture]

**MOK:** Would that be OK with you? After you had breakfast?

**BD:** How long will it take though?

**MOK:** I don't know. About as long as you and I took, because now that you got the truth out, now it's easy.

**BD:** Tomorrow would be OK.

**MOK:** OK. Let me call Len and tell him. [dials cell phone] Would you like Len to be here too?

**BD:** Don't matter to me.

**MOK:** OK. Hi Len, this is Mike. Brendan would like to watch, uh, a TV show tonight, he has something that he'd like to see on TV. So he'd like to forego tonight and he said

18

APR-000531

after breakfast tomorrow morning would be fine. Ah, the interview by law enforcement can occur after breakfast tomorrow morning. [pause] Yes, I will. OK. Perfect. Of course, yes. [pause] Uh, you know, I don't know. I'd presume that they would, and I'm going to presume that they'd like to see what he gave me this evening. [pause] Yeah, I think it'd be easier for Brendan to visit with them using, using this statement here. It'd be easier on Brendan than it would be to start all over again. [pause] OK. OK [laughing]. OK. Sounds great, Len. Thank you very much. Take care. Bye. [hangs up, dials another number] Yes, this is Michael O'Kelly calling for Special Agent Fassbender. Hi there. Hi there. I'm inside the Sheboygan County jail facility, and I'm sitting, uh, here with Brendan, and we've had several conversations with the attorney, and Brendan would like to visit with you folks. Um, he'd like to watch a movie tonight, so he said you can come by tomorrow morning after breakfast. And he's, um, also prepared a document for me, and it'll be up to you if you want a copy or not. Len mentioned that -- discovery issues and let you make that decision. Let you make that decision if you want it or not. [pause] OK. And, and this is what he suggested. He suggested you send him an e-mail and he'll confirm everything in writing for you. That, that way you'll have the authorization in writing. [pause] OK, I'll call him right back now. [pause] I understand, I understand. That sounds fine. Take care. Bye. [dials cell phone] Hi Len, this is Mike again. Would you call Special Agent Fassbender at his, at his cell phone? It's [*number redacted*]. And just let him know -- ask him to give me a call if he decides to come over in the morning, and I'll meet him at the, uh, Sheboygan County facility. All right? Thanks so much. Take care. [hangs up] What else do you think? OK, who moved the Suzuki down there into the pit?

BD:    I don't know.

MOK: Who moved your mom's van down into the pit?

BD:    I didn't even know it was down in the pit.

MOK: Yeah, they were both down there.

BD:    I didn't know that.

MOK: Did Steve…did Teresa ever come near the Suzuki?

BD:    I don't know.

MOK: OK. Who else knows that he killed her?

BD:    I don't know.

MOK: Your grandmother?

BD:    [shakes head no]

MOK: What does she think?

BD:    That he didn't do it.

MOK: And Earl and Chuck, what do they think?

BD:    I don't know.

MOK: Does, does Blaine know what you did?

BD:    Not right away, before -- after that, uh, first interview.

MOK: How much did you tell him?

BD:    Before the interview?

MOK: So far.

BD:    Well, when we went to, uh, Fox Hills after the first interview, we were telling him why he had to come up to Fox Hills and that. That's pretty much it.

MOK: So that…is that in November?

19

APP-000532

**BD:** No, it was February.

**MOK:** So you didn't tell Blaine until February? Did you tell him you had, you had sex with her too?

**BD:** No.

**MOK:** What'd you tell him?

**BD:** I just told him that I was by the fire.

**MOK:** With the body in the fire.

**BD:** Well, I didn't tell him that her body was in there.

**MOK:** He knows, he knows that you were there when she died, right?

**BD:** I think he knows.

**MOK:** And why do you think that?

**BD:** Well now, I think he knows because he's all hearing it on TV and from family members.

**MOK:** Did you also tell him things?

**BD:** What do you mean?

**MOK:** Did you tell him things about Teresa that day?

**BD:** No.

**MOK:** Who else have you told besides me?

**BD:** No one.

**MOK:** You haven't told anybody else at all?

**BD:** [shakes head no] But when on May 4 when they questioned my mom, you know, and they asked her if she knew why I was losing weight and depressed, and she said she didn't know, but it wasn't because of this.

**MOK:** What was it?

**BD:** It was because I was trying to im-, impress my girlfriend. But then when I met her, she broke up with me. So after that I was feeling sad and then like two weeks after that I went by my friend's house, and he said that he knew another girl that would like to go out with me. And the Wednesday when they arrested me, that's when – that day I was going to go see her.

**MOK:** How many times have you thought about committing suicide?

**BD:** Never.

**MOK:** What about hanging, hanging in the garage? One of your friends told me that you did, that you were thinking about committing suicide. That you told him.

**BD:** [shakes head no] Maybe I was talking to my friend about his future job. Because he wanted to be a suicide bomber.

**MOK:** And who's that?

**BD:** Travis.

**MOK:** And who is he going to suicide bomb?

**BD:** I don't know. He said that was one of his careers that he wanted to do.

**MOK:** Was he thinking about suicide bombing the school?

**BD:** No.

**MOK:** He's been having some difficulty at the school, you know.

**BD:** Mostly everybody at school has a problem with school.

**MOK:** Do you feel better right now?

**BD:** [long pause] A little.

**MOK:** Good. You did the right thing. You still have my card?

20

APP-000533

**BD:** Mm-hmm.

**MOK:** OK.

**BD:** It kind of sucks up here because if I wanted to call my friend and talk to him, I couldn't unless I ordered a phone card. At first I could have, but then after this one day I couldn't. It says it's restricted or something.

**MOK:** [long pause] What are you going to watch tonight on TV?

**BD:** I don't know, what time is it now?

**MOK:** [shows watch]

**BD:** Well, if I go right now there's only 15 minutes.

**MOK:** Of what?

**BD:** Wrestling.

**MOK:** Hmm. What do you think should happen to Steve?

**BD:** I don't know.

**MOK:** How come you knew about her plates being, being, being taken off her car?

**BD:** I didn't know about that.

**MOK:** You didn't? You told the police that.

**BD:** I didn't know about it though.

**MOK:** What do you think should happen to you?

**BD:** Probably get, like, I don't know. Probably, quite a few years.

**MOK:** What do you call quite a few years?

**BD:** Like ten, fifteen.

**MOK:** What if they gave you 20 years?

**BD:** I don't know.

**MOK:** Would that be fair for what you've done?

**BD:** I guess so.

**MOK:** It's better than life without pa-, without parole, isn't it? Do you think you can keep this between you and I and Len right now, and not tell your family at all or your mom or anybody?

**BD:** [slight nod yes]

**MOK:** Keep this real quiet?

**BD:** [nods yes]

**MOK:** Anything you want to ask me?

**BD:** [shakes head no]

**MOK:** You know you can always call me collect, right?

**BD:** [nods yes]

**MOK:** 'Kay. [hands blue ribbon to BD] You want to take this with you, something of Teresa's?

**BD:** I don't want it.

**MOK:** Let's do this – let's go ahead and stop for this evening, and then…unless you have questions you want to ask me, anything you want to say? 'Kay, then we'll probably come back in the morning and we'll just go from there. Thanks for doing the right thing. I think you made a good choice. I think you'll feel better too. It'll be hard facing Steve but if you want me there, I'll be there when you face him…in court.

**BD:** [nods yes]

21

**MOK:** And you don't have to worry – let me – he can't get to you, he can't hurt you. [pats Brendan on back] OK? [gets up] Get the folks over here. Yes, officer, this is Mike O'Kelly. And we're ready to come back. Thank you. Want this also?
**BD:** No.
**MOK:** Did you ever see her car like this?
**BD:** [shakes head no]
**MOK:** [officer enters room, cuffs Brendan] Thanks very much. You're doing the right thing. [BD leaves room with officer]

**END OF DVD 3**

22

APP-000535

State of Wisconsin vs. Brendan H. DASSEY

Date of Birth: 10-19-1989

## Judgment of Conviction
Sentence to Wisconsin State Prisons and Extended Supervision
Case No.: 2006CF000088

MANITOWOC COUNTY
STATE OF WISCONSIN
**FILED**

AUG   **2** 2007

CLERK OF CIRCUIT COURT

The defendant was found guilty of the following crime(s):

| Ct. | Description | Violation | Plea | Severity | Date(s) Committed | Trial To | Date(s) Convicted |
|-----|-------------|-----------|------|----------|-------------------|----------|-------------------|
| 2 | PTC Mutilating a Corpse [939.05 Party to a Crime] | 940.11(1) | Not Guilty | Felony F | 10-31-2005 | Jury | 04-25-2007 |
| 3 | PTC 2nd Degree Sexual Assault/Use of Force [939.05 Party to a Crime] | 940.225(2)(a) | Not Guilty | Felony C | 10-31-2005 | Jury | 04-25-2007 |

**IT IS ADJUDGED** that the defendant is guilty as convicted and sentenced as follows:

08-02-2007 : On count 2 defendant is confined to prison for 4 years followed by a period of 2 years extended supervision for a total length of sentence of 6 years.
Concurrent with/Consecutive to/Comments: Concurrent with count 1. Court finds that the defendant is not eligible for the Challenge Incarceration Program or the Earned Release Program.

08-02-2007 : On count 3 defendant is confined to prison for 10 years followed by a period of 4 years extended supervision for a total length of sentence of 14 years.
Concurrent with/Consecutive to/Comments: Concurrent with the sentences imposed on counts 1 and 2. The Court finds that the defendant is not eligible for the Challenge Incarceration Program or the Earned Release Program.

| Ct. | Sent. Date | Sentence | Length | Concurrent with/Consecutive to/Comments | Agency |
|-----|------------|----------|--------|------------------------------------------|--------|

**IT IS ADJUDGED** that **0** days sentence credit are due pursuant to § 973.155, Wisconsin Statutes

**IT IS ORDERED** that the Sheriff execute this sentence.

Jerome L. Fox, Judge
Kenneth R Kratz, Special Prosecutor
Mark R Fremgen, Defense Attorney

BY THE COURT:

Court/Official

8/2/07

Date

| State of Wisconsin vs. Brendan R. DASSEY | **Judgment of Conviction** Sentence to Wisconsin State Prisons | |
|---|---|---|
| Date of Birth: 10-19-1989 | Case No.: 2006CF000088 | |

MANITOWOC COUNTY
STATE OF WISCONSIN
F I L E D

AUG 2 2007

CLERK OF CIRCUIT COURT

The defendant was found guilty of the following crime(s):

| Ct. | Description | Violation | Plea | Severity | Date(s) Committed | Trial To | Date(s) Convicted |
|---|---|---|---|---|---|---|---|
| 1 | PTC 1st-Degree Intentional Homicide [939.05 Party to a Crime] | 940.01(1)(a) | Not Guilty | Felony A | 10-31-2005 | Jury | 04-25-2007 |

**IT IS ADJUDGED** that the defendant is guilty as convicted and sentenced as follows:

| Ct. | Sent. Date | Sentence | Length | Concurrent with/Consecutive to/Comments | Agency |
|---|---|---|---|---|---|
| 1 | 08-02-2007 | State prison | 1 LF | The Court orders that the defendant is eligible for extended supervision on 11-01-2048. | Department of Corrections |

**IT IS ADJUDGED** that **534** days sentence credit are due pursuant to § 973.155, Wisconsin Statutes

**IT IS ORDERED** that the Sheriff execute this sentence.

Jerome L. Fox, Judge
Kenneth R Kratz, Special Prosecutor
Mark R Fremgen, Defense Attorney

BY THE COURT:

Court Official

Date 8/2/07

100

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 130 of 212    Document 19-8    APP-000537

| Detail of March 1, 2006 Confession | Source of Contamination: Police Prompting | Source of Contamination: Widespread News Reports | Source of Contamination: Brendan's Innocent Knowledge |
|---|---|---|---|
| **Halbach was in Steven Avery's trailer on October 31, 2005. (R.121:61.)** | | R.169:18,19; R.171: 101 - 105, 120 - 122, 127, 139, 140, 150, 151, 173; R:172:183, 199. | |
| **Halbach was restrained with handcuffs. (R.113:71; R.121:61.)** | | R:169:27, 31; R.171:110, 113, 121, 122, 150, 151; R:173:254, 255, 258, 260, 264, 265, 269, 270, 297. | |
| **Halbach was killed in Avery's garage. (R.113:71-72; R.121:62.)** | FASSBENDER: We know there's…some things that… you're not tellin' us. We need to get the accuracy about the garage and stuff like that and the car…Again, w-we have, we know that some things happened in that garage, and in that car, we know that[...]Tell us where she was shot? BRENDAN: In the head. FASSBENDER: No, I mean where, in the garage BRENDAN: Oh. FASSBENDER: Outside, in the house? BRENDAN: In the garage. FASSBENDER: OK. WEIGERT: Was she in the garage floor or in the truck? BRENDAN: Innn the truck. WIEGERT: Ah huh, come on, now where was she shot? Be honest here. FASSBENDER: The truth. BRENDAN: In the garage. (R.79:34:595-97.) (App. 290-92.) | R.169:27, 33; R.171:143, 151; R.173:256, 260, 266, 267, 270, 296 - 298, 300. | |
| **Halbach was shot ten or eleven times. (R.113:72; R.121:63.)** | | R.169:27, 33; R.171:143, 148, 151; R.173:296 - 298, 300. | |
| **Halbach was shot with Avery's .22-caliber rifle. (R.113:72-73; R.121:63.)** | | R.169:27, 29, 33; R.171:143, 148, 151. | |

APP-000538

| Detail of March 1, 2006 Confession | Source of Contamination: Police Prompting | Source of Contamination: Widespread News Reports | Source of Contamination: Brendan's Innocent Knowledge |
|---|---|---|---|
| **Halbach was shot in the left side of the head. (R.113:73-74; R.121:63-64.)** | WIEGERT: All right, I'm just gonna come out and ask you. Who shot her in the head?<br>BRENDAN: He did.<br>FASSBENDER: Then why didn't you tell us that?<br>BRENDAN: Cuz I couldn't think of it. (R.79:34:578-87.) (App. 273-82.)<br>---<br>FASSBENDER: Do you know what side of the head? (R.79:34:592.) (App. 287.)<br>---<br>FASSBENDER: Tell me where in the head [Halbach was shot]. What sides? (R.79:34:630.) (App. 325.) | | |
| **Halbach's body was placed in the rear cargo area of her Toyota RAV4. (R.113:74; R.121:64-65.)** | | R.169:33, 34, 38; R.171:110, 133, 135, 163, 165, 168, 169, 172; R.173:255. | |
| **Halbach's body was burned in Avery's fire pit. (R.113:75-76; R.121:65-67.)** | FASSBENDER: Brendan, we know that, that Halloween and stuff you were with him and, and helped him tend to a fire and stuff like that behind the garage and stuff, and [...] we believe that's where Teresa was cooked. (R.79:33:441.) | R.169:31, 33, 35; R.171:106 - 108, 115, 117 - 119, 123, 124, 129, 136 - 138, 147, 150, 163, 165, 167 - 173; R.172:176 - 179, 181 - 187, 199 - 204; R.173:242, 253, 294, 298 - 301. | |
| **A van seat and tires were used as fuel for the fire. (R.113:76; R.121:67-68.)** | | R.171:126, 134, 163 - 168; R.173:283 - 285. | On October 31, Brendan had helped his uncle feed what he believed was an ordinary bonfire by placing tires, a junked van seat, branches, and other debris on the burn pit. (R.119:29-33.) |
| **Halbach's RAV4 was driven to the "pit area" of the salvage yard near a stand of trees. (R.113:76-77; R.121:69.)** | | R.169:27, 37, 39; R.171:105, 109, 112, 140 - 142; R.172:188, 190, 239; R.173:240, 298, 300. | |

APP-000539

| Detail of March 1, 2006 Confession | Source of Contamination: Police Prompting | Source of Contamination: Widespread News Reports | Source of Contamination: Brendan's Innocent Knowledge |
|---|---|---|---|
| Halbach's RAV4 was concealed with branches and a car hood. (R.113:77; R.121:69.) | | R.169:27, 39; R.171:114, 143, 151; R.172:185, 187, 188, 190; R.173:241, 254, 298. | |
| The license plates were removed from Halbach's RAV4. (R.113:77; R.121:69.) | WIEGERT: With, how's, the license plates were taken off the car, who did that?<br>BRENDAN: I don't know.<br>WIEGERT: Did you do that?<br>BRENDAN: (shakes head "no") No.<br>WIEGERT: Did Steve do that?<br>BRENDAN: Yeah.<br>WIEGERT: Well then why'd you say you don't know? Did Steve take the license plates off the car?<br>BRENDAN: Yeah. (R.79:34:601-03.) (App. 296-98.) | R.169:39; R.171:116, 150, 151, 163, 165, 168; R.172:189, 191; R.173:254, 259, 260, 270, 282, 298 - 300, 302. | |
| Avery went under the hood of Halbach's RAV4. (R.113:77; R.121:69-70.) | FASSBENDER: That's not what I'm thinkin' about. He did something to that car. He took the plates and he, I believe he did something else in that car. (pause)<br>BRENDAN: I don't know.<br>FASSBENDER: OK. Did he, did he, did he go and look at the engine, did he raise the hood at all or anything like that? To do something to that car?<br>BRENDAN: Yeah.<br>FASSBENDER: What was that? (pause)<br>WIEGERT: What did he do, Brendan?<br>WIEGERT: It's OK, what did he do?<br>FASSBENDER: What did he do under the hood, if that's what he did? (pause)<br>BRENDAN: I don't know what he did, but I know he went under. (R.79:34:601-03.) (App. 296-98.) | | |

APP-000540

| Detail of March 1, 2006 Confession | Source of Contamination: Police Prompting | Source of Contamination: Widespread News Reports | Source of Contamination: Brendan's Innocent Knowledge |
|---|---|---|---|
| Avery's garage floor had been cleaned with bleach. (R.113:78; R.121:70-71.) | | | On October 31, Brendan helped his uncle clean what appeared to be automotive fluid off the garage floor using bleach and other chemicals. (R.119:29-33.) |
| The key to Halbach's RAV4 was hidden in Avery's bedroom. (R.113:78; R.121:71.) | | R.169:22, 23, 24; R.171:106 - 109, 112, 113, 120, 122, 128, 130 - 132, 134, 142, 144 - 146, 149, 152, 157, 159 - 163, 165, 168, 169, 172; R.172:174, 175, 184, 185, 187, 189, 191 - 199; R.173:242 - 254, 258, 259, 262 - 264, 269, 273, 275, 277, 279 - 281, 286 - 293, 295, 297 - 305. | |
| Halbach's clothing was burned in the fire. (R.113:78-80; R.121:71-72.) | WIEGERT: Was there blood on those clothes? Be honest Brendan. We know. We already know you know. Help us out. Think of yourself here. Help that family out. FASSBENDER: It's gonna be all right, OK. WIEGERT: Was there blood on those clothes? BRENDAN: A little bit […] WIEGERT: Where did he tell you those clothes came from? BRENDAN: He said that they were…[…] WIEGERT: You now know better, they were girl clothes, weren't they? (R.79:33:449-51.) | R.169:28, 33; R.171:150, 151; R.173:260, 270, 283 - 285. | |
| Avery had a cut on his finger. (R.113:80; R.121:72-73.) | | R.25, 37, 38; R.171:110 - 112, 120, 122, 134, 153; R.173:257, 261, 268, 271 - 278, 298. | |

| Detail of March 1, 2006 Confession | Source of Contamination: Police Prompting | Source of Contamination: Widespread News Reports | Source of Contamination: Brendan's Innocent Knowledge |
|---|---|---|---|
| **Halbach's cellular telephone, camera, and purse were burned in a burn barrel. (R.113:80; R.121:73.)** | FASSBENDER: [D]o you remember anything about that burn barrel? [....] [Y]ou might want to be a little more truthful about now [....] Did you put some things in that burn barrel that night?<br>BRENDAN: (shakes head "no") No.<br>FASSBENDER: What happened to Teresa's other personal effects? I mean ah a woman usually has a purse right? (Brendan nods "yes") Tell us what happened ta that?<br>BRENDAN: I don't know what happened to it.<br>FASSBENDER: What happened ta her ah, her cell phone? (short pause) Don't try ta ta think of somethin' just.<br>BRENDAN: I don't know. [...]<br>FASSBENDER: Do you know whether she had a camera?<br>BRENDAN: (shakes head "no") No. [...]<br>WIEGERT: Brendan, it's OK to tell us OK [...] If you know what happened to a cell phone or a camera or her purse, you need to tell us [...].<br>BRENDAN: He burnt 'em.<br>WIEGERT: How do you know?<br>BRENDAN: Because when I passed it there was like a purse in there and stuff [...]<br>WIEGERT: What did you see?<br>BRENDAN: Like a cell phone, camera, purse<br>WIEGERT: Are you being honest with us?<br>BRENDAN: (nods "yes") Yeah.<br>WIEGERT: Did you actually see those items?<br>BRENDAN: (nods "yes") Yeah. (R.79:34:619-23.) (App. 314-18.) | R.171:111, 150, 154 - 156; R.173:254, 255, 259, 260, 262, 263, 265, 270, 296, 297. | |
| **Avery's fiance Jodi called him twice on October 31, 2005, including once at 5:30 PM. (R.113:80; 121:73.)** | | | Jodi called Avery once while Brendan was at Avery's house helping him build the bonfire. (R.119:52-53.) At that time, Avery mentioned to Brendan that Jodi had also called earlier that afternoon, at approximately 5:30 PM. (R.119:52-53.) |

