**RECEIVED**

**03-20-2012**

**CLERK OF COURT OF APPEALS OF WISCONSIN**

STATE OF WISCONSIN

COURT OF APPEALS

DISTRICT II

————

Case No. 2010AP3105-CR

——————————————————————

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

BRENDAN R. DASSEY,

      DEFENDANT-APPELLANT.

——————————————————————

APPEAL FROM A JUDGMENT OF CONVICTION AND
AN ORDER DENYING POST-CONVICTION RELIEF
ENTERED IN THE CIRCUIT COURT FOR MANITOWOC
COUNTY, THE HONORABLE JEROME L. FOX,
PRESIDING

——————————————————————

BRIEF OF THE PLAINTIFF-RESPONDENT

——————————————————————

        J.B. VAN HOLLEN
        Attorney General

        WARREN D. WEINSTEIN
        Assistant Attorney General
        State Bar #1013263

        Attorneys for Plaintiff-Respondent

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-9444
(608) 266-9594 (Fax)
weinsteinwd@doj.state.wi.us

# TABLE OF CONTENTS

Page

STATEMENT ON ORAL ARGUMENT
AND PUBLICATION ...........................................1

ARGUMENT ......................................................2

I.  THE CIRCUIT COURT CORRECTLY
    DENIED DASSEY'S MOTION TO
    SUPPRESS............................................2

    A.  WHETHER              DASSEY'S
        CONFESSION IS TRUTHFUL IS
        NOT BEFORE THIS COURT...............2

    B.  THE CIRCUIT COURT'S FINDINGS
        OF FACT AND CONCLUSIONS OF
        LAW    REGARDING    DASSEY'S
        FEBRUARY      27,     2006
        STATEMENTS AND HIS MARCH 1,
        2006 CONFESSION. ..........................8

    C.  THE CIRCUIT COURT'S FINDINGS
        OF FACT ARE NOT CLEARLY
        ERRONEOUS. ............................... 13

    D.  DASSEY'S   CONFESSION   WAS
        VOLUNTARY.................................. 15

    E.  ANY ERROR IN THE CIRCUIT
        COURT'S RULING THAT DASSEY
        VOLUNTARILY     GAVE     HIS
        FEBRUARY      27,     2006
        STATEMENTS IS HARMLESS.......... 27

II. THE CIRCUIT COURT CORRECTLY
    DENIED DASSEY'S CLAIM THAT
    LEN    KACHINSKY     PROVIDED
    INEFFECTIVE-ASSISTANCE-OF-
    COUNSEL. ........................................... 34

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 2 of 84    Document 19-7

A. THE LAW GOVERNING INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS BASED ON A CONFLICT OF INTEREST.............. 35

B. DASSEY FAILS TO DEMONSTRATE ANY CONFLICT ADVERSELY AFFECTED ANY OF HIS LAWYERS REPRESENTATION. ........................ 52

III. THE CIRCUIT COURT CORRECTLY DENIED DASSEY'S CLAIM THAT HIS TRIAL ATTORNEYS PROVIDED INEFFECTIVE-ASSISTANCE-OF-COUNSEL. ............. 56

A. DASSEY DID NOT PROVE HIS COUNSEL INEFFECTIVE IN FAILING TO CALL AN EXPERT........ 57

B. DASSEY DID NOT PROVE HIS COUNSEL INEFFECTIVE IN NOT INTRODUCING A PART OF HIS CONFESSION................................. 63

C. DASSEY DID NOT PROVE HIS COUNSEL INEFFECTIVE IN HIS CLOSING ARGUMENT..................... 66

IV. DASSEY IS NOT ENTITLED TO A NEW TRIAL IN THE INTEREST OF JUSTICE. ............................................. 70

CONCLUSION ..................................................... 72

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 3 of 84    Document 19-7

CASES CITED

Allen v. McCotter,
    804 F.2d 1362 (5th Cir. 1986).................... 24

Bell v. Miller,
    500 F.3d 149 (2d Cir. 2007) ................. 59, 60

Clewis v. Texas,
    386 U.S. 707 (1967)......................... 30, 31, 33

Colorado v. Connelly,
    479 U.S. 157 (1986)......................... 16, 17, 19

Colorado v. Spring,
    479 U.S. 564 (1987).................................... 14

Crane v. Kentucky,
    476 U.S. 683 (1986)................................. 4, 7

Cuyler v. Sullivan,
    446 U.S. 335 (1980)......................... 35, 36, 37

Harris v. New York,
    401 U.S. 222 (1971)................................... 55

Hoffman v. Leeke,
    903 F.2d 280 (4th Cir. 1990)...................... 41

Holland v. McGinnis,
    963 F.2d 1044 (7th Cir. 1992).............. 17, 25

Jackson v. Denno,
    378 U.S. 368 (1964)...................................... 3

Ledbetter v. Edwards,
    35 F.3d 1062 (6th Cir. 1994)...................... 26

Lisenba v. California,
314 U.S. 219 (1941) ..................................... 19

Lock v. State,
31 Wis. 2d 110,
142 N.W.2d 183 (1966) .............................. 71

Mentek v. State,
71 Wis. 2d 799,
238 N.W.2d 752 (1976) .............................. 72

Mickens v. Taylor,
535 U.S. 162 (2002) .............................. 37, 38

Miranda v. Arizona,
384 U.S. 436 (1966) ..........................9, passim

Moran v. Burbine,
475 U.S. 412 (1986) .................................... 21

Reck v. Pate,
367 U.S. 433 (1961) .................................... 29

Rogers v. Richmond,
365 U.S. 534 (1961) ............................ 2, 3, 21

Rubin v. Gee,
292 F.3d 396 (4th Cir. 2002)..........41, passim

Schneckloth v. Bustamonte,
412 U.S. 218 (1973) .............................. 17, 21

Sims v. Georgia,
385 U.S. 538 (1967) ...................................... 3

State v. Agnello,
226 Wis. 2d 164,
593 N.W.2d 427 (1999) .............................. 16

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 5 of 84    Document 19-7

State v. Balliette,
2011 WI 79, 336 Wis. 2d 358,
805 N.W.2d 334 ........................................... 56

State v. Berggren,
2009 WI App. 82, 320 Wis. 2d 209,
769 N.W.2d 110 ........................................... 23

State v. Charbarneau,
82 Wis. 2d 644,
264 N.W.2d 227 (1978) ............................... 68

State v. Clappes,
136 Wis. 2d 222,
401 N.W.2d 759 (1987) .................. 13, 16, 20

State v. D'Acquisto,
124 Wis. 2d 758,
370 N.W.2d 781 (1985) ............................... 71

State v. Deets,
187 Wis. 2d 630, 523 N.W.2d 180
(Ct. App. 1994) ........................................... 22

State v. Drogsvold,
104 Wis. 2d 247, 311 N.W.2d 243
(Ct. App. 1981) ........................................... 22

State v. Eugenio,
219 Wis. 2d 391,
579 N.W.2d 642 (1998) ............................... 64

State v. Gordon,
2003 WI 69, 262 Wis. 2d 380,
663 N.W.2d 765 .................................... 68, 69

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 6 of 84    Document 19-7

State v. Grady,
2009 WI 47, 317 Wis. 2d 344,
766 N.W.2d 729 .................................... 26, 53

State v. Hicks,
202 Wis. 2d 150,
549 N.W.2d 435 (1996) ......................... 71, 72

State v. Kalk,
2000 WI App 62, 234 Wis. 2d 98,
608 N.W.2d 428 .......................................... 38

State v. Kaye,
106 Wis. 2d 1,
315 N.W.2d 337 (1982) ......................... 35, 36

State v. King,
904 A.2d 808 (N.J. Super 2006) ................... 4

State v. Knapp,
2003 WI 121, 265 Wis. 2d 278,
666 N.W.2d 881 .......................................... 55

State v. Love,
227 Wis. 2d 60,
594 N.W.2d 806 (1999) ......................... 36, 38

State v. Mabe,
864 P.2d 890 (Utah 1993) ..................... 32, 33

State v. Maloney,
2004 WI App 141, 275 Wis. 2d 557,
685 N.W.2d 620, *aff'd.* 2005 WI 74,
281 Wis. 2d 595, 698 N.W.2d 583 .............. 59

State v. Maloney,
2006 WI 15, 288 Wis. 2d 551,
709 N.W.2d 436 .......................................... 71

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 7 of 84    Document 19-7

State v. Marhal,
172 Wis. 2d 491, 493 N.W.2d 758
(Ct. App. 1992) ........................................... 72

State v. Medina,
2006 WI App 76, 292 Wis. 2d 453,
713 N.W.2d 172........................................... 38

State v. Owen,
148 Wis. 2d 922,
436 N.W.2d 869 (1989) .............................. 23

State v. Ray,
166 Wis. 2d 855, 481 N.W.2d 288
(Ct. App. 1992) ........................................... 71

State v. Samuel,
2002 WI 34, 252 Wis. 2d 26,
643 N.W.2d 423........................................... 13

State v. Schumacher,
144 Wis. 2d 388,
424 N.W.2d 672 (1988) .............................. 71

State v. Silva,
2003 WI App 191, 266 Wis. 2d 906,
670 N.W.2d 385........................................... 70

State v. Simpson,
185 Wis. 2d 772, 519 N.W.2d 662
(Ct. App. 1994) ........................................... 72

State v. Smith,
207 Wis. 2d 258,
558 N.W.2d 379 (1997) .............................. 56

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 8 of 84    Document 19-7

State v. Stuart,
    2003 WI 73, 262 Wis. 2d 620,
    664 N.W.2d 82 .............................................. 54

State v. Thiel,
    2003 WI 111, 264 Wis. 2d 571,
    665 N.W.2d 305 ........................................... 65

State v. Tkacz,
    2002 WI App 281, 258 Wis. 2d 611,
    654 N.W.2d 37 .............................................. 38

State v. Trigg,
    2003 WI App 91, 264 Wis. 2d 861,
    663 N.W.2d 396 .................................... 17, 25

State v. Van Buren,
    2008 WI App 26, 307 Wis. 2d 447,
    746 N.W.2d 545 .................................... 59, 64

State v. Wyss,
    124 Wis. 2d 681,
    370 N.W.2d 745 (1985) .............................. 71

State ex rel Goodchild v. Burke,
    27 Wis. 2d 244,
    133 N.W.2d 753 (1965) ............................. 3, 4

Strickland v. Washington,
    466 U.S. 668 (1984) ........................ 35, passim

Summerlin v. Stewart,
    267 F.3d 926 (9th Cir. 2001) ........... 39, passim

Thompson v. Haley,
    255 F.3d 1292 (11th Cir. 2001) ................... 23

Triana v. United States,
205 F.3d 36 (2d Cir. 2000) ............43, passim

Triplett v. State,
65 Wis.2d 365,
222 N.W.2d 689 (1974) ................................ 7

Underwood v. Clark,
939 F.2d 473 (7th Cir. 1991) ........................ 69

United States v. Bayer,
331 U.S. 532 (1947).......................... 27, 28, 29

United States v. Chalan,
812 F.2d 1302 (10th Cir. 1987).......... 8, 31, 32

United States v. Hunt,
543 F.2d 162 (D.C. Cir. 1976)..................... 36

United States v. Johnson,
351 F.3d 254 (6th Cir. 2003)........................ 23

United States v. Montgomery,
555 F.3d 623 (7th Cir. 2009).................. 23, 25

United States v. Rutledge,
900 F.2d 1127 (7th Cir. 1990)............... 18, 24

United States v. Tatum,
943 F.2d 370 (4th Cir. 1991)...........39, passim

Vollmer v. Luety,
156 Wis. 2d 1,
456 N.W.2d 797 (1990) ................................ 70

Westover v. United States,
384 U.S. 436 (1966)................................ 29, 30

Williams v. Taylor,
    529 U.S. 362 (2000)...................................... 43

Woods v. State,
    701 N.E.2d 1208 (Ind. 1998)..........48, passim

## STATUTES CITED

28 U.S.C. § 2254(d) ............................................. 43

28 U.S.C. § 2255.................................................. 43

Wis. Stat. § 752.35 .......................................... 70, 71

Wis. Stat. § 908.01(4)(a)1 ................................... 64

Wis. Stat. § 940.11(1).......................................... 68

Wis. Stat. § 974.02 ............................................. 43

## OTHER AUTHORITIES

Fred E. Inbau, John E. Reid,
Joseph P. Buckley III, and Brian C. Jayne,
Criminal Interrogations And Confessions 417
Jones & Bartelt, Fourth Ed. (2001) .................... 17

Laurie Magid, Deceptive Police Interrogation
Practices: How Far Is Too Far?
    99 Mich. L. Rev. 1168 (2001)...................... 25

Wis. JI—Criminal 1193 (Rel. No. 44—2006)....... 68

STATE OF WISCONSIN

C O U R T O F A P P E A L S

DISTRICT II

————

Case No. 2010AP3105-CR

_____

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

BRENDAN R. DASSEY,

DEFENDANT-APPELLANT.

_____

APPEAL FROM A JUDGMENT OF CONVICTION AND
AN ORDER DENYING POST-CONVICTION RELIEF
ENTERED IN THE CIRCUIT COURT FOR MANITOWOC
COUNTY, THE HONORABLE JEROME L. FOX,
PRESIDING

_____

BRIEF OF THE PLAINTIFF-RESPONDENT

_____

## STATEMENT ON ORAL ARGUMENT AND PUBLICATION

The State does not request oral argument. Publication of the court's decision may be warranted in light of the issues raised in this appeal.

