RECEIVED
06-07-2012
CLERK OF COURT OF APPEALS
OF WISCONSIN

STATE OF WISCONSIN

C O U R T   O F   A P P E A L S

DISTRICT II

Case No. 2010AP3105 CR

_____

STATE OF WISCONSIN,

Plaintiff-Respondent,

v.

BRENDAN R. DASSEY,

Defendant-Appellant.

_____

On Appeal from Judgment of Conviction and an
Order Denying Postconviction Relief Entered in the
Manitowoc County Circuit Court,
The Honorable Jerome L. Fox, Presiding

_____

REPLY BRIEF OF
DEFENDANT-APPELLANT

_____

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

LAURA H. NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)

THOMAS F. GERAGHTY (IL Bar No. 0937436)
JOSHUA A. TEPFER (IL Bar No. 6294120)
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue, 8th Floor
Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977
E-mail: l-nirider@law.northwestern.edu
        s-drizin@law.northwestern.edu
        tgeraghty@law.northwestern.edu
        j-tepfer@law.northwestern.edu

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

Page(s)

ARGUMENT ................................................................ 1

I. ATTORNEY KACHINSKY PROVIDED
INEFFECTIVE ASSISTANCE OF COUNSEL
THAT WARRANTS BOTH A NEW
SUPPRESSION HEARING AND A NEW
TRIAL ................................................................ 1

   A. Attorney Kachinsky took concrete actions to
support the prosecution of his own client,
thus laboring under a conflict of interest. ......... 1

   B. At minimum, Brendan is entitled to a new
suppression hearing. ......................................... 3

   C. Brendan is also entitled to a new trial .............. 4

II. BRENDAN'S MARCH 1, 2006 CONFESSION
SHOULD HAVE BEEN SUPPRESSED AS
INVOLUNTARY. ......................................... 11

   A. That Brendan's March 1, 2006 statement
was a product of intensive fact-feeding by
police is highly relevant to the voluntariness
inquiry ............................................................. 11

   B. Brendan's youthfulness warrants the
application of "special caution" throughout
the entire voluntariness analysis. .................... 15

III. TRIAL COUNSEL RENDERED
INEFFECTIVE ASSISTANCE BY FAILING
TO DEMONSTRATE THAT BRENDAN'S
MARCH 1 CONFESSION WAS
UNRELIABLE. ............................................. 20

IV. THE INTEREST OF JUSTICE CALLS FOR A
NEW TRIAL AT WHICH A JURY WILL
HEAR ALL THE EVIDENCE REGARDING

i

THE UNRELIABILITY OF BRENDAN'S
CONFESSION. ............................................. 29

CONCLUSION ......................................................... 31

CERTIFICATION AS TO FORM/LENGTH ........... 33

CERTIFICATE OF COMPLIANCE WITH RULE
809.19(12) .................................................. 34

INDEX TO SUPPLEMENTAL APPENDIX ............ 35

## CASES CITED

Page(s)

*Colorado v. Connelly*,
479 U.S. 157 (1986) .................................................. 13

*Commonwealth v. Truong*,
2011 Mass. Super. LEXIS 61
(Mass. Super. Ct. 2011) ............................................ 17

*Crane v. Kentucky*,
476 U.S. 683 (1986) .................................................. 12

*Culombe v. Connecticut*,
367 U.S. 568 (1961) .................................................. 12

*Florida v. Sawyer*,
561 So.2d 278 (Fla. Ct. App. 1990) ........................... 14

*Garcia v. State*,
73 Wis.2d 651, 245 N.W.2d 654 (1976) .................... 30

*Graham v. Florida*,
130 S. Ct. 2011 (2010) .............................................. 15

*Harris v. New York*,
401 U.S. 222 (1971) .................................................. 10

*Haynes v. Washington*,
373 U.S. 503 (1963) .................................................. 11

ii

*J.D.B. v. North Carolina*,
131 S. Ct. 2394 (2011)........................................ 15, 19

*Johnson v. Trigg*,
28 F.3d 639 (7th Cir. 1994) ...................................... 16

*Lafler v. Cooper*,
132 S. Ct. 1376 (2012).............................................. 10

*Logan v. State*,
43 Wis.2d 128, 168 N.W.2d 171 (Wis. 1969) .... 29, 30

*Massachusetts v. Schuler*,
2011 Mass. Super. LEXIS 195
(Mass. Super. Ct. 2011) ........................................... 12

*Passama v. Nevada*,
735 P.2d 321 (Nev. 1987)......................................... 12

*Ramirez v. State*,
15 So.3d 852 (Fla. App. Ct. 2009)............................ 18

*Roper v. Simmons*,
543 U.S. 551 (2005) ................................................. 15

*Rubin v. Gee*,
292 F.3d 396 (4th Cir. 2002) .................................. 5, 8

*State v. Gordon*,
2003 WI 69, 262 Wis.2d 380,
663 N.W.2d 765................................................... 28, 29

*State v. Hicks*,
202 Wis.2d 150, 549 N.W.2d 435
(Wis. 1996) ................................................... 29, 30, 31

*State v. Hoppe*,
2003 WI 43, 261 Wis. 2d 294,
661 N.W.2d 407.................................................. 12, 15

*State v. Jerrell C.J.*,
2005 WI 105, 283 Wis. 2d 145,
699 N.W.2d 110....................................... 11, 16, 19, 20

iii

*State v. Kaye*,
106 Wis.2d 1, 315 N.W.2d 337 (1982)................ 2, 3, 4

**State v. Knapp,**
2003 WI 121, 265 Wis.2d 278, 666 N.W.2d 881 ...... 10

*State v. Love*,
227 Wis.2d 60, 594 N.W.2d 806 (1999).......... 1, 2, 3, 4

*State v. Polk*,
2012 Iowa Sup. LEXIS 33 (Iowa Apr. 6, 2012)........ 17

**State v. Randle,**
366 S.E.2d 750 (W. Va. 1988) .................................. 12

*State v. Ray*,
166 Wis.2d 855, 481 N.W.2d 288
(Ct. App. 1992) ............................................................ 31

*State v. Rettenberger*,
984 P.2d 1009 (Utah 1999)........................................ 12

**State v. Silva,**
2003 WI App 191, 266 Wis. 2d 906,
670 N.W.2d 385........................................................... 29

*State v. Triggs*,
2003 WI App. 91, 264 Wis.2d 861,
663 N.W.2d 396) ........................................................ 18

*State v. Van Buren*,
2008 WI App 26, 307 Wis. 2d 447,
746 N.W.2d 545........................................................... 26

**Steese v. Nevada,**
960 P.2d 321 (Nev. 1998).......................................... 12

*Summerlin v. Stewart*,
267 F.3d 926 (9th Cir. 2001) .................................... 6

*Summerlin v. Stewart*,
281 F.3d 836 (9th Cir. 2002) .................................... 6

iv

*Summerlin v. Stewart*,
310 F.3d 1221 (9th Cir. 2002) ...................................... 6

*Summerlin v. Stewart*,
341 F.3d 1082 (9th Cir. 2003) ..................................... 6

*Summerlin v. Stewart*,
542 U.S. 348 (2004).................................................... 6

*Summerlin v. Stewart*,
427 F.3d 623 (2005).................................................... 6

*Thomas v. McLemore*,
2001 U.S. Dist. LEXIS 6763
(E.D. Mich. Mar. 30, 2001) ......................................... 1

*Triana v. U.S.*,
205 F.3d 36 (2d Cir. 2000) ...................................... 5, 6

*Warney v. State*,
16 N.Y.3d 428 (N.Y. 2011) ...................................... 13

*Woods v. State*,
701 N.E.2d 1208 (Ind. 1998) ..................................... 5

*United States v. Ellison*,
798 F.2d 1102 (7th Cir. 1986) ................................... 10

*United States v. Johnson*,
3513 F.3d 254 (6th Cir. 2003) ................................... 18

*United States v. Tatum*,
943 F.3d 370 (4th Cir. 1991) ............................ 5, 7, 8, 9

## STATUTES CITED

                                                           Page(s)

Wis. Stat. § 752.35 (2009-10)................................... 30

Wis. Stat. 940.11(1) ................................................. 28

v

## ARGUMENT

## I. ATTORNEY KACHINSKY PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL THAT WARRANTS BOTH A NEW SUPPRESSION HEARING AND A NEW TRIAL.

