Receipt of Copy of the within acknowledged
the _1st_ day of _MARCH_ 20_13_
Time _2:58 PM_
Attorney General's Office of Wisconsin
By _P. R. Crossen_

# STATE OF WISCONSIN

## IN SUPREME COURT

### Case No. 2010AP3105 CR

---

STATE OF WISCONSIN,

        Plaintiff-Respondent,

v.

BRENDAN DASSEY,

        Defendant-Appellant-Petitioner.

---

## PETITION FOR REVIEW

---

ROBERT J. DVORAK (WI Bar # 1017212)
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

LAURA H. NIRIDER (IL Bar # 6297299)
STEVEN A. DRIZIN (IL Bar # 6193320)
JOSHUA TEPFER (IL Bar # 6284120)
THOMAS GERAGHTY (IL Bar # 0937436)
Bluhm Legal Clinic
375 East Chicago Avenue, 8th Floor
Chicago, IL 60611
Telephone: 312-503-2204
Facsimile: 312-503-8977
E-mail: l-nirider@law.northwestern.edu

Attorneys for Defendant-Appellant-Petitioner

# TABLE OF CONTENTS

Page

ISSUES PRESENTED ........................................................... 1

I.      DID 16-YEAR-OLD BRENDAN DASSEY
        VOLUNTARILY CONFESS TO MURDER,
        WHEN POLICE TOLD HIM "YOU DON'T
        HAVE TO WORRY" BECAUSE THEY
        WERE HIS "FRIENDS" WHO WOULD "GO
        TO BAT" FOR HIM "NO MATTER WHAT
        YOU DID," WHEN HE WAS LED TO
        BELIEVE HE WOULD RETURN TO
        SCHOOL AFTER CONFESSING, AND
        WHEN HE COULD NOT DESCRIBE THE
        CRIME UNTIL POLICE TOLD HIM THE
        RESULTS OF THEIR INVESTIGATION ................. 1

II.     DOES THE DISLOYALTY OF BRENDAN'S
        PRE-TRIAL ATTORNEY WARRANT A
        NEW SUPPRESSION HEARING OR TRIAL,
        WHEN – NOTWITSTANDING BRENDAN'S
        PROTESTATIONS OF INNOCENCE – THE
        ATTORNEY SOUGHT TO COERCE
        BRENDAN INTO PLEADING GUILTY BY
        LEADING POLICE TO WHAT THE
        ATTORNEY THOUGHT WAS THE
        MURDER WEAPON WITHOUT
        BRENDAN'S KNOWLEDGE AND BY
        ORDERING HIS DEFENSE INVESTIGATOR
        TO INTERROGATE BRENDAN UNTIL HE
        CONFESSED, AND WHEN EVIDENCE
        GENERATED THROUGH THESE ACTIONS

WAS USED AGAINST BRENDAN AT TRIAL? ........................................................................ 1

CRITERIA FOR GRANTING REVIEW ............................... 3

STATEMENT OF THE CASE ................................................ 5

STATEMENT OF FACTS ...................................................... 7

ARGUMENT ....................................................................... 15

I.     In Light of This Court's Holding In *Jerrell C.J.*, Developing U.S. Supreme Court Jurisprudence, and Evolving Law Enforcement Interrogation Practices, It Is Time For This Court To Address Whether Certain Police Interrogation Tactics Should Be Deemed Coercive *Per Se*, Or Should Be Given Greater Weight In The Involuntariness Analysis, When The Person Being Interrogated Is A Juvenile ................................ 15

II.    This Court Should Address Whether The Disloyalty Of A Pre-Trial Attorney Warrants A New Suppression Hearing And Trial, When The Pre-Trial Attorney Tried to Coerce His Client To Plead Guilty By Generating Incriminating Evidence That Was Later Used At Trial. ................... 22

       A.    This Court should provide much-needed guidance concerning whether an attorney who seeks to coerce a client to plead guilty by worsening the case against him breaches the duty of loyalty and thus labors under an actual conflict of interest. ..................................... 23

B. This Court should provide guidance concerning whether a defendant who is represented before trial by conflicted counsel is entitled to new pre-trial proceedings and, when the conflict affected trial, whether he is also entitled to a new trial.................................................................. 25

CONCLUSION ................................................................. 28

CERTIFICATION AS TO FORM/LENGTH....................... 31

CERTIFICATION OF COMPLIANCE
WITH RULE 809.19(12) ...................................................... 31

APPENDIX ........................................................................ 32

INDEX TO APPENDIX ...................................................... 33

CERTIFICATION OF APPENDIX........................................ 34

CERTIFICATION OF COMPLIANCE
WITH RULE 809.19(12) (APPENDIX).............................. 34

# TABLE OF AUTHORITIES

Page

## CASES CITED

*Commonwealth v. Truong*,
2011 Mass. Super. LEXIS 61
(Mass. Super. Ct. 2011)........................................................20

*Cuyler v. Sullivan*,
446 U.S. 335 (1980) ............................................................23

*Gallegos v. Colorado*,
370 U.S. 49 (1962) ..............................................................16

*In re Gault*,
387 U.S. 1 (1967) ................................................................16

*Gideon v. Wainwright*,
372 U.S. 335 (1963) ............................................................29

*Graham v. Florida*,
130 S.Ct. 2011 (2010) .........................................................16

*Haley v. Ohio*,
332 U.S. 596 (1948) ............................................................16

*Henderson v. Frank*,
155 F.3d 159 (3rd Cir. 1998).............................................27

*J.D.B. v. North Carolina*,
131 S.Ct. 2394 (2011) ......................................................3, 17

*Jones v. Barnes*,
463 U.S. 745 (1983) ............................................................25

*Miranda v. Arizona,*
384 U.S. 436 (1966) ............................................................ 21

*Miller v. Alabama,*
132 S.Ct. 2455 (2012) ......................................................... 16

*Missouri v. Frye,*
132 S.Ct. 1399 (2012) ......................................................... 25

*Osborn v. Shillinger,*
861 F.2d 612 (10th Cir. 1988)............................................. 23

*People v. Austin M.,*
975 N.E.2d 22 (Ill. 2012) .................................................... 25

*Rubin v. Gee,*
292 F.3d 396 (4th Cir. 2002)............................................... 27

*Sands v. Menard,*
2010 WI 96, 328 Wis.2d 647, 787 N.W.2d 384.................... 22

*State v. Berggren,*
2009 WI App 82, 320 Wis. 2d 209, 769 N.W.2d 110........... 21

*State v. Hoppe,*
2003 WI 43, 261 Wis. 2d 294, 661 N.W.2d 407................... 15

*State v. Jerrell C.J.,*
2005 WI 105, 283 Wis.2d 145, 699 N.W.2d 110........ 3, 15, 16

*State v. Kalk,*
2000 WI App 62, 234 Wis. 2d 98, 608 N.W.2d 428............. 22

*State v. Kaye,*
106 Wis.2d 1, 315 N.W.2d 337 (1982) ........................... 23, 26

*State v. Love,*
227 Wis.2d 60, 594 N.W.2d 806 (1999) ............................ 4, 23

*State v. Randle,*
366 S.E.2d 750 (W. Va. 1988) ............................................... 20

*State v. Rettenberger,*
984 P.2d 1009 (Utah 1999) .................................................. 20

*State v. Samuel,*
2002 WI 34, 252 Wis.2d 26, 643 N.W.2d 423 ...................... 20

*State v. Ward,*
2009 WI 60, 318 Wis. 2d 301, 767 N.W.2d 236 ................... 15

*Strickland v. Washington,*
466 U.S. 668 (1984) .............................................................. 22

*Thomas v. McLemore,*
2001 U.S. Dist. LEXIS 6763
(E.D. Mich. Mar. 30, 2001) .................................................. 23

*Triana v. U.S.,*
205 F.3d 36 (2d Cir. 2000) .................................................... 28

*United States v. Ellison,*
798 F.2d 1102 (7th Cir. 1986) .......................................... 22, 26

*United States v. Marshank,*
777 F. Supp. 1507 (N.D. Cal. 1991) ..................................... 24

*United States v. Swanson,*
943 F.2d 1070 (9th Cir. 1991) .............................................. 23

***United States v. Tatum,***
943 F.2d 370 (4th Cir. 1991)................................................27

***Von Moltke v. Gillies,***
332 U.S. 708 (1948) ..........................................................22

## OTHER AUTHORITIES CITED

Fred Inbau, John E. Reid, et al,
*Criminal Interrogations and Confessions*
(5th ed. 2013)........................................................................19

International Association of Chiefs of Police,
*Reducing Risks: An Executive's Guide to Effective*
*Juvenile Interview and Interrogation* (2012) ........................17

John E. Reid & Associates, *Clarifying Misinformation*
*about the Reid Technique*, available online at
http://www.reid.com/pdfs/20120311.pdf .............................20

John E. Reid & Associates, Inc.,
http://www.reid.com/educational_info/criticfalse conf.html 17

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 9 of 142     Document 19-9

## ISSUES PRESENTED

**I.     DID 16-YEAR-OLD BRENDAN DASSEY VOLUNTARILY CONFESS TO MURDER, WHEN POLICE TOLD HIM "YOU DON'T HAVE TO WORRY" BECAUSE THEY WERE HIS "FRIENDS" WHO WOULD "GO TO BAT" FOR HIM "NO MATTER WHAT YOU DID," WHEN HE WAS LED TO BELIEVE HE WOULD RETURN TO SCHOOL AFTER CONFESSING, AND WHEN HE COULD NOT DESCRIBE THE CRIME UNTIL POLICE TOLD HIM THE RESULTS OF THEIR INVESTIGATION?**

The trial court held: Yes.

The court of appeals held: The trial court did not err in denying the motion to suppress.

**II.     DOES THE DISLOYALTY OF BRENDAN'S PRE-TRIAL ATTORNEY WARRANT A NEW SUPPRESSION HEARING OR TRIAL, WHEN – NOTWITHSTANDING BRENDAN'S PROTESTATIONS OF INNOCENCE – THE ATTORNEY SOUGHT TO COERCE BRENDAN INTO PLEADING GUILTY BY LEADING POLICE TO WHAT THE ATTORNEY THOUGHT WAS THE MURDER WEAPON WITHOUT BRENDAN'S KNOWLEDGE AND BY ORDERING HIS DEFENSE INVESTIGATOR TO INTERROGATE BRENDAN UNTIL HE CONFESSED, AND WHEN EVIDENCE GENERATED THROUGH THESE ACTIONS WAS USED AGAINST BRENDAN AT TRIAL?**

The trial court held: No.

The court of appeals held: The trial court did not err in denying a new suppression hearing or trial.

## CRITERIA FOR GRANTING REVIEW

*Issue One: Voluntariness*

The first issue concerns the voluntariness of an uncounseled juvenile's statements during police interrogation. This issue raises a real and significant question of constitutional law, the resolution of which will help develop and clarify the law in Wisconsin. It should be reviewed pursuant to Wis. Stat. (Rule) 809.62(1r)(a) and (c).

Eight years ago, in *State v. Jerrell C.J.*, 2005 WI 105, ¶ 21, 283 Wis.2d 145, 699 N.W.2d 110, this Court found that courts should use "special caution" when considering the voluntariness of statements given by juveniles during police interrogation. This prescript has since been echoed and expanded by the United States Supreme Court. *See J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2398 (2011) ("children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave," because youth are "most susceptible to influence and outside pressures"). Now, in 2013, Brendan Dassey's case presents this Court with the natural sequel to *Jerrell C.J.* Specifically, the Dassey case concerns whether certain police interrogation tactics – namely, promises of leniency and fact-feeding – should be deemed coercive *per se*, or should be given greater weight in the involuntariness analysis, when the person being interrogated is a juvenile. This question was, as a practical matter, unaddressable before *Jerrell C.J.*'s recording mandate provided courts with word-for-word records of what is said during police interrogations.

Neither the trial court nor the Court of Appeals took special notice of Brendan's age in ruling on whether such

tactics were coercive and, in turn, whether his confession was involuntary. Notwithstanding *Jerrell C.J.*, both courts simply applied coercion and voluntariness rules developed in adult cases.

This Court has never addressed whether the use of promises of leniency and/or fact-feeding should be given greater weight in the involuntariness analysis when the person being interrogated is a juvenile.

### Issue Two: Ineffective Assistance of Counsel

The second issue concerns whether the disloyalty of Brendan's pre-trial attorney, who sought to coerce Brendan into pleading guilty by generating evidence against him that was later used at trial, constitutes ineffective assistance of counsel that warrants a new trial or, at least, a new suppression hearing. This issue raises novel, real, and significant questions of constitutional law, the resolution of which will develop and clarify the law with statewide impact. It should be reviewed pursuant to Wis. Stat. (Rule) 809.62(1r)(a) and (c).

This Court has never before addressed a case in which a pre-trial defense attorney sought to coerce his client to plead guilty by generating evidence against him, but was then removed from the case before trial. The Court of Appeals appears to have agreed with Brendan that this issue is best treated as a conflict of interest under *Cuyler v. Sullivan* and its Wisconsin progeny, which allow relief after a defendant has shown that his attorney was "actively representing a conflicting interest, so that the attorney's performance was adversely affected." *State v. Love*, 227 Wis.2d 60, 71, 594 N.W.2d 806 (1999).

Brendan's case raises several novel issues under *Cuyler* on which this Court's guidance is needed. First, it asks whether an attorney who generates evidence against his own client in an effort to coerce him to plead guilty has labored under an "actual conflict of interest" as defined in *Love*. *Id.* at 69-70. This case accordingly presents this Court with a much-needed opportunity to set clear, client-centered standards governing the steps attorneys may and may not take when advising their clients to plead guilty.

This case also asks what type of relief is warranted when conflicted counsel represents a defendant during a critical pre-trial suppression hearing but then is replaced with conflict-free counsel before trial. These are novel issues in Wisconsin; the second issue, moreover, is likely to recur whenever a conflicted attorney must withdraw from a case before trial.

This case has an unusually rich, well-developed trial and post-conviction record relating to both issues, enabling this Court to provide law enforcement and defense attorneys with clear guidance and trial courts with a refined analytical framework.

## STATEMENT OF THE CASE

On March 3, 2006, in Manitowoc County, the State filed a criminal complaint charging sixteen-year-old Brendan Dassey with being party to the crimes of first-degree intentional homicide, mutilation of a corpse, and second-degree sexual assault. (R.2.) The other charged defendant was Brendan's uncle, Steven Avery. (R.2.) The criminal complaint alleged that these crimes had been committed

against Teresa Halbach, a photographer who had come to the family-owned Avery Salvage Yard to photograph a car for sale. (R.2.)

Dassey entered a plea of not guilty and moved to suppress the statements he had made to police. The trial court found the statements voluntary and admissible on May 12, 2006. (R.26; R.46:11.) (APP-045.)

Trial commenced on April 16, 2007, before the Honorable Jerome L. Fox. (R.113.) A jury convicted Dassey of first-degree intentional homicide, mutilation of a corpse, and second-degree sexual assault on April 25, 2007. (R.87; R.88; R.89; R.121.)

The court sentenced Dassey to life imprisonment with extended supervision ("ES") eligibility in 2048, along with concurrent sentences of 6 years (4 years confinement and 2 years ES) for the mutilation of a corpse and 14 years (10 years confinement and 4 years ES) for the second-degree sexual assault. (R.99; R.100.)

Dassey filed a notice of intent to pursue post-conviction relief on August 6, 2007 and requested the State Public Defender's Office to appoint counsel. (R.102.) The SPD appointed Attorney Bob Dvorak on October 17, 2007. Attorneys Steven Drizin, Thomas Geraghty, Laura Nirider, and Joshua Tepfer of Northwestern University's Bluhm Legal Clinic have since joined the case pro bono.

Dassey subsequently filed a motion for post-conviction relief, seeking a new trial and a new suppression hearing. The court held a five-day evidentiary hearing on the post-conviction motion from January 15 to January 22, 2010.

R.189-193.) On December 13, 2010, the court denied post-conviction relief in a written order. (R.206.) (APP-013.) Dassey filed a timely notice of appeal. (R.207.)

In an unpublished decision dated January 20, 2013, the Court of Appeals affirmed the trial court's holding. (APP-001.) Brendan Dassey petitions from the Court of Appeals' decision.

## STATEMENT OF FACTS

On October 31, 2005, twenty-five-year-old Teresa Halbach went missing. (R.116:187.)[1] She had last been seen at the Avery Salvage Yard, a family-owned junkyard near Two Rivers. (R.113:105-06.) After her incinerated remains were found at the junkyard, police arrested Steven Avery, who lived in a trailer on the property. (R.114:22; R.115:69-72, 231.) Special Prosecutor Kenneth Kratz charged him with first-degree intentional homicide and mutilating a corpse. (R.169:13.)

On November 6 and November 10, 2005, police interviewed Steven's sixteen-year-old nephew, Brendan Dassey, who also lived at the junkyard with his mother and brothers. (R.46:3; R.116:107-09; R.169:12.) Brendan was enrolled as a tenth-grader at Mishicot High School, where he took some special education classes and some mainstream classes. Psychological tests later showed that Brendan's I.Q. was 74 and that he was "highly suggestible" such that only

---

[1] Citations to the record on appeal appear with the document number before the colon and the page number after the colon. A citation to R.116:187, for instance, refers this Court to page 187 of document 116. Citations to different documents in the record are separated by semicolons. Where available, parallel citations to the Appendix appear in separate parentheticals after the citations to the record.

five people out of one hundred would be more suggestible than him. ((R.45:3, 86; R:120:54-56.) Aside from his previous police interviews concerning the Halbach case, Brendan had no prior experience with law enforcement. During those November interviews, Brendan denied knowledge of Halbach's disappearance.

Police re-interviewed Brendan on February 27, 2006, in his high school principal's office, at which point Brendan told police he had been present when Halbach's body was incinerated. (R.79:33:452-53.)

At 10:00 A.M. on March 1, 2006, Calumet County Investigator Mark Wiegert and Department of Justice Special Agent Tom Fassbender again pulled Brendan out of his class at Mishicot High School and drove him to the Manitowoc County Sheriff's Department. (R.193:57-59; R.172:209:525-26.) At the beginning of the forty-five-minute car ride, the officers read Brendan his *Miranda* rights and obtained a signed waiver.

In an interrogation room at the police station, the officers made a series of statements to Brendan, including:

- "I wanna assure you that Mark and I both are in your corner, we're on your side." (R.79:34:540)

- "Even if I filled those [gaps in Brendan's previous statements] in, I'm thinkin' you're all right. OK, you don't have to worry about things. We're there for ya." (R.79:34:540)

- "OK, no matter what you did, we can work through that." (R.79:34:541)

- "We can't make any promises, but we'll stand behind you no matter what you did. OK. Because you're being the good guy here." (R.79:34:541)

- "By you talking with us, it's, it's helping you." (R.79:34:541)

- "Honesty is the only thing that will set you free." (R.79:34:541)

- "I'm your friend right now, but I gotta – I gotta believe in you, and if I don't believe in you, I can't go to bat for you." (R.79:34:547)

- "We're in your corner." (R.79:34:547)

- "If you helped him, it's OK, because he was telling you to do it. You didn't do it on your own." (R.79:34:552)

Brendan denied knowing anything more about Halbach's disappearance for some time. After the officers made the above statements, however, he eventually stated that he helped his uncle sexually assault and murder Halbach. After implicating himself, he asked "What time will this be done?" and asked if the police would get him back to school in time for his 1:29 PM class. (R.79:34:613, 667.) When told that he was going to be arrested, Brendan asked, "Is it only for one day?" (R.79:34:671-72.)

During his confession, moreover, Brendan often repeated what the officers told him about the crime, rather than providing information himself, as in the following example:

> WIEGERT: Brendan, be honest. You were there when she died and we know that. Don't start lying now. We know you were there. What happened? [...] What else did he do to her? We know something else was done. Tell us, and what else did he do? Come on. Something with the head. Brendan?
> BRENDAN: Huh? [...]
> WIEGERT: What else happens to her in her head?
> FASSBENDER: It's extremely, extremely important you tell us this, for us to believe you.
> WIEGERT: Come on Brendan, what else? (pause)
> FASSBENDER: We know, we just need you to tell us.

BRENDAN: That's all I can remember.

WIEGERT: All right, I'm just gonna come out and ask you. Who shot her in the head?

BRENDAN: He did.

FASSBENDER: Then why didn't you tell us that?

BRENDAN: Cuz I couldn't think of it.  (R.79:34:578-87.)

Based on Brendan's March 1 confession, Special Prosecutor Kenneth Kratz charged Brendan with being party to the crimes of first-degree intentional homicide, mutilation of a corpse, and second-degree sexual assault.  (R.2.)  The March 1 interrogation was videotaped in its entirety and constituted the centerpiece of the State's case against Brendan at trial.

Brendan pled not guilty and received a court-appointed attorney: Len Kachinsky.  On March 7, 2006 – three days before he met Brendan – Attorney Kachinsky told television reporters that "we have a 16 year old who while morally and legally responsible was heavily influenced by someone that can only be described as something close to evil incarnate." (R.173:317; R.187:374.)  At the *Machner* hearing, Kachinsky testified that such a statement was "bothersome" because it "would, in effect, admit guilt."  (R.189:118.)

On March 10, Kachinsky met Brendan.  From that point forward, Brendan consistently told Kachinsky that he was innocent and had falsely confessed. (R.189:123, 130, 137-38, 237; R.190:11, 57, 59.)  Kachinsky, however, told the press that same day that Brendan was "remorseful" and that he had pled not guilty "simply to keep his options open." (R.173:321; R.128:133.)

On April 3, Kachinsky hired investigator Michael O'Kelly to polygraph Brendan.  O'Kelly did so and told Kachinsky on April 16 that the polygraph was inconclusive. (R.189:210.)

Kachinsky then tasked O'Kelly with gathering "anything that would further the State's case against Steven Avery...even if that evidence tends to inculpate Brendan Dassey." (R.192:46-47.) On April 23, Kachinsky directed O'Kelly also "to get Brendan to confess." (R.192:47, 50; R.173:353.) No plea discussions had taken place between Kachinsky and the State to date. (R.189:42, 66, 80.)

On April 27, O'Kelly told Kachinsky that he had identified two vehicles at the junkyard that the defense should "protect...for the prosecution in Avery's case." He thought one of them contained a knife that had been used to attack Halbach and reasoned that "this [evidence] will only serve to bolster the prosecution...it will corroborate [Brendan's] testimony and color him truthful." (R.170:64; R.192:42, 47.) On May 5, without informing Brendan or obtaining his permission, Kachinsky sent an e-mail to D.A. Kratz and Wiegert offering them information on the whereabouts of two vehicles "which may contain some evidence useful in this case." (R.189:237; R.190:11; R.181; R.173:338.) He told them that the information "may go a long way toward getting you...PC for another search of the Avery salvage yard" but requested to "stay unnamed in any affidavit for a search warrant if at all possible." (R.173:338; R.181.) D.A. Kratz knew that Kachinsky believed that the vehicles contained the knife used to attack Halbach. (R.189:70.) The State sent investigators to the junkyard, but no knife or other evidence was found. (R.193:88.)

On May 4, the trial court held a hearing on Kachinsky's motion to suppress Brendan's February 27 and March 1 statements. (R.45.) Kachinsky expected to lose that motion. (R.189:252.) After the hearing, Kachinsky and O'Kelly decided that O'Kelly should interrogate Brendan on Friday, May 12 – the same day that the trial court would rule on the motion – because the blow of losing would leave

Brendan at his most vulnerable. (R.189:244; R.192:104.) In order to maximize Brendan's sense of aloneness, Kachinsky cancelled the visit he had planned for May 10. (R.192:88; R.170:66.)

On May 12, the trial court denied Kachinsky's motion to suppress Brendan's statements. (R.26; R.46:11.) Hours later, O'Kelly conducted a videotaped interrogation of Brendan at the Sheboygan County Jail. (R.170:95; R.194.) He began by telling Brendan that his polygraph indicated a 98% probability of deception. (R.170:95; R.194:1.) When Brendan protested his innocence, O'Kelly refused to listen. (R.194:5.) He told Brendan that if he confessed again, then "I'll help you through this process and you will not be doing life in prison." (R.194:5.) In that event, he said, Brendan could "get out and have a family" in as soon as "20 years" (R.194:4, 21) – even though no plea offer was or had yet been on the table. (R.189:42, 66, 80.) On the other hand, O'Kelly told him that "if you lie to me, guess what I have to do? I have to stand up, put everything away, and leave. Because that means that you want to go to prison for the rest of your life." (R.194:3.) All told, he instructed Brendan that he would face life in prison "if you lie to me" no fewer than ten times. (R.170:95; R.194:2, 3, 4, 5.)

After approximately forty minutes, Brendan began making inculpatory statements. (R.194:5-16.) After O'Kelly told him that he wanted Brendan to repeat his confession to the police, he agreed to do so. (R.194:18.) At Kachinsky's direction, O'Kelly called Agent Fassbender, told him what Brendan had just said, and offered him another chance to interrogate Brendan. (R.175; R.192:153; R.193:213-14; R.194:18-19.) Meanwhile, Kachinsky e-mailed Fassbender, Wiegert, and D.A. Kratz to confirm that the police would get a second chance to freely interrogate Brendan. (R.173:356; R.193:216-17.)

The next morning, on Saturday, May 13, Wiegert and Fassbender interrogated Brendan alone at the jail. (R.193:104.)  As of May 13, the State had neither extended a plea offer nor requested a proffer (R.189:42, 66, 80); in fact, Kachinsky had explicitly agreed with D.A. Kratz the previous night that the State would offer "no consideration" for Brendan's statement on May 13.  (R.173:356; R.189:80; R.190:34.)  Kachinsky had obtained no immunity for Brendan and had not discussed with the State whether any new inculpatory statements would later be used against Brendan. (R.190:36-38.)  Alone in the interrogation room, Brendan gave police another hours-long, videotaped statement implicating himself in the rape and murder of Halbach. (R.189:97; R.172:211.)

After he confessed, police told Brendan on May 13 that it would be a "good idea" to call his mother and confess to her over the recorded prison phones.  Brendan complied. That same day, he called his mother and told her that "Mike [O'Kelly] and Mark [Wiegert] think I was lying."  Echoing O'Kelly, he explained that if he "came out with it," he would only face "twenty or less" years in prison and added that "[t]hey asked me if I wanted to be out to have a family later on."  (R.170:70:2, 5.)  Brendan then explained that he had done "some of it" and that he went to Avery's trailer after school on October 31, came home in time to see his mother at 5:00, and then returned to Avery's trailer to help kill Halbach. (R.170:70:5.)

