STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 3

STATE OF WISCONSIN,

                    PLAINTIFF,        MOTION HEARING

vs.                                   Case No. 06 CF 88

BRENDAN R. DASSEY,

                    DEFENDANT.

**DATE:**    MAY 4, 2006

**BEFORE:**  Hon. Jerome L. Fox
             Circuit Court Judge

**APPEARANCES:**

             KENNETH R. KRATZ
             Special Prosecutor
             On behalf of the State of Wisconsin.

             LEONARD D. KACHINSKY
             Attorney at Law
             On behalf of the Defendant.

             BRENDAN R. DASSEY
             Defendant
             Appeared in person.


                    * * * * * * * *

             **TRANSCRIPT OF PROCEEDINGS**

             Reported by Jennifer K. Hau, RPR

                Official Court Reporter

                         1

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 1 of 114    Document 19-12

I N D E X

WITNESSES                                                    PAGE

**MARK WIEGERT**

Direct Examination by ATTORNEY KRATZ            8-48

Cross-Examination by ATTORNEY KACHINSKY        48-62

Redirect Examination by ATTORNEY KRATZ         62-63

**BARBARA JANDA**

Direct Examination by ATTORNEY KACHINSKY       64-68

Cross-Examination by ATTORNEY KRATZ            68-79

Redirect Examination by ATTORNEY KACHINSKY     79-80

**KRIS SCHOENENBERGER-GROSS**

Direct Examination by ATTORNEY KACHINSKY       81-91

Cross-Examination by ATTORNEY KRATZ            91-99

Redirect Examination by ATTORNEY KACHINSKY     99-100

| EXHIBITS | MARKED | MOVED | ADMITTED |
|---|---|---|---|
| 1 | 16 | 16-17 | 17 |
| 2 | 26 | 28 | 28 |
| 3 | 81 | 91 | 91 |
| 4 | 83 | 91 | 91 |
| 5 | 103 | 103 | 103 |

2

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 2 of 114    Document 19-12

THE COURT: Good morning. Uh, this is the State of Wisconsin vs. Brendan R. Dassey. It's case No. 06 CF 88. Appearances, please, counsel?

ATTORNEY KRATZ: The State appears by Calumet County District Attorney Ken Kratz appearing as special prosecutor. Also appearing this morning on behalf of the State is Tom Fallon from the Department of Justice.

ATTORNEY KACHINSKY: And the defendant appears personally with Attorney Len Kachinsky.

THE COURT: This matter was last in court on March 17, 2006, at which time the defendant's continued arraignment was concluded and he reaffirmed his previously entered not guilty pleas. At that time, the Court set today as the date to hear any motions to suppress any statements given by this defendant.

On April 19, defendant filed a motion seeking to suppress certain statements which contend, uh -- he contends that these statements were involuntarily given. We are here today to hear that motion.

While this is the defendant's motion, the State has the burden of proof to show by a preponderance of the evidence that the statements

3

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 3 of 114    Document 19-12

given were voluntary. The motion that's before the Court today is not directly concerned with the truthfulness or the falsity of the statements given, but, rather, their voluntariness.

The Court will render a decision on this motion, uh, May 12 -- Friday, May 12, at 9:00 a.m. Gentlemen, any stipulations? The State?

ATTORNEY KRATZ: Judge, uh, there are some stipulations that, uh, have been entered into. First of all, the record should reflect that prior to this morning's hearing, the State had transmitted to the Court, uh, several audio and videotapes. They are the subject of the, uh, motions. Although the State is offering the March 1, uh, admission by Mr. Dassey, we've included, uh, those interviews of, uh, February 27, as Mr. Kachinsky included those in, uh, his motion.

The, uh, State, uh, is asking, uh -- and I believe the Court has agreed to accept those audio and, uh, videotape, uh, statements -- to have them marked for purposes of this hearing, and to be, uh, placed, uh, in the record at the conclusion of the Court's, uh, decision on May 12 to avoid any, uh, possibility of, uh, pretrial

4

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 4 of 114    Document 19-12

publicity that, uh, may adversely affect the, uh, fair trial of this and a related matter.

It's my understanding that the Court, uh, has decided to have those, uh, matters or, excuse me, have those, uh, tapes sealed. That is, uh, remained part of the court record; however, without, uh, access to the general public.

THE COURT: Uh, Mr. Kachinsky, is -- is that your understanding as well?

ATTORNEY KACHINSKY: Uh, it is, Your Honor, and that applies both to, uh, the, uh -- the tapes, uh, electronically preserved evidence, as well as the written summaries of that evidence which the Court also has.

THE COURT: All right. The Court will have those marked as an exhibit. It will use the cover letters; one in the case of, uh -- one from the district attorney -- or one from, uh, Mr. Kratz, uh, as the inventory of the exhibit, and one from you, Mr. Kachinsky, relating to the transcript of the February 27 interview.

The Court will review those documents in camera, which means in chambers. They will not be part of the -- the public record. And I

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 5 of 114    Document 19-12

believe that's the understanding we have -- have here. Is that correct, gentlemen?

ATTORNEY KRATZ: That is, Judge. It's also my understanding that, as we sit here this morning, uh, certainly the State, uh, and the defense have reviewed the contents of those audio and, uh, video, uh, representations, and I understand the Court has had some opportunity to review those as well.

THE COURT: That is correct. Mr. Kachinsky, any further -- any further stipulations?

ATTORNEY KACHINSKY: Uh, that is correct, also, and, uh, I think, as we discussed in chambers, based on the review of those tapes, uh, and the transcripts, and also consultations with my client, investigator, and other witnesses, uh, the question of whether or not this is a custodial interrogation is not, uh, at issue in this case. It's not a custodial, uh, interrogation, although, the, uh, giving of the *Miranda* rights, or failure to do the same during portions of the, uh, statements, would be relevant in determining voluntariness.

THE COURT: So, the -- the -- the parties agree that this is not a cus -- uh, custodial

6

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 6 of 114    Document 19-12

interview. And are you referring just to the March 1 or both dates, February 27 and March 1?

ATTORNEY KACHINSKY: Both, Your Honor. Because --

THE COURT: All right.

ATTORNEY KACHINSKY: -- it's not custodial *Miranda*, we're not required to, uh, nor are --

THE COURT: So -- so, *Miranda* warnings are not an issue, or Mirandizing is not an issue here, neither is the -- the custodial or noncustodial nature of the -- of the -- of the, uh, interviews. All right. Any other stipulations or anything else we -- we should do here, gentlemen, before we start?

ATTORNEY KRATZ: Not before the hearing, Judge, no.

THE COURT: From you, Mr. Kachinsky, anything?

ATTORNEY KACHINSKY: No, Your Honor, that's it.

THE COURT: Proceed, Mr. Kratz.

ATTORNEY KRATZ: Thank you, Judge. The State will call Investigator Mark Wiegert to the stand.

THE CLERK: Raise your right hand.

7

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 7 of 114    Document 19-12

**MARK WIEGERT,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Mark Wiegert, W-i-e-g-e-r-t.

**DIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q    Mr. Wiegert, how are you employed?

A    I'm an investigator with the Calumet County Sheriff's Department.

Q    How long have you been a police officer?

A    About 13-and-a-half years.

Q    And how long have you acted in the capacity as and investigator?

A    Um, three-and-a-half.

Q    What are your general duties as a Calumet County sheriff's investigator?

A    To investigate a number of crimes, um, including misdemeanors, felonies, um, and a range from burglaries up to homicides.

Q    Investigator Wiegert, uh, were you involved, specifically, with the investigation into the homicide of Teresa Halbach?

A    Yes, I was.

8

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 8 of 114    Document 19-12

Q    Prior to that investigation, have you had specific training and do you have specific experience in, uh, interview techniques? That is, interviewing witnesses and suspects?

A    Yes, I do. I've attended, um, numerous classes and trainings on interviews and interrogations.

Q    How was it that you became involved in this investigation?

A    Um, I was first notified, I believe it was, on November 3 of '05, of a missing person's report from one of our deputies, and she requested my assistance in, um, the missing person's report.

Um, as time went on during that missing person's report, um, after the vehicle was discovered, at that point, um, I was appointed co-lead investigator along with, uh, Special Agent Fassbender from the Department of Justice. Um, after the discovery of the vehicle, I was requested by the Manitowoc County Sheriff's Department to head up the investigation.

Q    Now, this vehicle, as I understand, was discovered here in Manitowoc County; is that correct?

A    That's correct.

Q    And because of at least a perceived conflict that

9

the Manitowoc County Sheriff's Department had, your agency, the Calumet County Sheriff's Department, was named as one of the lead investigating agencies; is that right?

A    That's correct.

Q    At the scene of the recovery of the vehicle, uh, as we know, at the Avery salvage property, uh, did you assist in the coordination of the execution of several search warrants at that property?

A    Yes, I did.

Q    After coordinating that search effort, uh, were you involved in directing the collection, processing, uh, and later request for analysis of physical evidence found upon that property?

A    Yes, I was.

Q    As part of this investigation, also, Investigator Wiegert, were you, uh, involved in decision-making regarding interviews of witnesses and possible suspects, uh, regarding, uh, surrounding criminal activity?

A    Yes.

Q    On the 9th of November, 2005, were you involved in an arrest of, and subsequent interview of, a gentleman by the name of Steven Avery?

10

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 10 of 114    Document 19-12

A    Yes.  Myself, along with Agent Fassbender.

Q    And after that interview -- after that arrest and, in fact, after several further days of investigation, did you become aware of Mr. Avery's, um, being charged with offenses, including first degree intentional homicide?

A    Yes.

Q    Between November and February, 2006, did this investigation continue?

A    The investigation continued, um, with the numerous, um, interviews during that time period.  We also, um, continued with the evidence and, uh, the sending of evidence to the crime lab, the analysis of evidence, talking to experts about the evidence.

Q    All right.  Did you follow up interviews as well?

A    Yes.  We had numerous interviews.  Follow-up interviews.

Q    Are you familiar with, uh, Brendan Dassey?

A    Yes, I am.

Q    Is he in the courtroom here this morning?

A    Yes, he's seated --

Q    Identify him for the record, please.

A    Seated at the table to your immediate right, um, wearing a green jumpsuit, uh, next to his attorney.

        ATTORNEY KRATZ:  Judge, would ask that the

11

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 11 of 114    Document 19-12

record reflect Mr. Dassey's identification.

THE COURT: It will so reflect.

Q (By Attorney Kratz) In spring of, uh, 2006, were you aware of Mr. Dassey's age?

A Yes. He would have been, uh, I believe, 16-years-old.

Q The time of the homicide of Ms. Halbach, were you familiar with where Mr. Dassey lived?

A Yes. Um, his exact address, I believe, is 12930-A Avery Road, which would be, um, directly next to, uh, the Steven Avery trailer where Steven Avery was living.

Q Were you familiar with his relationship with Mr. Avery?

A Yes. It would be, um, Mr. Avery's nephew.

Q Prior to, um, the end of February, 2006, had Mr. Dassey been interviewed by any law enforcement officials regarding this investigation?

A Yes. He was interviewed, um, initially, in Marinette County by a detective from Marinette County Sheriff's Department. I believe it was Detective O'Neil. Um, there was another interview done by Special Agent Skorlinski and Investigator Baldwin, um, after the interview in Marinette County.

12

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 12 of 114    Document 19-12

Q I believe the records reflect that the Marinette County interview of Mr. Dassey first occurred on -- I think it's the 6th of November? On or about the 6th?

A Yes, that's correct.

Q And the follow-up interview with Agent Skorlinski and Deputy Baldwin occurred on the 10th; is that right?

A Yes.

Q Both of these interviews were with Mr. Dassey and law enforcement officials. Were they of the, uh, subject matter, again, uh, relating to and surrounding the disappearance and subsequent homicide of Miss Halbach?

A Yes. It was -- They were done to, uh, try to gain more information about that case.

Q On February 27, 2006, did you have occasion to re-interview Mr. Dassey?

A Yes. Myself and, uh, Agent Fassbender did re-interview Mr. Dassey on the 27th.

Q Where did that occur?

A Um, it occurred at the, uh, Mishicot High School.

Q And what was the purpose of that interview?

A It was, again, a -- a fact finding mission, um, to determine what he knew about the case. We had

13

previously learned that he had been, um, near the fire, um, where bones were discovered, so, we wanted to see if he knew any other information about it at that time.

Q Describe for the Court the difference between a witness interview and a suspect interview if, in fact, there are any differences?

