STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 3

_____

STATE OF WISCONSIN,

                PLAINTIFF,      JURY TRIAL
                            TRIAL DAY 2

vs.                         Case No. 06 CF 88

BRENDAN R. DASSEY,

                DEFENDANT.

_____


**DATE:**     APRIL 17, 2007

**BEFORE:**  HON. JEROME L. FOX
          Circuit Court Judge

**APPEARANCES:**

      KENNETH R. KRATZ
      Special Prosecutor
      On behalf of the State of Wisconsin.

      THOMAS J. FALLON
      Special Prosecutor
      On behalf of the State of Wisconsin.

      NORMAN A. GAHN
      Special Prosecutor
      On behalf of the State of Wisconsin.

      MARK R. FREMGEN
      Attorney at Law
      On behalf of the defendant.

      RAYMOND L. EDELSTEIN
      Attorney at Law
      On behalf of the defendant.

      BRENDAN R. DASSEY
      Defendant
      Appeared in person.

1

**COPY**

* * * * * * * *

## TRANSCRIPT OF PROCEEDINGS

Reported by Jennifer K. Hau, RPR

Official Court Reporter

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 2 of 272     Document 19-16

**I N D E X**

| WITNESSES | PAGE |
|---|---|

**SERGEANT WILLIAM TYSON**

| | |
|---|---|
| Direct Examination by ATTORNEY KRATZ | 5-28 |
| Cross-Examination by ATTORNEY FREMGEN | 28-40 |

**SPECIAL AGENT KEVIN HEIMERL**

| | |
|---|---|
| Direct Examination by ATTORNEY KRATZ | 40-67 |
| Cross-Examination by ATTORNEY FREMGEN | 68-87 |
| Redirect Examination by ATTORNEY KRATZ | 87-88 |

**DEPUTY DANIEL KUCHARSKI**

| | |
|---|---|
| Direct Examination by ATTORNEY KRATZ | 88-108 |
| Cross-Examination by ATTORNEY EDELSTEIN | 109-125 |
| Redirect Examination by ATTORNEY KRATZ | 125-127 |
| Recross-Examination by ATTORNEY EDELSTEIN | 128 |
| Re-redirect Examination by ATTORNEY KRATZ | 128-129 |

**JOHN ERTL**

| | |
|---|---|
| Direct Examination by ATTORNEY FALLON | 130-167 |
| Cross-Examination by ATTORNEY FREMGEN | 167-181 |

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 3 of 272    Document 19-16

**C O N T' D   I N D E X**

| WITNESSES | PAGE |
|---|---|
| **WILLIAM NEWHOUSE** | |
| Direct Examination by ATTORNEY FALLON | 181-211 |
| Cross-Examination by ATTORNEY EDELSTEIN | 211-217 |
| Redirect Examination by ATTORNEY FALLON | 217-218 |
| Recross-Examination by ATTORNEY EDELSTEIN | 218 |
| **KENNETH OLSON** | |
| Direct Examination by ATTORNEY FALLON | 219-240 |
| Cross-Examination by ATTORNEY FREMGEN | 240-246 |
| Redirect Examination by ATTORNEY FALLON | 246-247 |

| EXHIBITS | MARKED | MOVED | ADMITTED |
|---|---|---|---|
| 79-94 | | 27 | 28 |
| 95-114 | | 67 | 67 |
| 115 | | 68 | 68 |
| 116-131 | | 108 | 109 |
| 132 | 154 | 167 | 167 |
| 133 | | 240 | 249 |
| 134-135 | | 211 | 249 |
| 136-140 | | 240 | 249 |

4

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 4 of 272    Document 19-16

(Reconvened at 8:34 a.m.)

THE COURT: Morning counsel.

ATTORNEY KRATZ: Morning.

THE COURT: We're going to resume State vs. Dassey, 06 CF 88. Uh, Mr. Kratz.

ATTORNEY KRATZ: Thank you, Judge. The State appears by Calumet County District Attorney Ken Kratz. The, um, uh, State also appears by Assistant District Attorney -- Excuse me. Assistant, uh, Attorney General Tom Fallon, Assistant District Attorney Norm Gahn also appearing as special prosecutors.

ATTORNEY FREMGEN: Attorney Mark Fremgen appears with Attorney Ray Edelstein, and the defendant appears personally.

THE COURT: You may call your first witness.

ATTORNEY KRATZ: Thank you, Judge. The State will call Bill Tyson to the stand.

THE CLERK: Please raise your right hand.

**WILLIAM TYSON,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

5

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 5 of 272    Document 19-16

THE WITNESS: William Tyson, T-y-s-o-n.

**DIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q    Mr. Tyson, please tell the jury how you're employed?

A    I am a patrol sergeant with the Calumet County Sheriff's Department.

Q    If you'd speak up just a little bit, we'd appreciate it.  How long have you been employed with the Calumet County Sheriff's Department?

A    I've been employed with the Sheriff's Department for 15 years approximately.

Q    And could you describe, please, for the jury your general duties with the Sheriff's Department?

A    Currently, like I said, I'm a patrol sergeant, so I supervise -- I'm the immediate supervisor for the patrol staff.  Um, prior to that I was a road officer.

Q    Um --

A    My responsibilities as road officer were to respond to call to service, things like that.  I did have specialized training as an evidence technician, um, back in 1994, which I processed crime scenes, things of that nature.

Q    The specialized training, and I assume your

6

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 6 of 272    Document 19-16

Q experience in, um, being an evidence tech, um, what more, specifically, does that entail, if you could tell the jury?

A The specialized training, um, re -- respond to a crime scene. You know, certain officers can do that if they have this specialized training. You take -- you look for pieces of evidence. Um, you can collect the evidence, take it back, process the evidence looking for fingerprints, DNA evidence, things of that nature.

Q Were you employed in that capacity on the 5th of November, 2005?

A Yes.

Q And on the 5th of November, 2005, were you asked to, uh, respond to a scene known as the Avery Salvage Yard?

A Yes.

Q Could you tell the jury, please, what were your first duties upon your arrival at that scene?

COURT REPORTER: Mr. Kratz, one moment please.

(Wherein break was taken to fix a technical problem.)

COURT REPORTER: Let's try it again. You can continue where you left off.

7

ATTORNEY KRATZ: If I can remember.

Q (By Attorney Kratz) Uh, your first duties on your arrival at the scene, if you could describe that for the jury?

A Sure. Um, upon arriving at the scene, I was directed to the lower portion of the junkyard area where Teresa's vehicle was located. Uh, my responsibilities were to maintain security around the area where her vehicle was located.

Q Thereafter, um, Sergeant Tyson, because of your evidence technician training, were you assigned with other officers and put into what's called a search team?

A Yes. Um, upon arriving at the command center, after clearing from Teresa's vehicle, I was assigned with three deputies from the Manitowoc County Sheriff's Department, um, Andrew Colborn, Detective Dave Remiker, and, uh, Investigator or Detective Jim Lenk.

Q And that first, uh, evening, that is, the 5th of November, were you assigned to search a particular building or residence upon that property?

A We were instructed to execute the search warrant at Steven Avery's trailer.

Q And did you do so?

8

A    Yes.

Q    Now, the trailer, itself, uh, Sergeant Tyson, has, um, several rooms as I understand. Uh, if you could just briefly describe the layout of the trailer for us, I'd appreciate it?

A    Um, when you walk into the main entrance, you're walking into the living room area. Um, directly off of the living room would be the kitchen. You go down a hallway, uh, there's a bedroom, and there's a bathroom, and then there's the -- the final bedroom at the end of the trailer.

Q    Sergeant, I'm going to have you look at an exhibit that's already been received. This is Exhibit No. 72 in this case. Um, be so kind, please, as to take, uh, the laser pointer, which has been provided, and a little bit more in detail describe the layout of Mr. Avery's trailer?

A    This area right here would be the kitchen area. And this area here was the living room area. And this would be the hallway. We got the first bedroom here. The bathroom would be right about here. And this would be Steve's bedroom back in the corner.

Q    And on the 5th of November, were you asked to complete a search of the entire residence?

9

A     Yes.

Q     Can you describe the, uh, thoroughness or the scope of that particular search, if you can recall?

A     Um, the first search that was conducted was a quick search of the -- the residence looking for anything obvious. Any signs of Teresa, anything that would lead us in any direction, um, to go on. At that time we were unsure of what we had exactly.

Q     I'm going to hand you, uh, several photos that will assist in describing your search efforts. Um, we're going to start with the living room, uh, area of, um, Mr. Avery's residence. You've been handed Exhibit No. 79. Can you tell us what that is, please?

A     This would be a photograph of the computer area in the corner of the living room.

Q     And did you, with the assistance of other search team members, um, search this particular area of Mr. Avery's living room?

A     Yes.

Q     Have you look at the next Exhibit, please. Exhibit No. 80. Tell us what we're looking at here?

A     Be a photograph of the *AutoTrader Magazine*.

10

Q  And, if you recall, could you tell the jury where this particular exhibit -- or this particular item was found on that computer desk?

A  This one, I believe, Detective Dave Remiker located and it was sitting on top of the desk. The computer desk in the living room.

Q  Exhibit No. 81, also from *AutoTrader*, can you tell us what that is, please?

A  This would be a photograph of a bill of sale through *AutoTrader Magazine*.

Q  And as we look at the large screen, in the lower left-hand corner of this document, actually has the *AutoTrader Magazine* logo; isn't that, uh, correct?

A  Yes.

Q  Now, Sergeant Tyson, so that the jury has a better understanding of the, um, methodology, or how law enforcement performs these searches, uh, do different officers have different responsibilities when, um, a -- a search, not only of a residence, but any kind of search is undertaken?

A  Yes. For example, on this evening my responsibilities were to document what the officers were doing. Um, taking notes after the evidence was

11

collected, take custody of the evidence, and, you know, secure it. So that was my responsibilities. The other officers were searching different areas. You know, I was keeping a -- a watch on them to see what they were finding, documenting the exact minute when something was located, where it was located, things of that nature.

Q When these searches, uh, occur, because of the possibility of DNA, or other kinds of trace evidence, uh, do searching officers wear some kind of protective items or gloves?

A Yes. All the officers that were in the trailer that I was with had gloves on. Um, and they would change the gloves routinely with, um, each new item that we were looking at, or whatever, so nothing would be contaminated.

Q If you could explain that? Just -- just take a moment and explain that a little bit more. If something is handled, you said that, uh, you would then change into a different pair of gloves. Um, why does that occur? Why are you trained that that occurs?

A Well, for example, uh, you find a piece of evidence, you may not know exactly what's on it, be it any type of DNA, blood, or anything like that, you pick it up,

12

Q I don't know if I asked you, and perhaps it's obvious by this particular picture, uh, but where was this bill of sale found within the residence?

A Uh, this one, I believe, was found on the -- or in a drawer on -- in the computer desk.

Q All right. In the same living room area near the *AutoTrader Magazine* that we've, uh, previously seen; is that right?

A Yes.

Q Let's move, if we can, to the bedroom area. That is, the master bedroom. Bedroom of Steven Avery. Could you describe, first, um, the size of that bedroom? Then describe the search efforts that occurred in there?

A It's a rather small bedroom. Um, you got the queen size bed, I believe, is in the middle of the room. Uh, he had a walkway just to walk around and get to

13

the other side.  Then there was closets up against the wall.  So it was a smaller room.

Um, and when we entered that room, we had, um -- like Sergeant Colborn, he concentrated his efforts on one side, Detective Remiker and, uh, Detective Lenk searched the other area, and I stood pretty much in the doorway watching what was going on, documenting, uh, what was located.

Q  Now, this is the very first night of the search. Uh, is it fair to say that, uh, you and other law enforcement officers were unaware of what had happened to Teresa Halbach at that time?

A  That's correct.  We didn't know exactly what we had at that time.

Q  Did you specifically know what you were looking for?

A  No.  We were looking for anything that might lead us in a direction, any clue, any type of evidence.

Q  All right.  I'm showing you now what's been marked as Exhibit No. 82.  Describe what that is for the jury, please?

A  This would be a photograph of, um, the headboard area of Steven Avery's bed.

Q  Now, a bed -- or on top of, or above, uh, Mr. Avery's bed, uh, could you tell the jury what

14

Q you observed on the 5th of November?

A It's kind of cut off on the photo, but up on top there is a -- right above the bed there was a gun rack, um, which housed two firearms, and there were two long, um, barreled firearms in the gun rack directly above the bed.

Q All right. I think we have a better picture of the gun rack, itself, which is Exhibit No. 83. We will move to that. Tell us what we're looking at here?

A That is the photo of the gun rack that was, um, directly above the bed.

Q All right. Now, at this early search, at this early stage, were those firearms, um, confiscated or seized by you and other officers?

A On the night of the 5th, those firearms were not seized. We knew we had opportunity to come back. So those firearms were not taken at that time.

Q All right. And that concept, the concept of knowing that you were going to be able to come back or that other law enforcement officers were going to be able to come back, could you describe that a little bit more for the jury?

A Well, the scene, itself, um, you know, the whole area, the junkyard, we didn't know exactly where we

15

Q It turned out to be almost eight days; is that right?

A Correct.

Q On this particular gun rack, that is, the gun rack in Mr. Avery's, uh, bedroom, how many long guns, that is, how many rifles, were located on that gun rack, if you recall?

A There were two.

Q The rifle on top, uh -- I'm going to show you a photograph that is Exhibit No. 86. Do you recognize that?

A Okay. It appears to be one of the firearms that was located in the gun rack in the bedroom.

Q And just so this jury understands, and they'll hear from another witness, but, uh, it wasn't you, but a different officer, actually, on the next day, that seized this weapon; is that right?

A That's correct.

Q The other, um, weapon, uh, Exhibit No. 87? Tell

16

us what that is, please?

A    Be a photograph of a muzzleloader.  I believe this was the other firearm that was in the gun rack.

Q    All right.  Mr. Tyson, um, within the bedroom, uh, itself, uh, did you, during the search, and your fellow law enforcement officers, uh, locate any items or obvious items that would be capable of restraint?  That is, uh, capable of restraining another person?

A    Yes.  Um, Sergeant Colborn located a set of handcuffs and a set of leg irons.

Q    I'm going to show you what's been, uh, marked as Exhibit No. 84.  Tell us what we're looking at, please?

A    Be a photograph of the handcuffs that were found in Steven Avery's bedroom.

Q    Do you remember, and can you describe for the jury, from what location those handcuffs were recovered?

A    I have in my report that it was taken from a nightstand, which was directly next to the desk.  Uh, that nightstand has now become known as the bookcase.  Um, Sergeant Colborn located the handcuffs and the leg irons in that bookcase, which was right next to the desk.

17

Q All right. You had mentioned some leg irons as well. I'll have you look at Exhibit No. 85. Tell us what, uh -- what this is, please?

A It'd be a photograph of those leg irons.

Q Do you know what, uh, the handcuffs and leg irons found in Mr. Avery's bedroom were made of?

A They're your standard, uh, steel, um, handcuffs and leg irons.

Q I show you what's been, uh, marked as Exhibit No. 91. The item, itself. Uh, tell the jury what it is we're looking at?

A It's a standard set of, um, the iron handcuffs.

Q And, uh, are those the handcuffs? And do they look the same and similar today as when they were recovered and seized from Mr. Avery's bedroom on the 5th of November?

A Yes.

Q I show you Exhibit No. 92. Tell the jury what those are, please?

A Set of, um, iron leg irons.

Q Once again, uh, Exhibit No. 92, do those look the same or similar, uh, as the day that they were received and recovered from Mr. Avery's bedroom?

A Yes.

ATTORNEY KRATZ: Thank you, Mr. Wiegert.

18

Q    (By Attorney Kratz)  Now, Mr. Tyson, the, um, search effort, you said, lasted several days?  Were you involved, uh, throughout the entire week in these search efforts?

A    For most of the days, I was on the property.  Um, we were searching other residences, uh, outbuildings, um, areas of land, junked cars, automobiles that were parked in certain areas.  Um, so my responsibilities were with other officers throughout the week, but we were doing searches of different residences and areas on the property.

Q    I'm going to show you -- I think in front of you, you have an exhibit, uh, Exhibit No. 88.  Could you look at that, uh, exhibit, please, and tell us what it is?

A    Evidence photograph of a bleach bottle.

Q    And do you recognize this particular piece of evidence?

A    Yes.

Q    How is it that you recognize it?

A    This evidence was collected, I believe, on March 1.  Um, we were executing another search warrant on the property, and this bottle was taken out of the bathroom/laundry area of Steven Avery's, uh, residence.

19

Q   I know that we're jumping ahead a little bit to March 1. Do you understand that search warrant to have been authorized by a judge, uh, after a statement was given by this defendant, Brendan Dassey?

A   Yes.

Q   Were you, specifically, looking for a bleach bottle at that time?

A   Yes. We were given numerous specific items to be looking for. Um, we did the search warrant looking for specifics this time, compared to the time prior.

Q   Mr. Wiegert's going to hand you Exhibit No. 93. The -- Perhaps, uh, tell the jury what that is, please?

A   That would be the bleach bottle taken from the bathroom/laundry area of Steven Avery's residence.

Q   So it was within his trailer, that is, within his bathroom, that this bleach bottle was found; is that right?

A   That's my understanding. Yes.

Q   Do you recall, Sergeant Tyson, whether the bleach bottle, uh, was full at the time that you recovered it? Or is -- or that it was recovered?

A   Okay. Like I said, um, Deputy Riemer collected it. My understanding was is that it was empty at the time

20

Q  of collection.

Q  All right. Just to go back for just a moment about the concept of search teams on the 1st of March, uh, that is, after, uh, Mr. Dassey's statement was made, after a search warrant was authorized, was a search team put together for the trailer of Mr. Avery again?

A  Yes. I was assigned with Deputy Rick Riemer and Investigator Wendy Baldwin. Uh, we were sent back into the trailer to execute that warrant.

Q  All right. Move ahead just a couple of days to the, um, 9th -- Wednesday, the 9th of November, um, you were employed on that day?

A  Yes.

Q  And could you tell the jury, please, what your duties were on the 9th of November? This is 2005. I'm sorry.

A  Okay. I'm trying to think back. Um --

Q  If I ask you a more specific question, would that --

A  Could you, please?

Q  -- help you? Sure. Uh, were you involved at all in this case in, um, collecting what are called exemplars or standards?

A  Yes.

21

Q   And could you tell us, uh, how you were involved in that process?

A   On the 9th, I was directed by, um, Agent Fassbender and Investigator Wiegert, was told my responsibility would be to go to the Aurora Medical Clinic in Two Rivers. Uh, I was informed that search warrants were going to be executed on members of the Avery family, and that they'd be brought to the Aurora Clinic where a physical examination would be done, DNA exemplars would be taken, and my responsibility was to document, photograph, and collect any of the exemplars that were taken by the medical professionals.

Q   Were one of the individuals brought to the Aurora medical facility, uh, Steven Avery?

A   Yes.

Q   Did you have occasion to participate in and document a physical examination of Mr. Avery on the 9th of November?

A   Yes.

Q   And during that physical examination, did you note any, um, specific, uh, uh, uh, injury or the remnants of any injury at that time?

A   Yes. Um, his -- it was his middle finger on the right hand. He had a deep laceration.

22

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 22 of 272   Document 19-16

Q I'm showing you what's been, uh, marked as Exhibit No. 89. Tell us what we're looking at, please?

A Yeah. That would be the finger, uh, showing the -- the cut to the finger with a scale, uh, for measurement purposes.

Q This was a photograph that you took?

A Yes.

Q Recognizing that you are not a, uh, uh -- a medical professional -- I assume you're not --

A Correct.

Q -- from what I know of you Sergeant Tyson, but the, uh, observations that you made, uh, and the photograph that is a depiction of that injury, that appear to be a significant or a deep cut to you?

A Yes.

Q Later that week, in just general terms, could you describe for the jury what your responsibilities were at the Avery salvage property?

A At the end of the week we were completing our searches, and, um, my responsibilities were to assist where needed. I was also requested to videotape the entire property. Um, inside the residences, the whole area, to show exactly how we were leaving the

23

property, and to give an idea of what this crime scene all entailed.

Q    The last series of inquiry I believe I have for you, Sergeant Tyson, is after, um, a statement was received by Mr. Dassey --

ATTORNEY FREMGEN:  Objection, Judge.  At this point there's been no evidence of any statement in the record.

THE COURT:  Response?

ATTORNEY KRATZ:  I could ask him if he knows of the statement by Mr. Dassey.  It isn't for -- isn't the statement, itself.  It's just is to establish what this, uh, writer did.  It certainly isn't hearsay, Judge.

THE COURT:  Well, why don't you try to lay a foundation, then, for the question.

ATTORNEY KRATZ:  All right.

Q    (By Attorney Kratz)  Sergeant Tyson, have you been involved in this investigation, that is, the investigation which included Mr. Avery and Mr. Dassey, throughout the entire process?

A    Yes.

Q    Uh, were you aware that Mr. Brendan Dassey provided a statement to law enforcement officials?  Specifically, Investigator Wiegert

24

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 24 of 272    Document 19-16

and Special Agent Fassbender?

A    Yes.

Q    Did you know the date on which that statement was given?

A    I know it was at the end of February.  Maybe the 28th.  March 1.  In that area.

Q    Thereafter -- Sometime thereafter, were you asked to, um, attempt to obtain, uh, some evidence from a area of, uh, Teresa Halbach's SUV?

A    Yes.

Q    Could you describe that process for the jury, please?

A    Sure.  Deputy Jeremy Hawkins is also an evidence technician within the Department.  He assisted in the processing of a lot of the evidence that we did collect.  On April 3 we were requested to go to where we had stored Teresa's vehicle.  Uh, Investigator Wiegert and Agent Fassbender had requested that we do DNA swabs of both door handles, interior and exterior, as well as the hood latch to the vehicle, and the battery cables, um, under the hood.

Q    Directing your attention to the hood latch, and now I'm going to have you look at, uh, Exhibit No. 90, tell us what it is that we're looking at, please?

25

A   This would be a photograph of the hood latch to Teresa's vehicle.

Q   And so a jury, um, member, or all jury members understand, uh, what is a hood latch?

A   It secures the hood to the vehicle.  Locks it in.

Q   All right.  Um, on my vehicle, or at least on most vehicles, there's a -- a release or a button on the inside of the -- the vehicle.  Are you familiar with those?

A   Yes.

Q   But is there another safety feature or an additional latch that's usually on a hood?

A   Yes.  And that would be the hood latch.

Q   All right.  Did you, again, personally swab, uh, or, uh, collect possible DNA material from Teresa Halbach's hood latch?

A   Yes, I did.

Q   Would you describe for the jury that process please?  How was that done?

A   Sure.  When you swab for any type of DNA evidence, you have a cotton tip applicator, kind of like a big Q-tip.  Um, you have distilled water.  And the tip is sterile as well.  So you're taking it from a fresh package.

Um, you take your distilled water, you

26

would -- not touching the cotton tip applicator, but you would drop two to three drops of this water onto the cotton tip applicator. You then take that applicator and swab the area in which you were interested in.

Q Could you point to the large screen, please, and tell the jury where it was that you swabbed? That is, what area of the hood latch was, um, swabbed by this applicator?

A Sure. This area right in here.

Q I'm going to have Mr. Wiegert show you, uh, what's been marked for identification as Exhibit No. 94. Because it contains biological material, I'm not going to have you open it, but I would ask you, if you're able to, identify Exhibit No. 94?

A Yes. It's got, um, the evidence tag on that I personally wrote out, and it states it contains the swab containing possible DNA evidence.

Q From?

A From the hood latch of Teresa's vehicle.

ATTORNEY KRATZ: If I could have just a moment, Judge? Judge, I would move the admission of exhibits, I think it's 79 through 94, at this time, and I have no further questions of Sergeant

27

Tyson.  Thank you.

THE COURT:  Any objection, Counsel?

ATTORNEY FREMGEN:  What was No. 90?

THE COURT:  Number 90 is a photo of a hood latch of the, uh, Halbach vehicle.

ATTORNEY FREMGEN:  No objection.

THE COURT:  All right.  They're received. Cross?

### CROSS-EXAMINATION

BY ATTORNEY FREMGEN:

Q    Officer, you indicated that you are currently in a position of -- like a supervisory role with the Sheriff's Department?

A    That's correct.

Q    And you indicated that you had been trained back in 1984 as an evidence tech?

A    Nineteen ninety-four.  Correct.

Q    Nineteen ninety-four?

A    Yes.

Q    Okay.  Have you had any, uh, follow-up training or primers since 1994?

A    Maybe in 1995, '96, '97, in the early stages, um, some updates.  Photography, things like that.  But, no, most of my training now would consist of supervisory training.

28

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 28 of 272     Document 19-16

Q Between 1994 and now, did the, uh -- was the majority of your duties or your responsibilities involving evidence tech, or evidence collecting, or was it general police duties?

A The majority of my responsibilities are general police duties. Uh, if we have a crime that occurred in the county, um, I could be dispatched to that. You know, there's five officers in our Department at that time that were evidence technicians. If I was on duty, or even if I was not on duty, I could get a call at my house to come out to process that scene. So if we had a crime, yeah, we would have to respond to it.

Q Did this training consist of a couple of classes at the Fox Valley Tech, or like a week-long training somewhere?

A It was a week-long training class held by Mike Campbell. He was an officer to the Milwaukee Police Department. He put on the training. I think it was at Lakeshore Technical College, and it was -- I believe it was one full week.

Q So something locally?

A Yes.

Q Now, your first duty involved in this investigation was, uh, my understanding, um, to

29

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 29 of 272    Document 19-16

Q   secure the RAV 4; is that correct?

A   Correct.

Q   Did you do any processing of any evidence at the scene of the RAV 4?

A   No, I did not.

Q   I -- I don't want minimize your role, it's -- but, essentially, you just stood watch of the vehicle?

A   Correct.  Initially, I was -- you know, make sure nobody got near the vehicle, nobody touched the vehicle.  Uh, due to inclement weather -- We had a storm that was approaching.  Um, Agent Fassbender was on location with, I think, other DCI officers, and, you know, we were taking measures to make sure that no evidence that was possibly on the exterior of the vehicle would be destroyed with the incoming storm.

So they had, um, gone and gotten a tarp and very carefully, uh, tried to protect the vehicle from the elements that were approaching as there was a mist in the air, rain was coming. Um, so they were doing that type of stuff.

Q   Once your role as security or securing the, uh -- the vehicle was completed, were you involved in processing any of that scene?

A   With the RAV 4?

30

Q    Correct.

A    No, I was not.

Q    So -- so the next role or duty within this investigation would have been when you were assigned to a search team to search the trailer of Steven Avery?

A    There were a few things I did prior to the execution of the search warrant at Steve's trailer. Um, you know, we had K-9s on the property that were searching the area. So when the K-9 handler showed up, I directed officers to go with the K-9 officers that were there with their dogs, and, um, documented times of arriving on scene, time they completed, who they were with, what areas they searched, things like that.

Q    You didn't just sit around? You're doing work?

A    Yes.

Q    Okay. But your next specialized task would have been to assist in the search of the Steven Avery trailer?

A    That'd be correct.

Q    How many searches of that trailer were you involved in?

A    One search that night. I was sent back in, I believe, on the 7th of November, um, to get a serial

31

number and a model number off of a computer. Technically, that would be a search. So -- But that was our only responsibilities that day was to get the serial number off the computer and the model number for Investigator Wiegert.

Q Prior to entering the, uh, trailer when you did the initial search, not -- not the second one when you went through it to get some model numbers, did you -- you indicated that your role was essentially to oversee, watch, and take notes?

A Yes.

Q Did you first go through, videotape or photograph the entire residence, to memorialize what it looked like prior to the scene? To -- to the search?

A Yes. Um, for example, um, Detective Remiker had a digital camera and Sergeant Colborn had a 35mm evidence camera. Both of them, before we even started anything, photographed the entire interior of the residence before any searching had begun.

Q Now, you indicated this is kind of a small trailer?

A Yes.

Q Would it be fair to say that it would be best in

32

the small setting to have as few people in there?

A    Yes.

Q    And -- and do you think that you had too many, not enough, just enough searchers of the residence?

A    I found it to be adequate.  You know, it was hard in certain areas because it was small and confined.  Um, but we were, you know, in hallways, in -- in rooms, and, um, it was adequate, I would say.

Q    When they did the search, since your were, obviously, you indicated, trying to monitor or take notes of each individual -- other three individuals searching, did they -- did you basically go through it methodically one room at a time, or did everyone just go off on their own and you'd tried to follow them around?

A    Well, we started out in Steve's bedroom.  Um, after a period of time, you know, like, Lieutenant Lenk had told me, he said, I'm going to start just looking in the bathroom for anything obvious.  So I relocated my position into the hallway.  I could see, um, Investigator Lenk, I could see Sergeant Colborn, um, on this side of the -- the bedroom.  I would -- could watch Lieutenant Lenk.  He was in the bathroom.  But it was confined to that area.  Nobody was allowed to

33

just wander about the residence, you know.

Q So there were times when they were in two different rooms? A bathroom and a bedroom --

A Yes.

Q -- for instance? You commented, um, that it's important to change the gloves as items are handled?

A Yes.

Q Is it just any item or just items that have evidentiary value?

A We look at it, you know, on scene. Um, we're looking for major evidence, things like that. We're not going to touch one thing and then change gloves every single time we touch something. But if it's evidentiary in nature, we suspect it might be evidentiary in nature, yes.

Q Is -- is it possible for DNA to be transferred, though, from touching some items that might have DNA that maybe you didn't find to have evidentiary value, and then touching something that you end up seizing?

A Sure.

Q And that could have happened? You don't know that?

A In something specific?

34

Q I'm just asking in general.

A Oh, sure.

Q If you're not changing your gloves every time you touch something, that could happen?

A Right.

Q If --

A Right. It's not something that you're looking at to be evidentiary, you move onto the next item. Sure.

Q But each time you found a -- an important item, you would change your gloves?

A The officers would, yeah. I wasn't specifically handling the evidence that night.

Q I'm sorry. I meant -- I guess I meant colloquially with you --

A Yes.

Q -- all.

A Yes.

Q The other three?

A Sure.

Q Okay. Now -- And, again, you're testifying about what some of the other officers found. One of the officers found the handcuffs, and I'm -- I'm going to imagine that -- maybe I'm -- didn't hear you say it, and the leg irons together in the bookshelf?

35

A    Yes.

Q    Okay.  Were they just lying on the bookshelf?

A    I did not see the location inside the shelf.  I was standing to the side.  He pulled them out and was showing me what he was locating.  I was documenting. So where, exactly?  Um, they were -- they were on top of each other?  Or right next to each other?  That I do not know.

Q    Let me ask you this, if you know the answer, why did you take the handcuffs and the leg irons?

A    The deputies at that time thought it was potentially something that could be evidentiary.

Q    But you left the guns?

A    The guns were left in the gun rack.

Q    You didn't think that guns might be evidentiary?

A    We figured they probably would, but looking at the circumference of what we were supposed to do, um, they left them.

Q    When the bleach bottle was -- Now, this was in a separate search; correct?  When --

A    Yes.

Q    -- you found that bleach bottle?

A    Yes.

Q    Excuse me.  Did you -- Again, your role at that time was the same as before?  To document and

36

Q monitor?

A That warrant I was more involved with the actual searching. Investigator Baldwin was more the one assigned to documenting and note taking.

Q So you would have been the one who actually physically collected the bot -- bleach bottle?

A I was not. Um, Officer Riemer was the one who actually seized it.

Q And, again, you're wearing gloves --

A Yes.

Q -- at this time? Um, did you process that to determine if there were any fingerprints on it? Or is that somebody else's job?

A That was also my responsibility at a later time. Deputy Hawkins and myself were assigned to the duties of processing what we had collected from the scene. So, yes, that bottle was processed.

Q Okay. So when you process it and try to extract fingerprints, then is that sent off to the Crime Lab for, uh, some sort of, uh, review to determine whether or not it matches anyone?

A Our focus for the bleach bottle was not so much fingerprints. Because it was in, uh, Steve's trailer, uh, we assumed his fingerprints would be on it. We were looking more for any type of DNA

37

evidence, um, blood, or anything like that.

Q But you didn't check to see if someone else's fingerprints were on it?

A We did not check it for fingerprints. We were specifically looking for DNA.

Q When you were -- You were involved, you indicated, with the second time the RAV 4 was processed. And I guess I shouldn't say second. It may have been processed a number of times. As far as your involvement, you were involved the first time with securing the RAV 4 --

A Yes.

Q -- correct? And the second time with obtaining some, uh, uh, swabs of the hood latch?

A Correct.

Q Do you know how many times the vehicle had been opened and closed in between those two times?

A It came from the Crime Lab. Um, it was secured in the storage facility. I don't know exactly the answer to that question, no.

Q So you don't know what the Crime Lab did to the vehicle?

A I have no idea what the Crime Lab did to that vehicle.

Q And when you swabbed the latch, the only -- you

38

Q indicated you swabbed the -- looks like it -- the hood was down, the part that you would -- would be facing towards the ground; correct?

A Yeah. The part that you would commonly use your finger to pull up on to unlatch the hood -- the hood.

Q Did you swab just above the -- the latch as well? Or just that lower portion of the latch?

A I believe I did the lower part and I did all the way around that. Just did the entire latch, itself.

Q Okay. So the entire latch?

A Yeah.

Q Did you, uh, swab the interior release? Hood release.

A No, I did not.

Q Was it because you weren't told to or didn't think about doing it?

A Um, we weren't instructed to do that. I don't know what was done before that. Um, our focus was the hood latch and other specific areas.

Q Was it just one swab that you --

A Yes.

Q Okay. So you didn't have to change your gloves then?

A I changed gloves from the time that I swabbed the door handles to the time that I went and did the hood

39

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 39 of 272    Document 19-16

latch.

Q When you opened the -- the hood latch, did you change gloves before you swabbed or you used the same gloves that you, uh, opened the hood latch?

A I think it was one process. You know, I probably released it, had the cotton applicator, and immediately did the swabbing of the hood latch.

Q Thank you.

ATTORNEY FREMGEN: Nothing else, Judge.

THE COURT: Any redirect, Counsel?

ATTORNEY KRATZ: That's all for this witness. Thank you.

THE COURT: You may step down.

ATTORNEY KRATZ: State would call Agent Kevin Heimerl to the stand.

THE CLERK: Please raise your right hand.

**KEVIN HEIMERL,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Kevin Heimerl, H-e-i-m-e-r-l.

**DIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q Good morning, Mr. Heimerl. Could you tell the

40

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 40 of 272    Document 19-16

Q jury, please, how you're employed?

A I'm employed with the Wisconsin Department of Justice, Division of Criminal Investigation.

Q And what are your duties with the Department of Justice?

A I'm assigned to the Arson Bureau. It's -- My primary assignment is to investigate fires. Um, but my duties also include assisting other bureaus within our agency in other types of investigations.

Q In that second regard, that is, assisting other agencies, were you asked on, um, November 5 and, uh, times after November 5, 2005 to assist in the investigation surrounding the death of Teresa Halbach?

A Yes, I was.

Q Tell the jury, please, how you first became involved in this investigation?

A On, uh, Sunday, I believe it was November 6, I was contacted at my residence, um, by Special Agent Fassbender, I believe, and was asked to respond to Manitowoc County to assist with the investigation, which I did. And I arrived in the early morning hours.

Q How was it that you first assisted in the investigation?

41

A    I responded to the command post on Avery Road, uh, and met with Special Agent Fassbender, and Investigator Wiegert, and other investigators. Uh, received a briefing, um, as to what information had been obtained at that point, what some of the goals of the investigation were, and some of the activities that were taking place at the scene. I was then -- My initial assignment was to respond into the city of Manitowoc to conduct an interview with a citizen.

Q    Agent Heimerl, of the seven or eight days of that, officers were involved in the, uh, search of -- at least the initial search of the Avery salvage property, how many of those days were you involved in those efforts?

A    I was involved in the, uh, initial investigation at the scene for approximately the first week. Um, the majority of my time was spent conducting a neighborhood canvass, uh, of the area.

Q    What is a neighborhood canvass?

A    A neighborhood canvass is simply, um, going out and trying to make personal face to face contact with all individuals that reside in the immediate vicinity of the crime, um, or people that may work at businesses or locations in the immediate vicinity, um, and interviewing them and asking them if they have made

42

any observations, seen or heard anything that they feel, or that investigators feel, may be somehow related to the investigation.

Q Directing your attention, then, to, um, the 7th, that would be Monday, the 7th of November, were you involved in, and did you participate in, search efforts of the Avery salvage property?

A Yes. I was assigned to, um, assist with the recovery of some evidence.

Q Describe for the -- Well, I'm going to have you look at, uh, a photograph, Exhibit No. 95. Tell the jury what it is that Exhibit No. 95 is?

A It's a photograph of a steel burn barrel. It was found in the, uh, front yard area of Steven Avery's residence.

Q And could you tell me where the burn barrel was located, please?

A The gravel driveway that you, um, see in the background behind the barrel, uh, is the access roadway, or a driveway to provide access to Steven Avery's trailer and his detached garage. This barrel is north of that driveway, um, and Steven Avery's trailer and garage are south of the driveway and to the right of the barrel as you're looking at the photograph.

43

Q    Before you're completed, uh, Agent Heimerl, we'll look at some, um, computer-generated images. But as long as we're on, uh, this photo, uh, could you tell us, uh, what it is that we're looking at and what's located outside of, uh, this particular barrel? You might have a laser pointer up there if that's going to help you.

A    Is it most convenient if I use the pointer?

Q    I think -- Yeah.

A    Uh, to the right of the barrel is, uh, a steel rim from a motor vehicle tire or wheel.

Q    Did you have occasion, after, um, this particular burn barrel was turned over for your processing, to view the interior of the barrel?

A    Yes, I did.

Q    Okay. I'm going to show you what's been marked as Exhibit No. 96. Tell us what, uh, we're looking at, please?

A    It's a photograph of the interior of the barrel, um, obviously looking down through the open top of it, um, and burned debris and so forth inside the barrel.

Q    Now, when you looked into the interior of the burn barrel, uh, just through your training and experience as a law enforcement officer, and especially with your arson, um, training and

44

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 44 of 272    Document 19-16

Q experience, were you able to, uh, make any conclusions or identifications at that time?

A When I looked into the barrel, um, and without disturbing anything, I -- it was a -- apparent that, um, all of the material in the barrel had been involved in a fire. That a fired had occurred in the barrel. Um, but I did recognize, um, non-combustible items, metal objects, and what appeared to be possibly glass objects inside the barrel within this debris.

In particular, um, I observed one item that appeared to be, um, a panel or a cover for a Motorola electronic device.

Q After making these observations, uh, Agent Heimerl, what did you do?

A I fully documented, uh, this scene through photographs, um, and, ultimately, the barrel and its contents were turned over to the custody of evidence technicians that were assisting with the investigation.

Q Um, sometime later, that is, uh, sometime after the 7th of November, were you involved in further processing of this barrel? Or was, in fact, that, um, assignment given to somebody else?

A Uh, that assignment was given to others, um, besides

45

Q You are familiar, are you not, with the processing of the barrel and what was found inside of it?

A Yes, I am.

Q I'm going to have you look at Exhibit No. 97. Show that to the jury. Tell us what it is that we're looking at, please?

A This is a photograph of, uh, components for three electronic devices that were ultimately recovered from that burn barrel, um, either by, uh, Crime Lab analysts with the Wisconsin State Crime Lab, or, um, the Federal Bureau of Investigation.

Q So these items were examined by, not only our State Crime Lab, but also were sent to Virginia to the FBI; is that right?

A That's my understanding, yes.

Q And Exhibit No. 97 is the totality, that is, all of the, uh, electronics as laid out on a table from your understanding; is that right?

A That's correct.

Q I'm going to jump ahead, uh, just a minute and hand you what's been marked as Exhibit No. 115. Tell us what Exhibit No. 115 is, please?

A This is a report, a two-page report, of examination

46

completed by, uh, Mr. Curtis Thomas of the Federal Bureau of Investigation's laboratory. He is in a unit assigned to the Cryptographic and Electronic Analysis.

Q All right. Do you know what that means?

A Well, from the title, I, uh, can surmise that it involves the analysis of electronic devices and, uh, other things.

Q All right.

A That's not my specialty.

Q In that regard, though, and, um, in, uh, your review of Exhibit No. 115, the FBI report, was Mr. Thomas able to positively identify these electronic components that are, um, uh, shown in the photograph in Exhibit No. 97?

A Yes, he was.

Q Uh, we'll talk about the individual, um, uh, findings through some other photos, but, uh, if you could tell the jury, uh, what Mr. Thomas' findings were?

A Mr. Thomas was able to conclude that the components, um, depicted in the photograph, all came from the three electronic devices, which he was able to identify as a Canon A310 PowerShot digital camera, a Motorola RAZR cellular telephone, and a Palm Zire 31

47

PDA.

Q Let's go through those, uh, one at a time then. I'm going to show you Exhibit No. 98. Tell us what we're looking at, please?

A This is a closer photograph of one of those components, which happens to be the front cover plate for a Motorola cellular telephone.

Q And just so the jury understands, these are close-up photographs of the items that were recovered, processed, and eventually identified from that burn barrel outside of Mr. Avery's, uh, trailer; is that correct?

A That is correct.

Q Uh, the FBI was able to compare some of these components to what a new, or a, uh, identical model Motorola V3 RAZR phone looked like? Is that your understanding?

A Yes.

Q I show you what's been received -- excuse me -- marked as Exhibit No., um, 99. Tell us what that is, please?

A This is a photograph of two components. The one on the left being the same component we saw in the previous exhibit, the front cover plate for that Motorola RAZR cellular telephone, and it's next to an

48

Q All right. Basically, to show the jury where that component comes from on a, uh, a -- a non-damaged or non-burned phone; is that right?

A Correct.

Q Exhibit 100?

A Again, this is another comparison photograph, um, of the damaged component that was recovered from the burn barrel next to an exemplar of the Motorola RAZR phone.

Q These were -- To your understanding, they're prepared by the FBI; is that right?

A Correct.

Q And, finally, uh, Exhibit No. 101?

A Again, this is a demon -- a demonstration photo with the, uh, component on the left being the fire damaged, um, keypad plate, if you will, for the corresponding, um, Motorola cellular phone. Again, the object on the left was recovered from the burn barrel.

Q This same process, that is, the identification process, occurred with the, um, camera that was recovered from Mr. Avery's burn barrel? That is, the Canon, uh, PowerShot A310? I think you testified to that. But I'm going to show you

49

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 49 of 272    Document 19-16

Exhibit No. 102. Tell us what we're looking at, please?

A   That is a photograph of one of the components for that Canon A310 PowerShot digital camera, and, uh, the etched or, um, embossed wording, uh, is visible and ides -- identifies it as a PowerShot A310.

Q   As I zoom in, you probably don't have to be an expert to do this, but you can see it says PowerShot A310; is that right?

A   That's correct.

Q   Agent Heimerl, throughout the, um, search of this property, um, and throughout, uh, the investigation, were you asked on occasion to assist in post-recovery analysis? That is, analysis of items that had been recovered from the Avery property?

A   Yes, I was.

Q   Specifically, the -- what's been, um, referred to as the burn area or the burn pit behind Mr. Avery's garage, were you at some point asked to assist in the sorting or sifting process, uh, of those items?

A   Yes, I was.

Q   Could you describe that process for the jury, please?

50

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 50 of 272    Document 19-16

A   During the initial week of the on-scene investigation, other investigators recovered a large amount of burned debris and material from locations on the Avery property. Specifically, um, a large burn pit or burn area directly behind Steven Avery's residence, um, and, it's my understanding, as well as other areas where burned debris had been found.

Um, in addition to that, several burn barrels, to include the one from the front yard of Steven Avery's residence, were recovered from the scene, and removed from the scene, and all of this material was initially taken to the Calumet County Sheriff's Department.

Subsequent to that, the burned debris and material, um, underwent a very detailed examination to attempt to recover any other potential evidence from that material.

Q   What kind of evidence was, uh, law enforcement looking for at that time?

A   We, myself and other investigators, were looking for, number one, any, um, items that we readily recognized or believed could be human remains. Uh, other materials that we felt may have, um, been related to clothing or electronic devices. Um, we were looking for potential weapons, um, bullet fragments, bullet

51

casings, any items that we felt may be relevant to the death of Teresa Halbach.

Q    This process, this sifting and sorting process, um, I'm just going to show you Exhibit, uh, No. 103.  First of all, tell us what it is that we're looking at?

A    This is a photograph that was taken in the basement of the Wisconsin State Crime Lab in Madison.

Q    And what, uh -- what does it depict?  And if you need to use the laser pointer, go ahead.

A    This de -- depicts, um, basically, the process or the system, um, that we implemented to begin examining this debris.  And this examination occurred over the course of four days.  The first two days in Madison at this location, and the following two days in April of 2006 at the Sheriff's Department in Calumet County.

And, uh, what we had, um -- The -- the individuals in this photograph include Investigator Wiegert, myself, Special Agent Pevytoe, and, I believe, uh, the individual in the back may be, uh, Special Agent Holmes or Special Agent Sielehr with DCI, but on this occasion in Madison what we did was we happened to utilize, um, sections of scaffolding, that

52

happened to be in the basement, because of certain rem -- remodeling that was occurring, and they proved to be very suitable for our process.

We would raise the scaffold planking or table, if you will, to approximately waist to chet -- chest height, so it made it, uh, more conducive to standing and working, um, in close eyesight. They were covered with tarps. We had supplemental lighting.

And the process included bringing a small quantity of debris onto the table in front of you, and utilizing a variety of tools or instruments, such as wooden skewers, or wooden picks, um, maybe putty knives or brushes. We would very thinly and finely layer out the -- the debris, and this debris includes soil, um, and sand, and burned ash and non-burned, or, um, burned non-combustible items.

We would layer it out and sift it, if -- if you will, but not with sifting screens, but, visually, examine it very closely and pick out items that we felt may be human remains, bone material, uh, potentially dental remains, and other non-cumbustible items, metal items that were left behind in attempt to determine what

53

they were, and if they were relevant to what we were looking for.

Q Do you know an individual by the name of Dr. Leslie Eisenberg?

A Yes, I do.

Q Who is that?

A Dr. Eisenberg is a forensic anthropologist with the state of Wisconsin.

Q Is Dr. Eisenberg involved in this process?

A Yes, she was.

Q Could you describe -- and we'll hear from Dr. Eisenberg later this week -- but can you describe how she may have been involved in overseeing this process with law enforcement?

A She was present with us on the first day in December of 2005 in Madison at the Crime Laboratory, and was involved in, uh, the planning, if you will, and the im -- implementation of this process and assisted alongside of us in going through the same procedure.

Um, and if an investigator were to recover an item that they felt was potentially, uh, bone fragments, she was there and available to make a better determination if it was or if it was not.

Q You talked about, uh, bone and other items of

54

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 54 of 272    Document 19-16

Q   evidentiary value.  Did those include any metal items?

A   Yes.

Q   And could you describe that for the jury, please?

A   There were numerous metal items that were found among this debris, and that included, uh, ammunition casings, um, miscellaneous items of steel, um, steel belting from tires.  Um, in particular, I recall there was a zipper pull recovered.  There were clothing rivets recovered.  Batteries.  Um, quite a wide variety of materials.

Q   The clothing rivets, uh, specifically -- I'm going to show you Exhibit No. 104.  Ask you to tell the jury what it is that we're looking at?

A   This is a close-up photograph of a clothing rivet, which is identified, um, through stamping on the head of the rivet with the name Daisy Fuentes.

Q   Were you involved in the recovery of any of these Daisy Fuentes clothing rivets from, uh, this sifting process?

A   Yes, I was.

Q   Are you aware of how many Daisy Fuentes rivets were recovered throughout the entire process?

A   There were five of these same rivets recovered.

Q   I'm going to have Mr. Wiegert show you, uh, just

55

Q as an example, what's been marked as Exhibit No. 112. Ask you to tell the jury what that is, please?

A This is one of those rivets, as identified in this photograph, that was recovered from that burned debris.

Q Repackage it. Thank you. Mr., uh -- Or Agent Heimerl, on March 1 of 2006, were you made aware of the application and receipt of a search warrant for not only the residence, but the garage of Steven Avery?

A Yes, I was.

Q Tell the jury how, if at all, you were involved in the execution of that search warrant?

A On the afternoon of March 1, or in the morning hours, I was contacted by Special Agent Fassbender, and informed that additional information had been gathered or gained through the ongoing investigation, uh, which included statements from Brendan Dassey, and as a result of those statements, investigators, um, sought and received a search warrant to return to Steven Avery's residence and garage to look for and potentially collect any additional evidence that investigators felt may be present as a result of this new information.

56

Q    Could you first describe for the jury an overview of the garage?  What was it that you saw upon your arrival on the 1st of March?  And, by the, way, this was, uh, later -- uh, later on?  Early evening?  That is, after Mr. Dassey made his statement?  Is that your understanding?

A    That's correct.  Uh, investigators arrived at the property in the late afternoon hours.  I believe approximately 4 to 4:30 p.m.  Um, the investigators were divided into two separate teams, if you will.

Uh, one team was responsible for conducting the search of Steven Avery's residence.  The second team, which I was a part of, was assigned to conduct the search of the detached garage.

When we arrived, um, initially, I photographed the exterior of the garage.  I noted that the personnel door, um, the walk-through door on the north side of the garage, was locked with a padlock.  We made arrangements to make entry into the garage by cutting that padlock.

When that was completed, uh, the first thing that was done was the interior of the garage was videotaped.  Um, on that day there was, uh, snow on the ground.  A relatively good

57

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 57 of 272    Document 19-16

quantity of snow. The overhead garage door was ultimately opened. Um, there was a passenger vehicle that was found parked inside the garage.

And after the videotaping was completed, I then, um, conducted photography of the entire interior of the garage, uh, just documenting in an overview fashion of the -- what the interior of the garage looked like.

We then, basically, um -- four investigators that were present, uh, which included myself, Investigator John Dedering from Calumet County, Investigator Gary Steier of Calumet County, um, and, eventually, Detective Dave Remiker of Manitowoc County, assumed, um, general responsibilities as working as this -- as this team, and came up with a -- a plan, if you will, uh, or objectives as to how we were going to go about searching the garage.

Q I'm going to show you Exhibit No. 105, and ask you if you can describe what it is that we're looking at here?

A This is a photograph of the interior of Steven Avery's garage, obviously with the overhead garage door open. Uh, as I took this photograph, I was standing north of the front of the garage in front of

58

the overhead garage door. This was taken at a point in the evening in which we had done a cursory search, if you will, of the interior of the garage, looking for any readily recognizable items of evidence that we knew, based on Brendan Dassey's statements, that we should be looking for.

Some of those had been ad -- identified. Um, the vehicle has been removed at the, uh, time of this photograph, and we have identified with some of these yellow photographic markers, numbered markers, um, the location of some items of evidence that had been found to that point.

Q  Had you been informed, and was one of the items that you were looking for in this, uh, garage, uh, a item of, uh, paint thinner?

A  Yes.

Q  Let me show you what's been marked as Exhibit No. 106. Ask you if you can tell me what we're looking at here, please?

A  This is a photograph of a plastic bottle or jug of paint thinner that was found on the workbench at the rear or south side of the garage in a central area of the south wall.

Q  Was another specific item that you were looking for and, uh, included, um, in Mr. Dassey's

59

Q statement, something called a roller creeper?

A Yes.

Q And can you tell the jury, and those jurors that may not know what that is, what is a roller creeper?

A I don't have much experience in the automotive work, but I understand a roller creeper is a piece of equipment that, um, if you will, is a bench, a padded bench often, um, that rests on wheels to allow a person to lay on their back on this bench and roll themselves underneath a motor vehicle so they can conduct work on the under -- underside of the vehicle.

Q Were you able to locate a roller creeper within Mr. Avery's garage?

A Yes, we did.

Q Let me show you what has been marked as Exhibit No. 107. Tell us what we're looking at, please?

A That is a photograph of a roller creeper with the name, uh, labeled on the face of it as a Black Jack brand creeper. This was found in this location which is, um, in the central area of the south wall, basically in the middle of the garage, all the way at the rear of the garage.

Q Just so that before I leave this photo, just to

60

the right of the roller creeper is a green object that has some wheels on it. Do you know what that is?

A   Yes, I do.

Q   What is that?

A   The green cylindrical object, uh, behind and to the right of the creeper is an air compressor, and it has numerous additional miscellaneous items stacked on top of it.

Q   Now, the -- I'm going to go back to Exhibit No. 105. When we look at the stuff in that garage during the 1st and 2nd of March, were each of those items removed and thoroughly searched?

A   Yes, but not -- I don't know if re -- removed is, um, a term I would use. We did not physically remove them from the garage. But --

Q   They -- They are moved?

A   Yes. Our course of action, uh, beginning on March 1, um, was to physically, visually examine virtually every item within that garage, um, looking for any potential relevance to the investigation based on the statements we had received from Brendan Dassey. Um, examining these items to determine if we could see any visible biological evidence or other forms of trace evidence.

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 61 of 272   Document 19-16

And in doing so, we began at the -- in this photograph, the front left corner, which would have been in the, uh, northeast corner of the garage, and we proceeded south along the east wall picking up and moving every object. And in most cases, there were multiple objects stacked on top of, say, a snowmobile or a shelf. Each item was picked up, moved, turned over, examined, and set aside. And we'd move onto the next object.

We proceeded south along the east wall to the corner, and then along the south wall, um, from left to right in this photograph, and, ultimately, finishing on the following day, March 2, coming up along the west wall.

Q  Agent Heimerl, once again, based upon statements of Mr. Dassey, uh, were you looking for, and did the search warrant authorize, a search for bullets or bullet fragments?

A  Yes, it did, and we were looking for those items.

Q  I'm going to have you, before I leave this, uh -- this photograph, point out for the jury, uh, what's called Evidence Tent No. 9. Could you tell the jury where that's located?

A  No. 9 is located just behind -- The white is the

62

snowbank on the outside of the garage. And just behind there, in the right half of the photograph, is Marker No. 9.

Q I show you, now, what has been marked as Exhibit No. 108. Tell the jury what we're looking at, please?

A This is a photograph, again, of, uh, evidence, or Photo Identification Marker No. 9, taken from standing above it. You can see a crack in the concrete traveling right underneath the marker. Just in front of that marker edge, right where the cursor is now, there's a small, cylindrical, gray object that was ultimately recovered and found to be a bullet, or a portion of a bullet.

Q Mr. Wiegert just handed you, also, uh, what's now been, uh, marked as Exhibit No. 114. It's a -- a package, and although it, uh, contains, um, an item of evidentiary value with a biological, or potentially biological, material on it, and I'm not going to ask you to open it, can you tell us what Exhibit 114 is?

A This is identified as a bullet fragment, and the date for the recovery is 3/1/06.

Q Is this the bullet fragment that is depicted in Exhibit No. 108, uh, next to, uh, Exhibit -- Tent

63

No. 9?

A   I believe it to be, yes.

Q   Agent Heimerl, I'm now going to show you what has been marked for identification as Exhibit No. 109.  Tell us what that is, please?

A   This is a photograph that was taken on March 2, the second day of our search.  From the previous photograph of the overview of the garage that we looked at, um, directly at the back of the garage in the central area of that south wall, we saw the Black Jack creeper and the green air compressor.

In that previous photograph, the green air compressor was directly adjacent to the left side of a large rolling tool chest, which we see in the upper right corner of this photograph. The air compressor, and all of the materials were stacked on top, have obviously been removed for this photograph, and Marker No. 23 identifies a bullet which was found under that air compressor near that back wall in the garage.

Q   I show you, now, Exhibit No. 110.  Tell us what we're looking at here, please?

A   This is a close-up photograph of that same Marker No. 23.  Also, in the photograph, is a -- a scale or a ruler.  Between the number four and number five on

64

the ruler, just above the edge of the ruler, is a round object which is the bullet that was located underneath the air compressor.

Q  By the way, this bullet, uh, that it was next to Tent No. 23, and also the bullet next to Tent No. 9, uh, were those recovered by your, um, evidence recovery team and, thereafter, sent to the Wisconsin State Crime Laboratory for further analysis?

A  Yes, they were.

Q  Just to complete the discussion of this particular bullet, um, I'm going to show you photograph 111, ask if you're able to identify that?  And Mr. Wiegert's going to also hand you Exhibit No. 113 to assist you in describing photograph 111 as well.

A  The photograph is a -- a photograph of the same object, evidence bag that I'm holding, uh, Evidence Tag No. 8623, which identifies the contents as a bullet fragment that was collected on March 2, 2006.

Q  And so that the record is clear, the photo, uh, of the bullet fragment, what the jury is looking at on their screen, is, uh, Exhibit No. 111.  The package, itself, the bullet, itself, if you will, is Exhibit No. 113.  Is that your understanding?

65

A   Yes.

Q   I'm just going to take a moment to show you a couple of exhibits. This is Exhibit 77 that has already been received. It's a computer-generated image created by Trooper Tim Austin. Um, does this exhibit assist you, or will it assist you, in describing for the jury where those two bullets were found?

A   Yes.

Q   Why don't you take your laser pointer and tell the jury?

A   The first bullet that I described, which was in the crack of the concrete, is in the area of the No. 9 marker in the foreground of the garage. The second bullet -- bullet that we just discussed, No. 23 marker, was found at the rear, or south side of the garage, directly next to the tool chest. Um, I believe the black rectangular object here is meant to depict the location of the creeper. What is not identified in that photograph is the location or the presence of the green air compressor.

Q   And the last, uh, exhibit that I want to show you has been received as Exhibit No. 67. Does this contain the, um, burn barrel, and will this assist you in describing where that was recovered

66

and processed by you?

A    Yes.

Q    Would you just describe that for us, please?

A    This is, uh, Steven Avery's trailer.  His detached garage.  Here's the gravel roadway that I described earlier.  And this is the burn barrel that was ultimately recovered that contained the burned electronic components.

Q    Contained the, um, Motorola, um, V3 RAZR phone, the Canon PowerShot A310 camera, and the Palm Zire 31 PDA.  Is that your understanding?

A    That's correct.

Q    And, again, that is verified and, um, positively identified by FBI and also Mr. Thomas; is that right?

A    Correct.

        ATTORNEY KRATZ:  With that, Judge, I'm going to move the admissions of Exhibits 95 through 114, and I have no further questions of Agent Heimerl.

        THE COURT:  All right.  Is there any objection to these exhibits?

        ATTORNEY FREMGEN:  No, Judge.

        THE COURT:  Since there are none, the exhibits will be received.  I think, uh, this is an

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 67 of 272    Document 19-16

appropriate time to take a morning break. We'll take a 15-minute recess.

(Recess had at 10:04 a.m.)

(Reconvened at 10:29 a.m.)

THE COURT: I think we've reached the point where this witness is set for cross-examination. Mr. Fremgen?

ATTORNEY FREMGEN: Judge, I think the State wanted to -- Did -- Didn't you want to include 115 in that offer?

ATTORNEY KRATZ: We did.

THE COURT: Right. Uh, no objection to 115?

ATTORNEY FREMGEN: No.

THE COURT: Received. Go ahead, Mr. Fremgen.

ATTORNEY FREMGEN: Thank you.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q    Agent Heimerl; correct?

A    That's correct. Yes. Thank you.

Q    Okay. You were testifying about the burn barrel in your direct, and I have what's up -- Uh, well -- I have up on the screen, again, uh, what's been marked as State's Exhibit No. 80 --

68

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 68 of 272    Document 19-16

Q or 95? It's a photograph of that burn barrel; is that correct?

A That's correct.

Q You can see it from there?

A Yes, sir.

Q Okay. Now this is the barrel you indicated that you first did a visual observation without going into the barrel, itself, and noted metal and glass within the debris?

A Yes, I did.

Q And you -- I think you indicated you also, visually, identified the Motorola cell phone?

A I could see that component. That cover piece with the very distinctive Motorola "M" on it. And that was on top of the debris. I could see that.

Q Okay. Now, looking at that burn barrel, the location is approximately in front of the Avery trailer? Or, I guess, if you want to say, kind of a triangular, uh, angle from the trailer and the garage; correct?

A That's correct. It's almost, um, due north of the garage and northeast of the trailer.

Q So that would be that opening -- the gar -- the actual main entrance of the garage?

A Correct.

69

Q On the barrel, did -- Can you see from where you're at, or do you have the picture in front of you?

A Both. Correct.

Q Okay. Does it appear to have bullet holes in the barrel? I know you're not an expert on -- I'm not asking about your expertise in the area of -- of, uh, firearms or ammunition, but you're an off -- you're an agent; correct?

A Yes, I am.

Q You've fired a firearm?

A Yes, I have.

Q Familiar with what a bullet hole might look like?

A Yes.

Q Does it appear that -- like it has bullet holes in the barrel?

A All I can say is that there are circular penetrations in the barrel.

Q Okay. And I don't need you to go any further if you don't have ability to tell whether or not that's from a bullet or something else. It's a -- but appears to have some sort of circular indentation in the side?

A Yes.

Q Now, in the burn area, you actually found shell

70

casings; correct?

A   In the material that came from the burn pit to the burn area, yes, there were ammunition --

Q   Did you find -- I'm sorry.

A   There were am -- ammunition casings found.

Q   Did you find the same in -- when you sifted through the barrel?

A   I did not, um, examine the debris from the barrel. From this barrel.

Q   So someone else sifted through the burn barrel?

A   That's correct.

Q   Your observations were just visual?

A   Of what?

Q   The burn barrel.

A   That's correct.

Q   When you sifted, did you -- through the burn area, now. We're beyond the burn barrel. Did you actually set up the procedure for sifting through that burn area?

A   I did not. It was, uh, um -- Special Agent Pevytoe had an idea in his mind as to what procedure he wanted to follow. He presented that to those of us that were there, and we all agreed that that was a -- appeared to be a sound and good procedure to follow.

Q   Now, you indicate that your primary expertise

71

with the -- with the DCI would be in arson investigations?

A    That's correct.

Q    So you're familiar with going through, um, charred remains like, for instance, buildings?

A    Correct.

Q    Um, would a burn area like this be unusual for you in your investigation experti -- or, uh, experience?

A    Uh, no, it wouldn't.  In fact, I've participated in examinations of, um, burn areas or burn pit areas, if you will, on at least one other occasion looking for, um, similar types of evidence.

Q    When you set up the investigation, or the actual sifting, then, through this burn area, did you set it up where you, uh, indicated some sort of grid-like, um, procedure so you could identify what location items had been taken out of, or boxed, when you were digging out and putting it into something to take back to the Crime Lab?

A    You maybe misunderstood, only because it was not -- I don't think I was asked earlier, but to clarify, when the material, and burn debris, and soil, and material was removed from the burn pit, and initial examinations were conducted at the burn pit, I was

72

not present and involved in it. I was -- at that time, during that first week, was involved in the neighborhood canvass aspect.

Q Okay.

A The examination of the debris that I testified under direct exam, um, was conducted after all of the material had been removed from the Avery property in, um, various containers and brought to the Crime Laboratory. That's where that examination was completed.

Q So your in -- sifting involvement would have been at the Crime Lab?

A At the Crime Lab and at Calumet County Sheriff's Department. Yes.

Q In regards to your involvement with this investigation, were you aware of what type of sifting or -- or the procedure that went on actually at the burn area?

A No, I was not.

Q When you went through the items that were taken to the Crime Lab, were they in separate boxes? Or how -- Actu -- How were they stored and -- and transported to the Crime Lab?

A When we examined the debris at the Crime Lab, it was, um -- on the first two dates, December 19 and 20 of

73

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 73 of 272    Document 19-16

2005, the majority of that material I -- I recall came out of large tarps. Um, the material had been placed on large tarps, and then secured or taped closed. If you'd take, say, a bedsheet and bring the corners up, twist it, and turn it, and secure it with tape, that's how it was brought to the Crime Lab.

Um, on the second occasion, in April of 2006, the majority of the debris that we examined on that occasion was in individual five-gallon plastic buckets.

Q Okay. Were they labeled as to where they were taken from the -- from the burn area or the burn pit?

A I know that they were labeled. The -- the buckets, in particular, and the tarps, for that matter, I believe, were labeled as to where they were collected from, but I was not involved in the actual collection of that material.

Q Were you involved later in the process of organizing that in some sort of a -- a diagram of where each items were found within the burn pit, itself?

A No.

Q So you wouldn't have no idea where items might have been located in the burn pit?

74

A No.

Q Are you aware of whether every item that was in that burn pit was brought to the Crime Lab and -- and reviewed by you or your -- your crew of -- of techs?

A I believe that -- It's my understanding that all of the material that was removed, all burned and soil material that was removed from the Avery property, was examined by an investigator over the course of those four days, as well as prior to that.

I believe, uh, Special Agent Pevytoe had done some examinations with other agents. I say that because I know that it was our goal to visually examine and go through all of the debris that came out of the burn pit, as well as other areas, as I alluded to, stated was in the buckets. And when that was finished, when we went through all of that material, it was my understanding everything had been done.

Q Did you receive, or do you recall, as one item that was brought to the Crime Lab, uh, the, uh -- a burned out van seat?

A I -- I was not involved in the examination of that.

Q Okay. So you didn't personally investigate or review that, uh, van seat?

75

A No, I did not.

Q Do you recall, though, if it was actually at the Crime Lab when your, um -- your team was reviewing the -- going through the sift -- or sifting through the burn area buckets to determine if there were bones or, I think you mentioned, metal objects?

A I don't know if it was there or not.

Q When you were sifting through -- You -- You -- You indicated that at some times there were a forensic anthropologist there to assist in determining whether something might be a suspect bone fragment or -- or something that she might be interested in looking at; correct?

A Correct.

Q As the, uh, Crime Lab technicians, including yourself, went through and sifted, you're going through dirt; correct?

A It's dirt and then ash.

Q Were you using anything like a brush or a water bottle to clean off items that you thought were suspected evidence?

A I'm sorry, you said a brush and a what?

Q A brush or some sort of a -- like a water, uh, jar, squeeze water -- to squee -- to clean the

76

item off?

A   No, we did not use any water rinsing. Um, and, basically, it came down to the preference of the investigator as to if they preferred to use it just -- uh, do this process just with their hands, or if they preferred to use a -- a wooden skewer, or a pick, um, or if they wished to use a brush, or a putty knife. It's personal preference, but some of those instruments were used.

Q   Okay. No one -- You know, this may sound silly, no one was told, go ahead, blow on it, get rid of the -- the dust or the dirt?

A   No.

Q   Okay. That could potentially contaminate that with that investigator's saliva; correct?

A   I believe that's a potential.

Q   So you guys sat down and talked about what procedures you're going to take in sifting through these, um, buckets and -- and the bags of debris taken from the area before you actually started, uh -- the, uh, sifting?

A   Correct.

Q   You mentioned that you were involved on the team on approximately March 1, or maybe it was on March 1, 2006, in the Avery garage?

77

A   Yes, it was March 1 and 2.

Q   And 2nd.  And I believe you indicated that you -- the search, itself, was somewhat methodical?  One person went in and videotaped the garage first?

A   Correct.

Q   Um, and then -- How many were on your team searching?

A   On March 1 it was, uh, four.  Four individuals.  And on March 2, uh, one additional, Agent Roswell, joined us.

Q   Did you videotape the actual search, itself?

A   No.

Q   Just the before and after?

A   Correct.

Q   When you went through the search, you indicated that you started from one corner of the garage and worked your way in a horseshoe around to the other; correct?

A   That's correct.

Q   When you -- When you first went through the garage --

        ATTORNEY FREMGEN:  And if I could ask the State to put up -- I believe it's Exhibit 105.  The photo of the garage.

Q   (By Attorney Fremgen)  Do you have State's

78

Q Exhibit 105 before you?

A Yes, I do.

Q And, again, this is, uh, Steven Avery's garage;
correct? On March 1, 2006?

A Correct.

Q And this a view after you have opened the garage
door? The -- the -- the main overhead door?

A Correct.

Q Was there a vehicle in the garage when you first
arrived there to search the garage?

A Yes, there was.

Q And you had to remove the -- the vehicle?

A Yes.

Q How did you get it -- Did you drive it? Push it
out?

A A tow truck.

Q Okay. When -- Was there someone in the garage
watching in case car knocked over a shell casing
or moved some item of debris within the garage?
Just to make note of that?

A Yes. We were present in the garage as it was being
removed, but, um, vehicle was parked in the garage
similar to the way any of us parked a vehicle in the
garage. It did not come into contact with anything
else as it's being moved.

79

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 79 of 272     Document 19-16

Q Okay.

A And removed from the garage. So I don't believe that was a concern.

Q You -- You noticed on the picture -- Again, it's -- I believe it's Exhibit is 1-0 -- 105. You refer to them as tents or evidence tents? Those are those little cones or numbered cones?

A They -- Various terms. They could be marking evidence, or they could just be, uh, for -- for photographic ref -- uh, reference.

Q Okay. Some of those don't -- Well, let me ask you this: When the -- when the car was in the garage, you can -- you can see in the picture there seems to be a tire track?

A Yes, I see that.

Q Like a white tire track in the middle?

A Yes.

Q That's where the -- the -- that, uh, Suzuki was?

A I -- I don't know that because the vehicle that we removed was not a Suzuki.

Q Oh. I'm sorry. Whatever the vehicle was that was in the garage, that's where that was?

A It was in that area. In the large open area. If you see the -- if I can point to the --

Q Sure.

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 80 of 272     Document 19-16

A -- black object right here, this is an engine hoist. The vehicle was here to the left of it in the open bay.

Q Okay. So there was some items that you located and marked with those yellow tags that weren't covered by the vehicle; correct?

A I don't know if I understand your question, sir.

Q They weren't concealed. The vehicle wasn't on top of any -- some of the items that you -- you note in this picture; correct?

A I -- I still don't know if I can answer that. And I -- I --

Q Let me ask it a third way. Maybe that will -- I'll try a third way. Could you see some of the items when you walked into the garage originally? The videotape? The items I mean would be the ones that you've marked with these yellow cones or tents?

A Some of these yellow markers, specifically the ones around the back of the garage, are next to circles that are drawn on the concrete floor, and the reason some of these, in particular No. 10, appears to be where the car would have been, if I can explain how this occurred, after we entered the garage and videotaped the interior, did a cursory search, we had

81

identified the presence of the Black Jack creeper, we had identified the presence of some paint thinner jugs, and other things that we believed were items that we were going to collect.

We also became aware of some of these circles that were on the floor. It was my understanding, I was informed, that those had been placed on the floor by Crime Lab personnel during a previous search, and identified areas that may have, uh, luminesced from luminol.

So we identified those just for identification purposes that they are here. At that point, um, we then removed the vehicle, and I felt as long as the vehicle was out of the way, let's take a photograph of where our markers are. And that's why some of these markers, in particular, as I said, No. 10, is under the vehicle.

Q	Okay. Thank you. That clarifies that. So when you did your search on March 1 and into March 2, the only two items, I think -- well, that you testified -- correct me if I'm wrong -- that you would have -- would have been new, would be No. 9 and No. 23, the one underneath the compressor that, as of yet, in this picture, isn't marked?

82

A I'm sorry? That would have been new?

Q Would have been new items that came to your --
You know, you said -- you mentioned that someone
else came through and searched previously;
correct?

A In November of 2005.

Q And they circled some areas on the ground and on
the pavement in the driveway -- in the garage;
correct?

A Correct.

Q And you noted those circles; correct?

A Correct.

Q And you put the little marking next to those
little white circles?

A Correct.

Q That wasn't something that you just found;
correct? It was some -- some subject or some
item that previous search team thought was of
interest; correct?

A Well, to answer your question the way you -- you
stated it, it was something that, yes, I did just
find, because this is the first occasion I had been
in the garage. I saw that there were circles, and I
was informed that those circles had been placed by
Crime Lab personnel to identify areas that had

83

reacted through luminol. So for the sake of photographic documentation, we placed markers next to those. That does not mean that we specifically collected an item of evidence from, say, Marker No. 3 or Marker No. 4.

Q Which items did you actually, specifically, remove an item of, uh, evidentiary value then?

A Well, this photograph was taken in the early evening hours of March 1, and there was a great deal of searching that took place after this photograph was taken, and many items of evidence were collected after this photograph was taken.

As each individual item of evidence was found, or something was identified that we felt was going to be an item of evidence and we were going to collect it, we would place an -- an evidence photographic marker next to it, photograph it, measure it, and collect it. So there are many numbers that come after the highest number in this photograph.

Q You mentioned there was a prior Crime Lab taper, or Crime Lab technician, that came through, made those circles, where you noted had been positive for the luminol testing; correct?

A That's what I was told.

84

Q   What you were told?  So someone else went through the garage before you'd gone through the garage on March 1?

A   That's correct.

Q   And No. 9 on the picture, uh, notes, apparently, a bullet fragment that you found; correct?

A   Correct.

Q   And it's in a crack in the pavement of the -- the garage floor?

A   Correct.

Q   Okay.  So -- so I would assume, correct me if I'm wrong, that someone missed that the first time?

A   I don't know as if I -- I can assume that.  All I can say is that on March 1 I happened to be walking in the garage, and I stopped, and I looked down, and I saw the gray object that struck me as being similar in color to the lead from a bullet, which -- which caused me to examine it closer.

Q   Just walking into the garage you saw it and made note of it?

A   Yes.  In fact, several other investigators had already been into the garage.  I happened to be in this front corner of the garage looking with a flashlight at the floor in the early stage of the search, and looked down, and, as I said, I saw a

85

light gray-colored object that -- I knew in my mind that we need to be looking for bullets. That looks to be the color of lead from a bullet.

Q Did you process -- And what I mean by that is, did you take uh, uh, swabs of -- of the bullet, for instance, and the creeper, while you were in the garage?

A No, we did not.

Q Did -- So no one in your team actually swabbed any of those items to determine if there was any potential DNA evidence?

A Not on the items as stated, no.

Q I'm sorry. I didn't hear.

A Not on the items that you just stated, no.

Q Okay. Any item -- any items in the -- the garage that you did that to?

A The swabs were collected on the 2nd, yes.

Q What were the swabs collected? What -- what items were swabbed?

A The red tool chest at the back of the garage was swabbed.

Q Any reason why you didn't swab the creeper?

A Uh, we -- we need to make a decision. Are we going to try and collect any visible stains here in the field? Or is it more practical to collect this

86

object in its entirety as a whole, if it is portable, can we package it sufficiently and protect any evidence that may be on it, and transfer it to the Crime Lab? And that's what we chose to do.

Q So you actually did transport the entire creeper to the Crime Lab?

A I did not. It was collected and packaged and removed from the garage. And any further analysis or testing at the Crime Lab became someone else's responsibility.

Q Someone in your team packaged the creeper; correct?

A Yes. It was removed from the garage, and it was collected and packaged for transport away from there.

ATTORNEY FREMGEN: I have nothing else.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q Mr. Fremgen suggests that law enforcement officers may have missed something before March 1. Isn't it true that it wasn't until March 1 that law enforcement was even told that Teresa Halbach was shot in the garage --

A That's correct.

Q -- that you (inaudible.)

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 87 of 272    Document 19-16

A    That's correct.

Q    And that was by the defendant, Mr. Dassey; is that right?

A    Correct.

            ATTORNEY KRATZ:  That's all I've got, Judge.  Thank you.

            ATTORNEY FREMGEN:  Just --

            THE COURT:  You may step down.

            ATTORNEY FREMGEN:  -- one moment, Judge. Nothing more, Judge.  Thank you.

            THE COURT:  You may step down.

            ATTORNEY KRATZ:  State would call Dan Kucharski to the stand, please.

            THE CLERK:  Please raise your right hand.

**DANIEL KUCHARSKI,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

            THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

            THE WITNESS:  Daniel J. Kucharski, K-u-c-h-a-r-s-k-i.

**DIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q    Mr. Kucharski, how are you employed?

88

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 88 of 272    Document 19-16

A    I'm employed by the Calumet County Sheriff's Office.

Q    How long have you been on the -- a police officer?

A    I've been with Calumet County for about four years, and two years before that with another agency.

Q    What are your current duties with Calumet County?

A    I'm a patrol deputy with the additional duties as an evidence tech and armor for the county.

Q    Were you asked, Deputy Kucharski, to assist in, uh, search and other investigative efforts regarding the death of Teresa Halbach?

A    Yes, I was.

Q    I'm going to move, um, right ahead to your specific areas of, uh, involvement, specifically, to Sunday, the 6th of November.  Were you asked to proceed to what's now known as the Avery salvage property?

A    Yes, I was.

Q    What were your duties on the 6th of, uh, November?

A    I was assigned a -- a search team that included, uh, Lieutenant Lenk, Sergeant Colborn, and Detective Remiker.  We were given, uh, several areas on the property to search different times of the day.

Q    Speak up just a little bit.  I'm sure we would

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 89 of 272    Document 19-16

appreciate it. Uh, do you have, and did you have, prior to the 6th of November, any specific training and experience as an evidence technician?

A Yes. I went through the two-week evidence technician school at Fox Valley Technical College.

Q On the 6th of November, uh, were you asked, and did you, in fact, perform a search of the, uh, detached garage of Steven Avery?

A Yes, I did.

Q Could you describe on that early stage, that is, just in the first full day of searching of that property, describe what it was that you were looking for in that garage?

A Basically, myself and my team were sent to the, uh, garage for a general search. We were looking for general, um, items that made a point as to a crime that had been committed. Um, nothing specific at that time were we looking for.

Q And, in fact, on that, uh, early date, uh, did you have, um, a detailed or a solid understanding what it was you were looking for?

A Not at all. There was very little guidance. Um, as the facts would roll in, we would get, uh, more specific things. As the days went past, we'd get

90

Q All right. I've got some photographs that will assist. I show you what's marked as Exhibit 116. Tell the jury what this is, please?

A This is a photo of the inside of the garage that, uh, we searched on that Sunday. So it would be towards the, um -- the front or overhead door looking back towards the, um, southeast corner of the garage.

Q There are two large objects, two vehicles, if you will, that are depicted in this particular photograph. Could you describe those for the jury, please?

A It's a Suzuki Samurai automobile and a, um, Ski-doo Mach 1, um, snowmobile.

Q And is this photograph taken and does it accurately depict how Mr. Avery's garage looked, uh, on the 6th of November?

A Yes, it does.

Q The back of this photograph you see a, uh -- a Black Jack creeper?

A Yes.

Q And I've zoomed in a little bit, uh, to that. You can see it on the -- the large screen. Um,

91

Q on the 6th of November, did you have any indication that that Black Jack creeper may, in fact, have any evidentiary value?

A No. Nothing stood out.

Q Did you have a general impression of this garage when you first walked into it? Can you give the, uh, jury kind of a flavor of it?

A I would say it was a typical garage on the messy side. Um, the west side of the garage was piled up with types of, um, uh, machinery, junk, um, things like that, several feet deep on that west side.

Um, along the back of the garage, that would be the south side of the garage, was -- also had equipment and junk on it. Not quite as deep as that -- that west side.

Then on the east side of the garage, into the garage, there's also a pile of junk. Um, the floor was a typical garage floor with, uh, stains on it, dirt.

Q At some point was that snowmobile removed from the garage?

A Yes. At one point, uh, towards the end of our searching, we wanted to see -- look underneath the snowmobile, so we removed it from the garage.

Q All right. And, again, since this was a -- a

92

relatively cursory search, did you believe that you or other law enforcement officers would have an opportunity to go back into this garage and re-search it if you need -- needed today?

A   Yes.  As -- as more information came in, more specific information came in, we would go back to places that we had -- had already searched looking for specific things.

Q   I'm showing you Exhibit No. 117 now.  It's on the large screen.  Is this a photograph after the snowmobile's been removed?

A   Yes.

Q   Could you, uh, describe some -- And I think you have a laser pointer up there.  Describe some, um, landmarks or specific, uh, areas that you observed on the 6th of November?

A   Well, after we, um, removed the snowmobile, we could see more clearly, um, the -- a crack running, uh -- be north and south, and one east and west.  Uh, these are the scratches made by the, uh, snowmobile pulling in and out of the, uh, um, um, garage.  There were scratches already on the floor before we pulled it out, because they obviously had to get it in there somehow.  Um, that's what we saw when we pulled the snowmobile out.

93

Q   All right.  There's a riding, uh, lawnmower?
    Looks like a John Deere lawnmower to the right;
    is that right?

A   Towards the back here in this area.  Riding
    lawnmower.

Q   Large red tool chest?  Show us that?

A   Stand-up tool chest in the center area here towards
    the back wall.

Q   Next to that tool chest, on the 6th, I can see a,
    uh -- a green air compressor.  Do you see that in
    the photograph?

A   It's dark, but it's right here, the green air
    compressor on the floor next to the tool chest.

Q   Now, for the jury's benefit, were, um, many or,
    in fact, any of those items removed?  And did you
    search behind or under them?  Or was it that
    thorough of a search on the 6th?

A   It was a general search.  We -- You know, on the most
    detailed search, we would have pulled everything out
    of the garage.  We, obviously, didn't do that.  Um,
    the only thing we pulled out was the -- the sled, um,
    because we couldn't see underneath it, uh, readily,
    and it was out in the open anyways.  We didn't take
    out any of the things along the back wall or the side
    walls.

94

Q    All right.  The floor of this, uh, garage you had described briefly, but I'm going to show you Exhibit No. 118.  Tell us what we're looking at here, please?

A    It's little bit closer view of the, uh, floor after the snowmobile had been pulled out.

Q    During your search of the garage, did you have occasion to, uh, find any, um, what are referred to as shell casings?

A    Yes.  We found, located and collected several .22 caliber long rifle shell casings.

Q    I'm showing you what's been marked as Exhibit No. 119.  Tell the jury what we're looking at here, please?

A    This is one of the shell casings that we found in place on the floor of the garage on the date we searched it.

Q    All right.  Did you take a photograph of more than one shell casing?

A    We photographed more than one shell casing.  We took as many photographs of the shell casings that we could.  Some were behind things that we couldn't readily photograph.  We collected those and, uh, put them altogether into a box.

Q    If you remember, Deputy Kucharski, on the 6th of

95

Q November, uh, can you remember, and can you tell the jury, how many shell casings were recovered from that garage?

A There were either 10 or 11 shell casings recovered.

Q In fact, now I'm going to show you Exhibit No. 120, I believe. Tell us what we're looking at here, please?

A This is the pill box that I put the, um, shell casings in, photographed, um, after it had been entered into evidence.

Q And as you sit here, are you able to tell the jury, and can you count, how many shell casings are in that pill box?

A I count 10 -- uh, I count 11 in this photograph.

Q All right. And, again, those were recovered from inside the garage on the garage floor; is that right?

A That's correct.

Q What exhibit, uh, was that that you were just handed?

A (No verbal response.)

THE CLERK: One twenty-eight.

ATTORNEY KRATZ: One twenty-eight?

Q (By Attorney Kratz) I'm sorry. We've handed you what's been marked as, uh, Exhibit 128. Tell us

96

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 96 of 272     Document 19-16

Q   what that is, please?

A   It appears to be the -- the box with the .22 shell casings.

Q   All right. After you recovered those shell casings, do you know what happened to them?

A   After I sealed them in the package and put them into the, uh, paper bag and enter those into evidence at the Calumet County Sheriff's Department, and I left it in the care and custody of the, uh, evidence custodian.

Q   Now, you didn't perform any analysis on those shell casings? In other words, you aren't qualified to compare, uh, shell casings to specific firearms, are you?

A   Correct. I just collected them. I didn't do any analysis on them.

Q   Is it fair to say that that is a -- a discipline or a science that is left to somebody with greater expertise than you have?

A   Yes.

Q   Deputy Kucharski, after the, uh, garage was searched in relatively general fashion, do you recall, um, what other searches were performed on the 6th of November?

A   Only the searches that my team did. Um, directly

97

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 97 of 272    Document 19-16

after we finished up with the, uh, search of the garage, I was called over to a area behind the, uh, Janda residence to take some burn barrels, um, that were waiting to be loaded up and taken -- entered into evidence.

Um, after that, I was given the assignment --

Q Let me just stop you there. I'm going to show you what's been marked as Exhibit No. 121. Tell us what we're looking at here, please?

A Those are the burn barrels that I tagged, and they were lowered onto a trailer that you can see the ramp on there, and they were taken.

Q After the search of the, um, burn barrels or -- excuse me -- the recovery of, uh, the Janda and, uh -- That's Mr. Dassey's residence as well? Is that your understanding?

A I -- I don't know.

Q Okay. You knew that it was Barb Janda's --

A Yes.

Q -- trailer?

A That's how it was referred to.

Q After the recovery of those burn barrels, um, what were you asked to do?

A We were sent to the, uh, Janda residence to, um,

98

Q  And did you, in fact, search that residence?

A  Yes, we did.  Uh, again, this was a general search.  Um, not looking for anything in specific.

Q  During the search of, uh, the Janda trailer, did you have occasion to observe and recover a, um -- a phone message that was found on, um, the answering machine of the Janda residence?

A  Yes.  One of the first things that we did when we entered the residence is, uh, Detective Remiker played the phone message while we were all standing around.  Uh, he recorded it.  Um, and then we commenced searching the rest of the, uh, residence.

Q  Direct your attention to the photos in front of you.  Exhibit No. 123, and now being shown on the large screen for the jurors, what are we looking at?

A  This is a photo of the phone and answering machine that was in the, uh, Janda residence.

Q  Did -- And you indicated that you had occasion to listen to, uh, at least one of those phone messages; is that correct?

A  Yes.

Q  Did an individual on that phone message identify herself?

99

A    Yes.  We listened to the message that, uh, the female caller, uh, identified herself as Teresa.

ATTORNEY KRATZ:  At this time, Judge, assuming this works, I will ask the Court for permission to play that particular phone message. We do have the, uh, phone message, uh, reduced to a -- an audio CD as well that I will then ask to have marked, and then I'll place into evidence at that time.

THE COURT:  Any objection, Counsel?

ATTORNEY FREMGEN:  No, Judge.

THE COURT:  All right.  Go ahead.

(Wherein attempt is made to play phone message.)

ATTORNEY KRATZ:  We should try this maybe one more time.  Apologize.  Do it the old fashioned way, Judge.  See how this works.  Let's try it again.

THE COURT:  Counsel, do you have other questions to ask of Mr. Kuchar -- Kucharski? Maybe you'll want to --

ATTORNEY KRATZ:  Thank you, Judge.  We will --

THE COURT:  -- give another shot at this later on.

100

ATTORNEY KRATZ: We will come back to this a little bit later.

Q (By Attorney Kratz) Investigator Kucharski -- or, excuse me -- Deputy Kucharski, after the, um, phone call was, um, recovered from you, uh, what were your other search efforts that day?

A After we finished with the, uh, Janda house, we were also assigned to, uh, search, um, the shop buildings, um, and then, ultimately, assigned to search the, um, pickup truck that was parked outside of Steven Avery's garage.

Q Deputy Kucharski, did you have occasion to, um, recover any firearms that day?

A Yes. We were also sent to the, uh, Steven Avery trailer to specifically pick up, um, firearms that were in the trailer, a, uh, vacuum cleaner that was in the trailer, and bedding from a spare bedroom that was in the trailer.

Q And could you tell the jury, please, uh, what firearm, if any -- or firearms, if any, were recovered from Mr. Avery's trailer?

A Inside of, uh, Steven Avery's bedroom, we found, above the bed in a, um, gun rack, two rifles. One was a Connecticut Valley Arms Hawkin-type .50 caliber muzzleloader. Um, the other was a .22 caliber

101

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 101 of 272    Document 19-16

Glenfield Model 60 semi-automatic rifle.

Q I'm showing you a, uh, photo that has already been received, uh, into evidence in this case as Exhibit No. 86. Do you recognize that photograph?

A Yes. It's a photo of the rifle. The .22 caliber semi-automatic rifle.

Q We're going to actually have marked, uh, Deputy Kucharski, and show you -- It's Exhibit -- I'm showing you what's been marked as Exhibit No. 129. Tell the jury what that is, please?

A This is the rifle that, uh, I collected out of Steven Avery's bedroom. The .22 caliber semi-automatic rifle.

Q Now, are you familiar with a firearm -- Specifically, do you have some working familiarity with this particular firearm?

A I am the armor for the, uh, county, so I have been to several schools, uh, trained in maintenance and identification of weapons. Yes, I know how this rifle works.

Q All right. When you describe a rifle as a semi-automatic rifle, and, specifically, Exhibit No. 129, can you tell us what that means, please?

A A semi-automatic is referring to the action of the

102

rifle. This rifle is -- has a tubular magazine. Below the magazine with the, uh -- the -- the ammunition for it. After it's loaded, every time you pull the trigger, one round will be fired. The next round will be automatically cycled into the chamber, and then with every successing pull of the trigger you get one round.

Q I don't know if you know this answer, uh, Deputy Kucharski, but does this particular weapon, this .22 caliber semi-automatic rifle, uh, contain several, um, bullets within its, what's called, magazine?

A Inside the magazine to this particular model, depending on when it was made, is somewhere between 14 and 17 rounds you can put in the tubular magazine.

Q All right. So before stopping to reload, an individual could shoot, uh, 14 to 17 rounds of ammunition through it? Is that what your testimony is?

A Yes.

Q Where was that, uh, rifle seized from, specifically?

A This was in Steven Avery's bedroom inside the trailer on the wall in a gun rack above his bed.

ATTORNEY KRATZ: Could you --

103

Investigator Wiegert, thank you.

Q   (By Attorney Kratz)   Deputy Kucharski, upon a, um, search of Mr. Avery's residence, do you have occasion to, uh, seize or remove any cleaning, uh, equipment?

A   On the 6th, we were specifically sent in to, um, take a vacuum, and, then, on the 8th, when we went back to do a thorough search of the residence, we, um, collected as evidence a Bissell carpet cleaner.

Q   I'm going to show you a photograph, Exhibit No. 124.   It's on the large screen.   Can you tell us what that is, please?

A   That is the Bissell carpet cleaner that we, um, took into evidence on the 8th.

Q   Do you remember where that was received from?

A   I think it was in the hallway, um, living room portion.

Q   Investigator Wiegert is actually going to show you that item.

ATTORNEY KRATZ:   Roberta, what number is that?

THE CLERK:   Exhibit 130.

Q   (By Attorney Kratz)   I'm showing you what's been marked as Exhibit No. 130.   Tell the jury what that is, please?

104

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 104 of 272   Document 19-16

A     That is the Bissell carpet cleaner that, uh, we took from the residence on the 8th.

Q     All right.  Thank you.  If I can just go back. Uh, I believe it was on the 6th you talked about, a -- maybe it was the 7th -- a searching an office area or another building within the, uh, Avery compound; is that right?

A     On the 6th and the 7th, um -- On the 6th was more -- more of a general search of the office buildings, on the, uh, property there.  On the 7th, I also went into some of the buildings to specifically take some items.

Q     I'm going to show you Exhibit No. 122.  It's a photograph.  Can you tell us what we're looking at, please?

A     This is a photograph of -- on the inside of one of the office buildings.  That's kind of like a, uh -- a customer counter, I believe.  And that's, uh, with a endangered/missing poster for Teresa Halbach.

Q     Directing your attention, now, to the 8th of November, were you asked to perform a more thorough search of the residence of Steven Avery?

A     On the 8th, um, myself, Lieutenant Lenk, and Sergeant Colborn were sent back to the Steven Avery residence to, uh, specifically take several items, and then

105

complete a thorough search of the residence.

Q On the 8th, uh, did you have occasion to find any ammunition? Specifically, any .22 caliber long rifle ammunition from the bedroom of Steven Avery?

A Yes, we did. We located and collected .22 caliber long rifle ammunition from the bedroom.

Q An evidence photograph of that was taken. I'm going to direct your attention to Exhibit 125. Could you tell us what that is, please?

A That is a photo of the .22 caliber ammunition that was taken from the bedroom.

Q Also, on the 8th, did you have occasion to find and recover, uh, a key?

A Yes. On the 8th we recovered a Toyota key in the bedroom of Steven Avery.

Q I show you what's been marked as Exhibit No. 127. Excuse me, 126. Could you tell us what Exhibit No. 126 is, please?

A It's a photograph that I took of the key as it was found in the bedroom.

Q Who collected this key?

A I did.

Q And how was it collected, please?

A I collected the key by taking new gloves out of a

106

package that I brought into the residence to do the searching with. Put the key into a new paper bag, sealed the paper bag, and it was in my possession until it left with Special Agent Joy to the Crime Lab.

Q A photograph of that key was, uh, later taken by, um, evidence technicians at the Sheriff's Department. I'm showing you Exhibit No. 127. Can you tell us what that is, please?

A That's another photograph of the key that we located and took into evidence out of Steven's Avery's, uh, bedroom.

Q Just so the jury's clear, this is what's commonly referred to as a -- an evidence photo? That is, after it's been collected; is that right?

A That's correct.

Q And the last thing we're going to show you, Exhibit No. 131, and tell the jury what that is, please?

A That is the key that we found in the -- Steven Avery's bedroom.

Q Now, on the end of the key is a blue, um, what's called a key fob. Something that would be attached or go into a -- a lanyard. Is that your understanding?

107

A    Yes.  A female end of the key fob is attached to the key.

Q    As depicted, that is, the key it, itself, with the fob, um, and the key chain, is that how it was recovered?  And does it look the same or similar, uh, as Mr. Wiegert is holding it, as it did when you recovered it on the 8th of November from Mr. Avery's bedroom?

A    Yes, it looks the same.

ATTORNEY KRATZ:  With, uh, my reservation, Judge, for, uh, replaying that exhibit, once a -- and probably after lunch when the, uh, technical, uh, problems are resolved -- and moving the admission of Exhibits 116 through 131, I have no further questions of this witness. Thank you.

THE COURT:  Any objections to the exhibits, Counsel?

ATTORNEY FREMGEN:  One thirty-one?

THE COURT:  Yes.

ATTORNEY KRATZ:  One thirty-one.

ATTORNEY FREMGEN:  One thirty-one was --

ATTORNEY KRATZ:  The key, itself.

THE COURT:  The actual key.

ATTORNEY FREMGEN:  No.  That's fine.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 108 of 272    Document 19-16

That's fine, Judge.

THE COURT:  All right.  They're received. You may cross.

### CROSS-EXAMINATION

BY ATTORNEY EDELSTEIN:

Q    Deputy, good morning.

A    Good morning.

Q    I'm sorry.  Is that better?

A    Yes.

Q    Okay.  All right.  So you -- you work for Cal County?  You've been over there four years; right?

A    Yes.

Q    And where were you, specifically, before that?

A    Oconto Police Department.

Q    Okay.  Do you have a, uh, four-year degree in Police Science?

A    I have a two-year degree in Police Science.

Q    From?

A    Um, Green Bay.  From, uh, uh, Northeast Wisconsin Technical College.

Q    Okay.  Other than the training you described, uh, the two-week training at Fox Valley, do you have any other formal training, uh, through educational entities for purposes of, uh, being

109

qualified on evidence collection?

A No.

Q Now, I noticed in response to Mr. Kratz, when you were questioned about firearms collected, you were very quick to state that you took that .22 out of Steven Avery's trailer; correct?

A I took the .22 out of the trailer, yes.

Q Okay. I think the question he asked you, though, with your involvement, um, was a little broader than that. And the truth of the matter is you picked up a lot of firearms from the Avery property; didn't you?

A Two firearms out of the Steven Avery trailer, and many other firearms off the property.

Q Okay. So the two from the trailer certainly weren't the only firearms that were picked up?

A That's correct.

Q As a matter of fact, there was at least one other .22; right?

A Yes.

Q Any particular reason you can think of, when Mr. Kratz asked you about firearms you picked up, you didn't mention the others?

A We were speaking about the Steven Avery trailer. I don't think we went into the searches, uh, on the

110

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 110 of 272    Document 19-16

other pieces of property and weapons.

Q    Deputy, I may have misunderstood Mr. Kratz's question, but I understood him to ask you about any firearms.  But now that you've cleared that up, you acknowledge that there -- there were other firearms and there was at least one other .22?

A    Yes.

Q    Okay.  The .22 Glenfield, you indicated that it holds between 14 and 17 rounds; correct?

A    I believe so, yes.

Q    Well, upon what do you believe that?

A    Um, records, um, from the Marlin Company.  They changed the, uh, configuration of the magazine at a certain period during the manufacture.  Um, the only real way to tell exactly how many it holds is to actually load it.  I don't know if it's been modified or anything like that.

Q    You didn't -- Well, you -- you looked at it I assume?

A    Yes.

Q    You're fairly adept with firearms?

A    I didn't examine it.  I didn't take it apart at all.

Q    Well, certainly by way of appearance, there wasn't anything obvious that would indicate that

111

Q    the magazine had been modified, was there?

A    Nothing overly, no.

Q    So your 14 to 17, this a guesstimate?

A    Yes.

Q    You never actually checked it?

A    No.

Q    Okay.  In order to load that particular firearm, the individual cartridges, the shells, themselves, have to be individually handled; correct?

A    Yes.

Q    Okay.  And, basically, they slide down the tube and then it's fed via a spring?

A    Well, there is a -- there is a speed loading device that they have on the market you can put into another device, and then that fits into the tube, and then they all drop in there, so I guess, individually, it depends if you had that extra device or not.

Q    Well, not to quibble with you, Deputy, but in order to load the speed loader, you're going to still have to handle each one of them separately, aren't you?

A    To put them into the speed loader, yes.

Q    So whether you load the thing directly, without the benefit of a speed loader, or you utilize a

112

speed loader, someone is going to have to handle each and every shell that ultimately ends up in the tubular magazine of the rifle?

A    Yes.

Q    All right.  Now, you recovered, I believe you said, uh, 11 shell casings from the garage?

A    Yes.

Q    In various states of condition?  Is that a fair statement?

A    Yes.

Q    Okay.  Did you personally pick each and every one of them up?

A    No, I did not.

Q    So you can't tell us how they were handled prior to you getting your hands on them, so to speak?

A    Everyone was wearing gloves as we were searching. Um, that's about the only thing that I could tell you about how they were handled.

Q    But you didn't sit there and observe each and every casing being picked up?

A    Correct.

Q    All right.  So you don't know if they were picked up using any type of device, or they were picked up using, um, uh, hands or gloved hands, or anything like that?

113

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 113 of 272    Document 19-16

A    That's correct.

Q    Prior to the shell casings being removed from the garage -- I assume you were in the garage, and, essentially, everybody said, well, gee, I found one, they bring them over to you.  Is that what happened?

A    I found one, we'd, um, attempt to photograph it if it was out in the open.  Circle it.  Put a tent there.  Um, after, um, the point reached there where we didn't find any more, okay, collect them all up.

Q    At some point did you remove each and every item from the garage?

A    No, I did not.

Q    Did you or anyone else document the precise location within the garage of each of the shell casings you did leave the garage with?

A    Only the photographs.

Q    Okay.  So there were no measurements, for example, that a shell casing was "X" distance from the rear wall, or so many feet from another wall?

A    That's correct.

Q    Deputy, you testified about, uh, finding what's depicted in the photograph on display -- and for the record it's the -- described as the CCI, uh,

114

.22s; correct?

A    Yes.

Q    When you -- Are you the individual who located that?

A    Um, that was located in -- in Steven Avery's bedroom. Um, Sergeant Colborn was searching that area of the, uh, bedroom. That would be the desk area.

Q    So I guess the answer to my question is, no, you were not the one who actually located it?

A    Correct.

Q    You took the picture?

A    No.

Q    Did you become, uh, the custodian of that box?

A    Yes.

Q    And that was on which day?

A    The 8th.

Q    Of November?

A    Yes.

Q    When it was -- Who -- Who gave it to you? Who gave you the box?

A    I don't know.

Q    When it was given to you, was the top open or closed?

A    I don't remember -- If it was given to me, if it was pointed out to me and I picked it up, I don't

115

remember if the box was open or closed.

Q Did you ever -- The -- the top of that will slide in order to open; correct?

A Yes.

Q Did you at anytime open it or close it to your memory?

A No.

Q When you received it, how did -- if at all -- did you package it?

A We took the ammunition out of that, um, bedroom and placed it all into one bag. A grocery bag.

Q Okay. Are you telling us that you removed each and every cartridge from that particular container and put it in a grocery sack?

A No.

Q You left the thing in one piece with them in place; correct?

A Yes.

Q And then put it in the sack?

A Yes.

Q All right. So you didn't handle, or to your knowledge nobody else handled, the individual shells?

A Correct.

Q What about the outside? How was the outside of

116

Q that preserved for purposes of, um, testing or trying to lift any fingerprints off that?

A It wasn't preserved for fingerprint evidence.

Q You're a trained evidence technician, are you not?

A Yes.

Q You've already seized a firearm, including a .22, from that residence; correct?

A Yes.

Q Don't you think it would be important to try to determine who, if anybody, has handled that particular box?

A Not at the time.

Q Didn't Agent Fassbender specifically tell you, go back into Steven Avery's trailer and get that .22?

A Among other things, yes.

Q Well, now, as an officer, particularly one who's trained in evidence collection, can you explain to me why you did not think it was critical, in light of the fact that Fassbender instructed you, specifically, to go get that .22 rifle, and you've come across a box of .22s, not to preserve it in such a fashion as would allow for fingerprint processing?

117

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 117 of 272    Document 19-16

A    Out of all the items that, uh, myself and my team collected, probably into the hundreds of items, I only remember one item that we preserved for fingerprint evidence.

Q    That doesn't really answer my question.  I didn't ask you how many items you picked up.  I just want to know why you didn't think it was important, particularly in light of the fact that the lead investigator, Fassbender, tells you to go get the .22 rifle, and you come across .22 shells in a plastic case, that you didn't think it was important to preserve it in a fashion which would allow the processing for fingerprints?

A    I don't have an answer.

Q    Did you not think that was important to be preserved in such a fashion as to allow the lifting of prints?

        ATTORNEY KRATZ:  Objection.  Both argumentative and irrelevant.  If Mr. Edelstein is saying somebody other than Steven Avery handled this, it becomes relevant.  Otherwise, it's not relevant, Judge.

        THE COURT:  I agree.  Move on, Mr. Edelstein.  And, for the record, we're talking

118

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 118 of 272    Document 19-16

here, I believe, about Exhibit 125.

Q   (By Attorney Edelstein)  You didn't examine --
Did you examine any of the individual cartridges
in there to determine what type of bullet was
contained in the box?

A   No.

Q   Did you, or any member of your search team, while
you were in the garage, or anytime after you
collected the 11 shell casings, um, perform any
swabbing on there so as to allow for the
processing of DNA evidence?

A   On the shell casings?

Q   Correct.

A   No.

Q   Do you know if that was ever done by anybody
involved in the investigation?

A   I don't know.

Q   Did you, or any member of your search team
assigned to perform the search in the garage,
following the receipt of the shell casings, do
anything in an attempt to, um, preserve them in
such a fashion as would allow the lifting of
fingerprints?

A   No.

Q   Now, you were there first in the garage on the

119

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 119 of 272    Document 19-16

Q      6th; is that right?

A      That's correct.

Q      You didn't find any bullets in any cracks on that
       day?

A      No, I did not.

Q      You didn't find any on the 8th; correct?

A      That's correct.

Q      What about underneath the compressor?  Did you
       find any bullets or bullet fragments on the 6th
       or the 8th?

A      No, I did not.

Q      You first testified that when you went in, when
       you -- You characterize it as a general search
       and that you weren't looking for anything
       specific?

A      Yes.

Q      What are you searching for un -- under what you
       describe as a general search?

A      Anything that stood out.  Um, any type of evidence
       that stood out.

Q      Prior to going in there on the 6th, were you
       advised by Fassbender or anyone else to look for
       any spec -- particular items?

A      Not that I recall, no.

Q      Before you went in there with the search team,

120

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 120 of 272    Document 19-16

Q uh, were you briefed by the agent in charge at the command center?

A No. I was getting most of my orders from, uh, Lieutenant Bowe or Lieutenant Sippel, and they were getting it from the, uh, investigators in charge or someone else.

Q So before you went in on the 6th, did you even go down there? To the command center?

A Yes. I would check in at the command center, um, before each assignment to get the -- or after each assignment and at the beginning of each day to get the next assignment.

Q Now, the bedding that you picked up that you testified about on direct, that was from Steve Avery's trailer; correct?

A Yes.

Q Specifically, what did the bedding consist of? Let -- Let me do it this way. Was there a pillowcase?

A I don't remember.

Q Was there a, um, quilt or any sort of blanket you took?

A I took several sets of bedding off of the property and I don't remember exactly what was in each set.

Q Do you recall, specifically, what you took off of

121

the bed at the time you were there?

A    No.  That's what I'm referring to.

Q    Well, did all the bedding that you took come off of the bed?  Or did it come from -- for example, from a closet or some sort of storage container?

A    All of the bedding that I took came off of a bed.

Q    Are you aware of any other bedding that was removed that you did not take or that somebody else took?

A    I'm not aware of.

Q    As to any of the bedding that you may have taken -- Well, first of all, let's establish the date.  What date did you do that?

A    I took bedding on the 6th of November.  I took bedding on the 8th of November.

Q    From the same bed?

A    No.

Q    How many beds were in the trailer?

A    Two.

Q    On the 6th, which bed did you take it from?

A    On the 6th, I took the bedding from the spare bedroom in Steven Avery's trailer.

Q    I take it, then, on the 8th, you took it from the bed in the -- what's been described as Steve's bedroom?

122

A    Yes.

Q    And you don't have a specific recollection of the individual items on either date?

A    Correct.

Q    Just generally described as bedding?

A    Correct.

Q    On the 8th, you took the Bissell carpet cleaner?

A    Yes.

Q    On the 6th, you took the vacuum cleaner?

A    Yes.

Q    Did you take the vacuum, itself, or did you just take the bag?

A    The vacuum, itself.

Q    And you understood that to be important because of the potential for obtaining evidentiary clues? For example, hair?

A    No.  At that time I was instructed to pick it up.

Q    Did you have an -- Again, you're try -- During the course of your training as an evidence tech, in addition to the techniques that you're taught about preserving the integrity of the object, I assume you learn a little something about why the object might have some relevancy in a criminal investigation?  Is that a fair statement?

A    Yes.

123

Q   And you're not going to argue with me if I say taking the vacuum cleaner would be important, because sometimes fiber evidence is contained in those bags?  You know that, don't you?

A   Why it was taken you'd have to ask the person that instructed me to take it.

Q   So you have no opinion as to why it would be important to take it?

A   My opinion would be, yes, probably for some type of, uh, um, trace evidence.

Q   Okay.  Did you -- Were you instructed to remove any carpeting from Steve Avery's trailer?

A   No, I wasn't.

Q   Did you remove any?

A   No, I wasn't -- didn't.

Q   Did you remove any carpet from any of the -- the other locations you visited during the course of your participation in the investigation?

A   Not that I remember.

Q   Well, that's something you would remember, isn't that?  If you cut out a piece of carpet and turned it over to somebody for evidentiary purposes, isn't it?

A   I didn't cut out any carpet.

Q   Well, you -- you just said you didn't remember.

124

But now you remember that you didn't; right?

A   I remember I didn't cut out any carpet.  Um, if I picked up carpet, um, slim possibility, but I -- I don't remember it.

Q   As to the items you did collect, did you regularly turn them over to the same individual from the lab?

A   I never turned over any items to any lab personnel.

Q   Did you turn over the items you did collect to the same individual?

A   Yes.

Q   And who was that?

A   Deputy Hawkins.

Q   So everything you picked up, from bedding, the shell casings, carpet stuff, the cleaner stuff, the bullets, all of that went over to Hawkins?

A   Yes.

Q   All right.  That's all.  Thank you.

THE COURT:  Any redirect, Counsel?

ATTORNEY KRATZ:  Just, uh, one question.

**REDIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q   Mr. Edelstein asked you what you knew, and who told you, or why you might have, uh, searched the garage.  On the 6th, the day that you did search

125

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 125 of 272    Document 19-16

the garage, the 6th of November, were you told that anybody had yet made any statements about Teresa Halbach being shot in that garage?

ATTORNEY EDELSTEIN: And I object. And call for a hearsay answer.

THE COURT: I think it's a fair question. Overruled.

THE WITNESS: No, I did not.

Q (By Attorney Kratz) If you would have been told that Brendan Dassey, or Steven Avery, or somebody else would have made a statement that Teresa Halbach would have been shot in that garage, would you have done a different kind of search on the 6th?

A Absolutely. Uh, when information like that comes in, that helps to direct your search.

ATTORNEY KRATZ: With the indulgence of the Court, Judge, I'm going to try this again. If it doesn't work, we'll have to wait until after lunch. I think Mr. Fremgen's helped me, Judge.

ATTORNEY FREMGEN: Can you say that for the record?

(Wherein phone message is played.)

"Hello. This is Teresa with *AutoTrader*

126

*Magazine.* I'm the photographer, and just giving you a call to let you know that I could come out there today, um, in the afternoon. It would -- will probably be around two o'clock or even a little later. But, um, if you could please give me a call back and let me know if that will work for you, because I don't have your address or anything, so I can't stop by without getting the -- a call back from you. And my cell phone is 737-4731. Again, it's Teresa, 920-737-4731. Thank you."

ATTORNEY KRATZ: Once again, Judge, we will have that marked as an exhibit. Uh, I will offer that, uh, to the Court.

Q (By Attorney Kratz) My last question, is that, in fact, uh, Deputy Kucharski, the message that you heard from the Janda residence when you searched it on the 6th of November?

A Yes, it is.

ATTORNEY KRATZ: That's all I've got, Judge. Thank you.

THE COURT: All right. Any cross related to that?

ATTORNEY EDELSTEIN: Uh, just very briefly, Your Honor. Uh, this is not,

127

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 127 of 272    Document 19-16

necessarily, as to this last item that Mr. Kratz just dealt with, but, uh, in response to his other question.

**RECROSS-EXAMINATION**

BY ATTORNEY EDELSTEIN:

Q    Officer, if you did not know that Brendan Dassidly -- Dassey had allegedly given information that Ms. Halbach had been shot in that garage, can you explain to me why you took the .22 shells from the trailer, as well as the .22 rifle?

A    The .22 rifle was taken from the trailer on instructions from supervisor.  The ammunition was taken from the trailer on a different date from instructions by a supervisor.

ATTORNEY EDELSTEIN:  That's all.

ATTORNEY KRATZ:  One other question.

**RE-REDIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q    Steven Avery was a convicted felon at the time and couldn't possess a weapon.  That's true; isn't it?

A    Yes, it is.

Q    And it's another reason to take the gun -- to take the weapon that --

128

ATTORNEY EDELSTEIN: Your Honor, I object. It's leading. Suggestive.

THE COURT: It's leading. Suggestive.

ATTORNEY EDELSTEIN: It's irrelevant.

THE COURT: It's -- it's --

ATTORNEY KRATZ: It's not irrelevant at all, Judge.

THE COURT: I -- Counsel?

ATTORNEY KRATZ: He said it was irrelevant, Judge. It was cer -- certainly not.

THE COURT: I -- It was leading and suggestive. It was not irrelevant.

ATTORNEY KRATZ: That's all I have. Thank you, Judge.

THE COURT: All right. You may step down. We will adjourn for the lunch hour. Um, Mr. Kratz, you have more witnesses today? What time do you expect your first witness to be here for this afternoon?

ATTORNEY KRATZ: We can certainly begin, uh, anytime after 1:00 if the Court wants to.

THE COURT: How about 1:00?

ATTORNEY KRATZ: That sounds perfect.

THE COURT: All right. We'll be back, then, at 1:00. Again, I remind you, ladies and

129

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 129 of 272   Document 19-16

gentlemen, not to speak about this case or anything connected with it.

(Recess had at 11:54 a.m.)

(Reconvened at 1:01 p.m.)

THE COURT:  Good afternoon.  I think we're ready to proceed.  Mr. Kratz.

ATTORNEY FALLON:  Good afternoon.  Um, I'll be handling this afternoon's witnesses. State will commence, uh, testimony this afternoon with, uh, Dr. John Ertl.

THE COURT:  All right.

THE CLERK:  Please raise your right hand.

**JOHN ERTL,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  My name is John Ertl, J-o-h-n  E-r-t-l.

**DIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q    How are you employed, sir?

A    I work for the State Crime Laboratory in Madison.

Q    And how long have you worked for the State Crime Laboratory in Madison?

130

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 130 of 272    Document 19-16

A   Since January of 2000.

Q   What do you do for them?

A   I am chiefly a DNA analyst in the DNA Analysis Unit. I'm also involved with the Crime Scene Response Team.

Q   What does the Crime, uh, Lab Response Team do?

A   Uh, we offer assistance to, uh, law enforcement agencies in the processing and collecting of evidence at crime scenes. And, typically, it would -- it will involve a homicide.

Q   Typically, what does a team consist of? This response team?

A   Um, well, it can -- it can be as little as answering a phone call and answering some questions that you might have. Um, if -- if we actually respond to the scene, we typically take two people. One person to take notes and interact with the agency, the other one is chiefly a photographer.

Q   And do the, uh -- is this, uh, response team also known as a Field Response Unit?

A   Uh, that's what it says on the side of the van that we drive around, yes.

Q   All right. And, uh, typically, do some of these response teams, uh -- do they include more than two people on occasion?

A   Uh, yes. Typically -- typically, the minimum would

131

be two.  Uh, three is more usual.  Um, for very
involved cases, sometimes will take as many as four.

Q   Now, you indicated your role, typically, when
you're not doing field response, is that as an
analyst?

A   Right.  In the DNA Unit.

Q   And, uh, when these field response teams are put
together, are there other, um, disciplines
reflected in the makeup of the team?

A   Uh, yes.  The -- the team isn't so much made up of
people from specific units for specific tasks at the
scene.  Rather, it's a volunteer unit that people
from the entire lab feel that they can contribute to
it, and -- and then we go on the rotational basis
for -- to be on call.  And I just happened to be on
call when this call came in.

Q   How long have you been a member of the Field
Response Unit?

A   Since 2002.

Q   Approximately how many crime scenes have you had
an opportunity to respond to as a member of the
Field Response Unit?

A   I would -- It's a guess.  I would guess, um, maybe 20
to 30.

Q   Well, before we get into the particular, uh,

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 132 of 272    Document 19-16

details of your response in this case, let's find out a little bit about yourself, Doctor. Would you, first of all, tell us about your educational background?

A First of all, I'm -- I'm a mister. I'm not a doctor. I have a Master's Degree in molecular biology, uh, University of Wisconsin-Parkside. That's where my Bachelor's Degree in chemistry was from as well.

Q Uh, and when did you receive that again?

A Um, Bachelor's Degree was in 1984 and Master's Degree in 1992.

Q And from which institution did you receive your Master's Degree?

A The University of Wisconsin at Parkside.

Q And when did you receive that particular degree?

A In 1992.

Q After receiving that degree, what pursuit did you, um, follow in terms of your education or job training?

A I -- I obtained that degree while I was working at the University as a research specialist in a plant in molecular biology laboratory. Um, after I left the University, I went and worked for Abbott Laboratories in Waukegan, Illinois for awhile, where I worked on diagnostic acetates using DNA techniques. Uh, from

133

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 133 of 272    Document 19-16

Q   there, I moved to the State Crime Laboratory in Milwaukee where I was trained as a serologist and a DNA analyst.

Q   From -- from what time period did you work in Milwaukee?

A   From 1997, in March, until about November of 1998.

Q   And what occurred in November of '98?  Where did you move next?

A   I moved down to Austin, Texas, and I worked for a short time at the M. D. Anderson Cancer Research Center In Smithville.  And then I moved to the State Crime Laboratory.  It's called the Department of Public Safety Crime Laboratory in Austin, Texas.

Q   And how long did you work for the Texas State Crime Lab?

A   Until December of 1999.  And then I moved back to Madison to work at the laboratory in Madison.

Q   Very well.  What are, um -- Again, returning to your job experiences as a -- particularly as a member of the Field Response Unit, what types of cases does the Field Response Unit usually get called in on?

A   Usually, it's a homicide.  Um, missing persons are also something we get involved in.  Um, we get calls anytime the agency has any question about anything.

134

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 134 of 272     Document 19-16

How should they collect a certain item of evidence. We do -- usually don't respond unless it's -- it's bigger than that. Usually -- usually, we respond to the smaller agencies. The County Sheriff's Departments. Um, generally, we don't respond to the larger cities because they have their own crime scene response people.

Q All right. Let's direct your attention, then, uh, to this particular case, Mr. Ertl. On Saturday, November 5, 2005, were you called to assist in the investigation of the missing person, Teresa Halbach?

A Yes, I was.

Q Tell us how you became involved?

A Well, it was around noon on Saturday, and I received a call from the -- it's called the Time Control System. They're the people who take the laboratory phone calls while we're not actually at the laboratory. And he directed me to call, um, Manitowoc County and to ask for a Detective Dave Remiker. And so I did that.

And he indicated that they were, um, working on a missing persons case out of Calumet County, and the vehicle from the missing person had been located in a salvage yard in Manitowoc

135

County. And it looked as if it had been concealed in some way. There were things around it and they were -- were looking for assistance in recovering the vehicle.

Q All right. What did you do?

A I talked with him about it. Um, he indicated that the weather was threatening, and for a vehicle, if -- if it's out in the weather, that could jeopardize any, uh, fingerprint evidence, could jeopardize any biological evidence that may be on the outside of the vehicle. I suggested that they get it covered if they could.

And I contacted, um, my director, told him about it, and he indicated to me that I should go up and help out with that.

Q Did you, in fact, then, eventually leave Madison to help out?

A Yes.

Q Approximately what time did you leave Madison?

A It was about 1:15 p.m. that same day.

Q Who, if anyone, accompanied you on this response?

A Yes, um, Mr. Guang Zhang, Z-h-a-n-g.

Q All right.

A He was the photographer and I was the team leader.

Q Anyone else accompanied you for this initial

136

Q  response?

A  No, just the two of us.

Q  What time did you arrive, um, at the salvage yard?

A  Bel -- I believe it was around 4 p.m.

Q  What happened when you arrived?  What did you do first?

A  Well, there were several road blocks that we had to pass through.  And we finally got to a checkpoint where our names were taken, and then we were directed up to a place where there was some firetrucks, and some canopies laid out, or coming off the firetrucks, and told to look there for the people who were in charge.  And we found, um, Tom Fassbender and Mark Wiegert.  And they seemed to be the ones to talk to, and they filled us in on what they knew so far, and, um, we were directed down to where the vehicle was.

Q  All right.  Let's start there, then, uh, your first assignment, if you will.  When you arrived at the location where the vehicle was found, first of all, describe for us the general area where the SUV was located?

A  Well, it was -- it was a auto salvage yard, so there were row after row after row of salvaged vehicles or junked vehicles.  Um, they directed us down to a flat

137

area where we drove the van to park and there was a car crusher nearby. There was also a -- a water -- storm water retaining pond nearby, and there was a -- a little -- sort of a dirt roadway that went around the pond, and the roadway was lined with vehicles, and in the row of vehicles there was the, uh, bluish/green RAV 4.

Q All right. Describe -- Describe the vehicle in greater detail for us, would you please?

A Well, it was -- it was a newer looking vehicle. It didn't have any license plates on it. And it was, as was conveyed to me, that it -- it kind of looked like it had been hidden in some way. There was a -- a Rambler hood leaning up against the back end of it.

Q Uh, and I'm going to stop you right there and direct your attention to Exhibit 26, which appears to be leaning up against the table. Does that look like the hood?

A Yes, it does.

Q All right. Continue.

A Uh, there were tree branches and/or small trees piled on and against it, and there was a cardboard box on the hood. There was a piece of plywood up against one of the front tires, and some fence posts with fencing attached to them, some wire fencing, um,

138

leaned up against the vehicle as well.

Uh, the other vehicles in the area looked older than this one. This one looked like the newest of the bunch, and they didn't have things leaned up against them. They had trees and brush growing around them, but there was nothing put around them.

Q Was there anything unusual about the trees or the brush that you observed leaning against the SUV?

A Well, this was in November, so there weren't -- weren't any leaves or anything on it. But these trees and brush didn't have any bark on them either. And, um, some of the trees had bits of the roots still coming out of the base of them as if they'd been pulled from the ground, rather than sawed off.

Q All right. Was the roof of the, uh, vehicle covered or obstructed with any items that you recall?

A Uh, not that I recall. No.

Q All right. Now, you described something about the weather. Initially, upon your observation of the -- of the vehicle, describe the weather conditions at that point in time?

A It was overcast.

Q When you first approached, was it still daylight?

139

Dusk?  Or dark?

A    It was -- It was going on 4:30 in November, and it
wasn't quite dusk.  I would think.

Q    All right.  Now, at some point did the weather
change that evening?

A    Um, yes.  We didn't -- We left that evening around
quarter to ten, and at some point it did pour, and
there was quite a lightening storm.

Q    All right.  When you arrived, was the vehicle
covered in a tarp at that particular point?

A    I never saw the vehicle covered in a tarp.

Q    Okay.  Approximately how long were you there
before the weather changed to the extent that it
began to rain?

A    I believe within an hour of us arriving, it was sort
of on and off showers.

Q    All right.  What plans did you make to secure the
vehicle for its ultimate transport?

A    Well, I asked that a trailer be secured to put the
vehicle in for transport back to the Madison
Laboratory.

Q    Now, did that occur immediately or did that
involve the passage of some time before it could
be arranged to transport the vehicle?

A    It -- It did take some time.  Um, they also needed

140

to -- to bring a wrecker truck into the yard to -- to move the vehicle from its, uh, position to a place where they could load it onto the trailer.

And I believe those two things, the wrecker and the trailer, arrived pretty much simultaneously. Maybe an hour-and-a-half, two hours. I'm not sure.

Q Your best estimate as to the time that the SUV was loaded onto the, uh -- the -- the wrecker and moved from the scene, about what time was that?

A I would guess 7:30 to 8:00.

Q All right. Could it have been later?

A Possibly.

Q All right. Could it have been as late as 8:30 or 9:00?

A Well, I checked the time when we left. I think it was about quarter 'til ten, so that -- that is a possibility, yes.

Q All right. Now, while you were awaiting for the arrival of the equipment to secure the vehicle and move it to Madison, did you have an opportunity to examine, as it were, the SUV more closely?

A Yes, I did.

Q Can you tell us, um, a -- about the vehicle,

141

itself? For instance, um, you mentioned something about the absence of license plates. What else did you note about the vehicle?

A Um, it -- The doors were locked. We couldn't gain access to it. And we looked through the glass with flashlights to see what we could see inside and it looked relatively clean inside.

Um, there was some minor damage to the vehicle. I believe there was a dent located behind the Rambler hood on the right rear quarter panel. And I believe the left front signal lamp, the plastic that covers that, was cracked and broken.

Q How were you able to determine that the doors of the vehicle were locked?

A We tried to get in -- inside the vehicle. So we tried the doors.

Q While you were waiting for the, uh, wrecker and other equipment, did you also have an opportunity to examine the debris that surrounded the car for the possibility of any trace or biological evidence?

A Yes, I did.

Q Tell us about that, please?

A Well, the first thing I did, was I directed the

142

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 142 of 272    Document 19-16

photographer to -- to photograph the vehicle as it was when we arrived. Um, I then looked at the debris and those items which I felt may hold a fingerprint, that did have a certain texture to them. Um, the Rambler hood and the cardboard box were pulled away from the vehicle, and we had transported those to the Madison Lab, as well, along with the vehicle.

I examined all the brush and the plywood and fence posts, etc., looking for any signs of biological materials or fibers that may have caught on them, attached themselves to them. Um, and I didn't notice anything that I could collect from that.

Q So, in other words, you found no trace or biological evidence on any of those items?

A No, I did not.

Q Okay. I take it there was a decision made not to process, or further examine might be the better term, the SUV at the scene; is that correct?

A Um, I don't believe it was much of a -- The -- the decision, yes, that was made. But that -- I mean, in -- in threatening weather, the -- the first order is to -- to preserve and protect the evidence and not to begin processing it.

Q All right.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 143 of 272    Document 19-16

A   And out in the middle of a junkyard is not the ideal situation to process a vehicle anyway. You can -- want to get it back to the laboratory where we have the proper tools and lighting and controlled conditions where we can look at it properly.

Q   Describe for us, if you would, um, how the vehicle was actually transported to Madison?

A   A -- a large wrecker truck was needed to get -- get the vehicle out from behind the pond. Uh, it was a four-wheel drive vehicle, and it was -- all the wheels were locked, so they couldn't roll it out. Um, so attempts were made to put it in neutral to see if the parking brake was on or -- or not, and we couldn't get inside.

The tow truck guy attempted to get under the hood to get access to the transmission linkage to disconnect that, and he couldn't get the hood open. Uh, he ended up crawling underneath and unbolting one of the driveshafts. He then lifted the back end of the vehicle, which still had the driveshaft attached, and rolled it out on the front wheels into the clear area where the car crusher was located.

He then used his truck to maneuver the vehicle, the RAV 4 vehicle, into a large covered

144

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 144 of 272    Document 19-16

trailer, and it was secured into that with, I believe, floor straps, and then the trailer was closed up.

And then Guang Zhang, my photographer, rode with the driver back to Madison. They followed me, and I drove the -- my van back.

Q So once the vehicle was loaded on the trailer, was it exposed at all to the elements?

A No, it wasn't.

Q However, prior to getting it onto the vehicle, had it been exposed to the rain?

A Yes, it did.

Q And it had been raining for awhile before you were able to finally secure it and get it onto the, um -- the wrecker and the enclosed trailer?

A Yes, it had.

Q All right. Um, you indicated, uh, your colleague, Mr. Zhang, he rode with the driver, did you say?

A Yes, he did.

Q All right. And what did you do at that time?

A I drove the Field Response Unit back to Madison.

Q Your best estimate as to your approximate arrival time at the Crime Lab in Madison?

A I believe it was just after 1 a.m.

145

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 145 of 272     Document 19-16

Q    So that would have been Sunday morning, the 6th of --

A    November.

Q    -- November.  All right.  Did there come a time where your services were requested again by Agent Fassbender or others, uh, to return to the salvage yard and assist in executing the search warrant that was underway?

A    Yes.

Q    All right.  And, um, in addition to the Saturday work that you've just described, how many other days did you participate in the search of the salvage yard and other duties associated with this case?

A    We returned to the salvage yard on Sunday afternoon.  We worked through Sunday evening.  We stayed over Sunday night.  We worked all day Monday.  Stayed over Monday night.  Worked all day Tuesday.  Stayed over Tuesday night.  And returned back to the lab on Wednesday morning.

Q    I'm going to direct your attention, if I may, to your services on, um, Tuesday, November 8.  What were the duties that you were particularly assigned to do on Tuesday, November 8?

A    Uh, we started in the morning at the Calumet County

146

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 146 of 272    Document 19-16

Sheriff's Department Service Garage in Chilton. Um, four -- Actually, five burn barrels from the salvage yard had been taken there, and we had set up a sifting station. We were sifting through the burned debris of those burn barrels. On Tuesday morning, we finished that up with, I believe, the fourth and fifth barrels.

Q All right. Would it be fair to say you had started that particular task the day before? Monday?

A I believe we started it even before that, although it got interrupted several times.

Q Because of other duties that you were assigned?

A Yes.

Q All right. So you finished up the processing of the burn barrels?

A Yes.

Q All right. If you would, tell us about the processing of the last barrel? Barrel No. 5? Would you describe, um, that for us, please?

A All right. Um, Barrel No. 5, I believe, was, uh, different than the other barrels in that the contents were -- were mostly ash. The other barrels had a lot of partially burned materials, lot of food-type items wrapped in foil. You could recognize corn on the

147

cob, and potatoes, and fish, and chicken, and whatnot.

This one was a little different than that. It was -- had a lot of, uh, coiled wires in it that we had seen, um, kind of reminiscent of a burnt tire. Uh, there was the rim of a tire, or a wheel sitting on top of the ash. But under that, everything else was pretty much ash.

And we sifted that and found things that looked like they were electronic components. Um, some of them had, um, the Mot -- Motorola "M" clearly on them. Um, things that looked like -- sort of like burnt batteries. Things you could identify as a battery. Um, that sort of thing. Whereas, we hadn't found those sorts of things in the other barrels.

Q All right. Approximately how deep was the ash in Barrel No. 5 that you began to sift and process?

A I would guess it -- it was a quarter to a third of the barrel. And these were 55-gallon drums. They stand about three-and-a-half feet tall. So there's probably a foot-and-a-half of ash in it.

Q All right. And tell us how you went about processing that barrel? In other words, how did you go about it? Did you shovel it out? Reach

148

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 148 of 272    Document 19-16

Q in? Sift through with your hands? Tell us about the process?

A Uh, well, we start by just picking through with your hands, and in placing handfuls or -- I think we had small mason's trowels as well. Scoopfuls of the material onto a tripod and screen setup that we have. And you move the material around on the screen. The small particles fall out, and then you can examine the larger pieces of things. And that's how we worked through the barrels.

Q All right. About what time did you finish that task of processing, um, the barrel?

A I believe we finished, um, somewhere in the ten o'clock hour.

Q All right. Now, was there anyone who assisted you in this sifting process?

A Uh, yes. The photographer that I had taken on Sunday, or on Saturday, the initial response, came along with me, and we had a third person as well.

Q And who was your third person?

A It was Chuck Cates.

Q All right. And what does Mr. Cates, um -- What was his role, if any, in the process on the succeeding days? Particularly this day, November 8?

149

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 149 of 272    Document 19-16

A   Um, he -- he was just there to help.

Q   All right.

A   He didn't have any specific role.

Q   Was there anyone from the Calumet County Sheriff's Department present?

A   Um, there was. I -- I believe there were different people on and off, but the -- the main contact person there was, uh, Jeremy Hawkins.

Q   And, uh, to whom did you provide anything that you deemed of evidentiary significance?

A   Uh, we were collecting all the evidence as we went along from the different locations where we were searching.

Q   Right.

A   We packaged it, and we -- then we -- at some point we turned it all over to the Calumet County Sheriff's Department.

Q   All right. With respect to the, uh, burn barrel components, were they turned over to Officer Hawkins?

A   I don't believe so.

Q   All right. Do you recall which one of the officers?

A   No. I don't recall which one. There was two or three of them --

150

Q    All right.

A    -- at one point, inventoried all the materials we had collected at that point, and we turned it over to them.

Q    Okay.  Very good.  After you completed processing, um, the burn barrel, what was the next assignment that you were given on that day?

A    Uh, we returned to the salvage yard, and they had just located the license plates from the RAV 4 vehicle.  And so we went over and photographed that area, photographed the vehicle that they had been found in.  And then we searched that area, and there was a -- a camper -- a trailer camper nearby, and I searched that.

Q    All right.  And, um, after you processed the -- the location where the license plates were found -- By the way, did you examine those plates?  Or did look at them, I should say?

A    I was involved in -- in packaging them, yes.

Q    All right.  Tell us about that?

A    Um, Chuck Cates was assigned to, uh, process the vehicle for fingerprints.  In -- in his former role at the lab, he was a fingerprint analyst.  Um, at this time he was the field response coordinator.  That was his chief duty.  So he was processing the

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 151 of 272    Document 19-16

plates.

Uh, when the plates were found, they were sort of rolled or crumpled up so you couldn't read them. Uh, the person who had found them, was reported, had opened them up enough to be able to read them and know which ones they were. That they had belonged to the RAV 4. Um, he then reportedly placed them back where he had found them as best he could.

Q Right.

A Um, Chuck, then, looked at them for any obvious fingerprints on them.

Q Okay.

A I don't believe he processed them with powder or anything. Just looked at them. We then placed them into a pistol box and secured them with zip tags.

Q All right.

A And then secured the box.

Q And the box was given to whom? Do you recall?

A At that very moment it was placed in our field response van.

Q Very good. What was the next assignment or -- uh, that you, um, participated in?

A Around 3 p.m., uh, we were -- got a request to use our sifting equipment. They had found an area, a --

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 152 of 272    Document 19-16

a burn pit type area, behind the garage next to Steven Avery's trailer. And they had been looking in there and they wanted to use our sifters. We had previously loaned them out for another assignment in the gravel yard, and so they had asked for them again.

And at that moment we didn't have anything else to do, so we went along with them to help sift. And it was a -- maybe a four-by-six foot area on the ground. A small depression behind the garage. And it looked like it had been -- uh, some fire going on there. There looked like a lot of the remains of burnt tires, there was the frame from some sort of car seat, and some ash on the ground.

The ground below the ash looked like it had the consistency of baked clay. Like a ceramic. It was hard. It wasn't like -- like you'd expect the ground to be after thunder storms a few days earlier. So it looked like a burn area. And we sifted that, just as we had been sifting the -- the burn barrel contents.

Q   All right.

A   Put it on the screen.

Q   We'll get into a little more detail in just a

153

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 153 of 272   Document 19-16

Q Officer Wiegert is handing you a photograph. Would you identify that for us, please? First, of all, tell us what the exhibit number is?

A Exhibit 132.

Q Thank you. What is Exhibit 132?

A It's a photograph showing the -- the burn area behind the garage. You can't see the garage in the photo, but you can see the -- the frame from the -- the car seat. There's one tire there, and some tools on the ground, and some flags in the ground.

Q All right. Um, we have it now projected on our screen. Is, uh, what is projected, is that Exhibit 132?

A Um, that one's cropped more than this one is, but, otherwise, yes.

Q All right.

A The center area of this photo was on the screen.

Q How about the larger screen over here to your left?

A Well, this one shows -- You can see it better. There's a red building behind that tank. That

154

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 154 of 272    Document 19-16

Q Very good. Is that the, uh -- How about, uh, a zoomed out? Is that --

A Yes.

Q -- more accurate?

A That looks like the photograph.

Q All right. And who participated in the processing of this, um, burn pit?

A Uh, the three of us assisted, and, uh, the person in charge with that area was Tom Sturdivant, Special Agent, with the Division of Criminal Investigations.

Q All right. And, um, tell us how you proceeded to, um, uh, process that pit?

A Uh, there were also additional officers present who assisted in the sifting process. Uh, I was the one who shoveled the -- the materials from the -- the ground up to the sifting platform, and then there were probably four, five, or six of us standing around the sifter at anytime, um, collecting things and placing them in boxes. We sifted through all the ash and material that was in that area.

Q Now, if you would, um -- If you would, um, describe for us exactly how the shovel was used to, uh, remove debris and other materials from

155

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 155 of 272    Document 19-16

this pit, and, uh -- and brought to the sifter? Tell us about how that was, uh, conducted?

A Okay. On the photograph there, we set the sifter up, it would be just, um, past those red flags, and just past the end of that, uh, um, frame from that car seat. Um, the shovel we used was one that we carried with us for this purpose. Um, the sifter we usually use is for exhuming gravesites. So we'll shovel out the material and sift through it looking for bones or bullets or whatever from a gravesite.

Uh, in this case, we had, uh, very hard ground on top of which was maybe from zero to six inches of ashen material. It's a flat blade shovel, sort of like a garden spade, and that was used to -- sort of like a dustpan to scoop up the ash, and then I stood up, turned around, and took a step, and set it on the screen. And then the -- the people around the screen would pick through it. The smaller material would fall through the screen onto a tarp, and the larger materials they would collect and put in a box.

Q All right. What efforts did you undertake to ensure that you wouldn't damage or create any harm to any of the debris that was being recovered from the pit?

156

A    Well, it was done carefully. I -- I guess that's what I can say. Um, we didn't look real hard at the materials we were collecting. Um, my advice to the people around -- around the, uh, sifter was, if you're not sure, just put it in the box. Uh, someone else will figure that out later what it is. Um, so we didn't spend time picking at the things that we were collecting.

Um, the shovel -- We had a hard surface. It's just pick up the ash with it. I mean, it wasn't like we had to dig and -- and put your foot on it and push down and dig or anything. It wasn't necessary. So it -- it was a pretty gentle process.

Q    Tell us about the sifting part of the process?

A    Um, it's a -- sort of like hardware cloth, and we carry it -- three different grades of it. I think there's a half-inch mesh, a quarter-inch mesh, and an eighth-inch mesh, and we put this material through the quarter-in -- quarter-inch mesh.

So one scoopful at a time is placed onto the mesh, and the mesh is probably, uh, three-foot by three-and-a-half-foot rectangular area, and then the five people would, with their gloved hands, uh, I believe some of them had, uh,

157

a mason's trowel, it's about this big, triangular metal-shaped object with a handle, to move the -- the ash on the screen, spread it out, and then you can sort of tap the screen and it sort of jiggles the material, and the -- the finer particles fall through.

Q All right. Did you, or any of your team who participated in this process, recognize any of the debris as human remains?

A We recognized it as remains for sure. Uh, there were things that looked like teeth. Things that looked like bone. Um, nothing bigger than the palm of my hand, and -- but whether it was human remains or not, we weren't sure.

Q Most of the items were very small?

A Yes, they were.

Q All right. Approximately how long did this process last?

A Well, they had asked for the sifter for about 3 p.m., and we worked until it got dark. It was just after five. So about two hours.

Q All right. And what did you do at the scene as you wrapped up this, um, processing for that evening?

A Well, once we had sifted all the materials, then we

158

Q  had what was collected in boxes.  We packaged that up.  That was eventually turned over to Calumet County.  The -- the material that was fallen through the screen onto the tarp was also saved, and Tom Sturdivant took care of that.  And we just cleaned up the sifter and put it away, and then we proceeded onto our next task.

Q  How was the, um, material preserved that had fallen through the screen?

A  It was fallen through onto a tarp, and it's my understanding that Tom Sturdivant was going to keep that.  How he did that, I -- I don't know.

Q  All right.  In other words, you, uh, left that scene before the -- the complete wrap-up, as it were, had undertaken?

A  Yes.

Q  Was undertaken?  All right.  What was the next assignment, then, that you performed, um, on this day, Tuesday, November 8?

A  Uh, we were then asked to -- to do some luminol testing on a couple of residences.  Uh, Steven Avery's residence, Chuck Avery's residence, and the garage next to Steven Avery's residence.

Q  All right.  Let me stop you there.  And if you would be so kind as to explain to us, first of

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 159 of 272    Document 19-16

all, what luminol is, and then, uh -- Well, we'll start with that. What is luminol?

A   Okay. Uh, luminol's a chemical that, when it comes in contact with blood, will glow. So we use it to find traces of usually highly diluted blood or very small blood amounts. Uh, if there's larger amounts of blood, or whatever, they're usually pretty obvious because blood has a -- a distinctive color.

Um, we had already searched the Avery residence for -- looking for a bloodstain pattern and we hadn't found any. We had found blood staining, but nothing -- nothing that would indicate a pattern. Um, there had been talk about luminolling the, uh, residence earlier in the week. I had recommended that that be your last -- the last thing you do in attempt to find blood.

Um, this treatment with luminol will leave a luminol residue, and then you don't want -- really want to be, uh, going in there and doing other things after you've luminolled. And treatment with luminol should come after a thorough visual search. It shouldn't be your first attempt.

Q   All right.

160

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 160 of 272   Document 19-16

A   So we went in and luminolled the residence. We found, um, just a couple of stains on the couch that we had missed visually. Um, we then luminolled the garage and we found a lot of luminol reactive stains in the garage that we couldn't confirm with another test.

Q   All right. Let me stop you there and ask: You indi -- uh, you told us just a few moments ago that luminol reacts to blood?

A   Yes.

Q   Let me ask this: Does luminol chemically react with substances other than blood?

A   Yes, it does.

Q   What substances will the luminol react to?

A   It -- it reacts with, actually, quite a few different substances. Um, uh, one thing would be a shiny penny, is what we quite often use as a positive to make sure the luminol's working okay. If the penny glows, the luminol's working. It's actually the iron in the heat molecule in the blood that the luminol's reacting with.

So pennies, copper, lead. Um, I've never seen it with a -- with rusty iron-type stains, but it's reported that it might. Um, the -- the big thing that we see quite often is

161

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 161 of 272   Document 19-16

Q  cleaning reagents that have some sort of bleach in them.  It reacts quite vigorously with that.

Q  Of all the substance -- Of all the substances that you mentioned, uh, the blood, the, uh -- the copper, iron, and bleach, which are the substances -- which substances did the luminol react most vigorously to?

A  Well, with the bleach, but depending on the concentration of -- of the bleach.

Q  All right.  Does it react with, um, gasoline or paint thinner?

A  No, it doesn't.

Q  All right.  Okay.  Let's return, then, back to the garage.  You indicated there were several spots where you had luminol reactions.  Let's pick it up there and have you tell us about it, please?

A  Most of the spots looked like -- sort of like a maybe inch, inch-and-a-half diameter circle.  Uh, when you do this, the glowing that comes from the luminol reaction is -- is very weak.  So you always want to do it in complete darkness if possible.

And what you do is use a spritz bottle.  You spray an area, and you have a piece of chalk in your other hand, if anything glows, you circle

162

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 162 of 272    Document 19-16

it. And you work through an area, and then you go back and sample those areas you've circled with chalk, and do another more specific test for blood. It's called phenolphthalein. And if it reacts with the phenolphthalein, that's an indication that there may be enough material there to do DNA on, and then you would collect that.

Uh, in the garage, uh, only one area, was right behind the vehicle that's on the screen there, was confirmed with phenolphthalein.

Q You're referring to, uh, Exhibit 76 now, which is, um, depicted on the screens?

A Yes.

Q All right. And, um, I believe there's a laser pointer, uh, right there in front of you. Um, first of all, let's start with the -- If you could use that, um, computer animation, which is reflected in Exhibit 76, and, um, probably easier to point to the larger screen, point out the spot where you did have one positive reaction to phenolphthalein?

A You actually can't -- I can't point to it because it -- it's right below the bump -- back bumper of that vehicle --

163

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 163 of 272    Document 19-16

Q   All right.

A   -- on the floor.

Q   Okay.

A   And there were other people there, and when we turned the lights back on and started checking the stains that we had circled in chalk, they said, yes, we -- we had found that earlier visually. We have collected that one. So we didn't collect that.

Q   All right. Because it had already been processed --

A   It had already --

Q   -- by others?

A   -- been collected.

Q   All right. Now, you indicated that there were several spots. Um, if you can recall, uh, approximately -- Um, using this same diagram, if you would just briefly point us -- point to several of those spots where you did get luminol reactions, um, which did not test positive for phenolphthalein?

A   I can't point to any specifically.

Q   All right.

A   There were just small spots here and there. Sort of a random distribution. Not a lot by the door. Not a lot by the -- the snowmobile. Uh, there was -- there

164

was one area that did stand out.

Q   All right.  What area was that?

A   It was behind this tractor lawnmower here, and it -- it wasn't just a -- a small spot.  It's a -- maybe a -- a -- a three-by-three or three-by-four foot area that was more of a smeary diffuse reaction with the luminol.  The light was coming from, seemingly, everywhere, not just this little spot.

Q   Would that be something like a three-by-four foot oval?  Was it a circular shape?  Square-shaped?  Or any particular --

A   Well --

Q   -- irregular?

A   It sort of went up into the debris here.  So that would have been the extent of it.  And then coming out sort of, um, maybe oval on the open side.

Q   All right.  When you made that observation, what did you do?

A   We marked off the area in chalk and we saw the -- the luminescence.  Then, later, we went back with the -- and swabbed it, tried to confirm the presence of blood with phenolphthalein, and we could not.

Q   All right.  Just one moment.  After you made the observation with respect to this larger area that reacted to the luminol, what did you do?

165

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 165 of 272   Document 19-16

A    After I made the observation?

Q    Yes.

A    Well, upon seeing it, we marked off the perimeter with chalk.

Q    All right. And you tried the phenolphthalein test?

A    Tried the phenolphthalein test.

Q    Did you report your findings to any of the law enforcement officers?

A    Well, there were some in there with us.

Q    Do you recall who, um, might have been with you that night?

A    I do not recall their names.

Q    All right.

A    They had been in there previously. They were the ones who told us that the stain behind the -- the vehicle had already been collected.

Q    I see. All right. Your best estimate, approximately how many spots reacted to the luminol in that garage area?

A    I would guess, um, a dozen.

Q    All right. Now, the -- You talked about the one large spot. The remaining spots, can you give us a range as to their varying size?

A    I would say they were all inch-ish. Inch or

166

inch-and-a-half diameter. Smaller.

Q All right. All 11 were in that inch to inch-and-a-half range?

A Yes.

Q All right.

ATTORNEY FALLON: I would move into intro -- uh, evidence the one, uh, exhibit, 1 -- 132, and, uh -- the photograph, and tender the witness for cross-examination.

THE COURT: Any objection to reception of 132?

ATTORNEY FREMGEN: No, Judge.

THE COURT: It is received. You may cross.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q Uh, Mr. Ertl, were you referring to any notes while you were testifying?

A Yes, I was.

Q I notice you're looking down.

A Okay.

Q That -- that's all right. You needed to refresh -- It's been several years since -- or year-and-a-half since --

A Year-and-a-half. And he's asking for times so...

Q Did you want to be accurate?

167

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 167 of 272    Document 19-16

A    Yes.

Q    And these are the same notes you previously provided to the State?

A    The notes I'm staring at right here are not --

Q    So these are --

A    -- notes --

Q    -- just some handwritten notes?  Maybe summary of the notes you previously provided to the --

A    Yes.

Q    -- State?

A    Notes that I've been jotting down while I've been waiting to come on.

Q    That's fine.  Okay.  When you were called to the scene, this would be the first time, November 5, um, essentially your involvement on November 5 was to deal with the RAV 4; is that correct?

A    That's correct.

Q    And you indicated that you attempted to enter into the RAV 4, but unable to do so?

A    Correct.

Q    So there's no way you could have been able to process anything within the vehicle?

A    No.  We wanted to just open the door and look inside.

Q    Was your intent to process any of the vehicle, itself, when you were called?

168

A No. Just to -- They had indicated it had been obscured with things. So the intent was to check out what those things were, look at them, and then to bring back to the lab anything that we -- we thought was inform -- going to be useful.

Q Well, you noted that you were aware that the weather was going to turn, and -- Well, it's going to rain later?

A Yes.

Q And this was, uh, a -- probably a project you needed to get done before the vehicle, itself, got rained on?

A Ideally, yes.

Q Was -- And was there a tarp being utilized at that point to hopefully keep the rain from the vehicle?

A I was told that they had covered it with a tarp and that they were removing it once they knew we would -- had arrived on the scene.

Q Okay.

A And they also told me that there had been some debris on the roof that got pulled off when they pulled the tarp down.

Q Did you, uh -- a -- and, again, you -- you're -- indicated that your intent wasn't necessarily to

169

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 169 of 272     Document 19-16

process the vehicle, but noting that it was going to rain, uh, did you consider maybe we should process the out -- the exterior to some extent to avoid losing potential evidence?

A   No.  Uh, my hope was that we could get it inside of a trailer before it rained.

Q   Now, you did remove the -- some of the items that were up against the vehicle; correct?

A   Correct.

Q   And you did that with some sort of methodology? You didn't just -- Let's rip them all away from the car?  One at a time you removed them?

A   Correct.

Q   In fact, you indicated you wanted to look at, uh, further, the hood and -- and the cardboard box, since there -- I'm going to assume -- may be some sort of trace evidence on -- on those items?

A   I thought that if any of the items would hold a fingerprint, those would be the ones.

Q   Now, you had in -- indicated -- And I -- I -- And I just want to cross -- Or maybe I didn't understand you correctly.  When, uh, Attorney Fallon asked you if there was any trace ev -- evidence that you were able to find, you indicated, no?

170

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 170 of 272    Document 19-16

A    Correct.

Q    But you hadn't yet processed the hood or the cardboard box; correct?

A    No.  I was going to collect those items.  Those would be examined back at the lab.

Q    So they may have had trace evidence?  You had no idea?

A    Right.

Q    That was sent back to the lab.  Let the lab look at those?

A    Correct.

Q    You were talking about some of the debris?

A    Right.

Q    The branches?

A    Right.

Q    Now, obviously, the vehicle didn't just come out of the sky and drop right into that spot; correct?

A    Correct.

Q    I think we can assume that, though no one saw that?  So it had to get there somehow?

A    Correct.

Q    Did you -- In processing the scene, you indicated you were looking around for trace evidence outside the vehicle?  Did you try to make a

171

determination of how it got there?

A    I did.  I looked from where the tires were resting towards the front.  It didn't -- didn't seem that that would have been a possibility because there was another vehicle in front of it.

Um, looking towards the back is probably the direction it came in from.  I tried to look for tread marks.  Uh, it was a grassy area, and below that was hard-packed gravel.  And I wasn't able to -- to even see the tire prints from the vehicle, which, I would assume, had to have been there.

Q    Okay.  Did you go any distance away from the vehicle, um, to try to trace potentially some of the path to see if there might be additional trace evidence you could find?

A    I didn't get very far.  It -- it seems pretty futile in that I couldn't even see the -- any -- any indication from beneath the tire.  Uh, I did look around.  There were some areas were a little bit more clearer and, perhaps, a puddle had been there and it was more of a -- a smoother surface.

Uh, I -- I didn't see any footwear impressions.  I didn't see any tire track impressions that I could discern.

172

Q And -- and footwear impressions, you would assume, again, because it didn't magically appear, whoever brought the vehicle there would have to have maybe left on foot?

A Correct.

Q But unable to find anything that would assist you in that?

A Correct. There were some footwear impressions on -- on top of the vehicle next to the -- the RAV 4. I was -- I was told that those were from the officers who had been removing the tarp.

Q So you -- you don't know if there were any, uh -- Strike that. On November 8, you indicated you were involved with two processes in -- of -- of sifting debris, um -- or sifting ash, excuse me. One was in the barrels; correct?

A Correct.

Q And one was assisting with the, uh -- the burn area or the burn pit; correct?

A That's' correct.

Q As to the burn barrels, um, you indicated that the process was essentially going in there with either handfuls or taking a --

A Trowel.

Q A -- a -- What was it?

173

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 173 of 272    Document 19-16

A  Trowel.

Q  A trowel?  Okay.  And that was consistent among all of the individuals assisting in the -- the burn barrel sifting?

A  Yes.

Q  Did each person have their own separate barrel?  Did you go barrel by barrel?

A  We went barrel by barrel.

Q  So you didn't have teams off on their own doing it?  That was together?  You're doing it one after the other?

A  Right.

Q  Is --

A  There were three of us doing that.

Q  Okay.  All -- Was -- Wasn't you didn't have a lot of people to help anyways?

A  No.

Q  And took -- You said it took you some time over three days because you were called to other spots?

A  Yes.

Q  Now, you indicated at times you would take some of the larger items out by hand?

A  Yes.

Q  And then you would scoop out a -- a layer of ash?

174

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 174 of 272    Document 19-16

A   Yes.

Q   Did you try to take it by layers?

A   Well, it's a barrel.  You -- you pretty much have to work down, so, yeah, we would go bit by bit.

Q   Well, what I mean is, you know, it is -- like you say, it's a barrel, and you could go with one full layer, or you could just keep scooping down in the middle and off to the sides?  Kind of haphazardly?

A   No, we -- we'd try to work down.  So then we --

Q   You tried to do it somewhat organized?  Logical?

A   Well, I mean, what's on top is -- is -- that's what you take.  You know, try to dig to the bottom leaving the top.

Q   Well, now, you -- you said this was a pretty full, or three-quarters, or two-thirds full barrel?

A   Well, the fifth barrel was a -- like, one-quarter to one-third full.

Q   Okay.  And you don't know how many times these barrels had been used over the last, let's say, several months?

A   No idea.

Q   Could have been used 10, 15 times, potentially?  Or just once?

175

A    I have no idea.

Q    So you don't know when items were burned in the barrel; right?

A    No, I don't.

Q    Could you tell by going down layer by layer versus just scooping away through the barrel?

A    If you assume that the person doing the burning never mixes the contents, then I would -- I would guess, yes, you could determine which was burned last.  That would be the closest to the top.

Q    Was -- was that something you thought about that maybe that would be important to note?  Or felt wasn't necessary?

A    Um, at that point, no.  We -- When we collected, we collected everything from a given barrel together.

Q    Okay.  In regards to the license plate, you indicated that you processed the license plate.  That's the term you used.  What do you mean by processed the license plate?

A    No.  I would -- I said that the -- the fingerprint analyst, who was with us, was given the task to process the vehicle.  He examined the license plate, but I don't believe he processed them at the scene.

Q    So if I were to say, using it in that context, processing, you would assume processing would be

176

Q use the -- the powder to extract the potential extract? The potential fingerprint; correct?

A Correct.

Q But he didn't do that?

A He did that with the vehicle. He did not do that with the license plate.

Q Okay. And do you know what happened to the license plate?

A I packaged it in a pistol box, sealed it, and turned it over to Calumet County.

Q So you don't know if it made its way to the Crime Lab, eventually?

A I don't know.

Q That's not your job?

A No.

Q In regards to the burn pit, were -- were you keeping track of where you were scooping items of ash from the pit as far as what point in the pit? For instance, if you gridded out the pit?

A No. Um, the -- the pit was most accessible from the position where we set up the tripod. It was level with the -- the surroundings there. Um, it was sort of a depression compared to the -- the other three sites. So we began at the accessible area and worked our way towards the inaccessible area.

177

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 177 of 272    Document 19-16

Q So where an item was located wasn't as important as whether there was potential evidential value to anything that was found in that pit?

A Correct.

Q Did you -- When you indicate -- And, again, maybe you didn't do this part. Uh, when you packaged what was sifted from the burn pit, did it go to the Crime Lab from there?

A I don't know.

Q You weren't in that -- involved in that process?

A No, I wasn't.

Q Were you involved in the process -- involved, uh, in regards to the car seat that was found? Was that taken to the Crime Lab as far as you know?

A I don't believe so. I don't know.

Q Okay. You testified in regards to luminol. Now, that can react with human or animal blood; correct?

A Yes.

Q So, for instance, hypothetically, if someone were skinning a deer in the garage, and cleaned up afterwards, it might react to luminol?

A That's true.

Q You -- You commented that oftentimes it's a way to detect diluted blood? Or -- Is that correct?

178

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 178 of 272    Document 19-16

A   Yes.

Q   By that you mean if someone, for instance, had washed, for instance, the gar -- the garage floor, possibly find blood, that wouldn't be readily, uh, uh, noticeable to the naked eye?

A   That is correct.

Q   And that could be with anything?  Not just the -- a garage floor?  You could do that with a table, for instance?

A   Yes.

Q   Clothing?

A   Yes.

Q   Okay.  Did you do the luminol spray on the entire garage floor?

A   No.  Some of the garage floor wasn't accessible due to the presence of a lot of stuff.

Q   Okay.  Anything that was exposed, though, you were able to spray the luminol on?

A   Yes.  And we did go underneath the vehicle there, because we could spray under it and see what was there -- going on in there.  We did not go under the snowmobile or the tractor.

Q   Did -- You did indicate that it would also react to lead?

A   Yes.

179

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 179 of 272    Document 19-16

Q   Potentially?

A   Potentially.

Q   So, hypothetically, a lead bullet may end up
    if -- might react to a luminol spray with that
    glow?

A   Yeah, it's possible.

Q   In -- In the picture, um, behind the lawnmower,
    is where you indicated was that three-by-four
    foot area that seemed to be entirely in the
    glow --

A   Yes.

Q   -- of luminol?

A   Yes.

Q   To the right of that seems to be lot of items.
    Boxes, etc.?

A   Yes.

Q   Did you spray luminol there as well, since it
    was -- abutted that area you found?

A   Maybe a foot, foot-and-a-half above the floor.  But
    we didn't -- We didn't -- You couldn't access that
    area to move into it.  It was packed full.  We didn't
    attempt to clear it, or to look behind it, or to
    examine those items.

Q   But the boxes, themselves, show that the items
    that were stacked up there you were able to

180

spray?

A   To some extent.

Q   Were you able -- Did you receive any positive, uh, um, results, uh, from any of those items that you might have sprayed?

A   I don't believe so.

Q   Okay.  Nothing further.  Thank you.

THE COURT:  Any redirect, Counsel?

ATTORNEY FALLON:  None.  Thank you.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Your --

ATTORNEY FALLON:  State --

THE COURT:  -- next --

ATTORNEY FALLON:  State would call William Newhouse.

THE CLERK:  Please raise your right hand.

**WILLIAM NEWHOUSE,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  It's William L. Newhouse. And then it's N-e-w-h-o-u-s-e.

**DIRECT EXAMINATION**

181

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 181 of 272   Document 19-16

BY ATTORNEY FALLON:

Q   How are you employed?

A   I'm employed as a firearms and toolmark examiner in the Wisconsin State Crime Laboratory in Madison, Wisconsin.

Q   What does a firearms and toolmarks examiner do?

A   In general terms, uh, we're asked to examine physical evidence that's been recovered in the course of some kind of a criminal investigation, answer questions about that evidence, whether or not it's pertinent to the investigation, and then, of course, report about those examinations in our findings.

A little more specifically, as a firearms and toolmark examiner, most of the physical evidence that I examine is going to be related to the firing of a gun.  So I'm going to be looking at guns, of course, I'll examine bullets, cartridge casings.  I do gunpowder residue examinations and -- and studies, uh, just trying to answer questions about how that evidence relates to that particular criminal investigation.

Q   All right.  How is that you are involved in this case, Mr. Newhouse?

A   Well, there were a -- a number of items of evidence

182

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 182 of 272   Document 19-16

Q All right. How many examinations, uh, in total did you do for the investigators in this case?

A There was a rifle that was submitted. Uh, there were, I think, 11 cartridge casings -- fired cartridge casings -- and two bullets that were all submitted for my examination.

Q All right. And, um, before we have you explain your findings, let's, uh, find out a little bit about yourself. I'm going to have, um, Investigator Wiegert, uh, hand you Exhibit 133. And what is Exhibit 133, please?

A Exhibit 133 is a curriculum vitae. It's a description of my training, my background, my work experience.

Q All right. And, um, I believe there is one, um, typo that we may have to clarify regarding the time spent at the, uh, California Department of Justice in -- in terms of your years there --

A Um --

Q -- versus Kansas City experience?

A There were a -- there were a couple of typos that --

183

that I had noted. Uh, in California, I was there, as it indicates, from 1972, uh, to, actually, 1981, and, um -- and then I went to Montana in 1981. Was there until 1998. And then in Kansas City from 1988 until I came to, uh, Wisconsin in September of 2002.

Q All right. Um, first of all, um, do you have an undergraduate degree, sir?

A I do.

Q And, um, what is your degree in?

A I have a Bachelor of Science Degree in physics.

Q Um, from what university?

A From Purdue University.

Q Um, did you pursue, um, graduate courses beyond that?

A I took some graduate courses after I received my Bachelor of Science Degree. Uh, some of those were in physics.

Q All right. And, um, in terms of, uh, your experience as a firearms and toolmark examiner, where did you begin your career?

A Um, I accepted a position with the California Department of Justice in the Sacramento Laboratory in August of 1972. Didn't really get acquainted with firearms and toolmarks immediately. I was trained in a couple of other areas of the laboratory, um, until

184

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 184 of 272    Document 19-16

about 19 -- I think the fall of 1973, when I took a -- a course, taught by one of the examiners there in the laboratory, that dealt with kind of the history of firearms and toolmark identification, and how it related to criminal justice.

And then in the fall of -- of 1974, I went through the training program that they had in place in the Sacramento Laboratory at that time for firearms and toolmark examiners. It was a two-and-a-half or three-month program as I recall. Um, I completed that successfully, and in January of 1975, was asked to take, um, a course that dealt with the theory of identification, um, how is it we can look at a bullet, or a cartridge casing, or any kind of toolmark, and really answer questions about what tool or what weapon caused the markings that we observed on those items.

Uh, completed that course successfully. I think the next week I was over in San Mateo Crime -- Crime Laboratory on another three-day course that dealt with ammunition problems and automatic weapons.

And then having completed that series of courses in May of 1975, I was assigned to the

185

firearms and toolmark section of the Sacramento Laboratory. And until I left there, I was responsible for most of the firearms and oth -- and toolmark case work that left that laboratory. There were other examiners that could do that kind of work, and did. I worked in there full time until I left there and went to, um, the Montana State Crime Laboratory in -- I think it was January, 1981.

Q All right. In terms of, uh, your California experience, in particular the Sacramento Lab, how many other examiners did you work with in that lab?

A Um, there were probably, anytime there, three or four other examiners -- um, we called -- they're called criminalists in California -- uh, who were trained and capable of doing firearms cases.

Uh, most of them did not do those full time. They did them as they encountered them in their work in other kinds of disciplines in the laboratory. Uh, but I was the -- for that period, the single examiner who worked full time in the -- in the, uh, fire -- firearms and toolmark section.

Q All right. And, um, after you left California,

186

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 186 of 272    Document 19-16

Q what was your, next, um, uh, experience?

A I went to the Montana State Crime Laboratory, uh, that was in January of 1981, and become -- became that state's firearms and toolmark examiner.

Q All right. And then, um, you mentioned something about, uh, Kansas City, Missouri? Tell us about that?

A In November of 19 -- Is that right? Uh, November, I think, of 1988, um, I accepted a position in the -- the Kansas City Police Department Crime Laboratory in Kansas City, Missouri, as one of four firearms examiners in that laboratory.

Q And I believe you indicated you, uh, came to Wisconsin in September, 2000?

A Um, I think it was 2002.

Q All right.

A Yes.

Q And, um, you are based in the Madison office?

A Yes.

Q All right. And, um, do you have any estimate for us as to approximately how many times you've been asked to come to a court of law and render expert opinion regarding firearms identification?

A Um, I know it's been more than 300 times in the course of the 30-some years that I've -- I've been

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 187 of 272    Document 19-16

doing the work.

Q All right. Um, are you a member of any professional associations or affiliations that you find, uh, useful and practical in the field of, uh, firearms identification?

A Yes, I am.

Q Tell us about those, please?

A I'm a member of the Association of Firearms and Toolmark Examiners. Um, it is the -- the single professional organization, international organization, for a firearms and toolmark examiner, um, that is focused, specifically, on that area of forensics.

Q All right. From time to time, have you taken any courses to maintain, um, currency in the literature and in the science of firearms identification?

A Um, there are couple of things that we can do. Uh, in terms of formal courses, while I was in Montana, um, I had the opportunity to go to the FBI Academy. I took and completed a week-long course there that dealt with specialized techniques in firearms identification.

Um, beyond that, a -- attending the -- the -- the AFTE, or the -- the Association of

188

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 188 of 272   Document 19-16

Firearms and Toolmark Examiners meetings.  Uh, those are training seminars.  A lot of it, of course -- Most of it is papers and research being presented to those of us who attend.  And I've gotten to do that of and on over the years as well.

Q  All right.  Very well.  Let's begin, then.  First of all, tell us what firearms identification is or involves?

A  Um, well, as I said, I'm examining evidence that's been recovered in -- in -- in investigations or crimes that involve the shooting of a firearm.  Clearly, I'm going to be involved with firearms, be examining firearms.  I'm test-firing them in the laboratory, uh, determining whether they function or don't function, or whether they've been altered.

Additionally, we recover bullets and cartridge casings, um, from scenes, from autopsies, and there is always the question, when we have a gun recovered, of whether that bullet or the cartridge casing, if it's recovered, have been fired from the particular gun that was recovered.

In those cases where we might not have a gun recovered, I answer other questions.  Was

189

there only one gun involved in this shooting? Was there more than one gun involved in this shooting? Those questions are all answered by examinations of the bullets and cartridge casings, and, where possible, the test-firing of the weapon in the laboratory.

Finally, the other area of -- of firearms and toolmarks that I'm involved in, is involved with gunpowder residues, answering questions about distances, where I can, uh, between a victim and the muzzle of the weapon when it was fired.

Q All right. Well, let's begin, I think, by defining some terms, um, for many of us who may not be all that familiar with firearms. Um, first of all, tell us, what is a cartridge?

A Um, if you're going to fire a gun, you have to load the cartridge into the weapon, and the cartridge is designed for the particular weapon in which it's going to be fired.

Usually a cartridge consists of, say, four components. One of them is going to be the projectile or the -- or the bullet. Um, sometimes it's called a slug.

Uh, one component will be the cartridge

190

casing, in which the bullet is mounted.

Another component is the gunpowder. When the cartridge fires, it's the gunpowder inside the cartridge that explodes, and that's what forces the bullet out of the barrel of the weapon, and, of course, down range and in the direction that the weapon is pointed.

The last component, the most modern ammunition, is going to be something called a primer. And this is just a -- another compound, not dissimilar to gunpowder, but chemically different. That is, very shock sensitive. And that when struck by a part of the gun designed to strike the cartridge, will cause the -- the primer to explode, set the gunpowder on fire, essentially cause that to explode, and then we have a gun firing.

Q All right. How is a cartridge then fired from a weapon?

A Well, you're going to -- going to have to load the cartridge in one manner or another into the -- a particular part of the weapon. Uh, you're going to have to cock the weapon, or arm it, and this is all defined by how that weapon is designed.

And then, to actually fire the

191

cartridge, assuming the gun's working properly, you have to generally pull the trigger. And pulling that trigger causes a part of the gun to strike the cartridge and causes the cartridge, then, to explode and the bullet to be fired.

Q All right. Where does the, um -- the firing pin -- or how does that figure into the actual firing of the cartridge?

A Well, that part of the gun that actually strikes the cartridge and causes it to fire is what we call a -- a firing pin. In certain weapons it might be called a striker. Essentially, what it is, is a piece of metal that, when the trigger is pulled, is released and allowed to strike the cartridge.

Q What happens to a, uh -- the cartridge? Or, uh, perhaps, a better way of asking it is what happens to the bullet which is mounted in the, uh, casing or the cartridge once the weapon is fired?

A Well, the bullet, which initially is mounted in the cartridge, is propelled by the gases created by the explosion of the gunpowder, is propelled down the barrel of the weapon, and, of course, whatever direction the gun's pointed at is the direction that the bullet is going to be projected.

192

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 192 of 272    Document 19-16

Q    All right.  Generally, what happens to the cartridge, itself, once the bullet is expelled?

A    Once fired your cartridge, you now have -- and the bullet's on its way -- you have left in the gun the cartridge casing.  What happens to the cartridge casing after you fired the gun is -- is determined by how that weapon is designed.

In a semi-automatic weapon, whether a handgun, or a rifle, or a shotgun, that cartridge casing is going to be extracted and ejected from the weapon.  Out of the weapon and onto the ground.

Um, if it's a revolver, certain other kinds of handguns, the cartridge may stay -- cartridge casing may remain in the weapon, and then you may have to actually extract it from the weapon manually.

Q    Now, there's some other terms and phrases that I think are bandied about quite a bit in, um, mainstream media and television.  And these are terms called lands and grooves.  Do you recognize those terms and, if so, tell us what they are?

A    Yeah.  Um, if you look down the barrel of -- of any modern weapon, with the exception of a shotgun, uh, what you'll notice is that there are grooves in the

193

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 193 of 272    Document 19-16

barrel. And we're talking about the inside of the barrel, and the barrel of the weapon is just a tube, and inside that barrel, they -- they've -- in the manufacture of the barrel, they've put these grooves in there.

You probably also notice that they are twisted as you look down there. We call those grooves, of course, "grooves". We call the areas between the grooves in the barrel, lands. That's l-a-n-d-s. I'm not sure where the term ever came from and never heard a really good story for it.

When I'm looking at bullets, what I see are land and groove impressions, but they're created by contact between the bullet and the inside of the barrel of that weapon.

Q Given that, what, um -- how a cartridge is filed -- or -- or, excuse me, how a cartridge is fired in a weapon, and these lands and grooves, what is it that makes the actual identification, for instance, of, uh -- of a bullet as having been fired by a particular gun possible?

A Well, what makes it possible, ultimately, is the manufacturing process used to create the -- the barrel of the gun, um, in the case of a bullet, or other parts of the weapon that come into contact with

194

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 194 of 272    Document 19-16

the cartridge casing.

Uh, if I'm asked to determine whether a bullet was fired from a particular gun, the way I'm going to do that, eventually, is by putting a test-fired bullet, one I fired in the laboratory from that gun, and one that I know has been marked only by the barrel of that gun, I'm going to put that bullet under the microscope, I'm going to examine those test-fired bullets, and what I'm going to look for are patterns of scratches, or what we call in the -- in the field are stria. These are engravings on the side of the bullet that are created by microscopic defects inside the barrel of the weapon.

When the bullet passes through that barrel, it's coming into contact with those defects and they're leaving patterns of scratches or stria on the surface of the bullet. I have to be able to determine or -- or do -- or con -- conclude that, in fact, all the test-fired bullets that I'm seeing from that gun are creating the same pattern of markings.

Having done that, I then know what to look for on the bullet that's been recovered in a crime, and maybe a bullet that's been recovered

195

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 195 of 272    Document 19-16

in a autopsy, or may have been taken out of a tree in a shooting. But I'm going to look at that bullet. I'm going to look for those same patterns of stria on the surface of that bullet, and if I see those patterns, if I can be assured with my examination the patterns I do see are the kind of thing I expect to see on any bullet fired from that specific gun, then I can conclude that the bullet that was recovered in the shooting was fired from that particular gun. Until I see these patterns, and I see them reproducing, I can't come to any conclusion at all about that.

Q Very well. Let's talk about your findings in this case. Um, first, I'm going to have Investigator, uh, Wiegert, uh, show you, I believe, what is marked for -- or had been received into evidence as Exhibit No. 128, and ask if you, um, first of all, can examine that item and tell us if you recognize it?

A Yes, I do.

Q And what is Exhibit 128?

A Well, Exhibit 128 is, um, a paper bag, now opened, that -- that contained, um, a box. Um, all of these are marked in some way or another so that I could recognize them later. Within the box are -- I

Case 1:14-cv-01310-WED Filed 05/04/15 Page 196 of 272 Document 19-16

believe, is 11 fired cartridge casings that were submitted in the course of this investigation.

Q All right. Now, we're, uh, showing a projection now of that item. Is that what you're examining? I believe it's, uh, Exhibit 120 is being depicted on the screen?

A Yes, it is. At this point, when I concluded my examinations, I put the cartridge casings in small plastic bags. When that photograph was taken, they, obviously, were not in those plastic bags.

Q All right. And, um, as part of your first examination in this case, um, were you also asked to examine a .22 caliber rifle?

A Yes, I was.

Q All right. I'm going to have Investigator Wiegert show you Exhibit 129. Do you recognize Exhibit 129?

A I do.

Q What is 129?

A Um, Exhibit 129 is a -- a .22 caliber rifle. It's manufactured by Marlin Firearms Company. The model of rifle is a -- a Glenfield Model 60. Uh, this happens to be a semi-automatic rifle. I -- I can recognize it because of the -- the sticker I placed on it that -- with the appropriate information and by

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 197 of 272    Document 19-16

the serial number on the weapon.

Q   All right.  And, um, just so that we're clear, um, what kind of examination did you do reference, um, that rifle and the, um, uh, cartridges which are, uh, contained in Exhibit 128?

A   Um, well, the first thing that I did with Exhibit 129, um, because I knew I was going to test-fire the weapon, was to -- to give it an examination, uh, checking the function of the weapon, checking the condition of the gun, uh, documenting and writing down information about the weapon, the serial number, manufacturer, and so on.

Uh, and I wanted to make sure that the gun was working, first of all, and, secondly, I wanted to make sure that it was safe to -- to fire the weapon, because I knew this was something I wanted to do, and because I'm going to want bullets and cartridge casings that I know have been fired in this gun.

So having completed that series of examinations, the next thing I did was to obtain those test fires to determine what ammunition to fire in the weapon, fire it in the laboratory, and then recover the cartridge casings and

198

bullets.

Q All right. Tell us about the procedure you then employed for test-firing. What did you do? What was the first step?

A Uh, well, as I said, I -- I simply wrote down various information about the weapon, marked the weapon for later identification. Uh, one of the examinations that's -- that's, of course, important to do, is just to look down the barrel of the weapon, after, of course, I've determined it's not loaded, and to determine -- make sure there's no obstruction in the barrel. Occasionally, the bullets don't get out of the barrels of weapons, and -- and, uh, that's not a -- a safe way to fire a weapon. So I did perform that examination.

I, essentially, determined that this gun was functioning, and at that point, as I expected it to, and saw no problems with the weapon in terms of -- of safety, um, I then would have test-fired rounds, cartridges in the weapon, and, in fact, test-fired three of them.

Q All right. How did you test-fire them?

A Um, this weapon loads cartridges -- or you load cartridges in it, in a tube on the -- just a sec, it's stuck -- on the bottom of the barrel. That's

199

this tube right here.  Uh, you drop the cartridges in this slot here, and then put the tube back in the -- in position.

And then to actually fire this weapon, had it ammunition in it, I'd pull this back. This is called a bolt.  Let it drop.  That action pushes the cartridge into this part of the weapon, called the chamber.  It also cocks the weapon.  That means if I pull the trigger now, it would fire, assuming I had a cartridge in there.

This, by the way, for those of you that aren't familiar with weapons, is the barrel of the gun.  I described to some -- in some detail what that is.  So to fire the weapon, I pull the trigger, that click you heard was the snap of the -- the striker, or the firing pin in this weapon, and had there been a cartridge in it, it would have fired at that moment.

Q  Uh, is there any way, from just looking at it, to, um, tell what the magazine capacity is in that weapon?

A  Um --

Q  Or do they vary?

A  No.  The only way to do that, and I did not do that with this gun, um, is to actually put a number of

200

cartridges in it, see how many it would hold.  I could have looked it up in some magazine or something and determined the same thing, but it would hold, I would assume, anywhere from -- from 10 to 15 cartridges.

Q All right.  Now, um, first question, then, uh, were you able to determine that that weapon, um, fired and functioned properly?

A Yes, I was.

Q All right.

A And it does.

Q And, um, in order to fire it, I would imagine you would have to have some ammunition?

A Yes.

Q And what ammunition did you select for your test-fire?

A Well, the -- one of the things that's important in my examinations is to make sure I'm firing the same kind of ammunition that was submitted.  That was recovered.  In other words, I examined the cartridge casings in Exhibit 128.  I determined that those are -- are CCI manufactured cartridges, uh, .22 long rifle, and so that's what I fired in the rifle.  I obtained three of these cartridges from a collection I have at the laboratory and fired those three

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 201 of 272    Document 19-16

cartridges in this weapon.

Q  All right.  And what -- what are those fired into so that you can, um, check both the cartridge and the bullets?

A  I have a -- a water tank in the laboratory, about, uh, nine feet long, probably three-and-a-half foot deep, and a couple of feet wide.  And I can fire through a tube in that -- in that, um, essentially big box of water.  I can fire my weapons into that. The water slows the bullets down.  They simply drop to the bottom.  The cartridge casings are, in this case, ejected from the weapon and caught in a trap that I have on the front of the -- of the water tank.

Q  All right.  Now, with respect to, um, your examination, were you able to, um, determine whether those cartridge casings, which were submitted to you, had actually been fired from that rifle that you now hold in your hand? Exhibit 1, uh, 29?

A  Yes, I was.

Q  Um, and what opinion did you reach, sir?

A  I was able to determine that all 11 of these cartridge casings in Exhibit 128 had been fired in this rifle.

Q  All right.  And do you hold that opinion to a

202

reasonable degree of scientific certainty?

A   I do.

Q   Very well.  Now, did there come a time where you were asked to perform a second examination of evidence involving that very same rifle?  Exhibit 129?

A   Yes.

ATTORNEY FALLON:  Um, let me then ask, um, if I could have, uh, Investigator Wiegert, um, bring Exhibits 114 and 113 to your attention?

Q   (By Attorney Fallon)  Let's begin with Exhibit, uh, 114.  I believe it's Item FK?  Crime Lab designation; is that correct?

A   That's correct.

Q   All right.  Um, tell us about Exhibit 114, please?

A   Um, well, Exhibit 114, uh, was a -- again, a paper bag, inside of which was a -- is a bullet or bullet fragment.  Um, it's a bullet that -- that's in very bad shape.  Uh, some of it missing.  Um, that was what I was asked to examine.  I was asked to answer the -- the same question, really, I answered with the cartridge casings, uh, and that was whether this bullet was fired in this weapon or whether I can say it was or not.

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 203 of 272   Document 19-16

Q    All right.  Tell me about the condition of that particular bullet?  Uh, Item FK?  Exhibit 114?

A    Item Fk -- Um, the first thing I do with these items is to examine them microscopically.  Um, I want to define and determine what I can about the kind of gun that fired this, based on the characteristics of the bullet that remained.

Uh, for example, I can look at a bullet and determine the caliber of the bullet.  Uh, in this case, I can look at this bullet and tell you that this is a .22 caliber bullet.  I know because -- be -- because of my familiarity with guns, that then it had to have been fired from a gun that's a .22 caliber gun.  And that means that the -- the bore diameter of that barrel has to be .22 inches, approximately.

There are other class characteristics or other design features of the gun in which a bullet is fired that are transferred to that bullet.  And the other one of those that I was able to look at, and is present on -- on this bullet, at least in part, were the land and groove impressions.  The bullet's in very bad condition.  I examined it.  Uh, some of the land and groove impressions on this had been

204

obliterated, um, by its contact with something hard, or passage through something hard.

But, nonetheless, with Item FK, um, I was able to determine that there are eight remaining land and groove impressions on this bullet in Exhibit 114, and that they had what I would call a right-hand twist. That is, the gun from which they were fired, those -- those grooves in that barrel were twisted clockwise when they were created.

So after I've examined this bullet, I know it was fired from something manufactured with -- in a .22 caliber, and it was fired from a gun whose barrel had 16 land and groove impressions. There were 8 remaining. There were 16 originally. And I can determine that from the 8 that remained on that -- that bullet.

Q    What did that bullet look like? I mean, did it look like a bullet when it was submitted to you?

A    Um, to me it looked like a bullet, but I'm used to looking at bullets that have -- that have struck things, that have been -- been broken up into pieces or smashed up. Uh, it may not look like a bullet to somebody who's not familiar with them. Uh, it does have the characteristics of a bullet. It's lead.

205

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 205 of 272    Document 19-16

That's fairly easy to determine. And it's -- it's coated with a copper coating, and that's what they do with -- in particular, with .22 caliber bullets.

So I was satisfied, after my microscopic examination, that that's exactly what I had, was a .22 caliber bullet.

Q All right. But if one did not have, say, the, uh, assistance of, uh, your training, and experience, and a microscope, to the untrained eye, what would -- what would -- what did it possibly look like?

A It really look -- looks like a chunk of metal. Um, it might not look like anything more than that to somebody who isn't used to seeing these kinds of things.

Q All right. Um, would the, uh -- the head of a roofing nail be a fair description?

A Well, maybe in terms of size. Uh, again, it would look different from that.

Q All right. What conclusions, if any, were you able to reach with respect to, um, um, Item FK, Exhibit 114, uh, relative to, uh, the firearm in question here? Uh, Exhibit 129?

A Um, I was limited in my conclusions to what I could tell based on the class characteristics that are

206

there.  All I can say about, uh, this Item 114, is that it's a .22 caliber bullet, that it was fired from a gun manufactured with 16 lands and grooves, and a right-hand twist in the barrel of the gun.

I cannot be specific of what -- about what gun that was.  For example, whether, specifically, it was fired from this particular rifle.  Because of those microscopic markings that I've described as having been scratched in the surface of bullets by barrels, are not present there anymore.  They've been obliterated by its -- its contact, or passage through, with whatever it struck.

Q So, in -- in effect, you're saying there -- it just lacks sufficient individual characteristics beyond those general ones of the lands and grooves and 8 out of the 16 twists?  Other than that, that's what you got?

A Exactly.

Q All right.  Very good.  Let's move on, then, to, um, Exhibit 113, Item FL.  Did you have an opportunity to examine that particular item?

A I did.

Q Um, first of all, then, uh, for our benefit, uh, what is I -- Item FL, Exhibit, uh, 113?

207

A Well, Exhibit 113 is a second bullet. Again, I went through the same examination process. In this case, again, I'm able to determine that it's a -- a .22 caliber bullet. Uh, in this case, I have 11 of the 16 original land and groove impressions that were transferred to this bullet when it was fired from the gun from which it was fired.

Um, I also, uh -- didn't mention on the other bullet -- but I also weighed the bullet, which can be helpful in -- in determining the caliber and so on.

Um, and, additionally, on this bullet, on Exhibit 113, I do have the microscopic detail, the stria and scratches on the surface of the bullet, that I can relate back to a particular weapon. I can compare it to test fires from a particular weapon.

Q All right. And, um, as such, were you able to make any determination as to whether, um, Item FL, uh, that's the Crime Lab designation, and Exhibit 113, were, uh -- was fired from Exhibit 129, the Marlin Glenfield 60 .22 caliber rifle?

A Yes, I was.

Q And what, uh, conclusion did you reach, sir?

A I was able to determine that -- that this bullet in

208

Exhibit 113 was fired from this particular Marlin rifle.

Q All right. Um, and do you hold that opinion to a reasonable degree of scientific certainty?

A I do.

Q And how is that you're, uh -- Well, let's follow that up with, is it to the exclusion of any other rifle that that bullet was fired from?

A It is.

Q Why is that?

A Um, when I examined the test fires from this rifle, um, I'm sorry, Exhibit 129, um, when I looked at those bullets under the microscope, I found that I was seeing patterns of scratches or stria reproducing on each of the test fires. There's always differences, not all there on every bullet test-fired from that rifle, but I was able to determine that I could expect to see certain patterns of these markings.

More importantly, when I put Exhibit 113 under the microscope and compared it directly to my test fires, I was able to demonstrate that I had the same patterns on the test fires that I had on this bullet in Exhibit 113.

And, in fact, it was enough markings

209

that I was able to determine that I had more agreement in these kinds of stria, and these patterns of stria, than I ever would expect to see from two bullets that were not fired from the same gun. We have to be able to satisfy that kind of -- of correlation that we expect to see in bullets not fired from guns, same gun.

The fact of the matter was, in this case, the patterns, the amount of agreement and correlation that I see, and saw, on this bullet, when I compared it to test fires, was enough for me to be able to conclude that it had been fired from this Marlin rifle, and could have been fired in none other.

Q All right. I'm having Investigator Wiegert, uh, show you Exhibits 134, 135. Do you recognize them?

A I do.

Q And what are Exhibit 134 and 135?

A Well, Exhibit 134 is a report that I wrote, uh, describing the evidence I looked at and the findings or conclusions to which I came. Uh, this report is dated February 21 of 2006, and, in particular, it describes the examination and comparison of the cartridge casings that I looked at and related to or

210

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 210 of 272    Document 19-16

determined were fired in that rifle in Exhibit 129.

The other report, Exhibit 135, is dated May 10 of 2006. This is the description of the bullets that I looked at, uh, in Exhibits 113 and 114, uh, and describes my findings with regard to whether they were or were not fired from the rifle in 129.

Q    All right. And are those the official reports that you filed in this particular case?

A    Yes, they are.

ATTORNEY FALLON: Your Honor, subject to the receipt of those last two exhibits, 134 and 135, I would tender the witness for cross-examination.

THE COURT: All right. Cross, Counsel?

**CROSS-EXAMINATION**

BY ATTORNEY EDELSTEIN:

Q    Good afternoon, Mr. Newhouse. You've been at it for a good while, haven't you?

A    A little while.

Q    Okay. Um, I'm not going to take issue with your qualifications. I think it's pretty obvious that you've had plenty of experience in the training. I do want to ask you a little bit about the FBI program. Um, I believe you said you spent about

211

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 211 of 272    Document 19-16

Q a week out there?

A That's true. Yes.

Q Did you spend any time, in connection with your visit to the firearm and toolmark section of the FBI Lab, with the metallurgy section?

A No, I do not.

Q Do -- You know they have a metallurgy section?

A Yes.

Q Does Wisconsin have a metallurgy section?

A Um, no.

Q All right. Well, let me ask you this: Given the fact that you received the empty cartridges, and you were able to identify the manufacturer as CCI, did you make any attempt beyond the identification of the manufacturer to determine which specie, if you will, of CCI .22 caliber cartridge, turned into, or was the originating source, of your FK, um, and FL?

A Um, no, there was no other association that I attempted to make between the cartridge casings and the bullets.

Q Uh, CCI, just like a lot of manufacturers, they make a multitude of .22 caliber bullets; right?

A They do.

Q Okay. They vary by weight; correct?

212

A     Yes.

Q     They vary by, uh, size?  And by that I mean long, short; correct?

A     Uh, essentially by weight, but -- and by length, yes.

Q     Well, but that's related to the relative, um, power, if you will, of any given cartridge, because of the amount of powder?

A     Uh, yes.  Uh --

Q     Okay.  What -- what I'm getting at, Mr. Newhouse, just to get down to the point here, the test-firings that you made in order to get a clean bullet, to be able to do the microscopic examination, the CCI bullets that you took from your stock, you cannot tell us that they are, in fact, the same CCI type which resulted in what you've labeled FL and FK?  Is that a fair statement?

A     Um, I -- That's all going to revolve around what you mean by type.  The -- the fact of the matter is they are the same type.  That doesn't mean there are not differences between what I test-fired and what we have in 113 and 114.

Q     Well, let's go backwards.  Can you tell me precisely what stock number, for example, CCI test-fire bullets you used?

213

A   No.

Q   Can you tell me what Stock No. F-- assuming they're CCI -- FK and FL were?

A   No, I cannot.

Q   All right.  You undertook no efforts, and correct me if I'm wrong, to have any comparison done between FK and FL as they relate to one another with respect to the metallurgy composition of those shells; correct?  Or those --

A   That's correct.

Q   -- bullets?  And, Mr. Newhouse, let me ask you this:  Wa -- was there submitted to you, for any, um, examination, a box of CCI, uh, .22s?

A   None that I'm aware of, no.  None that I examined, certainly.

Q   When things get submitted for you to examine, they get a number, and everything has one particular number for -- for your file purposes; right?

A   That's correct.

Q   Okay.  And you've had a chance to look at your records in anticipation of your testimony?

A   Yes.

Q   If a box of .22 shells were submitted to you for examination in connection with this case, it

214

Q  would be reflected in those records; right?

A  If I examined it, yes.

Q  Well --

A  My --

Q  Exam --

A  -- point -- My point is that it's possible a box of ammunition could have been submitted that I didn't see.

Q  Submitted to the lab?

A  Yes.

Q  Doesn't mean it made it to you?

A  Correct.

Q  But the bottom line, again, is nothing was submitted to you?

A  That's correct.

Q  Okay.  So if there were some shells recovered from a particular crime scene, um, you undertook no efforts to compare your FK, your FL, to anything else that was submitted; correct?

A  That's correct.

Q  All right.  I believe you testified that either FK or FL, uh, had charasteris -- characteristics of a coated bullet?

A  Yes.  They both did.

Q  They both did?  Okay.  Copper?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 215 of 272    Document 19-16

A    I'm sorry, what?

Q    Copper?

A    Uh, I would presume of copper, copper ac -- copper
alloy, the more likely.

Q    Okay.  You didn't undertake any test to
determine?

A    None.

Q    All right.

A    No.

Q    So from your testimony, we know that FK was fired
in that particular rifle you've examined?

A    It was the one that I designated FL.

Q    Oh, I'm sorry, FL.  Okay.  FL being the one with
19.7 grains remaining?

A    Yes.  I believe that's correct.

Q    And when I say, remaining, you can't tell this
jury how many grains it may have originated with,
can you?

A    Uh, no.

Q    All right.

A    I cannot.

Q    And the same would be true on FK as far as
weight?

A    I could only guess.  I wouldn't be able to determine,
specifically, no.

216

Q   And that's because the manufacturers vary the weights of the bullet; right?

A   Yep.  That's correct.

Q   So FL, you're satisfied, came out of that gun?

A   That's correct.

Q   FK, we can't really say?  Can't say the same thing, certainly?

A   That's correct.

Q   Okay.  And, certainly, you absolutely cannot say what or who caused either FK, or FL for that matter, arguing they both maybe came out of there, caused them to be projected through the barrel of that rifle?

A   No, I cannot.

Q   You have nothing by way of your examination, whatsoever, to suggest that it was fired at anytime by this defendant; correct?

A   That's correct.

Q   Okay.  That's really out of your bailiwick; right?

A   Yes, it is.

Q   All right.  That's all.  Thank you.

            THE COURT:  Any redirect, Counsel?

            ATTORNEY FALLON:  One clarification.

                **REDIRECT EXAMINATION**

                        217

BY ATTORNEY FALLON:

Q    Um, I take it it is possible that Item FK, Exhibit 114, was discharged by the weapon, 129? At -- at least it's the same general characteristics?

A    Yes, it is possible.

Q    But beyond that, you cannot say for any degree of certainty?

A    That's right.

Q    Okay.  That's fine.  Thank you.

          ATTORNEY EDELSTEIN:  Judge, just some real quick follow-up.

### RECROSS-EXAMINATION

BY ATTORNEY EDELSTEIN:

Q    When you say, it could be, isn't it just as likely, Mr. Newhouse, that that one that, um, Counsel just referred to, FK, could not have been fired from that gun?

A    I simply can't say.  And that's what that means.

Q    Thank you.  That's all.

          THE COURT:  All right.  You may step down.

          THE WITNESS:  Thank you.

          THE COURT:  Uh, I think we'll take a recess now for about 15 minutes.  Counsel, if I could see you for just a couple of minutes?

218

ATTORNEY FALLON: Sure.

(Recess had at 2:57 p.m.)

(Reconvened at 3:20 p.m.)

THE COURT: Before, uh -- Before -- Oops. Before proceeding, I'd like to remind the media that the trial administration order says that during recesses, the camera should not be operating, and in this -- during this past recess, it was, so I'd appreciate it if you could, uh, look a little bit more closely at that. All right. Uh, gentlemen? Are you ready to proceed, Mr. Fallon?

ATTORNEY FALLON: Yes. State would call Kenneth Olson.

THE COURT: Is it your plan that Mr. Olson will be your last witness this afternoon?

ATTORNEY FALLON: Yes.

THE CLERK: Raise your right hand, please.

**KENNETH OLSON,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Be seated. State your name and spell your last name for the record, please?

THE WITNESS: Kenneth B. Olson, O-l-s-o-n.

**DIRECT EXAMINATION**

BY ATTORNEY FALLON:

219

Q How are you employed?

A I'm a forensic scientist at the State Crime Laboratory in Madison.

Q And how long, um, have you been employed in that cap -- uh, in that capacity?

A Approximately 27 years.

Q What type of, uh, forensic science do you practice at the Crime Lab?

A My main duties at the Crime Laboratory is in the area of trace evidence examination. I examine a variety of materials; paint, glass, fibers, plastics, metals, um, anything that needs chemical identification or comparison, um, that doesn't fit into drugs, toxicology, or DNA.

Q All right. And how long have you been actively engaged in the trace evidence, uh, field?

A My -- The whole time that I've been employed at the laboratory.

Q All right. Have you ever been a member of -- for instance, of, uh, the Field Response Unit for the Crime Lab?

A Yes. I was an active member of our field response program for 24 years.

Q All right. Um, are you a current member?

A I kind of fill in as needed.

220

Q   All right.  How is it that you became involved in this particular case?

A   I was asked to examine, um, several items that were recovered during the investigation of this case.  Um, items from a burning barrel, uh, and some, uh, charred bones.

Q   All right.  Um, and, in particular, your reason for being here today is to provide us the, uh, results of your examinations?

A   That's correct.

Q   All right.  Um, before we do so, um, I'd like to find out a little bit about your, um -- your background.  I'm going to have Exhibit, um, 136, uh, given to you by Investigator Wiegert.  Do you recognize Exhibit 136?

A   Yes, I do.

Q   What is Exhibit 136?

A   Exhibit 136 is a statement of my qualifications.

Q   And, uh, did you prepare that exhibit?

A   Yes, I did.

Q   All right.  Well, first of all, let's talk about your, uh, educational, um, experience.  First of all, do you have an undergraduate degree?

A   Yes, I do.

Q   And from which institution?

221

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 221 of 272   Document 19-16

A   I have a Bachelor of Science Degree from the University of Wisconsin at Superior with a major in chemistry.

Q   All right. Uh, have you received any, uh, post, um, uh, graduate experience at all in -- or courses of that ilk?

A   I took a couple, um, um, Master's of Business Administration courses.

Q   Very good. And what particular, uh, on-the-job-training have you received to assist you in performing the tests that you, uh, currently perform for the Crime Lab?

A   Since being employed at the Crime Laboratory in the area of trace evidence, I did a three-year apprenticeship-type activity, learning the different aspects of trace evidence. So I had extensive on-the-job-training, and the laboratory sent me to several schools over those training years in all the different areas that I do analysis, um, with the different types of instruments that we use to the different types of evidence that we handle.

Q   All right. Um, are there any particular, um, associations or organizations that you belong to, either for training purposes or for professional development?

222

A    Yes.  Relating to forensic science, I'm a member of the Midwest Association of Forensic Scientists.  I'm also a member of the Association for Crime Scene Reconstruction, and a member of the International Association of Blood Stain Pattern Analysts.

Q    All right.  And do you regularly a -- attend trainings in these areas of specialization to maintain, uh, current familiarity with the research and the literature and general crime scene processing requirements?

A    As often as -- as I can.

Q    All right.  Um, when did you first become involved in this case?  What was your first, um, assigned task?

A    The first evidence that I examined in this case, um, I received some items from a burning barrel on December 1, 2005.

Q    What kind of items did you examine from a burn barrel?

A    The items were submitted in -- in -- I, um, put the materials out on a -- an exam table, and I found, um, items of -- of -- uh, from a cell phone.  Um, it was a Motorola -- Motorola cell phone.  You could tell that the -- um, just visually, the material -- it was, um, consistent with, uh, a cell phone, flip

223

Q   phone, and I found, um, charred remains of a -- a Canon Sure Shot A310 camera, and then some other electrical components and, uh, some batteries.

Q   All right. Um, did you recommend any additional or further forensic work on that material that you, yourself, were unable to, um, uh -- to conduct?

A   I was asked if I could get any information from the cell phone or the components of the camera. And I informed the investigators that, um, our laboratory's not equipped to do that type of analysis. Um, I'm basically one that can examine things either visually or microscopically, and give them investigative leads. So if they needed a more in detailed analysis, they would have to send that to, uh, another laboratory or the FBI.

Q   All right. After examining the contents of the, uh -- the burn barrel, what was the next, um, matter, uh, which concerned your, uh, expertise?

A   In February of 2006, I was asked to examine some skull fragments, some charred skull fragments from a burning pit. Um, specifically, uh, they wanted me to examine, uh, an entrance, uh, defect into that skull fragment.

Q   All right. And describe the skull fragment that

224

you were asked to examine?

A   The skull fragment was, um, a small, um, approximately two inches in -- in diameter, um, piece of charred skull that had a hole in it, and that hole had some beveling on the outer surface, and it -- and it had some, um -- some beveling or concave appearance on the inside of the -- the bone fragment.

Q   All right.  I'm showing investigate -- uh, having Investigator Wiegert show you a photograph.  Um, what exhibit number is that, please?

A   Exhibit 140 is a photograph of that cranial skull fragment that I examined that had the beveling, um, and the -- can't think of the term -- the concave, uh, nature of the -- of the bone.

ATTORNEY FREMGEN:  Judge, at this point I don't know if I necessarily have an objection, but I -- I suppose I'd like some more foundation from this witness.  He's referring to it as a cranial or a skull fragment.  I don't think the expert has -- Well, I don't think he has an expertise to say what type of bone this is other than, someone told me it might have been a cranial bone.

I -- I know he mentioned charred bones when he was talking about what he reviewed, and

225

now it's referred to as cranial bone. If there could be some more foundation as to how he knows what that is.

ATTORNEY FALLON: That's where I'm going next.

ATTORNEY FREMGEN: Okay.

THE COURT: All right.

ATTORNEY FREMGEN: Thank you.

Q (By Attorney Fremgen) Um, from whom did you receive these items for purposes of, uh, analysis?

A These items were, uh, originated from, uh, Dr. Leslie Eisenberg, um, an anthropologist with the State Historical Society.

Q All right. And, um, did the -- the items that you examined, they did receive a Crime Lab designation; is that correct?

A Yes, they did.

Q All right. And, um, first of all, tell us about the -- the items that were -- how they were originally submitted to you in their packaging? Would you describe that for us, please?

A Could I refer to my notes to that?

Q Sure.

A This particular item in Exhibit 140, uh, was received

226

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 226 of 272    Document 19-16

in a box, um, from DCI, and Item EJ, which is that, um, bone fragment there, um, was received in, uh, three sealed plastic Ziplock bags. Uh, one was labeled cranial refits with suspected entrance deficit. The second one was labeled cranial refits, and the third one was labeled cranial refits. Um, I was only interested in the suspected entrance defect in that one, uh, uh, skull fragment.

Q All right. And, um, again, um, from whom were those, um, uh, items received?

A EJ and EK were submitted by Special Agents -- Special Agent James Holmes, uh, Division of Criminal Investigation.

Q That's correct. Now, you mentioned something about Dr. Eisenberg? Were there indications or markings on the materials indicating that she had previously examined those items?

A Yes. Those were, um, her markings, her initials.

Q All right. And her labeling?

A Yes.

Q All right. Very well. With respect to, um -- Of the items that you examined, you -- you indicated you only examined one item?

A Of -- of the two that were submitted, Item EJ and A -- uh, EK, I only examined the one, uh, fragment

227

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 227 of 272    Document 19-16

Q All right. And the item -- and the other items were -- how were they labeled?

A The other item was a sealed plastic bag with bone -- bone fragments labeled cranial, slash, face, slash, dental.

Q All right. And was there any indication of a suspected entrance defect on Item EK?

A No, there was not.

Q All right. Let's begin, then, with, um, Item EJ. Specifically, how did you begin your analysis of that item?

A Um, first thing I did was just examine, um, that, uh, skull fragment, uh, under my normal stereo microscope to see what the surfaces looked like, to see if I could see any, um, metallic metal present. Um, I then, um, mounted the item on a -- a scanning electron microscope that uses energy disbursed x-rays to do elemental analysis on the areas, and I was specifically interested in the areas, um, around the -- the entrance defect, both on the -- on the inner surface and on the, um -- on the inward beveling.

Q All right. And, um, what was the condition of the fragment that you examined?

228

A     It was heavily charred.  Um, and it was -- and it was
brittle.

Q     All right.  And did you take any special
precautions in handling the matter, um, prior to
subjecting it to testing?

A     Just, uh, handled with, uh, gloves and was gentle
with it.

Q     All right.  And subsequent to your, um,
examination of that item, did you receive other
fragments from Dr. Eisenberg, uh, to examine?

A     In November, um -- November 17, 2006, um, I received,
uh, two other, uh, charred cranial pieces from
Dr. Eisenberg.

Q     All right.  And what were those items designated?

A     Those items were designated Item KQ and KR.

Q     All right.  And describe, um, if you would, uh,
Item KQ in a little more detail, would you,
please?

A     Item KQ was a smaller bone fragment than Item EJ.  It
also had an entrance defect present.  And what, uh,
was interesting from Dr. Eisenberg's standpoint,
and -- and my standpoint, was the x-rays of that item
showed some tiny little bright spots present in the
x-ray, which usually means there's some type of dense
metal there.

229

Q   All right. I'm going to show you one more photograph, 137. Do you recognize that?

A   Yes. Exhibit 137 is the outer surface of Item KQ, uh, showing the entrance defect with the beveled edge.

Q   All right. And, um, you mentioned something also about, um, some x-rays. I'm going to have two more exhibits, uh, provided to you, uh, 138 and 139. Beginning with, uh, 138, do you recognize 138?

A   Exhibit 138 appears to be a x-ray image of Item EJ, the, um, first skull fragment that I examined.

Q   All right. I'm showing the inner surface. All right? And, uh, now, you mentioned, uh, before, we -- Well, yeah. All right. Let's go to the next one. Exhibit, uh, one thirty --

A   Nine?

Q   -- nine. And directing your attention to the piece in the upper left-hand corner, uh, of that exhibit, do you recognize that?

A   Yes, I do.

Q   All right. And is, um -- What is that?

A   Uh, Exhibit 139, uh, is a x-ray image of eight, um, bone fragments. And, specifically, the one in the upper left-hand corner, which has an entrance defect,

230

shows some bright spots right on the edge of that entrance defect, both on the beveled edge, uh, and inside of the beveling.

Q All right. Now, that, um, looks different than Item 137. Um, and if you can explain to us, um, the apparent difference?

A One thirty-seven, um, shows this smaller bone fragment with the entrance defect, um, attached to, uh, some more bone fragments. And that attachment is, uh, done after these x-rays were taken, um, when Dr. Eisenberg was putting together the pieces to try to, um, put the bone fragments back together to what they originally were.

Q Hence, the designation cranial refit?

A Correct.

Q All right. Well, um, let's start, then, with the, um, exhibit, uh, with the, um -- the -- the x-ray of the last one, 138?

A One thirty-nine?

Q Oh, 139, I'm sorry. There we go. All right. Now, directing your attention to the -- the zoomed-in picture of 139, what are we -- If you'd -- I believe there's a laser pointer to, uh -- right next to your material there. And you can either use the large screen over here, or one

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 231 of 272    Document 19-16

Q of those. It might be easier to use the large screen. Um, what are we looking at with the, um -- the area that seems to fluoresce there?

A I was interested in these bright particles here, and focused my scanning electron microscope on those areas.

Q All right. And with respect to those areas, what were you able to, um, determine?

A I was able to determine what elements were present, um, on that -- on that area that I was examining.

Q All right. And, um, similarly, I'm going to back up to Exhibit 138 now, the, um, previous one, and ask you, on this particular one, on a zoomed-in, uh, picture of that, there appears to be, likewise, some fluorescing material there?

A There is one bright particle there. Um, I did not have access to this x-ray when I was doing my analysis. So I focused my attention in this area here and this area in here.

Q All right. And, um, were you able to, uh, make any determination as to what these substances were, uh, along that ridgeline that you've just identified?

A Most of the -- the -- The strongest elements that I found in these areas were calcium and phosphorus,

232

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 232 of 272    Document 19-16

which are the elements of bone.  Um, but in the upper area, in this area, I did detect, uh, traces of elemental lead.

Q    All right.  When we say "traces of elemental lead", what do you mean?

A    Like I mentioned, um, the strongest elements that were present in that area were calcium and phosphorus, and those are the -- the main elements of bone.  Um, and I would suspect to see them, since I'm looking at a -- a -- a sample of -- of bone.

Um, but I was also interested in seeing if I could detect any lead, um, because this entrance defect interested me from a science standpoint that that was, indeed, a bullet hole, that I would be looking for any traces of lead metal.

Q    All right.  And how many different locations along that area did you examine?

A    I examined three areas in here and found elemental lead.  And I examined four areas over here and I did not detect any elemental lead.

Q    All right.  Did you examine any other, um, aspects of this particular item to determine whether there was any trace of elemental lead elsewhere on the, um, exhibit?

233

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 233 of 272    Document 19-16

A    Yes, I did.

Q    Tell us about that?

A    I purposely went to an area away from that entrance defect, uh, to get a background or a control sample of what elements I would suspect or would think to find in that area. And in that area, that control area, a -- away from that entrance defect, I did not detect any presence of elemental lead.

Q    So in -- in terms -- As a scientist, having looked at a control area, and now having that knowledge, and comparing it with the area near the defect, what does that suggest to you or what does that tell you?

A    That tells me that if I'm seeing lead in that entrance defect, that a source of that could be a bullet.

Q    All right. How many control areas did you utilize?

A    I believe I took four, uh, control areas away from that entrance defect.

Q    All right. Very good. In your experience, um -- Well, let me also ask, have you had any firearms training as part of your, uh, Crime Lab training?

A    Yes, I -- I do.

Q    And tell us about that?

234

A    For about a year and two or three months in the year
2000, I did some cross-training in the Firearms Unit,
um, examining guns, preparing guns for destruction,
um, test firing guns, recovering the bullets, doing
bullet comparisons, cartridge case comparisons.

Q    All right.  Very good.  I want to, um, move onto
the, um -- Well, before I do, let me ask you this
question:  With respect to Item EJ, based on your
findings of traces of elemental lead, uh, your,
uh, Crime Lab training, is -- is that defend --
uh, defect that you observed on that item
consistent with having been caused by a
high-speed projectile?

A    Yes, it is.

Q    Um, and why is that?  What is it about the defect
and your findings that, um, lead you to that
conclusion?

A    From my experience in crime scenes and field
response, uh, pending autopsies, and giving training
to law enforcement, that when, um, something --
something is shot with a bullet in the skull, you get
this type of beveling on the surface from where the
bullet impacts, and then you have that concave
beveling on the inside surface that, uh, is very, um,
characteristic of a high-speed projectile, including

235

bullets.

Q   All right.  Very good.  Let's, um, move onto, um, the item, um, KQ, and I think we have that as Exhibit 139?

A   That's correct.

Q   All right.  Again, we're focusing in on the, um, piece of the upper left-hand corner of this exhibit.  Tell us about your examination of this particular fragment?

A   I did have a photograph of this x-ray when I was doing my analysis of this item, and I focused my analysis in the area here.  I took four samples.  One here, two, three and four.  Um --

Q   All right.  And, um, with respect to those particular four areas, what did you find?

A   In areas one and two, the two strongest elements were calcium and phosphorus.  Uh, and then the third strongest element in that area was -- was elemental lead.  Uh, Item -- areas three and four, the strongest, um, element present was lead on those two areas.

Q   All right.  And, um, likewise, uh, comparatively speaking, was there more or less lead associated with, um, Item KQ, Exhibit 139, than with Item EJ, Exhibit 137?

236

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 236 of 272    Document 19-16

A  There was considerably more lead in this particular bone fragment, KQ, than there was in Item EJ.

Q  Um, likewise, with respect to this particular item, did -- did you test other areas of the fragment?  In other words, did you develop control areas from which to make comparisons?

A  Yes, I did.

Q  Tell us about that?

A  Like in the previous item, I went to an area away from the defect and, um, did not detect any lead present in tho -- in those areas.

Q  All right.  And so what did that tell you or signify to you relative to your findings of, uh, lead in -- in -- in and around the area perceived to be the defect?

A  That finding lead in the area of this entrance defect, associated with bright spots that are consistent with very dense metal that -- that -- containing mainly lead, that it could have come from a bullet.

Q  All right.  Is the, um -- on microscopic examination, is that defect area, which you identified as having traces of lead present, or -- or be more than traces of el -- actual elemental lead present -- is that consistent

237

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 237 of 272    Document 19-16

Q   with, um, a -- a -- a defect caused by a high-speed projectile?

A   Yes, it is.

Q   All right.  And why is that?

A   As I mentioned earlier, that type of defect, um, striking hard bone, causes the beveling effects on the out -- outside and on the inside surfaces that is consistent with a high-speed projectile, such as a bullet.

Q   On this -- On this particular item, did you do both the inside and the outside?

A   Yes, I did.

Q   First of all, so we're all clear, what do you mean inside and outside?  Are we referring to the defect beveled area?  Or what are we referring to?

A   I'm referring to the in -- inner surface of the skull versus the outer surface.  What we're -- What we see in this exhibit, this is the inner surface here.  So this is the inner beveling of that defect.  And I did look at the other side, the, um, outside surface.

Q   All right.  And with respect to the outer -- the other outside area, what did you find relative to the presence or absence of lead?

A   In the area inside of that bevel, I was able to

238

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 238 of 272    Document 19-16

Q   detect elemental lead on the -- the beveling on the outside surface.

Q   All right. Similarly, did you employ that same control technique on this, um -- outside, as you did on the inside area?

A   Yes, I did.

Q   All right. And what did that, if anything, indicate to you?

A   I did not defect any lead, uh, in my control area.

Q   Is it fair to say, then, that the only traces, or presence, actually, of lead were in and around the area identified as this defect?

A   From what I examined, yes.

Q   All right. All right. Mr. Olson, the opinion that, um, Item EJ, the first one we examined, had traces of elemental lead, uh, associated with it, do you hold that opinion to a reasonable degree of scientific certainty?

A   Yes, I do.

Q   Um, with respect to the item given Crime Lab designation KQ, uh, do you hold the opinion to a reasonable degree of scientific certainty that Item KQ, uh, contained elemental lead in and around that defect area?

A   Yes, I do.

239

ATTORNEY FALLON: Subject to the receipt of the four exhibits, one -- Or, excuse me, five. The, uh, CV, 136 through 140, we, uh, move those into evidence, and tender the witness for cross-examination.

THE COURT: Yeah. My sheet shows that, uh, 132 through 135 had not yet been offered.

ATTORNEY FALLON: Oh. Well, then I would make a motion that they be received as well.

THE COURT: Any objection, gentlemen, to either of those motions?

ATTORNEY FREMGEN: Judge, we reserve -- Ask -- ask the Court to reserve ruling on those at this time. I wish to be heard on a few of those.

THE COURT: All right. Cross.

## CROSS-EXAMINATION

BY ATTORNEY FREMGEN:

Q    Doctor, I -- I noticed -- And you did ask, uh, Attorney Fallon if you could refer to your notes. Um, I understand it's been about 12 or 15 months since you evaluated these items? Completed --

A    I --

Q    -- your reports?

240

A I evaluated in December of '05, February of '06, April of '06, and November of '06.

Q So it would be difficult for you, from the top of your head, to know everything that you wrote in your reports, or recall everything you wrote in your reports?

A Well, I tried to prepare today to be able to not refer to them, but some of the specific questions I asked to review my notes.

Q And that's fine. You, um, had indicated -- And, actually, I only have a few questions for you. So, hopefully, we'll make it easier for you. You'd indicated that when you reviewed, uh -- when you tested the areas of -- on EJ, I think in your notes you refer to them as -- there's one, two, three, and four, five, six? That's the outer edges of that bevel area?

A That's correct.

Q That you noted the -- the presence of calcium and phosphorus? Which you've testified is consistent with bone?

A Correct.

Q And lead? Which wouldn't normally be -- be consistent with a human bone?

A I'm not aware of finding that large a concentrations

241

in human bone.

Q    There's small concentrations of lead in the human body, but not in bone like that; correct?

A    Not that I'm able to detect.

Q    Now -- And -- and your assumption is that it might be from some sort of a lead projectile?  In fact, you said bullet?

A    Yes.

Q    Um, are you aware of what items were in the fire pit, or in this -- where -- where -- this burning pit, that might have maybe contributed to the lead presence?

A    I knew there were tires.  That's about the limit of my knowledge.

Q    Okay.  Could -- could -- Well, it -- could have something in the fire, had it been lead, contributed to these deposits?

A    It's possible, but it would have to be a relatively pure sample.

Q    Did you note any copper in any of these -- in your evaluation?

A    No, I did not.

Q    You did note other elements?  Including zinc, magnesium, aluminum?

A    That's correct.

Q So, uh, just to be correct, on -- on your direct, it wasn't just calcium, phosphorus, and lead, but at least three or four more other elements?

A That's correct.

Q And would that be normal to find in the human bone?

A I have limited, um, um, opportunities to examine bone fragments, but on the samples that I did examine, I was not surprised with the elements I was seeing there.

Q When you also, uh, did your control samples, similar type of elements would show up?

A Yes.

Q And, again, not a surprise to you?

A That's correct.

Q Your control was only on one other area of the bone fragments you -- provided to you?

A Every surface that I examined, um, like if it was the inner surface of one of the bones, I would do a control on the inner surface. If I examined the -- the entrance on the outer surface, I would do a control on that same outer surface.

Q And you did that for every fragment that you received?

A Yes, I did.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 243 of 272    Document 19-16

Q  You also received a -- a headboard?

A  Yes, I did.

Q  And -- and you had an opportunity to examine it to determine if there were any rope fibers; correct?

A  That's what I was requested to examine, to see if I could find any rope fibers attached to the headboard.

Q  So you're directed to look for this?

A  That's correct.

Q  And you did, uh, an actual -- a visual examination; correct?

A  Visual with some microscopic exam.

Q  So the first step would be to visually observe the item?

A  That's correct.

Q  And when you visually observed the item, you noted no rope fibers; correct?

A  That's correct.

Q  Uh, and then, of course, the microscopic evaluation would be because our eyes aren't that great; right?

A  A magnification helps in the area of trace evidence.

Q  And, obviously, that's your training? And you know that the next step would be to try to take a closer look; correct?

244

A    That's correct.

Q    And in order to do so, you used some sort of an adhesive tape to -- to pull up what might be on the surface of that, uh, wooden spindle on the headboard?

A    Yes.

Q    That's one -- one technique for looking for fibers is by using a tape lift to take a, um -- not too strong of an adhesive, um, but just to tape lift, like a lint remover type lift, and then examine what fibers were recovered from that? You don't want to pull off the surface, itself?

A    That's correct.

Q    And so with that, you were able to then, uh, place it onto some -- uh, some sort of a slide?

A    Actually, I placed it on a plastic backing, and then I can examine that under the microscope, and if I see something of interest, I can put a little cut in that plastic and, with a solvent, remove all the fibers I'm interested in.

Q    Did you note any fibers?

A    Yes.

Q    Were they rope fibers?

A    Uh, they were not consistent with rope fibers.

Q    You noted some cotton fibers?

A    That's correct.

Q    Okay.  I have nothing else.  Thank you, Doctor.

THE COURT:  Any redirect?

ATTORNEY FALLON:  Yes.

**REDIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q    Was it, um -- Is it, uh, expected or unusual for
you not to find any rope fibers given the -- the
material you examined?

A    In my experience, um, smooth surfaces, like spindles
on a headboard, are not your best surface for
snagging fibers.  Um, if there was, uh, slivers, a
nail, or something that could snag, uh, rope fibers,
that would be a better method for depositing fibers,
um, on a surface.

Q    All right.  Now, did you find something --
anything else on that -- that headboard?

A    Yes.  On one of the spindles there was a thin,
plastic film that I removed and analyzed, and
identified it as polypropylene.

Q    What are some of the uses of polypropylene is?

A    Um, polypropylene, um, is used in garments, it's
used, um, uh, as plastic containers, um, it -- it is
also used in rope manufacturing.

246

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 246 of 272    Document 19-16

ATTORNEY FALLON:  No further questions.

ATTORNEY FREMGEN:  No, Judge.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You're welcome.  Any further witnesses this afternoon?

ATTORNEY FALLON:  We do not have any this afternoon, Judge.  We went a little more quickly than anticipated.

THE COURT:  All right.  Uh, Mr. Fremgen, you want to be heard on some of these exhibits? I'll excuse the jury for the afternoon and we can talk about the exhibits.

Ladies and gentlemen, you are done for this afternoon.  We'll see you tomorrow at 8:30. Again, I remind you, don't talk about this among yourselves or anyone else.  Have a good night.

(Jurors out at 3:59 p.m.)

THE COURT:  All right.  Be seated.  At issue are Exhibits 132 through, and including, 140.  You, Mr. Fremgen, or Mr. Edelstein, have -- have objections to one or the other of those?

ATTORNEY FREMGEN:  Judge, I have no objections to Exhibit 132, and 137 through 140. My objections are, specifically, to 133 and 136.

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 247 of 272   Document 19-16

They're curriculum vitae of the two witnesses.  I don't believe that that is evidence.  I'm not entirely sure why they were even, um, marked.  These witnesses were testifying already about their expertise and their backgrounds.  For the -- for those two, that's the reason I have an objection.

THE COURT:  All right.  You want to be heard on that?

ATTORNEY FALLON:  Just -- They're just part of the record.

THE COURT:  Uh, yeah.  They can be received.  They're not -- They're not going to be published to the jury or anything of that sort, so...

ATTORNEY FREMGEN:  And if that's the ruling of the Court, then I would have the same as to 134 and 135, and -- and, simply, if it gets to the point of what the jury wants to see, we want to be heard on that, because, technically, those are reports.  Technically, they're hearsay reports.  Um, the witnesses have already testified.  And it should be the recollection of the witnesses at the time of jury deliberations, not what the reports say.

248

THE COURT: Yeah, I understand. I -- I -- I will receive all of them subject to, uh, the reservation of -- of hearing what gets published or what goes back, if anything, to the jury.

ATTORNEY FALLON: All right. That's fine. That's -- that's all we would ask.

THE COURT: Okay. Uh, anything else?

ATTORNEY FREMGEN: No, Judge.

THE COURT: All right. Uh, we'll meet in my chambers in about ten minutes?

ATTORNEY FALLON: Sure.

THE COURT: We're adjourned until tomorrow at 8:30 then.

(Court stands adjourned at 4:01 p.m.)

249

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 249 of 272   Document 19-16

STATE OF WISCONSIN    )
                      )SS.
COUNTY OF MANITOWOC   )


            I, Jennifer K. Hau, Official Court

Reporter for Circuit Court Branch 3 and the State

of Wisconsin, do hereby certify that I reported

the foregoing matter and that the foregoing

transcript has been carefully prepared by me with

my computerized stenographic notes as taken by me

in machine shorthand, and by computer-assisted

transcription thereafter transcribed, and that it

is a true and correct transcript of the

proceedings had in said matter to the best of my

knowledge and ability.

            Dated this 11th day of December, 2007.


                    _Jennifer K. Hau_____
                    Jennifer K. Hau, RPR
                    Official Court Reporter

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 250 of 272    Document 19-16

**'**

'05 [1] 241/1
'06 [3] 241/1 241/2 241/2
'96 [1] 28/22
'97 [1] 28/22
'98 [1] 134/7
'til [11] 141/17

**.**

.22 [37] 95/10 97/2 101/25 102/6
 102/13 103/10 106/3 106/6 106/11
 110/5 110/7 110/19 111/7 111/9 117/7
 117/16 117/22 118/10 118/10 128/10
 128/11 128/12 197/13 197/20 201/22
 204/11 204/14 204/16 205/13 206/3
 206/6 207/2 208/4 208/22 212/16
 212/23 214/24
.22 caliber [17] 101/25 102/6 102/13
 103/10 106/3 106/6 106/11 197/13
 197/20 204/11 204/14 205/13 206/3
 206/6 208/4 212/16 212/23
.22s [3] 115/1 117/23 214/13
.50 [1] 101/24
.50 caliber [1] 101/24

**0**

06 [3] 1/6 5/5 63/23

**1**

1-0 [1] 80/5
10 [7] 81/22 82/17 96/4 96/14 175/24
 201/4 211/3
100 [1] 49/6
101 [1] 49/14
102 [1] 50/1
103 [1] 52/5
104 [1] 55/13
105 [5] 58/19 61/11 78/24 79/1 80/5
106 [1] 59/18
107 [1] 60/18
108 [4] 3/12 4/18 63/5 63/25
109 [2] 4/18 64/5
109-125 [1] 3/13
10:04 [1] 68/3
10:29 [1] 68/4
11 [9] 96/4 96/14 113/6 119/9 167/2
 183/8 197/1 202/22 208/4
110 [1] 64/21
111 [3] 65/13 65/16 65/23
112 [1] 56/2
113 [13] 65/15 65/25 203/10 207/21
 207/25 208/1 208/13 208/21 209/1
 209/20 209/24 211/4 213/22
114 [15] 4/16 63/16 63/21 67/19 203/10
 203/12 203/15 203/17 204/2 205/6
 206/22 207/1 211/5 213/22 218/3
115 [6] 4/17 46/23 46/24 47/12 68/10
 68/13
116 [2] 91/5 108/14
116-131 [1] 4/18
117 [1] 93/9
118 [1] 95/3
119 [1] 95/13
11:54 [1] 130/3
12 [1] 240/22
120 [2] 96/6 197/5
121 [1] 98/9
122 [1] 105/13
123 [1] 99/15
124 [1] 104/11
125 [3] 3/13 106/9 119/1
125-127 [1] 3/14

126 [2] 106/18 106/19
127 [3] 3/14 106/17 107/8
128 [8] 3/15 96/25 196/17 196/21
 196/22 198/6 201/21 202/23
128-129 [1] 3/16
129 [15] 3/16 102/11 102/24 197/16
 197/17 197/19 197/20 198/8 203/6
 206/23 208/22 209/12 211/1 211/7
 218/3
130 [2] 104/22 104/24
130-167 [1] 3/19
131 [3] 4/18 107/18 108/15
132 [10] 4/19 154/4 154/8 154/9 154/17
 167/8 167/11 240/7 247/20 247/24
133 [5] 4/20 183/14 183/15 183/16
 247/25
134 [5] 210/16 210/19 210/20 211/12
 248/18
134-135 [1] 4/21
135 [7] 4/21 210/16 210/19 211/2
 211/13 240/7 248/18
136 [6] 221/13 221/15 221/17 221/18
 240/3 247/25
136-140 [1] 4/22
137 [5] 230/2 230/3 231/5 236/25
 247/24
138 [6] 230/8 230/9 230/10 230/11
 231/18 232/12
139 [6] 230/9 230/23 231/20 231/22
 236/4 236/24
14 [4] 103/15 103/17 111/10 112/3
140 [6] 4/22 225/11 226/25 240/3
 247/21 247/24
15 [5] 6/12 175/24 201/4 218/24 240/22
15-minute [1] 68/2
154 [1] 4/19
16 [5] 205/14 205/16 207/3 207/17
 208/5
167 [3] 3/19 4/19 4/19
167-181 [1] 3/20
17 [6] 1/10 103/15 103/17 111/10 112/3
 229/11
181 [1] 3/20
181-211 [1] 4/4
19 [3] 73/25 185/1 187/8
19.7 [1] 216/14
1972 [2] 184/2 184/23
1973 [1] 185/1
1974 [1] 185/6
1975 [2] 185/12 185/25
1981 [4] 184/2 184/3 186/9 187/3
1984 [2] 28/16 133/10
1988 [2] 184/4 187/9
1992 [2] 133/11 133/16
1994 [3] 6/23 28/21 29/1
1995 [1] 28/22
1997 [1] 134/6
1998 [2] 134/6 184/4
1999 [1] 134/16
1:00 [3] 129/21 129/22 129/25
1:01 [1] 130/4
1:15 p.m [1] 136/20
1st [3] 21/3 57/3 61/12

**2**

20 [2] 73/25 132/23
2000 [3] 131/1 187/14 235/2
2002 [3] 132/19 184/5 187/15
2005 [9] 7/12 7/14 21/17 41/12 54/16
 74/1 83/6 135/10 223/17
2006 [10] 52/16 56/8 65/20 74/8 77/25
 79/4 210/23 211/3 224/20 229/11
2007 [2] 1/10 250/15

21 [1] 210/23
211 [2] 4/4 4/21
211-217 [1] 4/5
217 [1] 4/5
217-218 [1] 4/6
218 [2] 4/6 4/7
219-240 [1] 4/10
23 [5] 64/18 64/24 65/5 66/15 82/24
24 [1] 220/23
240 [3] 4/10 4/20 4/22
240-246 [1] 4/11
246 [1] 4/11
246-247 [1] 4/12
247 [1] 4/12
249 [3] 4/20 4/21 4/22
26 [1] 138/16
27 [2] 4/15 220/6
28 [2] 3/4 4/15
28-40 [1] 3/5
28th [1] 25/6
29 [1] 202/19
2:57 [1] 219/2
2nd [3] 61/12 78/2 86/17

**3**

3/1/06 [1] 63/23
30 [1] 132/24
30-some [1] 187/25
300 [1] 187/24
31 [2] 47/25 67/11
35mm [1] 32/18
3:20 [1] 219/3
3:59 [1] 247/18

**4**

40 [1] 3/5
40-67 [1] 3/8
4731 [2] 127/10 127/10
4:01 [1] 249/15
4:30 in [1] 140/2
4:30 p.m [1] 57/9

**5**

5-28 [1] 3/4
55-gallon [1] 148/20
5th [7] 7/11 7/14 8/19 9/24 15/1 15/16
 18/16

**6**

60 [3] 102/1 197/22 208/22
67 [4] 3/8 4/16 4/16 66/23
68 [2] 4/17 4/17
68-87 [1] 3/9
6th [28] 89/15 89/19 90/2 90/7 91/19
 92/1 93/16 94/9 94/17 95/25 97/24
 104/6 105/4 105/8 105/8 120/1 120/9
 120/21 121/7 122/14 122/20 122/21
 123/9 125/25 126/1 126/14 127/18
 146/1

**7**

72 [1] 9/14
737-4731 [1] 127/10
76 [2] 163/12 163/19
77 [1] 66/3
79 [2] 10/14 27/24
79-94 [1] 4/15
7:30 [1] 141/11
7th [7] 31/25 43/4 43/5 45/22 105/5
 105/8 105/10

**8**

80 [2] 10/23 68/25

**8**

81 [1] 11/7
82 [1] 14/20
83 [1] 15/8
84 [1] 17/13
85 [1] 18/2
86 [2] 16/16 102/4
8623 [1] 65/19
87 [2] 3/9 16/25
87-88 [1] 3/10
88 [4] 1/6 3/10 5/5 19/13
88-108 [1] 3/12
89 [1] 23/2
8:00 [1] 141/11
8:30 [2] 247/15 249/14
8:30 or [1] 141/14
8:34 [1] 5/1
8th [15] 104/7 104/14 105/2 105/20
 105/23 106/2 106/13 106/15 108/7
 115/16 120/6 120/10 122/15 122/23
 123/7

**9**

90 [3] 25/24 28/3 28/4
91 [1] 18/10
92 [2] 18/18 18/21
920-737-4731 [1] 127/10
93 [1] 20/12
94 [4] 4/15 27/13 27/16 27/24
95 [4] 43/11 43/12 67/18 69/1
95-114 [1] 4/16
96 [1] 44/17
97 [3] 46/6 46/18 47/15
98 [1] 48/3
99 [1] 48/20
9:00 [1] 141/15
9s [1] 31/9
9th [5] 21/12 21/12 21/16 22/3 22/19

**A**

a.m [5] 5/1 68/3 68/4 130/3 145/25
A310 [7] 47/24 49/24 50/4 50/6 50/9
 67/10 224/2
Abbott [1] 133/23
above [10] 14/24 15/3 15/6 15/12 39/6
 63/9 65/1 101/23 103/24 180/19
absence [2] 142/2 238/24
abutted [1] 180/18
ac [1] 216/3
Academy [1] 188/20
accepted [2] 184/21 187/9
access [6] 43/19 43/20 142/5 144/16
 180/20 232/17
accessible [3] 177/20 177/24 179/15
accompanied [2] 136/21 136/25
accurately [1] 91/18
acetates [1] 133/25
acknowledge [1] 111/5
acquainted [1] 184/23
across [2] 117/23 118/10
action [3] 61/18 102/25 200/6
active [1] 220/22
actively [1] 220/15
activities [1] 42/6
activity [1] 222/15
Actu [1] 73/22
ad [1] 59/7
additional [9] 26/12 56/17 56/23 61/8
 78/9 89/7 155/15 172/15 224/4
additionally [2] 189/17 208/12
address [1] 127/7
adept [1] 111/22

adequate [2] 33/6 33/9
adhesive [2] 245/3 245/9
adjacent [1] 64/13
adjourn [1] 129/16
adjourned [2] 249/13 249/15
administration [2] 219/6 222/8
admission [2] 27/23 108/14
admissions [1] 67/18
ADMITTED [1] 4/14
advice [1] 157/3
advised [1] 120/22
affiliations [1] 188/3
AFTE [1] 188/25
afternoon [14] 56/15 57/8 127/3 129/19
 130/5 130/7 130/9 146/15 211/18
 219/15 247/6 247/8 247/12 247/15
afternoon's [1] 130/8
afterwards [1] 178/22
agencies [3] 41/11 131/7 135/4
agency [4] 41/9 89/5 131/16 134/25
agent [31] 3/7 22/3 25/1 25/18 30/12
 40/14 41/19 42/2 42/10 44/1 45/14
 50/11 52/20 52/22 52/23 56/7 56/16
 62/16 64/3 67/20 68/20 70/9 71/20
 75/11 78/9 107/4 117/14 121/1 146/5
 155/12 227/12
agents [2] 75/12 227/11
agree [1] 118/24
agreement [2] 210/2 210/9
ahead [8] 20/1 21/11 46/22 52/10 68/15
 77/11 89/13 100/12
air [10] 30/20 61/7 64/11 64/13 64/16
 64/19 65/3 66/21 94/10 94/12
allegedly [1] 128/7
allow [6] 60/9 117/24 118/13 118/17
 119/10 119/22
allowed [2] 33/25 192/14
alloy [1] 216/4
alluded [1] 75/16
almost [2] 16/7 69/21
along [12] 62/4 62/11 62/12 62/15 92/12
 94/24 143/7 149/19 150/12 153/8
 232/22 233/18
alongside [1] 54/19
altered [1] 189/16
altogether [1] 95/24
aluminum [1] 242/24
ammunition [20] 55/6 70/8 71/3 71/5
 103/3 103/18 106/3 106/4 106/7 106/11
 116/10 128/13 185/22 191/9 198/23
 200/5 201/13 201/15 201/19 215/7
among [4] 55/5 117/17 174/2 247/16
amount [3] 51/3 210/9 213/7
amounts [2] 160/6 160/6
analysis [19] 47/4 47/7 50/14 50/15
 65/9 87/8 97/11 97/16 131/3 183/3
 222/19 224/11 224/15 226/11 228/11
 228/19 232/18 236/11 236/12
analyst [5] 131/3 132/5 134/3 151/23
 176/21
analysts [2] 46/12 223/5
analyzed [1] 246/20
and/or [1] 138/21
Anderson [1] 134/10
Andrew [1] 8/17
angle [1] 69/19
animal [1] 178/17
animation [1] 163/18
anthropologist [3] 54/7 76/11 226/13
anticipated [1] 247/9
anticipation [1] 214/22
anybody [3] 117/11 119/15 126/2
anymore [1] 207/11

anyone [8] 37/21 114/14 120/22 136/21
 136/25 149/15 150/4 247/17
anytime [7] 116/5 119/8 129/21 134/25
 155/20 186/14 217/17
anyway [1] 144/2
anyways [2] 94/23 174/16
anywhere [1] 201/4
apart [1] 111/23
Apologize [1] 100/16
apparent [2] 45/4 231/6
apparently [1] 85/5
appear [4] 23/15 70/5 70/15 173/3
appearance [2] 111/24 225/7
APPEARANCES [1] 1/13
appeared [4] 1/25 45/8 45/12 71/24
appearing [1] 5/12
appears [11] 5/7 5/8 5/14 5/15 16/18
 70/22 81/22 97/2 138/17 230/11 232/14
application [1] 56/9
applicator [6] 26/21 27/1 27/3 27/4 27/9
 40/6
appreciate [4] 6/9 9/5 90/1 219/9
apprenticeship [1] 222/15
apprenticeship-type [1] 222/15
approached [1] 139/25
approaching [2] 30/12 30/19
appropriate [2] 68/1 197/25
approximate [1] 145/23
approximately [17] 6/12 42/16 53/5 57/9
 69/17 77/24 132/20 136/19 140/12
 148/17 158/17 164/16 166/19 187/21
 204/16 220/6 225/3
APRIL [5] 1/10 25/16 52/15 74/7 241/2
April 3 [1] 25/16
aren't [4] 97/12 112/22 200/12 244/20
argue [1] 124/1
arguing [1] 217/11
argumentative [1] 118/20
arm [1] 191/23
armor [2] 89/8 102/18
Arms [1] 101/24
arranged [1] 140/24
arrangements [1] 57/20
arrival [5] 7/19 8/3 57/3 141/20 145/23
arrive [1] 137/3
arrived [10] 41/22 57/7 57/16 79/10
 137/6 137/19 140/9 141/5 143/2 169/19
arriving [4] 8/5 8/14 31/13 140/15
arson [3] 41/6 44/25 72/1
ash [16] 53/17 76/19 147/23 148/7
 148/8 148/17 148/22 153/15 153/16
 155/22 156/16 157/10 158/3 173/15
 174/25 177/18
ashen [1] 156/13
aside [1] 62/9
aspect [1] 73/3
aspects [2] 222/16 233/23
assigned [20] 8/11 8/15 8/20 21/8 31/5
 37/4 37/15 41/6 43/8 47/3 57/14 89/21
 101/8 101/9 119/19 146/24 147/13
 151/21 185/25 223/14
assignment [13] 41/7 42/8 45/24 45/25
 98/7 121/10 121/11 121/12 137/19
 151/7 152/22 153/4 159/18
assist [20] 10/11 23/22 31/19 41/12
 41/21 43/8 50/14 50/21 65/15 66/6 66/6
 66/25 76/11 89/9 91/5 135/11 146/7
 154/2 173/6 222/10
assistance [4] 10/18 131/6 136/3 206/8
Assistant [3] 5/9 5/10 5/11
assisted [7] 25/14 41/24 54/18 149/15
 155/10 155/16 250/10
assisting [5] 41/8 41/10 45/19 173/18

## A

assisting... [1] 174/3
associated [4] 146/13 236/23 237/17 239/16
association [6] 188/8 188/25 212/19 223/2 223/3 223/5
associations [2] 188/3 222/23
assume [14] 6/25 23/10 85/11 85/13 111/20 114/3 123/22 170/16 171/20 172/11 173/2 176/7 176/25 201/4
assumed [2] 37/24 58/14
assuming [4] 100/4 192/1 200/10 214/2
assumption [1] 242/5
assured [1] 196/5
attached [7] 107/24 108/1 138/25 143/11 144/21 231/8 244/7
attachment [1] 231/9
attempt [10] 25/8 51/16 53/25 100/13 114/7 119/21 160/16 160/24 180/22 212/14
attempted [3] 144/15 168/18 212/20
attempts [1] 144/12
attend [2] 189/4 223/6
attending [1] 188/24
attention [12] 25/22 43/4 99/14 105/20 106/9 135/8 138/16 146/21 203/10 230/18 231/21 232/18
Attorney [149] 1/20 1/22 3/4 3/5 3/8 3/9 3/10 3/12 3/13 3/14 3/15 3/16 3/19 3/20 4/4 4/5 4/6 4/7 4/10 4/11 4/12 5/3 5/6 5/7 5/9 5/10 5/11 5/13 5/13 5/14 5/18 6/3 8/1 8/2 18/25 19/1 24/6 24/10 24/17 24/18 27/22 28/3 28/6 28/10 40/9 40/11 40/14 40/24 67/17 67/23 68/8 68/11 68/14 68/17 68/19 78/22 78/25 87/15 87/18 88/5 88/7 88/9 88/12 88/24 96/23 96/24 100/3 100/11 100/15 100/22 101/1 101/3 103/25 104/2 104/20 104/23 108/10 108/19 108/21 108/22 108/23 108/25 109/5 118/19 119/2 125/20 125/22 126/4 126/9 126/17 126/22 127/12 127/15 127/20 127/24 128/5 128/16 128/17 128/19 129/1 129/4 129/6 129/9 129/13 129/20 129/23 130/7 130/21 167/6 167/12 167/15 170/22 181/9 181/13 181/15 182/1 203/8 203/11 211/11 211/17 217/24 218/1 218/11 218/14 219/1 219/12 219/16 219/25 225/15 226/4 226/6 226/8 226/9 240/1 240/8 240/13 240/19 240/21 246/5 246/7 247/1 247/2 247/7 247/23 248/10 248/16 249/6 249/9 249/12
audio [1] 100/7
August [1] 184/23
Aurora [3] 22/5 22/8 22/14
Austin [3] 66/5 134/9 134/13
authorize [1] 62/18
authorized [2] 20/3 21/6
auto [1] 137/23
automatic [9] 102/1 102/7 102/13 102/23 102/25 103/10 185/23 193/8 197/23
automatically [1] 103/5
automobile [1] 91/15
automobiles [1] 19/7
automotive [1] 60/6
autopsies [2] 189/19 235/19
autopsy [1] 196/1
AutoTrader [6] 10/25 11/7 11/10 11/13 13/15 126/25
Avery [35] 7/15 13/19 21/7 22/7 22/15 22/18 23/20 24/20 31/6 31/19 42/1 42/12 43/7 50/16 51/4 56/11 69/17 73/7 75/8 77/25 89/16 90/9 101/14 105/7 105/22 105/24 106/5 106/16 110/11 110/13 110/24 118/21 126/10 128/20 160/9
Avery's [47] 8/24 9/17 10/13 10/20 14/23 14/25 16/11 17/16 18/6 18/15 18/23 19/24 20/16 43/14 43/21 43/22 48/11 49/23 50/20 51/5 51/10 56/22 57/12 58/23 60/15 67/4 79/3 91/18 101/11 101/21 101/22 102/13 103/23 104/3 107/11 107/21 108/8 110/6 115/5 117/15 121/15 122/22 124/12 153/2 159/22 159/22 159/23
avoid [1] 170/4
awaiting [1] 141/19
away [10] 87/14 143/5 159/6 170/11 172/13 176/6 234/3 234/7 234/19 237/9
awhile [2] 133/24 145/13

## B

B. [1] 219/23
B. Olson [1] 219/23
Bachelor [3] 184/10 184/16 222/1
Bachelor's [2] 133/8 133/10
background [5] 43/19 133/4 183/17 221/13 234/4
backgrounds [1] 248/5
backing [1] 245/17
backwards [1] 213/23
bad [2] 203/20 204/23
bag [10] 65/18 97/7 107/2 107/3 116/11 116/11 123/12 196/22 203/18 228/4
bags [5] 77/19 124/4 197/9 197/10 227/3
bailiwick [1] 217/19
baked [1] 153/17
Baldwin [2] 21/9 37/3
bandied [1] 193/19
Barb [1] 98/19
bark [1] 139/12
barrel [91] 43/13 43/16 43/19 43/21 43/24 44/6 44/10 44/13 44/14 44/19 44/21 44/23 45/3 45/5 45/7 45/9 45/17 45/23 46/3 46/11 48/11 49/9 49/20 49/23 66/24 67/6 68/22 69/1 69/6 69/8 69/16 70/1 70/6 70/16 70/18 71/7 71/8 71/9 71/10 71/14 71/17 147/19 147/19 147/21 148/18 148/20 148/24 149/12 150/18 151/6 153/22 174/4 174/6 174/7 174/7 174/8 174/8 175/3 175/6 175/17 175/18 176/3 176/6 176/15 191/5 192/23 193/23 194/1 194/2 194/2 194/3 194/4 194/9 194/15 194/24 195/7 195/14 195/16 199/9 199/12 199/25 200/12 204/15 205/9 205/14 207/4 217/13 221/5 223/16 223/19 224/18
barreled [1] 15/5
barrels [18] 51/9 98/3 98/11 98/14 98/23 147/2 147/5 147/7 147/16 147/22 147/23 148/16 149/10 173/16 173/21 175/21 199/13 207/10
basement [2] 52/7 53/1
bathroom [8] 9/10 9/22 19/24 20/16 20/18 33/20 33/24 34/3
bathroom/laundry [2] 19/24 20/16
batteries [3] 55/10 148/13 224/3
battery [2] 25/21 148/14
bay [2] 81/3 109/20
bed [15] 13/24 14/23 14/24 14/25 15/3 15/6 15/12 101/23 103/24 122/1 122/4 122/6 122/16 122/20 122/24

bedding [13] 101/17 121/13 121/17 121/23 122/3 122/6 122/7 122/11 122/14 122/15 122/21 123/5 125/14
bedroom [36] 9/9 9/10 9/21 9/23 13/18 13/19 13/19 13/21 13/23 16/11 16/19 17/4 17/16 18/6 18/15 18/23 33/17 33/23 34/3 101/17 101/22 102/13 103/23 106/4 106/7 106/12 106/16 106/21 107/12 107/21 108/8 115/5 115/7 116/10 122/21 122/25
beds [1] 122/18
bedsheet [1] 74/4
begun [1] 32/21
behind [21] 43/19 50/19 51/5 53/25 61/6 62/25 63/2 94/16 95/22 98/2 142/10 144/9 153/1 153/11 154/10 154/25 163/10 165/3 166/16 180/7 180/22
Bel [1] 137/5
believed [2] 51/22 82/3
belting [1] 55/8
bench [3] 60/8 60/9 60/10
beneath [1] 172/19
benefit [3] 94/14 112/25 207/24
besides [1] 45/25
best [7] 32/25 141/8 145/23 152/9 166/18 246/12 250/13
bevel [2] 238/25 241/17
beveled [3] 230/4 231/2 238/15
beveling [10] 225/5 225/6 225/12 228/23 231/3 235/22 235/24 238/6 238/20 239/1
big [4] 26/21 158/1 161/25 202/9
bigger [2] 135/3 158/12
bill [3] 5/19 11/9 13/11
biological [8] 27/13 61/24 63/18 63/19 136/10 142/21 143/10 143/15
biology [2] 133/6 133/22
Bissell [4] 104/9 104/13 105/1 123/7
bit [18] 6/8 9/16 12/18 15/23 20/1 89/25 91/24 95/5 101/2 133/2 172/20 175/4 175/4 183/12 193/19 211/24 219/9 221/12
bits [1] 139/13
black [7] 60/20 64/10 66/18 81/1 82/1 91/22 92/2
blade [1] 156/13
blanket [1] 121/21
bleach [13] 19/16 20/7 20/15 20/18 20/21 36/19 36/22 37/6 37/22 162/1 162/5 162/8 162/9
blocks [1] 137/8
blood [20] 12/25 13/5 38/1 160/4 160/5 160/6 160/7 160/8 160/11 160/17 161/9 161/12 161/20 162/4 163/4 165/22 178/17 178/25 179/4 223/5
bloodstain [1] 160/10
blow [1] 77/11
blue [1] 107/22
bluish [1] 138/7
bluish/green [1] 138/7
body [1] 242/3
bolt [1] 200/6
bone [30] 53/22 54/22 54/25 76/13 158/12 225/7 225/14 225/21 225/23 226/1 227/2 228/4 228/5 229/19 230/24 231/7 231/9 231/12 233/1 233/9 233/10 237/2 238/6 241/21 241/24 242/1 242/3 243/6 243/7 243/17
bones [5] 76/6 156/9 221/6 225/24 243/19
bookcase [2] 17/22 17/24
bookshelf [2] 35/25 36/2
bore [1] 204/15

## B

bot [1] 37/6
bottle [14] 19/16 19/23 20/8 20/15 20/18 20/22 36/19 36/22 37/6 37/17 37/22 59/20 76/21 162/23
bottom [4] 175/13 199/25 202/11 215/13
Bowe [1] 121/4
box [27] 95/24 96/8 96/13 97/2 115/13 115/20 116/1 117/12 117/23 119/5 138/22 143/5 152/16 152/18 152/19 156/21 157/5 170/15 171/3 177/9 196/23 196/25 202/9 214/13 214/24 215/6 227/1
boxed [1] 72/19
boxes [5] 73/21 155/21 159/1 180/15 180/24
brake [1] 144/13
BRANCH [2] 1/1 250/5
branches [2] 138/21 171/14
brand [2] 49/1 60/21
break [2] 7/22 68/1
BRENDAN [9] 1/7 1/24 20/4 24/23 56/19 59/5 61/22 126/10 128/6
briefed [1] 121/1
briefing [1] 42/4
bright [5] 229/23 231/1 232/4 232/16 237/17
bringing [1] 53/10
brittle [1] 229/2
broader [1] 110/9
broken [2] 142/13 205/22
brought [9] 22/8 22/14 73/8 74/6 75/3 75/21 107/1 156/1 173/3
brush [8] 76/20 76/23 76/24 77/7 139/6 139/9 139/12 143/8
brushes [1] 53/14
buckets [5] 74/10 74/14 75/17 76/5 77/19
building [3] 8/21 105/6 154/25
buildings [5] 72/5 101/8 105/9 105/11 105/17
bullet [100] 51/25 51/25 62/19 63/14 63/14 63/22 63/24 64/19 65/2 65/4 65/5 65/12 65/20 65/22 65/24 66/12 66/15 66/15 70/5 70/13 70/15 70/21 85/6 85/17 86/3 86/5 119/4 120/9 180/3 185/15 189/20 190/23 191/1 191/5 192/5 192/17 192/20 192/25 193/2 194/14 194/20 194/24 195/3 195/5 195/8 195/13 195/15 195/18 195/24 195/25 196/3 196/4 196/7 196/9 203/18 203/18 203/19 203/24 204/2 204/7 204/8 204/9 204/10 204/11 204/19 204/20 204/22 205/6 205/11 205/17 205/18 205/19 205/20 205/23 205/25 206/6 207/2 208/1 208/4 208/6 208/9 208/9 208/12 208/15 208/25 209/8 209/16 209/24 210/10 213/12 215/23 217/2 233/14 234/16 235/5 235/21 235/23 237/20 238/9 242/7
bullet's [2] 193/4 204/23
bullets [34] 62/19 66/8 86/2 103/11 120/3 120/9 125/16 156/10 182/18 183/9 189/17 190/4 194/12 195/9 195/21 198/19 199/1 199/12 202/4 202/10 205/21 206/3 207/10 209/13 210/4 210/7 211/4 212/21 212/23 213/13 213/25 214/11 235/4 236/1
bump [1] 163/24
bumper [1] 163/24
bunch [1] 139/4

Bureau [3] 41/6 46/13 47/2
bureaus [1] 41/8
burn [64] 43/13 43/16 44/13 44/23 46/11 48/11 49/9 49/19 49/23 50/19 50/19 51/5 51/5 51/8 66/24 67/6 68/22 69/1 69/16 70/25 71/2 71/3 71/10 71/14 71/16 71/17 71/19 72/7 72/11 72/11 72/15 72/23 72/24 72/25 73/18 74/12 74/12 74/21 74/25 75/3 75/15 76/5 98/3 98/11 98/14 98/23 147/2 147/5 147/16 150/18 151/6 153/1 153/21 153/22 154/10 155/9 173/18 173/19 173/21 174/4 177/16 178/7 223/18 224/18
burned [16] 44/21 49/4 51/3 51/7 51/14 53/17 53/17 53/18 56/5 67/7 75/7 75/22 147/4 147/24 176/2 176/9
burning [5] 176/7 221/5 223/16 224/22 242/10
burnt [3] 148/6 148/13 153/13
Business [1] 222/7
businesses [1] 42/23
button [1] 26/7

## C

cables [1] 25/21
Cal [1] 109/10
calcium [5] 232/25 233/7 236/17 241/19 243/2
caliber [23] 95/11 101/24 101/25 102/6 102/13 103/10 106/3 106/6 106/11 197/13 197/20 204/9 204/11 204/14 205/13 206/3 206/6 207/2 208/4 208/11 208/22 212/16 212/23
California [6] 183/21 184/1 184/21 186/10 186/16 186/25
caller [1] 100/2
calls [2] 134/24 135/18
Calumet [18] 5/7 6/6 6/10 51/12 52/16 58/12 58/13 73/13 89/1 89/4 89/6 97/8 135/23 146/25 150/4 150/16 159/2 177/10
camera [9] 32/18 32/19 47/24 49/22 50/4 67/10 219/7 224/2 224/9
Campbell [1] 29/18
camper [2] 151/13 151/13
Cancer [1] 134/10
Canon [5] 47/24 49/24 50/4 67/10 224/2
canopies [1] 137/12
canvass [4] 42/18 42/19 42/20 73/3
cap [1] 220/5
capable [3] 17/7 17/8 186/17
capacity [3] 7/11 200/20 220/5
car [11] 79/18 80/12 81/23 138/2 142/20 144/23 153/14 154/12 156/5 170/12 178/13
cardboard [4] 138/22 143/5 170/15 171/3
care [2] 97/9 159/5
career [1] 184/20
carefully [3] 30/18 157/1 250/8
carpet [10] 104/9 104/13 105/1 123/7 124/16 124/21 124/24 125/2 125/3 125/15
carpeting [1] 124/12
carried [1] 156/6
carry [1] 157/17
cars [1] 19/7
cartridge [55] 116/13 182/18 183/8 183/9 185/15 189/18 189/21 190/4 190/16 190/18 190/18 190/21 190/25 191/3 191/4 191/14 191/18 191/21 192/1 192/4 192/4 192/8 192/10 192/14 192/15 192/18 192/21 193/2 193/3

193/5 193/5 193/9 193/14 193/15 194/16 194/17 195/1 197/1 197/8 198/19 198/25 200/7 200/10 200/17 201/20 202/3 202/11 202/16 202/23 203/23 210/25 212/17 212/20 213/6 235/5
cartridges [13] 112/8 119/3 198/5 199/20 199/23 199/24 200/1 201/1 201/5 201/22 201/24 202/1 212/12
case [30] 1/6 9/14 21/23 79/18 102/3 118/11 130/1 133/1 135/9 135/23 146/14 156/11 182/24 183/6 186/4 194/24 196/14 197/12 202/12 204/10 208/2 208/4 210/9 211/9 214/25 221/2 221/4 223/13 223/15 235/5
cases [5] 62/6 132/2 134/21 186/17 189/24
casing [14] 79/18 95/19 95/20 113/20 114/19 185/15 189/21 191/1 192/18 193/5 193/6 193/10 193/15 195/1
casings [39] 52/1 55/7 71/1 71/5 95/9 95/11 95/15 95/21 96/2 96/4 96/9 96/12 97/3 97/5 97/12 97/13 113/6 114/2 114/16 119/9 119/12 119/20 125/15 182/18 183/8 183/9 189/18 190/5 197/1 197/8 198/19 198/25 201/21 202/11 202/16 202/23 203/23 210/25 212/20
Cates [3] 149/21 149/22 151/21
caught [2] 143/11 202/12
caused [6] 85/18 185/17 217/10 217/12 235/12 238/1
CCI [10] 114/25 201/22 212/14 212/16 212/22 213/13 213/15 213/24 214/3 214/13
CD [1] 100/7
cell [6] 69/12 127/9 223/22 223/23 223/25 224/9
cellular [4] 47/25 48/7 48/25 49/18
center [7] 8/14 94/7 121/2 121/8 121/9 134/11 154/21
central [3] 59/22 60/22 64/10
cer [1] 129/10
ceramic [1] 153/18
certify [1] 250/6
CF [2] 1/6 5/5
chain [1] 108/4
chalk [5] 162/24 163/3 164/6 165/19 166/4
chamber [2] 103/5 200/8
chambers [1] 249/11
chance [1] 214/21
changed [3] 39/24 111/14 140/13
characteristic [1] 235/25
characteristics [7] 204/6 204/17 205/25 206/25 207/15 215/22 218/5
characterize [1] 120/13
charasteris [1] 215/22
charge [4] 121/1 121/5 137/14 155/11
charred [8] 72/5 221/6 224/1 224/21 225/4 225/24 229/1 229/12
check [5] 38/2 38/4 121/9 169/2 202/3
checked [2] 112/5 141/16
checking [3] 164/5 198/10 198/10
checkpoint [1] 137/9
chemical [2] 160/3 220/12
chemically [2] 161/11 191/11
chemistry [2] 133/8 222/3
chest [8] 53/6 64/14 66/17 86/20 94/6 94/7 94/9 94/13
chet [1] 53/6
chicken [1] 148/1
chief [1] 151/25
chiefly [2] 131/3 131/17

## C

Chilton [1] 147/1
chose [1] 87/4
Chuck [4] 149/21 151/21 152/11 159/22
chunk [1] 206/12
circle [3] 114/8 162/19 162/25
circled [3] 83/7 163/2 164/6
circles [7] 81/20 82/6 83/11 83/14 83/23 83/24 84/23
CIRCUIT [3] 1/1 1/12 250/5
circular [3] 70/17 70/22 165/10
circumference [1] 36/17
cities [1] 135/6
citizen [1] 42/9
city [6] 42/8 183/24 184/4 187/6 187/10 187/11
clarification [1] 217/24
clarifies [1] 82/19
clarify [2] 72/22 183/20
class [3] 29/17 204/17 206/25
classes [1] 29/14
clay [1] 153/17
clean [4] 76/21 76/25 142/7 213/12
cleaned [2] 159/5 178/21
cleaner [8] 101/16 104/9 104/13 105/1 123/7 123/9 124/2 125/15
cleaning [2] 104/4 162/1
clear [6] 65/21 107/13 144/22 180/22 198/2 238/13
cleared [1] 111/4
clearer [1] 172/21
clearing [1] 8/15
clearly [3] 93/18 148/12 189/13
CLERK [2] 88/14 104/22
click [1] 200/15
Clinic [2] 22/5 22/8
clockwise [1] 205/9
close [5] 48/9 53/7 55/15 64/23 116/5
close-up [3] 48/9 55/15 64/23
closed [5] 38/17 74/4 115/23 116/1 145/3
closely [3] 53/21 141/23 219/10
closer [4] 48/5 85/18 95/5 244/25
closest [1] 176/10
closet [1] 122/5
closets [1] 14/1
cloth [1] 157/16
clothing [6] 51/24 55/10 55/12 55/15 55/19 179/11
clue [1] 14/18
clues [1] 123/15
coated [2] 206/2 215/23
coating [1] 206/2
cob [1] 148/1
cock [1] 191/23
cocks [1] 200/8
coiled [1] 148/4
Colborn [9] 8/17 14/4 17/10 17/23 32/18 33/22 89/22 105/24 115/6
colleague [1] 145/18
collect [20] 7/7 22/11 25/16 26/15 56/23 82/4 84/16 84/18 86/24 86/25 91/1 114/10 125/5 125/9 135/1 143/12 156/21 163/7 164/8 171/4
collected [33] 12/1 19/21 20/24 37/6 37/16 65/20 74/16 84/4 84/11 86/17 86/18 87/7 87/14 95/10 95/23 97/15 102/12 104/9 106/6 106/22 106/24 106/25 107/15 110/4 118/2 119/9 151/3 159/1 164/8 164/13 166/17 176/14 176/15
collecting [8] 21/23 29/3 91/3 131/7

150/11 155/20 157/3 157/8
collection [5] 21/1 74/17 110/1 117/19 201/24
College [3] 29/20 90/6 109/21
colloquially [1] 35/14
color [3] 85/17 86/3 160/8
colored [1] 86/1
combustible [2] 45/7 53/18
coming [7] 30/20 62/15 137/12 139/14 165/7 165/15 195/16
command [5] 8/14 42/1 121/2 121/8 121/9
commence [1] 130/9
commenced [1] 99/13
commented [2] 34/5 178/24
committed [1] 90/18
commonly [2] 39/4 107/13
Company [2] 111/13 197/21
comparatively [1] 236/22
compare [4] 48/14 97/13 208/16 215/18
compared [4] 20/11 177/23 209/21 210/11
comparing [1] 234/11
comparison [4] 49/7 210/24 214/6 220/13
comparisons [3] 235/5 235/5 237/6
complete [5] 9/25 65/11 106/1 159/14 162/22
completed [14] 30/23 31/13 44/1 47/1 57/22 58/4 73/10 151/5 185/11 185/19 185/24 188/21 198/21 240/23
completing [1] 23/21
component [8] 48/23 49/3 49/8 49/16 69/13 190/25 191/2 191/8
components [13] 46/9 47/14 47/21 48/6 48/15 48/22 50/3 67/8 148/10 150/19 190/22 224/3 224/9
composition [1] 214/8
compound [2] 105/7 191/10
compressor [11] 61/7 64/11 64/13 64/16 64/19 65/3 66/21 82/24 94/10 94/13 120/8
computer [10] 10/16 11/3 11/5 13/13 32/1 32/4 44/2 66/4 163/18 250/10
computer-assisted [1] 250/10
computer-generated [2] 44/2 66/4
computerized [1] 250/9
con [1] 195/19
concave [3] 225/6 225/13 235/23
concealed [2] 81/8 136/2
concentrated [1] 14/4
concentration [1] 162/9
concentrations [2] 241/25 242/2
concept [3] 15/19 15/19 21/3
concern [1] 80/3
concerned [1] 224/19
conclude [4] 47/21 195/20 196/8 210/12
concluded [1] 197/7
conclusions [4] 45/2 206/20 206/24 210/22
concrete [3] 63/10 66/13 81/21
condition [5] 113/8 198/11 204/1 204/24 228/24
conditions [2] 139/23 144/5
conducive [1] 53/7
conduct [4] 42/9 57/14 60/12 224/7
conducted [5] 10/5 58/5 72/25 73/6 156/2
conducting [2] 42/17 57/12
cones [3] 80/7 80/7 81/17
configuration [1] 111/14
confined [2] 33/7 33/25
confirm [2] 161/5 165/21

confirmed [1] 163/11
confiscated [1] 15/14
connected [1] 130/2
Connecticut [1] 101/24
connection [2] 212/3 214/25
considerably [1] 237/1
consist [4] 28/24 29/14 121/17 131/10
consistency [1] 153/17
consists [1] 190/21
contact [9] 42/21 79/24 150/7 160/4 194/14 194/25 195/16 205/1 207/12
contacted [3] 41/19 56/16 136/13
contain [2] 66/24 103/10
contained [7] 67/7 67/9 119/5 124/3 196/23 198/5 239/23
container [2] 116/14 122/5
containers [2] 73/8 246/24
containing [2] 27/19 237/19
contains [3] 27/13 27/18 63/17
contaminate [1] 77/14
contaminated [3] 12/16 13/4 13/8
contents [6] 45/18 65/19 147/22 153/22 176/8 224/17
context [1] 176/24
continue [2] 7/25 138/20
contribute [1] 132/13
contributed [2] 242/11 242/17
control [13] 135/16 234/4 234/6 234/10 234/17 234/19 237/6 239/4 239/9 243/11 243/16 243/20 243/22
controlled [1] 144/4
convenient [1] 44/8
conveyed [1] 138/12
convicted [1] 128/20
coordinator [1] 151/24
copper [9] 161/22 162/5 206/2 215/25 216/2 216/3 216/3 216/3 242/20
corn [1] 147/25
corner [13] 9/23 10/17 11/12 62/2 62/3 62/12 64/15 78/16 85/23 91/10 230/19 230/25 236/7
corners [1] 74/5
correctly [1] 170/22
correlation [2] 210/6 210/10
corresponding [1] 49/18
cotton [5] 26/21 27/1 27/3 40/6 246/1
couch [1] 161/2
counsel [13] 5/2 28/2 40/10 100/10 100/19 108/18 125/19 129/8 181/8 211/15 217/23 218/17 218/24
count [3] 96/12 96/14 96/14
counter [1] 105/18
county [30] 1/1 5/7 6/6 6/10 8/16 29/7 41/21 51/13 52/17 58/12 58/13 58/14 73/13 89/1 89/4 89/6 89/8 97/8 102/18 109/11 135/4 135/20 135/24 136/1 146/25 150/4 150/16 159/3 177/10 250/2
couple [11] 21/11 29/14 66/3 159/21 161/2 183/25 184/25 188/18 202/7 218/25 222/7
course [23] 52/14 61/18 75/9 123/19 124/17 182/8 182/11 182/17 183/1 185/2 185/13 185/19 185/22 187/25 188/21 189/3 191/6 192/23 194/8 197/2 199/8 199/10 244/19
courses [7] 184/13 184/15 185/25 188/15 188/19 222/6 222/8
cover [4] 45/12 48/6 48/24 69/13
covered [8] 53/8 81/6 136/11 139/17 140/10 140/11 144/25 169/17
covers [1] 142/12
crack [4] 63/9 66/13 85/8 93/18

## C

cracked [1] 142/12
cracks [1] 120/3
cranial [10] 225/11 225/19 225/23 226/1 227/4 227/5 227/6 228/5 229/12 231/14
crawling [1] 144/18
create [2] 156/23 194/23
created [5] 66/5 192/21 194/14 195/13 205/10
creating [1] 195/22
creeper [17] 60/1 60/5 60/7 60/14 60/19 60/21 61/1 61/7 64/11 66/19 82/1 86/6 86/22 87/5 87/11 91/22 92/2
crew [1] 75/4
crime [75] 6/23 7/5 24/1 29/6 29/12 37/19 38/18 38/21 38/23 42/23 46/11 46/12 46/15 52/8 54/16 65/8 72/20 73/8 73/12 73/13 73/21 73/23 73/24 74/6 75/3 75/21 76/3 76/16 82/8 83/25 84/21 84/22 87/4 87/6 87/9 90/17 107/4 130/23 130/24 131/4 131/5 131/8 132/20 134/1 134/12 134/13 134/15 135/6 145/24 177/11 178/8 178/14 182/4 185/21 185/21 186/8 187/2 187/10 195/25 203/12 208/20 215/17 220/2 220/8 220/9 220/21 222/12 222/13 223/3 223/9 226/16 234/23 235/10 235/18 239/20
crimes [1] 189/12
criminal [7] 41/3 123/23 155/12 182/9 182/21 185/5 227/12
criminalists [1] 186/16
critical [1] 117/20
cropped [1] 154/18
cross [24] 3/5 3/9 3/13 3/20 4/5 4/11 28/8 28/9 68/6 68/18 109/3 109/4 127/22 167/9 167/13 167/14 170/21 211/14 211/15 211/16 235/2 240/5 240/17 240/18
cross-examination [16] 3/5 3/9 3/13 3/20 4/5 4/11 28/9 68/6 68/18 109/4 167/9 167/14 211/14 211/16 240/5 240/18
cross-training [1] 235/2
crumpled [1] 152/3
crusher [2] 138/2 144/23
Cryptographic [1] 47/3
cumbustible [1] 53/24
currency [1] 188/15
current [3] 89/6 220/24 223/8
currently [3] 6/15 28/11 222/12
curriculum [2] 183/16 248/1
cursor [1] 63/11
cursory [3] 59/2 81/25 93/1
Curtis [1] 47/1
custodian [2] 97/10 115/13
custody [3] 12/1 45/18 97/9
customer [1] 105/18
cut [7] 15/2 23/5 23/15 124/21 124/24 125/2 245/19
cutting [1] 57/21
CV [1] 240/3
cycled [1] 103/5
cylindrical [2] 61/6 63/12

## D

Daisy [3] 55/17 55/19 55/22
damage [2] 142/8 156/23
damaged [3] 49/4 49/8 49/17
Dan [1] 88/12
DANIEL [3] 3/11 88/16 88/21
dark [3] 94/12 140/1 158/20

darkness [1] 162/22
DASSEY [15] 1/7 1/24 5/5 20/5 24/5 24/11 24/21 24/23 56/19 57/5 61/22 62/17 88/2 126/10 128/7
Dassey's [4] 21/4 59/5 59/25 98/16
Dassidly [1] 128/7
date [9] 1/10 25/3 63/22 90/20 95/16 122/13 122/13 123/3 128/14
dated [3] 210/23 211/2 250/15
dates [1] 73/25
Dave [4] 8/17 11/4 58/14 135/20
day [28] 1/5 16/6 16/23 18/22 21/13 32/3 54/15 57/24 62/14 64/7 89/24 90/12 91/2 101/6 101/13 115/15 120/4 121/11 125/25 136/20 146/17 146/18 147/9 149/24 151/7 159/19 185/21 250/15
daylight [1] 139/25
days [15] 16/7 19/2 19/5 21/11 42/10 42/13 52/14 52/14 52/15 75/10 90/25 146/12 149/24 153/20 174/19
DCI [4] 30/13 52/23 72/1 227/1
de [1] 52/11
deal [2] 84/9 168/16
dealt [5] 128/2 185/3 185/13 185/22 188/22
death [3] 41/13 52/2 89/11
debris [31] 44/21 45/10 51/3 51/7 51/14 52/13 53/11 53/16 53/16 55/6 56/6 69/9 69/15 71/8 72/23 73/5 73/24 74/8 75/14 77/20 79/19 142/20 143/2 147/5 155/25 156/24 158/9 165/14 169/21 171/12 173/15
December [5] 54/15 73/25 134/16 223/17 241/1
December 19 [1] 73/25
decision [3] 86/23 143/17 143/21
Dedering [1] 58/11
deemed [1] 150/10
deep [6] 22/25 23/15 92/11 92/15 148/17 202/7
deer [1] 178/21
Deere [1] 94/2
defect [28] 224/23 227/7 228/8 228/21 229/20 230/4 230/25 231/2 231/8 233/13 234/4 234/7 234/12 234/15 234/20 235/11 235/15 237/10 237/15 237/17 237/22 238/1 238/5 238/15 238/20 239/9 239/12 239/24
defects [2] 195/14 195/17
defend [1] 235/10
defendant [8] 1/8 1/21 1/23 1/24 5/15 20/4 88/2 217/17
deficit [1] 227/5
define [1] 204/5
defined [1] 191/24
defining [1] 190/14
degree [21] 109/16 109/18 133/6 133/8 133/10 133/10 133/13 133/15 133/17 133/20 184/7 184/9 184/10 184/16 203/1 209/4 218/7 221/23 222/1 239/17 239/22
deliberations [1] 248/24
demon [1] 49/15
demonstrate [1] 209/22
demonstration [1] 49/15
dense [2] 229/24 237/18
dent [1] 142/9
dental [2] 53/23 228/6
Department [24] 6/7 6/10 6/11 6/14 8/17 25/14 28/13 29/8 29/19 41/2 41/4 51/13 52/16 73/14 97/8 107/8 109/15 134/12 147/1 150/5 150/17 183/21 184/22

187/10
Departments [1] 135/5
depending [2] 103/14 162/8
depends [1] 112/18
depict [3] 52/9 66/19 91/18
depicted [7] 47/22 63/24 91/12 108/3 114/24 163/13 197/5
depiction [1] 23/14
depicts [1] 52/11
depositing [1] 246/15
deposits [1] 242/17
depression [2] 153/11 177/23
deputies [2] 8/16 36/11
deputy [20] 3/11 20/24 21/8 25/13 37/15 89/7 89/9 95/25 97/21 101/4 101/12 102/8 103/8 104/2 109/6 111/2 112/19 114/23 125/13 127/16
describe [38] 6/13 8/3 9/4 9/17 10/2 13/20 13/21 14/20 15/22 17/17 23/19 25/11 26/18 43/10 50/24 54/11 54/13 55/4 57/1 58/20 67/3 90/11 90/13 91/13 93/13 93/14 102/22 120/18 137/21 138/8 138/8 139/22 144/6 147/20 155/24 224/25 226/22 229/16
described [11] 66/12 67/5 95/2 109/22 114/25 122/24 123/5 139/20 146/11 200/13 207/9
describes [2] 210/24 211/5
describing [5] 10/11 65/15 66/7 66/25 210/21
description [3] 183/17 206/17 211/3
design [1] 204/18
designated [3] 216/12 229/14 229/15
designation [5] 203/13 208/20 226/17 231/14 239/21
designed [4] 190/19 191/13 191/24 193/7
desk [7] 11/3 11/5 11/6 13/13 17/21 17/25 115/7
destroyed [1] 30/16
destruction [1] 235/3
detached [4] 43/21 57/15 67/4 90/9
detail [6] 9/17 138/9 153/25 200/13 208/13 229/17
detailed [4] 51/15 90/21 94/19 224/14
details [1] 133/1
detect [8] 178/25 233/2 233/12 233/21 234/8 237/10 239/1 242/4
Detective [10] 8/17 8/18 11/4 14/5 14/6 32/17 58/13 89/22 99/10 135/20
determination [4] 54/23 172/1 208/19 232/21
determine [33] 37/12 37/21 53/25 61/23 76/6 86/10 117/11 119/4 142/14 176/9 195/2 195/19 198/23 199/11 201/7 202/15 202/22 204/5 204/9 205/4 205/16 206/1 208/3 208/25 209/17 210/1 212/15 216/6 216/24 232/8 232/9 233/23 244/4
determined [6] 193/6 199/10 199/16 201/3 201/21 211/1
determining [3] 76/12 189/15 208/10
develop [1] 237/5
development [1] 222/25
device [5] 45/13 112/14 112/16 112/18 113/23
devices [4] 46/10 47/7 47/23 51/24
diagnostic [1] 133/25
diagram [2] 74/20 164/16
diameter [4] 162/19 167/1 204/15 225/3
difference [1] 231/6
differences [2] 209/16 213/21
difficult [1] 241/3

## D

diffuse [1] 165/6
dig [3] 157/11 157/12 175/13
digging [1] 72/19
digital [3] 32/18 47/24 50/4
diluted [2] 160/5 178/25
direct [22] 3/4 3/8 3/12 3/19 4/4 4/10 6/2 40/23 68/23 73/6 88/23 99/14 106/9 121/14 126/16 130/20 135/8 138/16 146/21 181/25 219/24 243/1
directed [9] 8/5 22/3 31/11 135/19 137/10 137/17 137/25 142/25 244/8
directing [6] 16/1 25/22 43/4 105/20 230/18 231/21
direction [6] 10/8 14/18 172/7 191/7 192/24 192/24
directly [11] 9/7 15/6 15/12 17/21 51/5 64/9 64/13 66/17 97/25 112/24 209/21
director [1] 136/13
dirt [5] 76/18 76/19 77/12 92/19 138/4
disbursed [1] 228/18
discern [1] 172/25
discharged [1] 218/3
discipline [1] 97/17
disciplines [2] 132/8 186/20
disconnect [1] 144/17
discussed [1] 66/15
discussion [1] 65/11
dispatched [1] 29/7
display [1] 114/24
dissimilar [1] 191/11
distance [2] 114/19 172/13
distances [1] 190/10
distilled [2] 26/22 26/25
distinctive [2] 69/14 160/8
distribution [1] 164/24
District [3] 5/7 5/9 5/11
disturbing [1] 45/4
divided [1] 57/10
Division [3] 41/3 155/12 227/12
DNA [21] 7/9 12/9 12/25 22/9 25/19 26/15 26/20 27/19 34/17 34/19 37/25 38/5 86/11 119/11 131/3 131/3 132/6 133/25 134/3 163/7 220/14
doctor [4] 133/2 133/5 240/20 246/3
document [6] 11/12 11/24 22/11 22/18 36/25 114/14
documentation [1] 84/2
documented [2] 31/12 45/16
documenting [6] 12/5 14/8 36/5 37/4 58/6 198/11
dogs [1] 31/12
doing [17] 11/25 19/10 30/21 31/16 39/16 62/1 132/4 160/21 174/9 174/10 174/14 176/7 186/17 188/1 232/17 235/4 236/11
doo [1] 91/15
door [12] 25/19 39/25 57/18 57/19 58/1 58/24 59/1 79/7 79/7 91/9 164/24 168/23
doors [3] 142/4 142/14 142/17
doorway [1] 14/7
dozen [1] 166/21
Dr [3] 54/4 54/7 231/11
Dr. [8] 54/9 54/12 130/10 226/12 227/15 229/10 229/13 229/21
Dr. Eisenberg [5] 54/9 54/12 227/15 229/10 229/13
Dr. Eisenberg's [1] 229/21
Dr. John [1] 130/10
Dr. Leslie [1] 226/12
drawer [1] 13/13

drawn [1] 81/21
drive [3] 79/14 131/21 144/10
driver [2] 145/5 145/18
driveshaft [1] 144/21
driveshafts [1] 144/19
driveway [5] 43/18 43/20 43/22 43/23 83/8
drop [6] 27/2 112/17 171/17 200/1 200/6 202/10
drops [1] 27/2
drove [3] 138/1 145/6 145/22
drugs [1] 220/13
drums [1] 148/20
due [3] 30/11 69/21 179/15
duly [6] 5/22 40/18 88/17 130/14 181/19 219/19
dusk [2] 140/1 140/3
dust [1] 77/12
dustpan [1] 156/15
duties [17] 6/14 7/19 8/2 21/16 29/2 29/4 29/6 37/15 41/4 41/8 89/6 89/7 89/19 146/13 146/23 147/13 220/9
duty [5] 29/10 29/10 29/24 31/3 151/25

## E

E-r-t-l [1] 130/19
earlier [6] 67/6 72/22 153/20 160/14 164/7 238/5
early [9] 15/13 15/14 28/22 41/22 57/4 84/8 85/24 90/11 90/20
easier [3] 163/19 232/1 241/12
east [4] 62/4 62/11 92/16 93/19
easy [1] 206/1
EDELSTEIN [21] 1/22 3/13 3/15 4/5 4/7 5/14 109/5 118/20 118/25 119/2 125/23 126/4 127/24 128/5 128/16 129/1 129/4 211/17 218/11 218/14 247/21
edge [5] 63/11 65/1 230/5 231/1 231/2
edges [1] 241/17
education [1] 133/18
educational [3] 109/25 133/3 221/22
effect [1] 207/14
effects [1] 238/6
effort [1] 19/2
efforts [11] 10/11 13/21 14/5 19/4 42/14 43/7 89/10 101/6 156/22 214/5 215/18
eight [6] 16/7 42/10 96/22 96/23 205/4 230/23
eighth [1] 157/19
eighth-inch [1] 157/19
Eisenberg [9] 54/4 54/7 54/9 54/12 226/13 227/15 229/10 229/13 231/11
Eisenberg's [1] 229/21
EJ [12] 227/1 227/11 227/24 228/1 228/10 229/19 230/11 235/8 236/25 237/2 239/15 241/14
ejected [2] 193/10 202/12
EK [4] 227/11 227/25 228/1 228/8
el [1] 237/24
electrical [1] 224/3
electron [2] 228/18 232/5
electronic [9] 45/13 46/10 47/3 47/7 47/14 47/23 51/24 67/8 148/10
electronics [1] 46/19
element [2] 236/18 236/20
elemental [13] 228/19 233/3 233/4 233/19 233/21 233/24 234/8 235/9 236/18 237/25 239/1 239/16 239/23
elements [13] 30/19 145/8 232/9 232/24 233/1 233/6 233/8 234/5 236/16 242/23 243/3 243/9 243/12
else's [3] 37/13 38/2 87/9
elsewhere [1] 233/25

embossed [1] 50/5
employ [1] 239/3
employed [17] 6/5 6/9 6/11 7/11 21/13 41/1 41/2 88/25 89/1 130/22 182/2 182/3 199/3 220/1 220/4 220/17 222/13
empty [2] 20/25 212/12
enclosed [1] 145/15
encountered [1] 186/19
end [11] 9/11 23/21 25/5 34/21 92/22 107/22 108/1 138/14 144/20 156/5 180/3
endangered [1] 105/19
endangered/missing [1] 105/19
ended [1] 144/18
ends [1] 113/2
energy [1] 228/18
enforcement [14] 11/18 14/11 15/21 17/6 24/24 44/24 51/18 54/14 87/19 87/22 93/2 131/6 166/9 235/20
engaged [1] 220/16
engine [1] 81/1
engravings [1] 195/12
enough [6] 33/4 33/4 152/5 163/6 209/25 210/11
ensure [1] 156/23
entail [1] 7/2
entailed [1] 24/2
enter [2] 97/7 168/18
entered [5] 14/3 81/24 96/10 98/4 99/10
entering [1] 32/6
entire [13] 9/25 19/3 23/24 24/21 32/14 32/20 39/9 39/10 55/23 58/5 87/5 132/13 179/13
entirely [2] 180/9 248/3
entirety [1] 87/1
entities [1] 109/25
entrance [19] 9/6 69/24 224/23 227/4 227/7 228/8 228/21 229/20 230/4 230/25 231/2 231/8 233/13 234/3 234/7 234/15 234/20 237/16 243/21
entry [1] 57/21
equipment [6] 60/8 92/14 104/5 141/20 142/19 152/25
equipped [1] 224/11
ERTL [6] 3/18 130/10 130/13 130/18 135/9 167/16
especially [1] 44/25
essentially [10] 30/7 32/10 114/4 168/15 173/22 191/16 192/12 199/16 202/8 213/4
establish [2] 24/13 122/12
estimate [4] 141/8 145/23 166/18 187/20
etc [2] 143/9 180/15
etched [1] 50/5
ev [1] 170/23
evaluated [2] 240/23 241/1
evaluation [2] 242/21 244/20
evening [10] 8/19 11/23 16/4 57/5 59/2 84/8 140/5 140/6 146/16 158/24
eventually [6] 48/10 58/13 136/16 159/2 177/12 195/4
everybody [1] 114/4
everyone [2] 33/15 113/16
everything [8] 75/19 94/19 125/14 148/8 176/15 214/17 241/4 241/5
everywhere [1] 165/8
evidence [118] 6/22 7/1 7/7 7/8 7/8 7/9 8/11 11/25 12/1 12/10 12/23 13/3 13/8 14/18 19/16 19/18 19/21 24/7 25/8 25/13 25/15 26/20 27/17 27/19 28/16 29/3 29/3 29/9 30/3 30/15 32/19 34/12 35/12 38/1 43/9 45/18 51/17 51/18

**E**

evidence... [80]  56/23 59/4 59/12 61/24 61/25 62/23 63/7 65/6 65/18 65/18 72/13 76/22 80/6 80/9 84/4 84/11 84/13 84/15 84/17 86/11 87/3 89/8 90/3 90/5 91/2 96/10 97/7 97/9 98/5 100/8 102/3 104/9 104/14 106/8 107/7 107/11 107/14 110/1 117/3 117/4 117/19 118/4 119/11 120/19 123/19 124/3 124/10 131/7 135/1 136/9 136/10 142/22 143/15 143/23 150/11 167/7 170/4 170/17 170/24 171/6 171/24 172/16 182/8 182/10 182/15 182/21 182/25 189/10 196/17 203/5 210/21 220/10 220/16 222/14 222/16 222/21 223/15 240/4 244/22 248/2
evidential [1]  178/2
evidentiary [14]  34/10 34/15 34/16 34/20 35/8 36/12 36/15 55/1 63/18 84/7 92/3 123/15 124/22 150/10
exact [1]  12/5
exactly [13]  10/9 12/24 14/13 15/25 16/5 23/25 36/6 38/19 111/16 121/24 155/24 206/5 207/19
exam [4]  73/6 215/5 223/21 244/12
examination [71]  3/4 3/5 3/8 3/9 3/10 3/12 3/13 3/14 3/15 3/16 3/19 3/20 4/4 4/5 4/6 4/7 4/10 4/11 4/12 6/2 22/9 22/18 22/21 28/9 40/23 46/25 51/16 52/13 68/6 68/18 73/5 73/9 75/23 87/17 88/23 109/4 125/21 128/4 128/18 130/20 167/9 167/14 181/25 183/10 196/6 197/12 198/3 198/9 199/15 202/15 203/4 206/5 208/2 210/24 211/14 211/16 213/13 214/13 214/25 217/15 217/25 218/13 219/24 220/10 229/9 236/8 237/22 240/5 240/18 244/11 246/6
examinations [12]  72/11 72/25 75/12 182/12 182/19 183/5 190/4 197/8 198/22 199/7 201/18 221/9
examine [41]  53/21 61/19 71/8 75/14 85/18 111/23 119/2 119/3 141/22 142/20 143/18 149/8 151/17 180/23 182/7 182/15 182/17 195/9 196/18 197/13 203/21 204/4 207/22 214/16 220/10 221/3 223/18 224/12 224/20 224/23 225/1 228/13 229/10 233/18 233/22 243/7 243/8 244/3 244/6 245/11 245/18
examined [37]  5/23 40/19 46/14 62/8 73/24 74/8 75/9 88/18 130/15 143/8 171/5 176/22 181/20 201/20 204/24 205/11 209/11 214/14 215/2 216/11 219/20 223/15 225/12 226/16 227/17 227/22 227/23 227/25 228/25 230/12 233/19 233/20 239/13 239/15 243/18 243/20 246/10
examiner [7]  182/3 182/6 182/14 184/19 186/22 187/4 188/11
examiners [8]  185/2 185/9 186/5 186/12 186/15 187/12 188/9 189/1
examining [8]  52/12 61/23 189/10 189/14 197/4 224/17 232/10 235/3
exception [1]  193/24
exclusion [1]  209/7
excuse [11]  5/9 36/24 48/19 98/15 101/4 106/18 173/15 194/17 228/1 240/2 247/12
execute [2]  8/23 21/10
executed [1]  22/7
executing [2]  19/22 146/7

execution [2]  31/7 56/14
exemplar [2]  49/1 49/9
exemplars [3]  21/24 22/9 22/12
exhibit [158]  9/13 9/14 10/14 10/22 10/23 11/2 11/7 14/20 15/8 16/16 16/25 17/13 18/2 18/9 18/18 18/21 19/13 19/13 19/14 20/12 23/2 25/23 27/12 27/15 43/11 43/12 44/17 46/6 46/18 46/23 46/24 47/12 47/15 48/3 48/20 48/24 49/6 49/14 50/1 52/4 55/13 56/1 58/19 59/17 60/17 61/10 63/4 63/16 63/21 63/25 63/25 64/4 64/21 65/15 65/23 65/25 66/3 66/6 66/22 66/23 68/25 78/23 79/1 80/5 91/5 93/9 95/3 95/12 96/5 96/19 96/25 98/9 99/15 102/4 102/9 102/10 102/23 104/10 104/22 104/24 105/13 106/9 106/17 106/18 107/8 107/18 108/12 119/1 127/13 138/16 154/4 154/7 154/8 154/9 154/17 163/12 163/19 167/7 183/14 183/15 183/16 196/17 196/21 196/22 197/5 197/16 197/17 197/20 198/5 198/7 201/21 202/19 202/23 203/5 203/11 203/15 203/17 204/2 205/6 206/22 206/23 207/21 207/25 208/1 208/13 208/21 208/21 209/1 209/12 209/20 209/24 210/19 210/20 211/1 211/2 218/3 221/13 221/15 221/17 221/18 221/19 225/10 225/11 226/25 230/3 230/11 230/16 230/20 230/23 231/17 232/12 233/25 236/4 236/8 236/24 236/25 238/19 247/24
exhibits [17]  4/14 27/24 66/3 67/18 67/22 67/25 108/14 108/17 203/10 210/16 211/4 211/12 230/8 240/2 247/11 247/13 247/20
exhuming [1]  156/8
expect [6]  129/18 153/19 196/7 209/18 210/3 210/6
expected [2]  199/17 246/8
expelled [1]  193/2
experience [18]  7/1 44/24 45/1 60/6 72/9 90/3 183/18 183/24 184/19 186/11 187/1 206/9 211/23 221/22 222/5 234/21 235/18 246/11
experiences [1]  134/19
expert [4]  50/8 70/6 187/22 225/20
experti [1]  72/8
expertise [6]  70/7 71/25 97/19 224/19 225/21 248/5
explain [8]  12/17 12/18 81/23 117/19 128/9 159/25 183/11 231/5
explode [3]  191/15 191/16 192/5
explodes [1]  191/4
explosion [1]  192/22
exposed [3]  145/8 145/11 179/17
extensive [1]  222/16
extent [4]  140/13 165/15 170/3 181/2
exterior [4]  25/20 30/15 57/17 170/3
extra [1]  112/18
extract [4]  37/18 177/1 177/2 193/16
extracted [1]  193/10
eye [2]  179/5 206/10
eyes [1]  244/20
eyesight [1]  53/8

**F**

face [4]  42/21 42/21 60/20 228/5
facility [2]  22/15 38/19
facing [1]  39/3
fairly [2]  111/22 206/1
fall [5]  149/8 156/19 158/6 185/1 185/6
fallen [3]  159/3 159/9 159/10

FALLON [36]  1/16 3/19 4/4 4/6 4/10 4/12 5/10 130/7 130/21 167/6 170/23 181/9 181/13 181/15 182/1 203/8 203/11 211/11 217/24 218/1 219/1 219/11 219/12 219/16 219/25 226/4 240/1 240/8 240/21 246/5 246/7 247/1 247/7 248/10 249/6 249/12
family [1]  22/7
far [6]  38/10 137/16 172/17 177/18 178/14 216/22
fashion [6]  58/7 97/22 117/24 118/12 118/17 119/22
fashioned [1]  100/17
Fassbender [13]  22/3 25/1 25/18 30/12 41/20 42/2 56/16 117/14 117/21 118/9 120/22 137/14 146/6
FBI [9]  46/16 47/12 48/14 49/12 67/14 188/20 211/24 212/5 224/16
feature [1]  26/11
features [1]  204/18
February [4]  25/5 210/23 224/20 241/1
February 21 [1]  210/23
fed [1]  112/13
Federal [2]  46/13 47/1
feel [3]  43/2 43/2 132/13
feet [5]  92/11 114/20 148/21 202/6 202/7
fellow [1]  17/6
felon [1]  128/20
felt [9]  51/23 52/1 53/22 54/21 56/24 82/14 84/14 143/3 176/12
female [2]  100/1 108/1
fence [2]  138/24 143/9
fencing [2]  138/25 138/25
few [7]  31/7 33/1 153/20 161/8 161/15 240/15 241/11
fiber [1]  124/3
fibers [16]  143/10 220/11 244/4 244/7 244/17 245/8 245/11 245/20 245/22 245/24 245/25 246/1 246/9 246/13 246/14 246/15
field [17]  86/25 131/19 132/4 132/7 132/17 132/22 134/20 134/21 145/22 151/24 152/20 188/4 195/11 220/16 220/20 220/22 235/18
fifth [2]  147/7 175/18
figure [2]  157/6 192/7
figured [1]  36/16
file [1]  214/18
filed [2]  194/17 211/9
fill [1]  220/25
filled [1]  137/16
film [1]  246/20
final [1]  9/10
finally [4]  49/14 137/9 145/14 190/7
findings [11]  47/18 47/20 166/8 182/12 183/12 196/13 210/21 211/5 235/9 235/16 237/13
fine [6]  108/25 109/1 168/13 218/10 241/10 249/7
finely [1]  53/15
finer [1]  158/5
finger [4]  22/24 23/4 23/5 39/5
fingerprint [9]  117/3 117/25 118/4 136/9 143/3 151/23 170/19 176/20 177/2
fingerprints [12]  7/9 37/12 37/19 37/23 37/24 38/3 38/4 117/2 118/14 119/23 151/22 152/12
finish [1]  149/11
finished [6]  75/17 98/1 101/7 147/6 147/15 149/13
finishing [1]  62/14
fire [24]  45/6 49/16 153/12 186/23

## F

fire... [20] 190/17 191/15 191/25 192/10 198/8 198/17 198/24 198/24 199/14 199/22 200/4 200/10 200/14 201/12 201/16 202/7 202/9 213/25 242/9 242/16
firearm [10] 17/3 70/11 101/20 102/15 102/17 112/7 117/7 189/12 206/22 212/4
firearms [49] 15/4 15/5 15/14 15/16 15/18 16/18 70/8 97/14 101/13 101/15 101/20 110/4 110/11 110/13 110/14 110/16 110/22 111/4 111/6 111/22 182/3 182/6 182/14 183/4 184/19 184/24 185/4 185/9 186/1 186/3 186/17 186/23 187/4 187/11 187/23 188/5 188/8 188/11 188/16 188/22 189/1 189/8 189/13 189/14 190/8 190/15 197/21 234/22 235/2
fired [57] 45/6 70/11 103/4 183/8 189/22 190/12 190/20 191/18 192/5 192/19 193/3 193/6 194/18 194/21 195/3 195/5 195/5 195/9 195/20 196/7 196/10 197/1 198/20 199/20 199/21 200/18 201/8 201/23 201/25 202/2 202/17 202/23 203/24 204/6 204/13 204/19 205/8 205/12 205/13 207/2 207/7 208/6 208/7 208/21 209/1 209/8 209/16 210/4 210/7 210/12 210/13 211/1 211/6 213/21 216/10 217/16 218/18
fires [9] 41/7 191/3 198/23 208/16 209/11 209/15 209/22 209/23 210/11
firetrucks [2] 137/11 137/12
firing [11] 182/16 189/14 190/5 191/17 192/6 192/8 192/11 199/3 200/16 201/18 235/4
firings [1] 213/11
fish [1] 148/1
fit [1] 220/13
fits [1] 112/16
five [10] 29/8 55/24 64/25 74/9 147/2 155/19 157/24 158/21 240/2 241/16
five-gallon [1] 74/9
fix [1] 7/22
FK [17] 203/12 204/2 204/3 205/3 206/21 212/18 213/16 214/3 214/7 215/18 215/22 216/10 216/22 217/6 217/10 218/2 218/17
FL [14] 207/21 207/25 208/20 212/18 213/16 214/3 214/7 215/18 215/22 216/12 216/13 216/13 217/4 217/10
flags [2] 154/14 156/4
flashlight [1] 85/24
flashlights [1] 142/6
flat [2] 137/25 156/13
flavor [1] 92/7
flip [1] 223/25
floor [20] 81/21 82/6 82/8 85/9 85/24 92/18 92/18 93/22 94/13 95/1 95/5 95/16 96/16 145/2 164/2 179/4 179/8 179/14 179/15 180/19
fluoresce [1] 232/3
fluorescing [1] 232/15
fob [3] 107/23 108/1 108/4
focus [2] 37/22 39/18
focused [4] 188/12 232/5 232/18 236/11
focusing [1] 236/6
foil [1] 147/25
follow [7] 28/20 33/16 71/22 71/24 133/18 209/6 218/12
follow-up [2] 28/20 218/12

followed [1] 145/6
following [3] 52/15 62/14 119/20
follows [6] 5/23 40/19 88/18 130/15 181/20 219/20
food [1] 147/24
food-type [1] 147/24
foot [12] 148/22 153/10 157/12 157/23 157/23 165/5 165/9 173/4 180/9 180/19 180/19 202/6
foot-and-a-half [2] 148/22 180/19
footwear [3] 172/23 173/1 173/8
forces [1] 191/5
foregoing [2] 250/7 250/7
foreground [1] 66/14
forensic [7] 54/7 76/11 220/2 220/7 223/1 223/2 224/5
forensics [1] 188/13
formal [2] 109/24 188/19
former [1] 151/22
forms [1] 61/24
forth [1] 44/21
found [61] 11/3 13/11 13/12 17/15 18/6 20/18 33/6 35/9 35/21 35/22 36/22 43/14 46/3 51/7 55/5 58/3 59/12 59/21 60/21 63/13 64/19 66/8 66/16 70/25 71/5 74/21 83/16 84/14 85/6 95/10 95/15 99/7 101/22 106/21 107/20 114/4 114/7 137/14 137/20 143/14 148/9 148/15 151/12 151/17 152/2 152/4 152/9 152/25 160/11 160/11 161/2 161/4 164/7 178/3 178/13 180/18 209/13 223/21 224/1 232/25 233/19
foundation [3] 24/16 225/17 226/2
four [31] 28/17 28/18 52/14 58/9 64/25 75/10 78/8 78/8 89/4 109/11 109/16 132/2 144/10 147/2 153/10 155/19 165/5 165/9 180/8 186/14 187/11 190/22 233/20 234/19 236/12 236/13 236/15 236/19 240/2 241/16 243/3
four-by-six [1] 153/10
four-wheel [1] 144/10
four-year [1] 109/16
fourth [1] 147/6
FOX [4] 1/11 29/15 90/6 109/23
fragment [25] 63/22 63/24 65/20 65/22 76/13 85/6 203/19 224/24 224/25 225/2 225/7 225/12 225/19 227/2 227/8 227/25 228/14 228/25 229/19 230/12 231/8 236/9 237/2 237/5 243/23
fragments [13] 51/25 54/22 62/19 120/9 224/21 224/21 228/5 229/10 230/24 231/9 231/12 243/8 243/17
frame [3] 153/14 154/12 156/5
FREMGEN [44] 1/20 3/5 3/9 3/20 4/11 5/13 5/13 24/6 28/3 28/6 28/10 40/9 67/23 68/7 68/8 68/14 68/16 68/17 68/19 78/22 78/25 87/15 87/19 88/7 88/9 100/11 108/19 108/22 108/25 126/22 167/12 167/15 225/15 226/6 226/8 226/9 240/13 240/19 247/2 247/10 247/21 247/23 248/16 249/9
Fremgen's [1] 126/20
fresh [1] 26/23
front [22] 19/12 43/14 48/6 48/24 51/9 53/11 58/25 58/25 62/2 63/11 69/17 70/2 85/23 91/9 99/14 138/24 142/11 144/22 163/16 172/3 172/5 202/13
Fuentes [3] 55/17 55/19 55/22
full [11] 20/22 29/21 90/12 175/7 175/16 175/16 175/19 180/21 186/6 186/18 186/22
fully [1] 45/16
function [3] 189/15 189/16 198/10

functioned [1] 201/8
functioning [1] 199/17
further [13] 27/25 45/22 65/8 67/19 70/19 87/8 108/15 143/18 170/15 181/7 224/5 247/1 247/5
futile [1] 172/17

## G

GAHN [2] 1/18 5/11
gain [1] 142/4
gained [1] 56/18
gallon [2] 74/9 148/20
gar [2] 69/23 179/3
garage [133] 43/21 43/23 50/20 56/11 56/22 57/2 57/15 57/17 57/19 57/21 57/24 58/1 58/3 58/6 58/8 58/18 58/23 58/23 58/25 59/1 59/3 59/14 59/22 60/15 60/23 60/24 61/11 61/16 61/20 62/4 63/1 64/8 64/9 64/20 66/14 66/17 67/5 69/20 69/24 77/25 78/4 78/16 78/21 78/24 79/3 79/6 79/9 79/10 79/17 79/19 79/21 79/22 79/24 80/2 80/13 80/22 81/15 81/20 81/24 83/8 83/23 85/2 85/2 85/9 85/15 85/19 85/22 85/23 86/7 86/15 86/20 87/8 87/13 87/23 90/9 90/14 90/16 91/7 91/10 91/18 92/5 92/8 92/9 92/12 92/13 92/16 92/17 92/18 92/21 92/24 93/3 93/21 94/20 95/1 95/7 95/16 96/3 96/16 96/16 97/21 98/2 101/11 113/6 114/3 114/3 114/12 114/15 114/16 119/8 119/19 119/25 125/25 126/1 126/3 126/12 128/9 147/1 153/1 153/11 154/11 154/11 159/23 161/4 161/5 162/14 163/9 166/20 178/21 179/3 179/8 179/14 179/15
garden [1] 156/14
garments [1] 246/23
Gary [1] 58/12
gases [1] 192/21
gasoline [1] 162/10
gathered [1] 56/18
gee [1] 114/4
general [22] 5/10 6/14 23/18 29/4 29/5 35/1 58/15 90/16 90/17 91/3 92/5 94/18 97/22 99/3 105/9 120/13 120/18 137/21 182/7 207/16 218/4 223/9
generally [4] 123/5 135/5 192/2 193/1
generated [2] 44/2 66/4
gentle [2] 157/14 229/6
gentlemen [4] 130/1 219/10 240/11 247/14
gets [2] 248/18 249/3
glass [4] 45/9 69/9 142/5 220/11
Glenfield [4] 102/1 111/9 197/22 208/22
gloved [2] 113/24 157/25
gloves [17] 12/11 12/13 12/14 12/21 13/7 34/6 34/13 35/3 35/10 37/9 39/22 39/24 40/3 40/4 106/25 113/16 229/6
glow [3] 160/4 180/5 180/10
glowing [1] 162/20
glows [2] 161/19 162/25
goal [1] 75/13
goals [1] 42/5
gone [2] 30/17 85/2
gotten [2] 30/17 189/5
grades [1] 157/17
graduate [3] 184/13 184/15 222/5
grains [2] 216/14 216/17
grassy [1] 172/8
gravel [4] 43/18 67/5 153/5 172/9
gravesite [1] 156/10
gravesites [1] 156/8

## G

gray [3] 63/12 85/16 86/1
gray-colored [1] 86/1
great [2] 84/9 244/21
greater [2] 97/19 138/9
green [9] 61/1 61/6 64/11 64/12 66/21 94/10 94/12 109/20 138/7
grid [1] 72/17
grid-like [1] 72/17
gridded [1] 177/19
grocery [2] 116/11 116/14
groove [6] 194/13 204/23 204/25 205/5 205/14 208/5
grooves [10] 193/21 193/25 194/4 194/8 194/8 194/9 194/18 205/9 207/3 207/17
ground [13] 39/3 57/25 83/7 139/15 153/10 153/15 153/16 153/19 154/14 154/14 155/18 156/12 193/12
growing [1] 139/6
Guang [2] 136/22 145/4
guesstimate [1] 112/3
guidance [1] 90/23
gun [54] 15/3 15/5 15/8 15/11 16/10 16/10 16/13 16/19 17/3 36/14 101/23 103/24 128/24 182/16 189/20 189/22 189/25 190/1 190/2 190/17 191/13 191/17 192/3 192/9 193/4 193/6 194/21 194/24 195/3 195/6 195/7 195/21 196/8 196/10 198/11 198/15 198/20 199/16 200/13 200/25 204/5 204/14 204/14 204/18 205/7 205/14 207/3 207/4 207/6 208/7 210/5 210/7 217/4 218/18
gun's [2] 192/1 192/24
gunpowder [7] 182/18 190/9 191/2 191/3 191/11 191/15 192/22
guns [10] 16/12 36/13 36/14 36/15 182/17 204/13 210/7 235/3 235/3 235/4
guy [1] 144/15
guys [1] 77/17

## H

H-e-i-m-e-r-l [1] 40/22
hadn't [3] 148/15 160/11 171/2
hair [1] 123/16
Halbach [11] 14/12 28/5 41/14 52/2 87/23 89/11 105/19 126/3 126/12 128/8 135/12
Halbach's [2] 25/9 26/16
half [14] 63/2 141/6 148/21 148/22 157/18 157/23 162/19 167/1 167/3 167/23 167/24 180/19 185/10 202/6
half-inch [1] 157/18
hallway [4] 9/9 9/21 33/21 104/16
hallways [1] 33/8
hand [22] 5/20 10/10 11/12 20/12 22/25 40/16 46/23 65/14 88/15 130/12 158/13 162/25 174/23 181/17 183/14 202/18 205/7 207/4 219/17 230/19 230/25 236/7
handcuffs [10] 17/10 17/15 17/18 17/23 18/5 18/7 18/12 18/13 35/22 36/10
handed [4] 10/14 63/15 96/20 96/24
handfuls [2] 149/4 173/23
handgun [1] 193/9
handguns [1] 193/14
handing [1] 154/5
handle [5] 112/21 113/1 116/21 158/2 222/21
handled [9] 12/19 34/7 112/9 113/14 113/18 116/22 117/11 118/22 229/6
handler [1] 31/10
handles [2] 25/19 39/25

handling [3] 35/12 130/8 229/4
hands [7] 77/5 113/15 113/24 113/24 149/1 149/4 157/25
handwritten [1] 168/7
haphazardly [1] 175/9
happen [1] 35/4
happened [11] 14/12 34/23 52/24 53/1 85/14 85/22 97/5 114/6 132/15 137/6 177/7
happens [6] 48/6 192/15 192/17 193/1 193/5 197/23
hard [9] 33/6 153/18 156/11 157/2 157/9 172/9 205/2 205/2 238/6
hard-packed [1] 172/9
hardware [1] 157/16
harm [1] 156/24
Hau [3] 2/3 250/4 250/19
Hawkin [1] 101/24
Hawkin-type [1] 101/24
Hawkins [6] 25/13 37/15 125/13 125/16 150/8 150/20
head [3] 55/16 206/16 241/4
headboard [6] 14/22 244/1 244/7 245/5 246/12 246/18
hearing [1] 249/3
hearsay [3] 24/14 126/5 248/21
heat [1] 161/20
heavily [1] 229/1
height [1] 53/6
HEIMERL [14] 3/7 40/15 40/17 40/22 40/25 42/10 44/1 45/15 50/11 56/8 62/16 64/3 67/20 68/20
held [1] 29/17
Hello [1] 126/25
helpful [1] 208/10
Hence [1] 231/14
Here's [1] 67/5
hereby [1] 250/6
herein [6] 5/22 40/18 88/17 130/14 181/19 219/19
herself [2] 99/25 100/2
hidden [1] 138/13
high [4] 235/13 235/25 238/2 238/8
high-speed [4] 235/13 235/25 238/2 238/8
highest [1] 84/20
highly [1] 160/5
Historical [1] 226/14
history [1] 185/4
hoist [1] 81/1
hold [9] 143/3 170/18 201/1 201/3 202/18 202/25 209/3 239/17 239/21
holding [2] 65/18 108/6
holds [2] 111/10 111/16
hole [4] 70/13 225/4 225/4 233/14
holes [2] 70/5 70/15
Holmes [2] 52/22 227/12
homicide [3] 131/9 134/23 183/1
HON [1] 1/11
Honor [4] 127/25 129/1 211/11 247/4
hood [31] 25/20 25/21 25/22 26/1 26/4 26/5 26/12 26/13 26/16 27/8 27/21 28/4 38/14 39/2 39/5 39/5 39/12 39/19 39/25 40/2 40/4 40/7 138/14 138/18 138/23 142/10 143/5 144/16 144/18 170/15 171/2
hope [1] 170/5
hopefully [2] 169/15 241/12
horseshoe [1] 78/17
hour-and-a-half [1] 141/6
hours [6] 41/23 56/15 57/8 84/9 141/7 158/21
house [2] 29/11 101/7

housed [1] 15/4
human [9] 51/22 53/22 158/9 158/13 178/17 241/24 242/1 242/2 243/5
humanly [1] 16/3
hundreds [1] 118/2
hypothetically [2] 178/20 180/3

## I

I'd [6] 9/5 200/5 219/5 219/8 221/11 225/17
I'll [6] 18/2 81/14 100/8 130/8 182/17 247/12
I'm [130] 6/15 6/16 9/12 10/10 14/19 16/15 17/12 19/12 21/17 21/18 23/1 25/23 27/11 27/14 33/19 35/1 35/13 35/22 35/22 35/23 41/2 41/6 43/10 44/16 46/6 46/22 48/3 49/25 52/4 55/12 55/25 58/19 61/10 62/21 63/19 64/3 65/12 65/18 66/2 67/17 70/6 71/4 76/23 80/21 82/22 83/1 85/11 86/13 89/1 89/7 89/13 89/25 93/9 95/2 95/12 96/5 96/24 98/8 102/2 102/9 104/10 104/23 105/13 106/8 107/8 109/8 122/2 122/10 126/18 127/1 131/4 133/5 133/5 133/5 138/15 141/7 146/21 168/4 170/16 182/3 182/16 183/13 188/8 189/10 189/13 189/14 190/8 194/10 194/12 195/2 195/4 195/7 195/8 195/10 195/21 196/2 196/3 196/14 197/15 198/18 201/18 205/20 208/3 209/12 210/15 211/21 213/9 214/6 214/14 216/1 216/13 220/2 221/13 223/1 223/2 224/11 225/8 226/4 230/1 230/7 230/13 231/20 232/11 233/9 234/14 238/17 241/25 242/4 245/21 248/2
I've [17] 6/11 72/10 88/5 89/4 91/4 91/24 127/20 161/22 168/11 168/11 187/25 187/25 189/4 199/10 205/11 207/9 220/17
idea [7] 24/1 38/23 71/21 74/24 171/7 175/23 176/1
ideal [1] 144/1
Ideally [1] 169/13
identical [1] 48/15
identification [18] 27/12 49/21 63/8 64/4 82/12 102/20 154/4 185/4 185/14 187/23 188/5 188/17 188/23 189/8 194/19 199/7 212/15 220/12
identifications [1] 45/2
identified [19] 48/10 55/16 56/4 59/7 59/9 63/22 66/20 67/14 69/12 82/1 82/2 82/9 82/11 84/14 100/2 232/23 237/23 239/12 246/21
identifies [3] 50/6 64/18 65/19
identify [10] 27/15 47/13 47/24 65/13 72/17 83/25 99/24 148/14 154/6 212/13
ides [1] 50/6
ilk [1] 222/6
Illinois [1] 133/24
im [1] 54/18
image [3] 66/5 230/11 230/23
images [1] 44/2
imagine [2] 35/23 201/12
immediate [3] 6/16 42/22 42/24
immediately [3] 40/7 140/22 184/24
impacts [1] 235/23
implementation [1] 54/18
implemented [1] 52/12
importantly [1] 209/20
impression [1] 92/5
impressions [10] 172/24 172/25 173/1 173/8 194/13 204/23 204/25 205/5 205/15 208/5

**I**

inaccessible [1] 177/25
inaudible [1] 87/25
inch [11] 157/18 157/18 157/19 157/20 162/19 162/19 166/25 166/25 167/1 167/2 167/3
inch-and-a-half [3] 162/19 167/1 167/3
inch-ish [1] 166/25
inches [3] 156/13 204/16 225/3
inclement [1] 30/11
includes [1] 53/16
including [5] 76/16 117/7 235/25 242/23 247/20
incoming [1] 30/16
indeed [1] 233/14
indentation [1] 70/23
indi [1] 161/8
indicate [6] 71/25 111/25 160/13 178/5 179/23 239/8
indicates [1] 184/2
indicating [1] 227/16
indication [4] 92/2 163/6 172/19 228/7
indications [1] 227/15
individually [2] 112/9 112/17
individuals [6] 22/14 33/13 42/22 52/19 78/8 174/3
indulgence [1] 126/17
inform [1] 169/5
informed [6] 22/6 56/17 59/13 82/7 83/24 224/10
initial [8] 32/7 42/8 42/12 42/15 51/1 72/24 136/25 149/18
initially [5] 30/9 51/12 57/16 139/21 192/20
initials [1] 227/18
injury [3] 22/22 22/23 23/14
inner [7] 228/22 230/13 238/17 238/19 238/20 243/19 243/20
inquiry [1] 24/3
inside [33] 23/24 26/8 36/3 44/21 45/9 46/4 58/3 91/7 96/16 101/22 103/13 103/23 105/16 142/6 142/7 142/16 144/14 168/23 170/5 191/4 194/1 194/3 194/15 195/14 203/18 225/7 231/3 235/24 238/7 238/11 238/14 238/25 239/5
instance [11] 34/5 72/5 86/6 142/1 177/19 178/20 179/2 179/3 179/9 194/20 220/20
institution [2] 133/12 221/25
instructed [6] 8/23 39/17 117/21 123/17 124/6 124/11
instructions [2] 128/13 128/15
instruments [3] 53/13 77/9 222/20
integrity [1] 123/21
intent [3] 168/24 169/2 169/25
interact [1] 131/16
interest [2] 83/19 245/19
interested [8] 27/5 76/14 227/7 228/20 232/4 233/11 233/13 245/21
interesting [1] 229/21
interior [12] 25/19 32/20 39/12 44/14 44/19 44/22 57/23 58/6 58/7 58/22 59/3 81/25
international [2] 188/10 223/4
interrupted [1] 147/12
interview [1] 42/9
interviewing [1] 42/25
intro [1] 167/7
inventoried [1] 151/2
investigate [3] 41/7 75/24 225/8
investigation [32] 24/19 24/20 29/25 31/4 41/3 41/13 41/17 41/21 41/25 42/6 42/15 43/3 45/20 46/13 50/13 51/2 56/18 61/21 72/8 72/14 73/16 119/16 123/24 124/18 135/11 182/9 182/11 182/22 183/2 197/2 221/4 227/13
Investigation's [1] 47/2
investigations [4] 41/9 72/2 155/12 189/11
investigative [2] 89/10 224/13
investigator [26] 8/18 21/9 22/4 24/25 25/17 32/5 33/22 37/3 42/3 52/20 54/20 58/11 58/12 75/9 77/4 101/3 104/1 104/18 118/9 183/14 196/15 197/15 203/9 210/15 221/14 225/9
investigator's [1] 77/15
investigators [13] 42/3 43/2 51/2 51/20 56/20 56/24 57/7 57/9 58/10 85/21 121/5 183/6 224/10
involvement [6] 38/10 73/11 73/15 89/14 110/9 168/15
involves [2] 47/7 189/9
inward [1] 228/22
iron [5] 18/12 18/20 161/19 161/23 162/5
iron-type [1] 161/23
irons [9] 17/11 17/24 18/1 18/4 18/5 18/8 18/20 35/24 36/10
irregular [1] 165/13
irrelevant [5] 118/20 129/4 129/6 129/10 129/12
ish [1] 166/25
issue [2] 211/21 247/20
It'd [1] 18/4
item [81] 11/3 12/14 13/2 13/5 18/10 34/9 35/8 35/9 45/11 54/21 59/15 59/24 61/20 62/8 63/18 75/2 75/20 77/1 79/19 83/18 84/4 84/7 84/13 84/15 86/15 104/19 114/11 118/3 128/1 135/1 178/1 196/19 197/4 203/12 204/2 204/3 205/3 206/21 207/1 207/21 207/22 207/25 208/19 218/2 226/25 227/1 227/23 227/24 228/1 228/2 228/4 228/8 228/10 228/12 228/17 229/9 229/15 229/17 229/19 229/19 229/22 230/3 230/11 231/5 233/23 235/8 235/11 236/3 236/11 236/19 236/24 236/24 237/2 237/4 237/9 238/10 239/15 239/20 239/23 244/14 244/16
Item 137 [1] 231/5
items [97] 12/11 17/7 17/7 20/9 34/6 34/9 34/18 45/8 46/14 48/9 50/15 50/22 51/21 52/1 53/18 53/22 53/24 53/24 54/25 55/2 55/5 55/7 59/4 59/11 59/13 61/8 61/13 61/23 62/20 72/18 73/20 74/21 74/24 76/21 81/4 81/9 81/15 81/16 82/3 82/21 83/2 84/6 84/11 86/10 86/12 86/14 86/15 86/19 90/17 94/15 105/12 105/25 118/1 118/2 118/6 120/23 123/3 125/5 125/8 125/9 139/17 143/3 143/15 147/24 158/15 170/7 170/17 170/18 171/4 174/23 176/2 177/17 180/14 180/23 180/24 181/4 182/25 185/18 204/3 221/3 221/5 223/16 223/18 223/20 223/22 226/10 226/12 226/15 226/20 227/10 227/17 227/22 228/2 229/14 229/15 240/23 242/9

**J**

J-o-h-n [1] 130/19
J. [1] 88/21
J. Kucharski [1] 88/21
Jack [5] 60/20 64/11 82/1 91/22 92/2
James [1] 227/12
Janda [8] 98/3 98/15 98/25 99/5 99/8 99/19 101/7 127/17
Janda's [1] 98/19
January [4] 131/1 185/12 186/9 187/3
jar [1] 76/25
Jennifer [3] 2/3 250/4 250/19
jeopardize [2] 136/8 136/9
Jeremy [2] 25/13 150/8
JEROME [1] 1/11
jiggles [1] 158/5
Jim [1] 8/18
job [6] 37/13 133/18 134/19 177/14 222/10 222/17
JOHN [6] 3/18 58/11 94/2 130/10 130/13 130/18
joined [1] 78/9
jotting [1] 168/11
Joy [1] 107/4
jug [1] 59/20
jugs [1] 82/3
jump [1] 46/22
jumping [1] 20/1
junk [3] 92/10 92/14 92/17
junked [2] 19/7 137/25
junkyard [3] 8/6 15/25 144/1
jurors [3] 60/3 99/16 247/18
jury [59] 1/4 6/4 6/13 7/3 7/18 8/4 11/1 11/16 14/21 14/25 15/23 16/20 17/18 18/10 18/18 20/13 21/15 23/19 25/11 26/3 26/3 26/18 27/7 41/1 41/16 43/12 46/7 47/19 48/8 49/2 50/24 55/4 55/14 56/2 56/13 57/1 60/3 62/22 62/24 63/5 65/22 66/7 66/11 91/6 91/14 92/7 95/13 96/2 96/12 101/19 102/11 104/24 107/18 216/17 247/12 248/14 248/19 248/24 249/5
jury's [2] 94/14 107/13
justice [5] 41/3 41/5 183/22 184/22 185/5

**K**

K-9 [2] 31/10 31/11
K-9s [1] 31/9
K-u-c-h-a-r-s-k-i [1] 88/22
Kansas [5] 183/24 184/4 187/6 187/10 187/11
keep [3] 159/11 169/15 175/7
keeping [2] 12/4 177/17
Ken [1] 5/8
KENNETH [5] 1/14 4/9 219/13 219/18 219/23
KEVIN [4] 3/7 40/15 40/17 40/22
key [17] 106/14 106/15 106/20 106/22 106/25 107/2 107/6 107/10 107/20 107/22 107/23 108/1 108/2 108/3 108/4 108/23 108/24
keypad [1] 49/17
kinds [5] 12/9 186/20 193/14 206/14 210/2
kitchen [2] 9/8 9/19
knife [1] 77/8
knives [1] 53/14
knocked [1] 79/18
knowing [1] 15/20
known [4] 7/15 17/22 89/16 131/19
KQ [9] 229/15 229/17 229/19 230/3 236/3 236/24 237/2 239/21 239/23
KR [1] 229/15
KRATZ [65] 1/14 3/4 3/8 3/10 3/12 3/14 3/16 5/3 5/5 5/6 5/8 5/18 6/3 7/20 8/1 8/2 18/25 19/1 24/10 24/17 24/18 27/22 40/11 40/14 40/24 67/17 68/11 87/18

**K**

KRATZ... [37] 88/5 88/12 88/24 96/23 96/24 100/3 100/15 100/22 101/1 101/3 103/25 104/2 104/20 104/23 108/10 108/21 108/23 110/3 110/22 118/19 125/20 125/22 126/9 126/17 127/12 127/15 127/20 128/1 128/17 128/19 129/6 129/9 129/13 129/16 129/20 129/23 130/6
Kratz's [1] 111/2
Kuchar [1] 100/20
KUCHARSKI [16] 3/11 88/13 88/16 88/21 88/25 89/9 95/25 97/21 100/20 101/3 101/4 101/12 102/9 103/9 104/2 127/16

**L**

l-a-n-d-s [1] 194/10
lab [56] 37/20 38/18 38/21 38/23 46/11 46/12 46/15 52/8 72/20 73/12 73/13 73/21 73/23 73/24 74/6 75/3 75/21 76/3 76/16 82/8 83/25 84/21 84/22 87/4 87/6 87/9 107/5 125/7 125/8 131/5 132/13 134/15 143/7 145/24 146/19 151/23 169/4 171/5 171/9 171/9 177/12 178/8 178/14 186/11 186/13 203/12 208/20 212/5 215/9 220/8 220/21 222/12 226/16 234/23 235/10 239/20
labeled [10] 60/20 74/11 74/14 74/16 213/16 227/4 227/5 227/6 228/3 228/5
labeling [1] 227/19
Laboratories [1] 133/23
laboratory [41] 47/2 54/16 65/8 73/9 130/23 130/25 133/22 134/1 134/12 134/13 134/17 135/17 135/19 140/21 144/3 182/4 183/3 184/22 184/25 185/3 185/8 185/21 186/2 186/4 186/8 186/21 187/2 187/10 187/12 189/15 190/6 195/5 198/24 201/25 202/5 220/3 220/9 220/18 222/13 222/17 224/16
laboratory's [1] 224/10
laceration [1] 22/25
lacks [1] 207/15
ladies [2] 129/25 247/14
laid [2] 46/19 137/12
Lakeshore [1] 29/20
lamp [1] 142/11
land [7] 19/7 194/13 204/22 204/24 205/5 205/14 208/5
landmarks [1] 93/15
lands [5] 193/21 194/9 194/18 207/3 207/16
lanyard [1] 107/24
large [21] 11/11 16/2 27/6 51/2 51/4 64/14 74/2 74/3 80/23 91/11 91/25 93/10 94/6 99/16 104/11 144/8 144/25 166/23 231/25 232/1 241/25
larger [8] 135/6 149/9 154/22 156/20 160/6 163/20 165/24 174/23
laser [7] 9/15 44/6 52/10 66/10 93/14 163/15 231/23
lasted [1] 19/2
latch [21] 25/20 25/22 26/1 26/4 26/12 26/13 26/16 27/8 27/21 28/5 38/14 38/25 39/6 39/7 39/9 39/10 39/19 40/1 40/2 40/4 40/7
late [2] 57/8 141/14
later [17] 23/18 37/14 45/21 54/12 57/4 57/4 74/19 100/25 101/2 107/6 127/5 141/12 157/6 165/20 169/8 196/25 199/7
laundry [2] 19/24 20/16

law [17] 1/20 1/22 11/18 14/10 15/21 17/6 24/24 44/24 51/18 54/14 87/19 87/22 93/2 131/6 166/8 187/22 235/20
lawnmower [5] 94/1 94/2 94/5 165/3 180/7
lay [2] 24/15 60/10
layer [6] 53/15 53/19 174/25 175/7 176/5 176/5
layers [1] 175/2
layout [2] 9/4 9/17
lead [42] 10/8 14/17 85/17 86/3 118/9 161/22 179/24 180/3 205/25 233/3 233/5 233/12 233/15 233/20 233/21 233/24 234/8 234/14 235/9 235/16 236/19 236/20 236/23 237/1 237/10 237/14 237/16 237/19 237/23 237/25 238/24 239/1 239/9 239/11 239/16 239/23 241/23 242/2 242/6 242/12 242/16 243/2
leader [1] 136/24
leading [3] 129/2 129/3 129/11
leads [1] 224/14
leaned [2] 139/1 139/5
leaning [3] 138/14 138/17 139/9
learn [1] 123/22
learning [1] 222/15
leave [6] 60/25 62/21 114/16 136/16 136/19 160/19
leaves [1] 139/11
leaving [3] 23/25 175/13 195/17
left-hand [4] 11/12 230/19 230/25 236/7
leg [9] 17/11 17/24 18/1 18/4 18/5 18/8 18/20 35/24 36/10
length [1] 213/4
Lenk [7] 8/18 14/6 33/18 33/22 33/24 89/22 105/23
Leslie [2] 54/4 226/12
less [1] 236/23
level [1] 177/21
license [10] 138/11 142/2 151/9 151/16 176/16 176/17 176/19 176/22 177/6 177/8
Lieutenant [6] 33/18 33/24 89/22 105/23 121/4 121/4
lift [4] 117/2 245/8 245/10 245/10
lifted [1] 144/20
lifting [2] 118/18 119/22
light [4] 86/1 117/21 118/8 165/7
lightening [1] 140/8
lighting [2] 53/9 144/4
lights [1] 164/5
likewise [3] 232/15 236/22 237/3
limit [1] 242/13
limited [2] 206/24 243/7
line [1] 215/13
lined [1] 138/5
linkage [1] 144/17
lint [1] 245/10
listen [1] 99/21
listened [1] 100/1
literature [2] 188/16 223/9
little [33] 6/8 9/16 12/18 15/23 20/1 80/7 83/13 83/14 89/25 90/23 91/24 95/5 101/2 110/9 123/22 127/5 131/12 133/2 138/4 148/3 153/25 165/8 172/20 182/13 183/12 211/20 211/24 219/9 221/12 229/17 229/23 245/19 247/8
living [9] 9/7 9/8 9/20 10/12 10/17 10/20 11/6 13/14 104/16
load [8] 111/17 112/7 112/20 112/24 141/3 190/17 191/20 199/23
loaded [5] 98/4 103/3 141/9 145/7 199/10

loader [4] 112/20 112/23 112/25 113/1
loading [1] 112/14
loads [1] 199/23
loaned [1] 153/4
locally [1] 29/22
locate [2] 17/6 60/14
located [29] 8/7 8/9 11/4 12/6 12/6 14/8 16/12 16/19 17/10 17/23 43/17 44/5 62/24 62/25 65/2 74/25 81/4 95/10 106/6 107/10 115/3 115/5 115/9 135/25 137/22 142/9 144/23 151/9 178/1
locating [1] 36/5
location [13] 17/18 30/13 36/3 52/15 59/11 60/21 66/19 66/20 69/17 72/18 114/15 137/20 151/16
locations [5] 42/24 51/3 124/17 150/12 233/17
locked [4] 57/19 142/4 142/15 144/11
Locks [1] 26/5
Logical [1] 175/11
logo [1] 11/13
long [23] 6/9 15/5 16/5 16/11 29/15 29/17 44/3 82/14 89/2 95/11 106/3 106/7 130/24 132/17 134/14 140/12 158/17 188/21 201/22 202/6 213/2 220/4 220/15
longer [1] 13/5
looks [7] 39/1 86/2 94/2 108/9 155/7 206/12 231/4
losing [1] 170/4
lot [15] 16/2 25/15 110/11 147/23 147/24 148/4 153/13 161/4 164/24 164/25 174/15 179/16 180/14 189/2 212/22
lower [4] 8/6 11/11 39/7 39/8
lowered [1] 98/12
luminesced [1] 82/10
luminescence [1] 165/20
luminol [27] 82/10 84/1 84/24 159/20 160/1 160/2 160/18 160/19 160/22 161/4 161/9 161/11 161/14 162/6 162/15 162/20 164/18 165/7 165/25 166/20 178/16 178/22 179/13 179/18 180/4 180/12 180/17
luminol's [4] 160/3 161/18 161/19 161/20
luminolled [3] 160/21 161/1 161/3
luminolling [1] 160/14
lunch [3] 108/12 126/20 129/16
lying [1] 36/2

**M**

Mach [1] 91/16
machine [3] 99/8 99/18 250/10
machinery [1] 92/10
Madison [20] 52/8 52/14 52/24 54/16 130/23 130/25 134/17 134/17 136/16 136/19 140/20 141/21 143/7 144/7 145/5 145/22 145/24 182/4 187/18 220/3
magazine [15] 10/25 11/10 11/13 13/15 103/1 103/2 103/12 103/13 103/15 111/14 112/1 113/3 127/1 200/20 201/2
magically [1] 173/2
magnesium [1] 242/24
magnification [1] 244/22
main [6] 9/6 69/24 79/7 150/7 220/9 233/8
mainly [1] 237/19
mainstream [1] 193/20
maintain [3] 8/8 188/15 223/8
maintenance [1] 102/19
major [2] 34/12 222/2

## M

majority [5]  29/2 29/5 42/17 74/1 74/8
makeup [1]  132/9
maneuver [1]  144/24
MANITOWOC [8]  1/1 8/16 41/21 42/9 58/14 135/20 135/25 250/2
manner [1]  191/21
manually [1]  193/17
manufacture [2]  111/15 194/4
manufactured [4]  197/21 201/22 205/12 207/3
manufacturer [3]  198/13 212/13 212/15
manufacturers [2]  212/22 217/1
manufacturing [2]  194/23 246/25
March [26]  19/21 20/2 21/4 25/6 56/8 56/15 57/3 61/12 61/18 62/15 64/6 65/20 77/24 77/25 78/1 78/8 78/9 79/4 82/20 82/20 84/9 85/3 85/14 87/20 87/21 134/6
March 1 [14]  19/21 20/2 25/6 56/8 56/15 61/18 77/25 78/1 78/8 82/20 84/9 85/3 85/14 87/21
March 2 [5]  62/15 64/6 65/20 78/9 82/20
MARK [3]  1/20 5/13 137/14
marked [38]  4/14 14/20 17/12 18/9 23/1 27/12 44/16 46/23 48/20 56/1 59/17 60/17 63/4 63/16 64/4 68/25 81/5 81/17 82/25 91/5 95/12 96/25 98/9 100/8 102/8 102/10 104/24 106/17 127/13 154/2 154/4 165/19 166/3 195/7 196/16 196/24 199/6 248/3
marker [11]  63/3 63/8 63/10 63/11 64/18 64/23 66/14 66/16 84/4 84/5 84/17
markers [6]  59/10 59/11 81/19 82/15 82/16 84/2
market [1]  112/15
marking [2]  80/8 83/13
markings [7]  185/17 195/22 207/8 209/19 209/25 227/16 227/18
marks [1]  172/8
Marlin [5]  111/13 197/21 208/22 209/1 210/13
mason's [2]  149/5 158/1
master [1]  13/19
Master's [4]  133/6 133/10 133/13 222/7
matches [1]  37/21
Mateo [1]  185/20
material [35]  26/15 27/13 45/5 51/3 51/12 51/15 51/17 53/23 63/19 71/2 72/23 72/23 73/7 74/1 74/2 74/18 75/7 75/8 75/18 149/6 149/7 155/22 156/9 156/13 156/19 157/19 158/5 159/3 159/8 163/6 223/24 224/5 231/24 232/15 246/10
materials [14]  51/23 55/11 64/16 143/10 147/24 151/2 155/17 155/25 156/21 157/3 158/25 220/11 223/21 227/16
matter [11]  74/15 110/10 110/18 154/3 210/8 213/19 217/11 224/19 229/4 250/7 250/13
May 10 [1]  211/3
mean [16]  81/16 84/3 86/4 143/21 157/10 175/5 175/12 176/18 179/2 205/18 213/2 213/19 213/20 215/11 233/5 238/14
meant [3]  35/13 35/13 66/18
measure [1]  84/18
measurement [1]  23/6
measurements [1]  114/18
measures [1]  30/14
media [2]  193/20 219/5

medical [4]  22/5 22/12 22/15 23/10
meet [1]  249/10
meetings [1]  189/1
member [14]  26/3 119/7 119/18 132/17 132/21 134/20 188/2 188/8 220/19 220/22 220/24 223/1 223/3 223/4
members [3]  10/19 22/7 26/3
memorialize [1]  32/14
memory [1]  116/6
mention [2]  110/23 208/8
mentioned [14]  18/1 76/7 77/23 83/3 84/21 142/1 162/4 187/5 225/24 227/14 230/6 230/14 233/6 238/5
mesh [6]  157/18 157/18 157/19 157/20 157/22 157/22
message [9]  99/7 99/11 99/24 100/1 100/5 100/6 100/14 126/24 127/16
messages [1]  99/22
messy [1]  92/8
met [1]  42/2
metal [13]  45/8 53/24 55/1 55/5 69/8 76/7 158/2 192/13 206/12 228/16 229/25 233/16 237/18
metal-shaped [1]  158/2
metallic [1]  228/16
metallurgy [4]  212/5 212/7 212/9 214/8
metals [1]  220/11
method [1]  246/15
methodical [1]  78/3
methodically [1]  33/14
methodology [2]  11/17 170/10
microscope [8]  195/8 206/9 209/13 209/21 228/14 228/18 232/5 245/18
microscopic [8]  195/13 206/4 207/8 208/13 213/12 237/21 244/12 244/19
microscopically [2]  204/4 224/13
middle [6]  13/24 22/24 60/23 80/16 144/1 175/8
Midwest [1]  223/2
Mike [1]  29/17
Milwaukee [3]  29/18 134/2 134/5
mind [2]  71/21 86/1
minimize [1]  30/6
minimum [1]  131/25
minor [1]  142/8
minute [3]  12/5 46/22 68/2
minutes [3]  218/24 218/25 249/11
miscellaneous [2]  55/7 61/8
missed [3]  85/12 87/20 161/3
missing [6]  105/19 134/23 135/11 135/23 135/24 203/20
Missouri [2]  187/6 187/11
mist [1]  30/20
mister [1]  133/5
misunderstood [2]  72/21 111/2
mixes [1]  176/8
model [9]  32/1 32/4 32/8 48/16 49/1 102/1 103/13 197/21 197/22
modern [2]  191/8 193/24
modified [2]  111/17 112/1
molecular [2]  133/6 133/22
molecule [1]  161/20
moment [10]  7/20 12/18 21/2 27/23 66/2 88/9 152/12 153/7 165/23 200/18
moments [1]  161/8
Monday [4]  43/5 146/17 146/18 147/10
monitor [2]  33/11 37/1
Montana [4]  184/3 186/8 187/2 188/19
month [1]  185/10
months [3]  175/22 235/1 240/22
morning [12]  5/2 5/3 40/25 41/22 56/15 68/1 109/6 109/7 146/1 146/20 146/25 147/5

mostly [1]  147/23
Mot [1]  148/11
motion [1]  240/9
motions [1]  240/12
motor [2]  44/11 60/11
Motorola [13]  45/13 47/25 48/7 48/16 48/25 49/9 49/18 67/9 69/12 69/14 148/11 223/23 223/23
mounted [4]  191/1 192/17 192/20 228/17
Mr [7]  7/20 56/7 67/14 118/20 214/11 219/11 247/21
Mr. [72]  5/5 6/4 9/17 10/13 10/20 14/25 16/11 17/4 18/6 18/15 18/23 18/25 19/1 20/12 21/4 21/7 22/18 24/5 24/11 24/20 24/21 24/23 27/11 40/25 47/1 47/13 47/19 47/21 48/11 49/23 50/20 55/25 57/5 59/25 60/15 62/17 63/15 65/14 68/7 68/16 87/19 88/2 88/25 91/18 98/16 100/20 101/21 104/3 108/6 108/8 110/3 110/22 111/2 118/25 125/23 126/20 128/1 129/16 130/6 135/9 136/22 145/18 149/22 167/16 182/24 211/18 213/9 218/16 219/14 239/14 247/10 247/21
Mr. Avery [3]  21/7 22/18 24/20
Mr. Avery's [16]  9/17 10/13 10/20 14/25 16/11 18/6 18/15 18/23 48/11 49/23 50/20 60/15 91/18 101/21 104/3 108/8
Mr. Brendan [1]  24/23
Mr. Cates [1]  149/22
Mr. Curtis [1]  47/1
Mr. Dassey [6]  24/5 24/11 24/21 57/5 62/17 88/2
Mr. Dassey's [3]  21/4 59/25 98/16
Mr. Edelstein [2]  118/25 125/23
Mr. Ertl [2]  135/9 167/16
Mr. Fremgen [5]  68/7 68/16 87/19 247/10 247/21
Mr. Fremgen's [1]  126/20
Mr. Guang [1]  136/22
Mr. Heimerl [1]  40/25
Mr. Kratz [6]  5/5 110/3 110/22 128/1 129/16 130/6
Mr. Kratz's [1]  111/2
Mr. Kuchar [1]  100/20
Mr. Kucharski [1]  88/25
Mr. Newhouse [4]  182/24 211/18 213/9 218/16
Mr. Olson [2]  219/14 239/14
Mr. Thomas [2]  47/13 47/21
Mr. Thomas' [1]  47/19
Mr. Tyson [3]  6/4 17/4 19/1
Mr. Wiegert [5]  18/25 27/11 55/25 63/15 108/6
Mr. Wiegert's [2]  20/12 65/14
Mr. Zhang [1]  145/18
Ms [1]  128/8
much [8]  14/7 37/22 60/6 132/10 141/5 143/20 148/8 175/3
multiple [1]  62/6
multitude [1]  212/23
muzzle [1]  190/11
muzzleloader [2]  17/2 101/25
myself [8]  37/15 46/1 51/20 52/20 58/11 90/15 105/23 118/1

## N

N-e-w-h-o-u-s-e [1]  181/24
nail [2]  206/17 246/14
naked [1]  179/5
name [16]  5/25 5/25 40/21 40/21 54/3 55/17 60/20 88/20 88/20 130/17 130/17

**N**

name... [5] 130/18 181/22 181/22 219/21 219/22
names [2] 137/10 166/13
nature [6] 6/24 7/10 12/7 34/15 34/16 225/14
near [4] 13/14 30/10 64/20 234/11
nearby [3] 138/2 138/3 151/13
necessarily [3] 128/1 169/25 225/16
necessary [2] 157/13 176/13
need [5] 52/10 70/19 86/2 86/23 93/4
needed [8] 23/23 93/4 140/25 144/8 167/21 169/11 220/25 224/14
needs [1] 220/12
neighborhood [4] 42/18 42/19 42/20 73/3
neutral [1] 144/12
never [6] 112/5 125/8 140/11 161/23 176/7 194/11
new [9] 12/14 13/8 48/15 56/25 82/23 83/1 83/2 106/25 107/2
newer [1] 138/10
newest [1] 139/4
NEWHOUSE [9] 4/3 181/16 181/18 181/23 182/24 211/18 213/9 214/11 218/16
night [9] 14/9 15/16 31/24 35/12 146/17 146/18 146/19 166/12 247/17
nightstand [2] 17/21 17/22
nine [4] 202/6 230/17 230/18 231/19
Nineteen [2] 28/17 28/18
ninety [2] 28/17 28/18
ninety-four [2] 28/17 28/18
nobody [4] 30/10 30/10 33/25 116/22
non [6] 45/7 49/4 49/4 53/17 53/18 53/24
non-burned [2] 49/4 53/17
non-combustible [2] 45/7 53/18
non-cumbustible [1] 53/24
non-damaged [1] 49/4
none [6] 67/24 181/9 210/14 214/14 214/14 216/7
nonetheless [1] 205/3
noon [1] 135/15
Norm [1] 5/11
normal [2] 228/14 243/5
normally [1] 241/23
NORMAN [1] 1/18
north [5] 43/22 57/19 58/25 69/21 93/19
northeast [3] 62/3 69/22 109/20
note [10] 22/22 37/4 79/20 81/10 85/20 142/3 176/12 242/20 242/23 245/22
noted [9] 57/17 69/8 83/11 84/23 169/6 184/1 241/19 244/17 246/1
notes [17] 11/25 32/11 33/12 85/5 131/16 167/16 168/2 168/4 168/6 168/7 168/8 168/11 226/23 240/21 241/9 241/15 250/9
notice [4] 143/12 167/19 193/25 194/6
noticeable [1] 179/5
noticed [3] 80/4 110/3 240/20
noting [1] 170/1
November [51] 7/12 7/14 8/20 9/24 15/1 18/16 21/12 21/16 22/19 31/25 41/11 41/12 41/18 43/5 45/22 83/6 89/15 89/20 90/2 90/7 91/19 92/1 93/16 96/1 97/24 105/21 108/7 115/17 122/14 122/15 126/1 127/18 134/6 134/7 135/10 139/10 140/2 146/3 146/4 146/22 146/24 149/24 159/19 168/14 168/15 173/13 187/8 187/8 229/11 229/11 241/2

November 5 [5] 41/11 41/12 135/10 168/14 168/15
November 8 [4] 146/22 146/24 159/19 173/13
number [20] 28/4 32/1 32/1 32/4 32/4 38/9 51/21 64/25 64/25 84/20 104/20 154/7 182/25 198/1 198/12 200/25 213/24 214/17 214/18 225/10
numbered [2] 59/11 80/7
numbers [2] 32/9 84/19
numerous [3] 20/9 55/5 61/8

**O**

o'clock [2] 127/4 149/14
O-l-s-o-n [1] 219/23
object [18] 49/19 61/1 61/6 62/5 62/10 63/12 65/2 65/18 66/18 81/1 85/16 86/1 87/1 123/21 123/23 126/4 129/2 158/2
objection [11] 24/6 28/2 28/6 67/22 68/12 100/10 118/19 167/10 225/16 240/11 248/7
objections [4] 108/17 247/22 247/24 247/25
objectives [1] 58/17
objects [5] 45/8 45/9 62/6 76/7 91/11
obliterated [2] 205/1 207/11
obscured [1] 169/2
observation [5] 69/7 139/21 165/17 165/24 166/1
observations [4] 23/13 43/1 45/14 71/12
observe [3] 99/6 113/19 244/13
observed [7] 15/1 45/11 93/16 139/9 185/18 235/11 244/16
obstructed [1] 139/17
obstruction [1] 199/11
obtain [2] 25/8 198/22
obtained [3] 42/5 133/20 201/24
obtaining [2] 38/13 123/15
obvious [8] 10/7 13/10 17/7 33/20 111/25 152/11 160/7 211/22
obviously [9] 33/11 44/20 58/23 64/17 93/23 94/20 171/16 197/10 244/23
occasion [16] 22/17 44/12 50/13 52/24 72/12 74/7 74/9 83/22 95/8 99/6 99/20 101/12 104/4 106/2 106/13 131/24
Occasionally [1] 199/12
occur [3] 12/8 12/21 140/22
occurred [7] 13/22 29/6 45/6 49/22 52/13 81/24 134/7
occurring [1] 53/2
occurs [1] 12/22
Oconto [1] 109/15
offer [3] 68/10 127/14 131/6
offered [1] 240/7
office [5] 89/1 105/6 105/9 105/17 187/18
officer [12] 6/18 6/20 16/22 28/11 29/18 37/7 44/24 89/3 117/18 128/6 150/19 154/5
officers [26] 7/5 8/12 11/19 11/24 12/3 12/10 12/12 14/11 15/15 15/21 17/6 19/9 29/8 30/13 31/11 31/11 35/11 35/21 35/22 42/11 87/20 93/2 150/23 155/15 166/9 173/10
official [4] 2/4 211/8 250/4 250/19
officials [1] 24/25
oftentimes [1] 178/24
old [1] 100/16
older [1] 139/3
OLSON [6] 4/9 219/13 219/14 219/18 219/23 239/14
on-scene [1] 51/1
on-the-job-training [2] 222/10 222/17

one [153] 7/20 11/4 13/12 14/5 16/3 16/18 22/14 29/21 31/24 32/7 33/14 34/13 35/21 37/3 37/5 37/7 39/20 40/5 45/11 48/2 48/5 48/22 50/3 51/9 51/21 56/4 57/11 59/13 72/12 75/20 77/10 77/11 78/3 78/9 78/16 82/24 86/9 88/9 92/22 93/19 95/15 95/19 95/20 96/22 96/23 99/9 99/21 100/16 101/23 103/4 103/7 105/16 108/19 108/19 108/21 108/21 108/22 108/22 110/18 111/6 112/21 113/11 114/5 114/7 115/9 116/11 116/16 117/18 118/3 125/20 128/17 131/15 131/17 138/24 139/3 139/3 144/19 148/3 150/22 150/24 151/2 154/1 154/13 154/18 154/24 155/16 156/6 157/21 161/16 163/9 163/21 164/8 165/1 165/23 166/22 167/7 170/12 171/20 173/16 173/18 174/10 175/6 175/18 175/19 183/19 185/2 187/11 190/1 190/2 190/22 190/25 191/21 195/5 195/6 199/7 201/17 204/20 206/7 214/7 214/17 216/12 216/13 217/24 218/16 224/12 227/3 227/5 227/6 227/8 227/23 227/25 230/1 230/16 230/16 230/24 231/7 231/18 231/19 231/25 232/12 232/13 232/16 236/12 236/16 239/15 240/2 241/15 243/16 243/19 245/7 245/7 246/19 247/22
one's [1] 154/18
one-quarter [1] 175/18
one-third [1] 175/19
ones [7] 81/17 81/19 137/15 152/6 166/16 170/19 207/16
ongoing [1] 56/18
Oops [1] 219/4
open [15] 27/14 44/20 58/24 63/20 80/23 81/2 94/23 114/8 115/22 116/1 116/3 116/5 144/18 165/16 168/23
opened [7] 38/17 40/2 40/4 58/2 79/6 152/5 196/22
opening [1] 69/23
operating [1] 219/7
opinion [9] 124/7 124/9 187/23 202/21 202/25 209/3 239/14 239/17 239/21
opportunities [1] 243/7
opportunity [8] 15/17 93/3 132/21 141/22 142/19 188/20 207/22 244/3
order [8] 112/7 112/20 116/3 143/22 201/12 213/11 219/6 245/2
orders [1] 121/3
organization [2] 188/10 188/11
organizations [1] 222/23
organized [1] 175/11
organizing [1] 74/20
original [1] 208/5
originally [4] 81/15 205/16 226/21 231/13
originated [2] 216/17 226/12
originating [1] 212/17
oth [1] 186/3
otherwise [2] 118/22 154/19
our [26] 16/1 23/21 29/8 32/3 37/22 39/18 41/9 46/14 53/3 61/18 64/7 75/13 82/15 92/22 137/10 152/20 152/25 153/3 154/15 159/7 177/25 182/12 207/24 220/22 224/10 244/20
outbuildings [1] 19/6
outer [7] 225/5 230/3 238/18 238/22 241/17 243/21 243/22
outside [15] 44/5 48/11 63/1 101/10 116/25 116/25 136/10 171/25 238/7 238/11 238/14 238/21 238/23 239/2

## O

outside... [1] 239/4
oval [2] 165/10 165/16
overcast [1] 139/24
overhead [5] 58/1 58/23 59/1 79/7 91/9
Overruled [1] 126/7
oversee [1] 32/10
overseeing [1] 54/14
overview [3] 57/1 58/7 64/8

## P

p.m [10] 57/9 130/4 136/20 137/5 152/24 158/19 219/2 219/3 247/18 249/15
package [7] 26/24 63/17 65/24 87/2 97/6 107/1 116/9
packaged [7] 87/7 87/11 87/14 150/15 159/1 177/9 178/6
packaging [2] 151/19 226/21
packed [2] 172/9 180/21
padded [1] 60/8
padlock [2] 57/20 57/21
page [3] 3/2 4/2 46/25
paint [5] 59/15 59/21 82/2 162/11 220/11
pair [1] 12/20
palm [3] 47/25 67/10 158/12
panel [2] 45/12 142/11
paper [5] 97/7 107/2 107/3 196/22 203/17
papers [1] 189/3
park [1] 138/1
parked [5] 19/8 58/3 79/22 79/23 101/10
parking [1] 144/13
Parkside [2] 133/7 133/14
partially [1] 147/24
participate [3] 22/17 43/6 146/12
participated [4] 72/10 152/23 155/8 158/8
participation [1] 124/18
particle [1] 232/16
particles [3] 149/8 158/6 232/4
particularly [5] 117/18 118/8 134/19 146/23 149/24
parts [1] 194/25
pass [1] 137/9
passage [3] 140/23 205/2 207/12
passenger [1] 58/2
passes [1] 195/15
past [4] 90/25 156/4 156/5 219/8
path [1] 172/15
patrol [4] 6/6 6/15 6/17 89/7
pattern [4] 160/10 160/13 195/22 223/5
patterns [11] 195/10 195/17 196/4 196/5 196/6 196/11 209/14 209/18 209/23 210/3 210/9
pavement [2] 83/8 85/8
PDA [2] 48/1 67/11
pending [1] 235/19
penetrations [1] 70/17
pennies [1] 161/22
penny [2] 161/17 161/18
perceived [1] 237/14
perfect [1] 129/23
perform [8] 90/8 97/11 105/21 119/9 119/19 199/14 203/4 222/12
performed [2] 97/23 159/18
performing [1] 222/11
performs [1] 11/18
perhaps [4] 13/9 20/13 172/21 192/16
perimeter [1] 166/3

period [4] 33/18 111/15 134/4 186/22
permission [1] 100/5
personal [2] 42/21 77/8
personally [5] 5/15 26/14 27/18 75/24 113/11
personnel [4] 57/18 82/8 83/25 125/8
persons [2] 134/23 135/23
pertinent [1] 182/10
Pevytoe [3] 52/21 71/20 75/11
phenolphthalein [8] 163/4 163/5 163/11 163/22 164/20 165/22 166/5 166/7
phone [24] 48/16 49/4 49/10 49/18 67/9 69/12 99/7 99/11 99/18 99/21 99/24 100/5 100/6 100/13 101/5 126/24 127/9 131/13 135/18 223/22 223/23 223/25 224/1 224/9
phosphorus [5] 232/25 233/8 236/17 241/20 243/2
photo [17] 15/2 15/11 28/4 44/3 49/15 60/25 63/8 65/21 78/24 91/7 99/18 102/2 102/6 106/11 107/14 154/11 154/21
photograph [89] 10/16 10/25 11/9 14/22 16/16 17/2 17/15 18/4 19/16 22/11 23/7 23/14 26/1 32/13 43/11 43/13 43/25 44/19 46/9 47/15 47/22 48/5 48/22 49/7 50/3 52/7 52/19 55/15 56/5 58/22 58/24 59/9 59/20 60/19 62/2 62/13 62/22 63/2 63/7 64/6 64/8 64/12 64/15 64/18 64/23 64/24 65/13 65/16 65/17 65/17 66/20 69/1 82/15 84/8 84/10 84/12 84/18 84/20 91/13 91/17 91/21 93/10 94/11 95/18 95/23 96/14 102/5 104/10 105/14 105/16 106/8 106/20 107/6 107/10 114/7 114/24 143/1 154/2 154/5 154/10 155/2 155/7 156/3 167/8 197/9 225/9 225/11 230/2 236/10
photographed [6] 32/20 57/17 95/20 96/9 151/10 151/11
photographer [6] 127/1 131/17 136/24 143/1 145/4 149/17
photographic [4] 59/10 80/10 84/2 84/17
photographs [5] 45/17 48/9 91/4 95/21 114/17
photography [2] 28/23 58/5
photos [3] 10/10 47/18 99/14
phrases [1] 193/18
physical [5] 22/9 22/18 22/21 182/7 182/15
physically [3] 37/6 61/15 61/19
physics [2] 184/10 184/17
pick [10] 12/25 13/1 53/21 77/7 101/15 113/11 123/17 156/18 157/10 162/16
picked [12] 62/8 110/11 110/16 110/22 113/20 113/22 113/23 115/25 118/6 121/13 125/3 125/14
picking [3] 62/5 149/3 157/7
picks [1] 53/14
pickup [1] 101/10
picture [12] 13/10 15/7 70/2 80/4 80/13 81/10 82/25 85/5 115/11 180/7 231/22 232/14
piece [13] 12/23 13/3 19/17 60/7 69/13 116/16 124/21 138/23 162/24 192/12 225/3 230/19 236/7
pieces [6] 7/7 111/1 149/9 205/22 229/12 231/11
pile [1] 92/17
piled [2] 92/9 138/21
pill [2] 96/8 96/13
pillowcase [1] 121/19
pin [3] 192/7 192/11 200/16
pistol [2] 152/16 177/9

pit [27] 50/19 51/5 71/2 72/11 72/24 72/25 74/13 74/21 74/25 75/3 75/15 153/1 155/9 155/14 156/1 156/25 173/19 177/16 177/18 177/18 177/19 177/20 178/3 178/7 224/22 242/10 242/11
place [10] 42/7 84/10 84/16 95/16 100/8 116/17 137/11 141/2 185/8 245/16
placed [11] 74/3 82/8 83/24 84/2 116/11 152/8 152/15 152/20 157/21 197/24 245/17
places [1] 93/7
placing [2] 149/4 155/21
PLAINTIFF [1] 1/4
plan [2] 58/16 219/14
planking [1] 53/4
planning [1] 54/17
plans [1] 140/17
plant [1] 133/21
plastic [12] 59/20 74/10 118/11 142/12 197/9 197/10 227/3 228/4 245/17 245/20 246/20 246/24
plastics [1] 220/11
plate [9] 48/6 48/24 49/17 176/16 176/17 176/19 176/22 177/6 177/8
plates [7] 138/11 142/2 151/9 151/16 151/18 152/1 152/2
platform [1] 155/18
play [2] 100/5 100/13
played [2] 99/11 126/24
plenty [1] 211/23
plywood [2] 138/23 143/8
pointed [3] 115/25 191/7 192/24
pointer [8] 9/15 44/7 44/8 52/10 66/10 93/14 163/16 231/23
police [8] 29/4 29/6 29/18 89/2 109/15 109/17 109/18 187/10
polypropylene [3] 246/21 246/22 246/23
pond [3] 138/3 138/5 144/9
portable [1] 87/1
portion [4] 8/6 39/7 63/14 104/17
position [7] 28/12 33/21 141/2 177/21 184/21 187/9 200/3
positive [5] 84/23 161/17 163/21 164/19 181/3
positively [2] 47/13 67/13
possess [1] 128/21
possession [1] 107/3
possibility [5] 12/9 125/3 141/18 142/21 172/4
possible [12] 26/15 27/19 34/17 162/22 180/6 190/5 194/21 194/22 215/6 218/2 218/6 242/18
possibly [5] 30/15 45/9 141/13 179/4 206/11
post [3] 42/1 50/14 222/4
post-recovery [1] 50/14
poster [1] 105/19
posts [2] 138/24 143/9
potatoes [1] 148/1
potential [10] 51/17 51/25 61/21 77/16 86/11 123/15 170/4 177/1 177/2 178/2
potentially [10] 36/11 53/23 54/21 56/23 63/19 77/14 172/14 175/24 180/1 180/2
pour [1] 140/7
powder [3] 152/14 177/1 213/7
power [1] 213/6
PowerShot [6] 47/24 49/24 50/4 50/6 50/9 67/10
practical [2] 86/25 188/4
practice [1] 220/8
precautions [1] 229/4
precise [1] 114/14

## P

precisely [1] 213/24
preference [2] 77/3 77/8
preferred [2] 77/4 77/6
prepare [2] 221/19 241/7
prepared [2] 49/12 250/8
preparing [1] 235/3
presence [10] 66/21 82/1 82/2 165/21
  179/16 234/8 238/24 239/11 241/19
  242/12
present [18] 54/15 56/24 58/10 73/1
  79/21 150/5 155/15 204/21 207/11
  228/16 229/20 229/23 232/9 233/7
  236/20 237/11 237/23 237/25
presented [2] 71/22 189/4
preserve [4] 117/23 118/12 119/21
  143/23
preserved [5] 117/1 117/3 118/3 118/17
  159/8
preserving [1] 123/21
presume [1] 216/3
pretty [9] 14/7 141/5 148/8 157/13
  160/7 172/17 175/3 175/15 211/22
previous [7] 48/24 64/7 64/12 82/9
  83/18 232/12 237/9
previously [7] 13/15 83/4 153/4 166/15
  168/2 168/8 227/17
primary [2] 41/6 71/25
primer [2] 191/10 191/15
primers [1] 28/21
prints [2] 118/18 172/10
prior [13] 6/17 20/11 31/7 32/6 32/15
  75/10 84/21 90/2 113/14 114/2 120/21
  145/10 229/4
procedure [7] 54/19 71/18 71/21 71/24
  72/17 73/17 199/2
procedures [1] 77/18
proceed [3] 89/16 130/6 219/11
proceeded [4] 62/4 62/11 155/13 159/6
proceeding [1] 219/5
proceedings [2] 2/2 250/13
process [50] 7/8 22/2 24/21 25/11 26/18
  29/11 37/11 37/18 40/5 46/1 49/21
  49/22 50/21 50/24 52/3 52/3 52/11 53/3
  53/10 54/9 54/14 54/18 55/20 55/23
  74/19 77/5 86/4 143/18 144/2 148/18
  149/2 149/16 149/23 151/21 155/14
  155/16 157/14 157/15 158/8 158/18
  168/22 168/24 170/1 170/3 173/22
  176/22 178/10 178/12 194/23 208/2
processed [13] 6/23 37/17 38/8 38/9
  48/10 67/1 151/15 152/14 164/10 171/2
  176/17 176/19 176/23
processes [1] 173/14
processing [24] 25/15 30/3 30/24 37/16
  44/13 45/23 46/3 117/25 118/13 119/11
  131/7 143/24 147/15 147/19 148/24
  149/12 151/6 151/25 155/9 158/23
  171/23 176/25 176/25 223/10
professional [4] 23/10 188/3 188/10
  222/24
professionals [1] 22/13
program [4] 185/7 185/10 211/25
  220/23
project [1] 169/10
projected [4] 154/15 154/16 192/25
  217/12
projectile [6] 190/23 235/13 235/25
  238/2 238/8 242/6
projection [1] 197/3
propelled [2] 192/21 192/22
proper [1] 144/4

properly [3] 144/5 192/1 201/8
property [24] 8/22 19/5 19/11 19/23
  23/20 23/24 24/1 31/9 42/13 43/7 50/12
  50/16 51/4 57/8 73/7 75/8 89/17 89/24
  90/13 105/10 110/12 110/14 111/1
  121/23
Prosecutor [3] 1/14 1/16 1/18
prosecutors [1] 5/12
protect [3] 30/18 87/2 143/23
protective [1] 12/11
proved [1] 53/3
Public [1] 134/13
published [2] 248/14 249/4
puddle [1] 172/21
pull [10] 39/5 55/9 103/4 103/6 192/2
  200/5 200/9 200/14 245/3 245/12
pulled [11] 36/4 93/22 93/24 94/19
  94/21 95/6 139/15 143/5 169/22 169/22
  192/13
pulling [2] 93/20 192/3
Purdue [1] 184/12
pure [1] 242/19
purpose [1] 156/7
purposely [1] 234/3
purposes [8] 23/6 82/12 109/25 117/1
  124/23 214/18 222/24 226/10
pursue [1] 184/13
pursuit [1] 133/17
push [2] 79/14 157/12
pushes [1] 200/7
putting [3] 72/19 195/4 231/11
putty [2] 53/14 77/8

## Q

Q-tip [1] 26/22
qualifications [2] 211/22 221/18
qualified [2] 97/13 110/1
quantity [2] 53/11 58/1
quarter [8] 140/7 141/17 142/10 148/19
  157/18 157/20 157/20 175/18
quarter-in [1] 157/20
quarter-inch [2] 157/18 157/20
quarters [1] 175/16
queen [1] 13/23
quibble [1] 112/19
quick [3] 10/5 110/5 218/12
quickly [1] 247/9
quilt [1] 121/21
quite [9] 55/10 92/14 140/3 140/8
  161/15 161/17 161/25 162/2 193/19

## R

rack [12] 15/4 15/5 15/8 15/11 16/10
  16/11 16/13 16/19 17/3 36/14 101/23
  103/24
rain [6] 30/20 140/14 145/11 169/8
  169/15 170/2
rained [2] 169/12 170/6
raining [1] 145/13
raise [7] 5/20 40/16 53/4 88/14 130/12
  181/17 219/17
Rambler [3] 138/14 142/10 143/5
ramp [1] 98/12
random [1] 164/24
range [3] 166/24 167/3 191/6
rather [3] 13/23 132/12 139/15
RAV [12] 30/1 30/4 30/25 38/7 38/11
  138/7 144/25 151/9 152/7 168/16
  168/19 173/9
ray [7] 5/14 229/24 230/11 230/23
  231/18 232/17 236/10
RAYMOND [1] 1/22
rays [4] 228/18 229/22 230/7 231/10

RAZR [5] 47/25 48/16 48/25 49/9 67/9
re [5] 3/16 7/4 61/14 93/4 128/18
Re-redirect [2] 3/16 128/18
re-search [1] 93/4
reach [4] 148/25 202/21 206/21 208/24
reached [2] 68/5 114/9
react [8] 161/11 161/14 162/7 162/10
  178/17 178/22 179/23 180/4
reacted [3] 84/1 165/25 166/19
reacting [1] 161/21
reaction [3] 162/21 163/21 165/6
reactions [2] 162/15 164/19
reactive [1] 161/4
reacts [4] 161/9 161/15 162/2 163/5
readily [5] 51/21 59/4 94/22 95/23 179/5
ready [2] 130/6 219/11
reagents [1] 162/1
real [3] 111/16 157/2 218/12
rear [5] 59/22 60/24 66/16 114/20
  142/10
reason [6] 81/21 86/22 110/21 128/24
  221/7 248/6
reasonable [4] 203/1 209/4 239/17
  239/22
receipt [4] 56/9 119/20 211/12 240/1
receive [9] 75/20 133/9 133/12 133/15
  181/3 226/10 226/16 229/9 249/2
received [32] 9/13 18/23 24/5 28/7 42/4
  48/19 56/21 61/22 66/4 66/23 67/25
  68/15 102/3 104/15 109/2 116/8 135/15
  167/13 184/15 196/17 212/12 222/4
  222/10 223/16 226/25 227/2 227/10
  229/11 240/9 243/24 244/1 248/13
receiving [1] 133/17
reception [1] 167/10
recess [6] 68/2 68/3 130/3 218/23 219/2
  219/8
recesses [1] 219/7
recognizable [1] 59/4
recognize [17] 16/17 19/17 19/20 45/7
  102/4 147/25 158/8 193/21 196/19
  196/25 197/16 197/24 210/16 221/15
  230/2 230/9 230/20
recognized [2] 51/21 158/10
Recognizing [1] 23/9
recollection [2] 123/2 248/23
recommend [1] 224/4
recommended [1] 160/15
Reconstruction [1] 223/4
Reconvened [4] 5/1 68/4 130/4 219/3
record [12] 5/25 24/8 40/21 65/21 88/20
  114/25 118/25 126/23 130/17 181/22
  219/22 248/11
recorded [1] 99/12
records [3] 111/13 214/22 215/1
recover [7] 51/16 54/21 99/6 101/13
  106/14 189/17 198/25
recovered [47] 17/19 18/15 18/23 20/23
  20/23 46/10 48/10 49/8 49/19 49/23
  50/15 51/2 51/10 55/9 55/10 55/23
  55/24 56/5 63/13 65/6 66/25 67/7 96/2
  96/4 96/15 97/4 101/5 101/21 106/15
  108/5 108/7 113/5 156/25 182/8 183/1
  189/11 189/20 189/21 189/23 189/25
  195/24 195/25 196/9 201/20 215/16
  221/4 245/11
recovering [2] 136/4 235/4
recovery [7] 43/8 50/14 55/18 63/23
  65/7 98/15 98/23
Recross [4] 3/15 4/7 128/4 218/13
Recross-Examination [4] 3/15 4/7 128/4
  218/13
rectangular [2] 66/18 157/23

## R

red [4] 86/20 94/6 154/25 156/4
redirect [16] 3/10 3/14 3/16 4/6 4/12 40/10 87/16 87/17 125/19 125/21 128/18 181/8 217/23 217/25 246/4 246/6
reduced [1] 100/6
ref [1] 80/10
refer [5] 80/6 226/23 240/21 241/8 241/15
reference [2] 80/10 198/4
referred [6] 50/18 95/8 98/22 107/14 218/17 226/1
referring [8] 102/25 122/2 163/12 167/16 225/18 238/14 238/15 238/17
refit [1] 231/14
refits [3] 227/4 227/5 227/6
reflected [3] 132/9 163/19 215/1
refresh [1] 167/22
regularly [2] 125/6 223/6
relate [2] 208/15 214/7
related [8] 43/3 51/23 127/22 182/16 183/4 185/5 210/25 213/5
relates [1] 182/21
Relating [1] 223/1
relative [4] 206/22 213/5 237/13 238/23
relatively [5] 57/25 93/1 97/22 142/7 242/18
release [3] 26/7 39/12 39/13
released [2] 40/6 192/13
relevance [1] 61/21
relevancy [1] 123/23
relevant [4] 52/1 54/1 118/22 118/23
reload [1] 103/16
relocated [1] 33/20
rem [1] 53/2
remain [1] 193/15
remained [2] 204/7 205/17
remaining [5] 166/23 205/5 205/15 216/14 216/16
remains [9] 51/22 53/22 53/23 72/5 153/13 158/9 158/10 158/13 224/1
remember [16] 8/1 17/17 95/25 96/1 104/15 115/24 116/1 118/3 121/20 121/24 124/19 124/20 124/25 125/1 125/2 125/4
Remiker [8] 8/18 11/4 14/5 32/17 58/14 89/23 99/10 135/21
remind [3] 129/25 219/5 247/16
reminiscent [1] 148/5
remnants [1] 22/23
remodeling [1] 53/2
remove [11] 61/15 79/12 84/7 104/4 114/11 124/11 124/14 124/16 155/25 170/7 245/20
removed [25] 51/11 59/8 61/13 61/14 64/17 72/24 73/7 75/7 75/8 79/22 80/2 80/20 82/13 87/7 87/13 92/20 92/24 93/11 93/17 94/15 114/2 116/12 122/8 170/12 246/20
remover [1] 245/10
removing [2] 169/18 173/11
render [1] 187/22
Repackage [1] 56/7
replaying [1] 108/11
report [9] 17/20 46/25 46/25 47/12 166/8 182/11 210/20 210/22 211/2
reported [4] 2/3 152/5 161/24 250/6
reportedly [1] 152/8
Reporter [5] 2/4 7/20 7/24 250/5 250/19
reports [7] 211/8 240/25 241/5 241/6 248/21 248/22 248/25

reproducing [2] 196/11 209/14
request [1] 152/24
requested [5] 23/23 25/16 25/18 146/5 244/6
requirements [1] 223/10
research [4] 133/21 134/10 189/3 223/9
reservation [2] 108/11 249/3
reserve [2] 240/13 240/14
reside [1] 42/22
residence [42] 8/21 9/25 10/6 10/13 11/21 13/11 19/25 20/16 32/14 32/21 33/5 34/1 41/19 43/15 51/6 51/10 56/10 56/22 57/13 98/3 98/16 98/25 99/2 99/8 99/10 99/13 99/19 104/3 104/8 105/2 105/22 105/24 106/1 107/1 117/8 127/17 159/22 159/22 159/23 160/10 160/14 161/1
residences [4] 19/6 19/10 23/24 159/21
residue [2] 160/19 182/19
residues [1] 190/9
resolved [1] 108/13
resources [1] 16/1
respect [12] 150/18 165/24 202/14 206/21 214/8 227/21 232/7 235/8 236/14 237/3 238/22 239/20
respond [11] 6/20 7/4 7/15 29/12 41/20 42/8 131/14 132/21 135/2 135/3 135/5
responded [1] 42/1
response [27] 24/9 96/21 110/3 128/2 131/4 131/5 131/11 131/18 131/19 131/23 132/4 132/7 132/18 132/22 133/1 134/20 134/21 135/7 136/21 137/1 145/22 149/18 151/24 152/21 220/20 220/22 235/19
responsibilities [12] 6/20 8/8 11/20 11/24 12/2 19/8 23/19 23/22 29/2 29/5 32/3 58/15
responsibility [4] 22/4 22/10 37/14 87/10
responsible [2] 57/11 186/3
rest [1] 99/13
resting [1] 172/2
restraining [1] 17/9
restraint [1] 17/8
rests [1] 60/9
result [2] 56/20 56/24
resulted [1] 213/15
results [2] 181/4 221/9
resume [1] 5/4
retaining [1] 138/3
return [3] 56/21 146/6 162/13
returned [3] 146/15 146/19 151/8
returning [1] 134/18
review [4] 37/20 47/12 75/25 241/9
reviewed [3] 75/4 225/25 241/13
reviewing [1] 76/4
revolve [1] 213/18
revolver [1] 193/13
Rick [1] 21/8
rid [1] 77/11
ridgeline [1] 232/22
riding [2] 94/1 94/4
Riemer [3] 20/24 21/8 37/7
rifle [44] 16/15 95/11 102/1 102/6 102/7 102/12 102/14 102/21 102/22 102/23 103/1 103/1 103/10 103/21 106/4 106/7 113/3 117/22 118/10 128/11 128/12 183/7 193/9 197/13 197/20 197/22 197/23 198/4 201/23 201/23 202/18 202/24 203/5 207/8 208/22 209/2 209/8 209/11 209/17 210/13 211/1 211/7 216/11 217/13
rifles [2] 16/12 101/23
right-hand [2] 205/7 207/4

rim [2] 44/10 148/6
rinsing [1] 77/2
rip [1] 170/11
Rivers [1] 22/6
rivet [2] 55/15 55/17
rivets [6] 55/10 55/12 55/19 55/22 55/24 56/4
road [4] 6/17 6/20 42/1 137/8
roadway [4] 43/20 67/5 138/4 138/5
Roberta [1] 104/20
rode [2] 145/5 145/18
role [10] 28/12 30/6 30/22 31/3 32/9 36/24 132/3 149/23 150/3 151/22
roll [3] 60/10 90/24 144/11
rolled [2] 144/21 152/3
roller [6] 60/1 60/4 60/7 60/14 60/19 61/1
rolling [1] 64/14
roof [2] 139/16 169/22
roofing [1] 206/17
room [13] 9/7 9/8 9/20 10/12 10/17 10/20 11/6 13/14 13/24 14/2 14/3 33/14 104/16
rooms [3] 9/3 33/8 34/3
roots [1] 139/13
rope [8] 244/4 244/7 244/17 245/24 245/25 246/9 246/14 246/25
Roswell [1] 78/9
rotational [1] 132/14
round [4] 65/2 103/4 103/5 103/7
rounds [4] 103/15 103/17 111/10 199/20
routinely [1] 12/14
row [4] 137/24 137/24 137/24 138/6
RPR [2] 2/3 250/19
ruler [3] 64/25 65/1 65/1
ruling [2] 240/14 248/17
running [1] 93/18
rusty [1] 161/23

## S

sack [2] 116/14 116/19
Sacramento [4] 184/22 185/8 186/1 186/11
safe [2] 198/16 199/14
safety [3] 26/11 134/13 199/19
sake [1] 84/1
sale [2] 11/9 13/11
saliva [1] 77/15
salvage [13] 7/16 23/20 42/13 43/7 89/17 135/25 137/3 137/23 146/7 146/13 146/15 147/2 151/8
salvaged [1] 137/24
sample [4] 163/2 233/10 234/4 242/19
samples [3] 236/12 243/8 243/11
Samurai [1] 91/15
San [1] 185/20
sand [1] 53/17
sat [1] 77/17
satisfied [2] 206/4 217/4
satisfy [1] 210/5
Saturday [4] 135/10 135/15 146/10 149/18
saved [1] 159/4
sawed [1] 139/15
scaffold [1] 53/4
scaffolding [1] 52/25
scale [2] 23/5 64/24
scanning [2] 228/17 232/5
scene [35] 7/5 7/15 7/19 8/3 8/5 15/24 24/2 29/11 30/4 30/24 31/13 32/15 34/11 37/16 42/7 42/16 45/16 51/1 51/11 51/11 131/4 131/15 132/12 135/6

**S**

scene... [11] 141/10 143/19 158/22 159/14 168/14 169/19 171/23 176/23 215/17 223/3 223/10
scenes [5] 6/23 131/8 132/20 189/18 235/18
school [1] 90/6
schools [2] 102/19 222/18
science [10] 97/18 109/17 109/18 184/10 184/16 188/16 220/7 222/1 223/1 233/13
scientific [4] 203/1 209/4 239/18 239/22
scientist [2] 220/2 234/9
Scientists [1] 223/2
scoop [2] 156/15 174/25
scoopful [1] 157/21
Scoopfuls [1] 149/5
scooping [3] 175/7 176/6 177/17
scope [1] 10/3
scratched [1] 207/9
scratches [6] 93/20 93/22 195/11 195/17 208/14 209/14
screen [26] 11/11 27/6 65/23 68/24 91/25 93/10 99/16 104/11 149/6 149/7 153/24 154/16 154/21 154/22 156/17 156/18 156/20 158/3 158/4 159/4 159/9 163/10 163/20 197/6 231/25 232/2
screens [2] 53/20 163/13
sealed [5] 97/6 107/3 177/9 227/3 228/4
search [96] 8/13 8/20 8/23 9/25 10/3 10/5 10/6 10/11 10/18 10/19 11/20 11/21 13/21 14/9 15/13 17/5 19/2 19/4 19/22 20/2 20/10 21/3 21/5 21/6 22/6 31/5 31/5 31/8 31/19 31/24 32/2 32/7 32/16 33/10 36/20 42/11 42/12 43/7 50/11 56/9 56/14 56/21 57/12 57/14 59/2 62/18 62/18 64/7 78/3 78/11 78/15 79/10 81/25 82/9 82/20 83/18 85/25 89/10 89/21 89/24 90/8 90/16 91/1 93/1 93/4 94/16 94/17 94/18 94/19 95/7 98/1 98/14 99/1 99/2 99/3 99/5 101/6 101/8 101/9 104/3 104/8 105/9 105/22 106/1 119/7 119/18 119/19 120/13 120/18 120/25 125/25 126/13 126/16 146/7 146/12 160/23
searched [13] 14/6 31/14 61/13 83/4 91/8 93/7 95/17 97/22 125/24 127/18 151/12 151/14 160/9
searchers [1] 33/4
searches [8] 11/18 12/8 19/10 23/22 31/22 97/23 97/25 110/25
searching [20] 12/3 12/10 19/6 31/9 32/21 33/13 37/3 58/18 78/7 84/10 90/12 91/3 92/23 99/13 105/5 107/2 113/16 115/6 120/17 150/13
seat [6] 75/22 75/25 153/15 154/13 156/6 178/13
seated [7] 5/24 40/20 88/19 130/16 181/21 219/21 247/19
sec [1] 199/24
second [13] 32/7 38/7 38/8 38/13 41/10 57/13 64/7 66/14 74/7 154/1 203/4 208/1 227/5
secondly [1] 198/15
section [6] 186/1 186/24 212/4 212/5 212/7 212/9
sections [1] 52/25
secure [6] 12/2 30/1 74/5 140/17 141/20 145/14
secured [6] 38/18 74/3 140/19 145/1 152/16 152/18
secures [1] 26/5

securing [2] 30/22 38/11
security [2] 8/8 30/22
seem [1] 172/3
seemed [2] 137/15 180/9
seemingly [1] 165/7
seems [4] 80/14 172/17 180/14 232/3
seen [4] 13/16 43/1 148/5 161/23
seize [1] 104/4
seized [7] 15/15 15/17 16/23 18/15 37/8 103/21 117/7
seizing [1] 34/21
select [1] 201/15
semi [8] 102/1 102/7 102/13 102/23 102/25 103/10 193/8 197/23
semi-automatic [8] 102/1 102/7 102/13 102/23 102/25 103/10 193/8 197/23
seminars [1] 189/2
send [1] 224/15
sensitive [1] 191/12
sent [12] 21/9 31/24 37/19 46/15 65/7 90/15 98/25 101/14 104/6 105/24 171/9 222/17
separate [4] 36/20 57/10 73/21 174/6
separately [1] 112/21
September [2] 184/5 187/14
sergeant [20] 3/3 6/6 6/15 8/10 9/2 9/12 11/16 14/4 17/10 17/23 20/21 23/12 24/4 24/18 27/25 32/18 33/22 89/22 105/23 115/6
serial [4] 31/25 32/4 198/1 198/12
series [3] 24/3 185/24 198/21
serologist [1] 134/2
service [2] 6/21 147/1
services [2] 146/5 146/22
set [15] 17/10 17/11 18/12 18/20 62/9 68/6 71/18 72/14 72/16 121/24 147/3 156/3 156/17 177/21 191/15
sets [1] 121/23
setting [1] 33/1
setup [1] 149/6
seven [2] 42/10 231/7
several [22] 9/3 10/10 19/2 51/8 85/21 89/23 92/11 95/10 102/19 103/11 105/25 121/23 137/8 147/12 162/14 164/15 164/18 167/22 175/22 183/3 221/3 222/18
shape [2] 165/10 203/20
shaped [2] 158/2 165/10
sheet [1] 240/6
shelf [2] 36/3 62/7
shell [25] 70/25 79/18 95/9 95/11 95/15 95/19 95/20 95/21 96/2 96/4 96/8 96/12 97/2 97/4 97/12 97/13 113/2 113/6 114/2 114/15 114/19 119/9 119/12 119/20 125/15
shells [7] 112/8 116/23 118/11 128/10 214/9 214/24 215/16
Sheriff's [16] 6/7 6/10 6/11 6/14 8/16 28/13 51/13 52/16 73/13 89/1 97/8 107/7 135/4 147/1 150/5 150/16
shiny [1] 161/16
shock [1] 191/12
shoot [1] 103/17
shooting [5] 189/12 190/1 190/3 196/2 196/9
shop [1] 101/8
short [2] 134/10 213/3
shorthand [1] 250/10
shot [7] 87/23 100/24 126/3 126/12 128/8 224/2 235/21
shotgun [2] 193/9 193/24
shovel [6] 148/25 155/24 156/6 156/8 156/14 157/9

shoveled [1] 155/17
show [44] 16/15 17/12 18/9 18/18 19/12 23/25 27/11 44/16 46/7 48/3 48/19 49/2 49/25 52/4 55/13 55/25 58/19 59/17 60/17 63/4 64/3 64/21 65/12 66/2 66/22 91/5 94/6 95/2 96/5 98/8 102/9 104/10 104/18 105/13 106/17 107/17 155/1 180/24 196/15 197/16 210/16 225/9 230/1 243/12
showed [2] 31/10 229/23
showers [1] 140/16
showing [15] 14/19 23/1 23/4 36/5 93/9 95/12 102/2 102/10 104/23 107/8 154/10 197/3 225/8 230/4 230/13
shown [2] 47/14 99/15
shows [4] 154/24 231/1 231/7 240/6
side [20] 14/1 14/5 33/23 36/4 57/19 59/22 64/14 66/16 70/23 92/9 92/9 92/11 92/13 92/15 92/16 94/24 131/20 165/16 195/12 238/21
sides [1] 175/8
Sielehr [1] 52/23
sift [6] 53/19 76/4 148/18 149/1 153/9 156/9
sifted [9] 71/6 71/10 71/16 76/17 148/9 153/21 155/21 158/25 178/7
sifter [7] 155/20 156/1 156/3 156/7 157/4 158/19 159/6
sifters [1] 153/3
sifting [23] 50/21 52/3 53/20 55/20 71/18 72/15 73/11 73/17 76/5 76/9 77/18 77/21 147/4 147/4 149/16 152/25 153/22 155/16 155/18 157/15 173/15 173/15 174/4
signal [1] 142/11
significance [1] 150/10
significant [1] 23/15
signify [1] 237/13
signs [2] 10/7 143/9
silly [1] 77/10
similar [7] 18/14 18/22 72/13 79/23 85/16 108/6 243/12
similarly [2] 232/11 239/3
simply [5] 42/20 199/5 202/10 218/19 248/18
simultaneously [1] 141/6
single [3] 34/14 186/22 188/9
Sippel [1] 121/4
sit [3] 31/16 96/11 113/19
sites [1] 177/24
sitting [2] 11/5 148/7
situation [1] 144/2
six [4] 153/10 155/19 156/12 241/16
size [5] 13/20 13/24 166/24 206/18 213/2
skewer [1] 77/6
skewers [1] 53/13
Ski [1] 91/15
Ski-doo [1] 91/15
skinning [1] 178/21
skull [13] 224/21 224/21 224/23 224/25 225/2 225/4 225/11 225/19 227/8 228/14 230/12 235/21 238/17
sky [1] 171/17
slash [2] 228/5 228/5
sled [1] 94/21
slide [3] 112/12 116/2 245/16
slim [1] 125/3
slivers [1] 246/13
slot [1] 200/2
slows [1] 202/10
slug [1] 190/24
small [17] 13/23 32/22 33/1 33/7 53/11

**S**

small... [12] 63/12 138/21 149/5 149/8 153/10 158/15 160/6 164/23 165/4 197/8 225/2 242/2
smaller [6] 14/2 135/4 156/19 167/1 229/19 231/7
smashed [1] 205/23
smeary [1] 165/6
Smithville [1] 134/11
smooth [1] 246/11
smoother [1] 172/22
snag [1] 246/14
snagging [1] 246/13
snap [1] 200/15
snow [2] 57/25 58/1
snowbank [1] 63/1
snowmobile [10] 62/7 91/16 92/20 92/24 93/17 93/20 93/25 95/6 164/25 179/22
snowmobile's [1] 93/11
Society [1] 226/14
soil [3] 53/16 72/23 75/7
solid [1] 90/21
solvent [1] 245/20
somehow [3] 43/2 93/24 171/21
sometime [3] 25/7 45/21 45/21
sometimes [3] 124/3 132/2 190/24
somewhat [2] 78/3 175/11
somewhere [3] 29/16 103/14 149/13
sort [30] 37/20 70/22 72/16 74/20 76/24 121/21 122/5 138/4 140/15 148/13 148/14 152/3 153/14 156/14 156/15 157/16 158/4 158/4 162/1 162/18 164/23 165/14 165/16 170/10 170/17 177/22 242/6 245/2 245/16 248/14
sorting [2] 50/21 52/3
sorts [1] 148/15
sought [1] 56/21
sound [2] 71/24 77/10
sounds [1] 129/23
source [2] 212/18 234/15
south [11] 43/23 59/22 59/23 60/22 62/4 62/11 62/12 64/10 66/16 92/13 93/19
southeast [1] 91/10
spade [1] 156/14
spare [2] 101/17 122/21
speak [4] 6/8 89/25 113/15 130/1
speaking [2] 110/24 236/23
spec [1] 120/23
special [19] 1/14 1/16 1/18 3/7 5/12 25/1 41/19 42/2 52/20 52/22 52/23 56/16 71/20 75/11 107/4 155/11 227/11 227/11 229/3
specialist [1] 133/21
specialization [1] 223/7
specialized [6] 6/22 6/25 7/4 7/6 31/18 188/22
specialty [1] 47/10
specie [1] 212/16
specifics [1] 20/11
speed [9] 112/14 112/20 112/23 112/25 113/1 235/13 235/25 238/2 238/8
spell [6] 5/25 40/21 88/20 130/17 181/22 219/22
spend [2] 157/7 212/3
spent [3] 42/17 183/21 211/25
spindle [1] 245/4
spindles [2] 246/11 246/19
spot [5] 163/20 165/4 165/8 166/23 171/17
spots [11] 162/15 162/18 164/15 164/18 164/23 166/19 166/23 174/20 229/23

231/1 237/17
spray [7] 162/24 179/13 179/18 179/20 180/4 180/17 181/1
sprayed [1] 181/5
spread [1] 158/3
spring [1] 112/13
spritz [1] 162/23
Square [1] 165/10
Square-shaped [1] 165/10
squee [1] 76/25
squeeze [1] 76/25
SS [1] 250/1
stacked [4] 61/8 62/6 64/17 180/25
staff [1] 6/17
stage [3] 15/14 85/24 90/11
stages [1] 28/22
stain [2] 166/16 223/5
staining [1] 160/12
stains [6] 86/24 92/19 161/2 161/4 161/24 164/5
stamping [1] 55/16
stand [6] 5/19 40/15 88/13 94/7 148/21 165/1
Stand-up [1] 94/7
standard [2] 18/7 18/12
standards [1] 21/24
standing [6] 36/4 53/7 58/25 63/9 99/11 155/19
standpoint [3] 229/21 229/22 233/14
stands [1] 249/15
staring [1] 168/4
start [7] 10/12 33/19 137/18 149/3 160/2 163/17 231/16
started [8] 32/20 33/17 77/21 78/16 146/25 147/9 147/11 164/5
state's [3] 68/25 78/25 187/4
statement [15] 20/4 21/5 24/4 24/8 24/11 24/12 24/24 25/3 57/6 60/1 113/9 123/24 126/11 213/17 221/18
statements [6] 56/19 56/20 59/5 61/22 62/16 126/2
states [2] 27/18 113/8
station [1] 147/4
stay [1] 193/14
stayed [3] 146/16 146/17 146/18
steel [5] 18/7 43/13 44/10 55/7 55/7
Steier [1] 58/12
stenographic [1] 250/9
step [11] 40/13 88/8 88/11 129/15 156/17 181/10 199/4 218/21 244/13 244/24 247/3
stereo [1] 228/14
sterile [1] 26/23
Steve [2] 121/14 124/12
Steve's [5] 9/23 31/8 33/17 37/23 122/24
Steven [43] 8/24 13/19 14/23 17/16 19/24 20/16 22/15 31/6 31/19 43/14 43/20 43/22 51/5 51/10 56/11 56/22 57/12 58/22 67/4 79/3 90/9 101/10 101/14 101/22 102/12 103/23 105/22 105/24 106/4 106/16 107/20 110/6 110/13 110/24 115/5 117/15 118/21 122/22 126/10 128/20 153/2 159/21 159/23
Steven's [1] 107/11
sticker [1] 197/24
still [5] 81/11 112/21 139/14 139/25 144/21
stock [3] 213/14 213/24 214/2
stood [6] 14/7 30/7 92/4 120/19 120/20 156/16
stop [5] 98/8 127/8 138/15 159/24 161/7

stopped [1] 85/15
stopping [1] 103/16
storage [2] 38/19 122/5
stored [2] 25/17 73/22
storm [4] 30/12 30/16 138/3 140/8
storms [1] 153/20
story [1] 194/11
straps [1] 145/2
stria [7] 195/12 195/18 196/4 208/14 209/14 210/2 210/3
strike [4] 173/13 191/14 192/4 192/14
striker [2] 192/12 200/16
strikes [1] 192/9
striking [1] 238/6
strong [1] 245/9
strongest [5] 232/24 233/6 236/16 236/18 236/20
struck [4] 85/16 191/13 205/21 207/13
stuck [1] 199/25
studies [1] 182/19
stuff [5] 30/21 61/11 125/15 125/15 179/16
Sturdivant [3] 155/11 159/5 159/11
subject [4] 83/17 211/11 240/1 249/2
subjecting [1] 229/5
submitted [18] 183/2 183/7 183/10 197/2 201/19 202/17 205/19 214/12 214/16 214/24 215/7 215/9 215/14 215/19 223/20 226/21 227/11 227/24
subsequent [2] 51/14 229/8
substance [1] 162/3
substances [7] 161/12 161/14 161/16 162/3 162/6 162/6 232/21
succeeding [1] 149/24
successfully [2] 185/11 185/19
successing [1] 103/6
sufficient [1] 207/15
sufficiently [1] 87/2
suggest [2] 217/16 234/12
suggested [1] 136/11
suggestive [3] 129/2 129/3 129/12
suggests [1] 87/19
suitable [1] 53/3
summary [1] 168/7
Sunday [8] 41/18 89/15 91/8 146/1 146/15 146/16 146/17 149/18
Superior [1] 222/2
supervise [1] 6/16
supervisor [3] 6/16 128/13 128/15
supervisory [2] 28/12 28/25
supplemental [1] 53/9
suppose [1] 225/17
supposed [1] 36/17
surface [26] 157/9 172/22 195/18 196/4 207/10 208/14 225/5 228/22 230/3 230/13 235/22 235/24 238/17 238/18 238/19 238/21 239/2 243/18 243/19 243/20 243/21 243/22 245/4 245/12 246/12 246/16
surfaces [3] 228/15 238/7 246/11
surmise [1] 47/6
surprise [1] 243/14
surprised [1] 243/9
surrounded [1] 142/20
surrounding [1] 41/13
surroundings [1] 177/22
suspect [4] 34/15 76/12 233/9 234/5
suspected [4] 76/22 227/4 227/7 228/8
SUV [6] 25/9 137/22 139/9 141/8 141/22 143/19
Suzuki [3] 80/18 80/20 91/15
swab [8] 26/14 26/20 27/4 27/19 39/6 39/12 39/20 86/22

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 269 of 272    Document 19-16

## S

swabbed [10]  27/7 27/9 38/25 39/1 39/24 40/3 86/9 86/19 86/21 165/21
swabbing [2]  40/7 119/10
swabs [5]  25/19 38/14 86/5 86/17 86/18
sworn [6]  5/23 40/19 88/18 130/15 181/20 219/20
system [2]  52/12 135/17

## T

T' [1]  4/1
T-y-s-o-n [1]  6/1
table [6]  46/19 53/5 53/11 138/17 179/8 223/21
tag [2]  27/17 65/19
tagged [1]  98/11
tags [2]  81/5 152/16
taken [38]  7/22 15/18 17/20 19/23 20/15 22/10 22/12 51/12 52/7 59/1 63/8 64/6 72/18 73/20 74/12 77/20 84/8 84/11 84/12 91/17 98/4 98/13 106/8 106/12 107/6 122/12 124/5 128/12 128/14 137/10 147/3 149/17 178/14 188/14 196/1 197/9 231/10 250/9
talking [5]  118/25 154/2 171/12 194/1 225/25
tall [1]  148/21
tank [3]  154/25 202/5 202/13
tap [1]  158/4
tape [4]  74/6 245/3 245/8 245/10
taped [1]  74/3
taper [1]  84/21
tarp [10]  30/17 140/10 140/11 156/20 159/4 159/10 169/14 169/17 169/23 173/11
tarps [4]  53/8 74/2 74/3 74/15
task [6]  31/18 147/9 149/12 159/7 176/21 223/14
tasks [1]  132/11
taught [2]  123/20 185/2
team [30]  8/13 10/19 21/6 31/5 57/11 57/13 58/16 65/7 76/3 77/23 78/6 83/18 86/9 87/11 89/21 90/15 97/25 118/1 119/7 119/18 120/25 131/4 131/5 131/10 131/11 131/18 132/9 132/10 136/24 158/7
teams [5]  21/3 57/10 131/23 132/7 174/9
tech [6]  7/1 28/16 29/3 29/15 89/8 123/19
technical [5]  7/23 29/20 90/6 108/13 109/21
technically [3]  32/2 248/20 248/21
technician [7]  6/22 8/11 25/14 84/22 90/4 90/5 117/4
technicians [4]  29/9 45/19 76/16 107/7
technique [2]  239/4 245/7
techniques [3]  123/20 133/25 188/22
techs [1]  75/5
teeth [1]  158/11
telephone [4]  47/25 48/7 48/25 49/1
television [1]  193/20
telling [1]  116/12
tells [2]  118/9 234/14
ten [4]  140/7 141/17 149/13 249/11
tender [3]  167/8 211/13 240/4
tent [5]  62/23 63/25 65/5 65/5 114/8
tents [3]  80/6 80/6 81/18
Teresa [15]  10/7 14/12 25/9 26/15 41/13 52/2 87/22 89/11 100/2 105/19 126/3 126/11 126/25 127/10 135/12
Teresa's [5]  8/7 8/15 25/17 26/2 27/21

term [5]  61/15 143/19 176/18 194/10 225/13
terms [15]  23/18 80/8 133/18 182/7 183/22 184/18 186/10 188/19 190/14 193/18 193/21 193/22 199/19 206/18 234/9
test [30]  161/6 163/3 164/19 166/6 166/7 189/14 190/5 195/5 195/9 195/20 198/8 198/23 199/3 199/20 199/21 199/22 201/16 208/16 209/11 209/15 209/16 209/22 209/23 210/11 213/11 213/21 213/25 216/5 235/4 237/4
test-fire [4]  198/8 199/22 201/16 213/25
test-fired [7]  195/5 195/9 195/20 199/20 199/21 209/16 213/21
test-firing [3]  189/14 190/5 199/3
test-firings [1]  213/11
tested [1]  241/14
testifying [4]  35/20 68/22 167/17 248/4
testimony [4]  103/19 130/9 214/22 216/10
testing [5]  84/24 87/8 117/1 159/21 229/5
tests [1]  222/11
Texas [3]  134/9 134/13 134/14
texture [1]  143/4
That'd [1]  31/21
That's' [1]  173/20
themselves [4]  60/11 112/9 143/11 180/24
theory [1]  185/13
thereafter [5]  8/10 25/7 25/7 65/7 250/11
they'd [2]  22/8 139/14
they'll [1]  16/20
thin [1]  246/19
thinly [1]  53/15
thinner [4]  59/15 59/21 82/2 162/11
third [8]  81/13 81/14 148/19 149/19 149/20 175/19 227/6 236/17
thirds [1]  175/16
thirty [6]  108/19 108/21 108/22 230/16 231/7 231/19
thirty-nine [1]  231/19
thirty-one [3]  108/19 108/21 108/22
thirty-seven [1]  231/7
this [339]
tho [1]  237/11
THOMAS [5]  1/16 47/1 47/13 47/21 67/14
Thomas' [1]  47/19
thorough [5]  94/17 104/8 105/22 106/1 160/23
thoroughly [1]  61/13
thoroughness [1]  10/2
though [6]  34/18 47/11 76/2 110/8 171/20 179/17
thought [6]  36/11 76/21 83/18 169/4 170/18 176/11
threatening [2]  136/7 143/22
three [37]  8/16 27/2 33/12 35/18 46/9 47/23 132/1 148/21 150/25 155/10 157/17 157/23 157/23 165/5 165/5 165/5 165/9 174/14 174/19 175/16 177/23 180/8 185/10 185/21 186/14 199/21 201/24 201/25 202/6 222/14 227/3 233/19 235/1 236/13 236/19 241/16 243/3
three-and-a-half [2]  148/21 202/6
three-and-a-half-foot [1]  157/23
three-by-four [3]  165/5 165/9 180/8
three-by-three [1]  165/5
three-day [1]  185/21

three-foot [1]  157/23
three-month [1]  185/10
three-quarters [1]  175/16
three-year [1]  222/14
through [70]  11/9 27/24 32/8 32/13 33/14 44/20 44/23 45/16 47/18 48/2 54/19 55/16 56/18 57/18 67/19 71/7 71/10 71/16 71/19 72/4 72/15 73/20 75/14 75/18 76/4 76/5 76/9 76/17 76/18 77/19 78/15 78/20 83/4 84/1 84/22 85/1 85/2 90/5 103/18 108/14 109/24 137/9 142/5 146/16 147/4 149/1 149/3 149/10 155/21 156/9 156/19 156/20 157/19 158/6 159/3 159/9 159/10 163/1 176/6 185/7 195/15 202/8 205/2 207/12 208/2 217/12 240/3 240/7 247/20 247/24
throughout [6]  19/3 19/9 24/21 50/11 50/12 55/23
thunder [1]  153/19
Tim [1]  66/5
times [15]  31/12 34/2 38/9 38/16 38/17 41/12 76/10 89/24 147/12 167/24 174/22 175/20 175/24 187/21 187/24
tiny [1]  229/23
tip [5]  26/21 26/22 26/22 27/1 27/3
tire [9]  44/11 80/14 80/16 148/6 148/7 154/13 172/10 172/19 172/24
tires [5]  55/8 138/24 153/14 172/2 242/13
title [1]  47/6
today [6]  18/14 93/4 127/3 129/17 221/8 241/7
together [7]  21/6 35/24 132/8 174/10 176/15 231/11 231/12
told [18]  22/4 33/19 39/15 77/11 84/25 85/1 87/22 125/24 126/1 126/9 136/13 137/13 161/8 166/16 169/17 169/21 173/10 225/22
Tom [5]  5/10 137/14 155/11 159/4 159/11
tomorrow [2]  247/15 249/13
too [2]  33/3 245/9
tool [8]  64/14 66/17 86/20 94/6 94/7 94/9 94/13 185/17
toolmark [14]  182/3 182/14 184/19 185/4 185/9 185/16 186/1 186/4 186/24 187/4 188/9 188/11 189/1 212/4
toolmarks [3]  182/6 184/24 190/8
tools [3]  53/12 144/4 154/13
top [20]  11/5 14/24 15/2 16/15 36/6 44/20 61/9 62/7 64/17 69/15 81/9 115/22 116/2 148/7 156/12 173/9 175/12 175/14 176/10 241/3
total [1]  183/5
totality [1]  46/18
touch [3]  34/13 34/14 35/4
touched [1]  30/10
touching [3]  27/1 34/18 34/20
tow [2]  79/16 144/15
towards [9]  39/3 91/8 91/10 92/22 94/4 94/7 172/3 172/6 177/25
toxicology [1]  220/14
Toyota [1]  106/15
trace [17]  12/9 61/25 124/10 142/21 143/14 170/17 170/23 171/6 171/24 172/14 172/16 220/10 220/16 222/14 222/16 233/24 244/22
traces [9]  160/5 233/2 233/4 233/15 235/9 237/23 237/24 239/10 239/16
track [4]  80/14 80/16 172/24 177/17
tractor [2]  165/3 179/22
trailer [55]  8/24 9/2 9/5 9/11 9/18 12/12 20/17 21/7 21/10 31/5 31/8 31/20 31/22

## T

trailer... [42] 32/6 32/23 37/24 43/21 43/23 48/12 67/4 69/18 69/19 69/22 98/12 98/21 99/5 101/15 101/16 101/17 101/18 101/21 103/23 110/6 110/7 110/13 110/15 110/24 117/15 121/15 122/18 122/22 124/12 128/10 128/12 128/14 140/19 141/3 141/5 145/1 145/2 145/7 145/15 151/13 153/2 170/6
trained [8] 12/22 28/15 102/19 117/4 117/19 134/2 184/24 186/16
training [35] 6/22 6/25 7/4 7/6 8/11 28/20 28/24 28/25 29/14 29/16 29/17 29/19 44/23 44/25 90/3 109/22 109/23 109/24 123/19 133/19 183/17 185/7 189/2 206/8 211/23 222/10 222/17 222/18 222/24 234/23 234/23 235/2 235/10 235/19 244/23
trainings [1] 223/7
transcribed [1] 250/11
transcript [3] 2/2 250/8 250/12
transcription [1] 250/11
transfer [2] 13/2 87/3
transferred [4] 13/8 34/17 204/19 208/6
transmission [1] 144/16
transport [5] 87/5 87/14 140/18 140/20 140/24
transported [3] 73/23 143/6 144/7
trap [1] 202/12
traveling [1] 63/10
tread [1] 172/8
treatment [2] 160/18 160/22
tree [2] 138/21 196/2
trees [5] 138/21 139/5 139/8 139/12 139/13
trial [3] 1/4 1/5 219/6
triangular [2] 69/19 158/1
tried [10] 30/18 33/16 142/16 142/17 165/21 166/5 166/7 172/7 175/11 241/7
trigger [7] 103/4 103/6 192/2 192/3 192/13 200/9 200/15
tripod [2] 149/6 177/21
Trooper [1] 66/5
trowel [4] 158/1 173/24 174/1 174/2
trowels [1] 149/5
truck [6] 79/16 101/10 141/1 144/8 144/15 144/24
truth [1] 110/10
try [17] 7/24 24/15 37/18 81/14 86/24 100/15 100/18 117/10 123/18 126/18 171/25 172/14 175/2 175/10 175/13 231/11 244/24
trying [5] 21/18 33/11 42/21 117/2 182/20
tube [7] 112/12 112/16 194/2 199/24 200/1 200/2 202/8
tubular [3] 103/1 103/15 113/3
Tuesday [6] 146/18 146/19 146/22 146/24 147/5 159/19
turn [4] 74/5 125/6 125/9 169/7
turned [14] 16/7 44/13 45/18 62/8 124/22 125/8 150/16 150/19 151/3 156/16 159/2 164/4 177/9 212/17
twenty [2] 96/22 96/23
twenty-eight [2] 96/22 96/23
twist [3] 74/5 205/7 207/4
twisted [2] 194/7 205/9
twists [1] 207/17
two [52] 15/4 15/5 16/14 22/5 27/2 34/2 38/17 46/25 48/22 52/14 52/15 57/10 66/7 73/25 82/21 89/5 90/5 91/11 91/11 101/23 109/18 109/23 110/13 110/15

122/19 127/4 131/15 131/24 132/1 137/2 141/4 141/6 150/24 158/21 173/14 175/16 183/9 185/10 210/4 211/12 225/3 227/24 229/12 230/7 235/1 236/13 236/16 236/16 236/20 241/16 248/1 248/6
two-and-a-half [1] 185/10
two-page [1] 46/25
two-thirds [1] 175/16
two-week [2] 90/5 109/23
two-year [1] 109/18
type [26] 12/24 14/18 26/20 30/21 37/25 73/16 101/24 113/23 119/4 120/19 124/9 147/24 153/1 161/23 213/15 213/19 213/20 220/7 222/15 224/11 225/21 229/24 235/22 238/5 243/12 245/10
types [6] 41/9 72/13 92/10 134/20 222/20 222/21
typical [2] 92/8 92/18
typically [7] 131/8 131/10 131/15 131/22 131/25 131/25 132/3
typo [1] 183/20
typos [1] 183/25
TYSON [15] 3/3 5/19 5/21 6/1 6/4 8/10 9/2 11/16 17/4 19/1 20/21 23/12 24/4 24/18 28/1

## U

ultimate [1] 140/18
ultimately [9] 45/17 46/10 58/2 62/14 63/13 67/7 101/9 113/2 194/22
un [1] 120/17
unable [3] 168/19 173/6 224/6
unaware [1] 14/11
unbolting [1] 144/19
undergraduate [2] 184/7 221/23
underneath [9] 60/11 63/10 65/3 82/24 92/23 94/22 120/8 144/19 179/19
underside [1] 60/12
undertake [2] 156/22 216/5
undertaken [3] 11/22 159/15 159/17
undertook [2] 214/5 215/17
underway [1] 146/8
underwent [1] 51/15
unit [12] 47/3 131/3 131/19 132/6 132/12 132/18 132/22 134/20 134/21 145/22 220/20 235/2
units [1] 132/11
university [7] 133/7 133/14 133/21 133/23 184/11 184/12 222/2
unlatch [1] 39/5
unless [1] 135/2
unsure [1] 10/9
untrained [1] 206/9
unusual [3] 72/7 139/8 246/8
updates [1] 28/23
upper [5] 64/15 230/19 230/25 233/1 236/7
useful [2] 169/5 188/4
uses [2] 228/18 246/22
usual [1] 132/1
utilize [3] 52/25 112/25 234/18
utilized [1] 169/14
utilizing [1] 53/12

## V

V3 [2] 48/16 67/9
vacuum [6] 101/16 104/7 123/9 123/11 123/13 124/2
Valley [4] 29/15 90/6 101/24 109/23
value [7] 34/10 34/20 55/1 63/18 84/7 92/3 178/2

van [6] 75/22 75/25 131/20 138/1 145/6 152/21
variety [3] 53/12 55/11 220/10
various [4] 73/8 80/8 113/8 199/5
varying [1] 166/24
vehicle [94] 8/7 8/9 8/15 25/17 25/20 26/2 26/5 26/6 26/8 27/21 28/5 30/8 30/10 30/11 30/16 30/19 30/23 38/16 38/22 38/24 44/11 58/3 59/8 60/11 60/13 79/9 79/12 79/22 79/23 80/19 80/21 81/2 81/6 81/8 82/13 82/14 82/18 135/24 136/4 136/7 136/11 137/17 137/20 138/8 138/10 139/1 139/16 139/22 140/9 140/11 140/18 140/20 140/24 141/2 141/20 141/25 142/3 142/9 142/15 142/16 143/1 143/6 143/7 144/2 144/7 144/9 144/10 144/20 144/25 144/25 145/7 145/10 151/10 151/11 151/22 163/10 163/25 166/17 168/22 168/24 169/11 169/16 170/1 170/8 171/16 171/25 172/5 172/11 172/14 173/3 173/9 176/22 177/5 179/19
vehicles [7] 26/7 91/11 137/24 137/25 138/5 138/6 139/2
verbal [1] 96/21
verified [1] 67/13
versus [3] 176/6 183/24 238/18
via [1] 112/13
vicinity [2] 42/22 42/24
victim [1] 190/11
videotape [4] 23/23 32/13 78/11 81/16
videotaped [3] 57/24 78/4 81/25
videotaping [1] 58/4
view [3] 44/14 79/6 95/5
vigorously [2] 162/2 162/7
Virginia [1] 46/15
virtually [1] 61/19
visible [3] 50/5 61/24 86/24
visit [1] 212/4
visited [1] 124/17
visual [5] 69/7 71/12 160/23 244/10 244/12
visually [10] 53/21 61/19 69/12 75/14 161/3 164/7 223/24 224/12 244/13 244/16
vitae [2] 183/16 248/1
volunteer [1] 132/12

## W

Wa [1] 214/12
waist [1] 53/5
wait [1] 126/19
waiting [3] 98/4 142/18 168/12
walk [3] 9/6 13/25 57/18
walk-through [1] 57/18
walked [2] 81/15 92/6
walking [3] 9/7 85/14 85/19
walkway [1] 13/25
wall [14] 14/2 59/23 60/22 62/5 62/11 62/12 62/15 64/10 64/20 94/8 94/24 103/24 114/20 114/21
walls [1] 94/25
wander [1] 34/1
warrant [13] 8/23 19/22 20/2 20/10 21/5 21/10 31/8 37/2 56/10 56/14 56/21 62/18 146/8
warrants [1] 22/6
washed [1] 179/3
watch [4] 12/4 30/7 32/10 33/24
watching [2] 14/7 79/18
water [13] 26/22 26/25 27/3 76/20 76/24 76/25 77/2 138/2 138/3 202/5 202/9

## W

water... [2]  202/10 202/13
Waukegan [1]  133/24
weak [1]  162/21
weapon [56]  16/23 16/25 103/9 128/21
  128/25 185/17 190/6 190/11 190/18
  190/19 191/6 191/7 191/19 191/22
  191/23 191/24 192/18 192/23 193/7
  193/8 193/11 193/11 193/15 193/17
  193/24 194/2 194/15 194/18 194/25
  195/14 198/1 198/9 198/10 198/12
  198/17 198/24 199/6 199/6 199/9
  199/14 199/18 199/20 199/23 200/4
  200/8 200/9 200/14 200/17 200/21
  201/7 202/1 202/12 203/24 208/16
  208/17 218/3
weapons [8]  51/25 102/20 111/1 185/23
  192/11 199/13 200/12 202/9
wear [1]  12/10
wearing [2]  37/9 113/16
weather [9]  30/11 136/7 136/8 139/21
  139/22 140/4 140/13 143/22 169/7
Wednesday [2]  21/12 146/20
week [17]  19/3 19/9 23/18 23/21 29/15
  29/17 29/21 42/16 51/1 54/12 73/2 90/5
  109/23 160/15 185/20 188/21 212/1
week-long [3]  29/15 29/17 188/21
weighed [1]  208/9
weight [3]  212/25 213/4 216/23
weights [1]  217/2
welcome [1]  247/5
Wendy [1]  21/9
west [5]  62/15 92/9 92/11 92/15 93/19
whatnot [1]  148/2
whatsoever [1]  217/16
wheel [3]  44/11 144/10 148/7
wheels [4]  60/9 61/2 144/11 144/22
Whereas [1]  148/15
Wherein [3]  7/22 100/13 126/24
white [3]  62/25 80/16 83/14
whoever [1]  173/3
whole [4]  15/24 23/25 87/1 220/17
wide [2]  55/11 202/7
Wiegert [22]  18/25 22/4 24/25 25/18
  27/11 32/5 42/3 52/20 55/25 63/15
  104/1 104/18 108/6 137/15 154/5
  183/14 196/15 197/16 203/9 210/15
  221/14 225/9
Wiegert's [2]  20/12 65/14
WILLIAM [7]  3/3 4/3 5/21 6/1 181/16
  181/18 181/23
windows [1]  155/1
wire [1]  138/25
wires [1]  148/4
WISCONSIN [21]  1/1 1/3 1/15 1/17 1/19
  41/2 46/12 52/8 54/8 65/8 109/20 133/7
  133/14 182/4 182/5 184/5 187/14 212/9
  222/2 250/1 250/6
Wisconsin-Parkside [1]  133/7
wish [1]  240/15
wished [1]  77/7
without [4]  45/3 69/7 112/24 127/8
witness [21]  5/17 5/22 16/21 40/12
  40/18 68/6 88/17 108/15 126/8 129/18
  130/14 130/18 167/9 181/11 181/19
  211/13 218/22 219/15 219/19 225/18
  240/4
witnesses [9]  3/2 4/2 129/17 130/8
  247/6 248/1 248/4 248/22 248/24
wooden [4]  53/13 53/13 77/6 245/4
wording [1]  50/5
words [6]  97/12 143/14 148/24 159/13
  201/20 237/5
work [23]  16/2 31/16 42/23 60/6 60/12
  109/10 126/19 127/6 130/23 134/4
  134/14 134/17 146/11 163/1 175/4
  175/10 183/17 186/4 186/6 186/12
  186/20 188/1 224/5
workbench [1]  59/21
worked [13]  78/17 130/24 133/23
  133/24 134/9 146/16 146/17 146/18
  149/10 158/20 177/24 186/6 186/22
working [9]  53/7 58/15 102/16 133/20
  135/23 161/18 161/19 192/1 198/15
works [3]  100/4 100/17 102/21
wrap [1]  159/14
wrap-up [1]  159/14
wrapped [2]  147/25 158/23
wrecker [6]  141/1 141/5 141/9 142/18
  144/8 145/15
writer [1]  24/13
writing [1]  198/11
wrote [5]  27/18 199/5 210/20 241/4
  241/5

## X

x-ray [6]  229/24 230/11 230/23 231/18
  232/17 236/10
x-rays [4]  228/18 229/22 230/7 231/10

## Y

yard [13]  7/16 43/14 51/9 135/25 137/4
  137/23 141/1 146/7 146/13 146/15
  147/3 151/8 153/5
year [7]  109/16 109/18 167/23 167/24
  222/14 235/1 235/1
year-and-a-half [2]  167/23 167/24
years [11]  6/12 89/4 89/5 109/11 167/22
  183/22 187/25 189/5 220/6 220/23
  222/18
yellow [4]  59/10 81/5 81/17 81/19
Yep [1]  217/3
yourselves [1]  247/17

## Z

Z-h-a-n-g [1]  136/22
zero [1]  156/12
Zhang [3]  136/22 145/4 145/18
zinc [1]  242/23
zip [1]  152/16
Ziplock [1]  227/3
zipper [1]  55/9
Zire [2]  47/25 67/11
zoom [1]  50/7
zoomed [4]  91/24 155/4 231/22 232/13
zoomed-in [2]  231/22 232/13