STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 3

_____

STATE OF WISCONSIN,

                PLAINTIFF,       JURY TRIAL
                            TRIAL DAY 3

vs.                        Case No. 06 CF 88

BRENDAN R. DASSEY,

                DEFENDANT.

_____

**DATE:**      APRIL 18, 2007

**BEFORE:**   HON. JEROME L. FOX
           Circuit Court Judge

**APPEARANCES:**

      KENNETH R. KRATZ
      Special Prosecutor
      On behalf of the State of Wisconsin.

      THOMAS J. FALLON
      Special Prosecutor
      On behalf of the State of Wisconsin.

      NORMAN A. GAHN
      Special Prosecutor
      On behalf of the State of Wisconsin.

      MARK R. FREMGEN
      Attorney at Law
      On behalf of the defendant.

      RAYMOND L. EDELSTEIN
      Attorney at Law
      On behalf of the defendant.

      BRENDAN R. DASSEY
      Defendant
      Appeared in person.

1

**COPY**

* * * * * * * *

**TRANSCRIPT OF PROCEEDINGS**

Reported by Jennifer K. Hau, RPR

Official Court Reporter

2

# I N D E X

| WITNESSES | PAGE |
|---|---|
| **KAYLA AVERY** | |
| Direct Examination by ATTORNEY FALLON | 5-16 |
| Cross-Examination by ATTORNEY FREMGEN | 16-22 |
| Redirect Examination by ATTORNEY FALLON | 22 |
| **SHERRY CULHANE** | |
| Direct Examination by ATTORNEY GAHN | 22-77 |
| Cross-Examination by ATTORNEY FREMGEN | 77-103 |
| Redirect Examination by ATTORNEY GAHN | 103-116 |
| Recross-Examination by ATTORNEY FREMGEN | 117-123 |
| **NICK STAHLKE** | |
| Direct Examination by ATTORNEY GAHN | 123-143 |
| Cross-Examination by ATTORNEY EDELSTEIN | 143-163 |
| Redirect Examination by ATTORNEY GAHN | 163-165 |
| Recross-Examination by ATTORNEY EDELSTEIN | 165 |
| **SUSAN BRANDT** | |
| Direct Examination by ATTORNEY FALLON | 166-170 |
| Cross-Examination by ATTORNEY FREMGEN | 170-172 |
| Redirect Examination by ATTORNEY FALLON | 172 |

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 3 of 255    Document 19-17

# C O N T ' D   I N D E X

| WITNESSES | | | PAGE |
|---|---|---|---|

**JODI STACHOWSKI**

Direct Examination by ATTORNEY KRATZ — 172-180

Cross-Examination by ATTORNEY FREMGEN — 180

**THOMAS STURDIVANT**

Direct Examination by ATTORNEY FALLON — 181-200

Cross-Examination by ATTORNEY FREMGEN — 200-206

**DR. DONALD SIMLEY, II**

Direct Examination by ATTORNEY FALLON — 207-232

| EXHIBITS | MARKED | MOVED | ADMITTED |
|---|---|---|---|
| 141-161 | | 76 | 77 |
| 162 | | 232 | 233 |
| 163 | 12 | 16 | 16 |
| 164 | 27 | 76 | 77 |
| 165-167 | | 165 | 166 |
| 168-174 | | 200 | 200 |
| 175 | | 233 | 233 |
| 176-182 | | 232 | 233 |

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 4 of 255    Document 19-17

(Reconvened at 9:02 a.m.)

THE COURT: Morning, ladies and gentlemen, counsel. Uh, this is State of Wisconsin vs. Brendan Dassey, 06 CF 88. Appearances, please.

ATTORNEY FALLON: Morning, Your Honor. May it please the Court, the State continues in its appearance by Special Prosecutors Ken Kratz, Tom Fallon, Norm Gahn.

ATTORNEY FREMGEN: Attorney Mark Fremgen appears with Attorney Ray Edelstein. Brendan Dassey appears in person.

THE COURT: All right. Uh, members of the prosecution, are we ready to go?

ATTORNEY FALLON: We are.

THE COURT: Okay.

ATTORNEY FALLON: State --

THE COURT: Proceed.

ATTORNEY FALLON: State will call its first witness, Kayla Avery.

THE CLERK: Please raise your right hand.

**KAYLA AVERY,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state

5

your name and spell your last name for the record.

THE WITNESS: Kayla Avery, A-v-e-r-y.

### DIRECT EXAMINATION

BY ATTORNEY FALLON:

Q Good morning. How old are you, Kayla?

A Fifteen.

Q All right. And do you go to school?

A Yes.

Q What school do you go to?

A Mishicot. Mishicot High School.

Q All right. And what grade are you in there?

A Ninth.

Q All right. And would you tell us who your mom and dad are?

A Earl and Candy Avery.

Q Okay. Um, are you related to Brendan Dassey?

A Yes.

Q And, uh, how are you related to Brendan?

A Um, well, we're first -- we're first cous -- we're first cousins, and through my dad is -- my dad is Barbara's brother, and Brendan's Barbara's son.

Q Okay. Very good. Now, um, while you're growing up, were you and Brendan close or good friends?

A Um, kind of. Not really.

Q All right. Do you like Brendan?

6

A    Yes.

Q    Okay.  Do you care about him a great deal?

A    Yes.

Q    Okay.  Um, how often would you see Brendan on a normal -- at a normal time?

A    Um, prob -- probably once a week probably.

Q    Okay.  All right.  Now, thinking about the time, from Halloween on October 31, 2005, until, say, the end of February, 2006, about four-month period, did you notice any changes in Brendan?

A    Kind of.  Yeah.

Q    All right.  Tell us about the changes that you saw?

A    It looked like he was losing weight and he was a little bit more upset.

Q    All right.  You're -- you're -- you're going to have to put that mike a little bit closer so that everybody can hear, all right?  All right.  Thank you.  Um, why was that different from what you had seen before that?

A    Um, he really wasn't acting the same.

Q    Okay.  Had he -- Before that, was he more of a happy-go-lucky type of boy?

A    Kind of.  Yeah.

Q    Was he pretty friendly to you?

7

A    Yeah.

Q    All right.  And as far as you could tell, did he seem to be friendly to other people?

A    Uh, yeah.

Q    All right.  But during this four-month period, is that what changed?

A    Um, kind of.  He was still nice to people.

Q    All right.  But was he as outgoing as he was before?

A    Kind of.  Not really.

Q    Not really.  Okay.  All right.  I want to direct your attention to a time in December of 2005.  Did you have a conversation with Brendan about Teresa Halbach?

A    Kind of.  Yeah.

Q    All right.  Would you tell us about that conversation with Brendan?

A    Well, um -- Well, not in December.  November.

Q    Okay.  Tell us about it?

A    In November, um, he was -- he was, um, sitting in our hallway, and, um, he was just in there.  One of my friends looked out the door, because we were having a birthday party, and he came over, um, and he -- he was -- my friend just looked out the door and seen him crying, and then she came to me.  And then I went

8

out there by him, and I asked him what was wrong, and all he did is shrugged his shoulders.

Q Okay. And then what did you ask?

A And then I asked him if it was about the Steven thing.

Q All right.

A And he shrugged his shoulders, and I was, like, you know you can -- you know you can talk to me, and then I just went back inside my room.

Q All right. And whose birthday party was this?

A My cousin, Ashley's.

Q All right. And what's Ashley's last name?

A Chevalier.

Q Okay. And where was the birthday party being held?

A My house.

Q All right. Now, when is her birthday? Is it -- Is it February? Or January? Or when is her birthday?

A I think it's February.

Q All right. Now, was the party actually on her, um, birthday, or a day or two before or after? Do you remember?

A No.

Q Okay. Now, you asked Brendan about, did it have

9

something to do with this "Steven thing". Tell us about the conversation you had with Brendan regarding Steven to which you referred?

A We didn't have a conversation about it.

Q All right. Didn't you tell your counselors at school about a conversation you had with Brendan?

A Yeah.

Q All right. And you told Officers Wiegert and Fassbender about that conversation as well; right?

A Yes.

Q All right. Tell us what you told them?

A I told them that he was crying on the steps and stuff like that.

Q All right. What -- What about the conversation regarding a fire? Tell us about that?

A That on, I think it was October 31, uh, we went down by my grandma's for trick or treating, and on the way back, I asked my mom if we could go down to the bonfire because I seen it, and my mom said, no.

Q All right. In terms of your conversation with your counselors, the one you told Investigator Wiegert and Fassbender about -- these two guys right here -- You recognize those two guys?

A (No verbal response.)

10

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 10 of 255    Document 19-17

Q   Yes?

A   Yes.

Q   Yes.  Okay.  Did you tell -- You told them about a conversation you had with Brendan about -- about that bonfire and what was in the bonfire. Tell us about that?

A   I really don't remember.

Q   All right.  Now, Kayla, didn't you tell the officers that Brendan told you he had seen body parts in a fire?

ATTORNEY FREMGEN:  Judge, I'd object at this point.  I think, first, the State should probably try to refresh recollection (inaudible.)

THE REPORTER:  Mr. Fremgen, can you speak up, please?

ATTORNEY FREMGEN:  Oh, I'm sorry. Judge, my -- my argument is simply that I think the State should try to refresh recollection with whatever documents they're referring to, as far as the statement, before they go directly to, I think, the efforts they're going to now.

THE COURT:  Mr. Fallon?

ATTORNEY FALLON:  Well, it is our witness to, uh, pursue -- proceed as we feel appropriate under the circumstances.  I'm asking

11

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 11 of 255   Document 19-17

Q  (By Attorney Fallon)  her, directly.  I mean, quite frankly, if one is to impeach a witness, one must give the witness, first, an opportunity.

THE COURT:  Yeah.  I'm going to overrule the objection.  You may go on.

ATTORNEY FALLON:  All right.

Q  (By Attorney Fallon)  What did -- What did you report telling the officers that Brendan told you about the fire?

A  I really can't remember.

Q  All right.  Did you give the officers a statement?

A  Uh, yeah.

Q  All right.

(Exhibit No. 163 marked for identification.)

ATTORNEY FALLON:  May I approach?

THE COURT:  You may.

Q  (By Attorney Fallon)  Kayla, I'm showing you what has been marked for identification as this Exhibit 163.  Would you hold that for me, please?  All right.  I'm going to take my seat here and ask some questions.  Do you recognize that exhibit?

A  (No verbal response.)

Q  Is that a yes?

12

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 12 of 255    Document 19-17

THE COURT: You have --

THE WITNESS: Yes.

THE COURT: -- to answer out loud.

THE WITNESS: Yes.

Q (By Attorney Fallon) All right. And is that the statement that you gave to Officers, um, Fassbender and Wiegert?

A Yes.

Q All right. Would you take a moment to read that statement to yourself, please? Have you finished reading it?

A Yes.

Q I'm going to have Mr. Kratz take the statement. Okay. Does reviewing that statement help you remember?

A Yes.

Q All right. What did Brendan tell you about the fire? You'll have to pull the microphone a little closer so we can hear you.

A He didn't tell me anything. I -- I kind of made up the statement. And I'm sorry.

Q All right. What did you make up? Tell us what you said you made up?

A That he seen body parts in there. I didn't -- He didn't see it. I -- He didn't tell me anything like

13

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 13 of 255    Document 19-17

that, or he didn't see Teresa's body or anything like that.

Q   You also told the officers that Brendan told you he saw Teresa alive and pinned up, didn't you?

A   Yes.

Q   All right.  And you love Brendan; right?

A   Yes.  Very much.

Q   And you wouldn't tell -- You wouldn't say anything like that to get him in trouble, would you?

A   No.  Not really.

Q   All right.  But yet you told the officers that those were the conversations you had with Brendan; isn't that right?

A   Yes.

Q   All right.  You told -- You told the officers that Brendan told you he had seen Teresa pinned up in Steven's trailer, didn't you?

ATTORNEY FREMGEN:  Ob -- Object.  I don't believe that was what the statement actually says.

ATTORNEY FALLON:  There's --

ATTORNEY FREMGEN:  And if I could be heard.

ATTORNEY FALLON:  There's additional

14

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 14 of 255    Document 19-17

statements, Counsel, as you well know.

ATTORNEY FREMGEN: Referring to the statement -- If we're referring to the statement that was just used to refresh recollection, I don't believe that's exactly what it says.

THE COURT: Well, why don't you restate the question, Mr. Fallon.

ATTORNEY FALLON: All right. I'll restate the question.

Q (By Attorney Fallon) First of all, um, Kayla, so that we're clear, the officers came and interviewed you, uh, the end of February; right?

A Yes.

Q All right. And you had a long conversation with him, your mom, and your dad; right?

A Yes.

Q Okay. And in the written statement that I just showed you, you reported that Brendan told you he had seen body parts in the fire on Halloween; right?

A Yes. But that's not true.

Q All right. And you also told the officers in a separate conversation that day that you had seen -- or that Brendan had seen Teresa alive in Steven's trailer?

15

Case 1:14-cv-01310-WED Filed 05/04/15 Page 15 of 255 Document 19-17

A    Yes.

Q    All right.  And that she was pinned up in a chair?

A    Yes.  But that's not true.

Q    All right.  Now, you're saying today you made that up?

A    Yes.

Q    All right.  So you're telling us you made something up to get Brendan into trouble?

A    Not really.  I was just really confused about everything.

ATTORNEY FALLON:  No further questions for this witness.  And to the extent, solely that Exhibit 163 was referred to for refreshment and impeachment, only that portion we seek admission.

THE COURT:  All right.  Any objection to that?

ATTORNEY FREMGEN:  With that condition, no.

THE COURT:  All right.  It's received. Cross.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q    You indicated that you would often see Brendan once a week?

16

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 16 of 255    Document 19-17

A    Yes.

Q    Did you guys hang out and do stuff together?

A    No.  When I went over there, we played video games and stuff, when I went inside his room, and he would be playing them.

Q    Would it be when your families got together you'd see them -- him then?

A    Normally, when we went over there.

Q    You would go over there?

A    (No verbal response.)

Q    Okay.  Would you -- Would you also be there with Blaine, his brother?

A    Yes.

Q    And the other brothers?  Bobby?

A    Yes.  Sometimes.

Q    Or Bryan?

A    Yes.

Q    You indicated that one of the -- something that concerned you was Brendan was losing weight; right?

A    Yes.

Q    And he was a little more upset?

A    Yes.

Q    Did he sometimes walk around being upset?

A    Kind of.  Yes.

17

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 17 of 255    Document 19-17

Q Just seemed to you that it was a little more than normal?

A Yes.

Q Did -- Now, did you know whether or not Brendan had a girlfriend at that time?

A At the time, after he was kind of on the steps, I found out that he had a girlfriend. Yes.

Q Do you know what happened between him and his girlfriend?

A Um, no. I heard that they broke up, but I don't know if that was true or not.

Q Don't know that, though?

A Yes.

Q At that birthday party, you tried to talk with Brendan; right?

A Yes.

Q And you sat down with Brendan on the stairs?

A Yes.

Q And tried to get him to open up to you?

A Yes.

Q But all he did was shrug his shoulders?

A Yes.

Q And then you just walked away then?

A Yes.

Q Now, Mr. Fallon was asking you to look at a -- a

18

statement that you wrote up with two, uh -- well, one investigator and -- and one special agent from the Department of Criminal Investigations. Do you remember that? You just saw it a minute ago?

A    Yes.

Q    You just said that you made that up?

A    Yes.

Q    So when you were talking to the officer -- You understand that they're police officers; right?

A    Yes.

Q    Okay.  So you were lying to the police officer?

A    Yes.

Q    Why did you lie?

A    I was confused and I didn't know what to do.

Q    Who were you confused about?

A    I don't know.  Everything.

Q    Did -- Now, at the time you spoke to the officers, that was in late February; is that right?  Of 2006?

A    I -- Yes, I think so.

Q    Couple weeks before Brendan was arrested; right?

A    Yes.

Q    Around that time?

A    Yes.

19

Q You'd heard some of the news that -- about what happened to Teresa Halbach?

A Yes.

Q It was -- It was kind of hard to miss some of that; right?

A Yes.

Q Did you know about that burn pit behind Steven's garage?

A Yes. I heard it on the news.

Q Read it in the news?

A Yes.

Q Did you read that they found body parts in the -- the burn pit, too?

A Yes.

Q What -- When you first spoke to the officers, and -- and, again, in -- sometime in late February of 2006, did they come there to talk to you about Brendan?

A I think. I can't remember, but I think -- I think so.

Q I -- I don't want you to tell us other things that you said to the officers, okay? But could it have been they came to talk to you about Steven?

A Yes.

20

Q  Okay.  And then Brendan's name came up?

A  Yes.

Q  When they spoke to you, did they -- let's -- ask you, specifically, about the burn pit and the body parts?

A  Yes.

Q  So when you say that you -- you told them you saw body parts, it was in response to a question they asked you about that?

A  Yes.

Q  When you say that Teresa was pinned up in a chair, where did you hear that?

A  I don't know.

Q  Did someone tell you that?

A  Probably, yeah.  I don't remember.

Q  Don't remember where it came from?

A  Yes.

Q  But you remember the body parts and burn pit came from reading the news or TV?

A  Yes.

Q  Now, at this point in time Steven had already been arrested; right?

A  Yes.

Q  Okay.  And he was already charged with the -- the murder of Teresa Halbach; right?

21

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 21 of 255    Document 19-17

A    I think so.  I don't know.

Q    You don't remember?

A    Yes.

Q    This was several months after he was arrested though; right?

A    I think so.  Yes.

Q    Thank you, Kayla.

THE COURT:  Redirect?

ATTORNEY FALLON:  Yes.  One question.

### REDIRECT EXAMINATION

BY ATTORNEY FALLON:

Q    Kayla, isn't it true the officers came to talk to you because of what you told the counselors at school?  They asked you about what you told the counselors?

A    I don't know.  I can't remember.

Q    Are you confused?

A    Right now?  Yes.

ATTORNEY FALLON:  No further questions.

THE COURT:  All right.  You may step down. Next witness, Counsel?

ATTORNEY GAHN:  Uh, the State would call Sherry Culhane to the stand.

THE CLERK:  Please raise your right hand.

**SHERRY CULHANE,**

22

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 22 of 255    Document 19-17

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Sherry Culhane, C-u-l-h-a-n-e.

**DIRECT EXAMINATION**

BY ATTORNEY GAHN:

Q And, Ms. Culhane, what is your occupation?

A I work as a forensic scientist in the Wisconsin State Crime Laboratory in Madison, Wisconsin.

Q And how long have you been employed, uh, at the State Crime Lab in Madison?

A Twenty-three years.

Q And what are your duties and responsibilities at the Crime Lab?

A I work in the DNA section of the Crime Lab, so I'm responsible for examining physical evidence, uh, usually things like clothing, bedding, objects, uh, samples that are taken from an alleged crime scene or an alleged victim, for the presence of biological material. We attempt to identify that biological material, and then, uh, develop a DNA profile from that.

We are also submitted DNA profiles from

23

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 23 of 255    Document 19-17

standard samples from specific individuals, and we also develop DNA profiles from those samples. And we basically compare the two to see if an individual could or could not be the source of the questioned evidence sample.

Q   And do you, yourself, have any additional duties at the Crime Lab?

A   Yes, I do.  I'm the technical unit leader in the section, which, uh, means that I'm also responsible for additional duties such as training new analysts in -- in our section, I'm responsible for overseeing the quality control program, um, make sure any technical issues that are resolved in this section. I'm responsible for setting up new equipment, new procedures, anything that are brought online, uh, those are all under my responsibility.

Q   Ms. Culhane, before I ask you the next question, could you maybe pull the microphone just a little closer to you?

A   Okay.

Q   Thank you.  Um, is your full workday devoted to, um, DNA analysis or testing?

A   Yes, it is.

Q   And how long have you been doing DNA testing at the Crime Lab in Madison?

24

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 24 of 255    Document 19-17

A   Um, since 1996.

Q   And approximately how many DNA tests have you, yourself, performed or run?

A   Uh, conservative answer for myself would be at least five thousand.

Q   And what education do you have that qualifies you to, um, work in the area of DNA testing?

A   I have a Bachelor of Science Degree in biology.  Um, as I said, we went online in 1994 with DNA testing, and I went through a -- a -- about a year-long training program, um, in the laboratory under the direction of my supervisor.

Uh, the training program consisted of lectures, uh, running many, many samples through the system, um, uh, proficiency tests, competency tests, um, and since that time I've also, uh, attended many schools and workshops specifically related to DNA testing or forensic applications, and also interpretations.

I've also taken a statistics course online and a molecular biology course and advanced chemistry class.

Q   Do you attend meetings or seminars on DNA technology?

A   Yes, I do.

25

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 25 of 255    Document 19-17

Q   And do you keep up-to-date and read the scientific literature on DNA technology?

A   Yes, I do.

Q   And why is it that you, um, attend meetings and seminars and keep up-to-date with the literature?

A   Uh, meetings and seminars are -- are really good venue to be able to talk to other individuals who are in crime labs, who are doing the same type of testing, individuals who are testing new procedures, new types of equipment.  Most of these meetings have representatives from, um, the instruments that we use or the kits that we use, and so these meetings allow us to exchange a lot of information.

Uh, research is being done, um, all of that information we can find in scientific journals that we have access to in the laboratory.

Q   Have you testified in court before today?

A   Yes, I have.

Q   Approximately how many times?

A   Ninety-two.

Q   Have you ever been qualified as an expert in DNA testing?

A   Yes.

Q   And approximately how many times?

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 26 of 255   Document 19-17

A    About 32 times.

Q    Have you ever been rejected as an expert in DNA technology?

A    No.

(Exhibit No. 164 marked for identification.)

Q    I'm going to ask Mr. Kratz to hand you what has been marked as Exhibit 164.  Just ask you to identify that?

A    This is a copy of my, uh, curriculum vitae.  It has all of my qualifications, and all the classes, and, uh, educational, uh, seminars that I've attended.

Q    Okay.  And, basically, that summarizes what you talked about just up until now?

A    Yes.

Q    Okay.  Um, what I'd like to do now is take a few moments, and I'd like you to explain to the jurors exactly what DNA, uh, stands for, and what it is, and we've, um, prepared a PowerPoint demonstration that you have seen; correct?

A    Yes.

Q    And would that assist you in, um, explaining DNA and its properties to the jury?

A    Yes, it will.

Q    Um, we put up our first slide, and you can -- Uh, and, also, do you have a, um -- a laser pointer

27

Q in the event that you may need one?

A No, I don't.

Q We're going to provide you with that, too, and please feel free to use that if you need to. So could you start with telling the jury, um, what DNA stands for and what it is?

A DNA stands for deoxyribonucleic acid, um, and, basically, it's the information storage system of the cell. Um, you can see -- Probably easier to see right here, um, this is a very small segment of DNA. It's a 3-D model of the DNA. And it illustrates the fact that DNA is made up of, um, a series of smaller units that are strung together in a specific order. That order is what determines the information and how that information is stored in the DNA.

Q And could you, um, explain to the jurors some of the characteristics about DNA and how it's inherited?

A Yes. The easiest way to think of DNA is to compare it to a blueprint. Um, just like when you build a house, all the information that you need to build a house is contained in the blueprint. All the directions, all the materials, everything you need. DNA is exactly the same, only on a cellular level. So all of the information that your body needs to

28

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 28 of 255    Document 19-17

produce proteins, enzymes, everything to basically function, all that information is contained in your DNA.

Your DNA directs cellular development. And if you'll look at this, um, schematic here, um, the information is stored in specific regions we refer to as genes. DNA directs development of your cells all the way from the beginning of conception all the way through your adult life.

So things like your eye color, hair color, the shape of your face, all of those are characteristics that are determined by your genes.

In a forensic setting, we're more interested in the areas of DNA that are not connected to a functional gene. Um, scientists really don't know what their function is, but they're there and there's a lot of variation within the population. So in the forensic community, we're looking at regions of DNA that don't really do anything, and, um, that's where we're -- we're most interested.

DNA's also inherited from your biological parents. You inherit 50 percent from your mother and 50 percent from your father. And

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 29 of 255   Document 19-17

Q How many analysts are there at the Crime Lab in Madison that are performing DNA testing?

A Currently, we have, uh, about ten. Over the course of years, we've had 10 to 12 people.

Q Since you began doing DNA testing at the Madison Crime Lab, can you estimate approximately how many samples of evidence have been analyzed, uh, for DNA testing?

A A conservative answer would be at least 60,000 over the course of the years.

Q And do you and your laboratory undergo proficiency testing?

A Yes, we do.

Q And what is that?

A Proficiency testing, um, in our laboratory -- We purchase proficiency tests from an outside private company. Proficiency tests are designed to mimmick forensic samples. So we treat them just like we do a case. They come into the lab from this private company, and we examine them just like we would a case. The proficiency tests are meant to test the laboratory system, as well as the individual analysts.

30

We, uh, examine these just like we do evidence. We developed DNA profiles from them, and we report those DNA profiles back to the company that we purchased them from.

Q And have you passed all of your proficiency tests?

A Yes.

Q And, um, is your -- Madison Crime Laboratory hold any certificates or accreditation?

A Yes. We are an accredited laboratory system. Um, we hold a certificate of accreditation from ASCLD, which stands for American Society of Crime Lab Directors. And it is a group of individuals that come into the laboratory once every five years and audit the laboratory -- um, every section of the laboratory. Uh, they look at all of our procedures. And this, um, certificate is awarded and -- and re-evaluated once every five years.

Q And what does that mean to be accredited in the forensic scientific community?

A Well, as I said, it's a -- part of the process of being accredited is to be audited. And what that means is you have a group of probably 10 to 15 people who come into the lab, they look at everything from security, they check, uh, evidence handling

31

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 31 of 255    Document 19-17

procedures, how we take in evidence, how we store the evidence.

Um, and then specific auditors are assigned to different sections at the laboratory. DNA usually has two to three auditors assigned to DNA. They check the physical layout of the laboratory, they check all of our validations of our equipment, all of our quality control. And, in addition to that, they pull, uh, case jackets from probably 10 to 15 different cases from each analyst, and analyze those to make sure that we're following our own protocols, and that we're making the correct interpretations.

It also checks, uh, educational backgrounds of all our analysts to make sure that -- that we are meeting all the requirements that are necessary, that have been put forth by, um, the DAB, which is a -- a group of individuals from the FBI that sets forth standards for these audits.

Q And does your laboratory only perform DNA testing for law enforcement or for the prosecution?

A Uh, by law, we perform testing for authorized submitters. Authorized submitters would be district attorney's offices, uh, coroner's offices, uh, police

32

Q Are you familiar with the Innocence Project at the University of Wisconsin Law School in Madison?

A Yes, I am.

Q And what is that, um, Innocence Project, briefly?

A My understanding, it is -- is that it's a group of, um, law students that review post-conviction cases. So they look at cases that have already been decided in court. And they review these cases to see if they're appropriate for a new trial because of new evidence, or new technology that was not available at the time.

Q And do they ever request testing from your Crime Laboratory?

A Yes.

Q And as a result of cases that you've tested, post-conviction cases, have people ever been freed from prison whom --

A Yes.

Q -- have been wrongfully convicted?

A That's correct.

Q And you do that work at your Crime Lab, also?

A Yes.

33

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 33 of 255    Document 19-17

Q  Um, I would like to now, uh, go back to the PowerPoint and just ask -- ask you -- to you -- would you describe to the jurors where DNA is found?

A  DNA can be found in all the nucleated cells in your body. Um, for our purposes, most -- If you'll look at the slide here, most of the common types of biological materials we're dealing with are blood, semen, saliva, and hair. But any biological component of your body that has a nucleated cell has the potential for DNA.

In the blood, it would be white blood cells. Semen would be epithelial cells, skin cells, and sperm sells. Saliva would be skin cells. Um, all of these, um, types of biological materials have a complete copy of your DNA. So the -- the important fact to remember, especially with forensics, is that, um, these questioned biological samples that may be found on a victim, alleged victim, or at an alleged crime scene, um, have a particular DNA profile, and that profile is the same as any other, um, nucleated cell in that person's body.

Q  Ms. Culhane, before I go any further, I'm going to ask that, um, when you point something out

34

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 34 of 255   Document 19-17

Q with the laser pointer, could you use the --

A Sure.

Q -- big screen so that the defense can also see what --

A Sure.

Q -- you're pointing to?

A I'm sorry.

Q Thank you, ma'am. So, basically, um, the DNA in one person's body, whatever tissue it comes from, is the same?

A Correct.

Q And, um, is it possible, uh, to make comparisons of the DNA that you find in a person's body, wherever it comes from, with, perhaps, samples that are found at a crime scene?

A Yes, it is.

Q And what allows you to do that?

A Uh, we can develop the DNA profile from the questioned sample, and we can also develop a DNA profile from the reference sample, or a standard sample, that it's from a known individual, and compare those profiles to see if they are consistent with one another or not.

Q And in order to test these biological fluids, what, um, testing procedure do you follow at the

35

Q   Crime Lab?

A   Currently, the type of technology that we're using is referred to as DNA: STR typing. Um, and this is what most -- as far as I understand, what most crime labs in the country are using, this type of technology for typing.

Q   And, um, basically, and -- and briefly, what is the, um, DNA:  STR method of typing?

A   STR typing is a PCR-based system that allows us to specifically amplify or make a whole lot of copies of specific regions of DNA.

If you look at the, uh, photograph here, there are target regions that -- that it -- are interspersed throughout your DNA. These target regions we refer to as STR or genetic markers.

When we develop a DNA profile, we actually look at 15 different target regions of DNA throughout the -- a person's entire DNA. So our profile is developed from 15 different target locations. We do this to the evidence sample as well as the reference sample, and we basically compare the two.

Q   So, again, if you were to develop a -- Can you develop a DNA profile from, like, a buccal swab from an individual?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 36 of 255    Document 19-17

A    Yes.

Q    And -- and please explain to the jurors what is a buccal swab?

A    A buccal swab refers to swabbing that we do on the inside of the cheek area.  Um, some laboratories at some point have used blood samples as a standard.  We currently use buccal swabs, which is swabbing of the inside of the cheek as a standard sample so that we'll know that those cells come from a particular person and we'll be able to assign that particular person, um, a profile.

Q    And you can develop a DNA profile from that?

A    Yes.

Q    And if that person were to leave, shall we say, their blood at a crime scene, can you develop a DNA profile from the blood at the crime scene?

A    Yes.

Q    And then could you compare those two?

A    Yes, we do.

Q    So can you make a determination whether someone may be the source of a biological substance at a crime scene?

A    Yes.

Q    And is this DNA technology that you've just talked about used in other fields besides law

37

Q enforcement and the forensic setting?

A Yes.

Q Could you explain just some of those for the jurors?

A Um, the technology -- the PCR technology that this system is based on is used in the medical com -- community quite frequently. It's used for a lot of diagnostic testing, um, it's used to, uh, identify individuals from mass disasters. Uh, I believe most servicemen now, uh, give a DNA sample that is kept on file. So there are lot of other applications. This -- this type of technology is used in many other applications besides forensics.

Q Now, in this case here, um, the case that we're trying today, did you receive items of evidence from law enforcement agencies to perform DNA testing?

A Yes, I did.

Q And when law enforcement submits items to the Crime Lab, do you generate some type of case file?

A Yes, I do.

Q And could you just explain to the jurors how you'll go about generating your case file?

A Any time evidence is brought into the laboratory, we

38

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 38 of 255    Document 19-17

have, uh, individuals, referred to as evidence specialists, they take the evidence from the submitter, the police officer, or -- or agency, um, and we have a -- a computerized bar coding system in the laboratory that keeps track of all of this evidence.

So anytime a piece of evidence comes into the lab, we give it a yellow sticker with a bar code on it that, um, is a designation of what the -- the lab number is. So we give it a numerical number.

Also, each item of evidence is also given an item designation. So, for instance, your number of the case, and then you'll have items A, B, C, D, E. So all of that information is, um, given to the items when they come into the laboratory. It's put into our computer system. All of that evidence is put into storage, into our evidence storage, and remains there until the analyst needs it to actually examine the evidence.

All of the documentation, um, that we generate for each case is kept in a case file. So all of our information with chain of custody, who took it in, what happened to it, plugs all of

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 39 of 255    Document 19-17

the notes and all of the data that we generate from our -- our analysis is kept in a case jacket. And, um, that's the -- the case file that's generated for each case.

Q And did you bring your case file with you today?

A Yes.

Q And do you need that to testify today?

A Yes.

Q And your file -- your case jacket, will that indicate what items of evidence you received and on what date?

A Yes, it will.

Q And will it also contain the dates that you performed your analysis?

A Yes.

Q I'm going to ask Mr. Kratz, if he would, uh, bring you a number of photographs, which I would like you first just to take a look at, and then I'll have a question for you when you've completed looking at those.

A Yes.

Q Those photographs -- Uh, do you know who took those photographs?

A I believe -- I believe they were taken in our laboratory.

40

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 40 of 255    Document 19-17

Q    And that was -- And those are photographs of -- of Teresa Halbach's RAV 4; correct?

A    That's correct.

Q    And that was brought to your Crime Laboratory from the, uh, Avery Salvage Yard; is that correct?

A    Yes.

Q    Okay.  And who is Ron Groffy?

A    He's the, uh -- our -- uh, one of our im -- imaging analysts, and he takes the photographs, uh, when we process vehicles or when we need evidence, uh, photographed.

Q    And did he take those photographs?

A    Yes.

Q    And as you look at each of those photographs, do they a -- appear to accurately depict, um, Teresa Halbach's RAV 4 as it appeared when you first saw it?

A    Yes, I do.

Q    Okay.  I would like you, first, to look at Exhibit 141?  And --

A    Yes.

Q    -- um, would you, um -- And is it -- The photograph that you have in your hand, is that the same photograph that we have up on the

41

screen?

A   Yes, it is.

Q   Okay.  And would you explain what that is?

A   This is a photograph that -- it's taken in our, uh, garage at the laboratory, and it is a picture of the, uh -- Teresa Halbach's RAV 4 as it was in our laboratory.

Q   And when did you first see Teresa Halbach's RAV 4 in your lab?

A   Uh, November 7, 2005.

Q   And that would have been on Monday?

A   Yes.

Q   Okay.  And what was your involvement at this point on November 7?

A   I was asked to, um, process the car for the presence of blood or any biological materials.

Q   And how did you go about doing that?

A   The first thing we do -- Anytime we're processing evidence, whether it's a -- a vehicle, or a piece of clothing, the first thing we do is a visual examination.  And we, basically, just look at the item of evidence to see if there's any obvious stains.  Um, we're looking for different biological materials depending on what type of case it is and what circumstances there were.

42

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 42 of 255    Document 19-17

Q   And did you find any blood stains in Teresa Halbach's RAV 4?

A   Yes.  As I was processing the car, um, again, I was just, basically, looking at the interior, and there were numerous obvious stains that were consistent with the appearance of blood stains.

Q   And, um, did you perform any type of preliminary tests on these -- what appear to be blood stains in Teresa Halbach's car?

A   Yes, I did.

Q   And what preliminary tests would those be?

A   Preliminary tests in the laboratory are tests that are not specific for a biological material, but it gives us a -- a good idea that what we're looking at is, for instance, blood or semen.  These are what we refer to as presumptive tests.  Um, they're not confirming for blood, and they're certainly not confirming for human blood, um, but when we get a positive reaction, we know that we're probably looking at a blood -- a blood stain and we need to take it a little further.  If we get a negative reaction, then it's not blood and we're not -- we're not going any further with the analysis.

Q   And the, um -- And once you perform a preliminary test and get a presumptive test, shall we say for

43

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 43 of 255    Document 19-17

blood, then what would you do? What would be the next step?

A  If I got a positive reaction, then I would sample the stain and retain that for further DNA testing. Uh, in this particular case, when I, um, got a positive preliminary test, then I sampled a portion of each one of the stains that I looked at, um, on a cotton swab. I moistened that with some sterile water, and then I, basically, just swabbed the stain and removed it, and that was retained for further DNA testing.

Q  Just give me one moment here, Ms. Culhane. Ms. Culhane, Mr. Kratz is going to hand you a number of envelopes, and they -- each one has been marked as an exhibit, and I would like you to look at Exhibit No. 155, and could you identify that for the jurors?

A  Yes, I can.

Q  And what is that?

A  This is a, um, swab that was taken, uh -- my item designation was A6, and this was a swab that was taken from the RAV 4.

Q  And I would like you at this point -- Would you look at Exhibit 142? That would be the photograph. Okay?

A  Yes.

44

Q   And, um, can you show the jurors on, um, this big screen where it is that you collected this item A6?

A   A6 was collected from the, uh, front seat driver's side portion of the -- the vehicle.  Um, and it was a -- a stain that I cut out of that area.

Q   And that was a -- a blood stain; correct?

A   Yes.

Q   You had done your preliminary test on that?

A   Yes.

Q   I would like you now to look at Exhibit 156, and could you explain to the jurors what that is?

A   This is my item designation A7.  Um, this was collected -- These were some, uh, reddish/brown crust material that was collected from this area right here on the floor by the console.

Q   And, again, that appeared to be a blood stain?

A   Yes.

Q   And what was the purpose of collecting that?

A   Um, I did my preliminary test, and, eventually, um, developed a DNA profile from that.

Q   Now, you state that you give these an item designation number.  Explain that a little bit to that?  What you mean by your Crime Lab designation number?

45

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 45 of 255    Document 19-17

A Okay. The car -- the vehicle, itself, was given the item designation of A. And everything that we subsequently collected from the car, was numbered one through however many samples we took. So this would be referred to as A7. "A" telling me that it came from the vehicle, and A7, uh, telling me exactly where I recovered this item from.

Q And I would ask you to look at Exhibit 157, and identify that for the jurors?

A This is my item designation A7, and this was a reddish/brown stain that was collected from the right of the ignition area in the vehicle.

Q Okay. Do you have Exhibit 157? Isn't that -- Is that A8?

A Yes.

Q I thought you said -- Did you say A7?

A I didn't mean to, if I did. I mean A8.

Q Okay.

A Yes.

Q So Exhibit 157?

A Is Item A8.

Q Okay. And, again, what is that?

A Uh, that was a reddish/brown stain that was taken right here to the right, uh, of the ignition. You can see it here on the photograph.

46

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 46 of 255    Document 19-17

Q   And, um, would you look at Exhibit 143, which is a photograph?

A   Yes.

Q   And is that -- The photograph you have in your hand, is that the photograph that's up on the large screen now?

A   Yes, it is.

Q   And, again, before you collected this blood stain from the -- by the ignition switch, you performed a preliminary test?

A   Yes, I did.

Q   It tested positive for blood?

A   Yes.

Q   And then you -- When you say, collected it, just tell the jurors how did you go about collecting it?

A   I took a -- a cotton swab and moistened that with some sterile water, and then I, basically, just swabbed the area of the stain.  That, uh, material is then transferred to the cotton swab, and then when I take that back to my lab bench to, uh, do my testing on it, then I will cut the portion that has the stained area on it and develop a DNA profile from that.

Q   I would like you now to look at Exhibit 158?

47

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 47 of 255   Document 19-17

That would be an envelope. And explain what that is?

A Yes. This is my, uh, item designation A9.

Q And, uh, where did you take that sample from?

A This was taken from the front passenger seat, and this was a stain that was cut out of that area.

Q And would you correlate that for the jurors, please, with Exhibit 144? That would be a photograph you have in front of you?

A Yes. This is the same photograph that's on the screen here. A9 was taken from this area right here. It was cut out of the front passenger seat.

Q I would like you to look at another envelope, which would be Exhibit 159, and tell and please explain to the jurors what that is and where you collected that?

A This is my item designation A10, and this was a reddish/brown stain that was recovered from a CD case, which was on the front passenger seat, and it's right here.

Q And, now, finally, would you look at Exhibit 160? That will be a envelope? And would you correlate that with the photograph, Exhibit 145, and tell the jurors where you got that from?

A This is my item designation A12, and this was also a

48

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 48 of 255    Document 19-17

reddish/brown stain that was found in this -- uh, on this metal panel here, um, between the backseat and the cargo area of the RAV 4. Uh, it was recovered from this area right here.

Q Now, did you perform DNA testing on each of these swabs and each of these cuttings that you've just described for the jurors?

A Yes, I did.

Q And were you able to develop a DNA profile from each of those items?

A Yes.

Q Now, did you awful -- also have a buccal swab from an individual by the name of Steven Avery?

A Yes, I did.

Q And, once again, what is a buccal swab?

A That is a swabbing of the inside of -- the cells on the inside of your check.

Q And is that referred to as a standard?

A Yes.

Q And why is a standard necessary in DNA testing?

A Because in order to compare an evidence sample, or a question sample, to someone, a person, you need a reference sample. You need to know what a particular person's, um, DNA profile is. So we use a reference standard. We know it comes from a particular person

49

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 49 of 255    Document 19-17

and we can develope a profile from that and compare that to the evidence.

Q And did you develop a DNA profile from the buccal swab of one Steven Avery?

A Yes.

Q And I'm going to show you, on the PowerPoint demonstration, a slide, and ask if your -- does this slide correctly display your findings of your testing of the buccal swab of Steven Avery?

A Yes, it does.

Q Would you explain to the jurors what -- what this slide means?

A Earlier, when I was talking about the STR markers, or genetic markers, and I told you that, uh, the PCR process amplifies or makes a lot of copies of 15 different markers, these series of numbers and letters on this side are actually, um, designations of where those markers are found throughout the DNA. So it -- it tells me a specific location of this marker. Where it's found.

These numbers on this side reflect the size of that target region of DNA that we're amplifying at that particular location. So, in other words, at this location, D-3, Steven -- the sample from Steven Avery had two fragments of

50

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 50 of 255    Document 19-17

DNA, size 16 and size 18. And the entire DNA profile -- This is what we use, these numbers and fragment sizes, that's what we use to actually compare to the evidence sample.

Q    And the example you just gave, where Mr. Avery was a 16, comma, 18 at D-3, are there other possible numbers at that location that one could be?

A    Yes.

Q    Do you know how -- what the range of numbers it could be?

A    Um, at that particular location, I believe it starts at around 11, up to, maybe, in the 20's. So there are numerous fragment sizes at that particular, uh, location.

Q    But here, at that location, Mr. Avery happened to be a 16, comma, 18.

A    Yes. And at each different location, there are many choices, several choices, of fragment sizes at each one of those markers.

Q    Now, did you compare this profile that you obtained from Steven Avery's buccal swab with the DNA profiles that you developed from the blood stains in Teresa Halbach's RAV 4?

A    Yes, I did.

51

Q   And I'm going to put up another slide now and ask, uh, does this slide accurately show your findings?

A   Yes, it does.

Q   Now, in this slide we just did, um, we put up for A10 -- I'm sorry, A8, A10, and A12. And, again, A8 was a blood stain found where?

A   By the ignition.

Q   A10?

A   On the CD, uh, case.

Q   And A12?

A   Was found on the metal panel between the rear seat and the cargo area.

Q   And the DNA profile that you developed from each of those blood stains, please explain to the jurors how that profile compared to Steven Avery?

A   You can see by the numbers that it's -- it's consistent all the way throughout. So at each one of these markers -- Um, the evidence sample was a 16, 18. Steven Avery was a 16, 18.

    At this marker, THO-1, um, the evidence sample was 9.3. Steven Avery was 9.3. So he's con -- These evidence samples are consistent with his profile throughout all the 15 markers.

Q   And is there any way in your testing process you

52

can tell whether it's a male or a female who leaves a, uh, biological substance?

A   Yes, it is.

Q   And how do you do that?  The last marker that we used is referred to as amelogenin.  And it's a gender marker.  Um, if you are a female, you're only going to have an "X" chromosome.  If you are a male, you're going to have an "XY" chromosome.

So you can see that both the evidence sample and Steven Avery both have an XY, so that tells me that's DNA from a male.

Q   Now, you also developed a DNA profile from the other blood stains that you found in the passenger compartment; correct?

A   Yes.

Q   That would be A6, A7, and A9?

A   Yes.

Q   Okay.  And did you develop similar profiles with Steven Avery as you did with A10, 8 and 12?

A   Yes, I did.

Q   Okay.  Do you have an opinion to a reasonable degree of scientific certainty whether Steven Avery was the source of, uh, those blood stains that you found in the passenger compartment of Teresa Halbach's RAV 4?

53

A    Yes, I do.

Q    What is that opinion?

A    Uh, it is my opinion that Steven Avery is the source of the evidence samples that -- as they're illustrated right here.

Q    Now, I'm going to ask Mr. Kratz to bring you up, and -- what has previously been marked as Exhibit 94 -- and, um, this has been described as a -- a swab which was taken from the release lever of the hood latch of Teresa Halbach's RAV 4. And did you receive that as evidence?

A    Yes, I did.

Q    And how can you tell that you received it?

A    Um, again, this is an example of, uh, our be -- our system that -- our computer tracking system. This is a label with the lab number on it, and the item designation is ID. That's our item designation with a bar code that keeps track of that. These are my initials, and when I received it, and, um, a seal across the back with my initials when the evidence was opened.

Q    And did you, um -- When you received that swab of the hood latch, what did you do with that?

A    Uh, in this particular case, um, I did a visual exam of it. Uh, there was no visible staining that was

54

consistent with blood or anything. And so I, uh, took the swab, I cut a portion of the swab, and simply began my extraction for DNA.

Q And did you assign a Crime Lab item designation to that?

A Yes.

Q And what was that item designation?

A ID.

Q And were you able to develop a DNA profile from the swab of the hood latch of Teresa Halbach's RAV 4?

A Yes, I did.

Q And I'm going to ask if the slide that we have put up before the jury, whether this correctly displays your findings for the DNA profile from the hood latch?

A Yes, it does.

Q And, again, briefly just explain it to the jurors what that is?

A Again, these are the -- all the 15 different genetic markers, or STR markers, the locations throughout the DNA, and these are the size of the fragments that were developed from the evidence sample.

So in this case, they were fragments that were developed from Item ID, which was the

55

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 55 of 255    Document 19-17

hood latch.

Q   And did you compare that DNA profile with the DNA profile that you developed from the buccal swab of Steven Avery?

A   Yes, I did.

Q   And does this slide correctly display your results?

A   Yes, it does. And, again, you can see that, um, the profile that was developed from the hood latch is, uh, consistent all the way throughout the markers with Steve Avery's sample.

Q   And do you have an opinion to a reasonable degree of scientific certainty whether Steven Avery is the source of the DNA which was found on the hood latch of Teresa Halbach's RAV 4?

A   Yes, I do.

Q   What is that opinion?

A   Uh, that Steven Avery is the source of the DNA that I developed from the swab of the hood latch.

Q   And I would like you now to see Exhibit 131, which has been previously identified as, um, the Toyota key, which was found in the trailer of Steven Avery. I'm sorry, if Mr. Wiegert could locate that for you. And that has been previously marked as Exhibit 131, and, uh, can

56

you identify that for the jurors?

A    Yes, I can.  Uh, this is a Toyota key, um, that I swabbed and recovered DNA from.  The key was found -- This is a photograph of the key and it was found to fit the Toyota, uh, RAV 4.

Q    And did you, yourself, put that key in the igni -- ignition switch of the RAV 4?

A    Yes, I did.

Q    And what happened when you put it in?

A    Uh, when I put the key in and -- it turned completely over, but the engine, uh, did not actually start.  Uh, but it did turn it over and it opened the doors of the vehicle.

Q    And did you perform DNA testing on, uh, that key?

A    Yes, I did.

Q    And could you explain for the jurors what you did with that key when you first received it?

A    Uh, when I first received it, um, I simply took the key, I did a visual examination.  Uh, there was nothing -- There were no visible stains that I could see.  So I took a swab and I swabbed the edges of the key, this portion of the key, and both sides of the -- of the key.  Um, the swab, itself, after I did that swabbing, was not discolored, so there was no indi -- no visual indication that there was any blood

57

or anything, uh, that I could see on the key. Um, and then I took that swab, and I, um, um did a DNA extraction and developed a profile from that.

Q And I'm going to ask you to inform the jurors whether this slide adequately or correctly displays your findings of your testing of the Toyota key?

A Yes, it does.

Q And the DNA profile that you developed from the Toyota key, did you compare that to the DNA profile of Steven Avery?

A Yes, I did.

Q And does this slide correctly display your findings?

A Yes, it does.

Q And, again, would you just explain to the jurors what this shows?

A Again, this is, uh, the profile from the evidence sample, which is a swabbing of the Toyota key. And it's consistent throughout with the DNA profile developed from, uh, the buccal swab of Steven Avery.

Q Do you have an opinion to a reasonable degree of scientific certainty whether Steven Avery is the source of the DNA that was found on the swabbing of the Toyota key?

58

A    Yes.

Q    And what is that opinion?

A    Um, my opinion is that he is the source of the swabbing -- uh, the DNA from the swabbing of the key.

Q    Ms. Culhane, I would like to now, um, shift back to the processing of the RAV 4, and you found other blood stains in that RAV 4; isn't that correct?

A    Yes.

Q    Did you also look into the rear cargo area of the RAV 4?

A    Yes, I did.

Q    And did you find blood stains there?

A    Yes.

Q    There was also another item that was in the passenger compartment, and that was a Wild Cherry Pepsi can; is that correct?

A    Yes.

Q    And I'd like to go back to, um -- And can you point out for the jurors where you found this Wild Cherry Pepsi can?

A    Yes.  I recovered it from the console area where the opening is to put a can or something.  Um, and there was -- the soda can was right here, and that's where I recovered it from.

59

Q    And I'm going to ask Mr. Kratz to bring you up
Exhibit 161, and ask if you recognize that
exhibit?

A    Yes, I do.  This is the Pepsi can that I recovered
from the RAV 4.  Um, again, it has, uh, our
laboratory, um, item designation and lab number on
it, and my item designation was A14.

Q    And it -- That bag contains the actual Pepsi can?

A    Yes, it does.

Q    And how did you process that Pepsi can?

A    At the time when I found, um, the can, I was, um,
trying to -- I -- I, basically -- There was nothing
visible on the can.  There was no stains or anything
like that.  So I was trying to determine who may have
drank out of the can.  So I swabbed the opening
where -- if you were drinking, where your mouth would
touch, and that's -- that's what was the swabbing and
that's what I processed for DNA.

Q    I'm going to ask Mr. Kratz to hand you some
additional photographs.  I'd like you to take and
look at those first.  Those are Exhibits 146,
147, 4 -- 148, 149, I believe; is that correct?

A    Yes.

Q    Okay.  And, again, are those photographs of areas
of Teresa Halbach's SUV?

60

A    Yes, they are.

Q    And, again, were those taken by Ron Groffy, your photographer at the Crime Lab?

A    Yes.

Q    And I'm also going to ask, um, you to identify a few other exhibits. I'm going to ask Mr. Kratz to hand you four additional envelopes. What I'd like you to do is to look at the first, um, envelope. I believe it is, um, 151?

A    Yes.

Q    And what is that?

A    Um, this is a -- a sample that was recovered by me from the vehicle. Um, and it was my item designation A1.

Q    And would you please look at Exhibit 146? It's a photograph. And, uh, is that photograph being shown on the big screen now?

A    Yes, it is.

Q    And your item designation, A1, can you show the jurors, uh -- First of all, that was a blood stain that you located?

A    Yes.

Q    Show them where you located that blood stain?

A    Okay. This was -- It was a -- a fairly large stain right here in this area up against this wheel well.

61

Q I'm going to, uh, ask you to look, um, at another photograph, which is Exhibit 147? Which is a close-up of that area. And, again, could you just point out to the jurors where you took your DNA sample from?

A Right in here.

Q And, again, would --

A You can see the stain here.

Q And could you just describe for the jurors the size of that stain and how it appeared to you?

A Um, it was a fairly large stain. I don't know the exact measurements, but maybe six inches long or so. Um, and it was a fairly substantial stain, so I only collected a small portion of -- the portion that I would need for my examination.

Q I would now ask you to look at, please, Exhibit 152, and can you describe that for the jurors? What that is?

A This is also a -- a reddish/brown stain that I recovered from the vehicle. Um, it's my item designation A2.

Q And I would like you to correlate that with Exhibit 148, which would be a photograph?

A Yes.

Q And could you show the jurors where it was that

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 62 of 255    Document 19-17

Q you located A2?

A Right here along this plastic, um, threshold here into the -- This is the cargo area of the RAV 4. So right along this plastic piece right here.

Q And did that appear to be blood to you?

A Yes.

Q Did you perform preliminary tests on these stains also?

A Yes.

Q And did they show positive for blood?

A Yes.

Q I would ask that you now look at Exhibit 153, an envelope? And, uh, at least inform the jurors what that is?

A This is also, um, a reddish/brown stain that was recovered by myself from the, uh, cargo area of the RAV 4, and my item designation was A3.

Q And -- and -- and where did you locate that on? On where?

A That was on the, um, door. The actual door that you open of the cargo area. Right here.

Q Would you correlate that with, um, Exhibit 149, the photograph you have?

A Yes. This is the same photograph that's on the screen there and my sample was taken from this area

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 63 of 255    Document 19-17

right here.

Q  And did you perform preliminary blood tests for that?

A  Yes, I did.

Q  And that stain proved positive for blood?

A  Yes.

Q  Now, I'd like to go back to, um, the previous slide, and I'd like to talk about, um, Exhibit 153, now.  I'm sorry.  Would you look at -- If -- Would -- would -- would -- This is Exhibit 148?  Is the photograph; correct?  And I'm looking for -- And Exhibit 154?

A  Yes.

Q  Okay.  And do those correlate?  Can you correlate those for the jury?

A  Yes.  Um, A4 is also a reddish/brown stain that I took from the rear cargo area.  And Exhibit 148 is a photograph, um, and I took it from the metal -- this metal piece right here along the -- the opening, um, in the -- this area.  Approximately this area here.

Q  And did you perform DNA testing on each of these four swabs that you took from the rear cargo area of the RAV 4?

A  Yes, I did.

Q  Now, did you also have a standard DNA sample from

64

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 64 of 255    Document 19-17

Teresa Halbach?

A   Yes, I did.

ATTORNEY GAHN:  Your Honor, I had, uh, spoken with Mr. Fremgen previously, and he has agreed that he will stipulate that in the year 2002, a pap smear was taken from Teresa Halbach at the Bellin Hospital in Green Bay, Wisconsin, and that that pap smear was retrieved by law enforcement officers and taken to the Crime Lab to use as a standard.

THE COURT:  Is that correct?

ATTORNEY FREMGEN:  Yes, Judge.

THE COURT:  All right.

Q   (By Attorney Gahn)  And can you just, uh -- What is a pap smear?

A   A pap smear is a medical test where, uh, cells from the cervical area of a woman are collected and those are used to make, uh, medical diagnostics.

Q   And is it okay to use a pap smear as a standard for DNA testing?

A   Yes.  Any nucleated cell from a particular person can be used as a standard.  We normally use buccal cells because it's easy to collect and convenient.  In this case, that wasn't, uh, available.  So the, uh, pap smear -- the cells from the pap smear were perfectly

65

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 65 of 255    Document 19-17

fine.

Q   And did you develop a DNA profile from the pap smear of Teresa Halbach?

A   Yes, I did.

Q   And I'm going to ask you to look at this slide, and, uh, does this correctly display the DNA profile that you obtained from the pap smear of Teresa Halbach?

A   Yes, it does.

Q   And, again, would you explain a little bit about this to the jurors?

A   Um, again, these are the 15 markers that we're looking at.  You can see this is a little different from the last profiles because this is from a female.  So there's only an X chromosome and not an XY.  And, also, um, the types are quite different.  Some of the types are the same, but if you take the entire profile in its entirety, um, it's quite different from the, uh, profiles that we just looked at.

Q   And did you compare this profile from the pap smear of Teresa Halbach with the DNA profiles that you developed from the rear cargo area?  Namely, the blood stains in A1, A2, A3, A4, as well as the DNA profile from the Pepsi can?

A   Yes.

66

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 66 of 255    Document 19-17

Q   And I'm going to ask you to inform the jurors
whether this slide correctly displays the DNA
profile that you developed from those items?

A   Yes, it does.

Q   And did you compare the DNA profile from the
blood stains in the rear cargo area of Teresa
Halbach's car, and from the Pepsi can, with the
pap smear of Teresa Halbach?

A   Yes, I did.

Q   And I'm going to ask if this slide correctly
displays your findings?

A   Yes.  And, again, you can see that the profile from
the questioned evidence here, and the profile from
Teresa Halbach, is consistent throughout all the 15
markers.

Q   And do you have an opinion to a reasonable degree
of scientific certainty whether Teresa Halbach is
the source of the DNA from those blood stains in
the rear of -- the cargo area of the RAV 4?

A   Yes, I do.

Q   And what is that opinion?

A   Uh, my opinion is that the profiles from the evidence
samples, um, are consistent with Teresa Halbach and
that she is the source of that DNA.

Q   And -- and, also, do you have an opinion whether

67

she's the source of the DNA that you found on your swabbing of the Wild Cherry Pepsi can?

A    Yes, she is.

Q    I'm going to put a -- a slide up now.  Um, and I'm also going to be asking Mr. Kratz to bring you a photograph for you to identify.  And what is the exhibit number on that?

A    One-fifty.

Q    One-fifty?  And can you, um, describe -- What does that photograph show?

A    This is a photograph of a -- a bone fragment with some, um, burned, charred tissue attached to it.

ATTORNEY GAHN:  And, once again, Your Honor, um, I had spoken with Mr. Fremgen earlier, and, um, we do have this as a piece of charred remains that was found in the burn pit.  Um, these charred remains are with the Calumet County Sheriff's Department, and Mr. Fremgen stated that we did not have to produce this item here in court today, and that the photograph would be fine for identification.

THE COURT:  Mr. Fremgen, is that correct?

ATTORNEY FREMGEN:  That's correct.

THE COURT:  All right.

Q    (By Attorney Gahn)  And, again, would you

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 68 of 255    Document 19-17

describe what this item -- Did you receive this item in the Crime Lab? From the Crime Lab?

A  Yes, I did.

Q  And what was it that you received? Please describe what this is?

A  Um, this is a -- a bone fragment here with a piece of, um, charred tissue attached to it. When I sampled this, I took a portion of -- of the tissue that was, uh, least -- appeared to be least burned, uh, towards the bone and that's what I used for my examination.

Q  And did you assign a Crime Lab item designation to this?

A  Yes, I did.

Q  And what was that?

A  Item BZ.

Q  And did you conduct DNA testing on this tissue portion of this burned bone fragment?

A  Yes, I did.

Q  And were you able to develop a DNA profile from this piece of charred remains?

A  Yes, I was.

Q  And I'm going to put a slide up and ask you to explain, uh -- Firstly, does this accurately display the findings of your DNA testing on these

69

charred remains?

A   Yes, it does.

Q   And would you explain to the jury what your findings were for the charred remains?

A   Um, you can see that I tested for each of the 15 markers that I've been talking about. But I did not get results, um, from all 15. The markers with numbers by them are the ones that I got results for. So there were seven markers that I actually got a type from. Um, and, again, I got a -- a gender marker telling me that it was from a female.

Q   And is this what the scientists refer to as a partial profile?

A   Yes.

Q   Is it unusual to get a partial profile from a sample such as this?

A   No, it's not.

Q   Explain to the jurors why?

A   Uh, this sample was -- obviously been compromised and, um, exposed to heat. Uh, there are a lot of things that will, uh, work to break down or degrade DNA, and heat is one of them. Um, and, basically, what it does is just chews up the DNA.

So on the markers that have larger fragments, uh, you're not going to get any

70

results in most cases. These are -- The D5, D13, D7, D3, those are all smaller markers, so the fragments are smaller, and so you have a better chance of getting, uh, results from those particular markers.

Q Now, the prior charts that we looked at, where you showed the profile of Teresa Halbach and the DNA profiles you developed from the blood in the rear cargo area of the RAV 4, those are what you would call complete or full profiles; correct?

A Yes.

Q And this, here, is what's called a partial profile?

A That's correct.

Q Now, for the complete profiles, I asked you a question whether Teresa Halbach was the source of, um, the blood in the rear cargo area of the RAV 4; correct?

A Correct.

Q And you were able to state, yes, Teresa Halbach was the source?

A Correct.

Q Can you say that Teresa Halbach is the source of this, uh, DNA profile that you found?

A No.

71

Q    Now, you did compare it to Teresa Halbach's pap smear; correct?

A    Yes, I did.

Q    And does this show your results?

A    Yes.  And, again, all of the markers that I did get results for are -- are consistent with the types of Teresa.

Q    Now, why can't you state that Teresa is the source of this profile?

A    When we -- Anytime we develop a DNA profile, we do a statistic analysis.  And the purpose of that is for us to det -- determine how common or how rare the entire profile is in the general population.  So we have statistic numbers that reflect how common or how rare each one of these types is, each -- at each one of these markers is, within the population.

In order to get a -- a composite number that reflects the entire profile, we multiply these numbers together and that tells us how common or how rare the entire profile is in the population.

As a matter of laboratory policy, anything -- any profile that is rarer than three times the world's population, which would be six trillion, we, um, refer to that as a source

72

attribution, so we're able to say, any profile that's rarer than that is consistent, and that person is the source of that profile.

Now, because this was a partial profile, the numbers are not that high. Um, and that's why I could not attribute it to Teresa.

Q  And this is a laboratory policy based upon world population?

A  Correct.

Q  Okay. However, were you able to, uh, generate a statistic to tell how rare or how common this profile would be in the general population?

A  Yes, I was.

Q  And what is that statistic?

A  Um, one person in one billion in the Caucasian population. One person in two billion in the African American population, and, also, in the Southeastern Hispanic population. And one person in three billion in the Southwestern Hispanic population.

Q  And what does that statistic mean? What does this mean?

A  Uh, when we -- When we calculate these statistics, we use a database of individuals that's maintained by the FBI, and it's the same database that's used in most crime labs throughout the country. And each one

73

of those DNA types is assigned a specific frequency. It tells you how -- how often that occurs in the population.

So, in the first one, one person in one billion, I would expect to find that partial profile from the evidence sample. I would expect to find that if -- one time in one billion instances in the Caucasian population.

Q So it's a very rare statistic; correct?

A Correct.

Q Are there more than a billion people in the state of Wisconsin.

A I don't think so.

Q In any event, Teresa -- the charred remains that were found in the burn pit, um, those, uh, matched Teresa Halbach at a -- a number of genetic locations?

A Yes.

Q I believe there were seven genetic locations?

A Correct.

Q And that was a complete match; correct?

A Correct.

Q And I'm going to ask you now to look at one more exhibit -- uh, two more exhibits -- and that would be, um, Exhibit -- what has previously been

74

marked as Exhibit 113, and described as a bullet fragment that was found in the garage of Steven Avery. And can you identify that exhibit for us, please?

A   Yes. Uh, this is a bull -- bullet fragment that I examined. Um, it's my item designation FL.

Q   And when you received that bullet fragment, how did you process that?

A   This was a very small bullet fragment. Um, I was interested in -- in trying to determine if I could, uh, find any DNA on the bullet fragment. I visually looked at it. There were no visual stains like blood or anything that I could see.

So I took the bullet fragment, itself, put it into a test tube, and washed the surface of it with, um, the reagents that we use to extract DNA. So, basically, I was trying to wash off all the DNA that was actually on the surface of the bullet fragment. And I took that washing, and that's what I did -- uh, that's what I processed for DNA.

Q   And were you able to develop a DNA profile from that washing?

A   Yes.

Q   And does this slide correctly display the DNA

75

profile that you developed from Item FL, the bullet, which was found in Steven Avery's garage?

A    Yes, it does.

Q    And did you compare that DNA profile to the profile of Teresa Halbach that you developed from her pap smear?

A    Yes, I did.

Q    And does this slide adequately or correctly display your findings?

A    Yes, it does.

Q    And, um, do you have an opinion to a reasonable degree of scientific certainty whether Teresa Halbach is the source of the DNA that was found on the bullet, Item FL?

A    Yes, I do.

Q    And what is that opinion?

A    That the profile from the bullet fragment, FL, was consistent with Teresa and, um, she is the source of the DNA that was recovered from the bullet fragment.

ATTORNEY GAHN:  At this time I would like to move into evidence Exhibits 141 through 161?  Is that correct?  I believe?

THE COURT:  Yes.  Her CV is in -- Her CV is in at -- at 164.

ATTORNEY GAHN:  And -- and Exhibit 164,

76

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 76 of 255    Document 19-17

yes.

THE COURT: Counsel, any objections?

ATTORNEY FREMGEN: No.

THE COURT: All right. Those exhibits are received.

ATTORNEY GAHN: I have no further questions.

THE COURT: Uh, let's take a break. We'll take a 15-minute break at this time, ladies and gentlemen. We'll be back in 15 minutes.

(Recess had at 10:33 a.m.)

(Reconvened at 11:01 a.m.)

THE COURT: Mr. Fremgen, cross?

ATTORNEY FREMGEN: Thank you, Judge.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q     Ms. Culhane, I'm not going to ask you anything about your qualifications. I think they seem to be fine. Seems that you have significant experience in DNA matching, as well as, uh, developing profiles. Fair to state?

A     Um-hm. Yes.

Q     Now, in this case, you also had to prepare a profile of Brendan Dassey's DNA; correct?

A     Correct.

77

Q And suffice it to say, same procedure you went through with Attorney Gahn and how you, uh, developed Steven Avery's profile, as well as, to some extent, Teresa Halbach's profile, the same procedure you followed with Brendan Dassey?

A Correct.

Q And other members of the family as well; correct?

A Yes.

Q You had a number of profiles to develop?

A Yes.

Q When you spoke about matching with potential biological evidence, again, we're talking about sweat, for instance?

A Yes.

Q Possibly?

A Correct.

Q Saliva?

A Yes.

Q Um, semen?

A Correct.

Q And, obviously, blood?

A Yes.

Q And, at times, you mentioned there was no blood, yet able to develop a DNA profile, and that's from some other form of -- as you put it, some

78

other form of biological transfer from the person? A cell transfer, I think, you referred to it as?

A Yes. Anytime, uh -- It would have been from some type of nucleated cell that was present on that item of evidence.

Q Now, obviously, the same, uh, procedures were used, then, when you developed profile on, for instance, a swab that you took from the RAV 4 to match with a known person?

A Correct.

Q Do you recall seeing this item before?

A Yes, I do.

Q And -- and I believe that would be -- Was it your designation DD?

A Yes.

Q And I believe it's Exhibit -- The exhibit number is on there?

A One twenty-nine.

Q Okay. Did you have an opportunity to not just determine whether or not you could obtain a DNA or some sort of -- of profile from some source, you actually swabbed it yourself? The gun?

A Yes, I did.

Q Did you swab the trigger?

79

A  Yes, I swabbed the -- the trigger area and the trigger guard here, and, also, the area around the barrel. The end of the barrel.

Q  Now, specifically, as to the end of the barrel, were you looking, also, for blood on the end of the barrel?

A  Yes.

Q  Did you find any blood on the end of the barrel?

A  No.

Q  And you did that from first visually observing the end of the barrel?

A  Yes.

Q  And then did you do a -- a swab to determine if, possibly, it would react to something that would be positive for blood?

A  Yes, I did.

Q  And that was negative.

A  Negative. Yes.

Q  But that doesn't end your examination; correct?

A  Correct.

Q  You also did a separate swab to determine if, possibly, there's some other sort of fluid on the end of the barrel that might create a profile? DNA profile?

A  Correct.

80

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 80 of 255    Document 19-17

Q    And so you did the same thing?

A    Yes.  I swabbed the barrel area and also this trigger guard.

Q    And unable to develop any sort of DNA from that firearm?

A    No, I did not develop a profile.

Q    Okay.  And, specifically, did you provide it -- any profile that matches Brendan Dassey; correct?

A    Well, I didn't develop a profile at all.

Q    At all?

A    Yeah.

Q    I'm going to have Attorney Edelstein put up on the screen, using an ELMO, it's, uh, Exhibit No. 45.  Can you see that from -- Oh, you have it on that screen, too.  Okay.  So you can see Exhibit 45 on the screen?

A    Yes.

Q    And, again, does that -- that appears to be a license plate; correct?

A    Correct.

Q    Do you recognize that license plate as something that you looked at at the Crime Lab?

A    Yes.

Q    And, again, did you attempt to devel -- develop some sort of a DNA profile, from something that

81

might be biological, transferred onto this plate?

A    Yes.  When I was examining this plate -- This is the same license number that I have in my notes.  Um, I was primarily looking -- There was no visible stains that were consistent with blood or anything like that.  So I was primarily looking for DNA that might have been transferred when someone touched it.

So I, uh -- For my sample, I swabbed around the, um, edge -- excuse me -- uh, the edges, um, of the item, and -- with a cotton swab -- and that's what I extracted.

Q    And you were unable to develop any profile; correct?

A    Correct.

Q    I'm now going to have Attorney Edelstein put on the screen for us Exhibit 107.

ATTORNEY FREMGEN:  Is there a way to put it in more focus or closer up?  Ray's the technologically, uh, limited.  There you go.  Okay.

Q    (By Attorney Fremgen)  Do you see what -- Well, do -- You -- you see the picture, obviously, on the screen?

A    Yes.

Q    In that picture, there's something that says

82

Black Jack?

A    Correct.

Q    Have you seen that before?

A    Yes.

Q    And referred to as a creeper?

A    Yes.

Q    Correct?  Okay.  And you actually had an opportunity to -- to attempt to extract some sort of, again, biolog -- determine whether there was any biological, uh, fluid or something on this creeper that you might be able to develop a DNA profile; correct?

A    Uh, in this instance -- On this item of evidence, I was simply looking for the presence of blood, apparent blood stains.  And I examined it, and, um, it was negative.

Q    And when you do that, again, you first did a visual examination?

A    Yes.

Q    And then after that, since we're -- our eyes aren't always perfect, you, again, took a swab of -- of somewhere on the creeper, and used a -- a chemical to determine the existence, if possible, of blood; correct?

A    Yes.

83

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 83 of 255    Document 19-17

Q Did you swab in just one spot or did you try to --

A I'll have to look at my notes to see exactly.

Q That's fine.

A Okay. Yes. In my notes, there were numerous brownish stains, um, that were on different areas on the creeper, and I, um, uh, checked them all for the presumptive test for blood, and they were all negative.

Q In your -- in your notes, or in -- in your report, you indicate two, uh, identification numbers for the creeper? A GG and GH?

A Correct.

Q Was it two separate pieces?

A Yes. It's two different creepers.

Q Two different creepers?

A Yes.

Q So on both, the -- neither one noted the existence of any blood?

A Correct.

Q Now, I'm going to have Attorney Edelstein place on the ELMO, this is exhibit -- This is photograph, I believe it's Exhibit No. 82. State's Exhibit 82. Do you recall examining a wooden headboard at the Crime Lab?

84

A    Yes.

Q    Does it appear to be the wooden headboard on this picture, Exhibit No. 82?

A    Yes, it does.

Q    And -- And it wasn't just the headboard you examined; correct?

A    Um, I examined -- Some swabs were taken by someone else, and those were submitted. I examined those, and then I, in addition to that, examined the headboard.

Q    Did you actually, again, start with determination of whether there was blood on the headboard?

A    Yes. I did a visual examination to see if any stains, uh, were consistent with the appearance of blood, and then -- there were different types of various stains, um, which I checked with the presumptive test, and they were all negative.

Q    So no blood on the headboard?

A    Correct.

Q    And on the swabs of the headboard, or spindles, that you -- that someone else had, uh, taken, but you tested?

A    Right.

Q    No blood?

A    Correct.

85

Q    Were you able to develop any sort of DNA -- DNA profile from the headboard or those swabs?

A    Uh, no.  I -- Um, the headboard, itself, I didn't actually take any swabs myself, because there was nothing that looked like blood.  Um, the swabs from the headboard I will have to check and see if I actually extracted those.  No.  Those were not extracted.  They were all negative, um, for any blood.  So I didn't go any further with them.

Q    Now, is there a reason why you didn't want to determine if there was any sort of biological fluid that might provide you with a profile?  A DNA profile?

A    Well, at this point I was -- I was simply focusing on the blood.  Possibility of any blood.  So, no, I did not.  I made the decision not to go any further with that.

Q    But on other items, you went beyond determination of blood to determine if there was some sort of other biological sample that might be able to provide you with a DNA profile; correct?

A    Correct.  And in most of those cases it was items that were thought to have been touched by someone, um, and, again, in this -- in this particular item of evidence, uh, we were focusing on the presence or

86

absence of blood.

Q  Did you, yourself, do the swabs of the RAV 4?

A  Yes.

Q  And that would be interior and exterior?

A  Yes.  All the swabs except -- Did you mean -- Do you mean did I collect them?

Q  Yes.

A  Yes.  I collected all the swabs that I examined from the RAV 4, except for the hood latch, um, which was collected -- swabbed by someone else, and there were also some swabs from a battery cable and some interior door handles that were collected by someone else.

Q  But regardless of who collected it, you did the testing on it?

A  Oh, yes.  Yes, I did.

Q  Okay.  Now, when you actually collected -- Let me start there first.  Did you collect, um, a swab from obvious places that a person might use to open up the vehicle?  Like, for instance, a door handle?

A  Again, I -- I didn't swab those areas.  So someone else swabbed those areas.  But I'm assuming that's what they did, is take them from obvious areas where someone would have touched.

87

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 87 of 255    Document 19-17

Q Did each swab indicate where they came from on the vehicle?

A Yes.

Q And do you recall whether there were swabs of the cargo door handle?

A The back. The very back. There was a -- I did take a swab of, um -- and I believe it was my Item A23, because, um, I did -- analyst was processing that area, and saw something, and I did swab that area, and I did extract it.

Q Okay. You -- You did extract a sample?

A Yes.

Q And that was human or nonhuman blood?

A It was positive, uh, for blood, because the presumptive test was positive, but it was inconclusive because I didn't -- the profile was too partial. I could not, uh, make any kind of conclusion. So that was inconclusive.

Q So you were unable, then, to then go further and determine if that had any sort of a DNA profile, whether it be a partial profile or a full pro -- profile?

A I did get a partial profile, but it was inconclusive because, uh, sometimes -- if a partial profile only shows up one or two, uh, types, then we usually

88

report that as inconclusive, because that's not really enough genetic information, um, to report that. So, in this case, um, it was inconclusive.

Q So on direct, for example, you had been asked by Attorney Gahn, about partial profiling --

A Yes.

Q -- or a partial profile. Excuse me.

A Yes.

Q And, uh, for instance, I believe it was one where there were seven characteristics --

A Yes.

Q -- of 15; is that right?

A Yes.

Q And you were able to come up with a partial profile, but here you're saying it was probably more like three characteristics?

A Yes. Right.

Q So because it was so little, you weren't able to come up with something that you can even give a partial profile to?

A Correct.

Q Okay. Now -- And -- and -- and the items that you were able to obtain a DNA profile within the RAV 4, were you able to match any of that DNA profile in comparison to Brendan Dassey's

89

profile?

A No. None of the samples that I, uh, were able to develop a profile were consistent with his profile.

Q But they were consistent with Steven Avery?

A And Teresa Halbach.

Q And Teresa Halbach?

A Yes.

Q So you were able to match it with somebody?

A Correct.

Q Just not Brendan Dassey?

A That's correct.

Q I believe you also looked at a jacket and a pair of jeans; correct?

A Yes, I did.

Q I believe that was your designation IJ and IK?

A That's correct.

Q Did it indicate who those jeans were from?

A Yes. I was told they were -- they belonged to Brendan Dassey.

Q And were you able to determine whether there was any blood on those jeans?

A Yes. They were both negative for blood.

Q And the jacket as well?

A Yes.

Q And, again, did you go any further than to

90

determine any blood and determine some sort of other DNA that might be, uh, available from the jeans or the jacket?

A    No.

Q    Just the blood?

A    Correct.

Q    Now, did -- Again, was that your decision?  Or did someone else tell you, we're just looking for blood?

A    Well, in --in -- It depends on the type of case.  In most cases, if we're looking for something like blood, then we focus on blood.  Um, a lot of times there are lots of different types of stains on clothing or bedding or whatever, um, and some of those biological materials we have presumptive tests for and some we don't.  We don't test every stain that we encounter.  Um, and in this case, like I said, I was focused on whether there was blood there or not.  And it was negative.

Q    So no blood on Brendan's jeans?

A    Correct.

Q    Or on his jacket?

A    Correct.

Q    Speaking of bedding, did you have an opportunity to review any bedding that was provided to you by

91

law enforcement or other members of the Crime Lab?

A   No.

Q   Were you aware that bedding had been seized?

A   I don't believe so.

Q   So no one told you about the bedding?

A   I don't recall, no.

Q   And if there was any possible biological samples from the bedding, we won't know about it; right? Unless you get to look at it to determine if there's an extractable sample?

A   Correct.

Q   Were you provided with any shell casings to determine any sort of, uh -- whether there was any sort of biological sample that you could provide a -- or develop a profile?

A   No, I did not look at the shell casings.  That's -- No, I did not.

Q   Now, you said you didn't look at the shell casings?  You were aware there were shell casings?

A   I believe there was some submitted, but they wouldn't have come to me, so I don't really have any knowledge of them.

Q   So, again, if they don't give them to you, you

92

can't --

A   Correct.

Q   -- tell us if there's any sort of DNA that you can extract from those shell casings; is that correct?

A   That's correct.

Q   Did you have an opportunity to look at a large car hood?  I think it's referred to as a Rambler hood?

A   No.

Q   Any cardboard boxes provided to you to determine whether there might be some blood or extractable DNA?

A   No.

Q   Were you aware of any?

A   No.  I don't recall.

Q   Okay.  I believe you may have already testified as to Exhibit 211.  Do you recall this item?

A   Yes.

Q   The key.  Uh, you had an opportunity, as you testified, to develop a DNA profile from, uh -- from two sub -- on -- on two subjects from the key; correct?

A   Um, I'm sorry.  Could you repeat that?

Q   Sure.  That was kind of confusing.  You had an

93

opportunity to review the key; correct?

A   Yes.

Q   And from that key you were able to, um, obtain some trace biological sample?

A   Yes.

Q   And from that you were able to develop a DNA profile?

A   Correct.

Q   And I believe your testimony was that it reflected that of Steven Avery?

A   Yes.

Q   Was there also a mix, including that of Teresa Halbach, on the key?

A   No.

Q   Just Steven Avery?

A   Correct.

Q   Was Brendan Dassey's DNA on that key?

A   No.

Q   Was there any blood on the key?

A   Uh, there was no visually, uh -- anything that looked like blood.  Uh, the swabbings that I took from the key were also -- there was nothing consistent with the appearance of blood.  I did not do any preliminary testing for blood on that.

Q   Okay.  And if I may just ask, why not?

94

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 94 of 255   Document 19-17

A Well, because in a sample like this, when something is that small, I really, um -- the important part in most cases is whose DNA is there. And so I made the decision that I was probably working with a limited amount of sample, and I wasn't going to, uh, waste any of that on a preliminary result that really didn't give us very much information.

Q I'm going to show you what's been marked as Exhibit 92. And do you recognize this exhibit?

A Yes.

Q And that, I believe, has your identification number CJ2?

A Correct.

Q And that's a pair of leg irons you were asked to test to see if you could find any extractable DNA?

A Correct.

Q And were you able to do so?

A Yes.

Q And whose DNA were you able to extract from that?

A Uh, when I sampled this, I swabbed the inside surface, um, of the round part, and it was a mixture of DNA from more than one individual.

Q Were you able to make any match with any of the -- the known samples you had before you?

95

A    Um, Steven Avery, based on his, uh, standard sample, he could be included in, uh, that mixture of DNA.

Q    And Teresa Halbach was excluded?

A    Correct.

Q    As well as Brendan Dassey?

A    Yes.

Q    So he was, specifically, excluded from that?

A    Correct.

Q    And, again, I'm going to show you what's been marked as Exhibit 9 -- 91.  Thank you.

A    Um-hm.

Q    And I believe that has -- Well, first of all, do you recognize that item?

A    Yes, I do.

Q    And that has identification number CJ1 on it?

A    Yes.

Q    And that's your identification number from the Crime Lab?

A    Yes.

Q    And you had an opportunity, again, to determine -- or to swab that and determine if there was any sort of extractable DNA?

A    That's correct.  I swabbed the inside surface just like I did with the other cuffs, um, and I got a mixture of DNA from more than one individual.

96

Q    Did you have the same conclusions with CJ1 that you had with CJ2?

A    Yes.

Q    And that would be, you could include Steven Avery as possible match to the DNA?

A    Yes.

Q    And exclude Brendan Dassey?

A    Correct.

Q    And Teresa Halbach was also not -- or -- not included in that?

A    She was also excluded.

Q    Excluded?

A    Correct.

Q    Did you review any other -- Excuse me.  Did you review any other leg irons such as these?

A    No.

Q    Any other handcuffs?

A    No.

Q    Just those two sets?

A    Correct.

Q    So if there were any biological samples on these, we wouldn't know, because you didn't have a chance to look at them and test them; correct?

A    Correct.

Q    Were you able to -- or -- I'm sorry.  Were you

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 97 of 255    Document 19-17

asked to obtain any DNA profile from any hair samples?

A No.

Q Would it have been your duties at the Crime Lab, if, for say, a vacuum were seized, to go through it and try to determine if there were any usable hair samples?

A Uh, yes. In -- in a hair sample, really, the only thing that you're looking at is going to be the root portion of a hair. So I would, uh -- To see if hairs were suitable for DNA, they would have to contain a root portion.

Q Would someone else first go through it to determine if that's possible before they send it to you?

A No, I would do that.

Q Okay. And you don't recall, at anytime in this investigation, they asked you to go through any -- excuse me -- hair samples that might come from, say, for instance, a vacuum?

A No.

Q You had testified previously that you had reviewed a -- a -- a bullet fragment? I believe it was your identification FL?

A Correct.

98

Q   There was also a second bullet -- bullet fragment; correct?

A   Yes.

Q   And you also had an opportunity to review that?

A   Yes.

Q   And that was, I believe, your designation FK?

A   Yes.

Q   Were you able to make any determination of whether -- Well, first of all, were you able to determine if there was blood on FK?

A   Um, again, I treated that exactly like I did FL. There was no visual, uh, indication of blood, so I did not, um, do any preliminary test on anything. Um, I simply washed that fragment -- bullet fragment, as well, and treated it just like FL.

Q   And were you able to extract some -- any sort of a DNA sample for purposes com -- of a comparison?

A   No, I was not able to develop a profile.

Q   Now, you weren't the actual technician, or the crime, uh, scene person, who was at the Steven Avery trailer swabbing potential stains, etc.; correct?

A   That's correct.  Excuse me.

Q   Did you observe photographs while -- of items that had been -- photographs of the trailer or

99

items that they suspected might be, um, blood or some other sort of biological sample?

A No, I don't believe so.

Q So when you would get a swab, for instance, it would just say where it came from?

A Yes.

Q And you recall that there had been some swabs of stains of suspected blood from Steven Avery's -- Avery's bathroom floor, vanity, and sink?

A Yes.

Q And you had an opportunity to test all those stains; correct?

A Yes.

Q And you were able to -- Well -- well, first of all, it was -- Was it positive for blood?

A Um, I tested, um, several different swabs from those areas. I tested, um, three from the vanity, one from a toilet seat, and one from a sink. Um, one of those swabs from the vanity was positive for blood, and one from the sink was positive for blood.

Q And you were able, then, to -- to develop a DNA profile of that blood sample? Or that --

A Yes. Yes.

Q Which one?

A Both of those samples, um -- Oh, I'm sorry. One of

100

those samples from the sink was consistent with Steven Avery. The other, I did not develop a profile.

Q Okay. None were consistent with Teresa Halbach?

A Correct.

Q And none were consistent with Brendan Dassey?

A That's correct.

Q Do you recall, again, having the opportunity to test a swab of what appeared to be, or may have been labeled as, a suspected blood found -- suspected blood found by the molding of the bathroom or bedroom door?

A Yes.

Q And, again, you followed the same procedure you just explained?

A Yes.

Q Were you able to test it positive for blood?

A That's correct.

Q And, again, were you able to develop a profile as to the DNA of that blood?

A Yes.

Q And that DNA was?

A Consistent with Steven Avery.

Q And, again, excluding Teresa Halbach?

A Yes.

101

Q    And excluding Brendan Dassey?

A    Yes.

Q    Some items were sent to the Crime Lab?  Number of knives.  Were you able to, um -- Did you see those knives?

A    Yes.  Excuse me.  Yes.

Q    And -- and, again, did you go through the same process to make a visual ob -- observation to determine if there was any blood on the knives?

A    Yes.

Q    Um, did you also do the same testing you explained earlier about determining if there was positive for -- for blood by using a -- a -- a swab?

A    On some of the knives, yes.  I did -- uh, if there was nothing visual to look at, no visual-type stain, then I just did random swabbings, um, on the blade portion to test for blood.

Q    Did you, also, then, test, thereafter, to determine if there was anything that you could extract from it that would develop into a DNA profile?

A    No.

Q    And why wouldn't -- Why didn't you decide to go that far?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 102 of 255    Document 19-17

A   Well, because, again, um, in a lot of the -- a lot of cases, especially with a case of this magnitude, we have to make decisions along the way. Um, what samples to take forward and what -- and when to, um, stop. And in this case, I was focused on if it was blood. It was not, so I chose to stop there.

Q   At anytime do you recall independently, or if you need to review your notes, any item that was positive for some sort of a extractable fluid, such as blood, sweat, saliva, that in -- under comparison, matched with Brendan Dassey?

A   No.

Q   The answer is, there weren't any?

A   No. There were -- Of all of the samples that I extracted evidence samples and developed a profile were -- from, none were consistent with Brendan Dassey.

Q   Thank you.

ATTORNEY FREMGEN:  Nothing else.

THE COURT:  Any redirect?

ATTORNEY GAHN:  Yes, Your Honor. Few --

THE COURT:  Go ahead.

ATTORNEY GAHN:  -- questions.

**REDIRECT EXAMINATION**

BY ATTORNEY GAHN:

103

Q  Ms. Culhane, do you know how many total items of evidence, approximately, the Madison Crime Lab received in this case from law enforcement?

A  I believe there was a -- about 350 submissions.

Q  And that was just in this one case?

A  Correct.

Q  Is that the largest number of submissions that Crime Lab has ever received?

A  I believe so.  Yes.

Q  And how many of those submissions -- Do you know how many of them came to your unit?  The DNA unit?

A  About 180.

Q  So law enforcement submitted about 180 samples for potential DNA testing?

A  Yes.

Q  Did you examine in some form or another all of those submissions?

A  Yes.

Q  Would you explain to the jury, what is the range of tests or examinations you do for an item of evidence?

A  Well, again, a lot depends on the type of case it is and the request that -- that may be made.

       Um, in a lot of these particular items

104

of evidence, I was looking for a transfer of blood. Okay? Blood was found in the RAV 4. Um, this was a homicide case. So, obviously, blood would be a potential -- a very important potential biological material. So I was focusing on the presence or absence of blood in most of these, um, pieces of evidence.

However, in some cases, it was more -- the information or the question we were trying to answer was more, who touched this item or who may have touched this item? Um, and in those instances, blood wasn't necessarily the -- the primary focus. The primary focus was, was there DNA on that -- that evidence and who may it have belonged to.

So those kind of decisions are made routinely by all analysts as you go through the evidence, based on what the piece of evidence is, what type of case it is, and what information you may have at the time.

And, of course, during the course of the -- the investigation, a request can be made from anyone to go back and look at other items of evidence or, um, examine for different biological fluids, or whatever. At some point a request can

105

Q   Of those 180 samples that were submitted to the DNA analysis unit, do you know about how many tested positive for blood?

A   Forty-one.

Q   And did I ask you, this 180 that were submitted to you, is that the largest amount of submissions for one case that your unit has ever received?

A   It's the most I've ever received.  I'm -- I'm not sure about the unit.

Q   But you said that 41 tested positive for blood?

A   Correct.

Q   And then did you carry each of those on for DNA testing further?

A   I attempted, uh, some type of further testing on them.  In some cases, the -- even though the test may indicate there's -- You know, if -- if the preliminary test may be positive for blood, when we finally extract it, part of our procedure in the extraction is to quantitate or to find out how much DNA you actually have in your samples.

       And in some of these samples, the level of DNA, or the amount of DNA there, was below the limits of detection for our system.  In other words, there wasn't enough there to go any

Q And even if there -- Let's say there -- your system can say, well, there is enough to go forward, and you do go forward with other steps of the tests, are there other limitations that you still may not develop a profile?

A In some cases, it may depend on the sample. If there's, uh, degradation, if there is, um, uh -- You may have -- Your quantitation part of the -- part of the procedure may tell you you have enough DNA, but when you actually amplify or you try to make copies of those, uh, target portions of DNA, um, you may -- just may not develop a profile. And in that case, um, because of the condition of the sample, or whatever, there's just no profile there to be developed.

Q So as opposed to what we may see on *CSI*, and *Law and Order*, and other shows, there are detection limits built into the system, itself. Is that fair to say?

A Yes, there are.

Q And I want to talk a little bit about the different samples that have come up now. You found complete DNA profiles from blood swabbings in the car; correct?

107

A     Yes.

Q     You found Steven Avery's from blood?

A     Correct.

Q     You found Teresa Halbach's from considerable blood stains in the rear cargo area; correct?

A     Yes.

Q     And you could carry the system through to get a complete, full DNA profile?

A     Yes.

Q     Now, we talked a little bit, or I think defense counsel has asked about, um, what's referred to as touch DNA?

A     Yes.

Q     Understand what I'm talking about? Or what we're talking about when you --

A     Yes.

Q     -- say touch DNA?

A     Yes.

Q     Could you talk about the limitations or the sensitivity of the system, and the differences between having a blood standard and what you think may be touch DNA? Could you explain that to them?

A     Most of the time when you have a blood sample, you have a -- a -- a large, large amount of DNA to work

108

with.  Our systems are very sensitive, um, and we get -- we can get very good results on most samples. However, uh, there is a limitation to the system.

When you're talking about a blood sample, you're talking about a lot of cells, in most cases, are present in that -- in that sample.  If you have enough blood to see a reddish/brown stain, you've got a lot of cells.

When you're talking about a touched item, you're not necessarily, um, targeting a specific stain.  If I were to touch this, um, all I can do is swab the area that I touched, and what I'm looking for is a transfer of epithelial or skin cells that may have been transferred from my hand to the item.

Um, so it's not quite the same thing as actually looking at a -- at a blood or a semen stain where there's plenty -- in most cases, plenty of DNA, um, to sample.  When you're looking at a touched item, you're looking at very small amounts of DNA.

And, also, if you're looking at a touched item that, um, is an item that could have been touched by more than one individual, in some cases you're going to get mixtures of DNA.  Some

109

cases you won't. Some cases you're going to get DNA from the last person who touched it.

A lot of that depends on the person, themselves. Most of us, when we touch items of evidence, we leave, um, some of our DNA behind. but some people leave more than others. Some people naturally shed more cells than others. So if you're a person who sheds a lot of cells, when you touch something, you are probably going to leave behind more DNA than someone who does not naturally shed that many cells.

So when we're looking at touched items, all of these variables and all these factors come into play, and all of this determines whether you're going to get a usable profile from a sample or not.

Q And when you talk about someone being a good shedder or a poor shedder, does the surface that's touched have any impact on whether you'll find a -- sufficient DNA to develop a profile?

A Yes. If you're touching something rough, uh, like a piece of wood, maybe, or, um, I don't know, a rough surface, you're probably going to leave more cells than if you're touching a smooth surface, probably. And, again, these are generalizations. These are not

110

rules, and these are not always exactly the same.

Um, smooth surfaces, sometimes there's not as much, uh, DNA left behind, but, again, that's not to say that you can't get a profile from a smooth surface. They're just generalizations.

Q An example would be -- And I believe Mr. Fremgen handed you the .22 caliber rifle; correct?

A Yes.

Q And you swabbed the barrel? Well, you looked for blood and did not find any; correct?

A Yes.

Q And then you swabbed the trigger guard?

A Yes.

Q But, according to your notes, as I recall them, you developed some DNA; correct? Some DNA markers?

A I -- Yes. I developed one marker.

Q And I think you referred to it as res -- uh, finding some trace DNA being present?

A Correct.

Q So, if there, is it a limitation of the system to develop the full profile? Or could it be that whoever touched it just did not leave enough or the surface wasn't sufficient to gather enough?

111

A It's probably a combination of all three. I --
There's no way to tell exactly why. Um, the bottom
line is the person who touched it may not have shed
enough DNA, um, the DNA, itself, may be degraded, not
of -- of good enough quality to get a full profile.
So it's probably a combination of all those factors.

Q And that would be the same for license plates?
The same factors would, uh, determine whether DNA
was left on license plates if they were touched
by someone?

A Yes, that's correct.

Q And that, of course, is also going to be assuming
someone's not wearing gloves, or using something
to put in between the item and their hands, or
whatever?

A Right. I'm -- I'm making the assumption that you're
actually touching it with your skin. Your bare skin.

Q And, um, Mr. Fremgen asked about the key. And
you found Steven Avery's profile on that key;
correct?

A Yes.

Q Have there been any studies done, or any
literature that talks about this, um, somewhat --
I think you stated that you generally will find
the profile of the last person who touched it; is

112

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 112 of 255    Document 19-17

that correct?  Did you state that?

A  Yes.

Q  Could you explain that to the jurors more?

A  Well, again, there have been studies done about, uh, transfer and -- and how much -- how much you have to handle something, um, what -- what factors are involved in transferring DNA by touched items.  And, again, these are not -- these are generalizations.

And in a lot of cases it has been found that transfer of DNA happens instantaneously, um, and it's usually either the last person that touched the item or you're going to get a mixture of DNA.  And, again, this is simply a generalization.  Um, you may get mixtures of DNA from several different people who have touched it, or you may just get a single source DNA.

Q  And I believe, also, Mr. Fremgen asked you whether there was any blood on the pants of Brendan Dassey that were submitted.  Do you remember that?

A  Yes.

Q  And I believe your -- And what -- what was your answer to that question?

A  There was no blood found.

Q  Um, do you recall what you put in your notes when

113

you examined the pants of Brendan Dassey?

A   Uh, yes, I can refer to those notes.  Um, in my notes I describe the size, um, what brand they were.  Um, my notes read that they're fairly clean.  Large areas of whitish stain.  Looks like staining from bleach.  No stains consistent with the appearance of blood.  There was one small brown stain on the leg of the jeans, and that was negative for blood.

Q   I've put up what has been previously marked as Exhibit 54, and are these the jeans of, uh, Brendan Dassey, do you recall, that you examined?

A   I believe so.

Q   And you note in your notes that there appear to be bleach stains; correct?

A   Yes.

Q   And what, um -- What does bleach do to DNA?

A   Um, bleach, basically, chews up DNA and destroys it.  We use bleach in the laboratory, a five percent solution of bleach, to clean our bench tops, to clean all of our scissors and forceps, um, to make sure that we don't have any DNA that's -- that's left on our -- our bench tops, uh, or pipets, or any of the instrumentation that we use.

Q   And, I'm sorry, you use bleach to clean your instruments, you stated?

114

A    Yes.

Q    And the reason being because it, basically, kills the DNA?

A    Yes.

Q    And, um, if these -- If pants have been washed a number of times or, uh -- what is that going to do to potential DNA if you've had a number of washings of pants?

A    Well, in most cases, DNA is -- is -- if it's going -- if it's in a -- a material like blood, or semen, or a biological fluid, it's going to be soluble in water. So the more times you wash it, uh, depending on how thorough you wash it, what type of -- you know, whether you wash it with bleach, whether you wash it -- what type of detergent you use, um, eventually it's going to destroy the DNA, or at least wash it from the garment where we would not be able to detect it.

Q    And so cleaning materials, like bleach, or wiping surfaces clean, that all, also, would have an impact on whether you will find DNA on a particular item to test?

A    Yes.

Q    And is there anything in the literature that, uh, discusses what the absence of DNA at a crime

115

scene means?

A  Um, most of the references that you see in the literature, the absence of DNA's, basically, inconclusive. The presence of DNA, obviously, uh, point to some sort of physical contact.

Uh, the absence of DNA, because there's so many variables, it either -- there was no contact, it wasn't there in the first place, or it's been destroyed by some environmental factor, or it's just in a level that's too low to detect. So, basically, the absence is an inconclusive, uh, conclusion.

Q  And all the other variables kick in, too, whether someone's a good shedder or bad shedder; correct?

A  Yes. Correct.

Q  The surface area that perhaps the biological substance is left upon; correct?

A  Yes.

Q  Whether someone's cleaned it up or not?

A  Correct.

Q  So the absence of DNA at a crime scene does not mean someone was not there?

A  Well, the absence just means that there's no DNA that we can detect.

Q  Thank you. That's all I have.

116

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 116 of 255    Document 19-17

THE COURT: Any recross?

ATTORNEY FREMGEN: A few, Judge.

**RECROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q    Uh, one of the comments, I think, Mr. Gahn was asking was about blood and comment about touching items versus, um, a blood stain, for instance. It's easier to see blood; correct?

A    Yes.

Q    Would you agree it's easier to develop DNA profile from blood than from possibly a touched transfer of DNA?

A    Well, it depends on how much blood is there. But if you have a -- a visible blood stain, a fairly visible blood stain, with a lot of material to work with, um, you'll probably be able easily to develop a DNA profile. It's -- it's hard to compare the two, because there's no visual, um, measure between the two. There may be a touched item that you have with lots and lots of DNA on it. There may not. But you can't really see that. There also may be touched items with very little DNA that you can't really see.

Q    One you can see you think you could more easily extract DNA from something that you can't see?

A    Um, I suppose I would agree with that.

117

Q Well, one of the comments you made on redirect was there are more cells available in a blood --

A Well, if you have a fairly large blood stain, again, you're talking about a -- a -- I was referring to the stains, primarily, that I recovered from the RAV 4. If you have a very light blood stain, and you don't have very much -- I mean, it's a very weak blood stain -- stain, you may not have that many cells in that as well.

Q But the fact that -- you just, I think, mentioned it -- the fact that it may be -- it may not be blood, doesn't mean you can't extract the DNA sample from that item?  It just depends on whether or not the -- the -- you know, whether or not there was a transfer of some sort of biological fluid or cell from a touch, for instance, that you can actually be able to, uh, extract and develop into a profile?

A Correct.

Q Okay.  So, for instance, you had mentioned the bullet fragment FL.  You weren't able to discern, um, blood on the bullet?

A Not visually, no.

Q Visually.

A Right.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 118 of 255    Document 19-17

Q   And -- But you were able -- you said you -- I think you said you washed the bullet?

A   Yes.

Q   And able to extract DNA from that, that matched Teresa Halbach?

A   Correct.

Q   You tried the same with the bullet FK, and unable to do so?

A   Correct.

Q   And that would be the same with such things as shell casings, for instance?  You could probably wash those to extract, potentially, a DNA sample or something that might be able to develop into a profile?

A   Correct.

Q   But -- But, again, you didn't do that in this case?

A   That's correct.

Q   So I guess the issue is, if you don't try, you won't know; right?  If you don't try to extract DNA from something, you don't know if it's there?

A   That's correct.

Q   In regards to the -- the jeans, question was raised about there -- you -- you noticed some white specks and a light, um, kind of a brushed

119

area that appeared to be bleach?

A    Yes.

Q    Now, if the entire pair of jeans had been soaked in bleach, you probably expect a little more white, uh, I guess, bleaching stain, than what you saw; correct?

A    I don't really recall. All I recall is that the stains looked like they were consistent with stains that would have been left from bleach. I don't really recall how much bleaching there was.

Q    And when you were looking for blood, you were looking, again, visually, first?

A    Yes.

Q    And did you then swab the entire, even cuffs, to decide -- to determine whether or not there might be more -- I won't -- I don't want to call it invisible, but blood that you just can't detect with the naked eye?

A    No. I -- There was one small brownish stain on the bottom leg of the jeans that was negative.

Q    So other than that detectable colored stain --

A    Yes.

Q    -- you didn't swab for any other areas?

A    No.

Q    Now, you mentioned that there were about 350

120

submissions to the Crime Lab in this --

A    Yes.

Q    -- case?  And about 180-plus just to your lab?

A    Just to the DNA section.

Q    Just to the DNA section?

A    Yes.

Q    Now, you mentioned this is a homicide case, so, obviously, I take it, that it had a more priority than some other cases you were handling?

A    Yes.

Q    And some of the comments you made in questions to myself, and I think redirect to Attorney Gahn, were you had to make decisions what you were going to test further to see if there was a D -- potential extractable DNA sample; correct?

A    Yes.

Q    Now, you didn't just decide, we're just too busy. Just plain busy.  We can't do it.  That wasn't your reason; right?

A    No.

Q    Correct?  And you didn't do it because it's too hard?

A    No.

Q    Why didn't you do it?

A    Well, again, because we're -- what we're doing was,

121

as an analyst, it's my job to take all the information I have on a case and to decide what evidence is going to be -- I feel is going to be probative. Again, at some point during the -- my analysis, and after my reports are written, um, if there was more evidence that was felt to be probative by either the submitter or defense counsel, then those requests could be made at that time to further do more testing.

Q    You said that this is a homicide case?  You're also aware there were allegations of sexual assault?

A    Yes.

Q    And would you agree with me that in those types of investigations testing the bedding is often a very common investigate -- or a common way of determining if there's any extractable DNA?

A    Yes, it can be.

Q    Okay.  And, again, you weren't asked to look at any bedding?

A    That's correct.

Q    No one sent it to you?

A    No, it was not submitted.

Q    And you didn't test anything like that?

A    That's correct.

122

Q    Thank you.

THE COURT: All right. You may step down. Unless the State has a five-minute witness here, we're going to adjourn and -- and reconvene at 1:00.

ATTORNEY FALLON: Can you make that about 1:10?

THE COURT: One-ten.

ATTORNEY FALLON: Thank you.

(Recess had at 11:54 a.m.)

(Reconvened at 1:15 p.m.)

THE COURT: Good afternoon. Counsel, your first witness?

ATTORNEY GAHN: Yes, Your Honor. The State would call Nick Stahlke to the stand.

THE CLERK: Please raise your right hand.

**NICK STAHLKE,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Nick Stahlke, S-t-a-h-l-k-e.

**DIRECT EXAMINATION**

BY ATTORNEY GAHN:

Q    Mr. Stahlke, where are you employed?

A    Wisconsin State Crime Laboratory in Madison.

123

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 123 of 255    Document 19-17

Q    And what is your position there?

A    I'm a forensic science training coordinator.

Q    And what is your formal, um, educational background?

A    I have a Bachelor's Degree in chemistry and medical technology.

Q    And would you please, uh, summarize your current duties and responsibilities at the State Crime Lab?

A    As a forensic science training coordinator, I'm responsible for coordinating the teams of individuals that go out and process crime scenes, and I'm also responsible for the training of those teams to respond to those cases.

Q    And, um, how long have you been at the Wisconsin State Crime Laboratory?

A    Fifteen years.

Q    And during those 15 years, did -- was there any time period that you were involved in the interpretation of blood stain patterns?

A    Actually, the entire time that I've been at the State Crime Lab in -- in Madison I've been involved in blood stain pattern interpretation.

Q    Have you attended any specialized schools for blood stain pattern interpretation?

124

A    Yes, I have.

Q    And would you just describe some of, uh, the schooling you've had for the --

A    In -- in 1988, I attended a 40-hour course in basic blood stain pattern interpretation. In '99, I also attended a advanced, uh, course in crime scene processing, which had a component of blood stain patterning interpretation. And I've also been to or attended workshops involving the examination of clothing with stains.

Q    And could you, uh -- What skills and experience, uh, do you have in blood pattern analysis?

A    Well, I've been, uh, examining scenes and clothing for the past 19 years. I had, uh, five-and-a-half years at the State Crime Lab in Idaho prior to my, uh, being employed with the state of Wisconsin. So for the past 19 years I've examined, uh, scenes and see whether or not there's any, uh, information that we can -- that we can, uh, gain from interpreting those stains at crime scenes.

And then any, uh -- any clothing that has been submitted to the Crime Lab that has blood stains on them to determine whether or not there's any additional information that can be gained from an interpretation of those stains.

125

Q   And have you given lectures or taught on this subject that's related to blood stain pattern analysis?

A   Yes, I have.

Q   And, um, you stated you've been involved for 19 years with blood stain pattern analysis?

A   That's correct.

Q   Have you ever testified in a court of law in, um, Wisconsin as an expert in interpreting blood stain patterns?

A   Yes, I have.

Q   And how many times?

A   Approximately ten times in interpretation of stains.

Q   And have you ever been rejected as an expert in this area?

A   No, I have not.

Q   Um, I'd like you just to take a moment and -- Well, first, I'm going to ask Mr. Kratz to hand you what's been marked as Exhibit 165, and if you would please identify that for us?  And what -- what is that document, sir?

A   This is my curriculum vitae.

Q   And is that, basically, a summary of your training, education, and experience in blood pattern analysis?

126

A    Yes, it is.

Q    Thank you.  Now, I would ask you to, um, just explain for the jurors the types of determinations that can be made from blood stain patterns?

A    Interpretation of stains -- blood stain -- blood stains, can help in determining the victim's placement, the suspect's placement, whether or not the victim has moved since bloodshed has occurred or it began, or it can also give some indication of whether or not the suspect has -- that -- that there's been any movement from the suspect.

It is a, uh -- It also can give us in some indication of, uh, the types of weapons that may have been used, or the instruments that use -- were used in the -- in the assault, uh, and it's uh -- it can give me -- give us some indication of the manner in which those, um, blows or -- or the types of what -- how the blood actually had -- has been deposited.

Uh, one -- one of the valuable things between -- of blood stain pattern interpretation is trying to determine the difference between -- or disting -- to distinguish the difference between a suicide and a homicide.  Um --

127

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 127 of 255    Document 19-17

Q   Are there different types of blood stain patterns?

A   Yes, there is.

Q   And what -- And what are they, briefly, for the jury?

A   Basically, there's three categories of stains.  You have passive stains, uh, projected stains, and contact stains.

Q   I'm going to, um, put up on the screen an exhibit that has already been introduced into evidence.  It's Exhibit 141.  And this is a photograph, um, which you'll see in just a moment, of, uh, Teresa Halbach's, um, 1999 RAV 4.  Do you recognize this vehicle?

A   Yes, I do.

Q   And when did you first see this vehicle, Mr. Stahlke?

A   It would have been on a Monday, November 7 in 2005.

Q   And where was the vehicle at that time?

A   This is in the center bay of our garage at the State Crime Laboratory in Madison.

Q   And did you have an occasion to examine the interior of this vehicle for any type of blood stains?

A   Yes, I did.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 128 of 255    Document 19-17

Q And exactly what -- what did your examination consist of, initially?

A Basically, the examination of a -- of a case for blood stains is to a visual examination, and in this particular case I observed blood stains in the front passenger compartment of this RAV 4.

Q And what type of blood stains did you observe in this RAV 4 in the passenger compartment?

A In the front passenger compartment, uh, I saw a contact transfer stains. And I said that as a -- one of the categories of contact transfer stains is those stains that, um, have a bloody object that has come in contact with the nonbloody surface.

Q I'm going to, um, now show you what has already been marked as Exhibit 142, and I -- also identified by, uh, Sherry Culhane as a photograph of Teresa Halbach's vehicle from the Crime Lab. And do you recognize this photograph?

A Yes, I do.

Q Mr. Stahlke, is the laser pointer up there?

A I do not see one.

Q Okay. We're going to look for that, uh, now. Um, but, uh, what does this, um, photograph depict?

A Well, this is the driver's compartment. Front -- or

129

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 129 of 255    Document 19-17

the seat with the door open.

Q   And did you observe any type of, um, individual contact transfer stains, uh, in this area?

A   Yes, I did.

Q   Okay.  I'd like you to just to point out to the jurors where you found these, uh, stains?

A   Right here on this front driver's seat right here.

Q   And how did you describe that?  As what type of stain?

A   That would be a contact transfer stain.

Q   And what do you mean by a contact transfer stain?

A   Be the type of stain that's deposited when a bloody source has come in contact with a nonstained surface.

Q   And I'm going to just show you now what has been previously marked as Exhibit 144.  And this is a photograph, also, of Teresa Halbach's RAV 4.  Can you describe or show any other contact pattern stains that you observed in the vehicle for the jury?

A   This image is of the passenger's front compartment, or passenger seat, with the front door open, and, uh, I also saw contact transfer stains right on the front edge, or on the left edge, of that, uh, front bucket -- bench seat or bottom of the seat.  There's also stains on this, uh, plastic CD holder.

130

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 130 of 255    Document 19-17

Q And, again, what type of stains did you find on that? On those -- In those two locations?

A Again, these are all contact transfer stains.

Q Are these stains consistent with being left by a person who would have a bloody hand, shall we say?

A Yes.

Q I'm going to now show you what has been marked as Exhibit 143 and ask you to describe if you observed any contact blood stains in this photograph?

A Yes, I did.

Q Point those out to the -- point it out to the jury, please?

A Right here. Right below -- Here's the ignition to the, uh, RAV 4 right here, and this is just down and to the right of the ignition.

Q And, again, that is the type of stain that is left by something that has blood on it, coming in contact, and leaving the stain?

A That's correct.

Q I'm going to now show you what has been previously marked as Exhibit 89, and identified as a cut. Uh, photograph of a cut to the middle right finger of Steven Avery. Do you see that?

131

Have you take a look at that, please? Seen that before; correct?

A Yes, I have.

Q Is that cut that you observed to Steven Avery's hands, is that the type of bloody object that could leave the blood pattern that you observed by the ignition switch of Teresa Halbach's car?

A This type of cut would be a candidate for the type of -- of bloody source that could have, uh, left that blood stain or that contact transfer stain.

Q I'm going to show you now and what has been previously marked as Exhibit 145, and ask if you can identify that photograph for us?

A Yes, I can.

Q And is there a blood stain in that photograph that you observed?

A Yes. This is actually a photograph of the right rear passenger side door, and there's a -- a stain right here that is considered -- I consider a passive drop.

Q And when you say "a passive drop" -- here we have zoomed in on it -- what do you mean by a passive drop?

A This is the type of stain that, um, if you have a -- a bloody object, and there's enough blood on that object, uh, that it will drip or fall to the ground,

132

uh, when gravity is the only thing that is influencing, uh, that particular blood stain or blood droplet that hits the -- the -- that impacts that surface.

Q  And, again, could a passive drop, such as this, be left by someone who has a cut to their hand?

A  Yes, it could.

Q  Based upon the -- the combination of blood stain patterns that you observed in the passenger compartment and here at the rear, uh, passenger compartment, uh, do you have an opinion to a reasonable degree of scientific certainty whether these combinations of blood stain patterns were left by someone who was actively bleeding?

A  Yes, I do.

Q  And what is that opinion?

A  That that is, in -- indeed, the -- uh, what probably happened.  A individual that is, uh -- has a -- a -- a wound of some sort, uh, and taken all these things into combination or consideration, that, uh, they were left by somebody that was actively bleeding.

Q  Now, did you also examine the rear cargo area of Teresa Halbach's car?

A  Yes, I did.

Q  Okay.  And I'm going to show you what we have

133

Q previously marked as Exhibit 146 and ask if you recognize that area?

A Yes. This is an image of the rear cargo area of the -- the RAV 4 that I examined on the -- on November 7.

Q And did you observe any blood stain patterns in this area, of, uh, Teresa Halbach's car?

A Yes, I did.

Q And would you point those out for the jury?

A Right along this right -- the molding, plastic molding, just behind the right rear passenger side seat are a series of stains.

Q We're going to zoom in here a little bit for you, um, Mr. Stahlke, and, again, describe for the jurors what -- what actually you're observing here?

A These -- All these stains, uh, fall in the category of a contact transfer in which a bloody object has come in contact or -- with a, uh, nonbloodied stain surface. And in this particular case, we've got some characteristics within that stain that are unique.

These stains right here have a, uh elliptical pattern. In other words, they -- they look like they're, um, half circles, and they're -- they have the appearance of -- if you

134

Q would take spaghetti, and put spaghetti sauce on, and, um, then flip it out on a table top or something on that order, or on the edge of your plate, you could see that there's strands of -- of -- and then take those -- spaghetti out of that -- out of those -- off that surface, it would leave a -- the surf -- the, um -- the characteristics of these particular stains. And they're characteristic of, and typical of, bloody hair that has come in contact with that surface.

Q Is that, uh, in your field, sort of a -- a classic pattern that you see left by bloody hair?

A When I see a -- a stain like this, this is definitely a classic stain, and it indicates a strong likelihood that that is head hair that has been -- that has been bloodied, and then that has come in contact transferring that -- that blood to that surface.

Q Did you observe any other type of blood stain patterns in this area of Teresa Halbach's vehicle?

A Well, there's additional contact stains or transfer stains here. Uh, and those are, in general, in a -- in description because they're -- they're just a bloody object that's come in contact.

There's also some light transfer stains

135

on the carpeting, which are consistent with a swipe pattern. Now, a swipe pattern is a, uh -- an object that has blood on its surface, and it's -- indicates movement, and it transfers, then, that blood from the bloody object onto a nonstained surface. But showing -- but it also indicates movement, so we call that a swipe pattern.

Q I'm going to show you what has been marked as Exhibit 148. And I believe Ms. Culhane described this as the rear panel area of the RAV 4; is that correct?

A Well, this would be the threshold.

Q Threshold or rear area of the cargo --

A Correct. It's a -- it's -- it's just below this picture would be where the -- the, uh, bumper of that vehicle would be. So this is the threshold of the rear door.

Q Did you observe any blood stain patterns in this area?

A Yes. As you can see, there's some stains here, here, um, some stains here as well, and along here. Some of them are more difficult to see than others.

Q And how would you describe those stains that you observed on the threshold of the door?

136

A Well, they've got, um -- These are -- Some of them are contact transfer stains like I described earlier, others are impact stains. And they're -- There's one here that might be, uh -- might be considered a -- that's considered a swipe pattern there as well.

Q And, again, what does a swipe pattern indicate to you?

A Movement.

Q It --

A It's the transfer of a -- of blood from a -- a moving object that has blood, uh, on it, and, uh, it's a trans -- it's -- has contact with a nonstain surface, leaving that blood behind, and it also indicates that there's been movement.

Q Based upon your observation of the combination of bloody stain patterns you've observed here on the threshold, and, also, those wavy patterns that you observed up in the -- the inside panel of the rear cargo area, are these consistent with a body that has bloody hair being moved into the rear cargo area?

A I would say it's very consistent with that, yes.

Q Did you also examine the, um, interior door of the RAV 4?

A Yes, I did.

137

Q I'm going to show you now what -- what has been marked as Exhibit 149, and ask you to point out to the jurors any observations you made of this examination?

A This is the rear cargo door. It's hinged on one side and it opens like any other door entrance to a vehicle, but it's larger, and it covers the whole rear end of this RAV 4, and it opens to the right.

This is the interior of that particular door. On this door were numerous impact stains. Some of these stains, then, had associated flow patterns to them.

Q I'm going to zoom in here on some of these stains and ask you to just point out to the jury, um, the stains, again, that you observed?

A Okay. Some of the stains right here. You see these? They're -- These are more circular in nature. Here, here, here. These here. This one.

Q And what does that mean to you when you say they're circular in nature? Or they appear that way on the door?

A It means that blood has been flung off of a bloody object and then impacts that surface. And if they're perfectly circful (phonetic) -- circular, that means, then, that they impacted that circuit -- surface at a

138

90-degree angle.

Now, if there's any elliptical pattern to that, then they impacted at an angle. In this particular case, these are near circular. However, some of them are more -- are somewhat elliptical in that they may have fallen. So it -- it's indicative of blood being flung or thrown from a moving object.

Q Now, I think you also stated that you saw some associated flow patterns?

A That's correct.

Q And, again, please point those to the jury and explain what you mean by that?

A Right here, you can see that there's, um, some -- flow or some stains that -- that have, uh, not only impacted the surface, but then, also, uh, flowed down toward the ground. Well, these flow patterns, uh, are then acted on by gravity alone after they've impacted the surface of this interior of the door.

Q And seeing this type of pattern, what does that indicate to you?

A Well, the flow patterns after an impact stain would indicate that it's a fairly large amount of blood that's -- that's impacted that surface, and it -- it just didn't stick on that particular surface, it had

139

enough, then, that there was gravity acted on it, and pulled it down toward the ground.

Uh, with all these stains, these stains are indicative of -- of a -- a bloody object that has been -- is flung around and then causing that blood to, uh, release from that bloody object and striking the surface of that interior side of the door.

Q I'm going to show you what has been marked as Exhibit 166, and ask you to identify this? What is that, sir?

A This is the entire, uh -- an overall shot of the, uh, rear cargo area of that RAV 4.

Q And did you do -- make any measurements in this area?

A Yes, I did.

Q And what area did you measure?

A I measured the opening of the cargo area.

Q And, um, would a slender 5'6 woman fit in the back of that RAV 4?

A Yes.

Q And based upon all the blood patterns that you observed in the rear cargo area of that, um, RAV 4, um, do you have an opinion to a reasonable degree of scientific certainty whether the

140

patterns you observed by the interior panel on the threshold, and on the interior door, itself, are consistent with a body with a bloody head being loaded into the rear cargo area?

A   Yes, I do.

Q   And what's that opinion?

A   That that is, indeed, what may have happened.  A bloody -- a body that has bloody head hair was, uh, loaded in, uh -- into this rear carg -- cargo area and placed, uh, just behind the right rear seat of this, uh -- of the seating area in this car.  This Toyota RAV 4.

Q   And, finally, Mr. Stahlke, I just have, uh, one other issue to discuss with you.  I'm going to hand you what's been marked as Exhibit 167, and ask you if you would, um, identify this photograph for the jurors?  And we'll also put it up on the big screen.  Uh, I want to ask you, did the time come when you were asked to check the odometer on this vehicle?

A   Yes, there was.

Q   And -- and, um, what happened when you attempted to check the odometer?

A   I believe it was the second day.  It would have been the 8th of November, then, that, uh, we got a call

141

requesting that we check the odometer reading on this vehicle. Uh, when, uh, we attempted to, uh -- It's a digital dashboard. So when we went to open or turn the key, there was -- there was no electronics, uh, to this particular dashboard. So we couldn't get the reading.

Q So what did you do?

A We, uh, opened up the -- the hood of the, uh -- to the engine compartment, and, uh, to checks -- I was thinking that the battery was probably dead.

Q And what did you find when you opened up the hood and looked under the hood?

A Well, it's -- like indicated in this particular, uh, photograph, Exhibit 167, the battery cables were disconnected.

Q And that's how you found the vehicle on -- when you saw it on November 7 of 2005 in your, um, bay at the Crime Lab?

A Yes. And I believe that actually it was November 8, the second day that we were doing examinations that -- on that vehicle. Uh, it hadn't been checked prior to this, so this is the way it would have come into the laboratory.

Q And when you opened up the hood of the vehicle, um, were you wearing gloves?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 142 of 255    Document 19-17

A    Yes, I was.

Q    And what type of gloves were you wearing?

A    Nitron.

Q    And -- And what are those?  Why -- why are those and why do you wear them?

A    Oh.  They're -- they're like a, uh -- a surgeon's gloves.  We put them on so we're not transferring any of our DNA onto a, uh, object or piece of evidence, and we're not, also, uh, receiving any evidence -- evidence from the object, themselves.  So we're protecting the surface of anything that we touch as far as evidentiary value.

Q    Thank you, sir.

         ATTORNEY GAHN:  That's all I have, Your Honor.

         THE COURT:  Cross?

         ATTORNEY EDELSTEIN:  Thank you, Your Honor.

### CROSS-EXAMINATION

BY ATTORNEY EDELSTEIN:

Q    Mr. Stahlke, what, precisely, if any, is actually your area of specialty in the lab?

A    Uh, I've got -- I don't have a specific specialty any longer.  I --

Q    Go ahead.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 143 of 255    Document 19-17

A    I have -- I'm the training -- training -- forensic science training coordinator, so I have many job duties.

Q    Well, given the fact that it's a lab, I would expect that that would encompass overseeing the training of a multitude of, um, disciplines within the lab?  Is that a fair statement?

A    Well, in my particular area, it would be more for those people that are involved in field response. Not any specific discipline.

Q    Okay.  All right.  But you have to agree, obviously, that field response encompasses a multitude of disciplines; correct?

A    Well, you hope to have some, uh, knowledge in all areas, yes.

Q    Could we call you, then, um, a jack-of-all-trades in the forensic business?

          ATTORNEY GAHN:  Objection, Your Honor. I'm sorry.  Objection to the form of that question.

          THE COURT:  Overruled.

          THE WITNESS:  Well, I would -- I would probably be more considered a criminalist, and that's an individual that has, uh, general -- general skills or knowledge in multiple areas.

144

Q    All right.  So you don't have a specific specialty?

A    It's not in my title, no.

Q    Whether it's in your title or not, by way of practice -- Well, let me ask you this:  Besides blood spatter interpretation, what other areas, if any, have you testified to as an expert and in courts in Wisconsin?

A    Controlled substances.

Q    Are we talking -- Okay.  Let me just -- So I'm clear, are you talking about running gas chromatograph to determine what a substance might be?

A    Correct.

Q    Okay.

A    That's one.  We have a -- With all the other presumptive tests as well.

Q    Right.

A    Sure.

Q    Drug -- And drug tests.

A    Drug testing --

Q    Okay.

A    -- right.  Controlled substances.  Um, and document -- questioned documents.

Q    Anything else?

145

A    Crime scenes and blood spatter.

Q    Well, crime scenes are pretty broad; right?

A    Correct.

Q    Okay.  Blood spatter's pretty specific?

A    That's true.

Q    As they would call it a sub-discipline of crime scene investigation?

A    That's true.

Q    All right.  Now, I take it during your undergraduate studies that you said -- I think you said that was, uh -- you had -- was it a B.S. in chemistry?

A    B.S in medical technology with a minor in chemistry.

Q    Okay.  And you've been at the Wisconsin Lab for 15 years; right?

A    Approximately.  It will be June, actually, when it's 15 years.

Q    Okay.  And in that time you -- I believe you testified on direct you've testified as an expert ten times over the course of the 15 years in -- involving blood spatter?

A    That's correct.

Q    Okay.  So less than once a year?

A    For blood stain cases, that would be -- if you'd take the average, yes.

146

Q All right. When you first began your testimony and you were describing different types of stains, I believe you said there's three? Passive, projected, and contact? Is that your understanding?

A These are the three categories of types of stains, yes. So -- And then each category, uh, has other stains, more specific characteristics.

Q Okay. And where would impact stains come in?

A The projected stains.

Q All right. If an individual is struck with different types of instruments, you've learned over the course of your experience and training that, uh, different types of patterns emerge; right?

A There is a likelihood, or a possibility, I guess, that that could have -- you could see those differences, yes.

Q Well, don't you base much of your interpretation and conclusions -- For example, State asked you here a few minutes ago, um, do you have an opinion about whether, uh, a body was placed in the back of the RAV 4? And you -- you based -- You said, yes, and you based your opinion upon the -- the stains that you observed; right?

147

A   Wasn't your question about whether or not we could distinguish the types of weapons that were used?

Q   Well, I'm getting to that.  But you -- you answered that, and I assume that the answer that, yes, a body was placed back there, was based upon the interpretation of those patterns and stains that you observed?

A   That has nothing to do with weapons.

Q   I understand that.  You would expect, for example, if a firearm were used, a different type of pattern, um, than you would if someone cut themselves with a -- with a knife?

A   If I'm looking at stains that were generated from a firearm or -- and comparing them to stains that were generated from a passive drop or bleeding from a -- a cut or a wound to the finger, yes, I would see differences.

Q   That wasn't my question.  My ques -- Let -- let's use this as a hypothetical.

A   Please repeat your question.

Q   Okay.  I'll do my best.  Would you expect a difference in patterning from a gunshot wound as opposed to a stab wound?

A   And I would describe that as differences in their characteristics.

148

Q Pard me?

A Yes.

Q In the back of the RAV 4, the blood that you described that you saw over toward the speaker area, not on the back, but on the side where you talked about the spa -- you used your spaghetti example?

A Correct.

Q Okay. I'm assuming that's where you concluded that it would be consistent with the hair being placed; right?

A That's correct.

Q Toward the -- Well, let me ask you this: The -- What were the dimensions -- the inside dimensions -- of the back of the RAV 4?

A I have a width, is all. I don't have the -- the depth of that particular cargo area.

Q So I take it, then, you -- you don't have an opinion? Or you do have an opinion as to how a body with bloody hair was placed -- located within the back of the RAV 4? Do you have an opinion?

A Yes, I do.

Q Other than where the head was located?

A I have an opinion. My opinion was that a -- an

149

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 149 of 255    Document 19-17

individual that's 5'6 would fit in the storage area of that RAV 4.

Q   Well, probably not a total length, though; right?

A   No.

Q   Okay.  But you don't -- you don't have an opinion as to -- If that's where the head was, do you have an opinion where the feet were?

A   No.  I haven't -- Common sense would say that the feet were at the other end.  Head at the top, feet at the other end.

Q   And somewhere in between there --

A   Would be the torso.

Q   Exactly.  And as a mat -- and -- and the -- from your examination, am I correct in stating that you found absolutely no evidence by way of blood pattern evidence to suggest an active wound in the torso area of this body?

A   Repeat that question.

Q   Am I correct in stating that you found absolutely no evidence, given how you believed the body was placed in the back of the RAV 4, for you to conclude that there was a wound in the torso area of the body?

A   There is no direct evidence from the stains that were -- uh, that I examined in that particular, uh,

150

cargo area of this RAV 4 that would indicate the position of those -- or location of any wounds other than the ones that were indicative to bloody hair, which would then indicate that that bloody hair is head hair, and that there was a blood source or a -- you would then assume a wound to the head.

Q   And I assume your answer would be the same that you found no indirect evidence, because you said there was no direct evidence that you noticed? And there was no indirect?  I guess I'm ask -- Distinguish for me, if --

A   I can --

Q   -- you can, the difference between direct and indirect?

A   I can tell you that those stains that were on the threshold area, the stains that were on the inner front panel of the rear door, I cannot, uh, distinguish the location from -- on a body that those stains could have originated from.  They could have been from anywhere on the body.  Any bloody source could have caused those stains when blood was flung from any part of the body.

The only ones that I can positively identify, or distinguish, from any other part of the body would be the -- the stains that were

151

textbook stains for, uh, bloody head hair that were transferred to the area just behind the rear of the passenger seat.

Q Okay. Let me ask you this, then, Mr. Stahlke: Given your experience, the assumptions you've made about the location of the body, assume that this body had at least one, and perhaps two, stabbing wounds to the torso area, would you not expect to find some pooled -- some blood in the area between where you believe the head was and where the feet were?

A Well, that's a fair question, and I saw some -- some swipe patterns between the -- the area -- or the threshold of the door, or the vehicle, and that rear -- rear passenger seat. Now --

ATTORNEY EDELSTEIN: Your Honor, if the Court please --

A -- outside of that --

ATTORNEY EDELSTEIN: Would -- would the -- I hate to interrupt the witness, Your Honor, but I would ask that the witness be directed to answer the question. I didn't ask about sweat.

THE COURT: It's about swiped.

ATTORNEY EDELSTEIN: Oh, I'm sorry.

152

THE COURT: He's talking about swipe.

ATTORNEY EDELSTEIN: I -- Go ahead.

THE COURT: I think that's part of the answer. So why don't you finish your answer, please.

THE WITNESS: Thank you. Those are the only stains that I saw between -- on that carpeted area in that cargo area. I would expect that if we had an individual that had multiple wounds, especially to the torso area, that you would see additional staining.

Now, the lack of stains would -- may indicate that you have some, uh, surface or some object that was underneath, between the -- the blood source and that carpeted area, which then was removed with the body, let's say, and would prevent any blood, then, from transferring onto that carpeted area.

Q Well, Mr. Stahlke, in connection with your, um, duties as the, uh, training coordinator for the response teams -- Let -- Let -- Just let me ask you this: Given what you know about this, when that RAV 4 got to the lab, there's no reason for you to even remotely suggest that there was anything other than what appeared as the -- at

153

the carpet level, in between, prior to it coming to the lab, is there?

A   I -- No.  We just examine and -- and make note of those observations.  This was just your -- your speculation, or your -- your probing that I came up with that hypothesis.

Q   Okay.  But there was nothing to suggest that that hypothesis has any basis, in fact, in this particular incident as far as that vehicle goes?

A   I have no, um, reason to believe that.  No.

Q   All right.  As far as the timing of when stains that you discover appeared, you conducted no examination to determine the relationship, for example, between the stain present by the ignition switch in relation to the stain you observed in -- on the back door inside panel?

A   No, I cannot determine a timeline from comparing two stains in this particular case.

Q   Or in any case?

A   In some cases you can get a feeling for the age of a stain.

Q   Okay.  But, certainly, not any degree of, uh, expertise that you'd be able to render an opinion on that?

A   At least not with, uh -- within a short time frame,

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 154 of 255    Document 19-17

no.

Q    If someone's -- Have you had occasion to be involved in the examination of scenes where an individual has had their throat cut?

A    Yes, I have.

Q    Can you describe for the benefit of this jury what sort of pattern is likely to result when that occurs?

A    Well, there's obviously a lot of blood, and depending on the variables involved, uh, you can have a -- a large amount spread over a -- a great -- a large area, or you can have it confined to a small space. But in either case, you'll have a -- a large amount of blood directly below, uh, the area where that throat was cut.

Q    So if an individual, for example, had their throat cut while they were on a bed, you would expect to find a great deal of blood in that area; would you not?

A    Well, yes.  Especially if the body -- if the person is still alive at that point.

Q    All right.

A    If they -- If they're already dead, of course, then there's not going to be, uh, as much blood flow because there's no -- there's no heart -- or blood

155

pressure. Uh, there would be draining blood. However, you -- you'd still see some blood from a thro -- cut throat.

Q In this particular case, um, did you ever go to what you understood to be the Avery property?

A No, I did not.

Q So you never were asked to go inside of a garage to do any examination for blood pattern evidence?

A I was not involved in any of scene work there, no.

Q If an individual is struck from a projectile from a firearm, there are distinctive patterns that emerge; is that correct?

A If you have the classic gunshot, uh, wound, high velocity spatter from a gunshot wound, uh, there are some, uh, stains that are indicative of -- of that type of wounding, yes.

Q Is it a fair statement that the patterning that emerges as a result of a gunshot wound, as compared to a stabbing-type wound, would tend to, and typically, uh, cover, or be able to -- it would -- it would spread out a little further is what I'm trying to say?

A A gunshot wound?

Q Right.

A Not necessarily.

156

Q    All right.  Are there any differences between the patterns that emerge from a gunshot wound to a head as opposed to, for example, an arm?

A    Yes, there are some indications, uh, that you can gather from that, that would be different.

Q    But it is fair to say that there are patterns, which you understand through your training and experience, that when you look at, you can conclude this was as a result of a gunshot wound?

A    Yes.  If those patterns are present, uh, those patterns will give you some indication of the -- or may give you some indication -- of the type of weapon that was used, uh, to -- to create them.

Q    When you say "type of weapon" are you able to distinguish, for example, between a small caliber rifle, say a .22 caliber, and, say, a .30 caliber?

A    Typically, the larger the caliber, the greater the, uh, amount of stains that are going to be present or created.

Q    You talked about the gravity effect of the -- on blood on the back door inside panel.  Blood does not flow, necessarily, at a uniform rate, does it?

A    I believe that it would -- it would flow at a uniform

157

rate on the same or similar surface.

Q  On the same what?

A  Same or similar surface.

Q  You're --

A  So if -- if you put blood -- throw blood onto a glass surface, it will flow at the same rate.

Q  Irregardless of the source of the blood?

A  Irregardless of the source?  No.  It would still be the same substance that is striking the surface. You're talking about a large enough amount to cause -- cause the flow?

Q  Well, you described on the back panel the flow pattern?  What you called elliptical; right?

A  Um-hmm.

Q  Okay.  Of some blood that hit that back panel and that basically dripped down a little bit.  My question is, is there a uniform flow rate for human blood?

A  I don't know that there is actually a uniform flow rate, but through my experimentation and testing, blood is blood.  If you throw it on a similar surface, it's going to flow at the same rate.

Q  When you examined the -- Well, strike that. Other than the photographs that we've all had a chance to look at here today, and I'm talking

158

about the area in the back of the RAV 4 where you believe there was -- there was hair, um, other than the photographs, did you bring with you, um, any portion of that plastic molding -- that molded area -- with so the jury could see it today?

A No, I did not.

Q And I take it you did not see any evidence whatsoever -- Well, let me ask you: When you examine those type of patterns, um, and you know that it's been caused by hair, are you able to tell anything about that other than the fact that you believe it was hair?

A Well, sometimes you can get a -- an -- a feeling for the -- if there was some direction. Uh, other than -- other than the contact that I saw that was indicative of a transfer of -- of blood from bloody head hair, no, there was no other indication in that stain that I could gather --

Q So --

A -- any additional information on.

Q So you would have no opinion as to whether or not the -- How did -- I -- I want to use the same term you did. Did you call it swiping? Or wiping?

159

A   Swipe. Well, there's swipes and wipes. One's with blood and one's without blood.

Q   Okay. The -- the portion that you talked about with the -- the blood evident, though, that was the swipe with the hair?

A   Excuse me. Say that again?

Q   I'm just talking about the hair, okay?

A   The -- the hair transfer stain?

Q   Right.

A   Okay.

Q   Okay. Was that -- do you -- you use the term "swipe" for that?

A   No, I did not.

Q   What term did you use?

A   That was a contact transfer.

Q   All right. As to that particular contact transfer, were you able to make -- or did you make any additional findings regarding, um, for example, the length of the hair?

A   No, I did not.

Q   Did you discern from your visual observations any differences in the pattern that would set -- suggest that it was anything other than uniform length?

A   No, I never saw anything that would indicate.

160

Q  Would you be able to determine that based upon your experience, training, and education?

A  Unlikely. Because, typically, bloody head hair, uh -- it will leave a -- a textbook stain. However, it won't, necessarily, tell me the entire length of that -- of the hair that was on that person's head. It could maybe give me an indicator of the total length, but then that's, uh, a stretch, too, because we don't know, uh, if it's just a portion of that hair that contacted the surface, and if it -- if -- it could be long strands and we only get a small portion that contacted the surface. So, it would -- we'd be guessing if we wanted to come up with an entire length of that hair.

Q  Do you understand what I mean by the -- Does the term "blowback" have any significance to you in your experience with, uh, blood spatter examination?

A  Yes, it does.

Q  Okay. Is it fair to say that you performed no tests, no examinations, in the lab to determine whether or not there was any blowback evident in this particular case?

A  I did not.

Q  You weren't asked to?

161

A No.

Q Okay. And just so everybody's aware, can you explain very briefly what blowback really means?

A Blowback is generally related to a -- a firearm, or a gunshot wound, and when a projectile leaves the end of the, uh, the barrel and strikes a -- a surface causing, um, some blood spatter, there is a -- some energy that returns back toward the gun, and that would be considered blowback.

Now, you can also view it as general terminology, too. Anything that, uh, comes back from a -- a particular wound is maybe considered, as a general term, as blowback.

Q Right. But it -- it's not uncommon, though, in, uh, a case -- an investigation involving, uh, homicide, and there's a firearm involved, to request that type of examination on a suspected weapon? Is that a fair statement?

A I think that's -- that's been requested before, yes.

Q Fairly regularly where there's a gun involved? In your experience.

A I -- You know, it -- it's not your, um -- your fairly regular question -- or um, request, but it definitely has -- does -- is requested.

Q And I take it you've done those type of

162

examinations previously in your career?

A   I have examined, um, guns or firearms for the presence of it, yes.

Q   But in this case nobody asked you to do that?

A   I did not see the weapon, no.

Q   Okay.  All right.  Thank you.

ATTORNEY EDELSTEIN:  Pass the witness.

ATTORNEY GAHN:  Just a couple questions, Your Honor.

**REDIRECT EXAMINATION**

BY ATTORNEY GAHN:

Q   Mr. Stahlke, the blood patterns, or the blood stains, that you observed in the threshold area of the, uh, cargo -- of the rear cargo area of Teresa Halbach's car, or on the bumper, um, you would not be able to tell whether those blood stains came from the head area of Teresa or any other part of her torso?

A   That's correct.

Q   And, um, when you talked about, um, blood from a, um -- a cut to the neck, or a -- a throat being cut, the amount of blood would determine how large the cut is?  How deep it is; correct?

A   Well, it -- it can be the size of the wound and it could also be a matter of time.

163

Q I mean, if an artery or aorta or something is hit, you will, but if there is -- I mean, someone -- you can cut your throat shaving and you're not going to have a lot of blood?

A No.

Q You can have a superficial cut to the neck and there's not going to be a lot of blood?

A Correct.

Q And the same thing from your analysis, or crime scenes, a single stab wound to the torso, say the stomach area, or even the chest area, may be all internal bleeding as opposed to any external bleeding; is that fair to say?

A Well, that's true. And it -- There's other variables as well. It could be you could have clothing on, or something on that order, and it can trap the blood that's -- had been, uh, leaking out of that, or projected out of that, particular wound as well.

Q And -- and, finally, with, um, regard to blood stain patterns, um, and how they're left, blood stain patterns also can be, uh, cleaned up, can't they, afterwards, and there wouldn't be any patterns available?

A That's true.

Q Correct? And someone could use bleach to clean

164

up blood, uh, stains?

A   Yes.

Q   And that could destroy, um, any, uh, future finding of the biological substance, or DNA, or whatever it may be?  Is that fair to say?

A   That's fair to say.

Q   Thank you.  That's all I have.

            THE COURT:  Any recross?

            ATTORNEY EDELSTEIN:  Just one.

### RECROSS-EXAMINATION

BY ATTORNEY EDELSTEIN:

Q   There's absolutely nothing that you saw on the back of that RAV 4 suggested use of bleach; correct or incorrect?

A   I do not have any -- any information of that.  No.  I didn't see anything that would indicate that.  No.

            ATTORNEY EDELSTEIN:  That's all.

            THE COURT:  All right.  You may step down.

            ATTORNEY FALLON:  State would call Susan Brandt.  Hold on.  Excuse me.

            ATTORNEY GAHN:  Your Honor, I would offer, um, the exhibits, um -- just one second -- 165, 166 and 167 into evidence.

            THE COURT:  Any objection?

            ATTORNEY FREMGEN:  No.

165

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 165 of 255    Document 19-17

THE COURT: Received.

THE CLERK: Please raise your right hand.

**SUSAN BRANDT,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Susan Brandt, B-r-a-n-d-t.

## DIRECT EXAMINATION

BY ATTORNEY FALLON:

Q    What do you do for a living at this time?

A    I'm a stay-at-home mom.

Q    All right. And, um, how many children do you have?

A    Three.

Q    All right. What is your, um, educational training?

A    I have a Bachelor's in psychology and a Master's in counselor education.

Q    All right. And when did you receive your Bachelor's Degree?

A    I graduated, um, December of 2002.

Q    And from which institution?

A    The University of Wisconsin-Platteville.

Q    And your Masters Degree, uh, when did you receive

166

that?

A    I graduated May of 2006.

Q    All right.  And from which institution?

A    The University of Wisconsin-Platteville also.

Q    Directing your attention to a time period of January, 2006 until May of 2006, while you were a student, did you have any internship or employment associated with your pursuit of your Master's Degree?

A    Yes.

Q    And where were you employed?

A    I was an intern at Mishicot Middle School and Mishicot High School.

Q    All right.  Tell us about your internship arrangement at the, uh, middle school?

A    I had worked with, um, Karen Baumgartner in the middle school guidance office in the morning, and in the afternoon I worked with Amber Fox-Brewer in the afternoon.

Q    And that was at the high school?

A    At the high school.

Q    All right.  And were you, um, at the schools on a daily basis in your internship capacity?

A    Yes.  I worked, um, Monday through Thursday, and I had Fridays off.

167

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 167 of 255    Document 19-17

Q   Um, directing your attention to January of 2006, early January, did you have occasion to have contact with a student by the name of Kayla Avery?

A   Yes.

Q   Um, would you describe for us, um, first and foremost, um, how that contact occurred?

A   Kayla came into the counseling office and asked to speak to a counselor.

Q   All right. And, um, who was present when she came in and asked to speak with a counselor?

A   It was myself and Karen Baumgartner.

Q   Tell us what happened?

A   Kayla came in, um, to the office, and, um, she was asked by Ms. Baumgarner -- Ms. Baumgartner if she minded that I was there, and Kayla said, no. And she said she was there because she was feeling scared.

Q   All right. Let me stop you there, first, and ask who else, if anyone, was present for this conversation?

A   No one else.

Q   All right. So there's just the three of you?

A   Correct.

Q   All right. And did Kayla reveal to the two of you why she was feeling scared and why she wanted

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 168 of 255    Document 19-17

Q  to talk?

A  Yes.

Q  And what did she tell you?

A  She told us that she was scared, um, because her uncle, Steven Avery, had asked one of her cousins to help move a body.

Q  All right. What else, if anything, did she tell you about that?

A  She also said she was scared about going to the shop, um, and she, specifically, asked if blood can come up through concrete.

Q  All right. Now, was -- Did she identify which of her cousins may have been asked by her uncle, Steven Avery, to move this body?

A  No.

Q  All right. Describe for us, if you will, Kayla's demeanor, her affect, during these revelations?

A  She -- She was scared.

Q  All right. Did she seem at all confused?

A  No.

Q  Was this the first time you, um, ever, uh, had contact with Kayla?

A  Yes.

Q  All right. Um, your best estimate, approximately how long did this conversation take?

169

A    My best guess would be 15 or 20 minutes.

Q    All right.  How was Kayla's demeanor at the conclusion of this discussion?

A    I think she still felt scared, but maybe a little bit more relieved.

Q    All right.  Did she, at the end of the conversation, um, seem confused by anything that she was telling you?

A    No.

ATTORNEY FALLON:  I'll pass the witness.

THE COURT:  Cross.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q    You said this was the first time you've met Kayla?

A    Yes, that's correct.

Q    So you had no perspective as to what her normal demeanor is?

A    No.

Q    Don't know if she's normally a scared girl?

A    No.

Q    You had, uh, no way of telling whether she was telling you the truth; correct?

A    Correct.

ATTORNEY FALLON:  Objection.  Improper

170

question. Commenting on the veracity.

THE COURT: I -- You're correct. Uh, the objection's sustained. Credibility is solely to be judged by -- by this jury.

ATTORNEY FALLON: Move to strike.

THE COURT: Motion granted. Question is struck.

Q (By Attorney Fremgen) You don't have any -- Again, because this is the first time you met her, you don't know her reputation for telling the truth; correct?

A Correct.

Q Now, you indicated that you had both, uh, a -- a Bachelor's Degree and -- were -- did you have a Master's at this point?

A No.

Q Were you working on it? This was the internship portion of the Master's?

A Correct.

Q And you've taken a number of classes in child development?

A Yes.

Q Number of classes, uh, or courses of study that deal with, um, children in general?

A Yes.

171

Q It -- Is it fair to state in your studies that, uh, one -- maybe not a common -- theme with children is that they sometime -- sometimes are looking for attention; is that correct?

A Sometimes.

Q Okay. And they do things that sometimes it's just intended to draw attention to themselves?

A Correct.

ATTORNEY FREMGEN: I have nothing else.

THE COURT: Any redirect, Counsel?

**REDIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q Was there any point during this meeting that you thought she was just there to get some attention?

A No.

ATTORNEY FALLON: That's it.

THE COURT: All right. The witness may step down.

ATTORNEY KRATZ: State would call Jodi Stachowski to the stand.

THE CLERK: Please raise your right hand.

**JODI STACHOWSKI,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

172

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 172 of 255    Document 19-17

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Jodi Stachowski, S-t-a-c-h-o-w-s-k-i.

**DIRECT EXAMINATION**

BY ATTORNEY KRATZ:

Q    Ms. Stachowski, you'll have to speak right into the microphone so that we can all hear what you're saying. Ms. Stachowski, in, um -- during the year 2005, and up to and including Halloween of 2005, were you involved in a, uh, relationship with an individual?

A    Yes, I was.

Q    Who was that relationship with?

A    Steven Avery.

Q    And what, in fact, was your relationship with Mr. Avery during that year?

A    I was his fiancé.

Q    Ms. Stachowski, I'm going to direct your attention to October 31 of 2005, uh, ask if you'd tell the jury, please, where you were physically, uh, located that day, if you recall?

A    I was in the Manitowoc County Jail.

Q    And can you tell the jurors, please, why it was that you were in jail at that time?

173

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 173 of 255    Document 19-17

A     For a fifth drunk driving.

Q     All right.  During your stay at the Manitowoc County Jail, uh, which included, uh, Halloween of 2005, did you have occasion to remain in contact with your then fiancé, Steven Avery?

A     Yes, I did.

Q     When was it, Ms. Stachowski, that you went into jail?  That is, when was it that you had to report to jail, if you can remember?

A     I believe it was in August.

Q     All right.  And how long of a stay?  That is, how long were you scheduled to be in jail from August, '05?

A     Seven months.

Q     Between August, then, and October 31 of '05, uh, how regularly would you remain in contact with Mr. Avery?

A     I talked to him once a day.

Q     Were there any occasions, Ms. Stachowski, when you would talk to Mr. Avery on more than one occasion during a particular day?

A     Yeah.

Q     All right.  And how would those conversations occur?  In other words, were they in person or were they on the telephone?

174

A     On the telephone.

Q     Could you tell the jurors, please, how those phone calls would be placed?  That is, would you place the calls to Mr. Avery or would he call you?

A     I had to call him collect.

Q     Let me ask you, Ms. Stachowski, do you remember October 31 of 2005?  And, specifically, do you remember placing any calls to your fiancé, Steven Avery?

A     Yes.

Q     On October 31, 2005, on how many occasions did you talk to Mr. Avery?

A     I called Steven twice that day.

Q     And could you tell the jurors about what times those two calls were placed?

A     The first one was about 5:30, and then the second one about 9:30.

Q     All right.  Are those estimates, Ms. Stachowski?

A     As close as I can remember, yes.

Q     How long would those phone calls last?

A     Fifteen minutes.

Q     And how do you know they lasted 15 minutes?  In other words, was there something with the jail that --

175

A    Yeah.  They just disconnected after 15 minutes.

Q    All right.  Ms. Stachowski, the last area of -- of inquiry I have for you for this trial is the, um, arrangement or setup of Mr. Avery's, um, trailer.  First of all, are you familiar with, uh, Mr. Avery's, um, residence?  With his trailer?

A    Yes.

Q    Did you live in that trailer prior to you having to go to jail in August of '05?

A    Yes, I did.

Q    And at the time that you lived there, did you and Mr. Avery share the same bedroom?

A    Yes.

Q    Describe, if you will, um, the kind of furniture that Mr. Avery had, or that you and Mr. Avery shared, in his bedroom?  Uh, that is, prior to you going into jail.

A    There was the bed, a filing cabinet, a desk, a bookcase, dresser, and a TV.

Q    All right.  Do you remember, Ms. Stachowski, prior to your going into the jail, if Mr. Avery had any, uh, gun racks or firearms on the wall?

A    There was a gun rack with two guns on the wall.

Q    Do you know what kind of guns those were?  If you

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 176 of 255     Document 19-17

Q   don't, that's fine. I'm just --

A   No.

Q    -- just asking. All right. I'm going to show you what has been received as Exhibit No. 73. This is a computer-generated diagram. Um, first of all, at least from the standpoint of having a bed, uh, a desk, a bookcase, uh, and a nightstand, or filing cabinet, and a dresser, assuming that's what that is down there, uh, is that the same kind of furniture that Mr. Avery and you had in that bedroom before you went into jail?

A   Yes.

Q   Now, before you went into jail, looking at Exhibit No. 73, was the room set up or configured that way?

A   No, it wasn't.

Q   Could you tell the jurors, please, how it was different? What -- First of all, where was the bed when -- uh, when you went into jail? How was it situated?

A   In the corner underneath the two windows. When you first walk in the door, you'd walk straight into the bed.

Q   All right. And so if I'm taking a laser pointer,

177

Q   uh, and pointing, um, what would be to the, uh, top right, or towards the bottom left, uh, is it a fair characterization that the bed was facing this way?

A   Yes.

Q   Which, uh, side, or which wall was the headboard on?

A   The headboard was on the farthest wall, the small window.

Q   And I'm pointing, uh, to, uh, the wall, which would be the east wall, of the trailer. Um, is that the wall that the headboard was on?

A   Yes.

Q   The headboard was here and the bed was, uh, along, um, that way; is that -- is that correct?

A   That's correct.

Q   Okay. Now, was the bed all the way against this right-hand or, uh, south wall, or was it away from the wall?

A   It was against the wall.

Q   So it was abutted all the way up against --

A   Yeah.

Q   -- the wall? The, um -- This bookcase, um, that we see, uh, depicted in Exhibit No., uh, 73, can you tell us where that was located while you were

178

there?

A   That was located on the wall where the bed is underneath the guns.

Q   All right. And where was the nightstand?

A   Next to the bed.

Q   Um --

A   Like right there. Yeah.

Q   Would be right next to the door?

A   Yep.

Q   So the nightstand would be here, and the bed would -- would -- would be this way right next to it; is that right?

A   Yes.

Q   All right. A -- assuming that this dresser -- and I can show you another version if I need to -- but assuming the dresser is kind of kitty-corner, uh, in the, uh, southwest corner of the bedroom, would that have been in about the same place?

A   Yes.

Q   I'm going to show you one more photo just to kind of orient us. This is Exhibit No. 75. I think you've told us that the bed was along, uh, this wall with the headboard underneath, uh, the east window; is that correct?

179

A That's correct.

Q As you looked down this hallway, then -- This is a hallway; is that right?

A Yes.

Q As you looked down this hallway, uh, and through the open doorway, uh, would you be able, then, to see the bed?

A Yes, you would.

Q All right.

ATTORNEY KRATZ: That's all the questions today for Ms. Stachowski, then, Judge. Thank you.

THE COURT: Counsel? Cross?

ATTORNEY FREMGEN: I guess I just have one -- Excuse me. I just have one question.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q Your testimony is essentially that the configuration of the bedroom in August is different than the picture here?

A Yes.

ATTORNEY FREMGEN: Nothing else.

THE COURT: All right. You may step down.

ATTORNEY KRATZ: This might be a good time for our afternoon break, Judge.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 180 of 255    Document 19-17

THE COURT: All right. We'll take 15 minutes. We'll be back at approximately quarter -- well, ten -- ten of three.

(Recess had at 2:33 p.m.)

(Reconvened at 2:54 p.m.)

THE COURT: Your next witness, Counsel?

ATTORNEY FALLON: State would call Mr. Tom Sturdivant.

**THOMAS STURDIVANT,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Special Agent Thomas Allen Sturdivant. It's S-t-u-r-d-i-v-a-n-t.

**DIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q    What do you do for a living?

A    I'm a special agent with the Wisconsin Department of Justice, Division of Criminal Investigation, Narcotics Bureau.

Q    How long have you been employed for the Wisconsin Department of Justice?

A    Since 1998.

Q    Prior to that time, did you hold any other law

181

enforcement, um, positions?

A    I did.  I worked for the, uh, Maine State Police in the state of Maine.

Q    And how long did you work for the Maine State Police?

A    Approximately 11 years.

Q    Uh, you indicated your current assignment is the Narcotics Bureau for the Division of Criminal Investigation.  Prior to that assignment, did you have any other assignment?

A    Yes.  I worked in both the Financial Crimes Bureau, as well as the Arson Bureau.

Q    And how much time did you spend in the Arson Bureau?

A    Approximately two years.

Q    During what time frame would that have been roughly?

A    Uh, that would be roughly between 2003 and 2005.

Q    All right.  Now, Mr. Sturdivant, I'd like to direct your attention to, uh, Tuesday afternoon, November 8, 2005.  At that particular time were you currently in the employ of the Department of Justice?

A    I was.

Q    All right.  Uh, on that particular day were you

182

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 182 of 255    Document 19-17

Q asked to assist in execution of a search warrant at the Avery Salvage Yard?

A I was.

Q And where is that salvage yard located, generally? Which county?

A Uh, Manitowoc County.

Q All right. What, um, in particular, on that day, were you asked to do?

A I was asked to do a couple of things. One was to execute a search warrant at the Avery business. The junkyard business. And, secondly, I was asked to go out and take a look at so-called hot spots. These were just areas that were identified by the state troopers as having some, um -- some -- some areas of interest. Perhaps they might have been ashen sites, they might have been a motor vehicle, they might have been a variety of other things.

Q All right. And in terms of, um, one of these spots, was there a time where you were asked -- or your attention was directed to an area behind the garage identified as Steven Avery's garage?

A Yes. Uh, sometime after 1:30, I was asked to go over and take a look at some of these so-called places that -- of interest, and one happened to be a -- a -- behind the Steven Avery garage, and, uh, Manitowoc

183

Q All right. And how was your attention directed to that area?

A I think at some point, um, we were asked to go out -- uh, prior to 1:30 -- go out and take a look at some of these places of interest. And as I walked over there, myself and Special Agent Deb Straus were basically summoned by, uh, Deputy Jost to come over and take a look at an item that he was standing, uh, near.

Q All right. And when your attention was directed to that area, what did you, um -- what did you do?

A Well, the first thing I did is when I walked over and -- and -- by the deputy, he pointed out this piece of material that was lying on the ground, which appeared to be about, uh -- about one inch in length -- one -- one inch by one inch, which appeared to me, again, to be a piece of charred bone matter.

Q All right. Um, and to begin with, I'd like to, uh -- the skee (phonetic) the screen to, uh, project, uh, Exhibit 132, um, first, and then,

184

uh, we're going to have two more photographs marked.

Um, your attention is directed either to the screen in front of you or the one to your immediate left. Um, do you recognize that particular area? Exhibit 132?

A    I do.

Q    All right. Tell us about that. What is depicted there?

A    What is depicted here is a -- What is depicted here is a pile of gravel, which I estimated to be approximately 30 feet by 30 feet, um, which gradually rises to approximately two feet in height, and it's sand and gravel piled up on the natural landscape. And this was directly behind the -- Steven Avery's -- the, uh, detached two-car garage.

And in the center of this pit -- And in the center of this, uh, 30-foot by 30-foot pile of gravel here was what I considered a -- or I -- I refer to it as a burn pit, which is about six feet wide, and it appeared to me as though somebody had come in with a six-foot scoop and scooped out six feet of this gravel. This wasn't -- The -- This pile of gravel wasn't natural to the landscape. It had been placed on

185

top of the grass behind Steven Avery's garage.

Q All right.

A And the piece of bone fragment that I initially --

Q We'll get to that in just a minute. I think we have, uh, two more other photographs in front of you that might be illustrative. Um, what are the exhibit numbers on those photographs, please?

A The first one I looked at was Exhibit 0-4-1-8-0-7. I'm sorry, 06 CF 88. Exhibit 168.

Q Exhibit 168?

A Yes.

Q Thank you. All right. And, um, we're going to have that projected in just a moment. All right. Now, um, the exhibit which is depicted on the screen now, is that 168?

A Yes, it is.

Q All right. Now, um, is that a fair and accurate portrayal of this burn area at the time you first set eyes on it?

A Yes, it is.

Q All right. We note that there is a, uh -- a German or Belgian Shepherd appearing there?

A Yes.

Q Uh, was that dog present when you first discovered the area?

186

A    Yes, it was.

Q    Uh, tell us about that particular dog, if you would?

A    This was a large German Shepherd-type dog that was a -- very aggressive, and would actually lunge at people as they walked towards this mound of dirt. The doghouse was positioned on top of the dirt and the dog could reach, um, around the mound of dirt. Um, and, again, it was -- it was barking, it would lunge at people, and -- and I was also told that the dog might have bit a, uh, trooper.

            ATTORNEY EDELSTEIN:  Um, that -- that's hearsay.  Ask that it be stricken.

            ATTORNEY FALLON:  It's not a matter, uh --

            THE COURT:  It will -- It will -- Objection's sustained.  Strike that last remark about the dog biting.

            ATTORNEY FALLON:  All right.

Q    (By Attorney Fallon)  Now, I note that there is a red, um, box-like, or shed, um, item which appears on the left-hand side of the photograph. What is that?

A    That is the doghouse.

Q    All right.  Now, um, you have one other

187

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 187 of 255    Document 19-17

photograph in front of you. Let's talk a little bit about that.

A    Okay.

Q    Which photograph -- What exhibit number is that?

A    That's Exhibit 169.

Q    All right. And what is depicted in Exhibit 169?

A    Depicted in this photo are a number of things. The, uh, swirl from the, uh, steel belt from the tires.

Q    Let's use your, um, pointer, if you would, and --

A    Sure.

Q    -- identify for us what you believe is steel-belted wiring?

A    This is -- This is what I believe to be steel-belted wiring from steel-belted tires. Another tire. Uh, this is a burned out, uh -- the burned out -- completely consumed, um, uh, seat from a, uh -- what I thought might be a bench seat from a van. Um, also, in here, was, uh, what I believed to be bone fragment intertwined within the steel-belted, uh, tire, um, stuff here.

Q    All right. All right. Let's take these a little bit, um, at a time. What was the first thing about this area that drew your attention to this, um, pit area as being, perhaps, somewhat significant? Or at least interesting?

188

A    Well, the first thing that drew my attention to this burn pit was the bone fragment that was approximately eight feet away from the burn pit. As you're looking at this photo, that piece of bone fragment was about eight feet out this way.

Q    All right. We're going to switch back to Exhibit -- I believe it was 168?

A    Okay.

Q    And, um, does that help you assist, perhaps, in placing the area where the fragment is?

A    Yes, it does. The bone fragment's located, I estimated, about eight feet away from the -- the burn pit.

Q    All right. Upon discovering that fragment, what did you do?

A    I -- I looked at the fragment. I did not touch it. And I was curious about this pit, so I walked over towards the burn pit, looked at the burn pit, and noticed what I believed to be other or additional burned or charred bone matter within this pile of debris and around the burn pit.

         Also, there was what I believed to be bone fragment intertwined in the steel belts -- the steel -- of the steel-belted, uh, material here. And the other thing I did is I -- I had a

189

twig, I moved -- there were leaves in this -- there's some leaves here, and I moved a couple leaves, and noticed what I thought to be was, uh, skull matter or skull bone fragments, um, within the -- the, uh, debris pile.

Q All right. Now, there -- Yeah. There appear to be other implements, um, near the, uh, burn pile. Um, could you identify those for us?

A Yes. I noticed a shovel, which was of a spade design. I also noted a hammer, um, a rake. There was a rake here as well. A screwdriver, um, and some other things, uh, within the burn area.

Q All right. Upon making, um -- We're going to have a few exhibits brought in for you to examine. I'm having Investigator Wiegert hand you what is marked as Exhibit 170. Do you recognize that item?

A Yes, I do.

Q And what is Exhibit No. 170?

A This is the rake that was, uh, at the -- the burn site.

Q All right. And that is the one. All right. And if we could have the officer show you 171? While Investigator Wiegert is, um, taking that out, just so the record is clear, would you describe

190

the condition of the rake first?

A It's, um -- It's a handled rake, um, certainly partially burned. Um, the handle is partially -- or the, uh, rake, itself, is somewhat oxidized or rusted, and it's got leaves, and, um, metal, uh, perhaps steel belt, um, stuck in some of the, uh -- the rake blades.

Q From your time in the, uh, Arson Bureau, you -- are you familiar with the phrase, "alligatoring effect"?

A In terms of the burn?

Q Yes.

A Uh, to -- to a certain extent.

Q All right. Well, do you see any particular type of -- What -- What's the degree of burning on that, um -- that rake?

A Well, the burning is -- is -- is at the bottom, and working its way towards the top, meaning that more heat was applied to the bottom of this than the top. Therefore, you've got more charring and more burning from the bottom up.

Q All right. What do you call, in your experience, the -- that ridge-like effect on the wood that you're holding?

A The, um -- the specific name, um, escapes me but --

191

Q Okay.

A -- um -- But, you know, the heat -- By looking at this, you can tell that it burned more from the bottom than from the top, and it was used -- or that -- in the fire at the bottom.

Q All right.

A So --

Q And the handle of that rake is made out of what substance, just --

A Wood.

Q -- so --

A Wood.

Q Very good. All right. Would you take it -- a look at Exhibit 171, please? Do you recognize Exhibit 171?

A Yes, I do. Um, this is the spade that was at the scene, um, as depicted in the photo as well, um, that I observed, uh, near the burn pit, um, on November 8.

Q All right. And if you would, what is the handle of the spade made out of?

A This would be a, uh -- a wood as well.

Q All right. And describe the condition of, first of all, the spade, itself? The shovel portion of the --

A The -- the -- the bottom of the shovel, the metal

192

part is what I would refer to as a spade, and it does show some signs of, also, being exposed to fire, um, with some of the charring, um, at the bottom of the blade, towards the blade, itself.

Q   All right.  Does the blade appear to be somewhat oxidized?

A   Yes, it does.

Q   Is that an unusual occurrence for metal being exposed to fire?

A   No.

Q   All right.  Very good.  I'll have Investigator Wiegert take that from you.  Now, after you made the discovery of the bone fragment, which was about eight feet in front of the area that you've described, and then you said -- you indicated you used, perhaps, a twig or something to move some leaves to get a closer look at some of the other items directly in the -- the darkened area, which is depicted in, uh, Exhibit 168, um, which is portrayed on the screen, I believe?

A   Yes.

Q   All right.  After you made these discoveries, what did you do?

A   After -- after the bones, or bone matter, or charred matter, was discovered, at that point we made several

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 193 of 255    Document 19-17

phone calls. We attempted to, um, contact some of the arson folks and have them come over. They were busy with other issues. We also contacted the Crime Lab folks, and because they were busy processing other, uh, scenes, it was probably, uh, an hour-and-a-half or so before the Crime Lab actually arrived at the burn pit.

Q All right. And who, in fact, arrived at the burn pit to assist you?

A The, uh -- The Crime Lab personnel were, um, John Ertl, uh, Chuck Cates, and Guang Zhang. Um --

Q All right. Prior to their arrival, did you attempt any processing of the pit yourself?

A Absolutely not.

Q All right. Um, when they arrived, tell us how the pit was processed?

A When the Crime Lab arrived at the scene, um, John Ertl and others, as -- as well as myself and Deputy Jost, assisted with erecting a sifting apparatus. And this is just not something one person can erect. It's a large, um, tripod-type to -- um, piece of equipment, and so it took a -- a couple of us, uh, to erect this thing. It's, again, a large tripod. It probably stands eight feet off the ground.

And from that, um, after -- after

194

Q All right. And, um, how did this sifting actually mechanically occur?

A John Ertl, and some of the other Crime Lab folks, actually scooped up that debris material with a -- I believe a flat shovel, if I'm -- if my memory serves me correctly, placed that onto those sifting screens, which were, again, I think, two feet wide by four feet in length. There may have been more than one sifter. And as the debris is placed on top of what we sorted, and we picked out things that we felt were either bone fragments, teeth, um, metal grommets, zipper, uh, a, uh, piece of a metal belt buckle, and, um, so as we sifted through that, we took those things out that we thought might be bone matter and other things that might be of importance, and then placed those items into a box, um, that, uh, was turned -- or -- or -- that the Crime Lab took with them after we completed sifting that pile of debris, which is right there.

Q All right. I'm showing -- I'm having Mr. Fassbender, um, show you Exhibit 172. If you

195

would take a moment to examine that exhibit?  Do you recognize Exhibit 172?

A  Yes.  This is -- This is the, uh, zipper that we picked out of the -- the debris that we were sifting through --

Q  All right.

A  -- from this pile.

Q  All right.  Are there any particular markings or anything on that zipper?

A  Yes, there are.

Q  And would you tell us what they are, please?

A  They are in capital Y-K-K.

Q  All right.  Very good.  Thank you.  Approximately how long did, um, the sifting process take that you engaged in?

A  I think -- I would -- I would just have to guess, was roughly two hours, and that included the time that we actually set up the apparatus, the sifting, and we sifted rapidly due to -- due to, uh, darkness.

Q  All right.  And you indicated the presence of other, uh, implements or items, uh, in the general area of the pit?

A  Yes.

Q  I'd like you to, first of all, if you can recall, what was -- what implements, if any, were

196

Q actually found in the darkened area, which looks like the burn part?  If you could recall what -- what was found in that part?

A I believe there was a screwdriver, hammer, um, of course, this, um, steel-belt wiring, a hacksaw blade, and I believe that was it to the best of my recollection.

Q I'm having Investigator Fassbender show you Exhibit 173.  Uh, is there, uh, an item depicted in there?

A Yes.  It's --

Q Is that --

A It's a screwdriver.

Q We'll have that projected in just a moment.  That is the screwdriver that you were, um, just speaking of?

A Yes.

Q Uh, the photograph also appears to depict some circular wire material?

A Yes.  In -- in -- in my opinion, this was more steel belt -- steel-belt wiring.

Q All right.  Very good.

A And that was Exhibit 173.

Q As, um, five o'clock drew near, what did you do?

A As -- As darkness was nearing, um, we sifted what we

197

could, um, and I felt it was important to pick this -- these items up and get them to the Crime Lab, because at this point in time we don't know if Teresa Halbach is alive or dead. So it was important, with the impending darkness, to sift through this stuff, do it fairly quickly, be thorough, pick out what we could, and then get that to the Crime Lab so the Crime Lab could analyze that and make some sort of determination.

So after -- after we sifted through the remaining debris -- And we sifted this on top of a tarp that I think was six feet by eight feet. So the stuff that we sifted through we collected, we double- and triple-bagged that debris that was depicted in the picture, and placed that into the Calumet County, uh, evidence van, if you will. So --

Q All right. And how was the pit preserved, if at all, when you were done?

A The pit -- Uh, we placed a tarp over the pit so that if this, in fact, turned out to be Teresa, that we would then go back and more closely examine that pit and, um -- a little closer.

Q We're going to have you identify one more exhibit. Uh, Investigator Wiegert, um, prepared

the exhibit for your examination. This may require you to step off of the stand. I'm not sure how -- what your view will be. Just bear with us one moment. Um, Mr. Sturdivant, would you step forward? Um, I'll share my microphone with you so everyone can hear.

A    Um-hmm.

Q    Uh, we've had now produced, um, an exhibit marked 174. And do you recognize it?

A    I -- I don't know that I need it. I do. And then maybe we put up photo 169 or --

Q    Sure.

A    -- and I can just point that out to you.

Q    Yep.

A    This is a -- in my opinion, just a -- a burned out, um, bench seat frame from a motor vehicle that is clearly completely consumed. That was to the -- if you -- as you're facing this pit, if it's directly in front of us, this -- this seat, or bench seat, was immediate to the right, or the edge of it, towards the -- the burn pit.

Q    All right. And just so it's clear, Exhibit 174, is this the seat which you observed at the scene and which is depicted in Exhibit 169?

A    Yes, it is.

Q    All right.  You may have your seat.  Thank you.
Does it appear to be in substantially the same
condition as it was when, um, you first observed
it?

A    It does.

ATTORNEY FALLON:  Your Honor, at this
time I would, um, move into evidence Exhibits 168
through 174.  Upon their receipt, uh, would
tender the witness for cross-examination.

THE COURT:  Any objection, Counsel?

ATTORNEY FREMGEN:  No objection.

THE COURT:  Uh, items 168 through 174 are
received.  And you may cross.

ATTORNEY FREMGEN:  Thank you.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q    If I could just use those photographs?  Thank
you.

A    You're welcome.

Q    While I'm doing this, if I could ask you a couple
of questions.  Maybe a silly question, but I
don't un -- I don't know the answer to this.  As
you looked at each item, you put on a pair of
gloves; correct?

A    Yes, I did.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 200 of 255    Document 19-17

Q   Why do you do that?

A   Well, because there's -- For one, there's, um, soot on the items.  And, two, to keep my hands clean. And, secondly, just because it's something you typically do when you're processing evidence.

Q   So you -- It's just a normal occurrence for you in your -- probably from being a -- a crime scene tech for so long that you just, second nature, grabbed some gloves?

A   Yes.

Q   I'm not a crime scene tech so that's why I -- (inaudible.)

A   I'm not a crime -- crime scene technician, either.

Q   Okay.  This is, uh, Exhibit 169?  The picture?

A   Yes, sir.

Q   And this, I believe you testified to, was essentially the van seat with some steel-belted tire wiring wadded up; correct?

A   Yes, sir.

Q   And just behind that is a tire; correct?

A   Yes.

Q   Obviously, that tire doesn't look burned --

A   No.

Q   -- correct?  Is this the way the scene looked when you got to this fire pit area?

201

A    I do not recall some of these red flags being in the -- in the crime scene.

Q    The van seat, itself, though, was not on the actual ashened area of the pit?  It was off to the side like this?

A    The van -- The van seat was close to the edge of the burn pit, and this -- there -- we don't have -- this isn't a complete photo, so I'm not certain how close that is to the pit.

Q    So did someone move the van seat to where it's at now?

A    It's hard to depict from this photo exactly where the burn pit is, but the seat was located -- that's your -- that's a -- that's -- that's a fairly accurate representation of where that seat was.

Q    Okay.  I -- I guess I was under the impression from your previous answer that that -- you said that the van seat, itself, was somewhere in this area when you first arrived?

A    Maybe we can get a better photo, but the van seat was to the immediate right of the burn pit.

Q    Okay.  I'll show you Ex -- Exhibit 168 again.  The large -- larger picture of the burn pit?

A    Yes.  The seat would have been right here, right beside the pile of steel-belted wire.

202

Q   Do you know who moved it?

A   I do not.

Q   Was it, uh, some other -- some other officer or someone else that was at the scene before you?

A   I assume that was moved after the scene.  Probably taken into evidence.

Q   Agent, I'm going to show you what's been marked Exhibit 175.  Can you describe what that picture or photograph shows?  And then I'll put it on the --

        ATTORNEY KRATZ:  If you just hit one, it's all cued up.

        ATTORNEY FREMGEN:  Great.

Q   (By Attorney Fremgen)  Now, using this photograph, can you better --

A   Yes.

Q   -- describe --

A   Um-hmm.

Q   Okay.

A   All right.  This -- This is the burn pit, and this is a seat to the right of the burn pit.

Q   Okay.  But as far as you know, the seat, itself, had not been on the -- the burn pit area where -- the sunken area when you arri -- rived.  It was where it is --

203

A It was --

Q -- now in the picture?

A Right. It was not -- The burn -- The -- The seat was not on top of the debris pile. It was to the right.

Q Okay. Now, you indicated you found some smallen (phonetic) -- what you believed to be smallen pieces of bone in the -- that large wad of steel belts?

A Yes.

Q Did you find any in the van seat?

A No. The, uh -- The bone material was intertwined in all this steel belt.

Q You -- you mentioned that what drew your attention to this area in particular was having seen a small bone fragment about eight feet from the front end of the bone -- of the burn pit?

A Yes, sir.

Q And about how big a bone fragment was it?

A As I estimated, it was about one inch by one inch. Just a small bone fragment.

Q Could you tell by looking at that bone fragment whether it was human or animal?

A I could not.

Q Do you have expertise in bone fragments? Being able to distinguish between human and the -- and

204

Q the animal?

A I do not, sir.

Q When you refer to a skull bone fragment in the burn pit, you don't have an expertise that it's distinguished between skull fragments and other fragments?

A No, sir.

Q You were just assuming?

A Wasn't assumption. I think what -- what I -- I testified to is I thought that it was important that we pick these bones up and have them analyzed to determine whether or not they were human bones and Teresa Halbach's.

Q Okay. But, I mean, at the time you arro -- arrived at the scene, you didn't know what they were?

A I did not, sir. No.

Q But they at least provided you with some sort of ev -- potential evidential value that you wanted to protect it or preserve it?

A That's correct.

Q In Exhibit 173 -- I'll put that back up on the ELMO -- you were describing the screwdriver in the middle of this pit area; correct?

A Yes, sir.

205

Q And, actually, I -- I think I might have misspoke. It's actually on the outer edge of the pit area?

A Well, I believe the screwdriver was -- I consider the pit the concave area, or that area that had that six-foot rectangular area that was scooped out.

Q The screwdriver, did it -- was it burned?

A I believe it just had -- you can see soot on the handle. Did not see any indication where it's burned here.

Q Nothing on the, uh -- the metal portion?

A No.

Q Didn't have that same look, for instance, as the spade of -- of -- of the shovel?

A No. This is, uh, the way it appears.

Q Okay.

ATTORNEY FREMGEN: Thank you, Your Honor. I have nothing else.

THE COURT: Any redirect?

ATTORNEY FALLON: None.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: You're welcome.

ATTORNEY FALLON: We have one last witness.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 206 of 255    Document 19-17

THE COURT: All right.

ATTORNEY FALLON: State would call, um, Don Simley to the stand.

THE COURT: Why don't you just remain standing there and take the oath, please.

**DONALD SIMLEY,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: My name is a Donald O. Simley, S-i-m-l-e-y. It's the 2nd.

**<u>DIRECT EXAMINATION</u>**

BY ATTORNEY FALLON:

Q    What do you do for a living?

A    I'm a general dentist in Madison, Wisconsin.

Q    And how long have you been employed in that capacity?

A    I graduated from Marquette University in 1976, and have been there ever since.

Q    Uh, what type of dentistry, um, do you practice?

A    Uh, general dentistry is a family dentistry where I take care of patients and their general oral health. I also am a consultant in forensic dentistry.

Q    All right. And, um, what is forensic dentistry?

207

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 207 of 255    Document 19-17

A   Forensic dentistry can, basically, be defined as the application of the science of dentistry to the field of law. I'm sorry. Slow down? The application of science of dentistry to the field of law.

Uh, there are a number of different areas that can be involved in forensic dentistry. Uh, routine dental identifications are the most commonly involved where individuals that are -- are not viewable or visually identifiable need to be identified. Um, mass disaster involvement, uh, just dental identifications taken to a -- a higher number. Uh, child abuse cases. Uh, bite mark evidence, uh, dental malpractice and negligence in trauma of injury that are involved in litigation.

Q   All right. And how is it that you are involved in this case, Doctor?

A   Uh, received a phone call from, uh, Special Agent Duranda Freymiller, on November 9 of 2005.

Q   What were you asked to do?

A   She asked me to assist in the identification of -- of an individual that was recovered in Manitowoc County.

Q   All right. And, um -- And why are you here today?

A   Uh, to render my opinion after analysis of the

208

remains and to give my opinion.

Q   All right.  Well, before we get to the opinion, uh, and your findings in this case, um, if you would tell us a little bit about yourself.  First of all, tell us, uh, where you received your undergraduate degree?

A   I graduated, uh, from Elmhurst College in 1960 -- '72, I'm sorry.  Uh, received a B.S. Degree there. And then in 1976 I graduated from Marquette University, School of Dentistry.

Q   And if you would tell us a little bit about, um, your forensic dental experience?  What are some of the types of things that you did?

A   Um, well, I've been in -- involved in forensic dentistry since 1981.  Um, most of the cases I -- I do are -- are dental identification cases.  Again, bite mark evidence, um, child abuse cases.  Uh, been involved in 435 cases, approximately.  Uh, that does not include work where I was involved in the World Trade Center and down in Katrina.  Um --

Q   We'll touch -- touch base with them in just a moment.

A   Okay.

Q   Um, just so that we're clear, tell the jury what a dental identification is?  What does it mean?

209

A   Dental identification is -- it's a means of positive identification.  If -- if an individual is, uh, decomposed, or skeletonized, or burned beyond recognition, uh, if there's been disfigurement to the face, uh, where a visual identification is not applicable, or fingerprint, uh, identification is not available, uh, sometimes you resort to dental identifications, which is usually easier, quicker, cheaper than -- than DNA.

Q   All right.  And, um, have you been called upon, um, to, uh, render expert opinion on dental identification in the past?

A   Yes, sir, I have.

Q   Uh, any estimate as to approximately how many times you've been asked to express an opinion?

A   Meaning in-court testimony?

Q   Regarding an -- a dental identification, yes.

A   I've testified, I believe, 32 times.  Most of those were involved with dental identifications.  Um, probably three-quarters of them.  The other ones were in bite mark cases, and I think there's only one that was involved in an injury case.  Personal injury case.

Q   All right.  Tell -- You mentioned something about, uh, disaster response experience.  You

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 210 of 255    Document 19-17

mentioned something about the World Trade Center and Katrina. How were you involved in those types of responses?

A I'm a member of a -- a national disaster team. It's part of what they call NDMS, or the National Disaster Medical System, which currently operates underneath the Health and Human Services. And it was under Health and Human Services at September 11. And then they restructured things. And then Katrina, they were actually underneath, uh, Department of Homeland Security and FEMA. And now we're back with Health and Human Services.

And I've been involved with this NDMS, and they have a DMORT team, and DMORT stands for Disaster Mortuary Operational Response Team. And I've been involved with the DMORT team for a number of years, but I've only actually been deployed or activated twice. And once was for the World Trade Center and then once was for Katrina.

Q And your role in those responses was what?

A Two assist and help in the identification of the individuals.

Q All right. Are you familiar with, uh, a -- a standing or a title called board certification?

211

A     Yes, sir.

Q     Tell us what that is?

A     Um, to be board certified, uh, would indicate that you have a -- I'd say a higher degree of experience, or expertise, um, or training in the area of, in this particular case, forensic dentistry.

      Uh, it means taking a -- a -- an examination. In my particular case, to be qualified, you have to submit an application. I believe the application that I submitted, uh, and I was board certified in 1993, was -- consisted of two, three-ring binders that were full of documentation of, uh, cases that I've been involved with, uh, court testimony, uh, documentation of affiliations with certain agencies, continuing education.

      And then if you're deemed to be board eligible to take the examination, the examination is a -- it's a two-day written/oral examination that you have to take to pass.

Q     All right. And so I take it, then, from your comments, you are a board certified forensic dentist?

A     Yes, sir.

Q     All right. Uh, how many board certified forensic

212

Q dentists are there in Wisconsin, for instance?

A There are only two of us in Wisconsin.

Q All right. And in terms of, um, generally, in North America, United States, and Canada, in particular, do you have any idea approximately how many board certified dentists there are?

A There are approximately a hundred board certified forensic dentists in -- in North America.

Q Do you belong to any professional organizations? Uh, you mentioned the National Disaster Medical System. Are there any other organizations that you, um, you are a member of that assist you in your forensic work?

A Uh, there are a number of different organizations that I -- I belong to. I'm not so sure that they assist me, although you -- I shouldn't say that either, because they -- they do assist me in the fact that you gain, uh, continuing education and additional learning experiences from these organizations.

Uh, the American Society of Forensic Odontology is kind of an entry level organization, but it's one of the biggest forensic organizations in the country and the world.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 213 of 255    Document 19-17

The, um, American Academy of Forensic Sciences, uh, is probably one of the premier organizations in the United States.

Um, I'm also a member of the Wisconsin Association for Identification. Uh, the Wisconsin Coroners and Medical Examiners Association.

Um, and then the board affiliation with the American Board of Forensic Odontology. And odontology is just a fancy name for dentistry.

Q All right. And, um, drawing your attention just ver -- very briefly to Exhibit 182, um, do you recognize Exhibit 182?

A Yes, sir, I do.

Q What is Exhibit 182?

A Uh, this is a copy of my CV, or curriculum vitae.

Q All right. And is that an accurate summary of your educational and professional experience as it relates to the field of forensic dentistry?

A Yes, sir, it is.

Q All right. Now, to this case. When was it that you first became involved in the case, Doctor?

A That would have been on November 9 of 2005.

Q All right. And what were you asked to do?

A Well, Special Agent Freymiller had asked me to assist

214

in the identification, and then Assistant, uh, District Attorney Jeff Froehlich, uh, had called and, um, wanted to know, number one, I -- that I'd already looked at some of the remains on that date, and wanted to know if they were human or nonhuman, and then he also wanted to know a little bit about my -- my background and -- and my qualifications.

Q All right. Uh, did it come to pass that you were asked to examine, um, items to determine whether or not they involved, uh, your field of forensic dentistry?

A Yes, sir.

Q And approximately how many items were you asked to examine and -- and attempt identification of?

A There were six times that I received evidence. A total number of pieces of -- of potential evidence were 52, uh, potential items of evidence.

Q All right. And tell us about those items? What did they consist of?

A When I say potential, because, initially, it's -- it's -- it's difficult to identify, uh, some burned and fragmented dental structures. Um, so potential, meaning that some of the items that were recovered were not dental structures, but it wasn't initially known then, or they wanted to be verified.

215

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 215 of 255    Document 19-17

Um, there were, I believe, 24, uh, dental structures, root fragments, um, crown fragments. There was not one whole tooth that I was able to examine. There were three bone fragments. There were 24 pieces of wood that, again, looked like dental structures. And one piece of plastic.

Q   Is it at all unusual to have, for instance, a -- a piece of wood, um, mistaken for a tooth?

A   No, sir. It's, uh, quite common. It's -- it's easy for anybody else to misidentify them, or to exclude them, or -- or not identify them as tooth structures. In -- in fact, sometimes I can't even identify them without taking x-rays of -- because they look totally different radiographically or on the x-rays.

Q   And is that, um, particularly more problematic when they've been consumed in a fire?

A   Yes, sir.

Q   All right. Um, having said that, would you tell us or describe for us the condition of -- of, uh, these -- the 24 tooth fragments and the three bone fragments that you examined?

A   They were all burned. They were all charred. Uh, they were very, very brittle. Um, again, they didn't look like normal tooth like we would normally see,

and, essentially, the crowns were all gone. What we were looking at was just the root structure, which was, um, part of the tooth that's buried in the bone.

There was one portion of a crown, um, but that portion of the crown was from a -- a cuspid or an eyetooth and was not able to be identified.

Q All right. In terms of the condition of these fragments, how did they compare to other fragments that you've been asked to examine in attempt at identification of in the past?

A Since 1981, I've examined a number of -- of individuals who've been burned, and, uh, these were probably among the worst that I've examined.

Q Are you familiar with a phrase that some dentists use called fracture matching?

A Yes, sir.

Q Um, what is fracture matching?

A When you fracture match something, you can put two pieces back together. And if I can say that they came from a common source, that they were at one time one piece, you can fracture match them back together.

Q Did you attempt any fracture matching in this case?

A Yes, sir, I did.

217

Q   All right.  Tell us about that?

A   There were two root fragments that I was able to fracture match back together.  Actually, I should say four.  There were two that were very critical, but there were two other ones that ended up being academic.

Um, the two critical ones were -- were root fragments from, uh, the lower right second molar, which would be Tooth No. 31, which we call it, and that particular tooth, the crown, again, was -- was destroyed, but there were two roots associated with that tooth, and they were separate, but I could put those back together, and I could see that they had initially come -- at one time been together.  And then to fracture match them, I put them back together and then I applied a little cyanoacrylate, or Super Glue so that they stick together.

Q   All right.  And is that a common approach?

A   Yes, sir.

Q   And what is the benefit of fracture matching?

A   Well, there's a couple benefits, really.  Number one, if you've got 52 pieces of potential evidence, if you can combine that down so that there's a little bit less, that's a -- a small advantage, not a big one.

218

The big one is -- is that these pieces of -- of dental remains are extremely brittle when they're burned and they're charred. And these pieces of -- of -- of dental structures could be very easily crushed with finger pressure. If they're dropped, they could be broken. And if that happens, that pot -- potential piece of evidence is -- is lost. It's gone forever.

So by Super Gluing them, and -- and fracture matching, and putting them back together, and reinforcing them with the cyanoacrylate, you can preserve, you can protect, and -- and maintain that evidence better.

Q All right. And, um, in this particular case, uh, were you -- uh, did you attempt to make a comparison?

A Yes, sir, I did.

Q All right. And that would assume, then, that you had something to compare or standards to compare the fracture matched tooth with something else?

A That's correct.

Q Um, and tell us, what did you have at your disposal to assist in this comparison?

A Well, there were a number of different x-rays that I

219

had of -- of Teresa Halbach, and all the x-rays were labeled with -- with Teresa's name. On November 10, uh, Special Agent Jim Holmes brought to my office dental records for Teresa.

And those records consisted of a panorex x-ray from August 30 of 2001. Um, a panorex x-ray is an x-ray that goes around the outside of the mouth and picks up everything from ear to ear. Uh, oral surgeons love them. A lot of general dentists love them. Pediatric dentists love them. Because it -- it picks up everything.

He also brought over 16 bitewing x-rays. And a bitewing x-ray, as I'm sure you're familiar with, is you go in to see your family dentist, and they have you bite down on the film, and shoot the x-ray in from the side, and it picks up the most amount of tooth structure with the least amount of x-rays. And, usually, you're looking for decay. You can look at the bone support there, too.

There were 16 bitewing x-rays varying in ages from 1998 to 2004. At that particular time, though, I knew that we needed -- additional x-rays would be more beneficial. And what I was looking for, specifically, is what they call a

220

periapical x-ray.

Q  Uh, what was that again?

A  A periapical x-ray.

Q  Could you, uh, spell that for us?  Um --

A  P-e-r-i-a-p-i-c-a-l.

Q  What -- what is that?

A  A periapical x-ray, it -- it's just -- it's just like the bitewing x-ray.  The same size.  But it's positioned down lower on the tooth so it will pick up one or two teeth in its entirety, and it will pick up the whole root structure.  Whereas, on a bitewing x-ray, you're picking up top and bottom teeth, and you kind of cut off the ends of the roots, uh, because they're not designed to pick up the whole root structure.

And I was looking -- Since we had the entire root from this Tooth No. 31 that we were looking at, um, I was looking for periapical x-rays, of which Teresa's dentist did not have any of these x-rays, but he said he did have some additional x-rays from 1997.  Um, it was August 25 of 1997.  And he said those x-rays were positioned just a little bit lower and they showed a little bit more root structure.  So he forwarded those to me so I had those to look at

221

also.

Q  With the assistance of the 1997, um, x-ray, were you able to make a comparison?

A  Yes, sir, I was.

Q  All right.  And before we do that, um, just so that we know, um, in dental circles, you number your teeth, so --

A  Yes.

Q  -- tell -- tell us what Tooth No. 31 is?

A  All the teeth have specific numbers.  They have what they call a universal numbering system.  So if I talk about Tooth No. 1, uh, any dentist in the country will know that I'm talking about the upper right third molar.  The wisdom tooth.

If I'm talking about Teeth No. 8 and 9, they'll know I'm talking about the two central incisors right underneath the nose.  The big front teeth.

Uh, No. 19 is a lower left first molar, and Tooth No. 31 is a lower right second permanent molar.

Q  All right.

A  So just a -- a way of -- for us to more easily, um, identify a particular tooth by number.

Q  All right.  I'm going to have, um, an exhibit

222

marked and shown to you. I'm having Agent, uh, Fassbender show you Exhibit 162. If you'd take a moment to examine it? Do you recognize Exhibit 162?

A Yes, sir, I do.

Q And what is Exhibit 162?

A These are the remains that I received on, uh, November 11, 2005 from Special Agent Jim Holmes.

Q All right. And, um, what remains are depicted in Exhibit 162?

A There were two bone fragments. Um, one of what they call the coronoid process, which is just an upper part of the lower jaw, which was academic in recovery. There was another, uh, bone fragment, which was from the lower right mandible, or lower jaw. And then there were three root fragments.

Q All right. Now, is exhibit -- Excuse me. Does Exhibit, um, 162, uh, contain these -- this Tooth No. 31 that you used in your comparison?

A Yes, sir, it does.

Q All right. All right. Um, I believe that, um, we have prepared a, um, PowerPoint presentation to assist in, um, your explanation of your findings; is that correct?

A That's correct.

223

Q    All right.  And would the use of the PowerPoint assist you in further, um, demonstrating what your findings were?

A    I think it would be beneficial for the jurors, please.

Q    All right.  While we're working on, um, getting that up and running, um, explain why you were able to do a comparison involving Tooth No. 31?

A    Well, Tooth No. 31 was really the one that was best preserved.  It had the most physical evidence that was there with the two root structures.  Uh, again, there were no crowns that were remaining.  Uh, fillings that Teresa had in her teeth were gone.  Uh, they were destroyed in the fire.  Uh, all the crown structure that was easily identifiable was gone.

Uh, some of the root fragments that were recovered, uh, of those 24 initial root fragments -- I mean, there were some that I couldn't identify.  I mean, they were burned badly enough, and they had just por -- portions of roots that, um -- I mean, I tried to identify each tooth as to, you know, if it was a molar, or bicuspid, a cuspid, an incisor, or what type of tooth it was, and there were some that I couldn't identify.  Uh, so that was the best physical

piece of evidence that we had for examination.

And, also, then, you have an, uh -- a dental record from Teresa, um, that you can compare. So you need decent postmortem evidence and you need decent, uh, antemortem evidence, also.

Q All right. I'm going to have some photographs presented to you in -- in conjunction with, um, PowerPoint. What is, um -- First of all, um, you have a photograph there, which was, uh, depicted in the photograph? The top one?

A This top one is, um, what's on the screen. You want the number you mean?

Q Yes, please. The exhibit number?

A Exhibit No. 176.

Q Very good. And that is what is depicted on the screen?

A Yes, sir.

Q All right. What does, uh, Tooth No. 31, buccal, b-u-c-c-a-l, what -- what does that signify?

A Buccal means cheek side. So, uh, there are actually five aspects to a tooth that we can examine. And the buccal aspect is the cheek side. The lingual, which we'll see in a second, is the tongue side. The occlusal portion is the top of the tooth. And then

225

two additional sides would be the mesial, towards the front of the mouth, and distal, towards the back of the mouth.

So this just happens to depict the -- the buccal aspect. And what we're looking at is -- If you compare this grainy aspect here, that surface is very rough, um, and usually the cheek side aspect of a dental fragment is usually going to be burned more than the tongue side aspect, because on the tongue side aspect, the tongue actually pushes up against the tooth and the jaw fragment to -- to further preserve and protect that particular fragment.

Whereas, once the cheek gets burned through, uh, the outside or the cheek side aspect of that tooth is going to take a bigger hit in there. Um --

Q How much of that is the actual tooth, itself, which is depicted, if you could help us out?

A Right -- This is the back root, and this is the front root. This would have been the socket where the first molar, Tooth No. 30, would have been, and this is a socket where the second bicuspid would have been.

So we're actually seeing a section from

226

the second bicuspid back to -- And this is actually where a wisdom tooth might have been if one had been present.

Q All right. And, um, what is the next, um, um, photograph you have there?

A The next photograph is not here.

Q All right. All right. And, um, what is depicted, then, on the --

A This --

Q -- um, PowerPoint?

A This PowerPoint -- This shows the lingual aspect, or the tongue side aspect. And, again, you can see -- you compare that surface of the bone compared to the cheek side aspect, it's very smooth. It was protected. It was -- it was further insulated in there. And this is just a portion of Tooth No. 31. Uh, that's all that was left of the crown portion of the tooth.

Q All right. Next one? And, uh, what are we looking at here on the -- the photograph? This should be Exhibit 177, I believe?

A That's correct, 177. Uh, this is from the occlusal or from the biting surface. And this just shows the top of the tooth. And the way it was fractured matched, that fracture was down -- looks like it

227

Q   comes across here and comes up here.  So this root and this root were two separate entities, uh, when I received them, and then I fracture matched them back together.

Q   All right.  So are you telling us that what we're looking at here is actually the root and not so much -- the -- the top of the root and not really the crown or the top that -- the part where we chew with?

A   Correct.  That part that you chew with, the part that's normally above the gum, is -- is, for all practical purposes, 99.9 percent gone.

Q   All right.  All right.  And what is, uh, depicted here now?

A   Uh, this is Exhibit 178.

Q   All right.

A   Uh, this was the panorex x-ray from 2001, uh, that I received from Special Agent Jim Holmes.  Again, the panorex x-ray goes around the outside of the mouth, picks up everything from ear to ear.  Um, so it shows all of the teeth, and it shows the wisdom teeth that Teresa had at this particular time.  The tooth that we're looking at is on the lower right second molar, and that's Tooth No. 31.

Q   What are we looking at here?

228

A   Uh, this would be Exhibit 179.  And this is just a cropped picture of that panorex.  So it's just -- That area that we're looking at on Tooth No. 31 kind of zoomed in on that particular tooth.

Q   Okay.

A   That is Tooth No. 31.  I had other fragments in there at one time, uh, trying to see if that particular fragment was part of Tooth No. 30, and that it was not.  Um, so what we're looking at, again, this is the postmort x-ray of the fragment of Tooth No. 31.

Q   All right.

A   And then this is just a cropped picture of Tooth No. 31, and that is -- looks like Exhibit 180.

Q   All right.  And what does, um, postmortem x-ray mean?

A   Postmortem is just after death.

Q   All right.  And so is that the -- is that an x-ray of what you previously showed?

A   Correct.  The initial photographs, uh, of -- of Tooth No. 31 with the buccal, lingual and occlusal views.  Uh, that's an x-ray of that fragment, yes.

Q   So that's that tooth there.  Now, is that, um, x-ray taken after it's fracture matched?

A   Correct.

Q   Okay.  All right.  And what are we looking at

229

here?  We have a split screen; panorex and postmortem?

A    This is Exhibit 181.  And this is just a side-by-side comparison of the panorex at the cropped Tooth No. 31, and then the postmortem Tooth No. 31.  And just some of the things I'm looking at is the distance between the roots.  The whiter area up here that we're looking at is the enamel.  That's the crown of the tooth.  From here over is the crown of the tooth.  And that part has been destroyed.

The little grayer shade on the inside is the dentin.  That's the inside part of the tooth.  Um, enamel is the hardest structure in the body.  Dentin is the second hardest structure in the body.  Uh, they're both harder than bone.

The dark line in the middle of the tooth is the pulp.  That's the blood vessel near the middle of the tooth.

So what I'm looking at, I'm comparing the pulp tissues in the middle of the tooth, antemortem and postmortem.  There's a little curvature in the root on the postmortem x-ray that I can see on the antemortem x-ray.

So that's just a side-by-side comparison.

230

Q All right. All right, Doctor, let me ask you, then, for, um, your opinion. Um, based on your analysis of Tooth No. 31, the one that you were able to fracture match back together, do you have an opinion on whether the root and bone fragments from Tooth 31 recovered, uh, from the burn pit, are consistent with the dental x-rays of Teresa Halbach that you obtained from Dr. Krupka?

A Yes, I do.

Q And what is that opinion?

A In my opinion, they were very consistent. And that I could place -- actually place the antemortem x-ray on top of the postmortem x-ray on the panorex, and then, also, on the '97 bitewing x-rays, and they would appear as one. I mean, I could superimpose one on top of the other.

And the -- the pulp tissue, the root structure, uh, would coincide perfectly in there. So they were very consistent.

Q Now -- now, in your terms of forensic dentistry, what does very consistent mean?

A To me, very consistent means that it's a probable identification. Um, positive identification -- I -- I was a little leary of -- of that term, because of the fact that I only, essentially, had one fragment

231

to really work with.  Um, but I also am very conservative in my opinion.  Um, if I say positive identification, to me that means to the exclusion of all others.  And, um --

Q  Does that mean a hundred percent in your mind?

A  A hundred percent in my mind.  Yes.  And --

Q  So --

A  -- this is -- looked like it was very, very close.

Q  All right.  That was my question.  How close are -- were you to making a positive identification here?

A  I was very close.  I mean, it was right there, and -- and probably the only thing holding me back is that I'm, again, ultra-conservative in my opinion.

Q  All right.

ATTORNEY FALLON:  I have no further questions for the witness and would move into evidence the, uh, photographs which, uh, Dr. Simley has identified.  Um, Exhibits, uh -- Plus Exhibit 162, which was the tooth fragment that he fractured matched.  And that would be Exhibit 162, 176, 177, 178, 179, 180, 181, and, for completion of the record, Exhibit 182, the CV.

THE COURT:  Any objection, Counsel?

232

ATTORNEY FREMGEN:  No, Judge.

THE COURT:  They're received. Cross-examination.

ATTORNEY FREMGEN:  No, Judge.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Any further witnesses?

ATTORNEY FALLON:  I think that concludes our witnesses for this afternoon.

THE COURT:  For this afternoon?

ATTORNEY FREMGEN:  Judge, for the -- for the record, I would move in Exhibit 175.  I believe that was the one I introduced with, uh, Agent Sturdivant.  I believe it was a picture of a -- a larger, wider angle picture of the burn --

THE COURT:  Photo of the burn pit.

ATTORNEY FREMGEN:  -- pit.  Right.

ATTORNEY FALLON:  We have no objection.

THE COURT:  All right.

ATTORNEY FALLON:  We would join in that request.

THE COURT:  All right.  That's -- that's received as well.  All right.  We are then adjourned until tomorrow at, uh, 8:30.

ATTORNEY FALLON:  Very well.

233

THE COURT: Ladies and gentlemen, the usual admonition. Don't talk about the case to anyone, not even among yourselves. Okay.

(Wherein court stands adjourned at 4:07 p.m.)

STATE OF WISCONSIN    )
                      )SS.
COUNTY OF MANITOWOC   )


            I, Jennifer K. Hau, Official Court

Reporter for Circuit Court Branch 3 and the State

of Wisconsin, do hereby certify that I reported

the foregoing matter and that the foregoing

transcript has been carefully prepared by me with

my computerized stenographic notes as taken by me

in machine shorthand, and by computer-assisted

transcription thereafter transcribed, and that it

is a true and correct transcript of the

proceedings had in said matter to the best of my

knowledge and ability.

            Dated this 11th day of December 2007.


                        _____
                        Jennifer K. Hau, RPR
                        Official Court Reporter


235

**'**

'05 [3]  174/13 174/15 176/10
'72 [1]  209/8
'97 [1]  231/14
'99 [1]  125/5

**-**

--in [1]  91/10

**.**

.22 [2]  111/8 157/16
.22 caliber [2]  111/8 157/16
.30 [1]  157/17
.30 caliber [1]  157/17

**0**

0-4-1-8-0-7 [1]  186/8
06 [3]  1/6 5/4 186/9

**1**

10 [4]  30/6 31/23 32/10 220/2
103 [1]  3/10
103-116 [1]  3/11
107 [1]  82/16
10:33 [1]  77/11
11 [4]  51/13 182/6 211/8 223/8
113 [1]  75/1
116 [1]  3/11
117-123 [1]  3/12
11:01 [1]  77/12
11:54 [1]  123/9
12 [3]  4/16 30/6 53/19
123 [1]  3/12
123-143 [1]  3/14
131 [2]  56/20 56/25
132 [2]  184/25 185/6
141 [3]  41/21 76/21 128/11
141-161 [1]  4/14
142 [2]  44/23 129/15
143 [3]  3/14 47/1 131/9
143-163 [1]  3/15
144 [2]  48/8 130/15
145 [2]  48/23 132/12
146 [3]  60/21 61/15 134/1
147 [2]  60/22 62/2
148 [5]  60/22 62/23 64/10 64/17 136/10
149 [3]  60/22 63/22 138/2
15 [21]  31/23 32/10 36/17 36/19 50/15
 52/24 55/20 66/12 67/14 70/5 70/7
 77/10 89/12 124/18 146/15 146/17
 146/20 170/1 175/23 176/1 181/1
15-minute [1]  77/9
151 [1]  61/9
152 [1]  62/17
153 [2]  63/12 64/9
154 [1]  64/12
155 [1]  44/15
156 [1]  45/11
157 [3]  46/8 46/13 46/20
158 [1]  47/25
159 [1]  48/14
16 [10]  3/4 4/16 4/16 51/1 51/6 51/17
 52/19 52/20 220/12 220/21
16-22 [1]  3/5
160 [1]  48/21
161 [3]  4/14 60/2 76/22
162 [8]  4/15 223/2 223/4 223/6 223/10
 223/18 232/20 232/22
163 [5]  3/15 4/16 12/15 12/20 16/14
163-165 [1]  3/16
164 [5]  4/17 27/5 27/7 76/24 76/25
165 [5]  3/16 3/17 4/18 126/19 165/23

165-167 [1]  4/18
166 [3]  4/18 140/10 165/23
166-170 [1]  3/20
167 [4]  4/18 141/15 142/14 165/23
168 [8]  186/9 186/10 186/15 189/7
 193/19 200/7 200/12 202/22
168-174 [1]  4/19
169 [5]  188/5 188/6 199/11 199/24
 201/14
170 [3]  3/20 190/16 190/19
170-172 [1]  3/21
171 [3]  190/23 192/14 192/15
172 [4]  3/21 3/22 195/25 196/2
172-180 [1]  4/4
173 [3]  197/9 197/23 205/22
174 [5]  4/19 199/9 199/22 200/8 200/12
175 [3]  4/20 203/8 233/12
176 [2]  225/15 232/22
176-182 [1]  4/21
177 [3]  227/21 227/22 232/22
178 [2]  228/15 232/22
179 [2]  229/1 232/22
18 [6]  1/10 51/1 51/6 51/17 52/20 52/20
180 [8]  4/4 4/5 104/13 104/14 106/2
 106/6 229/13 232/22
180-plus [1]  121/3
181 [2]  230/3 232/22
181-200 [1]  4/8
182 [5]  4/21 214/12 214/13 214/15
 232/23
19 [4]  125/14 125/17 126/5 222/19
1960 [1]  209/7
1976 [2]  207/19 209/9
1981 [2]  209/15 217/12
1988 [1]  125/4
1993 [1]  212/11
1994 [1]  25/9
1996 [1]  25/1
1997 [3]  221/21 221/22 222/2
1998 [2]  181/24 220/22
1999 [1]  128/13
1:00 [1]  123/4
1:10 [1]  123/6
1:15 [1]  123/10
1:30 [2]  183/22 184/8

**2**

20 [1]  170/1
20's [1]  51/13
200 [3]  4/8 4/19 4/19
200-206 [1]  4/9
2001 [2]  220/6 228/17
2002 [2]  65/6 166/22
2003 [1]  182/18
2004 [1]  220/22
2005 [16]  7/8 8/12 42/10 128/18 142/17
 173/10 173/11 173/20 174/4 175/8
 175/12 182/18 182/21 208/19 214/23
 223/8
2006 [7]  7/9 19/20 20/17 167/2 167/6
 167/6 168/1
2007 [2]  1/10 235/15
206 [1]  4/9
207-232 [1]  4/11
211 [1]  93/18
22 [2]  3/5 3/6
22-77 [1]  3/9
232 [3]  4/11 4/15 4/21
233 [4]  4/15 4/20 4/20 4/21
24 [4]  216/1 216/5 216/21 224/17
25 [1]  221/22
27 [1]  4/17
2:33 p.m [1]  181/4

2:54 [1]  181/5
2nd [1]  207/12

**3**

3-D [1]  28/11
30 [5]  185/12 185/12 220/6 226/22
 229/8
30-foot [2]  185/18 185/18
31 [25]  7/8 10/17 173/20 174/15 175/8
 175/12 218/9 221/17 222/9 222/20
 223/19 224/8 224/9 225/19 227/16
 228/24 229/3 229/6 229/10 229/13
 229/20 230/5 230/5 231/3 231/6
32 [2]  27/1 210/18
350 [2]  104/4 120/25

**4**

40-hour [1]  125/4
41 [1]  106/11
435 [1]  209/18
45 [2]  81/14 81/16
4:07 [1]  234/4

**5**

5'6 [2]  140/19 150/1
5-16 [1]  3/4
50 [2]  29/24 30/1
50 percent [1]  29/25
52 [2]  215/17 218/23
54 [1]  114/10
5:30 [1]  175/17

**6**

60,000 [1]  30/11

**7**

73 [3]  177/4 177/15 178/24
75 [1]  179/22
76 [2]  4/14 4/17
77 [3]  3/9 4/14 4/17
77-103 [1]  3/10

**8**

82 [3]  84/23 84/24 85/3
88 [3]  1/6 5/4 186/9
89 [1]  131/23
8:30 [1]  233/24
8th [1]  141/25

**9**

9.3 [2]  52/22 52/22
90-degree [1]  139/1
91 [1]  96/10
92 [1]  95/9
94 [1]  54/8
99.9 percent [1]  228/12
9:02 [1]  5/1
9:30 [1]  175/18

**A**

A-v-e-r-y [1]  6/2
a.m [4]  5/1 77/11 77/12 123/9
A1 [3]  61/14 61/19 66/23
A10 [5]  48/17 52/6 52/6 52/9 53/19
A12 [3]  48/25 52/6 52/11
A14 [1]  60/7
A2 [3]  62/21 63/1 66/23
A23 [1]  88/7
A3 [2]  63/17 66/23
A4 [2]  64/16 66/23
A6 [4]  44/20 45/3 45/4 53/16
A7 [6]  45/13 46/5 46/6 46/10 46/16
 53/16

## A

A8 [5] 46/14 46/17 46/21 52/6 52/7
A9 [3] 48/3 48/11 53/16
above [1] 228/11
absence [8] 87/1 105/6 115/25 116/3 116/6 116/11 116/21 116/23
abuse [2] 208/12 209/17
abutted [1] 178/21
academic [2] 218/6 223/13
Academy [1] 214/1
access [1] 26/16
accreditation [2] 31/9 31/11
accredited [3] 31/10 31/19 31/22
accurately [3] 41/16 52/2 69/24
acid [1] 28/7
across [2] 54/20 228/1
acted [2] 139/18 140/1
acting [1] 7/21
activated [1] 211/18
active [1] 150/16
actively [2] 133/14 133/21
additional [15] 14/25 24/6 24/10 60/20 61/7 125/24 135/21 153/11 159/21 160/18 189/19 213/19 220/23 221/21 226/1
adequately [2] 58/5 76/8
adjourn [1] 123/4
adjourned [2] 233/23 234/4
admission [1] 16/15
ADMITTED [1] 4/13
admonition [1] 234/2
adult [1] 29/9
advanced [2] 25/22 125/6
advantage [1] 218/25
affect [1] 169/17
affiliation [1] 214/8
affiliations [1] 212/15
African [1] 73/16
afternoon [7] 123/11 167/18 167/19 180/25 182/20 233/9 233/10
afterwards [1] 164/22
age [1] 154/20
agencies [3] 33/1 38/16 212/16
agency [1] 39/3
agent [12] 19/2 181/14 181/19 184/10 203/7 208/18 214/25 220/3 223/1 223/8 228/18 233/14
ages [1] 220/22
aggressive [1] 187/5
agree [4] 117/10 117/25 122/14 144/11
ahead [3] 103/22 143/25 153/2
alive [4] 14/4 15/24 155/21 198/4
allegations [1] 122/11
alleged [4] 23/20 23/21 34/20 34/20
Allen [1] 181/14
alligatoring [1] 191/9
allow [1] 26/12
allows [2] 35/17 36/9
alone [1] 139/18
along [8] 63/2 63/4 64/19 103/3 134/10 136/22 178/15 179/23
Amber [1] 167/18
amelogenin [1] 53/5
America [2] 213/4 213/8
American [5] 31/12 73/17 213/21 214/1 214/9
among [2] 217/14 234/3
amount [12] 95/5 106/7 106/23 108/25 139/23 155/11 155/13 157/19 158/10 163/22 220/17 220/18
amounts [1] 109/21
amplifies [1] 50/15

amplify [2] 36/10 107/11
amplifying [1] 50/23
analysis [14] 24/22 40/2 40/14 43/23 72/11 106/3 122/5 125/12 126/3 126/6 126/25 164/9 208/25 231/3
analyst [4] 32/11 39/20 88/8 122/1
analysts [6] 24/10 30/3 30/25 32/15 41/10 105/17
analyze [2] 32/11 198/8
analyzed [2] 30/9 205/11
angle [3] 139/1 139/3 233/15
animal [2] 204/22 205/1
antemortem [4] 225/5 230/21 230/23 231/12
anybody [1] 216/11
anyone [3] 105/23 168/19 234/2
anytime [6] 39/7 42/18 72/10 79/4 98/17 103/7
anywhere [1] 151/20
aorta [1] 164/1
apparatus [2] 194/19 196/18
apparent [1] 83/15
appear [10] 41/16 43/8 63/5 85/2 114/13 138/20 190/6 193/5 200/2 231/15
appearance [6] 5/7 43/6 85/14 94/23 114/6 134/25
APPEARANCES [2] 1/13 5/4
appeared [12] 1/25 41/17 45/17 62/10 69/9 101/9 120/1 153/25 154/12 184/20 184/21 185/21
appearing [1] 186/22
appears [6] 5/10 5/11 81/18 187/22 197/18 206/15
applicable [1] 210/6
application [4] 208/2 208/3 212/9 212/10
applications [3] 25/18 38/11 38/13
applied [2] 191/19 218/17
approach [2] 12/16 218/19
appropriate [2] 11/25 33/12
approximately [21] 25/2 26/20 26/25 30/8 64/20 104/2 126/13 146/16 169/24 181/2 182/6 182/15 185/12 185/13 189/2 196/13 209/18 210/14 213/5 213/7 215/13
APRIL [1] 1/10
aren't [1] 83/21
argument [1] 11/17
arm [1] 157/3
arrangement [2] 167/15 176/4
arrested [3] 19/22 21/22 22/4
arri [1] 203/24
arrival [1] 194/12
arrived [6] 194/7 194/8 194/15 194/17 202/19 205/15
arro [1] 205/14
arson [4] 182/12 182/13 191/8 194/2
artery [1] 164/1
ASCLD [1] 31/11
ashen [1] 183/15
ashened [1] 202/4
Ashley's [2] 9/11 9/12
aspect [10] 225/23 226/5 226/6 226/8 226/10 226/10 226/15 227/11 227/12 227/14
aspects [1] 225/22
assault [2] 122/12 127/16
assign [3] 37/10 55/4 69/12
assigned [3] 32/4 32/5 74/1
assignment [3] 182/7 182/9 182/10
assist [13] 27/21 183/1 189/9 194/9 208/21 211/22 213/12 213/16 213/17

214/25 219/24 223/23 224/2
assistance [1] 222/2
Assistant [1] 215/1
assisted [2] 194/19 235/10
associated [4] 138/11 139/10 167/8 218/12
Association [2] 214/5 214/7
assume [6] 148/4 151/6 151/7 152/6 203/5 219/19
assuming [7] 87/23 112/12 149/9 177/9 179/14 179/16 205/8
assumption [2] 112/16 205/9
assumptions [1] 152/5
attached [3] 68/12 69/7 195/1
attempt [8] 23/22 81/24 83/8 194/13 215/14 217/11 217/23 219/16
attempted [4] 106/15 141/22 142/2 194/1
attend [2] 25/23 26/4
attended [6] 25/17 27/11 124/24 125/4 125/6 125/9
attention [16] 8/12 167/5 168/1 172/4 172/7 172/14 173/20 182/20 183/20 184/5 184/14 185/3 188/23 189/1 204/14 214/11
Attorney [143] 1/20 1/22 3/4 3/5 3/6 3/9 3/10 3/11 3/12 3/14 3/15 3/16 3/17 3/20 3/21 3/22 4/4 4/5 4/8 4/9 4/11 5/5 5/9 5/9 5/10 5/14 5/16 5/18 6/4 11/11 11/16 11/23 12/6 12/7 12/16 12/18 13/5 14/19 14/22 14/23 14/25 15/2 15/8 15/10 16/12 16/18 16/23 22/9 22/11 22/19 22/22 23/8 65/3 65/12 65/14 68/13 68/23 68/25 76/20 76/25 77/3 77/6 77/14 77/16 78/2 81/12 82/15 82/17 82/21 84/21 89/5 103/19 103/21 103/23 103/25 117/2 117/4 121/12 123/5 123/8 123/13 123/23 143/14 143/17 143/20 144/18 152/16 152/19 152/25 153/2 163/7 163/8 163/11 165/9 165/11 165/17 165/19 165/21 165/25 166/10 170/10 170/13 170/25 171/5 171/8 172/9 172/12 172/16 172/19 173/6 180/10 180/14 180/17 180/22 180/24 181/7 181/17 187/12 187/14 187/19 187/20 200/6 200/11 200/14 200/16 203/11 203/13 203/14 206/17 206/20 206/24 207/2 207/14 215/2 232/16 233/1 233/4 233/8 233/11 233/17 233/18 233/20 233/25
attorney's [1] 32/25
attribute [1] 73/6
attribution [1] 73/1
audit [1] 31/14
audited [1] 31/22
auditors [2] 32/3 32/5
audits [1] 32/20
August [7] 174/10 174/13 174/15 176/10 180/19 220/6 221/22
August 25 [1] 221/22
August 30 [1] 220/6
authorized [2] 32/23 32/24
average [1] 146/25
AVERY [56] 3/3 5/19 5/22 6/2 6/15 41/5 49/13 50/4 50/9 50/25 51/5 51/16 52/16 52/20 52/22 53/10 53/19 53/23 54/3 56/4 56/13 56/18 56/23 58/11 58/21 58/23 75/3 90/4 94/10 94/15 96/1 97/4 99/21 101/2 101/23 131/25 156/5 168/4 169/5 169/14 173/15 173/17 174/5 174/17 174/20 175/4 175/10 175/13 176/13 176/16 176/16 176/22 177/10 183/2 183/10 183/25

## A

Avery's [14] 51/22 56/11 76/2 78/3 100/8 100/9 108/2 112/19 132/4 176/4 176/6 183/21 185/15 186/1
awarded [1] 31/17
away [4] 18/23 178/18 189/3 189/12
awful [1] 49/12

## B

B-r-a-n-d-t [1] 166/8
b-u-c-c-a-l [1] 225/20
B.S [3] 146/11 146/13 209/8
Bachelor [1] 25/8
Bachelor's [4] 124/5 166/18 166/21 171/14
background [2] 124/4 215/7
backgrounds [1] 32/15
backseat [1] 49/2
bad [1] 116/14
badly [1] 224/20
bag [1] 60/8
bagged [1] 198/14
bar [3] 39/4 39/9 54/18
Barbara's [2] 6/21 6/21
bare [1] 112/17
barking [1] 187/9
barrel [10] 80/3 80/3 80/4 80/6 80/8 80/11 80/23 81/2 111/10 162/6
bathroom [2] 100/9 101/12
battery [3] 87/11 142/10 142/14
Baumgarner [1] 168/15
Baumgartner [3] 167/16 168/12 168/15
bay [3] 65/7 128/20 142/17
bear [1] 199/3
bed [13] 155/17 176/19 177/7 177/20 177/24 178/3 178/14 178/17 179/2 179/5 179/10 179/23 180/7
bedding [9] 23/19 91/14 91/24 91/25 92/4 92/6 92/9 122/15 122/20
bedroom [6] 101/12 176/13 176/17 177/11 179/18 180/19
begun [1] 195/3
behind [14] 20/7 110/5 110/10 111/3 134/11 137/13 141/10 152/2 183/20 183/25 184/4 185/15 186/1 201/20
Belgian [1] 186/22
believed [5] 150/20 188/18 189/19 189/22 204/6
Bellin [1] 65/7
belt [7] 188/8 191/6 195/16 197/5 197/21 197/21 204/12
belted [7] 188/12 188/13 188/14 188/19 189/24 201/17 202/25
belts [2] 189/23 204/8
bench [7] 47/21 114/19 114/22 130/24 188/17 199/16 199/19
beneficial [2] 220/24 224/4
benefit [2] 155/6 218/21
benefits [1] 218/22
beside [1] 202/25
besides [3] 37/25 38/13 145/5
best [7] 148/21 169/14 170/1 197/6 224/9 224/25 235/13
bicuspid [3] 224/23 226/23 227/1
big [8] 35/3 45/1 61/17 141/18 204/18 218/25 219/1 222/17
bigger [1] 226/16
biggest [1] 213/23
billion [6] 73/15 73/16 73/18 74/5 74/7 74/11
binders [1] 212/12
biolog [1] 83/9

biological [31] 23/21 23/22 29/24 34/8 34/9 34/15 34/19 35/24 37/21 42/16 42/23 43/13 53/2 78/12 79/1 82/1 83/10 86/11 86/20 91/15 92/8 92/15 94/4 97/21 100/2 105/5 105/24 115/11 116/16 118/16 165/4
biology [2] 25/8 25/21
birthday [7] 8/23 9/10 9/14 9/17 9/19 9/22 18/14
bit [18] 7/15 7/17 45/23 66/10 107/22 108/10 134/13 158/16 170/4 187/11 188/2 188/22 209/4 209/11 215/6 218/24 221/23 221/24
bite [4] 208/12 209/17 210/21 220/15
bitewing [6] 220/12 220/13 220/21 221/8 221/11 231/14
biting [2] 187/18 227/23
Black [1] 83/1
blade [5] 102/17 193/4 193/4 193/5 197/5
blades [1] 191/7
Blaine [1] 17/12
bleach [14] 114/5 114/14 114/16 114/17 114/18 114/19 114/24 115/14 115/19 120/1 120/4 120/9 164/25 165/13
bleaching [2] 120/5 120/10
bleeding [5] 133/14 133/21 148/15 164/12 164/13
blood [226] 34/8 34/12 34/12 37/6 37/15 37/16 42/16 43/1 43/6 43/8 43/15 43/17 43/18 43/20 43/20 43/22 44/1 45/7 45/17 47/8 47/12 51/23 52/7 52/15 53/13 53/23 55/1 57/25 59/7 59/13 61/20 61/23 63/5 63/10 64/2 64/5 66/23 67/6 67/18 71/8 71/17 75/12 78/21 78/23 80/5 80/8 80/15 82/5 83/14 83/15 83/24 84/8 84/19 85/12 85/15 85/18 85/24 86/5 86/9 86/15 86/15 86/19 87/1 88/13 88/14 90/21 90/22 91/1 91/5 91/9 91/12 91/12 91/18 91/20 93/12 94/19 94/21 94/23 94/24 99/10 99/12 100/1 100/8 100/15 100/19 100/20 100/22 101/10 101/11 101/17 101/20 102/9 102/13 102/18 103/6 103/10 105/2 105/2 105/3 105/6 105/12 106/4 106/11 106/18 107/24 108/2 108/5 108/21 108/24 109/4 109/7 109/17 111/11 113/18 113/24 114/6 114/8 115/10 117/6 117/7 117/8 117/11 117/13 117/14 117/15 118/2 118/3 118/6 118/7 118/12 118/22 120/11 120/17 124/20 124/23 124/25 125/5 125/7 125/12 125/23 126/2 126/6 126/9 126/24 127/4 127/6 127/6 127/19 127/22 128/1 128/23 129/4 129/5 129/7 131/10 131/19 132/6 132/10 132/15 132/24 133/2 133/2 133/8 133/13 134/6 135/17 135/18 136/3 136/5 136/19 137/10 137/11 137/13 138/22 139/7 139/23 140/6 140/22 145/6 146/1 146/4 146/21 146/24 149/3 150/15 151/5 151/21 152/9 153/15 153/17 155/9 155/14 155/18 155/24 155/25 156/1 156/2 156/8 157/22 157/22 158/5 158/5 158/7 158/15 158/18 158/21 158/21 159/17 160/2 160/2 160/4 161/17 162/7 163/12 163/12 163/16 163/20 163/22 164/4 164/7 164/16 164/19 164/20 165/1 169/10 230/17
bloodied [1] 135/16
bloodshed [1] 127/9
bloody [26] 129/12 130/12 131/5 132/5 132/9 132/24 134/18 135/9 135/12

135/24 136/5 137/16 137/20 138/22 140/4 140/6 141/3 141/8 141/8 149/20 151/3 151/4 151/20 152/1 159/17 161/3
blowback [6] 161/16 161/22 162/3 162/4 162/9 162/13
blows [1] 127/19
blueprint [2] 28/20 28/22
board [10] 211/25 212/3 212/11 212/17 212/22 212/25 213/6 213/7 214/8 214/9
Bobby [1] 17/14
body [35] 11/9 13/24 14/1 15/19 20/12 21/5 21/8 21/18 28/25 34/6 34/10 34/23 35/9 35/13 137/19 141/3 141/8 147/22 148/5 149/20 150/17 150/20 150/23 151/18 151/20 151/22 151/25 152/6 152/7 153/16 155/20 169/6 169/14 230/13 230/15
bone [36] 68/11 69/6 69/10 69/18 184/2 184/22 186/3 188/18 189/2 189/4 189/11 189/20 189/23 190/4 193/13 193/24 195/15 195/18 204/7 204/11 204/15 204/16 204/18 204/20 204/21 204/24 205/3 216/4 216/22 217/3 220/19 223/11 223/14 227/13 230/15 231/5
bones [3] 193/24 205/11 205/12
bonfire [3] 10/20 11/5 11/5
bookcase [3] 176/20 177/7 178/23
bottom [12] 112/2 120/20 130/24 178/2 191/17 191/19 191/21 192/4 192/5 192/25 193/3 221/12
box [2] 187/21 195/20
box-like [1] 187/21
boxes [1] 93/11
boy [1] 7/23
BRANCH [2] 1/1 235/5
brand [1] 114/3
BRANDT [4] 3/19 165/20 166/3 166/8
break [4] 70/21 77/8 77/9 180/25
BRENDAN [49] 1/7 1/24 5/3 5/10 6/16 6/18 6/23 6/25 7/4 7/10 8/13 8/17 9/25 10/2 10/6 11/4 11/9 12/8 13/17 14/3 14/6 14/14 14/17 15/18 15/24 16/9 16/24 17/19 18/4 18/15 18/17 19/22 20/18 77/24 78/5 81/8 89/25 90/10 90/19 94/17 96/5 97/7 101/6 102/1 103/11 103/16 113/19 114/1 114/11
Brendan's [3] 6/21 21/1 91/20
Brewer [1] 167/18
brittle [2] 216/24 219/2
broad [1] 146/2
broke [1] 18/10
broken [1] 219/7
brother [2] 6/21 17/12
brothers [1] 17/14
brought [6] 24/15 38/25 41/4 190/14 220/3 220/12
brown [10] 45/14 46/11 46/23 48/18 49/1 62/19 63/15 64/16 109/8 114/7
brownish [2] 84/6 120/19
brushed [1] 119/25
Bryan [1] 17/16
buccal [17] 36/24 37/3 37/4 37/7 49/12 49/15 50/3 50/9 51/22 56/3 58/21 65/22 225/19 225/21 225/23 226/5 229/20
bucket [1] 130/24
buckle [1] 195/16
build [2] 28/20 28/21
built [1] 107/19
bull [1] 75/5
bullet [19] 75/1 75/5 75/7 75/9 75/11 75/14 75/19 76/2 76/14 76/17 76/19 98/23 99/1 99/1 99/14 118/21 118/22

**B**

bullet... [2] 119/2 119/7
bumper [2] 136/16 163/15
Bureau [6] 181/21 182/8 182/11 182/12 182/14 191/8
buried [1] 217/3
burn [36] 20/7 20/13 21/4 21/18 68/16 74/15 185/20 186/18 189/2 189/3 189/12 189/18 189/18 189/21 190/7 190/12 190/20 191/11 192/18 194/7 194/8 197/2 199/21 202/7 202/13 202/21 202/23 203/20 203/21 203/23 204/3 204/16 205/4 231/6 233/15 233/16
burned [20] 68/12 69/9 69/18 188/15 188/15 189/20 191/3 192/3 199/15 201/22 206/7 206/9 210/3 215/21 216/23 217/13 219/3 224/19 226/9 226/14
burning [3] 191/15 191/17 191/20
business [3] 144/17 183/10 183/11
busy [4] 121/17 121/18 194/3 194/4
BZ [1] 69/16

**C**

C-u-l-h-a-n-e [1] 23/6
cabinet [2] 176/19 177/8
cable [1] 87/11
cables [1] 142/14
calculate [1] 73/22
caliber [5] 111/8 157/15 157/16 157/17 157/18
calls [6] 175/3 175/4 175/9 175/16 175/21 194/1
Calumet [2] 68/17 198/16
Canada [1] 213/4
candidate [1] 132/8
Candy [1] 6/15
capacity [2] 167/23 207/18
capital [1] 196/12
car [14] 42/15 43/3 43/9 46/1 46/3 67/7 93/8 107/25 132/7 133/23 134/7 141/11 163/15 185/16
cardboard [1] 93/11
care [2] 7/2 207/23
career [1] 163/1
carefully [1] 235/8
carg [1] 141/9
cargo [31] 49/3 52/13 59/10 63/3 63/16 63/21 64/17 64/22 66/22 67/6 67/19 71/9 71/17 88/5 108/5 133/22 134/3 136/14 137/19 137/21 138/5 140/13 140/18 140/23 141/4 141/9 149/17 151/1 153/8 163/14 163/14
carpet [1] 154/1
carpeted [3] 153/8 153/15 153/18
carpeting [1] 136/1
carry [2] 106/13 108/7
case [63] 1/6 30/21 30/23 32/9 38/14 38/14 38/20 38/24 39/14 39/23 39/23 40/2 40/3 40/4 40/5 40/9 42/24 44/5 48/19 52/10 54/24 55/24 65/24 77/23 89/3 91/10 91/17 103/2 103/5 104/3 104/5 104/23 105/3 105/19 106/8 107/13 119/17 121/3 121/7 122/2 122/10 129/3 129/5 134/20 139/4 154/18 154/19 155/13 156/4 161/23 162/15 163/4 208/17 209/3 210/22 210/23 212/6 212/8 214/21 214/22 217/24 219/15 234/2
cases [32] 32/10 33/9 33/10 33/11 33/18 33/19 71/1 86/22 91/11 95/3 103/2 105/8 106/16 107/7 109/6 109/18 109/25 110/1 110/1 113/9 115/9 121/9 124/14 146/24 154/20 208/12 209/15 209/16 209/17 209/18 210/21 212/13
casings [6] 92/13 92/17 92/20 92/21 93/4 119/11
categories [3] 128/6 129/11 147/6
category [2] 134/17 147/7
Cates [1] 194/11
Caucasian [2] 73/15 74/8
caused [2] 151/21 159/11
causing [2] 140/5 162/7
CD [3] 48/18 52/10 130/25
cell [7] 28/9 34/10 34/22 65/21 79/2 79/5 118/16
cells [20] 29/8 34/5 34/13 34/13 34/14 34/15 37/9 49/16 65/16 65/22 65/25 109/5 109/8 109/14 110/7 110/8 110/11 110/23 118/2 118/8
cellular [2] 28/24 29/4
center [6] 128/20 185/17 185/18 209/20 211/1 211/19
central [1] 222/16
certificate [2] 31/11 31/17
certificates [1] 31/9
certification [1] 211/25
certified [6] 212/3 212/11 212/22 212/25 213/6 213/7
certify [1] 235/6
cervical [1] 65/17
CF [3] 1/6 5/4 186/9
chain [1] 39/24
chair [2] 16/3 21/12
chance [3] 71/4 97/23 158/25
changed [1] 8/6
characteristic [1] 135/9
characteristics [8] 28/17 29/12 89/10 89/16 134/21 135/8 147/8 148/25
characterization [1] 178/3
charged [1] 21/24
charred [14] 68/12 68/15 68/17 69/7 69/21 70/1 70/4 74/14 184/2 184/22 189/20 193/24 216/23 219/3
charring [2] 191/20 193/3
charts [1] 71/6
cheaper [1] 210/9
check [8] 31/25 32/6 32/7 49/17 86/6 141/19 141/23 142/1
checked [3] 84/7 85/16 142/21
checks [2] 32/14 142/9
cheek [8] 37/5 37/8 225/21 225/23 226/8 226/14 226/15 227/14
chemical [1] 83/23
chemistry [4] 25/22 124/5 146/12 146/13
Cherry [3] 59/16 59/21 68/2
chest [1] 164/11
Chevalier [1] 9/13
chew [2] 228/9 228/10
chews [2] 70/23 114/17
child [3] 171/20 208/12 209/17
children [3] 166/13 171/24 172/3
choices [2] 51/19 51/19
chose [1] 103/6
chromatograph [1] 145/12
chromosome [3] 53/7 53/8 66/15
Chuck [1] 194/11
circful [1] 138/24
circles [2] 134/24 222/6
circuit [4] 1/1 1/12 138/25 235/5
circular [5] 138/17 138/20 138/24 139/4 197/19
circumstances [2] 11/25 42/25
CJ1 [2] 96/15 97/1
CJ2 [2] 95/12 97/2
class [1] 25/22
classes [3] 27/10 171/20 171/23
classic [3] 135/12 135/14 156/13
clean [7] 114/4 114/19 114/19 114/24 115/20 164/25 201/3
cleaned [2] 116/19 164/21
cleaning [1] 115/19
clear [5] 15/11 145/11 190/25 199/22 209/24
clearly [1] 199/17
CLERK [2] 5/20 172/21
close [8] 6/23 62/3 175/20 202/6 202/8 232/8 232/9 232/12
close-up [1] 62/3
closely [1] 198/22
closer [6] 7/17 13/19 24/19 82/18 193/17 198/23
clothing [7] 23/19 42/20 91/14 125/10 125/13 125/21 164/15
code [2] 39/9 54/18
coding [1] 39/4
coincide [1] 231/18
collect [4] 65/23 87/6 87/18 175/6
collected [17] 45/2 45/4 45/14 45/15 46/3 46/11 47/8 47/14 48/16 62/14 65/17 87/8 87/10 87/12 87/14 87/17 198/13
collecting [2] 45/19 47/15
College [1] 209/7
color [2] 29/10 29/11
colored [1] 120/21
com [2] 38/6 99/17
combination [5] 112/1 112/6 133/8 133/20 137/15
combinations [1] 133/13
combine [1] 218/24
coming [2] 131/19 154/1
comma [2] 51/6 51/17
comment [1] 117/6
Commenting [1] 171/1
comments [4] 117/5 118/1 121/11 212/22
common [12] 34/7 72/12 72/14 72/20 73/11 122/16 122/16 150/8 172/2 216/10 217/21 218/19
commonly [1] 208/8
community [3] 29/20 31/20 38/7
company [3] 30/19 30/22 31/4
compare [22] 24/3 28/19 35/21 36/22 37/18 49/21 50/1 51/4 51/21 56/2 58/10 66/20 67/5 72/1 76/4 117/17 217/9 219/20 219/20 225/4 226/6 227/13
compared [3] 52/16 156/19 227/13
comparing [3] 148/14 154/17 230/19
comparison [10] 89/25 99/17 103/11 219/17 219/24 222/3 223/19 224/8 230/4 230/25
comparisons [1] 35/12
compartment [11] 53/14 53/24 59/16 129/6 129/8 129/9 129/25 130/20 133/10 133/11 142/9
competency [1] 25/15
complete [7] 34/16 71/10 71/15 74/21 107/24 108/8 202/8
completed [2] 40/20 195/22
completely [3] 57/10 188/16 199/17
completion [1] 232/23
component [2] 34/10 125/7
composite [1] 72/17
compromised [1] 70/19
computer [4] 39/17 54/15 177/5 235/10

**C**

computer-assisted [1] 235/10
computer-generated [1] 177/5
computerized [2] 39/4 235/9
con [1] 52/23
concave [1] 206/5
conception [1] 29/9
concerned [1] 17/19
conclude [2] 150/22 157/9
concluded [1] 149/9
concludes [1] 233/8
conclusions [2] 97/1 147/20
concrete [1] 169/11
condition [7] 16/18 107/14 191/1 192/22 200/3 216/20 217/8
conduct [1] 69/17
conducted [1] 154/12
configuration [1] 180/19
configured [1] 177/15
confined [1] 155/12
confirming [2] 43/17 43/18
confused [6] 16/10 19/15 19/16 22/17 169/19 170/7
confusing [1] 93/25
conjunction [1] 225/8
connected [1] 29/16
connection [1] 153/19
conservative [4] 25/4 30/11 232/2 232/14
considerable [1] 108/4
consist [2] 129/2 215/19
consisted [3] 25/13 212/11 220/5
console [2] 45/16 59/22
consultant [1] 207/24
consumed [3] 188/16 199/17 216/17
contact [34] 116/5 116/8 128/8 129/10 129/11 129/13 130/3 130/10 130/11 130/13 130/17 130/22 131/3 131/10 131/20 132/10 134/18 134/19 135/10 135/16 135/21 135/24 137/2 137/12 147/4 159/16 160/15 160/16 168/3 168/7 169/22 174/4 174/16 194/1
contacted [3] 161/10 161/12 194/3
contain [3] 40/13 98/11 223/18
contained [2] 28/22 29/2
contains [1] 60/8
continues [1] 5/6
continuing [2] 212/16 213/18
control [2] 24/12 32/8
Controlled [2] 145/9 145/23
convenient [1] 65/23
conversation [14] 8/13 8/17 10/2 10/4 10/6 10/9 10/15 10/21 11/4 15/14 15/23 168/20 169/25 170/7
conversations [2] 14/13 174/23
convicted [1] 33/22
conviction [2] 33/9 33/19
coordinating [1] 124/11
coordinator [4] 124/2 124/10 144/2 153/20
copies [3] 36/10 50/15 107/11
copy [3] 27/9 34/16 214/16
corner [3] 177/22 179/17 179/17
coroner's [1] 32/25
Coroners [1] 214/6
coronoid [1] 223/12
correctly [11] 50/8 55/14 56/6 58/5 58/13 66/6 67/2 67/10 75/25 76/8 195/10
correlate [6] 48/7 48/22 62/22 63/22 64/14 64/14
cotton [4] 44/7 47/17 47/20 82/10

counsel [12] 5/3 15/1 22/21 77/2 108/11 122/7 123/11 172/10 180/13 181/6 200/10 232/25
counseling [1] 168/8
counselor [3] 166/19 168/9 168/11
counselors [4] 10/5 10/22 22/13 22/15
country [4] 36/5 73/25 213/24 222/12
county [9] 1/1 68/17 173/23 174/3 183/5 183/6 198/16 208/22 235/2
couple [7] 19/22 163/8 183/9 190/2 194/22 200/20 218/22
course [13] 25/20 25/21 30/5 30/12 105/21 105/21 112/12 125/4 125/6 146/20 147/13 155/23 197/5
courses [1] 171/23
courts [1] 145/8
cous [1] 6/19
cousin [1] 9/11
cousins [3] 6/20 169/5 169/13
cover [1] 156/20
covers [1] 138/7
create [2] 80/23 157/13
created [1] 157/20
Credibility [1] 171/3
creeper [5] 83/5 83/11 83/22 84/7 84/12
creepers [2] 84/15 84/16
crime [73] 23/11 23/13 23/16 23/17 23/20 24/7 24/25 26/8 30/3 30/8 31/8 31/12 33/15 33/24 34/20 35/15 36/1 36/4 37/15 37/16 37/22 38/20 41/4 45/24 55/4 61/3 65/9 69/2 69/2 69/12 73/25 81/22 84/25 92/1 96/18 98/4 99/20 102/3 104/2 104/8 115/25 116/21 121/1 123/25 124/8 124/12 124/16 124/22 125/6 125/15 125/20 125/22 128/21 129/17 142/18 146/1 146/2 146/6 164/9 194/3 194/6 194/10 194/17 195/7 195/21 198/2 198/7 198/8 201/7 201/11 201/13 201/13 202/2
Crimes [1] 182/11
Criminal [3] 19/3 181/20 182/8
criminalist [1] 144/23
critical [2] 218/4 218/7
cropped [3] 229/2 229/12 230/4
cross [20] 3/5 3/10 3/15 3/21 4/5 4/9 16/21 16/22 77/13 77/15 143/16 143/19 170/11 170/12 180/13 180/16 200/9 200/13 200/15 233/3
cross-examination [14] 3/5 3/10 3/15 3/21 4/5 4/9 16/22 77/15 143/19 170/12 180/16 200/9 200/15 233/3
crown [9] 216/2 217/4 217/5 218/10 224/14 227/17 228/8 230/8 230/9
crowns [2] 217/1 224/12
crushed [1] 219/5
crust [1] 45/14
crying [2] 8/25 10/13
CSI [1] 107/17
cued [1] 203/12
cuffs [2] 96/24 120/14
CULHANE [14] 3/8 22/23 22/25 23/5 23/9 24/17 34/24 44/11 44/12 59/5 77/17 104/1 129/16 136/10
curious [1] 189/17
current [2] 124/7 182/7
currently [5] 30/5 36/2 37/7 182/22 211/6
curriculum [3] 27/9 126/22 214/16
curvature [1] 230/22
cuspid [2] 217/6 224/23
custody [1] 39/24
cut [22] 45/6 47/22 48/6 48/12 55/2 131/24 131/24 132/4 132/8 133/6

148/11 148/16 155/4 155/15 155/17 156/3 163/21 163/22 163/23 164/3 164/6 221/13
cuttings [1] 49/6
CV [4] 76/23 76/23 214/16 232/24
cyanoacrylate [2] 218/17 219/13

**D**

D-3 [2] 50/24 51/6
D13 [1] 71/1
D3 [1] 71/2
D5 [1] 71/1
D7 [1] 71/2
DAB [1] 32/18
dad [4] 6/14 6/20 6/20 15/15
daily [1] 167/23
dark [1] 230/16
darkened [2] 193/18 197/1
darkness [3] 196/19 197/25 198/5
dashboard [2] 142/3 142/5
DASSEY [18] 1/7 1/24 5/4 5/11 6/16 78/5 81/8 90/10 90/19 96/5 97/7 101/6 102/1 103/11 103/17 113/19 114/1 114/11
Dassey's [3] 77/24 89/25 94/17
data [1] 40/1
database [2] 73/23 73/24
date [5] 1/10 26/1 26/5 40/11 215/4
Dated [1] 235/15
dates [1] 40/13
day [13] 1/5 9/22 15/23 141/24 142/20 173/22 174/18 174/21 175/14 182/25 183/7 212/19 235/15
DD [1] 79/15
dead [3] 142/10 155/23 198/4
deal [3] 7/2 155/18 171/24
dealing [1] 34/8
death [1] 229/16
Deb [1] 184/10
debris [10] 189/21 190/5 195/4 195/8 195/13 195/22 196/4 198/11 198/14 204/4
decay [1] 220/19
December [3] 8/12 8/18 166/22
decent [2] 225/4 225/5
decide [4] 102/24 120/15 121/17 122/2
decided [1] 33/10
decision [3] 86/16 91/7 95/4
decisions [3] 103/3 105/16 121/13
decomposed [1] 210/3
deemed [1] 212/17
deep [1] 163/23
defendant [4] 1/8 1/21 1/23 1/24
defense [3] 35/3 108/10 122/7
defined [1] 208/1
definitely [2] 135/13 162/23
degradation [1] 107/8
degrade [1] 70/21
degraded [1] 112/4
degree [19] 25/8 53/22 56/12 58/22 67/16 76/12 124/5 133/12 139/1 140/25 154/22 166/21 166/25 167/9 171/14 191/15 209/6 209/8 212/4
demeanor [3] 169/17 170/2 170/18
demonstrating [1] 224/2
demonstration [2] 27/19 50/7
dental [22] 208/7 208/11 208/13 209/12 209/16 209/25 210/1 210/7 210/11 210/17 210/19 215/22 215/24 216/2 216/6 219/2 219/4 220/4 222/6 225/3 226/8 231/7
dentin [2] 230/12 230/14
dentist [5] 207/16 212/23 220/14 221/19

**D**

dentist... [1] 222/12

dentistry [16] 207/21 207/22 207/22 207/24 207/25 208/1 208/2 208/4 208/6 209/10 209/15 212/6 214/10 214/19 215/11 231/20

dentists [6] 213/1 213/6 213/8 217/15 220/10 220/10

deoxyribonucleic [1] 28/7

Department [6] 19/3 68/18 181/19 181/23 182/22 211/10

depend [1] 107/7

depending [3] 42/24 115/12 155/9

depends [5] 91/10 104/23 110/3 117/13 118/13

depict [5] 41/16 129/24 197/18 202/12 226/4

depicted [18] 178/24 185/8 185/10 185/10 186/14 188/6 188/7 192/17 193/19 197/9 198/15 199/24 223/9 225/10 225/16 226/19 227/8 228/13

deployed [1] 211/18

deposited [2] 127/20 130/12

depth [1] 149/17

deputy [3] 184/11 184/18 194/18

describe [23] 34/3 62/9 62/17 68/9 69/1 69/5 114/3 125/2 130/8 130/17 131/9 134/14 136/24 148/24 155/6 168/6 169/16 176/15 190/25 192/22 203/8 203/17 216/20

described [8] 49/7 54/8 75/1 136/10 137/2 149/4 158/12 193/15

describing [2] 147/2 205/23

description [1] 135/23

design [1] 190/10

designation [26] 39/9 39/13 44/20 45/13 45/23 45/25 46/2 46/10 48/3 48/17 48/25 54/17 54/17 55/4 55/7 60/6 60/7 61/13 61/19 62/21 63/17 69/12 75/6 79/15 90/15 99/6

designations [1] 50/17

designed [2] 30/19 221/14

desk [2] 176/19 177/7

destroy [2] 115/16 165/3

destroyed [4] 116/9 218/11 224/14 230/10

destroys [1] 114/17

det [1] 72/12

detached [1] 185/16

detect [4] 115/17 116/10 116/24 120/17

detectable [1] 120/21

detection [2] 106/24 107/18

detergent [1] 115/15

determination [5] 37/20 85/11 86/18 99/8 198/9

determinations [1] 127/4

determine [36] 60/14 72/12 75/10 79/21 80/13 80/21 83/9 83/23 86/11 86/19 88/20 90/20 91/1 91/1 92/10 92/14 93/11 96/21 96/21 98/6 98/14 99/10 102/9 102/20 112/8 120/15 125/23 127/23 145/12 154/13 154/17 161/1 161/21 163/22 205/12 215/9

determined [1] 29/12

determines [2] 28/14 110/14

determining [3] 102/12 122/17 127/7

devel [1] 81/24

develop [44] 23/23 24/2 35/18 35/19 36/16 36/23 36/24 37/12 37/15 47/23 49/9 50/3 53/18 55/9 66/2 69/20 72/10 75/22 78/9 78/24 81/4 81/6 81/9 81/24 82/12 83/11 86/1 90/3 92/16 93/21 94/6

99/18 100/21 101/2 101/19 102/21 107/6 107/13 110/20 111/23 117/10 117/16 118/18 119/13

develope [1] 50/1

developed [25] 31/2 36/19 45/21 51/23 52/14 53/12 55/23 55/25 56/3 56/9 56/19 58/3 58/9 58/21 66/22 67/3 71/8 76/1 76/5 78/3 79/8 103/15 107/16 111/16 111/18

developing [1] 77/21

development [3] 29/4 29/7 171/21

devices [1] 195/2

devoted [1] 24/21

diagnostic [1] 38/8

diagnostics [1] 65/18

diagram [1] 177/5

difference [4] 127/23 127/24 148/22 151/13

differences [6] 108/20 147/18 148/17 148/24 157/1 160/22

difficult [2] 136/23 215/21

digital [1] 142/3

dimensions [2] 149/14 149/15

direct [22] 3/4 3/9 3/14 3/20 4/4 4/8 4/11 6/3 8/11 23/7 89/4 123/22 146/19 150/24 151/9 151/13 166/9 173/5 173/19 181/16 182/20 207/13

directed [5] 152/22 183/20 184/5 184/14 185/3

directing [2] 167/5 168/1

direction [2] 25/12 159/15

directions [1] 28/23

directly [6] 11/20 12/1 155/14 185/15 193/18 199/18

Directors [1] 31/12

directs [2] 29/4 29/7

dirt [4] 184/4 187/6 187/7 187/8

disaster [6] 208/10 210/25 211/4 211/5 211/15 213/10

disasters [1] 38/9

discern [2] 118/21 160/21

discipline [2] 144/10 146/6

disciplines [2] 144/6 144/13

discolored [1] 57/24

disconnected [2] 142/15 176/1

discover [1] 154/12

discovered [2] 186/25 193/25

discoveries [1] 193/22

discovering [1] 189/14

discovery [1] 193/13

discuss [1] 141/14

discusses [1] 115/25

discussion [1] 170/3

disfigurement [1] 210/4

display [7] 50/8 56/6 58/13 66/6 69/25 75/25 76/9

displays [4] 55/15 58/6 67/2 67/11

disposal [1] 219/24

distal [1] 226/2

distance [1] 230/6

distinctive [1] 156/11

disting [1] 127/24

distinguish [7] 127/24 148/2 151/11 151/18 151/24 157/15 204/25

distinguished [1] 205/5

district [2] 32/24 215/2

Division [2] 181/20 182/8

DMORT [3] 211/14 211/14 211/16

DNA [228] 23/17 23/23 23/25 24/2 24/22 24/24 25/2 25/7 25/9 25/18 25/23 26/2 26/22 27/2 27/17 27/21 28/6 28/7 28/10 28/11 28/12 28/15 28/17 28/19 28/24 29/3 29/4 29/7 29/15 29/20 30/2

30/4 30/7 30/10 31/2 31/3 32/5 32/6 32/21 34/3 34/5 34/11 34/16 34/21 35/8 35/13 35/18 35/19 36/3 36/8 36/11 36/14 36/16 36/18 36/18 36/24 37/12 37/16 37/24 38/10 38/16 44/4 44/10 45/21 47/23 49/5 49/9 49/20 49/24 50/3 50/18 50/22 51/1 51/1 51/23 52/14 53/11 53/12 55/3 55/9 55/15 55/22 56/2 56/2 56/14 56/18 57/3 57/14 58/2 58/9 58/10 58/20 58/24 59/4 60/18 62/5 64/21 64/25 65/20 66/2 66/6 66/21 66/24 67/2 67/5 67/18 67/24 68/1 69/17 69/20 69/25 70/22 70/23 71/8 71/24 72/10 74/1 75/11 75/17 75/18 75/21 75/22 75/25 76/4 76/13 76/19 77/20 77/24 78/24 79/21 80/24 81/4 81/25 82/6 83/11 86/1 86/1 86/13 86/21 88/20 89/23 89/24 91/2 93/3 93/13 93/21 94/6 94/17 95/3 95/16 95/20 95/23 96/2 96/22 96/25 97/5 98/1 98/11 99/17 100/21 101/20 101/22 102/21 104/11 104/15 105/14 106/3 106/13 106/21 106/23 106/23 107/10 107/12 107/24 108/8 108/12 108/17 108/22 108/25 109/19 109/21 109/25 110/2 110/5 110/10 110/20 111/3 111/16 111/16 111/20 112/4 112/4 112/8 113/7 113/10 113/13 113/14 113/16 114/16 114/17 114/21 115/3 115/7 115/9 115/16 115/21 115/25 116/4 116/6 116/21 116/23 117/10 117/12 117/16 117/20 117/22 117/24 118/12 119/4 119/12 119/21 121/4 121/5 121/15 122/17 143/8 165/4 210/9

DNA's [2] 29/23 116/3

Doctor [3] 208/17 214/22 231/1

document [2] 126/21 145/24

documentation [3] 39/22 212/13 212/15

documents [2] 11/19 145/24

dog [6] 186/24 187/2 187/4 187/8 187/11 187/18

doghouse [2] 187/7 187/24

doing [7] 24/24 26/8 30/7 42/17 121/25 142/20 200/20

Don [1] 207/3

DONALD [3] 4/10 207/6 207/11

door [28] 8/22 8/24 63/20 63/20 87/12 87/20 88/5 101/12 130/1 130/21 132/18 136/18 136/25 137/23 138/5 138/6 138/10 138/10 138/21 139/19 140/8 141/2 151/17 152/14 154/16 157/22 177/23 179/8

doors [1] 57/12

doorway [1] 180/6

double [1] 198/14

DR [2] 4/10 231/8

Dr. [1] 232/19

Dr. Simley [1] 232/19

draining [1] 156/1

drank [1] 60/15

draw [1] 172/7

drawing [1] 214/11

dresser [4] 176/20 177/8 179/14 179/16

drew [4] 188/23 189/1 197/24 204/13

drinking [1] 60/16

drip [1] 132/25

dripped [1] 158/16

driver's [3] 45/4 129/25 130/7

driving [1] 174/1

drop [5] 132/19 132/20 132/22 133/5 148/15

droplet [1] 133/3

dropped [1] 219/6

**D**

drug [3]  145/20 145/20 145/21
drunk [1]  174/1
due [2]  196/19 196/19
duly [7]  5/23 23/1 123/17 166/4 172/24
 181/10 207/7
Duranda [1]  208/19
duties [7]  23/15 24/6 24/10 98/4 124/8
 144/3 153/20

**E**

ear [4]  220/8 220/9 228/20 228/20
Earl [1]  6/15
earlier [4]  50/13 68/14 102/12 137/2
early [1]  168/2
easier [4]  28/9 117/8 117/10 210/8
easiest [1]  28/19
easily [5]  117/16 117/23 219/5 222/23
 224/15
east [2]  178/11 179/24
easy [2]  65/23 216/10
EDELSTEIN [18]  1/22 3/15 3/17 5/10
 81/12 82/15 84/21 143/17 143/20
 152/16 152/18 152/25 153/2 163/7
 165/9 165/11 165/17 187/12
edge [7]  82/9 130/23 130/23 135/3
 199/20 202/6 206/2
edges [2]  57/21 82/10
education [6]  25/6 126/24 161/2 166/19
 212/16 213/18
educational [5]  27/11 32/14 124/3
 166/16 214/18
effect [3]  157/21 191/10 191/23
efforts [1]  11/21
eight [8]  184/3 189/3 189/5 189/12
 193/14 194/24 198/12 204/15
electronics [1]  142/4
eligible [1]  212/18
elliptical [4]  134/23 139/2 139/6 158/13
Elmhurst [1]  209/7
ELMO [3]  81/13 84/22 205/23
emerge [3]  147/14 156/12 157/2
emerges [1]  156/18
employ [1]  182/22
employed [6]  23/12 123/24 125/16
 167/11 181/22 207/17
employment [1]  167/8
enamel [2]  230/8 230/13
encompass [1]  144/5
encompasses [1]  144/12
encounter [1]  91/17
end [15]  7/9 15/12 80/3 80/4 80/5 80/8
 80/11 80/19 80/23 138/8 150/9 150/10
 162/5 170/6 204/16
ended [1]  218/5
ends [1]  221/13
energy [1]  162/8
enforcement [9]  32/22 38/1 38/16 38/19
 65/9 92/1 104/3 104/14 182/1
engaged [1]  196/15
engine [2]  57/11 142/9
enough [13]  89/2 106/25 107/3 107/10
 109/7 111/24 111/25 112/4 112/5
 132/24 140/1 158/10 224/20
entire [13]  36/18 51/1 66/17 72/13
 72/18 72/20 120/3 120/14 124/21
 140/12 161/5 161/14 221/17
entirety [2]  66/18 221/10
entities [1]  228/2
entrance [1]  138/6
entry [1]  213/22
envelope [5]  48/1 48/13 48/22 61/9

63/13
envelopes [2]  44/13 61/7
environmental [1]  116/9
enzymes [1]  29/1
epithelial [2]  34/13 109/13
equipment [4]  24/14 26/10 32/8 194/22
erect [2]  194/20 194/23
erecting [1]  194/19
Ertl [3]  194/11 194/18 195/7
escapes [1]  191/25
especially [4]  34/17 103/2 153/10
 155/20
essentially [4]  180/18 201/17 217/1
 231/25
estimate [3]  30/8 169/24 210/14
estimated [3]  185/11 189/12 204/19
estimates [1]  175/19
etc [1]  99/21
ev [1]  205/19
evaluated [1]  31/17
event [2]  28/1 74/14
eventually [2]  45/20 115/15
everybody [1]  7/18
everybody's [1]  162/2
everyone [1]  199/6
everything [9]  16/11 19/17 28/23 29/1
 31/24 46/2 220/8 220/11 228/20
evidence [85]  23/18 24/5 30/9 31/2
 31/25 32/1 32/2 33/13 36/20 38/15
 38/25 39/1 39/2 39/6 39/7 39/12 39/18
 39/19 39/21 40/10 41/11 42/19 42/22
 49/21 50/2 51/4 52/19 52/21 52/23 53/9
 54/4 54/11 54/20 55/23 58/18 67/13
 67/22 74/6 76/21 78/12 79/6 83/13
 86/25 103/15 104/2 104/22 105/1 105/7
 105/14 105/18 105/18 105/24 110/5
 122/3 122/6 128/10 143/8 143/9 143/10
 150/15 150/16 150/20 150/24 151/8
 151/9 156/8 159/8 165/23 198/16 200/7
 201/5 203/6 208/13 209/17 215/15
 215/16 215/17 218/23 219/8 219/14
 224/10 225/1 225/4 225/5 232/18
evident [2]  160/4 161/22
evidential [1]  205/19
evidentiary [1]  143/12
Ex [1]  202/22
exact [1]  62/12
exactly [11]  15/5 27/17 28/24 46/6 84/3
 99/11 111/1 112/2 129/1 150/13 202/12
exam [1]  54/24
examination [64]  3/4 3/5 3/6 3/9 3/10
 3/11 3/12 3/14 3/15 3/16 3/17 3/20 3/21
 3/22 4/4 4/5 4/8 4/9 4/11 6/3 16/22
 22/10 23/7 42/21 57/19 62/15 69/11
 77/15 80/19 83/18 85/13 103/24 117/3
 123/22 125/9 129/1 129/3 129/4 138/4
 143/19 150/14 154/13 155/3 156/8
 161/18 162/17 163/10 165/10 166/9
 170/12 172/11 173/5 180/16 181/16
 199/1 200/9 200/15 207/13 212/8
 212/18 212/18 212/19 225/1 233/3
examinations [4]  104/21 142/20 161/21
 163/1
examine [19]  30/22 31/1 39/21 104/17
 105/24 128/22 133/22 137/23 154/3
 159/10 190/15 196/1 198/22 215/9
 215/14 216/4 217/10 223/3 225/22
examined [24]  5/24 23/2 75/6 83/15
 85/6 85/7 85/8 85/9 87/8 114/1 114/11
 123/18 125/17 134/4 150/25 158/23
 163/2 166/5 172/25 181/11 207/8
 216/22 217/12 217/14
Examiners [1]  214/6

examining [4]  23/18 82/2 84/24 125/13
except [2]  87/5 87/9
exchange [1]  26/13
exclude [2]  97/7 216/11
excluded [4]  96/3 96/7 97/11 97/12
excluding [2]  101/24 102/1
exclusion [1]  232/3
excuse [10]  82/9 89/7 97/14 98/19
 99/23 102/6 160/6 165/20 180/15
 223/17
execute [1]  183/10
execution [1]  183/1
exhibit [124]  12/15 12/20 12/23 16/14
 27/5 27/7 41/21 44/14 44/15 44/23
 45/11 46/8 46/13 46/20 47/1 47/25 48/8
 48/14 48/21 48/23 54/7 56/20 56/25
 60/2 60/3 61/15 62/2 62/16 62/23 63/12
 63/22 64/8 64/10 64/12 64/17 68/7
 74/24 74/25 75/1 75/3 76/25 79/17
 79/17 81/13 81/15 82/16 84/22 84/23
 84/24 85/3 93/18 95/9 95/9 96/10
 114/10 126/19 128/9 128/11 129/15
 130/15 131/9 131/23 132/12 134/1
 136/10 138/2 140/10 141/15 142/14
 177/4 177/15 178/24 179/22 184/25
 185/6 186/7 186/8 186/9 186/10 186/14
 188/4 188/5 188/6 189/7 190/16 190/19
 192/14 192/15 193/19 195/25 196/1
 196/2 197/9 197/23 198/25 199/1 199/8
 199/22 199/24 201/14 202/22 203/8
 205/22 214/12 214/13 214/15 222/25
 223/2 223/3 223/6 223/10 223/17
 223/18 225/14 225/15 227/21 228/15
 229/1 229/13 230/3 232/20 232/22
 232/23 233/12
exhibits [10]  4/13 60/21 61/6 74/24
 76/21 77/4 165/22 190/14 200/7 232/19
existence [2]  83/23 84/19
expect [9]  74/5 74/6 120/4 144/5 148/9
 148/21 152/9 153/8 155/18
experience [14]  77/20 125/11 126/24
 147/13 152/5 157/8 161/2 161/17
 162/21 191/22 209/12 210/25 212/4
 214/18
experiences [1]  213/19
experimentation [1]  158/20
expert [7]  26/22 27/2 126/9 126/14
 145/7 146/19 210/11
expertise [4]  154/23 204/24 205/4 212/5
explain [26]  27/16 28/16 37/2 38/3
 38/23 42/3 45/12 45/23 48/1 48/15
 50/11 52/15 55/18 57/16 58/16 66/10
 69/24 70/3 70/18 104/20 108/22 113/3
 127/3 139/13 162/3 224/7
explained [2]  101/15 102/12
explaining [1]  27/21
explanation [1]  223/23
exposed [3]  70/20 193/2 193/9
express [1]  210/15
extent [3]  16/13 78/4 191/13
exterior [1]  87/4
external [1]  164/12
extract [15]  75/17 83/8 88/10 88/11 93/4
 95/20 99/16 102/21 106/19 117/24
 118/12 118/18 119/4 119/12 119/20
extractable [7]  92/11 93/12 95/15 96/22
 103/9 121/15 122/17
extracted [4]  82/11 86/7 86/8 103/15
extraction [3]  55/3 58/3 106/20
extremely [1]  219/2
eye [2]  29/10 120/18
eyes [2]  83/20 186/19
eyetooth [1]  217/6

**F**

face [2] 29/11 210/5
facing [2] 178/3 199/18
factor [1] 116/9
fairly [11] 61/24 62/11 62/13 114/4 117/14 118/3 139/23 162/20 162/22 198/6 202/14
fall [2] 132/25 134/17
fallen [1] 139/6
FALLON [54] 1/16 3/4 3/6 3/20 3/22 4/8 4/11 5/5 5/8 5/14 5/16 5/18 6/4 11/22 11/23 12/6 12/7 12/16 12/18 13/5 14/22 14/25 15/7 15/8 15/10 16/12 18/25 22/9 22/11 22/19 123/5 123/8 165/19 166/10 170/10 170/25 171/5 172/12 172/16 181/7 181/17 187/14 187/19 187/20 200/6 206/20 206/24 207/2 207/14 232/16 233/8 233/18 233/20 233/25
families [1] 17/6
family [3] 78/7 207/22 220/14
fancy [1] 214/10
far [8] 8/2 11/19 36/4 102/25 143/12 154/9 154/11 203/22
farthest [1] 178/8
Fassbender [6] 10/9 10/23 13/7 195/25 197/8 223/2
father [1] 29/25
FBI [2] 32/19 73/24
February [6] 7/9 9/18 9/20 15/12 19/19 20/17
feel [3] 11/24 28/4 122/3
feeling [4] 154/20 159/14 168/17 168/25
feet [22] 150/7 150/9 150/9 152/11 184/3 185/12 185/12 185/13 185/21 185/23 189/3 189/5 189/12 193/14 194/24 195/2 195/3 195/11 195/12 198/12 198/12 204/15
felt [4] 122/6 170/4 195/14 198/1
FEMA [1] 211/11
female [4] 53/1 53/6 66/14 70/11
few [6] 27/15 61/6 103/21 117/2 147/21 190/14
fiancé [3] 173/18 174/5 175/9
field [7] 135/11 144/9 144/12 208/2 208/4 214/19 215/10
fields [1] 37/25
Fifteen [3] 6/6 124/17 175/22
fifth [1] 174/1
fifty [2] 68/8 68/9
file [7] 38/11 38/21 38/24 39/23 40/3 40/5 40/9
filing [2] 176/19 177/8
fillings [1] 224/13
film [1] 220/15
finally [4] 48/21 106/19 141/13 164/19
Financial [1] 182/11
findings [13] 50/8 52/3 55/15 58/6 58/14 67/11 69/25 70/4 76/9 160/18 209/3 223/24 224/3
fine [5] 66/1 68/21 77/19 84/4 177/1
finger [3] 131/25 148/16 219/5
fingerprint [1] 210/6
finish [1] 153/4
finished [1] 13/10
fire [11] 10/16 11/10 12/9 13/18 15/19 192/5 193/2 193/9 201/25 216/17 224/14
firearm [6] 81/5 148/10 148/14 156/11 162/4 162/16
firearms [2] 163/2 176/23
Firstly [1] 69/24
fit [3] 57/5 140/19 150/1

five [8] 25/5 31/14 31/18 114/18 123/3 125/14 197/24 225/22
five-and-a-half [1] 125/14
five-minute [1] 123/3
FK [3] 99/6 99/10 119/7
FL [8] 75/6 76/1 76/14 76/17 98/24 99/11 99/15 118/21
flags [1] 202/1
flat [1] 195/9
flip [1] 135/2
floor [2] 45/16 100/9
flow [14] 138/11 139/10 139/15 139/17 139/22 155/24 157/23 157/25 158/6 158/11 158/12 158/17 158/19 158/22
flowed [1] 139/16
fluid [6] 80/22 83/10 86/12 103/9 115/11 118/16
fluids [2] 35/24 105/25
flung [4] 138/22 139/7 140/5 151/21
focus [4] 82/18 91/12 105/13 105/13
focused [2] 91/18 103/5
focusing [3] 86/14 86/25 105/5
folks [3] 194/2 194/4 195/7
follow [1] 35/25
followed [2] 78/5 101/14
following [1] 32/12
follows [7] 5/24 23/2 123/18 166/5 172/25 181/11 207/8
foot [4] 185/18 185/18 185/22 206/6
forceps [1] 114/20
foregoing [2] 235/7 235/7
foremost [1] 168/7
forensic [29] 23/10 25/18 29/14 29/19 30/20 31/20 38/1 124/2 124/10 144/1 144/17 207/24 207/25 208/1 208/6 209/12 209/14 212/6 212/22 212/25 213/8 213/13 213/21 213/24 214/1 214/9 214/19 215/10 231/20
forensics [2] 34/18 38/13
forever [1] 219/9
form [4] 78/25 79/1 104/17 144/19
formal [1] 124/3
forth [2] 32/17 32/19
Forty [1] 106/5
Forty-one [1] 106/5
forward [4] 103/4 107/4 107/4 199/5
forwarded [1] 221/25
found [45] 18/7 20/12 34/4 34/5 34/19 35/15 49/1 50/18 50/20 52/7 52/12 53/13 53/24 56/14 56/22 57/3 57/4 58/24 59/6 59/20 60/11 68/1 68/16 71/24 74/15 75/2 76/2 76/13 101/10 101/11 105/2 107/24 108/2 108/4 112/19 113/9 113/24 130/6 142/16 150/15 150/19 151/8 197/1 197/3 204/5
four [7] 7/9 8/5 61/7 64/22 195/3 195/11 218/4
four-month [2] 7/9 8/5
FOX [2] 1/11 167/18
Fox-Brewer [1] 167/18
fracture [14] 217/16 217/18 217/19 217/22 217/23 218/3 218/15 218/21 219/11 219/21 227/25 228/3 229/23 231/4
fractured [2] 227/24 232/21
fragment [43] 51/3 51/14 51/19 68/11 69/6 69/18 75/2 75/5 75/7 75/9 75/11 75/14 75/19 76/17 76/19 98/23 99/2 99/14 99/14 118/21 186/3 188/19 189/2 189/4 189/10 189/14 189/16 189/23 193/13 204/15 204/18 204/20 204/21 205/3 223/14 226/8 226/12 226/13 229/8 229/10 229/21 231/25 232/20

fragment's [1] 189/11
fragmented [1] 215/22
fragments [25] 50/25 55/22 55/24 70/25 71/3 190/4 195/15 204/24 205/5 205/6 216/2 216/3 216/5 216/17 216/22 217/9 217/10 218/2 218/8 223/11 223/16 224/16 224/18 229/6 231/5
frame [3] 154/25 182/16 199/16
frankly [1] 12/1
free [1] 28/4
freed [1] 33/20
FREMGEN [52] 1/20 3/5 3/10 3/12 3/21 4/5 4/9 5/9 5/9 11/11 11/14 11/16 14/19 14/23 15/2 16/18 16/23 65/4 65/12 68/14 68/18 68/22 68/23 77/3 77/13 77/14 77/16 82/17 82/21 103/19 111/7 112/18 113/17 117/2 117/4 165/25 170/13 171/8 172/9 180/14 180/17 180/22 200/11 200/14 200/16 203/13 203/14 206/17 233/1 233/4 233/11 233/17
frequency [1] 74/1
frequently [1] 38/7
Freymiller [2] 208/19 214/25
Fridays [1] 167/25
friend [1] 8/24
friendly [2] 7/25 8/3
friends [2] 6/23 8/22
Froehlich [1] 215/2
front [23] 45/4 48/5 48/9 48/12 48/19 129/5 129/9 129/25 130/7 130/20 130/21 130/22 130/23 151/17 185/4 186/5 188/1 193/14 199/19 204/16 222/18 226/2 226/20
full [7] 24/21 71/10 88/21 108/8 111/23 112/5 212/12
function [2] 29/2 29/17
functional [1] 29/16
furniture [2] 176/15 177/10
further [23] 16/12 22/19 34/24 43/21 43/23 44/4 44/10 77/6 86/9 86/16 88/19 90/25 106/14 106/15 107/1 121/14 122/8 156/21 224/2 226/12 227/15 232/16 233/7
future [1] 165/3

**G**

GAHN [29] 1/18 3/9 3/11 3/14 3/16 5/8 22/22 23/8 65/3 65/14 68/13 68/25 76/20 76/25 77/6 78/2 89/5 103/21 103/23 103/25 117/5 121/12 123/13 123/23 143/14 144/18 163/8 163/11 165/21
gain [2] 125/19 213/18
gained [1] 125/25
games [1] 17/3
garage [12] 20/8 42/5 75/2 76/2 128/20 156/7 183/21 183/21 183/25 184/4 185/16 186/1
garment [1] 115/17
gas [1] 145/11
gather [3] 111/25 157/5 159/19
gender [2] 53/6 70/10
gene [1] 29/16
general [13] 72/13 73/12 135/22 144/24 144/25 162/10 162/13 171/24 196/22 207/16 207/22 207/23 220/10
generalization [1] 113/14
generalizations [3] 110/25 111/6 113/8
generally [4] 112/24 162/4 183/5 213/3
generate [4] 38/20 39/23 40/1 73/10
generated [4] 40/4 148/13 148/15 177/5
generating [1] 38/24

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 243 of 255    Document 19-17

**G**

genes [2]  29/7 29/13
genetic [6]  36/15 50/14 55/20 74/17 74/19 89/2
gentlemen [3]  5/2 77/10 234/1
German [2]  186/22 187/4
gets [1]  226/14
GG [1]  84/12
GH [1]  84/12
girl [1]  170/20
girlfriend [3]  18/5 18/7 18/9
glass [1]  158/5
gloves [6]  112/13 142/25 143/2 143/7 200/24 201/9
Glue [1]  218/17
Gluing [1]  219/10
gone [5]  217/1 219/9 224/13 224/15 228/12
grabbed [1]  201/9
grade [1]  6/11
gradually [1]  185/12
graduated [5]  166/22 167/2 207/19 209/7 209/9
grainy [1]  226/6
grandma's [1]  10/18
granted [1]  171/6
grass [1]  186/1
gravel [5]  185/11 185/14 185/19 185/23 185/24
gravity [4]  133/1 139/18 140/1 157/21
grayer [1]  230/11
great [4]  7/2 155/11 155/18 203/13
greater [1]  157/18
Green [1]  65/7
Groffy [2]  41/8 61/2
grommets [1]  195/15
ground [5]  132/25 139/17 140/2 184/19 194/24
group [4]  31/13 31/23 32/18 33/8
growing [1]  6/22
Guang [1]  194/11
guard [3]  80/2 81/3 111/13
guessing [1]  161/13
guidance [1]  167/17
gum [1]  228/11
gun [5]  79/23 162/8 162/20 176/23 176/24
guns [4]  163/2 176/24 176/25 179/3
gunshot [8]  148/22 156/13 156/14 156/18 156/23 157/2 157/9 162/5
guys [3]  10/23 10/24 17/2

**H**

hacksaw [1]  197/5
hadn't [1]  142/21
hair [30]  29/10 34/9 98/1 98/7 98/8 98/10 98/19 135/10 135/12 135/15 137/20 141/8 149/10 149/20 151/3 151/4 151/5 152/1 159/2 159/11 159/13 159/18 160/5 160/7 160/8 160/19 161/3 161/6 161/10 161/14
hairs [1]  98/10
Halbach [30]  8/14 20/2 21/25 65/1 65/6 66/3 66/8 66/21 67/8 67/14 67/17 67/23 71/7 71/16 71/20 71/23 74/16 76/5 76/13 90/5 90/6 94/13 96/3 97/9 101/4 101/24 119/5 198/4 220/1 231/8
Halbach's [25]  41/2 41/17 42/6 42/8 43/2 43/9 51/24 53/25 54/10 55/10 56/15 60/25 67/7 72/1 78/4 108/4 128/13 129/17 130/16 132/7 133/23 134/7 135/19 163/15 205/13

half [3]  125/14 134/24 194/6
Halloween [4]  7/8 15/19 173/10 174/3
hallway [4]  8/21 180/2 180/3 180/5
hammer [2]  190/10 197/4
hand [19]  5/21 22/24 27/6 41/24 44/12 47/5 60/19 61/7 109/15 123/15 126/18 131/5 133/6 141/15 166/2 172/22 178/18 187/22 190/15
handcuffs [1]  97/17
handed [1]  111/8
handle [7]  87/21 88/5 113/6 191/3 192/8 192/19 206/9
handled [1]  191/2
handles [1]  87/12
handling [2]  31/25 121/9
hands [3]  112/14 132/5 201/3
hang [1]  17/2
happened [10]  18/8 20/2 39/25 51/16 57/9 133/18 141/7 141/22 168/13 183/24
happens [3]  113/10 219/7 226/4
happy [1]  7/23
happy-go-lucky [1]  7/23
hard [4]  20/4 117/17 121/22 202/12
harder [1]  230/15
hardest [2]  230/13 230/14
hate [1]  152/20
Hau [3]  2/3 235/4 235/19
head [15]  135/15 141/3 141/8 149/24 150/6 150/9 151/5 151/6 152/1 152/10 157/3 159/18 161/3 161/6 163/17
headboard [15]  84/25 85/2 85/5 85/10 85/12 85/18 85/20 86/2 86/3 86/6 178/6 178/8 178/12 178/14 179/24
health [4]  207/23 211/7 211/8 211/11
hearsay [1]  187/13
heart [1]  155/25
heat [4]  70/20 70/22 191/19 192/2
height [1]  185/13
held [1]  9/15
Here's [1]  131/15
hereby [1]  235/6
herein [7]  5/23 23/1 123/17 166/4 172/24 181/10 207/7
high [6]  6/10 73/5 156/13 167/13 167/20 167/21
higher [2]  208/12 212/4
hinged [1]  138/5
Hispanic [2]  73/18 73/19
hit [4]  158/15 164/2 203/11 226/16
hits [1]  133/3
hm [2]  77/22 96/11
hold [5]  12/20 31/8 31/11 165/20 181/25
holder [1]  130/25
holding [2]  191/24 232/13
Holmes [3]  220/3 223/8 228/18
home [1]  166/12
Homeland [1]  211/10
homicide [5]  105/3 121/7 122/10 127/25 162/16
HON [1]  1/11
Honor [14]  5/5 65/3 68/14 103/21 123/13 143/13 143/18 144/18 152/16 152/21 163/9 165/21 200/6 206/18
hood [15]  54/10 54/23 55/10 55/16 56/1 56/9 56/14 56/19 87/9 93/8 93/9 142/8 142/11 142/12 142/24
hope [1]  144/14
Hospital [1]  65/7
hot [1]  183/12
hour-and-a-half [1]  194/6
hours [1]  196/17
house [3]  9/16 28/21 28/22

human [10]  43/18 88/13 158/18 204/22 204/25 205/12 211/7 211/8 211/12 215/5
hundred [3]  213/7 232/5 232/6
hypothesis [2]  154/6 154/8
hypothetical [1]  148/19

**I**

I'd [15]  11/11 27/15 27/16 59/19 60/20 61/7 64/7 64/8 126/17 130/5 182/19 184/23 196/24 212/4 215/3
I'll [10]  15/8 40/19 84/3 148/21 170/10 193/11 199/5 202/22 203/9 205/22
I'm [118]  11/16 11/25 12/4 12/18 12/21 13/13 13/21 23/17 24/8 24/9 24/11 24/14 27/6 34/24 35/7 40/16 50/6 52/1 52/6 54/6 55/13 56/23 58/4 60/1 60/19 61/5 61/6 62/1 64/9 64/11 66/5 67/1 67/10 68/4 68/5 69/23 74/23 77/17 81/12 82/15 84/21 87/23 93/24 95/8 96/9 97/25 100/25 106/9 106/9 108/14 109/13 112/16 112/16 114/24 124/2 124/10 124/12 126/18 128/9 129/14 130/14 131/8 131/22 132/11 133/25 136/9 138/1 138/13 140/9 141/14 144/1 144/19 145/10 148/3 148/13 149/9 151/10 152/25 156/22 158/25 160/7 166/12 173/19 177/1 177/3 177/25 178/10 179/21 181/19 186/9 190/15 195/9 195/24 195/24 197/8 199/2 200/20 201/11 201/13 202/8 203/7 207/16 208/3 209/8 211/4 213/15 214/4 220/13 222/13 222/15 222/16 222/25 223/1 225/7 230/6 230/19 230/19 232/14
I've [20]  25/16 25/20 27/11 70/6 106/9 114/9 124/21 124/22 125/8 125/13 125/17 143/23 209/14 210/18 211/13 211/16 211/17 212/13 217/12 217/14
ID [3]  54/17 55/8 55/25
Idaho [1]  125/15
idea [2]  43/14 213/5
identifiable [2]  208/9 224/15
identification [27]  12/15 12/19 27/5 68/21 84/11 95/11 96/15 96/17 98/24 208/21 209/16 209/25 210/1 210/2 210/5 210/6 210/12 210/17 211/22 214/5 215/1 215/14 217/11 231/23 231/23 232/3 232/11
identifications [4]  208/7 208/11 210/8 210/19
identified [8]  56/21 129/16 131/23 183/13 183/21 208/10 217/7 232/19
identify [25]  23/22 27/8 38/8 44/15 46/9 57/1 61/5 68/6 75/3 126/20 132/13 140/10 141/16 151/24 169/12 188/11 190/8 198/24 215/21 216/12 216/13 222/24 224/19 224/21 224/25
igni [1]  57/7
ignition [9]  46/12 46/24 47/9 52/8 57/7 131/15 131/17 132/7 154/15
II [1]  4/10
IJ [1]  90/15
IK [1]  90/15
illustrated [1]  54/5
illustrates [1]  28/11
illustrative [1]  186/6
im [1]  41/9
image [2]  130/20 134/3
imaging [1]  41/9
immediate [3]  185/5 199/20 202/21
impact [6]  110/19 115/21 137/3 138/10 139/22 147/9

## I

impacted [5] 138/25 139/3 139/16 139/19 139/24
impacts [2] 133/3 138/23
impeach [1] 12/2
impeachment [1] 16/15
impending [1] 198/5
implements [3] 190/7 196/21 196/25
importance [1] 195/19
impression [1] 202/16
Improper [1] 170/25
in-court [1] 210/16
inaudible [2] 11/13 201/12
inch [5] 184/20 184/21 184/21 204/19 204/19
inches [1] 62/12
incident [1] 154/9
incisor [1] 224/23
incisors [1] 222/17
including [2] 94/12 173/10
inconclusive [7] 88/16 88/18 88/23 89/1 89/3 116/4 116/11
incorrect [1] 165/14
indeed [2] 133/17 141/7
independently [1] 103/7
indi [1] 57/25
indicate [14] 40/10 84/11 88/1 90/17 106/17 137/6 139/21 139/23 151/1 151/4 153/13 160/25 165/16 212/3
indicates [4] 135/14 136/4 136/7 137/13
indication [9] 57/25 99/12 127/10 127/14 127/18 157/11 157/12 159/18 206/9
indications [1] 157/4
indicative [5] 139/7 140/4 151/3 156/15 159/17
indicator [1] 161/7
indirect [3] 151/8 151/10 151/14
individuals [12] 24/1 26/7 26/9 31/13 32/18 38/9 39/1 73/23 124/11 208/8 211/23 217/13
influencing [1] 133/2
inform [3] 58/4 63/13 67/1
inherit [1] 29/24
inherited [2] 28/18 29/23
initial [2] 224/17 229/19
initially [5] 129/2 186/3 215/20 215/24 218/14
initials [2] 54/19 54/20
injury [3] 208/14 210/22 210/22
inner [1] 151/16
Innocence [2] 33/3 33/7
inquiry [1] 176/3
inside [15] 9/9 17/4 37/5 37/8 49/16 49/17 95/21 96/23 137/18 149/14 154/16 156/7 157/22 230/11 230/12
instance [16] 39/13 43/15 78/13 79/9 83/13 87/20 89/9 98/20 100/4 117/7 118/17 118/20 119/11 206/13 213/1 216/8
instances [2] 74/8 105/12
instantaneously [1] 113/10
institution [2] 166/23 167/3
instrumentation [1] 114/23
instruments [4] 26/11 114/25 127/15 147/12
insulated [1] 227/15
intended [1] 172/7
interest [3] 183/15 183/24 184/9
interested [3] 29/15 29/22 75/10
interesting [1] 188/25
interior [10] 43/4 87/4 87/12 128/23 137/23 138/9 139/19 140/7 141/1 141/2
intern [1] 167/12
internal [1] 164/12
internship [4] 167/7 167/14 167/23 171/17
interpretation [12] 124/20 124/23 124/25 125/5 125/8 125/25 126/13 127/6 127/22 145/6 147/19 148/6
interpretations [2] 25/19 32/13
interpreting [2] 125/19 126/9
interrupt [1] 152/20
interspersed [1] 36/14
intertwined [3] 188/19 189/23 204/11
interviewed [1] 15/12
introduced [2] 128/10 233/13
investigate [1] 122/16
investigation [6] 98/18 105/22 146/7 162/15 181/20 182/9
investigations [2] 19/3 122/15
investigator [7] 10/22 19/2 190/15 190/24 193/11 197/8 198/25
invisible [1] 120/17
involvement [2] 42/13 208/10
irons [2] 95/14 97/15
Irregardless [2] 158/7 158/8
issue [2] 119/19 141/14
issues [2] 24/13 194/3
item [61] 39/12 39/13 42/22 44/19 45/2 45/13 45/22 46/2 46/7 46/10 46/21 48/3 48/17 48/25 54/16 54/17 55/4 55/7 55/25 59/15 60/6 60/7 61/13 61/19 62/20 63/17 68/19 69/1 69/2 69/12 69/16 75/6 76/1 76/14 79/5 79/12 82/10 83/13 86/24 88/7 93/18 96/13 103/8 104/21 105/10 105/11 109/10 109/15 109/20 109/23 109/23 112/14 113/12 115/22 117/19 118/13 184/12 187/21 190/17 197/9 200/23
items [32] 38/15 38/19 39/15 39/16 40/10 49/10 67/3 86/18 86/22 89/22 99/24 100/1 102/3 104/1 104/25 105/23 110/4 110/12 113/7 117/7 117/22 193/18 195/20 196/21 198/2 200/12 201/3 215/9 215/13 215/17 215/18 215/23

## J

jack [2] 83/1 144/16
jack-of-all [1] 144/16
jacket [6] 40/3 40/9 90/12 90/23 91/3 91/22
jackets [1] 32/9
jail [13] 173/23 173/25 174/3 174/8 174/9 174/12 175/24 176/10 176/18 176/22 177/12 177/14 177/20
January [4] 9/18 167/6 168/1 168/2
Jason [1] 184/1
jaw [3] 223/13 223/16 226/12
jeans [10] 90/13 90/17 90/21 91/3 91/20 114/8 114/10 119/23 120/3 120/20
Jeff [1] 215/2
Jennifer [3] 2/3 235/4 235/19
JEROME [1] 1/11
Jim [3] 220/3 223/8 228/18
job [2] 122/1 144/2
JODI [4] 4/3 172/19 172/23 173/3
John [3] 194/10 194/17 195/7
join [1] 233/20
Jost [3] 184/1 184/11 194/19
journals [1] 26/16
judged [1] 171/4
June [1] 146/16
junkyard [1] 183/11

jurors [43] 27/17 28/16 34/3 37/2 38/4 38/23 44/16 45/1 45/12 46/9 47/15 48/7 48/15 48/24 49/7 50/11 52/16 55/18 57/1 57/16 58/4 58/16 59/20 61/20 62/4 62/9 62/17 62/25 63/13 66/11 67/1 70/18 113/3 127/3 130/6 134/15 138/3 141/17 173/24 175/2 175/15 177/18 224/4
jury [18] 1/4 27/22 28/5 55/14 64/15 70/3 104/20 128/5 130/19 131/14 134/9 138/14 139/12 155/6 159/5 171/4 173/21 209/24
Justice [3] 181/20 181/23 182/23

## K

Karen [2] 167/16 168/12
Katrina [4] 209/20 211/2 211/9 211/20
KAYLA [17] 3/3 5/19 5/22 6/2 6/5 11/8 12/18 15/10 22/7 22/12 168/3 168/8 168/14 168/16 168/24 169/22 170/15
Kayla's [2] 169/16 170/2
keep [3] 26/1 26/5 201/3
keeps [2] 39/5 54/18
Ken [1] 5/7
KENNETH [1] 1/14
kept [3] 38/10 39/23 40/2
key [29] 56/22 57/2 57/3 57/4 57/6 57/10 57/14 57/17 57/19 57/22 57/22 57/23 58/1 58/7 58/10 58/19 58/25 59/4 93/20 93/23 94/1 94/3 94/13 94/17 94/19 94/22 112/18 112/19 142/4
kick [1] 116/13
kills [1] 115/2
kits [1] 26/12
kitty [1] 179/17
kitty-corner [1] 179/17
knife [1] 148/12
knives [4] 102/4 102/5 102/9 102/15
known [4] 35/21 79/10 95/25 215/25
KRATZ [18] 1/14 4/4 5/7 13/13 27/6 40/16 44/12 54/6 60/1 60/19 61/6 68/5 126/18 172/19 173/6 180/10 180/24 203/11
Krupka [1] 231/8

## L

lab [58] 23/13 23/16 23/17 24/7 24/25 30/3 30/8 30/21 31/12 31/24 33/24 36/1 38/20 39/8 39/10 42/9 45/24 47/21 54/16 55/4 60/6 61/3 65/9 69/2 69/2 69/12 81/22 84/25 92/2 96/18 98/4 102/3 104/2 104/8 121/1 121/3 124/9 124/22 125/15 125/22 129/17 142/18 143/22 144/4 144/7 146/14 153/23 154/2 161/21 194/4 194/6 194/10 194/17 195/7 195/21 198/2 198/7 198/8
label [1] 54/16
labeled [2] 101/10 220/2
laboratories [1] 37/5
laboratory [31] 23/11 25/11 26/17 30/13 30/17 30/24 31/8 31/10 31/14 31/15 31/15 32/4 32/7 32/21 33/16 38/25 39/5 39/17 40/25 41/4 42/5 42/7 43/12 60/6 72/22 73/7 114/18 123/25 124/16 128/21 142/23
labs [3] 26/8 36/4 73/25
lack [1] 153/12
ladies [3] 5/2 77/9 234/1
landscape [2] 185/14 185/25
large [19] 47/6 61/24 62/11 93/7 108/25 108/25 114/4 118/3 139/23 155/11 155/11 155/13 158/10 163/23 187/4 194/21 194/23 202/23 204/7

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 245 of 255    Document 19-17

## L

larger [5]  70/24 138/7 157/18 202/23 233/15
largest [2]  104/7 106/7
laser [4]  27/25 35/1 129/20 177/25
lasted [1]  175/23
latch [9]  54/10 54/23 55/10 55/16 56/1 56/9 56/15 56/19 87/9
late [2]  19/19 20/16
law [18]  1/20 1/22 32/22 32/23 33/4 33/9 37/25 38/16 38/19 65/8 92/1 104/3 104/14 107/17 126/8 181/25 208/3 208/4
layout [1]  32/6
leader [1]  24/8
leaking [1]  164/17
learned [1]  147/12
learning [1]  213/19
leary [1]  231/24
leave [9]  37/14 110/5 110/6 110/10 110/23 111/24 132/6 135/7 161/4
leaves [7]  53/2 162/5 190/1 190/2 190/3 191/5 193/17
leaving [2]  131/20 137/13
lectures [2]  25/14 126/1
left-hand [1]  187/22
leg [4]  95/14 97/15 114/7 120/20
length [9]  150/3 160/19 160/24 161/5 161/8 161/14 184/21 195/3 195/12
less [2]  146/23 218/25
letters [1]  50/17
level [5]  28/24 106/22 116/10 154/1 213/22
lever [1]  54/9
license [5]  81/19 81/21 82/3 112/7 112/9
lie [1]  19/14
light [3]  118/6 119/25 135/25
limitation [2]  109/3 111/22
limitations [2]  107/5 108/19
limited [2]  82/19 95/4
limits [2]  106/24 107/19
line [2]  112/3 230/16
lingual [3]  225/23 227/11 229/20
literature [5]  26/2 26/5 112/23 115/24 116/3
litigation [1]  208/15
little [32]  7/15 7/17 13/19 17/22 18/1 24/18 43/21 45/23 66/10 66/13 89/18 107/22 108/10 117/22 120/4 134/13 156/21 158/16 170/4 188/1 188/21 198/23 209/4 209/11 215/6 218/17 218/24 221/23 221/24 230/11 230/21 231/24
live [1]  176/9
lived [1]  176/12
living [3]  166/11 181/18 207/15
loaded [2]  141/4 141/9
locate [2]  56/24 63/18
located [11]  61/21 61/23 63/1 149/20 149/24 173/22 178/25 179/2 183/4 189/11 202/13
location [11]  50/19 50/23 50/24 51/7 51/12 51/15 51/16 51/18 151/2 151/18 152/6
locations [5]  36/20 55/21 74/17 74/19 131/2
long [16]  15/14 23/12 24/24 25/10 62/12 124/15 161/11 169/25 174/11 174/12 175/21 181/22 182/4 196/14 201/8 207/17
longer [1]  143/24

looks [4]  114/5 197/1 227/25 229/13
losing [2]  7/14 17/19
lost [1]  219/8
lot [22]  26/13 29/18 36/10 38/7 38/11 50/15 70/20 91/12 103/1 103/1 104/23 104/25 109/5 109/8 110/3 110/8 113/9 117/15 155/9 164/4 164/7 220/9
lots [3]  91/13 117/20 117/20
loud [1]  13/3
love [4]  14/6 220/9 220/10 220/11
low [1]  116/10
lower [9]  218/8 221/9 221/23 222/19 222/20 223/13 223/15 223/15 228/23
lucky [1]  7/23
lunge [2]  187/5 187/10
lying [2]  19/12 184/19

## M

ma'am [1]  35/8
machine [1]  235/10
Madison [12]  23/11 23/13 24/25 30/4 30/7 31/8 33/5 104/2 123/25 124/22 128/21 207/16
magnitude [1]  103/2
Maine [3]  182/2 182/3 182/4
maintain [1]  219/14
maintained [1]  73/23
male [3]  53/1 53/8 53/11
malpractice [1]  208/13
mandible [1]  223/15
MANITOWOC [7]  1/1 173/23 174/2 183/6 183/25 208/22 235/2
manner [1]  127/18
mark [5]  1/20 5/9 208/13 209/17 210/21
marked [28]  4/13 12/15 12/19 27/5 27/7 44/14 54/7 56/25 75/1 95/8 96/10 114/9 126/19 129/15 130/15 131/8 131/23 132/12 134/1 136/9 138/2 140/9 141/15 185/2 190/16 199/8 203/7 223/1
marker [6]  50/20 52/21 53/4 53/6 70/11 111/18
markers [22]  36/15 50/13 50/14 50/16 50/18 51/20 52/19 52/24 55/21 55/21 56/10 66/12 67/15 70/6 70/7 70/9 70/24 71/2 71/5 72/5 72/16 111/17
markings [1]  196/8
Marquette [2]  207/19 209/9
mass [2]  38/9 208/10
Master's [4]  166/18 167/9 171/15 171/18
Masters [1]  166/25
mat [1]  150/13
match [11]  74/21 79/10 89/24 90/8 95/24 97/5 217/19 217/22 218/3 218/16 231/4
matched [8]  74/16 103/11 119/4 219/21 227/25 228/3 229/23 232/21
matches [1]  81/8
matching [7]  77/20 78/11 217/16 217/18 217/23 218/21 219/11
material [13]  23/22 23/23 43/13 45/15 47/19 105/5 110/5 117/15 184/19 189/24 195/8 197/19 204/11
materials [7]  28/23 34/8 34/16 42/16 42/24 91/15 115/19
matter [12]  72/22 163/25 184/3 184/22 187/14 189/20 190/4 193/24 193/25 195/18 235/7 235/13
mean [30]  12/1 31/19 45/24 46/17 46/17 73/20 73/21 87/5 87/6 116/22 118/7 118/12 130/11 132/21 138/19 139/13 161/15 164/1 164/2 205/14 209/25 224/18 224/19 224/21 225/13

229/15 231/15 231/21 232/5 232/12
meant [1]  30/23
measure [2]  117/18 140/17
measured [1]  140/18
measurements [2]  62/12 140/14
mechanically [1]  195/6
medical [8]  38/6 65/16 65/18 124/5 146/13 211/6 213/10 214/6
meeting [2]  32/16 172/13
meetings [5]  25/23 26/4 26/6 26/10 26/12
member [3]  211/4 213/12 214/4
members [3]  5/12 78/7 92/1
memory [1]  195/9
mentioned [9]  78/23 118/10 118/20 120/25 121/7 204/13 210/24 211/1 213/10
mesial [1]  226/1
met [2]  170/14 171/9
metal [10]  49/2 52/12 64/18 64/19 191/5 192/25 193/8 195/15 195/16 206/11
method [1]  36/8
microphone [4]  13/18 24/18 173/8 199/5
middle [8]  131/24 167/12 167/15 167/17 205/24 230/16 230/18 230/20
mike [1]  7/17
mimmick [1]  30/19
mind [2]  232/5 232/6
minded [1]  168/16
minor [1]  146/13
minute [4]  19/4 77/9 123/3 186/4
minutes [7]  77/10 147/21 170/1 175/22 175/23 176/1 181/2
Mishicot [4]  6/10 6/10 167/12 167/13
misidentify [1]  216/11
miss [1]  20/4
misspoke [1]  206/2
mistaken [1]  216/9
mix [1]  94/12
mixture [4]  95/22 96/2 96/25 113/12
mixtures [2]  109/25 113/14
model [1]  28/11
moistened [2]  44/8 47/17
molar [7]  218/9 222/14 222/19 222/21 224/22 226/22 228/23
molded [1]  159/5
molding [4]  101/11 134/10 134/11 159/4
molecular [1]  25/21
mom [5]  6/13 10/19 10/20 15/15 166/12
moment [10]  13/9 44/11 126/17 128/12 186/13 196/1 197/14 199/4 209/22 223/3
moments [1]  27/16
Monday [3]  42/11 128/18 167/24
month [2]  7/9 8/5
months [2]  22/4 174/14
morning [4]  5/2 5/5 6/5 167/17
Mortuary [1]  211/15
mother [1]  29/25
Motion [1]  171/6
motor [2]  183/16 199/16
mound [2]  187/6 187/8
mouth [5]  60/16 220/8 226/2 226/3 228/19
movement [5]  127/12 136/4 136/7 137/8 137/14
Mr [2]  11/14 40/16
Mr. [49]  11/22 13/13 15/7 18/25 27/6 44/12 51/5 51/16 54/6 56/23 60/1 60/19 61/6 65/4 68/5 68/14 68/18 68/22 77/13 111/7 112/18 113/17 117/5 123/24 126/18 128/17 129/20 134/14 141/13 143/21 152/4 153/19 163/12 173/17

**M**

Mr.... [15] 174/17 174/20 175/4 175/13 176/4 176/6 176/13 176/16 176/16 176/22 177/10 181/8 182/19 195/25 199/4
Mr. Avery [12] 51/5 51/16 173/17 174/17 174/20 175/4 175/13 176/13 176/16 176/16 176/22 177/10
Mr. Avery's [2] 176/4 176/6
Mr. Fallon [3] 11/22 15/7 18/25
Mr. Fassbender [1] 195/25
Mr. Fremgen [8] 65/4 68/14 68/18 68/22 77/13 111/7 112/18 113/17
Mr. Gahn [1] 117/5
Mr. Kratz [9] 13/13 27/6 44/12 54/6 60/1 60/19 61/6 68/5 126/18
Mr. Stahlke [9] 123/24 128/17 129/20 134/14 141/13 143/21 152/4 153/19 163/12
Mr. Sturdivant [2] 182/19 199/4
Mr. Tom [1] 181/8
Mr. Wiegert [1] 56/23
Ms [21] 23/9 24/17 34/24 44/11 44/11 59/5 77/17 104/1 136/10 168/15 168/15 173/7 173/9 173/19 174/7 174/19 175/7 175/19 176/2 176/21 180/11
much [14] 14/7 95/7 106/20 111/3 113/5 113/5 117/13 118/7 120/10 147/19 155/24 182/13 226/18 228/7
multiple [2] 144/25 153/9
multiply [1] 72/18
multitude [2] 144/6 144/13
murder [1] 21/25
myself [7] 25/4 63/16 86/4 121/12 168/12 184/10 194/18

**N**

naked [1] 120/18
name [22] 6/1 6/1 9/12 21/1 23/4 23/4 49/13 123/20 123/20 166/7 166/7 168/3 173/2 173/2 181/13 181/13 191/25 207/10 207/10 207/11 214/10 220/2
Namely [1] 66/23
Narcotics [2] 181/21 182/8
national [3] 211/4 211/5 213/10
natural [2] 185/14 185/25
naturally [2] 110/7 110/11
nature [3] 138/17 138/20 201/8
NDMS [2] 211/5 211/13
near [6] 139/4 184/13 190/7 192/18 197/24 230/17
nearing [1] 197/25
necessarily [5] 105/12 109/10 156/25 157/23 161/5
necessary [2] 32/17 49/20
neck [2] 163/21 164/6
need [16] 28/1 28/4 28/21 28/23 40/7 41/11 43/20 49/22 49/23 62/15 103/8 179/15 199/10 208/9 225/4 225/5
needed [1] 220/23
needs [2] 28/25 39/20
negative [11] 43/21 80/17 80/18 83/16 84/9 85/17 86/8 90/22 91/19 114/8 120/20
negligence [1] 208/14
neither [1] 84/18
never [2] 156/7 160/25
new [8] 24/10 24/14 24/14 26/9 26/10 33/12 33/12 33/13
news [4] 20/1 20/9 20/10 21/19
nice [1] 8/7
NICK [4] 3/13 123/14 123/16 123/21

nightstand [3] 177/8 179/4 179/10
nine [1] 79/19
Ninety [1] 26/21
Ninety-two [1] 26/21
Ninth [1] 6/12
Nitron [1] 143/3
nobody [1] 163/4
nonbloodied [1] 134/19
nonbloody [1] 129/13
none [5] 90/2 101/4 101/6 103/16 206/20
nonhuman [2] 88/13 215/5
nonstain [1] 137/12
nonstained [2] 130/13 136/6
Norm [1] 5/8
normal [6] 7/5 7/5 18/2 170/17 201/6 216/25
normally [5] 17/8 65/22 170/20 216/25 228/11
NORMAN [1] 1/18
North [2] 213/4 213/8
nose [1] 222/17
note [4] 114/13 154/3 186/21 187/20
noted [2] 84/18 190/10
notes [13] 40/1 82/3 84/3 84/5 84/10 103/8 111/15 113/25 114/2 114/2 114/4 114/13 235/9
notice [1] 7/10
noticed [5] 119/24 151/9 189/19 190/3 190/9
November [15] 8/18 8/20 42/10 42/14 128/18 134/5 141/25 142/17 142/19 182/21 192/18 208/19 214/23 220/2 223/8
November 10 [1] 220/2
November 11 [1] 223/8
November 7 [4] 42/10 42/14 128/18 142/17
November 8 [2] 142/19 192/18
November 9 [2] 208/19 214/23
nucleated [5] 34/5 34/10 34/22 65/21 79/5
number [39] 39/10 39/11 39/14 40/17 44/12 45/23 45/25 54/16 60/6 68/7 72/17 74/16 78/9 79/17 82/3 95/12 96/15 96/17 102/3 104/7 115/6 115/7 171/20 171/23 188/4 188/7 208/5 208/12 211/17 213/14 215/3 215/16 217/12 218/22 219/25 222/6 222/24 225/13 225/14
numbered [1] 46/3
numbering [1] 222/11
numbers [13] 50/16 50/21 51/2 51/7 51/10 52/17 70/8 72/14 72/19 73/5 84/12 186/7 222/10
numerical [1] 39/11
numerous [4] 43/5 51/14 84/5 138/10

**O**

o'clock [1] 197/24
oath [1] 207/5
ob [2] 14/19 102/8
object [18] 11/11 14/19 129/12 132/5 132/24 132/25 134/18 135/24 136/3 136/5 137/11 138/23 139/8 140/4 140/6 143/8 143/10 153/14
objection [10] 12/5 16/16 144/18 144/19 165/24 170/25 200/10 200/11 232/25 233/18
objection's [2] 171/3 187/17
objections [1] 77/2
objects [1] 23/19
observation [2] 102/8 137/15

observations [3] 138/3 154/4 160/21
observe [6] 99/24 129/7 130/2 134/6 135/18 136/19
observed [20] 129/5 130/18 131/10 132/4 132/6 132/16 133/9 136/25 137/16 137/18 138/15 140/23 141/1 147/25 148/7 154/16 163/13 192/18 199/23 200/3
observing [2] 80/10 134/15
obtain [4] 79/21 89/23 94/3 98/1
obtained [3] 51/22 66/7 231/8
obvious [4] 42/22 43/5 87/19 87/24
obviously [10] 70/19 78/21 79/7 82/22 105/3 116/4 121/8 144/12 155/9 201/22
occasion [5] 128/22 155/2 168/2 174/4 174/21
occasions [2] 174/19 175/12
occlusal [3] 225/25 227/22 229/20
occupation [1] 23/9
occur [2] 174/24 195/6
occurred [2] 127/9 168/7
occurrence [2] 193/8 201/6
occurs [2] 74/2 155/8
October [6] 7/8 10/17 173/20 174/15 175/8 175/12
October 31 [6] 7/8 10/17 173/20 174/15 175/8 175/12
odometer [3] 141/20 141/23 142/1
odontology [3] 213/22 214/9 214/10
offer [1] 165/22
office [4] 167/17 168/8 168/14 220/3
officer [6] 19/9 19/12 39/3 184/1 190/23 203/3
officers [16] 10/8 11/9 12/8 12/11 13/6 14/3 14/12 14/16 15/11 15/22 19/10 19/19 20/15 20/22 22/12 65/9
offices [2] 32/25 32/25
Official [3] 2/4 235/4 235/19
offspring [1] 30/2
old [1] 6/5
one [129] 8/21 10/22 12/1 12/2 17/18 19/2 19/2 22/9 28/1 35/9 35/22 41/9 44/7 44/11 44/13 46/3 50/4 51/7 51/20 52/18 68/8 68/9 70/22 72/15 72/15 73/15 73/15 73/16 73/18 73/25 74/4 74/4 74/4 74/7 74/7 74/23 79/19 84/1 84/18 88/25 89/9 92/6 95/23 96/25 100/17 100/18 100/18 100/19 100/24 100/25 104/5 106/5 106/8 109/24 111/18 114/7 117/5 117/23 118/1 120/19 122/22 123/7 127/21 127/21 129/10 129/21 137/3 138/5 138/18 141/13 145/16 152/7 165/9 165/22 168/21 169/5 172/2 174/20 175/17 175/17 179/21 180/15 180/15 183/9 183/18 183/24 184/20 184/21 184/21 184/21 185/4 186/8 187/25 190/22 194/20 195/12 198/24 199/4 201/2 203/11 204/19 204/19 206/24 210/21 213/23 214/2 215/3 216/3 216/6 217/4 217/21 217/22 218/15 218/22 218/25 219/1 221/10 223/11 224/9 225/11 225/12 227/3 227/19 229/7 231/3 231/15 231/15 231/25 233/13
one's [2] 160/1 160/2
One-fifty [2] 68/8 68/9
One-ten [1] 123/7
ones [6] 70/8 151/3 151/23 210/20 218/5 218/7
online [3] 24/15 25/9 25/21
open [7] 18/19 63/21 87/20 130/1 130/21 142/3 180/6
opened [5] 54/21 57/12 142/8 142/11

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 247 of 255    Document 19-17

**O**

opened... [1] 142/24
opening [4] 59/23 60/15 64/19 140/18
opens [2] 138/6 138/8
operates [1] 211/6
Operational [1] 211/15
opinion [43] 53/21 54/2 54/3 56/12
 56/17 58/22 59/2 59/3 67/16 67/21
 67/22 67/25 76/11 76/16 133/11 133/16
 140/24 141/6 147/22 147/24 149/19
 149/19 149/22 149/25 149/25 150/5
 150/7 154/23 159/22 184/2 197/20
 199/15 208/25 209/1 209/2 210/11
 210/15 231/2 231/5 231/10 231/11
 232/2 232/14
opportunity [11] 12/3 79/20 83/8 91/24
 93/7 93/20 94/1 96/20 99/4 100/11
 101/8
opposed [4] 107/17 148/23 157/3
 164/12
oral [3] 207/23 212/19 220/9
order [8] 28/13 28/14 35/24 49/21 72/17
 107/18 135/3 164/16
organization [1] 213/23
organizations [6] 213/9 213/11 213/14
 213/20 213/24 214/3
orient [1] 179/22
originated [1] 151/19
our [41] 8/20 11/23 24/11 27/24 30/17
 31/16 32/7 32/8 32/8 32/12 32/15 34/6
 36/19 39/17 39/19 39/24 40/2 40/2
 40/24 41/9 41/9 42/4 42/6 54/14 54/14
 54/15 54/17 60/5 83/20 106/19 106/24
 109/1 110/5 114/19 114/20 114/22
 114/22 128/20 143/8 180/25 233/9
outer [1] 206/2
outgoing [1] 8/8
outside [5] 30/18 152/18 220/7 226/15
 228/19
overall [1] 140/12
overrule [1] 12/4
Overruled [1] 144/21
overseeing [2] 24/11 144/5
oxidized [2] 191/4 193/6

**P**

P-e-r-i-a-p-i-c-a-l [1] 221/5
p.m [4] 123/10 181/4 181/5 234/4
PAGE [2] 3/2 4/2
pair [4] 90/12 95/14 120/3 200/23
panel [10] 49/2 52/12 136/11 137/18
 141/1 151/17 154/16 157/22 158/12
 158/15
panorex [8] 220/5 220/6 228/17 228/19
 229/2 230/1 230/4 231/13
pants [4] 113/18 114/1 115/5 115/8
pap [13] 65/6 65/8 65/15 65/16 65/19
 65/24 65/25 66/2 66/7 66/20 67/8 72/1
 76/6
Pard [1] 149/1
parents [1] 29/24
partial [13] 70/13 70/15 71/12 73/4 74/1
 88/17 88/21 88/23 88/24 89/5 89/7
 89/14 89/20
partially [2] 191/3 191/3
particularly [1] 216/16
parts [7] 11/10 13/24 15/19 20/12 21/5
 21/8 21/18
party [5] 8/23 9/10 9/14 9/21 18/14
pass [5] 30/1 163/7 170/10 212/20
 215/8
passed [1] 31/5

passenger [16] 48/5 48/12 48/19 53/14
 53/24 59/16 129/6 129/8 129/9 130/21
 132/18 133/9 133/10 134/11 152/3
 152/15
passenger's [1] 130/20
passive [7] 128/7 132/19 132/20 132/21
 133/5 147/4 148/15
past [4] 125/14 125/17 210/12 217/11
patients [1] 207/23
pattern [25] 124/23 124/25 125/5
 125/12 126/2 126/6 126/25 127/22
 130/17 132/6 134/23 135/12 136/2
 136/2 136/8 137/5 137/6 139/2 139/20
 148/11 150/16 155/7 156/8 158/13
 160/22
patterning [3] 125/8 148/22 156/17
patterns [30] 124/20 126/10 127/5
 128/2 133/9 133/13 134/6 135/19
 136/19 137/16 137/17 138/12 139/10
 139/17 139/22 140/22 141/1 147/14
 148/6 152/13 156/11 157/2 157/6
 157/10 157/11 159/10 163/12 164/20
 164/21 164/23
PCR [3] 36/9 38/5 50/14
PCR-based [1] 36/9
Pediatric [1] 220/10
Pepsi [8] 59/17 59/21 60/4 60/8 60/10
 66/24 67/7 68/2
percent [7] 29/24 29/25 30/1 114/18
 228/12 232/5 232/6
perfect [1] 83/21
perfectly [3] 65/25 138/24 231/18
perform [10] 32/21 32/23 38/16 43/7
 43/24 49/5 57/14 63/7 64/2 64/21
performed [4] 25/3 40/14 47/9 161/20
performing [1] 30/4
perhaps [8] 35/14 116/16 152/7 183/15
 188/24 189/9 191/6 193/16
periapical [4] 221/1 221/3 221/7 221/18
period [4] 7/10 8/5 124/19 167/5
permanent [1] 222/21
person's [6] 34/23 35/9 35/13 36/18
 49/24 161/6
Personal [1] 210/22
personnel [1] 194/10
perspective [1] 170/17
phone [4] 175/3 175/21 194/1 208/18
phonetic [3] 138/24 184/24 204/6
photo [9] 179/21 188/7 189/4 192/17
 199/11 202/8 202/12 202/20 233/16
photograph [49] 36/12 41/24 41/25 42/4
 44/24 46/25 47/2 47/4 47/5 48/9 48/10
 48/23 57/4 61/16 61/16 62/2 62/23
 63/23 63/24 64/11 64/18 68/6 68/10
 68/11 68/20 84/23 128/11 129/16
 129/18 129/23 130/16 131/11 131/24
 132/13 132/15 132/17 141/17 142/14
 187/22 188/1 188/4 197/18 203/9
 203/15 225/10 225/11 227/5 227/6
 227/20
photographed [1] 41/12
photographer [1] 61/3
photographs [20] 40/17 40/22 40/23
 41/1 41/10 41/13 41/15 60/20 60/24
 99/24 99/25 158/24 159/3 185/1 186/5
 186/7 200/17 225/7 229/19 232/18
phrase [2] 191/9 217/15
physical [5] 23/18 32/6 116/5 224/10
 224/25
physically [1] 173/21
pick [6] 198/1 198/6 205/11 221/9
 221/10 221/14
picked [2] 195/14 196/4

picking [1] 221/12
picks [4] 220/8 220/11 220/16 228/20
picture [15] 42/5 82/22 82/25 85/3
 136/16 180/20 198/15 201/14 202/23
 203/8 204/2 229/2 229/12 233/14
 233/15
piece [22] 39/7 42/19 63/4 64/19 68/15
 69/6 69/21 105/18 110/22 143/8 184/2
 184/19 184/22 186/3 189/4 194/21
 195/16 216/7 216/9 217/22 219/8 225/1
pieces [9] 84/14 105/7 204/7 215/16
 216/5 217/20 218/23 219/1 219/4
pile [12] 184/4 185/11 185/18 185/24
 189/20 190/5 190/7 195/4 195/22 196/7
 202/25 204/4
piled [1] 185/14
pinned [4] 14/4 14/17 16/2 21/11
pipets [1] 114/22
pit [46] 20/7 20/13 21/4 21/18 68/16
 74/15 185/17 185/20 188/24 189/2
 189/3 189/13 189/17 189/18 189/11
 189/21 192/18 194/7 194/9 194/13
 194/16 196/22 198/18 198/20 198/20
 198/22 199/18 199/21 201/25 202/4
 202/7 202/9 202/13 202/21 202/23
 203/20 203/21 203/23 204/16 205/4
 205/24 206/3 206/5 231/6 233/16
 233/17
place [6] 84/21 116/8 175/4 179/19
 231/12 231/12
placed [14] 141/10 147/22 148/5 149/11
 149/20 150/21 175/3 175/16 185/25
 195/10 195/13 195/20 198/15 198/20
placement [2] 127/8 127/8
places [3] 87/19 183/23 184/9
placing [2] 175/9 189/10
plain [1] 121/18
PLAINTIFF [1] 1/4
plastic [6] 63/2 63/4 130/25 134/10
 159/4 216/7
plate [5] 81/19 81/21 82/1 82/2 135/4
plates [2] 112/7 112/9
Platteville [2] 166/24 167/4
play [1] 110/14
played [1] 17/3
playing [1] 17/5
plenty [2] 109/18 109/19
plugs [1] 39/25
pointed [1] 184/18
pointer [5] 27/25 35/1 129/20 177/25
 188/9
pointing [3] 35/6 178/1 178/10
police [6] 19/10 19/12 32/25 39/3 182/2
 182/5
policy [2] 72/22 73/7
pooled [1] 152/9
poor [1] 110/18
population [13] 29/19 72/13 72/16 72/21
 72/24 73/8 73/12 73/16 73/17 73/18
 73/19 74/3 74/8
por [1] 224/20
portion [25] 16/15 44/6 45/5 47/22 55/2
 57/22 62/14 62/14 69/8 69/18 98/10
 98/12 102/18 159/4 160/3 161/9 161/12
 171/18 192/23 206/11 217/4 217/5
 225/25 227/16 227/17
portions [2] 107/12 224/20
portrayal [1] 186/18
portrayed [1] 193/20
position [2] 124/1 151/2
positioned [3] 187/7 221/9 221/23
positions [1] 182/1

## P

positive [22] 43/19 44/3 44/5 47/12 63/10 64/5 80/15 88/14 88/15 100/15 100/19 100/20 101/17 102/13 103/9 106/4 106/11 106/18 210/1 231/23 232/2 232/10
positively [1] 151/23
possibility [2] 86/15 147/16
possible [6] 35/12 51/7 83/24 92/8 97/5 98/14
possibly [4] 78/15 80/14 80/22 117/11
post [2] 33/9 33/19
post-conviction [2] 33/9 33/19
postmort [1] 229/10
postmortem [8] 225/4 229/14 229/16 230/2 230/5 230/21 230/22 231/13
pot [1] 219/7
potential [15] 34/11 78/11 99/21 104/15 105/4 105/5 115/7 121/15 205/19 215/16 215/17 215/20 215/22 218/23 219/8
potentially [1] 119/12
PowerPoint [8] 27/18 34/2 50/6 223/22 224/1 225/9 227/10 227/11
practical [1] 228/12
practice [2] 145/5 207/21
precisely [1] 143/21
preliminary [14] 43/7 43/11 43/12 43/24 44/6 45/9 45/20 47/10 63/7 64/2 94/24 95/6 99/13 106/18
premier [1] 214/2
prepare [1] 77/23
prepared [4] 27/18 198/25 223/22 235/8
presence [8] 23/21 42/15 83/14 86/25 105/6 116/4 163/3 196/20
present [10] 79/5 109/6 111/20 154/14 157/10 157/19 168/10 168/19 186/24 227/3
presentation [1] 223/22
presented [1] 225/8
preserve [3] 205/20 219/13 226/12
preserved [2] 198/18 224/10
pressure [2] 156/1 219/6
presumptive [7] 43/16 43/25 84/8 85/17 88/15 91/15 145/17
pretty [3] 7/25 146/2 146/4
prevent [1] 153/17
previous [2] 64/7 202/17
previously [13] 54/7 56/21 56/25 65/4 74/25 98/22 114/9 130/15 131/23 132/12 134/1 163/1 229/18
primarily [3] 82/4 82/6 118/5
primary [2] 105/13 105/13
prior [11] 71/6 125/15 142/22 154/1 176/9 176/17 176/22 181/25 182/9 184/8 194/12
priority [1] 121/8
prison [1] 33/20
private [2] 30/18 30/21
pro [1] 88/21
prob [1] 7/6
probative [2] 122/4 122/6
probing [1] 154/5
problematic [1] 216/16
procedure [6] 35/25 78/1 78/5 101/14 106/19 107/10
procedures [5] 24/15 26/9 31/16 32/1 79/7
proceed [2] 5/17 11/24
proceedings [2] 2/2 235/13
process [11] 31/21 41/11 42/15 50/15 52/25 60/10 75/8 102/8 124/12 196/14

223/12
processed [3] 60/18 75/21 194/16
processing [8] 42/18 43/3 59/6 88/8 125/7 194/4 194/13 201/5
produce [2] 29/1 68/19
produced [1] 199/8
professional [2] 213/9 214/18
proficiency [7] 25/15 30/14 30/17 30/18 30/19 30/23 31/5
profile [121] 23/23 34/21 34/21 35/18 35/19 36/16 36/19 36/24 37/11 37/12 37/16 45/21 47/23 49/9 49/24 50/1 50/3 51/2 51/21 52/14 52/16 52/24 53/12 55/9 55/15 56/2 56/3 56/9 58/3 58/9 58/11 58/18 58/20 66/2 66/7 66/18 66/20 66/24 67/3 67/5 67/12 67/13 69/20 70/13 70/15 71/7 71/13 71/24 72/9 72/10 72/13 72/18 72/20 72/23 73/1 73/3 73/4 73/12 74/6 75/22 76/1 76/4 76/5 76/17 77/24 78/3 78/4 78/24 79/8 79/22 80/23 80/24 81/6 81/8 81/9 81/25 82/12 83/12 86/2 86/12 86/13 86/21 88/16 88/20 88/21 88/22 88/23 88/24 89/7 89/15 89/20 89/23 89/25 90/1 90/3 90/3 92/16 93/21 94/7 98/1 99/18 100/22 101/3 101/19 102/22 103/15 107/6 107/13 107/15 108/8 110/15 110/20 111/4 111/23 112/5 112/19 112/25 117/11 117/17 118/18 119/14
profiles [17] 23/25 24/2 31/2 31/3 35/21 51/23 53/18 66/14 66/19 66/21 67/22 71/8 71/10 71/15 77/21 78/9 107/24
profiling [1] 89/5
program [3] 24/12 25/11 25/13
project [3] 33/3 33/7 184/25
projected [6] 128/7 147/4 147/10 164/18 186/13 197/14
projectile [2] 156/10 162/5
properties [1] 27/22
property [1] 156/5
prosecution [2] 5/13 32/22
Prosecutor [3] 1/14 1/16 1/18
Prosecutors [1] 5/7
protect [3] 205/20 219/13 226/13
protected [1] 227/15
protecting [1] 143/11
proteins [1] 29/1
protocols [1] 32/12
proved [1] 64/5
psychology [1] 166/18
pull [3] 13/18 24/18 32/9
pulled [1] 140/2
pulp [3] 230/17 230/20 231/17
purchase [1] 30/18
purchased [1] 31/4
purpose [2] 45/19 72/11
purposes [3] 34/6 99/17 228/12
pursue [1] 11/24
pursuit [1] 167/8
pushes [1] 226/11
putting [2] 195/1 219/11

## Q

qualifications [3] 27/10 77/18 215/7
qualified [2] 26/22 212/9
qualifies [1] 25/6
quality [3] 24/12 32/8 112/5
quantitate [1] 106/20
quantitation [1] 107/9
quarter [1] 181/2
quarters [1] 210/20
ques [1] 148/18

quicker [1] 210/8
quickly [1] 198/6
quite [6] 12/1 38/7 66/16 66/18 109/16 216/10

## R

rack [1] 176/24
racks [1] 176/23
radiographically [1] 216/15
raise [5] 5/20 22/24 123/15 166/2 172/21
raised [1] 119/24
rake [9] 190/10 190/11 190/20 191/1 191/2 191/4 191/7 191/16 192/8
Rambler [1] 93/8
random [1] 102/17
range [2] 51/10 104/20
rapidly [1] 196/19
rare [5] 72/12 72/15 72/20 73/11 74/9
rarer [2] 72/23 73/2
rate [6] 157/23 158/1 158/6 158/17 158/20 158/22
RAV [53] 41/2 41/17 42/6 42/8 43/2 44/21 49/3 51/24 53/25 54/10 55/11 56/15 57/5 57/7 59/6 59/7 59/11 60/5 63/3 63/17 64/23 67/19 71/9 71/18 79/9 87/2 87/9 89/24 105/2 118/5 128/13 129/6 129/8 130/16 131/16 134/4 136/11 137/24 138/8 140/13 140/20 140/24 141/12 147/23 149/3 149/15 149/21 150/2 150/21 151/1 153/23 159/1 165/13
ray [23] 5/10 220/6 220/7 220/7 220/13 220/16 221/1 221/3 221/7 221/8 221/12 222/2 228/17 228/19 229/10 229/14 229/18 229/21 229/23 230/22 230/23 231/12 231/13
Ray's [1] 82/18
RAYMOND [1] 1/22
rays [14] 216/14 216/15 219/25 220/1 220/12 220/18 220/21 220/24 221/19 221/20 221/21 221/22 231/7 231/14
re [1] 31/17
re-evaluated [1] 31/17
reach [1] 187/8
react [1] 80/14
reaction [3] 43/19 43/22 44/3
reading [4] 13/11 21/19 142/1 142/6
ready [1] 5/13
reagents [1] 75/16
rear [32] 52/12 59/10 64/17 64/22 66/22 67/6 67/19 71/9 71/17 108/5 132/17 133/10 133/22 134/3 134/11 136/11 136/14 136/18 137/19 137/20 138/5 138/8 140/13 140/23 141/4 141/9 141/10 151/17 152/2 152/15 152/15 163/14
reason [5] 86/10 115/2 121/19 153/23 154/10
reasonable [7] 53/21 56/12 58/22 67/16 76/11 133/12 140/24
receipt [1] 200/8
receive [5] 38/15 54/11 69/1 166/20 166/25
received [26] 16/20 40/10 54/13 54/19 54/22 57/17 57/18 69/4 75/7 77/5 104/3 104/8 106/8 106/9 166/1 177/4 200/13 208/18 209/5 209/8 215/15 223/7 228/3 228/18 233/2 233/23
receiving [1] 143/9
Recess [3] 77/11 123/9 181/4
recognition [1] 210/4
recognize [16] 10/24 12/22 60/2 81/21

**R**

recognize... [12] 95/9 96/13 128/13 129/18 134/2 185/5 190/17 192/14 196/2 199/9 214/13 223/3
recollection [4] 11/13 11/18 15/4 197/7
reconvene [1] 123/4
Reconvened [4] 5/1 77/12 123/10 181/5
record [11] 6/1 23/4 123/20 166/7 173/2 181/13 190/25 207/10 225/3 232/23 233/12
records [2] 220/4 220/5
recovered [16] 46/7 48/18 49/3 57/3 59/22 59/25 60/4 61/12 62/20 63/16 76/19 118/5 208/22 215/23 224/17 231/6
recovery [1] 223/14
recross [6] 3/12 3/17 117/1 117/3 165/8 165/10
Recross-Examination [4] 3/12 3/17 117/3 165/10
rectangular [1] 206/6
red [2] 187/21 202/1
reddish [9] 45/14 46/11 46/23 48/18 49/1 62/19 63/15 64/16 109/8
reddish/brown [9] 45/14 46/11 46/23 48/18 49/1 62/19 63/15 64/16 109/8
redirect [14] 3/6 3/11 3/16 3/22 22/8 22/10 103/20 103/24 118/1 121/12 163/10 172/10 172/11 206/19
refer [9] 29/7 36/15 43/16 70/12 72/25 114/2 185/20 193/1 205/3
reference [4] 35/20 36/21 49/23 49/24
references [1] 116/2
referred [12] 10/3 16/14 36/3 39/1 46/5 49/18 53/5 79/2 83/5 93/8 108/11 111/19
referring [4] 11/19 15/2 15/3 118/4
refers [1] 37/4
reflect [2] 50/21 72/14
reflected [1] 94/10
reflects [1] 72/18
refresh [3] 11/13 11/18 15/4
refreshment [1] 16/14
regardless [1] 87/14
region [1] 50/22
regions [6] 29/6 29/20 36/11 36/13 36/15 36/17
regular [1] 162/23
regularly [2] 162/20 174/16
reinforcing [1] 219/12
rejected [2] 27/2 126/14
related [5] 6/16 6/18 25/18 126/2 162/4
relates [1] 214/19
relation [1] 154/15
relationship [4] 154/13 173/11 173/14 173/16
release [2] 54/9 140/6
relieved [1] 170/5
remain [3] 174/4 174/16 207/4
remaining [2] 198/11 224/12
remains [12] 39/19 68/16 68/17 69/21 70/1 70/4 74/14 209/1 215/4 219/2 223/7 223/9
remark [1] 187/17
remember [18] 9/23 11/7 12/10 13/15 19/4 20/19 21/15 21/16 21/18 22/2 22/16 34/17 113/20 174/9 175/7 175/9 175/20 176/21
remotely [1] 153/24
removed [2] 44/9 153/16
render [3] 154/23 208/25 210/11
repeat [3] 93/24 148/20 150/18

report [6] 12/8 31/3 84/11 89/1 89/2 174/9
reported [3] 2/3 15/18 235/6
Reporter [4] 2/4 11/14 235/5 235/19
reports [1] 122/5
representation [1] 202/15
representatives [1] 26/11
reputation [1] 171/10
request [7] 33/15 104/24 105/22 105/25 162/17 162/23 233/21
requested [2] 162/19 162/24
requesting [1] 142/1
requests [2] 33/1 122/8
require [1] 199/2
requirements [1] 32/16
res [1] 111/19
research [1] 26/14
residence [1] 176/6
resolved [1] 24/13
resort [1] 210/7
respond [1] 124/14
response [9] 10/25 12/24 17/10 21/8 144/9 144/12 153/21 210/25 211/15
responses [2] 211/3 211/21
responsibilities [2] 23/15 124/8
responsibility [1] 24/16
responsible [6] 23/18 24/9 24/11 24/14 124/11 124/13
restate [2] 15/6 15/9
restructured [1] 211/9
result [5] 33/18 95/6 155/7 156/18 157/9
results [8] 56/7 70/7 70/8 71/1 71/4 72/4 72/6 109/2
retain [1] 44/4
retained [1] 44/10
retrieved [1] 65/8
return [1] 30/1
returns [1] 162/8
reveal [1] 168/24
revelations [1] 169/17
review [8] 33/9 33/11 91/25 94/1 97/14 97/15 99/4 103/8
reviewed [1] 98/23
reviewing [1] 13/14
ridge [1] 191/23
ridge-like [1] 191/23
rifle [2] 111/8 157/16
right-hand [1] 178/18
ring [1] 212/12
rises [1] 185/13
rived [1] 203/24
role [1] 211/21
Ron [2] 41/8 61/2
room [3] 9/9 17/4 177/15
root [23] 98/9 98/12 216/2 217/2 218/2 218/8 221/11 221/15 221/17 221/24 223/16 224/11 224/16 224/17 226/20 226/21 228/1 228/2 228/6 228/7 230/22 231/5 231/17
roots [4] 218/11 221/13 224/21 230/7
rough [3] 110/21 110/22 226/7
roughly [3] 182/17 182/18 196/17
round [1] 95/22
routine [1] 208/7
routinely [1] 105/17
RPR [2] 2/3 235/19
rules [1] 111/1
run [1] 25/3
running [3] 25/14 145/11 224/7
rusted [1] 191/5

**S**

S-i-m-l-e-y [1] 207/12

S-t-a-c-h-o-w-s-k-i [1] 173/4
S-t-a-h-l-k-e [1] 123/21
S-t-u-r-d-i-v-a-n-t [1] 181/15
saliva [4] 34/9 34/14 78/17 103/10
salvage [3] 41/5 183/2 183/4
sample [51] 24/5 35/19 35/20 35/20 36/20 36/21 37/8 38/10 44/3 48/4 49/21 49/22 49/23 50/25 51/4 52/19 52/22 53/10 55/23 56/11 58/19 61/12 62/5 63/25 64/25 70/16 70/19 74/6 82/8 86/20 88/11 92/11 92/15 94/4 95/1 95/5 96/1 98/8 99/17 100/2 100/22 107/7 107/14 108/24 109/5 109/7 109/19 110/16 118/13 119/12 121/15
sampled [3] 44/6 69/8 95/21
samples [31] 23/20 24/1 24/2 25/14 30/9 30/20 34/19 35/14 37/6 46/4 52/23 54/4 67/23 90/2 92/8 95/25 97/21 98/2 98/7 98/19 100/25 101/1 103/4 103/14 103/15 104/14 106/2 106/21 106/22 107/23 109/2
sand [1] 185/14
sat [1] 18/17
sauce [1] 135/1
scared [7] 168/17 168/25 169/4 169/9 169/18 170/4 170/20
scene [23] 23/20 34/20 35/15 37/15 37/16 37/22 99/20 116/1 116/21 125/6 146/7 156/9 192/17 194/17 199/23 201/7 201/11 201/13 201/24 202/2 203/4 203/5 205/15
scenes [9] 124/12 125/13 125/17 125/20 146/1 146/2 155/3 164/10 194/5
scheduled [1] 174/12
schematic [1] 29/5
school [13] 6/7 6/9 6/10 10/6 22/14 33/4 167/12 167/13 167/15 167/17 167/20 167/21 209/10
schooling [1] 125/3
schools [3] 25/17 124/24 167/22
science [6] 25/8 124/2 124/10 144/2 208/2 208/4
Sciences [1] 214/2
scientific [10] 26/2 26/15 31/20 53/22 56/13 58/23 67/17 76/12 133/12 140/25
scientist [1] 23/10
scientists [2] 29/16 70/12
scissors [1] 114/20
scoop [1] 185/22
scooped [3] 185/23 195/8 206/6
screen [21] 35/3 42/1 45/2 47/6 48/11 61/17 63/25 81/13 81/15 81/16 82/16 82/23 128/9 141/18 184/24 185/4 186/15 193/20 225/12 225/17 230/1
screens [1] 195/10
screwdriver [7] 190/11 197/4 197/13 197/15 205/23 206/4 206/7
seal [1] 54/19
search [2] 183/1 183/10
seat [36] 12/21 45/4 48/5 48/12 48/19 52/12 100/18 130/1 130/7 130/21 130/24 130/24 134/12 141/10 152/3 152/15 188/16 188/17 199/16 199/19 199/19 199/23 200/1 201/17 202/3 202/6 202/10 202/13 202/15 202/18 202/20 202/24 203/21 203/22 204/3 204/10
seated [7] 5/25 23/3 123/19 166/6 173/1 181/12 207/9
seating [1] 141/11
second [13] 99/1 141/24 142/20 165/22 175/17 201/8 218/8 222/20 225/24 226/23 227/1 228/23 230/14

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 250 of 255    Document 19-17

## S

secondly [2]  183/11 201/4
section [8]  23/17 24/9 24/11 24/13 31/15 121/4 121/5 226/25
sections [1]  32/4
security [2]  31/25 211/11
seek [1]  16/15
seem [4]  8/3 77/18 169/19 170/7
seemed [1]  18/1
Seems [1]  77/19
seen [13]  7/20 8/24 10/20 11/9 13/24 14/17 15/19 15/24 15/24 27/19 83/3 132/1 204/15
segment [1]  28/10
seized [2]  92/4 98/5
sells [1]  34/14
semen [6]  34/9 34/13 43/15 78/19 109/17 115/10
seminars [4]  25/23 26/5 26/6 27/11
send [1]  98/14
sense [1]  150/8
sensitive [1]  109/1
sensitivity [1]  108/20
sent [2]  102/3 122/22
separate [5]  15/23 80/21 84/14 218/13 228/2
September [1]  211/8
September 11 [1]  211/8
series [3]  28/12 50/16 134/12
serves [1]  195/9
servicemen [1]  38/10
Services [3]  211/7 211/8 211/12
set [4]  160/22 177/15 186/19 196/18
sets [2]  32/19 97/19
setting [3]  24/14 29/14 38/1
setup [1]  176/4
seven [4]  70/9 74/19 89/10 174/14
several [5]  22/4 51/19 100/16 113/15 193/25
sexual [1]  122/11
shade [1]  230/11
shape [1]  29/11
share [2]  176/13 199/5
shared [1]  176/17
shaving [1]  164/3
shed [4]  110/7 110/11 112/3 187/21
shedder [4]  110/18 110/18 116/14 116/14
sheds [1]  110/8
shell [6]  92/13 92/17 92/19 92/20 93/4 119/11
Shepherd [2]  186/22 187/4
Shepherd-type [1]  187/4
Sheriff's [1]  68/18
SHERRY [5]  3/8 22/23 22/25 23/5 129/16
shift [1]  59/5
shoot [1]  220/16
shop [1]  169/9
short [1]  154/25
shorthand [1]  235/10
shot [1]  140/12
shoulders [3]  9/2 9/7 18/21
shovel [5]  190/9 192/23 192/25 195/9 206/14
show [31]  45/1 50/6 52/2 61/19 61/23 62/25 63/10 68/10 72/4 95/8 96/9 129/14 130/14 130/17 131/8 131/22 132/11 133/25 136/9 138/1 140/9 177/3 179/15 179/21 190/23 193/2 195/25 197/8 202/22 203/7 223/2
showed [4]  15/18 71/7 221/24 229/18

showing [3]  12/18 136/6 195/24
shown [2]  61/17 223/1
shows [8]  58/17 88/25 107/18 203/9 227/11 227/23 228/20 228/21
shrug [1]  18/21
shrugged [2]  9/2 9/7
side [25]  45/5 50/17 50/21 132/18 134/11 138/5 140/7 149/5 178/6 187/22 202/5 220/16 225/21 225/23 225/24 226/8 226/9 226/10 226/15 227/12 227/14 230/3 230/3 230/24 230/24
side-by-side [2]  230/3 230/24
sides [2]  57/22 226/1
sift [2]  195/4 198/5
sifted [6]  195/17 196/19 197/25 198/10 198/11 198/13
sifter [1]  195/13
sifting [8]  194/19 195/1 195/5 195/10 195/22 196/4 196/14 196/18
significance [1]  161/16
significant [2]  77/19 188/25
signify [1]  225/20
signs [1]  193/2
silly [1]  200/21
similar [4]  53/18 158/1 158/3 158/21
SIMLEY [5]  4/10 207/3 207/6 207/12 232/19
simply [7]  11/17 55/3 57/18 83/14 86/14 99/14 113/13
single [2]  113/16 164/10
sink [4]  100/9 100/18 100/20 101/1
site [1]  190/21
sites [1]  183/15
sitting [1]  8/20
situated [1]  177/21
six [9]  62/12 72/24 184/3 185/20 185/22 185/23 198/12 206/6 215/15
six-foot [2]  185/22 206/6
size [8]  50/22 51/1 51/1 55/22 62/10 114/3 163/24 221/8
sizes [3]  51/3 51/14 51/19
skee [1]  184/24
skeletonized [1]  210/3
skills [2]  125/11 144/25
skin [5]  34/13 34/14 109/14 112/17 112/17
skull [4]  190/4 190/4 205/3 205/5
slender [1]  140/19
slide [20]  27/24 34/7 50/7 50/8 50/12 52/1 52/2 52/5 55/13 56/6 58/5 58/13 64/8 66/5 67/2 67/10 68/4 69/23 75/25 76/8
Slow [1]  208/3
small [14]  28/10 62/14 75/9 95/2 109/21 114/7 120/19 155/12 157/15 161/11 178/8 204/15 204/20 218/25
smallen [2]  204/6 204/7
smaller [3]  28/12 71/2 71/3
smear [13]  65/6 65/8 65/15 65/16 65/19 65/25 65/25 66/3 66/7 66/21 67/8 72/2 76/6
smooth [4]  110/24 111/2 111/5 227/14
so-called [2]  183/12 183/23
soaked [1]  120/3
Society [2]  31/12 213/21
socket [2]  226/21 226/23
soda [1]  59/24
solely [2]  16/13 171/3
soluble [1]  115/11
solution [1]  114/19
someone's [4]  112/13 116/14 116/19 155/2
sometime [3]  20/16 172/3 183/22

sometimes [10]  17/15 17/24 88/24 111/2 159/14 172/3 172/5 172/6 210/7 216/13
somewhat [5]  112/23 139/5 188/24 191/4 193/5
somewhere [3]  83/22 150/11 202/18
son [1]  6/21
soot [2]  201/2 206/8
sort [24]  79/22 80/22 81/4 81/25 83/8 86/1 86/11 86/19 88/20 91/1 92/14 92/15 93/3 96/22 99/16 100/2 103/9 116/5 118/15 133/19 135/11 155/7 198/8 205/18
sorted [1]  195/14
source [29]  24/4 37/21 53/23 54/3 56/14 56/18 58/24 59/3 67/18 67/24 68/1 71/16 71/21 71/23 72/9 72/25 73/3 76/13 76/18 79/22 113/16 130/13 132/9 151/5 151/20 153/15 158/7 158/8 217/21
south [1]  178/18
Southeastern [1]  73/17
southwest [1]  179/17
Southwestern [1]  73/19
spa [1]  149/6
space [1]  155/12
spade [6]  190/9 192/16 192/20 192/23 193/1 206/14
spaghetti [4]  135/1 135/1 135/5 149/6
spatter [6]  145/6 146/1 146/21 156/14 161/17 162/7
spatter's [1]  146/4
speak [4]  11/15 168/9 168/11 173/7
speaker [1]  149/4
speaking [2]  91/24 197/16
special [13]  1/14 1/16 1/18 5/7 19/2 181/14 181/19 184/10 208/18 214/25 220/3 223/8 228/18
specialists [1]  39/2
specialized [1]  124/24
specialty [3]  143/22 143/23 145/2
specks [1]  119/25
speculation [1]  154/5
spell [8]  6/1 23/4 123/20 166/7 173/2 181/13 207/10 221/4
spend [1]  182/13
sperm [1]  34/14
spindles [1]  85/20
split [1]  230/1
spoke [4]  19/18 20/15 21/3 78/11
spoken [2]  65/4 68/14
spot [1]  84/1
spots [2]  183/12 183/19
spread [2]  155/11 156/21
SS [1]  235/1
stab [2]  148/23 164/10
stabbing [2]  152/8 156/19
stabbing-type [1]  156/19
STACHOWSKI [14]  4/3 172/20 172/23 173/3 173/7 173/9 173/19 174/7 174/19 175/7 175/19 176/2 176/21 180/11
STAHLKE [13]  3/13 123/14 123/16 123/21 123/24 128/17 129/20 134/14 141/13 143/21 152/4 153/19 163/12
stain [86]  43/20 44/4 44/9 45/6 45/7 45/17 46/11 46/23 47/8 47/19 48/6 48/18 49/1 52/7 61/21 61/23 61/24 62/8 62/10 62/11 62/13 62/19 63/15 64/5 64/16 91/16 102/16 109/8 109/11 109/18 114/5 114/7 117/7 117/14 117/15 118/3 118/6 118/8 118/8 120/5 120/19 120/21 124/20 124/23 124/25 125/5 125/7 126/2 126/6 126/10 127/4

**S**

stain... [35]  127/6 127/22 128/1 130/9 130/10 130/11 130/12 131/18 131/20 132/10 132/10 132/15 132/18 132/23 133/2 133/8 133/13 134/6 134/19 134/21 135/13 135/14 135/18 136/19 137/16 139/22 146/24 154/14 154/15 154/21 159/19 160/8 161/4 164/20 164/21
stained [1]  47/23
staining [3]  54/25 114/5 153/11
stains [106]  42/23 43/1 43/5 43/6 43/8 44/7 51/24 52/15 53/13 53/23 57/20 59/7 59/13 60/13 63/7 66/23 67/6 67/18 75/12 82/4 83/15 84/6 85/14 85/16 91/13 99/21 100/8 100/12 108/5 114/6 114/14 118/5 120/8 120/8 125/10 125/20 125/23 125/25 126/13 127/6 127/7 128/6 128/7 128/7 128/8 128/24 129/4 129/5 129/7 129/10 129/11 129/12 130/3 130/6 130/18 130/22 130/25 131/1 131/3 131/4 131/10 134/12 134/17 134/22 135/8 135/21 135/22 135/25 136/21 136/22 136/24 137/2 137/3 138/10 138/11 138/13 138/15 138/16 139/15 140/3 140/3 147/3 147/6 147/8 147/9 147/10 147/25 148/6 148/13 148/14 150/24 151/15 151/16 151/19 151/21 151/25 152/1 153/7 153/12 154/11 154/18 156/15 157/19 163/13 163/17 165/1
stairs [1]  18/17
stand [5]  22/23 123/14 172/20 199/2 207/3
standard [13]  24/1 35/20 37/6 37/8 49/18 49/20 49/25 64/25 65/10 65/19 65/22 96/1 108/21
standards [2]  32/19 219/20
standing [4]  184/1 184/12 207/5 211/25
standpoint [1]  177/6
stands [7]  27/17 28/6 28/7 31/12 194/24 211/14 234/4
start [4]  28/5 57/11 85/11 87/18
starts [1]  51/12
State's [1]  84/24
statement [15]  11/20 12/12 13/6 13/10 13/13 13/14 13/21 14/20 15/3 15/3 15/17 19/1 144/7 156/17 162/18
statements [1]  15/1
States [2]  213/4 214/3
statistic [6]  72/11 72/14 73/11 73/14 73/20 74/9
statistics [2]  25/20 73/22
stay [3]  166/12 174/2 174/11
stay-at-home [1]  166/12
steel [16]  188/8 188/12 188/13 188/14 188/19 189/23 189/24 189/24 191/6 197/5 197/20 197/21 201/17 202/25 204/8 204/12
steel-belt [2]  197/5 197/21
steel-belted [7]  188/12 188/13 188/14 188/19 189/24 201/17 202/25
stenographic [1]  235/9
step [10]  22/20 44/2 123/2 165/18 172/18 180/23 199/2 199/5 206/21 233/5
steps [3]  10/13 18/6 107/4
sterile [2]  44/8 47/18
Steve [1]  56/11
Steven [51]  9/4 10/1 10/3 20/24 21/21 49/13 50/4 50/9 50/24 50/25 51/22 52/16 52/20 52/22 53/10 53/19 53/22 54/3 56/4 56/13 56/18 56/23 58/11 58/21 58/23 75/2 76/2 78/3 90/4 94/10 94/15 96/1 97/4 99/20 100/8 101/2 101/23 108/2 112/19 131/25 132/4 169/5 169/14 173/15 174/5 175/9 175/14 183/21 183/25 185/15 186/1
Steven's [3]  14/18 15/25 20/7
stick [2]  139/25 218/18
sticker [1]  39/8
still [6]  8/7 107/6 155/21 156/2 158/8 170/4
stipulate [1]  65/5
stomach [1]  164/11
stop [3]  103/5 103/6 168/18
storage [4]  28/8 39/19 39/19 150/1
store [1]  32/1
stored [2]  28/15 29/6
STR [6]  36/3 36/8 36/9 36/15 50/13 55/21
straight [1]  177/23
strands [2]  135/4 161/11
Straus [1]  184/10
stretch [1]  161/8
stricken [1]  187/13
strike [3]  158/23 171/5 187/17
strikes [1]  162/6
striking [2]  140/7 158/9
strong [1]  135/14
struck [3]  147/11 156/10 171/7
structure [9]  217/2 220/17 221/11 221/15 221/24 224/15 230/13 230/14 231/18
structures [7]  215/22 215/24 216/2 216/6 216/12 219/4 224/11
strung [1]  28/13
stuck [1]  191/6
student [2]  167/7 168/3
students [1]  33/9
studies [4]  112/22 113/4 146/10 172/1
study [1]  171/23
stuff [6]  10/13 17/2 17/4 188/20 198/5 198/13
STURDIVANT [7]  4/7 181/8 181/9 181/15 182/19 199/4 233/14
sub [2]  93/22 146/6
sub-discipline [1]  146/6
subject [1]  126/2
subjects [1]  93/22
submissions [6]  104/4 104/7 104/10 104/18 106/7 121/1
submit [1]  212/9
submits [1]  38/19
submitted [10]  23/25 85/8 92/22 104/14 106/2 106/6 113/19 122/23 125/22 212/10
submitter [2]  39/3 122/7
submitters [2]  32/24 32/24
subsequently [1]  46/3
substance [7]  37/21 53/2 116/17 145/12 158/9 165/4 192/9
substances [2]  145/9 145/23
substantial [1]  62/13
substantially [1]  200/2
suffice [1]  78/1
sufficient [2]  110/20 111/25
suggest [4]  150/16 153/24 154/7 160/23
suggested [1]  165/13
suicide [1]  127/25
suitable [1]  98/11
summarize [1]  124/7
summarizes [1]  27/12
summary [2]  126/23 214/17
summoned [1]  184/11

sunken [1]  203/24
Super [2]  218/17 219/10
superficial [1]  164/6
superimpose [1]  231/15
supervisor [1]  25/12
support [1]  220/19
suppose [1]  117/25
surf [1]  135/7
surface [40]  75/15 75/18 95/22 96/23 110/18 110/23 110/24 111/5 111/25 116/16 129/13 130/13 133/4 134/20 135/6 135/10 135/17 136/3 136/6 137/12 138/23 138/25 139/16 139/19 139/24 139/25 140/7 143/11 153/13 158/1 158/3 158/6 158/9 158/22 161/10 161/12 162/6 226/7 227/13 227/23
surfaces [2]  111/2 115/20
surgeon's [1]  143/6
surgeons [1]  220/9
SUSAN [4]  3/19 165/19 166/3 166/8
suspect [2]  127/11 127/12
suspect's [1]  127/8
suspected [5]  100/1 100/8 101/10 101/11 162/17
sustained [2]  171/3 187/17
SUV [1]  60/25
swab [43]  36/24 37/3 37/4 44/8 44/19 44/20 47/17 47/20 49/12 49/15 50/4 50/9 51/22 54/9 54/22 55/2 55/2 55/10 56/3 56/19 57/21 57/23 58/2 58/21 79/9 79/25 80/13 80/21 82/11 83/21 84/1 87/18 87/22 88/1 88/7 88/9 96/21 100/4 101/9 102/14 109/12 120/14 120/23
swabbed [15]  44/9 47/19 57/3 57/21 60/15 79/23 80/1 81/2 82/8 87/10 87/23 95/21 96/23 111/10 111/13
swabbing [11]  37/4 37/7 49/16 57/24 58/19 58/24 59/4 59/4 60/17 68/2 99/21
swabbings [3]  94/21 102/17 107/24
swabs [16]  37/7 49/6 64/22 85/7 85/20 86/2 86/4 86/5 87/2 87/5 87/8 87/11 88/4 100/7 100/16 100/19
sweat [3]  78/13 103/10 152/23
swipe [10]  136/2 136/2 136/7 137/5 137/6 152/13 153/1 160/1 160/5 160/12
swiped [1]  152/24
swipes [1]  160/1
swiping [1]  159/24
swirl [1]  188/8
switch [5]  47/9 57/7 132/7 154/15 189/6
sworn [7]  5/24 23/2 123/18 166/5 172/25 181/11 207/8
system [20]  25/15 28/8 30/24 31/10 36/9 38/6 39/4 39/18 54/15 54/15 106/24 107/3 107/19 108/7 108/20 109/3 111/22 211/6 213/11 222/11
systems [1]  109/1

**T**

table [1]  135/2
taken [22]  23/20 25/20 40/24 42/4 44/19 44/21 46/23 48/5 48/11 54/9 61/2 63/25 65/6 65/9 85/7 85/21 133/19 171/20 203/6 208/11 229/23 235/9
takes [1]  41/10
talking [19]  19/9 50/13 70/6 78/12 108/14 108/15 109/4 109/5 109/9 118/4 145/10 145/11 153/1 158/10 158/25 160/7 222/13 222/15 222/16
talks [1]  112/23
target [6]  36/13 36/14 36/17 36/19 50/22 107/12
targeting [1]  109/10

## T

tarp [2] 198/12 198/20
taught [1] 126/1
team [4] 211/4 211/14 211/15 211/16
teams [3] 124/11 124/13 153/21
tech [2] 201/8 201/11
technical [2] 24/8 24/13
technician [2] 99/19 201/13
technologically [1] 82/19
technology [12] 25/24 26/2 27/3 33/13
 36/2 36/5 37/24 38/5 38/5 38/12 124/6
 146/13
teeth [10] 195/15 221/10 221/12 222/7
 222/10 222/15 222/18 224/13 228/21
 228/21
telephone [2] 174/25 175/1
telling [11] 12/8 16/8 28/5 46/5 46/6
 70/11 170/8 170/22 170/23 171/10
 228/5
tells [4] 50/19 53/11 72/19 74/2
ten [6] 30/5 123/7 126/13 146/20 181/3
 181/3
tend [1] 156/19
tender [1] 200/9
Teresa [70] 8/14 14/4 14/17 15/24 20/2
 21/11 21/25 41/2 41/16 42/6 42/8 43/1
 43/9 51/24 53/25 54/10 55/10 56/15
 60/25 65/1 65/6 66/3 66/8 66/21 67/6
 67/8 67/14 67/17 67/23 71/7 71/16
 71/20 71/23 72/1 72/7 72/8 73/6 74/14
 74/16 76/5 76/12 76/18 78/4 90/5 90/6
 94/12 96/3 97/9 101/4 101/24 108/4
 119/5 128/12 129/17 130/16 132/7
 133/23 134/7 135/19 163/15 163/17
 198/3 198/21 205/13 220/1 220/4
 224/13 225/3 228/22 231/7
Teresa's [3] 14/1 220/2 221/19
term [6] 159/24 160/11 160/14 161/16
 162/13 231/24
terminology [1] 162/11
terms [6] 10/21 183/18 191/11 213/3
 217/8 231/20
test [27] 30/23 35/24 43/25 43/25 44/6
 45/9 45/20 47/10 65/16 75/15 84/8
 85/17 88/15 91/16 95/15 97/23 99/13
 100/11 101/9 101/17 102/18 102/19
 106/16 106/18 115/22 121/14 122/24
tested [8] 33/18 47/12 70/5 85/22
 100/16 100/17 106/4 106/11
testimony [5] 94/9 147/1 180/18 210/16
 212/14
testing [42] 24/22 24/24 25/7 25/9 25/18
 26/9 26/9 26/23 30/4 30/7 30/10 30/14
 30/17 32/21 32/23 33/15 35/25 38/8
 38/17 44/4 44/10 47/21 49/5 49/20 50/9
 52/25 57/14 58/6 64/21 65/20 69/17
 69/25 87/15 94/24 102/11 104/15
 106/14 106/15 122/9 122/15 145/21
 158/20
tests [20] 25/2 25/15 25/16 30/18 30/19
 30/23 31/6 43/8 43/11 43/12 43/12
 43/16 63/7 64/2 91/15 104/21 107/5
 145/17 145/20 161/21
textbook [2] 152/1 161/4
theme [1] 172/2
themselves [4] 110/4 143/10 148/12
 172/7
thereafter [2] 102/19 235/11
Therefore [1] 191/20
they'll [1] 222/16
thinking [2] 7/7 142/10
third [1] 222/14

this [380]
THO [1] 52/21
THO-1 [1] 52/21
THOMAS [4] 1/16 4/7 181/9 181/14
thorough [2] 115/13 198/6
though [9] 18/12 22/5 106/16 150/3
 160/4 162/14 185/21 202/3 220/23
thought [7] 46/16 86/23 172/14 188/17
 190/3 195/18 205/10
thousand [1] 25/5
three [18] 23/14 32/5 72/23 73/18 89/16
 100/17 112/1 128/6 147/3 147/6 166/15
 168/22 181/3 210/20 212/12 216/4
 216/21 223/16
three-quarters [1] 210/20
three-ring [1] 212/12
threshold [10] 63/2 136/13 136/14
 136/17 136/25 137/17 141/2 151/16
 152/14 163/13
thro [1] 156/3
throat [6] 155/4 155/15 155/17 156/3
 163/21 164/3
through [28] 6/20 25/10 25/14 29/9 33/2
 46/4 76/21 78/2 98/5 98/13 98/18 102/7
 105/17 108/7 157/7 158/20 167/24
 169/11 180/5 195/4 195/17 196/5 198/5
 198/10 198/13 200/8 200/12 226/15
throughout [10] 36/14 36/18 50/18
 52/18 52/24 55/21 56/10 58/20 67/14
 73/25
throw [2] 158/5 158/21
thrown [1] 139/8
Thursday [1] 167/24
timeline [1] 154/17
times [15] 26/20 26/25 27/1 72/24 78/23
 91/12 115/6 115/12 126/12 126/13
 146/20 175/15 210/15 210/18 215/15
timing [1] 154/11
tire [5] 188/14 188/20 201/18 201/20
 201/22
tires [2] 188/8 188/14
tissue [6] 35/9 68/12 69/7 69/8 69/17
 231/17
tissues [1] 230/20
title [3] 145/3 145/4 211/25
today [10] 16/5 26/18 38/15 40/5 40/7
 68/20 158/25 159/6 180/11 208/24
together [14] 17/2 17/6 28/13 72/19
 217/20 217/22 218/3 218/13 218/15
 218/16 218/18 219/12 228/4 231/4
toilet [1] 100/18
told [24] 10/8 10/12 10/13 10/22 11/3
 11/9 12/8 14/3 14/3 14/12 14/16 14/16
 14/17 15/18 15/22 21/7 22/13 22/14
 50/14 90/18 92/6 169/4 179/23 187/10
Tom [2] 5/8 181/8
tomorrow [1] 233/24
tongue [5] 225/24 226/9 226/10 226/11
 227/12
too [11] 20/13 28/3 81/15 88/16 116/10
 116/13 121/17 121/21 161/8 162/11
 220/20
tooth [55] 216/3 216/9 216/12 216/21
 216/25 217/3 218/9 218/10 218/12
 219/21 220/17 221/9 221/17 222/9
 222/12 222/14 222/20 222/24 223/18
 224/8 224/9 224/22 224/24 225/19
 225/22 225/25 226/11 226/16 226/18
 226/22 227/2 227/16 227/18 227/24
 228/22 228/24 229/3 229/4 229/6 229/8
 229/10 229/12 229/19 229/22 230/4
 230/5 230/9 230/9 230/12 230/16
 230/18 230/20 231/3 231/6 232/20

top [20] 135/2 150/9 178/2 186/1 187/7
 191/18 191/19 192/4 195/13 198/11
 204/4 221/12 225/11 225/12 225/25
 227/24 228/7 228/8 231/13 231/16
tops [2] 114/19 114/22
torso [7] 150/12 150/17 150/22 152/8
 153/10 163/18 164/10
total [4] 104/1 150/3 161/7 215/16
totally [1] 216/14
touch [12] 60/17 108/12 108/17 108/22
 109/11 110/4 110/9 118/16 143/11
 189/16 209/21 209/21
touched [23] 82/7 86/23 87/25 105/10
 105/11 109/9 109/12 109/20 109/23
 109/24 110/2 110/12 110/19 111/24
 112/3 112/9 112/25 113/7 113/12
 113/15 117/11 117/19 117/21
touching [4] 110/21 110/24 112/17
 117/6
toward [5] 139/17 140/2 149/4 149/13
 162/8
towards [9] 69/10 178/2 187/6 189/18
 191/18 193/4 199/20 226/1 226/2
Toyota [8] 56/22 57/2 57/5 58/7 58/10
 58/19 58/25 141/12
trace [2] 94/4 111/20
track [2] 39/5 54/18
tracking [1] 54/15
Trade [3] 209/20 211/1 211/19
trades [1] 144/17
trailer [9] 14/18 15/25 56/22 99/21
 99/25 176/5 176/7 176/9 178/11
training [17] 24/10 25/11 25/13 124/2
 124/10 124/13 126/24 144/1 144/1
 144/2 144/6 147/13 153/20 157/7 161/2
 166/17 212/5
trans [1] 137/12
transcribed [1] 235/11
transcript [3] 2/2 235/8 235/12
transcription [1] 235/11
transfer [25] 79/1 79/2 105/1 109/13
 113/5 113/10 117/12 118/15 129/10
 129/11 130/3 130/10 130/11 130/22
 131/3 132/10 134/18 135/21 135/25
 137/2 137/10 159/17 160/8 160/15
 160/17
transferred [5] 47/20 82/1 82/7 109/14
 152/2
transferring [4] 113/7 135/17 143/7
 153/17
transfers [1] 136/4
trap [1] 164/16
trauma [1] 208/14
treat [1] 30/20
treated [2] 99/11 99/15
treating [1] 10/18
trial [4] 1/4 1/5 33/12 176/3
trick [1] 10/18
tried [4] 18/14 18/19 119/7 224/21
trigger [5] 79/25 80/1 80/2 81/2 111/13
trillion [1] 72/25
triple [1] 198/14
triple-bagged [1] 198/14
tripod [3] 194/21 194/23 195/1
tripod-type [1] 194/21
trooper [1] 187/11
troopers [1] 183/14
trouble [2] 14/9 16/9
truth [2] 170/23 171/11
try [7] 11/13 11/18 84/1 98/6 107/11
 119/19 119/20
trying [9] 38/15 60/12 60/14 75/10 75/17
 105/9 127/23 156/22 229/7

## T

tube [1]  75/15
Tuesday [1]  182/20
turn [2]  57/12 142/3
turned [3]  57/10 195/21 198/21
TV [2]  21/19 176/20
twenty [2]  23/14 79/19
twenty-nine [1]  79/19
Twenty-three [1]  23/14
twice [2]  175/14 211/18
twig [2]  190/1 193/16
two [54]  9/22 10/23 10/24 19/1 24/3
 26/21 32/5 36/22 37/18 50/25 73/16
 74/24 84/11 84/14 84/15 84/16 88/25
 93/22 93/22 97/19 117/17 117/19 131/2
 152/7 154/17 168/24 175/16 176/24
 177/22 182/15 185/1 185/13 185/16
 186/5 195/2 195/11 196/17 201/3
 211/22 212/12 212/19 213/2 217/19
 218/2 218/4 218/5 218/7 218/11 221/10
 222/16 223/11 224/11 226/1 228/2
two-car [1]  185/16
two-day [1]  212/19
type [44]  7/23 26/8 36/2 36/5 38/12
 38/20 42/24 43/7 70/10 79/5 91/10
 102/16 104/23 105/19 106/15 115/13
 115/15 128/23 129/7 130/2 130/8
 130/12 131/1 131/18 132/5 132/8 132/8
 132/23 135/18 139/20 143/2 148/10
 156/16 156/19 157/12 157/14 159/10
 162/17 162/25 187/4 191/14 194/21
 207/21 224/23
types [23]  26/10 34/7 34/15 66/16 66/17
 72/6 72/15 74/1 85/15 88/25 91/13
 122/14 127/3 127/14 127/19 128/1
 147/2 147/6 147/12 147/14 148/2
 209/13 211/3
typical [1]  135/9
typically [4]  156/20 157/18 161/3 201/5
typing [4]  36/3 36/6 36/8 36/9

## U

ultra [1]  232/14
ultra-conservative [1]  232/14
Um-hm [2]  77/22 96/11
un [1]  200/22
unable [4]  81/4 82/12 88/19 119/7
uncle [2]  169/5 169/13
uncommon [1]  162/14
undergo [1]  30/13
undergraduate [2]  146/10 209/6
underneath [7]  153/14 177/22 179/3
 179/24 211/6 211/10 222/17
uniform [5]  157/23 157/25 158/17
 158/19 160/23
unique [1]  134/21
unit [6]  24/8 104/11 104/12 106/3 106/8
 106/10
United [2]  213/4 214/3
units [1]  28/13
universal [1]  222/11
University [5]  33/4 166/24 167/4 207/19
 209/10
Unless [2]  92/10 123/3
Unlikely [1]  161/3
unusual [3]  70/15 193/8 216/8
up-to-date [2]  26/1 26/5
upper [2]  222/13 223/12
upset [3]  7/15 17/22 17/24
usable [2]  98/6 110/15
usual [1]  234/1

## V

vacuum [2]  98/5 98/20
validations [1]  32/7
valuable [1]  127/21
value [2]  143/12 205/19
van [10]  188/17 198/16 201/17 202/3
 202/6 202/6 202/10 202/18 202/20
 204/10
vanity [3]  100/9 100/17 100/19
variables [5]  110/13 116/7 116/13
 155/10 164/14
variation [1]  29/18
variety [1]  183/17
various [1]  85/16
varying [1]  220/21
vehicle [28]  42/19 45/5 46/1 46/6 46/12
 57/13 61/13 62/20 87/20 88/2 128/14
 128/16 128/19 128/23 129/17 130/18
 135/20 136/17 138/7 141/20 142/2
 142/16 142/21 142/24 152/14 154/9
 183/16 199/16
vehicles [1]  41/11
velocity [1]  156/14
venue [1]  26/7
ver [1]  214/12
veracity [1]  171/1
verbal [3]  10/25 12/24 17/10
verified [1]  215/25
version [1]  179/15
versus [1]  117/7
vessel [1]  230/17
victim [4]  23/21 34/19 34/20 127/9
victim's [1]  127/7
video [1]  17/3
view [2]  162/10 199/3
viewable [1]  208/9
views [1]  229/20
visible [6]  54/25 57/20 60/13 82/4
 117/14 117/14
visual [15]  42/20 54/24 57/19 57/25
 75/12 83/18 85/13 99/12 102/8 102/16
 102/16 117/18 129/4 160/21 210/5
visual-type [1]  102/16
visually [7]  75/11 80/10 94/20 118/23
 118/24 120/12 208/9
vitae [3]  27/9 126/22 214/16

## W

wad [1]  204/7
wadded [1]  201/18
walk [3]  17/24 177/23 177/23
walked [5]  18/23 184/9 184/17 187/6
 189/17
wall [13]  176/23 176/24 178/6 178/8
 178/10 178/11 178/12 178/18 178/19
 178/20 178/23 179/2 179/24
warrant [2]  183/1 183/10
wash [7]  75/17 115/12 115/13 115/14
 115/14 115/16 119/12
washed [4]  75/15 99/14 115/5 119/2
washing [2]  75/19 75/23
washings [1]  115/8
waste [1]  95/5
water [3]  44/8 47/18 115/11
wavy [1]  137/17
weak [1]  118/7
weapon [4]  157/12 157/14 162/18 163/5
weapons [3]  127/14 148/2 148/8
wear [1]  143/5
wearing [3]  112/13 142/25 143/2
week [2]  7/6 16/25
weeks [1]  19/22

## weight column

weight [2]  7/14 17/19
welcome [2]  200/19 206/23
whatsoever [1]  159/9
wheel [1]  61/25
Whereas [2]  221/11 226/14
Wherein [1]  234/4
wherever [1]  35/14
white [3]  34/12 119/25 120/5
whiter [1]  230/7
whitish [1]  114/5
who've [1]  217/13
whoever [1]  111/24
whole [5]  36/10 138/7 216/3 221/11
 221/14
wide [2]  185/21 195/11
wider [1]  233/15
width [2]  149/16 195/2
Wiegert [8]  10/8 10/23 13/7 56/23
 190/15 190/24 193/12 198/25
Wild [3]  59/16 59/21 68/2
window [2]  178/9 179/25
windows [1]  177/22
wipes [1]  160/1
wiping [2]  115/19 159/25
wire [2]  197/19 202/25
wiring [5]  188/12 188/14 197/5 197/21
 201/18
WISCONSIN [28]  1/1 1/3 1/15 1/17 1/19
 5/3 23/10 23/11 33/4 65/7 74/12 123/25
 124/15 125/16 126/9 145/8 146/14
 166/24 167/4 181/19 181/22 207/16
 213/1 213/2 214/4 214/6 235/1 235/6
Wisconsin-Platteville [2]  166/24 167/4
wisdom [3]  222/14 227/2 228/21
without [2]  160/2 216/14
witness [30]  5/19 5/23 11/24 12/2 12/2
 13/2 13/4 16/13 22/21 23/1 123/3
 123/12 123/17 144/22 152/20 152/21
 153/6 163/7 166/4 170/10 172/17
 172/24 173/3 181/6 181/10 181/14
 200/9 206/25 207/7 232/17
witnesses [4]  3/2 4/2 233/7 233/9
woman [2]  65/17 140/19
wood [7]  110/22 191/23 192/10 192/12
 192/21 216/5 216/9
wooden [2]  84/25 85/2
words [5]  50/24 106/25 134/23 174/24
 175/24
work [12]  23/10 23/17 25/7 33/24 70/21
 108/25 117/15 156/9 182/4 209/19
 213/13 232/1
workday [1]  24/21
worked [5]  167/16 167/18 167/24 182/2
 182/11
working [4]  95/4 171/17 191/18 224/6
workshops [2]  25/17 125/9
world [5]  73/7 209/19 211/1 211/19
 213/25
world's [1]  72/24
worst [1]  217/14
wound [19]  133/19 148/16 148/22
 148/23 150/16 150/22 151/6 156/13
 156/14 156/18 156/19 156/23 157/2
 157/9 162/5 162/12 163/24 164/10
 164/18
wounding [1]  156/16
wounds [3]  151/2 152/8 153/10
written [3]  15/17 122/5 212/19
written/oral [1]  212/19
wrongfully [1]  33/22
wrote [1]  19/1

| X |
|---|
| x-rays [14]  216/14 216/15 219/25 220/1 220/12 220/18 220/21 220/24 221/19 221/20 221/21 221/22 231/7 231/14 XY [3]  53/8 53/10 66/15 |

| Y |
|---|
| Y-K-K [1]  196/12 yard [3]  41/5 183/2 183/4 year [5]  25/10 65/5 146/23 173/10 173/17 year-long [1]  25/10 years [17]  23/14 30/6 30/12 31/14 31/18 124/17 124/18 125/14 125/15 125/17 126/6 146/15 146/17 146/20 182/6 182/15 211/17 yellow [1]  39/8 Yep [2]  179/9 199/14 yourselves [1]  234/3 |

| Z |
|---|
| Zhang [1]  194/11 zipper [3]  195/16 196/3 196/9 zoom [2]  134/13 138/13 zoomed [2]  132/21 229/4 |