APP-000542

**WE ALREADY KNOW**

**February 27, 2006**

1. "I know you saw something." (R.79:33:442)

2. "By your look I can tell you know of something." (R.79:33:443)

3. "I know you and him knew what was going on there." (R.79:33:446)

4. "We know. We already know you know." (R.79:33:449)

5. "We know you saw some flesh." (R.79:33:451)

**March 1, 2006**

1. "We know there's some things you left out and we know there's some things that maybe weren't quite correct that you told us." (R.79:34:541)

2. "We already know what happened now tell us exactly." (R.79:34:547)

3. "We already know. Just tell us. It's OK." (R.79:34:548)

4. "Come on we know this already. Be honest." (R.79:34:550)

5. "Remember, we already know, but we need to hear it from you." (R.79:34:552)

6. "So just be honest. We already know." (R.79:34:554)

7. "We already know." (R.79:34:555)

8. "See we already knew that." (R.79:34:555)

APP.000543

9. "What else did he do ta her? We already know, be honest." (R.79:34:560)

10. "We've got enough of her to know some things that happened to her. So tell us the truth." (R.79:34:560)

11. "We already know Brendan. We already know." (R.79:34:561)

12. "We already know, it's, OK? We gonna help you through this, alright?" (R.79:34:561)

13. "It's OK Brendan. We already know." (R.79:34:565)

14. "We know but we need it in your words." (R.79:34:568)

15. "Brendan, I already know. You know we know." (R.79:34:568)

16. "Remember, we already know, but we need to hear it from you, it's OK. It's not your fault." (R.79:34:571)

17. "We know you were back there." (R.79:34:572)

18. "We know what happened." (R.79:34:574)

19. "We know what happened, it's OK." (R.79:34:574)

20. "You were there when she died and we know that." (R.79:34:578)

21. "Don't start lying now. We know you were there." (R.79:34:578)

22. "We already know, don't lie to us now, OK, come on." (R.79:34:578)

APP-000544

23. "He did something else, we know that."
    (R.79:34:578)

24. "We know he did something else to her, what else
    did he do to her?" (R.79:34:579)

25. "We know something else was done."
    (R.79:34:584)

26. "We know he made you do somethin' else."
    (R.79:34:584)

27. "We have the evidence Brendan, we just need you
    ta, ta be honest with us." (R.79:34:584)

28. "We know, we just need you to tell us."
    (R.79:34:587)

29. "We know there's some, some things that you're,
    you're not tellin' us." (R.79:34:593)

30. "Again, we have, w-we know that some things
    happened in that garage, and in that car, we know
    that." (R.79:34:595)

31. "We have a pretty good knowledge of what
    happened there." (R.79:34:614)

**PROMISES OF LENIENCY**

<u>February 27, 2006</u>

1. "You're a kid, you know and we got, we've got
   people back at the sheriff's dept., district attorney's
   office, and their [sic] lookin' at this now saying
   there's no way that Brendan Dassey was out there
   and didn't see something. They're talking about
   trying to link Brendan Dassey with this event.
   They're not saying that Brendan did it, they're
   saying that Brendan had something to do with it or
   the cover up of it which would mean Brendan
   Dassey could potentially be facing charges for
   that...You know some people don't care, some
   people back there say no we'll just charge him. We
   said no, let us talk to him, give him the opportunity
   to come forward with the information that he has,
   and get it off of his chest." (R.79:33:440-41)

2. "The only way it's ever gonna end is if you talk
   about it." (R.79:33:440)

3. "We're not just going to let you high and dry,
   we're gonna talk to your mom after this and we'll
   deal with this, the best we can for your good OK?"
   (R.79:33:443)

4. "I promise I will not let you high and dry, I'll stand
   behind you." (R.79:33:443)

5. "We both will [stand behind you] Brendan. We're
   here to help ya." (R.79:33:443)

6. "Everybody gets an opportunity with Tom and I
   OK, and we want to give you that opportunity to be
   honest. We want to help you through this."
   (R.79:33:446)

7. "We wanna go back and tell people that, you know,
   Brendan told us what he knew. We wanna be able
   to tell people that Brendan was honest, he's not like
   Steve, he's honest, he's a good guy. He's gonna go

places in this life. But in order for us to do that, you need to be honest with us." (R.79:33:446-47)

8. "There's no way that you're going to get over this and move on in your life without being honest." (R.79:33:447)

9. "Mark and I both can go back to the district attorney and say, ah, Dassey…came forward and finally told us. Can [you] imagine how this was weighing on him? They'll understand that." (R.79:33:448)

10. "We'll go to bat for ya, but you have to be honest with us." (R.79:33:448)

11. "It's OK to tell us." (R.79:33:448)

12. "I promise you I'll not let you hang out there alone, but we've gotta have the truth." (R.79:33:448)

13. "We're not gonna run back and tell your grandma and grandpa what you told us or anything like that. OK." (R.79:33:448)

14. "Talk to us Brendan if you want this resolved." (R.79:33:448)

15. "Help us out. Think of yourself here." (R.79:33:449)

16. "It's actually gonna help Steven come to grips with what he needs to do. More important, this could help you." (R.79:33:451)

17. "Like I said, Mark and I are not going to leave you high and dry." (R.79:33:451)

18. "It's not your fault. Remember that." (R.79:33:451)

19. "Did you help him put that body in the fire? If you did it's OK." (R.79:33:453)

APP-000547

20. "[A]gain, we're not gonna leave ya high and dry."
(R.79:33:481)

**March 1, 2006**

1. "I wanna assure you that Mark and I both are in your corner, we're on your side." (R.79:34:540)

2. "One of the best ways to prove to us or more importantly, you know, the courts and stuff is that you tell the whole truth…even if those statements are against your own interest…it might make you look a little bad or make you look like you were more involved than you wanna be, ah, looked at, um, it's hard to do but it's good from that vantage point to say hey, there's no doubt you're telling the truth." (R.79:34:540)

3. "It's real obvious there's some places where some things were left out or maybe changed just a bit ta, to maybe lookin' at yourself to protect yourself a little. Um, from what I'm seeing, even if I filled those in, I'm thinkin' you're all right. OK, you don't have to worry about things. We're there for ya." (R.79:34:540)

4. "It's going to be a lot easier on you down the road, ah, if this goes to trial and stuff." (R.79:34:540)

5. "Honesty here Brendan is the thing that's gonna help you." (R.79:34:541)

6. "OK, no matter what you did, we can work through that." (R.79:34:541)

7. "We can't make any promises, but we'll stand behind you no matter what you did. OK. Because you're being the good guy here." (R.79:34:541)

8. "By you talking with us, it's, it's helping you." (R.79:34:541)

9. "The honest person is the one who's gonna get a better deal out of everything. You know how that works." (R.79:34:541)

10. "Honesty is the only thing that will set you free." (R.79:34:541)

11. "If in fact you did somethings, which we believe, somethings may have happened that you didn't wanna tell us about. It's OK. As long as you can, as long as you be honest with us, it's OK. If you lie about it that's gonna be problems. OK." (R.79:34:541)

12. "Be honest. I told you before that's the only thing that's gonna help ya here." (R.79:34:547)

13. "I'm your friend right now, but I gotta – I gotta believe in you, and if I don't believe in you, I can't go to bat for you." (R.79:34:547)

14. "We're in your corner." (R.79:34:547)

15. "If you helped him, it's OK, because he was telling you to do it. You didn't do it on your own." (R.79:34:552)

16. "Make it easy on yourself, just tell us the truth the first time." (R.79:34:558)

17. "It's OK. It's not your fault. What happens next?" (R.79:34:571)

18. "Be honest with us. Be honest with us. We already know, it's OK? We gonna help you through this, alright?" (R.79:34:561)

19. "Let's get it all out today and this will be all over with." (R.79:34:572)

20. "It's not your fault, he makes you do it." (R.79:34:574)

process wherein he was not given timely notice appropriating the exact time of the alleged offense, that he may have prepared an adequate defense or present an alibi.

VII. The Court of Appeals erred in ruling appellant's due process right under the *Fourteenth Amendment* were not violated wherein the trial court incorrectly applied the sentencing guidelines.

VIII. Trial Court failed to adhere to its duty violating appellant constitutional rights under the due process clause wherein a clear conflict of interest lay openly displayed between defense counsel and the appellant.

IX. Trial court abused its discretion wherein it amended original formal information, varying from the pertinent specific detailed information on discovery and exculpatory testimony.

X. Trial court erred in allowing finding of guilty to stand wherein insufficient evidence was presented in establishing complete elements of the charged offense.

XI. Appellant was denied effective appellate counsel wherein appellant (sic) counsel failed to raise pertinent issues detailed in this petition.

## II. STANDARD [*7] OF REVIEW

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*28 U.S.C. § 2254(d)*; *Harpster v. State of Ohio, 128 F.3d 322, 326 (6th Cir. 1997).*

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's [*8] decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor, 529 U.S. 362, 412-413, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (2000).* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id. at 411.*

## II. DISCUSSION

### I. Petitioner's claims are not procedurally defaulted.

Respondent contends that petitioner's second, third, sixth, eighth, and ninth claims were procedurally defaulted by the Michigan courts when they denied these claims in his post-conviction motion for relief from judgment pursuant to M.C.R. 6.508(D).

In the present case, neither the Michigan Court of Appeals nor the Michigan Supreme Court indicated which subsection of M.C.R. 6.508 they were denying petitioner's claims under, so this Court must "look through" these unexplained orders and examine the last reasoned order to determine whether that opinion explicitly relied on a procedural bar. *See Alvarez v. Straub, 64 F. Supp. 2d 686, 692 (E.D. Mich. 1999)* [*9] (Rosen, J.). In this case, the last reasoned order was from the trial court, which denied petitioner's claims on the ground that these issues had already been decided adversely against petitioner either by the trial court or in his direct appeal. In denying petitioner's motion for

rehearing, the trial court specifically pointed to M.C.R. 6.508(D)(2), which bars relief for issues raised in a motion for relief from judgment which had previously been considered on direct appeal. A federal district court is not precluded from addressing the merits of a habeas petitioner's claims despite procedural default, where a state trial court does not clearly and expressly rest its denial of petitioner's claims upon a procedural bar but instead denied the state post conviction motion on the ground that the issue raised had previously been determined on the merits on appeal. *Taylor v. Kuhlmann, 36 F. Supp. 2d 534, 545-546 (E.D.N.Y. 1999)*. M.C.R. 6.508(D)(2) is simply a res judicata rule barring a defendant from relitigating claims in a motion for relief from judgment that had been decided adversely in a prior state court decision. *Morse v. Trippett, 102 F. Supp. 2d 392, 402 (E.D. Mich. 2000)* [*10] (Tarnow, J.). Because the trial court found that these claims had been considered on their merits on petitioner's direct appeal or in prior proceedings before the trial court, there is no procedural bar to habeas review of these claims. *Id.*

## II. Petitioner's claims.

Several of petitioner's claims have been consolidated for purposes of judicial economy.

## A. Claims # 1,5, and 10. The sufficiency of evidence claims.

Petitioner raises a number of challenges to the sufficiency of the evidence used to convict him at trial. In his first claim, petitioner contends that the evidence was insufficient to convict him of the crimes charged because of the inconsistencies in the victim's testimony. In his fifth claim, petitioner claims that the verdict was against the great weight of the evidence. In his tenth claim, petitioner argues that there was insufficient evidence to establish that he committed an armed robbery in this case, because he was unarmed at the moment that he took the money from the victim.

The *Due Process clause of the 14th Amendment* protects an accused in a criminal case against conviction except upon proof beyond a reasonable doubt. *In re Winship, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970)*. [*11] The appropriate standard of review in a federal habeas corpus proceeding involving a claim of insufficiency of evidence in a state criminal conviction is whether, after reviewing the evidence in the light most favorable to the government, any rational trier of fact

could have found the essential elements of the crime had been proven beyond a reasonable doubt. *Warren v. Smith, 161 F.3d 358, 360-361 (6th Cir. 1998)*. The reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Marshall v. Lonberger, 459 U.S. 422, 434, 74 L. Ed. 2d 646, 103 S. Ct. 843 (1983); Kines v. Godinez, 7 F.3d 674, 678 (7th Cir. 1993)*. It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris, 972 F.2d 675, 679 (6th Cir. 1992)*.

Petitioner initially claims that the evidence was insufficient to convict because of the inconsistencies in the victim's testimony. An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence [*12] claims. *Gall v. Parker, 231 F.3d 265, 286 (6th Cir. 2000)*. The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. *Id.* A district court is without authority to reweigh the evidence in a federal habeas proceeding. *Holmes v. McKune, 117 F. Supp. 2d 1096, 1113 (D. Kan. 2000)*. The federal habeas corpus statute gives federal courts no license to redetermine credibility of witnesses whose demeanor has been observed by a state trial court. *Perfetto v. Hoke, 898 F. Supp. 105, 113 (E.D.N.Y.1995)*(quoting *Marshall v. Lonberger, 459 U.S. at 434*). Thus, in reviewing a sufficiency of the evidence claim, a federal habeas court may not question a fact finder's determinations of witness credibility. *Rodgers v. Angelone, 113 F. Supp. 2d 922, 934 (E.D. Va. 2000)*.

In the present case, the victim testified that he walked into his apartment and was struck from behind with a bat or club by petitioner, who then took fifty seven dollars from him. (Trial Tr., pp. 13-16). The victim testified that when he left his apartment, he locked his door. The victim also testified that the screen [*13] to his back door had been cut. (*Id.*, pp. at 11, 17). The elements of armed robbery are: (1) an assault; (2) a felonious taking of property from the victim's presence or person; (3) while armed with a weapon described in the armed robbery statute. *People v. Carines, 460 Mich. 750, 757; 597 N.W.2d 130 (1999)*. The elements of breaking and entering an occupied dwelling with intent to commit a felony are: (1) breaking and entering; (2) of an occupied dwelling; and (3) with felonious intent. *People v. Brownfield, 216 Mich. App. 429, 431; 548 N.W.2d 248 (1996)*.

In the present case, the trial court had the opportunity to observe the victim testify and found him to be more credible than the petitioner or his witnesses. In finding petitioner guilty, the trial court took note of the fact that there was uncertainty as to the time of the crimes due to the conflict in the testimony between the victim, a seventy one year old man, and the police. (Trial Tr., pp. 103-104). However, the trial court noted that the victim was "absolutely positive and struck the Court as being knowledgeable and unwavering in that identification of the [*14] Defendant as the person who committed the offense charged herein." (*Id.* at p. 104). The trial court also noted that the victim recognized petitioner from having lived on the premises for several years. (*Id.* at p. 103). In fact, the victim testified that he had known petitioner for seven years, testifying that he lived on the third floor of the apartment building and petitioner's mother lived on the second floor of the same building. (*Id.*, at pp. 9, 12). This Court cannot question the trial court's credibility determination. The victim's testimony was legally sufficient to establish the elements of the offenses of armed robbery and breaking and entering an occupied dwelling. Petitioner is not entitled to habeas relief on his claim that the victim's testimony may have been inconsistent.

Petitioner next argues that his verdict went against the great weight of the evidence. A federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of the evidence. *Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985).* A claim that a verdict went against the great weight of the evidence is not of constitutional [*15] dimension, for habeas corpus purposes, unless the record is so devoid of evidentiary support that a due process issue is raised. *Griggs v. State of Kansas, 814 F. Supp. 60, 62 (D. Kan. 1993).* The test for habeas relief is not whether the verdict was against the great weight of the evidence, but whether there was any evidence to support it. *United States ex. rel. Victor v. Yeager, 330 F. Supp. 802, 806 (D.N.J. 1971).* Because there was sufficient evidence to convict petitioner of armed robbery and breaking and entering an occupied dwelling, the fact that the verdict may have gone against the great weight of the evidence would not entitle him to habeas relief.

Petitioner lastly claims that there was insufficient evidence established to show that petitioner was armed when he took the victim's money. Petitioner bases this claim on the victim's testimony that after petitioner hit

him with the club, the victim grabbed petitioner and the two men began to struggle. The victim testified that during the struggle, petitioner did not have the club in his possession and further testified that petitioner put both of his hands into the victim's pockets and took his [*16] money from him.

Michigan courts utilize a "transaction approach" to analyze any larceny, particularly a robbery, where the forceful act may greatly precurse or lag behind the taking. *See People v. LeFlore, 96 Mich. App. 557, 562, 293 N.W.2d 628 (1980).* The entire larcenous transaction should be reviewed to determine if there was a continuity of intent between the forceful act and the taking (or vice versa). If so, a robbery conviction is possible. *Id.*

In the present case, when looking at the evidence in a light most favorable to the prosecution, there was sufficient evidence to establish that petitioner committed an armed robbery. Petitioner was laying in wait for the victim when he returned to his apartment and struck him with a weapon. A struggle ensued, during which petitioner took fifty seven dollars from the victim. The mere fact that petitioner was unarmed at the precise moment that the money was taken would not defeat his robbery conviction, because the evidence established a "continuity of intent" between the initial assault with the weapon and the taking of the money.

In the present case, there was sufficient evidence to convict petitioner [*17] of the crimes of armed robbery and breaking and entering an occupied dwelling. Petitioner's first, fifth, and tenth claims do not entitle him to relief.

## B. Claim # 2. The prosecutorial misconduct claim.

Petitioner next contends that the prosecutor committed misconduct when he asked petitioner whether he believed that the victim was incorrect, mistaken, or guessing as to his identification of petitioner and his description of his assailant's clothes. The Michigan Court of Appeals agreed that it was error for the prosecutor to ask these questions, but found the error to be harmless both because petitioner's answers neutralized the questions, as well as the fact that the case was tried before a judge sitting without a jury. *People v. Thomas*, Slip. Op. at *3.

A bench trial judge is presumed to have considered only relevant and admissible evidence in reaching his or

her decision. *United States v. McCarthy, 470 F.2d 222, 224 (6th Cir. 1972)*. The presumption that a trial judge disregarded incompetent evidence at a bench trial is inapplicable only where it is plain from the trial court's findings that in finding the defendant guilty, the trial court relied on [*18] inadmissible evidence. *United States v. Joseph, 781 F.2d 549, 552 (6th Cir. 1986)*.

In the present case, the prosecutor asked petitioner three questions about whether the victim was incorrect, guessing, or mistaken either as to his identification of petitioner as the assailant or his description of petitioner on the night in question. (Trial Tr., pp. 87-89). The prosecutor's questions did not rise to the level of constitutionally impermissible misconduct warranting habeas relief, because the questions were isolated and would not likely have prejudiced a trial judge in a bench trial. *Matthews v. Abramajtys, 92 F. Supp. 2d 615, 642 (E.D. Mich. 2000)*(Tarnow, J.). A review of the trial court's findings of fact (Trial Tr., pp. 102-104) does not show that the trial court judge relied on these questions in reaching his decision. Accordingly, petitioner has not shown that these questions rendered his trial fundamentally unfair. *Id.* Petitioner's second claim is without merit.

## C. Claim # 3. The claim that the prosecutor failed to produce a res gestae witness.

Petitioner next claims that the prosecutor failed to investigate and list on its witness [*19] list a res gestae witness that he claims would have been helpful to his case.

Federal law does not require the production of res gestae witnesses. Under federal law, there is no obligation on the part of prosecutors to call any particular witness unless the government has reason to believe that the testimony would exculpate the petitioner. *Atkins v. Foltz, 856 F.2d 192, 1988 WL 87710, *2 (6th Cir. 1988)*(citing to *United States v. Bryant, 461 F.2d 912, 916 (6th Cir. 1972)*).

In the present case, an evidentiary hearing was conducted on this claim subsequent to petitioner's trial. Reba McCory testified that petitioner lived across the street from her. On July 4, 1989, McCory testified that petitioner came over to her yard at 3:15 in the afternoon and stayed until approximately 7:45 p.m. (Evidentiary Hearing Transcript, 05/03/91, pp. 5-6). McCory testified that she also lived across the street from the victim. (*Id.* at

p. 7). While she and her friend Ms. Murphy were sitting on her front porch, the victim came over to them with a dark blue cap and asked Ms. Murphy whether this was her son Dexter's hat. Murphy told the victim that the hat [*20] did not belong to her son. (*Id.* at pp. 7-8). McCory indicated that later that evening, petitioner came walking down the street with Dexter and that both men were dressed alike. McCory indicated that petitioner and Dexter both had on gray pants. (*Id.* at pp. 9-10). McCory testified that the police first responded to the crime scene after dark. At the time, Ms. Murphy told McCory that the victim had been robbed. Later on, McCory saw the police return to the apartment building just as petitioner and Dexter were returning home. The men started arguing and petitioner told them that he didn't do it. McCory told petitioner that if he didn't do it, he should just stay there. The police arrested petitioner. (*Id.* at pp. 11-12).