# ARGUMENT

Dassey raises four claims on this appeal. Dassey argues: (1) Len Kachinsky provided ineffective-assistance-of-counsel during his pre-trial representation of Dassey. Dassey claims he is entitled to a new trial or, alternatively, a new suppression hearing. Dassey's Br. at 48-72; (2) the circuit court erred in denying his motion to suppress. Dassey's Br. at 73-88; (3) his trial attorneys provided ineffective-assistance-of-counsel during his trial "by failing to present substantial evidence indicating that Brendan's March 1 confession was unreliable" and by conceding the mutilation charge during closing argument. Dassey's Br. at 89-103; and (4) he is entitled to a new trial in the interest of justice. Dassey's Br. at 103-104. The State will address these claims in a slightly different order.

## I. THE CIRCUIT COURT CORRECTLY DENIED DASSEY'S MOTION TO SUPPRESS.

### A. WHETHER DASSEY'S CONFESSION IS TRUTHFUL IS NOT BEFORE THIS COURT.

In *Rogers v. Richmond*, 365 U.S. 534 (1961), the United States Supreme Court held that the truth or falsity of a confession should play no part in determining whether a confession is voluntary.

> [T]he trial judge should have been focused, for purposes of the Federal Constitution, on

> the question whether the behavior of the
> State's law enforcement officials was such as
> to overbear petitioner's will to resist and
> bring about confessions not freely self-
> determined—a question to be answered with
> complete disregard of whether or not
> petitioner in fact spoke the truth.

*Id.* at 544.

"The jury, however, may find it difficult to understand the policy forbidding reliance upon a coerced, but true, confession ...." *Jackson v. Denno*, 378 U.S. 368, 382 (1964). Therefore, *Jackson* held, a criminal defendant has a due process right to have whether a confession is voluntary determined by a judge. *Jackson,* 378 U.S. at 380-81; *see also Sims v. Georgia*, 385 U.S. 538, 543-44, (1967). One can only conclude from these cases that the truthfulness of a confession and whether it is voluntary are separate and independent questions. And the *Rogers* Court as much as said so.

> To be sure, confessions cruelly extorted may
> be and have been, to an unascertained extent,
> found to be untrustworthy. But the
> constitutional principle of excluding
> confessions that are not voluntary does not
> rest on this consideration. Indeed, in many of
> the cases in which the command of the Due
> Process Clause has compelled us to reverse
> state convictions involving the use of
> confessions obtained by impermissible
> methods, independent corroborating evidence
> left little doubt of the truth of what the
> defendant had confessed.

*Rogers*, 365 U.S. at 541.

The Wisconsin Supreme Court in *State ex rel Goodchild v. Burke*, 27 Wis. 2d 244, 258, 133

N.W.2d 753 (1965), held that the question of whether a confession is voluntary was solely for the judge, but whether that confession was truthful, was a question solely for the jury.

> If the trial judge finds on a proper record that the confession is involuntary, that is the end of the matter and the jury never considers the confession. If the judge determines that the confession was voluntarily made, the confession is admitted and the jury consideration is limited to its weight and credibility.

*Id.* at 262.

The United States Supreme Court held that a defendant may present evidence of "the manner in which a confession was secured[, which] will often be germane to its probative weight …." *Crane v. Kentucky*, 476 U.S. 683, 688 (1986). But the Court made clear the probative weight of the confession, *i.e.* whether the confession is true, is "*a matter that is exclusively for the jury to assess.*" *Id.* (emphasis added).

It is true that courts do allow a defendant at trial to present expert witness testimony on a defendant's psychological characteristics but they do so, largely on the basis of *Crane*, as relevant to a jury's determination of a confession's reliability. *See e.g., State v. King*, 904 A.2d 808, 817 (N.J. Super 2006) (and cases cited analyzing holdings that permitted "expert testimony of a defendant's psychological makeup and internal psychological characteristics impacting on the reliability of the confession.").

The State concludes that here the question of whether Dassey's confession is truthful is not before this court. Dassey presented evidence of his

"suggestibility" to the jury through the testimony of Dr. Gordon (120:15-76). The jury found the confession to be true. They convicted Dassey of both sexual assault and homicide based on his confession.

And they had good reason to do so. There are three strong indicia that Dassey told the truth when he admitted to helping Avery. On February 28, 2006, the day before the March 1, 2006 confession, Wiegert received a lab report that lead had been detected on a defect found on skull bone fragments (193:55-56). Wierget suspected based on this report that Halbach had been shot (193:56). Dassey's confession confirmed that Avery shot Halbach in the head (79:34:50). He further told Wiegert and Fassbender that Avery shot Halbach "about ten" times (79:34:60). This fit with the ten or eleven shell casings police found in their November searches (114:96). Dassey said Avery shot Halbach on the left side of her head (79:34:93). The forensic anthropologist "refit" three bone fragments together and determined they came from the left side of the head (114:226-27; 116:78). And Dassey told Wiegert and Fassbender that Avery shot Halbach when they were in the garage (79:34:59). Police obtained a search warrant that same day (114:56; 117:25-26). The search of the garage yielded a bullet fragment embedded in the garage floor and a bullet under an air compressor (114:63-64). An analysis of a DNA sample from one bullet revealed Halbach as the source of the DNA (115:76). And that bullet had been fired from a rifle found in Avery's bedroom ( 114:15-16, 197, 208-209).

Dassey also told Wiegert and Fassbender that Avery hid the key to Halbach's car in his

dresser (79:34:70-71). On March 8, 2006, police executed another search warrant on Avery's bedroom (114:106; 117:26). That search yielded the key to Halbach's car with a blue key fob attached (114:106-107). Halbach's sister identified the blue fob as a lanyard she gave Halbach (113:129).

Dassey told Wiegert and Fassbender that Avery received two phone calls from "Jodi"; one about "five thirty, five" (79:34:82). Jodi Stachowski testified she made two phone calls to Avery on October 31, 2005; the first at about 5:30 pm (115:175).

Dassey drew a diagram of Avery's bedroom during his March 1, 2006 confession (79:34:110-11). Jodi Stachowski confirmed that Avery's bedroom was configured as Dassey depicted it when she went into jail in August 2005 (115:176-80). The diagram differed from the configuration at the time police searched the bedroom in November, 2005 (115:177).

Dassey places considerable emphasis on his suggestibility. He refers to leading questions in six different places in his brief. Dassey's Br. at 42, 47, 78, 83, 88, 93. He points to Dr. Gordon's testimony

> that Brendan's tendency to "give in and go along with leading questions" and to "shift his answers due to pressure" made him "highly suggestible" such that only five people out of one hundred would be more suggestible than him. (R.120:54-56.)

Dassey's Br. at 78. Dr. Gordon testified that suggestibility as measured by the Gudjonsson Suggestibility Scales provided a method to

evaluate false confessions (120:15-16). He had examined Dassey and also testified to his suggestibility (120:35-56). Dr. Gordon's testimony, which the jury heard, established both suggestibility's relevance to truthfulness and his opinion of Dassey's suggestibility. So the jury evaluated Dassey's suggestibility in accepting his confession as true.

Dassey also argues that "[t]he presence of contamination is, like any relevant fact, part of the 'totality of the circumstances' surrounding any interrogation." He cites *Triplett v. State*, 65 Wis.2d 365, 368, 222 N.W.2d 689 (1974). Dassey's Br. at 74-75. *Triplett* does not hold that suggestibility is a relevant fact or circumstance in determining whether a confession is voluntary. It merely repeats the general rule that whether a confession is voluntary is determined on the facts and circumstances surrounding the confession.

Dr. Leo equated contamination with false confessions (190:135-136). Under the relevant case law of both the United States Supreme Court and the Wisconsin Supreme Court, whether a confession is false is "a matter that is exclusively for the jury to assess." *Crane*, 476 U.S. at 688. (So if *Triplett* does stand for the proposition for which Dassey cites it, *Crane* has overruled it.) The issue before this court concerns whether Dassey's confession is voluntary.

## B. THE CIRCUIT COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DASSEY'S FEBRUARY 27, 2006 STATEMENTS AND HIS MARCH 1, 2006 CONFESSION.

Wiegert and Fassbender interviewed Dassey three times, twice on February 27, 2006 and again on March 1, 2006 (117:4, 7, 12). In addition, Fassbender alone talked to Dassey about how he got bleach stains on his blue jeans on the night of February 27, 2006 (113:193-95). Dassey's motion sought to suppress the three statements Dassey gave to both Wiegert and Fassbender (17:1).[1] On May 12, 2006, the circuit court issued an oral decision in which it made the following findings of fact and conclusions of law (46).

DASSEY'S PERSONAL CHARACTERISTICS

In February and March of 2006, Brendan Dassey, was sixteen years of age (46:3). At the time of the police interviews, he was a student at Mishicot High School enrolled in mostly regular classes, but also in some special education classes. Testing disclosed an IQ level in the low-average to borderline range. There is no evidence that he suffered from any emotional disorder which made him unusually susceptible or vulnerable to police pressures (46:3-4). Whether the suspect was particularly susceptible to police coercion is a factual question. *See United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987) (Whether the suspect was particularly susceptible to police

_____

[1]Dassey does not challenge the Fassbender interview the night of February 27, 2006.

coercion is subject to review under the clearly erroneous standard.).

INTERVIEW AT MISHICOT HIGH SCHOOL, FEBRUARY 27, 2006.

Investigator Wiegert and Agent Fassbender met with Brendan Dassey on February 27, 2006, at Mishicot High School at approximately 12:30 p.m. (46:4). They told Dassey that he didn't have to answer any questions and he was free to go whenever he wanted (46:5). After an hour they again told Dassey he could stop answering questions and could, "walk out anytime." The interview ended at 2:14 p.m. He returned to his eighth hour class at Mishicot High School (46:5).

INTERVIEW AT TWO RIVERS POLICE DEPARTMENT, FEBRUARY 27, 2006.

On February 27, 2006, Brendan Dassey and his mother, Barbara Janda, met with the investigators at Mishicot High School at approximately 3:00 p.m. and agreed that Dassey could do a videotape interview at the Two Rivers Police Department. The investigators asked Janda if she wanted to be present during the interview. She said it was not necessary. And Dassey said he did not care if his mother was present or not (46:5).

Exhibit No. 1 is a *Miranda*[2] warning and waiver signed and initialed by Dassey on February, 27, 2006, at 3:21 p.m. (46:4). After he signed the warnings and waiver, the investigators interviewed Dassey about certain events which he

_____

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

claimed occurred on the night of October 31, 2005 (46:5-6). The interview lasted approximately forty-one minutes and was conducted entirely in a conversational tone of voice by the interviewers. At no time during the interview did Dassey appear visibly stressed or pressured by the questions or conduct of the interviewers.

CONFESSION AT MANITOWOC COUNTY SHERIFF'S DEPARTMENT, MARCH 1, 2006.

On March 1, 2006, Investigator Wiegert and Agent Fassbender sought and received permission from Janda to speak with Dassey. She was to pick him up at the conclusion of the interview. Following her grant of permission, Wiegert and Fassbender picked up Dassey at Mishicot High School at approximately 10:05 a.m. (46:6). Exhibit 2 is a *Miranda* warning and waiver Dassey signed and initialed on March 1, 2006, at 10:10 a.m. (46:4). The investigators transported him to the Manitowoc County Sheriff's office (46:6). The three arrived at the sheriff's office at approximately 10:43 a.m. and went to a carpeted interview room equipped with videotaping equipment (46:7). Shortly after arriving in the interview room and after the videotape equipment had been activated, Investigator Wiegert asked Dassey whether he remembered his *Miranda* rights and whether he still wanted to talk to the investigators. He responded to both questions by saying, "yeah," and nodding his head (46:7).

The interview lasted approximately three hours during the course of which Dassey made a number of inculpatory admissions. At no time during the interview was Dassey handcuffed or otherwise physically restrained (46:7). On several

occasions during the course of the interview the investigators offered soda, water, or food to Dassey and asked him if he wanted to use the bathroom (46:7). During the interview Dassey was seated on an upholstered loveseat (46:7-8).

At various times during the interview the investigators encouraged Dassey to provide details to them by appealing to his sense of honesty (46:8). Both investigators spoke in a normal speaking tone with no raised voices, no hectoring, or threats of any kind during the entire interview, including the admonitions (46:8).

Nothing on the videotape visually depicts Dassey as being agitated, upset, frightened, or intimidated by the questions of either investigator (46:8-9). His demeanor was steady throughout the actual questioning (46:9). He displayed no difficulty in understanding the questions asked of him (46:9). He answered the questions put to him (46:9). At no time did he ask to stop the interview or request that his mother or a lawyer be present (46:9).

Sometimes he revised his answers after being prodded to be truthful or being told by his questioners that they knew his answer was either incomplete or untrue and he should be honest (46:9).

On occasion, the interviewers purported to know details which, in fact, were not true or which represented uncorroborated theories of the crime which they presented to Dassey as factually accurate in order to draw information from him (46:9).