### A. Attorney Kachinsky took concrete actions to support the prosecution of his own client, thus laboring under a conflict of interest.

The State misconstrues Appellant as suggesting that Attorney Kachinsky labored under a "personal or financial [conflict of] interest," which it then argues falls outside *Cuyler v. Sullivan*. St. Br. at 37. This straw man argument is alleged nowhere in Brendan's briefs. Rather, the nature of Kachinsky's conflict was that he "join[ed] the prosecution in an effort to obtain a conviction." *Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763, at *31 (E.D. Mich. Mar. 30, 2001) (deeming this an "obvious" conflict of interest) (citing *Dixson v. Quarles*, 627 F.Supp. 50, 53 (E.D. Mich. 1985) (discussing *Cuyler* standard)). Such a conflict falls squarely within the purview of *Cuyler*, which has been interpreted by the Wisconsin Supreme Court as governing conflicts arising out of defense counsel's "side-switching." *State v. Love*, 227 Wis.2d 60, 79, 594 N.W.2d 806 (1999) (applying the *Cuyler-Kaye-Love* standard when a defense attorney had formerly served as a prosecutor in the same case). Indeed, Kachinsky's behavior is simply a more egregious variant on the *Love* attorney's behavior.

The State next argues that *Cuyler* requires Brendan to show that Kachinsky's conflict "adversely affected" his performance, which it interprets as a requirement that Brendan show that he suffered "significant" harm at trial from Kachinsky's pre-trial behavior. St. Br. at 39, 51. In so doing, it confusingly condenses what should be a three-step analysis: First, what must Brendan prove under *Cuyler v. Sullivan* and its Wisconsin progeny to show the existence of an actionable conflict on Kachinsky's part? Second, did

1

Kachinsky suffer from an actionable conflict of the type contemplated by *Cuyler* and its Wisconsin progeny? And third, to what relief is Brendan entitled, given the existence of an actual conflict on the part of his pre-trial attorney?

To answer the first question: The Wisconsin Supreme Court has devoted much time and ink to interpreting *Cuyler v. Sullivan*, concluding that:

> In order to establish that he was denied effective representation by counsel, [defendant] must establish by clear and convincing evidence that an actual conflict of interest existed. […] *Sullivan* requires proof that an "actual conflict of interest adversely affected his lawyer's performance." We do not interpret this language as meaning that a defendant must first show an actual conflict and then prove that some kind of specific adverse effect or harm resulted from this conflict. […] This seems to be a nearly impossible burden to meet. The harm to a defendant necessarily follows once it has been demonstrated that his lawyer actively represented a conflicting interest.

*State v. Kaye*, 106 Wis.2d 1, 8-9, 315 N.W.2d 337 (1982) (internal citations omitted); *see also Love*, 227 Wis.2d at 71 ("In order to establish a Sixth Amendment violation on the basis of a conflict of interest, a defendant who did not raise an objection at trial must demonstrate by clear and convincing evidence that his or her counsel had an actual conflict of interest."). An "actual conflict of interest," in turn, exists when a defendant can identify "some deficiency in the attorney's performance either in what was done or in what was not done," rather than identifying "a mere possibility or suspicion of a conflict [that] could arise under hypothetical circumstances." *Love*, 227 Wis.2d at 69-70, 71. Thus, the "adverse effect" language in *Cuyler* on which the State relies has been interpreted in Wisconsin as meaning that the conflict must have been real, active, and concrete, not merely hypothetical. Once such an "actual conflict" has been shown, "counsel is considered per se ineffective." *Love*, 227 Wis.2d at 71.

2

As for the second step of the analysis, Brendan has certainly proven that Kachinsky labored under an actual conflict of interest. Kachinsky's sympathy for the prosecution is not a creature of "mere possibility or suspicion." Rather, his divided loyalties repeatedly revealed themselves in the form of multiple, concrete efforts to provide the State with evidence incriminating his own client, as detailed in Appellant's Brief at Section I-B. Among other things, Kachinsky surreptitiously led the State to what he believed was the murder weapon, which Brendan had told police he used; and Kachinsky instructed his defense investigator to interrogate Brendan until he confessed on the same day that Kachinsky expected to lose the all-important suppression hearing, because that loss would make Brendan especially vulnerable. (R.189:244; R.192:104.) This proof robustly establishes the existence of an actual conflict of interest, meaning that Kachinsky must be considered "per se ineffective." *Love*, 227 Wis.2d at 71. The only remaining question is to what remedy Brendan is entitled, given that Kachinsky represented him before trial but not at trial.

## B. At minimum, Brendan is entitled to a new suppression hearing.

Brendan is entitled at minimum to a new suppression hearing, because it was held during the pendency of Kachinsky's conflicted representation. The State characterizes Appellant as requesting a new suppression hearing because Kachinsky had improperly conceded that Brendan's interrogations were noncustodial; but once again, it misconstrues Appellant's argument. St. Br. at 52-53. Brendan has never argued that he must "link" Kachinsky's conflict to some deficiency at the hearing. St. Br. at 52. Rather, the Wisconsin Supreme Court has established that Brendan has no obligation to identify any "specific adverse effect or harm" that flowed from Kachinsky's conflict. *Kaye*, 106 Wis.2d at 9 ("We do not interpret [*Cuyler*] as meaning that a defendant must first show an actual conflict and then prove that

3

some kind of specific adverse effect or harm resulted from this conflict"). He is entitled to a new suppression hearing simply because an attorney with an actual conflict – who, under Wisconsin law, was "per se ineffective" – represented him during it. *See id.*; *Love*, 227 Wis.2d at 71.

As for the State's argument that Brendan has already appealed the outcome of Kachinsky's suppression hearing to this Court in a separate voluntariness claim, that is beside the point. St. Br. at 54. If this Court determines both that Kachinsky's ineffectiveness warrants a new suppression hearing and that the trial court's voluntariness ruling was correct, such a decision would not render a new suppression hearing useless or unnecessary. Rather, a new hearing would enable unconflicted attorneys to develop new facts concerning the voluntariness of Brendan's confession, which could underpin a new and different argument for suppression.

**C. Brendan is also entitled to a new trial.**

Kachinsky's behavior also entitles Brendan to a new trial, notwithstanding the appointment of successor counsel. In its brief, the State gathers five cases in which a conflicted attorney was replaced or joined before trial by an unconflicted attorney. St. Br. at 39-52. Importantly, the State appears to agree that these cases support one fundamental proposition: If pre-trial counsel's conflict tainted the subsequent trial, notwithstanding the appointment of unconflicted trial counsel, then the defendant is entitled to a new trial. This has been Appellant's position ever since Kachinsky's disloyalty was discovered during post-conviction proceedings. The only remaining question is what degree of trial taint must be shown.

The State claims that its five cases demonstrate that a new trial is warranted when "conflicted counsel played a *significant role* in the defense." St. Br. at 51 (emphasis added). This claim can be tested by a close

examination of the ways in which pre-trial counsel's conflict affected trial in each case.

In *United States v. Tatum*, conflicted pre-trial counsel, who had represented Tatum for years before the appointment of trial counsel, "brief[ed] [trial counsel] on both the facts and the prior proceedings." 943 F.3d 370, 378 (4th Cir. 1991). Pre-trial counsel also "attend[ed] the trial daily as counsel for Tatum and sat at the trial table" but "did not question witnesses at trial." *Id*. The court concluded that this arrangement constituted sufficient taint to warrant relief.

In *Rubin v. Gee*, conflicted pre-trial counsel advised Rubin who to hire as trial counsel and "continued to collect a fee from Rubin, even though they did not sit at counsel table during her trial." 292 F.3d 396, 399 (4th Cir. 2002). Pre-trial counsel did not enter an appearance on Rubin's behalf in the trial court, though they did meet with her in the period before her trial. *Id*. at 404, 407. The state court found that pre-trial counsel "were not responsible for deciding upon or for carrying out Mrs. Rubin's trial strategy," a finding not disturbed by the habeas court. *Id*. Nonetheless, the Fourth Circuit deemed even this relatively minimal involvement by pre-trial counsel sufficient to have tainted trial and granted relief. *Id*. at 406.