Weeks later, the trial court removed Kachinsky from the case after learning only that he had permitted his client to be interrogated alone on May 13, deeming such performance "deficient" under *Strickland v. Washington.*  (R.49:22.)  None of Kachinsky's or O'Kelly's other activities were known to Brendan's trial counsel or the trial court until post-conviction counsel uncovered them.  At the *Machner* hearing, Kachinsky

- 13 -

testified that all his actions were intended to convince the State to view Brendan as a cooperating witness and, ultimately, to convince Brendan to plead guilty. (R.190:67-68, 224.)

Even after Kachinsky withdrew, Brendan's May 13 telephone call to his mother remained part of the case against him. During plea negotiations with Brendan's trial counsel, the State always "led with" the existence of the May 13, 2006 telephone call. (R.191:140.) And at trial, the State used that telephone call three times. First, prosecutors played it during their cross-examination of psychologist Dr. Robert Gordon, to counteract his testimony that Brendan's police confession was a product of suggestibility. (R.120:123.) Second, prosecutors played it during cross-examination of Brendan himself, after he testified he had confessed falsely to police. (R.193:162-64; R.119:50.) And third, prosecutors used it to neutralize Brendan's alibi. Family friend Mike Kornely had testified that he called the Dassey residence at 5:30 or 6:00 PM on October 31 and Brendan answered. (R.118:128-134.) During the May 13 telephone call, however, Brendan told his mother that he had been at Steven's trailer in the afternoon, went home around 5:00, and then returned to Steven's trailer later – a timeline that accounted for Kornely's call. The State specifically referenced this timeline in closing argument, stating that "We know he goes back [to Steven's trailer] because he tells his mother in those phone conversations, ten weeks later on May 13 and May 15, that he went back. That he was there." (R.121:56-57.)

At the *Machner* hearing, Brendan's trial counsel called this telephone call "damning" evidence that they "couldn't really come up with any way to defend against." (R.191:141.)

# ARGUMENT

**I. In Light of This Court's Holding In *Jerrell C.J.*, Developing U.S. Supreme Court Jurisprudence, and Evolving Law Enforcement Interrogation Practices, It Is Time For This Court To Address Whether Certain Police Interrogation Tactics Should Be Deemed Coercive *Per Se*, Or Should Be Given Greater Weight In The Involuntariness Analysis, When The Person Being Interrogated Is A Juvenile.**

This issue concerns the lower courts' determination that Brendan Dassey's March 1, 2006 confession to police was voluntary and admissible. That confession went on to become the centerpiece of the State's case against him. The voluntariness of Brendan's confession is a question of law that should be reviewed *de novo. State v. Ward*, 2009 WI 60, ¶ 17, 318 Wis. 2d 301, 767 N.W.2d 236.

The admission of an involuntary confession violates a defendant's due process rights under both the Fourteenth Amendment of the U.S. Constitution and Article I, Section 8 of the Wisconsin Constitution. *State v. Jerrell C.J.*, 2005 WI 105, ¶ 17, 283 Wis. 2d 145, 699 N.W.2d 110. A defendant's statements are voluntary only if "they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *State v. Hoppe*, 2003 WI 43, ¶ 36, 261 Wis. 2d 294, 661 N.W.2d 407 (internal citations omitted). While improper police conduct is a "necessary prerequisite" to a finding of involuntariness, such improper

conduct need not be outrageous in order to be coercive.
Rather, even subtle pressures are considered to be coercive if
they "exceed the defendant's ability to resist." *Jerrell C.J.*,
283 Wis. 2d 145, ¶ 19 (internal citations omitted). In this
way, coercion is defined as a function of each defendant's
particular vulnerabilities: "[P]ressures that are not coercive in
one set of circumstances may be coercive in another set of
circumstances if the defendant's condition renders him or her
uncommonly susceptible to police pressures." *Hoppe*, 261
Wis. 2d 294, ¶ 46.

The voluntariness of juvenile confessions was first
directly addressed by this Court eight years ago in *Jerrell C.J.*
There, this Court established that youthfulness is a "critical
factor" in the voluntariness analysis, because "the condition
of being a child renders one uncommonly susceptible to
police pressures." *Jerrell C.J.*, 283 Wis. 2d 145, ¶ 26. In so
concluding, this Court ordered that all police interrogations of
juveniles be electronically recorded. *Id.* at ¶ 58.

Recent developments in United States Supreme Court
jurisprudence make this an excellent time for this Court to
return to the issue of juvenile voluntariness. In *Jerrell C.J.*,
this Court relied on decades-old U.S. Supreme Court cases –
including *In re Gault*, 387 U.S. 1 (1967), *Gallegos v.
Colorado*, 370 U.S. 49 (1962), and *Haley v. Ohio*, 332 U.S.
596 (1948). Since *Jerrell C.J.*, however, the U.S. Supreme
Court has revived and expanded the protections to which
juveniles are entitled, concluding that children are more
vulnerable than adults to the application of external pressure;
they are suggestible, impulsive, eager to please authority
figures, and hampered by immature decision-making. *See
Graham v. Florida*, 130 S.Ct. 2011, 2026, 2032 (2010)
(outlawing life without parole for juveniles who committed

nonhomicide offenses); *Miller v. Alabama*, 132 S.Ct. 2455, 2464-68 (2012) (barring the mandatory imposition of life without parole for all juveniles). The Court has also explicitly applied these principles to the interrogation context, recognizing that "children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave," because youth are "most susceptible to influence and outside pressures." *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2398 (2011) (holding that a child's age must be considered when determining whether he is in custody for *Miranda* purposes). In *J.D.B.*, even the four dissenting justices explained that they "do not dispute that many suspects who are under 18 will be more susceptible to police pressure than the average adult." *Id.* at 2413 (Alito, J., dissenting).

In the years since *Jerrell C.J.*, law enforcement organizations have also come to recognize that standard police interrogation tactics can become coercive when used on children and teenagers. John E. Reid & Associates, which markets the most widely used police interrogation technique in the country, now acknowledges that "every interrogator must exercise extreme caution and care when interviewing or interrogating a juvenile." *See* John E. Reid & Associates, Inc., http://www.reid.com/educational_info/criticfalse conf.html (last visited February 19, 2013).

In 2012, moreover, the International Association of Chiefs of Police published a new guide on juvenile interrogation techniques that has been disseminated to chiefs of police across the country. *See* International Association of Chiefs of Police, *Reducing Risks: An Executive's Guide to Effective Juvenile Interview and Interrogation* (2012) (abstract available online at http://www.theiacp.org/

tabid/255/Default.aspx?id=1891&v=1).[2] That guide warns that "officers who interrogate juveniles must…use different and more appropriate interrogation tactics that reflect the differences between adults and teenagers." *Id.* at 7. With specific reference to promises of leniency, the guide warns that "many officers are trained to indirectly suggest during interrogation that the suspect will avoid trouble or get help if he confesses. Even these indirect promises of leniency and threats of harm can be inappropriate when the suspect is a juvenile. They can trigger involuntary or false confessions by presenting the juvenile with an offer he can't refuse: Say what the police want to hear or face negative consequences." *Id.* at 9.

In light of these mounting concerns regarding juvenile interrogations, this Court should view Brendan Dassey's case as the natural sequel to *Jerrell C.J.* Specifically, the Dassey case concerns whether certain police interrogation tactics – namely, promises of leniency and fact-feeding – should be considered coercive *per se*, or should be given greater weight in the involuntariness analysis, when the person being interrogated is a juvenile. As a practical matter, this question was unaddressable before *Jerrell C.J.*'s recording mandate provided Wisconsin courts with word-for-word records of what is said during police interrogations.

Brendan's interrogation video reveals that police repeatedly made statements that could not be understood by an inexperienced, uncounseled youth as anything other than promises of leniency. Instead of explaining the adversarial

---

[2] The Guide was published in conjunction with the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention and was written by a team including law enforcement representatives and three of Petitioner's attorneys.

nature of the interrogation, Brendan's interrogators told him that they were his "friends" who would "go to bat" for him "no matter what [he] did" and make sure he was "all right." (R.79:34:540, 541, 547.) He was also told that even if he made "statements…against your own interest," then "from what I'm seeing, even if I filled those in, I'm thinkin' you're all right. OK, you don't have to worry about things. We're there for ya." (R.79:34:540.) This theme – that if Brendan confessed, then the officers would help him avoid negative consequences – was repeated many times throughout the interrogation. Importantly, these promises were often made immediately before Brendan's most damning admissions. For instance, right before Brendan confessed to assaulting Halbach, his interrogators told him that "we know what happened, it's OK…it's not your fault, [Avery] makes you do it." (R.79:34:574.)

When authority figures – here, two police officers – tell an unsophisticated sixteen-year-old special education student that everything will be "all right" if he confesses, it is unreasonable to expect that sixteen-year-old to interpret those words as anything other than an assurance that he will go home and avoid trouble.[3] Plainly, that is how Brendan understood these promises. After confessing to rape and murder, he naively asked his interrogators if they would get him back to school in time for his 1:29 PM class. (R.79:34:613, 667.) Even after he was arrested, Brendan asked his interrogators, "Is it only for one day?"

---

[3] The nation's leading interrogation manual now instructs interrogators to refrain from suggesting that the suspect would be "better off" if he confessed or that the "best thing" the suspect can do for himself is to confess, because these statements imply leniency. *See* Fred Inbau, John E. Reid, et al., *Criminal Interrogations and Confessions*, 331 (5th ed. 2013).

(R.79:34:671-72.) *See Commonwealth v. Truong*, 2011 Mass. Super. LEXIS 61, at *22-23 (Mass. Super. Ct. 2011) (suppressing sixteen-year-old's murder confession because she thought she would be placed in foster care as a result of confessing and thus "never understood the implications of her statements"). (APP-081.)

Additionally, Brendan's interrogators used leading questions to induce him to provide responses. Throughout his interrogation, he was repeatedly unable to describe key aspects of the crime without extensive fact-feeding by his interrogators. Most notably, he was unable to describe how Halbach was killed – despite his interrogators' repeated hints that "something" was "done to her head" – until they told him what they already knew from crime lab reports: that she had been shot in the head.[4] (R.79:34:578-87.) *See, e.g., State v. Rettenberger*, 984 P.2d 1009, 2010 (Utah 1999) (finding eighteen-year-old's confession involuntary because it "contains little information that was not first provided or suggested by the interrogating officers"); *State v. Randle*, 366 S.E.2d 750 (W. Va. 1988) (confession was involuntary when police used suggestive questioning to propose how the crime could have happened to the suspect); *cf. State v. Samuel*, 2002 WI 34, ¶ 31, 252 Wis.2d 26, 643 N.W.2d 423 (when deciding whether to admit witness statements obtained during police questioning, courts examine "whether a witness was coached on what to say" and "whether investigating authorities asked questions blatantly tailored to extract a particular answer");

---

[4] John E. Reid & Associates states that it is "imperative" that interrogators "do not reveal details of the crime" during interrogation, but rather should "hold back" information about "how the crime was committed." John E. Reid & Associates, *Clarifying Misinformation about the Reid Technique*, available online at http://www.reid.com/pdfs/20120311.pdf.

*Miranda v. Arizona*, 384 U.S. 436, 455 (1966) (disapproving of interrogation in which the defendant "merely confirm[ed]" the police's "preconceived story").

The lower courts took no special notice of Brendan's age in ruling on whether such tactics were coercive and, in turn, whether his confession was involuntary. Notwithstanding *Jerrell C.J.*, both the trial court and the Court of Appeals simply applied coercion and voluntariness rules developed in adult cases. With respect to the promises made by Brendan's interrogators, the Court of Appeals cited a case involving an adult man – *State v. Berggren*, 2009 WI App 82, ¶ 31, 320 Wis. 2d 209, 769 N.W.2d 110 – for the proposition that statements that "merely encourage honesty" and tell a defendant that "cooperating would be to his or her benefit" are not coercive.[5] Ct. App. Op., ¶ 7. (APP-004.) The Court did not address how such promises could affect an inexperienced child. As for fact-feeding, the Court of Appeals noted only that the "truth of the confession remained for the jury to determine." Ct. App. Op., ¶ 7. (APP-004.) No indication was given, again, that the Court considered the impact of fact-feeding on the voluntariness of a statement given by a teenager, particularly a highly suggestible and compliant teenager like Brendan.

Such an analysis can no longer be considered adequate, given the widening recognition that juveniles are more likely to make involuntary statements and thus must be treated differently than adults during interrogation. This Court should hear argument that promises of leniency and fact-feeding of the type and quantity presented here should be

---

[5] The case does not specify the defendant's age, but the opinion discloses that he was old enough at the time of the crime to have a twelve-year-old daughter.

deemed coercive *per se*, or at least should be given great
weight in the involuntariness analysis, when the person being
interrogated is a juvenile. Such a rule, built on the foundation
of *Jerrell C.J.*, will not only protect juveniles' due process
rights, but it will improve the truth-seeking function of our
judicial system.

## II. This Court Should Address Whether The Disloyalty Of A Pre-Trial Attorney Warrants A New Suppression Hearing And Trial, When The Pre-Trial Attorney Tried to Coerce His Client To Plead Guilty By Generating Incriminating Evidence That Was Later Used At Trial.

This issue involves a breach of the duty of loyalty on
the part of Brendan's court-appointed pre-trial attorney, Len
Kachinsky. The issues raised herein, including whether an
actual conflict of interest existed, are questions of law that
may be reviewed without deference to the lower courts. *State
v. Kalk*, 2000 WI App 62, ¶13, 234 Wis. 2d 98, 608 N.W.2d
428.

Under the Sixth Amendment to the United States
Constitution, every criminal defendant is entitled to "counsel
whose undivided loyalties lie with his client." *U.S. v. Ellison*,
798 F.2d 1102, 1106 (7th Cir. 1986). Indeed, an attorney's
duty of loyalty to his client is "perhaps the most basic of
counsel's duties." *Strickland v. Washington*, 466 U.S. 668,
692 (1984); *see also Sands v. Menard*, 2010 WI 96, ¶ 2, 328
Wis.2d 647, 787 N.W.2d 384 ("An attorney owes a fiduciary
duty of loyalty to her clients, a duty so replete in our cases
and in the Rules of Professional Conduct as to be axiomatic.
Such a duty is deeply rooted in our laws and embodies the
strong public policy of the State of Wisconsin"); *Von Moltke*

*v. Gillies*, 332 U.S. 708, 725 (1948) ("Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision").

This Court has never before addressed a case in which a defense attorney generated evidence incriminating his own client in an effort to coerce a guilty plea, despite the client's protestations of innocence. The lower court properly applied the conflict of interest standard articulated in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and developed in *State v. Kaye*, 106 Wis.2d 1, 315 N.W.2d 337 (1982), and *State v. Love*, 227 Wis.2d 60, 594 N.W.2d 806 (1999), to this situation. That standard requires a defendant to show that his or her counsel had an "actual conflict of interest," which exists "when the defendant's attorney was actively representing a conflicting interest, so that the attorney's performance was adversely affected." *Love*, 227 Wis.2d at 71. *Accord Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763, at *31 (E.D. Mich. Mar. 30, 2001) (an "obvious" conflict of interest arises when a defense attorney "abandons his or her duty of loyalty to the client and joins the prosecution in an effort to obtain a conviction") (APP-095); *U.S. v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991) (an attorney's "abandonment of his duty of loyalty to his client by assisting the prosecutor also created a conflict of interest"); *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988) (attorney who acted "apparently with the intention to weaken his client's case" suffered from a "conflict in loyalty"). It is against this framework that Brendan raises the following points.

### A. This Court should provide much-needed guidance concerning whether an attorney who seeks to coerce a client to plead guilty by

**worsening the case against him breaches the
duty of loyalty and thus labors under an actual
conflict of interest.**

The Court of Appeals stated that it was not convinced
that Attorney Kachinsky's actions amounted to an "actual
conflict of interest." Ct. App. Op., ¶ 13. (APP-007.) In
defense of Attorney Kachinsky, it noted that he "hoped to get
the best deal he could for Dassey." Ct. App. Op., ¶ 11.
(APP-006.) In essence, the Court of Appeals seems to have
excused Attorney Kachinsky's attempts to generate evidence
against his own client as simply an effort to convince the
State to offer, and his client to accept, a favorable plea deal.

This Court should seize this opportunity to set clear
limits on the ways in which an attorney may persuade a client
who is professing his innocence to plead guilty. One of those
limits is the attorney's duty of loyalty to the client. It is one
thing for an attorney to have a frank discussion with his client
about the strength of the State's case within the confines of a
privileged conversation. It is quite another for an attorney to
announce his client's guilt to the press; to coerce his client
into confessing; and to affirmatively search for evidence
incriminating his client – and to hand over such evidence to
the State without authorization – when his client says he is
innocent. Such conduct degrades the bedrock principle of
loyal counsel and the adversarial system on which we rely to
ferret out the truth. *See U.S. v. Marshank*, 777 F. Supp. 1507,
1520 (N.D. Cal. 1991) (defense counsel's representation of
Marshank was "rendered completely ineffectual" when he
"essentially turned Marshank over to the government in an
effort to force him to cooperate" and "attempt[ed] to worsen
Marshank's position vis-à-vis the government in order to
ensure that Marshank would cooperate"). It is axiomatic,

after all, that the decision to plead guilty belongs only to the accused. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The decision to deal with the State was not Kachinsky's to make – or to force onto his client – no matter how badly he wanted a deal to be reached. *See People v. Austin M.*, 975 N.E.2d 22, 43, 46 (Ill. 2012) (reversing juvenile conviction where defense counsel "align[ed] himself" with the prosecution "in an attempt to do what he believed would be in [his client's] best interest," because he "labored under a *per se* conflict of interest").

To counsel's knowledge, this Court has never provided guidance concerning how far an attorney may go when persuading his client to plead guilty – and when the attorney's efforts begin to trespass upon the duty of loyalty. Such guidance is particularly needed because a full 94% of state convictions are the result of guilty pleas. *Missouri v. Frye*, 132 S.Ct. 1399, 1407 (2012) (internal citations omitted). And such guidance is essential in cases such as Brendan's, in which an indigent, inexperienced, intellectually limited sixteen-year-old has no alternative but to place his future in the hands of his court-appointed attorney.

**B. This Court should provide guidance concerning whether a defendant who is represented before trial by conflicted counsel is entitled to new pre-trial proceedings and, when the conflict affected trial, whether he is also entitled to a new trial.**

This case will also permit this Court to clarify what relief is warranted when conflicted counsel represents a client during critical pre-trial proceedings – here, a motion to suppress Brendan's March 1, 2006 confession to police – but then withdraws before trial. Such an issue is likely to recur

whenever counsel discovers a conflict and withdraws midway
through a case; but to counsel's knowledge, this Court has
never considered it before.

Brendan argued below that he is entitled, at least, to a
new suppression hearing, since his hearing occurred during
the pendency of Attorney Kachinsky's conflicted
representation. The Court of Appeals disagreed, holding that
Brendan had not "draw[n] any viable link between
Kachinsky's actions and any demonstrable detriment to him"
at the hearing. Ct. App. Op., ¶ 11. (APP-006.) It concluded
that Kachinsky's "advocacy" was not "adversely affected,
such that it was detrimental to Dassey's interests." Ct. App.
Op., ¶ 13. (APP-007.)

In so holding, the Court of Appeals created a conflict
in the law concerning *Cuyler*'s "adverse effect" requirement.
Thirty years ago, this Court held that *Cuyler* does not require
that "a defendant must first show an actual conflict and then
prove that some kind of specific adverse effect or harm
resulted from this conflict…this seems to be a nearly
impossible burden to meet." *Kaye*, 106 Wis.2d at 8-9;
*Ellison*, 798 F.2d at 1107 (explaining that the *Cuyler*
"presumption of prejudice is necessary because a true conflict
of interest forecloses the use of certain strategies and thus the
effect is difficult if not impossible to measure"). This Court
must now clarify whether *Cuyler*, *Kaye*, and *Love* require a
defendant to identify some "demonstrable detriment," as the
Court of Appeals held, or whether the law as stated in *Kaye*
remains in effect. It is Brendan's position that once a
defendant has proven an actual conflict of interest, he should
be entitled to re-litigate the proceedings during which
conflicted counsel represented him – in this case, the crucial
pre-trial motion to suppress Brendan's March 1 confession –

without being compelled to identify any specific harm or detriment. *Cf. Henderson v. Frank*, 155 F.3d 159, 170 (3rd Cir. 1998) (the denial of a defendant's right to counsel pre-trial necessarily impacts trial). In this case, therefore, Brendan is at least entitled to a new suppression hearing.

Furthermore, Brendan argued below that he is also entitled to a new trial, notwithstanding Attorney Kachinsky's withdrawal, because Kachinsky's conflict still tainted the trial. Specifically, Brendan argued that the State used his recorded telephone admission to his mother – in which he said that his defense team thought he was lying and that they had told him he would face life in prison unless he said he was guilty – against him at trial. At the *Machner* hearing, Brendan's trial counsel testified that they considered this telephone call "damning" evidence that they "couldn't really come up with any way to defend against," because it undercut their efforts to prove that Brendan had falsely confessed to police. (R.191:141.)

The Court of Appeals disagreed, finding that Attorney Kachinsky's actions did not entitle Brendan to a new trial because Kachinsky had withdrawn and was "long gone" before trial. Ct. App. Op., ¶ 13. (APP-007.)

The mere fact that Kachinsky was "long gone" at the time of trial, however, does not fully remedy the harm that he caused. As courts outside Wisconsin have recognized, pre-trial counsel's conflict can taint trial sufficiently to warrant a new trial, notwithstanding conflicted counsel's withdrawal before trial. *See, e.g., U.S. v. Tatum*, 943 F.2d 370, 379 (4th Cir. 1991) (granting a new trial where, even though a conflicted attorney was removed prior to trial, the trial was still "infected"); *Rubin v. Gee*, 292 F.3d 396, 399 (4th Cir.

2002) (finding that pre-trial counsel's conflict tainted trial and granting relief). The United States Court of Appeals for the Second Circuit has articulated a clear standard: "We hold that there is no *per se* violation of the right to counsel where the [conflicted lawyer] is not the lawyer conducting the defense, *and has done nothing that has bearing on the result* [of trial]." *Triana v. U.S.*, 205 F.3d 36, 43 (2d Cir. 2000) (emphasis added). Stated in the inverse, there is a *per se* violation of the right to counsel where the conflicted lawyer either is the lawyer conducting the defense at trial, or has done something that bears on the result of trial.

This Court should take this opportunity to adopt a similar standard, thus providing an answer to a question on which it has heretofore been silent. Under such a standard, Brendan Dassey is entitled to relief in the form of a new trial, because Attorney Kachinsky's disloyal actions – and the evidence generated as a result of them – bore on the result of trial.

## CONCLUSION

Petitioner Brendan Dassey's case raises two critical issues on which this Court's guidance is needed.

First, Brendan's appeal presents this Court with a timely opportunity to return to the issue of juvenile voluntariness. This Court's 2005 holding in *Jerrell C.J.* – that courts must use "special caution" when assessing juvenile voluntariness – has been repeatedly echoed and expanded upon by law enforcement and the United States Supreme Court. That "special caution" standard, however, was largely ignored by the lower courts in this case. It is time for this Court to provide more specific guidance concerning

this standard, with particular emphasis on two interrogation techniques that law enforcement now warns against using on juveniles: promises of leniency and fact-feeding.

Second, Brendan's appeal also presents critical, factually developed issues concerning an attorney's duty of loyalty to his client. These issues are particularly timely, as 2013 is the fiftieth anniversary of *Gideon v. Wainwright*, in which the United States Supreme Court guaranteed indigent criminal defendants like Brendan Dassey "the guiding hand of counsel at every step in the proceedings" – a "fundamental right" that is "essential to a fair trial." 372 U.S. 335, 342-45 (1963) (internal quotations omitted). Attorney Kachinsky's actions in this case make a mockery of this right. He directed his investigator to coerce a videotaped confession from Brendan – despite Brendan's protestations of innocence – and then allowed police to interrogate Brendan alone; and he led the State to what he (wrongly) believed was the murder weapon without Brendan's knowledge or consent. These actions were all part of his effort to coerce his own client into pleading guilty. When this effort failed, prosecutors used "damning" evidence generated as a result of Attorney Kachinsky's actions against Brendan at trial, in the form of the May 13 recorded telephone conversation between Brendan and his mother. In short, Brendan's appeal raises important and novel issues concerning the meaning of the right to counsel for indigent defendants, the effect of a lawyer's conflict of interest, and the consequences of counsel's disloyalty. On this fiftieth anniversary of *Gideon*, it is only fitting that this Court take up these issues.

Petitioner Brendan Dassey respectfully asks this Court to grant him leave to appeal the issues raised herein.

Dated this 21st day of February, 2013.

Signed:

ROBERT J. DVORAK (WI Bar # 1017212)
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com


LAURA H. NIRIDER (IL Bar # 6297299)
STEVEN A. DRIZIN (IL Bar # 6193320)
JOSHUA TEPFER (IL Bar # 6284120)
THOMAS GERAGHTY (IL Bar # 0937436)
Bluhm Legal Clinic
375 East Chicago Avenue, 8th Floor
Chicago, IL 60611
Telephone: 312-503-2204
Facsimile: 312-503-8977
E-mail: l-nirider@law.northwestern.edu

Attorneys for Defendant-Appellant-Petitioner

# CERTIFICATION AS TO FORM/LENGTH

I hereby certify that this petition confirms to the rules contained in Rules 809.19(8)(b) and 809.62(4) for a petition for review produced with a proportional serif font. The length of this petition is 7,639 words.

## CERTIFICATE OF COMPLIANCE
## WITH RULE 809.19(12)

I hereby certify that the text of the electronic copy of this petition is identical to the text of the paper copy of the petition.

Dated this 21st day of February, 2013.

Signed:

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700
Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

LAURA H. NIRIDER (IL Bar No. 6297299)
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone: 312-503-2204
Facsimile: 312-503-8977
E-mail: l-nirider@law.northwestern.edu

Attorneys for Defendant-Appellant-Petitioner

# APPENDIX

# INDEX
# TO
# APPENDIX

Pages

Decision of Court of Appeals...........................APP-001

Trial Court Decision and Order on Defendant's
Motion for Postconviction Relief
(R:206)...............................................…....APP-013

May 12, 2006 Transcript of Trial Court Oral Ruling
Denying Defendant's Motion to Suppress Statements
(R:46)..............................................…..…....APP-045

May 12, 2006 Trial Court Order
Denying Defendant's Motion to Suppress Statements
(R:26)................................................…......APP-066

*Commonwealth v. Truong*, 2011 Mass. Super. LEXIS
61 (Mass. Super. Ct. 2011)...............…..…..APP-067

*Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763
(E.D. Mich. Mar. 30, 2001) ……...................…..APP-087

# CERTIFICATION OF APPENDIX

I hereby certify that filed with this petition, either as a separate document or as a part of this petition, is an appendix that complies with s.809.19(2)(a) and that contains, at a minimum, (1) a table of contents; (2) the findings or opinions of the circuit court; and (3) portions of the record essential to an understanding of the issues raised, including oral or written rulings or decisions showing the circuit court's reasoning regarding those issues.