A Well, there's several differences. A witness interview, basically, is when a person is not in custody. They're free to leave. They can stop answering questions at any time. Um, they're treated as somebody who may have information about a case. Or a suspect interview, sometimes they're not free to go. Um, they're sometimes, um, you know more information, you know that they're involved in something, they're treated as that you already know something has occurred and they are involved in it. That's the difference between the two.

Q So, these are -- are different kinds of interviews?

A Yes.

Q They -- They look different? They feel different?

A Correct.

Q What -- what is, uh, the kind of interview you

14

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 14 of 114    Document 19-12

performed with Mr. Dassey on the 27th of February?

A   It was a witness interview.  Um, he was advised that he did not have to answer any questions.  He was advised that he could leave at any time.  So, it was a witness interview, not a suspect interview at that time.

Q   Now, after receiving some information from Mr. Dassey at the high school, was it decided to, um, further, electronically, record that interview?

A   Uh, yes.  Uh, it was initially audiotaped at the high school, um, and after speaking with Mr. Dassey and him providing us a written statement, we decided that we would do a videotape interview of Mr. Dassey, at which time, uh, we did contact Mr. Dassey's mother, um, and she actually came to the school and rode with us to the Two Rivers Police Department where a videotape interview was done of Mr. Dassey.

Q   During the course of, uh -- or prior to either of these interviews, was Mr. Dassey provided with common -- with what's commonly referred to as his *Miranda* warnings?

A   Um, prior to the interview that took place at the Two Rivers Police Department, um, Mr. Dassey was given

15

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 15 of 114   Document 19-12

his *Miranda* warnings. Correct.

Q Provided you what's been marked for identification as Exhibit No. 1. Could you tell us what that is, please?

A Yeah. It's a copy of the City of Two Rivers Police Department's, uh, *Miranda* warnings form.

Q That *Miranda* form in -- instructs an individual, uh, that you are interviewing that they have a right not to speak with you. That they have a right to have a lawyer present. And those other, uh, rights that are enumerated on that form; is that right?

A That's right.

Q And those were all read to Mr. Dassey?

A Yes. Mr. Dassey, in fact, signed the, uh, *Miranda* waiver form and also initialed where I read the information to him from that form.

Q Mr. Dassey indicate that he was willing to speak with you?

A Yes, he did.

Q Did that orally and, also, in writing, as shown on Exhibit No. 1; is that correct?

A That's correct.

ATTORNEY KRATZ: For purposes, and to complete the record in this case, Judge, I would ask

16

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 16 of 114    Document 19-12

the Court receive Exhibit No. 1 at this time.

THE COURT: Any objection to that offer?

ATTORNEY KACHINSKY: Uh, no, Your Honor.

THE COURT: Exhibit is received.

Q (By Attorney Kratz) Now, you said that not only did Mr. Dassey agree to being interviewed, but a discussion was held with his mother on that day; is that right?

A Yes, we did discuss it with, uh, Brendan's mother, Barb, um, and she actually came to the school and rode with us down to the Two Rivers Police Department.

Q Did she agree to allow her son to be interviewed?

A Yes. And we, um, actually offered for her to sit in on that interview at the police department, and she had told us that it was not necessary for her to do that at that point.

Q How long did that interview take at the, uh, Two Rivers Police Department?

A Uh, the best of my recollection, maybe an hour. Somewhere in there.

Q What happened after the interview?

A Um, Mr. Dassey and -- and Barb were transported over to, actually, um, Fox Hills Resort where we had arranged for a room for them to stay for the night.

17

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 17 of 114    Document 19-12

Q   Tell the Judge why you thought that a hotel room was necessary for Barb and her son after that interview?

A   Well, there were several reasons that we had done that.  Uh, number one, was to protect the integrity of the investigation.  We wanted to interview the rest of the people who lived out on Avery Road property, and we didn't want Brendan or Barb going back there and giving them information about the previous interview.  We wanted to --

Q   Just -- not that we're going into any details about the September -- excuse me -- the, uh, February 27 interview, but, uh, I understand that there were, uh, some specific details provided by Brendan on the 27th that, um, implicated, uh, Steven Avery in not only homicide, but, uh, the mutilation of the corpse of Teresa Halbach; is that correct?

A   That's correct.  Yes.

Q   And this was information that you had not received up to that point.  In other words, this was new information from, uh, a witness who had now come forward, uh, indicating that he actually saw, uh, some specific, um, things and, uh, relayed some specific evidence to you, again,

18

that you hadn't had up to that point; is that correct?

A   Yes, that's correct.

Q   Can you describe that, um, newly discovered evidence as significant?

A   Very significant, yes.

Q   And, again, significant enough that you believed that Brendan shouldn't go back to where he was previously living; is that right?

A   Yes.

Q   So this Court understands as well, prior to the 27th of February, had you been aware of, uh, some attempts -- whether they were veiled or direct attempts -- by Steven Avery and other Avery members to discourage or dissuade witnesses from coming forward with information?

A   Yes.

Q   Did, uh, Brendan's mother and Brendan then agree, uh, to, uh, be put up in a hotel that night?

A   Yes, they did.

Q   After Brendan's, um, statement, and after your analysis of the information that he had provided to you, uh, did you, um, review some of that information and compare it to some of the physical evidence that you had obtained in this

19

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 19 of 114    Document 19-12

Q case?

A Yes.

Q After reviewing some of the things that Brendan told you on the 27th of February, and after considering some of the physical evidence, did you and Investigator Fassbender decide to re-interview Brendan Dassey?

A We did, yes.

Q When did that interview occur?

A That interview occurred on March 1 of 2006.

Q Could you tell the Court, please, what the purpose of that interview was?

A Well, we had, uh -- After the initial interview that, uh, Mr. Fassbender and myself conducted on Brendan, there were discrepancies in his story, um, from previous interviews as well, and the purpose of that interview on the first, again, was to try to, um, have Brendan come forth with the truth and tell us exactly what he knew. It appeared that there was more things that happened there than -- that Brendan, um, admitted to knowing about.

Q Now, on the 1st of March, would you consider that to still be more of a witness interview or was that a suspect interview, at least when it began?

A The -- Based on the information that Brendan had

20

Q  provided us on the 27th, we still considered him a --
a witness and not a suspect at that time based on the information which he provided.

Q  As I heard, uh, Investigator Wiegert, there were some details he provided on the 27th that were either inconsistent or what you believed were implausible?  Is that a fair statement?

A  Yes.

Q  Did you intend on the 1st of March to ask Brendan what he had seen on or about the 31st of October?

A  Yes.  That was the purpose of talking with him.

Q  Did you intend to ask him what he may have been told by Steven Avery regarding Mr. Avery's involvement in the homicide and related charges?

A  Yes.

Q  You had talked about attempts to dissuade witnesses by Steven Avery and others.  Had Brendan told you at that point what direction his Uncle Steven had specifically given him regarding cooperation with the police?

A  Yes.  Um, when speaking with Brendan, he had told us that Steve had told him not to talk to the police.  Specifically, not to talk to the police.

Q  On March 1, and prior to the interview with Brendan, did you, again, have, uh, contact with

21

Brendan's mother, Barbara?

A   Uh, yes, we did. Um, prior to going to the high school on the 1st of March, um, Agent Fassbender had contacted Barb, um, and spoke with her and gained her permission to speak with Brendan at the school, and, also, to take Brendan to the Manitowoc Sheriff's Department for another videotaped interview, and she did give us permission to do that.

Q   Now, is it your intent, prior to the 1st of March and prior to that interview occurring, that Brendan would be released or that Barb would be able to take Brendan home after that interview?

ATTORNEY KACHINSKY: I'm going to object. I think the officer's subjective intent at that point is really not relevant.

ATTORNEY KRATZ: I -- If I can be heard, Judge. Uh, the issue of whether it is a custodial interrogation is a factor for this Court to consider. When this officer had a conversation with Barb Janda that he expected after the interview, even, that Brendan was going home, uh, that's as clear a indication as we can have that it was a noncustodial interrogation.

THE COURT: Yeah. The objection is overruled. You may answer.

22

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 22 of 114    Document 19-12

THE WITNESS: Yes. Um, in -- When we spoke with, um, Barb on the phone, um, Agent Fassbender informed her that we would bring Barbara -- excuse me -- bring Brendan back to her, um, after the interview was concluded.

Q (By Attorney Kratz) All right. So that the Judge is clear, um, when walking into that interview on the 1st of March, not only was this a witness interview rather than a suspect interview, but there were some details, and, as it turns out, some things that developed through this interview that surprised you regarding Brendan's involvement; is that right?

A Oh, absolutely. Yes.

Q Prior to removing Brendan from school on the 1st of March, did you also have contact with school officials at the Mishicot High School?

A Yes. After speaking with Barb, um, Brendan's mother, and gaining her permission, uh, we spoke with the dean of students, um, and informed him of our, um, decision to take Brendan to the sheriff's department for the interview. And we advised the dean of students at that time that, uh, we had gained Brendan's mother's permission to do that.

Q Did you make contact, then, with Brendan on the

23

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 23 of 114    Document 19-12

Q 1st of March?

A Yes, we did.

Q Where did that happen?

A Um, it initially happened, um, at the high school office, and we had asked Brendan at that time if he'd be willing to go with us to the Manitowoc Sheriff's Department to do another interview. And, again, we told him that it was going be a videotaped interview, and he agreed to do that.

Q While in the, um, squad car -- By the way, uh, whose -- whose vehicle did you -- did you take?

A Uh, we had taken, uh, Special Agent Fassbender's unmarked, um, squad car.

Q All right. And we call it a squad car, but does it look like a police car?

A No. It doesn't have any lights on it. Um, it's got regular license plates on it. You can -- You get in the backseat, you can get out of the backseat. The doors are not secured from the inside. Um, it's just like a regular car.

Q While in that regular car, uh, where was Brendan seated?

A Brendan was seated in the backseat of that car.

Q Was Brendan handcuffed or otherwise restrained?

A No, he was not.

24

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 24 of 114   Document 19-12

Q   Were the doors locked?

A   No, they were not.

Q   While Brendan, uh, was with you, was he advised that he was not in custody and that he, in fact, was free to leave?

A   Yes, he was.

Q   Were any guns brandished?  In other words, did you take out your weapon?  Show your weapon to Brendan or point your weapon at him?

A   No.  As a matter of fact, um, both my weapon, and, I believe, Agent Fassbender's weapon, were covered by jackets, so --

Q   Prior to having Brendan, um, step into Special Agent Fassbender's vehicle, was he frisked?

A   No, he was not.

Q   What is a frisk?

A   Um, a frisk is when you pat somebody down to check them for weapons, um, to make sure that, uh, they're don't have -- carrying anything that can harm either the officers or the person that we're frisking.  Um, we generally do that when somebody's in custody.

Q   And just so -- so we're clear as to how this looks and feels differently from a suspect interview, if you have a suspect and you take him into custody and you're putting him in the back

25

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 25 of 114    Document 19-12

Q of your squad car, that person frisked?

A Oh, absolutely. I mean, uh, anytime you take somebody into custody, it's -- it's basic police work. You always frisk them. And that was not done that day.

Q That didn't happen with Brendan.

A No.

Q But in a squad car, uh, you still advised Brendan of what's commonly referred to as his *Miranda* warnings. In other words, the same warnings that were provided to him on the 27th; is that correct?

A Yes, we did, um, read him his *Miranda* warnings from our *Miranda* warnings form, um, and that was when we started the audiotape also in the squad car.

(Exhibit No. 2 marked for identification.)

Q I showed you what's been marked for identification as Exhibit No. 2. Could you tell us what that is, please?

A Yes, the Calumet County Sheriff's Department Warning and Waiver of Rights form.

Q And were those the same rights that were read to Brendan on the 1st of March?

A Yes, they were.

Q That document appear to be a true and accurate

26

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 26 of 114    Document 19-12

document or copy of the same document that you read to Brendan on the 1st of March?

A   Yes, it is.

Q   Again, informing him that he didn't have to talk to you, but he had the right to have a lawyer, he could stop questioning any time, and those other, um, commonly, uh, given *Miranda* warnings; is that right?

A   Yes.

Q   Brendan seemed to understand those warnings?

A   Yes.  Brendan, uh, indicated he understood them, and he signed the form, and he also initialed where I read to him from that form.

Q   By the way, either on the 27th or on the 1st, did Brendan express to you any difficulty in understanding either his rights or the questions that you were asking him?

A   No.  As a matter of fact, um, one of the questions are:  Do you understand these rights?  And he indicated he understood them.

Q   And, again, on Exhibit No. 2, Brendan waived those rights and signed that form; is that right?

A   Yes, he did.