On cross-examination, McCory indicated that she had known petitioner since 1975. Although she observed the arrest that night, McCory acknowledged that she did not give her name to the police. (*Id.* at p. 13). In rejecting this claim, the trial court indicated that there was nothing in McCory's testimony that would have prevented petitioner from going to the same premises where both he and the victim lived and commit these offenses. The trial court further [*21] found that petitioner had failed to show that he was unable to produce McCory or that the prosecutor was aware of her existence. The trial court found no failure on the part of the prosecutor to produce a res gestae witness whose testimony could have been "outcome determinative." (*Id.* at pp. 34-35).

In order to determine whether petitioner is entitled to relief on this claim, this Court must determine whether McCory's testimony would have been exculpatory. Suppression by the prosecution of evidence favorable to the defendant upon request violates due process, where the evidence is material to either guilt or punishment of the defendant, irrespective of the good or bad faith of the prosecution. *Brady v. Maryland, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)*. To establish a *Brady* violation, a defendant has the burden of establishing that the prosecution suppressed evidence, that such evidence was favorable to the defendant, and that the evidence was material. *Carter v. Bell, 218 F.3d 581, 601 (6th Cir. 2000)*. *Brady* does not apply to information that is not wholly within the control of the prosecution; there is no *Brady* violation [*22] where a defendant knew or should

have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source. *Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998).* Under *Brady*, the prosecution cannot be required to produce to the defendant exculpatory or impeachment evidence which it does not control and never possessed or inspected. *United States v. Beckford, 962 F. Supp. 780, 801-802 (E.D. Va. 1997).*

In the present case, petitioner is unable to show a *Brady* violation. First, petitioner was aware of this witness' existence prior to trial. Secondly, Ms. McCory admitted that she never gave the police her name, even though she witnessed the arrest. Therefore, neither the prosecutor nor the police were ever aware of McCory's existence. Moreover, in light of the fact that the police were told by the victim that the crimes occurred between 10:30 and 11:30 p.m., McCory's testimony that petitioner was with her between 3:15 and 7:45 p.m. would not have appeared to have been exculpatory evidence to the prosecution. Lastly, nothing in McCory's testimony would have made it impossible [*23] for petitioner to leave her house and go across the street and commit the crime charged, even if the victim was not precise as to the time of the crime's commission. Petitioner is not entitled to habeas relief on a claim that the prosecutor failed to call res gestae witnesses because the circumstances of this case do not reflect that petitioner was denied fundamental fairness. *Smith v. Elo, 198 F.3d 247, 1999 WL 1045877, *2 (6th Cir. 1999).*

**D. Claims # 4 and # 8. The ineffective assistance of counsel claims.**

Petitioner next raises several allegations involving the denial of the effective assistance of counsel.

A. *Standard of Review*

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the *Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).* In so doing, the defendant must overcome a [*24] strong presumption that counsel's behavior lies within the wide range of reasonable

professional assistance. *Id.; O'Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir. 1994).* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland, 466 U.S. at 689.* Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, 466 U.S. at 694.*

B. *The individual claims*

1. Subclaims # 1 and # 4. Failure to investigate or bring out prior inconsistent statements.

Petitioner first claims that his attorney was ineffective for failing to investigate the police reports for inconsistencies in the victim's story, as well as failing to impeach the victim with his prior inconsistent statements to the police.

Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in [*25] retrospect better tactics may have been available. *Gallo v. Kernan, 933 F. Supp. 878, 881 (N.D. Cal. 1996).*

In the present case, defense counsel engaged in a thorough cross-examination of the victim. Counsel elicited an admission from the victim that he wore glasses. (Trial Tr., p. 23). Counsel also confronted the victim with the fact that there was no window in his door, thus, the victim would have been unable to see who was standing behind his door. (*Id.* at pp. 24-25). Counsel confronted the victim with the fact that he never gave a physical description of the perpetrator to the police. Counsel also locked the victim into testifying that his assailant had no facial hair. (*Id.* at p. 29). After the prosecution rested, defense counsel recalled the victim and confronted him with the fact that he initially told the police that the robbery took place between 10:30 p.m. and 11:30 p.m., which conflicted with his testimony that the robbery took place between 3:30 and 4:00 p.m. (*Id.* at pp. 35-37).

Defense counsel subsequently called the two police officers who responded to the crime scene. Both officers indicated that the victim informed them that the robbery [*26] took place between 10:00 and 10:30 p.m. (*Id.* at

pp. 40-41, 45-46). Defense counsel also called the investigating officer to testify that the victim's original description of the suspect indicated that the perpetrator had on gray pants, and not white pants, as the victim had testified. Defense counsel also elicited the fact that at the time of his arrest, petitioner had facial hair. (*Id.* at p. 50).

Where, as here, trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim. *Rich v. Curtis, 2000 U.S. Dist. LEXIS 17238, 2000 WL 1772628, *5 (E.D. Mich. 2000)*(Friedman, J.); *Cardwell v. Netherland, 971 F. Supp. 997, 1019 (E.D. Va. 1997)*. Moreover, the failure of trial counsel to develop every bit of testimony through all available inconsistent statements to impeach witnesses is not ineffective assistance of counsel where the omissions were not sufficient to demonstrate unprofessional or improper assistance of counsel and where petitioner was [*27] not prejudiced as a result of the alleged errors. *See Poyner v. State of Iowa, 990 F.2d 435, 438 (8th Cir. 1993)*. Here, defense counsel brought out many of the victim's inconsistent statements through other witnesses. Petitioner has failed to show that counsel's performance was deficient.

Subclaim # 2. Failure to subpoena witnesses.

Petitioner claims that counsel was ineffective for failing to subpoena or call either his mother Johnnie Thomas or Shane O'Guin to testify. Petitioner claims that his mother would have testified that the victim told her he wasn't certain who robbed him. Shane O'Guin would have been an alibi witness.

In the present case, petitioner's counsel presented two witnesses, Corline Smith and Audie O'Guin, who testified in support of petitioner's alibi defense. In addition, Corline Smith testified that the victim informed her, in the presence of petitioner's mother, that he was unable to identify his assailant. The alleged ineffectiveness of counsel in failing to call these additional two witnesses to testify was not prejudicial where their testimony would have been merely cumulative to other testimony. *See Ashker v. Class, 152 F.3d 863, 874 (8th Cir. 1998).* [*28]

3. Subclaim # 3. Failure to object to the failure of the

prosecution to present the whole res gestae and list res gestae witnesses on the information.

Petitioner next contends that counsel was ineffective for not objecting to the prosecution's failure to present the entire res gestae of the crime by calling Reba McCory as a witness. Petitioner claims that McCory's testimony would have either contradicted the victim's testimony as to the time that the crime occurred, or alternatively, McCory could have been an alibi witness for petitioner for the time that the victim testified that the robbery occurred. Petitioner also appears to claim that counsel was ineffective for failing to call McCory as a witness for the defense.

Petitioner's claim fails for two reasons. First, petitioner does not allege that he either informed counsel that he had been with Reba McCory earlier in that day, nor is there any indication from the investigator's report that counsel should have been aware of McCory's existence. If an attorney has little or no notice that a witness may exist after diligent preparation of a case, he or she is not ineffective for failing to investigate that witness or calling that [*29] witness to testify. *Battle v. Delo, 19 F.3d 1547, 1555 (8th Cir. 1994)*. A defendant in a criminal case is not denied the effective assistance of counsel due to defense counsel's failure to investigate or to call witnesses where the defendant failed to provide counsel with the names, addresses, and phone numbers of the witnesses. *United States v. King, 936 F.2d 477, 480 (10th Cir. 1991); United States v. Robles, 814 F. Supp. 1233, 1246 (E.D. Pa. 1993)*.

Secondly, there is no indication that counsel would have been on notice that McCory's testimony would have been exculpatory even had he known of her existence, in light of the fact that the police reports indicated that the robbery took place between 10:30 p.m. and 11:30 p.m. Indeed, even McCory indicated that the police were first called to the crime scene after dark. A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant. *Marra v. Larkins, 111 F. Supp. 2d 575, 585, fn. 13 (E.D. Pa. 2000)*. Because all of the objective evidence indicated that the robbery took place much later than 3:30 or 4:00 in [*30] the afternoon, petitioner is unable to show that counsel was ineffective for failing to interview or call a witness whose testimony would not have exculpated petitioner.

4. Subclaim # 5. Failure not to labor under a conflict

of interest.

In Claim # 8, petitioner alleges that his defense counsel represented him as though he believed that petitioner was guilty of the charged offense. In support of this claim, he points to defense counsel's testimony from the hearing conducted on petitioner's ineffective assistance of counsel claims. At this hearing, counsel was asked why he did not bring out an inconsistency between the police report, in which the victim allegedly told the police that petitioner threw him to the floor, and the victim's trial testimony, in which the victim testified that he threw petitioner to the floor. Counsel testified that he did not bring out this inconsistency because he believed it to be a clerical error, noting that the victim weighed 260 pounds and petitioner weighed only 160 pounds. Petitioner claims that this is evidence that his attorney believed that he was guilty of these crimes, and hence, labored under a conflict of interest.

Prejudice is presumed, [*31] in connection with an ineffective assistance of counsel claim, where a defendant demonstrates actual conflicts of interest that compromise his or her attorney's ability to advocate his or her client's interests. *Olden v. United States, 224 F.3d 561, 565 (6th Cir. 2000)*. An attorney who abandons his or her duty of loyalty to the client and joins the prosecution in an effort to obtain a conviction suffers from an obvious conflict of interest. *Osborn v. Shillinger, 861 F.2d 612, 629 (10th Cir. 1988)*. Courts, however, will not find an actual conflict of interest unless a defendant can point to specific instances in the record to suggest an actual conflict or impairment of their interests. *Dixson v. Quarles, 627 F. Supp. 50, 53 (E.D. Mich. 1985)*(Guy, J.)(internal citations omitted).

In the present case, petitioner has failed to show that his attorney abandoned him and joined with the state in an attempt to obtain a conviction against petitioner. As already mentioned, defense counsel confronted the victim with several of his inconsistent statements and called several witnesses to contradict the specifics of the victim's testimony. Counsel [*32] also called two alibi witnesses, one of whom also testified that the victim told her he could not identify his assailant. Counsel had petitioner testify, during which petitioner testified as to his alibi and denied committing the crime. (Trial Tr., pp. 77-80). In closing argument, counsel brought out the inconsistencies in the victim's testimony and also pointed out that petitioner's alibi witnesses had testified that

petitioner was with them at the time of the crime. ( *Id. at pp. 96-100*).

In the present case, defense counsel subjected the prosecution's case to meaningful adversarial testing, and thus prejudice to petitioner from this representation cannot be presumed. *Houchin v. Zavaras, 107 F.3d 1465, 1471 (10th Cir. 1997)*. The record contains no evidence that petitioner's attorney conveyed to the trial court his belief that petitioner was guilty or that he in any way abandoned his duty of loyalty to petitioner and aligned himself with the prosecutor to obtain a conviction. *Id.* This part of petitioner's claim is completely without merit.

5. Subclaim # 6, Failure to seek disqualification of the trial judge from presiding over petitioner's bench [*33] trial.

Petitioner next claims that counsel was ineffective for failing to disqualify the trial court from sitting as the trier of fact in this case, after counsel made a motion in limine to suppress petitioner's prior criminal record for impeachment purposes in front of that judge.

When a case is tried before a judge, it is presumed that a judge will ignore matters which come to his or her attention and are excluded from evidence, even if such matters include a defendant's prior criminal record. *See United States v. Cobb, 396 F.2d 158, 159 (2nd Cir. 1968); vacated on other grds, 402 U.S. 937 (1971); aft remand 455 F.2d 405 (2nd Cir. 1972)*. In this case, although counsel did bring a motion to suppress petitioner's prior record, the prosecutor agreed to the suppression of petitioner's prior record for impeachment purposes and petitioner's prior convictions were not even mentioned on the record to the judge. (Trial Tr., pp. 3-4). Moreover, the trial court did not mention petitioner's prior convictions in finding him guilty. (*Id., at pp. 102-104*). Because there is no evidence that the trial judge was directly influenced by petitioner's [*34] prior convictions, petitioner has not rebutted the presumption that the trial court was able to reach a decision without considering the excluded evidence. *See Stephens v. LeFevre, 467 F. Supp. 1026, 1029-1030 (S.D.N.Y. 1979)*. Petitioner has therefore failed to show that he was prejudiced by counsel's decision not to seek to have the trial court disqualified from hearing petitioner's case.

6. Subclaim # 7. Counsel's multiple errors denied petitioner a fair trial.

Petitioner lastly claims that the cumulative nature of the errors deprived him of the effective assistance of counsel. Because the individual claims of ineffectiveness alleged by petitioner are all essentially meritless, petitioner cannot show that the cumulative errors of his counsel amounted to ineffective assistance of counsel. *Seymour v. Walker, 224 F.3d 542, 557 (6th Cir. 2000).*

C. *Conclusion*

Petitioner has failed to show that he was deprived of the effective assistance of counsel.

**E. Claims # 6 and # 9. The inadequate notice and variance claims.**

Petitioner's sixth and ninth claims are interrelated. Petitioner first claims that he was given inadequate notice of the charges [*35] against him, because the victim originally told the police that the crime took place sometime between 10:30 and 11:30 at night, but at trial, the victim testified that the offenses were committed at 3:30 to 4:00 p.m. Petitioner further claims that the trial court impermissibly amended the original information charging petitioner with these offenses when the trial court, in its findings of fact, found that the crime took place sometime in the afternoon or evening hours of the day.

A complaint or indictment need not be perfect under state law so long as it adequately informs the petitioner of the crime in sufficient detail so as to enable him or her to prepare a defense. Therefore, an indictment "which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall, 806 F.2d 636, 639 (6th Cir. 1986)*; *Ransom v. Davis, 613 F. Supp. 430, 431 (M.D. Tenn. 1984).* A claim of a variance between a criminal information and the evidence at the state court trial is not reviewable by way of federal habeas corpus. *See Bradshaw v. State of Oklahoma, 398 F. Supp. 838, 844 (E.D. Okla. 1975)*; [*36] *See also Anderson v. Love, 681 F. Supp. 1279, 1283 (M.D. Tenn. 1986).* A charge is sufficiently specific when it contains the elements of the crime, permits the accused to plead and prepare a defense, and allows any disposition of the case to be used as a bar against any further prosecutions. *Fawcett v. Bablitch, 962 F.2d 617, 618 (7th Cir. 1992).*

In the present case, petitioner contends that he was deprived of a fair trial because of a variance between the time that the victim told the police that the crime occurred and the time that the victim testified at trial that the crimes took place. The time of an offense is not an essential element that needs to be proven by the state. Instead, the time of the crime implicates only due process concerns, such as whether a late amendment of an information interferes with a habeas petitioner receiving adequate notice of the charge or whether petitioner was denied the opportunity to present a defense. *Scott v. Roberts, 777 F. Supp. 897, 900 (D. Kan. 1991).*

In the present case, a review of the complaint filed in this case shows that it alleged that petitioner committed the offenses of armed robbery [*37] and breaking and entering an occupied dwelling against Alton Austin on July 4, 1989 at 1521 West Forest Street in Detroit, Michigan. [2] The complaint sufficiently apprised petitioner as to the date, location, the victim, and the criminal conduct charged so as to place petitioner on notice as to the crimes charged. Moreover, the investigator's report indicated that the robbery occurred between the hours of 10:30 p.m. and 11:30 p.m. [3] Plaintiff was made sufficiently aware of the time that the crimes allegedly occurred and was able to present alibi witnesses to account for his whereabouts at the time that the crime was committed. Although petitioner now claims that he was prejudiced by the variance between the time that the victim originally told police that the crimes had occurred and his testimony at trial, a review of the trial testimony and the prosecutor's theory shows that the prosecution never changed their theory that the crime occurred in the evening hours. In fact, during his cross-examination of Officer Joseph, the prosecutor elicited testimony that Officer Joseph worked the 7:00 p.m. to 3:00 a.m. shift. Officer Joesph testified that the victim had informed the police upon [*38] their arrival that the robbery had occurred "just recently". (Trial Tr., p. 48). Officer Joesph's partner had testified that the police took the report from the victim at 11:30 p.m. (*Id.* at p. 41). In his closing argument, the prosecutor indicated that it was their theory that the victim was mistaken as to the time of the offense, either due to his age or the amount of activities taking place on the Fourth of July. (*Id. at p. 91*).

  2  Complaint attached as Petitioner's Exhibit 2.
  3  Complaint attached as Petitioner's Exhibit 1.

In the present case, there was no error of

constitutional magnitude from an enlargement of the time period contained in the original investigator's report, where the petitioner was aware of the general time that the prosecutor alleged that the incident had taken place, as well as the location of the alleged incident. Moreover, the enlargement of time did not appear to prejudice petitioner's defense, because he was able to present an alibi defense. *Scott, 777 F. Supp. at 900-901*. [*39] Petitioner's claim does not entitle him to habeas relief.

### F. Claim # 7. The sentencing guidelines issue.

Petitioner next claims that the trial court incorrectly scored his sentencing guidelines range by assessing him points under Offense Variable 2 of the Michigan Sentencing Guidelines for inflicting bodily injury. Petitioner's claim involving the trial court's allegedly improper interpretation of the state's sentencing guidelines is not a cognizable claim for federal habeas review. *See Cook v. Stegall, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999)*(Gadola, J.). Petitioner has no state created liberty interest in having the Michigan sentencing guidelines applied rigidly in determining his sentence. *Thomas v. Foltz, 654 F. Supp. 105, 106-107 (E.D. Mich. 1987)*(Cohn, J.). To the extent that petitioner is claiming that his sentence violates the Michigan state sentencing guidelines, his claim is not cognizable in a habeas proceeding because it is a state law claim. *Id.*

### G. Claim # 11. The ineffective assistance of appellate counsel.

Petitioner lastly claims that he was deprived of the effective assistance of appellate counsel, because appellate [*40] counsel failed to raise certain pertinent issues detailed in this petition.

The *Sixth Amendment* guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey, 469 U.S. 387, 396-397, 83 L. Ed. 2d 821, 105 S. Ct. 830 (1985)*. However, court appointed counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes, 463 U.S. 745, 751, 77 L. Ed. 2d 987, 103 S. Ct. 3308 (1983)*. An attorney's failure to present a nonmeritorious issue on appeal does not constitute ineffective assistance of counsel. *Daniel v. Overton, 845 F. Supp. 1170, 1176 (E.D. Mich. 1994)*(Gadola, J.).

Because none of petitioner's issues were meritorious, he has failed to demonstrate that his appellate counsel was ineffective for failing to raise them on appeal. His last claim is without merit.

### IV. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DISMISSED WITH PREJUDICE.**

### HONORABLE PAUL D. BORMAN

UNITED [*41] STATES DISTRICT JUDGE

**Dated:** MAR 30 2001

Not Reported in N.E.2d, 2011 WL 4089553 (Mass.Super.)
(Cite as: 2011 WL 4089553 (Mass.Super.))

Only the Westlaw citation is currently available.

Superior Court of Massachusetts,
Worcester County.
COMMONWEALTH of Massachusetts
v.
Carlos RIOS.

No. 2007–1051.
Sept. 7, 2011.

**MEMORANDUM AND ORDER ON DEFEND-
ANT'S MOTION TO SUPPRESS**

PETER W. AGNES, JR., Justice.

*1 1. The defendant, Carlos Rios, is charged by
indictment with the murder of Christopher Olivencia
on March 8, 2007. He has filed a pretrial motion to
suppress statements he made to Florida police and
Massachusetts police on March 14–15, 2007.

2. *Findings of fact.* The record before the court
consists of the audio recordings of the two police
interviews (exhibits 2 and 3), a signed Miranda waiver
form dated March 15, 2007 (exhibit 1), a written re-
port from the Orange County Sheriff's Department to
the Worcester Police (exhibit 4), a transcript of the
recorded interview between the defendant and the
Worcester Police on March 15, 2007 (exhibit 5),
Worcester Police "Master Card" detail for the de-
fendant (exhibit 6), and a compilation of Worcester
Police Department reports relating to the defendant
(exhibit 7). Based on this evidence, I make the fol-
lowing findings of fact. The defendant, Carlos Rios,
surrendered himself to the Orange County Sheriff's
Department at approximately 9:00 p.m. On March 14,
2007. He told the police he believed there was a war-
rant for his arrest for the crime of attempted murder.
The defendant was placed in custody. The Florida
police, Detective Susan Hempsfield and Detective
Mark Hussey, verified that there was an arrest warrant
outstanding for the defendant, but that it was for the
crime of Murder alleged to have been committed in
Worcester, Mass. on March 8, 2007. The Florida de-
tectives also contacted the Worcester Police and were
briefed on the status of the investigation. The de-
fendant was brought to an interview room. He was not
handcuffed. He was told the interview was being
recorded. He was informed of his Miranda rights. At

one point he indicated he did not understand the Mi-
randa rights. He also remarked that he was unable to
afford an attorney and questioned how it was that he
could have an attorney. After his rights were read to
him, the defendant asked the police "what does that
Miranda warning do." The Miranda rights were read
again to the defendant. Thereafter, the defendant
signed a Miranda waiver form.