The interviewers made no promises of leniency to Dassey (46:10). He was told, "we can't make any promises, but we'll stand behind you no matter what you did" (46:10; 79:34:4). "I want to assure you that Mark and I are both in your corner. We're on your side" (46:10; 79:34:3). "[W]e don't get honesty here. I'm your friend right now, but I gotta – I gotta believe in you, and if I don't believe in you, I can't go to bat for you" (46:10; 79:34:10). "We're in your corner" (46:10; 79:34:10).

Conclusions Of Law

The interviewers' appeals to honesty were nothing more than a reminder to Dassey that he had a moral duty to tell the truth (46:9). In the context of this interview, the Court finds that this tactic of misleading Dassey by occasionally pretending to know more than they did was neither improper nor coercive because it did not interfere with Dassey's power to make rational choices (46:9-10).

Interviewers statements such as "we'll stand behind you; we're in your corner; I'll go to bat for you" were an attempt to achieve a rapport with Dassey and convince him that a truthful account of events would be in his best interest (46:10-11).

"Under a totality of the circumstances test, which I'm using here, given Brendan Dassey's relevant personal characteristics as set forth in the previous findings and on the record in this case, the State has met its burden by showing by a preponderance of the evidence that the statements made by Brendan Dassey to Investigators Wiegert and Fassbender, and which are the subject of this motion, were the product of Brendan Dassey's free

and unconstrained will reflecting deliberateness of choice. In short, they were voluntary statements" (46:11).

## C. THE CIRCUIT COURT'S FINDINGS OF FACT ARE NOT CLEARLY ERRONEOUS.

Voluntariness is a question of constitutional fact. *State v. Clappes*, 136 Wis. 2d 222, 234-35, 401 N.W.2d 759 (1987). "In reviewing questions of constitutional fact, we uphold a circuit court's factual findings unless clearly erroneous, but we independently determine whether those facts meet the constitutional standard." *State v. Samuel*, 2002 WI 34, ¶15, 252 Wis. 2d 26, 643 N.W.2d 423 (citations omitted). Disputes over the factual circumstances surrounding the confession must be resolved in favor of the circuit court. *Clappes*, 136 Wis. 2d at 235.

Dassey does not directly claim the circuit court's findings of fact are clearly erroneous. But his brief states facts either inconsistent with or directly contrary to the circuit court's findings. For instance, he contends he "was isolated from adult support" during "four rounds of police questioning." Dassey's Br. at 73. Dassey also asserts all but one of the four different interviews occurred in settings controlled by the police. These statements find no support in the record. Dassey was not isolated from adult support either during the interviews or between them. Dassey returned to his eighth hour class after his interview at Mishicot High School (46:5; 79:33:44). His mother, Barbara Janda, rode to the Two Rivers Police Department with Dassey (45:15; 79:33:44; 117:7).

Wiegert and Fassbender offered Janda to sit in on that interview but she declined (45:17; 117:7). She waited in waiting area (117:7). Dassey did not care whether his mother sat in or not (79:33:44). Wiegert and Fassbender removed Dassey from school on March 1, 2006 (45:23). The interview began with Fassbender commenting that Dassey had had "a chance to reflect and breathe" (79:34:2). Dassey spent the day and night of February 28, 2006 at home (119:46).

Wiegert and Fassbender sought and received Janda's permission to interview Dassey on March 1, 2006 (117:12). Dassey complains that Janda was not informed that the officers "suspected that her son might be guilty of a crime." Dassey's Br. at 81. This statement also misstates the record. Wiegert testified Dassey never admitted any involvement in the crimes on February 27 (117:11). At the post-conviction hearing, Wiegert flatly denied that he and Fassbender suspected Dassey of "some involvement in the actual perpetration of the crime" (193:38). Moreover, the Supreme Court does not view withholding the subject matter of questioning from the suspect as bearing on voluntariness. *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987). How, then is it relevant in Janda's case?

There is nothing in the record from which one could even infer that either Mishicot High School or Fox Hills Resort was controlled by police. The most one can conclude is that police arranged and paid for Dassey's and Janda's room (45:17; 117:9) and arranged for additional patrols that night (193:54). Wiegert denied that Dassey and Janda were not free to leave (193:54). Dassey's

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 25 of 84    Document 19-7

brief cites the record at (79:33:483) as supporting his statement that police controlled three of the four interview settings. Dassey's Br. at 80. The State could not find a page 483 in Subdocument 33 of Document 79. The last page bears a pagination in the upper right hand corner of 482 (79:33:44).[3]

The record supports the circuit court's factual findings. Dassey certainly does not present evidence to demonstrate the circuit court's factual findings to be clearly erroneous.

### D. DASSEY'S CONFESSION WAS VOLUNTARY.

As noted above, Dassey sought to suppress the three statements he gave on February 27 and March 1, 2006. The State only introduced the March 1, 2006 confession in its case-in-chief (117:53-64). The circuit court sustained the State's objection to introducing Dassey's statements at Mishicot High School and the Two Rivers Police Department (117:62). Dassey does not advance that ruling as a claim of error in this court.

A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist.

---

[3]Dassey uses the upper right hand pagination in citing both (79:33) and (79:34) rather than the circuit court clerk's document pagination in the lower center following the subdocument number. The State uses the clerk's pagination.

*Clappes*, 136 Wis. 2d at 236. Courts apply a totality of the circumstances standard to determine whether a defendant's statements are voluntary. *Id.* The totality of the circumstances analysis involves a balancing of the personal characteristics of the defendant against the pressures imposed upon the defendant by law enforcement officers. *Id.*

The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. *Id.* The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as: the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination. *Id.* The State must demonstrate a statement is voluntary by a preponderance of the evidence. *State v. Agnello*, 226 Wis. 2d 164, 182, 593 N.W.2d 427 (1999).

Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Clappes*, 136 Wis. 2d at 239. There must be an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." *Connelly*, 479 U.S. at 165.

This does not mean coercion in the broad psychological sense—any conduct overcoming completely free will. "[V]oluntariness … has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word. *Connelly*, 479 U.S. at 170. *See also* FRED E. INBAU, JOHN E. REID, JOSEPH P. BUCKLEY III, AND BRIAN C. JAYNE, CRIMINAL INTERROGATIONS AND CONFESSIONS 417 Jones & Bartell, Fourth Ed. (2001)[4] (stating "no confession following interrogation is completely voluntary in the psychological sense of the word") (35:8).

"Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly* 479 U.S. at 164. But "[c]ausation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because it can almost always be said that the interrogation caused the confession." *State v. Trigg*, 2003 WI App 91, ¶19, 264 Wis. 2d 861, 663 N.W.2d 396 quoting *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) (citations and internal quotation marks omitted). Rather, our society feels strongly that to permit an agency of the government, in the course of securing a conviction, to wring a confession out of an accused against his will, sacrifices important human values. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

The Seventh Circuit Court of Appeals said it this way.

---

[4]The Reid Institute recently released a fifth edition of the book. The state cites to the fourth edition because the record contains Chapter 15 of that edition.

Taken seriously [completely free choice] would require the exclusion of virtually all fruits of custodial interrogation, since few choices to confess can be thought truly "free" when made by a person who is incarcerated and is being questioned by armed officers without the presence of counsel or anyone else to give him moral support. The formula is not taken seriously. *Connelly* may have driven the stake through its heart by holding that a confession which is not a product of the defendant's free choice—maybe he was so crazy, retarded, high on drugs, or intoxicated that he did not even know he was being interrogated—is admissible so long as whatever it was that destroyed the defendant's power of choice was not police conduct. In any event, very few incriminating statements, custodial or otherwise, are held to be involuntary, though few are the product of a choice that the interrogators left completely free.

An alternative approach, which is implied by *Connelly* and may well describe the courts' actual as distinct from articulated standard, is to ask whether the government has made it impossible for the defendant to make a rational choice as to whether to confess—has made it in other words impossible for him to weigh the pros and cons of confessing and go with the balance as it appears at the time.

*United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990) (Emphasis omitted).

Dassey begins his analysis by addressing his personal characteristics. But he ignores the circuit court's findings in this regard. The circuit court found Dassey to be sixteen years old, had an IQ in the low-average to borderline range, enrolled in some special education and some regular high school classes; "[t]here is no evidence that he

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 29 of 84    Document 19-7

suffered from any emotional disorder which made him unusually susceptible or vulnerable to police pressures" (46:3-4).

Dassey does not argue any of these findings are clearly erroneous. He does place reliance on his lower IQ and his suggestibility. He points to contamination and leading questions. He contends these techniques produce a coercive atmosphere because, in view of his suggestibility, they create a heightened risk of an unreliable confession. But as noted above, the constitutional principle of excluding confessions that are not voluntary does not rest on the consideration of unreliability. *Id.* "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." *Connelly*, 479 U.S. at 167 (quoting *Lisenba v. California,* 314 U.S. 219, 236 (1941)).

Dassey presents nothing here to demonstrate that the circuit court made a clearly erroneous finding that he was not unusually susceptible or vulnerable to police pressures. His suggestibility, on which the jury heard evidence, might have suggested a reasonable doubt about whether he had actually been a party to the crimes, but the jury was not persuaded. Dassey's reliance on his difficulty with memory is disingenuous because he also claims that he came up with the detail for his confession from the book "Kiss The Girls" which he read "three or four years" before his trial (119:67). The inconsistency is apparent.

Dassey does argue that he had no prior experience with law enforcement. That is true as

far as it goes. Dassey had never been arrested or questioned prior to Halbach's disappearance. But he was interviewed twice in November, 2005 and, four times between February 27, 2006 and March 1, 2006. So on March 1, 2006, he had some experience with police questioning. And his three interviews on February 27, 2006 did not produce any incriminating statements (117:11; 193:38).

In evaluating the police pressures and tactics used, courts consider the length of the questioning, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination. *Clappes*, 136 Wis. 2d at 236.

The interview here lasted from 10:52 am. to 3:53 pm., a total of five hours; however the last one hour and thirty-five minutes consisted of no questioning (79:30, Exhibit 210). So the interview itself lasted three hours and twenty-five minutes. This is not a particularly long interview.

The circuit court found that during the interview Dassey was seated on an upholstered loveseat (46:8). At no time during the interview was Dassey handcuffed or otherwise physically restrained (46:7). The investigators offered soda, water, or food and asked him if he wanted to use the bathroom (46:7). Nothing on the videotape visually depicts Dassey as being agitated, upset, frightened, or intimidated by the questions of either investigator (46:8-9). His demeanor was steady throughout the actual questioning (46:9).

He displayed no difficulty in understanding the questions asked of him (46:9). He answered the questions put to him (46:9). At no time did he ask to stop the interview or request that his mother or a lawyer be present (46:9). The video of the interview demonstrates these findings were not clearly erroneous (79:31, Exhibit 213).

Dassey does not claim any physical coercion. Rather he argues Wiegert and Fassbender used subtle psychological techniques to overcome his will to resist questioning.

The United States Supreme Court recognizes that

> the need for police questioning as a tool for effective enforcement of criminal laws cannot be doubted. Admissions of guilt are more than merely desirable, they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.

*Moran v. Burbine*, 475 U.S. 412, 426 (1986) (citations and internal quotation marks omitted). "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished." *Bustamonte*, 412 U.S. at 225. Thus certain techniques, courts have concluded, do not rise to impermissible methods "to which, under our accusatorial system, an accused should not be subjected …." *Rogers*, 365 U.S. at 541.

Dassey contends that Wiegert and Fassbender promised him leniency which in his view overbore his will. Dassey begins by pointing

to an interchange on February 27 at MHS in which the officers indicated that if Dassey "had something to do with it or the cover up" he could "potentially be facing charges" Dassey's Br. at 85, A-App. at 546. He refers to statements such as "[w]e'll go to bat for you," "we won't leave you high and dry," "we're in your corner," "we want to help you through this" or other indications they would help him. A-App. at 546-550.

> The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, "advice or exhortation by a police officer to an accused to 'tell the truth' or that 'it would be better to tell the truth' *unaccompanied by either a threat or a promise*, does not render a subsequent confession involuntary...."

*State v. Deets*, 187 Wis.2d 630, 645, 523 N.W.2d 180 (Ct. App. 1994). The fact that a defendant seeks a benefit by giving a statement does not make the statement involuntary. *State v. Drogsvold*, 104 Wis. 2d 247, 275, 311 N.W.2d 243 (Ct. App. 1981).

> "An officer telling a defendant that his cooperation would be to his benefit is not coercive conduct, at least so long as leniency is not promised." *State v. Deets*, 187 Wis. 2d 630, 636, 523 N.W.2d 180 (Ct. App. 1994); *see also [State v.] Cydzik*, 60 Wis. 2d [683,] 692, 211 N.W.2d 421 [(1973)]. "Similarly, coercive conduct does not occur when ... an officer, without promising leniency, tells a defendant that if he or she does not cooperate the prosecutor will look upon the case differently." *Deets*, 187 Wis. 2d at 636–37, 523

N.W.2d 180. "In either case, the officer does nothing other than predict what the prosecutor will do, without making a promise one way or the other." *Id.* at 637, 523 N.W.2d 180.

*State v. Berggren*, 2009 WI App. 82, ¶31, 320 Wis. 2d 209, 769 N.W.2d 110.