The State's next two cases, *Triana* and *Woods*, are less instructive because in both cases – as the State omits to point out – the defendant either conceded that the conflicted attorney did not affect the outcome of trial or failed to argue that the conflicted attorney did affect trial. *See Triana v. U.S.*, 205 F.3d 36, 43 (2d Cir. 2000) ("As conceded by Triana's counsel at oral argument, it is not claimed on appeal that [conflicted counsel]…somehow affected the outcome of the trial or was prejudicial to Triana's interests"); *Woods v. State*, 701 N.E.2d 1208, 1224 (Ind. 1998) ("Woods has not explained how [trial counsel] would have handled the case differently if they had been told of or

5

discovered [pre-trial counsel's] conflict"). Unsurprisingly, relief was denied in both cases. Because both Triana and Woods failed to argue the point, the facts of these cases shed little light on the degree of trial taint required for relief.

Finally, the fifth opinion on which the State relies – *Summerlin v. Stewart*, 267 F.3d 926 (9th Cir. 2001) – has been withdrawn by the Ninth Circuit. *Summerlin v. Stewart*, 281 F.3d 836 (9th Cir. 2002) (withdrawing opinion published at 267 F.3d 926); 310 F.3d 1221 (9th Cir. 2002) (granting en banc review while emphasizing that the opinion published at 267 F.3d 926 had been withdrawn); 341 F.3d 1082 (9th Cir. 2003) (en banc panel vacating sentence on grounds unrelated to *Cuyler*); 542 U.S. 348 (2004) (overturning Ninth Circuit); 427 F.3d 623 (2005) (vacating sentence on different grounds also unrelated to *Cuyler*). This Court must disregard the withdrawn *Summerlin* opinion improperly cited by the State.

The facts of *Tatum* and *Rubin* show that the State's proposed takeaway – that a new trial is warranted only when conflicted counsel played a "significant role" at trial – is not quite right. After all, the conflicted attorney in *Rubin*, who did not affect the trial or trial strategy but merely visited Rubin before trial and continued to collect fees during trial, hardly played a "significant role" at trial. Rather, the *Triana* court stated the legal rule much better: "We hold that there is no per se violation of the right to counsel where the [conflicted lawyer] is not the lawyer conducting the defense, *and has done nothing that has bearing on the result*." *Triana*, 205 F.3d at 43 (emphasis added).[1] Stated in the inverse, there has been a per se violation of the right to counsel when the conflicted attorney either conducts the defense or has done something that has bearing on the result of trial. While Kachinsky was not the lawyer conducting

---

[1] While the facts of *Triana* do not shed light on the degree of trial taint required for relief, the *Triana* court's statement of the law is sound and applicable.

6

Brendan's defense at trial, his actions utterly flunk the second part of this test. There can be no question that Kachinsky's actions had plenty of bearing on the result of trial, even more than the actions of the conflicted attorneys in *Tatum* and *Rubin*.[2]

Kachinsky's disloyalty caused the creation of incriminating evidence that was used against Brendan at trial: namely, the May 13, 2006 telephone call in which Brendan told his mother he did "some of it." (R.170:70:5.) That call was played during cross-examination of Brendan himself (R.193:162-64; R.119:50) and during cross-examination of his only expert witness (R.120:123); further, the State's closing argument relied on what Brendan had said during the call to provide a timeline of the crime that undermined the testimony of Brendan's alibi witness, Mike Kornely.[3] (R.121:56-57.) Attorney Fremgen testified that the May 13, 2006 call was "damning" evidence that he and Attorney Edelstein "couldn't really come up with any way to defend against," because it undercut the defense theory that Brendan had confessed only under the coercion and duress of police interrogation. (R.191:141.) *See Tatum*, 943 F.3d at 378-79 (relying on trial counsel's opinion regarding the degree to which conflicted counsel's actions affected trial). The State suggests that this call was an insignificant part of the evidence against Brendan; but its position is undercut by its own trifold reliance on the call at trial, by Fremgen's testimony about how the call stymied Brendan's defense, and by the fact that, according to Fremgen, D.A. Kratz commonly "led

_____

[2] Appellant does not concede that he would be unable to meet the State's "significant role" test. Kachinsky's conflict of interest played a significant role at trial, as argued extensively in Appellant's Brief at Section I-C.

[3] To the extent the State is suggesting that the May 13 call was used only as nonsubstantive impeachment evidence, it is entirely wrong. *See* St. Br. at 55. Appellant respectfully refers this Court to Appellant's Brief at Section I-C for a detailed account of the ways in which the May 13, 2006 call was used at trial, including for its substance during closing argument.

with" the existence of the May 13, 2006 telephone call during plea negotiations, thus suggesting that the State considered it powerful leverage. (R.191:140.) It is plain that the way in which Kachinsky tainted Brendan's trial – *by taking actions leading to the introduction of "damning" evidence against his own client* – represents a far more fundamental breakdown of the adversarial process than the taint in either *Tatum* or *Rubin*. *See Rubin*, 292 F.3d at 402 (a conflict of interest "represents a breakdown in the adversarial process fundamental to our system of justice"). Kachinsky's conflict did not merely inhibit Brendan's trial counsel, serious though such a taint is; rather, his conflict both inhibited trial counsel and affirmatively aided the State. It is hard to imagine a more troubling way in which a conflicted attorney's actions could have tainted trial.

While the seriousness of the trial taint attributable to Kachinsky's conflict far surpasses the taint in *Rubin* and *Tatum*, it is also worth noting that some of Kachinsky's behavior does echo the behavior of the conflicted attorney in *Tatum*. In that case, the court concluded that trial counsel was prevented from "focusing on a larger strategic design of possibly implicating [pre-trial counsel's] law firm as the source of Tatum's criminal liability" because he had relied on pre-trial counsel's knowledge of the case in order to educate himself. *Tatum*, 943 F.3d at 379. Clearly, the court was concerned that pre-trial counsel had withheld information from his successor in order to protect his own hide. But Kachinsky, too, withheld information about his conflict from his successors – perhaps for similar reasons. Kachinsky did not give trial counsel the videotape or transcript of O'Kelly's May 12, 2006 interrogation of Brendan or the May 5, 2006 email in which he had offered to lead the State to what he thought was the murder weapon. (R.191:116-18, 135; R.192:225-27.) Just as in *Tatum*, these omissions "infected" trial counsel's strategic decisions. Fremgen testified that if he and Edelstein had known of these documents, they would have sought the suppression of the May 13, 2006 telephone call on

8

Sixth Amendment grounds under the theory that
"[Kachinsky] was working for the State."
(R.191:126-29, 133.) (Kachinsky's failure to turn over
these documents, of course, is the reason that Fremgen
and Edelstein did not object to the State's use of the
May 13 telephone call on Sixth Amendment grounds, a
fault ascribed to them by the State at page 55 of its
brief.) Kachinsky's nondisclosure also affected
Fremgen's plea talks with the State, since D.A. Kratz
used – and, indeed, led with – the existence of the May
telephone call to bolster his position during
negotiations. (R.191:140.) In short – even setting
aside all his other misdeeds – Kachinsky's acts of
nondisclosure tainted the performance of trial counsel
as in *Tatum*; but in the present case, Kachinsky's
nondisclosure represents only a small fraction of his
conflicted actions and the taint flowing therefrom.

One final point about the *Tatum* decision must
also be noted. That court found that pre-trial counsel's
conflict can be enough *by itself* to warrant a new trial,
without any examination of trial taint at all. Omitted
from the State's discussion of *Tatum* is this key part of
the holding:

> Even if we were to consider only [pre-trial counsel's]
> direct representation of Tatum, our conclusions in this
> case would not be different. Before [trial counsel]
> entered his appearance for Tatum, [pre-trial counsel's]
> representation resulted in an actual lapse, because he did
> not think to invite the government to alter the focus of its
> investigation from Tatum to his law firm as part of a
> plea bargain. As observed by the Supreme Court in
> *Holloway*, a conflict of interest has constitutionally
> detrimental effects before trial, just as during trial,
> "because of what it tends to prevent the attorney from
> doing." We find that [pre-trial counsel's] actual
> conflicts of interest adversely affected Tatum's defense
> when he alone was representing Tatum and when at trial
> he assisted [trial counsel] in representing Tatum.