I further certify that if this appeal is taken from a circuit court order or judgment entered in a judicial review of an administrative decision, the appendix contains the findings of fact and conclusions of law, if any, and final decision of the administrative agency.

I further certify that if the record is required by law to be confidential, the portions of the record included in the appendix are reproduced using first names and last initials instead of full names of persons, specifically including juveniles and parents of juveniles, with a notation that the portions of the record have been so reproduced to preserve confidentiality and with appropriate references to the record.

# CERTIFICATE OF COMPLIANCE WITH RULE 809.19(12)

I hereby certify that the text of the electronic copy of this appendix is identical to the text of the paper copy of the appendix.

Dated this 21st day of February, 2013.

Signed:

_____

ROBERT J. DVORAK
State Bar No. 1017212
Halling & Cayo, S.C.
320 East Buffalo Street, Suite 700

Milwaukee, Wisconsin 53202
Telephone: 414-271-3400
Facsimile: 414-271-3841
E-mail: rjd@hallingcayo.com

_Laura H Nirider_

LAURA H. NIRIDER (IL Bar No. 6297299)
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
Telephone: 312-503-2204
Facsimile: 312-503-8977
E-mail: l-nirider@law.northwestern.edu

Attorneys for Defendant-Appellant-
Petitioner

## COURT OF APPEALS
## DECISION
## DATED AND FILED

### January 30, 2013

Diane M. Fremgen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    2010AP3105-CR

Cir. Ct. No. 2006CF88

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

BRENDAN R. DASSEY,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Manitowoc County: JEROME L. FOX, Judge. *Affirmed.*

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶1    PER CURIAM. Brendan Dassey appeals from a judgment convicting him of first-degree intentional homicide, second-degree sexual assault, and mutilation of a corpse, all as party to a crime. He also appeals from the order

denying his motion for postconviction relief. Dassey contends that his pre-trial and trial counsel provided ineffective assistance, that his confession was involuntary and that, because the jury did not hear evidence of the unreliability of his confession, the real controversy was not tried. He seeks a new trial and/or a new suppression hearing. We reject his arguments, deny the requested remedies, and affirm the judgment and order.

¶2      Sixteen-year-old Dassey and his uncle, Steven Avery, were charged in the October 2005 sexual assault and murder of Teresa Halbach and with later burning her body. After a nine-day trial, the jury returned guilty verdicts on all three counts. Avery was tried and convicted separately. Postconviction, Dassey moved for a new trial and a new suppression hearing. The trial court denied his motion after a five-day hearing in a thorough, soundly reasoned decision. This appeal followed. Additional facts will be supplied as warranted.

### Voluntariness of Confession

¶3      On February 27, 2006, law enforcement officers conducted a witness interview of Dassey at his high school and a second videotaped interview at the Two Rivers Police Department. Dassey's mother, Barbara Janda, agreed to the second interview but declined the offer to accompany Dassey. On March 1, again with Janda's permission, officers retrieved Dassey from school for a videotaped interview. During the ride to the Manitowoc County Sheriff's Department, Dassey was read his *Miranda*[1] rights and signed a waiver. Upon arriving, Dassey acknowledged that he remembered the advisories and still wanted to talk to the

---

[1]  *See* *Miranda v. Arizona*, 384 U.S. 436 (1966).

interviewers. Dassey made several inculpatory statements over the course of the three-hour interview, such that he now was viewed as a suspect. He was charged two days later.

¶4     Dassey contends that his March 1 confession was involuntary and should have been suppressed. He claims that law enforcement used psychological interrogation tactics like fact feeding and suggestions of leniency that overbore his will and exceeded his personal ability to resist due to his age, intellectual limitations and high suggestibility.

¶5     In assessing voluntariness, "the essential inquiry is whether the confession was procured via coercive means or whether it was the product of improper pressures exercised by the police." *State v. Clappes*, 136 Wis. 2d 222, 235-36, 401 N.W.2d 759 (1987). A prerequisite for a finding of involuntariness is coercive or improper police conduct. *Id.* at 239. We evaluate a confession's voluntariness on the totality of the circumstances. *Id.* at 236. Our analysis involves a balancing of the defendant's personal characteristics against the police pressures used to induce the statements. *State v. Jerrell C.J.*, 2005 WI 105, ¶20, 283 Wis. 2d 145, 699 N.W.2d 110. "This court will not upset a trial court's determination that a confession was voluntary unless it appears that the finding was clearly erroneous," nor will we substitute our judgment for that of the trial court as to the credibility of disputed factual testimony. *State v. Echols*, 175 Wis. 2d 653, 671, 499 N.W.2d 631 (1993). Whether the facts as found constitute coercion is a question of law that we review independently. *See Clappes*, 136 Wis. 2d at 235.

¶6     The trial court heard the testimony of Dassey's mother, his school psychologist and a police interviewer, and had the benefit of listening to the

3

audiotapes and viewing the videotaped interviews. The trial court found that Dassey had a "low average to borderline" IQ but was in mostly regular-track high school classes; was interviewed while seated on an upholstered couch, never was physically restrained and was offered food, beverages and restroom breaks; was properly Mirandized; and did not appear to be agitated or intimidated at any point in the questioning. The court also found that the investigators used normal speaking tones, with no hectoring, threats or promises of leniency; prodded him to be honest as a reminder of his moral duty to tell the truth; and told him they were "in [his] corner" and would "go to bat" for him to try to achieve a rapport with Dassey and to convince him that being truthful would be in his best interest. The court concluded that Dassey's confession was voluntary and admissible.

¶7     The court's findings are not clearly erroneous. Based on those findings, we also conclude that Dassey has not shown coercion. As long as investigators' statements merely encourage honesty and do not promise leniency, telling a defendant that cooperating would be to his or her benefit is not coercive conduct. *State v. Berggren*, 2009 WI App 82, ¶31, 320 Wis. 2d 209, 769 N.W.2d 110. Nor is professing to know facts they actually did not have. *See State v. Triggs*, 2003 WI App 91, ¶¶15, 17, 264 Wis. 2d 861, 663 N.W.2d 396 (the use of deceptive tactic like exaggerating strength of evidence against suspect does not necessarily make confession involuntary but instead is factor to consider in totality of circumstances). The truth of the confession remained for the jury to determine.

*Alleged Ineffective Assistance of Pre-Trial Counsel*

¶8     Attorney Len Kachinsky was appointed to represent Dassey shortly after Dassey was charged in March 2006. Dassey contends that Kachinsky rendered ineffective assistance due to an "actual conflict of interest" that so

4

breached the fundamental duty of loyalty owed him that, under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and its progeny, prejudice can be presumed. We disagree.

¶9    Conflict of interest claims in criminal cases are analyzed as a form of ineffective assistance of counsel. *State v. Love*, 227 Wis. 2d 60, 68, 594 N.W.2d 806 (1999). To prevail, the defendant must show by clear and convincing evidence that counsel had an "actual conflict of interest"—*i.e.*, that counsel "was required to make a choice advancing his [or her] own interests to the detriment of [the] client's interests." *Id.* at 71-72 & n.5 (citations and one set of quotation marks omitted). Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected [counsel's] performance." *Sullivan*, 446 U.S. at 350. "The possibility of conflict is insufficient to impugn a criminal conviction." *Love*, 227 Wis. 2d at 68 (citing *Sullivan*, 446 U.S. at 350).

¶10    Dassey contends that Kachinsky: conceded that the March 1 interview was noncustodial; made statements to the media about the possibility of a plea deal; directed his investigator, Michael O'Kelly, to gather further evidence on the Avery property; shared information with the State that helped build its case against Avery but which also implicated him because he faced party liability; and, through O'Kelly's duplicity,[2] allowed another Dassey police interview on May 13 which resulted in a telephone confession to his mother. Dassey asserts that he at least is entitled to a new suppression hearing because when he did not prevail at

---

[2] O'Kelly told Dassey that his inconclusive polygraph results showed a ninety-eight percent probability of deception.

the original hearing, his March 1 statement went on to become "the centerpiece" of the State's case.

¶11    Dassey draws no viable link between Kachinsky's actions and any demonstrable detriment to him.  While Dassey contends that at least as of April 23, 2006, Kachinsky and O'Kelly began planning to gather evidence favorable to the State and to extract a confession from him against his will, he identifies no "adverse effect" at the May 4 suppression hearing.  Kachinsky testified at the *Machner*[3] hearing that he hoped to get the best deal he could for Dassey and that, knowing Dassey's family was pressuring him, he mentioned the possibility of a plea to the media to "send a message" to them that Dassey might have to "take a legal option that they don't like."  He also concluded that Dassey was properly Mirandized before the March 1 questioning; the trial court agreed and successor counsel likewise saw no meritorious *Miranda* issue.   The totality of the circumstances also persuades us that Dassey was sufficiently aware of the precustodial *Miranda* advisements after the nature of the interview changed.  *See State v. Grady*, 2009 WI 47, ¶20, 317 Wis. 2d 344, 766 N.W.2d 729.

¶12    The search warrant resulting from information given to the State yielded nothing.  The jury did view a brief video clip of Dassey's post-interview telephone conversation with his mother.  Significantly, though, the State properly introduced it only to rebut Dassey's testimony on direct that the acts to which he had admitted "didn't really happen" and that his confession was "made up."  Voluntary statements obtained even without proper *Miranda* warnings are available to the State for the limited purposes of impeachment and rebuttal.  *See*

---

    [3] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

APP-006

*State v. Knapp*, 2003 WI 121, ¶114, 265 Wis. 2d 278, 666 N.W.2d 881, *vacated and remanded by* 542 U.S. 952 (2004), *reinstated in material part by* 2005 WI 127, ¶2 n.3, 285 Wis. 2d 86, 700 N.W.2d 899.

¶13    Kachinsky was long gone before Dassey's trial or sentencing.[4] Dassey has not convinced us that Kachinsky's actions amounted to an actual conflict and that Kachinsky's advocacy was adversely affected, such that it was detrimental to Dassey's interests. He is not entitled to a new trial or hearing.

*Alleged Ineffective Assistance of Trial Counsel*

¶14    Dassey next submits that the representation by successor counsel, Attorneys Mark Fremgen and Ray Edelstein, also was ineffective because they failed to present substantial evidence that his March 1 confession was unreliable, failed to retain an expert on coercive interrogation tactics, failed to present a part of his confession suggesting recantation, and, in closing argument, conceded his guilt to the corpse-mutilation charge. Once again, we disagree.

¶15    To prevail, Dassey must show that he was prejudiced by his counsel's deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel is deficient when the identified acts or omissions were "outside the wide range of professionally competent assistance." *See State v. Pitsch*, 124 Wis. 2d 628, 637, 369 N.W.2d 711 (1985). Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 642. "A reasonable

---

[4] Kachinsky ceased representing Dassey eight months before Dassey's trial began. He withdrew after his performance was deemed "deficient" for arranging to have Dassey again questioned by the State on May 13, 2006 and then failing to appear.

7

probability is a probability sufficient to undermine confidence in the outcome." *Id.* We "strongly presume" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 637. We need not address both prongs of the ineffectiveness analysis if the defendant fails to make a sufficient showing on one. *Strickland*, 466 U.S. at 697.

¶16     Dassey complains that his counsel should have engaged in a point-by-point attack on each of the nineteen details in his confession to demonstrate that his knowledge came from external contamination such as fact-feeding by police, exposure to media coverage and conversations with his family, rather than personal knowledge.   It is unclear how Dassey thinks counsel should have proceeded.   He denied that he watched television coverage, does not establish what facts he actually learned from other sources, repeatedly said he did not know why he gave various answers and even told counsel he might have dreamed the details or gotten them from a book.   Under the circumstances, we are satisfied that counsel's performance was reasonable. *See id.* at 688.

¶17     Dassey also asserts that trial counsel should have introduced evidence that his March 1 confession was unreliable, and likely false, by calling an expert on police interrogation methods.   The failure was more egregious, he claims, once counsel learned that the State had retained Joseph Buckley, a prominent expert in that area and head of the firm that markets the "Reid" interrogation technique.   Although forensic psychologist Dr. Robert Gordon, the expert the defense did retain, testified as to Dassey's "high suggestibility" under "mild pressure," he lacked the credentials to testify about coercive police tactics.

¶18     Besides Dr. Gordon, Fremgen and Edelstein consulted with other experts, including a Reid Institute-trained police officer and Dr. Lawrence White,

a professor of psychology and legal studies. They ultimately decided not to counter Buckley with an expert of their own. Fremgen was reluctant to engage in a "battle of the experts" he was not certain they could win, and Edelstein thought experts would detract from the defense strategy of trying to humanize Dassey. Moreover, the State did not call Buckley, and Fremgen testified that retaining White always was tied to responding to Buckley's testimony. Had the defense put White on the stand, the State could have called Buckley in rebuttal. We cannot say that failing to call a false-testimony expert was "outside the wide range of professionally competent assistance" evidence.[5] *See Pitsch*, 124 Wis. 2d at 637; *State v. Van Buren*, 2008 WI App 26, ¶19, 307 Wis. 2d 447, 746 N.W.2d 545.

¶19   Next, Dassey contends counsel ineffectively failed to play the portion of a videotape, taken after his May 13 questioning, that contained this spontaneous exchange with his mother:

> BRENDAN: What'd happen if he [Avery] says something his story's different? Wh—he says he, he admits to doing it?
>
> BARB JANDA: What do you mean?
>
> BRENDAN: Like if his story's like different, like I never did nothin' or somethin'.
>
> BARB JANDA: Did you? Huh?

---

[5] At the postconviction motion hearing, police interrogation expert Dr. Richard Leo testified in person about Dassey's vulnerability to the police interview methods; Dr. White provided similar testimony by affidavit. Noting that the trial court found that both would have qualified as experts at trial and that at least some of their testimony would have been admissible, Dassey contends that it was "manifestly unreasonable" not to call them at trial. In an ineffective assistance claim, the question is not the admissibility of expert testimony but whether the failure to attempt to introduce it was unprofessional error.

9

> BRENDAN: Not really.
>
> BARB JANDA: What do you mean not really?
>
> BRENDAN: They got to my head.

Dassey asserts that the comments "not really" and "[t]hey got to my head" amount to a recantation.

¶20    The defense team disagreed on the clip's benefit. Fremgen feared it depicted a parent who recognized that her child was involved in a serious matter; Edelstein thought the jury should see it. Fremgen, as lead counsel, prevailed. The trial court found that the exchange at best was ambiguous and at worst validated Dassey's confession. This finding is not clearly erroneous. Further, had the defense played that clip, the State well might have played portions in which Dassey nods "yes" when Janda asks, "Did [Avery] make you do it?" and, when she asks, "What did he do to you to make you do it?" he answers, "Nothin'." We cannot say that Fremgen's decision was unreasonable trial strategy.

¶21    Finally, Dassey contends that, without his consent, Edelstein conceded the mutilation charge during closing argument. Edelstein told the jury that Dassey went to Avery's house expecting a Halloween bonfire and "probably" saw something in the fire "and that something was Teresa Halbach." Dassey argues that Edelstein's concession is the "functional equivalent of a guilty plea."

¶22    We disagree. "A guilty plea waives trial, cross-examination of witnesses, the right to testify and call witnesses in one's own defense, and the right to a unanimous jury verdict of guilt beyond a reasonable doubt." *State v. Gordon*, 2003 WI 69, ¶24, 262 Wis. 2d 380, 663 N.W.2d 765. Dassey exercised all of these rights. Furthermore, Edelstein in no way conceded that Dassey mutilated, disfigured or dismembered a corpse with intent to conceal a crime. *See* Wis.

10

STAT. § 940.11 (2009-10).[6]  Mere presence at a crime scene does not establish party-to-a-crime liability.  *See State v. King*, 120 Wis. 2d 285, 293, 354 N.W.2d 742 (Ct. App. 1984).  Edelstein testified postconviction that, as the mutilation charge carried the least penalty, he wanted to "provide that option to the jury." The trial court's finding that counsel's concession was a reasonable tactical decision is not clearly erroneous.  *See Gordon*, 262 Wis. 2d 380, ¶28.

## Discretionary Reversal

¶23    Lastly, Dassey asks us to reverse his conviction in the interest of justice, asserting that the real controversy—whether his March 1 confession was reliable evidence of his guilt—was not fully tried.  *See* WIS. STAT. § 752.35.  We decline to use our discretionary power of reversal so that Dassey may take a different approach in a new trial when the defense that was presented was competent, if unsuccessful.  *See State v. Hubanks*, 173 Wis. 2d 1, 28-29, 496 N.W.2d 96 (Ct. App. 1992).

*By the Court.*—Judgment and order affirmed.

This  opinion  will  not  be  published.  *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[6]  All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise noted.

APP-012

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 57 of 142    Document 19-9

STATE OF WISCONSIN        CIRCUIT COURT        MANITOWOC COUNTY

STATE OF WISCONSIN,        Plaintiff

                                              MEMORANDUM DECISION
                                                   AND ORDER
        -vs-

                                              Case No. 06 CF 88

BRENDAN R. DASSEY,        Defendant

---

## **INTRODUCTION**

The defendant, Brendan Dassey (Dassey) was charged on March 3, 2006, with being party

to the crimes of first degree intentional homicide, second degree sexual assault, and mutilation of

a corpse. The victim in all three charges was Teresa Halbach, who was murdered on October 30,

2005, in Manitowoc County. In a separate trial, Dassey's uncle, Steven Avery, was convicted on

March 18, 2007, of being a party to the crime of Teresa Halbach's first degree murder, and being a

felon in possession of firearms. Jury selection for Dassey took place over a day-and-a-half period

in Dane County. The court ordered Dassey's jury sequestered in Manitowoc and his trial began

on April 16, 2007. It concluded on April 25, 2007, when the jury returned guilty verdicts to all

three charges.

On August 2, 2007, this court sentenced Dassey on the intentional homicide conviction to

life in prison with the possibility of release to extended supervision on November 1, 2048;

additional concurrent sentences were given for the other two convictions.

Dassey filed a motion under Wis. Stats. §809.30, on August 25, 2009, seeking post-

conviction relief. Specifically, Dassey is seeking a new trial or a new suppression hearing. He

1

APP-013

alleges he is entitled to this because his trial counsel, Mark Fremgen and Ray Edelstein and Attorney Leonard Kachinsky, who represented him immediately before trial counsel was appointed, were ineffective in their representation of him. He also requests a new trial in the interest of justice because, he alleges, the real controversy was not fully tried and his conviction represented a miscarriage of justice. Lastly, Dassey asks for a new hearing on the suppression of his March 1, 2006, confession. A motion to suppress those statements was originally heard by this court on May 4, 2006, and denied in a decision given May 12, 2006. Subsequently, a motion to reopen the hearing to suppress statements was filed by successor trial counsel; the court denied that motion on December 15, 2006.

Dassey's post-conviction motions were heard by this court over a five-day period beginning January 15, 2010, and ending January 22, 2010. No hearings were held on Martin Luther King Day, January 19, 2010. Following the close of defendant's post-conviction case, the State waived its right to call witnesses on its behalf. The court ordered a briefing schedule for the parties and those briefs have been completed and received. The court's decision follows.

## STANDARD OF REVIEW
### Ineffective Assistance of Counsel

Dassey was represented by Attorney Len Kachinsky from March 8, 2006, until August 25, 2006, when this court found his performance as counsel for Dassey to be "deficient" as a result of his failure to attend a police interview with his client which Kachinsky had arranged. Attorney Mark Fremgen was appointed successor counsel on August 29, 2006; Attorney Ray Edelstein

2

joined Fremgen as co-counsel for Dassey. All counsel were appointed through the Wisconsin State Public Defender's Office. Dassey's post-conviction motions allege each counsel ineffectively assisted him, either singly or collectively, and their deficient performance entitles him to the relief he is seeking.

To establish an ineffective assistance of counsel claim, Dassey must show that counsel made errors so serious that counsel was "not functioning as the counsel 'guaranteed' the defendant by the Sixth Amendment...[and]...that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." **Strickland v. Washington**, 466 US 668, 687 (1984). The court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. **Id.** at 697.

Deficient performance requires a showing "that counsel's representation fell below an objective standard of reasonableness" **Id.** at 688. The court reviews the attorney's performance with great deference and the burden is placed on the defendant to overcome the strong presumption that counsel acted reasonably within professional norms. **State v. Johnson**, 153 Wis. 2d 121, 127, 449 NW 2d 845 (1990). An attorney's performance "need not be perfect, nor even very good, to be constitutionally adequate." **State v. Carter**, 2010 WI 40, §22, 324 Wis. 2d 640, 782 NW 2d 695. When evaluating effectiveness, the court grants "a heavy measure of deference to counsel's judgments." **Id.**, §23. A defendant that can demonstrate counsel's performance was deficient must also show a reasonable probability that the deficient performance had an adverse effect on the outcome. **Id.**, §37.

3

Generally, when a defendant accepts counsel, the defendant delegates to counsel those tactical decisions an attorney must make at trial. To show prejudice, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." **Strickland** at 694. The burden of proof is on the defendant to show by clear and convincing evidence that both components of the ineffective assistance of counsel test have been met. **State v. Lukasik**, 115 Wis. 2d 134, 140, 340 NW 2d 62 (Court App. 1983).

## I. Attorney Len Kachinsky's Ineffective Assistance of Counsel.

### A. His breach of loyalty to his client.

Dassey urges this court to find that Kachinsky's actions on behalf of his client constituted disloyalty to the client and amounted to a conflict of interest. He sets forth in his brief a series of things Kachinsky did or that were done at his direction which Dassey says justify his claim that Kachinsky was disloyal and furnished him ineffective assistance of counsel. He starts with statements Kachinsky made to media even before meeting Dassey in which Kachinsky seemed to imply that Dassey may have had some involvement in the Halbach matter. (Def. Br. at 2; PC Exs. 317, 374.) This brief notes other instances of remarks made by Kachinsky to the press which again implied that Dassey had some involvement in the crime for which his uncle, Steven Avery, was also charged. In his post-conviction testimony, Kachinsky admitted talking to the press about his client's possible involvement in the crime but said he did it in part to blame Steven Avery and

4

in part to send a message to the family that Dassey might have to take a "legal option that they don't like". (Tr. 1-19-10 at 134, L. 13 to 25; at 136, L. 24-25, at 137, L.1 to 9.)

Dassey goes on to cite what he believes are additional instances of Kachinsky's disloyalty. Chief among them is a confession extracted from Dassey on March 12, 2006, by Michael O'Kelley, an investigator employed by Kachinsky. The admissions made by Dassey followed a "lie detector" test administered to Dassey by O'Kelley and which O'Kelley told Dassey he failed because the test showed a 98% probability of deception. (PC Ex. 97 at 1). After some prefatory prodding and cajoling by O'Kelley, Dassey went on to make a series of incriminating admissions and created a number of drawings depicting events that he was describing. (PC Ex. 97 at 5 to 19).

Dassey also points to Kachinsky's direction of O'Kelley to gather additional evidence from the Avery salvage yard bolstering the State's case against Steven Avery even though that evidence would further implicate Dassey. (Def. Br. at 3-4). Kachinsky's actions, according to Dassey, even if motivated by a benign intent to secure a favorable plea deal for his client, were neither authorized nor supported by Dassey who continued to maintain to Kachinsky that he was innocent of any wrongdoing. Dassey argues that Kachinsky's acts were disloyal and represented a conflict of interest as that term is defined in **Cuyler v. Sullivan**, 446 US 335 (1980). Furthermore, once an actual conflict of interest is shown prejudice is automatic. **State v. Kaye**, 106 Wis. 2d 1, 8-16, 315 NW 2d 337 (1982).

The State counters Dassey's position by saying that Kachinsky was trying to get the best deal for Dassey and some of his actions were simply push-back against family members who were fearful that Dassey would testify against Steven Avery. (St. Br. at 8 & 9). The State characterizes

5

Dassey's May 13th statement given to Fassbender and Wiegert in Sheboygan County without Kachinsky present as a "proffer" which could result in a plea agreement. (St. Br. at 9).

In **Cuyler v. Sullivan**, 446 US 335 (1980), two privately retained lawyers represented three defendants charged with first degree murders of two victims. **Id**. at 446. The three were tried at separate trials and Sullivan was convicted while his co-defendants were acquitted. His appeal, on grounds that his counsel had impermissible conflicts of interest with the multiple representation, was denied by the state courts but ultimately his conviction was reversed by the Federal Court of Appeals on his Writ of Habeas Corpus. In vacating and remanding for further proceedings, the Supreme Court held that the defendant "who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief". 446 US at 349-350.

The Wisconsin Supreme Court, in **State v. Kaye**, 106 Wis. 2d 1, 315 NW 337 (1982) adopted the holding of **Sullivan** in a case where the defendant claimed ineffective assistance of counsel because he and his co-defendant had been represented by the same attorney. While it denied the defendant's claim of ineffective assistance of counsel, the language of the opinion suggested that it viewed any representation of multiple defendants by a single lawyer or law firm as problematic and it prospectively required trial courts to make an inquiry on the record whenever that situation arose. **Kaye** at 13-14. The **Kaye** holding was amplified in **State v. Dadas**, 190 Wis. 2d 339, 526 NW 2d 818 (Ct. App. 1994) where the court ruled that "specific prejudice need not be shown if the defendant demonstrates by clear and convincing evidence that trial counsel actively represented a conflicting interest". **Id**. at 344. Counsel in **Dadas** undertook

6

APP-018

the representation of two defendants who were charged with commercial gambling. His clients waived in writing any potential conflict of interest and then entered guilty pleas after which they were sentenced. Their attorney, who represented both of them throughout, urged them to cooperate with law enforcement so that they might avoid federal charges. **Dadas** at 345-346. The court found an actual conflict of interest to exist when an attorney has one client voluntarily supply incriminating information to be used against another client. **Dadas** at 346-347.

Dassey believes that the sum effect of what he refers to as Kachinsky's "multiple, concrete acts of disloyalty" warrant a finding by this court that an actual conflict of interest existed which entitles him to a new trial. (Def. Br. at 10). Additionally, he contends Kachinsky's acts are egregious enough so that the court should use them to presume prejudice, a presumption which makes unnecessary any inquiry into trial counsel's performance. **U.S. v. Cronic**, 466 US 648, 662 (1984).