Q   He agreed to answer your questions both without the assistance of an attorney, again in the squad

27

car, and, also -- I'm fast forwarding just a little bit -- but you renewed or refreshed those rights when you eventually got to the Manitowoc Sheriff's Department; is that right?

A    Yes.

ATTORNEY KRATZ:  And, again, Judge, for purposes of this hearing and to complete the record, I'm asking the Court, uh, accept Exhibit No. 2 at this time.

THE COURT:  Any objection?

ATTORNEY KACHINSKY:  No, Your Honor.

THE COURT:  The offered exhibit is accepted.  Received.

Q    (By Attorney Kratz) You said that in the squad car you began electronically recording your interview or your meeting with Brendan; is that right?

A    That's correct.

Q    And it was audiotaped, at least in the beginning, from the squad car?

A    It was audiotaped from the point we got in the squad car all the way 'til we, um, got to the sheriff's department.  Actually, we made a stop along the way.  We stopped at his house to collect some things and then went from his house to the Manitowoc Sheriff's

28

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 28 of 114    Document 19-12

Department. And the entire time, um, it was audiotaped.

Q And so that the Court and everybody else is aware and clear, from the time that you made contact, then, with Brendan in the squad car until the entire interview process was completed, this whole event was electronically recorded; is that right?

A Yes, that's correct.

Q There wasn't any break in the action, wasn't any, uh, opportunity for you to discuss or to have conversations with Brendan that weren't electronically recorded; is that right?

A There's one short break in it, and that is where, um, we got to Mr. Dassey's house where he went into the house with Agent Fassbender and retrieved some items and when -- came back to the squad car. And that lasted, um, probably less than a minute. That's the only time. Other than that, everything was recorded.

Q Okay. And so that everybody else and the Judge is clear, there were -- was there any interrogation, interviewing, or questioning of Brendan that occurred during that time other than as related to picking up -- I think, it was his jeans that you were picking --

29

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 29 of 114    Document 19-12

A    Yes.

Q    -- up; is that right?

A    Yes.

Q    All right.  Now, Investigator Wiegert, while in
the squad car while traveling both to Brendan's
house and then, also, to the Manitowoc, uh,
Sheriff's Department, what kinds of discussions
and -- and, uh, conversation occurred at that
time?

A    It was mostly small talk.  As -- as -- What I
recollect, we had a snowstorm maybe a week prior to
that.  I know we talked about the snowstorm.  Uh, we
had talked about whether Brendan had to go to school
that day of the snowstorm.  I remember him saying
that he did go to school that day.  That um, Mishicot
High School was not called off that day.  And it was
small talk about things like that.  Um --

Q    Nothing of substance?  Or at least nothing as it
relates to this investigation --

A    No.

Q    -- is that correct?  When you, rec -- uh -- when
you arrived at the, uh, Manitowoc Sheriff's
Department, could you tell us where you went?

A    Um, when we arrived there, we went up into a
interview room on the -- I believe it's the second

30

floor of the sheriff's department, which is in the investigator's area. We went into, uh, what's commonly referred to as a soft interview room.

Q   What does that mean?

A   Um, a soft interview room -- generally, what you'll have in there is carpeting, you'll have soft furniture, couches, um, soft chairs, things like that. There's two different types of interview rooms; there's a soft one, there's a hard one. And we chose to use that soft interview room.

The hard one generally is -- they don't have carpeting. You have hard chairs, maybe a table. Um, but we used the one with the couches and carpeting in.

Q   And, again, this was a room that was capable of, uh, supporting a videotaped, uh, statement; is that right?

A   Yes.

Q   Again, Brendan was told that the entire interview was going to be videotaped; is that right?

A   Yes, he was advised of that.

Q   How many officers were involved in this, uh, interview process?

A   Uh, during the entire, uh, interview, it was just two of us. Myself and Special Agent Fassbender were the

31

only two that were involved in it.

Q  So the Court is clear, these were the same two officers involved in the, um, February 27 interview; is that correct?

A  Yes, that's correct.

Q  Brendan had known both of you.  And do you believe on the 27th of February you had gained some familiarity with each other?  Some, at least, professional rapport with him?

A  Yes.  Um-hmm.

Q  The beginning of the interview with Brendan on the 1st of March, was Brendan reminded of the importance to tell the truth?

A  Yes, he was reminded of that several times.

Q  Was that a common, uh, strategy?  Or at least is that a, uh, common part of, uh, all of your interviews, whether witnesses or suspects?

A  Yes.

Q  Seems kind of obvious.  Is that the, uh, obvious statement that you give?  In other words, you're not hoping that you're going to be lied to; is that right?

ATTORNEY KACHINSKY:  Objection. Argumentative.

THE COURT:  Well, I don't know that it's --

32

I don't know that it's argumentative. I don't know that it's relevant either. Uh, but objection's sustained.

ATTORNEY KRATZ: That's fine.

Q (By Attorney Kratz) What was the length of the interview with Brendan?

A Um, on the 1st, um, the length of the interview, I believe -- The interview portion, itself, where we were actually interviewing, not including the breaks, would have been approximately 2 hours and 52 minutes. Somewhere in there. Just short of three hours.

Q All right. You had mentioned breaks. Were breaks, uh, offered to Brendan during the course of this interview process?

A Yes, um, he was provided with, um, bottled water. At one point he was provided with a soda. At one point, um, he was offered to use the bathroom. Um, he even had a sandwich at one point.

Q So, refreshments were not only offered but received by Brendan during this interview; is that right?

A Yes.

Q And, then, there were also breaks. In other words, it wasn't a -- a continuous questioning session; is that --

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 33 of 114    Document 19-12

A No.

Q -- right?

A No.

Q I think we mentioned -- at least we touched on it briefly -- that, uh, during the initial portions of the interview, Brendan was reminded of his *Miranda* warnings, reminded of his opportunity to have an attorney present; is that right?

A Yes. Uh, when we first got into the interview room at the sheriff's office, um, I did remind him of his *Miranda* warnings and he agreed at that point to continue talking with us.

Q Now, at some point during this interview process, Brendan was also offered an opportunity to speak with his mother; is that right?

A Yes.

Q And, in fact, that occurred during this interview; didn't it?

A Yes, his brother -- his -- his mother, um, Barb, did, uh, present herself at the sheriff's department, was allowed to speak with Brendan.

Q At anytime during the course of this, uh, 2-hour and 52-minute, uh, interview, were there any instances of violence? In other words, was Brendan ever, um, struck, or, uh, any violence

34

that came to Brendan during that time?

A  No.

Q  Any threats of violence by either you or Investigator Fassbender?

A  No.

Q  Were there any threats at all?  In other words, was Brendan ever told that if you refuse to talk to us, or if you don't tell us what we want to hear, or anything to that effect, that something bad would happen to him?

A  No.

Q  Any forms of, uh, intimidation used with Brendan? In other words, did you or Agent Fassbender ever raise up out of your chair or become physically intimidating towards him?

A  No, there was nothing like that that occurred.  Um, commonly in interviews you'll see the good cop/bad cop roles used.  And that wasn't used either.  There was none of that.

Q  Good cops; right?

A  Both good cops.

Q  No raised voices at all?  At least as far as you can recall?

A  No.

Q  Now, obviously, those of us that, uh, have

35

reviewed these, um, tapes -- and -- and, specifically, now, we're talking about March 1, uh, videotapes, since that's the, um, interview that the State's offering in the case, uh, there were points when Mr. Dassey, um, provided you with information that you believed was either not truthful or wasn't the whole truth. Is that a fair statement?

A   Yes.

Q   Investigator Wiegert, I'm going to ask you to draw a little bit on your experience. Especially your experience in serious felony investigations. Is it unusual for suspects in serious felony investigations to, perhaps, minimize their involvement or not tell you the complete, um, story or the complete truthful story the first time that you go through that version?

A   No. Pardon me. No. It's -- it's common. And the more serious -- In my experience, the more serious the crime, uh, the more that it takes for them to tell you that. And, um, they'll give you a lot of untruths, initially. And, usually, the more serious the crime, the more of that you have.

Q   So, interviewing suspects, at least on serious cases, is, uh -- it's a process. It takes a

36

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 36 of 114   Document 19-12

while; is that right?

A    Yes.

Q    You had talked about the more serious the crime, the more reluctant suspects may be to, what's called, inculpate themselves.  What that means is that they're more reluctant to, um, confess or to tell you that they were involved; is that right?

A    Yes, that's correct.

Q    The subject matter of this interview included homicide; is that right?

A    Yes.

Q    It included rape?

A    Yes.

Q    Included, uh, some very serious -- in fact, perhaps, the most serious charges we have in the state of Wisconsin; is that right?

A    Yes, I would say so.

Q    Investigator Wiegert, during the course -- or prior to Mr. Dassey's, um, explanation to you about his involvement in these crimes, his involvement, uh, in the homicide and related cases, were there any specific promises made to him to encourage his cooperation?

A    No, he was never promised anything.

Q    Any promises of leniency?

37

A    No.

Q    Any promises of specific charges he'd be facing if he made statements to you?

A    No.

Q    Any promises of specific sentencing recommendations that the D.A.'s office might make at the conclusion of the case?

A    No.

Q    You did suggest, uh, Investigator Wiegert, at one point, that he'd feel better once he, uh, in essence, got this story off his chest; is that -- is that fair?

A    That's correct.  Yes.

Q    You believe that to be a true statement?

A    Yes.

Q    One of the, uh, specific statements, and I know that Mr. Kachinsky included this in his motion, uh, was that investigators had agreed, uh, if Brendan was honest, if he was cooperative and truthful with you, that, uh, investigators would, uh, I think, the term was, go to bat for him, uh, during this, uh, process; is that right?

A    Yes, we -- we did say that.

Q    Was that a truthful statement as well?

A    Yes, it was.

38

Q   Were you willing to do that at the time?

A   We were and we did.

Q   And, in fact, just so the Court understands, after Brendan, uh, indicated his involvement in these cases, you and Investigator Fassbender met with me; is that right?

A   We did, yes.

Q   To share the details of Brendan's cooperation, with me?

A   We did.

Q   Did you advance your opinion to me that Brendan should be provided with some credit, at least, as compared to, perhaps, other actors in this case that haven't taken as much responsibility, that he should be given some credit for his honesty and his remorse?

A   Yes, we did.

Q   So, the statement that we'll go to bat for you, uh, not only was a true statement before the, uh, statement was given but, in fact, was fulfilled or followed through by investigators; is that right?

A   Yes.

Q   Investigator Wiegert, prior to the March 1 interview process, uh, you had, I think,

39

previously mentioned that some, um, physical evidence had been examined and some findings had been made by some experts in the case; is that right?

A That's correct. Yes.

Q Had you determined, or did you have a reasonable idea, of who was involved in the homicide and surrounding crimes regarding Teresa Halbach?

A Well, based on the evidence that we had collected and the evidence that we had examined, and in speaking with the experts who were involved with examining that evidence, we kind of had a good idea who was involved and a basic idea of what had occurred, um, on October 31, yes.

Q And just so this Court is, uh -- is aware, and those that might be listening to it, much of the physical evidence that you had obtained at that point had not at that point been made public; is that right?

A That's correct.

Q And --

A And some of it still hasn't been made public.

Q In fact, much of it hasn't yet been made public; is that correct?

A That's correct. Yes.

40

Q Were you aware at that time, or at least were told by experts as to their opinion, as to the method of homicide? That is, how -- or at least partially -- how, uh, Teresa Halbach was killed?

A Yes. At least one of the methods, correct. Yes.

Q And, again, that hadn't been made public at that time?

A No.

Q Were you familiar, and were you told by experts, as to the place of the homicide? That is, the -- uh, where some specific evidence was found that suggested that this crime may have been committed in that location --

A Um, based --

Q -- or locations?

A Yes. Yes.

Q One of the charges that, uh, Mr. Avery faced at that point included a crime that's called "mutilation of a corpse." Has to do with the disposal, uh, of, uh, a body after a homicide, uh, and the hiding of it for purposes of investigations. Were you given specific information by expert witnesses, uh, as to that particular crime and as to how those things may have occurred?

41

A    Yes, we were.

Q    Now, other than the, um, specific physical evidence that you had received, were you also in a position to draw inferences, not just as an investigator but with the assistance of lots of experts that you spoke with, uh, as to, uh, what, perhaps, motivated this homicide?

A    Uh, yes, we were.

Q    And we know now, and I'm going to ask you, on the 1st of March, uh, was it an inference and a theory by investigators that this was a, um, sexually-motivated homicide?

A    Absolutely, yes.

Q    Consistent with that, Investigator, uh, did you believe that there may be, uh, related charges or related crimes that occurred, including sexual assault, uh, or, uh, being, uh, held against her will or other kinds of related matters?