3. The defendant was asked about his drug and
alcohol use. He admitted to being a regular marijuana
smoker, but said he had not been drinking for several
weeks. He told the Florida police he turned himself in
because he knew the police were looking for him. He
indicated he got to Florida by stealing three cars and
that he walked seven miles to the Sheriff's Office. He
told the police he had little memory of the trip to
Florida. He said he had been "throwing up" for the
past three days over the death of his aunt. He said he
had not eaten in eight days. The police did offer him
food and candy. He reported he was feeling sick. The
defendant provided some biographical details in-
cluding the fact that he had two young children and a
girlfriend who was their mother.. At first he denied
any knowledge of the victim, but then indicated that
the victim had stabbed him three times in August,
2010. Soon after the interview began, the defendant
began to cry and at times was sobbing. He also said he
was scared of the victim's family, that they had
harmed his girlfriend and would kill him. The de-
fendant said, in a sobbing voice, he wanted to hang
himself.

*2 4. The police questioned the defendant's ac-
count of recent events and indicated that they had
information from an unidentified eyewitness who was
with the defendant that on March 8, 2007, the de-
fendant was in a vehicle which pulled up to 33 Mount
Vernon Street in Worcester. The victim was standing
in the vicinity. The defendant rushed out of the vehicle
and stabbed the victim to death and returned to the car
which left the scene. The police also indicated they
had corroborating information from his girlfriend. The
defendant denied stabbing the victim. The police
suggested that it would be a "big deal" to the court if
the defendant said it was self-defense. In reply to the
defendant's statement, as he was crying, that if he told
the police what happened he would be killed, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2011 WL 4089553 (Mass.Super.)
(Cite as: 2011 WL 4089553 (Mass.Super.))

police indicated that if the defendant said it was an accident or self-defense, it would be understandable. The police again stated that they had information that it was an unprovoked stabbing. The defendant continued to sob, but admitted he did it and said it was self-defense. According to the defendant, the victim pulled out a knife and the defendant grabbed it and stabbed the victim. Most of the police questions were of the leading variety and most of the defendant's answers were short with little elaboration. The defendant repeated his statement about wanting to kill himself.

5. At some point during this recorded interview, the police told the defendant that Erika, his girlfriend, told them his story was a lie, and that the defendant had a motive to kill the victim because the victim had fathered one of the defendant's children with Erika while the defendant was in jail. The police also identified the defendant's companion at the time of the stabbing who the police said told them he saw the defendant stab the victim. The police indicated that the defendant was facing a charge of murder in the first degree, and "this is your opportunity to tell the truth." When the defendant claimed he could not recall what had happened, the police added that if the defendant stuck to his story he would be placed in the general population of the jail back in Massachusetts and the police would not be able to protect him from the victim's friends and family. When the defendant remarked rhetorically he was dead either way whether he lied or told the truth, the police suggested a third alternative—that he describe the stabbing as an accident or self-defense. Shortly thereafter, the defendant described the event as a stabbing in self-defense. The defendant said he could not recall the details of how he arrived in Florida from Massachusetts. The police then asked him if there was anything else he wished to add to the tape "because this may be your only opportunity."

6. The following day, the defendant was interviewed again by Worcester Police detective Daniel Rosario and the Florida detectives who had interviewed him the day before. When asked if he recalled his Miranda warnings, the defendant replied, in what appears to be a slurred voice, that "they gave me two pills." The police indicated that they would make inquiry later about the medication given to the defendant, but continue with the interview. Without repeating the Miranda warnings, Detective Rosario

inquires about the stabbing asking the defendant "what happened?" Most of the talking is done by the police. The defendant states, in reply to Detective Hempfield's question about the origin of the knife, that it came from the victim's hand. Early in the interview the defendant begins to cry and sob again as he did during the interview the day before. About five minutes into the interview, the police summarize the Miranda warnings, and then add "this is really going to help you."

*3 7. At some point during this interview, the defendant gives an account of the stabbing similar to his self-defense account of the day before with the additional fact that he picked up his "wife" after the event. When he repeated that he had driven himself to Florida, Detective Rosario interjected that the police suspect that uncle Jesus drove the defendant to Florida, that the uncle is facing serious criminal charges that could involve imprisonment for seven years, and that the defendant "could take the heat off his family," including his uncle, his girlfriend and his mother, by telling the truth. Again, most of the conversation is from the police. The defendant expressed fear that he would be killed in jail. The police add that apart from the safety of his family, the defendant should be aware that his buddy was beaten up. Thereafter, the defendant, speaking with what appears to be slurred speech, stated that he was trying to answer the questions but "the medication is working." Shortly thereafter, the defendant states "I don't want to speak no more." However, the interview continues without regard for this assertion of the right to remain silent.

8. *Discussion. First Interview.* There is no dispute that the defendant was subjected to custodial police interrogation by the Florida detectives on March 14, 2007. The first question presented for this court's review is whether the defendant "voluntarily, knowingly and intelligently waive[d] his Miranda rights." *Commonwealth v. Jackson,* 377 Mass. 319, 325 (1979), quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). He maintains that the Commonwealth did not meet its "heavy burden" of proving a knowing and voluntary waiver. *Id.* [A]s a matter of Massachusetts practice, the Commonwealth must prove a knowing and intelligent waiver beyond a reasonable doubt." *Commonwealth v. Day,* 387 Mass. 140, 145 (1982).[FN1] On the basis of the record before me, it cannot be said that the Commonwealth met that burden. The tape recording of the first interview indicates that the de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2011 WL 4089553 (Mass.Super.)
(Cite as: 2011 WL 4089553 (Mass.Super.))

fendant was confused about the right to counsel, and, in particular, about the idea that an attorney would be provided for him without cost if he could not afford an attorney. Although the defendant signed a written waiver form, this is not conclusive. Factors that are relevant on this question are (1) the defendant's educational level (he said it was 10th grade), (2) his physical condition (he said he had not eaten in a week and had been throwing up for three days), and (3) his emotional and psychological condition (he was overcome with fear that he and his family would be killed, he cried and sobbed throughout most of the interview, and said at two different points in the interview he wanted to kill himself. When a person expresses the intention to kill himself in circumstances such as these in which there is a context which explains why the defendant may have such thoughts, the police must be extremely cautious. Although there is no per se rule that a person with a mental illness or who is mentally retarded cannot make a valid waiver of Miranda or a voluntary statement, see, e.g., _Commonwealth v. McGowan,_ 458 Mass. 461, 472 (2010) mildly retarded defendant); _Commonwealth v. Hilton,_ 443 Mass. 597, 606–07 (2005) (mentally ill defendant), the law requires the exclusion of statements when a mental health problems cause a person to be indifferent to his own self-protection. See _Commonwealth v. Vasquez,_ 387 Mass. 96, 100 & n. 8 (1982). While the Supreme Judicial Court has observed that "distress, even profound distress does not necessarily mean that a defendant is incapable of witholding any information he conveys," _Commonwealth v. Stroyny,_ 435 Mass. 635, 646–47(200), this case presents an extreme example. The interview reflects that the defendant knew his girlfriend had already been physically beaten. The defendant left no doubt that he believed his death at the hands of persons associated with the victim's family was inevitable. In this case, the record before me depicts a defendant who was so upset and so overcome with fear that he and his family would be killed by the friends and family of the victim that he was unable to make a rational choice about whether or not to answer the questions put by the police. The weight of the defendant's fear of retaliation against him and his family is comparable to the effect of the televised news broadcast on the defendant in _Commonwealth v. Murphy,_ 442 Mass. 485, 494 n .11 (2004). Certainly, when one considers the very heavy burden of proof resting on the Commonwealth,[FN2] there is some doubt about the validity of the defendant's waiver. That doubt must be resolved in the defendant's favor. The court would have been reassured

and might have reached a different result if the interview was conducted on the basis of open-ended questions put to the defendant by the police followed by narrative answers by the defendant. Instead, the questions by the police were mostly leading, and at critical moments consisted of efforts to minimize the crime and suggestions that it was advantageous for the defendant to speak. Moreover, the police actually suggested accident or self-defense to the defendant who up to that point had either denied his involvement or said he could not remember the details.

> FN1. The parties have not addressed the question of whether Massachusetts law or Florida law should be applied to this issue. Since it appears that the Florida police questioned the defendant to assist the Massachusetts police and for the specific reason of gathering evidence to be used in a Massachusetts prosecution, it seems clear that Massachusetts law is applicable.

> FN2. The jury instruction used to express proof beyond a reasonable doubt is instructive. Perhaps the best synopsis of the concept of proof beyond a reasonable doubt is "a subjective state of near certainty." _Commonwealth v. Pinkney,_ 419 Mass. 341, 347 (1995).

*4 9. Massachusetts law also requires that the Commonwealth prove voluntariness by a standard of proof beyond a reasonable doubt. See _Commonwealth v. Tavares,_ 385 Mass. 140, 145, 149–53 (1982). There was no physical coercion employed by the Florida police. Although the use of the technique of minimization (suggestions that the crime was understandable or that the defendant is less culpable than some may think) creates risks that the statements made by the defendant may not be voluntary, and should be avoided, it is not forbidden. See _Commonwealth v. Gaboriault,_ 439 Mass. 84, 88–89 (2003). However, the same factors discussed above, in paragraph 8, that preclude a finding by a standard of proof beyond a reasonable doubt that the defendant waived his Miranda rights, preclude a determination that the defendant's statement to the Florida police was voluntary. _See_ note 2, supra.

10. _Second interview._ The second interview is even more problematic than the first interview. The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2011 WL 4089553 (Mass.Super.)
(Cite as: 2011 WL 4089553 (Mass.Super.))

police did not begin by restating the Miranda warnings. The police do not have to re-advise the defendant of his Miranda warnings and secure a new waiver in every case before questioning him a second or subsequent time. See, e.g., *Commonwealth v. Martinez,* 458 Mass. 684, 691–93 (2011). However, a second day interview is an interview after a significant lapse of time and should be preceded by a new set of warnings and another waiver. Not only did the police fail to re-advise the defendant at the outset of his Miranda rights, but they did not determine what medication he had been given after he told the police he had taken two pills despite the fact that even the audio tape reveals signs of the defendant's impairment (slurring of his speech). In addition, the Worcester police informed the defendant that speaking to them was going to help him. At a minimum such a statement diminishes the defendant's right to remain silent. However, more fundamentally, it is a false statement calculated to induce the defendant to abandon his constitutional rights. See *Commonwealth v. DiGiambattista,* 442 Mass. 423, 432–33 (2004). How can it be said that a waiver of Miranda rights, which can be asserted at any time during a custodial interrogation, remains valid when the police inform the defendant that cooperation with them and speaking to them will help his case? In addition to this regrettable mistake, when the defendant finally stated that he no longer wanted to talk, the police made no inquiry (although it was not an ambiguous statement), but simply kept interrogating the defendant. The right to remain silent exists from the beginning to the end of the interview. See *Commonwealth v. Bradshaw,* 385 Mass. 244, 265 (1982). Once the right to remain silent is invoked, all questioning must cease until the defendant freely and voluntarily chooses to initiate questioning. See *Oregon v. Bradshaw,* 462 Mass. 1039, 1044 (1983); *Michigan v. Mosley,* 423 U.S. 96, 103–04 (1975); *Commonwealth v. Lopes,* 455 Mass. 147, 163 & n. 15 (2009). In view of the actions by the police, the defendant's medicated condition which caused him to slur his speech, his emotional condition (crying and sobbing because of fear he and his family would be killed), and the nature of the police questioning (again, mostly leading questioning in which answers were suggested to the defendant), I am unable to say, by the standard of proof beyond a reasonable doubt, that the second interview was conducted on the basis of a valid waiver of his Miranda rights or that it was voluntary.

### ORDER

*5 In more than twenty-one years of service as a trial judge in both the District and Superior Courts, I have had occasion to conduct a hundreds of hearings on motions to suppress statements based on allegations that there was a violation of Miranda or that the statement was not voluntary. In recent years, largely as a result of *Commonwealth v. DiGiambattista,* 442 Mass. 423 (2004), both trial and appellate judges commonly receive in evidence as an exhibit a video or audio recording of the actual custodial interrogation in a case as opposed to hearing witnesses give accounts of what happened and what was said. After viewing perhaps forty recorded custodial interrogations since *DiGiambattista,* I am persuaded that police departments, with input from prosecutors and others, should give consideration to recognizing a specialty designation for conducting custodial interrogations. The officers and detectives who conduct custodial interrogations face significant challenges in terms of the need to understand a complex body of state and federal law, and the use of appropriate interrogation methods. There are some important guideposts in the law. Purposeful use of deception about the existence of evidence, minimization of the gravity of the crime under investigation, and incorrect statements about the law are all techniques that should not be used. Beyond this, it is time for the law enforcement community to take into account developments in social science research about the impact of certain types of interrogation methods on persons who are likely to be more susceptible to persuasion and whose interrogations may need to be conducted differently than the interrogations of others,[FN3] and to reach out to other interested parties, as it did to address shortcoming with eyewitness identification procedures, to consider best practices in the area of custodial interrogations and incorporate these into the day to day work of police officers and detectives. The issue is not whether the police should attempt to obtain confessions. Rather, the issue is given the extraordinary weight assigned to confessions by juries, and the commitment our system has to present juries with reliable evidence, the approach to questioning persons who are in a custodial setting should be based on guidelines that are designed to promote, if not ensure, reliability. For example, in this case, most of the questions put to the defendant were leading, and many were argumentative. Very few of the questions were open-ended. In addition, when a person makes statements about killing himself in the midst of an emotionally charged interrogation, and later when it is known that he has been medicated as a result of that condition, is it appropriate to simply continue with the interrogation or should there be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2011 WL 4089553 (Mass.Super.)
(Cite as: 2011 WL 4089553 (Mass.Super.))

guidelines that provide police officers and detectives
with alternatives?

> FN3. See Saul M. Kassin, Steven A. **Drizin**,
> Thomas Grisso, Gisli H. Gudjonsson, Rich-
> ard A. leo, & Allison D. Redlich, Po-
> lice–Induced Confessions: Risk Factors and
> Recommendations, published online July 15,
> 2009 as a "scientific review paper" of the
> American        Psychology–Law        Socie-
> ty/Division 41 of the American Psychologi-
> cal Association. See also William C.
> Thompson, An American Psychology–Law
> Society Scientific Review Paper on Police
> Interrogation and Confession, 34 Law and
> Human Behavior 1 (2010). Professor
> Thompson observes that although the or-
> ganization usually addresses the legal com-
> munity and the public on the basis of the
> views of individual members, there are times
> when the organization deems it important to
> speak as an organization. "By authorizing
> and endorsing Scientific Review papers, the
> Society makes known the consensus views of
> its members and lends its authority to the
> conclusions reached." *Id.* The above paper is
> only the second time in 42 years that the So-
> ciety has commissioned such a paper.

    For the above reasons, the defendant's motion to
suppress the first and second statements made to
Florida police detectives and both Massachusetts and
Florida police detectives on march 14 and March 15,
2007 is *ALLOWED.*

Mass.Super.,2011.
Com. v. Rios
Not Reported in N.E.2d, 2011 WL 4089553
(Mass.Super.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CRIMINAL ACTION
NO. 2009-0385

## COMMONWEALTH

### vs.

### NGA TRUONG

## FINDINGS OF FACT, RULINGS OF LAW, AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The defendant, Nga Truong ("Nga"), moves the court to suppress any and all statements made by her to law enforcement on December 1, 2008, together with all evidence obtained by the Commonwealth as a result of any statements she made. For the following reasons, the defendant's motion to suppress is **ALLOWED**.

## FINDINGS OF FACT

Based on the evidence presented at the hearing and the reasonable inferences therefrom, the court makes the following findings of fact.[1]

On November 30, 2008 at approximately 11:10 a.m., Sergeant Kevin Pageau ("Pageau"), of the Worcester Police Department, accompanied by two other officers,[2] responded to an apartment located at 3 Henderson Avenue in Worcester, Massachusetts in order to investigate a 911 call of an unconscious and unresponsive one-year old baby, Khyle Truong ("Khyle"). Khyle

---

[1] The findings of fact made by the court are those that are relevant to the issues presented by this motion. The evidence presented, and considered by the court, consisted of the testimony of Sergeant Kevin Pageau, a computer screen printout, the audio recordings of the interviews of Nga Truong and Van Truong, the video recordings of those interviews, the Miranda Warnings and Waiver form signed by Nga Truong, and the death certificate. The court was also provided with a transcript of the audio and video recording of the interview with Nga Truong to assist the court in following the audio portion of her interview.
[2] Pageau arrived with Detectives Doherty and Goulet. Detective Goulet was from the juvenile division of the Worcester Police Department.

had been taken to the hospital, but was believed to have died. Khyle's mother, Nga, and his grandmother, Van Truong ("Van") had also gone to the hospital. Pageau had been assigned as the detective in charge of the investigation.

When Pageau arrived at the apartment shortly after 11:00 a.m. he knew Worcester police had initially arrived at about 10:40 a.m. to find an infant (Khyle) not breathing, and that the responding officer had found vomit on the baby's face and around his mouth when he attempted to perform CPR. Pageau himself observed what he believed to be vomit in the crib where Khyle had been. Once at the scene, Pageau directed officers from the department's crime scene unit to collect evidence and take photographs. Pageau remained at the apartment for approximately two hours that day. Khyle Truong was officially pronounced dead just after 12:00 p.m. on November 30, 2008.

Edwin Vasquez ("Edwin"), Nga's boyfriend, was at the apartment when Pageau and the other officers arrived. Edwin had been at the apartment when the 911 call came in regarding Khyle.[3] Pageau had a brief conversation with him at that time. Later that afternoon, at approximately 2:00 p.m., the police brought Edwin to the police department and took his statement.[4]

At 2:30 p.m. on November 30th Pageau met with both Nga and Van and spoke with them together for approximately half an hour. Prior to speaking with them, Pageau had learned from the emergency room doctors that an hour after he had been removed from the apartment Khyle had a temperature of 101; that Khyle's death did not appear to be a traditional SIDS[5] death; and that there were no signs of injury or significant illness. Neither Nga nor Van was placed in

---

[3] From the interviews with Van and Nga, the court learned that Edwin lived at the apartment with Nga.
[4] Detective Doherty interviewed Edwin and that interview was not audio or video-recorded. Notably, Pageau testified that the Worcester police do not audio or video-record non-custodial statements.
[5] Sudden Infant Death Syndrome

custody and Pageau did not read them their <u>Miranda</u> warnings. The court finds that Pageau did not discuss with Nga or Van that before speaking with him Nga could meet with Van or another interested adult to discuss her rights. Based on the information he received from Nga and Van, Pageau sent officers from the crime scene unit back to the apartment to retrieve additional evidence.[6]

After the interviews with Edwin, Nga & Van, Pageau and Detective John Doherty ("Doherty") proceeded with their investigation and obtained information from Worcester Police Department records that a year before Khyle's death Nga had been a run-away and involved with the Department of Social Services ("DSS").[7] They had also discovered that eight years earlier, when Nga was eight-years old, Van had left her in charge of Nga's three-month old baby brother, Hein. Nga found Hein unconscious and brought the baby to an adult who lived downstairs. Hein was taken to the hospital and pronounced dead. It was determined that the cause of death was SIDS. A DSS report had been filed and neglect found on the part of Van for leaving Nga in charge of Hein. No criminal charges were brought.