Perhaps the best indication that Dassey's confession resulted from a rational choice to reveal his complicity comes from comparing the February 27 statements with the March 1 confession. Wiegert and Fassbender used all of the techniques of which Dassey complains on February 27 yet Dassey resisted these techniques; he did not reveal his involvement in Halbach's death, or his sexual assault or even assisting Avery in putting the body in the fire. He only admitted to seeing body parts.

Moreover, it is *false* promises of leniency that are coercive. "Although a promise was made to the defendant, it was fulfilled. Therefore, it was not part of an impermissible, coercive police tactic which could have rendered the confession involuntary." *State v. Owen*, 148 Wis. 2d 922, 931, 436 N.W.2d 869 (1989). *See also United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009) ("Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him."); *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003) ("[P]romises of leniency may be coercive if they are broken or illusory."); *Thompson v. Haley*, 255 F.3d 1292, 1296–1297 (11th Cir. 2001) (no coercion when defendant claimed that he confessed to spare his girlfriend from being arrested because the police

had probable cause to arrest her); *Allen v. McCotter,* 804 F.2d 1362, 1364 (5th Cir. 1986) (detective had probable cause to arrest the petitioner's wife for aiding in the commission of the robbery. The petitioner's confession was therefore not involuntary by reason of his desire to extricate his wife from a possible good faith arrest.).

The circuit court found that the interviewers made no promises of leniency to Dassey (46:10). Many of Dassey's supposed promises of leniency are indefinite or general in nature. Wiergert denied making specific promises or promises of leniency (45:37-38). He testified he made no promises as to specific charges (45:38). And at one point Wiegert specifically told Dassey "we can't make any promises" (79:34:4). The circuit court found these statements not to be promises of leniency. Dassey presents nothing demonstrating that finding to be clearly erroneous.

Other claimed promises, particularly those of help for Dassey fall into the "true promise" category of cases. Wiegert testified he did advocate for crediting Dassey's honesty with the special district attorney (45:38-39). Thus, promises such as "we'll go to bat for you," "we won't leave you high and dry," "we're in your corner," were truthful. "Government is not forbidden to 'buy' information with honest promises of consideration." *Rutledge*, 900 F.2d at 1130, citations omitted.

Dassey also claims that the technique of claiming superior knowledge renders Dassey's confession involuntary. This technique falls into the category of trickery.

"The interrogation of a suspect typically requires some deception; a common form of deception is to exaggerate the strength of the evidence against the suspect." *State v. Triggs,* 2003 WI App. 91, ¶15, 264 Wis. 2d 861, 663 N.W.2d 396, citing Laurie Magid, *Deceptive Police Interrogation Practices: How Far Is Too Far?*, 99 Mich. L. Rev. 1168, 1174 (2001). "In fact, precedent holds that a police officer may "actively mislead" a suspect prior to obtaining a statement or confession so long as a rational "decision remains possible." *Montgomery*, 555 F.3d at 632.

> Of the numerous varieties of police trickery, however, a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary.
>
>       *     *     *
>
> Inflating evidence of [the defendant's] guilt interfered little, if at all, with his "free and deliberate choice" of whether to confess, for it did not lead him to consider anything beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime. In other words, the deception did not interject the type of extrinsic considerations that would overcome [the defendant's] will by distorting an otherwise rational choice of whether to confess or remain silent.

*Triggs,* 264 Wis. 2d 861, ¶19. quoting *Holland v. McGinnis*, 963 F.2d at 1051. By telling Dassey "we already know," the officers suggested to Dassey they knew more about his involvement than they actually did. "A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater

than it actually is." *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994).

Finally, the circuit court found that Wiegert and Fassbender administered the *Miranda* warnings prior to both the Two Rivers interview and the confession on March 1, 2006 (46:4-6). The record bears out the correctness of this finding (45:15-16, 26; 117:16). Dassey argues that the warnings were not given at a time that gave him a meaningful choice about waiving those rights. Dassey's Br. at 82-84. The Wisconsin Supreme Court rejected the identical claim on virtually the same facts in *State v. Grady*, 2009 WI 47, 317 Wis. 2d 344, 766 N.W.2d 729. There Grady voluntarily went to the police station and agreed to answer some questions concerning a homicide. *Id.* ¶4. Police began the interview by administering *Miranda* warnings. Grady was not in custody at the beginning of the interview. *Id.* ¶5. After about two and one-half hours, another witness told police Grady committed the homicide. Grady was placed under arrest. *Miranda* warnings were not readministered *Id.* ¶6. Grady then confessed. *Id.* ¶7. The Supreme Court held that the police were not required to readminister the warnings once Grady's interrogation became custodial. *Id.* ¶15.

Considering all the circumstances, the circuit court correctly denied Dassey's motion to suppress.

**E.** **ANY ERROR IN THE CIRCUIT COURT'S RULING THAT DASSEY VOLUNTARILY GAVE HIS FEBRUARY 27, 2006 STATEMENTS IS HARMLESS.**

Dassey argues that the four interviews occurring February 27 and March 1, 2006, should be considered together. He contends three of his statements are involuntary. The circuit court did rule all three statements voluntarily made (46:11). The State contends the circuit court correctly ruled. But the alternative, since the State only introduced the March 1, 2006 confession, the State believes that if the circuit court erroneously concluded the two February 27, 2006 statements to be voluntary, that error was harmless so long as the March 1 statement is sufficiently attenuated from the two prior statements. Stated differently, if this court holds the circuit court's denial of Dassey's motion to suppress erroneous, the March 1 confession must be analyzed without regard to the February 27 statements under the doctrine of attenuation.

In *United States v. Bayer*, 331 U.S. 532 (1947), the Supreme Court considered a case involving two confessions of one Radovich. Radovich admitted receiving money as a bribe but a jury found he and his co-defendants guilty of conspiracy to defraud the government. *Id.* at 533-34. As relevant here, on August 9, 1944, Radovich was arrested and confined in the psychopathic ward in Mitchel Field hospital. He was denied callers, communication, comforts and facilities. He was not promptly charged under military law or promptly taken before a magistrate for

arraignment on any civilian charges. On September 5 or 6, 1944, he confessed. But this confession was neither offered nor received in evidence. The Court assumed this confession to be inadmissible. *Id.* at 539-40.

On March 15 and 17, 1945, Radovich gave a second confession to an FBI agent. At the time of this confession, Radovich was still at Mitchel Field but only under "administrative restrictions," which meant that he could not leave the base. The agent warned him his statement might be used against him. Radovich requested the original statement and read it before making the second. The March statement was 'basically' the same as the September statement but with more detail. *Id.* at 540.

The court of appeals held the second confession to be the fruit of the first. *Id.* at 540. The Supreme Court observed:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

*Id.* at 540-41. Since Radovich's sole restriction in March when he made his second confession consisted of his limit to the base, the Court held

his confession voluntary and admissible. *Id.* at 541.

In *Reck v. Pate*, 367 U.S. 433 (1961), the Supreme Court considered and found involuntary two confessions taken on a Saturday and Sunday. But in finding both confessions involuntary, the Court considered whether the first confession should be considered separately from the second.

> The State has made no effort to distinguish between the Saturday and Sunday confessions. Nor could it properly do so. The coercive circumstances preceding the first confession existed through Sunday. Reck remained in police custody, without a judicial hearing. He was subjected to further interrogation. He did not see counsel, family or friends between Saturday afternoon and Sunday afternoon. There are no other facts in the record suggesting that the Sunday confession was an act independent of the confession extracted on Saturday. Both confessions are subject to the same infirmities.

*Id.* at 444.

In *Westover v. United States*, 384 U.S. 436 (1966) a case decided with *Miranda*, Kansas City police questioned Westover concerning some robberies without warning him of his right to remain silent. The next day FBI agents questioned him in the Kansas City Police Department concerning a robbery of a bank in California. The agents did warn Westover of his right to remain silent and that his statements could be used against him. *Miranda*, 384 U.S. at 494-95. A jury found Westover guilty of the California robbery. *Id.* at 495. The Court held his waiver involuntary. Although questioned by different authorities about

different crimes, the Court noted the questioning was continuous. The FBI "agents gave warnings at the outset of their interview, [but] from Westover's point of view the warnings came at the end of the interrogation process. *Id*. at 496. In holding that Westover did not waive his rights, the Court observed

> We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them.

*Id.*

In *Clewis v. Texas*, 386 U.S. 707 (1967), the Supreme Court held the third of three statements and the only statement admitted at trial, involuntary. The Court stated

> On this record, we cannot hold that petitioner's third statement was voluntary. It plainly cannot on these facts, be separated from the circumstances surrounding the two earlier 'confessions.' There is here no break in the stream of events from the time Sunday morning when petitioner was taken to the police station to the time Tuesday morning some nine days later that he signed the statement in issue, sufficient to insulate the statement from the effect of all that went before. Compare *United States v. Bayer*, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1947) with *Reck v. Pate*, 367 U.S. 433,

444, 81 S.Ct. 1541, 1548, 6 L.Ed.2d 948 (1961).

*Id.* at 710.

Using the methodology apparent in these decisions, lower courts have held statements voluntary where sufficient separation is demonstrated from previous confessions, even involuntary ones. In *United States v. Chalan*, 812 F.2d 1302 (1987) a robbery and killing occurred within the Cochiti Pueblo, New Mexico. *Id.* at 1304. Federal and local law enforcement had the Pueblo Governor summon Chalan to his office for questioning about the incident. Chalan was questioned by a number of officers, the Governor, and Chalan's mother. Some of the officers were visibly armed. Chalan was not arrested nor administered *Miranda* warnings. The officers explicitly informed Chalan he did not have to answer any questions, that he was not a suspect in the case, and that the officers merely wanted him to provide them with information. But the questioning was often accusatory. The investigators, the Governor, and Chalan's mother exhorted him to tell the truth. No one threatened him, no one mistreated him physically, and no one forced him to remain at the Governor's office. Chalan consistently denied any participation in the robbery and murder. After approximately one and one-half hours of questioning, the interview ended, and Chalan departed. *Id.* at 1305. The next day, Chalan decided to discuss things with the law enforcement officers again. When the agent arrived, and before the agent had asked Chalan any questions, Chalan confessed to having committed the crimes. *Id.*

In holding the confession voluntary, the court relied on the almost twenty-four hour separation of the two interviews, during which time Chalan had no contact with law enforcement, and his initiating contact and spontaneous confession and his execution of a Miranda waiver in his written confession. *Id.* at 1308.

In *State v. Mabe*, 864 P.2d 890 (Utah 1993), Mabe voluntarily appeared at the Salt Lake City Police Department for questioning about the death of his wife. The videotaped interview lasted about three hours. Midway through, the interview became confrontational. Detectives confronted Mabe with the evidence against him and told him that he was their primary suspect.

> The detectives made numerous references to a guilty plea that Mabe entered in a prior, unrelated theft offense (referred to by them as the "Brink's deal"). In that case, Mabe's guilty plea and cooperation with police resulted in probation rather than incarceration. The detectives compared the Brink's deal to the present case and suggested that pleading guilty might result in similarly lenient treatment. In addition, the detectives told Mabe that if he refused to cooperate, he might be charged with a more serious offense.

*Id.* at 891. Mabe continued to deny any involvement in his wife's death. Three days later Mabe called the detective and said he wanted to discuss his wife's death. After receiving *Miranda* warnings, Mabe confessed to the killing. *Id.* at 891-92.

After the trial court denied Mabe's motion to suppress his confession, Mabe pled guilty and appealed. *Id.* at 892. He argued the coercive

effects of the first interview caused him to confess three days later. *Id.* at 893. The court assumed the first interview was impermissibly coercive. *Id.* The court relied on the fact that Mabe maintained his innocence at the first interview, two and one-half days lapsed between the coercive interview and the confession, that Mabe initiated the second interview and that he was not particularly susceptible to the coercive police pressure in holding his confession voluntary. *Id.* at 894.

Here, assuming for the sake of argument that the two February 27 interviews were coercive, Dassey spent the time from the end of the Two Rivers interview with his mother at Fox Hills Resort. He had no contact with the investigators until 10 pm. that night when Fassbender asked him about the bleach on his jeans (113:193-95). He had no further law enforcement contact until about 10:30 am March 1, about thirty-six hours after the Fassbender interview (119:46). The March 1 interview was at a different location than either of the February 27 interviews. The officers gave Dassey *Miranda* warnings and he signed a waiver, initialing that he understood his right to remain silent and to have an attorney (117:16-17; 79:26 Ex. 206).

The March 1 interview was removed in both time and place from the February 27 interviews. *Miranda*, 384 U.S. at 496. There is a sufficient separation from the circumstances surrounding the two earlier statements. *Clewis*, 386 U.S. at 710. And as demonstrated above, given the trial courts factual findings and the techniques Wiergert and Fassnbender used, Dassey's confession on March 1 resulted from his own decision to tell the officers of his involvement in

Halbach's death. The confession was properly admitted at trial.

## II. THE CIRCUIT COURT CORRECTLY DENIED DASSEY'S CLAIM THAT LEN KACHINSKY PROVIDED INEFFECTIVE-ASSISTANCE-OF-COUNSEL.

Dassey argues Len Kachinsky provided ineffective-assistance-of-counsel. Kachinsky represented Dassey from March 8, 2006 until August 25, 2006 (206:2). Kachinsky ceased his representation when the circuit court found him to be ineffective because he failed to attend a police interview which he had arranged. The court required new counsel appointed (206:2-3).