*Id.* at 379 (internal citations omitted). This paragraph
is instructive. Like pre-trial counsel in *Tatum*,
Kachinsky "did not think to invite the government to
alter the focus of its investigation from" Brendan,

because he was too focused on obtaining a conviction – in this case, via a guilty plea. Not once did he think to suggest to the State that his client may have falsely confessed, nor did he think to task his defense investigator with finding exculpatory, rather than inculpatory, evidence. If he had done either of these things, Brendan's trial and sentencing could easily have unfolded differently. By identifying flaws in the State's case, rather than trying to build it up, Kachinsky could have affected the nature of any plea offers extended; the nature and type of evidence presented by both sides at trial; and even the length of sentence requested by the State – even though he was not present at trial and sentencing. *See U.S. v. Ellison*, 798 F.2d 1102, 1107 (7th Cir. 1986) (explaining that "a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure"); *cf. Lafler v. Cooper,* 132 S. Ct. 1376, 1388 (2012) (rejecting the government's argument, in the context of a *Strickland* claim, that "[a] fair trial wipes clean any deficient performance by defense counsel during plea bargaining").

Lastly, the State's discussion regarding the voluntariness of the May 13 telephone call rebuts a legal argument that, once again, Appellant has never made. St. Br. at 55. The issue regarding the May 13 call is not its Fifth Amendment voluntariness, which is the issue discussed in the State's cases. St. Br. at 55 (citing *Harris v. New York*, 401 U.S. 222 (1971); *State v. Knapp*, 2003 WI 121, 265 Wis.2d 278, 666 N.W.2d 881). Rather, Appellant has argued that the State's repeated use of the May 13 telephone call during trial is an example of how Attorney Kachinsky's conflicted representation tainted trial under the Sixth Amendment. In this regard, whether the May 13 call is a product of state action – at least as the term is traditionally understood – is not the relevant issue. Instead, the key fact is the close link between the call and Kachinsky and O'Kelly's actions on the evening of May 12, 2006.

Evidence of such a link comes straight from Brendan's mouth during the call. During the May 13

10

call, Brendan explained to his mother that he was confessing because "Mike [O'Kelly] and Mark [Wiegert]…think I was lying." (R.170:70:2.) He explained that if he "came out with it," he would only face "twenty or less" years in prison (R.170:70:2), echoing what O'Kelly had told him the previous day. (R.194:21.) (App. 534 (O'Kelly telling Brendan that "20 years" would be "fair for what you've done").) Brendan also told his mother that "[t]hey asked me if I wanted to be out to have a family later on" (R.170:70:5), again quoting O'Kelly. (R.194:4) (App. 517 (O'Kelly telling Brendan that if "you want to get out and have a family some day…that means you have to cooperate with me and have me work with you").) In essence, Brendan told his mother during the May 13 telephone call that he chose to incriminate himself on the advice of his counsel and counsel's agent Michael O'Kelly. The link between Brendan's disloyal defense team and the "damning" May 13, 2006 call could not be clearer; and the State's use of it in three different ways against Brendan at trial cannot be tolerated under any conception of a meaningful right to effective counsel.

## II. BRENDAN'S MARCH 1, 2006 CONFESSION SHOULD HAVE BEEN SUPPRESSED AS INVOLUNTARY.

### A. That Brendan's March 1, 2006 statement was a product of intensive fact-feeding by police is highly relevant to the voluntariness inquiry.

It is axiomatic that courts determine a confession's voluntariness by examining the "totality of the circumstances." *See, e.g.*, *State v. Jerrell C.J.*, 2005 WI 105, ¶ 20, 26, 283 Wis. 2d 145, 699 N.W.2d 110. The word "totality" means what it says: Courts must examine "*all* of the attendant circumstances" surrounding the confession. *See Haynes v. Washington*, 373 U.S. 503, 513-14 (1963) (emphasis added). This includes "any…methods or strategies used by the police to compel a response." *See, e.g.*,

11

*State v. Hoppe*, 2003 WI 43, ¶ 39, 261 Wis. 2d 294, 661 N.W.2d 407.

The State argues that despite this language, courts evaluating voluntariness must blind themselves to the presence of fact-feeding, which it suggests relates only to reliability. St. Br. at 4. Appellant agrees that significant reliability concerns are raised when a defendant such as Brendan cannot produce a coherent confession until police compel him to repeat back their own theories. That such fact-feeding is relevant to reliability, however, does not make it irrelevant to voluntariness. Indeed, the U.S. Supreme Court "has never questioned that evidence surrounding the making of a confession bears on its credibility as well as its voluntariness." *Crane v. Kentucky*, 476 U.S. 683, 688 (1986).

This uncontroversial proposition – that fact-feeding is relevant to voluntariness – has been acknowledged by many courts. *See, e.g.*, *Culombe v. Connecticut*, 367 U.S. 568, 634 (1961) (the fact that defendant's statement "was not even cast in his own words" was evidence that his "will was broken"); *Passama v. Nevada*, 735 P.2d 321, 324 (Nev. 1987) (finding confession to be "the product of police coercion, and therefore involuntary" when "the sheriff continued to suggest how the [crime] had occurred until he secured the written confessions"); *State v. Randle*, 366 S.E.2d 750, 754 (W. Va. 1988) (finding confession involuntary when police used "highly suggestive" questioning to "propose that the killing might have resulted from an aborted robbery"); *Steese v. Nevada*, 960 P.2d 321, 328 (Nev. 1998) (finding confession voluntary when police "did not provide Steese with the key facts of his confession"); *State v. Rettenberger*, 984 P.2d 1009, ¶ 40 (Utah 1999) (finding confession involuntary when it "contains little information that was not first provided or suggested by the interrogating officers"); *Massachusetts v. Schuler*, 2011 Mass. Super. LEXIS 195, at *12 (Mass. Super. Ct. 2011) (finding confession voluntary when "[t]he defendant's answers appear to be independent of the

12

suggestions made to him by officers, as opposed to someone who simply repeats or restates what is said by the police"); *Warney v. State*, 16 N.Y.3d 428, 436 (N.Y. 2011) (finding that wrongfully convicted plaintiff in civil rights lawsuit had "adequately pled that he was coerced" during his interrogation, because he had pled that police fed him facts about the crime). The State's brief does not acknowledge these cases or rebut their reasoning. And those cases that the State does discuss, such as *Colorado v. Connelly*, do not advance its argument. *Connelly* held only that the voluntariness inquiry does not encompass "inquiries quite divorced from any coercion brought to bear on the defendant by the State." 479 U.S. 157, 167 (1986). When two adult police officers lead a sixteen-year-old, intellectually limited boy to adopt and repeat their narrative of the crime, fact by fact, over an hours-long interrogation, such circumstances are not "quite divorced" from the issue of coercion. Rather, as recognized by many courts, such fact-feeding itself indicates the presence of coercion – particularly when it is combined with other interrogation tactics discussed in Section II-B *infra*.

The State's attempt to identify crime details that Brendan knew absent fact-feeding betrays the fallacy of its argument. Most importantly, the State emphasizes that Brendan knew that Halbach had been shot in the head.[4] St. Br. at 5. This statement, however, was the product of egregious fact-feeding:

> WIEGERT: Brendan, be honest. *You were there when she died and we know that.* Don't start lying now. We know you were there. What happened? […]
> BRENDAN: Then he went in, back in there and he stabbed her.

---

[4] Assuming it is relevant to the present discussion, Appellant can easily rebut the State's assertion that Brendan's confession is reliable because he knew some details of the crime. St. Br. at 5-6. Every one of the facts recited by the State was fed to Brendan by police, well-known by members of the public, or a product of Brendan's own innocent familiarity with the crime scene. *See* Section III *infra* for a point-by-point rebuttal of the State's claim.

WIEGERT:  You were with him?  (Brendan nods "yes") Yes?

BRENDAN: Yeah […]

WIEGERT: *We know he did something else to her*, what else did he do to her?

BRENDAN: He choked her […]

WIEGERT:  What else did he do to her?  *We know something else was done.*  Tell us, and what else did he do?  Come on.  *Something with the head.*  Brendan? […]

BRENDAN: That he cut off her hair. […]

WIEGERT: OK, What else?

FASSBENDER: *What else was done to her head?*

BRENDAN: That he punched her.

WIEGERT: *What else?*  (pause) *What else?* […]

BRENDAN: Cut her.

WIEGERT: Cut her where?

BRENDAN: On her throat….