He cites as support for his actual conflict argument **State v. Love**, 227 Wis. 2d 60, 594 N.W. 2d 806 (1999) where the Supreme Court reiterated the holding in **Kaye** while at the same time reversing a court of appeals' decision which had found on a per se rule an attorney to have provided ineffective assistance of counsel when she represented the state at the defendant's original sentencing, and then months later working as a public defender she represented the same defendant at his sentencing after revocation of probation. The court defined an actual conflict of interest as occurring "when the defendant's attorney was actively representing a conflicting interest, so that the attorney's performance was adversely affected." **Love** at 71. No showing of prejudice need be made because prejudice is presumed and counsel is considered per se

7

APP-019

ineffective. **Love** at 71. The defendant in **Love** argued that the per se rule should be extended to cases of serial representation. The court declined to do so and found that on the facts of the case no clear and convincing evidence was adduced to prove an actual conflict of interest. **Love** at 82.

Unquestionably, Wisconsin courts have recognized that in certain instances a presumption of prejudice will attach to counsel's representation of a defendant. A number of the instances in which prejudice is presumed are set out in **State v. Erickson**, 227 Wis. 2d 758, 770, 596 NW 2d 749 (1999). The **Erickson** court opines that these instances are rare and in the absence of a presumption of prejudice a defendant must make a showing of actual prejudice and that the actual prejudice created a reasonable probability that the result of the trial would have been different. **Erickson** at 773 citing **Strickland**, 466 US at 694.

Dassey relies on **Kaye**, **Dadas**, **Cuyler**, and **Love** to support his claim that the court should use the per se rule to find Kachinsky ineffective and grant Dassey a new trial. (Reply Br. at 3 to 7). There are distinct factual differences between Dassey's situation and the conduct complained of in the cases on which he relies. All except **Love** are instances in which an attorney or attorneys jointly represented more than one client being charged on the same set of facts. Moreover, the lawyer or lawyers involved in the joint representation cases, represented their clients from the onset of the case through the plea or trial stage. The court has previously alluded to the factual background in **Love** and those facts do not parallel any of Dassey's complaints about Kachinsky's representation nor do the facts in **State v. Franklin**, 111 Wis. 2d 681, 331 NW 2d 633 (Ct. Apps. 1983), another case Dassey cites in support for his per se argument. The **Franklin** court found that the defendant's attorney who had represented the defendant throughout

8

her proceeding, had placed himself in an "actual conflict of interest" with his client when he placed his financial interest before his allegiance to his client. **Franklin** at 688-689.

Kachinsky's representation of Dassey ceased on August 25, 2006, after this court found that his failure to personally appear with his client at a May 13, 2006, interview with Investigators Wiegert and Fassbender constituted deficient performance. (Tr. 8-25-06 at 21 to 24). This was some seven months before the actual trial began with the selection of the jury in Dane County on April 12, 2007. Regardless of how the conduct of Kachinsky and his agent, O'Kelley, is characterized as it relates to the events of May 12th and May 13, 2006, Dassey "must establish that an actual conflict of interest adversely affected his lawyer's performance". **Cuyler** at 350. By the time a jury was selected and Dassey was tried Kachinsky was long gone from the case. Nothing from O'Kelley's May 12th interview in which he had Dassey incriminate himself found its way into the trial record. Other than a brief audio clip of a portion of a phone conversation between Dassey and his mother, which the State played without objection in its cross-examination of the defendant, and several questions asked on the cross-examination of Dr. Robert Gordon, nothing from May 13th was introduced at trial. (Tr. 4-23-07 at 50-51; Tr. 4-24-07 at 121-122). And, the State made little more than passing reference to the May 13th phone call in its closing to the jury. (Tr. 4-25-07 at 57, L. 1 to 3; at 80, L. 1 to 3).

To successfully sustain a challenge absent a showing of actual prejudice, Dassey must show that the reliability of the trial process itself was somehow negatively affected by Kachinsky's conduct or the conduct of his agent, O'Kelley. **Cronic** at 658. On this record, in this case, this court cannot find that Kachinsky's conduct constituted an actual conflict of interest that

9

APP-021

somehow affected the reliability of a trial which was held seven months after his departure from the case.

## B. Kachinsky's deficient performance at the May 4, 2006, suppression hearing.

Dassey also claims to be entitled to a new suppression hearing because Kachinsky's performance at the May 4, 2006, hearing was inflected by his conflict of interest and this deficient performance unfairly prejudiced his offense. (Def. Br. at 15 to 17). As proof of this claimed deficient performance, Dassey points to Kachinsky's failure to effectively cross-examine the State's witnesses as well as his concession that there were no Miranda issues concerning Dassey's March 1, 2006, statement to Investigators Mark Wiegert and Thomas Fassbender.

Kachinsky filed on April 19, 2006, a motion to suppress the use of any statements made by Dassey to law enforcement agents on February 27, 2006 and March 1, 2006. His motion came in the form of a ten page statement of facts coupled with a written argument citing what he believed to be the relevant law as it related to those facts. (4-19-06 Motion to Suppress). The State responded with a memorandum of law setting forth its position on the legal issues it believed were implicated in the suppression hearing. (5-1-06 State's Memorandum in Response). Kachinsky filed a reply to the State's memorandum in which he argued that the video-recorded March 1, 2006, statement given by Dassey to Wiegert and Fassbender contained inculpatory statements made by Dassey as a direct or indirect result of misrepresentations made to him by his interviewers. (5-3-06 at 1 to 5).

10

APP-022

At the suppression hearing, Investigator Wiegert testified how he and Special Agent Fassbender had elicited Brendan Dassey's admission to his involvement in the Teresa Halbach murder at their March 1, 2006, interview of him. Kachinsky cross-examined Wiegert and following the completion of Wiegert's testimony he called Dassey's mother, Barbara Janda, and Kris Schoenenberger-Gross, the Mishicot School District psychologist, as his witnesses. (Tr. 5-4-06 at 64 to 80; at 81 to 100).

In his brief Dassey criticizes Kachinsky by accusing him of a conflict of interest at the suppression hearing which compromised his ability to faithfully proceed on his client's behalf. (Def. Br. at 15). He also scores Kachinsky for failing to call a police interrogation expert and doing a poor job of cross-examining Investigator Wiegert. (Def. Br. at 16-17). Lastly, he faults Kachinsky for conceding that the Miranda warnings were not an issue by stipulating to that fact at the outset of the hearing. (Tr. 5-4-06 at 6-7). According to Dassey, Kachinsky's failure to argue that the March 1st statement should be suppressed for its violation of Miranda guidelines is, in and of itself, an example of his deficient performance. (Def. Br. at 28).

On May 12, 2006, this court issued findings of fact and conclusions of law finding that the State had met its burden of showing by a preponderance of the evidence that the Dassey statements given to Wiegert and Fassbender on March 1, 2006, "were the product of Brendan Dassey's free and unconstrained will reflecting deliberateness of choice. In short, they were voluntary statements." (Tr. 5-12-06 at 11). The court has heard or seen nothing that was introduced at the Machner hearing or in the briefings which would cause it to recede from its May 12, 2006, decision. Moreover, the court believes that Kachinsky, at the hearing and in his

11

APP-023

prehearing briefs, adequately represented Dassey's interests and cannot be said to have provided ineffective assistance of counsel. Nothing raised in Dassey's post-conviction briefs, either by way of new or different witnesses, or more rigorous cross-examination of Wiegert, comes close to showing that Kachinsky's representation at the hearing fell below an objective standard of reasonableness. Wiegert acknowledged both at the May 4, 2006, suppression hearing and the post-conviction motion hearing that initially he did not regard the interview of Dassey as a suspect interview, but rather a witness interview. (Tr. 5-4-06 at 23; Tr. 1-22-10 at 139). Nonetheless, Dassey was given written Miranda warnings on March 1, 2006, before arriving at the Manitowoc County Sheriff's Office and was reminded of those warnings shortly after getting to the interview room at the sheriff's department. (5-4-06 Hearing Exhibit 2; Tr. 5-4-06 at 28, and Tr. 1-22-10 at 138-139). Despite the fact that the officers interviewing Dassey on March 1, 2006, considered him a witness rather than a suspect, they furnished him written Miranda warnings. It became evident as the interview progressed that Dassey was much more than a witness to the events that culminated in Teresa Halbach's death. The court believes that the initial segment of the interview qualified as a noncustodial interview when viewed under the totality of the circumstances standard set out in **State v. Gruen,** 218 Wis. 2d 581, 594 to 596, 582 NW 2d 728 (1998).

The fact that it became a custodial interrogation after Dassey made inculpatory admissions, does not mean that it was necessary for the interrogators to revivify the previously given Miranda warnings. **State v. Grady,** 2009 WI 47, 317 Wis. 2d 344, 766 NW 2d 729, a case discussed by the State in its brief, held that there is no bright line rule requiring a readministration of Miranda rights after a noncustodial interview becomes a custodial interrogation. **Grady** at

APP-024

§§19 & 20. Instead, the court found that the sufficiency of the timing of the Miranda warnings must be determined under a totality of the circumstances test. **Grady** at §31. The purpose of Miranda warnings is to make a defendant aware of his or her rights during any kind of questioning. Here, Dassey had received the written warnings which he signed and initialed on the morning of March 1, 2006. He was reminded of those warnings not many minutes later when he arrived at the Manitowoc County Sheriff's Department. There is nothing in the videotape of his interview that suggests he was either physically or emotionally exhausted. The length of time elapsing between his receipt of the warnings and his inculpatory statements belie any notion that he had forgotten them. Indeed, at his trial, he testified on direct examination:

> "Q    Okay. Brendan, I want to talk about that video a little bit with you, okay?
> A    Okay.
> Q    You-- you know it was being videotaped that day?
> A    Yes.
> Q    And-- and the officers explained to you your rights; is that right?
> A    Yes.
> Q    Did you understand them?
> A    Yes."

(Tr. 4-23-07 at 42, L. 7 to 14).

This court concludes that neither Kachinsky's conduct of the suppression hearing nor his concession on the Miranda issues constituted ineffective assistance of counsel.


## II. Attorneys Mark Fremgen and Raymond Edelstein's Ineffective Assistance of Counsel.

### A. Failure to call the appropriate expert was ineffective assistance.

13

Dassey raises a number of instances in his post-conviction brief which he contends show that Kachinsky's successor counsel, Attorneys Mark Fremgen and Ray Edelstein ineffectively assisted him at and before his trial. Chief among them is his assertion that while these defense counsel called Dr. Robert Gordon as an expert witness on the issue of false confession, they should have called, in addition to Gordon, one or more expert witnesses to show the jury that Dassey's confession was produced by coercive police questioning. These additional experts were necessary because Gordon lacked the requisite expert qualifications to opine on coercive police interrogation tactics. (Def. Br. at 23 to 26).

Dassey's defense counsel elicited a substantial amount of testimony at the post-conviction motion hearing attempting to show that Dassey's confession may have been a false confession. Dr. Richard Leo, an associate professor of law at the University of San Francisco, testified at length on behalf of the defendant. His area of professional expertise includes the social psychology of police interrogations and how unreliable confessions can be produced by coercive police interrogation tactics. (Tr. 1-19-10 at 91). In his direct examination testimony, Dr. Leo reviewed the statements Dassey had given to police, as well as his confession, and pointed out areas that he believed were examples of psychologically coercive interrogation tactics employed by the police who questioned Dassey. He said in looking at the videos in the case he observed some psychologically coercive tactics being used by those who questioned Brendan Dassey; even tactics which are not psychologically coercive, if repeated over and over again, can become psychologically coercive, according to his testimony. (Tr. 1-19-10 at 149).

14

He said Investigators Fassbender and Wiegert provided Dassey with "systemic inducements" when they talked to him about interceding with the district attorney on his behalf or going "to bat" for him if he was honest with them. (Tr. 1-19-10 at 160). The defense claims that these inducements couched as promises to help him out with law enforcement, the justice system or his family, were tactics designed to undermine his will and get him to confess. According to Dr. Leo, the investigators repeatedly used what he referred to as the "superior knowledge ploy" in which they pretended to know far more about what occurred than in fact they did. (Tr. 1-19-10, at 168-169). These, and a number of other stratagems Dr. Leo said investigators used in questioning Dassey could have pushed him into implicating himself in a crime in which he was not involved.

Under police questioning, Dassey was able to identify the fact that Teresa Halbach was shot in the left side of her head when questioned by the investigators, a fact the state believed tied him to the crime. Dr. Leo said this was not truly corroborative of his confession because the information about the head shot was supplied by the investigators and the side location was a fact that could be arrived at by a chance guess. (Tr. 1-19-10 at 220 to 222). When asked about evidence the police found in the Avery garage which they searched as a result of Dassey's confession, Dr. Leo denied that this was evidence of corroboration and said this occurred because the police had planted the garage suggestion in Dassey's mind and he simply was repeating it back to them. (Tr. 1-19-10 at 224-225). Certain police interrogation techniques, many of which he described as being used on Dassey, can lead to false confessions and as a social scientist he could have educated the jury "about these counterintuitive and not popularly known phenomena in their

APP-027

effects and why they're significant in understanding how false confessions come about". (Tr. 1-19-10 at 237 to 239).

Testimony similar to that offered by Dr. Leo was furnished in affidavit form by Dr. Lawrence White, a professor of psychology and legal studies at Beloit College. (PC Exhibit 80). In Dr. White's affidavit, he reviews Dassey's confession to Investigators Wiegert and Fassbender along with his February 27th interviews at Mishicot High School and the Two Rivers Police Department with the same two investigators. (PC Exhibit 80, at 9 to 19). His affidavit testimony makes many of the same points as Dr. Leo's testimony about the police interrogation tactics and Dassey's vulnerability. Dr. White concludes his affidavit testimony by saying that there are reasons to believe that Dassey's "statements may not be wholly reliable or truly voluntary." (PC Exhibit 80, at 20). Dr. White's affidavit was used as his direct examination at the post-conviction motion hearing but he appeared personally and was subject to cross-examination by the State. On his cross-examination he said he had received an email request from Attorney Mark Fremgen to testify on the defendant's behalf at the Dassey trial. (Tr. 1-21-10 at 189). The Fremgen request concerned testimony Dr. White might give about the police interrogation tactics used on Dassey and how those techniques may have affected the reliability for voluntariness of the defendant's statements. (Tr. 1-21-10 at 190, 191.) Dr. White said he would have testified had he been asked to by Attorney Fremgen but Fremgen did not make that request of him.

Dassey contends that Attorneys Fremgen and Edelstein rendered ineffective assistance of counsel by their failure to supplement Dr. Gordon's testimony on the personality factors which may make a suspect more suggestible or vulnerable to suggestion when being questioned by the

16

police, with an expert like Dr. Leo or Dr. White who could testify about the psychology of interrogation, coercion and false confessions. Dr. Leo testified that he thought the suggestibility expert such as Dr. Gordon could not adequately educate a jury on the social science research and phenomena of false confessions. (Tr. 1-19-10 at 237 to 239). Dassey believes that only through testimony from experts like Dr. White or Dr. Leo could the jury learn how contaminated was his March 1st confession. (Def. Br. at 27 to 29). Under the circumstances of this case Dassey argues that trial counsel's "failure to call such an expert was manifestly unreasonable and constitutes deficient performance." (Def. Br. at 30).

In its brief the State questions whether the type of testimony discussed by Dr. Leo and Dr. White would have been admissible in Wisconsin since it might be opinion testimony which invades the fact-finding role of the jury by opining on the truthfulness of Dassey's statements. **State v. Haseltine**, 120 Wis. 2d 92, 96, 352 NW 2d 673 (Ct. App. 1984). The State also points to cases from other jurisdictions that have barred Dr. Leo's testimony as invading the province of the jury, citing two cases, one from Kansas and the other from Missouri. (St. Br. at 21). This court believes that both Dr. Leo and Dr. White would have qualified as expert witnesses at Dassey's trial and in all likelihood some, and maybe much of their testimony, at least as they outlined it in the post-conviction motion, would have been admissible. **State v. Walstad**, 119 Wis. 2d 483,

17

515-516, 351 NW 2d 469 (1984).[1]  With that said, the fact that the testimony may have been admissible and that trial counsel failed to procure it for trial does not mean that they acted deficiently.

In **State v. VanBuren**, 2008 WI App. 26, 307 Wis. 2d 447, 746 NW 2d 545, a case decided *after* the Dassey trial, our Court of Appeals faced a similar claim when post-conviction counsel challenged as ineffective assistance trial counsel's failure to offer evidence from a false confession expert at trial. **Id**. at §17 to 19.  The court concluded, given the dearth of published or unpublished cases in Wisconsin in which false confession expert testimony was introduced, it could not find that failing to offer that kind of testimony constituted ineffective assistance of counsel. **Id** at §19.  At the time this court granted defense counsel's motion to permit Dr. Gordon to testify it noted that it was unable to find a reported or published Wisconsin case discussing the admissibility of false confession testimony.  (Tr. 4-5-07 at 7-8).  Even if the holding in **VanBuren** is outdated or not applicable to Dassey, this court cannot and will not find that absence of testimony from a social scientist who could talk about the psychology of interrogation and confession constituted deficient performance by trial counsel.

Attorney Edelstein explained at some length in the post-conviction motion hearing how trial counsel considered, but rejected, another expert who could have offered testimony on

---

[1] The subject of false confessions has been treated in a number of law review pieces but articles about false confessions are not confined to law journals and academic literature.  Two recent examples appearing in general circulation media:  John Schwartz, *"Confessing to Crime but Innocent,"* **New York Times Online**, September 13, 2010, www.nytimes.com/2010/09/14/us/14confess.html;  Robert Kolker, *"I Did It"*, **New York,** October 11, 2010, at 22, 89.  Interestingly, Kolker says at one point in his article:  "To prevent false confessions, interrogation critics say there's a solution so simple that it's remarkable it hasn't happened already: videotaping every minute of every police interrogation".  At 90.

APP-030

Dassey's confession. (Tr. 1-21-10 at 266 to 269). Referring to Dr. Gordon, he said: "We had an

expert who we best believed was appropriate for the defense in this case." (Tr. 1-21-10 at 266-

269). Later, he went on:

> "To muddy the waters with another expert, irregardless (sic) of
> whether the State presented one, sometimes, and can, I believe, in
> the eyes of jurors, look like a desperate attempt by an accused to
> turn it into a battle of the experts without focusing on both the facts
> and, most importantly in this case in the defense of Brendan, the
> humanization of Brendan as a young, easily manipulated
> individual." (Tr. 1-21-10 at 267, L. 15 to 23).

It is clear that Dassey's trial counsel made a strategic choice to use Dr. Gordon as their

expert witness and not supplement him with another expert or other experts. They were also

aware that the state was prepared to call Joseph Buckley, an expert on the Reid method of

interrogation if the defense produced its own interrogation expert. (Tr. 1-21-10 at 259-260). It

was their considered opinion that the trial focus should be Dassey and his cognitive limitations

and suggestibility, not interrogation techniques. (Tr. 1-21-10 at 260 and 266 to 269).

The court finds this not to be deficient performance but a trial decision rationally based on

the facts and the law. **State v. Elm**, 201 Wis. 2d 452, 464-465, 476 NW 2d 471 (Ct. App. 1996).


**B. The State's trial testimony and Dassey's own trial testimony nullified anything
additional defense experts could have said.**

Dassey's March 1, 2006, videotaped confession was the centerpiece of the trial and the

State's case against him. Our Supreme Court, in **State v. Jerrell**, C. J., 205 WI 105, 283 Wis. 2d

145, 674 NW 2d 607 adopted a rule requiring electronic recording of all questioning of a juvenile

19

when it occurs at a place of detention. **Id**. at §58. Here, the jury had the opportunity as the finder of fact to view the questioning of Brendan Dassey by Investigators Wiegert and Fassbender. It heard and saw how Dassey responded to the questions asked of him and his admissions of his participation in the charged crimes.

While his confession may have been the pivotal piece of evidence against Dassey, it was by no means the only testimony implicating him heard by the jury. Jurors had an opportunity to watch and listen to Dassey testify in his own defense at trial. They heard him admit to being with his uncle, Steven Avery, on the evening of Teresa Halbach's murder (Tr. 4-23-07 at 29 to 31). They heard him say he helped his uncle clean up a three foot by three foot stain on the garage floor with gas, paint thinner, and bleach. (Tr. 4-23-07 at 32, L. 13 to 25 and at 33, L. 1 to 10). Jurors heard his counsel ask Dassey:

> Q    "Why did you tell those two investigators that you
>      participated in killing and-- raping Teresa Halbach?
> A    I don't know.
> Q    You have no idea why you would say that?
> A    No."
>      (Tr. 4-23-07 at 42, L. 1 to 6).

When asked on cross-examination how he was able to tell Fassbender and Wiegert so much detail about what happened to Teresa he responded first by saying "I don't know" and then answering a follow-up question said "I could have got it out of books". (Tr. 4-23-07 at 65, L. 12 to 19). Pressed on cross-examination about the name of the book he would have read that had events such as he described to the police, he said "I believe it was called *Kiss the Girls*". (Tr. 4-23-07 at 67, L. 17 to 21). The jurors had a chance to weigh Dassey's credibility based, not only

20

on his video-taped confession but upon his testimony in open court. That testimony, with its evasive answers to questions, frequent "I-don't-knows", and closing with what jurors may have felt was an outlandish explanation for the origin of the story he gave the police in his March 1st confession gave them a firsthand opportunity to evaluate his credibility.

Jurors also heard a much less equivocal Dassey in an audio interview played during the trial testimony of Marinette County Sheriff's Department Detective Anthony O'Neill. (Tr. 4-19-07 at 113; Tr. Ex. 201). O'Neill and other Marinette County officers stopped a car in which Dassey was a passenger late in the morning of November 6, 2005. (Tr. Ex. 202). Marinette County police had been asked to assist because Dassey's uncle, Steven Avery, and other family members were staying on property owned by Steven Avery's parents (Dassey's grandparents) in Marinette County. The Marinette police stopped a car registered to Steven Avery but occupied by his nephews, Bryan and Brendan Dassey. (Tr. Ex. 202). They removed Brendan to another vehicle and questioned him extensively. (Transcript of Interview, Tr. Ex. 203). The jury heard the aggressive and sometimes confrontational questioning of Dassey during which he adamantly resisted any suggestion that he knew where Teresa Halbach went. (Tr. Ex. 203, at 32-33, at 40-41).

The jury heard testimony from Susan Brandt, who interned at Mishicot High School from January of 2006 to May of 2006, while pursuing a master's degree in educational counseling, that she had contact with Kayla Avery who came to the counseling office because she said she was feeling scared. (Tr. 4-18-07 at 168). Kayla said she was scared because her uncle, Steve Avery, had asked one of her cousins to help move a body. (Tr. 4-18-07 at 169). In her trial testimony,

21

Kayla Avery, who was Dassey's first cousin, said Brendan appeared to change between October 31, 2005, and the end of February, 2006. And she described that change as Brendan losing weight and being a little bit more upset. (Tr. 4-18-07 at 7). At a birthday party in November she said that she observed Brendan crying. (Tr. 4-18-07 at 8- 9). While at trial she claimed not to have talked at that time with Brendan about Steven, she admitted telling the school counselors and Officers Wiegert and Fassbender about her conversation with Brendan at the party. (Tr. 4-18-07 at 10). Investigator Mark Wiegert testified that the Mishicot school counselors had notified the police about their contact with Kayla Avery and what she had told them. Following that contact, Wiegert and Fassbender interviewed Kayla in the presence of her mother and she told them that Brendan had told her about hearing screaming from Steven Avery's residence and seeing body parts in the fire behind Steven Avery's residence. (Tr. 4-19-07 at 193-194). Kayla also gave them a written statement. (Trial Ex. 163).

Even if this court were to conclude that trial counsel committed unprofessional errors by failing to call an expert on police interrogation tactics, the quality and quantity of evidence against Dassey is such that there is no reasonable probability that the proceeding would have turned out differently.

### C. Trial counsel's failure to deconstruct the March 1st confession as ineffective assistance of counsel.

In his brief, Dassey reprises the contaminated confession argument that he raised with Dr. Leo's post-conviction testimony when he claims as deficient trial counsel's failure "to

22

systematically deconstruct Brendan's March 1st confession so that the jury would understand that each corroborated 'fact in the confession' was a product of external contamination." (Def. Br. at 30). He claims that each of nineteen details in his confession that the State represented to the jury as corroborated by physical evidence should have been deconstructed by counsel at trial because each of those so-called facts could be traced to either Dassey's innocent knowledge of events or his acquaintance with the news media reports or arose from contamination introduced by the investigators who questioned Dassey on March 1st. (Def. Br. at 30 to 33).

In short, the jury heard testimony about purportedly corroborated evidence that actually emanated from noninculpatory sources and trial counsel was deficient by not forcefully bringing this to the jury's attention. The State responds to this by pointing out that there is no proof in the record that Dassey obtained the information he now calls contaminated from other than his own personal experience. Additionally, it discusses some of the post-conviction testimony of trial counsel who asked Dassey where he got the information that he used in his confession and why he falsely confessed. (St.'s Br. at 28-29).

According to that testimony, Dassey never adequately explained to either Attorney Fremgen or Attorney Edelstein the source of the details in his confession or why he might have falsely confessed. The two attorneys said in their post-conviction motion testimony that Dassey told them he might have dreamt it or gotten it out of a book. (Tr. 1-20-10 at 226; Tr. 1-21-10 at 256).

The appropriate measure of attorney performance within professional norms is reasonableness under the circumstances of the case. **State v. Brooks**, 124 Wis. 2d 349, 352, 369

NW 2d 183 (Ct. App. 1985). Dassey provided little or nothing to his trial counsel that they could have used to deconstruct his March 1st confession. His trial testimony, both on direct and cross-examination, provided no evidentiary platform on which trial counsel could construct a plausible contamination attack. Instead, it created through Dassey's own words an explanation for his March 1st confession which lacked any credibility and added to the negative weight of his original admissions. Moreover, much of what Dassey maintains about the deconstruction of his confession by either Dr. Leo, another interrogation expert or trial counsel, comes at a remove of more than two plus years from the trial itself and rests entirely upon assumptions as to what testimony would or might have been and how that testimony would have played out to the jury. The court considers much of the post-conviction testimony on deconstructing Dassey's confession through either defense counsel or an expert more speculative than convincing. The court finds trial counsel's performance with respect to these matters to be within the realm of reasonableness, considering the circumstances of the case.

### D. Video clips of Dassey's "recantation".

Dassey's post-conviction motion faults trial counsel as being deficient for their failure to insist upon the admission at trial of several video clips from the March 1, 2006, confession. The clips, which post-conviction counsel categorize as a "recantation" of Dassey's confession to police occurred after the end of police questioning while Dassey was speaking with his mother, Barbara Janda. The text of the video clip reads:

24

> "Brendan:      What'd happen if he [Steven Avery] says something
>                his story's different? Wh- he says he, he admits to
>                doing it?
> Barb Janda:    What do you mean?
> Brendan:       Like if his story's like different, like I never did
>                nothin' or somethin'.
> Barb Janda:    Did you? Huh?
> Brendan:       Not really.
> Barb Janda:    What do you mean, not really?
> Brendan:       They got to my head."
> (Post-conviction Exhibit 209 at 672).