A    Yes.

Q    And those were inferences. Again, not just speculation by you, but consistent with the physical evidence and with what you knew at the time on March 1; is that right?

A    Correct.

Q    Finally, Investigator, did you believe that it

42

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 42 of 114    Document 19-12

was possible, or even likely, that Brendan Dassey had seen more than he had previously told you or may, in fact, have been involved at least at some portion of these particular crimes?

A Based on the interviews that we have done, based on the, um, evidence which was collected, yes, we did believe that.

Q I ask you these questions because during the course of this interview, um, you tell Brendan, or you suggest to Brendan, that, uh, we already know what happened. Uh, was that an expression of not only the physical evidence that you knew at the time, but also these inferences, connecting the dots, if you will, uh, from what, uh, you'd already learned?

A Yes, both of those. Um, um, after reviewing and -- the evidence which we had collected, and, again, after speaking with the experts about the evidence that was collected, and after they had a chance to examine that evidence, along with the interviews, uh, we had come up with a theory on what had taken place there.

Q During the interview of Brendan, or if you believed that Mr. Dassey was not being totally honest with you, were -- was he reminded to,

43

uh -- to remain honest during the -- the interview?

A    Yeah, he was reminded of that several times.

Q    Now, there were some details that Mr. Dassey provided you that you didn't know.  Or, I mean, in all candor, as you sit here, came to somewhat of a surprise to you; is that right?

A    Yes.

Q    Fair to say that that's purpose of interviews? That is, to find stuff out that you don't know yet?

A    Absolutely.  That's why we interview people.

Q    Now, Investigator Wiegert, to ensure the accuracy or truthfulness of information you're receiving sometimes from either witnesses or suspects, there's a tactic or a strategy which includes providing deliberately false information.  That is, providing information about the case that you very well know never happened.  That it didn't happen.  Are you familiar with that strategy or tactic?

A    Yes.

Q    Was that employed in this case?

A    Yes, it was.

Q    And, uh, could you describe for the Court why

44

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 44 of 114    Document 19-12

that was used and, uh, what, uh, results you got therefrom?

A   Well, the reason you do things like that is to, um, see if the witness is going to go along with the false statements or if he's going to stop you and correct you.  Um, and when we did that with Mr. Dassey, when we gave him false information, he would deny it, stop us, and he would correct that information.  And that the purpose is to make sure that he's not just going along with everything we're saying and to see that he is telling us the truth. And we did that.

Q   So that would -- could be more specific.  And at least what this Court has to determine what's called, uh, demonstrating a free and unconstrained will.  If it's -- if you tell somebody something that you know didn't happen in this case --

A   Uh-hum.

Q   -- just so the Court understands, and if there's anything secret about this, you had told Brendan that you believed Teresa had a tattoo on her stomach.  Remember telling him that?

A   We did tell him that.

Q   You knew that not to be true; isn't that right?

45

A   We knew that not to be true, correct.

Q   Rather than just go along with that or just say, oh, yeah, I remember that, or that happened, Brendan told you, I don't remember seeing that --

A   Yes.

Q   -- isn't that correct?

A   That is correct.

Q   That when provided with, on a couple of occasions, false statements or things that you knew didn't happen, Brendan was able to resist those suggestions or to resist your, um, attempts to just get him to go along with stuff; is that right?

ATTORNEY KACHINSKY:  Objection.  Leading question.

ATTORNEY KRATZ:  I'm not sure how else to ask it, Judge.

THE COURT:  Yeah.  The objection is sustained.  Uh, it -- it -- it's a leading question. Can you reframe it in a nonleading way?

ATTORNEY KRATZ:  I can certainly try, Judge.

Q   (By Attorney Kratz) Was Mr. Dassey able, or did he demonstrate the ability to resist these suggestions?

46

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 46 of 114   Document 19-12

A    Yes, he did.

Q    At one point you had suggested to Brendan that, we know that, uh, the gun that was used in this case was in your hands.  Do you remember suggesting that to him?

A    Yes, I do.

Q    Was he able to resist that suggestion?

A    Yes, he did.  He indicated to us that the gun was never in his hand.

Q    So, any suggestions, then, that he just went along with whatever it was you were trying to tell him, or that you were putting these words in his mouth, you believe that to be false; is that --

ATTORNEY KACHINSKY:  Objection. Argumentative.  Asks the witness to invade the province of the Court.

THE COURT:  Well, the questioner is, in effect, testifying here.  The objection is sustained.  Can we move -- I think I see where you've gone and where you're going.  Can we move on?

ATTORNEY KRATZ:  We certainly can, Judge.  I'd be happy to.

Q    (By Attorney Kratz) Finally, uh, Investigator Wiegert, at anytime during this interview

47

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 47 of 114    Document 19-12

process, uh, did you, uh, employ overly leading questions?  That is, did you suggest answers within your questions to Brendan?

A    No.

ATTORNEY KRATZ:  For purposes of this hearing, Judge, that's all the questions I have of Investigator Wiegert.

THE COURT:  All right.  Cross?

**CROSS-EXAMINATION**

BY ATTORNEY KACHINSKY:

Q    Investigator Wiegert, uh, you're aware, as a result of your professional experience, that there was a decision by the Wisconsin Supreme Court in July of last year that required that suspect interviews of, uh, juveniles be recorded electronically; is that correct?

A    Yes.

Q    And is it correct that, uh, after that decision came down, that, uh, you complied with the decision and you electronically record, uh, questioning of suspects when they're juveniles; correct?

A    Yes, we do.

Q    Uh, juvenile is defined, for purposes of that particular, uh, decision, as being those, uh,

48

under the age of 18; is that right?

A   Yes.

Q   And I think -- and -- and Mr. Dassey was a -- a little bit over the age of 16 at the time of the interviews of February 27 and March 1, 2006; is that right?

A   Yes.

Q   Now, it's also not required, however, that interviews of juveniles, where the juvenile is simply a witness to someone else committing a crime, uh, be recorded; is that correct?

A   That's correct.

Q   Uh, and, in fact, uh, if an interview of a juvenile occurs, for example, near a crime scene, or in their home, or something like that, uh, and they're not, uh, a suspect in an offense, uh, those typically are still not recorded; is that correct?

A   I wouldn't say typically, no.  Um, we record a lot of interviews whether they're interrogations or not, um, with juveniles now.

Q   And that's just to be cautious so that in case an interview changes its character that, uh, you're protected and in compliance with that court decision; is that right?

49

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 49 of 114   Document 19-12

A    That's correct. Yes.

Q    Now, you've indicated that, uh, between the time of Mr. Dassey's, uh, first interview with law enforcement regarding this case in November of 2005, and, uh, February of 2006, uh, that he was, uh, someone that you thought, uh, would be of interest and might provide more information than he had originally provided; is that right?

A    That's correct.

Q    And, in fact, uh, shortly before the February 27, 2006, interview, you had some information that Mr. Dassey may have revealed some details involving the offense to a relative of his; is that right?

A    Yes.

Q    Um, and it was within a day or two of that that you arranged this, uh, February 27 interview; is that correct?

A    Yes.

Q    Um, now, the information that you had specifically from a relative of, uh, Mr. Dassey's, was that, uh, he had seen, uh, body parts in a bonfire near his, uh, residence; is that correct?

A    Um, along with that he had been losing weight and

50

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 50 of 114    Document 19-12

crying a lot.

Q  Sure. He was emotionally upset, disturbed, something to that effect?

A  My understanding.

Q  Um, now, knowing that there is some information that Mr. Dassey, uh, was aware of the, um, destruction of a -- a human corpse by fire, uh, led you to at least suspect that he might have been involved, uh, in the, uh, disposal of that corpse, uh, by -- in conjunction with Mr. Avery; is that right?

A  Yes.

Q  And, in fact, that's the reason why you decided from the beginning of the February 27, uh, interview to, uh, audiotape it; correct?

A  Uh, no, I would disagree with that. It was, um, to protect him, to protect us, um, because of the -- the enormity of the case, um, we did not want to make any mistakes in the case. And that was the primary reason that we decided to do that.

Q  Um, now, during the course of the, uh, February 27, 2006, interview, then, at Mishicot High School, Mr. Dassey, uh, gave information regarding some observations he'd made of, uh, human body parts in a bonfire at or near his,

51

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 51 of 114    Document 19-12

uh -- his residence, uh, on Avery Road; is that correct?

A    Near his residence, yes.

Q    And when Mr. Dassey, uh, told you that during the interview at, uh, Mishicot High School, uh, that led you to believe that he, at a minimum, might have been involved in, uh, helping Mr. Avery in some way dispose of the corpse of Mr. -- of, uh, Teresa Halbach; is that right?

A    Well, led us to believe that he observed, you know, her body in the fire. Um, we didn't know at that point whether he had anything to do with helping get the body in the fire.

Q    But you knew, as a result of your experience, that frequently witnesses, um, to events like that might initially not tell you all the information they knew, and there might be more that, uh, Mr. Dassey knew about the disposal of, uh, body parts than what he had initially provided at the high school; is that correct?

A    Yes.

Q    And that's the reason why -- one of the reasons why, when you got over to the, uh, Two Rivers Police Department, you read him his *Miranda* rights; is that correct?

52

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 52 of 114   Document 19-12

A    Um, again, because of the enormity of the case is the reason that we read him his **Miranda** rights and to protect him as well.

Q    Um, now, the **Miranda** rights that you read to Mr. Dassey, uh, did not include any reference as to what offenses, if any, you suspected him of, did -- did they?

A    No.

Q    And, in fact, the standard **Miranda** warnings don't contain any sort of, uh, warning to a suspect of the offense that you, uh, believe someone may have committed before you do the interview; is that correct?

A    That's correct.

Q    Now, after the -- When you did the videotape interview at the Two Rivers, uh, Police Department, um, Mr. Dassey basically told you the -- the same information he'd told you over at the, uh, high school earlier that day; is that correct?

A    Uh, essentially the same, yes.

Q    Now, you've indicated today that the -- the reason you set up the, um, motel room at the, uh, Mishicot hills resort was because you wanted to protect the integrity of the, uh, investigation;

53

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 53 of 114    Document 19-12

is that right?

A   As I had started, um, explaining earlier, there were two reasons. That was one of them, yes.

Q   Okay. And there's second reason were you concerned about Brendan possibly harming himself?

A   Uh, not harming himself as much as maybe somebody, um, on the Avery property harming him after finding out that he had told us information.

Q   Had you told, uh, Barb Janda, uh, though, that you were concerned about Brendan possibly harming himself?

A   Oh, I'm sure, yes. I mean, that was, um, an issue, but the -- the bigger issue is we were worried that somebody else would harm him.

Q   Now, going to the, uh -- the March 21 -- or, excuse me -- the March 1 interview, part of the interview process, uh, both on March 1 and on February 27, was a period of time at the beginning of the interview when you and Mr. Fassbender, uh, made statements to, uh, Mr. Dassey regarding, uh, the purpose of the interview and stressing the needs why, uh, he should cooperate with you and Mr. Fassbender; is that correct?

A   Yes.

54

Q   As a standard technique during questioning to have kind of an initial pep talk with a -- a subject of an interview before going into greater detail as to the events you're interviewing him about; is that correct?

A   I don't know that I would call it a pep talk, but we do, um, talk to them initially to tell them why we are talking with them and the importance, um, of them being truthful to us.

Q   And one of the techniques that's, uh, used with suspects of all ages to try to persuade them to, uh, provide you information is to minimize the seriousness of the offenses that you, uh, suspect them of; is that correct?

A   Yes.

Q   And in this particular case, uh, one example of that technique that was used was, uh, Mr. Fassbender telling Brendan that he thought, uh, Brendan was all right, did not have to worry about things; is that correct?

A   Um, I believe that statement was made, yes.

Q   Uh, there was also a statement I believe you made to Mr. Dassey that you could work through whatever Brendan did; is that right?

A   Yes.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 55 of 114    Document 19-12

Q You also told him that the honest person's the one who get the better deal out of everything?

A Yes.

Q Um, these were all made on, uh, March 1; is that right?

A I believe so, yes.

Q And you had a chance to prepare for this hearing today by reviewing the tapes and the transcripts of the March 1 interview; is that correct?

A I have.

Q Um -- And there was another statement made to Brendan to the effect, um -- and made by you -- that honesty was the only thing that could set him free; is that correct?

A Yes, and -- and by that I meant his -- his feelings, um -- He had indicated to us he could not sleep. Um, we had information he had been losing weight. Um, by free, getting the weight off his shoulders. We commonly say that type of thing. We knew he wasn't going to be able to get through this until he admitted it to somebody. It was bothering him, obviously.