On December 1, 2008 at about 10:30 a.m. Pageau and Doherty returned to the apartment because they wanted to bring Nga, Van and Edwin to the police station for further interviews. When they arrived at the apartment, Van, Nga, Edwin, and Nga's aunt were there. Pageau testified that he told Edwin, Van and Nga that he wanted to speak with them at the police department.[8] Pageau did not place Nga, Van or Edwin into custody, nor did Pageau advise any of them of their <u>Miranda</u> warnings. The court finds that Pageau was not aware that Nga was

---

[6] The officers retrieved two used diapers that Pageau was told had been Khyle's.
[7] Now called the Department of Children & Families.
[8] This was Pageau's initial testimony at the hearing. In response to a question from the court, Pageau altered that testimony by stating that he told Van he wanted to speak with her and her daughter at the police station and asked Van if they would be willing to come down to the station to talk with him. The court does not credit this testimony and finds that Pageau did not speak only with Van and was not seeking Van's permission to speak with Nga.

sixteen years old [9] when he was at the apartment on the morning of December 1st, nor when he met with Nga and Van the day before on November 30th. Pageau testified that his understanding of a juvenile was anyone under the age of eighteen; however, he also testified that under the law a juvenile, at least with regard to <u>Miranda</u> warnings, is an individual under the age of seventeen. Based on that testimony, the court finds that while Pageau believed Nga was a minor (under eighteen), he treated her as if she was not a juvenile (at least seventeen) when telling her he wanted to bring her to the police department for another interview. There was no evidence that Pageau advised Nga or Van that Nga could consult with Van, some other interested adult, or an attorney, to discuss whether or not she should go the police station to be interviewed.

While Nga and Edwin remained at the apartment, a relative drove Van to the police station to meet with Pageau and Doherty. Van was taken to an interview room.[10] The interview with Van began shortly after 11:00 a.m., but the audio and video recording did not begin until 11:20 a.m. At the beginning of the interview, the detectives advised Van of her <u>Miranda</u> warnings. Van agreed to waive her rights and to speak with the detectives. At no time during the two hours of Van's interview did either detective indicate that they knew Nga was only sixteen, and when at the beginning of the interview they asked Van how old Nga was, she told them Nga was seventeen.[11] The officers never advised Van of Nga's <u>Miranda</u> rights, they did not ask her if they could interview Nga, and they did not tell Van they would give Nga an opportunity to consult with her, some other interested adult, or an attorney before they interviewed Nga.

---

[9] It is not in dispute that Nga was sixteen years old on December 1, 2008.

[10] The room was a small room, approximately 8 feet by 10 feet, containing a table and three chairs. Two of the chairs were on one side of the table and the third chair was on the other side, with the chairs facing each other. The video camera faced the single chair. There was one door to the room.

[11] Given all the information Pageau and Doherty had acquired about Nga prior to the interview with Van, including DSS records and police reports regarding Hein's death, the court finds it hard to believe they were not aware of Nga's date of birth (December 3, 1991) which would have told them Nga was only sixteen. Also, at one point in the interview with Van, Pageau tells Van that Nga needs help and that she is "still a juvenile."

It is evident from the interview with Van that Pageau and Doherty firmly believed that Nga had killed Khyle, and the officers were clearly interrogating Van. Pageau questioned Van about Hein's death and both detectives had reached the conclusion that Hein had not died from SIDS, but rather at the hands of Nga. They linked Khyle's and Hein's death together telling Van that two babies were dead and both times Nga was with those babies. They continually insisted that Van tell them what Nga did to those babies. When Van told them that Hein's death had been from SIDS, the officers were utterly dismissive of that explanation. They were forcefully direct with Van that the story of Hein's death was incorrect. The detectives insisted with Van that Hein had died the same way Khyle did – by suffocation from being smothered. They insisted that it could not have been a coincidence that two babies died the same way, and that Nga was with both babies when they died. Pageau told Van that Nga had lied to him the day before, he told Van he was going to bring Nga back in, and sarcastically asked Van "Do you think she's [meaning Nga] going to just walk out of here?" Pageau also told Van they had medical proof that Khyle had been smothered and that science does not lie. They accused Van of not cooperating with them because she would not tell them how Nga had killed Khyle and Hein. Pageau and Doherty also told Van that Nga needed a lot of help, that she was still a juvenile and that Van needed to help Nga get the help she needed.

The interrogation of Van ended at 1:17 p.m. At the end, Pageau tells Van that he's bringing in her daughter and boyfriend to speak with them. This was simply a statement of fact and not a request for Van's permission. Pageau's testimony that during Van's interrogation they asked Van for permission to speak with Nga, but that he was not sure if his request was on the actual video (which it was not) or after the video recording was over, is simply not credible.

Given that the detectives believed Nga was seventeen, that the focus of their investigation was entirely on Nga, that they had just spent two hours telling Van that Nga had killed Khyle and Hein, and had demanded that Van tell them what Nga had done to those babies, this court finds that the police purposely brought Nga to the station separately from Van and interviewed her after Van.[12] Based on the above, the detectives never intended that Nga and Van would consult with each other prior to Nga's interview. This court does not credit any portion of Pageau's testimony that he asked Van for permission to interview Nga or that he asked Van if she wanted to be present during Nga's interview.[13]

Either during Van's interrogation or shortly after its conclusion, Pageau sent an officer to the apartment to bring Nga in.[14] Van was no longer at the station when Nga arrived with the officer. Nga was brought to an interview room in the juvenile division located on the second floor of the police department and left alone in that room.[15] Nga was not in handcuffs. At some point, Doherty and Pageau came into the room. Within the first twenty seconds of the interview, Doherty asks Nga to give her date of birth, which she gave as December 1, 1991. The court finds that from that moment Pageau and Doherty should have been and were on notice that Nga

---

[12] Based on the conduct of the police during their interview of Van, together with the information the police had learned regarding Hein's death, the court finds that Pageau and Doherty specifically wanted to interview Van first and agreed to meet Van at the station. The court does not credit Pageau's testimony that he thought Nga had come with Van to the police station and did not realize Nga was not there until after his interview with Van was over, since it was clear during the interview with Van that he knew Nga was not there (having left the interview room at least once during Van's interview, despite testifying that he had not) and that he sent other officers to the apartment to pick up Nga and Edwin.

[13] This is borne out from the interview with Van in which Pageau tells Van that this time he is not interested in hearing the rehearsed and made-up story Van and Nga told him the day before, and when he told Van that Nga had lied to him the day before. During the interview Pageau told Van that she knew Nga had killed Khyle because Nga had told her that. When Van kept saying she did not know how Khyle died, Pageau kept saying that she did and kept asking her what Nga had told her and what Nga had done to those babies. Given the tact he and Doherty had taken with Van, it is logical to infer that Pageau believed that if Van and Nga met and talked before Nga's interview that Van would tell Nga what had occurred during her interview, which would have seriously compromised his investigation.

[14] It was somewhat unclear from Pageau's testimony if he sent the officer to go pick up Nga and Edwin while still interviewing Van or if he sent the officer after Van's interview was concluded.

[15] From the video recordings, this interview room appears to be the same as the one Van had been in.

was only sixteen years old. Doherty then advised Nga that he was going to go over her rights and asked her if she was there voluntarily. Nga responded that she was, but confirmed that she had been brought to the station by a police officer. Doherty then read Nga her <u>Miranda</u> warnings. He asked her if she understood them and she responded that she did. She also responded "sure" when Doherty asked her if she wanted to speak with them. Doherty asked Nga to sign the <u>Miranda</u> Warnings & Waiver form, which she did at 1:54 p.m.

Immediately after signing, Doherty asked Nga how old she was. Nga responded that she was seventeen. Doherty then asked Nga if she was going to be eighteen in a couple of days, to which Nga said: "I'm going to turn seventeen." Doherty responded by saying "Oh, you're going to turn seventeen in a couple days. Okay." At this point, Pageau asked Nga "You're not seventeen yet?" Nga said "No." Pageau's response was: "But you have spoken with your mother, and you spoke with me, with your mother present yesterday, right?" Nga said "Yes." Pageau then asked, "And your mother knows you're here today?" Nga said "Mm-hmm." Pageau then said "And that's okay. And as a matter of fact, she just left; right?" Nga responded, "Yes."

Based on the dialogue between the police and Nga, the court finds that Pageau and Doherty were now well aware that Nga was only sixteen years old, that Van was not present at the police station at this point, and that Nga had not had an opportunity to consult with Van, another interested adult, or an attorney before having her <u>Miranda</u> warnings read and agreeing to waive her rights. The court also finds that the police never told Nga, prior to waiving her <u>Miranda</u> rights, that she could speak with Van, another interested adult, or an attorney about her rights.

Because Pageau and Doherty had come to believe that Nga had killed Kyle prior to their meeting with either Van or Nga, the ensuing interview with Nga became an interrogation in

which Pageau and Doherty conveyed their belief to Nga that she had killed not only Khyle, but also her brother, Hein. Despite having told Nga that she was free to leave initially, once the interrogation became forceful, Nga's requests to end the interview were not honored.[16]

During more than two hours of interrogation, Pageau and Doherty focused exclusively on Nga's involvement in the death of Khyle. Throughout their questioning, the police theme was that (1) they were aware she had killed Khyle and Hein, (2) they had medical evidence confirming she had smothered Khyle,[17] (3) they knew her mother placed the responsibility for caring for her younger siblings on her, putting too much pressure on her, (4) that neither Van nor Edwin were involved in Khyle's death, leaving her as the only possible person, and (5) that if she told them what she did, they would get her the help she needed because she was just a juvenile,[18] but if she refused to admit what she did, they would take her to court and tell the jury that she smothered Khyle.

As the interrogation proceeded the detectives' tone became increasingly aggressive. They continually refused to accept Nga's many denials that she did not hurt Khyle or Hein.[19] Each time Nga denied knowing how Khyle died, the police accused her of lying and that she was not cooperating with them. Also, throughout the interview, the police reminded Nga that she was only sixteen and at various points asked her about wanting to meet with her mother, or having already spoken with her mother, or that they could call Van if Nga wanted them to and that it was up to Nga. After almost two hours of accusing Nga of killing Khyle and promising

---

[16] For example, when Nga asked if she could come back another time to answer questions, she was told there would be no next time. At another point, when she asked when she could leave, Nga was left alone in the room for about five minutes while Pageau checked with his sergeant and then returned to continue questioning her.

[17] At the hearing Pageau testified that he knew no cause of death had been determined for Khyle and that lividity evident in Khyle's body at the autopsy may have occurred in the morgue. The death certificate did not contain a cause of death. The court finds that Pageau did not possess medical evidence that Khyle had been smothered when interviewing Nga.

[18] Including getting help for her siblings by getting them out of the house and away from Van.

[19] For example, when Nga told Pageau that Hein's death had been from SIDS, Pageau responded by saying "No.... big sister syndrome."

Nga that they would get her the help she needed because she was just a juvenile, and help for her brothers by getting them a better life, Nga admitted that she smothered Khyle with one of the teddy bears in his crib. Nga then asked if she could leave at which point she is then left alone in the interview room for almost twenty minutes. When the police return, Nga asks them "Will me and my brothers get to go to foster care?" Pageau responds by saying "Yes, I think so. We're going to get DSS involved to do some foster care. Okay. Try to help them out." Pageau then goes on to ask Nga if she had spoken with her mother about coming down to the station. Nga says that she had and that she had spoken with her mother by phone. Pageau then asks Nga "And it was okay with her and it was okay with you?" Nga said "Yes." Pageau then states "Okay. And we did ask you a couple times if you wanted to speak with her. You'd rather not speak with her?" And then Pageau stated "So as a matter of fact, we let her go, rather than let you talk with her?" Nga's responses were inaudible, but she nodded her head up and down. At the end of the interrogation, Nga was placed under arrest.

## RULINGS OF LAW

Under <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966), when an individual is taken into custody, police are required to inform that individual of her rights against self-incrimination and to an attorney. In addition, the police must obtain a knowing, intelligent, and voluntary waiver of those rights before any interrogation otherwise any subsequent statement is inadmissible. <u>Id.</u> at 444-445; <u>Commonwealth</u> v. <u>Bryant</u>, 390 Mass. 729, 736 (1984); <u>Commonwealth</u> v. <u>Haas</u>, 373 Mass. 545, 552 (1977). The defendant argues that the statement she gave must be suppressed because it was obtained during a custodial interrogation without her having made a knowing, intelligent and voluntary waiver of her <u>Miranda</u> rights. The defendant further argues that her statement was not made voluntarily. This court must first determine if Nga was subject to a

custodial interrogation. If she was, the court must then determine if she made a knowing, intelligent and voluntary waiver of her Miranda rights. Finally, the court must determine if Nga's statement was voluntary.

1.    *Was the defendant the subject of a custodial interrogation?*

Miranda warnings are only required when an individual, including a juvenile, is subject to custodial interrogation. See Commonwealth v. Morse, 427 Mass. 117, 122-23 (1998); Commonwealth v. A Juvenile, 402 Mass. 275 (1988). The defendant bears the burden of proving custody, Commonwealth v. Larkin, 429 Mass. 426, 432 (1999).

"[C]ustodial interrogation [is] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom in any significant way." Miranda v. Arizona, 384 U.S. at 444 (1966); see Commonwealth v. Haas, 373 Mass. 545, 551-554 (1977). In determining if a person is deprived of freedom in a significant way, the Supreme Judicial Court has recognized four factors to be considered: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, i.e. whether the interview was aggressive or, instead, informal; and (4) whether, at the time the incriminating statement or statements were made, the suspect was free to end the interview by leaving the place of the interrogation or by asking the interrogator to leave, or, alternatively, whether the interview terminated with the defendant's arrest." Commonwealth v. Sneed, 440 Mass. 216, 220 (2003); see also Commonwealth v. Ira I, 439 Mass. 805, 814 (2003).

"The test is an objective one: whether a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive." Commonwealth v. Larkin, 429 Mass. at 432. The critical question is "whether, considering all the circumstances,

a reasonable person in the defendant's position would have believed that [she] was in custody." Commonwealth v. Sneed, 440 Mass. at 220, quoting Commonwealth v. Brum, 438 Mass. 103, 111 (2002).

Taking into consideration the four factors and applying them to the totality of the circumstances in this case, the court finds that the defendant has met her burden of proving that she was in custody. Nga had been transported to the police station by a police officer and brought to an interrogation room, equipped with audio and video recording,[20] where she was questioned by two police officers for over two hours. Here, the officers did not just convey to Nga that she was a suspect, but, as found by this court, they spent most of the two hours telling Nga she had killed Khyle, and that she had also killed Hein eight years earlier. The nature of Nga's interrogation was not conversational or informal. To the contrary, the questioning was exceedingly formal and particularly aggressive. Finally, when Nga attempted to end the interview she was not free to leave, and at the end she was arrested. There is no question that a reasonable person in Nga's position would understand that she was not free to leave at the time she made the statement. See Commonwealth v. Morse, 427 Mass. at 127.

2.    *Did the defendant make a knowing, intelligent and voluntary waiver of her Miranda rights?*

Having determined that the defendant sustained her burden of proving she was in custody and Miranda warnings were required, the court must determine: (1) whether the warnings were validly given; (2) whether the defendant made a voluntary and knowing waiver of her Miranda rights; and (3) whether the defendant made statements voluntarily, without being intimidated or

---

[20] The court also notes that Pageau's testimony indicates that he believed the interview with Nga was custodial since he testified that custodial interrogations are ones that are audio and video recorded. While the subjective beliefs of law enforcement is irrelevant in determining if a person being questioned is in custody for the purposes of Miranda, such beliefs can influence the conditions surrounding an interrogation. See Stansbury v. California, 511 U.S. 318, 323-24 (1994); Commonwealth v. Morse, 427 Mass. at 124.

coerced.  Commonwealth v. Williams, 388 Mass 846, 850-56 (1983); Commonwealth v. A

Juvenile, 389 Mass. 128, 129 (1983);  Commonwealth v. Tavares, 385 Mass. 140, 145, *cert.*

*denied,* 457 U.S. 1137 (1982).  It is the Commonwealth's burden to prove beyond a reasonable

doubt the voluntariness of both the waiver and the statements. Commonwealth v. Day, 387 Mass.

915, 920-21 (1983).

There is no issue that the warnings given to Nga were valid.  Rather, this court must

determine whether the Commonwealth has proven beyond a reasonable doubt that Nga made a

voluntary and knowing waiver of her Miranda rights.  For the Commonwealth to successfully

demonstrate a knowing and intelligent waiver by a juvenile who has reached the age of fourteen,

such as Nga, there "should ordinarily be a meaningful consultation with the parent, interested

adult, or attorney to ensure that the waiver is knowing and intelligent.  For a waiver to be valid

without such a consultation, the circumstances should demonstrate a high degree of intelligence,

experience, knowledge, or sophistication on the part of the juvenile." Commonwealth v. A

Juvenile, 389 Mass. at 134.  This requirement envisioned that the parent of the juvenile was

present, the parent understood the warnings, and the parent had the opportunity to explain the

rights to the juvenile so that the juvenile understands the significance of waiving those rights. Id.

While actual consultation between the juvenile and a parent, interested adult, or attorney

is not required, there must be a "genuine opportunity" for such a consultation.  Commonwealth

v. Alfonso A., 438 Mass. 372, 381 (2003), citing Commonwealth v. MacNeill, 399 Mass. 71, 78

(1987).  In addition, to be any genuine consultation, the adult who is available must be informed

of and understand the juvenile's constitutional rights.  Commonwealth v. Alfonso A., 438 Mass.

at 382, citing Commonwealth v. Berry, 410 Mass. 31, 34-35 (1991)  Such a requirement

suggests the presence of an adult, or, "at the very least, contact between the adult and the police

standing alone, to support the finding that her statements were involuntary." Commonwealth v. Hilton, 450 Mass. 173, 178 (2007). Again, the Commonwealth bears the burden of proving that the defendant's statement was voluntary beyond a reasonable doubt. Commonwealth v. Tavares, 385 Mass. 140, 151-52 (1982).

In viewing the totality of the circumstances in this case, the Commonwealth has not sustained its burden of showing beyond a reasonable doubt that Nga's statement was voluntary. As stated above, the particularly aggressive interrogation conducted by the police given Nga's age together with her lack of sophistication and experience with the criminal process, coupled with her emotional state are all factors that lead to the conclusion that Nga's statement was not voluntary. In addition, the police repeatedly confronted Nga with knowingly false statements that they had conclusive medical and scientific evidence proving she had killed Khyle, which included false information regarding the presence of lividity and scientific evidence that Khyle had been smothered. Compounding this was the police insisting that Nga had killed Hein eight years earlier, despite having police reports, DSS records, and an autopsy showing that Hein's death had been investigated and determined to be a SIDS death.

The use of deception as a tactical device is disapproved, and such tactics cast doubt on whether a defendant's statement is voluntary. See Commonwealth v. Jackson, 377 Mass. 319, 328 n.8 (1979); Commonwealth v. Nero, 14 Mass. App. Ct. 714, 716 (1982). While the use of false statements is a relevant factor to be considered in voluntariness, it does not compel suppression. Instead, it is to be considered as part of the totality of the circumstances. Commonwealth v. DiGiambattista, 442 Mass. 423, 432-33 (2004). If the use of false information is the only factor pointing toward involuntariness, suppression would not ordinarily

follow. Id. at 433. However, where there are additional factors suggesting involuntariness, suppression will be required. Id.

. In addition to deception regarding medical evidence, the police continually told Nga that she was just a juvenile and if she would admit what she did she would remain in the juvenile court where she would get help. Statements such as "You tell us what happened. We walk right out here. To special crime, juvenile, get on the phone, talk with a social worker, and try to get you some help." They told Nga there were women out there (meaning outside the interrogation room) "that work with children like you and people that are abused and have issues at home, they have a lot of resources." The police also promised not just help for her, but also for Nga's brothers. The detectives told her "there's no doubt what happened in there. All everyone's waiting for today is for you admit to what you did so that we can start the process of getting you some help, getting you into a social program. Getting your brothers out of that house. And getting them in a better home, where there's a mom that gets up in the morning and takes care of them."[24]

Equally important, the police made it very clear that if Nga did not admit to what she did, they would proceed with putting the case together, go to court with all the evidence and prove that she smothered Khyle. If it went that route, the police clearly implied to Nga that no help would be available. With notable naiveté Nga believed what the officers told her since, after admitting she had smothered Khyle, all she wanted to know was whether she and her brothers would now be able to go to a foster home. By continually promising Nga that because she was a

---

[24] The police kept insisting that Van was a neglectful mother to not just Nga, but also Nga's brothers. Pageau and Doherty said how unfair the home situation was to Nga, and that she did not have the chance to just be a regular teenager because of Van. The police version was that Van had put Nga into an untenable and unbearable situation for someone her age by making Nga the one responsible for taking care of not only her own baby, but also her mother's. As a result, Nga was under tremendous pressure causing her to lose control that resulted in her smothering Khyle.

juvenile she would be given help if she admitted the crime, the police minimized the seriousness of the charge she was facing.