As in the circuit court, Dassey sets forth a series of things Kachinsky did or directed others to do, which, according to him, demonstrate Kachinsky's disloyalty. These include: statements Kachinsky made to the media Dassey claims imply his participation with Avery and thus his guilt in Halbach's sexual assault, homicide and the burning of her body (206:4); an arranged interview with Michael O'Kelly and police, in which Dassey made incriminating statements (206:5); and Kachinsky's direction to O'Kelly to attempt to gather additional incriminating evidence against Avery, which would also incriminate Dassey since he faced party liability (206:5).

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 45 of 84    Document 19-7

## A. THE LAW GOVERNING INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS BASED ON A CONFLICT OF INTEREST.

Generally, a court analyzes ineffective-assistance-of-counsel claims under the analytical structure set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective-assistance-of-trial-counsel, a criminal defendant must show both deficient performance and resultant prejudice. *Strickland*, 466 U.S. at 687. Where the ineffective-assistance claim rests on an alleged conflict of interest, however, the analysis is not governed by *Strickland's* standard. The claim is governed by *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *See also State v. Kaye*, 106 Wis. 2d 1, 7, 315 N.W.2d 337 (1982).

In *Sullivan*, the same counsel represented three defendants tried separately. Neither Sullivan nor his lawyers objected to the multiple representation. *Id.* The *Sullivan* Court held "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that *an actual conflict of interest adversely affected his lawyer's performance.*" *Sullivan*, 446 U.S. at 348 (emphasis added).

In *Strickland* itself, the Court observed that it had presumed prejudice for actual or constructive denial of the assistance of counsel altogether. *Strickland,* 466 U.S. at 692. *Sullivan*, the Court noted, warranted "a similar, though more limited, presumption of prejudice." *Id.*

> [I]t is reasonable for the criminal justice
> system to maintain a fairly rigid rule of
> presumed prejudice for conflicts of interest.
> Even so, the rule is not quite the per se rule
> of prejudice that exists for the Sixth
> Amendment claims [of complete denial of
> counsel]. Prejudice is presumed only if the
> defendant demonstrates that counsel
> "actively represented conflicting interests"
> and that "an actual conflict of interest
> adversely affected his lawyer's performance."

*Id.* (citations omitted). The Supreme Court substituted the two part *Sullivan* standard for *Strickland* prejudice: demonstrating a reasonable probability, a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different *Id.* at 694.

Dassey claims Kachinsky labored under an "actual conflict" during the period he represented him. He argues that Kachinsky "actively represented conflicting interests." *Sullivan*, 446 U.S. at 350; *Strickland*, 466 U.S. at 692. It is not clear from his brief that he recognizes he must also demonstrate any actual conflict "adversely affected [Kachinsky's] performance." *Id.*

But Kachinsky did not represent Dassey at the jury trial which adjudicated him guilty. Both Wisconsin cases and Federal cases assume that new conflict-free counsel will remedy any conflict of interest problem. *See e.g., Sullivan*, 446 U.S. at 351-54; *United States v. Hunt,* 543 F.2d 162, 167-68 (D.C. Cir. 1976); *Kaye*, 106 Wis. 2d at 13-15; *State v. Love*, 227 Wis. 2d 60, 79-83, 594 N.W.2d 806 (1999).

Dassey's invitation to extend *Sullivan* to his case raises some serious issues regarding

ineffective-assistance-of-counsel claims based on an alleged conflict of interest. First, the Supreme Court has expressed doubt that *Sullivan* applies to a defense counsel's personal or financial interest, the type of "conflict" at issue here. The Court noted that Courts of Appeals

> have applied *Sullivan* "unblinkingly" to "all kinds of alleged attorney ethical conflicts," *Beets v. Scott*, 65 F.3d 1258, 1266 (C.A.5 1995) (en banc). They have invoked the *Sullivan* standard not only when … there is a conflict rooted in counsel's obligations to former clients, but even when representation of the defendant somehow implicates counsel's personal or financial interests, including a book deal, *United States v. Hearst*, 638 F.2d 1190, 1193 (C.A.9 1980), a job with the prosecutor's office, *Garcia v. Bunnell*, 33 F.3d 1193, 1194–1195, 1198, n. 4 (C.A.9 1994), the teaching of classes to Internal Revenue Service agents, *United States v. Michaud,* 925 F.2d 37, 40–42 (C.A.1 1991), a romantic "entanglement" with the prosecutor, *Summerlin v. Stewart*, 267 F.3d 926, 935–941 (C.A.9 2001), or fear of antagonizing the trial judge, *United States v. Sayan*, 968 F.2d 55, 64–65 (C.A.D.C.1992).

> It must be said, however, that the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application. "[U]ntil," it said, "a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S., at 350, 100 S.Ct. 1708 (emphasis added).

*Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002) (some citations omitted). Attorneys do not actively represent themselves when appearing in cases in which they are not parties. *Sullivan* does not exist

to enforce the Canons of Legal Ethics. *Id.* at 175-76.

Second, no published Wisconsin case has considered a claim that a conflict of interest required a new proceeding despite newly appointed conflict-free counsel. Wisconsin published cases to date have considered ineffective-assistance-of-counsel claims where no objection to an "alleged" conflict of interest had been raised until after conviction. *See e.g. Love*, 227 Wis. 2d at 71 (and cases cited at ¶19). Published cases to date have considered a circuit court's denial of an objection to representation based on a conflict of interest prior to trial where that denial is claimed error on appeal after conviction. *See e.g., State v. Kalk*, 2000 WI App 62, ¶¶12-13, 234 Wis. 2d 98, 608 N.W.2d 428 (deciding the standard of review for the denial of an objection to attorney representation based on a conflict of interest claim presented directly); *State v. Tkacz,* 2002 WI App 281, ¶¶8-14, 258 Wis. 2d 611, 654 N.W.2d 37 (holding the "substantial relationship" test is the proper standard for disqualifying an attorney pre-trial because of a conflict of interest; the standard of review is an erroneous exercise of discretion); *State v. Medina,* 2006 WI App 76, ¶2, 292 Wis. 2d 453, 713 N.W.2d 172 (holding a trial court, in the exercise of discretion, can deny as untimely, an objection to attorney representation based on a conflict of interest). Because the circuit court relieved Kachinsky and required new counsel, this case is unique.

This court need not wrestle with the more complex and difficult question of whether Kachinsky's personal interest triggers a *Sullivan*

analysis, however. As with a *Strickland* ineffective-assistance-of-counsel claim, a court need not decide whether an actual conflict existed if it is satisfied that even if it did, the conflict did not "adversely affect" the lawyer's performance. *Summerlin v. Stewart*, 267 F.3d 926, 937 (9th Cir. 2001). Dassey cannot demonstrate that Kachinsky's conflict adversely affected attorneys' Fremgen and Edelstein's representation at trial.[5] And only the suppression hearing offers any chance of demonstrating Kachinsky's conflict adversely affected his own performance.

Cases raising a claim such as this are rare. The State could find only five cases in three federal circuits and one State, Indiana, in which a defendant claimed a reversal necessary despite new conflict-free counsel.

In *United States v. Tatum*, 943 F.2d 370 (4th Cir. 1991), the government prosecuted Tatum for bankruptcy fraud. When the government first investigated the fraud, Tatum retained David Gavin, a partner in the firm of Mann, Longest & Gavin. Tatum had transferred two automobiles to Mann, well within the preceding year, but he indicated on his petition that he had made no such transfers. *Id.* at 374. The government advised Gavin on two occasions that it viewed his representation as raising conflict questions. *Id.*

Thereafter, and still several months before trial, Paul Kemp entered his appearance as Tatum's counsel. Although Kemp took the lead and conducted the trial, Gavin sat at the trial table and continued to assist Kemp. *Id.* The

_____

[5]Mark Fremgen became successor counsel on August 26, 2006; Ray Edelstein joined as co-counsel (206:2-3).

government advised the court that Mann would be called as a government witness and Longest would be called as a defense witness. Gavin had actually represented Mann before the grand jury and another government witness, Green. The government contended Gavin would be in a position to directly or constructively conduct a cross-examination of his client (Green) and his client-law partner (Mann). Kemp persisted in having Gavin available to assist him at trial. Gavin continued to sit at trial table with Kemp throughout the trial. Mann testified as a government witness and Longest as a defense witness. *Id.* at 374-75.

The government conceded Gavin had disqualifying conflicts but argued that Gavin did not represent Tatum at trial; he served only as a consultant. *Id.* at 378. The court noted "[n]othing in the record shows that Kemp himself improperly represented conflicting interests, and the impediment, if any, could only be derivative from Gavin's conflicts." *Id.* at 378. But it concluded that Gavin's conflicts tainted Kemp's representation. The court relying on Kemp's explicit comments about the need to have Gavin's assistance because of his superior knowledge and Gavin's work on the case much longer than Kemp, together with Gavin's present throughout the trial, found that both Gavin and Kemp contributed to Tatum's defense, even though their contributions may have varied in function and degree. *Id.* at 378.

Further, Kemp, the court found, would be unable to focus on a larger strategic design of possibly implicating Gavin's law firm as the source of Tatum's criminal liability. Kemp could not be expected to know that substantial impeachment

testimony was available from prior testimony developed while Gavin was a lawyer for Greene and Mann. *Id.* at 378-79. The court concluded "[w]e can only conclude that because Kemp's knowledge of the case and the avenues for defense depended on Gavin's more complete knowledge, it was infected by Gavin's conflicts." *Id.* at 379.[6]

In *Rubin v. Gee*, 292 F.3d 396 (4th Cir. 2002), Rubin, while married to Timothy Warner, had an affair with William Glisson. In the course of a civil suit Rubin and Warner brought against Glisson, Glisson was poisoned when he drank out of a soda bottle containing cyanide. *Id.* at 398.

Rubin and Warner subsequently separated and Rubin hired private investigators, Miller and Leopold, to determine whether Warner was having an affair. Rubin told Miller that Warner confessed to her that he had poisoned Glisson. Rubin claimed she was afraid of Warner and wanted to tell the police what she knew about the attempt on Glisson's life. Miller referred Rubin to attorney Longest, so that Longest could secured immunity for Rubin. Four days later, Rubin met Warner at a veterinary clinic. During a walk with Warner in the woods behind the clinic, Rubin told Warner that she had gone to the authorities about his confession. According to Rubin, Warner was enraged and pulled out what she believed to be a gun. Rubin then took a handgun out of her purse and shot Warner eight times. *Id.* at 398.

After the shooting, Rubin called Miller in an attempt to reach her attorney, Longest. Rubin, Miller and Leopold, met Longest and his law

---

[6]*Hoffman v. Leeke*, 903 F.2d 280 (4th Cir. 1990) cited in Tatum involved co-counsel not successor counsel.

partner, David Gavin, at the crime scene. At that time, it became clear that Rubin had taken a lot of medication, so Longest told the investigators to take her to the hospital for a possible drug overdose. However, in an effort to have Rubin evade detection, Longest instructed them to have Rubin admitted to the hospital under a false name. *Id.* at 398-99.

Longest and Gavin continued to advise Rubin after the homicide. They persuaded her to hire Barry Helfand, who in turn brought in Alan Goldstein and Fred Joseph. Longest and Gavin remained part of the defense team even after Helfand, Goldstein, and Joseph assumed the case. Longest and Gavin continued to collect a fee from Rubin, even though they did not sit at counsel table during her trial. *Id.* at 399.

During Rubin's direct examination, Rubin's defense team brought out only that Rubin went to the hospital. Longest and Gavin were not called to testify about their roles in directing Rubin's actions in the immediate aftermath of the shooting. However, the State brought out the events from the twenty-four hours following the homicide during Rubin's cross-examination, to refute Rubin's self-defense claim. The State pointing out that she had fled the scene of the crime and lied about her identity, argued these facts showed consciousness of guilt.

The court found that Longest and Gavin's personal interests fundamentally conflicted with the objectives of Rubin's representation from the moment they arrived at the scene of the crime

until the completion of her trial.[7] *Id.* at 402. The court further concluded, bringing in independent counsel to make trial decisions while Longest and Gavin continued to function as members of the defense team did not cleanse the taint of their conflict. *Id.* at 405.

In *Triana v. United States*, 205 F.3d 36, 38 (2ᵈ Cir. 2000),[8] Triana held himself out as the president of Arenal, Inc., a firm in the business of importing sodium hydroxide, known as "caustic soda." In fact, Arenal was a front for importation of cocaine concealed in the bottom of drums filled with caustic soda.

Attorneys Levine and Beltre both appeared for Triana at his jury trial. The thrust of Triana's defense was that he was a legitimate businessman who did not know that Arenal was being used as a front for cocaine importation. Triana did not testify in his defense. *Id.*

Beltre appeared as Triana's counsel at the behest of Ramon Velasquez, who headed the narcotics distribution organization that employed Triana directly. His role in Triana's defense was to protect Velasquez's interests by monitoring the evidence for any risk to Velasquez. *Id.* at 39.

---

[7]Rubin is a federal habeas proceeding for a state prisoner, so the question before Fourth Circuit differs from the question posed here on direct review. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405-08 (2000). Nevertheless, the legal analysis informs this court's analysis.