WIEGERT: So Steve stabs her first and then you cut her neck?  (Brendan nods "yes")  *What else happens to her in her head?*

FASSBENDER:  It's extremely, extremely important you tell us this, for us to believe you.

WIEGERT:  Come on Brendan, what else? (pause)

FASSBENDER: We know, we just need you to tell us.

BRENDAN: That's all I can remember.

WIEGERT:  *All right, I'm just gonna come out and ask you.  Who shot her in the head?*

BRENDAN: He did.

FASSBENDER:  Then why didn't you tell us that?

BRENDAN:  Cuz I couldn't think of it.

(R.79:34:578-87 (emphases added).)  (App. 273-82.)

        This excerpt demonstrates that Brendan's interrogators were hardly passive recipients of a heartfelt unburdening.  Instead, they engaged Brendan in a macabre guessing game about how Halbach died; and after Brendan was unable to guess correctly – all of his answers were unsubstantiated by physical evidence – they ultimately told him what to say.  *See Florida v. Sawyer*, 561 So.2d 278, 287 (Fla. Ct. App. 1990) (finding confession involuntary when "the detectives instituted a guessing game…that used leading questions to nudge the defendant to adopt the facts as known to or believed to be known by the police about intimate details of the crime").  As such, their influence is difficult to separate from Brendan's

14

decision to confess. Indeed, Brendan even told police that he was out of ideas about how Halbach could have died – "That's all I can remember" – and, as such, had no response to give them until they told him that she had been shot in the head. Such fact-feeding is unquestionably a "method or strategy used by the police to compel a response" that otherwise would not have been forthcoming. *Hoppe*, 261 Wis.2d at ¶ 39.

Because much of Brendan's March 1 confession was the product of similar fact-feeding, as detailed in Appellant's Appendix at 538-542 and as argued in Section III *infra*, it should have been suppressed as involuntary.

**B. Brendan's youthfulness warrants the application of "special caution" throughout the entire voluntariness analysis.**

In arguing that Brendan's statement was voluntary, the State repeats the trial court's error: It overlooks the fact that Brendan's youthfulness – he was sixteen when interrogated – makes the analysis entirely different than if he had been an adult. Nowhere does the State mention *J.D.B. v. North Carolina*, in which the U.S. Supreme Court accepted as a matter of "common sense" that youth under 18 are more vulnerable to the pressures of interrogation, and even the Honorable Justice Alito acknowledged in dissent that "I do not dispute that many suspects who are under 18 will be more susceptible to police pressure than the average adult." 131 S. Ct. 2394, 2403-05 (2011). Nowhere does it mention *Roper v. Simmons* or *Graham v. Florida*, which explain that youth are more vulnerable than adults to the application of external pressure because they are categorically suggestible, impulsive, eager to please authority figures, and hampered by immature decision-making. *Roper v. Simmons*, 543 U.S. 551, 569 (2005); *Graham v. Florida*, 130 S. Ct. 2011, 2032 (2010). And most importantly, nowhere does the State – or the trial court – acknowledge the Wisconsin Supreme Court's 2005 landscape-changing mandate in *Jerrell*

15

*C.J.*, directing trial courts to "exercise special caution when assessing the voluntariness of a juvenile confession" because the mere condition of being a child necessarily renders one "uncommonly susceptible to police pressures." *Jerrell C.J.*, 2005 WI 105 at ¶ 21 (internal quotations omitted).   Instead, the State relies exclusively on cases involving adult defendants, all of which were decided before *Jerrell C.J.*[5]  Any hint of "special caution" is entirely absent from both the State's brief and the trial court's decision.

The State is right to begin by acknowledging that "rational choice" is at the heart of the voluntariness analysis.  St. Br. at 18 (citing *U.S. v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir. 1990)).  A child's ability to exercise rational choice, however, is weaker – and more easily derailed – than an adult's ability to exercise rational choice.  *See Johnson v. Trigg*, 28 F.3d 639, 643 (7th Cir. 1994) ("[P]olice tactics that might be unexceptionable when employed on an adult may cross the line when employed against the less developed reason of a child").  This reality makes many psychological interrogation tactics that are regularly used against seasoned adult criminals coercive when used against a sixteen-year-old special education student like Brendan.

This is true, for instance, with respect to the dozens of promises of leniency peppered throughout Brendan's interrogations, including suggestions that the police would ensure that Brendan would avoid criminal charges and otherwise be "okay" – but only if he confessed.   (App. 546-60 (listing promises).)  These promises exploited Brendan's juvenile naiveté, suggestibility, and eagerness to please, causing him to believe that confessing would carry no detrimental consequences and, in turn, depriving him of any meaningful ability to rationally choose to confess.  *See*

---

[5] While not every case on which the State relies names the age of the defendant, it is clear from each case's facts that the defendant is not a child.

16

*State v. Polk*, 2012 Iowa Sup. LEXIS 33 (Iowa Apr. 6, 2012) (finding confession involuntary when police told defendant that prosecutors "are much more likely to work with an individual that is cooperating with police than somebody who sits here and says I didn't do it") (internal citations omitted). (Supp. App. 627-32.) And these promises hit their mark: After confessing to rape and murder, Brendan naively asked his interrogators if he would be back at school in time for his 1:29 PM class. (R.79:34:613, 667.) (App. 308, 362.) *See Commonwealth v. Truong*, 2011 Mass. Super. LEXIS 61, at *22-23 (Mass. Super. Ct. 2011) (suppressing teen's murder confession because she thought she would be placed in foster care as a result of confessing and thus "never understood the implications of her statements"). (App. 567-86.) By taking advantage of Brendan's youthful ignorance, the use of such promises must raise red flags under *Jerrell C.J.*'s "special caution" analysis. Those red flags should begin waving furiously, moreover, in light of the fact that interrogators encouraged Brendan to trust their promises by portraying themselves as protective father figures who thought of him not as a suspect but as a son: "Mark and I, yeah we're cops, we're investigators and stuff like that, but I'm not right now. I'm a father that has a kid your age too. I wanna be here for you." (R.79:33:443.) *Jerrell C.J.* cannot countenance such a direct exploitation of youthful vulnerability.

The State references several cases involving adult defendants to suggest that only false promises of leniency are coercive. St. Br. at 23. In so doing, it omits to mention that many of the promises made to Brendan *were* false; he most certainly was not "okay" after confessing, nor did he avoid charges. But setting that reality aside, the State's argument seems to be that Brendan's interrogators fulfilled some of their promises to help him by speaking to D.A. Kratz on his behalf – and they are not to be faulted if Brendan didn't understand that D.A. Kratz could charge him anyway. While an adult criminal defendant may understand that police have limited influence over

17

charging decisions and other areas of prosecutorial discretion, however, it is unlikely that a child understands this division. When a police officer with no authority over charging decisions represents that he will help a child avoid charges if the child cooperates, that promise is illusory and coercive. *See U.S. v. Johnson*, 3513 F.3d 254, 262 (6th Cir. 2003) ("Promises of leniency may be coercive if they are broken or illusory"); *Ramirez v. State*, 15 So.3d 852, 856-57 (Fla. App. Ct. 2009) (finding confession involuntary when officer failed to explain the limits of his authority while telling defendant that he would "help" him).

*Jerrell C.J.*'s "special caution" is absent from the State and trial court's analysis of other interrogation tactics, too. To excuse the police's dozens of assertions that they "already knew" what happened, the State relies on a case examining the effect of this tactic, in isolation, on an adult. St. Br. at 25 (citing *State v. Triggs*, 2003 WI App. 91, ¶ 13, 264 Wis.2d 861, 663 N.W.2d 396). But as interrogation expert Dr. Richard Leo testified at the *Machner* hearing, this tactic is "particularly influential…on juveniles." (R.190:170.) Moreover, this tactic's coercive effects must be measured not only against Brendan's youth, but also in conjunction with the officers' promises of leniency. The interrogators' assertions of superior knowledge gave their promises credibility: What did Brendan have to worry about, if his interrogators already knew what he was going to say and were still offering to help?