Post-conviction counsel seizes on the phrases "not really" and "they got to my head" as being Dassey's recantation of the confession he had just given to the police investigators. (Def. Br. at 33-34).

Testimony at the post-conviction motion hearing showed trial counsel differed on showing this video clip to the jury. Attorney Edelstein thought the jury should see it while Attorney Fremgen did not. (Tr. 1-21-10 at 236; Tr. 1-20-10 at 195). As lead counsel, Attorney Fremgen made the strategic decision not to play the portion of the tape because he thought it depicted a mother coming in to see her son and realizing he had just done something serious and would go to jail. (Tr. 1-20-10 at 195). This was not deficient performance. Counsel made a rational decision based on an evaluation of the information and emotion the video clip would convey to the jury.

Apart from that, to suggest as post-conviction counsel do that these remarks somehow constituted an unequivocal recantation of Dassey's previous confession is a dubious proposition. At best, the terms "not really" and "they got to my head" are, in the context of the conversation between Dassey and his mother, ambiguous. At worst, the words can be viewed as substantiating the confession he previously gave to the police.

25

### E. Trial Counsel's Claim Deficient Performance in Closing Argument.

Post-conviction counsel frame as concessions of guilt two statements that Attorney Edelstein made in his closing. The first statement made by Attorney Edelstein which counsel says represents a concession appears to do so at least as defense counsel excerpts Attorney Edelstein's remarks in the post-conviction brief. (Def. Br. at 34). However, when removed from the isolated context , post-conviction counsel gives it, it appears to concede nothing other than to depict Dassey as being pushed by investigators to say things he truly didn't believe. Edelstein argued:

> "But the truth of the matter is, a couple of times, when they weren't specific about who they're even talking about, he gives an answer, such as a number. And it changes. It bounces back and forth. He was confused. He was scared.
>
> And let's just briefly touch upon that. Ask yourselves, how probing were they when he told them, I seen it. And he said, he told, he seen me see it, so he told me not to say something or else it will—he threatened me a little bit. He made it clear to them early on. And they had no reason to doubt it. They just didn't like the answers. They didn't like what he said. But they never explored the potential truth and alternative that this young man walked over there and did see something in a fire, and that something was Teresa Halbach.
>
> They go through this scenario, and they start—once he tells them, I seen it, and Steve knew it, and he said, don't say anything, that's when it becomes, you saw this, you saw that."
> (Tr. 4-25-07 at 124, L. 25, at 125, L. 1 to 20).

The second part of Edelstein's argument which Dassey labels a concession begins where Edelstein talks about the Halloween bonfire and how Dassey went about picking things up for the fire "and eventually they start throwing stuff in there, and he probably did see something. Pretty traumatic." (Tr. 4-25-07 at 128, L. 2 to 5).

26

APP-038

Dassey acknowledged in his testimony at trial that he had been at the bonfire and helped his uncle put things on the fire including tires and the seat from Teresa Halbach's RAV4 automobile. (Tr. 4-23-07 at 64-65.) Edelstein's remarks in closing draw on Dassey's own admissions at trial but in no way suggest that Dassey committed either element necessary for conviction of mutilating a corpse as a party to a crime. (Wis. JI-CR 1193). Even if this court concluded that Edelstein's discussion of Dassey's appearance at the bonfire was a concession, it would not be ineffective assistance of counsel. **State v. Silva**, 2003 WI App. 191, 266 Wis. 2d 906, 670 NW 2d 385, and **State v. Gordon**, 2003 WI App. 69, 262 Wis. 2d 380, 663 NW 2d 765, both of which Dassey cites in his brief, give counsel leeway to concede on a count if counsel's decision is tactically reasonable. (**Silva** at §15 to §20 and **Gordon** at §28).

At the post-conviction motion hearing, Attorney Edelstein did not recall making any frank admission of Dassey's direct involvement in the corpse mutilation, the charge that carried the least significant penalty, but he did acknowledge making an argument "which was intended to provide that as an option to the jury." (Tr. 1-21-10 at 236, L. 23-24 and at 237). The court believes this falls within conduct permitted under **Silva** and **Gordon**.

**F. Trial counsel's alleged deficiency in failing to get Dassey's February 27, 2006, and May 13, 2006, statements admitted into evidence.**

Defense trial counsel sought to have admitted at trial all or portions of Dassey's February 27, 2006, interview at Mishicot High School with Wiegert and Fassbender. Dassey's March 1, 2006, interview with the two investigators had been heard by the jury and that interview as well

27

as some trial testimony that had made mention of a discussion with the defendant on February

27th. (Tr. 4-20-07 at 55-56). After hearing argument from counsel, this court, citing **State v.**

**Pepin**, 110 Wis. 2d 431, 328 NW 2d 898 (1982), and Wis. Stats. §908.01(4)(b)1, ruled that the

state could use any inculpatory statements made by Dassey since they constituted an exception of

the hearsay rule. The defense could not, however, use exculpatory material from the February

27th interview unless it was intertwined with the inculpatory statements and bore the same

guarantee of trustworthiness. (Tr. 4-20-07 at 62). Dassey now says that trial counsel performed

deficiently by failing to cite the right evidentiary rule for the admission of the February 27th and

May 13th statements. His trial counsel, he says, should have urged the court to admit the

statements because they weren't being offered to prove the truth of the matter asserted, but rather

as examples of Dassey's suggestibility. (Def. Br. at 36). This court finds nothing in Dassey's

post-conviction argument that would cause it to rule any differently than it did at the time the

matter was initially argued and the court determined the statements to be inadmissible hearsay.

Even if the statements were admitted as requested by trial counsel, the weight of the evidence

against Dassey was such that there is no reasonable probability that the outcome would have been

different.

Post-conviction counsel also contend the statement's admissibility should have been

argued by trial counsel under the completeness rule codified at Wis. Stat. §901.07. This court

understands that statute to permit the admission of otherwise hearsay evidence if it is necessary to

provide context and prevent distortion. **State v. Eugenio**, 219 Wis. 2d 391, 412, 579 NW 2d 642

(1998). Neither the February 27th nor the May 13th interview of Dassey was necessary to

complete or fairly balance other trial evidence. Trial counsel did not perform deficiently by failing to use the rule of completeness as a basis for the admission of the February 27th and May 13th statements.

Dassey closes that portion of his brief dealing with the deficient performance of his trial counsel, by asserting that the five instances of trial counsel's deficient performance cumulatively as well as individually prejudiced him and he is entitled to a new trial. (Def. Br. at 37-38). And he again raises as ineffective assistance of counsel the failure of Kachinsky and trial counsel to seek the suppression of his March 1st statement as the fruit of an illegal arrest. This court believes it has dealt sufficiently with the claim of an illegal arrest in an earlier portion of this decision. As to the five areas Dassey articulates as constituting deficient performance of trial counsel, this court has found trial counsel not to have performed deficiently in these instances. **State v. Felton**, 110 Wis. 2d 485, 505-506.

Even assuming that one or more of the complained of acts was wrong, none of them, either singly or collectively, was "so serious that the defendant was deprived of a fair trial and a reliable outcome." **Strickland v. Washington**, 466 U.S. 668, 687 (1984). Withal, this court has neither seen nor heard anything which creates a reasonable probability sufficient to undermine its confidence in the outcome of Dassey's trial. **Id**. 466 U.S. at 694.


### G. Dassey's claim to be entitled to a new trial in the interests of justice.

Wisconsin Stat. §805.50(1) empowers the trial court to set aside a verdict and order a new trial "in the interest of justice." Dassey urges the court to affirmatively exercise that power in his

29

APP-041

case "because his trial counsel failed to fairly explore the unreliability of his confession and therefore deprived the jury of trying his case on an informed basis." (Def. Br. at 39.) The failure of trial counsel to deconstruct his confession or call an expert to deconstruct his confession has resulted in a miscarriage of justice entitling him to another trial or at least another suppression hearing. (Def. Br. at 40).

This court has examined the cases Dassey cites in his brief and can find nothing in any of them which lend support to his claim for a new trial in the interest of justice. **State v. Hicks**, 202 Wis. 2d 150, 549 NW 2d 435 (1996) which he cites in support of his request was a case in which newly discovered DNA evidence excluding the convicted defendant was received at a post-conviction evidentiary hearing. **Id**. at 156. The State had used at trial a hair sample to help convict a defendant but no DNA test had been done of that sample. Our Supreme Court reasoned that the real controversy was not tried because the evidence excluding the defendant as the origin of one of the hair samples was relevant to the issue of identification and it was not heard by the jury. **Id**. at 158. Likewise, the defendant in **State v. Jeffrey**, 2010 WI App. 29, 323 Wis. 2d 541, 780 NW 2d 231 introduced post-conviction testimony that showed he did not have herpes in a case in which the victim claimed her case of herpes originally stemmed from sexual contact the defendant had with her when she was three years of age. **Id**. at §1 and §2. On appeal, the court reversed because it believed that the post-conviction evidence could have had a "great impact on the credibility battle between the prosecutor and the defendant, had it been presented." **Id**. at §20.

Both **Hicks** and **Jeffrey** were reversed because the respective courts decided that each jury should have had an opportunity to hear the critical, material, and relevant scientific evidence that

30

was not disclosed until a post-conviction evidentiary hearing. Dassey seeks to have us believe that expert testimony from academic police interrogation experts or trial counsel's deconstructing cross-examination exposing the contaminated parts of Dassey's confession would have the same qualitative trustworthiness as the scientific tests referenced in **Hicks** and **Jeffrey**.

Questions of its admissibility aside, the proposed testimony of experts such as Drs. Leo or White would not present any exculpatory evidence for the jury to consider. Rather, it would simply allow the expert to offer an opinion about the reliability of Dassey's confession. Opinion testimony and deconstructing cross-examination are a far cry from the evidence in **Hicks** and **Jeffrey** which triggered their reversals. This court cannot find that Dassey's trial represents a miscarriage of justice nor can this court find that the real controversy was not fully tried. **Lock v. State**, 31 Wis. 2d 110, 118, 142 NW 2d 183 (1966). He is not entitled to a new trial nor should he have another suppression hearing.

## CONCLUSION

In his post-conviction motions, Brendan Dassey has claimed that counsel who represented him at and prior to trial were ineffective and performed deficiently on his behalf. Because of counsel's various failures to effectively pursue his defense, Dassey says he is entitled to a new trial in which his inculpatory admissions are suppressed or, alternatively, a new hearing to suppress his self-incriminating statements. This court has examined Dassey's arguments on the issues raised in his post-conviction motions. Based on that examination, the court has concluded for the reasons set forth in the body of this opinion, that nothing done by his pretrial or trial

31

counsel has rendered the result of Dassey's trial unreliable or the proceeding fundamentally unfair.

Accordingly, the court denies Dassey's motions for a new trial and a new suppression hearing.
The state is directed to draft the order reflecting the court's decision.

Dated this 13th day of December, 2010.

BY THE COURT,

JEROME L. FOX
Circuit Judge

APP-044

1    STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
                                BRANCH 3
2
     _____
3
     STATE OF WISCONSIN,
4
                    PLAINTIFF,        DECISION
5
     vs.                              Case No. 06 CF 88
6
     BRENDAN R. DASSEY,
7
                    DEFENDANT.
8
     _____
9

10   **DATE:**    MAY 12, 2006

11   **BEFORE:**  Hon. Jerome L. Fox
                  Circuit Court Judge
12
     **APPEARANCES:**
13
                  KENNETH R. KRATZ
14                Special Prosecutor
                  On behalf of the State of Wisconsin.
15
                  LEONARD D. KACHINSKY
16                Attorney at Law
                  On behalf of the Defendant.
17
                  BRENDAN R. DASSEY
18                Defendant
                  Appeared in person.
19

20                  * * * * * * * *

21                **TRANSCRIPT OF PROCEEDINGS**

22               Reported by Jennifer K. Hau, RPR

23                  Official Court Reporter

24

25                                           **COPY**

                            1

```
 1          THE COURT:  Morning, counsel, morning

 2     ladies and gentlemen.  This is 06 CF 88.  State of

 3     Wisconsin vs. Brendan R. Dassey.  Appearances,

 4     please.

 5          ATTORNEY KRATZ:  The State of Wisconsin

 6     appears by Ken Kratz, Calumet County D.A.,

 7     appearing as special prosecutor.

 8          ATTORNEY KRATZ:  The defendant appears

 9     personally and with Attorney Len Kachinsky.

10          THE COURT:  All right.  Um, we are here

11     today for a decision on a motion to suppress.  Uh,

12     the defendant, Brendan Dassey, has brought this

13     motion requesting that the Court suppress statements

14     he made to Investigator Mark Wiegert with the

15     Calumet County Sheriff's Department and Agent Thomas

16     Fassbender of the Wisconsin Department of Justice.

17          The motion brought contends that the

18     statements made by Brendan Dassey were obtained

19     from him involuntarily and should, under the

20     applicable law, be suppressed.  The motion was

21     heard in this courtroom last Thursday, May 4.

22          Court heard testimony from Investigator

23     Wiegert.  It heard testimony from the defendant's

24     mother, Barb Janda, and Kris

25     Schoenenberger-Gross, a school psychologist for
```

2

1  the Mishicot School District.  The Court also

2  received, five exhibits during the course of the

3  hearing.

4          In addition, the Court has read the

5  relevant case law cited by the parties in their

6  briefs as well as a number of other pertinent

7  cases.

8          The Court has also reviewed the DVDs of

9  the interviews, read the transcripts and listened

10  to the audiotapes.  The audiotape in the form of

11  a CD.  Now, these electronic recordings are all

12  part of Exhibit 5.  Based on those exhibits, that

13  testimony, the briefs, and arguments of Counsel,

14  the Court makes the following findings of fact:

15          Number one.  The defendant, Brendan

16  Dassey, was born October 19, 1989, and was, at

17  the time of the police interviews in February and

18  March of 2006, 16 years of age.

19          Number two.  At the time of the police

20  interviews, he was a student at Mishicot High

21  School enrolled in mostly regular classes, but

22  also in some special education classes.  Testing,

23  it disclosed, an IQ level in the low average to

24  borderline range.  There is no evidence that he

25  suffered from any emotional disorder which made

3

1  him unusually susceptible or vulnerable to police

2  pressures.

3  Three.  Prior to his interviews which

4  are the subject of this motion, his only known

5  police contacts were on November 6 and

6  November 10, 2005, when he was questioned in

7  Marinette County about Teresa Halbach.

8  Number four.  The parties have

9  stipulated to the noncustodial nature of the

10  police interviews with Brendan Dassey on

11  February 27, 2006, and March 1, 2006.

12  Hearing Exhibit No. 1 is a *Miranda*

13  warning and waiver signed and initialed by

14  Brendan Dassey on February, uh, 27, 2006, at

15  3:21 p.m.  And Exhibit 2 is a *Miranda* warning and

16  waiver signed and initialed by Brendan Dassey on

17  March 1, 2006, at 10:10 a.m.

18  Number five.  Investigator Wiegert and

19  Agent Fassbender met with Brendan Dassey on

20  February 27, 2006, at Mishicot High School at

21  approximately 12:30 p.m.  He was told by them

22  that he didn't have to answer any questions and

23  he was free to go whenever he wanted.  Exhibit 5,

24  transcript page 440.

25  He was questioned for approximately an

4

1   hour and was again told he could stop answering

2   questions and could, quote, walk out anytime, end

3   quote.  Exhibit five, transcript page 467.

4        At the close of that interview, he gave

5   the investigators a written statement.  The

6   investigators both complimented him for giving

7   them a voluntary statement telling him they knew

8   how difficult it was to tell -- tell them the

9   details he divulged.  The interview ended at

10  2:14 p.m.  He returned to his eighth hour class

11  at Mishicot High School.

12        Number six.  At approximately 3:00 p.m.

13  on February 27, 2006, the same day of the earlier

14  interview, Brendan Dassey and his mother, Barb

15  Janda, met with the investigators at Mishicot

16  High School and agreed that Brendan Dassey could

17  do a videotape interview with the Two Rivers

18  Police Department.

19        Ms. Janda was asked if she wanted to be

20  present during the interview.  She said it was

21  not necessary.  And Brendan Dassey said he did

22  not care if his mother was present or not.

23        After he signed and initialed Exhibit 1,

24  the **Miranda** warnings and waiver, the

25  investigators interview Brendan Dassey about

5

certain events which he claimed occurred on the
night of October 31, 2005.

The interview lasted approximately 41
minutes and was conducted entirely in a
conversational tone of voice by the interviewers.
At no time during the interview did Brendan
Dassey appear visibly stressed or pressured by
the questions or conducts -- conduct of the
interviewers.

Number seven.  On March 1, 2006,
Investigators Wiegert and Agent Fassbender sought
and received permission from Brendan Dassey's
mother, Barb Janda, to speak with Brendan.  She
was to pick him up at the conclusion of the
interview.  Following her grant of permission,
Investigators Wiegert and Fassbender picked up
Brendan Dassey at Mishicot High School at
approximately 10:05 a.m. and transported him to
the Manitowoc County Sheriff's office, stopping
on the way at Brendan Dassey's residence so he
could retrieve a pair of blue jeans that the
investigators wanted for evidentiary purposes.

Number eight.  The conversation in the
car on the way to the sheriff's office was
electronically recorded except for the time spent

6

1   in Brendan Dassey's residence.  The three arrived

2   at the sheriff's office at approximately 10:43

3   a.m. and went to a carpeted interview room

4   equipped with videotaping equipment.

5           Shortly after arriving in the interview

6   room and while the videotape equipment had been

7   activated, Brendan Dassey was asked by

8   Investigator Wiegert whether he remembered his

9   *Miranda* rights that had been read to him and

10   whether he still wanted to talk to the

11   investigators.

12           He responded in the affirmative to both

13   questions by saying, quote, yeah, unquote, and

14   nodding his head.

15           Uh, number nine.  The interview between

16   Brendan Dassey and the two investigators lasted

17   approximately three hours during the course of

18   which Brendan Dassey made a number of inculpatory

19   admissions.  At no time during the interview was

20   Brendan Dassey handcuffed or otherwise physically

21   restrained.

22           On several occasions during the course

23   of the interview the investigators offered soda,

24   water, or food to Brendan Dassey and asked him if

25   he wanted to use the bathroom.  Throughout the

7

1   interview, Brendan Dassey was seated on an

2   upholstered loveseat.

3        Number 10.  At various times during the

4   interview the investigators encouraged Brendan

5   Dassey to provide details to them by appealing to

6   his sense of honesty.  Quote, honesty here is the

7   thing that's going to help you, end quote.

8   Exhibit 5, transcript page 541.

9        Quote, honesty is the only thing that

10  will set you free, uh, end quote.  Exhibit 5, uh,

11  transcript 5 -- page 541.

12       Quote, come on Brendan, be honest.  I

13  told you before that's the only thing that's

14  going to help ya here, end quote.  Exhibit 5,

15  transcript page 547.

16       Quote, we just need you to be honest

17  with us.  Exhibit 5, transcript page 584.

18       These are but a few example of

19  admonitions to be honest made to Brendan Dassey

20  by the investigators.  The entire interview,

21  including the admonitions, was done by both

22  investigators in a normal speaking tone with no

23  raised voices, no hectoring, or threats of any

24  kind.

25       Nothing on the videotape visually

8

1    depicts Brendan Dassey as being agitated, upset,

2    frightened, or intimidated by the questions of

3    either investigator. His demeanor was steady

4    throughout the actual questioning.

5            He displayed no difficulty in

6    understanding the questions asked of him. At no

7    time did he ask to stop the interview or request

8    that his mother or a lawyer be present. Instead,

9    he answered the questions put to him.

10           Sometimes he revised his answers after

11   being prodded to be truthful or being told by his

12   questioners that they knew his answer was either

13   incomplete or untrue and he should be honest.

14           These appeals to honesty made by the

15   interviewers were nothing more than a reminder to

16   Brendan Dassey that he had a moral duty to tell

17   the truth.

18           Number 11. On occasion, the

19   interviewers purported to know details which, in

20   fact, were not true or which represented

21   uncorroborated theories of the crime in which

22   they presented to Brendan Dassey as factually

23   accurate in order to draw information from him.

24   In the context of this interview, the Court finds

25   that this tactic of misleading Brendan Dassey by

9

1    the interviewers occasionally pretending to know

2    more than they did was neither improper nor

3    coercive because it did not interfere with

4    Brendan Dassey's power to make rational choices.

5         Number 12.  No frank promises of

6    leniency were made by the interviews to --

7    interviewers to Brendan Dassey.  He was told,

8    quote, we can't make any promises, but we'll

9    stand behind you no matter what you did, end

10   quote.  Exhibit 5, transcript page 541.

11        Quote, I want to assure you that Mark

12   and I are both in your corner.  We're on your

13   side, end quote.  Exhibit 5, uh, transcript page

14   540.

15        Quote, we don't get honesty here.  I'm

16   your friend right now, but I gotta -- I gotta

17   believe in you, and if I don't believe in you, I

18   can't go to bat for you, end quote.  Exhibit 5,

19   page 547.

20        Quote, we're in your corner, end quote.

21   Exhibit 5, page 547.

22        These and similar statements made by the

23   interviewers were an attempt to achieve a rapport

24   with Brendan Dassey and convince him that a

25   truthful account of events would be in his best

10

1    interest.

2        Based on those findings of fact, based

3    on the record, the exhibits in this matter, the

4    Court concludes, as a matter of law, the

5    following:

6        Under a totality of the circumstances

7    test, which I'm using here, given Brendan

8    Dassey's relevant personal characteristics as set

9    forth in the previous findings and on the record

10   in this case, the State has met its burden by

11   showing by a preponderance of the evidence that

12   the statements made by Brendan Dassey to

13   Investigators Wiegert and Fassbender, and which

14   are the subject of this motion, were the product

15   of Brendan Dassey's free and unconstrained will

16   reflecting deliberateness of choice. In short,

17   they were voluntary statements.

18       Accordingly, the defendant's motion to

19   suppress these statements is denied. And, I

20   might add as a -- as a footnote or, perhaps, more

21   than a footnote here, the parties stipulated to

22   the fact that this was not -- either of these

23   interviews, the 27th of February, March 1 of

24   2006, were noncustodial interviews.

25       Uh, the Court, after reviewing the

11

1     record, has determined that even had they been

2     custodial interviews, that the appropriate

3     *Miranda* warnings were given, were understood by

4     this defendant, and, thus, had they been

5     custodial -- had they been custodial interviews,

6     uh, the result, uh, that the statements were

7     voluntary would remain unchanged.

8           Now, uh, Exhibit 5, which I've alluded

9     to in the preface of -- of the findings, as well

10    as during the course of the findings, is, as I

11    noted at the last hearing, uh, an in camera, that

12    means in chambers, uh, exhibit. The Court is

13    going to seal that exhibit, uh, and it will

14    remain sealed until the trial.

15          The Court believes, given the continuing

16    media scrutiny in this matter, that the

17    dissemination of Exhibit 5, uh, would have,

18    conceivably, a tendency to taint a jury pool.

19    It's my understanding -- And, gentlemen, correct

20    me if I'm wrong. First you, Mr. Kratz, you have

21    no objection to proceeding in that fashion?

22          ATTORNEY KRATZ: That's correct, Judge.

23          THE COURT: Mr. Kachinsky?

24          ATTORNEY KACHINSKY: I don't object either,

25    Your Honor.

12

1      THE COURT: All right. Anything else on

2 this before we move on to -- And I'm going to ask

3 you, Mr. Kratz, to draft the order.

4      ATTORNEY KRATZ: I will -- I will do that,

5 Judge. Uh, Your Honor, I -- I know that the Court

6 was reading from a -- a -- a prepared statement. Is

7 it possible that I can get a copy of that to, uh,

8 amend or attach that to the order, or would the

9 Court just prefer I indicate in the order, for

10 reasons stated on the record.

11      THE COURT: Um, why don't you put, for

12 reasons stated on the record. Or, I suppose, in the

13 alternative, you can ask the already overworked

14 court reporter to -- to type a transcript here.

15      ATTORNEY KRATZ: I won't do that, Judge.

16 I'll just, uh, draft a generic order. That's

17 fine. Thank you.

18      THE COURT: All right. Um, the next item,

19 I believe, Mr. Kachinsky, is yours. It's -- it's a

20 motion. Do you want to be heard on your motion to,

21 uh, revise the terms of -- of the bail?

22      ATTORNEY KACHINSKY: Um, yes, Your Honor.

23      ATTORNEY KRATZ: Judge, before we get into

24 the -- to the merits of that, I --I wonder if I

25 could be heard just -- just briefly on, uh -- on

13

that, uh -- on that procedure. Um, because the,

um -- one of the factors on any motion to modify

bond, uh, directs the Court to consider the, uh,

strength of the State's case. Because of, uh, this

morning's rulings, uh, it is the State's position

that the strength of the State's case has become,

uh, significantly, uh, solidified.

Uh, let me also tell the Court that, um,

and Mr., uh, Kachinsky, uh, is to be, uh, made

aware of this, that additional, uh, forensic

conclusions were received. Additional reports

were received two days ago in our office which,

again, need to be revealed to this Court under

seal.

Lastly, Judge, the Manitowoc County, uh,

Corporation Counsel in a similar request made by

Mr. Avery, uh, made their position known, and I

don't know in this case if they've been invited

to do so.

With all of those factors, Judge, and

with the, uh, bond modification on the State's

part being at least an option, uh, I'm wondering

whether the Court would grant the State, uh, an

opportunity, perhaps five to seven days, to, uh,

file those matters with the Court to include, in

14

1  camera, uh, the additional information that, uh,

2  we have received, uh, and if the Court would be

3  willing, uh, to allow a, uh, more inclusive bail

4  modification hearing again in the next five to

5  seven days.

6         That seems to, uh, address those matters

7  that I cannot relay to the Court in open court

8  today, uh, and would provide this Court an

9  opportunity to reflect upon, or at least

10  consider, the relative, uh, strength of the

11  State's case in the bail modification motion.

12         THE COURT:  When were the -- the -- When

13  was the forensic evidence of -- of which you make

14  mention received?

15         ATTORNEY KRATZ:  The 10th.  Two days

16  ago, Judge.

17         THE COURT:  All right.  Mr. Kachinsky?

18         ATTORNEY KACHINSKY:  Well, Your Honor, this

19  motion was filed, I believe, on the 24th or 25th

20  of -- of April, 2006.  Uh, State's aware, from

21  having prosecuted the Avery case as well, at least

22  as to, uh, the values of the property that's --

23  that's involved, uh, and, uh, other factors relating

24  to bond other than the recent forensics evidence,

25  uh, as to whether or not the motion would be granted

15

or not. Um, I don't know if the State's forensic
evidence would add that much more to what the
Court's already ruled today in terms of the
admissibility of Mr. Dassey's statements.