Q You don't know from your own knowledge, uh, what it -- how it was that Brendan perceived that particular statement, do you?

56

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 56 of 114    Document 19-12

A No.

Q Now, after that, um, statement about honesty, concept of the free, Brendan then told you about seeing Mr. Avery and Miss Halbach talking on the porch; uh, is that correct?

A Um, it was some time after that. Correct.

Q Uh, and you had other information that led you to believe that, um, Mr. Dassey could not have seen Steve Avery and Teresa Halbach talking on the porch, correct?

A Uh, based on the other witness' statements, um, people who were there around that time, yes, that's correct.

Q Um, and, initially, back in November of 2005, Brendan had made the statement about seeing, uh, Steve Avery and Teresa Halbach talking on the porch; correct?

A I really can't answer that question. I'm not sure exactly what was all said during that interview.

Q Uh, at some point early in -- in the investigation you'd received information from a person that was claimed to be Brendan Dassey's, uh, bus driver from school who also claimed to have seen, uh, Steve Avery and Teresa Halbach, uh, talking on the porch at the time that, uh,

57

Mr. Dassey was let out of the school bus; is that correct?

A   I don't recall the, uh, bus driver saying that. I recall the bus driver telling us how she came down and dropped the kids off and saw several vehicles. I don't recall her saying anything about seeing Steve and Teresa talking.

Q   Now, at another point during the March 1 interview, uh, there was a discussion about how Teresa Halbach got in the back of the jeep that was, uh, on Steve Avery's property; is that correct?

A   Yes.

Q   And, uh, during the discussion of that, is it, uh, correct that you told Mr. Dassey that if you helped him, referring to Steve Avery, that it was okay because, uh, he, referring to Steve Avery, was telling you to do it?

A   Yes.

Q   You also made, uh, assurances to Mr. Dassey that, uh, referring to him as a buddy; is that correct?

A   Uh, yes.

Q   Now, before Brendan Dassey told you that he had sex with Teresa Halbach, uh, you made a statement to Mr. Dassey, quote, what happens next? Do you

58

Q remember? We already know, but we need to hear it from you. It's okay. It's not your fault. What happens next? Is that -- Did you say something to that effect before Mr. Dassey admitted having sex with, uh, Teresa Halbach?

A Yes.

Q Um, and -- but, as a matter of fact, is it, uh, correct that you really, uh, had nothing at that point, other than a theory, that, uh, Mr. Dassey had, uh, been involved in a sexual assault?

A In regards to the sexual assault portion, yes, that's correct.

Q Now, the videotaped interview of March 1, uh, 2006, you say it took place in what's called a soft-type, uh, interview room at the Manitowoc County Sheriff's Department; is that correct?

A That's correct.

Q Um, even though it's a so-called soft, uh, interview room, it's still, essentially, a closed off small area; is that correct?

A It's a smaller room, yes.

Q Uh, during the interview, the door was closed; is that right?

A Yes.

Q During the interview, there were, uh, three of

59

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 59 of 114    Document 19-12

you in the room; you, Mr. Fassbender, and Mr. Dassey; is that right?

A   That's correct.

Q   Uh, during your interviews of, uh, Mr. -- Mr. Dassey, uh, did you ever discuss with him how well he was doing in school?

A   Um, we -- we discussed school a lot.  I don't know that we specifically asked him how well he was doing in school.  I -- I don't recall that.

Q   Uh, did you also check records that were available to you as a law enforcement, uh, person to determine whether or not Mr. Dassey had any prior involvement, uh, with the criminal justice system?

A   Uh, we did, yes.

Q   And is it correct that, uh, you -- From those law enforcement records, you discovered that Mr. Dassey had never been, uh, arrested or titled for any sort of, uh, offense?

A   He was, uh, labeled as a suspect in one offense.  However, from reviewing that report, does not appear that he was ever interviewed on that.

Q   You've indicated that during the interview, um, of March 1, Brendan was allowed to speak to his mother; is that correct?

60

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 60 of 114   Document 19-12

A   Yes.

Q   Now, the point in time during the interview when that occurred was after Brendan had already made statements implicating himself in the homicide, mutilation of a corpse, and sexual assault; is that right?

A   That's correct.

Q   And would it be fair to characterize that portion of the interview where Barbara Janda was there as a -- basically a -- a mother saying -- having her last words with her son before he was going to be put into custody?

A   It was near the end of the interview.

Q   You've indicated that a couple times during the interview you deliberately provided false information to Mr. Dassey to determine whether or not he was simply, uh, saying things that you expected him or wanted him to say; is that correct?

A   Yes.

Q   And one example you've got -- you gave was whether or not, uh, Teresa Halbach had a tattoo; is that correct?

A   That's correct.

Q   And the other one was whether or not Mr. Dassey

61

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 61 of 114   Document 19-12

had ever handled a firearm during the offense; is that right?

A    Yes.

Q    Were there any other examples, other than that, where you provided, uh, incorrect information to Mr. Dassey to determine whether or not, uh, he was, um, responding to a suggestion or giving you his honest recollections?

A    Um, those would be the two instances that I can think of.  Um, but we would say certain things, he would say, no, that didn't happen, or, yes, that did happen.

ATTORNEY KACHINSKY:  That's all the questions I have, Your Honor.

THE COURT:  Any redirect?

ATTORNEY KRATZ:  Just a few questions.

### REDIRECT EXAMINATION

BY ATTORNEY KRATZ:

Q    Did Brendan ever ask for an attorney?

A    He did not.

Q    Brendan ever ask to speak with his mother?  Or was he ever denied the chance to speak with his mother?

A    He was not.

THE COURT:  That really was two questions;

62

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 62 of 114    Document 19-12

Did he ever ask to speak with his mother and --

ATTORNEY KRATZ: Sorry, Judge.

THE COURT: Why don't you just ask him as two simple questions.

Q (By Attorney Kratz) Did he ever ask to speak to the mother?

A No.

Q Was he ever denied access to his mother?

A He was not.

Q Finally, the detail of the version of events, who did the detail come from?

A Uh, the detail came from Brendan.

Q That detail include his involvement in the homicide?

A It did, yes.

Q Did it include his involvement in the surrounding crimes as well?

A It did, yes.

Q Did the detail also involve his Uncle Steven Avery's involvement?

A Yes.

Q These weren't suggestions by you where he just had to say the word "yes," right?

A No, it was not.

ATTORNEY KRATZ: All right. That's all for

63

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 63 of 114    Document 19-12

this hearing, Judge.

THE COURT: Any recross?

ATTORNEY KACHINSKY: Uh, no, Your Honor.

THE COURT: You may step down. Do you have any further witnesses?

ATTORNEY KRATZ: Uh, not -- not for, uh, our case in chief, Judge, no.

THE COURT: I think we'll take about a ten-minute break at this time. We'll be back ten minutes from now. Then we can proceed with the defendant.

(Recess had at 10:20 a.m.)

(Reconvened at 10:36 a.m.)

THE COURT: Mr. Kratz, you have no further witnesses?

ATTORNEY KRATZ: I don't, Judge.

THE COURT: Mr. Kachinsky.

ATTORNEY KACHINSKY: Uh, yes, we'd call to the stand, Barbara Janda.

THE CLERK: Would you raise your right hand?

**BARBARA JANDA,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state

64

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 64 of 114    Document 19-12

your name and spell your last name for the record.

THE WITNESS: Barb Janda, J-a-n-d-a.

### DIRECT EXAMINATION

BY ATTORNEY KACHINSKY:

Q   Okay.  Barb, are you related to the person that's, uh -- uh, has a hearing here today?

A   Yeah.

Q   Uh, and, uh, what's your relationship to, uh, Brendan Dassey?

A   He's my son.

Q   When was, uh, Brendan Dassey born?

A   October 19 of '89.

Q   Uh, as of February 27 and March 1 of 2006, how old was Brendan?

A   Sixteen.

Q   Um, what school does Brendan attend?

A   Mishicot High School.

Q   How long had Brendan been attending school as of, uh, February and March of this year?

A   In Mishicot?

Q   Right.

A   Um, I moved out there in 2001.  So, it would be 2001.

Q   Uh, now, as, uh -- Have you always had, uh, physical placement of, uh, Brendan Dassey?

A   Yes.

65

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 65 of 114     Document 19-12

Q  Uh, uh, were you married at some point to Brendan Dassey's father?

A  Yes.

Q  Uh, did that marriage terminate?

A  Yes.

Q  Uh, when did that marriage terminate?

A  Ninety-two.

Q  Now, um, as -- as Brendan's, uh, parent, have you been apprised from time to time as to his progress in school?

A  Brendan's a very slow learner.  I mean, his grades are really, really bad.

Q  Uh, has Brendan been subject to, uh, psychological testing in school?

A  Um, he had some testing done.

Q  Uh, is -- is Brendan in regular classes in school?

A  Um, some, I think, and some he's in special ed.

Q  Um, now, in connection with, uh, the motion that we're bringing in this particular case regarding Brendan Dassen's -- Dassey's statements to, uh, uh, law enforcement officials, uh, are you aware that the issue of his school performance was going to be part of the motion?

A  Yes.

66

Q In connection with that, did you receive a form for transmittal to the, uh, Mishicot School District, uh, permitting release of information regarding Brendan's, uh, behavioral and, uh, other records from the Mishicot School District?

A Yes.

Q Did that, uh, authorization for release of information include, uh, release of information not only to me but also to the Court?

A Yes.

Q And, uh, do you reaffirm, uh, your willingness to permit that information to be released so that this, uh, motion can be fairly decided by the Court?

A Yes.

Q Um, uh, your observations of Brendan's personality, uh, have you been able to, uh, make any observation regarding whether or not, uh, he's someone that responds readily to suggestions from others?

A Usually he does. Um, he's a very shy boy. Um, he doesn't say too much.

Q Um, have you been able to make any observations regarding Brendan's, uh, level, of, uh, self-esteem or assertiveness?

67

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 67 of 114    Document 19-12

A    Not really.

ATTORNEY KACHINSKY:   That's all the questions I have.

THE COURT:   Cross, if any?

**CROSS-EXAMINATION**

BY ATTORNEY KRATZ:

Q    Barb, you remember that, um, since this case began, that Brendan has been subjected to some questioning by police officers; is that right?

A    Yes.

Q    In fact -- You have to speak up just a little bit if you can, please.  In fact, uh, your whole family, you, your other sons, um, other members of, uh -- of your family have also been questioned; is that right?

A    Yes.

Q    And that questioning has occurred, really, since the time that, uh, search warrants were starting to be executed sometime after the 5th of November.  Does that sound about right?

A    Yes.

Q    And that's really continued through -- well, March 1 when -- when Brendan was interviewed by these officers, uh, but it's maybe even continued after that.  You've talked to police after that

68

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 68 of 114    Document 19-12

as well; is that right?

A    Um, I think once.

Q    When officers had sought to interview Brendan or your other son, Blain, as an example, would you provide them with permission?  Allow them to interview your sons?

A    Um, my two older ones, they're old enough to do what they want.  Um, Blain, they talked to, but I usually went along, and, with Brendan, they more or less didn't want me in there.

Q    My question, though -- My question to you, Barb, is you had, at least up until March 1, attempted to be cooperative with law enforcement efforts to interview not only yourself but other family members; is that right?

A    Yes.

Q    Now, until March 1, were there any questions of threats or promises or intimidation either to yourself or to your sons that you knew about that made you want to stop, uh, cooperating or stop the interviews with your family?

A    No.

Q    So, as far as you knew, officers were respectful.  I know -- I know the questions were hard and the -- and the topic was difficult to talk about,

69

uh, but you understood that they were doing their job and they were trying to be respectful to you and your family. Is that -- is that a fair statement?

A   Yes.

Q   Okay. And prior to March 1, did Brendan ever complain to you how he was treated by any police officers? Prior to March 1.

A   Not really, no.

Q   On March 1, then, that's the subject of -- of -- of this hearing, officers asked you for permission to interview Brendan at the sheriff's department in Manitowoc. Do you remember that?

A   Yes.

Q   And you gave them permission to transport him from the school to the police station; is that right?

A   Yes.

Q   Officers invite you to come along? Did they invite you to the police station as well?

A   No.

Q   During the interview, itself, were you invited to come to the police station?

A   The Manitowoc one or the Two Rivers one?

Q   The Manitowoc one.

70

A  No.

Q  Well, you were there, weren't you?

A  I was there, yes, but that was after it was all done and over with.

Q  Okay.  How did you get there?

A  I walked over there.

Q  Who --

A  The -- the day that they took him to Manitowoc, I was at the courthouse because I was getting a divorce that day.