Where there have been suggestions of leniency in exchange for a confession, combined with false statements concerning allegedly irrefutable evidence that would be used against a defendant, the defendant's ability to make a voluntary statement is undermined. See Commonwealth v. DiGiambattista, 442 Mass. at 435; Commonwealth v. Meehan, 377 Mass. 552, 563 (1979). The detectives' assurances to Nga that, because she was a juvenile, she would receive the help she needed if she simply admitted what she had done to Khyle was more than an implied offer of leniency. In this case, they were extremely close to explicit promises. Even if it was not an explicit promise, the police assurances to Nga were still coercive. Coercion can be applied by way of implied promises just as it is by express promises. See Commonwealth v. DiGiambattista, 442 Mass. at 435-36. Given Nga's age she was even more susceptible to the influences and pressures applied by the detectives. See Roper v. Simmons, 543 U.S. at 569-571. In this case, the offers of leniency if Nga admitted she smothered Khyle represented a quid pro quo. See Id. at 436; Commonwealth v. Magee, 423 Mass. at 387. When, as here, there exists a combination of trickery and implied promises, together with Nga's young age, lack of experience and sophistication, her emotional state, as well as the aggressive nature of the interrogation, the totality of the circumstances suggests a situation potentially coercive to the point of making an innocent person confess to a crime. See Commonwealth v. Scoggins, 439 Mass. 571, 576 (2003). When such a situation exists, the Commonwealth has failed to meet its burden of establishing beyond a reasonable doubt that Nga's statement was voluntary and the statement must be suppressed. See Commonwealth v. DiGiambattista, 442 Mass. at 439.

*4.      Seizure of physical evidence*

After admitting that she smothered Khyle, Nga told the officers that she had used a stuffed animal to smother Khyle with.[25] Nga was asked additional questions about which stuffed animal she used and was shown a photograph taken by police of stuffed animals recovered from Khyle's crib.   There were two teddy bears pictured and she was asked which bear she had used. Nga was not sure. Any evidence obtained by the police with regard to either of the two bears based on statements made by Nga must also be suppressed as a fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471 (1963); Commonwealth v. Perrot, 407 Mass. 539, 546-48 (1990); Commonwealth v. Lahti, 398 Mass. 829, 832-37 (1986), cert. denied, 481 U.S. 1017 (1987); Commonwealth v. DiMarzio, 436 Mass. 1012 (2002). [26]

### ORDER

For the foregoing reasons, it is hereby **ORDERED** that the defendant's motion to suppress all statements made by her to law enforcement on December 1, 2008, together with any evidence obtained as a fruit of those statements is **ALLOWED**.

Janet Kenton-Walker
Justice of the Superior Court

DATED: February 25, 2011

---

[25] Nga stated that the stuffed animal was one of the bears in Khyle's crib.
[26] There was no evidence presented at the hearing as to what specific evidence was obtained or if any such seizure can be admitted as being within an exception to the fruit of the poisonous tree doctrine.

NORTH CAROLINA               FILED THE GENERAL COURT OF JUSTICE
                                                  SUPERIOR COURT DIVISION
COUNTY OF HARNETT           2009 JUN 11 PM 2: 08  98 CRS 3143, 3144, 3147
                                                )
STATE OF NORTH CAROLINA     HARNETT CO., C.S.C.
                            BY_____
        v.                                      )
                                                )        **ORDER**
DAVID GAINEY,                                   )
                                                )
            Defendant.                          )
                                                )
_____       )

      THIS CAUSE coming on to be heard before Gregory A. Weeks, Superior Court Judge,

on the Defendant's Motion for Appropriate Relief and Amended Motion for Appropriate Relief.

After reviewing the files maintained by the Clerk of Superior Court of Harnett County, the

transcripts of Defendant's trial, the evidence and testimony presented to the Court in this

proceeding, and the various submissions of the parties, this Court makes the following Findings

of Fact and Conclusions of Law, and enters the following Order:

## INTRODUCTION

      1.    After his arrest, Defendant gave a confession to the Harnett County Sheriff's

Department. This confession was the centerpiece of the State's case against Defendant for first-

degree murder, kidnapping, and robbery of Dwayne McNeill; without the confession, there was

insufficient evidence to take the charges to the jury. The confession was, however, inconsistent

with much of the factual evidence discovered by law enforcement during its investigation of the

case. The lack of any physical evidence directly connecting Defendant to the crime combined

with the lack of corroboration between the confession and the actual facts made the outcome of

Defendant's trial far from certain.

2.     At trial, counsel for Defendant attempted to persuade the jury that Defendant's confession was not believable, that a different individual planned and committed the murder without Defendant's assistance, and that there was reasonable doubt of guilt. Trial counsel did not, however, fully investigate the circumstances of Defendant's confession. Trial counsel did not seek out information about police interrogations or false confessions and did not seek the assistance of an expert in the field of police interrogations to determine whether such an expert could provide information that would help advance their chosen strategy. Failing to fully investigate the circumstances of the confession was not a strategic choice and constituted deficient performance by trial counsel. There is a reasonable probability that, but for trial counsel's deficient performance, the outcome of trial would have been different.

3.     The State withheld exculpatory information from the Defendant at trial. The State had information that Defendant's younger brother, Michael Gainey, committed the murder of Dwayne McNeill. This information is documented in the handwriting of the Assistant District Attorney Peter Strickland, who learned it directly from law enforcement officers investigating the case. Law enforcement had learned this information from the victim's father, Dwight McNeill. The information that Michael Gainey did the shooting originated from James Gainey, Jr. – Defendant's cousin and the person whose accurate information led to Defendant's arrest. Despite having information that Michael Gainey was the person who shot the victim, the prosecution argued to the jury at Defendant's trial that Defendant alone shot and killed Dwayne McNeill. There is a reasonable probability that, had this information not been withheld from the Defendant, the outcome of Defendant's trial would have been different

4.     The State also withheld from Defendant the identity of the person who called the McNeill household with information about the case until the moment when Dwight McNeill took

2

the stand at Defendant's trial. The State's failure to disclose that James Gainey, Jr. was the so-called "anonymous" caller fore closed additional investigative avenues for trial counsel. In addition, the State withheld a portion of the Sheriff's Department's investigation report that reveals a factual discrepancy between Defendant's confession and the facts of the case. Defendant said in his confession that he met and abducted Dwayne McNeill at about 10:30 AM on March 3 whereas the investigation report demonstrates that Dwayne McNeill was seen by his grandparents at about 12:00 noon on that day. Finally, the prosecution withheld information that an anonymous caller provided law enforcement with the actual location of the crime scene. There is a reasonable probability that, had this information not been withheld from the Defendant, the outcome of Defendant's trial would have been different

5.      When testifying, Dwight McNeill was asked on cross-examination whether he had received any information about anyone else who might have hurt his son; he answered that he had not. Mr. McNeill's response did not match the information Mr. Strickland had previously learned from law enforcement indicating that Michael Gainey was the person who shot Dwayne McNeill. The prosecution knew that the testimony was false and made no effort to correct it. There is a reasonable likelihood that this failure to correct false testimony affected the judgment of the jury.

6.      As a result of trial counsel's ineffective assistance of counsel and the various instances of prosecutorial misconduct – both cumulatively and individually – Defendant is entitled to a new trial.

## PROCEDURAL HISTORY

7.      The Defendant was tried capitally at the June 28, 1999 Criminal Session of the General Court of Justice, Superior Court Division of Harnett County, the Honorable Henry

3

Barnette, Jr., presiding. The Defendant was convicted by a jury of first-degree murder, robbery with a dangerous weapon, and first-degree kidnapping. Following a sentencing hearing, the Defendant received a sentence of death for the first-degree murder conviction on July 13, 1999. The trial court imposed a term of 117-150 months imprisonment for the robbery conviction and 46-65 months imprisonment for second-degree kidnapping.

8.     On February 1, 2002, the North Carolina Supreme Court affirmed the conviction and death sentence. *State v. Gainey*, 355 N.C. 73, 568 S.E.2d 463 (2002). On October 7, 2002, the United States Supreme Court denied a petition for a writ of certiorari. *Gainey v. North Carolina*, 154 L. Ed. 2d 165, 123 S. Ct. 182 (2002).

9.     The Defendant timely filed a Motion for Appropriate Relief ("MAR") on June 4, 2003 and filed an Amended Motion for Appropriate Relief ("Amended MAR") on October 19, 2007.

10.     On November 20, 2007, Judge Franklin Lanier entered an order summarily denying the Defendant's Motion for Appropriate Relief and Amended Motion for Appropriate Relief without an evidentiary hearing.

11.     On November 30, 2007, the Defendant filed a Petition for a Writ of Certiorari to the North Carolina Supreme Court, which was granted on April 11, 2008 for the limited purpose of remanding the case to the superior court for an evidentiary hearing on Defendant's MAR and Amended MAR. *State v. Gainey*, ___ N.C. ___, 661 S.E.2d 885 (2008).

12.     On December 29, 2008, this Court entered an Order retaining jurisdiction of this matter; allowing hearings to be conducted outside of regular terms or sessions of Harnett County Superior Court; allowing any order or orders in this matter to be entered outside of Harnett County and outside any regular terms or sessions of superior court; allowing Defendant to

4

present evidence on any of the claims raised in the Defendant's MAR or Amended MAR; and granting Defendant's motion to bifurcate the evidentiary hearing – allowing the presentation of evidence on those claims for which appropriate relief would be a new trial before the presentation of evidence on those claims for which appropriate relief would be a new sentencing hearing. Because this Court is entering an order for appropriate relief on Claims II and III of Defendant's MAR, it is not necessary for this Court to consider or rule on the remaining issues in Defendant's MAR and Amended MAR at this time.

## FINDINGS OF FACT

**A.     Summary of the Evidence Presented by the State at Defendant's Trial**

13.     During the guilt-innocence phase of Defendant's trial, which lasted from July 6 to July 8, 1999, the State introduced testimony from 19 witnesses:  Sharon McNeill, Dwight McNeill, Detective Rick Hendricks, Lieutenant William Wade, Special Agent Kathy O'Brien, Carolyn Campbell, Joe Campbell, John Parker, Gaynelle Turlington, Dr. Robert Thompson, Agent Bill Morris, Bertha Campbell, Special Agent Mike East, Deputy Bernice Smith, Deputy Benny Wood, Special Agent Wyatt Pettengill, Special Agent Eugene Bishop, Special Agent Brenda Bissette, and Ramona Griffin. None of the testimony offered by these witnesses – except Lt. Wade's recitation of Defendant's confession – placed Defendant at the scene of the homicide or as a participant in the planning or perpetration of that homicide.

14.     The Defendant was represented by David Hartley and Charlene Edwards. He did not testify and did not put on any evidence.

15.     The State introduced evidence from Dwight and Sharon McNeill – parents of Dwayne McNeill – regarding their son's disappearance. They first became concerned when he

5

did not show up at work or return home on March 3, 1998. At the time of his disappearance, he was driving his new black Ford Mustang GT.

16.     The McNeills also testified about phone calls that they received on March 9 and 10 of 1998. From these calls – initially reported as anonymous calls – the McNeills learned that their son's car would be passing through the intersection of Highway 87 and Manchester Road in Spring Lake at 10:00 on March 11, 1998. Dwight McNeill also testified that he had recognized the caller's voice as James Gainey, Jr. Lt. Wade testified that he learned the caller's identify from Dwight McNeill on or about March 28, 1998.

17.     Det. Hendricks testified that David Gainey was apprehended driving Dwayne McNeill's Mustang at the time and place indicated by the caller to the McNeill household. After being arrested, Defendant was taken to the Harnett County Law Enforcement Center to be interrogated by Lt. Wade.

18.     Lt. Wade provided testimony about Defendant's interrogation at both a suppression hearing on February 25, 1999 and at Defendant's trial. After waiving his *Miranda* rights, David Gainey gave a number of different statements to Lt. Wade. No portion of the interrogation was videotaped or recorded. Instead, Lt. Wade wrote down a summary of Defendant's statements – except the first statement – and then gave those statements to Defendant to review and sign. Lt. Wade read these statements to the jury during Defendant's trial.

19.     In his first statement, given to Lt. Wade at approximately 11:30 AM on March 11, Defendant stated that he traded some crack cocaine for the Mustang from some unknown individuals in Sanford, North Carolina. Lt. Wade did not believe this story and asked Defendant to submit to a Computer Voice Stress Analysis ("CVSA"). Defendant consented to taking the

6

CVSA at about 11:45 on March 11. After the CVSA, Lt. Wade informed Defendant that the computer indicated that Defendant was not being truthful. Lt. Wade showed the results of the CVSA to Defendant and explained how to interpret those results.

20.     In his second statement, given from approximately 1:55 to 3:00 PM, Defendant stated that he had been approached by an individual named Larry McDougald in late February of 1998. Larry McDougald enlisted Defendant's help in selling a 1998 Ford Mustang GT that McDougald planned to steal. Defendant stated that Larry McDougald then brought over a black Mustang on March 3. Defendant recognized the Mustang as belonging to Dwayne McNeill. Larry McDougald confessed to killing Dwayne McNeill and showed Defendant Dwayne's body in the trunk of the car. Larry McDougald then disposed of the body, returning with the Mustang. Defendant stated that he parked the Mustang in the Spring Lake Wal-Mart parking lot and thereafter drove the car until he was apprehended. Defendant reported that he was supposed to sell the car and split the proceeds with Larry McDougald.

21.     Lt. Wade again thought that Defendant was not being truthful and again asked Defendant to submit to a CVSA test. At 4:05 on March 11, Lt. Wade conducted a second CVSA. At the conclusion of the CVSA, Lt. Wade informed Defendant that Defendant was still not being truthful.

22.     Beginning at approximately 4:37 and concluding at about 5:00 PM, Defendant gave a third statement to Lt. Wade. In this version, Defendant said that he and Larry McDougald planned on stealing Dwayne McNeill's car together, but had not planned on killing him. The Defendant stated that he met Dwayne McNeill at the parking lot of Norrington Church at about 10:30 AM on March 3 on the pretext of selling him light covers for the Mustang. After Dwayne McNeill arrived, Defendant reported that Larry McDougald came from behind the church with

7

his .22 semi-automatic rifle and forced Dwayne McNeill back into the Mustang. They all then drove to the woods off a dirt road where they planned to leave Dwayne McNeill. The Defendant reported that Dwayne McNeill then tried to run, at which point Larry McDougald shot him twice in the back of the head. Defendant reported that he later heard Dwayne gasping and asking for help. Defendant told Lt. Wade that he then took the rifle and shot Dwayne McNeill twice more in the head so that he would not suffer. Defendant reported throwing the gun out of the car on a little bridge over a stream. Defendant again stated that they then took the car to the Wal-Mart parking lot in Spring Lake and that Defendant was supposed to sell the car.

23.      Defendant took Lt. Wade and other law enforcement to the location where Dwayne McNeill's body was located -- in the woods behind the John Parker residence not far from David Gainey's home. At about 6:20 PM, while still at the location where the body was found, Defendant gave a fourth statement to Lt. Wade. In this version, Defendant clarified that he was planning on tying up Dwayne McNeill in the woods, and that Dwayne McNeill pushed David Gainey and tried to run away. After Larry McDougald shot Dwayne McNeill twice -- either in the back or the head -- Defendant and McDougald then placed Dwayne McNeill -- who was still alive -- in the trunk of the Mustang, wrapped in a blanket. They were going to take Dwayne McNeill out of the Norrington area and hide his body somewhere on Highway 87. After seeing some boys playing in a nearby field, they drove back into the woods and decided to leave Dwayne McNeill there. Defendant reported that he and Larry McDougald then took Dwayne McNeill about 25 yards back into the woods. At this point, Defendant reported hearing Dwayne McNeill's plea for help. The Defendant told Lt. Wade that he then walked back to the car to retrieve the .22 rifle, walked back to Dwayne McNeill, and shot him twice in the head. At

8

that point, Defendant stated that Larry McDougald and Defendant placed the body where it was found.

24.     The only evidence from the prosecution directly linking the Defendant to Dwayne McNeill's homicide came from these statements to Lt. Wade.  The prosecution introduced circumstantial evidence linking Defendant to some involvement in the crime or cover-up of the crime: (1) Defendant knew the location of Dwayne McNeill's body; (2) Defendant knew the location of the blanket used to wrap Dwayne McNeill's body; (3) Defendant was apprehended driving Dwayne McNeill's Mustang, had been seen in the Mustang earlier in the week, and was in possession of some of Dwayne McNeill's personal items; (4) Dwayne McNeill was killed by shots from a .22 weapon and the Defendant's father – Marshall Gainey – was missing his .22 rifle; (5) the .22 bullets in Marshall Gainey's possession and the shell casings found at the Campbell trailer were manufactured by the same company; and (6) Bertha Campbell – who was then in a romantic relationship with Larry McDougald's brother – testified that David Gainey had made some effort to contact Dwayne McNeill on the evening of March 3, 1998. Importantly, none of this circumstantial evidence specifically tends to prove or disprove that defendant had prior or contemporaneous knowledge of the homicide, that he directed or participated in its commission, or that he was present at or near the scene of the homicide at the relevant time.

25.     There was evidence that at least two individuals were involved in disposing of Dwayne McNeill's body in the woods behind the Parker residence.  John Parker testified that he saw two black males driving a black Mustang at about 6:00 AM on March 4, 1998 on the driveway that links Norrington Church Road to the woods behind his house.  Mr. Parker did not

9

see the Mustang drive back out onto the street at anytime that morning before he left for work at approximately 9:00 AM. Mr. Parker could not identify those two individuals.

26.     Larry McDougald was arrested based on Defendant's statements to law enforcement. According to SBI Agent Mike East, Larry McDougald provided an alibi for his whereabouts on the day of March 3, 1998 that was verified by law enforcement. All charges against him relating to his matter were eventually dismissed by the Harnett County District Attorney.

27.     A couple of weeks after Defendant's arrest, Lt. Wade, SBI Agent Mike East, and Deputy Wood investigated an abandoned trailer located on the Campbell property not far from Defendant's home and not far from the location where Dwayne McNeill's body was found. They discovered dried blood on the floor near the front door and refrigerator – later determined through DNA testing by the SBI to be Dwayne McNeill's blood – six spent .22 caliber shell casings grouped together down the hallway of the trailer, and bullet fragments.

28.     Dr. Thompson, a forensic pathologist at the Office of State Medical Examiner, performed an autopsy of Dwayne McNeill. Dr. Thompson testified that Dwayne McNeill was shot six times: (1) on the middle aspect of the right eyebrow; (2) in the inner aspect of the right eye and into the brain; (3) on the left side of the upper lip; (4) on the left side of the chest and through the lungs and heart; (5) on the right forearm; and (6) on the left upper back. Dr. Thompson concluded that two of the six gun shot wounds – one to the heart and one to the brain – would have caused almost immediate loss of consciousness and death within five minutes. Only one of these gunshot wounds entered from the back.

29.     The State argued to the jury that David Gainey fired the shots that killed Dwayne McNeill. Mr. Strickland said in opening statements that: "David Gainey killed Dwayne

10

McNeill....[he] had a gun....he went down the hall after he got Dwayne McNeill into that trailer, picked up the gun, and shot Mr. McNeill six times." In closing, Mr. Strickland told the jury that David Gainey "himself shot and killed Dwayne McNeill... with a deadly weapon, a firearm, a .22 caliber firearm, that his act was the proximate cause of Dwayne's death, a real cause. His act, shooting, killed Dwayne McNeill."

      30.    Trial counsel for Defendant acknowledged that David Gainey was likely guilty of the crime of accessory after the fact, but was not guilty of first-degree murder. Trial counsel's reasonable doubt and third-party guilt defenses depended on convincing the jury that David Gainey's inculpatory statements to law enforcement were not true.

      31.    The trial court instructed the jury that if it found that Defendant made a confession, then it "should consider all of the circumstances under which it was made in determining whether it was a truthful confession and the weight [the jury] will give to it." The only evidence relating to the facts and circumstances of Defendant's confession came from testimony of Lt. Wade. Trial counsel made no effort to shed light on the facts and circumstances of Defendant's confession and were unable to explain to the jury why their client would admit to involvement in a crime that they argued Defendant did not commit

      32.    As set forth above, the only evidence introduced at trial that placed Defendant at the scene of Dwayne McNeill's homicide and as a participant in that homicide came from Defendant's confession after his arrest. In several critical respects, however, the confession provided by David Gainey is inconsistent with the actual facts discovered by law enforcement in its investigation: (1) **the physical location of the shooting** – the shooting occurred in the trailer on the Campbell property and not in the woods behind the Parker residence as Defendant said; (2) **the placement of the shots that hit Dwayne McNeill** – the victim was hit by five bullets in

11

his front and only one in the back and not four times in the back or back of the head as Defendant stated; (3) **the number of shots that were fired and that hit Dwayne McNeill** – the autopsy revealed six gunshot wounds and six spent shell casings were found in the trailer, not four shots as reported by Defendant; (4) **the disposal of the murder weapon** – Defendant stated that the .22 rifle was thrown over a bridge into a small stream, but no weapon was recovered in that area by the Spring Lake dive team just over a week later; (5) **the timing of the shots** – all six shots were fired at one time from one location, not twice in one location and then twice from a different location as Defendant stated; (6) **Dwayne McNeill's alleged plea for help** – Dwayne McNeill lost consciousness almost instantaneously and would not have been able to ask for help several minutes after being shot as Defendant stated; (7) **the time when Defendant claimed to have met with Dwayne McNeill** – Dwayne McNeill's grandparents last saw him at 12:00 noon on his way to the store on March 3, thus Defendant could not have met and abducted Dwayne McNeill at about 10:30 AM on that day as he said in his confession; (8) **the date and time when Dwayne McNeill's body was left in the woods** – John Parker saw the Mustang drive back into the woods behind his home at about 6:00 AM on March 4, not on the morning or early afternoon of March 3 as Defendant stated; and (9) **the location where Defendant supposedly first met with Dwayne McNeill** – there was no evidence supporting Defendant's statement that he met with Dwayne McNeill in the parking lot of Norrington Church.