[8]Triana is a federal habeas proceeding but for a federal prisoner. *See* 28 U.S.C. § 2255. Section 2255 proceedings stand on the same footing as Wis. Stat. § 974.02 motions except they occur separate from direct appeal rather than as a part of it.

Levine learned of Triana from Parra, a former client. Levine quoted a fee of $80,000. Triana said he could not afford to pay it, but told Levine to see if any friends could. Parra supplied Levine with a phone number in Colombia. Levine spoke to a party who said they were helping Triana out. Levine asked that $50,000 be wired to his bank account to start the defense, and the money arrived shortly thereafter. The Colombian phone number was later disconnected, and the $30,000 balance of Levine's fee was never paid. Levine assumed the unknown source of funds to be the Colombian organization supplying Arenal with cocaine. Triana too assumed the Colombian organization to be the source of the money. *Id.*

Triana claimed Levine had a conflict, which influenced him to keep Triana off the witness stand. Triana argued that his testimony at trial would have drawn attention to Velasquez and Levine, acting on the conflict, prevented Triana from testifying in order to protect Velasquez. *Id.* at 40.

The court presumed that Beltre had an actual conflict based on his participation in the criminal enterprise. *Id.* at 42. The court found Levine had no actual conflict in advising Triana not to testify or in receiving his fee from an unknown third party. *Id.* at 41-42. The court concluded no basis existed for thinking that Levine's advice was infected by Beltre's conflict of interest. The trial judge found no evidence that Beltre had any input into the strategic decisions made during the defense and had no influence over Levine's decision to advise Triana not to testify. Triana presented no evidence to undermine that determination. *Id.* at 41.

In *Summerlin v. Stewart*, 267 F.3d at 930, Summerlin's defense counsel, Ms. Roe, had a one night romantic relationship with the attorney in the Maricopa County Attorney's Office, Mr. Doe, who was prosecuting Summerlin's case. Summerlin was charge with, among other crimes, capital murder. *Id.* at 929-30. Roe negotiated a plea agreement, which as relevant here, allowed Summerlin to plea to noncapital crimes and a stipulated twenty-one year sentence. *Id.* at 930-31. The plea was, however, conditional, that is the judge could reject the stipulated sentence. If the judge rejected the sentence, Summerlin could stand by the plea allowing the judge to sentence him up to the maximum or withdraw his plea, which in his case would reinstate the capital murder charge. *Id.* at 931.

Although the court found his plea voluntary after a colloquy, a few days later Summerlin became dissatisfied with the plea, sentence and Roe. He moved to withdraw his plea pro se and asked for a different attorney. At a hearing on December 15, 1981, the court, after explaining to him that he would again face the death penalty and receiving Summerlin's assurance he still wished to withdraw his plea, denied both the motion to withdraw and the request for new counsel. But the court indicated it intended to reject the stipulated sentence at Summerlin's sentencing on December 18, 1981, so Summerlin did have the option to withdraw his plea then. Summerlin understood his options. *Id.* at 931.

Roe attempted to have the case transferred to another judge who might look more favorably on the stipulated sentence. On Friday, December 18, 1981, the presiding judge denied Roe's motion.

Her one night romantic relationship with Doe occurred after a Christmas party that night, December 18, 1981. The next day Roe felt she could no longer function as Summerlin's attorney. *Id.* at 932. She did not, however, take any steps to accomplish a withdrawal from the case. *Id.* at 934.

On December 22, 1981, Roe accompanied Summerlin to the sentencing hearing. (The court does not explain why the sentencing hearing did not occur on December 18, 1981 as scheduled; presumably the attempted transfer delayed it.) As promised, the court rejected the stipulated sentence. After some confusion, including the denial of a second request for new counsel, Summerlin withdrew his plea. *Id.* at 934.

On December 28, 1981, Roe discussed her concern about her perceived conflict with Doe. He saw no reason to step down as prosecutor. But he arranged a hearing before another judge at which Roe planned to withdraw and to have the entire Public Defender's Office withdraw. She did not tell Summerlin of her liaison, her intention to withdraw or even the purpose of the hearing. The judge began the hearing by asking Summerlin if he wanted Roe removed. When he said he did, the judge granted the motion and appointed a private practitioner, George Klink, to represent Summerlin. *Id.* at 935.

Roe told Klink why she had to get off Summerlin's case. But Klink did not tell Summerlin. Klink wanted Doe to remain on the case despite the impropriety because he believed Doe would be more inclined to plea bargain. Summerlin steadfastly refused to accept any plea bargain. In February, 1982, the Attorney General

took over the case and would not offer any plea bargain. After jury trials resulting in guilty verdicts, the court sentenced Summerlin to death. *Id.* at 935.

The Ninth Circuit looked only at the December 22, 1981 hearing. *Id.* at 938. It noted that Summerlin did not complain about anything said there and also the record disclosed no evidence that Roe and Doe discussed Summerlin's case during their interlude or that she revealed any confidences. *Id.* The court concluded:

> Our examination of the record leaves us unable to find anything that Jane Roe might have done or failed to do during the withdrawal-of-plea hearing that was in any way linked to the supposed conflict, or that might have affected the course of the proceedings. The stark fact is that there was nothing that Jane Roe could have done. Judge Derickson had made it irrevocably clear just a few days earlier that he was going to reject the stipulated sentence, and Summerlin had made it equally clear that he was not going to stick with a plea that called for 38-1/2 years of incarceration. These dice were cast in stone, and they played out on the 22nd as the script had already been written on December 15, 1981, before any supposed conflict arose. Jane Roe had done her best for her client in negotiating a favorable life-saving plea, but Summerlin stubbornly rejected her advice and turned his back on both the plea and his attorney.

*Id.*

The court then considered and rejected whether Roe's obligation under the Canons of

Legal Ethics to advise the court of the problem.[9] Finally, the court concluded Summerlin suffered no adverse effect from Roe's conflict because any possible deficiencies in her performance were cured by her successor, George Klink. *Id.* at 939. The fallout from the December 22 hearing was that Summerlin voluntarily withdrew his guilty plea, and so lost the opportunity to avoid a death sentence. But, according to Klink, the Maricopa County Attorney's Office left the plea offer open, and Klink approached Summerlin about re-entering the same plea. Summerlin remained adamant about going to trial. *Id.*

In *Woods v. State*, 701 N.E.2d 1208 (Ind. 1998), Woods was charged with capital murder. The State requested the death penalty. Woods first trial counsel, Charles Rhetts Jr., requested a conference with the court because he had previously represented an expected witness for the State in a different matter. Successor counsel Allen Wharry was initially at the conference but left the room after Rhetts asked that Wharry not be present for the disclosure. In Wharry's absence, Rhetts told the court that the witness in question was Woods' mother. The court permitted Rhetts to withdraw. The court did not hold a hearing on the record or otherwise inform Woods or his new lawyers, Wharry and Douglas Johnston of the nature of the conflict. All they knew was that Rhetts had been allowed to withdraw due to a possible conflict. Opening statements in the trial began four months later. As expected, the mother

---

[9]It is noteworthy that *Summerlin* is one of the cases the *Mickens* Court criticized for applying *Sullivan* to cases as an enforcement of ethical canons. Nevertheless, the Ninth Circuit's analysis demonstrates how it applied *Sullivan* to a case with new counsel.

testified for the State regarding her son's involvement in the crimes. *Id.* at 1222.

Woods advanced four assertions for how the conflict affected his representation: (1) the State received an unfair tactical advantage because it knew what the conflict was while Woods' new attorneys didn't; (2) Rhetts did little to investigate due to his conflict; (3) Rhetts' conflict tainted the rest of the proceedings because of his delay in disclosing the conflict; and (4) the new lawyers provided ineffective-assistance-of-counsel by not discovering the conflict. The State maintained that Woods received effective-assistance-of-counsel because Wharry and Johnston rendered conflict-free representation after Rhetts withdrew and the conflict did not affect Rhetts' or the latter lawyers' performance. *Id.*

The court considered and rejected each of Woods claims. First, it pointed out Woods did not explain what the State learned at the conference giving it a tactical advantage. *Id.* at 1223. Second, it pointed out Rhetts' efforts on Woods behalf before he withdrew including investigating his sanity and competency, discovery requests, and securing a change of venue due to adverse pre-trial publicity. *Id.* at 1224. In addressing whether Rhetts' conflict tainted Wharry and Johnson's conflict-free representation, the court stated,

> Woods has not explained how Wharry and Johnston would have handled the case differently if they had been told of or discovered Rhetts' conflict. Any information Rhetts possessed about the mother was presumably privileged. Even if Rhetts' prior representation of the mother precluded him from fully probing her possible involvement in the crime, as Woods contends, Wharry and

> Johnston deposed her on that subject and had adequate opportunity to investigate that issue.

*Id.*

These five cases can be placed in two groups. In *Summerlin* and *Woods*, conflicted counsel had no input into defendant's representation after conflict-free counsel assumed representation. Summerlin was assigned private counsel, *Summerlin*, 267 F.3d at 935, and there is no indication Klink ever consulted Roe. Woods' conflict-free attorneys did not even know the nature of Rhetts' conflict, *Woods*, 701 N.E.2d at 1222. In *Tatum*, *Rubin* and *Triana*, conflicted counsel had at least an opportunity for input into the representation. In *Tatum*, the conflicted attorney, Gavin, attended the trial daily and sat at counsel table. *Tatum*, 943 F.2d at 378. The court concluded that both Gavin and Kemp (the conflict-free attorney) contributed to Tatum's defense. *Id.* In *Rubin*, even though Longest and Gavin (the conflicted attorneys) did not sit at counsel table, they continued to collect a fee from Rubin, and contributed to Rubin's defense. *Rubin* 292 F.3d at 399-400. In *Triana*, the conflicted attorney, Beltre, also participated in the trial as counsel; he cross-examined one minor witness. *Triana*, 205 F.3d 43.

In *Summerlin* and *Woods*, the courts looked upon the absence of input from conflicted counsel as insulating the post-substitution representation from the conflict. The *Summerlin* court actually opined that Klink "cured" any deficiencies in Roe's performance. *Summerlin*, 267 F.3d at 939. The Woods court also relied on conflict-free counsels' independent efforts. *Woods*, 701 N.E.2d at 1224.

The difference in the *Tatum* and *Rubin* results with the *Triana* result can be explained by the amount of contribution attributable to conflicted counsel's input into the representation. Where conflicted counsel played a significant role in the defense, as they did in *Tatum* and *Rubin*, all representation was adversely affected. Where conflicted counsel played a very minor role, as in *Triana*, the court found no taint and only the conflicted attorney's performance need be examined for adverse affect.

As to the conflicted attorneys representation of the defendants, in *Summerlin*, the court examined only the December 22 hearing which occurred after the conflict. *Summerlin*, 267 F.3d at 938. In *Woods*, the court examined Rhetts' pre-trial activity and the conference in which Rhetts disclosed his conflict to the court. *Woods*, 701 N.E.2d at 1223-24.

In all three cases in which the courts found no taint from the conflict extended to conflict-free counsel, the court rejected the claim of taint by examining the motives of the conflict-free attorney in pursuing a particular postulated course of action. For instance, where Triana claimed his conflict-free attorney, Levine, advised him not to testify because of fear Triana would implicate Valesquez in the conspiracy (one of the conflicts which infested Beltre's representation), Levine testified that he told Triana of his right to testify, but advised him against doing so because Triana failed, despite diligent preparation, to deal with the tough questions that Levine anticipated would be asked on cross-examination. *Id.* at 41. The *Summerlin* court examined what Roe could have possibly done differently during the period of

conflicted representation and found nothing. It also noted that the plea offer remained as an option after she withdrew but Summerlin rejected it. *Summerlin*, 267 F.3d at 939-40. The *Woods* court pointed to conflict-free counsels' opportunity to develop information Woods claimed his conflicted attorney could have provided. *Woods*, 701 N.E.2d at 1224.

The courts used the same principle to guide any analysis of whether a conflict "adversely affected" either the conflicted attorney's or the conflict-free attorney's representation. A defendant must establish the existence of a reasonable (or plausible in some jurisdictions) strategy that might have been pursued and the failure to pursue that strategy must be linked to the conflict. *Woods*, 701 N.E.2d at 1223; *Triana*, 205 F.3d at 41; *Summerlin*, 267 F.3d at 937; *Rubin*, 292 F.2d at 404.

### B. DASSEY FAILS TO DEMONSTRATE ANY CONFLICT ADVERSELY AFFECTED ANY OF HIS LAWYERS REPRESENTATION.

Dassey argues that Kachinsky's conflict adversely affected his handling of the suppression hearing in Dassey's case. As the circuit court found, Kachinsky filed written argument and called Janda and a school psychologist at the suppression hearing (206:11). Dassey complains that Kachinsky conceded the interview was noncustodial. Dassey attributes this concession to Kachinsky's disloyalty. But he fails to link a contrary strategy to the conflict.

Kachinsky testified he examined the *Miranda* warning Wiegert and Fassbender gave prior to the March 1, 2006 confession carefully (189:209). He concluded, as did the circuit court, the investigators read the *Miranda* warnings appropriately (190:51; 206:12). Kachinsky also considered whether the February 27 statements affected the *Miranda* warnings given on March 1 (189:215). Kachinsky believed the warning on March 1 sufficiently independent (189:215). Fremgen testified he had very little contact with Kachinsky (191:99-101). Fremgen did not think the *Miranda* issue viable (191:229-230).