As for the question of parental presence, the record is crystal-clear that at the conclusion of the February 27, 2006 Mishicot High School interview, Officer Mark Wiegert thought that "Brendan might have been involved in the disposal of the corpse." (R.193:38.) This suspicion, however, was kept from Brendan's mother when the officers sought permission to question him two days later on March 1 – thereby undercutting the purpose of Wisconsin's parental notification rules. The State, once again, relies on an

18

adult case to suggest that if an adult need not be informed of an interrogation's purpose, then a child's parent also need not be informed. St. Br. at 14 (citing *Colorado v. Spring*, 479 U.S. 564 (1987)). But *Jerrell C.J.* emphasized that "special caution" requires a close examination of the parent's role in protecting the juvenile. 2005 WI 105, ¶31 (noting that "we are troubled by this tactic" of denying a child access to their parent during questioning). It cannot be permissible to end-run these protections by misleading a parent into giving uninformed consent.

Furthermore, the State asserts that Brendan was not in custody on February 27, 2006, when he was questioned in his school principal's office and at the Two Rivers police station, or on March 1, 2006, when police drove him from school to the Manitowoc police station, where he was marooned with no way of getting home. St. Br. at 13-14. Such an assertion is simply wrong after *J.D.B. v. North Carolina*, which held that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." 131 S. Ct. at 2401, 2403 (strongly suggesting that a child questioned by police in his school principal's office was in custody). While *J.D.B.* admittedly post-dates the trial court's decision, its reasoning is merely a specific application of *Jerrell C.J.*, which was in full force at the time of Brendan's *Goodchild* hearing. With these cases in mind, the only proper conclusion as to custody is that Brendan could not realistically have chosen to terminate police questioning on February 27 or, even more so, on March 1.

While most of this Section has focused on interrogation tactics, Appellant also wishes to highlight one way in which *Jerrell C.J.* should have guided the trial court's analysis of Brendan's personal characteristics. The State suggests that as of March 1, 2006, Brendan was experienced with law enforcement, because he had been previously interviewed in November 2005 and February 2006 about the Halbach case. St. Br. at 19-20. The *Jerrell C.J.* court, however,

19

squarely rejected a very similar argument. There, the defendant had been arrested twice for misdemeanor offenses before his interrogation; in both instances, he answered police questions, admitted involvement, and was allowed to go home. 2005 WI 105, ¶ 29. The Court found that this experience "may have contributed to his willingness to confess in the case at hand…We note the argument of Jerrell's counsel that such an experience may have taught him a dangerous lesson that admitting involvement in an offense will result in a return home without any significant consequences." *Id.* The same can be said of Brendan Dassey. Each time he was questioned by the police, Brendan initially denied all involvement but eventually changed his story until he was repeating exactly what the police wanted him to say. On November 6, 2005, for instance, Brendan changed his story after police insisted that he must have seen Halbach when he got off the school bus on October 31. (R.79:23:2-3.) On February 27, 2006, similarly, police insisted that he must have seen body parts in Steven Avery's bonfire – so he changed his story to an implausible tale of seeing toes, fingers, and a "forehead." (R.79:33:452-53.) Each time, Brendan was released after changing his story. The fact that Brendan had been taught that saying what the police want "will result in a return home" weighs against, not in favor of, the voluntariness of the March 1 confession.

In sum, the trial court erred when it concluded that Brendan's March 1 confession was voluntary without any acknowledgement of the "special caution" with which his confession must be scrutinized. Appellant now asks this Court to take Brendan's age into full, realistic account and reverse the trial court's decision.

## III. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO DEMONSTRATE THAT BRENDAN'S MARCH 1 CONFESSION WAS UNRELIABLE.

20

At trial, Attorneys Fremgen and Edelstein intended to argue that Brendan had falsely confessed. To do this, they planned to show the jury that many facts in Brendan's March 1 confession were fed to him by police. (R.192:246.) But trial counsel never made such a showing in a systematic manner; instead, they made this argument with respect to only a few facts, thus implying that Brendan's knowledge of other details was unassailable proof of his guilt. (R.170:87.)

When weighing the degree of prejudice that flowed from this failure, this Court need look no further than the State's brief, which recycles the same arguments advanced by the State during closing argument. In its brief, the State argues that Brendan's March 1 confession must be reliable because "once Dassey definitively identified the garage as the location of the shooting, a search turned up bullets with Halbach's DNA [in the garage]." St. Br. at 62. (R.121:62.) The State calls these facts "strong indicia that Dassey told the truth when he admitted to helping Avery." St. Br. at 5. The police, however, had suspected for months that Halbach had been shot in Avery's garage, because eleven spent casings had been found on the garage floor in the days after her disappearance. (R.114:93-101; R.78:49.) When Brendan told the police on March 1 that Halbach had been shot there, he did so because the police suggested their own theory of the crime to him:

> FASSBENDER: We know there's…some things that…you're not tellin' us. We need to get the accuracy about the garage and stuff like that and the car…Again, w-we have, *we know that some things happened in that garage, and in that car, we know that*. You need to tell us about this so we can know you're tellin' us the truth.
> FASSBENDER: Tell us where she was shot?
> BRENDAN: In the head.
> FASSBENDER: No, I mean where, *in the garage*
> BRENDAN: Oh.
> FASSBENDER: Outside, in the house?
> BRENDAN: In the garage.
> FASSBENDER: OK.
> WEIGERT: *Was she in the garage floor or in the truck?*
> BRENDAN: Innn the truck.

21

> WIEGERT: *Ah huh, come on, now where was she shot?*
> *Be honest here.*
> FASBENDER: The truth.
> BRENDAN: In the garage.

(R.79:34:593, 595-97 (emphases added).) (App. 388, 290-92.) That police found a bullet with Halbach's DNA in the garage after Brendan's confession, in short, corroborates their own theory of the crime – not Brendan's guilt. Without anyone to point this out at trial, however, it was reasonable for jurors to conclude that Brendan's "knowledge" of this fact meant he was guilty.

Trial counsel could have shown that Brendan's interrogators fed him many other key details on March 1, too, including:

- Halbach's body had been burned in a fire behind Steven's garage on Halloween, a fact police already knew to be true because she had last been seen on Halloween and because her burned remains had been found in a fire pit behind the garage. (R.114:158; R.116:187.)
- Halbach had been shot in the head, a fact police already knew to be true because lab technicians had found traces of lead and bullet entry markings on a charred skull fragment. (R.114:230-34.)
- The license plates had been removed from Halbach's vehicle, a fact police already knew to be true because the plates had been found in a junked station wagon. (R.113:169; R.78:19.)
- The hood of Halbach's vehicle had been opened, a fact police already knew to be true because her vehicle had been found with the battery disconnected. (R.115:142.)
- Halbach's clothes had been burned in the bonfire, a fact police already knew to be true because rivets from her jeans had been found in the fire pit. (R.113:126; R.114:55.)
- Halbach's cell phone, camera, and purse had been burned in Steven's burn barrel, a fact police already knew to be true because charred remnants of those

items had been found in the barrel. (R.114:46; R.78:3, 40; R.79:1-7.)

Appellant respectfully refers this Court to the Appendix at 538-542 for the relevant interrogation transcript excerpts that show how police fed each of these facts to him.

Persuasive as this showing is, trial counsel could even have gone a step further. Brendan knew many of the facts in his confession because they were fed to him by police; but he knew several other facts because they had been widely publicized in the news. While Brendan himself may not have read or watched every news story about his uncle's case, his family members closely followed and regularly discussed case developments, often in Brendan's presence. (R.193:150-53.) These facts include:

- Halbach had been at Steven Avery's trailer on October 31, 2005;
- Handcuffs had been found in Avery's trailer;
- About ten .22-caliber casings from Avery's rifle had been found in his garage;
- Blood had been found in the rear cargo area of Halbach's SUV;
- Halbach's body had been burned in Avery's fire pit;
- Halbach's SUV had been found in the salvage yard concealed with branches and a car hood;
- Avery had cut his finger during the assault on Halbach; and
- The key to Halbach's SUV had been hidden in Avery's bedroom.

Again, Appellant respectfully refers this Court to the Appendix at 538-542 for citations to some of the media reports that publicized this information.