So, it would be our -- our preference
that the Court, uh, proceed with the motion
and -- and make a ruling today.

THE COURT: Well, let me ask you,
Mr. Kratz, is it your intention to, in effect,
request that -- that, uh, bail be revoked here and
no bail be allowed at all?

ATTORNEY KRATZ: No, Judge. But I am going
to be asking that bail be increased, uh, having the
Court now consider the relative strength of the
State's case. That's in -- that's information I
didn't have until three minutes ago.

THE COURT: All right. Uh, the -- the
Court -- the Court is inclined, uh -- Since the
State says it -- it -- it has received some
additional information that -- that have -- may have
a bearing on the, uh, uh -- on the outcome of the
motion, the Court is inclined to -- to, uh -- to
adjourn this particular motion today, Mr. Kachinsky,
and -- and set, uh, uh -- set a near date for -- for
hearing on it.

16

APP-060

1            Uh, I don't have my calendar with me.

2            ATTORNEY KRATZ:  I can file my motion by

3    Wednesday, if that's okay, Judge.

4            THE COURT:  Okay.

5            ATTORNEY KRATZ:  If the Court can give me

6    five days to do that, I -- I can certainly have that

7    to the Court and Mr. Kachinsky.

8            THE COURT:  So that would be, uh, Wednesday

9    the 17th.  Um, all right.  Could, um -- Well, I

10   think what we'll -- we'll -- we'll do, uh,

11   following -- uh, following business in this court

12   today is -- is, uh, discuss a motion date in

13   chambers.  I have to, uh -- I have to take a look at

14   the calendar and you, gentlemen, probably do have to

15   look at yours as well, and there's some other

16   matters we should be discussing.

17           So, I am going to, uh, grant the -- the

18   State's motion to adjourn, order that, uh --

19   order that the revised motion or information be

20   filed by Wednesday, May 17.  Um, any other

21   matters to come before the Court today?

22           ATTORNEY KACHINSKY:  Your Honor, perhaps,

23   just to avoid unnecessarily calling, a -- a witness,

24   I don't know if the State disputes at all the value

25   of the property that's involved, I could submit to

17

1    the Court, uh, extra copy of the appraisals that

2    were made and, I believe, perhaps, submitted in the

3    Avery case.

4            If that's not the issue, if the issue is

5    this additional evidence regarding the State's

6    case, if that -- at least that portion of the,

7    uh, motion was taken care of, uh, that would,

8    perhaps, facilitate some of the inconvenience

9    that this delay is going to cause us.

10            ATTORNEY KRATZ:  How about if we do this,

11    Judge, I'm willing to share with Mr. Kachinsky my,

12    uh -- my feelings on that after going through the

13    documents and at least alert him whether or not

14    we'll need a witness at that next hearing.

15            THE COURT:  Well, I -- I noticed in his

16    motion -- in Mr. Kachinsky's motion -- he said that

17    he had sent you some documentary, uh, proof as to

18    values that he was claiming in motion.

19            ATTORNEY KRATZ:  He -- he brought some with

20    him today as well.

21            THE COURT:  Yeah.  Well, is there any

22    reason we can't just have those marked and be part

23    of the record?

24            ATTORNEY KRATZ:  No.  That's fine.

25            THE COURT:  Yeah.  Let's do that.  And the

18

```
 1     bailiff was kind enough to bring a calendar here so

 2     let's take a look.  How about Friday?  The

 3     afternoon?  Friday, May 26?

 4              ATTORNEY KRATZ:  State's available, Judge.

 5              ATTORNEY KACHINSKY:  The only thing -- Uh,

 6     I've got something in Chilton, but, perhaps, that

 7     can be, uh, taken care of, Your Honor.

 8              ATTORNEY KRATZ:  I'll see what I can do,

 9     Judge, to --

10              THE COURT:  How about 1:15?

11              ATTORNEY KACHINSKY:  Sure.

12              THE COURT:  Anything else, gentlemen?

13              ATTORNEY KRATZ:  Judge, I have to, uh,

14     place on the record, and receive the Court's

15     acquiescence, as the information that I intend to

16     provide certainly has not been publicly disclosed

17     and would, uh, I believe, be the kind of information

18     that the Court, uh, likely would not want disclosed.

19     May I file my motion to amend under seal as well?

20              THE COURT:  All right.  It -- it will be

21     received as -- as an in camera motion, or at least

22     the exhibits to the motion, and -- and anything in

23     the motion that, uh, would be revelatory will be

24     received as an -- an -- as an in camera motion.

25              ATTORNEY KRATZ:  That's fine, Judge.
```

19

```
 1              THE COURT:  Anything further?

 2              ATTORNEY KRATZ:  No.

 3              ATTORNEY KACHINSKY:  And, Your Honor, the,

 4     uh, appraisal's been marked.  I don't know if we're

 5     going to -- I didn't see what letter you --

 6              THE CLERK:  One.

 7              ATTORNEY KACHINSKY:  As Exhibit 1.

 8              THE COURT:  Okay.  The appraisal will be,

 9     uh, Exhibit 1 and it will be part of the -- the

10     motion, uh, and, uh, Mr. Kratz, do you have any

11     objection to the appraisal?

12              ATTORNEY KRATZ:  No.

13              THE COURT:  I mean, you're not --

14              ATTORNEY KRATZ:  Not to -- not to its

15     receipt for this hearing, Judge.

16              THE COURT:  All right.  All right.

17     Anything else?

18              ATTORNEY KRATZ:  No.  Thank you, Judge.

19              ATTORNEY KACHINSKY:  No.

20              THE COURT:  Could I see you both in about

21     ten minutes in chambers, please?

22              ATTORNEY KRATZ:  Yes, Judge.

23              THE COURT:  Thanks.  We're adjourned.

24              (PROCEEDINGS CONCLUDED.)

25
```

APP-064

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 109 of 142    Document 19-9

```
 1    STATE OF WISCONSIN  )
                          )SS.
 2    COUNTY OF MANITOWOC )

 3

 4               I, Jennifer K. Hau, Official Court

 5    Reporter for Circuit Court Branch 3 and the State

 6    of Wisconsin, do hereby certify that I reported

 7    the foregoing matter and that the foregoing

 8    transcript has been carefully prepared by me with

 9    my computerized stenographic notes as taken by me

10    in machine shorthand, and by computer-assisted

11    transcription thereafter transcribed, and that it

12    is a true and correct transcript of the

13    proceedings had in said matter to the best of my

14    knowledge and ability.

15               Dated this 29th day of August, 2006.

16

17

18
                      Jennifer K. Hau
19                    Jennifer K. Hau, RPR
                      Official Court Reporter
20

21

22

23

24

25


                           21
```

ORIGINAL

State of Wisconsin        Circuit Court Branch III        Manitowoc County

STATE OF WISCONSIN                          ORDER DENYING
                              Plaintiff,     DEFENDANT'S MOTION TO
        vs.                                  SUPPRESS STATEMENTS

BRENDAN R. DASSEY,                           Case No. 06-CF-88
                              Defendant,

        The defendant, having filed a Motion to Suppress Statements in this matter; the
State having objected to said motion; and the Court having received evidence and
having heard oral arguments on May 4, 2006, as well as considering additional
evidence which has been "sealed" and made part of the record;

        NOW, THEREFORE, IT IS ORDERED that, for reasons articulated on the record
on May 12, 2006, the defendant's Motion to Suppress Statements is denied.

        Dated this _____ day of May, 2006.

MANITOWOC COUNTY
STATE OF WISCONSIN
FILED

MAY 16 2006

CLERK OF CIRCUIT COURT

                                  BY THE COURT:

                                  Jerome L. Fox
                                  Circuit Court Judge, Branch III

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CRIMINAL ACTION
NO. 2009-0385

### COMMONWEALTH

vs.

### NGA TRUONG

### FINDINGS OF FACT, RULINGS OF LAW, AND
### ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The defendant, Nga Truong ("Nga"), moves the court to suppress any and all statements

made by her to law enforcement on December 1, 2008, together with all evidence obtained by

the Commonwealth as a result of any statements she made. For the following reasons, the

defendant's motion to suppress is **ALLOWED**.

### FINDINGS OF FACT

Based on the evidence presented at the hearing and the reasonable inferences therefrom,

the court makes the following findings of fact.[1]

On November 30, 2008 at approximately 11:10 a.m., Sergeant Kevin Pageau ("Pageau"),

of the Worcester Police Department, accompanied by two other officers,[2] responded to an

apartment located at 3 Henderson Avenue in Worcester, Massachusetts in order to investigate a

911 call of an unconscious and unresponsive one-year old baby, Khyle Truong ("Khyle"). Khyle

---

[1] The findings of fact made by the court are those that are relevant to the issues presented by this motion. The evidence presented, and considered by the court, consisted of the testimony of Sergeant Kevin Pageau, a computer screen printout, the audio recordings of the interviews of Nga Truong and Van Truong, the video recordings of those interviews, the Miranda Warnings and Waiver form signed by Nga Truong, and the death certificate. The court was also provided with a transcript of the audio and video recording of the interview with Nga Truong to assist the court in following the audio portion of her interview.

[2] Pageau arrived with Detectives Doherty and Goulet. Detective Goulet was from the juvenile division of the Worcester Police Department.

had been taken to the hospital, but was believed to have died. Khyle's mother, Nga, and his

grandmother, Van Truong ("Van") had also gone to the hospital. Pageau had been assigned as

the detective in charge of the investigation.

When Pageau arrived at the apartment shortly after 11:00 a.m. he knew Worcester police

had initially arrived at about 10:40 a.m. to find an infant (Khyle) not breathing, and that the

responding officer had found vomit on the baby's face and around his mouth when he attempted

to perform CPR. Pageau himself observed what he believed to be vomit in the crib where Khyle

had been. Once at the scene, Pageau directed officers from the department's crime scene unit to

collect evidence and take photographs. Pageau remained at the apartment for approximately two

hours that day. Khyle Truong was officially pronounced dead just after 12:00 p.m. on November

30, 2008.

Edwin Vasquez ("Edwin"), Nga's boyfriend, was at the apartment when Pageau and the

other officers arrived. Edwin had been at the apartment when the 911 call came in regarding

Khyle.[3] Pageau had a brief conversation with him at that time. Later that afternoon, at

approximately 2:00 p.m., the police brought Edwin to the police department and took his

statement.[4]

At 2:30 p.m. on November 30th Pageau met with both Nga and Van and spoke with them

together for approximately half an hour. Prior to speaking with them, Pageau had learned from

the emergency room doctors that an hour after he had been removed from the apartment Khyle

had a temperature of 101; that Khyle's death did not appear to be a traditional SIDS[5] death; and

that there were no signs of injury or significant illness. Neither Nga nor Van was placed in

---

[3] From the interviews with Van and Nga, the court learned that Edwin lived at the apartment with Nga.
[4] Detective Doherty interviewed Edwin and that interview was not audio or video-recorded. Notably, Pageau
testified that the Worcester police do not audio or video-record non-custodial statements.
[5] Sudden Infant Death Syndrome

custody and Pageau did not read them their <u>Miranda</u> warnings. The court finds that Pageau did not discuss with Nga or Van that before speaking with him Nga could meet with Van or another interested adult to discuss her rights. Based on the information he received from Nga and Van, Pageau sent officers from the crime scene unit back to the apartment to retrieve additional evidence.[6]

After the interviews with Edwin, Nga & Van, Pageau and Detective John Doherty ("Doherty") proceeded with their investigation and obtained information from Worcester Police Department records that a year before Khyle's death Nga had been a run-away and involved with the Department of Social Services ("DSS").[7] They had also discovered that eight years earlier, when Nga was eight-years old, Van had left her in charge of Nga's three-month old baby brother, Hein. Nga found Hein unconscious and brought the baby to an adult who lived downstairs. Hein was taken to the hospital and pronounced dead. It was determined that the cause of death was SIDS. A DSS report had been filed and neglect found on the part of Van for leaving Nga in charge of Hein. No criminal charges were brought.

On December 1, 2008 at about 10:30 a.m. Pageau and Doherty returned to the apartment because they wanted to bring Nga, Van and Edwin to the police station for further interviews. When they arrived at the apartment, Van, Nga, Edwin, and Nga's aunt were there. Pageau testified that he told Edwin, Van and Nga that he wanted to speak with them at the police department.[8] Pageau did not place Nga, Van or Edwin into custody, nor did Pageau advise any of them of their <u>Miranda</u> warnings. The court finds that Pageau was not aware that Nga was

---

[6] The officers retrieved two used diapers that Pageau was told had been Khyle's.
[7] Now called the Department of Children & Families.
[8] This was Pageau's initial testimony at the hearing. In response to a question from the court, Pageau altered that testimony by stating that he told Van he wanted to speak with her and her daughter at the police station and asked Van if they would be willing to come down to the station to talk with him. The court does not credit this testimony and finds that Pageau did not speak only with Van and was not seeking Van's permission to speak with Nga.

3

sixteen years old [9] when he was at the apartment on the morning of December 1st, nor when he met with Nga and Van the day before on November 30th. Pageau testified that his understanding of a juvenile was anyone under the age of eighteen; however, he also testified that under the law a juvenile, at least with regard to Miranda warnings, is an individual under the age of seventeen. Based on that testimony, the court finds that while Pageau believed Nga was a minor (under eighteen), he treated her as if she was not a juvenile (at least seventeen) when telling her he wanted to bring her to the police department for another interview. There was no evidence that Pageau advised Nga or Van that Nga could consult with Van, some other interested adult, or an attorney, to discuss whether or not she should go the police station to be interviewed.

While Nga and Edwin remained at the apartment, a relative drove Van to the police station to meet with Pageau and Doherty. Van was taken to an interview room.[10] The interview with Van began shortly after 11:00 a.m., but the audio and video recording did not begin until 11:20 a.m. At the beginning of the interview, the detectives advised Van of her Miranda warnings. Van agreed to waive her rights and to speak with the detectives. At no time during the two hours of Van's interview did either detective indicate that they knew Nga was only sixteen, and when at the beginning of the interview they asked Van how old Nga was, she told them Nga was seventeen.[11] The officers never advised Van of Nga's Miranda rights, they did not ask her if they could interview Nga, and they did not tell Van they would give Nga an opportunity to consult with her, some other interested adult, or an attorney before they interviewed Nga.

---

[9] It is not in dispute that Nga was sixteen years old on December 1, 2008.
[10] The room was a small room, approximately 8 feet by 10 feet, containing a table and three chairs. Two of the chairs were on one side of the table and the third chair was on the other side, with the chairs facing each other. The video camera faced the single chair. There was one door to the room.
[11] Given all the information Pageau and Doherty had acquired about Nga prior to the interview with Van, including DSS records and police reports regarding Hein's death, the court finds it hard to believe they were not aware of Nga's date of birth (December 3, 1991) which would have told them Nga was only sixteen. Also, at one point in the interview with Van, Pageau tells Van that Nga needs help and that she is "still a juvenile."

It is evident from the interview with Van that Pageau and Doherty firmly believed that Nga had killed Khyle, and the officers were clearly interrogating Van. Pageau questioned Van about Hein's death and both detectives had reached the conclusion that Hein had not died from SIDS, but rather at the hands of Nga. They linked Khyle's and Hein's death together telling Van that two babies were dead and both times Nga was with those babies. They continually insisted that Van tell them what Nga did to those babies. When Van told them that Hein's death had been from SIDS, the officers were utterly dismissive of that explanation. They were forcefully direct with Van that the story of Hein's death was incorrect. The detectives insisted with Van that Hein had died the same way Khyle did – by suffocation from being smothered. They insisted that it could not have been a coincidence that two babies died the same way, and that Nga was with both babies when they died. Pageau told Van that Nga had lied to him the day before, he told Van he was going to bring Nga back in, and sarcastically asked Van "Do you think she's [meaning Nga] going to just walk out of here?" Pageau also told Van they had medical proof that Khyle had been smothered and that science does not lie. They accused Van of not cooperating with them because she would not tell them how Nga had killed Khyle and Hein. Pageau and Doherty also told Van that Nga needed a lot of help, that she was still a juvenile and that Van needed to help Nga get the help she needed.

The interrogation of Van ended at 1:17 p.m. At the end, Pageau tells Van that he's bringing in her daughter and boyfriend to speak with them. This was simply a statement of fact and not a request for Van's permission. Pageau's testimony that during Van's interrogation they asked Van for permission to speak with Nga, but that he was not sure if his request was on the actual video (which it was not) or after the video recording was over, is simply not credible.

5

Given that the detectives believed Nga was seventeen, that the focus of their investigation

was entirely on Nga, that they had just spent two hours telling Van that Nga had killed Khyle and

Hein, and had demanded that Van tell them what Nga had done to those babies, this court finds

that the police purposely brought Nga to the station separately from Van and interviewed her

after Van.[12]  Based on the above, the detectives never intended that Nga and Van would consult

with each other prior to Nga's interview.   This court does not credit any portion of Pageau's

testimony that he asked Van for permission to interview Nga or that he asked Van if she wanted

to be present during Nga's interview.[13]

Either during Van's interrogation or shortly after its conclusion, Pageau sent an officer to

the apartment to bring Nga in.[14]  Van was no longer at the station when Nga arrived with the

officer.  Nga was brought to an interview room in the juvenile division located on the second

floor of the police department and left alone in that room.[15]  Nga was not in handcuffs.  At some

point, Doherty and Pageau came into the room.  Within the first twenty seconds of the interview,

Doherty asks Nga to give her date of birth, which she gave as December 1, 1991.  The court

finds that from that moment Pageau and Doherty should have been and were on notice that Nga

---

[12] Based on the conduct of the police during their interview of Van, together with the information the police had learned regarding Hein's death, the court finds that Pageau and Doherty specifically wanted to interview Van first and agreed to meet Van at the station.  The court does not credit Pageau's testimony that he thought Nga had come with Van to the police station and did not realize Nga was not there until after his interview with Van was over, since it was clear during the interview with Van that he knew Nga was not there (having left the interview room at least once during Van's interview, despite testifying that he had not) and that he sent other officers to the apartment to pick up Nga and Edwin.

[13] This is borne out from the interview with Van in which Pageau tells Van that this time he is not interested in hearing the rehearsed and made-up story Van and Nga told him the day before, and when he told Van that Nga had lied to him the day before.  During the interview Pageau told Van that she knew Nga had killed Khyle because Nga had told her that.  When Van kept saying she did not know how Khyle died, Pageau kept saying that she did and kept asking her what Nga had told her and what Nga had done to those babies.  Given the tact he and Doherty had taken with Van, it is logical to infer that Pageau believed that if Van and Nga met and talked before Nga's interview that Van would tell Nga what had occurred during her interview, which would have seriously compromised his investigation.

[14] It was somewhat unclear from Pageau's testimony if he sent the officer to go pick up Nga and Edwin while still interviewing Van or if he sent the officer after Van's interview was concluded.

[15] From the video recordings, this interview room appears to be the same as the one Van had been in.

was only sixteen years old. Doherty then advised Nga that he was going to go over her rights and asked her if she was there voluntarily. Nga responded that she was, but confirmed that she had been brought to the station by a police officer. Doherty then read Nga her Miranda warnings. He asked her if she understood them and she responded that she did. She also responded "sure" when Doherty asked her if she wanted to speak with them. Doherty asked Nga to sign the Miranda Warnings & Waiver form, which she did at 1:54 p.m.

Immediately after signing, Doherty asked Nga how old she was. Nga responded that she was seventeen. Doherty then asked Nga if she was going to be eighteen in a couple of days, to which Nga said: "I'm going to turn seventeen." Doherty responded by saying "Oh, you're going to turn seventeen in a couple days. Okay." At this point, Pageau asked Nga "You're not seventeen yet?" Nga said "No." Pageau's response was: "But you have spoken with your mother, and you spoke with me, with your mother present yesterday, right?" Nga said "Yes." Pageau then asked, "And your mother knows you're here today?" Nga said "Mm-hmm." Pageau then said "And that's okay. And as a matter of fact, she just left; right?" Nga responded, "Yes."

Based on the dialogue between the police and Nga, the court finds that Pageau and Doherty were now well aware that Nga was only sixteen years old, that Van was not present at the police station at this point, and that Nga had not had an opportunity to consult with Van, another interested adult, or an attorney before having her Miranda warnings read and agreeing to waive her rights. The court also finds that the police never told Nga, prior to waiving her Miranda rights, that she could speak with Van, another interested adult, or an attorney about her rights.

Because Pageau and Doherty had come to believe that Nga had killed Kyle prior to their meeting with either Van or Nga, the ensuing interview with Nga became an interrogation in

7

APP-073

which Pageau and Doherty conveyed their belief to Nga that she had killed not only Khyle, but also her brother, Hein. Despite having told Nga that she was free to leave initially, once the interrogation became forceful, Nga's requests to end the interview were not honored.[16]

During more than two hours of interrogation, Pageau and Doherty focused exclusively on Nga's involvement in the death of Khyle. Throughout their questioning, the police theme was that (1) they were aware she had killed Khyle and Hein, (2) they had medical evidence confirming she had smothered Khyle,[17] (3) they knew her mother placed the responsibility for caring for her younger siblings on her, putting too much pressure on her, (4) that neither Van nor Edwin were involved in Khyle's death, leaving her as the only possible person, and (5) that if she told them what she did, they would get her the help she needed because she was just a juvenile,[18] but if she refused to admit what she did, they would take her to court and tell the jury that she smothered Khyle.

As the interrogation proceeded the detectives' tone became increasingly aggressive. They continually refused to accept Nga's many denials that she did not hurt Khyle or Hein.[19] Each time Nga denied knowing how Khyle died, the police accused her of lying and that she was not cooperating with them. Also, throughout the interview, the police reminded Nga that she was only sixteen and at various points asked her about wanting to meet with her mother, or having already spoken with her mother, or that they could call Van if Nga wanted them to and that it was up to Nga. After almost two hours of accusing Nga of killing Khyle and promising

---

[16] For example, when Nga asked if she could come back another time to answer questions, she was told there would be no next time. At another point, when she asked when she could leave, Nga was left alone in the room for about five minutes while Pageau checked with his sergeant and then returned to continue questioning her.

[17] At the hearing Pageau testified that he knew no cause of death had been determined for Khyle and that lividity evident in Khyle's body at the autopsy may have occurred in the morgue. The death certificate did not contain a cause of death. The court finds that Pageau did not possess medical evidence that Khyle had been smothered when interviewing Nga.

[18] Including getting help for her siblings by getting them out of the house and away from Van.

[19] For example, when Nga told Pageau that Hein's death had been from SIDS, Pageau responded by saying "No.... big sister syndrome."

Nga that they would get her the help she needed because she was just a juvenile, and help for her brothers by getting them a better life, Nga admitted that she smothered Khyle with one of the teddy bears in his crib. Nga then asked if she could leave at which point she is then left alone in the interview room for almost twenty minutes. When the police return, Nga asks them "Will me and my brothers get to go to foster care?" Pageau responds by saying "Yes, I think so. We're going to get DSS involved to do some foster care. Okay. Try to help them out." Pageau then goes on to ask Nga if she had spoken with her mother about coming down to the station. Nga says that she had and that she had spoken with her mother by phone. Pageau then asks Nga "And it was okay with her and it was okay with you?" Nga said "Yes." Pageau then states "Okay. And we did ask you a couple times if you wanted to speak with her. You'd rather not speak with her?" And then Pageau stated "So as a matter of fact, we let her go, rather than let you talk with her?" Nga's responses were inaudible, but she nodded her head up and down. At the end of the interrogation, Nga was placed under arrest.

## RULINGS OF LAW

Under <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966), when an individual is taken into custody, police are required to inform that individual of her rights against self-incrimination and to an attorney. In addition, the police must obtain a knowing, intelligent, and voluntary waiver of those rights before any interrogation otherwise any subsequent statement is inadmissible. <u>Id</u>. at 444-445; <u>Commonwealth</u> v. <u>Bryant</u>, 390 Mass. 729, 736 (1984); <u>Commonwealth</u> v. <u>Haas</u>, 373 Mass. 545, 552 (1977). The defendant argues that the statement she gave must be suppressed because it was obtained during a custodial interrogation without her having made a knowing, intelligent and voluntary waiver of her <u>Miranda</u> rights. The defendant further argues that her statement was not made voluntarily. This court must first determine if Nga was subject to a

custodial interrogation. If she was, the court must then determine if she made a knowing, intelligent and voluntary waiver of her <u>Miranda</u> rights. Finally, the court must determine if Nga's statement was voluntary.

*1.     Was the defendant the subject of a custodial interrogation?*

<u>Miranda</u> warnings are only required when an individual, including a juvenile, is subject to custodial interrogation. See <u>Commonwealth</u> v. <u>Morse</u>, 427 Mass. 117, 122-23 (1998); <u>Commonwealth</u> v. <u>A Juvenile</u>, 402 Mass. 275 (1988). The defendant bears the burden of proving custody. <u>Commonwealth</u> v. <u>Larkin</u>, 429 Mass. 426, 432 (1999).

"[C]ustodial interrogation [is] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom in any significant way." <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. at 444 (1966); see <u>Commonwealth</u> v. <u>Haas</u>, 373 Mass. 545, 551-554 (1977). In determining if a person is deprived of freedom in a significant way, the Supreme Judicial Court has recognized four factors to be considered: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, i.e. whether the interview was aggressive or, instead, informal; and (4) whether, at the time the incriminating statement or statements were made, the suspect was free to end the interview by leaving the place of the interrogation or by asking the interrogator to leave, or, alternatively, whether the interview terminated with the defendant's arrest." <u>Commonwealth</u> v. <u>Sneed</u>, 440 Mass. 216, 220 (2003); see also <u>Commonwealth</u> v. <u>Ira I</u>, 439 Mass. 805, 814 (2003).

"The test is an objective one: whether a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive." <u>Commonwealth</u> v. <u>Larkin</u>, 429 Mass. at 432. The critical question is "whether, considering all the circumstances,

a reasonable person in the defendant's position would have believed that [she] was in custody." Commonwealth v. Sneed, 440 Mass. at 220, quoting Commonwealth v. Brum, 438 Mass. 103, 111 (2002).

Taking into consideration the four factors and applying them to the totality of the circumstances in this case, the court finds that the defendant has met her burden of proving that she was in custody. Nga had been transported to the police station by a police officer and brought to an interrogation room, equipped with audio and video recording,[20] where she was questioned by two police officers for over two hours. Here, the officers did not just convey to Nga that she was a suspect, but, as found by this court, they spent most of the two hours telling Nga she had killed Khyle, and that she had also killed Hein eight years earlier. The nature of Nga's interrogation was not conversational or informal. To the contrary, the questioning was exceedingly formal and particularly aggressive. Finally, when Nga attempted to end the interview she was not free to leave, and at the end she was arrested. There is no question that a reasonable person in Nga's position would understand that she was not free to leave at the time she made the statement. See Commonwealth v. Morse, 427 Mass. at 127.