Q  Okay.  So, rather than being invited, you just happened to show up at the station; is that right?

A  I had called them to see if they were done with Brendan or if they had brung him back to school or not and that's when they told me that they had arrested him.

Q  And at that point you were invited to the station?

A  Yes.

Q  You were allowed to meet with Brendan at the station; is that right?

A  Yes.

Q  And were you informed at the station, uh, what Brendan had told them?  That is, his involvement

71

in these crimes?

A   More or less, yes.

Q   And that Brendan had also implicated his Uncle Steve in this murder as well; is that right? Were you told that then?

A   I don't remember.

Q   Okay.  But you knew that Brendan told the officers that he was involved; right?

A   That's what they had told me, that he was involved.

Q   All right.  After the interview is over and, in fact, several times since this interview, officers have invited you to watch the tape, haven't they?

A   Yes.

Q   And have you done that?

A   No.

Q   Barb, the, um, police describe some concerns that they had after Brendan had implicated Steven in this homicide.  Concerns about, um, attempts that some family members might make to get Brendan to change his story or to not talk.  Do you remember hearing Investigator Wiegert say that today?

A   Yes.

Q   Do you recall having that conversation with Investigator Wiegert that you also were concerned

72

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 72 of 114    Document 19-12

about what might happen to Brendan if he went back home to the Avery compound?

A   On the first?

Q   Before the first.

A   I mean --

Q   The 27th.

A   -- the 27th?

Q   Uh-huh.

A   Um, I had told them that I didn't have to go home.  I had other places that I could go.

Q   My question --

A   They suggested that I go to Fox Hills.

Q   My question is:  Did you also share with them your concern about what might happen to Brendan if he went back home?

A   I don't remember.

Q   You told investigators that day, on the first, and you've told them after that, that Brendan's a honest kid, that he's a truthful kid.  Do you remember telling them that?

A   Yes.

Q   In fact, I think you used the words, he doesn't lie.  Remember saying that?

A   Yes.

Q   And you believed, at least up until March 1, that

73

Brendan was truthful and honest, didn't you?

A    Yes.

Q    And that when he told people something, when he told authority figures something, he should be believed. You thought that, didn't you?

A    Yes.

THE COURT: Counsel, I'm going to stop you there. Uh, I understand the purposes of your question, but this is a hearing on voluntariness. We're -- we're not -- the -- the -- the truth -- the factual truth of -- of what was -- what was or wasn't uttered there is not the subject of this hearing, so, where are we going with this line of questioning?

ATTONREY KRATZ: Well, Judge, the suggestion will be that he was threatened, or coerced, or promised to say something, uh, that, uh, he either didn't, um, want to say or that there were problems within that. The fact that Brendan was truthful and honest, didn't complain about any coercion, or threats, or the like, I think, is relevant. It isn't for the truth of the -- the underlying statement, Judge.

THE COURT: Well, insofar as it goes to the -- the voluntariness, you can ask a couple of

74

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 74 of 114    Document 19-12

more questions, but --

ATTONREY KRATZ:  That's all I was going to ask --

THE COURT:  All right.

ATTORNEY KRATZ:  -- as -- as to that, Judge.  I appreciate that.

Q    (By Attorney Kratz) You talked about Brendan's, uh, school, and we'll hear from, I think, members of the, uh -- the school hereafter, but, basically, Brendan was in regular classes.  You were aware of that, weren't you?

A    Some of them, yes.

Q    Brendan was in the process of getting his driver's license, wasn't he?

A    Yes.

Q    You have to answer a little louder, please.

A    Yes.

Q    And to get your driver's license, you have to take some tests; is that right?

A    Yes.

Q    And you, I think, if I remember correctly, have to have a parent sign for you that, uh, indicates that this is a person that is smart enough to get their driver's license and makes good enough decisions to get their license.  Did you have to

75

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 75 of 114    Document 19-12

Q sign something like that?

A At -- at the motor vehicle, yes.

Q All right. And you, in fact, thought at that time, back, uh, in the fall, that Brendan was mature enough to drive an automobile, didn't you?

A Yes.

Q You thought he was bright enough, that he was smart enough to understand what went with driving an automobile, didn't you?

A Yes.

Q Was Brendan on any kind of medications at the time?

A No.

Q To your knowledge, was Brendan intoxicated or otherwise impaired when he spoke with, uh, law enforcement officers?

A No.

Q You have a computer at your home; is that right?

A Yes.

Q Brendan have access to that computer?

A Yes.

Q Brendan was able to use that computer, to use the internet and, uh, otherwise operate that piece of machinery; is that right?

A Yes.

76

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 76 of 114    Document 19-12

Q Do you know if Brendan had any e-mail accounts? If he would e -- use the e-mail?

A I couldn't tell you.

Q Send messages, or instant messages, or anything like that? Did you know --

A MSN.

Q -- if he did that or not?

A That's about it. MSN.

Q And send instant messages?

A Yeah, I think that's what it's called, yeah.

Q And that's communicating to other people? That's actually typing or writing answers to questions and communicating?

A Yes.

Q You're aware of that, aren't you?

A Yes.

Q And Brendan's able to do that; isn't he?

A Yes.

Q You believe Brendan's able to remember things that happened and tell you what happened? Like when you'd ask what happened at school today, would he answer those questions for you?

A Yes.

Q He was able to observe things, to process them, to understand them, and then to tell you at least

77

Q about what happened? That's all true, isn't it?

A Yeah. It takes him a while, though.

Q Okay. Well, he's not, um, ever been diagnosed as being incompetent or not understanding what's going on in his surroundings, has he?

A No.

Q You're aware that Brendan also gave a written statement to the police about, um, some of his involvement? Some of the things that he had seen in this case?

A I guess so.

Q You don't know?

A Not really. I don't know too much.

Q All right. At school, would Brendan have to write things out, whether it was homework, or some papers, or theme papers? Or, at least, um, homework was in a written form for Brendan; isn't that right?

A Yes.

Q He was able to do that?

A Honestly, I couldn't really tell you because he never brung any homework home.

Q Finally, Miss Janda, um, March 1, after the interview, was it your expectation that Brendan would be coming home with you? In other words,

78

um, did the officers believe that after that statement was given, you'd be able to take him home with you?

ATTORNEY KACHINSKY: Objection. That asks, uh, something that this witness would have no knowledge as to what the officers believed. She might know what the officers told her.

ATTONREY KRATZ: I can rephrase that, Judge.

THE COURT: Please do.

Q (By Attorney Kratz) Did the officers tell you that after the interview that Brendan would be going home with you?

A Yes.

Q Did they then also tell you that it was because of his admissions, because the details that he gave that day, that he couldn't go home? That they weren't going to allow him to go home?

A Yes.

ATTONREY KRATZ: Thank you, ma'am. That's all I have, Judge.

THE COURT: Any redirect?

ATTORNEY KACHINSKY: Yes.

**REDIRECT EXAMINATION**

BY ATTORNEY KACHINSKY:

79

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 79 of 114    Document 19-12

Q On March 1, had the officers contacted you before they removed Brendan from Mishicot High School to take him over to the Manitowoc County Sheriff's Department for an interview?

A Yes, they did.

Q And was that the time when the officers told you that they expected that Brendan was going to be coming home after the interview?

A Yes.

Q And, then, later on, when they contacted you after Brendan had made some admissions regarding involvement in the death of Teresa Halbach, is that when they made the contrary statement that they were going to arrest him and he would not be coming home?

A Yes.

ATTORNEY KACHINSKY: That's all I have, Your Honor.

ATTONREY KRATZ: I have nothing further. Thank you, Judge.

THE COURT: You may step down.

ATTORNEY KACHINSKY: Uh, we call, uh, Kris Schoen -- Schoenenberger-Gross.

THE CLERK: If you would raise your right hand.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 80 of 114    Document 19-12

**KRIS SCHOENENBERGER-GROSS,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Kris Schoenenberger-Gross, S-c-h-o-e-n-e-n-b-e-r-g-e-r hypen G-r-o-s-s.

## DIRECT EXAMINATION

BY ATTORNEY KACHINSKY:

Q    Uh, Kris, by whom are you employed?

A    Mishicot School District.

Q    What is the nature of your employment there?

A    I'm the school psychologist and the coordinator of alternative services.

Q    How long have you worked for the Mishicot School District?

A    Eight years.

Q    Um, have you prepared a resumé of your, uh, educational background and, uh, uh, professional positions?

A    Yes.

(Exhibit No. 3 marked for identification.)

ATTORNEY KACHINSKY: May I approach, Your Honor?

THE COURT: You may.

81

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 81 of 114    Document 19-12

Q   (By Attorney Kachinsky) I'll show you here what's, uh, been marked as Exhibit No. 3.· Is that a copy of your, uh -- your resumé?

A   Yes.

Q   And was that prepared for purposes of this hearing today?

A   Yes.

Q   Now, in the course of your professional duties as a school psychologist for the, uh, Mishicot School district, um, have you had occasion to deal with, uh, evaluations and, uh, concerns regarding the person that's the defendant in this case, Brendan Dassey?

A   Yes.

Q   Um, are you also -- Are you the custodian of his, uh, records in the Mishicot School District?

A   Yes, I am.

Q   What kind of records does, uh, the Mishicot School District, uh, maintain on Brendan Dassey?

A   We have special education records, cumulative records, um, behavioral records.

Q   Uh, has Brendan Dassey's, uh, mother, Barbara Janda, signed a release permitting those records to be released and information regarding those records to be released for purposes of this court

82

hearing?

A Yes, she has.

Q Um, uh, now, did you have occasion, uh, personally, to conduct an evaluation of Mr. Dassey for purposes of his, uh, educational, uh, placement and progress?

A Yes, in October of 2002.

Q Uh, before you I believe is an exhibit, uh, Exhibit No. 4, uh, is that a copy of the report that you prepared as a result of that, uh, evaluation?

A Yes, it is.

Q Uh, and is everything contained in that report, uh, true and correct to the best of your knowledge and belief?

A It is with one exception. There was one word omitted in the final typed version. In the observation section on page 2, the word "eye" was omitted. It should read "direct eye contact."

Q Uh, now, in preparing this, uh, report, uh, was this -- how did you, uh, go about doing that in terms of obtaining the information regarding Brendan Dassey?

A Um, through the evaluation processes? Is -- is that your question?

83

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 83 of 114    Document 19-12

Q   Right.

A   Okay. Um, it was a reevaluation. So, we reviewed the school records to determine what type of testing was needed, and, um, intelligence testing was one area that we decided we wanted to look at as far as his overall intellectual ability and how he processes information.

Q   According to the records that, uh, were available to you in preparing that evaluation, was -- when was the first time that Brendan Dassey was evaluated for purposes of a school district?

A   Um, his initial evaluation, first time, was in 1996. September of 1996.

Q   What sort of tests, uh, were used in evaluating, uh, Mr. Dassey's, um, potential performance in school?

A   Um, and my personal evaluation was done in October of 2002. The 1996 and 1999 evaluations were done by other psychologists in the Reedsville School District. Um, but we did do intelligence testing. Ninety-six and '99 they used the Wechsler Intelligence Scale for Children.

            THE REPORTER: Could you slow down, please?

            THE COURT: Could you --

84

ATTORNEY KACHINSKY: Oops, slow down.

THE WITNESS: Sorry.

Q (By Attorney Kachinsky) Okay. Sure. What -- what -- what was -- what was the test that was used by the, uh, uh -- by the, uh, Reedsville School District?

A The Wechsler Intelligence Scale for Children, Third Edition.

Q What does that test, in particular, measure?

A It's an intelligence test that measures a student's thinking ability, their ability to problem solve, and reason.

Q Uh, what were the res -- Is there a -- a measure of someone's, uh, intelligence and performance known has IQ?

A Yes.

Q And what does IQ stand for?

A Intelligence quotients.

Q What does that, uh, mean?

A Again, it -- it looks at the student's overall, um, intellectual ability, their ability to think, problem solve, reason, ability to learn.

Q Uh, does that particular measure, uh, compare a given -- child of a given age against, uh, his or her peers?

85

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 85 of 114    Document 19-12

A    Right.  It is -- is based on age.  Um-hmm.

Q    Um, if you were an average -- had average ability in school, what would your, uh, IQ score be?

A    Anywhere from a 90 to a 109 is an average range.

Q    Uh, when the tests were conducted of, uh, Brendan in the Reedsville School District in, uh, 1996, uh, what -- what did it indicate in terms of Mr. Dassey's, uh, IQ, uh, verbal performance, and full scale?

A    May I please refer --

Q    Sure.