B.   **Evidentiary Hearing**

        33.     Beginning March 23 and concluding March 25, 2009, this Court conducted an evidentiary hearing and entertained argument of counsel on two of the issues raised in Defendant's MAR: the *Brady* claim – designated as Claim II of the MAR; and the ineffective assistance of counsel claim for failure to obtain a false confession expert – designated as Claim

12

III of the MAR. The Defendant was represented by J. Donald Cowan, Jr. and David L. Neal. The State was represented by Special Deputy Attorney General Michael Dodd. The Defendant waived his right to be present for the hearing in open court.

34.      During the evidentiary hearing, Defendant submitted thirty exhibits and presented the testimony of testimony of eleven witnesses: Dr. Richard Ofshe, Wilson Currin, Earl Gassaway, Leticia Lamison, Benjamin Wood, William C. Wade, Michael B. East, David Hartley, Charlene Edwards, Peter Strickland, and Ernest L. Conner. In addition, Felicia Graves was subpoenaed by Defendant, but failed to appear. The Court issued a material witness order and requested that Deputies of the Cumberland County Sheriff's Department locate Ms. Graves and bring her to court. Ms. Graves was not located and was unavailable to testify. The State presented no witnesses and introduced no exhibits.

35.      On May 26, 2009, Defendant filed a Motion to Conform to the Evidence Presented in the Evidentiary Hearing, which this Court granted.

36.      This Court has heard the testimony and observed the demeanor of the witnesses, reviewed the exhibits and relevant portions of the Court files and trial transcripts, assessed all of the evidence for its credibility, reliability, accuracy, and consistency with other evidence and with the record as a whole, and considered the presentations of counsel.

**C.      Discovery During the Motion for Appropriate Relief Proceedings**

37.      On October 31, 2002 – pursuant to N.C. Gen. Stat. § 15A-1415(f) – post-conviction counsel for Defendant requested production of the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of David Gainey. In addition, post-conviction counsel requested trial counsel's complete file. On March 21, 2003, the Honorable Wiley F. Bowen signed an Order for

13

Discovery requiring the State to produce the complete law enforcement and prosecutorial files relating to this case.

38.     In compliance with Judge Bowen's Order and N.C. Gen. Stat. § 15A-1415(f), the State produced copies of the relevant law enforcement and prosecutorial files to counsel for David Gainey. This post-conviction discovery included the production of files from the District 11 District Attorney's office relating to this case, Bates Numbered 00000-02647. All references to documents with Bates Numbers in this Order are from the documents produced by the District Attorney's office in this case.

39.     Trial counsel were unable to locate their file and this file has therefore been unavailable to post-conviction counsel.

**D.      Findings of Fact Applicable to the Ineffective Assistance of Counsel Claim for Failure to Consult with a False Confession Expert**

40.     Trial counsel for David Gainey knew that their client would likely be convicted of first-degree murder if the jury believed the most incriminating aspects of his confessions to Lt. Wade. Trial counsel attempted to discredit the confession by demonstrating to the jury that parts of Defendant's story were inconsistent with facts developed in the investigation into the murder of Dwayne McNeill. Trial counsel had no strategic reason for not making additional efforts to persuade the jury that the most incriminating parts of David Gainey's confessions were false.

41.     Trial counsel did not investigate the circumstances of their client's confession by seeking the assistance of an expert in the area of police interrogations. There was no legitimate strategic reason for trial counsel not to pursue this kind of investigation and seek the assistance of an expert. Such an expert could have consulted with counsel to better understand the issues relating to false confessions and police interrogations and, if properly qualified, could have testified at Defendant's trial or suppression hearing.

14

42.     David Hartley testified at the evidentiary hearing that, during the time he represented David Gainey, he did not understand what an expert in false confessions or police interrogations did. In addition, Mr. Hartley testified that he had misunderstood the scope of work performed by false confession experts and had thought – without making any inquiries – that such experts would not review a confession like the one in Defendant's case.

43.     In addition, David Hartley testified that he might not have asked for funds for a false confession expert out of a fear of antagonizing the trial judge. This explanation is not consistent with other *ex parte* requests for expert assistance submitted by trial counsel. Trial counsel requested funds from the trial court for an expert to assist with jury selection. In addition, trial counsel requested funds for an expert psychiatrist a few weeks before the start of trial and after trial counsel had abandoned further pursuing competency issues. These requests reveal that trial counsel was willing to submit *ex parte* requests for expert assistance even under circumstances in which there was little chance of receiving the requested funding and regardless of whether such requests would have possibly antagonized the trial judge.

44.     Furthermore, as reflected in ABA Guideline 11.7.3, trial counsel has an obligation to make an adequate record for post-judgment review. This obligation includes making a record of requests for expert assistance that are necessary to preserve their client's constitutional rights.

45.     Trial counsel for Defendant did not consult with Dr. Jerry Noble – the expert forensic psychologist who they retained with funds from the trial court – about issues relating to guilt innocence phase generally or about false confessions more particularly. Dr. Noble's work was instead limited to sentencing and competency issues.

46.     The American Bar Association Guidelines for Appointment of Counsel in Death Penalty Cases ("ABA Guidelines") has been consistently cited by the United States Supreme

15

Court since 1984 as a useful guidepost in establishing prevailing norms of practice by counsel in a capital case. The Supreme Court has held that the ABA Guidelines contain "standards to which we long have referred as 'guides to determining what is reasonable'" attorney performance. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). The 1989 edition of the ABA Guidelines was widely available by 1998 when trial counsel for David Gainey were appointed.

47.     Section 11.4.1(D)(7) ABA Guidelines -- within the investigation section of the Guidelines -- set forth that capital trial counsel should consult with expert witnesses "where it is necessary or appropriate for: (A) preparation of the defense; (B) adequate understanding of the prosecution's case; (C) rebuttal of any portion of the prosecution's case at the guilt/innocence phase...of the trial." In commentary to the ABA Guidelines, the need for expert assistance is further explained: "Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, Guidelines 11.4.1(d)(7), 11.8.6(b)(8), and must be able to zealously challenge the prosecution's evidence...through effective cross-examination. Utilization of experts has become the rule, rather than the exception, in proper preparation of capital cases."

48.     At the evidentiary hearing, Ernest Conner was qualified as an expert witness under Rule 702 of the North Carolina Rules of Evidence in the areas of capital and criminal trial defense and in the standard of practice for attorneys in capital and criminal trials. Mr. Conner has approximately 18 years experience handling capital cases, primarily at the trial level, has attended numerous seminars on the defense of capital cases, and has taught at the North Carolina Capital College.

16

APP 000602

49.     After reviewing Defendant's trial and materials discovered in post-conviction, Mr. Conner concluded that, at the time of Defendant's trial, reasonable trial counsel would have consulted with an expert in the area of false confessions or police interrogations in order to properly prepare their defense. Mr. Conner further testified that reasonable counsel would have considered presenting testimony from such an expert to the jury. Mr. Conner testified that prevailing professional norms in North Carolina, consistent with the ABA Guidelines, required trial counsel to seek the assistance of an expert in such a specialized area of knowledge in the course of investigating their client's case. In the alternative, trial counsel could have consulted with the mental health expert retained in this case, Dr. Jerry Noble. Based on his review, including a conversation with Dr. Noble, Mr. Conner concluded that Dr. Noble had the expertise from a forensic psychologist's perspective to explore the psychological factors that would make Defendant more susceptible to giving a false confession, particularly in the context of wanting to protect his younger brother, Michael Gainey.

50.     In post-conviction, counsel for David Gainey obtained the assistance of Dr. Richard Ofshe, a sociologist with expertise in the area of police interrogations and false confessions. Dr. Ofshe reviewed the statements Defendant gave to Lt. Wade during his interrogation, Lt. Wade's testimony about the interrogation from the suppression hearing, and other materials related to the investigation and prosecution of Defendant for the murder of Dwayne McNeill. In addition, because Lt. Wade's interrogation of Defendant was not recorded or videotaped and because Defendant did not testify, Dr. Ofshe interviewed Defendant to learn more about the interrogation. At the evidentiary hearing, Dr. Ofshe was qualified as an expert witness under Rule 702 of the North Carolina Rules of Evidence in the area of police interrogations.

17

51.     Dr. Ofshe testified that he does not offer ultimate opinions on whether any particular confession is true or false when providing expert testimony.

52.     In 1998, Dr. Ofshe was a well known expert in the field of false confessions and police interrogation. Dr. Ofshe had presented at a seminar for criminal defense lawyers in North Carolina in 1994, had published a lengthy article regarding false confessions in the Denver Law Review in 1997, and was available to consult on cases from referrals from state and national criminal defense organizations.

53.     David Hartley testified that he had heard of Dr. Ofshe, but did not consider contacting him because of an uninformed opinion of the kind of expert assistance that Dr. Ofshe could have offered.

54.     Dr. Ofshe's expertise in police interrogations and false confessions helps to elucidate the facts and circumstances surrounding Defendant's interrogation and would be admissible for that purpose. Consulting with an expert – like Dr. Ofshe – would have provided trial counsel with alternative ways of exploring Defendant's interrogation through cross-examination of Lt. Wade at the suppression hearing and trial. In addition, after consulting with such an expert, trial counsel would then have been in a position to decide whether or not to call such an expert to testify at Defendant's trial.

55.     After his review, Dr. Ofshe concluded that Lt. Wade made use of psychologically coercive motivators in his interrogation of Defendant. These motivators included evidence ploys, such as the CVSA, and the threat of arresting the Defendant's brother, Michael Gainey. Dr. Ofshe concluded that these kinds of psychologically coercive elements have the potential to give rise to a false confession. Furthermore, such psychologically coercive motivators are

18

present in every instance of a demonstrably false confession that Dr. Ofshe has reviewed over a twenty-year period.

56.     Dr. Ofshe testified that a lack of fit or corroboration between a suspect's statement and the actual facts discovered by law enforcement in the investigation of a crime is additional evidence of a possible false confession. This is particularly true when a suspect gets mundane details of the crime wrong. For example, if a suspect states that he shot the victim in the living room of the victim's house when the shooting in fact took place in an upstairs bedroom, that lack of fit is evidence that the suspect is giving a false confession.

57.     Defendant's statements to law enforcement are inconsistent with the physical evidence gathered by the SBI and Sheriff's Department in several respects that are difficult to explain. Dr. Ofshe focused on four specific areas that were inconsistent with the evidence developed by law enforcement in their investigation (1) the physical location of the shooting; (2) the placement of the shots that hit Dwayne McNeill; (3) the number of shots that were fired and that hit Dwayne McNeill; and (4) the disposal of the murder weapon. Dr. Ofshe testified that Defendant's ignorance of these kinds of mundane details are consistent with the answers a person would give who did not know basic facts about the commission of the crime. Of particular note is Defendant's statement that he threw the murder weapon over a bridge into a stream. Dr. Ofhse testified that individuals who are known to have given false confessions – from DNA exonerations, for example – often had told law enforcement that they disposed of the murder weapon by throwing it off of a bridge into a body of water.

58.     In addition to those aspects of Defendant's confession that are not corroborated by the physical evidence discussed by Dr. Ofshe, the following details of Defendant's statements to Lt. Wade are also inaccurate as a factual matter: (1) all six shots were fired at one time from one

19

location – there is no evidence that the victim was moved in the car, taken back out, and shot twice more in a different location as Defendant told Lt. Wade; (2) the victim's supposed plea for help – the forensic pathologist testified that Dwayne McNeill lost consciousness almost instantaneously and would not have been able to ask for help several minutes after being shot; (3) the time when Defendant claimed to have met with Dwayne McNeill – Defendant states that he met and abducted Dwayne McNeill at about 10:30 AM whereas Dwayne McNeill's grandparents last saw him at 12:00 noon on his way to the store; (4) the date and time when Dwayne McNeill's body was left in the woods – Defendant stated that they took Dwayne McNeill to the woods behind the Parker residence right after they met him at Norrington Church on the morning of March 3 whereas John Parker saw the Mustang drive back into the woods at about 6:00 AM on March 4; and (5) where Defendant supposedly first met with Dwayne McNeill – there was no evidence supporting Defendant's statement that he met with Dwayne McNeill in the parking lot of Norrington Church.

59.     Trial counsel failed to point out all of these discrepancies to the jury and did not offer an explanation for why Defendant could have given a false confession to Lt. Wade.

60.     A reasonable juror could have concluded, based on these factual discrepancies and an explanation for how Defendant could have made a false confession, that Defendant was not present for and did not participate in the murder of Dwayne McNeill.

61.     According to the Innocence Project, twenty-five percent of all exonerations based on DNA evidence involve cases in which the defendant provided a false confession to law enforcement.

20

**E.      Findings of Fact Applicable to the *Brady* Claim**

62.      Before Defendant's trial in June and July of 1999, trial counsel made several efforts to obtain discovery from the Harnett County District Attorney's office.

63.      On January 14, 1999, trial counsel for Defendant filed a pretrial Motion to Require the Prosecution to Disclose Evidence Favorable to Defendant Under *Brady v. Maryland*. In the motion, Defendant requested any and all written or taped accounts of interviews of witnesses conducted by the State and its agencies, as well as "any and all evidence and information, whether specifically delineated and listed herein or not, that may be materially favorable to Movant in either a direct or impeaching manner or relevant to punishment, which falls within the context of *Brady v. Maryland*, 373 U.S. 83 (1963). *See also United States v. Giglio*, 405 U.S. 150 (1972); *Moore v. Illinois*, 408 U.S. 786 (1972)." Defendant also requested, "A list of any and all other possible suspects to the alleged murder, or an all inclusive list of all suspects that have been considered by any law enforcement officer or agent regarding the alleged murder."

64.      Trial counsel for Defendant filed several other motions seeking disclosure from the State on June 22, 1998: Motion for Disclosure of Evidence in a Capital Trial; Motion to Compel Investigating Officers to Turn Over All Information Relating to the Investigation of this Case to the Prosecutors; Motion to provide Complete Files of All Law Enforcement Agencies and Prosecutorial Files and Notes; and Motion for Disclosure of Impeaching Information. In addition, trial counsel filed a Motion to Voluntarily Disclose on April 17, 1998.

65.      The Trial Court granted Defendant's *Brady* request to the extent allowed by law, noting that the prosecution had a continuing duty to hand over exculpatory materials.

21

66.    Assistant District Attorney Peter Strickland had primary responsibility for pre-trial discovery matters for the State.  Mr. Strickland testified that in 1998 and 1999, it was the practice of the Harnett County District Attorney's office to document everything that was produced to defense counsel by filing a copy of that production in the court file.  In addition, Mr. Strickland testified that the Harnett County District Attorney's office had an "open file" policy, such that defense counsel could review the contents of the file.

67.    There were, however, a number of items known to the State that were not disclosed by the District Attorney's office to trial counsel for Defendant: (1) information from a credible source that Michael Gainey was the person who shot Dwayne McNeill; (2) the identity of the "anonymous" caller to the McNeill household was James Gainey, Jr.; (3) the Incident/Investigation Report, which documented that Dwayne McNeill was last seen by his grandparents at 12:00 noon on March 3, 1998; and (4) the Campbell trailer was discovered as a result of a separate anonymous call to Dep. Wood.

68.    Mr. Strickland did not disclose to trial counsel for Defendant information he received from law enforcement summarizing a conversation that Dwight McNeill had with James Gainey, Jr.  James Gainey, Jr. – the ultimate source for the accurate information that led to Defendant's arrest – also told Dwight McNeill that Michael Gainey is the person who shot Dwayne McNeill.  Mr. Strickland's receipt of this information is documented on hearing Ex. No. 17, Bates No. 02207.  On this notation, Mr. Strickland wrote "James Gainey called & told Dwight McNeill where car was.  [James Gainey] later told DM that Michael Gainey did the shooting."  Mr. Strickland received this information at some point before the motions hearing on February 25, 1999 and perhaps as early as November 16, 1998.  In his testimony at the

22

evidentiary hearing, Mr. Strickland acknowledged that the information in hearing Ex, No, 17 is exculpatory to Defendant.

69.     Lt. Wade and Agent East testified at the evidentiary hearing that, in the course of their investigation, they determined that Michael Gainey did not work on March 3, 1998 and that he did not have a verifiable alibi for that date.

70.     Even though Dwight McNeill informed Lt. Wade that the "anonymous" caller was James Gainey, Jr. within a matter of days or weeks after Defendant's arrest, there is no mention of James Gainey, Jr. in any of the law enforcement reports or any of the materials made available to trial counsel for Defendant.

71.     That the prosecution and law enforcement considered Michael Gainey a suspect is confirmed by their conversations with members of the jury at the conclusion of David Gainey's trial. Wilson Currin and Earl Gassaway, jurors at Defendant's trial, testified at the evidentiary hearing. Mr. Currin testified that at the conclusion of the trial and the jury's verdict, Lt. Wade told him that David Gainey's brother was involved in the murder. Mr. Gassaway testified that someone from the District Attorney's office spoke with him at the conclusion of the trial and informed him that they knew that David Gainey's brother was involved in the murder.   The testimony of Mr. Currin and Mr. Gassaway establish that both law enforcement and the District Attorney's office considered Michael Gainey a suspect at the time of Defendant's trial.

72.     Trial counsel for Defendant orally repeated their request for all *Brady* materials from the State at a pre-trial motions hearing on February 25, 1999 – the week before trial was originally scheduled to commence. At this hearing, the Court asked the State to give an update as to "where the State is as to *Brady* at this point." The State informed the Court that it would copy the only remaining *Brady* materials – notes taken by Lt. Wade regarding the arrest of Mr.

23

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 195 of 212    APP 000609

Gainey – and provide them to the defense.  In addition, Mr. Strickland stated in open court that he was not aware of any other evidence in the case subject to disclosure.  Once Mr. Strickland made this statement, trial counsel for Defendant had no reason to return to the District Attorney's office to review his case file again.

73.    On February 26, 1999, Mr. Strickland filed a Supplemental Answer to Request for Discovery attaching the Narrative Continuation Summary of the investigation into Dwayne McNeill's disappearance and murder (labeled by Mr. Strickland as "Lt. Wade's agent notes").  At this time, trial was scheduled to commence two days later, on March 1, 1999.  When trial counsel received this Supplemental Answer to Request for Discovery, this was the first time that they learned about the "anonymous" calls to Dwight McNeill that led directly to their client's arrest – nearly a year after those notes had been completed and two days before trial was originally scheduled to commence.

74.    Mr. Strickland did not disclose to trial counsel for Defendant that the so-called "anonymous" caller to the McNeill household had in fact been positively identified as James Gainey, Jr. until Dwight McNeill had taken the stand in Defendant's trial – which did not actually commence until June 28, 1999 (because of Charlene Edwards's illness in early March of 1999).  When Charlene Edwards argued in support of trial counsel's Motion to Continue on March 1, 1999, she specifically cited the need to investigate the identity of the person who made the so-called anonymous calls to the McNeill household.  Mr. Strickland was present in the courtroom when Ms. Edwards explained defense counsel's need to know the identity of the anonymous caller.  Mr. Strickland did not disclose this information at that time.

75.    In addition, Mr. Strickland did not disclose to trial counsel for Defendant the first pages of the Incident/Investigation Report.  These pages of the report show that Dwayne

24

McNeill's grandparents last saw him alive on March 3, 1998 at about 12:00 noon on his way to the store before going to work. This information contradicts Defendant's report that he met and abducted the victim an hour and a half before, at 10:30 AM on March 3. In the District Attorney's files, the Incident/Investigation Report — Bates Nos. 00042-43 — was grouped together with the Narrative Continuation Summary — Bates Nos. 00044-59 — which was produced to trial counsel for Defendant on February 26, 1999.

76.      When asked about these first pages of the report (Bates Nos. 00042-43) at the evidentiary hearing, Mr. Strickland testified that those pages would have been provided to trial counsel for Defendant with the State's initial Answer to Request for Discovery.

77.      These pages are not, however, included in the State's initial Answer to Request for Discovery. On May 11, 1998, Assistant District Attorney Strickland filed an Answer to Request for Discovery with the Harnett County superior court. Based on a review of the Harnett County court file in this matter, this Answer to Request for Discovery is the initial answer to discovery provided by the State. Paragraph five of the initial Answer to Request for Discovery lists with particularity those items produced to Defendant. There is no mention of the Incident/Investigation Report in this Answer to Discovery.