The circuit court found when Wiegert picked Dassey up on March 1, 2006, he gave him *Miranda* warnings. Dassey signed and initialed a copy of the written *Miranda* warnings and a waiver at 10:10 a.m. (46:4; 206:12). Shortly after arriving at the Manitowoc County Sheriff's office, Wiegert reminded him of his *Miranda* warnings and asked whether he still wanted to talk to the investigators. Dassey responded to both questions by saying, " yeah," and nodding his head (46:7).

In view of the circuit court's findings, Dassey cannot demonstrate that Kachinsky could reasonably or even plausibly contend that Dassey's statement should be suppressed based on a *Miranda* failure. Even had he pursued that strategy, it was doomed to failure because Wiegert gave *Miranda* warnings and reminded him of those warning immediately prior to the commencement of the interview.[10] Moreover, the circuit court's finding reinforces the credibility of

---

[10]As noted in Argument I, *State v. Grady*, 2009 WI 47, 317 Wis. 2d 344, 766 N.W.2d 729, forecloses Dassey's argument that he received untimely warnings.

Kachinsky's testimony that the futility of this argument motivated his concession. Nor can Kachinsky's conflict have adversely affected his decision to forgo arguing any defect in the February 27 interviews affected the March 1 interview. Kachinsky's testimony that he did not pursue that argument because he considered the March 1 warnings sufficiently independent finds support in the attenuation doctrine. *See* Argument I, E. *supra*. Fremgen's independent conclusion further demonstrates the Kachinsky's decision not to pursue a *Miranda* issue had no connection to his "conflict."

On whether any arguments Kachinsky did not advance is a sufficient link justifying some relief, the argument goes nowhere. The circuit court considered the confession in light of the post-conviction hearing evidence and argument. Nothing changed that court's conclusion (206:11). Moreover, Dassey presents his claim to this court. If this court determines the confession involuntary, Dassey receives a new trial on that basis. If this court determines the confession voluntary, the circuit court is bound by law of the case to that conclusion. *State v. Stuart*, 2003 WI 73, ¶23, 262 Wis. 2d 620, 633, 664 N.W.2d 82. A new suppression hearing or trial will accomplish nothing.

Dassey addresses his argument about Kachinsky's pre-trial press statements as evidence of Kachinsky's disloyalty. But, Dassey does not link this to anything in the case. The pre-trial publicity could only have affected jury selection. But the jury came from Dane County (206:1). And Dassey does not challenge the jury as biased.

Lastly, Dassey points to Kachinsky's direction to O'Kelly to gather evidence which might have been used against Dassey. However, he cannot trace any State's evidence to these efforts. The search warrant of which Dassey complains produced nothing. As to the O'Kelly interview, the circuit court found that nothing except a brief clip of a recorded conversation between Dassey and his mother found its way into the trial. The interview did not include that conversation. And Fremgen and Edelstein did not object to it.

The phone conversation was not only voluntary, it was volunteered. It is true that Wiegert suggested Dassey call his mother rather than have the investigators inform her of Dassey's lies to her. But that did no more than point out Dassey's alternatives. Dassey called later, after completion of the interview. There is no evidence of any law enforcement person's presence nor that Wiegert's motivation was to acquire an evidentiary statement. Moreover, voluntary statements can be used to cross-examine a testifying defendant even if they have been suppressed. *Harris v. New York*, 401 U.S. 222, 226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."); *State v. Knapp*, 2003 WI 121, ¶113, 265 Wis. 2d 278, 666 N.W.2d 881 (The *Miranda* presumption of coercion does not bar the use of voluntary statements for impeachment purposes on cross-examination.) Even if the interview was involuntary, the phone call occurred later at a different location.

Dassey fails to demonstrate that Kachinsky's conflict had any effect on Kachinsky's representation pre-trial or Fremgen's and Edelstein's representation at trail.

### III. THE CIRCUIT COURT CORRECTLY DENIED DASSEY'S CLAIM THAT HIS TRIAL ATTORNEYS PROVIDED INEFFECTIVE-ASSISTANCE-OF-COUNSEL.

Dassey faults his attorneys, Mark Fremgen and Ray Edelstein, for not calling an expert on "police interrogation," for not seeking to admit a later portion of the recording of his confession and for statements in closing argument, which he claims conceded his guilt on mutilation of a corpse. Dassey's Br. at 90-103.

To establish ineffective-assistance-of-trial-counsel under *Strickland*, a criminal defendant must show both deficient performance and resultant prejudice. *Strickland*, 466 U.S. at 687. Dassey has the burden of proving both deficient performance and prejudice. *Strickland*, 466 U.S. at 688; *State v. Smith*, 207 Wis. 2d 258, 273, 558 N.W.2d 379 (1997). Whether counsel was ineffective is a mixed question of fact and law. *State v. Balliette*, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334. The circuit court's findings of fact will not be disturbed unless shown to be clearly erroneous. *Id.* The ultimate conclusion as to whether there was ineffective assistance of counsel is a question of law. *Id.*

## A. DASSEY DID NOT PROVE HIS COUNSEL INEFFECTIVE IN FAILING TO CALL AN EXPERT.

Dassey claims his trial counsel should have called an expert on police interrogation techniques. The circuit court's written decision summarizes Dassey's post-conviction hearing evidence, testimony from Dr. Leo (206:14-16) and Dr. White's affidavit (206:16). Dassey claims his trial attorneys performed deficiently by not presenting White or Leo.

His trial counsel did call an expert, Dr. Gordon. Gordon met with Dassey, interviewed him and administered mental exams (120:23-26, 33). He testified Dassey exhibited social avoidance, social introversion, and social alienation, traits which caused him to be vulnerable to suggestion (120:35-55). He concluded Dassey was "highly suggestible when responding to leading questions or pressure, mild pressure" (120:56).

Gordon took into account the questions the investigators asked (120:58, 61-63), and factors such as custody (120:59-61), maturity level (120:71), familiarity with police (120:72), anxiety (120:72), and learning disabilities (120:73). He went through the March 1 statement in some detail addressing specific questions (120:63-71). Gordon did not testify about social research on police interrogation techniques as the circuit court held he did not qualify as an expert in that area (191:168-170).

Fremgen testified he consulted with White (191:175-178, 183-189), and he got some material

from Leo (191:160-161, 181-182). He gave several reasons for not putting on a police interrogation expert. The State served notice of an expert, Mr. Buckley, from the Reid Institute (191:179). Buckley was a prominent expert in police interrogation (191:237). The defense wanted to have their own expert to counter Buckley (191:237). White's retention "always related to Buckley" (191:237). But the State did not call him. Second, Fremgen did not believe the defense needed an expert (191:239). He wanted to focus the trial on what the jurors understood through the statement itself and he thought jurors could do that without an M.D. or Ph.D by using common sense (191:239-240). White also expressed reluctance to testify though he didn't eliminate the possibility (191:241). Calling an expert can cause the trial to become a battle of experts; that may not always be better in Fremgen's view (191:240). He had doubts that White would win a battle with Buckley (191:241).

To get an analysis of Dassey's confession from the Reid perspective, Edelstein consulted with a police officer who had trained at the Reid Institute (192:238-242). Edelstein testified he had concern over Buckley as a State's witness (192:260). When the State did not call Buckley, Edelstein did not believe it in the defense's best interest to put on an expert (192:260). Edelstein believed the jurors might see an expert as a desperate attempt to turn the trial into a battle of experts (192:267). He, like Fremgren, expressed concern over such a battle (192:267). He did not believe an expert was necessary because the jurors would understand through specific examples of the questions actually used in the interview, the police took advantage of Dassey, a cognitively limited

teenager (192:267). Finally, Edelstein believed expert testimony would detract from the defense attempt to humanize Dassey as a young easily manipulated individual (192:267).

The trial court found that the decision not to call an expert to have been a reasonable trial strategy rationally based on the law and the facts (206:19). That decision was correct. The law remains unsettled. This court held defense counsel did not perform deficiently by failing to offer false confession testimony in *State v. Van Buren*, 2008 WI App 26, 307 Wis. 2d 447, 746 N.W.2d 545. The *Van Buren* court noted that "the published and unpublished cases contain only one instance of [false confession testimony] introduction at a trial in Wisconsin, nearly fifty years ago." *Id.,* ¶19. Since an attorney cannot perform deficiently by not "argu[ing] a point of law that is unsettled," *id.*, ¶18, the court held no deficient performance. The *Van Buren* decision came down on January 3, 2008. *Id.* Dassey's trial took place in April, 2007. If the law was unsettled when this court decided *Van Buren*, it was unsettled when Fremgen and Edelstein made their decision not to present an expert. Counsel's performance must "be viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

Dassey's reliance on "extraordinary circumstances," Dassey's Br. at 95-96, ignores the point. *Van Buren* makes no such reference. Dassey also relies on three cases two of which, do not involve false confession experts: *State v. Maloney*, 2004 WI App 141, 275 Wis. 2d 557, 685 N.W.2d 620, *aff'd.* 2005 WI 74, 281 Wis. 2d 595, 698 N.W.2d 583 and *Bell v. Miller*, 500 F.3d 149 (2ᵈ Cir. 2007). *Maloney* does not even involve expert

witnesses. *Bell* held: "the failure of defense counsel to consider consulting an expert to ascertain the possible effects of trauma and pharmaceuticals on the memory of the witness is constitutionally ineffective." *Bell*, 500 F.3d at 157. *Bell's* facts come nowhere close to the facts here. Most striking is the failure of counsel to consider a consultation with an expert which is not the case here. *Id.*

The same is true of the *State v. Gainey*, the unpublished North Carolina trial court opinion contained in Dassey's appendix. Trial counsel testified he "did not understand what an expert in false confessions or police interrogations did," he "misunderstood the scope of work performed by false confession experts and … thought-without making any inquiries-that such experts would not review a confession like the one in" his case. A-App. 601. The trial court further found a failure to investigate. A-App. 600.

Here, both counsel did extensive investigation of false confession experts and consulted with two. In addition they consulted with a Reid trained police officer. This is far from the situations presented in *Gainey* or *Bell*.

Moreover, Dassey claims that Fremgen and Edelstein had a "longstanding plan" that "fell apart." Dassey's Br. at 93. Later he claims "trial counsel had long planned on calling exactly such an expert – a fact that makes this post-hoc rationalization implausible." Dassey's Br. at 96-97. This characterization distorts the record. Fremgen testified that the he was "concerned about the State putting on [M]r. Buckley, and having someone to actually respond to what Buckley was going to say…" (191:185). During cross-

examination Fremgen testified that White's retention "always related to Buckley" (191:237). Edelstein testified he did not believe an expert was necessary or desirable once the State did not call Buckley in its case in chief (192:260).

Far from a post-hoc rationalization, calling an expert, as opposed to consulting one, responded to the State's use of Buckley. Dassey's present counsel apparently does not realize that putting White on in the defense case would enable the State to present Buckley in rebuttal. Having escaped the battle of experts both Fremgen and Edelstein sought to avoid, a battle Fremgen had doubts that White would win (191:241), Dassey postulates in hindsight, it would be better to give the State a second opportunity to put on Buckley, an expert prominent in the field and author of a book on police interrogation (191:237; 192:259).

The circuit court's decision that Fremgen and Edelstein pursued a reasonable trial strategy is amply supported by the record. The decision is, therefore, "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Dassey also fails to prove prejudice. As noted Gordon testified about specific questions and how those questions related to Dassey's suggestibility (120:63-70). Gordon testified to four examples demonstrating Dassey's tendency to shift, to a different answer when the questioner express dissatisfaction with a given answer (120:53), and mild pressure (120:66-70). Wiegert testified he used deception, superior knowledge and befriending techniques in Dassey's interview (117:13-16).

Additionally, as the circuit court pointed out, by Dassey's own testimony he did not watch TV accounts of Avery's arrest (119:41). And the jury observed him repeatedly answer he did not know why he admitted to aiding Avery in Halbach's homicide (119:42, 44-45). Throughout his testimony, he answered "I don't know" both on direct and cross when asked about his confession. Finally on cross-examination, he claimed he got the details of his confession from a book he read some three to four years before (119:66-67). That answer went against the advice of his attorneys who thought that explanation ridiculous and one the jury would reject (191:226).

Lastly, the State did present corroboration of Dassey's confession. While Dassey claimed Avery told him Stachowski called (119:52), it is unlikely Avery would have told him the time or that Dassey would remember it unless he actually experienced it. Dassey never explained to the jury how he knew Avery's bedroom configuration changed if he was not with Avery during Halbach's homicide. And finally, once Dassey definitively identified the garage as the location of shooting, a search turned up bullets with Halbach's DNA.

Leo's or White's proposed testimony does not undermine confidence that the jury reached the correct result here. Dassey's claim must fail.