Unfortunately, trial counsel never raised these points, despite the fact that it was "not uncommon" for Brendan to tell them that he got some of the details in his confession from the news. (R.192:255.) Again,

23

the State's brief exemplifies the prejudice flowing from such an omission. The State argues now, as it did at trial, that Brendan's confession is reliable because he knew to say that Halbach had been shot "about ten" times and because he knew that Avery had hidden the key to Halbach's SUV in his bedroom. St. Br. at 5-6. (R.121:63, 71.) Those facts, however, were widely publicized after police found eleven shell casings and the key during their November 2005 searches; as such, these facts easily could have been recited by anyone in the State of Wisconsin who watched the news.[6]

Similarly, trial counsel never pointed out that Brendan's knowledge of the few remaining facts in his confession flowed from his own innocent familiarity with the salvage yard. Once again, the State's brief exemplifies how such a failure prejudiced trial. The State argues now, as it did at trial, that Brendan's confession is reliable because he could accurately describe the arrangement of Steven's bedroom furniture, and because he knew to say that Jodi Stachowski had called Steven twice during the evening of October 31, 2005. St. Br. at 6, 62. (R.121:73, 146-47.) But it is entirely natural for a nephew who lived next door to his uncle to be familiar with the furniture arrangement in his uncle's home; such knowledge does not suggest criminality. Further, Brendan's knowledge of Jodi's telephone calls to Steven matches his own innocent narrative of October 31, 2005. As Brendan testified, Jodi called while Brendan was helping his uncle build what Brendan thought was just another bonfire. (R.119:52-53.) At that time, Steven

---

[6] Appellant wishes to correct an important mistake of fact in the State's brief: The key to Halbach's car was not found in Avery's bedroom *after* Brendan's March 1, 2006 confession, as the State asserts. St. Br. at 6. Deputy Kucharski testified at trial that the key was found there on November 8, 2005, months *before* Brendan's confession. (114:105-06.) In fact, the key's discovery was well-publicized in dozens of news stories between November 8, 2005 and March 1, 2006. (App. at 541 (identifying news stories).) Brendan's knowledge of this detail proves only that he was familiar with news stories about his uncle's case, not that he participated in the crime.

24

mentioned that Jodi had also called earlier at approximately 5:30 PM. (R.119:52-53.) Once again, Brendan's knowledge of these facts does nothing to establish his guilt – but no one argued this to the jury.

Compounding their own failure to explain these matters to the jury, trial counsel never called a police interrogation expert who could have done the explaining for them. For months, trial counsel had planned to call such an expert to testify about false confessions; they had not merely planned to consult one pre-trial, as the State suggests. St. Br. at 61. In February 2007, Fremgen filed a motion in limine reflecting that he "expected Dr. Gordon to *testify*…about police questioning…[and] the reliability of Brendan's statements." (R.191:167 (emphasis added).) Even earlier, in the fall of 2006, Fremgen "knew I needed an expert. I wasn't going to simply walk in with a...chapter from a book and say I want to use this to cross-examine the officers." (R.191:161.)

But trial counsel never called the expert that Fremgen "knew" was "needed," despite having such an expert ready, willing, and available in the form of Dr. Lawrence White. (R.191:161.) The State asserts that trial counsel did not call an expert because the State omitted to call its own interrogations expert, Joseph Buckley, during its case-in-chief, and trial counsel did not want to enable the State to present Buckley in rebuttal. St. Br. at 61. It suggests that Fremgen and Edelstein's plan to use an expert "always related to [the State's use of] Buckley." St. Br. at 61. This is wrong; trial counsel had planned to call an expert for months before they learned in April 2007 that D.A. Kratz had retained Buckley. (R.191:161, 167, 179.) Furthermore, if this explanation were true, Fremgen and Edelstein would have retained White and prepared him to testify as a matter of basic trial preparation, in case the State did call Buckley in its case-in-chief. Instead, they never retained White before trial, even though they knew that the State had retained Buckley. (R.169:6.) The State's actions with respect to Buckley cannot explain the unexplainable:

25

trial counsel's last-ditch decision to jettison their long-held plan to call an interrogations expert.

The State makes much of *State v. Van Buren*, 2008 WI App 26, 307 Wis. 2d 447, 746 N.W.2d 545; but it does not control here. St. Br. at 59. Van Buren's ineffectiveness claim was rejected because the admissibility of a police interrogation expert was unsettled in Wisconsin, and an attorney cannot perform deficiently by failing to "argue a point of law that is unsettled." *Van Buren*, 2008 WI App 26 at ¶ 18. But admissibility was not at issue in Brendan's case, because both sides intended to call a police interrogations expert. Indeed, in its opinion denying post-conviction relief, the trial court explicitly acknowledged that "in all likelihood some, and maybe much of [such an expert's] testimony…would have been admissible." (R.206:17.) *Van Buren* can be distinguished on other grounds, too. Van Buren's trial counsel, for instance, did not admit that he felt he "needed" an interrogation expert. (R.191:161.) And counsel's failure in *Van Buren* was far less prejudicial; while Brendan's confession was strikingly uncorroborated except for the infamous May 13 telephone call, Van Buren's confession to sexual assault and possession of child pornography was corroborated by statements from the victim and the discovery of 51,760 images of child pornography on Van Buren's computer. *Van Buren*, 2008 WI App 26 at ¶ 3, 4.

As for trial counsel's failure to introduce Brendan's videotaped recantation into evidence, the State echoes the trial court in arguing that the videotaped excerpt in question is not actually a recantation. St. Br. at 65. (R.206:25.) Appellant challenges this factual finding. In the videotaped excerpt, Brendan tells his mother that he did "not really" do "nothin'." He asks her, "What'd happen if [Steven] says something his story's different? Wh— he says he, he admits to doing it?...Like if his story's like different, like I never did nothin'." And he

26

explains that he confessed because the police "got to my head." (R.79:34:671-72.) (App. 366-67.)

On its face, this statement is manifestly a recantation: I did "not really" commit these crimes. The trial court and State interpret Brendan's assertion that the police "got to my head" as consistent with guilt, but the context shows that Brendan was trying to explain that he had been manipulated. Throughout the interrogation, he had been influenced by the police's promises of leniency, as demonstrated by the fact that he naively asked his interrogators – after confessing to rape and murder – if he would be back at school in time for his 1:29 PM class. (R.79:34:613, 667.) (App. 308, 362.) Instead of releasing him as he expected, however, the police arrested him. (R.79:34:667.) (App. 362.) They had fooled Brendan well; they had "got to his head."

This interpretation is supported by the fact that Officer Wiegert – who was well aware that the conversation was being taped – immediately charged into the interrogation room and cut off the conversation as soon as Brendan began recanting. (R.79:34:672.) (App. 367.) If Brendan's words had actually been inculpatory, Wiegert would hardly have done so. Brendan's mother, too, interpreted her son's words as exculpatory, immediately asking Wiegert: "Were you pressuring him?" (R.79:34:672.) (App. 367.)

If this contemporaneous evidence is not enough, the fact that Brendan's confession does not demonstrate any firsthand knowledge of the crime also strongly supports the conclusion that he had been coerced into falsely confessing and, thus, that he recanted at the first opportunity. That trial counsel failed to raise either of these mutually reinforcing points demonstrates the importance of a cumulative prejudice analysis.

Just as it argues that Brendan's recantation was not a recantation, the State also argues that Attorney

Edelstein's concession of the mutilation charge was not a concession. St. Br. at 67-68. In so doing, the State claims that all Edelstein conceded during closing argument was that Brendan had "observ[ed]" a body in Steven's fire. St. Br. at 68. But this argument ignores what Edelstein actually said: "[Brendan] walked over there expecting a Halloween bonfire, and went around with the little cart, and picked up all the stuff, *and eventually they start throwing stuff in there, and he probably did see something.* Pretty traumatic." (121:127-128 (emphasis added).) Edelstein did not state that his client had merely observed a body in the fire; he stated that his client was "throwing stuff" onto a bonfire in which he had seen a body. Unless the State is willing to concede that a person who feeds a bonfire in which he sees a body has not committed mutilation of a corpse – which may give Appellant grounds for requesting leave to amend this appeal – then Edelstein's closing argument did concede Brendan's guilt on the mutilation charge.[7]

The State also claims that *State v. Gordon*, 2003 WI 69, 262 Wis.2d 380, 663 N.W.2d 765, "demolishes" Brendan's argument. St. Br. at 69. To the contrary, *Gordon* strengthens it. *Gordon* held that an attorney's concession during closing argument was permissible "after the defendant had admitted on the witness stand the facts constituting the offense." 2003 WI 69 at ¶ 5. But Brendan did *not* admit that he saw Halbach's corpse in the fire, instead testifying repeatedly that he never saw her dead or alive.[8] (R.119:41.) The State tries to evade this very

---

[7] Intent to conceal a crime is also an element of mutilation of a corpse under Wis. Stat. 940.11(1); but surely when a person feeds a bonfire in which he sees a dead body, these acts constitute circumstantial evidence of intent to conceal a crime.