2.    *Did the defendant make a knowing, intelligent and voluntary waiver of her Miranda rights?*

Having determined that the defendant sustained her burden of proving she was in custody and Miranda warnings were required, the court must determine: (1) whether the warnings were validly given; (2) whether the defendant made a voluntary and knowing waiver of her Miranda rights; and (3) whether the defendant made statements voluntarily, without being intimidated or

---

[20] The court also notes that Pageau's testimony indicates that he believed the interview with Nga was custodial since he testified that custodial interrogations are ones that are audio and video recorded. While the subjective beliefs of law enforcement is irrelevant in determining if a person being questioned is in custody for the purposes of Miranda, such beliefs can influence the conditions surrounding an interrogation. See Stansbury v. California, 511 U.S. 318, 323-24 (1994); Commonwealth v. Morse, 427 Mass. at 124.

11

coerced. Commonwealth v. Williams, 388 Mass 846, 850-56 (1983); Commonwealth v. A Juvenile, 389 Mass. 128, 129 (1983); Commonwealth v. Tavares, 385 Mass. 140, 145, *cert. denied*, 457 U.S. 1137 (1982). It is the Commonwealth's burden to prove beyond a reasonable doubt the voluntariness of both the waiver and the statements. Commonwealth v. Day, 387 Mass. 915, 920-21 (1983).

There is no issue that the warnings given to Nga were valid. Rather, this court must determine whether the Commonwealth has proven beyond a reasonable doubt that Nga made a voluntary and knowing waiver of her Miranda rights. For the Commonwealth to successfully demonstrate a knowing and intelligent waiver by a juvenile who has reached the age of fourteen, such as Nga, there "should ordinarily be a meaningful consultation with the parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent. For a waiver to be valid without such a consultation, the circumstances should demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." Commonwealth v. A Juvenile, 389 Mass. at 134. This requirement envisioned that the parent of the juvenile was present, the parent understood the warnings, and the parent had the opportunity to explain the rights to the juvenile so that the juvenile understands the significance of waiving those rights. Id.

While actual consultation between the juvenile and a parent, interested adult, or attorney is not required, there must be a "genuine opportunity" for such a consultation. Commonwealth v. Alfonso A., 438 Mass. 372, 381 (2003), citing Commonwealth v. MacNeill, 399 Mass. 71, 78 (1987). In addition, to be any genuine consultation, the adult who is available must be informed of and understand the juvenile's constitutional rights. Commonwealth v. Alfonso A., 438 Mass. at 382, citing Commonwealth v. Berry, 410 Mass. 31, 34-35 (1991). Such a requirement suggests the presence of an adult, or, "at the very least, contact between the adult and the police

so that the police may inform the adult of those rights." Commonwealth v. Alfonso A., 438 Mass. at 382. Although the law does not expressly require the adult in question to be physically present in order for there to be that "genuine opportunity" for consultation, in all cases where it was found that the required opportunity occurred, an adult was in fact present. Id. "The 'genuine opportunity' for consultation that our cases envision is not merely a theoretical opportunity, that the juvenile may utilize at some future time, but an opportunity that is immediately and evidently available to the juvenile before the juvenile waives his or her rights." Id.

The police never advised Van of Nga's Miranda rights. The police never provided Nga with the opportunity to consult with Van or some other interested adult, or an attorney, prior to reading her Miranda warnings, or prior to her verbally agreeing to waive those rights and signing the waiver form. In this case, not only was there no genuine opportunity for Nga to have the requisite consultation before she presumably waived her Miranda rights, the police specifically orchestrated their interrogation so Nga could not meet with Van prior to her interview.

Assuming the police believed Nga was seventeen when they interrogated Van, and continued to believe that when they began questioning Nga, moments after obtaining Nga's waiver, the police learned that she was only sixteen. Pageau was well aware of the significance of this because he immediately asked Nga "But you have spoken with your mother, and you spoke with me, with your mother present yesterday, right?"[21] The detectives' concern continued throughout Nga's interrogation because on multiple occasions they asked her if she had spoken with her mother, that her mother knew she was there, and told her that it was up to her if she

---

[21] As stated earlier, Pageau testified that he understood that a juvenile for Miranda purposes was anyone under the age of seventeen.

wanted to have her mother there. This continued right up to the very end of the interrogation, even after Nga admitted to having smothered Khyle.

At best, the evidence is that Nga spoke with Van over the phone at some point on December 1st prior to her being questioned, but since there is absolutely no evidence that the police ever explained Nga's rights to Van, the court finds that any such conversation between Van and Nga could not have included a discussion of Nga' rights and what it would mean to waive those rights.[22] Knowledge by Van that Nga was at the station and was being questioned is not compliance with the requirement that "in order for there to be any genuine consultation, the adult who is available must be informed of and understand the juvenile's constitutional rights." Commonwealth v. Alfonso A., supra at 381-381. Based on all of the circumstances, the Commonwealth has failed to demonstrate that Nga had a genuine opportunity for a meaningful consultation.[23]

Because there was no opportunity for meaningful consultation, the Commonwealth must make the alternative showing of "circumstances [demonstrating] a high degree of intelligence, experience, knowledge or sophistication on the part of [Nga]" in order to prove a valid waiver of her Miranda rights. Commonwealth v. Alfonso A., 438 Mass. at 384, quoting Commonwealth v. A Juvenile, 389 Mass. 128, 124 (1983). Prior to her contact with the police on November 30th, there was no evidence that Nga had had any previous involvement with the criminal process. At

---

[22] Nor is it helpful to the Commonwealth's cause that Pageau interviewed Van and Nga together the day before since again Pageau did not provide either with their Miranda warnings, did not advise Van of Nga's rights, nor provide Nga with an opportunity to consult with Van, another interested adult, or an attorney prior to being interviewed.

[23] Even if Nga had been given the opportunity to consult with Van prior to waiving her rights, given that the police had told Van that Nga killed both Khyle and Hein, it is questionable whether Van would have been sufficiently concerned with Nga's welfare to provide Nga with appropriate protection. See Commonwealth v. Alfonso A., 438 Mass. at 383, upholding the Appeals Court determination in 53 Mass. App. Ct. 279, 293 (2001). Whether an adult advising a juvenile is an interested adult must be viewed from the perspective of the police conducting the interview. See Commonwealth v. Berry, 410 Mass. at 37. Where it is apparent to the police that the adult may be actually antagonistic toward the juvenile, that adult could not qualify as someone to provide the juvenile with an opportunity for consultation as contemplated by the law. See Id. at 36-37.

APP-080

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 125 of 142    Document 19-9

best, there was some indication that Nga had been involved with DSS, allegedly because she had been a runaway, but that does not demonstrate the type of contact that would suggest that Nga was aware of and understood her Miranda rights. Even extensive contact with police and other authorities by itself does not demonstrate unusual sophistication or knowledge about Miranda rights. See Commonwealth v. Guyton, 405 Mass. 497, 503 (1989). In this case, any contact Nga had with official authorities was minimal and does not show that she was aware of and understood her Miranda rights. Also, there was no evidence that on some other occasion Nga had asserted her rights. Contrast Commonwealth v. Pucillo, 427 Mass. 108, 111 (1998); Commonwealth v. King, 17 Mass. App. Ct. 602, 609-610 (1984).

The Commonwealth's suggestion that because Nga was just two days from her seventeenth birthday she possessed the requisite intelligence and sophistication to independently waive her rights has no merit. While it may be true that there would not have been a difference in Nga's intelligence and sophistication from December 1, 2008 to December 3, 2008, Massachusetts law has determined that special care must be taken in assessing voluntariness when an individual is under seventeen. Even though drawing the line at seventeen is subject to the objections always raised against hard and fast rules, the law has determined that a line must be drawn. See Roper v. Simmons, 543 U.S. 551, 574 (2005).

The court did not observe either from the audio and video recording, or during the hearing, that Nga was a particularly sophisticated or intelligent sixteen year old. Nor did the recordings show an individual who demonstrated any particular experience in or knowledge of the criminal process. In fact, the court observed a frightened, meek, emotionally compromised teenager who never understood the implications of her statements, as evidenced by her asking the police "Will me and my brothers get to go to foster care?" after she admitted she had

smothered Khyle. Even assuming, which this court does not, that Nga's demeanor during the interrogation demonstrated her intelligence and "experience in the ways of the world," that is not proof beyond a reasonable doubt that Nga was aware of and understood her <u>Miranda</u> rights, and made a valid waiver. The court does not find that the Commonwealth has sustained its heavy burden of demonstrating that Nga had a high degree of intelligence, experience, knowledge, or sophistication to obviate the requirement that she be given the opportunity to consult with her mother, another interested adult, or an attorney prior to being provided with and waiving her <u>Miranda</u> rights. As a result, the court finds that the Commonwealth has failed to prove beyond a reasonable doubt that Nga gave a valid waiver of her <u>Miranda</u> rights.

3. *Was the defendant's statement voluntary?*

Apart from a consideration of the validity of a <u>Miranda</u> waiver, due process requires a separate inquiry into the voluntariness of a statement. <u>Commonwealth</u> v. <u>Magee</u>, 432 Mass. 381, 385 (1996). The court must look at the totality of the circumstances surrounding the making of the statement, "to ensure that the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne [her] will." <u>Commonwealth</u> v. <u>Mahnke</u>, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). "Relevant factors include, but are not limited to, promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." <u>Commonwealth</u> v. <u>Selby</u>, 420 Mass. 656, 663 (1995), quoting <u>Commonwealth</u> v. <u>Mandile</u>, 397 Mass. 410, 413 (1986). "[A] finding that the defendant was unable to make a knowing, voluntary and intelligent waiver of her Miranda rights is not enough,

standing alone, to support the finding that her statements were involuntary." Commonwealth v. Hilton, 450 Mass. 173, 178 (2007). Again, the Commonwealth bears the burden of proving that the defendant's statement was voluntary beyond a reasonable doubt. Commonwealth v. Tavares, 385 Mass. 140, 151-52 (1982).

In viewing the totality of the circumstances in this case, the Commonwealth has not sustained its burden of showing beyond a reasonable doubt that Nga's statement was voluntary. As stated above, the particularly aggressive interrogation conducted by the police given Nga's age together with her lack of sophistication and experience with the criminal process, coupled with her emotional state are all factors that lead to the conclusion that Nga's statement was not voluntary. In addition, the police repeatedly confronted Nga with knowingly false statements that they had conclusive medical and scientific evidence proving she had killed Khyle, which included false information regarding the presence of lividity and scientific evidence that Khyle had been smothered. Compounding this was the police insisting that Nga had killed Hein eight years earlier, despite having police reports, DSS records, and an autopsy showing that Hein's death had been investigated and determined to be a SIDS death.

The use of deception as a tactical device is disapproved, and such tactics cast doubt on whether a defendant's statement is voluntary. See Commonwealth v. Jackson, 377 Mass. 319, 328 n.8 (1979); Commonwealth v. Nero, 14 Mass. App. Ct. 714, 716 (1982). While the use of false statements is a relevant factor to be considered in voluntariness, it does not compel suppression. Instead, it is to be considered as part of the totality of the circumstances. Commonwealth v. DiGiambattista, 442 Mass. 423, 432-33 (2004). If the use of false information is the only factor pointing toward involuntariness, suppression would not ordinarily

follow. Id. at 433. However, where there are additional factors suggesting involuntariness, suppression will be required. Id.

. In addition to deception regarding medical evidence, the police continually told Nga that she was just a juvenile and if she would admit what she did she would remain in the juvenile court where she would get help. Statements such as "You tell us what happened. We walk right out here. To special crime, juvenile, get on the phone, talk with a social worker, and try to get you some help." They told Nga there were women out there (meaning outside the interrogation room) "that work with children like you and people that are abused and have issues at home, they have a lot of resources." The police also promised not just help for her, but also for Nga's brothers. The detectives told her "there's no doubt what happened in there. All everyone's waiting for today is for you admit to what you did so that we can start the process of getting you some help, getting you into a social program. Getting your brothers out of that house. And getting them in a better home, where there's a mom that gets up in the morning and takes care of them."[24]

Equally important, the police made it very clear that if Nga did not admit to what she did, they would proceed with putting the case together, go to court with all the evidence and prove that she smothered Khyle. If it went that route, the police clearly implied to Nga that no help would be available. With notable naiveté Nga believed what the officers told her since, after admitting she had smothered Khyle, all she wanted to know was whether she and her brothers would now be able to go to a foster home. By continually promising Nga that because she was a

---

[24] The police kept insisting that Van was a neglectful mother to not just Nga, but also Nga's brothers. Pageau and Doherty said how unfair the home situation was to Nga, and that she did not have the chance to just be a regular teenager because of Van. The police version was that Van had put Nga into an untenable and unbearable situation for someone her age by making Nga the one responsible for taking care of not only her own baby, but also her mother's. As a result, Nga was under tremendous pressure causing her to lose control that resulted in her smothering Khyle.

juvenile she would be given help if she admitted the crime, the police minimized the seriousness of the charge she was facing.

Where there have been suggestions of leniency in exchange for a confession, combined with false statements concerning allegedly irrefutable evidence that would be used against a defendant, the defendant's ability to make a voluntary statement is undermined. See Commonwealth v. DiGiambattista, 442 Mass. at 435; Commonwealth v. Meehan, 377 Mass. 552, 563 (1979). The detectives' assurances to Nga that, because she was a juvenile, she would receive the help she needed if she simply admitted what she had done to Khyle was more than an implied offer of leniency. In this case, they were extremely close to explicit promises. Even if it was not an explicit promise, the police assurances to Nga were still coercive. Coercion can be applied by way of implied promises just as it is by express promises. See Commonwealth v. DiGiambattista, 442 Mass. at 435-36. Given Nga's age she was even more susceptible to the influences and pressures applied by the detectives. See Roper v. Simmons, 543 U.S. at 569-571. In this case, the offers of leniency if Nga admitted she smothered Khyle represented a quid pro quo. See Id. at 436; Commonwealth v. Magee, 423 Mass. at 387. When, as here, there exists a combination of trickery and implied promises, together with Nga's young age, lack of experience and sophistication, her emotional state, as well as the aggressive nature of the interrogation, the totality of the circumstances suggests a situation potentially coercive to the point of making an innocent person confess to a crime. See Commonwealth v. Scoggins, 439 Mass. 571, 576 (2003). When such a situation exists, the Commonwealth has failed to meet its burden of establishing beyond a reasonable doubt that Nga's statement was voluntary and the statement must be suppressed. See Commonwealth v. DiGiambattista, 442 Mass. at 439.

*4.     Seizure of physical evidence*

After admitting that she smothered Khyle, Nga told the officers that she had used a stuffed animal to smother Khyle with.[25] Nga was asked additional questions about which stuffed animal she used and was shown a photograph taken by police of stuffed animals recovered from Khyle's crib.   There were two teddy bears pictured and she was asked which bear she had used. Nga was not sure.  Any evidence obtained by the police with regard to either of the two bears based on statements made by Nga must also be suppressed as a fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471 (1963); Commonwealth v. Perrot, 407 Mass. 539, 546-48 (1990); Commonwealth v. Lahti, 398 Mass. 829, 832-37 (1986), cert. denied, 481 U.S. 1017 (1987); Commonwealth v. DiMarzio, 436 Mass. 1012 (2002).[26]

## ORDER

For the foregoing reasons, it is hereby **ORDERED** that the defendant's motion to suppress all statements made by her to law enforcement on December 1, 2008, together with any evidence obtained as a fruit of those statements is **ALLOWED**.

Janet Kenton-Walker
Justice of the Superior Court

DATED: February 25, 2011

---

[25] Nga stated that the stuffed animal was one of the bears in Khyle's crib.
[26] There was no evidence presented at the hearing as to what specific evidence was obtained or if any such seizure can be admitted as being within an exception to the fruit of the poisonous tree doctrine.



JONATHAN JEFFREY THOMAS, Petitioner, v. BARRY McLEMORE, Respondent.

Civil No. 00-CV-71673-DT

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

*2001 U.S. Dist. LEXIS 6763*

March 30, 2001, Decided
March 30, 2001, Filed

**DISPOSITION:** [*1] Petition for a writ of habeas corpus DISMISSED WITH PREJUDICE.

**COUNSEL:** JONATHAN THOMAS, petitioner, Pro se, Coldwater, MI.

For BARRY MCLEMORE, respondent: Debra M. Gagliardi, Michigan Department of Attorney General, Lansing, MI.

**JUDGES:** HONORABLE PAUL D. BORMAN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** PAUL D. BORMAN

**OPINION**

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Jonathan Jeffrey Thomas, ("petitioner"), presently confined at the Lakeland Correctional Facility in Coldwater, Michigan, seeks the issuance of a writ of habeas corpus pursuant to *28 U.S.C. § 2254.* [1] In his *pro se* application, petitioner challenges his conviction on one count of armed robbery, *M.C.L.A. 750.529*; M.S.A. 28.797; one count of breaking and entering an occupied

dwelling, *M.C.L.A. 750.110*; M.S.A. 28.305, and being a fourth felony habitual offender. *M.C.L.A. 769.12*; M.S.A. 28.1084. For the reasons stated below, petitioner's application for writ of habeas corpus is **DENIED**.

> 1 At the time that petitioner filed this petition, he was incarcerated at the Thumb Correctional Facility in Lapeer, Michigan.

[*2] **I. BACKGROUND**

Petitioner was charged with breaking into the apartment of his seventy one year old neighbor and robbing him on July 4, 1989. Petitioner was convicted of the above offenses following a bench trial in the Detroit Recorder's Court before Judge George W. Crockett III on January 4, 1990. The Court will summarize the relevant facts from the Michigan Court of Appeals opinion affirming petitioner's conviction, which are presumed correct on habeas review. *See Briggs v. Makowski, 2000 U.S. Dist. LEXIS 13029, 2000 WL 1279168, *1 (E.D. Mich. August 18, 2000):*

> In this case, the victim testified that, as he walked into his apartment, he was struck from behind by defendant, who was waiting inside behind the door. He testified that a scuffle ensued during which defendant reached into the front pocket of

the victim's very loose pants, removed about $ 57.00, and fled. The victim testified that he recognized defendant because he lived in the same apartment building. Later that evening, the police were again called when the victim saw defendant, still wearing the clothes he had worn during the assault.

Defendant points out that there were discrepancies between the victim's [*3] statement to the police and his testimony at trial. Specifically, concerning the time of the assault, the location of the blow, the details of the scuffle, whether the assailant had facial hair, and the exact color of the assailant's pants. Defendant also argues that the victim could not have seen his assailant if he was hiding behind the door. He further argues that there was some evidence that the victim had told others that he did not know the identity of his assailant and that someone else helped him figure it out by identifying a hat left behind as belonging to defendant.

*People v. Thomas*, 127375, *1 (Mich.Ct.App. December 29, 1993).

Petitioner presented two alibi witnesses, Corline Smith and Audie O'Guin, who claimed that petitioner was with them between the hours of 8:00 p.m. and 11:00 p.m., when the assault was supposed to have taken place. (Trial Transcript, hereinafter Trial Tr., pp. 53-55; 69-70). Smith also testified that the victim told her and petitioner's mother after the robbery that he could not identify who it was who had broken into his apartment and assaulted him. (*Id.*, pp. 55-56).

Petitioner was found guilty of the above offenses and sentenced [*4] to eighteen (18) to thirty five (35) years in prison. His conviction and sentence were affirmed on appeal. *People v. Thomas*, 127375 (Mich.Ct.App. December 29, 1993); *lv. den. 446 Mich. 853; 521 N.W.2d 618 (1994)*. Petitioner thereafter filed a motion for relief from judgment pursuant to M.C.R. 6.500, *et. seq*. The trial court denied the motion for relief from judgment on the ground that the issues raised in the motion had previously been raised and decided by the trial court or the Michigan Court of Appeals and made specific

reference to the Michigan Court of Appeals' unpublished decision. *People v. Thomas*, # 89-08222 (Detroit Recorder's Court May 20, 1997). The trial court denied petitioner's motion for rehearing pursuant to M.C.R. 6.502(G)(1) and M.C.R. 6.508(D)(2). *Id.* (Detroit Recorder's Court June 2, 1997). The Michigan Court of Appeals denied petitioner's application for leave to appeal pursuant to M.C.R. 6.508 without mentioning which subsection of the statute the claims were being denied under. *People v. Thomas*, 211599 (Mich.Ct.App. March 31, 1999). The Michigan Supreme Court denied leave to appeal pursuant to M.C.R. 6.508(D). [*5] *People v. Thomas, 604 N.W.2d 682 (1999)*; *reconsideration den. 610 N.W.2d 926 (2000)*. Petitioner has now filed the instant application for writ of habeas corpus, alleging the following eleven grounds for relief:

I. The Court of Appeals erred in ruling the evidence presented at trial was sufficient for a finding of guilty of the charged offenses.

II. The Court of Appeals erred in its ruling that appellant's due process rights and equal protection under the *Fourteenth Amendment* were not denied wherein the prosecution used him to bolster the credibility of prosecution's primary witness.

III. The Court of Appeals erred, ruling Appellant's *Fifth* and *Fourteenth Amendment* due process rights under the state and federal constitutions were not denied, where the prosecution failed to list all res gestae witnesses.

IV. The Court of Appeals erred ruling that appellant was not denied *Sixth Amendment* Right to Effective Assistance of Counsel.

V. The Court of Appeals erred ruling the evidence presented at trial does not violate sufficiency of the great weight of evidence needed to find the appellant guilty of the charged offense which [*6] he is convicted.

VI. Appellant was denied his *Fourteenth Amendment* right of due

process wherein he was not given timely notice appropriating the exact time of the alleged offense, that he may have prepared an adequate defense or present an alibi.

VII. The Court of Appeals erred in ruling appellant's due process right under the *Fourteenth Amendment* were not violated wherein the trial court incorrectly applied the sentencing guidelines.

VIII. Trial Court failed to adhere to its duty violating appellant constitutional rights under the due process clause wherein a clear conflict of interest lay openly displayed between defense counsel and the appellant.

IX. Trial court abused its discretion wherein it amended original formal information, varying from the pertinent specific detailed information on discovery and exculpatory testimony.

X. Trial court erred in allowing finding of guilty to stand wherein insufficient evidence was presented in establishing complete elements of the charged offense.

XI. Appellant was denied effective appellate counsel wherein appellant (sic) counsel failed to raise pertinent issues detailed in this petition.

## II. STANDARD  [*7]  OF REVIEW

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*28 U.S.C. § 2254(d)*; *Harpster v. State of Ohio, 128 F.3d 322, 326 (6th Cir. 1997).*

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's [*8] decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor, 529 U.S. 362, 412-413, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (2000).* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id. at 411.*

## II. DISCUSSION

### I. Petitioner's claims are not procedurally defaulted.

Respondent contends that petitioner's second, third, sixth, eighth, and ninth claims were procedurally defaulted by the Michigan courts when they denied these claims in his post-conviction motion for relief from judgment pursuant to M.C.R. 6.508(D).

In the present case, neither the Michigan Court of Appeals nor the Michigan Supreme Court indicated which subsection of M.C.R. 6.508 they were denying petitioner's claims under, so this Court must "look through" these unexplained orders and examine the last reasoned order to determine whether that opinion explicitly relied on a procedural bar. *See Alvarez v. Straub, 64 F. Supp. 2d 686, 692 (E.D. Mich. 1999)* [*9] (Rosen, J.). In this case, the last reasoned order was from the trial court, which denied petitioner's claims on the ground that these issues had already been decided adversely against petitioner either by the trial court or in his direct appeal. In denying petitioner's motion for

rehearing, the trial court specifically pointed to M.C.R. 6.508(D)(2), which bars relief for issues raised in a motion for relief from judgment which had previously been considered on direct appeal. A federal district court is not precluded from addressing the merits of a habeas petitioner's claims despite procedural default, where a state trial court does not clearly and expressly rest its denial of petitioner's claims upon a procedural bar but instead denied the state post conviction motion on the ground that the issue raised had previously been determined on the merits on appeal. *Taylor v. Kuhlmann, 36 F. Supp. 2d 534, 545-546 (E.D.N.Y. 1999)*. M.C.R. 6.508(D)(2) is simply a res judicata rule barring a defendant from relitigating claims in a motion for relief from judgment that had been decided adversely in a prior state court decision. *Morse v. Trippett, 102 F. Supp. 2d 392, 402 (E.D. Mich. 2000)* [*10] (Tarnow, J.). Because the trial court found that these claims had been considered on their merits on petitioner's direct appeal or in prior proceedings before the trial court, there is no procedural bar to habeas review of these claims. *Id.*

## II. Petitioner's claims.

Several of petitioner's claims have been consolidated for purposes of judicial economy.

## A. Claims # 1,5, and 10. The sufficiency of evidence claims.

Petitioner raises a number of challenges to the sufficiency of the evidence used to convict him at trial. In his first claim, petitioner contends that the evidence was insufficient to convict him of the crimes charged because of the inconsistencies in the victim's testimony. In his fifth claim, petitioner claims that the verdict went against the great weight of the evidence. In his tenth claim, petitioner argues that there was insufficient evidence to establish that he committed an armed robbery in this case, because he was unarmed at the moment that he took the money from the victim.

The *Due Process clause of the 14th Amendment* protects an accused in a criminal case against conviction except upon proof beyond a reasonable doubt. *In re Winship, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970)*. [*11] The appropriate standard of review in a federal habeas corpus proceeding involving a claim of insufficiency of evidence in a state criminal conviction is whether, after reviewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime had been proven beyond a reasonable doubt. *Warren v. Smith, 161 F.3d 358, 360-361 (6th Cir. 1998)*. The reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Marshall v. Lonberger, 459 U.S. 422, 434, 74 L. Ed. 2d 646, 103 S. Ct. 843 (1983)*; *Kines v. Godinez, 7 F.3d 674, 678 (7th Cir. 1993)*. It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris, 972 F.2d 675, 679 (6th Cir. 1992)*.

Petitioner initially claims that the evidence was insufficient to convict because of the inconsistencies in the victim's testimony. An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence [*12] claims. *Gall v. Parker, 231 F.3d 265, 286 (6th Cir. 2000)*. The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. *Id.* A district court is without authority to reweigh the evidence in a federal habeas proceeding. *Holmes v. McKune, 117 F. Supp. 2d 1096, 1113 (D. Kan. 2000)*. The federal habeas corpus statute gives federal courts no license to redetermine credibility of witnesses whose demeanor has been observed by a state trial court. *Perfetto v. Hoke, 898 F. Supp. 105, 113 (E.D.N.Y.1995)*(quoting *Marshall v. Lonberger, 459 U.S. at 434*). Thus, in reviewing a sufficiency of the evidence claim, a federal habeas court may not question a fact finder's determinations of witness credibility. *Rodgers v. Angelone, 113 F. Supp. 2d 922, 934 (E.D. Va. 2000)*.