A    -- to the record?  In 1996, Brendan's full scale, his overall IQ was a 74, his verbal IQ was a 65, and his performance IQ was an 87.

Q    What do those particular measures of Mr. Dassey's IQ indicate in terms of his ability to communicate and to, uh, understand, uh, information?

A    Um, the -- the overall score is a little less meaningful, because there is such a big split between his verbal and his performance IQ's.  The verbal is looking at his ability to think with words and to use his words and verbal skills and problem solving, and that was a well below average, um, score.

His performance IQ of an 87 is looking

86

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 86 of 114    Document 19-12

more at visual kinds of tasks, um, and visual reasoning types of things. And that was in a below average to average range.

Q   Uh, was another evaluation performed on Mr. Dassey in November, 1999, that you were aware of?

A   Yes.

Q   And by whom was that evaluation conducted?

A   Um, that was done by another psychologist in the Reedsville School District.

Q   Uh, what were the, uh, scores that were noted during the 1999 evaluation?

A   Uh, the full scale IQ score was a 73, the verbal IQ was a 69, the performance IQ was an 82.

Q   Uh, was there any significant change, uh, between 1996 and 1999?

A   No. The results are consistent. He shows stronger nonverbal or visual reasoning abilities than his verbal abilities.

Q   Um, is it, uh, normal for these particular scores to remain fairly consistent over -- over time with, uh, someone who's a student?

A   Typically, yes. There -- there can be variability but, in general, they tend to stay fairly consistent.

Q   Uh, now, did you conduct your own evaluation of

87

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 87 of 114   Document 19-12

Mr. Dassey in, uh, October of 2002?

A   Yes, I did.

Q   What test did you use to, uh, evaluate Mr. Dassey at that time?

A   I used a test called the Woodcock-Johnson, Third Edition, tests of cognitive abilities.

Q   And what, uh, specifically does that test, uh, measure?

A   It measures his overall intelligence as well.

Q   Uh, what were the, uh, scores that were obtained in that particular test?

A   He obtained a general intellectual ability score of 78, a verbal ability score of 81, a thinking ability score of 93, and a cognitive efficiency score of 73.

Q   Now, what does the, uh -- Uh, was there a percentile ranking for those particular, uh, test results?

A   Yes --

Q   What is a percentile ranking?

A   Um, for example, his general intellectual ability percentile rank was a seven.  That means that Brendan scored as well as or better than seven out of one hundred students his age.

Q   Um, so he was in -- could be characterized as being in the top 93 percent of his class?

88

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 88 of 114   Document 19-12

A No. No. Um, showing that he has, um, some delays. That he's, um, on the lower end.

Q Um, were the results that you obtained from the Woodstock-Johnson (sic) test that you conducted in October of 2002, um, significantly different in any way than the two previous tests that you testified about from the Reedsville School District?

A No. Generally, results are consistent.

Q Uh, is, uh, there any reason to believe that, uh, there would be significant changes in Mr. Dassey's, uh, intellectual abilities between October, 2002 and February or March of 2006?

A No.

Q Um, from your review of Mr. Dassey's, uh, records from the Mishicot School District, uh, and your own evaluation, do you have, uh, any opinion as to what Mr. Dassey's overall cognitive ability is?

A Um, Brendan has an -- overall, some delays. Again, it's within a borderline to below average range, intellectually, overall. He does struggle more with the verbal abilities, um, as well as memory. He struggles with short-term memory kinds of tasks. Working memory.

89

He has strengths in the area of visual spacial problem solving. For example, solving puzzles. Um, he had below average to average score in that range, which is thinking ability. And he does better there.

There is a range of intelligence with a cognitive disability being the lowest range, and that was formally known as mental retardation. Brendan's scores do not fall within that range. He is not that low.

He has been identified with a specific learning disability and, as a result, has needs, um, and delays in the area of reading, written expression, and spelling skills related to his cognitive levels. Um, math is an area of strength for Brendan.

Q  Based on those scores and your observations of Brendan, does he have a -- how would you describe the difficulty he has, if any, in, uh, communicating information, uh, to others?

A  Brendan has also been identified with a speech and language impairment, particularly in the area of language. He has difficulties expressing himself, verbally, using his words, as well as understanding some aspects of language. For example, in the school

90

setting, um, understanding some directions, um, without assistance.

Um, he also has difficulties in the area of the social aspects of communication, and that would be such as, um, understanding and using nonverbal cues, facial expressions, eye contact, body language, tone of voice.

ATTORNEY KACHINSKY: Um, I have no further questions. We'd move Exhibits, uh, 3 and 4 into evidence.

THE COURT: Any objection to Exhibits 3 and 4?

ATTONREY KRATZ: No. That's fine, Judge.

THE COURT: Offered and received. May I have those, please? Thank you. Cross.

**CROSS-EXAMINATION**

BY ATTORNEY KRATZ:

Q    Miss Schoenenberger-Gross, can you describe how children within your school district are identified as qualifying for special ed services?

A    Um, initially a referral would need to be made by a parent or a teacher if there are concerns that there might be delays, and then we would go through an evaluation process, which includes interviews, review of school records, um, formal testing, observations,

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 91 of 114    Document 19-12

and then we meet as an IEP team to determine whether or not the student meets the eligibility criteria that's been set by the state to --

THE REPORTER: You're going to have to slow down.

ATTORNEY KRATZ: Slow down.

THE WITNESS: Where should I -- Where should I back up?

THE REPORTER: Uh, "student meets the eligibility --

THE WITNESS: We determine, as a team, if, um, the student meets the state eligibility criteria for disability, and whether or not the student has a need for special education services.

Q (By Attorney Kratz) Okay. As I understand, Brendan was identified, prior to coming to Mishicot High School, as qualifying for special ed services; is that right?

A Yes.

Q Now, special ed services, um, is not just you get them or you don't. It's a whole continuum or a range of services that can be offered to students; is that right?

A Correct.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 92 of 114    Document 19-12

Q      Some students have such disabilities or deficits that they can't be in regular classes; is that true?

A      Correct.

Q      Was Brendan one of those kids?

A      No, he was not.

Q      Some students have such emotional problems that they are in what's called a self-contained setting.  Can you tell us what that is?

A      Um, that would be if the student is, um, completely in a special education classroom and does not go into the regular education classroom at all.

Um, you were referring to some students with behavior problems and -- and those would be because of social and emotional behavioral difficulties --

THE COURT:  Again, you're going to have -- you're going to have to slow up.

THE WITNESS:  Okay.

Q      (By Attorney Kratz) You said that those would be some emotional or behavioral problems, uh, in addition to some special ed problems that would require them to be what's called self-contained; is that correct?

A      Correct.

93

Q   Was Brendan one of those kids?

A   No, he was not.

Q   Brendan was in regular classes; is that right?

A   He had a combination.  He was primarily in regular education classes with, um, a couple of classes that were in the special education classroom.

Q   Is Brendan at all incompetent?

A   No.

Q   Is Brendan mentally retarded?

A   No, he's not.

Q   Is Brendan, to your knowledge, psychotic?

A   Not to my knowledge.

Q   Does Brendan suffer from ADD or ADHD to your knowledge?

A   Not to my knowledge.

Q   Does Brendan have such deficits that he needs to be medicated to your knowledge?

A   Not to my knowledge.

Q   Do you have an opinion as to whether Brendan can understand right from wrong?

A   In the school setting, um, Brendan is a student who typically follows the school rules.  He does not tend to get in trouble.  Um, so, to me that demonstrates that he does understand right from wrong.

Q   All right.  So, in review of your school records

94

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 94 of 114    Document 19-12

he was able to, if he chose to, follow a code of
conduct; is that right?

A    Yes.

Q    Do you have an opinion as to whether Brendan has
the ability to observe, and process, and recall,
and later describe events?

A    Yes.

Q    Yes, he -- you have an --

A    Yes.

Q    -- opinion or, yes, he does.

A    Oh, yes.  Yes, I -- Yes, I believe that he can.

Q    Okay.

A    He does.

Q    So, there's nothing about Brendan's deficits or
lower than average abilities that affect his
ability to tell somebody what happened yesterday;
is that right?

A    Right.  Correct.

Q    You said that Brendan's test scores, at least
some of them, fall within simply the below
average range.  Is there a, um -- I think you
mentioned the continuum of average and below
average, but what comes after that?

A    As far as with intellectual ability --

Q    Yes.

95

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 95 of 114    Document 19-12

A -- for example?

Q Um-hmm.

A Um, there's an average range. Then there would be a below average range. A borderline range. And well below average. Well below average being the area of cognitive disability.

Q Okay. Is there something below that?

A No.

Q Well below average is as low as -- as you go in cognitive ability?

A Um-hmm. Lower extreme, well below average. Um-hmm.

Q As I understand, Brendan was making progress through high school in some of these areas. Specifically, um, um, socially. His, uh, social skills were improving; is that right?

A Um-hmm. He -- as far as he was able to participate in primarily regular education classes throughout the day with his same-aged peers, and that -- in that way, I would say, yes, that he'd made progress. Yes, sir.

Q And -- and -- and, importantly, what I'm -- I need to ask you, Miss -- Miss Schoenenberger-Gross, is that he was placed with his peers, with other kids. He was integrated with the rest of these kids at school; is that

96

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 96 of 114    Document 19-12

correct?

A   Correct.   Um-hmm.

Q   Not every high school student is average; is -- is that true?

A   That is true.

Q   There's some above average and some below average; is that right?

A   Correct.

Q   And although Brendan, um, may have been in the below average range, uh, you're not suggesting that he didn't understand things, or his surroundings, or wasn't able to, uh, be responsive; is that fair?

A   Yes.   Can I clarify something --

Q   Please do.

A   -- from a previous question?

Q   Sure.   Uh-huh.

A   You had asked about, um, whether or not he'd be able to tell you, for example, about his day.  Um, to be -- to be clear, yes, he is able to do that.  But he does have those communication needs which, um, in the school setting, um, he might not look at you. Those social communications just -- you know, aspects would come into play, um, as far as, you know, when talking with him.  But he is capable of remembering

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 97 of 114   Document 19-12

what happened and telling you about those things.

Q My question is, if he chose to communicate something to you about what had happened before, uh, he would have the ability to do that --

A Yes.

Q -- is that right?

A Yes.

Q Now, you haven't watched this videotape? You haven't watched the detail in which he provided to law enforcement about, uh, things that he was involved in, were you?

A No.

Q And there were no behavior intervention plans with Brendan that were necessary at school, were there?

A No.

Q This may be something you can or can't answer. And if not, just let me know. But as you or another teacher would see Brendan interacting at school or functioning at school, would he function just like a normal high school kid?

A Um, yes. Um, aside from some of the communication differences that you might see. Um, the -- the diminished eye contact, for example, where other kids are typically making eye contact more frequently.

98

But, otherwise, yes.

Q    Otherwise looks pretty normal --

A    Yes.

Q    -- is that right?  Okay.

ATTORNEY KRATZ:  That's all I have for this witness, Judge.  Thank you.

THE COURT:  Any redirect?

ATTORNEY KACHINSKY:  Um, yes.

### REDIRECT EXAMINATION

BY ATTORNEY KACHINSKY:

Q    You testified that, uh, Mr. Dassey had problems affecting his short-term memory.  How would that affect him in -- in everyday life in terms of his ability to receive events or to communicate regarding them?

A    Um, specifically, you know, looking at the short-term memory, um, you know, I can speak to it in the school setting as to how that can impact his ability to, um, learn to read and remember, um, and identify letters and -- and the sounds that go with those letters, and -- and words, and as far as getting that information into short-term memory.  Um, in everyday life, um, perhaps -- I -- I guess -- I -- I don't want to speak to that.  I can't -- I don't feel comfortable being able to answer that.

99

Q   And you said that Mr. Dassey had difficulties, uh, in picking up nonverbal cues. If, uh, he's involved in a conversation with a couple of, uh -- of adults in some sort of setting, uh, how would that problem affect his ability to communicate either in terms of, uh, understanding information or being able to provide it to others?

A   Um, to some of -- I think it's getting beyond my scope, because I'm not a speech and language pathologist who is the person that would specifically be working with Brendan on those aspects.

ATTORNEY KACHINSKY:  That's all the questions I have.

THE COURT:  All right.  Any, uh -- any recross?

ATTONREY KRATZ:  No, Judge.  Although, uh, I know that Ms. Schoenenberger-Gross had brought, uh, a volume of records with -- with her.  I didn't know if Mr., um, Kachinsky intended to complete the record by having those introduced, and I don't have any -- any objection if he's going to do that.

ATTORNEY KACHINSKY:  Uh, I don't intend to introduce them, Your Honor.