78.      In addition, trial counsel for Defendant did not recall having seen Bates Nos. 00042-43. Trial counsel for Defendant made an effort to point out inconsistencies between Defendant's confession to Lt. Wade and facts later learned in the investigation of the case. But trial counsel made no mention of the fact that the victim was last seen at 12:00 noon on March 3, 1998 whereas Defendant told Lt. Wade that he met and abducted Dwayne McNeill at Norrington Church at about 10:30 AM on that day.

25

79.    Mr. Strickland did not disclose to trial counsel for Defendant that Deputy Benny Wood received an anonymous tip indicating that the trailer on the Campbell property was the actual scene of Dwayne McNeill's murder.

80.    Patrol Deputy Benny Wood of the Harnett County Sheriff's Department testified at the evidentiary hearing. He testified that he received a call from an unidentified person on March 28, 1998. This unidentified caller made efforts to disguise his or her voice. Deputy Wood believed that the person was a female, but the person took steps to disguise his or her voice, making it difficult to be certain. This anonymous caller told Deputy Wood that he should investigate an abandoned trailer on the Campbell property in the Norrington area of Harnett County. The unidentified caller told Dep. Wood that the murder of Dwayne McNeill took place at that trailer. After receiving this information, Dept. Wood contacted Lt. Wade.

81.    This information would have alerted trial counsel to the existence of another person with more knowledge of the crime than Defendant and given defense counsel another avenue to argue that another person committed the crime.

82.    Trial counsel for Defendant testified that they did not receive any information from the State prior to the conclusion of trial relating to the suspected involvement of Michael Gainey in the murder of Dwayne McNeill. In addition, trial counsel for Defendant testified that they did not learn of James Gainey, Jr.'s identity as the anonymous caller to the McNeill household until Mr. McNeill had taken the stand.

83.    Dwight McNeill testified for the State in Defendant's trial. While being cross-examined by David Hartley, Mr. McNeill was asked whether he told "law enforcement about any other information that you received anonymously about who may have hurt your son." Mr. McNeill responded "not to my knowledge." Without the information in the possession of Mr.

26

Strickland indicating that James Gainey, Jr. had told Dwight McNeill that Michael Gainey was the shooter, trial counsel for Defendant lacked the ability to effectively cross-examine or impeach Dwayne McNeill. In addition, Mr. Strickland was present in the courtroom when Mr. McNeill gave this answer and made no effort to correct this testimony or provide trial counsel the contrary information from his file.

84.    Mr. Strickland testified that every piece of paper in his possession with any relation to the David Gainey case was in one file. Mr. Strickland testified that this file included his hand-written notes – hearing Ex. No. 17, No. 24 and No. 25 – and that the file was available to trial counsel for Defendant at any reasonable time.

85.    Trial counsel Charlene Edwards testified that she looked through the Gainey case file at Mr. Strickland's office at some point before trial was originally scheduled to commence on March 1, 1999. In addition, Mr. Strickland stated in open court on February 25, 1999 that "defense counsel has looked through my file" and that he was not aware of any other evidence that had not already been made available to trial counsel. After reviewing that file, Ms. Edwards did not learn that (1) James Gainey, Jr. was the source of the "anonymous" information to the McNeill household; (2) Michael Gainey had been named by James Gainey, Jr. as the person who shot Dwayne McNeill; or (3) law enforcement was alerted to the Campbell trailer as the actual crime scene by an anonymous caller.

86.    Mr. Strickland's assertion that hearing Ex. 17 and Ex. 25 were available to trial counsel for Defendant in the District Attorney's file is not credible. First of all, it is apparent on the record that trial counsel did not know the identity of "anonymous" caller at the time of either the pre-trial hearing on March 1, 1999 or at the time trial began on June 28, 1999. Mr. Strickland testified that he communicated the identity of the "anonymous" caller to trial counsel

27

at or about the time Dwight McNeill took the stand at Defendant's trial. If Mr. Strickland had thought that he had already made available documents that contained the identity of the "anonymous" caller prior to the start of trial, Mr. Strickland would have had no reason to communicate that information when Mr. McNeill took the witness stand. In addition, trial counsel had not seen the Narrative Continuation Summary – Lt. Wade's investigator notes – until two days before trial was originally set to commence on March 1, 1999. These notes – a fairly comprehensive overview of the investigation into the disappearance and murder of Dwayne McNeill by the lead investigator on the case – were not included in the file made available for trial counsel's review on the eve of trial. Because these documents were not in the District Attorney's file at the times that file was made available for trial counsel's review of the file, this Court finds that there was not an "open file" policy in this particular case.

87. Hearing Ex. No. 17 was not present in the Gainey case file at the Harnett County District Attorney's office at any of the times that file was reviewed by trial counsel for Defendant. Furthermore, there was nothing in the material produced by the Harnett County District Attorney's office to trial counsel that identified the "anonymous" caller as James Gainey, Jr. or that identified Michael Gainey as the shooter of Dwayne McNeill. Neither hearing Ex. 17 nor substantial equivalent evidence was available to Defendant or his counsel, with reasonable diligence, at trial, other than through disclosure by the State.

88. Trial counsel testified at the evidentiary hearing that they would have followed up on the information relating to James Gainey, Jr. as the informant and Michael Gainey as the perpetrator. Trial counsel were making efforts to investigate issues relating to the guilt-innocence phase of their client's case. Consistent with section 11.4.1(B) of the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty

28

Cases, trial counsel were investigating issues relating to the guilt/innocence phase of the case "regardless of any admission or statement by the client concerning facts constituting guilt."

89.     In the alternative, assuming that the relevant information was in the District Attorney's file and available for trial counsel's review, then trial counsel failed to discover available information that was crucial to developing a defense for their client. This failure would constitute deficient performance and would fall below prevailing professional norms for counsel in a capital case.

## CONCLUSIONS OF LAW

### A.     Conclusions of Law Related to the Ineffective Assistance of Counsel Claim for Failure to Consult an Expert Witness Claim

90.     The facts found above were proven by a preponderance of the evidence. N.C. Gen. Stat. § 15A-1420(c)(5).

91,     The Sixth Amendment to the United States Constitution guarantees that a criminal defendant with his or her life at stake will have the services of dedicated, conscientious counsel. *See, e.g., Smith v. Robbins*, 528 U.S. 259, 278 (2000) ("[A]n indigent does, in all cases, have the right to have an attorney, zealous for the indigent's interests, evaluate his case and attempt to discern nonfrivolous arguments.")

92.     An ineffective assistance claim under the Sixth Amendment has two components: (1) a Defendant must show that trial counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, a Defendant must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.*, at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the

29

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694.

93.    The United States Supreme Court has ruled that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Strickland*, at 690—691. The Supreme Court ruled in *Rompilla v. Beard*, 545 U.S. 374 (2005), that there was no strategic reason for trial counsel not to examine the court file of their client's prior conviction. Trial counsel's failure to investigate their client's prior conviction fell below the level of reasonable performance because trial counsel knew that the State was going to rely on that prior conviction in seeking a death sentence. Prejudice ensued because there was mitigating evidence documented in that court file that trial counsel otherwise failed to uncover. The Supreme Court held that, while

> it is possible that a jury could have heard [the undiscovered mitigating evidence] and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," *Wiggins*, 539 U.S., at 538 (quoting *Williams v. Taylor*, 529 U.S., at 398), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome"

94.    While not controlling, this Court notes that a number of federal circuit courts have concluded that trial counsel's failure to obtain expert assistance can constitute deficient performance and – depending on the circumstances of the case – such deficient performance can prejudice the defendant. For example, in *Gray v. Branker*, 529 F.3d 220, 236 (4th Cir. 2008), a capital case originating in Lenoir County, North Carolina, the Fourth Circuit reversed petitioner's death sentence on habeas corpus review for ineffective assistance of counsel. Trial counsel had – among other things – failed to obtain or consider a defense based on expert psychiatric evidence. Petitioner was prejudiced because the "expert evidence, which was

30

missing entirely, would have provided the jury with a medical explanation for Gray's compulsive behavior and his inability to control his reactions. The jury would have known that he suffered from a severe mental illness." This missing expert testimony would have supported two mental health mitigating circumstances. The Fourth Circuit determined that with this expert assistance, there is a reasonable probability of a different result. *Id.*, 529 F.3d at 238; *see also Bell v. Miller*, 500 F.3d 149 (2nd Cir. 2007) (where the only evidence identifying a criminal defendant as the perpetrator comes from a single eyewitness – whose memory has obviously been impaired by medical trauma – the failure of defense counsel to investigate by consulting a medical expert to explore the possible effects of the trauma on the state's key witness is constitutionally ineffective); *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) (failure to investigate the forensics of the fatal bullet by obtaining an expert witness constituted deficient performance in murder case in which the state's main argument for petitioner's intent to kill came from the distance at which the shot was allegedly fired); *Gersten v. Senkowski*, 426 F.3d 588 (2nd Cir. 2005) (in child sex abuse case, the state's case rested on the credibility of the victim rather than direct physical evidence; thus, trial counsel's failure to investigate the state's medical evidence by consulting with or obtaining the assistance of an expert medical witness constituted deficient performance and prejudiced the petitioner).

95.     This Court concludes that trial counsel's failure to investigate their client's confession by consulting with an expert in the area of police interrogations fell below an objective standard of reasonableness under prevailing professional norms. Trial counsel knew that that the State would rely on their client's confession in order to make the case for first-degree murder, robbery, and kidnapping and to make a case for a death sentence. A reasonably competent attorney would have realized that investigating the facts and circumstances of the

31

confession was necessary to making an informed choice about how to present their case to the jury.

96.     Under no construction of the evidence in this case could this failure to investigate the facts and circumstances of Defendant's confession be called "tactical" or "strategic." The State presented no evidence that this decision was tactical.

97.     Defendant was prejudiced by trial counsel's deficient performance. Prejudice in this case is assessed by reviewing the case against Defendant presented by the State at trial against the evidence supporting a false confession theory developed in post-conviction. The confession was the only evidence that directly implicated Defendant in the murder, robbery, or kidnapping of Dwayne McNeill. Without investigating the circumstances of their client's confession and without seeking the assistance of an expert in the area of police interrogations, trial counsel was left with no way to explain to the jury why their client might give a false confession.

98.     In contrast, the assistance of an expert – like Dr. Ofshe – might well have influenced the jury's appraisal of Defendant's culpability. The likelihood of a different result if trial counsel had investigated the circumstances of the confession and obtained the assistance of an expert in police interrogations is sufficient to undermine confidence in the outcome of Defendant's trial.

99.     In a close case, such as Defendant's, in which the confession is crucial to the State's case and is inconsistent in several respects with the physical evidence – prejudice is readily apparent for trial counsel's deficient performance.

100.    The State has failed to prove that this constitutional violation was harmless to Defendant beyond a reasonable doubt. N.C. Gen. Stat. §§ 15A-1420(c)(6) & 15A-1443(b).

B.    **Conclusions of Law Relating to the *Brady* Claim**

101.    The facts found above were proven by a preponderance of the evidence. N.C. Gen. Stat. § 15A-1420(c)(5).

102.    The State has an affirmative obligation to disclose information favorable to the accused which is material to either guilt or punishment. Failure to disclose such evidence violates due process whether the failure is intentional or inadvertent. *Brady v. Maryland*, 373 U.S. 83, 87, (1963); U.S. Const. Am. XIV; N.C. Const. Art. 1 § 19. The State's affirmative duty to disclose "*Brady* material" extends beyond the prosecutor's office to include State investigative agencies. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

103.    Over forty years after *Brady*, the Supreme Court summarized its case law dealing with *Brady* claims in *Banks v. Dretke*, 540 U.S. 668, 696 (2004):

> A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. "Ordinarily we presume that public officials have properly discharged their official duties." [] We have several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." [ ] Courts, litigants, and juries properly anticipate that "obligations to refrain from improper methods to secure a conviction ... plainly resting upon the prosecuting attorney, will be faithfully observed."

(citations omitted).

104.    There are three elements to a meritorious *Brady* claim: the material must be favorable to the accused, it must have been suppressed by the State, and prejudice to the defendant must have ensued. *Strickler v. Greene*, 527 U.S. 263 (1999). Impeachment material falls within the *Brady* rule. *Giglio v. United States*, 405 U.S. 150, 154 (1975); *United States v. Bagley*, 473 U.S. 667, 676 (1985) (there is no constitutional distinction between "impeachment material" and "exculpatory material").

33

105.    A defendant is prejudiced under *Brady* if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A reviewing court should consider not only the potential effect of the undisclosed material on the jury, but also its effect on the preparation and presentation of the defendant's case in light of the totality of the circumstances. *Bagley*, 473 U.S. at 683.

106.    In *Kyles*, the United States Supreme Court discussed the question of materiality at length. For purposes of measuring a *Brady* violation, "a showing of materiality," wrote the Court, "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." 514 U.S. at 434. A defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence there would not have been enough left to convict." 514 U.S. at 434-35. Rather, the "touchstone of materiality is a 'reasonable probability' of a different result....The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434.

107.    Finally, materiality is to be considered in light of the totality of the suppressed evidence, not item by item. *Kyles*, 514 U.S. at 436; *State v. Canady*, 355 N.C. 242, 252 (2002).

108.    In *State v. Canady*, 355 N.C. at 252, the North Carolina Supreme Court reversed the trial court's denial of defendant's *Brady* motion seeking information about the identity of a

34

confidential informant who had information about another possible perpetrator of the murder for which defendant was being charged. The North Carolina Supreme Court reversed, reasoning that:

> Here, defendant had neither the name of the informant who gave the State information...nor the name of the subject brought back from Mississippi by police. Defendant thus could not effectively use that information at trial. Defendant needed access to these individuals to interview them and develop leads. **There is a reasonable probability that if defendant had access to informants who had names of others involved in the murders, such information could have swayed the jury to reach a different outcome. Defendant had a right to this information in a timely manner so he could effectively use it.**

*Id.*, 355 N.C. at 252-53 (emphasis supplied).

109.    False trial testimony by a State's witness requires a conviction to be set aside if the prosecuting authorities knew the testimony was false and there is any reasonable likelihood that the judgment of the jury could have been affected. *Napue v. Illinois*, 360 U.S. 264, 271 (1959). The State need not have elicited the false testimony. A violation is shown where the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*, 360 U.S. at 269.

110.    Information that Michael Gainey was the person who shot Dwayne McNeill was withheld from the Defendant at trial, was material to the guilt/innocence phase of Defendant's trial, material to the pre-trial investigation and preparation of trial counsel, and would have impeached one of the State's witnesses. There is a reasonable likelihood that, had this evidence been disclosed to the Defendant at or prior to trial, the result of the proceeding would have been different. In the absence of this information, the Defendant did not receive a fair trial and instead received a trial resulting in a verdict that is not worthy of confidence.

35

111.    There is a reasonable likelihood that, had the additional withheld evidence been disclosed to the Defendant – the identify of the caller to the McNeill household, the missing pages from the Sheriff's incident report, and the anonymous call identifying the crime scene – the result of the proceeding would have been different.

112.    There is a reasonable likelihood that, given the cumulative effect of the various evidence withheld from Defendant, the result of the proceeding would have been different.

113.    In the alternative, assuming that the Harnett County District Attorney's office made the relevant information available to trial counsel through an adequate "open file" discovery policy, Defendant was prejudiced by trial counsel's deficient performance in failing to discover that information. But for deficient performance of trial counsel, there is a reasonable probability of a different result, and Defendant would be entitled to a new trial for ineffective assistance of counsel. *See, e.g., Levon Junior Jones v. Marvin Polk*, No. 5:00-HC-00238 (E.D.N.C. Sep. 26, 2006).

114.    Assistant District Attorney Strickland knew that Dwight McNeill gave false testimony on cross-examination when asked if he had received any information about someone else hurting his son. There is a reasonable likelihood that the judgment of the jury could have been affected by this uncorrected, false testimony.

115.    The State has failed to prove that these constitutional violations were harmless to Defendant beyond a reasonable doubt. N.C. Gen. Stat. §§ 15A-1420(c)(6) & 15A-1443(b).

36

## NOW, THEREFORE, IT IS ORDERED THAT:

116.    The Court, having determined that Defendant is entitled to appropriate relief as to Claims II and III of the Motion for Appropriate Relief, concludes that the Defendant is entitled to have the sentence of death imposed on July 13, 1999 vacated, his convictions of first-degree murder, kidnapping and robbery reversed and set aside and a new trial awarded to him.

117.    The Court reserves ruling on the remaining claims raised in the Motion for Appropriate Relief and Amended Motion for Appropriate Relief.

                                        The Honorable Gregory A. Weeks
                                        Superior Court Judge Presiding

37

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Submitted September 28, 2011
Decided October 25, 2011

**Before**

RICHARD A. POSNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 11-3212

| | |
|---|---|
| DANIEL TAYLOR, | On Motion for an Order Authorizing the |
| *Applicant,* | District Court to Entertain a Second or |
| | Successive Petition for Collateral Review. |
| *v.* | |
| DAVE REDNOUR, | |
| *Respondent.* | |

### O R D E R

Daniel Taylor has filed an application under 28 U.S.C. § 2244(b), seeking authorization to file a second petition for a writ of habeas corpus to review a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), for the prosecution's concealment of a witness and police reports that appear to exonerate him. We may authorize the filing of a second or successive application only after determining that the application makes a prima facie showing that the application satisfies the stringent requirements of 28 U.S.C. § 2244(b). *See* 28 U.S.C. § 2244(b)(2)(C). This standard requires that petitioner make "a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997).

At trial, Taylor presented evidence that he was jailed in a Chicago Police Department lockup at 8:45 pm on November 16, 1992–at the time of the shooting in his neighborhood for which he was convicted. The prosecution, however, pointed to Taylor's confession and argued that, while a "Daniel Taylor" was jailed, it was not *this* Daniel Taylor. The

prosecutor argued that Taylor's alibi was deficient because no eyewitness had actually seen *this* Daniel Taylor in the lockup on the night of the crime.

While Taylor's post-conviction petition was wending its way through the Illinois courts, the *Chicago Tribune* published a series on proven and probable false confessions and featured Taylor's case. See Steve Mills et. al., "When Jail Is No Alibi In Murders; New Evidence Undercuts State Case, Cops and Confessions," *Chicago Tribune*, Dec. 19, 2001, p. 1. The *Tribune's* investigation reported that James Anderson said he was Taylor's cellmate on November 16, 1992, *and* that he had positively identified Taylor to two detectives who interviewed him about whether he had been jailed with Taylor, telling him they were trying to determine whether Taylor had been in jail when a crime occurred elsewhere. Anderson positively identified a photograph of Taylor, and then the detectives, one of whom was taking notes, asked whether Anderson was sure; Anderson repeatedly stated he was. Anderson's account is supported by two newly disclosed Chicago police reports, dated December 29 and 31, 1992. The December 29 report states, *"Need to locate James Anderson concerning Lassiter Homicide. Anderson was locked-up in 023 District with Black T (Taylor) one of the offenders charged. . . ,"* showing that the police had identified Anderson before trial as Taylor's cellmate. The December 31 report recounted an unsuccessful effort to find Anderson. The CPD has listed as missing any notes of this conversation with Anderson.

Taylor contends that he could not have discovered the factual predicate for his *Brady* claim any earlier through the exercise of due diligence. Taylor filed his first federal habeas petition; two years later the *Chicago Tribune* reported on probable and proven false confessions, which brought to light the exculpatory witness, along with evidence that detectives had met with the witness and taken notes of the interview. This evidence was in the sole possession and control of the State, which had not revealed it to Taylor or his counsel. Taylor promptly supplemented his state post-conviction petition and exhausted his *Brady* claim.

Taylor contends that the facts underlying the *Brady* claim, if proved and viewed in light of the evidence as a whole, would establish by clear and convincing evidence that no reasonable factfinder could find him guilty. *See* 28 U.S.C. § 2244(b)(2)(B)(ii); see also *Schlup v. Delo*, 513 U.S. 298, 329 (1995). He reasons that the undisclosed *Brady* witness and documentary evidence were the missing linchpins that would have prevented the prosecution from arguing to the jury that the "Daniel Taylor" who was locked up on the night of the crime was not he. At trial, Taylor had offered his arrest report, which listed his date of birth, his home address, and his height and weight, and was dated 6:45 pm on November 16, the evening of the shooting, plus a signed bond slip that showed that he was detained until 10:00 pm. When combined with the testimony of the newly revealed witness and the newly disclosed police reports, this is strong proof that Taylor's participation in the

crime was physically impossible. In contrast, the circumstances surrounding the non-videotaped confession are suspect. Considerable empirical research shows that the potential for false confessions increases markedly when the defendant is a juvenile, placed in isolation, and sleep deprived.

        We conclude that Taylor has made a prima facie showing that the application satisfies the stringent requirements of 28 U.S.C. § 2244(b)(2)(B) with respect to his *Brady* claim. We therefore authorize him to file a second petition for a writ of habeas corpus.