## B. DASSEY DID NOT PROVE HIS COUNSEL INEFFECTIVE IN NOT INTRODUCING A PART OF HIS CONFESSION.

Investigators ended the main part of Dassey's March 1 interview at 02:15:30 (79:31:Exhibit 213 Disk 2; 79:34:128-29). The balance of Exhibit 213 Disk 2 and the beginning of Exhibit 213, Disk 3 depict Dassey eating a sandwich and sitting alone. At 03:05:45 the investigators returned and placed Dassey under arrest explaining their actions to him (79:31:Exhibit 213 Disk 3; 79:34:130-131). At 03:09:40, Barbara Janda, Dassey's mother, entered the interview room (79:31:Exhibit 213 Disk 3; 79:34:132). Dassey and Janda had a discussion in the presence of the investigators (79:31:Exhibit 213 Disk 3; 79:34:132-136).

Dassey claims his trial counsel should have introduced a part of his conversation with Janda which the State did not offer. He claims the statements in video show "that [Dassey] did 'not really' harm Halbach and that he confessed only because the police 'got to my head.'" In his view, the statements amounted to a recantation of his confession. Dassey's Br. at 97-98.

Dassey's trial attorneys differed on whether to offer the portion of the tape to which Dassey refers. Fremgen, who did not believe it constituted a recantation, did not want to use it because to him it appeared as if Janda realized Dassey had done something serious and would go to jail (191:195). He believed some of the jurors would empathize with Janda thinking "that this is how I

would react if my son admitted a very serious offense." He wanted the confession as sterile and non-dramatic as possible (191:195). Edelstein wanted to use it because he believed the statement, "They got to my head," was in keeping with the overall defensive strategy (192:235). Fremgen's view prevailed because he led the defense team (192:236). One cannot claim the defense team did not carefully consider the options in view of the attorneys' disagreement. The two views are equally reasonable. Fremgen's decision, therefore, does not constitute deficient performance.

There is also some question about whether this part of the recording is even admissible. Dassey's statements constitute inadmissible hearsay—a party's own statement offered in favor of the party, Wis. Stat. § 908.01(4)(a)1—unless this part of the recording is offered under the rule of completeness as part of the State's offer of Dassey's confession. "Under the rule of completeness the court has discretion to admit only those statements which are necessary to provide context and prevent distortion." *State v. Eugenio*, 219 Wis. 2d 391, 412, 579 N.W.2d 642 (1998). It is doubtful that the exchange between Janda and Dassey is necessary to prevent distortion. In any event, whether the statement is admissible is not the question here. The question is whether the attorneys' decision not to offer the exchange can be justified as reasonable in view of the uncertainty. *See Van Buren*, 307 Wis. 2d 447, ¶19.

More importantly perhaps, Dassey cannot prove prejudice. The circuit court quoted the

entire interchange in denying Dassey's post-conviction motion:

> Brendan: What'd happen if he [Steven Avery] says something his story's different? Wh- he says he, he admits to doing it?
>
> Barbara Janda: What do you mean?
>
> Brendan: Like if his story's like different, like I never did nothin' or somethin'.
>
> Barbara Janda: Did you? Huh?
>
> Brendan: Not really.
>
> Barbara Janda: What do you mean, not really?
>
> Brendan: They got to my head.

(206:25; 79:34:135.) The court found that the conversation did not constitute an unequivocal recantation. At best the interchange was ambiguous and at worst it substantiated the confession (206:25).

The court's factual finding which Dassey does not claim as clearly erroneous, considerably weakens his argument that this part of the recording would undermine confidence in the outcome of the trial. *See State v. Thiel*, 2003 WI 111, ¶80, 264 Wis. 2d 571, 665 N.W.2d 305 (The proper inquiry for assessing prejudice is the effect of counsel's deficiencies on the reliability of the trial's outcome.) Additionally, the State would surely have played other parts of Dassey's and Janda's interchange. For instance, earlier the following occurred:

> BARBARA JANDA: Huh? Did he make you do it? (Brendan nods "yes") I woulda walked out. That's what I woulda did. (crying during pause) Why didn't you just tell 'em, no? Huh?

BRENDAN: I don't know.

BARBARA JANDA: You knew it was wrong, right? (Brendan nods "yes") (pause) ….

\* \* \*

BARBARA JANDA: mh huh. What did he do to you to make you do it?

BRENDAN: Nothin'

BARBARA JANDA: Did he force you to do it? (Brendan shakes head "no")

(79:34:132, 134.)

Dassey's claim that his attorney provided ineffective-assistance-of-counsel by not introducing this part of the interview recording must fail.

## C. DASSEY DID NOT PROVE HIS COUNSEL INEFFECTIVE IN HIS CLOSING ARGUMENT.

Dassey claims Edelstein performed deficiently during closing argument. Dassey's brief does not set out counsel's argument beyond two phrases: "walked over [to Steven's house] and did see something in a fire, and that something was Teresa Halbach" and "walked over there expecting a Halloween bonfire, and went around with the little cart, and picked up all the stuff, and eventually they start throwing stuff in [the fire], and he probably did see something." Dassey's Br. at 98. A more complete quote of the first phrase follows:

Ask yourselves, how probing were they when he told them, I seen it. And he said, he told,

he seen me see it, so he told me not to say something or else it will-he threatened me a little bit. He made it clear to them early on. And they had no reason to doubt it. They just didn't like the answers. They didn't like what he said. But they never explored the potential truth and alternative that this young man walked over there and did see something in a fire, and that something was Teresa Halbach.

They go through this scenario, and they start-once he tells them, I seen it, and Steve knew it, and he said, don't say anything, that's when it becomes, you saw this, you saw that.

(121:125.) The more complete second quote:

How many times during the course of that discussion on the 1st did they say, come on, Brendan, we know you and Steven talked about it. Mr. Fallon just got up here and told you. And then they went from that bedroom into that front room and had a little chat. That's how he characterized it. A little chat about what they're going to do. How they're going to get rid of Teresa.

It's more likely that little chat happened when he walked over there expecting a Halloween bonfire, and went around with the little cart, and picked up all the stuff, and eventually they start throwing stuff in there, and he probably did see something. Pretty traumatic. Is that reason enough for a young man to be despondent? To be sad? Is that a reasonable hypothesis?

(121:127-128.)

Dassey claims these portions of the argument concede his guilt on the charge of mutilating a corpse. They do no such thing. At most they admit Dassey saw Halbach's body in the bonfire. The elements consist of (1) mutilating,

dismembering or disfiguring a corpse, and (2) with the intent to conceal a crime. Wis. Stat. § 940.11(1); Wis. JI—Criminal 1193 (Rel. No. 44—2006). Observing a body, even a disfigured or mutilated body or parts of a dismembered body does not prove Dassey mutilated, dismembered or disfigured that body, never mind establish any intent. Even under a party to the crime theory mere presence at a crime scene does not establish party to the crime liability. *State v. Charbarneau*, 82 Wis. 2d 644, 656, 264 N.W.2d 227 (1978) (Mere presence and ambivalent conduct at the scene of a crime is insufficient to support a conviction as party-to-the-crime.)

Dassey finds the concession troubling because Edelstein did not seek his authorization. Dassey equates Edelstein's argument to the functional equivalent of a guilty plea. Dassey's BR. at 98. He is wrong. *State v. Gordon*, 2003 WI 69, 262 Wis. 2d 380, 663 N.W.2d 765 makes clear that a concession even a concession to all the elements of a lesser count, is not the functional equivalent of a guilty plea. Defense counsel conceded that the evidence established Gordon's guilt to disorderly conduct while armed. The Court opined:

> The concession by counsel was not the functional equivalent of a guilty plea under the circumstances of this case, where it came in closing argument, on one count in a multiple-count case, after full adversarial testing of the State's case and after the defendant had admitted on the witness stand the facts constituting the offense.

*Id.,* ¶5.

Dassey insinuates that *Gordon* can be distinguished because Dassey did not admit to

seeing Halbach's body in his testimony. But his cursory treatment ignores the *Gordon* Court's reasoning.

> A guilty plea waives trial, cross-examination of witnesses, the right to testify and call witnesses in one's own defense, and the right to a unanimous jury verdict of guilt beyond a reasonable doubt. The concession in this case had none of these effects. Gordon had a jury trial, cross-examined the State's witnesses, testified in his own defense, and was adjudged guilty beyond a reasonable doubt by a unanimous jury.

*Id.,* ¶24. One can easily substitute Dassey for Gordon in the above quote and be completely accurate.

Gordon also demolishes Dassey's argument that Edelstein had some duty to obtain his authorization. The *Gordon* Court quoted with approval from *Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991), "one of the leading cases in the area." *Gordon*, 262 Wis. 2d 380, ¶29.

> It is [not a forced plea] if in closing argument counsel acknowledges what the course of the trial has made undeniable—that on a particular count the evidence of guilt is overwhelming. Such acknowledgment can be a sound tactic when the evidence is indeed overwhelming (and there is no reason to suppose that any juror doubts this) and when the count in question is a lesser count, so that there is an advantage to be gained by winning the confidence of the jury.

*Id.* The *Underwood* court concluded such a reasonable tactic may not have "had the consent of the client, [but] a lawyer is not required to consult with his client on tactical moves." *Id.* Edelstein

testified he did intend to provide the mutilation charge as an option to the jury in his closing argument (192:251-252). This was a reasonable tactic in keeping with *Gordon* and *Underwood*.

Dassey also cites, but does not discuss, Judge Schudson's separate opinion in *State v. Silva*, 2003 WI App 191, 266 Wis. 2d 906, 670 N.W.2d 385. He cites to three paragraphs where Schudson interprets *Gordon* as requiring both multiple counts (a circumstance present here) and the defendant's testimony establishing guilt (something not present here). He ignores the majority's criticism of Schudson's view: "The Dissent relies on the supreme court's fact-specific conclusions and observations in *Gordon []*, instead of considering the essence of the reasoning behind its reversal." *Id.*, ¶15 n.4.

Dassey also seizes on the circuit court's mistaken factual finding that he and Avery threw a seat from Halbach's car on the fire. Again he ignores the fact that Dassey acknowledged his presence at the fire and helping Avery put things on the fire (119:28-31).

## IV. DASSEY IS NOT ENTITLED TO A NEW TRIAL IN THE INTEREST OF JUSTICE.

This court has authority to reverse in the interest of justice. Wis. Stat. § 752.35. "[A] new trial may be ordered on either of two grounds: (1) whenever the real controversy has not been fully tried or (2) whenever it is probable that justice has for any reason miscarried." *Vollmer v. Luety*, 156 Wis. 2d 1, 16, 456 N.W.2d 797 (1990) (citation omitted).

Under the first prong of the "interest of justice" analysis, the real controversy has not been tried when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case; or when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried. *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996).

In order to grant a discretionary reversal because "it is probable that justice has for any reason miscarried," the second prong, there must be a substantial probability of a different result on retrial. *State v. Schumacher*, 144 Wis. 2d 388, 401, 424 N.W.2d 672 (1988), (citing *State v. Wyss*, 124 Wis. 2d 681, 741, 370 N.W.2d 745 (1985)). *See also State v. D'Acquisto*, 124 Wis. 2d 758, 765, 370 N.W.2d 781 (1985), (quoting *Lock v. State*, 31 Wis. 2d 110, 118, 142 N.W.2d 183 (1966)). As such, the defendant must meet a higher threshold in order for this court to grant a new trial under the second prong. *State v. Maloney*, 2006 WI 15, ¶14 n.4, 288 Wis. 2d 551, 709 N.W.2d 436.

The discretionary authority under Wis. Stat. § 752.35 to order a new trial in the interest of justice is, the case law cautions, a power to be used only "infrequently and judiciously." *State v. Ray*, 166 Wis. 2d 855, 874, 481 N.W.2d 288 (Ct. App. 1992).

Dassey relies on the absence of testimony such as Leo's or White's in his attempt to invoke the interest of justice's "not fully tried" prong. But their evidence does not meet the requirement that "the jury was *erroneously* not given the

opportunity to hear important testimony." *Hicks*, 202 Wis. 2d at 160 (emphasis added). His attorneys did not offer this type of testimony so no judicial error prevented the jury from hearing such testimony. This is a classic case of zero plus zero equals zero. *Mentek v. State*, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976); *see also State v. Simpson*, 185 Wis. 2d 772, 786, 519 N.W.2d 662 (Ct. App. 1994); *State v. Marhal*, 172 Wis. 2d 491, 507, 493 N.W.2d 758 (Ct. App. 1992).

## CONCLUSION

For the reasons given above, this court should affirm Dassey's conviction and the order denying post-conviction relief.

Dated this 20th day of March, 2012.

Respectfully submitted,

J.B. VAN HOLLEN
Attorney General


WARREN D. WEINSTEIN
Assistant Attorney General
State Bar #1013263

Attorneys for Plaintiff-Respondent

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-9444
(608) 266-9594 (Fax)
weinsteinwd@doj.state.wi.us

## CERTIFICATION

I hereby certify that this brief conforms to the rules contained in Wis. Stat. § 809.19(8)(b) and (c) for a brief produced with a proportional serif font. The length of this brief is 17,512 words.

_____
Warren D. Weinstein
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE
## WITH WIS. STAT. § (RULE) 809.19(12)

I hereby certify that I have submitted an electronic copy of this brief, excluding the appendix, if any, which complies with the requirements of Wis. Stat. § (Rule) 809.19(12). I further certify that this electronic brief is identical in content and format to the printed form of the brief filed as of this date.

A copy of this certificate has been served with the paper copies of this brief filed with the court and served on all opposing parties.

Dated this 20th day of March, 2012.

_____
Warren D. Weinstein
Assistant Attorney General