[8] This is true notwithstanding the trial court's erroneous factual finding that Edelstein's concession drew on Brendan's testimony that he had thrown the tires and seat from Halbach's vehicle on the fire. (R.206:27.) Brendan testified to no such thing, as set forth in Appellant's Brief at 99.

problematic fact by suggesting that Appellant has
ignored the *Gordon* court's reasoning:

> A guilty plea waives trial, cross-examination of
> witnesses, the right to testify and call witnesses in one's
> own defense, and the right to a unanimous jury verdict
> of guilt beyond a reasonable doubt. The concession in
> this case had none of these effects.

St. Br. at 69 (quoting *Gordon*, 2003 WI 69 at ¶ 24).
This reasoning, however, squarely supports Brendan's
position. The *Gordon* court deemed an unauthorized
concession acceptable only when it did not interfere
with the defendant's constitutionally guaranteed trial
rights, including "the right to testify...in one's own
defense." 2003 WI 69 at ¶ 24. This is surely why
Judge Schudson wrote separately in *State v. Silva*,
2003 WI App 191, 266 Wis. 2d 906, 670 N.W.2d 385,
to explain that *Gordon* is distinguishable when defense
counsel's concession contradicts the defendant's
testimony. 2003 WI App 191 at ¶ 46-48 (Schudson, J.,
concurring in part, dissenting in part). Under *Gordon*
and Judge Schudson's opinion in *Silva*, Attorney
Edelstein's unauthorized concession of the mutilation
charge – which directly contradicted Brendan's sworn
testimony – constituted ineffective assistance of
counsel.

## IV. THE INTEREST OF JUSTICE CALLS FOR A NEW TRIAL AT WHICH A JURY WILL HEAR ALL THE EVIDENCE REGARDING THE UNRELIABILITY OF BRENDAN'S CONFESSION.

The real controversy has not been "not fully
tried" when "highly relevant testimony" that "if
believed could have materially altered the result of the
trial" is not presented. *Logan v. State*, 43 Wis.2d 128,
137, 168 N.W.2d 171 (Wis. 1969). This means that
"all of the material evidence" related to the "major
facts" in dispute at trial should be presented to the jury
to "hear and evaluate." *State v. Hicks*, 202 Wis.2d 150,
163, 549 N.W.2d 435 (Wis. 1996) (citing *Garcia v.*

*State*, 73 Wis.2d 651, 245 N.W.2d 654 (1976)). In Brendan's case, it was critical for the jury to hear evidence of the unreliability of his confession – including evidence of fact-feeding and media contamination, expert testimony on police interrogations, and other evidence discussed in Section III *supra* – in order to properly determine if the State had proven Brendan guilty beyond a reasonable doubt. Unfortunately, no such evidence was presented.

The State argues that "judicial error" is required to find that a jury was "erroneously not given the opportunity to hear important testimony that bore on an important issue of the case." St. Br. at 72 (citing *Hicks*, 202 Wis.2d at 160). But *Hicks* never specifies a single proper source of error; instead, the *Hicks* court relied on *Garcia v. State*, in which relief was granted but the *defendant* committed the error by failing to name a witness who could have exonerated him, and on *Logan v. State*, in which the court granted relief while noting that "[w]e cannot conclude…that the trial judge committed error. …It was trial counsel who elected not to proceed and withdrew the witness." *Hicks*, 549 N.W.2d at 440-41 (citing *Garcia*, 73 Wis.2d at 655; *Logan*, 43 Wis.2d at 137). Plainly, judicial error is no prerequisite to relief. Indeed, such a requirement would functionally deprive this Court of its discretion under Wis. Stat. § 752.35 (2009-10). As in *Logan*, the source of the error in Brendan's case is trial counsel, who prevented the real controversy from being fully tried by failing to present evidence of the unreliability of Brendan's confession.

The court in *Hicks*, upon which the State relies, concludes with:

> [W]e must depend upon the jury to deliver justice. To maintain the integrity of our system of criminal justice, the jury must be afforded the opportunity to hear and evaluate such critical, relevant, and material evidence, or at the very least, not be presented with evidence on a critical issue that is later determined to be inconsistent with the facts. Only then can we say with confidence that justice has prevailed.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 37 of 42    Document 19-8

*Hicks*, 549 N.W.2d at 444 (citing *Garcia*, 73 Wis.2d at 655).  In the absence of competent argument from defense counsel regarding the unreliability of his confession, Brendan's jury cannot be depended on to have delivered justice.  The power to order a new trial should be used "infrequently and judiciously," *State v. Ray*, 166 Wis.2d 855, 874, 481 N.W.2d 288 (Ct. App. 1992), but this case – in which a sixteen-year-old boy was sentenced to life in prison after a trial that never confronted the unreliability of his confession – cries out for relief.  The State concludes its brief by suggesting that Appellant's argument amounts to "zero plus zero equals zero," St. Br. at 72, but with a proper showing by defense counsel at trial, the same might be said of the State's case against Brendan Dassey.  Appellant respectfully asks this Court to grant him a new trial in the interest of justice.

## CONCLUSION

Appellant respectfully requests that this Court grant him one of the following alternative remedies: (1) reverse the judgments of conviction and the order denying postconviction relief and remand for a new trial and a new suppression hearing; (2) reverse the judgments of conviction and the order denying postconviction relief and remand for a new trial; or (3) remand for a new suppression hearing alone.

Dated this 5th day of June, 2012.

Respectfully submitted,

_____

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin  53202
Telephone:  414-271-3400
Facsimile:  414-271-3841
E-mail:  rjd@hallingcayo.com

31

_____

LAURA H. NIRIDER (IL Bar No. 6297299)
STEVEN A. DRIZIN (IL Bar No. 6193320)
THOMAS F. GERAGHTY (IL Bar No. 0937436)
JOSHUA A. TEPFER (IL Bar No. 6294120)
Bluhm Legal Clinic
Northwestern University School of Law
357 East Chicago Avenue, 8th Floor
Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977
E-mail: l-nirider@law.northwestern.edu
        s-drizin@law.northwestern.edu
        tgeraghty@law.northwestern.edu
            j-tepfer@law.northwestern.edu

Attorneys for Defendant-Appellant

## CERTIFICATION AS TO FORM/LENGTH

I certify that this brief meets the form and length requirements of Rule 809.19(8)(b) in that it is: proportional serif font, minimum printing resolution of 200 dots per inch, 13 point body text, 11 point for quotes and footnotes, leading of minimum 2 points and maximum of 60 characters per line of body text. The length of this brief is 9,987 words. This Court granted Appellant leave to file a reply brief of up to 10,000 words on October 31, 2011.

Signed:

_____
ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin  53202
Telephone:  414-271-3400
Facsimile:  414-271-3841
E-mail:  rjd@hallingcayo.com

_____
LAURA H. NIRIDER (IL Bar No. 6297299)
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977
E-mail:  l-nirider@law.northwestern.edu
Attorneys for Defendant-Appellant

**CERTIFICATE OF COMPLIANCE**
**WITH RULE 809.19(12)**

I hereby certify that:

I have submitted an electronic copy of this brief, excluding the appendix, if any, which complies with the requirements of § 809.19(12).  I further certify that:

This electronic brief is identical in content and format to the printed form of the brief filed on or after this date.

A copy of this certificate has been served with the paper copies of this brief filed with the court and served on all opposing parties.

Dated this 5th day of June, 2012.

Signed:

_____
ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin  53202
Telephone:  414-271-3400
Facsimile:  414-271-3841
E-mail:  rjd@hallingcayo.com


_____
LAURA H. NIRIDER (IL Bar No. 6297299)
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone:  312-503-8576
Facsimile:  312-503-8977
E-mail:  l-nirider@law.northwestern.edu
Attorneys for Defendant-Appellant

34

## INDEX TO SUPPLEMENTAL APPENDIX

Pages

*State v. Polk*, 2012 Iowa Sup. LEXIS 33 (Iowa Apr. 6, 2012)……………………………………….627-632

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 42 of 42    Document 19-8