In the present case, the victim testified that he walked into his apartment and was struck from behind with a bat or club by petitioner, who then took fifty seven dollars from him. (Trial Tr., pp. 13-16). The victim testified that when he left his apartment, he locked his door. The victim also testified that the screen [*13] to his back door had been cut. (*Id.*, pp. at 11, 17). The elements of armed robbery are: (1) an assault; (2) a felonious taking of property from the victim's presence or person; (3) while armed with a weapon described in the armed robbery statute. *People v. Carines, 460 Mich. 750, 757; 597 N.W.2d 130 (1999)*. The elements of breaking and entering an occupied dwelling with intent to commit a felony are: (1) breaking and entering; (2) of an occupied dwelling; and (3) with felonious intent. *People v. Brownfield, 216 Mich. App. 429, 431; 548 N.W.2d 248 (1996)*.

In the present case, the trial court had the opportunity to observe the victim testify and found him to be more credible than the petitioner or his witnesses. In finding petitioner guilty, the trial court took note of the fact that there was uncertainty as to the time of the crimes due to the conflict in the testimony between the victim, a seventy one year old man, and the police. (Trial Tr., pp. 103-104). However, the trial court noted that the victim was "absolutely positive and struck the Court as being knowledgeable and unwavering in that identification of the [*14] Defendant as the person who committed the offense charged herein." (*Id.* at p. 104). The trial court also noted that the victim recognized petitioner from having lived on the premises for several years. (*Id.* at p. 103). In fact, the victim testified that he had known petitioner for seven years, testifying that he lived on the third floor of the apartment building and petitioner's mother lived on the second floor of the same building. (*Id.*, at pp. 9, 12). This Court cannot question the trial court's credibility determination. The victim's testimony was legally sufficient to establish the elements of the offenses of armed robbery and breaking and entering an occupied dwelling. Petitioner is not entitled to habeas relief on his claim that the victim's testimony may have been inconsistent.

Petitioner next argues that his verdict went against the great weight of the evidence. A federal habeas court has no power to grant habeas relief on the ground that a state conviction is against the great weight of the evidence. *Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985).* A claim that a verdict went against the great weight of the evidence is not of constitutional [*15] dimension, for habeas corpus purposes, unless the record is so devoid of evidentiary support that a due process issue is raised. *Griggs v. State of Kansas, 814 F. Supp. 60, 62 (D. Kan. 1993).* The test for habeas relief is not whether the verdict was against the great weight of the evidence, but whether there was any evidence to support it. *United States ex. rel. Victor v. Yeager, 330 F. Supp. 802, 806 (D.N.J. 1971).* Because there was sufficient evidence to convict petitioner of armed robbery and breaking and entering an occupied dwelling, the fact that the verdict may have gone against the great weight of the evidence would not entitle him to habeas relief.

Petitioner lastly claims that there was insufficient evidence established to show that petitioner was armed when he took the victim's money. Petitioner bases this claim on the victim's testimony that after petitioner hit

him with the club, the victim grabbed petitioner and the two men began to struggle. The victim testified that during the struggle, petitioner did not have the club in his possession and further testified that petitioner put both of his hands into the victim's pockets and took his [*16] money from him.

Michigan courts utilize a "transaction approach" to analyze any larceny, particularly a robbery, where the forceful act may greatly precurse or lag behind the taking. *See People v. LeFlore, 96 Mich. App. 557, 562, 293 N.W.2d 628 (1980).* The entire larcenous transaction should be reviewed to determine if there was a continuity of intent between the forceful act and the taking (or vice versa). If so, a robbery conviction is possible. *Id.*

In the present case, when looking at the evidence in a light most favorable to the prosecution, there was sufficient evidence to establish that petitioner committed an armed robbery. Petitioner was laying in wait for the victim when he returned to his apartment and struck him with a weapon. A struggle ensued, during which petitioner took fifty seven dollars from the victim. The mere fact that petitioner was unarmed at the precise moment that the money was taken would not defeat his robbery conviction, because the evidence established a "continuity of intent" between the initial assault with the weapon and the taking of the money.

In the present case, there was sufficient evidence to convict petitioner [*17] of the crimes of armed robbery and breaking and entering an occupied dwelling. Petitioner's first, fifth, and tenth claims do not entitle him to relief.

**B. Claim # 2. The prosecutorial misconduct claim.**

Petitioner next contends that the prosecutor committed misconduct when he asked petitioner whether he believed that the victim was incorrect, mistaken, or guessing as to his identification of petitioner and his description of his assailant's clothes. The Michigan Court of Appeals agreed that it was error for the prosecutor to ask these questions, but found the error to be harmless both because petitioner's answers neutralized the questions, as well as the fact that the case was tried before a judge sitting without a jury. *People v. Thomas*, Slip. Op. at *3.

A bench trial judge is presumed to have considered only relevant and admissible evidence in reaching his or

her decision. *United States v. McCarthy, 470 F.2d 222, 224 (6th Cir. 1972).* The presumption that a trial judge disregarded incompetent evidence at a bench trial is inapplicable only where it is plain from the trial court's findings that in finding the defendant guilty, the trial court relied on [*18] inadmissible evidence. *United States v. Joseph, 781 F.2d 549, 552 (6th Cir. 1986).*

In the present case, the prosecutor asked petitioner three questions about whether the victim was incorrect, guessing, or mistaken either as to his identification of petitioner as the assailant or his description of petitioner on the night in question. (Trial Tr., pp. 87-89). The prosecutor's questions did not rise to the level of constitutionally impermissible misconduct warranting habeas relief, because the questions were isolated and would not likely have prejudiced a trial judge in a bench trial. *Matthews v. Abramajtys, 92 F. Supp. 2d 615, 642 (E.D. Mich. 2000)*(Tarnow, J.). A review of the trial court's findings of fact (Trial Tr., pp. 102-104) does not show that the trial court judge relied on these questions in reaching his decision. Accordingly, petitioner has not shown that these questions rendered his trial fundamentally unfair. *Id.* Petitioner's second claim is without merit.

## C. Claim # 3. The claim that the prosecutor failed to produce a res gestae witness.

Petitioner next claims that the prosecutor failed to investigate and list on its witness [*19] list a res gestae witness that he claims would have been helpful to his case.

Federal law does not require the production of res gestae witnesses. Under federal law, there is no obligation on the part of prosecutors to call any particular witness unless the government has reason to believe that the testimony would exculpate the petitioner. *Atkins v. Foltz, 856 F.2d 192, 1988 WL 87710, *2 (6th Cir. 1988)*(citing to *United States v. Bryant, 461 F.2d 912, 916 (6th Cir. 1972)).*

In the present case, an evidentiary hearing was conducted on this claim subsequent to petitioner's trial. Reba McCory testified that petitioner lived across the street from her. On July 4, 1989, McCory testified that petitioner came over to her yard at 3:15 in the afternoon and stayed until approximately 7:45 p.m. (Evidentiary Hearing Transcript, 05/03/91, pp. 5-6). McCory testified that she also lived across the street from the victim. (*Id.* at

p. 7). While she and her friend Ms. Murphy were sitting on her front porch, the victim came over to them with a dark blue cap and asked Ms. Murphy whether this was her son Dexter's hat. Murphy told the victim that the hat [*20] did not belong to her son. (*Id.* at pp. 7-8). McCory indicated that later that evening, petitioner came walking down the street with Dexter and that both men were dressed alike. McCory indicated that petitioner and Dexter both had on gray pants. (*Id.* at pp. 9-10). McCory testified that the police first responded to the crime scene after dark. At the time, Ms. Murphy told McCory that the victim had been robbed. Later on, McCory saw the police return to the apartment building just as petitioner and Dexter were returning home. The men started arguing and petitioner told them that he didn't do it. McCory told petitioner that if he didn't do it, he should just stay there. The police arrested petitioner. (*Id.* at pp. 11-12).

On cross-examination, McCory indicated that she had known petitioner since 1975. Although she observed the arrest that night, McCory acknowledged that she did not giver her name to the police. (*Id.* at p. 13). In rejecting this claim, the trial court indicated that there was nothing in McCory's testimony that would have prevented petitioner from going to the same premises where both he and the victim lived and commit these offenses. The trial court further [*21] found that petitioner had failed to show that he was unable to produce McCory or that the prosecutor was aware of her existence. The trial court found no failure on the part of the prosecutor to produce a res gestae witness whose testimony could have been "outcome determinative." (*Id.* at pp. 34-35).

In order to determine whether petitioner is entitled to relief on this claim, this Court must determine whether McCory's testimony would have been exculpatory. Suppression by the prosecution of evidence favorable to the defendant upon request violates due process, where the evidence is material to either guilt or punishment of the defendant, irrespective of the good or bad faith of the prosecution. *Brady v. Maryland, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).* To establish a *Brady* violation, a defendant has the burden of establishing that the prosecution suppressed evidence, that such evidence was favorable to the defendant, and that the evidence was material. *Carter v. Bell, 218 F.3d 581, 601 (6th Cir. 2000).* *Brady* does not apply to information that is not wholly within the control of the prosecution; there is no *Brady* violation [*22] where a defendant knew or should

have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source. *Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998)*. Under *Brady*, the prosecution cannot be required to produce to the defendant exculpatory or impeachment evidence which it does not control and never possessed or inspected. *United States v. Beckford, 962 F. Supp. 780, 801-802 (E.D. Va. 1997)*.

In the present case, petitioner is unable to show a *Brady* violation. First, petitioner was aware of this witness' existence prior to trial. Secondly, Ms. McCory admitted that she never gave the police her name, even though she witnessed the arrest. Therefore, neither the prosecutor nor the police were ever aware of McCory's existence. Moreover, in light of the fact that the police were told by the victim that the crimes occurred between 10:30 and 11:30 p.m., McCory's testimony that petitioner was with her between 3:15 and 7:45 p.m. would not have appeared to have been exculpatory evidence to the prosecution. Lastly, nothing in McCory's testimony would have made it impossible [*23] for petitioner to leave her house and go across the street and commit the crime charged, even if the victim was not precise as to the time of the crime's commission. Petitioner is not entitled to habeas relief on a claim that the prosecutor failed to call res gestae witnesses because the circumstances of this case do not reflect that petitioner was denied fundamental fairness. *Smith v. Elo, 198 F.3d 247, 1999 WL 1045877, *2 (6th Cir. 1999)*.

**D. Claims # 4 and # 8. The ineffective assistance of counsel claims.**

Petitioner next raises several allegations involving the denial of the effective assistance of counsel.

A. *Standard of Review*

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the *Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)*. In so doing, the defendant must overcome a [*24] strong presumption that counsel's behavior lies within the wide range of reasonable

professional assistance. *Id.; O'Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir. 1994)*. In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland, 466 U.S. at 689*. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, 466 U.S. at 694*.

B. *The individual claims*

1. Subclaims # 1 and # 4. Failure to investigate or bring out prior inconsistent statements.

Petitioner first claims that his attorney was ineffective for failing to investigate the police reports for inconsistencies in the victim's story, as well as failing to impeach the victim with his prior inconsistent statements to the police.

Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in [*25] retrospect better tactics may have been available. *Gallo v. Kernan, 933 F. Supp. 878, 881 (N.D. Cal. 1996)*.

In the present case, defense counsel engaged in a thorough cross-examination of the victim. Counsel elicited an admission from the victim that he wore glasses. (Trial Tr., p. 23). Counsel also confronted the victim with the fact that there was no window in his door, thus, the victim would have been unable to see who was standing behind his door. (*Id.* at pp. 24-25). Counsel confronted the victim with the fact that he never gave a physical description of the perpetrator to the police. Counsel also locked the victim into testifying that his assailant had no facial hair. (*Id.* at p. 29). After the prosecution rested, defense counsel recalled the victim and confronted him with the fact that he initially told the police that the robbery took place between 10:30 p.m. and 11:30 p.m., which conflicted with his testimony that the robbery took place between 3:30 and 4:00 p.m. (*Id.* at pp. 35-37).

Defense counsel subsequently called the two police officers who responded to the crime scene. Both officers indicated that the victim informed them that the robbery [*26] took place between 10:00 and 10:30 p.m. (*Id.* at

pp. 40-41, 45-46). Defense counsel also called the investigating officer to testify that the victim's original description of the suspect indicated that the perpetrator had on gray pants, and not white pants, as the victim had testified to. Defense counsel also elicited the fact that at the time of his arrest, petitioner had facial hair. (*Id.* at p. 50).

Where, as here, trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim. *Rich v. Curtis, 2000 U.S. Dist. LEXIS 17238, 2000 WL 1772628, *5 (E.D. Mich. 2000)(Friedman, J.); Cardwell v. Netherland, 971 F. Supp. 997, 1019 (E.D. Va. 1997).* Moreover, the failure of trial counsel to develop every bit of testimony through all available inconsistent statements to impeach witnesses is not ineffective assistance of counsel where the omissions were not sufficient to demonstrate unprofessional or improper assistance of counsel and where petitioner was [*27] not prejudiced as a result of the alleged errors. *See Poyner v. State of Iowa, 990 F.2d 435, 438 (8th Cir. 1993).* Here, defense counsel brought out many of the victim's inconsistent statements through other witnesses. Petitioner has failed to show that counsel's performance was deficient.

Subclaim # 2. Failure to subpoena witnesses.

Petitioner claims that counsel was ineffective for failing to subpoena or call either his mother Johnnie Thomas or Shane O'Guin to testify. Petitioner claims that his mother would have testified that the victim told her he wasn't certain who robbed him. Shane O'Guin would have been an alibi witness.

In the present case, petitioner's counsel presented two witnesses, Corline Smith and Audie O'Guin, who testified in support of petitioner's alibi defense. In addition, Corline Smith testified that the victim informed her, in the presence of petitioner's mother, that he was unable to identify his assailant. The alleged ineffectiveness of counsel in failing to call these additional two witnesses to testify was not prejudicial where their testimony would have been merely cumulative to other testimony. *See Ashker v. Class, 152 F.3d 863, 874 (8th Cir. 1998).* [*28]

3. Subclaim # 3. Failure to object to the failure of the

prosecution to present the whole res gestae and list res gestae witnesses on the information.

Petitioner next contends that counsel was ineffective for not objecting to the prosecution's failure to present the entire res gestae of the crime by calling Reba McCory as a witness. Petitioner claims that McCory's testimony would have either contradicted the victim's testimony as to the time that the crime occurred, or alternatively, McCory could have been an alibi witness for petitioner for the time that the victim testified that the robbery occurred. Petitioner also appears to claim that counsel was ineffective for failing to call McCory as a witness for the defense.

Petitioner's claim fails for two reasons. First, petitioner does not allege that he either informed counsel that he had been with Reba McCory earlier in that day, nor is there any indication from the investigator's report that counsel should have been aware of McCory's existence. If an attorney has little or no notice that a witness may exist after diligent preparation of a case, he or she is not ineffective for failing to investigate that witness or calling that [*29] witness to testify. *Battle v. Delo, 19 F.3d 1547, 1555 (8th Cir. 1994).* A defendant in a criminal case is not denied the effective assistance of counsel due to defense counsel's failure to investigate or to call witnesses where the defendant failed to provide counsel with the names, addresses, and phone numbers of the witnesses. *United States v. King, 936 F.2d 477, 480 (10th Cir. 1991); United States v. Robles, 814 F. Supp. 1233, 1246 (E.D. Pa. 1993).*

Secondly, there is no indication that counsel would have been on notice that McCory's testimony would have been exculpatory even had he known of her existence, in light of the fact that the police reports indicated that the robbery took place between 10:30 p.m. and 11:30 p.m. Indeed, even McCory indicated that the police were first called to the crime scene after dark. A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant. *Marra v. Larkins, 111 F. Supp. 2d 575, 585, fn. 13 (E.D. Pa. 2000).* Because all of the objective evidence indicated that the robbery took place much later than 3:30 or 4:00 in [*30] the afternoon, petitioner is unable to show that counsel was ineffective for failing to interview or call a witness whose testimony would not have exculpated petitioner.

4. Subclaim # 5. Failure not to labor under a conflict

of interest.

In Claim # 8, petitioner alleges that his defense counsel represented him as though he believed that petitioner was guilty of the charged offense. In support of this claim, he points to defense counsel's testimony from the hearing conducted on petitioner's ineffective assistance of counsel claims. At this hearing, counsel was asked why he did not bring out an inconsistency between the police report, in which the victim allegedly told the police that petitioner threw him to the floor, and the victim's trial testimony, in which the victim testified that he threw petitioner to the floor. Counsel testified that he did not bring out this inconsistency because he believed it to be a clerical error, noting that the victim weighed 260 pounds and petitioner weighed only 160 pounds. Petitioner claims that this is evidence that his attorney believed that he was guilty of these crimes, and hence, labored under a conflict of interest.

Prejudice is presumed, [*31] in connection with an ineffective assistance of counsel claim, where a defendant demonstrates actual conflicts of interest that compromise his or her attorney's ability to advocate his or her client's interests. *Olden v. United States, 224 F.3d 561, 565 (6th Cir. 2000).* An attorney who abandons his or her duty of loyalty to the client and joins the prosecution in an effort to obtain a conviction suffers from an obvious conflict of interest. *Osborn v. Shillinger, 861 F.2d 612, 629 (10th Cir. 1988).* Courts, however, will not find an actual conflict of interest unless a defendant can point to specific instances in the record to suggest an actual conflict or impairment of their interests. *Dixson v. Quarles, 627 F. Supp. 50, 53 (E.D. Mich. 1985)*(Guy, J.)(internal citations omitted).

In the present case, petitioner has failed to show that his attorney abandoned him and joined with the state in an attempt to obtain a conviction against petitioner. As already mentioned, defense counsel confronted the victim with several of his inconsistent statements and called several witnesses to contradict the specifics of the victim's testimony. Counsel [*32] also called two alibi witnesses, one of whom also testified that the victim told her he could not identify his assailant. Counsel had petitioner testify, during which petitioner testified as to his alibi and denied committing the crime. (Trial Tr., pp. 77-80). In closing argument, counsel brought out the inconsistencies in the victim's testimony and also pointed out that petitioner's alibi witnesses had testified that

petitioner was with them at the time of the crime. ( *Id. at pp. 96-100*).

In the present case, defense counsel subjected the prosecution's case to meaningful adversarial testing, and thus prejudice to petitioner from this representation cannot be presumed. *Houchin v. Zavaras, 107 F.3d 1465, 1471 (10th Cir. 1997).* The record contains no evidence that petitioner's attorney conveyed to the trial court his belief that petitioner was guilty or that he in any way abandoned his duty of loyalty to petitioner and aligned himself with the prosecutor to obtain a conviction. *Id.* This part of petitioner's claim is completely without merit.

5. Subclaim # 6, Failure to seek disqualification of the trial judge from presiding over petitioner's bench [*33] trial.

Petitioner next claims that counsel was ineffective for failing to disqualify the trial court from sitting as the trier of fact in this case, after counsel made a motion in limine to suppress petitioner's prior criminal record for impeachment purposes in front of that judge.

When a case is tried before a judge, it is presumed that a judge will ignore matters which come to his or her attention and are excluded from evidence, even if such matters include a defendant's prior criminal record. *See United States v. Cobb, 396 F.2d 158, 159 (2nd Cir. 1968); vacated on other grds, 402 U.S. 937 (1971); aft remand 455 F.2d 405 (2nd Cir. 1972).* In this case, although counsel did bring a motion to suppress petitioner's prior record, the prosecutor agreed to the suppression of petitioner's prior record for impeachment purposes and petitioner's prior convictions were not even mentioned on the record to the judge. (Trial Tr., pp. 3-4). Moreover, the trial court did not mention petitioner's prior convictions in finding him guilty. (*Id., at pp. 102-104*). Because there is no evidence that the trial judge was directly influenced by petitioner's [*34] prior convictions, petitioner has not rebutted the presumption that the trial court was able to reach a decision without considering the excluded evidence. *See Stephens v. LeFevre, 467 F. Supp. 1026, 1029-1030 (S.D.N.Y. 1979).* Petitioner has therefore failed to show that he was prejudiced by counsel's decision not to seek to have the trial court disqualified from hearing petitioner's case.

6. Subclaim # 7. Counsel's multiple errors denied petitioner a fair trial.

Petitioner lastly claims that the cumulative nature of the errors deprived him of the effective assistance of counsel. Because the individual claims of ineffectiveness alleged by petitioner are all essentially meritless, petitioner cannot show that the cumulative errors of his counsel amounted to ineffective assistance of counsel. *Seymour v. Walker, 224 F.3d 542, 557 (6th Cir. 2000)*.

## C. Conclusion

Petitioner has failed to show that he was deprived of the effective assistance of counsel.

## E. Claims # 6 and # 9. The inadequate notice and variance claims.

Petitioner's sixth and ninth claims are interrelated. Petitioner first claims that he was given inadequate notice of the charges [*35] against him, because the victim originally told the police that the crime took place sometime between 10:30 and 11:30 at night, but at trial, the victim testified that the offenses were committed at 3:30 to 4:00 p.m. Petitioner further claims that the trial court impermissibly amended the original information charging petitioner with these offenses when the trial court, in its findings of fact, found that the crime took place sometime in the afternoon or evening hours of the day.

A complaint or indictment need not be perfect under state law so long as it adequately informs the petitioner of the crime in sufficient detail so as to enable him or her to prepare a defense. Therefore, an indictment "which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall, 806 F.2d 636, 639 (6th Cir. 1986)*; *Ransom v. Davis, 613 F. Supp. 430, 431 (M.D. Tenn. 1984)*. A claim of a variance between a criminal information and the evidence at the state court trial is not reviewable by way of federal habeas corpus. *See Bradshaw v. State of Oklahoma, 398 F. Supp. 838, 844 (E.D. Okla. 1975)*; [*36] *See also Anderson v. Love, 681 F. Supp. 1279, 1283 (M.D. Tenn. 1986)*. A charge is sufficiently specific when it contains the elements of the crime, permits the accused to plead and prepare a defense, and allows any disposition of the case to be used as a bar against any further prosecutions. *Fawcett v. Bablitch, 962 F.2d 617, 618 (7th Cir. 1992)*.

In the present case, petitioner contends that he was

deprived of a fair trial because of a variance between the time that the victim told the police that the crime occurred and the time that the victim testified at trial that the crimes took place. The time of an offense is not an essential element that needs to be proven by the state. Instead, the time of the crime implicates only due process concerns, such as whether a late amendment of an information interferes with a petitioner receiving adequate notice of the charge or whether petitioner was denied the opportunity to present a defense. *Scott v. Roberts, 777 F. Supp. 897, 900 (D. Kan. 1991)*.

In the present case, a review of the complaint filed in this case shows that it alleged that petitioner committed the offenses of armed robbery [*37] and breaking and entering an occupied dwelling against Alton Austin on July 4, 1989 at 1521 West Forest Street in Detroit, Michigan. [2] The complaint sufficiently apprised petitioner as to the date, location, the victim, and the criminal conduct charged so as to place petitioner on notice as to the crimes charged. Moreover, the investigator's report indicated that the robbery occurred between the hours of 10:30 p.m. and 11:30 p.m. [3] Plaintiff was made sufficiently aware of the time that the crimes allegedly occurred and was able to present alibi witnesses to account for his whereabouts at the time that the crime was committed. Although petitioner now claims that he was prejudiced by the variance between the time that the victim originally told police that the crimes had occurred and his testimony at trial, a review of the trial testimony and the prosecutor's theory shows that the prosecution never changed their theory that the crime occurred in the evening hours. In fact, during his cross-examination of Officer Joseph, the prosecutor elicited testimony that Officer Joseph worked the 7:00 p.m. to 3:00 a.m. shift. Officer Joesph testified that the victim had informed the police upon [*38] their arrival that the robbery had occurred "just recently". (Trial Tr., p. 48). Officer Joesph's partner had testified that the police took the report from the victim at 11:30 p.m. (Id. at p. 41). In his closing argument, the prosecutor indicated that it was their theory that the victim was mistaken as to the time of the offense, either due to his age or the amount of activities taking place on the Fourth of July. (Id. at p. 91).

2  Complaint attached as Petitioner's Exhibit 2.

3  Complaint attached as Petitioner's Exhibit 1.

In the present case, there was no error of

constitutional magnitude from an enlargement of the time period contained in the original investigator's report, where the petitioner was aware of the general time that the prosecutor alleged that the incident had taken place, as well as the location of the alleged incident. Moreover, the enlargement of time did not appear to prejudice petitioner's defense, because he was able to present an alibi defense. *Scott, 777 F. Supp. at 900-901.* [*39] Petitioner's claim does not entitle him to habeas relief.

### F. Claim # 7. The sentencing guidelines issue.

Petitioner next claims that the trial court incorrectly scored his sentencing guidelines range by assessing him points under Offense Variable 2 of the Michigan Sentencing Guidelines for inflicting bodily injury. Petitioner's claim involving the trial court's allegedly improper interpretation of the state's sentencing guidelines is not a cognizable claim for federal habeas review. *See Cook v. Stegall, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999)*(Gadola, J.). Petitioner has no state created liberty interest in having the Michigan sentencing guidelines applied rigidly in determining his sentence. *Thomas v. Foltz, 654 F. Supp. 105, 106-107 (E.D. Mich. 1987)*(Cohn, J.). To the extent that petitioner is claiming that his sentence violates the Michigan state sentencing guidelines, his claim is not cognizable in a habeas proceeding because it is a state law claim. *Id.*

### G. Claim # 11. The ineffective assistance of appellate counsel.

Petitioner lastly claims that he was deprived of the effective assistance of appellate counsel, because appellate [*40] counsel failed to raise certain pertinent issues detailed in this petition.

The *Sixth Amendment* guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey, 469 U.S. 387, 396-397, 83 L. Ed. 2d 821, 105 S. Ct. 830 (1985).* However, court appointed counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes, 463 U.S. 745, 751, 77 L. Ed. 2d 987, 103 S. Ct. 3308 (1983).* An attorney's failure to present a nonmeritorious issue on appeal does not constitute ineffective assistance of counsel. *Daniel v. Overton, 845 F. Supp. 1170, 1176 (E.D. Mich. 1994)*(Gadola, J.).

Because none of petitioner's issues were meritorious, he has failed to demonstrate that his appellate counsel was ineffective for failing to raise them on appeal. His last claim is without merit.

### IV. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DISMISSED WITH PREJUDICE.**

**HONORABLE PAUL D. BORMAN**

UNITED [*41] STATES DISTRICT JUDGE

**Dated:** MAR 30 2001