THE COURT:  Okay.  Uh, you may step down.

100

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 100 of 114    Document 19-12

You want to give her those records back?

ATTORNEY KACHINSKY: Right.

THE COURT: Yeah, why don't you come back here and pick up the records. Do you have any further witnesses, Mr. Kachinsky?

ATTORNEY KACHINSKY: No, Your Honor.

THE COURT: Uh, gentlemen, I have received -- Go ahead.

ATTORNEY KRATZ: Judge, the -- at any hearing, especially at a, um, uh, hearing to suppress statements, there would be the opportunity to call the defendant, Brendan, as a witness. It appears that Mr. Kachinsky is choosing, uh, by a trial strategy or other reason, not to do that. I'd ask the Court to engage in a brief colloquy with Counsel, and, perhaps, even Mr. Dassey as to their choice not to do that. I think we have to complete the record.

THE COURT: All right. Uh, Mr. Kachinsky, you heard what Mr. Kratz said; correct?

ATTORNEY KACHINSKY: Yes, I have, Your Honor.

THE COURT: Yeah. And you know you have the opportunity to call your client at this point

101

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 101 of 114    Document 19-12

should you choose?

ATTORNEY KACHINSKY: Uh, yes, I do, and, uh, Mr. Dassey and I have discussed that.

THE COURT: You have had ample opportunity to discuss it with him?

ATTORNEY KACHINSKY: Yes, I have.

THE COURT: He understands that he could offer testimonial information today in this court proceeding?

ATTORNEY KACHINSKY: Yes, he does.

THE COURT: And, uh, I don't want to invade the lawyer/client relationship, but, presumably, for one reason or another, you are choosing, and he is choosing, not to do that.

ATTORNEY KACHINSKY: Correct, Your Honor.

THE COURT: All right. I -- I'm not going to make an inquiry of the defendant.

ATTONREY KRATZ: That's fine, Judge.

THE COURT: Um, either of you have anything else -- Both of you have submitted a number of, uh -- or submitted in written argument form the various, uh, cases and points of law that you think the Court ought to be relying on here. I certainly never would try to stop lawyers from arguing at the close of any kind of hearing, but, uh, don't feel

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 102 of 114    Document 19-12

compelled to. Um, Mr. Kratz?

ATTONREY KRATZ: Judge, I do have a brief argument if the Court would -- uh, would entertain that at this time. I'm certainly prepared if -- if, um -- if the Court prefers --

THE COURT: Sure.

ATTORNEY KRATZ: -- that we not do that, I can --

THE COURT: Well, that's fine, but before -- before you argue, uh, for the record, I'm going to, uh, number as Exhibit No. 5, I think, in this case, we've got four exhibits here, the, uh -- the items that we had stipulated to, or that you had stipulated to at the, uh -- at the beginning of this hearing, specifically, Exhibit 5, will consist of the following:

A cover letter from Mr. Kratz dated, uh, April 7, 2006.

And a cover letter, uh, will be used as an inventory for a number of electronic recordings that accompanied that letter.

Uh, additionally, a transcript of -- excuse me -- the March 1, 2006, hearing, or -- or interview, rather, with, uh, uh, that transcript, consisted of pages 525 to 677.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 103 of 114    Document 19-12

Uh, Exhibit 5 will be closed out with a cover letter from Attorney Kachinsky dated, uh, April 28, 2006, with the transcript of the, uh, March -- or of the February 27, 2006, interview bearing pages numbered 439 to 512. Anything else?

ATTONREY KRATZ: No.

THE COURT: Go ahead.

ATTONREY KRATZ: Thank you, Your Honor. This is a -- a case that includes a very detailed admission by a young man, uh, inculpating himself in some very serious criminal conduct.

When this Court considers the voluntariness of those statements, uh, the Wisconsin and U.S., uh, courts that are based, uh, in Wisconsin law, uh, suggest that the Court need first find some improper police conduct, uh, before the Court even does a balancing of the defendant's personal characteristics.

And that becomes, uh, uh, important in this case because the State argues there's absolutely no improper police conduct that has been suggested. Nothing by Mr. Kachinsky in his, brief, uh, or his, uh, response memorandum, nor anything elicited today that would rise to the

104

level of improper police conduct.

The interview on March 1 was clearly a witness interview, not a suspect interview. And it wasn't until, as this Court's reviewed that interview, about halfway through, when Mr. Dassey, himself, starts providing some very, uh, disturbing details about, uh, his involvement and Mr. Avery's involvement, uh, that more questions were asked, uh, about that.

Some cases involve confessions and admissions, and especially serious cases, even homicide cases, uh, I don't think it's a stretch to say there isn't any real criminal justice advantage or justification, uh, in making those, uh, confessions. And so when the Court wonders why, or considers why, an individual, uh, inculpates themselves, or confesses, or, uh, tells the police that they were involved in real serious behavior, the motive for those confessions become im -- uh, important to understand.

There can, of course, be emotional reasons why people confess. I feel guilty, or I'm going to feel better if I'm truthful and I'm confessing about this. A demonstration of

105

remorse.

There can be a spiritual or moral reason to confess. The confession being good for the soul type of thing, or, uh, in a very base sense, the practical reason to confess. If a person thinks that the police are going to find out anyway, or they already know what happened, they hope to obtain some practical benefit in cooperation or honesty.

But that, uh, number of reasons, or combination of reasons, usually is why we're in these circumstances, uh, in deciding, uh, why an individual confesses. But, again, it's only if those confessions or admissions are the product of improper police pressures, or improper strategies, uh, does the Court need to consider whether that statement should be suppressed as being involuntary.

The success in law enforcement's efforts in obtaining truthful versions of events or, in this case, obtaining confessions is what law enforcement does. They try to get to the bottom, uh, of what happened.

And, therefore, appellate courts, and circuit courts before them, recognize and that

106

society benefits from sanctioning permissible police strategies when encouraging a suspect to take responsibility, or to allow accountability for, uh -- for these acts.

When we compare what happened in the Dassey case to other cases in Wisconsin, other cases that have been sanctioned when deceit has been used in those other cases, when suspects have been lied to, when we've got the good cop, bad cop, uh, strategy, when suspect's been confronted with physical evidence, even when it doesn't exist, or when trickery, uh, occurs when, uh, we invite suspects down to the police station, all of those have been deemed to be permissible. We don't have anything that even approaches those tactics here.

When we consider and compare, uh, permissible strategies to what was used here, this is prac -- practically a -- a warm and fuzzy meeting with, uh -- with Mr. Dassey. And I don't mean at all to diminish the seriousness of -- of what happened, but I'm arguing, Judge, it isn't even close. It's not even a close call.

There were no threats. There were no violence. There were no specific promises. No

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 107 of 114    Document 19-12

promises of leniency. And when Mr. Dassey's expected and told by the officers that he's expected to tell the truth, I think that's just a -- a common statement of what these officers believed would occur.

Under all of those circumstances, Judge, when the Court does apply the totality of the circumstances test, again, I believe there isn't any improper police conduct. But should the Court find that there were some subtle pressures used when compared to Mr. Dassey, when compared to his personal characteristics of being almost 17, which I would note for the Court in this case includes original adult court jurisdiction, when we consider his education level, his intelligence as being just below average, and, certainly, functioning adequately within a school setting, his physical and emotional condition is not such that, uh, it made anything involuntary.

And when he has prior police contacts, when he demonstrates the ability to resist suggestion, when he demonstrates a free and unconstrained will, this Court should and must allow these statements to be admitted. I'm asking the Court deny Mr. Kachinsky's motion to

108

suppress these statements. Thank you, Judge.

THE COURT: Any response, Mr. Kachinsky?

ATTORNEY KACHINSKY: Um, yes, Your Honor. In determining whether or not Mr. Dassey's statement was voluntary, uh, the Court, as, uh, repeatedly, uh, argued, has to consider the totality of the circumstances and not look at the tactics that were used, uh, in isolation in and of themselves.

Uh, certainly under the facts of this case, if the person that was the subject of the interrogation was 43-year-old -- 43 years old instead of, uh, 16 years old, if he had substantial criminal justice, uh, experience instead of having none, uh, if he had average or above average cognitive abilities, uh, instead of, um, below average as documented by school records from Mishicot and the testimony of psychologists, uh, clearly the State would be, uh -- be correct.

Of course, the person to meet those opposite characteristics of Mr. Dassey is his uncle, uh, Mr. Avery, but it's not Mr. Avery that was the subject of his interrogation. The subject of the interrogation and the questioning was Brendan Dassey, and the fact that, uh,

109

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 109 of 114    Document 19-12

Detective Wiegert chooses to characterize this as a witness versus a suspect interview is not at all determinative as to whether or not it was, uh, voluntary or not.

Certainly, the Court's, uh, seen the tapes, reviewed the transcripts, knows from its own observations this was not the classic third degree sort of, uh, interview that you'd see on, uh -- on TV shows where someone is isolated in a room with a couple of detectives, where there's spotlights and suggestive questioning, and things, uh, of that nature. But this is, instead, uh, much subtler, uh, and, uh, from the results, uh, much more effective means, of interrogation of someone.

Uh, and I think it's important to listen to specific wording, and the Court has, uh -- has the benefit of the videotape, and I'm sure has reviewed it and can see the context into which those statements were made to Mr. Dassey on a continuum starting with the 27th of -- of February.

I think it's clear that when the police decide to interview, uh, Mr. Dassey on the 27th of February they certainly strongly had at least

110

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 110 of 114    Document 19-12

a theory that he might have been involved in some respects, and, to some extent, Mr. Dassey confirmed that on the 27th when he indicated his observations of seeing body parts in a, uh, bonfire, which would have, at a minimum, perhaps, implicated him in the participation in the burning of a -- burning of a corpse, which is one of the three charges that he's now, uh -- now facing.

He was -- Uh, the police, both on February 27, and, to an even greater extent on March 1, uh, minimized the seriousness of the trouble that Mr. Dassey, uh, was in, and not having had any criminal justice experience Mr. Dassey, uh, didn't have any reason to, uh, not -- not believe them. They had -- they said they would be an advocate for him, um, uh, go to bat for him. Well, what, exactly, did that mean? And what expectations did that create in Mr. Dassey as to whether or not he'd be facing the sort of trouble that he's facing, uh, at this time?

And the Court, then, makes -- or, excuse me, not the Court. But they make the statement to Mr. Dassey, well, honesty will set you free.

111

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 111 of 114    Document 19-12

The Court has seen the tape, seen the context into which, uh, that particular statement was made, uh, and it's not at all clear that that's a -- a reference to some sort of psychological or, uh, spiritual freedom as opposed to the physical freedom of not being surrounded by police officers even in a soft, uh, interview room and being subjected to questioning about some of the most serious charges that anybody can face, uh, in state of Wisconsin.

Um, so we ask the Court to look at all the circumstances of this. Both Brendan's characteristics in terms of his age, uh, his lack of experience with the criminal justice system, uh, and, um, intellectual abilities, as well as the unrealistic, uh, impressions that were fostered upon him by continuous, uh, statements made by both detectives and find that, under those circumstances dealing with the suspect of Brendan's characteristics, that those were, uh, improper by giving him far greater expectations of leniency and favorable treatment than he was entitled to receive, find that those statements were involuntary and should not be admissible at the trial in this case.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 112 of 114    Document 19-12

THE COURT: Any response?

ATTONREY KRATZ: No, Judge, nothing. Thank you.

THE COURT: All right. Uh, the Court will render a decision on this motion on May 12 at 9:00 a.m. At that time, or shortly after that, uh, you have another motion filed here, Mr. Kachinsky, relating to the property bond, we'll take that up as well.

ATTORNEY KACHINSKY: Okay.

THE COURT: Uh, any further proceedings today, gentlemen?

ATTONREY KRATZ: Not for today, Judge. Thank you.

ATTORNEY KACHINSKY: No, Your Honor.

THE COURT: All right. We're adjourned.

(PROCEEDINGS CONCLUDED.)

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 113 of 114    Document 19-12

STATE OF WISCONSIN   )
                     )SS.
COUNTY OF MANITOWOC  )

I, Jennifer K. Hau, Official Court Reporter for Circuit Court Branch 3 and the State of Wisconsin, do hereby certify that I reported the foregoing matter and that the foregoing transcript has been carefully prepared by me with my computerized stenographic notes as taken by me in machine shorthand, and by computer-assisted transcription thereafter transcribed, and that it is a true and correct transcript of the proceedings had in said matter to the best of my knowledge and ability.

Dated this 29th day of August, 2006.


_Jennifer K. Hau_
Jennifer K. Hau, RPR
Official Court Reporter

114

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 114 of 114    Document 19-12