STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 3

---

STATE OF WISCONSIN,

               PLAINTIFF,      JURY TRIAL
                                 TRIAL DAY 4
vs.                          Case No. 06 CF 88

BRENDAN R. DASSEY,

               DEFENDANT.

---

**DATE:**     APRIL 19, 2007

**BEFORE:**   HON. JEROME L. FOX
           Circuit Court Judge

**APPEARANCES:**

       KENNETH R. KRATZ
       Special Prosecutor
       On behalf of the State of Wisconsin.

       THOMAS J. FALLON
       Special Prosecutor
       On behalf of the State of Wisconsin.

       NORMAN A. GAHN
       Special Prosecutor
       On behalf of the State of Wisconsin.

       MARK R. FREMGEN
       Attorney at Law
       On behalf of the defendant.

       RAYMOND L. EDELSTEIN
       Attorney at Law
       On behalf of the defendant.

       BRENDAN R. DASSEY
       Defendant
       Appeared in person.

116

1

**COPY**

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 1 of 219    Document 19-18

\* \* \* \* \* \* \* \*

**TRANSCRIPT OF PROCEEDINGS**

Reported by Jennifer K. Hau, RPR

Official Court Reporter

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 2 of 219    Document 19-18

**I N D E X**

|  | PAGE |
|---|---|
| TRIAL STIPULATIONS | 6-11 |

WITNESSES

**RODNEY PEVYTOE**

| Direct Examination by ATTORNEY FALLON | 11-38 |
|---|---|
| Cross-Examination by ATTORNEY FREMGEN | 38-49 |

**DR. LESLIE EISENBERG**

| Direct Examination by ATTORNEY FALLON | 49-95 |
|---|---|
| Cross-Examination by ATTORNEY FREMGEN | 95-98 |
| TRIAL STIPULATION | 98-99 |

**ANTHONY O'NEILL**

| Direct Examination by ATTORNEY FALLON | 100-126 |
|---|---|
| Cross-Examination by ATTORNEY EDELSTEIN | 126-174 |
| Redirect Examination by ATTORNEY FALLON | 174-180 |
| Recross-Examination by ATTORNEY EDELSTEIN | 181-182 |
| TRIAL STIPULATIONS | 183-185 |

**MARK WIEGERT**

| Direct Examination by ATTORNEY FALLON | 186-198 |
|---|---|

3

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 3 of 219    Document 19-18

**C O N T ' D    I N D E X**

| EXHIBITS | MARKED | MOVED | ADMITTED |
|----------|--------|-------|----------|
| 183-195 |  | 95 | 95 |
| 196 | 8 |  |  |
| 197 | 10 |  |  |
| 198 | 11 |  |  |
| 199 |  | 95 | 95 |
| 200 | 100 |  |  |
| 201 |  | 125 | 126 |
| 202 & 203 |  | 182 | 183 |
| 204 | 178 | 181 | 181 |
| 205 | 185 |  |  |

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 4 of 219    Document 19-18

(Reconvened at 8:38 a.m.)

THE COURT: This is the case of State of Wisconsin vs. Brendan Dassey. It's 06 CF 88. Appearances, please.

ATTORNEY FALLON: Morning, Your Honor. May it please the Court, the State continues in its appearance by Special Prosecutors Ken Kratz, Tom Fallon, and Norm Gahn.

ATTORNEY FREMGEN: Attorney Mark Fremgen appears with Attorney Ray Edelstein and Brendan Dassey.

THE COURT: Morning, Counsel, morning jurors. Uh, members of the jury, if you recall at the beginning of this case, I gave you some preliminary instructions. One of them concerned evidence. It was evidence defined, and then it said, evidence is, and it -- it gave you three different kinds of evidence.

Uh, the third of that tripartite was something, uh, called a stipulation. Third, evidence is any facts to which the lawyers have agreed or stipulated.

Uh, there also is going to be an instruction later on that, uh, will tell you that the district attorney or, in this case, the

5

special prosecutor and the defense attorney have stipulated or agreed to certain facts. And those facts, uh, would be, as stated, if the particular witness had been called, he or she would have testified as follows.

I'm going to read to you now three agreements or stipulations that the parties have agreed to. These are called trial stipulations. The first is as follows:

Steven Schmitz is a citizen living in New Holstein, Wisconsin, a community approximately 30 miles west of Manitowoc, uh, Wisconsin.

JoEllen Zipperer is a citizen living in rural Manitowoc County, Wisconsin.

That if called to testify, Steven Schmitz would testify that on October 31, 2005, Teresa Halbach came to the Schmitz property to take a photo of a vehicle for *AutoTrader Magazine*.

Schmitz would indicate that Halbach was at his residence at approximately 1:30 p.m. Was there for approximately ten minutes. Was wearing a white shirt, waist -- waist-length jacket, and blue jeans.

6

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 6 of 219    Document 19-18

Schmitz would state that before leaving, Halbach provided Schmitz with the latest *AutoTrader Magazine* and a bill of sale. Left his property and drove away in her SUV.

That if called to tref -- testify, JoEllen Zipperer would testify that on October 31, 2005, Teresa Halbach came to the Zipperer property to take a photo of a vehicle for *AutoTrader Magazine*.

Zipperer would indicate that Halbach was at her residence between approximately 2 to 2:30 p.m. Was there for approximately ten minutes. Was wearing a white top, waist-length jacket, and blue jeans.

Zipperer would state that before leaving, Halbach provided her with the latest *AutoTrader-Magazine* and a bill of sale. Left her property and drove away in her SUV.

Zipperer would finally state that Avery Salvage Yard is no more than a ten-minute drive from her residence in Manitowoc County.

That's the first stipulation. Uh, Counsel?

ATTORNEY KRATZ: Yes. And will that be marked as an Exhibit; Judge?

7

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 7 of 219    Document 19-18

THE COURT: I'm going to have it marked as an exhibit. Now, I just want to have you affirm for the record that this is your stipulation?

ATTORNEY KRATZ: That is, Judge.

THE COURT: Likewise, defense?

ATTORNEY FREMGEN: Yes, Judge.

THE COURT: Uh, this will be marked as an exhibit, and we'll get to the exhibit -- Well, we -- I guess we'll get to the exhibit number now.

(Exhibit No. 196 marked for identification.)

THE CLERK: One ninety-six.

ATTORNEY KRATZ: One ninety-six? Thank you.

THE COURT: The second trial stipulation is as follows:

Number one. On October 31, 2005, Bobby Dassey was the son of Barb Janda and brother of the defendant, Brendan Dassey. Bobby Dassey lived in the same residence with Barb Janda and Brendan Dassey at the time.

Number two. That if called to testify, Bobby Dassey would state that between 2:30 and 2:45 p.m. on October 31, 2005, he was inside the Janda/Dassey residence where he observed a blue, slash, green Toyota RAV 4 stop outside the

8

residence in close proximity to a maroon van that his mother, Barb Janda, had for sale.

Bobby Dassey would state that he observed a young woman, that he later came to identify as Teresa Halbach, exit her vehicle, take some photos of the maroon van, and walk toward the trailer of Steven Avery.

Bobby Dassey would further state that, after taking a shower, he left the residence at approximately 3:00 p.m. to go deer hunting, at which time he still observed the RAV 4 parked outside his residence, but that Teresa Halbach was not observed.

Bobby Dassey would state that he returned to the residence at approximately 5:00 p.m., and he no longer observed the RAV 4.

That completes the second of the stipulations.

Uh, Counsel -- and here I'm directing my question to the special prosecutor -- is that your stipulation?

ATTORNEY KRATZ: It is, Judge.

THE COURT: And counsel for the defense, is that your stipulation?

ATTORNEY FREMGEN: That's correct.

9

THE COURT: It will be marked as Exhibit...

(Exhibit No. 197 marked for identification.)

THE CLERK: One ninety-seven.

THE COURT: The third stipulation is as follows:

Number one. On October 31, 2005, Scott Tadych was the boyfriend of Barb Janda. Knew the defendant, Brendan Dassey, Steve Avery, and other family members living at the Avery salvage property.

Number two. That if called to testify, Scott Tadych would testify that between 7:30 and 7:45 p.m. on October 31, 2005, he was at the Janda, slash, Dassey property where he dropped off Barb Janda.

Tadych would testify that he observed a large fire in the burn area behind the detached garage of Steven Avery.

Tadych would further indicate that, at the time, he observed Brendan Dassey and Steven Avery standing next to the fire.

To the State, is that your stipulation?

ATTORNEY KRATZ: It is, Judge.

THE COURT: The defense, is this your stipulation?

10

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 10 of 219    Document 19-18

ATTORNEY FREMGEN: Yes, Judge.

THE COURT: It will be marked as Exhibit...

(Exhibit No. 198 marked for identification.)

THE CLERK: One ninety-eight.

THE COURT: Uh, ladies and gentlemen, there will be -- or -- additional stipulations, but not at this time.

ATTORNEY KRATZ: Thank you.

THE COURT: You may proceed.

ATTORNEY FALLON: State would call Mr. Rod Pevytoe to the stand.

**RODNEY PEVYTOE,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated.

THE WITNESS: Thank you.

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: My name is Rodney Pevytoe, P-e-v-y-t-o-e.

**DIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q    What do you do for a living?

A    I'm a special agent with the Wisconsin Department of Justice in the Division of Criminal Investigation. I

11

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 11 of 219    Document 19-18

work in the Arson Bureau of that unit.

Q How long have you been in the employ of the Department of Justice, Division of Criminal Investigation?

A I've been with, uh, that agency for 27 years. Twenty-five years have been in the Arson Bureau.

Q Prior to joining the Department of Justice, did you have any other law enforcement experience?

A Yes. I was a reserve deputy sheriff in Marathon County. It's near Wausau, Wisconsin.

Q What kinds of cases does the Arson Bureau involve themselves with?

A Well, generally speaking, we investigate fires and explosions, uh, that occur here in the state of Wisconsin. We'll investigate the cause. If it's determined to be of accidental origin, we do, uh, some reporting, and then, basically, end our involvement.

If it's determined that there's some criminal activity, we, uh, work with local law enforcement and further the criminal investigation into that matter.

Q All right. Um, Agent, would you pull that microphone a little bit closer to you?

A Sure.

12

Q   Um, how do you, typically, get involved in a case?

A   Typically, an -- an Arson Bureau agent receives a request, and it's generally either from a law enforcement agency or sometimes from a fire department, stating that they need some expertise in determining the cause of a fire or an explosion, then we go from there.

Q   All right.  And on approximately how many fire investigations have you been involved in in your tenure with the Arson Bureau?

A   Uh, unfortunately, I don't have an exact number.  Uh, I could easily say it's between eight hundred and a thousand.  It's probably more than that but, it seems like a whole lot.

Q   And, um, of those investigations, have you ever involved yourself in an investigation in which there was a fatality associated with the, uh, fire?

A   Yes, sadly, many times I do get involved in a fatal fire investigation.

Q   All right.  And approximately how many fatal fire investigations have you involved yourself in through the years?

A   Again, I can't give you an exact number, but, um, an

13

estimate would be in -- in excess of a hundred. Some of those would involve multiple fatalities, four, five people dying at a time.

Q All right. Um, tell us a little bit about your educational and training experience if you will? Uh, do you hold any, uh, degrees?

A . Yes. I have a Bachelor's Degree in criminal justice from the University of Wisconsin. Uh, in addition to that, I'm a certified police officer, certified firefighter. I'm also a certified in -- fire investigator by the International Association of Arson Investigators.

Um, as part of my duties within the Department of Justice, I've been able to receive some additional training from a lot of different agencies, to include the National Fire Academy, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the FBI. Uh, numerous, uh, IAAI, which means International Association of Arson Investigators, uh, conferences, as well as different private entities who have put on various types of educational opportunities for fire investigators.

Q If you could elaborate for us, what is the International Association of Arson Investigators?

14

A  The IAAI, International Association of Arson Investigators, is an organization of people who are devoted to the field of fire investigation, and it's a worldwide association.

Uh, we have members in that association from, uh, Europe, uh, Asia, uh, South America, uh, the Middle East, as well as all of North America.  There's about 7 to 8,000 people that are in that association um, at the present time.

Q  All right.  And, um, approximately how many certified investigators are there?  Do you know?

A  Uh, certified fire investigators by the IAAI, there's roughly a thousand of them right now.

Q  All right.  And is that in the world?  The country?  North America?

A  That's a thousand of them in the world.

Q  In your, um, experience, um, have you been called upon to instruct others in the -- in the field of, um, uh, fire investigation?

A  Yes.  I, um, teach quite frequently in, um, a lot of different areas.  Um, I teach frequently for the National Fire Academy as a member of their adjunct faculty.  Uh, as part of that, I travel throughout, uh, most of the states, it seems, at one time or another, as well as being, um, a guest speaker for

15

IAAI functions, and I teach fire-related subjects, fire death investigation, uh, different subjects related to our field.

Q All right. And are -- do you sit or are you associated with any, um, boards which are involved in either the training or the investigation of fire scenes?

A Uh, yes, I am. I'm -- I'm on the board of directors for the International Association of Arson Investigators. Um, in addition to that, I also, um, am the co-chair of the Certified Fire Investigator, um, Committee as part of that. And so I've worked with, uh, other people in our field in order to, uh, gain the accreditation of being a CFI, a Certified Fire Investigator.

Q All right. Um, as a result of your training and your experience, um, are you capable of recognizing human remains that have been damaged by fire?

A Yes. I've seen them many times, and, uh, over the course of many years that I've been doing those investigations have, uh, gained that skill.

Q Now, uh, Mr. Pevytoe, directing your attention, specifically, to this case, how did you become involved?

16

A On November 9, that was a Wednesday, I was on a different work assignment. I received a telephone call from our Madison office, and they were directing me to come down to Manitowoc to assist other investigations in the ongoing investigation into this incident.

Q And when did you arrive on the scene?

A Approximately mid-afternoon on the 9th.

Q Upon your arrival, what did you do?

A Uh, well, the first thing we had to do is we have a security checkpoint. So I went through that. After clearing security, I went down to the command area, if you will, and I spoke to the two lead investigators, uh, Special Agent Fassbender and Detective Wiegert.

Q At some point was your attention directed to what has now been referred to as a burn pit on the salvage yard property?

A Yes. I was informed of that on the 9th, and actually observed the area, but did no investigation at that time. My actions on the 9th were, really, just trying to assess what was there and what needs I might do in order to further the investigation.

Q All right. And, um, describe the scene for us on that, uh, Wednesday afternoon when you just,

17

Q    generally, looked around?

A    Uh, with respect to the burn pit area?

Q    Yes.

A    Uh, this burn pit is kind of a -- a large, sandy plateau, um, and in there -- there's a depression in there that had some charred remains. It was covered with a tarp, uh, to protect it from the elements as best as it could be done, and, um, it had covered an area, oh, I don't know, um, maybe two-thirds the size of this room. It seemed like the whole sandy area. Maybe a little bit smaller than that. But the, uh, burn pit, or the depression, was maybe five-by-six foot. Something of that rough approximation.

Q    Okay. After making this visual observation, um, what was the first step in your investigation?

A    Uh, the first thing I did was the following day, uh, that was the 10th, and what I actually started out the day doing is going over to the Sheriff's Department in Chilton at Calumet County, and I did a preliminary examination of some debris that had been removed from the burn pit by other investigators before me.

Q    All right. Tell us about, uh, your, um, review of, uh, the material?

A    Well, I had an opportunity to take that debris and

18

put it under some high intensity lighting so it could be inspected, uh, well, and then, uh, piece by piece started to go through that and identify the different items that I suspected would be of evidentiary value. Um, and then I turned them over to the evidence custodian, who was with me, uh, in order to maintain the custody of those items.

Q Who assifted (phonetic) you in this, uh --
assisted you in this examination?

A Um, Special Agent Tom Sturdivant was with me and, uh, Deputy, uh, Riemer, from the Sheriff's Department, was the evidence custodian. He was not doing the inspection, but he was there to receive the evidence.

Q All right. And tell us, uh, what items, if any, did you find that, um, you thought were of some evidentiary significance?

A Uh, during that pro -- uh, process, I recovered, uh, some small fragments that I believed to be consistent with bone. Uh, there was, uh, some fragments that I suspected were some dental remains, and, in addition to that, there were two small masses of, um, a charred material that, uh, upon closer examination, I felt that it was consistent with charred muscle, um, like I've seen on, uh, burned fire victims. And I recovered those items and turned those over for

19

evidentiary value.

Q Describe the -- the -- the pieces, or pieces that you, uh, suspected to be bone and tissue, can you tell us a little bit more about them?

A Um --

Q Their condition and their -- how they looked to you?

A Sure. Uh, the two pieces of tissue material, um, they were both relatively small. I -- I would estimate between the size of a golf ball and maybe a racket ball, just in -- in general size. They weren't certainly round in shape, they were kind of an unusual shape. But, uh, they were heavily charred and blackened. Uh, you could see that they had some, uh, cushioning. You could -- When you squeezed them, they had some give to them, uh, and one of them had a length of, uh, what appeared to be bone, uh, going through it.

Q All right. And, uh, to whom did you provide that material?

A I handed it directly to, uh, Def -- Deputy Riemer, or Riemer, excuse me.

Q All right. Um, approximately how much time did you and, um, Agent Sturdivant spend, uh, sifting through this initial, um, harvest from the pit?

20

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 20 of 219    Document 19-18

A    I would estimate it was about half the day, because it was close to the noon hour that we ended that preliminary examination, decided to come back to the scene.

Q    Uh, and when you went back to the scene, where, specifically, uh, did you go?

A    To the -- to the Avery property. And then, in particular, I went back to the burn pit area.

Q    All right.

A    And, uh, was going to do a reexamination of that area.

Q    All right. Who, if anyone, assisted you on the reexamination of the area at that time?

A    Uh, I had a couple different people. Um, we established a couple different areas to be searched around the burn pit. There were some, uh, evidence technicians from the Manitowoc Police Department there, and the grassy area that was around the burn pit, um, just to make sure that there was nothing that could be missed in there, we had them search that entire area.

Then on the -- the pit, itself, of the sandy mound, I had two additional special agents that were helping me, a depu -- or, excuse me, Special Agent Sielehr and Special Agent Rindt,

21

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 21 of 219    Document 19-18

Q All right. And, um, for the benefit of our reporter there, could you spell Sielehr?

A I -- I can try. I think it's S-i-e-h-e-l-e-r.

Q All right. Um, approximately how much time did you spend working on the pit on that area that day?

A We spent several hours, because we had started in the daylight, and I recall the fact that, uh, I requested some generators and some high intensity lighting to be brought in. Uh, once we started that process, I didn't want to end it, so I think we went 'til close to 10:00 at night, if my memory serves me right.

Q Uh, and did you then conclude?

A Yes.

Q All right. Now, I'd like to ask you a little bit about your observations of the -- the soil, the sod, and the ash that you, um, observed while you were processing the pit. Um, first, tell us about, um, the ash. Was there anything unusual about the ash in this burn pit?

A Well, to a fire investigator, no ash is unusual, but they may have characteristics, is probably the best way to say it. Um, when I looked at the -- the loose ash that was in the bottom of the pit, and there

22

still was some there, as well as the -- the bottom layer of the burn pit, formed almost -- it looked like just -- if you could imagine what blacktop looked like, it was the soil that had bonded with different, uh, distillance. Um, there was an odor and a consistency there that I had seen before, and that was from the burning of tires. Automobile tires and such.

Q All right. What -- what do you mean by distillant?

A Well, distillance would be -- When you burn a tire, actually, some liquids come off and they begin to flow, and they can bond in the soil. Uh, different oils of petroleums will flow. When you take a solid and you burn it, it actually has to be converted to a vapor, so it will go through a very temporary liquid stage. Sometimes that runs off.

Q All right. And so are you describing something like a crust-like?

A Yes. That would be a very good characterization of it.

Q In terms of, um, your examination of the pit, what else, um, struck you of evidentiary significance, uh, about, uh, the material that was taken from the pit? And I'm now asking you

23

Q to focus on nonbiological?

A Well, we saw some metal items there.

Q All right.

A In particular, to describe a couple of them, uh, the first thing that drew my attention, was there was a mass or a ball, uh, that was about the size of a tire, so 15-inches, of heavily oxidized wire. And, uh, there were a multitude of wires there. And based on my experience, what I've seen, is these wires are consistent with what's left when you burn steel-belted radial tires. Um, when you see -- It shows up in this exhibit here.

Q Right. This is, uh -- Right now we're depicting, uh, Exhibit 169. Does this help illustrate the point?

A Yes, very well. Uh, you can see the mass of wire or this ball of entwined wire there, uh, that's present.

Q Agent, there is a, um -- There it is. Right there. And you can probably -- it's easier -- might be easier to -- if you would use that screen --

A Oh, I'm sorry. Thank you. Um, right in that area is the mass of wire. And that type of wire that's heavily oxidized is what you see when you burn steel-belted radial tires. That's what remains

24

there.  And there's a -- a significant amount of wire there.  So we had a multitude of tires, steel-belted radial tires, that were burned, and that would be remaining.

In addition to that, I should also point out, that in the pit, itself, and in the remains of the ash, there were broken pieces of wire.  So that's -- What you see there is not representative of all the steel-belting that we saw at the scene, but that is the majority of it.

Q  All right.  Um, now, that mass of wire that you've identified, was there anything else, um, of significance about that mass of wire?

A  Uh, yes.  Um, as part of the scene examination, I wanted to look at everything, and I started looking at this entwined mass of wire.  And I noticed that inside the wire, deeply inside of it in some cases, were some white fragments that I looked at closer, and identified those to be bone material.  And they were entwined in there to the point where I actually had to, physically, pull apart the wire in order to get it there.  It wasn't just on the surface.  It was actually down entwined into the wires.

Q  Any, um -- Give my a second.  Ah, yes.  Now, also, um, what is depicted in, uh, Exhibit, um,

25

169, is a, um, car seat, which we've, um, previously identified and introduced as Exhibit 174. Did you have an opportunity to examine, more closely, uh, the car seat which is depicted in Exhibit 169, and which has now been marked as Exhibit is 174?

A    Yes. As you can see, it's in the center of that, uh, exhibit right there. It's the, um, rusted mass as pointed out right there. Um, I don't know if it's a car seat or from an SUV type of vehicle, but it's -- it's a vehicle seat. I -- I interpreted it to be a rear seat that may have been removed, or an extra seat, uh, but I did have an opportunity to examine it.

I didn't see any bone fragments entwined in that, but that's a pretty open area. It's not as dense as the wire, um, but as I looked at it, you could see it was heavily oxidized, it appeared to have some charred material on it, and it was my impression that it had been burned and destroyed in the fire.

Q    All right. And what is it about the condition of the, uh, car seat that led you to conclude that it had been burned or exposed to fire?

A    Well, there were several things. First of all, its

26

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 26 of 219    Document 19-18

location next to a burn pit might be suggestive of that. But when you look at, uh, the surface, one of the things that happens to metal, frequently, that's in a fire, is it rusts or oxidizes very quickly, and we see that this seat is -- is oxidized evenly, for the most part, over all of its surfaces.

During a fire, a lot of times the protective coatings that would be on metal are burned away. If there's oil or paint or whatever might be protecting that from the elements, as well as the -- the process of the fire, is -- is, by its definition, of rapid oxidation. So we see metal objects in a fire of rusting very quickly. In addition to that, there's actually some little fragments of charred remains there.

Q All right. Is that why, um, just for example purposes, people who have burn barrels, they don't seem to stay new very long?

A That's correct. They rust very quickly.

Q All right. Um, now, before we leave this particular -- Well, actually, it would be a good transition. I want to go back and revisit something that we talked about just a few moments ago, and that is, you, uh, told us that there were remains of multiple steel-belted radial

27

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 27 of 219    Document 19-18

tires.

Um, based on your examination of the pit area, itself, uh, can you give us a rough approximation of how many tires may actually be reflected in the remains which were recovered?

A Based on my experience from looking at other burned tires and different fire scenes, I could certainly comfortably say it was in excess of five. Probably more, uh, comfortably. But because they were so entwined, it was difficult to pull them apart and separate how many different tires that we had there, because they were all so comingled together.

Q All right. Now, based on your, um, training and experience and research, are you familiar, um, with tires as a potential fuel source?

A Yes. I've actually burned them.

Q All right. Um, tell us, what type or what kind of fuel source would a tire be?

A A tire is actually a very excellent fuel source. Uh, those of you who have seen them burning on television, or in real life, know that they burn with great intensity. Um, I'm actually hard-pressed to think of a commonly available material that's in solid form that would be a better material to use to accelerate a fire. And by accelerating, we're

28

talking about, by its definition to a fire investigator, something that would make the fire burn with greater intensity, a better fuel, or a better, uh, oxidizer. And, uh, I -- I think it's realistic to say that tires can be a form of a solid accelerant. They burn with great intensity. They release a lot of energy.

In fact, uh, studies have shown that one pound of tires releases about 15 thousand BTUs of energy as it burns, which is a pretty sizable amount of energy.

Q And, um, what -- Give us an example, what is a BTU?

A It's a -- By its definition, it's a British Thermal Unit, and it's the amount of energy that's required to heat one pound of water, one-degree Fahrenheit.

Q What's the weight of an average passenger tire?

A Twenty pounds.

Q All right. So one passenger tire would -- could be expected to generate how many BTUs of energy, roughly?

A About three hundred thousand.

Q All right. Could you put that into context for us? Um, for instance, an average furnace in a home? Anything like that? Can you relate that

29

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 29 of 219    Document 19-18

BTU figure in --

A    I -- I can try.  Um, you know, your furnace size will vary based on the size of the home and its efficiency, but, uh, like in my home, I have a hundred and -- a hundred and fifty thousand BTU furnace, and that's how much energy it can put out in one hour, uh, in order to heat that home.  And that's probably a pretty average size.  So that's about equivalent to half a tire.

Q    All right.  Now, um, if one is burning, um, two, three, four, five tires, what kind of fire are -- are we -- would we expect to see?

A    Uh, well, you'd see several things.  First of all, I think most of us know that a fire, in many cases, will give off a pretty distinguishable, uh, black or dark smoke from the burning of the tires, but the intensity of the fire will be great.  It will be a -- a very bright flame, usually in an orange color, and, um, uh, you'll have a flame height -- it may vary, depending on how the tires are oriented, if they're flat or standing up, or maybe sloped up, but, uh, generally, you'll see a flame anywhere from six to nine feet would be a good average.

         Uh, the other thing is, if you're burning multiple tires at a time, um, for a human

30

to approach it is pretty difficult because of the radiant heat that's coming off of it is a safety hazard.

Q     All right.  How close would you be able to get to a fire in its full effect?  If you've got four or five tires going at one time, would you be able to be within two or three feet or would you be --

A     No.  No.  I know from my own personal experience of burning tires, I -- you know, I needed a long implement, even if I'm burning one or two tires at a time.  And if you had three or four, you probably wouldn't even be able to get close to it without a rake or something, without getting some, you know, uncomfortable feeling, and maybe even some, uh, skin damage, thermal damage to the skin.

Q     All right.  Now, we talked a little bit about, um, steel-belted radial tires.  But how about regular radial tires that don't have steel-belt reinforcement?  Are they a similar fuel source?

A     Well, they're a very good fuel source.  In fact, there's many tires out there that don't have steel belts in.  Typically, uh, trailer tires.  In the sense of a snowmobile trailer or a utility trailer. As well as there's glass-belted radial tires, and they don't use that, uh, steel cording, so to speak,

31

that you would see in there. So there's, you know, a fair number of tires out there.

Q Was there any way for you, after examining this scene, to determine whether there were any regular, uh, radial-belted tires or glass-belted radial tires there?

A No.

Q Uh, in terms of their consumption, do they leave a -- the similar type of ash and residue that you previously described and attributed to the steel-belted radial tire?

A Yeah. Their construction is basically all the same, with the exception of the -- the belting material being different.

Q All right. Now, in terms of, um, the, uh, investigation that you've been involved in, is there -- can you give us a range of how long it would take to consume a human body in a fire to the degree that, um, the remains that you recovered here suggest?

A I couldn't give you an exact number of hours, um, because there are some variables. If a body is dismembered, it would burn faster because of higher surface exposure.

Q Let's stop right there and start with that. Why

32

is that?  Explain that?

A  Well, if -- if you're looking at a body in a fire, you have to consider it a piece of fuel that's -- that's exposed to the fire.  And anytime you have fuel with more surface area, it's going to burn better.

It's like taking a -- a 12-inch stack of newspapers and setting it on fire versus separating all the newspapers out and giving it more surface area.  Obviously, the newspapers will burn quicker.

In addition to that, when you're talking about a body, one of the effects that -- first effect that the fire has on the human body is to dehydrate it, because I'm sure all of you know that we have a lot of moisture in our bodies as we're living here now, and that moisture has to be driven out in order for a fire to consume the body to reduce it down to fuel and consume it, and down to its eventual skeletal remains.

So when you dismember a body, or if there's some sort of an injury to the body, the, uh, body will tend to bleed out, and if there's less blood in the body, it actually will be consumed quicker, because there'll be less

33

moisture for it to be, uh, dehydrated and evaporated off before it's consumed.

Q  So are you suggesting, then, if there are some kind of pre-fire wounds to the body, that may hasten the, uh, consumption of the body in the fire?

A  Exactly.

Q  What are some of the variables?  You -- you mentioned there are a -- a host of variables, uh, involved that would directly impact on how long it would take to consume a body in a fire.  What are some of those variables oth -- other than the one we just talked about?

A  Well, the type of fuel that's used certainly would be an important factor.  Tires would be a very good fuel, and would speed up that process as compared to say, green wood or some different types of firewood.  Uh, the type of, uh, weather conditions that are present.  Uh, heavy winds, cold weather, extreme cold weather, those would all be factors there, uh, as well as the orientation of the fuel and the body.

And what I'm saying there is, um, if a body's left in a scene, and it's undisturbed, the part of the body that's in contact with the ground, if you will, is protected by the ground

34

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 34 of 219    Document 19-18

or the surface that it's laying on. We call that, quite frankly, a protected area. Uh, if, uh -- As in any type of fire, if you were to stir the fire and mix up the fuel, that fuel tends to burn better, and you -- you're removing -- exposing the protected area.

So if a body is in a fire, and at some point the -- the body is moved around, you'll be exposing more of its surfaces and you'll be hastening that, uh, consumption process also.

Q All right. Now, um, what about continued exposure to fuel or adding fuel? I mean, if you were, uh, actively tending such a fire, what effect would that have?

A Well, that would certainly be probably a requirement in order to burn a body out in an open pit, uh, unless you had just an extraordinary amount of fuel, like we have in a house fire. Um, but if you're talking about an open burn pit like the one we saw there, um, you would have to be adding fuel in order to continue that consumption process, because it would take multiple hours in order to destroy a body in a fire in an open surrounding like that.

Q All right. Um, I'm going to have, uh, Investigator, uh, Wiegert, um, bring over a

35

couple of, uh, exhibits and have you take a look at them. We'll start with the rake. Um, if you would tell us, again, the exhibit number on there?

A It's Exhibit No. 170.

Q All right. Exhibit -- Referencing, then, to, uh, Exhibit No. 170, um, have you seen that item before?

A I have. Yes.

Q And tell us about the condition of that, uh, exhibit? The rake? Exhibit --

A May I stand --

Q -- 170.

A -- just stand up though?

Q Yes, please.

A Okay. Um, this is a rake that was found, uh, by the burn pit. I guess I'd call it kind of a soil or a -- a beach rake, is typically what it has. Uh, you can see that the bottom third or fourth of it is actually charred, and you can see some of the charring, especially on the sar -- side that would be exposed down or towards the fire if it had been used to rake.

In addition to that, you can see some wires in there, and those are some of those steel-belted radial wires that I was telling you

36

about that we had observed in the burn pit. So this bottom third or portion of that rake has been exposed to a fire.

Q All right. Very good. And, uh, the next exhibit, which is a spade?

A Okay. And that's Exhibit 171, and it's just a regular wooden-handled soil shovel, but, also, you can see it -- it's been exposed to a fire on its lower extremity by the darkening that's there, only to a lesser degree than the rake.

Q I see there's also some oxidation on the edging of the spade?

A Yes.

Q Is that reflective of fire exposure in your opinion as well?

A That could very easily have come from the fire because it would tend to rust quicker.

Q All right. Thank you. You may be seated. All right. I'd like to return, again, to our discussion of, um, fuel sources. Um, again, I'm directing your attention to, um, Exhibit 169, the picture, um, which is still on the screen, which displays the, um, uh, rear car or van seat that we've talked about. Exhibit 174.

With respect to Exhibit 174, are you

37

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 37 of 219    Document 19-18

familiar with what type of, um, packaging or seating normally accompanies a car seat?

A   Well, there's usually some sort of a vinyl, or fabric, or leather-type covering over it, but the padding material, frequently, is a polyurethane foam. Um, from a fire standpoint, polyurethane foam is -- is a tremendous fuel. Um, in fact, uh, we have a -- a nickname for it, in the fire investigation, as solid gasoline, uh, because, just like a tire, it is, uh, either a synthetic or a petroleum distillant, but once it's ignited, it has a tremendous amount of heat release into a room, uh, or into the environment that's burning. It's -- it's a very good fuel.

Q   Uh, is it on a par, as it were, with tires in terms of its ability to generate BTUs?

A   Uh, I'm not sure of the exact breakdown, but I -- I believe that it is. Um, yeah. In fact, I -- if I'm not mistaken, it might be slightly better than en -- energy released pound for pound than that, just because of its -- more often than not, it's a capillary-type structure, an open cell, and it tends to burn with greater intensity.

Q   All right.

        ATTORNEY FALLON:  If I may just have a moment?  We will pass the witness.  Thank you.

38

THE COURT: Cross.

**CROSS-EXAMINATION**

BY ATTORNEY FREMGEN:

Q   Mr. Pevytoe, you indicated that you had arrived on the scene on November 9?

A   That's correct, sir.

Q   Okay.  And when you got there, your first, um, step was to simply assess or evaluate the burn pit?

A   Well, that was the primary one.  But I -- I looked at other areas around that were designated to be searched and whatever, and tried to make assessments as to what type of needs we would have for personnel and materials and that.

Q   But -- but, in particular, you -- you were -- your attention was drawn to this burn area or burn pit?

A   Well, there were several areas, and the burn pit was included in that.

Q   When you arrived to look at the burn pit in particular, uh, did it appear to be as Exhibit 169 shows?

A   No.  It was covered with a tarp.

Q   Okay.  Did you take the tarp off?

A   Uh, they removed a portion of it, yes.

39

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 39 of 219    Document 19-18

Q  Were you able to see the van seat and the -- the wiring, the large wad of wiring?

A  I believe so.  Yes.

Q  Had they already removed much of the soil or the upper ash from the burn pit?

A  Well, they had removed the loose ash that was in the pit, but there was still the darkened area and some remains.

Q  So when you went to -- Was it at the Sheriff's Department that you next went to -- to look at some of the items that had been removed?

A  Well, that was on the following day.

Q  Okay.

A  Uh, on the 10th, in the morning, I went to the Sheriff's Department, and I did a preliminary examination of the, um, ash that had been removed from the pit previous to me being at the scene.

Q  So, obviously, you didn't remove any of that ash?

A  That's correct.

Q  And you didn't sift through the ash?

A  Which ash?

Q  The ash at the Sheriff's Department?

A  Yes.

Q  You did sift through all that ash?

A  Well, we examined that multiple times, because when

40

you're examining something, looking for small evidentiary items, such as bone fragments and dental fragments, it may take time. So, as I said, on the 10th, that was a preliminary examination, but, also, in December, we went back and literally went through it piece by piece, over a course of many hours with many people there, using a long, wooden skewer to remove each little fragment and examine it and go through the process there. So each time we were doing a more and more detailed examination. It's a very complex cli -- uh, process.

Q So over a period of about 30 or 40 days, you were able to, several times, go through the items, sift through items, to find, uh, things that might have evidentiary value?

A I'm not sure of the time frame, but it was examined multiple times, yes.

Q Now, you indicated that you didn't find any bone in the van seat?

A That's correct.

Q But you did find some small pieces in the, uh -- the ba -- uh, the ball or the wad of -- of steel-belted tire wiring?

A That's correct. I found multiple pieces entwined into the mass of the wire.

41

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 41 of 219    Document 19-18

Q   And, again, just go back.  No one had removed the
wiring or the van seat from the burn pit, just
some of the burn pit ash, itself?

A   That's correct.

Q   So when you went back, there was still more to do
in processing the burn pit?

A   That's correct.

Q   And -- And you were the one that, then, processed
it at that point?  You and others?

A   Yes, sir.

Q   Did you oversee or supervise the final processing
of the pit?

A   Uh, more or less, and as well as participated in it.

Q   Now, you -- you estimated that a fire that, uh,
had approximately five tires -- And -- and
that -- that was your approximation of the number
of tires based on the -- the -- the amount of
steel-belted wiring in the burn pit?

A   Well, that -- that's not fully correct, because there
could be additional tires that had -- would not be
steel-belted.  Uh, what I believe my testimony was,
is that there was -- I could see -- I'm -- feel
comfortable in saying that there was more than five
steel-belted radial tires there.  I certainly can't
give you an estimate as to glass-belted utility

42

Q    tires, all those different things that might have been present there. Judging by the ash that was remaining in the pit, there was certainly a quantity.

Q    And -- And you -- you agree with me that you can't tell when tires may have been burned in the pit as well?

A    That's correct. I could just say that the remains were there.

Q    And the pit, itself, may have been used many times other than immediately preceding law enforcement coming to the pit?

A    It's possible, but I don't know. I can only tell you what I saw that day.

Q    Correct. There are things you don't know about the pit that you can't -- even from your observations and your training, you're unable to tell?

A    That's correct.

Q    Under the hypothetical that, uh, Attorney Fallon had suggested, with, um, a number of tires in the pit, you'd indicated the intensity level would, uh, potentially see flames of between six and nine feet; correct?

A    Well, it'll vary with the fuel orientation and the amount of fuel that's present there, but I have

43

burned tires and I know from my research that six to nine feet -- And you have to remember that the flames are kind of going up and down, so the estimate is going to vary as it goes along.  There may be times where it could go higher than that, visually, and then come back down.

Because -- What we call that is a diffusion flame process.  So it's not a, uh -- Or, excuse me.  It's a turbulent flame, not a diffusion flame.  A candle flame is a diffusion flame.  It's a perfect flame.  It doesn't seem to vary.  When we get an open fire, we see the columns of visible, uh, luminescence coming up and going down.  The flames lick up and down.  That's why we see some variation of the flame height.

Q  And -- And the intensity of the fire, itself, isn't simply vertical?  It, uh -- be -- will expand outward in a horizontal fashion as well?

A  Well, you have heat transfer from several different methods.  One of those is radiant heat.  And that will be coming outward, unless it's impeded by an obstruction.

Q  And -- And your testimony, I believe, was that the radiant heat, the intensity, potentially,

44

would, uh, make it very difficult, or maybe even impossible, for someone to be several feet from the fire?

A   Well, that will depend on the intensity of the fire at any given point. Uh, I just know from my own practical experience of a burning, being by -- by some burning tires, if you have multiple tires, and it's -- they're burning freely in a full -- free state of burn, it is difficult to approach them or get close to them because of the radiant heat causing thermal damage to the skin.

Q   And, again, I simply was asking if that was what your testimony was before with Attorney Fallon, that that could have -- you know, that amount of, uh, of -- of tires, or what have you, accelerants, in the fire, because of the radiant heat, would be very difficult to get within a couple of feet?

A   It would be, but you have to remember the variable of how many tires are burning at a given time, because the intensity of the fire is going to go up and down with the fuel source. So if you have several tires that are in full state of combustion, yes, it would be difficult. If you have tires that are not fully burned, or are already partially burned, then it

45

Q So someone could be standing right next to the fire?

A At a given time, yes, depending on the fuel that's burning, because the fire will go up and down, and you can approach, and have to stay away because of the intensity of the fire.

Q And, hypothetically, with the more intensive radiant heat, might have to stand three or four feet beyond the fire?

A Correct.

Q From your, uh, experience and training, uh, are you aware of any studies that have, um, been conducted in regards to the, um, level of intensity of -- of -- of the radiant heat from one versus five tires? For example, wood versus a -- a -- a tire-type of substance or petroleum-based substance?

A There's a lot of studies that deal with the energy release of various materials that are out there.

Q Would one tire in a fire be less intensive than five tires in a -- a fire at one given time?

A Yes, because of the amount of energy that's being released. Without getting too in depth, the temperature would remain the same. Okay. The

46

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 46 of 219    Document 19-18

temperature is not going to go up.  It's always going to be about the same, because they're going to burn at the same temperature level.

However, the more fuel you're -- you add in there, it -- the fuel is all being consumed simultaneously.  It will release more heat energy in there just because more fuel is in the combustion process.

Q  So -- Correct.  The temperature doesn't change.  It's the -- the energy or the -- that's released from that fire that would be increased or intensified?

A  Correct.  It's called a heat release rate.  We generally measure it in joules and megawatts.

Q  A -- again -- Again, hypothetically, would wood burn at the same intensity as one petroleum-based tire, for instance?

A  What specie of the wood and moisture content?

Q  Let's just say standard oak wood.

A  What's the moisture content?

Q  Dry.

A  How dry?

Q  Fifty percent dry.

A  Would not burn with the same intensity.

Q  Okay.  Would plastics, for instance, let's say,

47

Q  milk cartons, burn at the same intensity as a tire?

A  Plastic milk cartons?  The one-gallon jugs?  Or the wax paper cartons?

Q  The one-gallon jugs you would find, let's say, at the -- the grocery store?

A  I don't believe that they burn with the same intensity, but there's a lot of different compositions there, so I'm reluctant to say, without knowing its exact chemical composition, to being able to research it.

Q  I -- I'm not trying to belabor the point, but if I -- my -- if you don't mind, I've -- have a couple extra questions in that regard.

A  Ask away.

Q  All right.  Clothing.  Does cotton fabric clothing, for instance, for example, burn at the same intensity level as, um, one tire?

A  No.  Most things burn at the same temperature range. Intensity, as far as the heat release, is going to vary with the fuel product.  And you -- you have to be careful with the terms you're using.  If you're talking about the heat release rate, it's going to be greater from certain products than others.  If that's what you're referring to as intensity?  That's what

48

I'm assuming you're referring to as intensity.

Q  I -- I mean -- Exactly.  The radiant heat released from the fire.

A  The heat release rate from the fire?

Q  Correct.

A  Okay.  That's what you mean?

Q  Correct.

A  All right.  It will vary with the types of fuels.

Q  Okay.

ATTORNEY FREMGEN:  I have nothing else.

THE COURT:  Any redirect, Counsel?

ATTORNEY FALLON:  No, redirect.

THE COURT:  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You're welcome.  Your next witness, Counsel?

ATTORNEY FALLON:  State would call Leslie Eisenberg.

THE CLERK:  Please raise your right hand.

**LESLIE EISENBERG,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  My name is Leslie Eisenberg,

49

E-i-s-e-n-b-e-r-g.

**DIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q    What is your occupation?

A    I am currently employed at the Wisconsin Historical Society as the program coordinator for the State of Wisconsin's Burial Sites Preservation Program.  I am also, um, privately employed as a forensic anthropologist.

Q    What is a forensic anthropologist?

A    A forensic anthropologist is someone who has had, uh, training in anthropology, and, specifically, in a subfield called physical anthropology, um, that looks at human variation, how we are the same and different from each other, um, with a specific focus on, uh, anatomy and the study and understanding of -- of human remains as it applies in a legal context.

Q    All right.  Doctor, uh, how is it that you are involved in this case?

A    I was requested, um -- My assistance was requested by the Calumet County, uh -- by Calumet County law enforcement, to provide assistance, um, looking at human remains that, uh, were recovered in November of 2005.

Q    And, um, you are here today to do what?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 50 of 219    Document 19-18

A    I am here today to explain my findings, and, uh, also here today to render several opinions, uh, notably, about the sex and age of the remains of the individual I examined, as well as rendering an opinion as to the manner of death.  Uh, how, um -- how the person, uh, whose remains I examined, um, died.

Q    Before we do that, um, if we could, uh, talk a little bit about, um, your background and training.

Um, first of all, beginning with your educational experience, um, what degrees do you hold?

A    I hold a, um, Bachelor's Degree in anthropology, a Master's Degree in anthropology, a Ph.D, or a Doctorate, in anthropology.  Um, and I am also a board certified forensic anthropologist.  One of 75 in the country.

Q    What does board certified mean?

A    Board -- Uh, being called a board certified forensic anthropologist, um, means that you've jumped through a lot of hoops and have had your work, um, carefully scrutinized, um, by members on the American Board of Forensic Anthropology.  Uh, in order to receive the title of what's called, diplomate, uh, which really

51

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 51 of 219    Document 19-18

means board certification, one must, uh, submit case reports for evaluation by the board. And the board then will determine whether or not you are fit, um, or ready to sit for an all-day examination, uh, the morning of which involves a written examination, and the afternoon is a hands-on practical examination involving the examination, analysis, and interpretation of bone in, uh, many different conditions, um, much of it fragmentary.

Q What, if you would, um, are some of the key positions or responsibilities that you have held in the field of forensic anthropology that assist you in performing that work?

A Uh, notably, I was a consultant for the Office of Chief Medical Examiner of New York from 1986 until 1993, when I moved to Wisconsin, um, to take the position as program coordinator for the Wisconsin Historical Society's Burial Sites Preservation Program, where I have occasion, on a fairly regular basis, to examine and identify human bone, animal bone, and so on, for law enforcement. Most of that bone comes from archaeological or older context.

Uh, I also, since 1995, have been a member of a federal disaster team, a regional federal disaster team, that goes by the -- the

52

acronym DMORT, D-M-O-R-T, which stands for Disaster Mortuary Operational Response Team.

And in that capacity I have been deployed on several occasions. Uh, the earliest of which was in 1999, uh, at the site of an Amtrak train crash in Bourbonnais, Illinois, where there were fatalities primarily as a result of, uh, um, a fire in the sleeping car of -- of that train.

Um, after that, I was asked, uh, immediately after the World Trade Center attacks on September 11, to be one of the first teams to respond to the east coast disaster, um, where I had occasion to work to identify, um, and examine, uh, fragmentary human and nonhuman remains. Many of those remains, uh, had been exposed to considerable trauma, uh, and burning, as you might imagine.

And, more recently, in September of 2005, I had occasion to be called or deployed down to Mississippi after the, uh, Hurricane Katrina, and at the same time, Hurricane Rita, uh, came through, to help identify remains, um, of, uh, individuals who died, uh, during the hurricane, as well as collecting and identifying

53

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 53 of 219    Document 19-18

skeletonized human remains that had been washed out of cemeteries, uh, in-ground burials as well as above ground mausoleums.

Q  All right.  And, um, so that we're -- How long have you held your board certification in the field of forensic anthropology?

A  Four ten years now.  I received that certification in, uh, 1997.

Q  Um, in addition to the, um, DMORT, uh, appointments and status, have you received any other, um, noteworthy appointments?

A  Um, yes, I have.  Um, I have, um -- May -- Are you talking about memberships or -- If you can clarify for me --

Q  Sure.  In the, uh -- In the field of forensic anthropology, are -- are you -- there are some appointments or memberships of groups that you find particularly pertinent that assist you in conducting your work?

A  Understood.  Thank you for that clarification.  Uh, from 1999 through 2005 I was an elected board member for the American Board of Forensic Anthropology, and for the last three years of that six-year appointment, I was elected secretary of that board.

Q  Do you have any particularly, um, uh -- Well,

54

let's ask it this way. Do you have any publications in the field of forensic anthropology?

A    Yes, I do, sir.

Q    Tell us about those?

A    Um, some of those publications are jointly authored by others with whom I've worked. Um, they appear in what is the preeminent journal in the field of forensic anthropology, which is called the Journal of Forensic Sciences.

Uh, I also have a number of other publications, uh, that span the, um -- the fields of archaeology and forensic anthropology that are specifically focused on human remains and the identification of human remains.

Q    I'm going to have, uh, Investigator Wiegert show you Exhibit 199.

A    Yes, sir.

Q    All right. And do you recognize that?

A    Yes, I do. It's my resumé, or what, uh, is referred to in the academic field as a curriculum vitae, a history, um, of your accomplishments, if you will.

Q    And did you prepare that?

A    Yes, sir, I did.

Q    Is that a true and accurate summary of your

55

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 55 of 219    Document 19-18

Q    educational training and professional experience
in both, um, uh, forensic anthropology and
otherwise?

A    Yes, sir, it is.

Q    Very good.  All right, Doctor.  Directing your
attention, then, to this particular case, when
did you become involved in this case?

A    I initially became involved in this case through a
telephone message that was left for me on November 9
of 2005.

Q    What were you asked to do?

A    The, um, contents of that voicemail message that was
left for me was, uh, that some remains had been
found, um, and I was, uh, asked to examine those
remains that had been left for me, uh, in a sealed,
uh, container in my office awaiting my return.

Uh, at the time I received that call on
November 9, I was in transit back to Madison from
a, uh, um, national, um, conference on missing
persons in Denver, Colorado.  I was one of
several people at the time who was representing
the state of Wisconsin at that conference.

Q    And what were the tasks?  What, specifically,
were you asked to do, um, by law enforcement?

A    I was asked to examine, um, items that were in a, um,

56

flat, uh, cardboard box that had been sealed with evidence tape when I received it. Um, and I was asked to identify if any of -- of the items in that box were of human origin.

Q I'm going to have Investigator Wiegert bring you a series of photographs.

A Thank you.

Q I believe the first photograph there is marked as Exhibit 183. We'll have that displayed on the screen in a moment. Um, let me ask, do you recognize that?

A Yes, sir, I do.

Q All right. And what is, um, depicted in Exhibit 183?

A I, along with other investigators, are sorting, uh, through material that was collected, um, uh, from the Steven Avery property, and -- and we are looking through this material, uh, with the objective of looking for any human remains or other objects of significance that had been collected from that property.

Q Tell us a little bit about that process that's depicted in the photograph, if you would?

A The process, uh, that I used to, um, examine all the material presented to me for examination, um, is a

57

fairly systematic process, and a process that every forensic anthropologist goes through.

And -- And the first thing that I do, uh, and the major contribution that any forensic anthropologist can make to an investigation like this, involves, um, the recognition and sorting of human bone, and in this case burned human bone, from burned and unbone -- unburned, uh, nonhuman bone.

The next step in that process is looking at the burned human bone that has been sorted out to see if there are any diagnostic or telling, um, attributes or traits on any of those fragments, um, that can tell the anthropologist something about whose remains you are looking at.

The next step in the process is taking those diagnostic fragments and developing what we call in the field a biological profile. And what that means is determining, if you can, the age of the individual, the sex of the individual, the stature of the individual, how tall they were, um, and the ancestry, if possible.

Also, uh, critically important is to determine, um, if there's anything else you can tell from those diagnostic fragments, including

58

the presence of any trauma to those remains, uh, that may have been sustained or may have occurred in what we call the antemortem interval, the interval before death, the perimortem interval, p-e-r-i-m-o-r-t-e-m, and that simply means at or near the time of death, or in the postmortem interval, uh, during a time after death.

And, um, the other activity that I undertook with these burn fragments was trying to see if I could refit any of those fragments with each other.

Q   Very well.  What is the -- the next photograph? I believe would be Exhibit 184; is that correct?

A   That is correct.

Q   And what is depicted in Exhibit 184?

A   That is, uh, a photo of myself and some other investigators looking through additional material that had been collected for the presence of any human remains, bone fragments, dental structures, or anything else that we considered significant.

Q   All right.  And the next photograph?  Exhibit 185, I believe?

A   That is correct.

Q   All right.

A   Exhibit 185 represents, um, the interior and contents

59

of the box that was initially left for me for examination on November 9 of 2005 that I had the opportunity to initially examine the following day on November 10, 2005.

Q   All right.  Let's stop there for a moment and talk a little bit about the -- the box and its contents.  What were the condition of those contents?  The bones that you -- or -- or fragments, is probably the best way of describing it, when --

A   Well --

Q   -- you looked at them?

A   As I look in this photograph and -- and on the screen, what I can see, and what I saw at the time, are, um, fragments of material, some of which were, um, clearly identifiable as human bone fragments that were heavily burned and, in some cases, calcined. Some of the bone that you see that looks white in color, um, is what we call calcined.

Um, it is, um -- It represents bone that has lost its moisture content, because all bone, um, has -- has fat content, has moisture content, has blood running through it, and when it's exposed to heat, and considerable heat, that moisture, and the blood, and the -- and the fatty

60

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 60 of 219    Document 19-18

tissue, the marrow, um, will all dry up, and the bone, itself, the or -- the organic content of the bone, um, what makes bone, bone, um, also disappears. And the bone -- calcined bone becomes, um, almost like a piece of porcelain or ceramic in that if you, um, knock it against a table, it will sound very much like a piece of porcelain.

Q In terms of -- As a forensic anthropologist, who often is called upon to attempt identification of remains, are there varying levels or degrees of destruction that you forensic anthropologists utilize to categorize exactly the condition of the items you're examining?

A We do. Um, in 1996, there was, um, a very basic scheme developed, uh, by a forensic anthropologist from Texas, and a colleague of his. Um, it -- it's known as the Crow-Glassman Scales. C-r-o-w, hyphen, Glassman, G-l-a-s-s-m-a-n. And what Crow and Glassman did was set up a five-stage, or five-level scheme, if you will, that talks about increasing levels of burning on bone.

Uh, level one, for example, would involve a body that was charred, but would be visually recognizable, um, to, uh, people who

61

know -- knew him or her, or to family members.

And that starts with level one and goes up to level five, and, increasingly, um, there is, uh, more destruction to the body. The body then becomes unrecognizable. Um, and, um, level five is, uh -- depicts the body in a state that is primarily only recognizable, because of its fragmentation and burning, to forensic anthropologists and forensic dentists.

Q And in nip particular -- And in this particular case, what was the level or condition of the, uh, fragments you were asked to examine?

A In -- In my opinion, the fragments that I was asked to examine, that I identified as -- as, uh, burned human fragments, would have fallen into that last category, um, the most destructive category, level five.

Q All right. Is this what is sometimes referred to as the ultimate level of destruction?

A Uh, by some auth -- authors, yes, it is.

Q In this particular case, of all the fragments that you examined, did -- you were -- were you able to locate any, um, human skull fragments?

A Yes, sir, I -- I was able to.

Q A -- A -- Approximately, how many fragments were

62

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 62 of 219     Document 19-18

Q    you able to locate?

A    There were --

Q    Or identify?

A    There were approximately 58 fragments that were, um, identifiable as human and diagnostic to the point that I could say these fragments came from a human skull.

Q    In terms of, um -- How much of a human skull was repre -- was represented by those 58 fragments? Rough estimate, if you have one?

A    A rough estimate, um, I would say, perhaps, a quarter, and that may be an exaggerated estimate.

Q    Could be less?

A    It could be less.

Q    All right, Doctor, let's begin with some of your conclusions or findings.  First, based on your examination of the bones recovered from the pit behind the garage of Steven Avery, did you find evidence of human remains?

A    Yes, sir, I did.

Q    And were they in, um -- Were you able to identify the relative age of the person whose remains you examined?

A    Yes, I was able to determine a relative age of -- of the person whose remains I did examine.

63

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 63 of 219    Document 19-18

Q Tell us about that, please?

A There are, um, many techniques that forensic anthropologists use to determine someone's age, um, when remains are unrecognizable and either too decomposed or, um, skeletonized for a traditional, um, autopsy.

Um, in this case, there, um -- Because of the fragmentation and burning, um, many of -- of the characteristics or traits we look at to make that determination, um, were not present or not recognizable because of the condition of the remains.

But there were several areas, um, of the face, um, skull, if you will, and what we call the postcranial remains, the remains below the skull, that were able to help me come to a determination of an approximate age of the individual whose remains I examined.

Q And what was that?

A My determination was that the remains of the individual I examined were no older than 30 to 35 years of age.

Q All right. If you could explain for us that -- that range, that step, you just gave us, 30 to 35, in terms of the field of forensic

64

anthropology and identification, what does that mean or represent?

A  Well, what that means to all of us, really, is that once we, um -- as we age, and at about the year -- the age of about 30 to 35, um, our body starts showing signs of wear, and that wear is -- is degenerative.  In other words, it's something that happens with use, as -- as we use our bodies to do lots of things.  And that's at about the time when forensic anthropologists can pick up signs of arthritis, or what's sometimes called degenerative joint disease, on many parts of the skeleton.

Um, what I did note, from the joint surfaces that were present to examine, was that there were absolutely no traces of the beginnings of arthritis, um, which allowed me to cap the age as no older than 30 to 35 years.

Um, I also had an opportunity in looking at the skull fragments, um -- And some of those fragments had suture lines.  Um, when we think of the skull, we may think of a -- a -- a ball-like structure, or a sphere-like structure, but, in fact, our skulls are made up of many joi -- uh, bones that come together at what are kind of joints.  They're not like a shoulder joint or a

65

hip joint, but it's where the bones fit together, almost like teeth in a zipper in -- in some places, and -- and those openings, called sutures, where those bones come together, uh, had not fused, um, which is something you typically see as someone, uh -- in someone who's much older than 30 to 35.

Q All right. So, in effect, then, you're telling us the -- these are the remains of a person who's under age 30?

A Yes, sir.

Q All right. Were you able to determine the sex of the person by the remains which were recovered?

A Yes, sir, I was.

Q And what -- what did you conclude?

A Based on examining certain diagnostic fragments, I was able to determine that the remains presented to me for analysis, those fragmented and burned remains, were those of a female.

Q All right. I'm going to have, uh, uh, the next exhibit, I believe the photograph is in front of you, it should be at 186?

A That's correct, sir.

Q We have that now on the screen. Um, does this, uh, photograph assist you in explaining why you

66

concluded these were the remains of a female?

A    Uh, this -- this image, um, is -- is one of the areas
I looked at in the body that allowed me to make that
conclusion.

Q    All right.  Tell us about that?

A    What --

Q    Now -- Now, there is a laser pointer.  It should
be right next to the --

A    Ah, yes.

Q    -- witness box?

A    Thank you.

Q    And if you would probably use the larger screen
to point, it might work better.

A    Okay.

Q    Are those shovels in the way?  Rakes?

A    No, they are -- they're not.  Um, what we are looking
at in -- Here we go.  What we are looking at in this
image are fragments from, um -- from a face, and we
are looking at these fragments as if we are looking
at someone face to face.  And so let me point out
some of the landmarks to you to help you orient what
it is you're looking at.

        Um, this area here represents the top of
the left eye socket.  This fragmentary bone, um,
and this eye -- the top of the eye socket, is

67

actually part of the bone that continues up to begin -- to become the forehead. So we have the top of the left eye socket, the left half of the nose. The nasal bones are two in number. And what this fragment is, is the left half of the nasal bones.

These are fragments from the right -- what would be the area above the right eye socket.

This is a complete -- and one of the few complete -- bones that I actually had an opportunity to examine. A complete right cheekbone. And while the placement may be a little off in this photo, what you are looking at here is the lower portion of the right eye socket.

This is a fragmentary portion of the left cheekbone, and a portion of a bone that runs from the left cheekbone over and above the left open -- the opening for the left ear.

Q    All right. If we could go to the next exhibit, uh, 187?

A    Yes, sir.

Q    And what are we looking at here?

A    What we are looking at here is a closeup of -- of a

68

portion of what we saw in the previous graphic. Excuse me. Again, this -- the top of the left eye socket, the portion of what then continues up to be the forehead, or what we call the frontal bone, and the left half of the nose at -- this would be the area that we would refer to as the bridge of the nose. This is the left half of the two nasal bones.

Q All right. Now, with respect to the last two exhibits, 186 and 187, what is it about them that specifically assists you in, um, identifying these remains as a female?

A Fairly diagnostic, or telling, to any forensic anthropologist, or any biological anthropologist, is that there are certain shapes that, um, are characteristically female in the skeleton, and other shapes, what we call morphology, that are characteristically male. And one of those key locations that anthropologists look at, um, is actually the top of the eye socket.

In females, that rim, or ridge, is fairly sharp and -- and, um, does not protrude. In male skulls, that area, that edge, is very blunt, and you often see heavy bone development over the eye sockets. And we don't see that here. I don't see that here. And what I see in

69

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 69 of 219    Document 19-18

terms of morphology, and shape, and general bone architecture to the facial bones, but especially above the left eye socket, uh, leads me to conclude that these facial bones and, in particular, this bone here, um, comes from a female.

Q All right. Now, um, Doctor, during the course of preparing, um, and in reviewing the matters of this case, did you have occasion to work with a Tim Austin from the Wisconsin State Patrol?

A Yes, sir, I did.

Q And did he assist you with some of the, um, exhibits that we're about to see?

A Yes, he did.

Q All right. If you would, uh, take your attention to the next, uh, photograph? All right. And this is Exhibit 188?

A Yes, sir.

Q And what are we looking at here with Exhibit 188?

A What we are looking at here is a graphic depiction, um, of not a real skull, but a -- a computer-generated skull, and, um, the arrows and the descriptions on this graphic point to the areas of the skull and the facial bones that have been recovered, and identified by me, and described to

70

Q    And that -- I see there's a notation, Evidence Tag 8318.  Is that at all referenced to the box that we previously examined?

A    Yes, sir.  The area, uh -- We don't see all of it here, but the identifier for this particular slide that says, Evidence Tag 831 -- and we'll wait for the 8 to show up -- 8318, was the, um, evidence tag identifier for that white opened box we saw earlier on.  Uh, the material that was illit -- initially collected and, um, the material that I initially examined and sorted through.

Q    All right.  All right.  Next exhibit, please?  Should be Exhibit 189?

A    Yes, sir.

Q    All right.  And, um, if you would, what is depicted here?

A    What is depicted here, through the work of, uh, Trooper Tim Austin, um, are two, um, computer-generated skeletons.  Um, the one on the left represents that of a female, and the one on the right, that of a male.

Q    All right.  And, um, in terms of the, uh, eye sockets, if you'd take a moment to, um, highlight the distinctions that you've just been talking

71

Q  about?

A  In the fragmentary skull and facial bones that were recovered, the area that I was pointing out a little bit earlier was just above the left eye socket and above, uh, the bridge of the nose.  In this female skeleton, on the left, I hope you can appreciate, um, the roundedness and the sharpness of the rim, or the top edge, of that left eye socket.

Q  Would it help if we zoomed in on that?

A  It may for the jury, sir.  This area in particular, um, is a hallmark of, um, what anthropologists recognize, or identify, as -- as coming from a female skeleton, because it's a relative, um, um, gracileness or, um, I guess sharpness, and -- and, um, smoothness of that edge.  In contrast to what we would see in a typical male skeleton, um, here's the bridge of the nose, the top of the left eye socket, and I hope you can appreciate or see, um, the area here where above the left eye socket there's a considerable buildup of bone, um, and, as well, the edge or the shape of the top of the eye socket is much more rounded and substantial.

Q  Doctor, um, although you determined the relative age and -- and sex of the person, were you able to determine, um, ancestry or stature of the

72

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 72 of 219    Document 19-18

Q person after your examination of the remains?

A No, sir, I was not. And that was, uh, because of the extreme fragmentation and burning that did not allow me to reconstruct, um, some of the long bones. In particular, the thigh bone that I would typically measure to develop a -- a stature estimate.

Likewise, many of the landmarks that I would use to determine ancestry or racial affiliation, uh, were not present because of that fragmentation.

Q All right. As a forensic anthropologist, are you familiar with the concepts of cause and manner of death?

A Yes, sir, I am.

Q Um, first of all, tell us, um, are you frequently asked to render opinions on, uh, for instance, cause or, perhaps, manner of death?

A More often, and most often, I am asked to render opinions as to what's called manner of death. By what mechanism did someone die? Less often, cause of death, because often that's the purview of a forensic pathologist. But in cases like this, where the remains are so fragmentary and, uh, are too fragmentary, um, for a traditional autopsy, it often falls to the forensic anthropologists to make a

73

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 73 of 219    Document 19-18

determination about what's called cause of death and manner of death.

Q All right. Then in your field of forensic anthropology, what is the difference between cause and manner of death, if you would explain for us?

A As it's generally understood in -- in, uh, forensic anthropology, cause of death is, um, fairly explicit. In other words, what did the person die from?

Manner of death, however, speaks to the mechanism. What caused the death? How did the person die?

Q All right. Can you give us an example, for instance, of a distinction that you might commonly run across in -- in your forensic work?

A Oh, I guess cause of death, um, if -- if I pretended to be a forensic pathologist for a minute, um, might be, um, heart attack, or tuberculosis.

Um, a manner of death, um, for a heart attack, might be, um, accidental. Manner of death, uh -- in general, there are four different categories, um, that are understood when we talk about manner of death. And, um, one of those categories can be a natural death, which might result from a heart attack.

74

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 74 of 219    Document 19-18

A second category of manner of death might be considered accidental. Did someone fall off a ladder, um, hit their head, uh, or sustain a spinal injury and die accidentally?

Um, a third manner of death is suicide.

And fourth, most commonly recognized, is homicide.

Q Is there sometimes a fifth? Such as unexplained?

A Unexplained. Or sometimes even a sixth, uh, being undetermined.

Q Okay. Based upon your training and experience -- Excuse me. Based upon your training and experience, and the examination that you conducted in this case, do you have an opinion as to the manner of death of the individual whose remains you examined?

A Yes, sir, I do.

Q What is that opinion?

A It is my opinion that the remains of the individual I examined died as a result of -- of a homicide, and, in particular, homicidal -- what I am calling homicidal violence.

Q All right. Now, during the course of this investigation, um, did you have an opportunity, uh, to meet and consult with a -- a physician by

75

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 75 of 219    Document 19-18

the name of Jeffrey Jentzen?

A    Yes, sir, I did.

Q    And who is Jeffrey Jentzen?

A    Dr. Jeffrey Jentzen is a very well-known and well-respected forensic anthropologist who is the medical examiner for Milwaukee County, Wisconsin.

Q    All right.  And just, generally, then, the distinction between a forensic pathologist, and a forensic anthropologist, which you are, just, briefly, what's the difference?

A    Well, if you ask a forensic pathologist what the difference is, their first answer will be that they, uh, have been to medical school.  They are real doctors.  And forensic anthropologists are fake doctors, because they only have a Ph.D.  But, in general, um, uh, forensic pathologists are doctors who specialize, uh, in pathology and who have further training and certification in a field called forensic pathology, or pathology, um, that is applied in legal context.

Um, they typically perform autopsies on, um, all types of remains, most of which, I would say, are recognizable.  The -- the people can be visually recognizable.  Sometimes those individuals, um, have died as a result of a

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 76 of 219    Document 19-18

burning episode, or a drowning, um, or any other, um, type of -- of, um, activity.

Q All right. And, um, did you and Dr. Jentzen look at, um, several of the cranial fragments during the course of this investigation?

A Yes, sir, on one occasion.

Q Very well. Um, I'd like to return, again, to your opinion regarding homicidal violence, and ask you, why do you believe, based on your examination, that that is the correct or accurate manner of death?

A After having examined all the fragments, and, uh, you have just seen one box of 50 different containers that I had the opportunity to, uh, sort through to distinguish human from nonhuman bone, um, to look for diagnostic human elements, to look for human bone that may have showed signs of trauma, to try and refit fragments that may have come from any one of 50 different containers, there were two, uh, skull fragments, in particular, that, to me, showed clear and, uh, unquestionable evidence for, uh, what I consider antemortem, or before death, uh, trauma.

Q All right. Um, was there anything about the, uh -- the fact that the fragments were burned or calcined that attributed to your opinion on

77

homicidal violence?

A   Well, I think anytime, um, remains are burned beyond recognition, um, and, um, that burning is not of an accidental nature, I think that the fact that these remains came primarily from a burn pit, um, that the fact that someone attempted to obscure the identity of another individual through burning, certainly could be considered, um, part of that umbrella heading, homicidal violence.

Q   All right.  Doctor, would you look at the next, uh, photograph?  This is marked, I believe, as Exhibit 190?

A   Yes, sir.

Q   What are we looking at in Exhibit 190?

A   We are looking at something that's probably unrecognizable to everyone in this courtroom except myself.  There are two skull fragments here.  We are looking at the internal side of two skull bones that -- actually, three skull bones.  I was able to refit these two bones together along this, uh, fracture break, as well as a third fragment that fits along this edge.

These are three fragments from the left side of a human skull, um, and one of those fragments shows, uh, evidence that I believe

78

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 78 of 219   Document 19-18

would speak to my determination of homicidal violence.

Q All right. If you would take the, um, uh, pointer and describe for us what it is you're looking at?

A Yes, sir. Um, the reason I know that this is the inside of a human skull, are these vessel impressions, these blood vessel impressions, that kind of look like spider webs, or an aerial view of a -- of a road network somewhere in this country.

Um, the vessels that run along the inside of the skull actually sit in these channels, and, um, the positioning of these channels, and the direction of these channels, actually allows me to make a determination as to whether this bone comes from the left side of the skull or the right side of the skull.

These three bones are all part of a bone called the parietal bone. P-a-r-i-e-t-a-l. And we have a parietal bone on the left side of our skull and a corresponding, or mirror, parietal bone on the right side of our skull.

Q All right. And what is it about the indentation at the top of the picture here which is of significance to you in your opinion on homicidal

79

violence?

A    When I looked at this fragment, there was an area of this fragment that caught my attention almost immediately, and it's this area here that I believed was quite significant with respect to a -- a determination of -- of hom -- homicidal violence.

To me, based on my experience, this would be considered what's called internal beveling. Now, remember, we're looking inside the skull at this moment, and where the hard compact bone of the inside of the skull stops, um, what you're looking at is -- is kind of a honeycomb-looking bone. That is, a bone that's sandwiched between the outside of the skull and the inside of the skull. And whenever there is, um, a, uh -- an unnatural defect to the skull that looks like this, um, where you have internal beveling, or what some people call cratering of the inside of the skull, um, it is identified, uh, as, um, an entrance wound from a gunshot.

Q    All right. Um, next exhibit? This is Exhibit 191?

A    Yes, sir.

Q    All right. And what are we looking at in Exhibit 191?

80

A What we are looking at here is the flip side of the three bones we had just examined depicting the inside of the skull. What you are looking at now is the outer portion of the skull. And I would call your attention to this area right here. That is the flip side, or the other side, of the, um, area that I've identified as an entrance wound from a gunshot.

Q All right. Now, I noticed, just so that we can have it explained, there seem to be some, um, uh, colored dots, and -- and, uh, one arrow on there, if you could tell us, if you know, what those are?

A I would be happy to. The, um -- Initially, because there were so many fragments to examine, um, and those fragments -- each were identified, um, with the location from where they came, I thought it might be necessary to begin to, um, mark the bone, um, to reference their location of where they were initially found. And what I started to do was, um, to mark those individual fragments that had come from different locations, or from the same general location, simply with different color nail polish.

Um, additionally, the -- the skull fragments were also taken to be x-rayed, and whenever any of those fragments, um, showed

81

something unusual and unexpected in x-ray, those fragments also received a nail polish color, but of a different color to distinguish them from the skull bone fragments that showed no unusual signs in x-ray.

Uh, additionally, it's my understanding that this copper-colored arrow pointing to the opening, um, for what I believe is an entrance wound on this left side of the skull, this, I believe, was affixed or placed by, uh, staff from the Wisconsin State Crime Laboratory.

Q And, as a matter of fact, um, to whom did you, um, refer, um, these, um, fragments for further radiological or metallurgic analysis?

A I had made contact with a forensic pathologist at the Middleton Veterans Memorial Hospital in Madison, a Dr. Michael Stier, S-t-i-e-r, who was able to set up an appointment for me to have these, uh, skull fragments x-rayed.

Q All right. And after they were x-rayed, did you have anyone else at the Wisconsin Crime Lab further examine them?

A Yes, sir. It was my recommendation that these fragments -- The fragments that showed unusual signatures, if you will, in x-ray, um, it was my

recommendation that those signatures be examined for the presence of any non-natural element or object other than what we would all expect to see associated with human bone.

Q All right. And were they subsequently, uh, examined by Kenneth Olson from the Crime Lab?

A Yes, sir, they were.

Q All right. Um, the next, uh, photograph, please? This would be Exhibit 192?

A Yes, sir.

Q And what are we looking at in Exhibit 192, Doctor?

A This is another one of those burned fragmentary skull bones, uh, on which I identified what I believe is another, uh, entry from a gunshot.

Q And what -- Which, um, type of the -- or what part of the skull is depicted in Exhibit 192?

A What we are looking at here is a fragment from the back of the skull, the part of the skull you can feel when you rub your hand up and down above the nape of your neck. It's called the occipital bone. O-c-c-i-p-i-t-a-l.

Q All right. And, again, if you'd use the pointer. Um, what was of interest or significance to you with respect to this occipital bone?

83

A    I saw the same bony signature, the same unnatural defect, in this fragment from the occipital bone as I did in the previous, uh, bone, the parietal bone, from the left side of the skull, where you can see that honeycomb appearance, uh, on the inside of the skull.

And here we are looking at the inner table, or the inside of the occipital bone, seeing the same kind of concentric -- partial concentric defect with the exposure of the honeycomb portion, or the intermediate portion, of the skull bone, um, where the force of the entry actually, um, blows a larger area -- or develops that cratering that I spoke about a minute ago.

Q    All right.  Um, next exhibit, please?  Now, we've had some discussions regarding the parietal, uh, defect.  Um, we're showing you, now, Exhibit 193?

A    Yes, sir.

Q    All right.  And does this, uh, show the relative placement of the parietal bone and the defect that you observed?

A    Yes, sir, it does.  What are looking at is a computer-generated image of a human skeleton, and we are looking at that skeleton from -- you're looking

84

towards the left side of the skeleton. So we are looking at the left side of the skull. And that area identified with the arrow and the -- the purple or lavender color is the parietal bone and the approximate location of that initial defect that I identified as a gunshot entry wound.

Q All right.

THE COURT: Counsel, I'm going to interrupt just for a moment. Are we getting to the close of this? Or, perhaps, it's appropriate to take a break now?

ATTORNEY FALLON: Well, I was just thinking of that. We have about 15 minutes or so. Do you want to take a break?

THE COURT: Yeah. I think so. All right. We'll take a 15-minute break.

(Recess had at 10:31 a.m.)

(Reconvened at 10:50 a.m.)

THE COURT: Proceed.

Q (By Attorney Fallon) All right. Doctor, I believe we left off with discussion of the parietal defect. We're going to go to the next exhibit. See what is being projected now as Exhibit 194?

A Yes, sir.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 85 of 219    Document 19-18

Q   All right.  And what is, uh, depicted in Exhibit 194?

A   We are looking at the, uh, back of a skull.  Uh, the back of a computer-generated, uh, skeleton.  Um, and focusing on, this time, not the parietal bone on the left side of the skull, but the bone at the lower back of the skull, called the occipital bone, and, in particular, the approximate area of the second internally beveled defect.

Q   All right.  Uh, next?  Should be, I believe, Exhibit, um, 138?  Is that the next one in line?

A   Yes, sir.

Q   Okay.  Exhibit 138, do you recognize that?

A   Yes, sir, I do.

Q   What is Exhibit 138?

A   We are looking at, um, one of ten x-rays that was taken on November 17 of 2005, depicting two of the left parietal bones.  And, in particular, um, the -- the fragment that showed the initial, um, unnatural defect, uh, and the presence of four different radiopaque areas, um, small particles that are white in color.

       There's one here, right within and adjacent to this cratering.  Again, these are the vessels that tell me that this is the inside of

86

the skull.

Here's another one of those bright white flecks. And there are two others. One is right here, and one just below it. And these flecks show up as bright white like this because they, uh -- the x-rays cannot penetrate them or pass through them like they can with the remainder of the bone.

Q All right. Now, um, Mr. Olson from the Crime Lab has advised us that, um, his findings were that they were, um, uh, in this particular exhibit, traces of elemental lead. My question for you, as a forensic anthropologist, is that a naturally occurring phenomenon in human skull tissue to your knowledge?

A It is absolutely not a naturally occurring defect and something I would never expect to see in bone that had not sustained a gunshot wound.

Q All right. Uh, your next exhibit, then, is which one, please? One thirty-nine, I believe?

A One thirty-nine, yes.

Q All right. Directing your attention, then, to Exhibit 139, and, in particular, the, um, fragment -- There are eight fragments. Your attention is directed to the fragment on the

87

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 87 of 219    Document 19-18

upper left-hand corner. Um, that fragment that you have now circled, what is it that we're looking at there?

A This particular fragment is yet another fragment, that occipital bone fragment, the fragment from the back of the skull, that also shows an internally beveled defect. And in this case, adjacent to and within that defect, are a minimum of ten different, um, areas, um, particles of -- of this bright white again, which, um, is of a substance different than the surrounding bone, radiopaque, in that the x-rays cannot pass through them.

Q And, um, is -- You said that was taken on November 17, 2005. Is that before you began your, uh, ref -- your cranial refit, um, efforts?

A Yes, it is, sir.

Q Okay. And just so that we're clear, um, is that the inside or the outside of the occipital bone at the back of the skull that's being depicted?

A Um, I do not know because I do not believe the radiology technician who took this image indicated whether it was an anterior, front, or posterior, back, image. From what direction she was taking the image.

Q Very well. Um, next, please? Should be, I

88

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 88 of 219    Document 19-18

believe, Exhibit --

A    The last exhibit I have before me is Exhibit 195.

Q    Okay.  Very good.  Now, um, I'm going to leave that on the screen for a moment and ask a few preliminary questions.  Do the presence of the radiopaque, these impenetrable flecks, as it were, are they supportive, in your mind, of your diagnosis that, uh -- that the manner of death is homicidal violence?

A    Absolutely, yes.

Q    And why is that, Doctor?

A    These non-naturally occurring particles that have been identified by the Crime Lab as having, um, lead content are not -- would never be seen in bone that had not been subjected, um, to uh, gunshot trauma.

Q    All right.  Now, of interest, I think, to many of us, uh, is this:  Is there any way for you determ -- for you to determine, based on your examination of the remains, which entry defect, the parietal or the occipital, came first?

A    No, sir, I cannot make that determination.

Q    However, were you able to determine whether these exist -- these defects existed prior to them being subjected to the burning episode or after?

A    Yes, absolutely, I could make that determination.

89

Q   And -- and what could you determine?  What is your opinion?

A   As I examined these fragments, it was clear to me that, uh, their edges were similar in color to the burning of the rest of the bone.  And what that tells me is that these edges, um, these fragments, the bone was fragmented with the edges exposed at the time it was exposed to fire.

Q   Now, were there other human remains in this case that were examined that were not of the cranial -- not from the cranial area?

A   Yes, sir.

Q   All right.  And, uh, we have what is depicted on the screen as Exhibit No. 195?

A   Yes, sir.

Q   And, um, first of all, ex -- would you be so kind as to explain the phrase postcranial findings?

A   Postcranial simply means anything below the head or the skull.

Q   And in terms of, um, your examination of the remains here, um, what other, uh, cran -- uh, postcranial remains were identified to you as coming from the burn pit behind Steven Avery's garage?

A   Virtually, um, every other bone in the body was

90

represented by at least one fragment, and in some -- in some cases, many more fragments. And what we see depicted here on this graphic, um, are areas of the body from which I was able to identify one or more fragments, or entire bones, that could be definitively, definitely, identified as to their origin.

For example, the clavicle or collarbone, or, um, the, um, metacarpals. The hand bone. Or the vertebrae. Parts of the spine.

Q Are all the remains consistent with that of an adult female?

A Not every bone in the body will allow you to make a determination of age and/or sex, but the fragments that were diagnostic or held that information for me to look at, um, allowed me to confirm that these remains, these fragmentary burned remains, were those of an adult female.

Q All right. Now, um, I have just a few more questions. During the course of your examination, did you find evidence of, um, human remains, um, obtained from an area other than the, um, burn pit behind Steven Avery's garage?

A Yes, sir, I did.

Q Tell us about that, please?

91

A    There was a second location, away from the burn pit, uh, and closer to the, um -- what was then referred to as the Janda -- Dassey/Janda property, uh, one of four burn barrels contained, uh, human bone fragments.

Q    All right.  And, uh, just for the benefit of the jury, can you kind of tell us a little bit about what kind of human bone fragments were recovered from that area?

A    Yes, sir.  In, um, the burn barrel identified as Burn Barrel No. 2, there were human -- burned human bone fragments from the spine, from the shoulder blade, or what we call the scapula, a possible hand bone fragment, what we call a metacarpal, um, and fragments of long bones that could have been, uh, from leg bones or from arm bones.

Q    I'm going to show you one, um, other exhibit before we conclude.  I'm going to direct your attention to Exhibit -- I believe it's 150, and, um, do you recognize that?

A    Yes, sir, I do.

Q    All right.  And what is, um, Exhibit 150?

A    One-five-zero is a portion of burned human bone, um, that was recovered with other smaller burned human bone fragments and fragments of dried or desiccated

92

human muscle tissue.

Q All right. And is this a -- a, um -- the fragment that you caused to be, um, transferred to the Crime Lab for DNA analysis?

A That is one of the fragments that I transferred to the Federal Bureau of Investigation for DNA analysis.

Q Now, um, in fact, there was a -- a subsequent attempted analysis on a number of the fragments which you were unable to identify, am I correct?

A There were fragments that, um -- whose origin -- I -- I knew what bone they came from, uh, that were sent to the FBI, uh, DNA Lab, but because of the extent of burning to those bones, they were not, in my knowledge, able to obtain, uh, a DNA signature.

Q But they did obtain a -- and the Crime Lab here in Wisconsin did obtain a DNA analysis from some of the fragments?

A I believe that's correct.

Q All right. All right, Doctor, to conclude, the opinion that the remains were those of an adult female less than 30 years of age, do you hold that opinion to a reasonable degree of scientific certainty?

A I would qualify that, to be consistent with my report, to say the remains were those of someone who

93

is younger than 30 to 35 years of age. Correct.

Q All right. And the opinion that the internal beveling observed in the left parietal bone is characteristic of a gunshot or bullet entrance wound, do you hold that opinion to a reasonable degree of scientific certainty?

A Yes, I do. The unnatural defect in the left temporal area of the skull, uh, is the result of a gunshot injury.

Q Um, the opinion that the internal beveling ob -- observed in the occipital bone, left of the midline, is characteristic of a gunshot or bullet entrance wound, do you hold that opinion to a reasonable degree of scientific certainty?

A Yes, sir, I do.

Q The opinion that the internal beveling, observed in the left parietal bone and in the occipital bone, occurred, um, before the burning episode?

A Yes.

Q Do you hold that opinion to a reasonable degree of scientific certainty?

A Yes, sir, I do.

Q And, finally, your opinion that the manner of death for this person was homicidal violence, do you hold that opinion to a reasonable degree of

94

scientific certainty?

A    Yes, sir, I do.

          ATTORNEY FALLON:  We'd, um, move into evidence, um, the exhibits identified by Doctor Eisenberg.  I believe they are Exhibits, uh, 183 through 195, and Exhibit 199.

          THE COURT:  Counsel, any objection?

          ATTORNEY FREMGEN:  No.

          ATTORNEY FALLON:  Would tender the witness for cross.

          THE COURT:  They're received.  You may cross.

### CROSS-EXAMINATION

BY ATTORNEY FREMGEN:

Q    Doctor, I just have a few questions for you.  Um, no questions about your qualifications.  I wanted to ask you about the box of items that were provided to you to, uh, view.  The box of bone fragments.  You recall that testimony earlier and the picture of the box that you received to go through?

A    Yes, sir.  That was the first of 50 containers, um, that I received to, as you say, go through.  It was identified as Evidence Tag No. 8318.  That's correct.

Q    Okay.  Now, the bones were all as the picture

95

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 95 of 219    Document 19-18

depicted?  That would be how you received it?

A    No.  At the time I received it, the box was closed and sealed with evidence tape.

Q    When you opened it, that's how you observed the bones?

A    Yes, sir.

Q    They weren't individually packaged within the box?

A    No, sir.

Q    Okay.  Did you receive any individually packaged bones along with that box?

A    In that box, and as we all saw in that photo, there was a clear plastic bag that contained, um, some items that had been segregated from all of the items that were collected in that box.

Q    Now, you indicated that the manner of death was homicidal violence?  Specifically, gunshot; correct?

A    I -- In terms of my determination of manner of death, yes, homicidal violence would be considered the manner of death.  There was evidence for two discrete gunshot wounds, and, uh, the extreme fragmentation and burning of the body, um, was part of the process in my opinion.

Q    In regards, specifically, to the two gunshot

96

wounds, based on beveling and the -- the two skull fracture fragments you received? Correct? That's where you came up with that determination or opinion?

A That is correct, sir.

Q You were able to determine that -- from your testimony, I understand it, that the -- those skull, um, defects could not have occurred during the burning process?

A That is correct.

Q Would have to have occurred prior to the burning process?

A Yes, sir.

Q But would you agree there is no evidence, at least from what you have testified to so far, that indicates that the individual was alive at the time of the two, uh, gunshot wounds?

A I cannot make that determination. That's not within my field of expertise.

Q So when you say this is the manner of death, it's more of a educated guesstimate versus an exact determination?

A Well, I am not a medical doctor, sir, but based on my experience, and having, um, examined other cases that show these characteristic signatures of gunshot

97

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 97 of 219    Document 19-18

wounds, um, it's my opinion that, um, it certainly would have contributed to the cause of death.

Q    If the person were alive prior to the gunshots --

A    Yes, sir.

Q    -- correct?  Okay.  Were you, um, present during the second -- the burn -- The four burn barrels you testified to, were you present during, uh, the sifting of those burn barrels?

A    To my knowledge, I was not.  Although, uh, I would like to -- to qualify that answer by saying that I did have, uh, occasion, on two separate occasions, to reexamine material that may have originated from any one of those four burn barrels.

Q    Okay.  That's all.  Thank you.

A    Thank you, sir.

          THE COURT:  Any redirect, Counsel?

          ATTORNEY FALLON:  No redirect.

          THE COURT:  You may step down.

          THE WITNESS:  Thank you.

          THE COURT:  You're welcome.

          ATTORNEY FALLON:  I believe there's a, uh, trial stipulation?

          THE COURT:  There is.  There's an additional trial stipulation.  Ladies and gentlemen of the jury, I remind you what I told you earlier

98

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 98 of 219    Document 19-18

this morning about stipulations. They are evidence. I'm going to read the following as a trial stipulation:

Number one. Dr. Jeffrey Jentzen is the Chief Medical Examiner for Milwaukee County, Wisconsin, and is a board certified forensic pathologist. Dr. Jentzen agreed to be a medical consultant in this case and offered expert opinion as to the manner and cause of death of Teresa Halbach.

Number two. That if called to testify, Dr. Jentzen would state that after consultation with forensic anthropologist, Dr. Leslie Eisenberg, he reviewed reports, photographs, x-rays, bone fragments, and other materials surrounding the Teresa Halbach death investigation.

Dr. Jentzen would testify that in his expert opinion, to a reasonable degree of medical certainty, the manner of death of Teresa Halbach was homicide, and the cause of death was gunshot wounds to the head.

To the prosecution, is that your stipulation?

ATTORNEY FALLON: It -- It is.

99

THE COURT: To the defense?

ATTORNEY FREMGEN: Yes.

THE COURT: It will be marked as Exhibit --

(Exhibit No. 200 marked for identification.)

THE CLERK: Two hundred.

THE COURT: Exhibit No. 200. You have an additional witness?

ATTORNEY FALLON: I -- I think we -- we can start. We will not finish.

THE COURT: All right. Please start.

ATTORNEY FALLON: State at this time would call Detective Anthony O'Neill. It may take us a moment to set up.

THE COURT: That's fine. Just come here, remain standing, and take the oath, please.

**ANTHONY O'NEILL,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Anthony John O'Neill, O'-N-e-i-l-l.

**DIRECT EXAMINATION**

BY ATTORNEY FALLON:

100

Q While we're, um -- While we're setting up here, I'll ask some preliminary questions. For whom are you employed, sir?

A The Marinette County Sheriff's Department.

Q And, um, how long have you been employed at the Marinette County Sheriff's Department?

A Approximately 18 years.

Q And in what capacity are you currently employed?

A A detective.

Q And how long have you been a detective, sir?

A Since 1998.

Q And during your time as a detective, have you been asked to interview both witnesses and suspects in your capacity as a detective with the Sheriff's Department?

A Yes, I have.

Q And, um, uh, during the course of your, uh, time at the Marinette County Sheriff's Department, have you participated in homicide investigations?

A Yes, I have.

Q Approximately how many investigations, uh -- homicide investigations have you been involved in?

A I'd say about eight.

Q All right. And in terms of general investigative

101

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 101 of 219    Document 19-18

experience, um, how -- how -- how many investigations?  Any reference?

A   It's the bulk of my job.

Q   Okay.  Fair enough.  Um, I'd like to direct your attention to a particular day, and that would be, Sunday, November 6, 2005, shortly before noon.  On that day, um, did you have occasion to assist the Calumet County Sheriff's Department, and the Wisconsin Department of Justice investigation involving the missing person of Teresa Halbach?

A   Yes, I did.

Q   And, first of all, tell us how you became involved?

A   On the previous day, uh, our office was contacted by the Calumet County Sheriff's Department and asked to assist them in speaking to the Avery family.  The family maintains a property in Town of Stephenson in Marinette County.

Uh, our understanding was that the Avery family was at that property and, uh, Teresa Halbach would have been at the Avery property in Manitowoc County previous to coming up there, and she was reported as a missing person.

Q   All right.  And, um, who, if anyone else, from your Department was involved in assisting the

102

Department of Justice and Calumet County Sheriff?

A  Primarily myself. Uh, Detective Todd Baldwin, uh, Sergeant Michael Siegert (phonetic) and some patrol officers as well.

Q  All right. And, again, um, particularly with respect to the, um, late morning, almost noon hour, what role were you asked to, um, fulfill by the Department of Justice and Calumet County Sheriff?

A  Uh, we had arrived at the Avery property a little earlier in the day, and, uh, completed some of the interviews that we started the day before. Um, we were also, in preparation of an -- or anticipating a search warrant for the, uh, two vehicles that were located at the Avery property.

Q  All right. Now, it might be of some help if you kind of direct that microphone a little bit closer to your -- your mouth, or maybe tip it up a little, I guess.

A  Okay. Is that better?

Q  Yep. Yeah, that's better. Maybe the end -- Just straighten the end out. There you go. That should do it. All right. Um, what were you asked to do?

A  Um, we were asked to stand by the Avery property in

103

anticipation of a search warrant being completed.

Q All right. And what kind of, um -- What was
being -- What was the object of the search?

A Uh, the seizure of, uh, Steven Avery's Pontiac Grand
Am, I believe it was, and also the, uh, Avery Auto
Salvage flatbed towing vehicle that was at that
property in the town of Stephenson.

Q All right. And, um, who else, um, in addition to
members, of the Marinette Sheriff's Department,
uh, were present to assist in the execution of
the warrant?

A Uh, also with us was a Department of Justice special
agent, Kim Skorlinski.

Q All right. Uh, did there come a time where you
executed, um, the search warrant and seized the,
um, vehicle in question?

A Uh, yes. The vehicle actually left the premises with
two occupants and, uh, we subsequently stopped the
vehicle in anticipation of the search warrant and
seized the vehicle.

Q All right. And, um, who were the occupants of
the vehicle at the time of your seizure?

A Uh, the driver of the vehicle would have been, um,
Bryan Dassey, and the passenger would have been
Brendan Dassey.

104

Q All right. And the passenger, Brendan Dassey, um, do you recognize him as being present in the courtroom today?

A Uh, yes, I do.

Q And would you briefly point out where he is seated for the benefit of, um, Court and jury?

A Uh, Mr. Dassey's seated to the left of your -- of me, wearing a white, long-sleeved shirt, uh, pair of glasses, dark-colored pants, and I believe a pair of sneakers.

Q All right.

ATTORNEY FALLON: The record reflect the witness has identified the accused?

THE COURT: So reflect.

Q (By Attorney Fallon) What happened when you stopped the vehicle with the two, uh, passengers? The defendant and his brother?

A When I approached the vehicle, I intro -- introduced myself to the driver, and al, Mr. -- also, Mr. Dassey. Um, stated for them we had a search warrant for the vehicle, and that we needed them to exit the vehicle, and that we would, uh, provide them a ride back to the Avery property.

Q Now, at that particular point, did you, um, decide to interview either one of the occupants

105

of the vehicle?

A  Um, yes.

Q  What did you do?

A  Uh, I asked Mr. Dassey if he'd be willing to talk to me in my vehicle, and he told me that he was not under arrest, free to leave at anytime. And, uh --

ATTORNEY EDELSTEIN:  Can we identify which --

THE COURT:  Right.

ATTORNEY FALLON:  We'll get there.

THE COURT:  Well, have him identify which Mr. Dassey.

ATTORNEY FALLON:  I was just about to do that.

THE COURT:  Okay.

Q  (By Attorney Fallon)  Um, since there are two Dassey's here, if -- if you would refer to them both by their first and last name, that would help, okay?

A  Yes.

Q  Um, did you, um, interview either one or both of them?

A  I interviewed Brendan Dassey.

Q  All right.  And who, if anyone else, participated in the interview of Brendan Dassey?

106

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 106 of 219    Document 19-18

A   Detective Todd Baldwin.

Q   All right. And, um, while you were interviewing Brendan Dassey, uh, what was going on with Bryan Dassey, if you know?

A   Uh, Bryan Dassey was being interviewed by Agent Skim (sic) Skorlinski and his partner.

Q   Um, where did the interview of the defendant, Brendan Dassey, take place?

A   In my unmarked police car.

Q   All right. Now, um, during the course of, uh, uh -- Well, let's ask it this way. Approximately how long or how much time did you spend -- you and/or Detective Baldwin spend -- interviewing, uh, Brendan Dassey?

A   I believe it was just over -- a little bit over an hour.

Q   And during the course of the interview, was there, uh, free give and take between the participants in the conversation?

A   Uh, yes, there was.

Q   All right. And at any point during the course of your conversation, your interview of the defendant, Brendan Dassey, did he ask you to, um -- to leave?

A   No.

107

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 107 of 219    Document 19-18

Q  All right.  Did he ask or make any other requests of you during the course of the interview that you recall?

A  No, he did not.

Q  All right.  Um, during the course of the interview, did he refuse or decline to answer any of your questions?

A  No, he did not.

Q  All right.  Now, um, this interview, was it recorded in any way?

A  Yes, it was.

Q  All right.  Tell us about what recording device and how that came to pass?

A  Uh, in my car I have a digital audio recorder.  It's just a small pocket one.  And, uh, uh, during the interview, it was in the record position, and, uh, once it was recorded, I, uh, archived it to our department computer, and, uh, subsequently sent, um, to the district attorney, a copy of that audio file. Actually, two audio files.

Q  All right.  Now, um, let me ask you this:  Where, in the vehicle, was your recorder?

A  It was in my visor.  I have a visor caddy, so it's placed up there.

Q  All right.  And, um, who sat in the, um -- the

108

front seat of the car?

A    I sat in the driver's seat, Detective Baldwin in the passenger front.

Q    All right.  And where did Mr. Dassey sit?

A    Uh, Brendan sat in the back seat passenger side.

Q    All right.  Now, um, during the course of this, was -- or -- did Mr. Dassey, um, audibly respond to all of your questions?

A    For the majority, yes, but he's a very much nonverbal responder as well.

Q    All right.  So what type of nonverbal responses or cues were you receiving from him during the course of the interview?

A    Uh, sometimes he'd go, um-hmm.  In that sense, not an affirmative, yes or no.  Or a, ugh-ugh.  And then, uh, those were the responses that were outside, yes or no, or any explanation, but then we also look at nonverbal-type responses as well.

Q    All right.  And did you receive, um, uh, from time to time, nonverbal responses during the course of this?

A    Uh, very much so.

Q    All right.  And, um, thus, the recording that, uh, we're about to play does not, um, contain all of the -- there's no know way of capturing the

109

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 109 of 219    Document 19-18

nonverbal responses?

A    That's correct.

Q    All right.  Um, during the course of this, um, interview, did you promise Mr. Dassey anything in an effort to get him to, um, talk to you?

A    Not at all.

Q    Very well.

ATTORNEY FALLON:  Um, Your Honor, at this time I guess we would, um, begin to play the interview, recognizing that it -- it may go, and will go, longer than 12:00.  So do you have an idea as to when you'd like us to -- Yeah.  We do have -- There is two parts to it, so we might be able to take a break at the end of part one.

THE COURT:  How long is part one?

ATTORNEY FALLON:  Probably about a half an hour.

THE COURT:  Okay.  Then let's do that.

ATTORNEY FALLON:  All right.

THE COURT:  Start the playing, and we'll -- we'll cut out after part one.

ATTORNEY FALLON:  Okay.  Very well.

THE COURT:  All right.  Do you want this taken by the re -- by the reporter?

ATTORNEY KRATZ:  No.  We actually have a

110

copy for the Court, Judge. I -- I don't have any objection to --

THE COURT: I --

ATTORNEY KRATZ: -- the --

THE COURT: Counsel?

ATTORNEY KRATZ: -- reporter not taking it.

ATTORNEY FREMGEN: Just one moment.

THE COURT: While they're talking, is there a transcript as well?

ATTORNEY FALLON: I believe we have a -- this is a closed caption, so it will be a -- a read-along or follow-along --

THE COURT: I -- I -- I understand that. But is there a separate trans -- Has someone transcribed this?

ATTORNEY KRATZ: We can check, Judge.

ATTORNEY EDELSTEIN: Your Honor, I don't believe it would be necessary for the rep -- I don't believe it would be necessary for the reporter to, uh, take this portion down so long as it consists solely of the audio, um, that this witness has described, and we're not stopping and starting for questions of the witness.

THE COURT: And -- and is that, uh --

111

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 111 of 219    Document 19-18

Mr. Fallon, is that what you intend to do?  To -- to play this completely?

ATTORNEY FALLON:  Yes.  Yes.  We're going to play this one, uh, at least, um, I would say, pretty much all the way through and then we'll have some follow-up questions for Detective O'Neill, and, perhaps, for Detective Baldwin, as well, and tender them for cross.  Um, Counsel is providing me -- We do have a, um -- a typed transcript that we could utilize as an exhibit, or our preference was simply going to be to mark, uh, the audio copy as the official record and --

THE COURT:  All right.

ATTORNEY FALLON:  -- use that as an exhibit.

THE COURT:  Any objection to doing that, Counsel?

ATTORNEY EDELSTEIN:  None.

THE COURT:  Marking the audio copy?

ATTORNEY FREMGEN:  That's fine.

THE COURT:  Or the CD?

ATTORNEY FREMGEN:  Right.

THE COURT:  Okay.  That, then, would be Exhibit 201?

THE CLERK:  It will.  Um-hmm.

112

(Wherein CD is played.)

(Wherein CD is stopped.)

ATTORNEY EDELSTEIN:  May we approach?

(Discussion off the record.)

THE COURT:  All right.  Proceed.

(Wherein playing of CD continues.)

THE COURT:  Is that the first disk?

ATTORNEY FALLON:  That's the first half, or -- We're about halfway through, so it probably would be a good time.

THE COURT:  Sure.  Uh, we'll break for lunch.  We'll be back here at 1:15.  Ladies and gentlemen, I'll remind you, don't talk about this among yourselves or with anyone else.  We'll see you at 1:15.

(Recess had at 11:59 a.m.)

(Reconvened at 1:10 p.m.; jurors not present.)

THE COURT:  Before we have the jury back here, it's my understanding, uh, Mr. Edelstein, that you wish to put some matters on the record?

ATTORNEY EDELSTEIN:  Yes, Your Honor. Thank you.  Um, not long after the last witness, uh, Detective O'Neill, took the stand and the Government started playing an audio of an

113

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 113 of 219    Document 19-18

interview of November 6, 2005, we did have a bench conference and, for the record, I'm asking the Court to memorialize that. Um, we'd have an objection to the visual display of the closed captioning with the highlighting of the line purportedly being broadcast, uh, through the audio, being highlighted in a very bright yellow.

Um, as the Court I'm sure is aware, the courtroom is set up with these monitors. I think everybody could agree that the jury is pretty much split down the middle, some looking to the left, some looking to the right, in order to try to follow along.

The only graphic on the screen is, in fact, I believe a clock timer showing the duration of the playing of the recording, as well as the closed caption, if you will. But it does contain the highlighted yellow portion.

It's, specifically, to the yellow portion, that we object. I believe it places an undue emphasis on the printed word as opposed to the spoken word, which is really the place the jury should be focusing, not on somebody else's transcription of what they believe to be the conversation to be.

114

And, for that reason, we have objected, and do continue to object, to the yellow highlighting. We have no objection to the display of the rendition, um, particularly if the Court were to give the instruction, I believe, the parties have agreed upon.

THE COURT: Before I ask for a response from you, Attorney Fallon, uh, I think what Mr. Edelstein has said accurately summarizes his objection raised at a bench conference. To put it in a little context, uh, the yellow highlighter that he is referring to, moves down the printed text that appears on a screen, and, uh, it does -- excuse me -- it did does so, uh, in a manner that -- that follows in a -- in a rough way, in an approximate way, the spoken, uh, matter that comes over the -- the audio portion of the, uh -- uh, of the tape. Now, Mr. Fallon.

ATTORNEY FALLON: Yes. Thank you, Judge. Um, I understand Counsel's concern, but, um, I guess I have two practical responses. Um, first and foremost, I don't believe -- and this is, of course, a judgment call on the part of the Court -- but, um, I don't believe that the highlighting necessarily, um, overemphasizes the

115

particular line which is being broadcast or spoken at that very moment.

In fact, the whole idea for the captioning and the yellow line is to try as best as possible to sync together the audio, uh, words, with the written word, and, thus, make it easier to follow, especially, I might add, in a case where one of the participants in the conversation is a very soft-spoken individual, and there is some distance between that individual and the recording device.

Um, so in that regard, I do not believe that it overemphasizes this, because it's a momentary thing, and as the yellow line, or highlighter, or cursor, follows the conversation, in -- in -- in that regard, so I don't think it's an overemphasis.

Secondly, and, uh, equally important, if -- or, if not, more so, is the fact that there -- there is an in -- instruction that we've agreed on. Um, Counsel has, uh, written it up, Counsel for the defense, and -- and I would encourage the Court, uh, to read the instruction, uh, to the jury at each and every point that we're going to play one of these, um, audio

116

recordings, whether they are closed captioned or not, because the instruction is, and we're all -- I think all the attorneys are in agreement that the law is that the jury must first rely and trust the spoken word rather than the written word, if there's some incongruence, and I -- I think that would take care of the matter.

THE COURT: Presumably, what you have in your hand is the instruction?

ATTORNEY FREMGEN: Yes.

THE COURT: Why don't you bring it up here. All right. And Mr. Edelstein, you've agreed to this instruction?

ATTORNEY FREMGEN: I actually drafted the instruction, Judge.

THE COURT: Presumably, that means you agree?

ATTORNEY FREMGEN: Yes, we do.

THE COURT: All right. All right. The Court is going to find just, uh -- just as -- for the record here, that the yellow highlighter, I believe, to be an -- a -- an -- an assist to the trier of fact in this case. That some portions of the audio are, uh, seemingly, disjunctive in that one of the participants is in the backseat of the

117

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 117 of 219    Document 19-18

car, two of them are in the front seat of the car. There -- there isn't, uh, perfect timing in doing this.

The yellow highlighter, uh -- the yellow highlighter brings to the -- the screen the attention of the listener exactly what is being said, and Court finds that to be an assist to the jury, which is the trier of fact, without depreciating from either the value or the nuance of any of the -- or nuances of any of the words that are -- are being spoken.

With that said, however, I will, uh, at the, apparently, joint request of counsel, read to the -- the jurors each time that we -- we undertake either an audio or a audio visual, uh, this particular instruction.

All right. Anything else before we bring the jury back in?

ATTORNEY FALLON: No. Uh, I would indicate that we'll be, uh, resuming with, uh, Detective O'Neill. I will ask him, oh, probably a half dozen or so questions right now just to break things up, and then we'll play the balance of, uh, this interview, and there'll be a few more questions, and then Mr. Edel -- Edelstein

118

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 118 of 219    Document 19-18

will cross.

THE COURT: All right. Detective, why don't you come back up here. Let's get the jury back in. I'll instruct them, and then you may proceed.

ATTORNEY FALLON: Thank you.

THE COURT: You're welcome.

(Jurors in at 1:19 p.m.)

THE COURT: Be seated. We're set to proceed this afternoon. Before we do, uh, ladies and gentlemen, I've been asked, and have agreed, to read this instruction to you.

Closed captioned transcripts have been added to the audiotape that you're listening to. If you believe in listening to the audio concurrently while reading the closed captioned words, that there is a variation between the audio and the closed caption, you are to rely solely on the audio. All right. You may begin.

ATTORNEY FALLON: Yes.

Q   Before we begin with part two of the interview, uh, Detective, I wonder if you could answer a couple of questions and put things in perspective for us? Um, first of all, a -- on November 6, this interview is indicated during the noon hour,

119

um, there seems to be a -- a fair amount of, um, in and out of the car by yourself and Detective Baldwin. Can you explain to us what's going on?

A Uh, during the interview, I was conferring with, uh, Special Investigator Skorlinski from the Department of Justice, as he was also conferring with, uh, agents that were in the Manitowoc area at the Avery residence and the salvage yard.

Q And, at this time, uh, on November 6, how much did you know in terms of the, uh, advancement, as it were, of the investigative efforts?

A Um, not much more than what I knew the day before, and that was very minimal as well.

Q All right. And what was that? I mean...

A Um, our initial request was for the assistance and trying to obtain information from witnesses that had last seen Teresa Halbach, which would have been the Avery family, or particularly, Steven Avery, and outside of that, uh, we were made aware that Teresa Halbach's vehicle was found in the Avery Salvage Yard on that Saturday, as well as, I think only that Sunday, that there was a, uh -- or it was a Saturday, a burn barrel that had been -- uh, some charred pieces of electronics that were found inside of it as well. I think that information was about the only

120

Q   All right. And so were these, um, entries and exits of the vehicle are efforts on the depart of you and Detective Baldwin to learn more of the state of the investigation?

A   Uh, yes. It was more of so to help clarify information that we were either -- or receiving from Brendan or, uh, not hearing.

Q   All right. Now, um, there were, uh -- One point here, um, there was a question that was asked of you by the, um, defendant, Mr. Dassey, um, about did he do it? Where did that come from?

A   Um, I don't know. I mean, it came from Mr. Dassey, and, uh, it was kind of confusing along the idea that he talked about, uh, you know, do you think he raped her? And, uh, up until that point there was never even anything mentioned about any type of, uh, sexual assault, or homicide, or kidnapping, or anything, other than, uh, Teresa Halbach being at the Avery property and missing.

Q   All right. Very well. I think we'll, um, continue with the presentation of the interview.

        (Wherein playing of CD continues.)

        (Wherein playing of CD ends.)

121

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 121 of 219    Document 19-18

Q (By Attorney Fallon) Detective, O'Neill, where were you when the -- the tape ends in terms of physically?

A Uh, seated in the driver's side of my car.

Q All right. And where was your vehicle? Had Brendan been returned yet to the family, uh, residence up in Crivitz? Or were you still on the roadside there?

A Still on the roadside, just getting to return him back to there.

Q All right. And, um, after the interview was completed where, uh, was Brendan taken?

A Uh, back to the cabin on the Avery property.

Q All right. And do you know, uh, who, um, provided transportation for him?

A I believe I did.

Q All right. Uh, do you know who was, uh, present, uh, uh, at the, uh, Avery property when you, uh, dropped him off?

A I don't recall.

Q All right. Um, in terms of, um, this investigation, did you have an opportunity to speak with a -- a variety of -- of family people up there?

A Yes, I did.

122

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 122 of 219    Document 19-18

Q Generally, then, just who was there, uh, during the days that you were assisting in this investigation?

A Uh, Charles Avery, Steven Avery, uh, his father, whose names escapes me. Uh, he -- that he refers to as grandpa. Uh, his grandmother, uh, his brother, Bryan, and I believe that's all I could recall.

Q All right. Now, first of all, tell us, generally, about, um, Mr. Dassey's, uh, demeanor, uh, during the course of your interview with him? Looks like, according to the tape, about an hour and twenty minutes total?

A Um, I interview a lot of people, and, uh, Mr. Dassey's demeanor was, uh, different in that during conversation he was almost to a point of being, uh, engaged when he wanted to be and disengaged when he didn't want to be. Just as what I'm observing a lot today.

Q All right.

A Um, if it was a -- if it was something that we were talking about that he was okay to talk about, he was actively engaged. He'd tell you about it, bang, bang, bang, and move on.

When it came to specifics regarding Teresa Halbach, Steven Avery, what happened on

123

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 123 of 219    Document 19-18

that day, he wasn't as engaged, and he went into a inner struggle, physically. He'd sit there, head down, withdrawn, motionless, answers would be muffled. Uh, totally contrary to what he chose to be involved with or engaged with.

It was his demeanor that I felt, from all the years of training and experience I've had with dealing with people, an inner struggle, a conflict. He was hiding something. It was not going be a ten-minute interview as to what he saw. There was something more.

Q   In speaking that, in terms of just, generally, the -- the amount of information that you were able to obtain from, um, Mr. Dassey, I mean, ordinarily, how much -- if -- if someone was freely to give that information, how long would this interview have taken?

A   From what, in totality, he had told -- he had told us, or wanted us to believe, as far as his time in -- in being there, seeing Teresa Halbach, seeing interaction between her and Steven Avery, it should have taken us ten minutes.

Q   All right. How long did the interview of, uh, the other brother last?

A   Not long at all. He was in and out of the car with

124

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 124 of 219    Document 19-18

Agent Skorlinski, uh, way before, uh, Brendan.

Q    All right.  Now, there -- there was some discussion about him being choked up, and sweating, and things of that sort.  Tell us about that?

A    Well, physically, you know, he even mentioned about his eyes watering.  I mean, we're all three sitting in the car.  It's November.  And, of course, I got in and out of the car a lot.  But he's in the backseat sweating like crazy, and I think even the other officer noticed that as well.

Uh, his body posture, his body language. Just as I'm sitting here with you today in the openness.  I mean, his was just totally different.  And, you know, from what I've seen in my experience, it was that that would, uh, suggest to me that there's something there. Uh --

ATTORNEY FALLON:  Your Honor, I believe we've marked that, um, CD.  Does -- Roberta, do you have that?

THE CLERK:  Yes.

ATTORNEY FALLON:  That's Exhibit 201?

THE CLERK:  Yep.

ATTORNEY FALLON:  Uh, we would move into

125

evidence Exhibit 201. Uh, if the Court or Counsel desires, we can provide a written transcript to accompanying it, and maybe make it 208-A, if there's a need. But, otherwise, we would move into evidence Exhibit 201 and tender the witness for cross.

THE COURT: Uh, Counsel, any objection? Other than that previously noted?

ATTORNEY EDELSTEIN: As to the transcript, Your Honor, I would -- As to the transcript, uh, I would at this time, uh, subject to, perhaps, some agreed upon corrections, no objection to the disk, itself.

THE COURT: All right.

ATTORNEY FALLON: That's fine.

THE COURT: Okay. It's received. Uh, you may cross.

### CROSS-EXAMINATION

BY ATTORNEY EDELSTEIN:

Q Detective O'Neill, you spent about an hour and twenty minutes with Brendan during the course of this contact on the 6th of November; correct?

A I'd have to take a lot out of that from being in and out of the car, but, in totality, myself, Detective Baldwin, that's correct.

126

Q  And Skorlinski was there as well?

A  For about, I think, the last five minutes, if that was about right.

Q  All right.  This had been some time back; right?

A  Uh, November 6.

Q  Of what year?

A  Two-thousand five.

Q  All right, 2005.  It's a while back; right?

A  Yes.

Q  Before coming to testify today, did you have an opportunity to discuss with anyone, um, the -- your testimony to help you be prepared for this jury?

A  Uh, I discussed with the attorneys, uh, that I read the transcripts, uh, some of the points that they asked me about in the transcripts.  On the way down here, I listened to both audio recordings.  It's a two-hour drive for me.  Uh, tried to bring myself up to speed, of course, because of the, uh -- the time, and, uh, also other things and matters that we have going on in Marinette County, yes.

Q  I'm sorry?  What about Marinette?

A  Other things that we have going on.  Other cases and so forth.  So I try to refresh myself with the attorneys, as well as my own records.  Uh, the

127

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 127 of 219    Document 19-18

audios.

Q   I don't want to get confused now.  On the way --
are you talking about on the way down here you
talked with these attorneys about things
happening in Marinette?

A   No.  Outside of your question about if I had talked
to anybody about what I was going to say today?

Q   Right.

A   I mentioned I'd spoke to the attorneys today.

Q   Right.

A   And then, also, I reviewed my notes and the audio
recordings on the way down here.

Q   Did you speak with any of the other officers who
were involved in the investigation in this
particular case?

A   I believe I spoke to Detective Baldwin.

Q   Did the, uh -- Did you and Baldwin come down
together?

A   No, sir.

Q   But you talked to Baldwin prior to testifying
here today?

A   Yes.

Q   Now, you knew that the girl's name, about whom
everyone was concerned, was Teresa Halbach;
right?

128

A    Yes.

Q    And you knew that the information was that the last place she was seen was at the Avery Salvage Yard; is that right?

A    That's how it was reported.  Yes.

Q    And you knew the date that she was last there; correct?

A    Yes.

Q    Prior to speaking with Brendan, had you spoken with Steven Avery?

A    Yes.

Q    Charles Avery?

A    Yes.

Q    The grandfather?

A    Yes.

Q    Grandma?

A    Yes.

Q    And that was there at the cabin; right?

A    Yes.

Q    And that was actually the day before?

A    For the most part, yes.

Q    What do you mean the "most part"?

A    I spoke to them -- Steven Avery on Sunday.  I believe I spoke to his dad on Sunday.  His mom on Sunday, as well.  I mean, there were various people I spoke to

129

on both dates.

Q Okay. But you had been in and out of the -- the cabin property a number of times over at least two days?

A On two occasions. Yes.

Q Okay. Prior to talking with Brendan?

A Yes.

Q Brendan wasn't the first one you talked to?

A Correct.

Q And you were in contact with, uh, agents from DCI; right?

A On a sporadic basis, yes.

Q Did you have daily contact over the course of the two days with, uh, Skorlinski?

A I spoke to him a couple times. Maybe four.

Q Had -- How many times had you personally met with Skorlinski before you spoke to Brendan?

A Twice.

Q And where was that?

A I believe he came up on Saturday night, and I would have met him then, and then, also, on Sunday morning.

Q Prior to stopping the Pontiac and talking with Brendan?

A Yes.

Q And the two of you, along with others, including,

130

uh, Baldwin, for example, you kind of laid the game plan out as far as who was going to talk to which of the boys; right?

A    Um, it was spontaneous, but we decided that we'd talk to them since we had the opportunity, yes.

Q    All right.  Well, the truth of the matter is, you had the opportunity over at the cabin to talk to him if you wanted to, didn't you?

A    No.

Q    And why was that?

A    We were pretty busy, and we just didn't get to him.

Q    You stopped the Pontiac on what day of the week?

A    Sunday.

Q    Okay.  And what time did you do your last interview on, um, the day before?  On Saturday?

A    It definitely was sunset.

Q    It was a pretty important case, isn't it?

A    Yes.

Q    I don't mean to give you a hard time, but you can work past sunset, can't you?  You live in the county?  You know your way around?

A    Well, what kind of case are you referring to at the point that I was dealing with it, sir?

Q    Well, on that Saturday night, you're working with, uh, what you understand to be a, um --

131

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 131 of 219    Document 19-18

certainly, at a very minimum, a missing persons case; right?

A  Uh, to my understanding and clarity that day it was a missing person case, yes.

Q  And was it important to make contact with individuals who may have had the last contact with this girl?

A  Correct.

Q  That's why you were there Saturday?

A  Yes.

Q  And you talked with a bunch of people that Saturday, but you left out -- what you're telling the jury, you left out about sunset?

A  I believe so, yes.

Q  Did you inquire on that Saturday as to the whereabouts of Brendan when you were at the Avery property?

A  I'm sure I knew he was there.

Q  Pard me?

A  I'm sure I knew he was there.

Q  So what stopped you from talking to him on Saturday?

A  Because up until the point of where we got on Sunday there was no need to talk to him.

Q  So you say up to a point on Sunday.  What

132

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 132 of 219    Document 19-18

happened between Saturday evening and Sunday?

A   About 12 hours.

Q   Well, can you be a little more specific?  What happened that caused you, besides the -- the lapse of 12 hours time, that you deemed it important at this point to talk with Brendan?

A   Brendan was not the last person reported to see Teresa Halbach.  Let's --

Q   Let me ask you this --

A   -- start -- I'm trying to answer your question.

Q   Okay.  Go ahead.

A   Okay?  We talked to various people in the family, we spoke -- spoke to family members, and, basically, gave an order of importance, and Brendan came up on Sunday.

Q   When did you exactly learn that the bus driver reported passing that area at roughly 3:45 on the 31st?  You knew that on Saturday, didn't you?

A   No, I did not.

Q   When did you learn it?

A   On Sunday when Agent Skorlinski and I conferred outside the vehicle, uh, when Brendan was being interviewed.

Q   Now, you had -- What was your purpose in going over there on Sunday?

133

A I believe, uh, the purpose was the search warrants for the vehicles.

Q Okay. Besides learning from -- Was Brendan already in your police vehicle when you learned from Skorlinski that this information had been developed about the bus driver?

A Yes.

Q Okay. And during the course of this hour and twenty minutes, do you know when that was?

A I may, but I want to back up just, uh, two questions before.

Q No. I -- I'd rather you answer my question. The Government will get --

A Um --

Q -- their chance.

A I think it was about a third of the way into the interview. I think it was pretty obvious, during the audio part, where I got out of the vehicle, came back and asked him the question about the, uh -- how many people were on the bus, and the bus driver, and so forth.

Q So you believe it was about the time you asked him the question about the number of individuals on the bus as far as the -- where that information came to you during the course of the

134

hour and twenty minutes?

A    Yes.

Q    Now, Skorlinski is the one who actually made application for and obtained the search warrant for Steve Avery's Pontiac; right?

A    I'd have to see a copy of the search warrant, but I believe so.

Q    Do you know when that occurred?

A    The execution of the search warrant?

Q    Correct.

A    Uh, the seizure of the vehicle was on Sunday. I don't know when I actually did the search of the vehicles.

Q    Okay. Do you know when Skorlinski actually got the warrant?

ATTORNEY FALLON:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Uh, no, I do not.

Q    (By Attorney Edelstein)  But you know it was before Sunday; correct?

A    I don't recall.

Q    Detective, obviously, you filed and prepared some reports as a result of your activity in this case; correct?

A    Yes.

135

Q  And you testified earlier that you had reviewed some of your notes, uh, to help refresh your memory for purposes of testifying?

A  The transcript and the audio recordings I did.

Q  Okay.  I thought that -- I thought you said your notes.

A  I probably did, but it was a transcript and the audio files.  I don't recall that I actually looked at the report, although I had a copy of it in my folder.

Q  Did you look at any notes that you made of your activities, which you would ordinarily make, to help you prepare reports, for example?

A  Not recently, no.

Q  Would those notes indicate when you learned that Skorlinski had obtained the search warrant for the Pontiac automobile?

A  I'd have to review the reports.

Q  The report or your notes?

A  I don't have notes.  There's a report that I produced.

Q  Now, before -- Are you the one who actually stopped the Pontiac automobile?

A  No, I'm not.

Q  Do you know who did?

A  I believe Deputy Degnitz.

136

Q    Okay.  And what time was that?

COURT REPORTER:  Could you spell his last name, please?

THE WITNESS:  D-e-g-n-i-t-z.  Before noon.

Q    (By Attorney Edelstein)  Can you be more specific?

A    I got there -- I think I re -- put down, like, 11:50, so shortly before that.  We were only maybe half a mile away.

Q    Okay.  So if -- if your report says at about 11:55 a.m. you and Baldwin, uh, met with Degnitz on Parkway, that would -- you wouldn't take issue with that?

A    After he made the stop we did.  I don't -- I don't know.

Q    Okay.  Had he already stopped the Pontiac?

A    Yes.

Q    And who's the one that directed him to stop the Pontiac?

A    I believe, uh, one of the officers.  Either myself, Detective Baldwin, or Agent Skorlinski.

Q    And you don't remember if you were the one who --
This -- this is a deputy within your department; right?

137

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 137 of 219    Document 19-18

A Yes.

Q And you can't tell us who -- whether you have an independent memory of telling one of your own deputies in your department to stop a vehicle where you have a search warrant?

ATTORNEY FALLON: Objection. Relevance.

THE COURT: I -- I'm going to sustain that objection. Move on.

Q (By Attorney Edelstein) So to the best of your recollection, was the vehicle stopped by the time you got there?

A Yes.

Q And I believe you testified that you and Baldwin took Brendan into your vehicle; right?

A We asked him if he would talk to us in my vehicle. He said, yes.

Q What happened to his brother?

A He went and talked to Agent Skorlinski in his vehicle.

Q Was it just Skorlinski over in his car?

A I think Skorlinski also had a partner. I -- Her name escapes me. I only met her once.

Q Is that the one referred to in your report as Deb, paren, unsure last name?

A I believe so. Yes.

138

Q    Okay.  Now, before you -- You had never met Brendan; right?

A    No.

Q    Okay.  Other than the fact that he was related, perhaps, to Steven Avery or some of the other members of the Avery family that you had visited with the day before, you -- you didn't know anything at all about him, did you?

A    No.

Q    Did you know how old he was?

A    Uh, yes.

Q    And where did you get that information?

A    From him.

Q    No.  I'm talking about before you talked with him?

A    If I had it before I talked to him, perhaps from Steven when he was telling me about who he come up with and who there were -- who was all present, perhaps.

Q    Steven didn't tell you that he came up there in the -- with his nephew accompanying him, did he?

A    No.

Q    You didn't know what grade he was in?

A    I don't recall what grade he was in.

Q    No.  I'm asking you, did you know, prior to

139

making contact with him on Sunday, November 6, what grade he was in?

A    No.

Q    You didn't know what school he went to, did you?

A    No.

Q    You had no idea whether you were dealing with what we would -- what you might typically call an average teenager or a teenager with any type of limitations, is that a fair statement?

A    Yes.

Q    You had no idea about, uh, his ability -- what his memory skills were, did you?

A    Before our conversation, no.

Q    Correct.  You had no idea about his ability to perceive and understand, um, language; correct?

A    Before our conversation, no.

Q    Okay.  Is it fair to say that during the course of your conversation with him, that you came to the conclusion that, um, he did have some difficulty sometimes understanding the question that was being asked of him?

A    No.

Q    You don't agree with that?

A    No, I don't.

Q    Mr. Fallon asked you about his demeanor.  You had

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 140 of 219    Document 19-18

Q   never been around this young man before, had you?

A   No, I had not.

Q   You had no idea what he acted like when he was playing a video game, for example?

A   No.

Q   Had no idea what he acted like when he was dealing, uh, with a teacher, for example?

A   No.

Q   You had no idea what he acted like when he was dealing with a person like yourself?  Of a -- an authoritative figure?

A   Prior to our conversation, no.

Q   And you told him you were a police officer; right?

A   Yes.

Q   Before he got into the police cruiser that you were driving, which I guess is unmarked; right?

A   It's a Ford Taurus like what any other person may have in their garage.

Q   Okay.  There's no cage in the back?

A   No.

Q   All right.  How much time elapsed from the time of the stop until you got him into the backseat of your Taurus?

A   From the time that I arrived there?

141

Q    Well, yes.

A    Not much.

Q    Ballpark?

A    Couple minutes.

Q    Okay.  You had some conversation with him before he got in there?  I'm talking about the back of your car.

A    Other than introducing myself, asking him if he'd like to come in --

Q    Right.

A    -- to talk to me in the car, that's about it.

Q    Okay.  So he agreed, sure, I'm going to come over, and you guys direct him into the backseat?  You're in the front, Baldwin's on the passenger side --

A    Yes.

Q    -- correct?  Okay.  And you've got this audio, um, recorder -- digital audio recorder stuck, you said, in a visor?  Which one was it in?  Right or left?

A    The visor caddy?  In the driver's side visor.

Q    Was it visible?

A    Yes.

Q    You didn't tell him it was there, did you?

A    No.

142

Q You first asked him something to the effect, last Monday, do you remember seeing this girl at all? Did you have a photograph that you showed him?

A I believe we did. Yes.

Q What became of that photograph?

A I don't know. I think you'd have to ask Detective Baldwin.

Q Did you get that from someone in Calumet County? If you know.

A I don't know.

Q Is it fair to say that you, as well as Baldwin, were not pleased with the answers you received to some of your inquiries?

A I can't say that. Are you asking if his answers were suspect? Yes.

Q Well, I assume if somebody gives you what you consider to be a suspect answer, it's not going to please you, is it?

A Well, the idea that someone gives me an answer, it's not supposed to please me. I -- I just don't base it on, does it please me or not.

Q Well --

A I mean, I don't --

Q -- as an --

A -- want to mince words, but --

143

THE COURT: One at a time.

THE WITNESS: I'm sorry.

Q (By Attorney Edelstein) As an investigator, you're trying to get information?

A Correct.

Q And it's important to get the right information?

A Truthful information.

Q Well, if it's truthful, it would be right, wouldn't it?

A If it pleases you.

Q Well, do you believe that untruthful information is sometimes right?

A It may please some people.

Q I'm not asking about pleasure. I'm asking how you perceived to be information. If it's truthful, it's right; correct?

A Yes, I agree with that.

Q Okay. And if it's not truthful, it's not right?

A It doesn't please me.

Q It does not please you?

A No.

Q Very good. Thank you. And you believed you were getting, at certain points during the course of this hour and twenty minutes, what you believed to be untruthful information; correct?

144

A    Correct.

Q    And that did not please you; correct?

A    I took no pleasure.

Q    Do you think your displeasure was evident to Brendan?

ATTORNEY FALLON:  Your Honor, I -- I'm going to interpose an objection.  The question is not pleasure or displeasure.  I -- I just object to the characterization to the line of inquiry. Uh, let's -- Eith -- Either it's information that they thought suspect or not suspect and what they did.  That's what's relevant, not displeasure.

ATTORNEY EDELSTEIN:  Your Honor, if I might respond?

THE COURT:  Go ahead.

ATTORNEY EDELSTEIN:  This witness has testified about the demeanor of the defendant. Those are subjective characterizations that he places upon reactions.  I believe we are entitled to inquire of this witness what actions he may have taken, whether he showed displeasure, his feelings, as that, obviously, may have affected how the defendant reacted.  This jury is entitled to evaluate that for themselves.

THE COURT:  Well --

145

ATTORNEY EDELSTEIN: I don't believe that this is beyond the scope.

THE COURT: You -- You're now reaching at -- at framing a question that seems to ask, do you think he reacted in a way to a question you might have asked, Detective, because you evinced some displeasure? At least that's where I hear you going, and I -- and I'm not -- I'm not sure that -- that, uh, this witness is competent to -- to be making that evaluation -- that -- that substantive evaluation about -- about the defendant.

Um, can you recast the question?

ATTORNEY EDELSTEIN: Let me try it this way, Judge. Maybe we can save a little time.

Q   (By Attorney Edelstein)  Detective, I guess you would agree with me that you -- you have no degrees of any sort, education, or training, which gives you any specific authoritative ability to evaluate, um, why an individual may react to you in the way they do?  Is that a fair statement?  You're not a psychologist?

A   I'm not a psychologist.  That's correct.

Q   And certainly not a child psychologist?

A   I am not a child psychologist.  That's correct.

Q   Okay.  How far into the interview that took about

146

an hour and twenty minutes, um, did you become confrontational with Brendan?

A    I wasn't confrontational with him.

ATTORNEY EDELSTEIN:  May I approach, Your Honor?

THE COURT:  Go ahead.

Q    (By Attorney Edelstein)  Detective, if you would, and ignore all the colorful marks on here, does this look to be -- these two pages look to be -- or three pages, I'm sorry, look to be a copy of the official supplemental report from the Marinette County Sheriff's Office, Investigative Division, that you prepared?

A    Yes.

Q    That's a yes?

A    Yes.

Q    Okay.  And for reference numbers for the record, it's Complaint 0-5-4-1-2-0; right?

A    Correct.

Q    And I'm making reference to page one of three right now?

A    Yes.

ATTORNEY FALLON:  Would you guys just talk into the mike just for our juror here?

Q    (By Attorney Edelstein)  If you would, take a

147

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 147 of 219    Document 19-18

look at the first paragraph of page two of your report and just read that to yourself. Does that help you, uh -- If I asked you the same question again about what time during the course of this hour and twenty minutes you got confrontational, would it change your answer?

A No.

Q Did you not write, when I confronted Brendan?

A Yes.

Q For the record, this has been marked as, uh, Exhibit 202; is that right?

A Yes.

Q Is that --

A I think so.

Q This is the same report we were just talking about?

A Uh, outside of the highlighting and circumstances, yes.

Q Well, you wrote in that report that you confronted Brendan; right?

A Confronted. Yes.

Q Is that different than my understanding of being confrontational?

A Yes.

Q Help me out. Explain it to me. Explain it to

148

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 148 of 219    Document 19-18

this jury.

A   Confrontational is more a presence of mind and demeanor. Confronted is questioning or, uh, having a person explain. I confronted him about his answer. I called him on it. I asked him about it. Why did you tell me this when you said this? Confrontational --

Q   And which -- And which ---

THE COURT: Just -- Just a moment. He was -- he was going to finish the answer. Allow him to finish please. Go ahead.

THE WITNESS: Confrontational would suggest the demeanor that I had when interviewing Brendan, and that was not correct statement that she had in asking why I was confrontational with him when I was not confrontational with him.

COURT REPORTER: Can you -- I'm sorry.

THE COURT: Yeah. You --

COURT REPORTER: Would you slow down, please? I'm having a hard time understanding you.

THE WITNESS: I did not have a confrontational conversation with Brendan Dassey. I confronted him, or questioned him, or called him on one of his answers that he gave that was

149

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 149 of 219   Document 19-18

not consistent with what he was telling us before.

Q (By Attorney Edelstein) And which answer was that?

A Multiple. Uh, things -- Specific one that's related to in the report was the, uh, school bus.

Q Were you present -- If -- If you know, who was the first one to ask Brendan, if anyone, be it you, Baldwin, or Skorlinski, whether or not he remembered anybody taking photographs of the van?

A I believe it was me.

Q And you were present when Baldwin said, you remember that girl taking that picture. You're getting off the bus. It's a beautiful day. Were you there when -- during that exchange?

A I believe that was me. Not Baldwin, was it?

Q Well, in any event, you remember it; right?

A Yes.

Q Okay. You're getting off the bus. It's a beautiful day. It's daylight. And everybody sees her, comma, you do, too. Did you mean to suggest to him that these are facts that he should affirm by the way you asked that question?

A I'd have to see it in its full context, because I know a couple times I asked him about seeing her on

150

the bus, and that may have been a reaffirming question to him. I'm not certain as to where it is in the transcript.

Q I think you told us already that you did have a chance to review the transcript from the audio?

A Yes.

Q Okay. Can you take a look at what I have in front of you here? Does this look to be a copy of that transcript?

A Yes.

Q Okay. Directing your attention to page 17 at the bottom where it's indicated, Detective Baldwin, yeah, you remember that girl. That portion? You thought maybe you said that? But if this indicates Baldwin, do you have any problem with it? Do you remember who said it?

A From the area you're representing inside the transcript, uh, Detective Baldwin.

Q Okay. And would you agree with me that this is really the first time, during the course of the conversation, where somebody suggests to him the girl's taking pictures?

A Could you repeat the question, please?

Q You had asked him about taking the pictures earlier?

151

A   Yes.

Q   Okay.  And you were the first one who brought that up?

A   Yes.

Q   Okay.  Then there was some follow-up by Baldwin; right?

A   By myself and then Baldwin.

Q   Okay.  But during the time that you first brought it up -- Or, I'm sorry.  That -- Yeah, that you first brought it up, and then when Baldwin brought it up, the question being, from yourself, the girl taking pictures.  You remember that.  Okay.  Would you agree that that's how it was asked?

A   After the initial one, yes.

Q   And you asked him in that fashion?

A   After the initial -- initial affirmation by Dassey that he did see the girl taking pictures, that next inquiry was what you said.

Q   You indicated after his initial affirmation that he saw the girl taking pictures.  Help me out and show me where that is -- precedes that in the transcript?

ATTORNEY FALLON:  Are we still on page 17, gentlemen?

152

ATTORNEY EDELSTEIN: Yeah.

A Okay. Baldwin's comments were after my initial asking him about the girl taking pictures.

Q (By Attorney Edelstein) All right. So you were incorrect when you said it was after his initial affirmation of seeing the girl take pictures?

A That's correct.

Q Okay. Well, nobody's perfect. We all make mistakes. Won't hold that against you. So you're the first one that really brought it up?

A Yes.

Q Okay. As long as I'm here, so I don't have to chase back and forth, between the first time you brought it up, you make the statement that's -- it's not on -- not everyday somebody's taking pictures of a van; right?

A Correct.

Q The question then becomes, how many people are on the bus?

A Correct.

Q He answers the question; right?

A Correct.

Q The next question, as far as taking pictures, comes from you. The girl taking pictures. You remember that. Right?

153

A   Correct.

Q   Okay.  He says, well, I wasn't looking at.  And then it looks like he was interrupted; right?

A   Uh --

ATTORNEY FALLON:  I -- I would object to that characterization.  I think the, uh, tape, itself, will speak another explanation.

THE COURT:  Yeah.  The -- the tape is the -- is the best evidence here.  I'll sustain the objection.

ATTORNEY EDELSTEIN:  That's fine.

Q   (By Attorney Edelstein)  In -- in any event, there's no answer to that?  He does not affirm or deny what you're asserting; correct?

A   According to the transcript, the written part, there is no specific answer to it.

Q   And if this is based upon the video everybody just saw, and you com -- I -- did -- had -- did you ever personally compare this to the -- to the audio?

A   Yes.

Q   And it's accurate?

A   To a point it can be, yes.

Q   But he never either affirmed or denied what you first suggested to him about the girl taking the

154

pictures?

A   He does state that they -- he saw the girl taking pictures.

Q   Not until it's brought up again, especially in this ex -- right in this little exchange, next, not by yourself, but by Baldwin?

A   Yes.

Q   And his answer was, maybe. I don't know. Right?

A   Initial copy, yes.

Q   And that's when Baldwin said, Brendan, come on, as if to suggest that Brendan was withholding something?

A   My opinion?

Q   Yes, sir.

A   Perhaps.

Q   If you're disappointed about something, Detective, would you be displeased?

        ATTORNEY FALLON:  Objection.  Relevance.

        THE COURT:  That's sustained.

Q   (By Attorney Edelstein)  Did you not --

        ATTORNEY FALLON:  As to the form anyways.

Q   (By Attorney Edelstein)  You told him, did you not, Brendan, and I quote, you're not going to disappoint us.  Do you remember telling him that?

155

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 155 of 219    Document 19-18

A Yes.

Q Do you remember asking him, did you see her standing there taking a picture?

ATTORNEY EDELSTEIN: Counsel, I'm on page 18.

Q (By Attorney Edelstein) And he -- he did answer, yeah?

A Yes.

Q And then you -- did you immediately thereafter ask him -- and if -- if you don't remember, I'll come back, but did you ask him, why didn't you tell me that?

A I'm going to save you a trip. Yes.

Q And you suggested to him the reason that he, perhaps, didn't tell you that, was that he was scared? Because you phrased it as, are you scared? Right?

A I'm not sure if it was in response to him saying he was afraid or if, by itself, I just said, are you scared?

Q Is there some reason you didn't offer up as an explanation for his failure or inability to answer your earlier question that, perhaps, he has a bad memory?

A I didn't have that opinion.

156

Q    You didn't know anything about him other than the brief contact you had that morning; correct?

A    Uh, nothing before our conversation to suggest to me that he had a bad memory.

Q    All right.

ATTORNEY FREMGEN:  Just one moment, Judge.

THE COURT:  Okay.

ATTORNEY FREMGEN:  Judge, if I may, it's 3:00.  I believe Mr. Edelstein still has some significant amount of cross, and the State will have a couple of questions.  Court want to take a break?

THE COURT:  Sure.  Uh, we'll break until 3:20.

(Recess had at 3:03 p.m.)

(Reconvened at 3:27 p.m.)

THE COURT:  Counsel, you may resume.

ATTORNEY EDELSTEIN:  Thank you.

Q    (By Attorney Edelstein)  Detective O'Neill, during the course of one hour and twenty minutes, roughly, would you agree or disagree with me that both, yourself, as well as Skorlinski and Baldwin, told Brendan that you believed that he was being told what to say?

157

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 157 of 219    Document 19-18

A   We brought that up, yes.

Q   All right. And when you say you brought it up, you, basically, flat out told him, you're being told what to say. Right? If -- if it'll help speed it along, Detective, I think that Mr. Fallon brought over --

A   It was brought up. That's correct.

Q   What's been marked as 203, does that look to be a copy of the transcript that we were looking at before?

A   Yes, it is.

Q   Same one that you compared to the audio?

A   Yes.

Q   And best you know, that's accurate?

A   Yes.

Q   Can you tell this jury how many times between you, Skorlinski, and Baldwin that that assertion was presented -- sor -- to Brendan?

A   I believe we asked him, uh, at least two, probably three, times, uh, whether or not he was told to say something.

Q   Okay. Can you tell this jury how many times during the course of an hour and twenty minutes interview that you had with Brendan that lies were told to him by either you, Skorlinski, or

158

Baldwin?

A    No lies.

Q    Would you turn to page 33, please?  Toward the bottom of that, uh, specifically, Detective Baldwin, the statement is made to Brendan, quote, she needs medicine -- medicines on a daily basis, okay?  Do you see where I'm talking about?

A    Yes, I do.

Q    It's not true, was it?

A    It's standard deception practice used by investigators.

Q    Okay.  Well, I don't want to go down the please, displease rows again, but can you tell me the difference between standard -- That what you said?  Standard deception practices and a lie?

A    I didn't say lie.  Deceptive practices that we may utilize as far as what responses we get from the question.

Q    Would you agree with me that a lie is something that's not true?

A    If there's a benefit gained that's ill will, yes.

Q    I'm sorry.  Could you repeat your answer?

A    If you could repeat your question?

Q    Okay.

A    I'm sorry, I just -- You're asking about a lie and if

159

this was a lie?

Q I'm trying to understand whether -- when you used the phrase "deceptive practices" --

A Um-hmm.

Q -- whether -- Let me ask it this way. In your business, does a deceptive practice contain intentionally false information that is conveyed to another person?

A It's allowable to use some trickery and deceit.

Q I'm not asking what's allowable. I'm asking what it is?

A Something in the idea of what we had asked him concerning the medications that she would need. Yes.

THE COURT: You -- you're not answering the question, Detective. Would you reask it, please?

Q (By Attorney Edelstein) Did -- Did you understand my question?

A If you're asking me if I lied -- or if Detective Baldwin lied to him, I'd say no.

Q All right. When the statement was made to Brendan, quote, she needs medicine on a daily basis, you acknowledge that the statement was made; correct?

A Correct.

Q And you acknowledge, also, that when it was made,

160

neither you nor Baldwin had any basis for believing that that was a true statement; isn't that also correct?

A    True.

Q    All right.  You, Baldwin, and Skorlinski implored him to tell you the truth; correct?

A    Yes.

Q    In addition to the deceptive practice, lie, misrepresentation, however you want to characterize it, about the medicine, it was also suggested to Brendan, in a similar fashion, that his brother was looking out the kitchen window. Do you recall that?

            THE COURT:  Do you have a page for that?

            ATTORNEY EDELSTEIN:  I'll have to find it, Judge.  I know it's in here.

Q    (By Attorney Edelstein)  Page 30, please?  You see at the bottom there, Detective, uh, by Baldwin, you and your brother both?  It's the third entry from the bottom.

A    I see it.

Q    Okay.  It recites, you and your brother both sat there and looked out the window at her.  Right?

A    Yes.

Q    You and -- You had no basis for believing that to

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 161 of 219    Document 19-18

Q be true, did you?

A I didn't make that statement.

Q Well --

A I can't say for that statement.

Q All right. You were in and out of the vehicle during this hour and twenty minutes; right?

A Yes.

Q Um, it was November. Do you remember what the temperature was that day?

A It was cool.

Q Give me a range. If -- if you don't remember, that's fine.

A I would say close to 35 to 40.

Q All right. Was the heater on in your vehicle?

A I don't recall.

Q Do you remember if Baldwin turned it off because Brendan asked him to? Or turned it down?

A Not while I was in the vehicle.

Q Okay. So if it happened, it might have happened when you were out talking to Skorlinski?

A It may have. I don't --

Q Okay. When you got out, that's what you were doing, weren't you? You were going back to talk to Skorlinski?

A For the most part, yes.

162

Q   And you were sort of reporting into Skorlinski what the progress was as far as, uh, gaining any information from Brendan; right?

A   Sometimes.  Yes.

Q   All right.  Do you know how many times that you told Brendan that he was not telling the truth?

A   No.

Q   But you acknowledge that it happened on multiple occasions during the course of this hour and twenty minutes; right?

A   It may have.  Yes.

Q   Well -- Now, you testified on direct that I think when Mr. Fallon first started having you explain your involvement in this matter, I believe you said the information that you had was minimal.
    Do you remember that testimony?

A   Yes.

Q   Okay.  Um, but, actually, you had certainly not every piece of information but you knew more than just name, rank, and serial number, so to speak, didn't you?  You had some very --

    ATTORNEY FALLON:  Objection.

Q   (By Attorney Edelstein)   -- specific details?

    ATTORNEY FALLON:  Name, rank and serial number is -- is vague.

163

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 163 of 219    Document 19-18

ATTORNEY EDELSTEIN: All right. That's fine.

THE COURT: Rephrase that, please.

Q (By Attorney Edelstein) For example, Detective, you knew that a vehicle had been found on the Avery property?

A Yes.

Q And you knew that that vehicle, uh, had been checked by a registration, and VIN, and all that, and that it was Teresa Halbach's?

A There was presumptive that it was. Yes.

Q Okay. So you -- you presumed that that was, in fact, the case?

A (No verbal response.)

Q All right. And, in addition to that, you also knew that, uh, the vehicle had been, in some respect, uh, apparently, concealed?

A Yes.

Q Okay. You knew that Teresa Halbach worked as a freelance photographer; correct?

A Yes.

Q You knew that she worked, uh, with the *AutoTrader Magazine.*

A Yes.

Q You knew that she had, uh, been at the Avery

164

Q property, or was scheduled to be at the Avery property, on the 31st of October?

A Yes.

Q You knew a bus driver had reported seeing her at the Avery property on the 31st of October?

A That Sunday. Yes.

Q Any other particular details that you may have known where we can judge whether your answer on the minimal is a good one or a bad one?

ATTORNEY FALLON: Objection. Argumentative.

THE COURT: Uh, sustained.

Q (By Attorney Edelstein) You testified -- If you'll bear with -- with me a second, I need to find this in the transcript. You testified that you made no sort of promises to him; right? Do you recall that?

A No.

Q Did you make any promises to him?

A No.

Q All right. Detective, just so I don't have to go through each individual present, did -- did you, or either Skorlinski or Baldwin, in your presence, make any promises to Brendan?

A Outside telling him he was free to leave, no.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 165 of 219    Document 19-18

Q Didn't someone tell him that, um, no matter what he said, or something to that effect, that he was not going to jail?

A He brought up the idea that he was afraid that we'd take him to jail. I remember that.

Q All right. Directing your attention to page 36. At the bottom. Four lines up.

A Um-hmm.

Q You said, okay, why did you not tell us the truth about when you saw her leaving? Answer: I was scared. Right?

A Correct.

Q Is there some reason -- Well, if -- What was the very next thing that you said in response to his assertion he was scared?

A Okay. Let's get beyond being scared.

Q All right.

A Continue?

Q Let me stop you right there. So you wanted to get beyond this issue of being scared. Is there some reason you didn't explore that more if your goal is to gather as much information to get to the truth of what happened? Why it happened? Who did what?

A I did.

166

Q   Why did you tell him, then, okay, let's get
    beyond being scared?

A   Because we had to deal with that part of it.

Q   With what?  I'm sorry.

A   We had to deal with his fear.  That part if he was
    scared about something.  Let's get beyond being
    scared.

Q   Well, I take that to mean that -- Let me ask you
    this:  Isn't it true that during the course of
    the hour -- hour and twenty minutes, despite him
    saying several times he was scared, you,
    Skorlinski, or Baldwin never really inquired any
    further about that?  What were you scared of?
    Why were you scared?  When did you become scared?
    You never -- You guys never had -- went into
    that, did you?

A   I think it was covered several times in the audio.
    What are you afraid of, Brendan?  I -- I think I
    remember those words, specifically.

Q   All right.  Well --

A   I think --

Q   Maybe we'll find that in a second.  I don't want
    to get off 36, though, but let's go back to this
    issue of promises.  At the second to the last
    entry on that page, Detective, right after

167

getting past being scared, um, what does -- you told him, in fact, um, get beyond the idea of getting in trouble and going to jail because that's not going to happen. That's what you told him; right?

A   Correct.

Q   Isn't that a promise? Aren't you promising him that he's not going to jail?

A   I told him he didn't have to talk to me and he was free to leave. There was no --

Q   Doesn't answer my question. Did you tell him he wasn't -- that -- quote, going to jail because that's not going to happen? Did you or did you not tell him that?

A   Yes.

Q   Do you construe that as a promise to him?

A   No.

Q   Is it fair to say that during the course of the interview, that you or the others suggest to him, uh, potential reasons why Teresa could be missing? For example, an accident?

A   Yes.

Q   Is it fair to say that during the course of the interviews, that you, Skorlinski, or Baldwin suggested to him alternatives, uh, such as

168

mistake?

A   Yes.

Q   Did you probe into Brendan when he indicated that sometimes he gets shy when he's talking to people he doesn't know?

A   At the end of the interview?  No.

Q   Would it be fair to -- to characterize that -- during the course of the interview, that the three of you, at various times, attempted to increase the emotional feeling of guilt in the mind of Brendan Dassey?

A   I apologize, but would you repeat that?

Q   Would you agree or disagree with me that during the course of the hour and twenty minutes that you, Baldwin, Skorlinski spent with Brendan Dassey, that there was a conscious effort to increase in his mind his belief and feeling of guilt?

A   No.

Q   Could you go to page 40?

A   Forty?

Q   Yes, please.  Fifth entry from the bottom?  You were there, and Baldwin said as follows:  You feel guilty right now that you didn't help that girl.  Correct?  You see where I'm talking about?

169

A    I see.

Q    I see the glasses you got during the break.

A    I see it.

Q    In fact, the very next statement made by an officer, and I'm just jumping down two lines there, again, as Baldwin, where he says, I can see in your eyes that you feel terrible about something.  Right?

A    Yes.

Q    Is that not a -- Did -- Did you and Skorlinski ever discuss, uh, how you might appeal to or cause Brendan to think that he was guilty of something in order to try to get some information?

A    No.

Q    Now, you indicated you made no notes at the time of the interview; correct?

A    Correct.

Q    You produced, uh, the supplement report that we talked about, uh, sometime after that; right?

A    Yes.

Q    So if it was dated 11/11, about five days later?

A    Yes.

Q    Okay.  And you didn't use your handy dandy little digital recorder that you had up on the visor to

170

Q make notes of this interaction with Brendan on the way back to either, uh, your home, or wherever you left when you did leave, uh, to help you prepare the report; right?

A No.

Q So you're having to rely entirely upon your memory when you described his demeanor; correct?

A Yes.

Q Okay. And that's about 16 months ago; right?

A Yes.

Q Okay. But you acknowledge there's nothing at all in your report about his demeanor?

A No.

Q Isn't it true that the first individual to state or suggest that Teresa Halbach went into the Steve Avery trailer was a police officer, as far as your interactions with Brendan on this date?

A Yes.

Q Okay. So it's not something that he came up with in response to a question, that, well, for example, I saw her when I got off the bus and I saw her go into the house?

A Correct.

Q Okay. That notion or that concept was promoted to him, uh, somewhat of a theme throughout this

171

Q interview, wasn't it?

A No.

Q You don't agree with that?

A No.

Q All right. But you acknowledge that it was a police officer who first brought that alleged fact up?

A Brought the question to him.

Q Okay. In fact, it happened more than once, didn't it? That very notion that she went into the trailer?

A I believe the question was brought through more than once. Yes.

Q Do you understand the difference between an open-ended question and a leading question, don't you?

A Yes.

Q Every time that that concept was brought up, i.e., she went into the trailer, it was done in a leading and suggestive fashion; agree or disagree?

ATTORNEY FALLON: I'm going to object to that question. It's, um, vague as asked. There's a specific legal definition for a leading question under the *Sarinske* case, and then

172

there's a whole psychological concept. So I -- I don't know what we're doing here, but I --

THE COURT: Well, you're objecting -- You -- You're objecting to the foundation, I -- I take it, and -- and --

ATTORNEY FALLON: Foundation and the manner --

ATTORNEY EDELSTEIN: I can --

ATTORNEY FALLON: -- in which the question is asked.

THE COURT: All right. Objection is sustained.

ATTORNEY EDELSTEIN: Just let me do it this way.

Q (By Attorney Edelstein) When you're conducting an interview, you oftentimes lead the interviewee; correct? Know what I'm saying, don't you?

A Well, I believe I do, except that, as Mr. Fallon suggested and brought forward, your definition and mine is different.

Q Pard me?

A Your -- your perception of leading question and what I may use as a question is different.

Q If a question suggests the answer, do you think

173

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 173 of 219    Document 19-18

Q it's leading?

A Yes.

Q During the course of the contact with Brendan, when he was questioned, if he's asked the question, and I make reference, for example, to page 31, about halfway down, Brendan, she went into that trailer, didn't she? Is that a leading question or is it not a leading question?

A Yes.

Q It is a leading question?

A Yes.

Q Correct?

A Um-hmm.

Q All right. That's all for now. Thank you.

THE COURT: Any redirect, Counsel?

ATTORNEY FALLON: Yes, a few questions. Thank you.

**REDIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q Counsel asked you about promises, inducements. For you, as a detective, did you make any promises or inducements to Mr. Dassey in order to get him to speak with you?

A Not at all.

Q All right. And, now, is that the concept of

174

promise that you had in your mind in response to Counsel's question on promises?

A   No, it is not.

Q   No, I mean the concept. When he asked you about promises, you said you made no promises. Is that what you meant when you said, no, we didn't make any promises?

ATTORNEY EDELSTEIN: Asked and answered and suggestive, Your Honor.

ATTORNEY FALLON: He's clarifying --
First of all, under 906.11 (c), a leading question in redirect examination to clarify a point -- clarify a point on cross-examination is permitted.

Number two, this witness clearly has just indicated he was uncertain as to the nature of my question, and I'm attempting to restructure and direct it.

THE COURT: That's fair. Uh, you may ask the question in that -- in that fashion.

Q   (By Attorney Fallon) Do you understand?

A   I'm trying to. I believe that, uh, got a little confused with what he was trying to explain before, my difference of it, and I'll try to get back on track as to what my reason was. Go ahead, sir.

175

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 175 of 219    Document 19-18

Q All right. When he was asking you what a promise is, what did you understand him to mean? Let's get at it that way.

A Uh, promises that I wouldn't do this in exchange for that.

Q All right. Now, you did make promises to him during the interview? For instance, you promised to take him home?

A Correct.

Q All right. And you said he could leave if he wanted to?

A Correct.

Q All right. Now, let's talk a little bit about, um, the statement, uh, the deceptive practice, regarding the need for medical attention. You indicated that that was a common practice in a missing persons case. Tell us about that?

A It's probative-type questions.

Q What do you hope to gain? I mean, what's the idea behind suggesting that somebody may have a medical need when you're trying to locate -- Why do you ask that?

A Being probative. If his answers would have been something to the effect, well, I think I could help her, or, I really want to see her get medication, or,

176

I don't think she needs it now. It give us an idea. You know, trying to determine as to whether or not, is she alive? Is she injured? Is she not?

Q All right. Would it be fair to say you were appealing to a sense of emotion on the part of a person?

A Probing into that venue, yes.

Q Um, Counsel also asked, um, about you -- your efforts, and Detective Baldwin's efforts, to suggest that, perhaps, Teresa was, uh, in Steven Avery's trailer. Do you recall that?

A Yes.

Q All right. And I believe you indicated that that, um, tact was taken on more than one occasion in the interview?

A Yes.

Q All right. At any point did Mr. Dassey adopt that and say, yeah, that happened?

A No.

Q So he resisted that suggestion?

A Very firmly.

Q Um, you were asked about a picture. Do you know if you had a picture of the missing persons, um, report, a poster, or a card?

A I'm trying to recall, but I think -- We had a missing

person case a month before. Wisconsin has a website. I think we might have yanked a picture or a poster off of it.

Q All right. So you can't recall, particularly, this case versus the last case, the missing person you worked on, as to which picture you may have had?

A No, I can't. But I think Detective Baldwin could clear this -- that up.

Q All right. Um, I'm going to have another photograph marked and, uh, shown to you.

(Exhibit 204 marked for identification.)

Q (By Attorney Fallon) Do you recognize the people which are depicted in that photograph?

A Uh, yes, I do.

Q And who -- who is depicted in that photograph?

A Steven Avery, Brendan Dassey, I think it's Al Avery, and Al's wife, Mrs. Avery, I think Carol? Barb? That's her.

Q All right. And, um, are those the individuals that you spoke with on Saturday and Sunday, November 5 and November 6?

A Yes.

Q All right. And, now, Counsel asked you questions about, um, uh, leaving the property so early. In

178

other words, sunset on Saturday evening.  What caused you to leave Saturday evening?

A   Mr. Avery, Al Avery, was, uh, intoxicated, and riding around in a golf cart, and told us to get off his property or he'd shoot us.

Q   All right.  So you left?

A   We left the Avery property and just maintained on the road.

Q   All right.  And, thus, you resumed your investigation the next day?

A   Correct.

Q   All right.  And the next day was Mr. Avery more receptive?

A   Yes.

Q   All right.  And cooperative?

A   Yes.

Q   All right.  And, thus, you were able to continue with the, um, investigation on Sunday?

A   With the interview of Steven Avery, initially, yes.

Q   All right.  Um, particularly with respect to the picture of Brendan Dassey in, I think, Exhibit 204 it is?

A   Yes.

Q   All right.  Um, is that a -- a fair depiction of his, um, physical appearance and attributes at or

179

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 179 of 219    Document 19-18

around the time of this, um, interview on November 6?

A Yes.

Q Uh, in other words, he appears to be a little heavier in that photograph than he does --

ATTORNEY EDELSTEIN: Your Honor --

Q (By Attorney Fallon) -- today?

ATTORNEY EDELSTEIN: -- object to the leading nature.

THE COURT: Uh, overruled.

A Yes.

Q (By Attorney Fallon) All right. Do you recognize the location of that picture?

A I believe so.

Q And what is it?

A It's the Avery cabin located in the town of Stephenson, I believe. I was in there once, and, uh, the table and the, uh, furnishings look familiar.

Q All right. Um, one last question. Uh, Counsel asked you, uh, in response to my questions about assessing Mr. Dassey's demeanor, does the playing of the audiotape assist in recollecting his demeanor during the course of the interview?

A Uh, definitely.

ATTORNEY FALLON: No further questions.

180

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 180 of 219    Document 19-18

Would offer the exhibit.

THE COURT: Any objection to the exhibit?

ATTORNEY EDELSTEIN: No, that's fine, Your Honor.

THE COURT: All right. The exhibit is received. I think that's, uh, two thou -- 204?

THE CLERK: Yep.

ATTORNEY FALLON: May we publish the exhibit, then, on the ELMO?

THE COURT: Sure.

ATTORNEY FALLON: Thank you.

THE COURT: Any recross?

ATTORNEY EDELSTEIN: Just very briefly.

## RECROSS-EXAMINATION

BY ATTORNEY EDELSTEIN:

Q  Uh, Detective, um, while they get that up on the screen so the jury can see that picture, um, where did that picture come from? Do you know?

A  No, I do not.

Q  Pard me?

A  No, I do not.

Q  All right. Um, Mr. Fallon asked you if that fairly depicted the condition, demeanor of the defendant, but he's sitting at the kitchen -- I'm sorry. The -- the physical attributes. Um, when

181

you talked to him, um, you didn't get any information from him about height, weight, anything like that, did you?

A   No.

Q   Okay.  Um, other than that hour and twenty-minute contact, that was really -- that's -- that's really the extent of your total contact with him throughout your participation in this investigation; right?

A   Yes.

Q   Okay.  That's all.

ATTORNEY EDELSTEIN:  Your Honor, we would move, uh, 202 and 203.

THE COURT:  Any objection to receiving the Exhibit Nos. 202 and 203?

ATTORNEY FALLON:  We would move for their admission.

THE COURT:  Well, it's -- it's already been offered by the defense.

ATTORNEY FALLON:  Oh.

THE COURT:  I'm asking if you have any objection.

ATTORNEY FALLON:  I'm sorry.  I thought --

THE COURT:  All right.

182

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 182 of 219    Document 19-18

ATTORNEY FALLON: Obviously, we don't.

THE COURT: All right. They're received. You may step down.

THE WITNESS: Thank you, Your Honor.

ATTORNEY FALLON: It's, um -- I think it's too late to start our next witness. He'll be a lengthy witness.

THE COURT: Can't we start it and at least get some testimony now?

ATTORNEY FALLON: We -- We can, if you wish.

THE COURT: Let's do it.

ATTORNEY FALLON: State would call, uh, Investigator Wiegert.

THE COURT: I think, before he testifies and is sworn in, there's a -- another trial stipulation that is to be, uh, published; is that correct?

ATTORNEY KRATZ: Yes.

ATTORNEY FALLON: I believe that's -- that's true.

THE COURT: All right. Ladies and gentlemen, I reminded you before that trial stipulations were evidence and should be treated as such. This trial stipulation reads as

183

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 183 of 219    Document 19-18

follows:

Number one. On October 31, 2005, Angela Schuster was the manager for *AutoTrader Magazine* with headquarters in Milwaukee, Wisconsin.

On the same date, Dawn Pliszka performed duties as receptionist for *AutoTrader*.

Number two. That if called to testify, Angela Schuster would testify that Teresa Halbach was hired as a photographer for *AutoTrader* in October, 2004, and continued in that employment through October 31, 2005.

Schuster would further state that Teresa Halbach had performed photo shoots at the Avery salvage business on five occasions prior to October 31 in 2005, including June 20, October 22, October -- or, excuse me. Let me start again. June 20, August 22, August 29, September 19 and October 10.

Number three. That if called to testify, Dawn Pliszka would testify that on October 31, 2005 she received a phone call from Steven Avery at approximately 8:12 a.m., at which time Avery requested that, quote, the same girl that had been out here before, end quote, come to his property to take photos of a van he had for

184

sale.

Pliszka would further state that Avery made the appointment under the name, quote, B. Janda, end quote, and that Pliszka left a voicemail for Teresa Halbach at 9:46 a.m. asking if she could make the appointment.

Number four. That if called to testify, Dawn Pliszka would further testify that at 2:27 p.m. she did speak with Teresa Halbach on Teresa's cell phone at which time Ms. Halbach indicated that she was, quote, on her way, end quote, to the Avery property from her previous appointment.

That is the entirety of that stipulation. It will be marked as Exhibit 205?

THE CLERK: Yes.

(Exhibit 205 marked for identification.)

THE COURT: Uh, first to the State, is this your stipulation?

ATTORNEY FALLON: It is.

THE COURT: To the defense, is this your stipulation?

ATTORNEY FREMGEN: That's correct.

THE COURT: All right. It's received. All right.

185

ATTORNEY FALLON: State will continue, uh, with Investigator Mark Wiegert.

**MARK WIEGERT,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name explain for the record.

THE WITNESS: Mark Wiegert, W-i-e-g-e-r-t.

**DIRECT EXAMINATION**

BY ATTORNEY FALLON:

Q    How are you employed?

A    I'm an investigator with the Calumet County Sheriff's Department.

Q    How long have you been employed by the Calumet County Sheriff's Department?

A    Approximately 14 years.

Q    How long have you held the rank of investigator?

A    It will be about five years.

Q    And what are, generally, the types of cases that you've been asked to investigate in your capacity at the Sheriff's Department?

A    In our Department, we do a wide variety of complaints. Anything from thefts, to burglaries, to,

186

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 186 of 219    Document 19-18

um, missing persons complaints, um, death investigations, up to homicide investigations.

Q All right. And, um, in this particular case, how is it that you are involved in this case?

A Um, I happened to be working on, um -- in November. I believe it was November 3, to be exact. Um, one of our patrol deputies had taking a phone call -- or, actually, a complaint, um, about a missing person complaint. Um, it was actually, uh, Karen Halbach had called our Department to report that her daughter, uh, was missing and they haven't heard from her in several days.

After, um, patrol deputy had taken the initial information, excuse me, she had contacted me and requested my assistance, um, in attempting to locate Teresa.

Q All right. And, um, from that point on have you been involved in the case?

A I have. Yes.

Q Now, there's been some, uh, discussion, uh, both by, um, Special Agent Fassbender and others, about your role as one of the lead investigators in this case. Tell us when that occurred?

A Sure. Um, on November 5, when the vehicle was discovered, um, on the Avery Salvage Yard property

187

uh, we were requested by Manitowoc County to lead the investigation.

At that point when we realized how big and how massive the salvage yard was, not only the salvage yard but all the residences, uh, the outbuildings, all the property that surrounded it, um, we realized that it was a little more than our Department could handle on its own. Um, at that point we contacted the, uh, Wisconsin Department of Justice and requested their assistance.

Q   And who responded on behalf of the Department of Justice?

A   Uh, at that time, uh, Agent Tom Fassbender, who you, um, heard earlier in the week testify, um, did respond, um, as well as several other agents from the Department. Um, at that point our Department was handed the investigation, and myself and Agent Fassbender were named the lead investigators of the com -- of the, uh -- of this case.

Q   All right. And, um, let's set that aside for a moment. And in the time we have, um, this afternoon, I'd like to focus your attention on a particular part of your investigation in this case, all right? Specifically, that is with

188

respect to, uh, your interview, uh, in context with a young woman by the name of Kayla Avery. All right.

Specifically, um, directing your attention to February 20, 2006, on that particular day, did you have, uh, an opportunity to interview Kayla Avery?

A    I did.  Um, myself, along with a female detective at our Department by the name of, uh, Wendy Baldwin, had went to, um, the Avery property, which would be the Earl and Candy Avery property, um, to interview Kayla.

Our purpose for going there was because we had some information from another person, which we had interviewed, that Kayla had information about Steve Avery.  Our purpose for going there was to interview Kayla in reference to Steve Avery.

Q    All right.  And at some point during that interview did the discussion change focus from Steve Avery to Brendan Dassey?

A    Yes.  Um, the interview started out about Steve Avery, and Kayla was talking about her relationship with Steve Avery.  And just about at the end of that interview, Kayla, uh, out of the blue, basically,

189

came out and told us that, uh, she had a cousin by the name of Brendan, and that Brendan was, quote, acting up lately.

So we asked Kayla what she meant by Brendan acting up lately. At that point Kayla told us that Brendan would just stare into space and start crying, basically, uncontrollably. She also told us that Brendan had -- had lost approximately, what she estimated to be, about 40 pounds.

Q Now, based on this information, what did you decide to do?

A Well, after looking at that information, um, and reviewing other interviews that were done, we decided that, um, we needed to talk to Brendan again.

Q And did you talk to him?

A We did. Yes.

Q And when did you talk to Brendan again?

A Um, myself and Agent Fassbender interviewed Brendan on February 27 of 2006.

Q All right. Now, before we get into the details of that, I have a few more questions relative to Kayla Avery. On this December 20, 2006 interview of Kayla, who was present?

A It had actually been February.

190

Q   Excuse me. I'm sorry. February 20?

A   Um, Kayla's -- Kayla was present. There was -- there was two of us investigators, myself and Wendy Baldwin, Kayla, her mother, Candy, and her father, Earl.

Q   All right. And, um, did there come a time where you reinterviewed Kayla Avery?

A   We did. Um, shortly after Brendan was arrested, actually, we interviewed Kayla again, and that would have been on March -- I believe it was March 7 of 2006.

Q   All right. And what was the reason for, um, revisiting or reinterviewing Kayla Avery?

A   Well, I take you back a little bit, uh, shortly after, uh, Brendan was arrested, and I believe would have been on, like, February 28, we had received a call from the Mishicot School District.

Um, two of the counselors at the Mishicot School District, after hearing that Brendan had been arrested, had called and reported that they may have some information in reference to the Teresa Hal -- Teresa Halbach, uh, homicide.

Q   All right. And, as such, did you then respond to the school to interview the counselors?

191

A    We did.  Um, again, myself and Agent Fassbender went to the school the following day, right away in the morning, uh, where we met with, uh, two counselors, uh, Mrs. Brandt, and I believe it was a Mrs. Baumgartner.

Q    All right.  And you interviewed them?

A    We did.  Yes.

Q    After interviewing them, where did you go next?

A    Well, after getting the information, um, we thought we needed to go back and talk to Brendan ag -- excuse me -- Kayla again.

Q    All right.  Did you, in fact, go back and reinterview Kayla Avery?

A    We did.  We -- Actually, after interviewing the two counselors, we made phone contact with, um, Kayla's mother and informed her that, um, we had been at the school and that we needed to talk with Kayla again. And we actually set up an appointment with Kayla's mother, and Kayla's mother, Candy, invited us, um, to her residence.  Um, so waited for Kayla to come home from school, and then we went over to the Avery residence, and, uh, again, interviewed Kayla in the presence of her mother, again, and her father.

Q    All right.  Uh, was her mother present for the entire conversation?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 192 of 219    Document 19-18

A Her mother was. Uh, Candy Avery was present for the entire conversation with Kayla. Um, her father, Earl, was in and out.

Q All right. And during that interview with Kayla Avery, did you discuss with her, um, the report that Brendan Dassey told her he had seen body parts in a fire behind Steven's garage?

A We did. Yes.

Q And what did she say about that?

A Well, Kayla came out and told us quite a few things at that point. Um, basically, she first broke down crying, and indicated to us, that, um, she had learned from her cousin, Brendan, that, um -- she stated that she had learned this in about December around the time there was a birthday party that they were both at at Kayla's house, and that Kayla -- correction -- Brendan had told Kayla that he had went and got the mail, and went over to Steven Avery's residence, and went into the residence, and observed Teresa Halbach pinned up in Steve Avery's bedroom.

She went on to tell us a couple other things. Um, she told us that Brendan had told her that after he had saw Teresa Halbach pinned up in the bedroom, that he exited the residence, and while leaving Steve Avery's residence, he

193

heard screaming coming from Steve Avery's residence.

Kayla went on to tell us how, um -- She had mentioned Brendan being out at the fire on Halloween night, and she also told us that her and her mother had seen the fire on Halloween night.

Kayla went on to tell us how Brendan described seeing body parts later that day, or that evening, in the fire behind Steve Avery's residence.

Q Now, during -- during the, um, questioning of Kayla Avery earlier this week, a statement, Exhibit No. 163, was shown to her. Are you familiar with that?

A I am. Yes.

Q All right. Was that statement generated by her?

A That's correct. Kayla wrote out that statement on her own.

Q All right. And is that -- was that statement written on this day, March 7, 2006?

A Yes.

Q During the, um, interview, uh, at Kayla's home, did she appear confused at all? Unsure of what she was telling you?

194

A    No, she did not.

Q    Was she upset?

A    Yes, she was upset.

Q    Did it appear to you that this was something easy for her to tell you about?

A    No.  Obviously, not.  I mean, like I explained before, she, um -- she had broke down crying, and was visibly upset when she was telling us about this information.

Q    All right.  Now, I want to back up a little bit here.  Returning, then, three weeks earlier -- two weeks earlier, excuse me, to that February 20 interview, your first encounter with Kayla Avery, at that particular point in the investigation what plans, if any, did you investigators have relative to speaking with other members of the Avery family?

A    Let me just back up a little bit.  We were constantly, as investigators, have meetings about this case and where we should go with it, what we should be doing.

     Um, because of the enormity of the case, we would get leads in all the time.  There would be people calling in, look at this, look at that.  Um, what we decided that we needed to do in order

195

to do a thorough investigation, we needed to go back and interview everybody who had access or who lived on that property.

Um, I felt, and I -- I think I can speak for Mr. Fassbender, that I don't believe we --

ATTORNEY FREMGEN: Objection. Speaking for another person, Judge. I think the witness can only speak for himself.

THE COURT: All right. Sustained. Speak for yourself.

THE WITNESS: Certainly. I felt that we needed to -- In order to do a thorough investigation, we needed to go back and talk to everybody who lived on that property.

Q (By Attorney Fallon) All right. And so around that time was that the plan?

A Yes. Absolutely was.

Q Based on the, um -- At that particular point in time could you say, from an investigative point of view, that Brendan Dassey was at all a suspect?

A No. Uh, we didn't consider him a suspect any more than we considered anybody else at that point as a suspect. No.

Q All right. Now, who was the first one of the

196

Q family members to be reinterviewed?

A I can't recall exactly which one, but I can say that -- And -- And if I can back up a little bit again?

Q Sure.

A Um, we not only felt the people on that -- that lived there, we thought the extended family, i.e., Kayla, and Earl, and Candy, and their children should be interviewed as well. So by my recollection, it was probably, um, Kayla, most likely.

Q All right. And, uh, during the course, did you, in fact, go back and reinterview a, um, um -- most, if not, all, of the immediate and extended family?

A I can tell you everybody that lived on that property, and the extended family, as far as we knew it, such as, Earl, Candy, and their children, were reinterviewed. Yes.

Q All right. In terms of the decision to reinterview Brendan Dassey on February 27, um, was there any particular reason that occurred at or around that time?

A Yes. Um, after receiving information from Kayla on the 20th of February, obviously, the loss of weight, the uncontrollable crying, are signs that we look

197

for. I mean, it's a change in behavior. It's -- it's not normal for a 16-year-old boy to be just crying uncontrollably and just lose that type of weight. So, obviously, that's something we look for.

And, for lack of a better word, it kind of moved into the front of the line, and we needed to -- we needed to interview him and talk to him.

Q Now, and at that particular point did you have some suspicion as to what may be causing the weight loss and change in behavior? I mean, practically speaking?

A Well, absolutely. I mean, at that point, um, we felt he knew more than he was telling us. And -- and we -- we do a lot of other things before we go interview people. We review prior interviews, such as the gentleman's interview that was sitting here prior to me. Marinette County's interview. I mean, review that. And we take a look at what he told them. There are things in there that didn't quite fit either.

So you take some of the things that he told the Marinette officers that just didn't seem to fit. And then his, uh, the losing weight, and the uncontrollable crying. Obviously, that, uh,

198

points you in a direction you want to go. He's somebody you need to talk to.

Q  All right.

ATTORNEY FALLON:  Your Honor, at this particular point I think it's time to take that break.

THE COURT:  I think -- Yeah. This would appear to be a good break point time. We'll adjourn for the day. Uh, ladies and gentlemen, I'll remind you, don't talk about this among yourselves or with anyone else. We'll convene tomorrow at 8:30.

(Court stands adjourned at 4:26 p.m.)

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 199 of 219    Document 19-18

STATE OF WISCONSIN )
                   )SS.
COUNTY OF MANITOWOC )

I, Jennifer K. Hau, Official Court Reporter for Circuit Court Branch 3 and the State of Wisconsin, do hereby certify that I reported the foregoing matter and that the foregoing transcript has been carefully prepared by me with my computerized stenographic notes as taken by me in machine shorthand, and by computer-assisted transcription thereafter transcribed, and that it is a true and correct transcript of the proceedings had in said matter to the best of my knowledge and ability.

Dated this 11th day of December, 2007.

_____
Jennifer K. Hau, RPR
Official Court Reporter

200

'til [1] 22/12

## 0

0-5-4-1-2-0 [1] 147/18
06 [2] 1/5 5/3

## 1

10 [3] 4/6 60/4 184/18
100 [1] 4/9
100-126 [1] 3/15
10:00 at [1] 22/13
10:31 [1] 85/17
10:50 a.m [1] 85/18
10th [3] 18/17 40/14 41/4
11 [4] 3/3 4/7 53/12 170/22
11-38 [1] 3/6
11/11 [1] 170/22
11:50 [1] 137/8
11:55 [1] 137/12
11:59 [1] 113/16
12 [2] 133/2 133/5
12-inch [1] 33/7
125 [1] 4/10
126 [2] 3/15 4/10
126-174 [1] 3/16
12:00 [1] 110/11
138 [3] 86/11 86/13 86/15
139 [1] 87/23
14 [1] 186/18
15 [2] 29/9 85/13
15-inches [1] 24/7
15-minute [1] 85/16
150 [2] 92/19 92/22
16 [1] 171/9
16-year-old [1] 198/2
163 [1] 194/14
169 [5] 24/14 26/1 26/5 37/21 39/22
17 [4] 86/17 88/14 151/11 152/25
170 [3] 36/5 36/7 36/13
171 [1] 37/6
174 [5] 3/16 26/3 26/6 37/24 37/25
174-180 [1] 3/17
178 [1] 4/12
18 [2] 101/7 156/5
180 [1] 3/17
181 [2] 4/12 4/12
181-182 [1] 3/18
182 [2] 3/18 4/11
183 [4] 4/11 57/9 57/14 95/5
183-185 [1] 3/19
183-195 [1] 4/4
184 [2] 59/13 59/15
185 [4] 3/19 4/13 59/22 59/25
186 [2] 66/22 69/9
186-198 [1] 3/22
187 [2] 68/22 69/9
188 [2] 70/17 70/19
189 [1] 71/14
19 [2] 1/10 184/18
190 [2] 78/12 78/14
191 [2] 80/22 80/25
192 [3] 83/9 83/11 83/17
193 [1] 84/18
194 [2] 85/24 86/2
195 [4] 4/4 89/2 90/14 95/6
196 [2] 4/5 8/10
197 [2] 4/6 10/2
198 [3] 3/22 4/7 11/3
1986 [1] 52/15
199 [3] 4/8 55/17 95/6
1993 [1] 52/16

1995 [1] 52/23
1996 [1] 61/15
1997 [1] 54/8
1998 [1] 101/11
1999 [2] 53/5 54/21
1:10 [1] 113/17
1:15 [2] 113/12 113/15
1:19 [1] 119/8
1:30 p.m [1] 6/22

## 2

20 [6] 184/15 184/17 189/5 190/23 191/1 195/12
200 [3] 4/9 100/5 100/7
2004 [1] 184/10
2005 [21] 6/17 7/7 8/16 8/23 10/6 10/13 50/24 53/20 54/21 56/10 60/2 60/4 86/17 88/14 102/6 114/1 127/8 184/2 184/11 184/15 184/21
2006 [5] 189/5 190/20 190/23 191/11 194/21
2007 [2] 1/10 200/15
201 [5] 4/10 112/24 125/23 126/1 126/5
202 [4] 4/11 148/11 182/13 182/15
203 [4] 4/11 158/8 182/13 182/15
204 [4] 4/12 178/12 179/22 181/6
205 [3] 4/13 185/15 185/17
208-A [1] 126/4
20th [1] 197/24
22 [2] 184/16 184/17
27 [3] 12/5 190/20 197/20
28 [1] 191/16
29 [1] 184/17
2:27 p.m [1] 185/9
2:30 and [1] 8/22
2:30 p.m [1] 7/12
2:45 p.m [1] 8/23

## 3

30 [10] 41/12 64/21 64/24 65/5 65/17 66/7 66/10 93/21 94/1 161/17
30 miles [1] 6/12
31 [11] 6/17 7/7 8/16 8/23 10/6 10/13 174/6 184/2 184/11 184/15 184/21
31st [3] 133/18 165/2 165/5
33 [1] 159/3
35 [7] 64/21 64/25 65/5 65/17 66/7 94/1 162/13
36 [2] 166/6 167/23
38 [1] 3/6
38-49 [1] 3/7
3:00 [1] 157/10
3:00 p.m [1] 9/10
3:03 [1] 157/16
3:20 [1] 157/15
3:27 [1] 157/17
3:45 on [1] 133/17

## 4

40 [4] 41/12 162/13 169/20 190/9
49 [1] 3/7
49-95 [1] 3/10
4:26 [1] 199/13

## 5

50 [3] 77/13 77/18 95/22
58 [2] 63/4 63/9
5:00 p.m [1] 9/16

## 6

6-11 [1] 3/3
6th [1] 126/22

## 7

75 [1] 51/17
7:30 and [1] 10/12
7:45 p.m [1] 10/13

## 8

8,000 [1] 15/8
831 [1] 71/7
8318 [3] 71/3 71/8 95/24
88 [2] 1/5 5/3
8:12 a.m [1] 184/22
8:30 [1] 199/12
8:38 [1] 5/1

## 9

906.11 [1] 175/11
95 [5] 3/10 4/4 4/4 4/8 4/8
95-98 [1] 3/11
98 [1] 3/11
98-99 [1] 3/12
99 [1] 3/12
9:46 a.m [1] 185/5
9th [3] 17/8 17/19 17/21

## A

a.m [7] 5/1 85/17 85/18 113/16 137/12 184/22 185/5
above [8] 54/3 68/8 68/19 70/3 72/4 72/5 72/19 83/20
academic [1] 55/21
Academy [2] 14/16 15/22
accelerant [1] 29/6
accelerants [1] 45/16
accelerate [1] 28/25
accelerating [1] 28/25
access [1] 196/2
accident [1] 168/21
accidental [4] 12/16 74/20 75/2 78/4
accidentally [1] 75/4
accompanies [1] 38/2
accompanying [2] 126/3 139/21
accomplishments [1] 55/22
accreditation [1] 16/14
accurately [1] 115/9
accused [1] 105/13
acknowledge [5] 160/22 160/25 163/8 171/11 172/5
acronym [1] 53/1
across [1] 74/15
acted [3] 141/3 141/6 141/9
acting [2] 190/3 190/5
actions [2] 17/21 145/20
actively [2] 35/13 123/22
activities [1] 136/11
activity [4] 12/20 59/8 77/2 135/23
added [1] 119/14
adding [2] 35/12 35/20
additional [7] 11/6 14/15 21/23 42/20 59/17 98/24 100/8
additionally [2] 81/23 82/6
adjacent [2] 86/24 88/7
adjourn [1] 199/9
adjourned [1] 199/13
adjunct [1] 15/22
admission [1] 182/17
ADMITTED [1] 4/3
adopt [1] 177/17
adult [3] 91/12 91/18 93/20
advancement [1] 120/10
advised [1] 87/10
aerial [1] 79/9
affected [1] 145/22

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 201 of 219    Document 19-18

## A

affiliation [1] 73/9
affirm [3] 8/2 150/23 154/13
affirmation [3] 152/17 152/20 153/6
affirmative [1] 109/15
affirmed [1] 154/24
affixed [1] 82/10
afraid [3] 156/19 166/4 167/18
afternoon [5] 17/8 17/25 52/6 119/10 188/23
ag [1] 192/10
age [15] 51/3 58/19 63/22 63/24 64/3 64/17 64/22 65/4 65/5 65/16 66/10 72/24 91/14 93/21 94/1
agencies [1] 14/16
agency [2] 12/5 13/5
agent [20] 11/24 12/23 13/3 17/14 19/10 20/24 21/25 21/25 24/18 104/13 107/5 125/1 133/21 137/22 138/18 187/21 188/14 188/18 190/19 192/1
agents [5] 21/23 22/1 120/7 130/10 188/16
agree [14] 43/4 97/14 114/10 117/17 140/23 144/17 146/16 151/19 152/13 157/22 159/19 169/13 172/3 172/20
agreement [1] 117/3
agreements [1] 6/7
Ah [2] 25/24 67/9
ahead [5] 133/11 145/15 147/6 149/11 175/25
al [3] 105/19 178/17 179/3
Al's [1] 178/18
Alcohol [1] 14/17
alive [3] 97/16 98/3 177/3
all-day [1] 52/4
alleged [1] 172/6
allow [3] 73/3 91/13 149/10
allowable [2] 160/9 160/10
allowed [3] 65/16 67/3 91/16
allows [1] 79/15
almost [6] 23/2 61/5 66/2 80/3 103/6 123/15
along [13] 44/4 57/15 78/20 78/22 79/11 96/11 111/13 111/13 114/13 121/15 130/25 158/5 189/8
alternatives [1] 168/25
America [3] 15/6 15/8 15/15
American [2] 51/23 54/22
among [2] 113/14 199/10
amount [12] 25/1 29/11 29/15 35/17 38/11 42/17 43/25 45/14 46/23 120/1 124/13 157/11
Amtrak [1] 53/6
analysis [7] 52/7 66/18 82/14 93/4 93/6 93/8 93/16
anatomy [1] 50/16
ancestry [3] 58/22 72/25 73/8
and/or [2] 91/14 107/13
Angela [2] 184/2 184/8
animal [1] 52/20
antemortem [2] 59/3 77/22
anterior [1] 88/22
ANTHONY [4] 3/14 100/13 100/17 100/22
anthropologist [17] 50/9 50/10 50/11 51/17 51/21 58/2 58/5 58/14 61/9 61/16 69/13 69/13 73/11 76/5 76/9 87/13 99/13
anthropologists [8] 61/12 62/9 64/3 65/10 69/18 72/11 73/25 76/14
anthropology [17] 50/12 50/13 51/14 51/15 51/16 51/24 52/12 54/6 54/16

54/22 55/3 55/9 55/13 56/2 65/1 74/4 74/8
anticipating [1] 103/13
anticipation [2] 104/1 104/19
anybody [3] 128/7 150/10 196/23
anyone [8] 21/12 82/21 102/24 106/24 113/14 127/11 150/8.199/11
anytime [3] 33/4 78/2 106/6
anyways [1] 155/22
anywhere [1] 30/22
apart [2] 25/21 28/10
apologize [1] 169/12
apparently [2] 118/13 164/17
appeal [1] 170/11
appealing [1] 177/5
appear [5] 39/21 55/7 194/24 195/4 199/8
appearance [3] 5/7 84/5 179/25
APPEARANCES [2] 1/12 5/4
appeared [3] 1/24 20/17 26/19
appears [3] 5/10 115/13 180/4
application [1] 135/4
applied [1] 76/19
applies [1] 50/17
appointment [6] 54/24 82/18 185/3 185/6 185/13 192/18
appointments [3] 54/10 54/11 54/17
appreciate [2] 72/6 72/18
approach [6] 31/1 45/9 46/1 46/6 113/3 147/4
approached [1] 105/18
appropriate [1] 85/10
approximate [4] 64/17 85/5 86/8 115/15
approximately [22] 6/12 6/22 6/23 7/11 7/12 9/10 9/15 13/9 13/22 15/10 17/8 20/23 22/5 42/15 62/25 63/4 101/7 101/21 107/11 184/22 186/18 190/9
approximation [3] 18/13 28/4 42/16
APRIL [1] 1/10
archaeological [1] 52/22
archaeology [1] 55/13
architecture [1] 70/2
archived [1] 108/17
Aren't [1] 168/7
Argumentative [1] 165/11
arm [1] 92/16
arrest [1] 106/6
arrested [3] 191/8 191/15 191/20
arrival [1] 17/9
arrive [1] 17/7
arrived [4] 39/4 39/20 103/10 141/25
arrow [3] 81/10 82/7 85/3
arrows [1] 70/22
Arson [11] 12/1 12/6 12/11 13/3 13/11 14/12 14/19 14/25 15/1 16/9 22/1
arthritis [2] 65/11 65/16
ash [17] 22/18 22/20 22/21 22/22 22/25 25/7 32/9 40/5 40/6 40/16 40/18 40/20 40/21 40/22 40/24 42/3 43/2
Asia [1] 15/6
aside [1] 188/21
assault [1] 121/19
asserting [1] 154/14
assertion [2] 158/17 166/15
assess [2] 17/22 39/8
assessing [1] 180/21
assessments [1] 39/12
assifted [1] 19/8
assignment [1] 17/2
assist [11] 17/4 52/12 54/18 66/25 70/12 102/7 102/16 104/10 117/22 118/7 180/22
assistance [5] 50/20 50/22 120/15

187/15 188/11
assisted [3] 19/9 21/12 200/10
assisting [2] 102/25 123/2
assists [1] 69/10
associated [3] 13/18 16/5 83/3
association [8] 14/11 14/19 14/25 15/1 15/4 15/5 15/9 16/9
assume [1] 143/16
assuming [1] 49/1
attack [3] 74/18 74/20 74/25
attacks [1] 53/11
attempt [1] 61/10
attempted [3] 78/6 93/8 169/9
attempting [2] 175/17 187/15
attention [19] 16/23 17/16 24/5 37/21 39/16 56/6 70/15 80/3 81/5 87/22 87/25 92/19 102/5 118/6 151/11 166/6 176/15 188/23 189/5
attorney [172] 1/20 1/22 3/6 3/7 3/10 3/11 3/15 3/16 3/17 3/18 3/22 5/5 5/9 5/9 5/10 5/25 6/1 7/24 8/4 8/6 8/12 9/22 9/25 10/23 11/1 11/8 11/10 11/22 38/24 39/3 43/19 45/13 49/10 49/12 49/17 50/3 85/12 85/20 95/3 95/8 95/9 95/14 98/17 98/21 99/25 100/2 100/9 100/12 100/25 105/12 105/15 106/7 106/10 106/13 106/16 108/19 110/8 110/16 110/19 110/22 110/25 111/4 111/6 111/8 111/11 111/17 111/18 112/3 112/14 112/18 112/20 112/22 113/3 113/8 113/22 115/8 115/19 117/10 117/14 117/18 118/19 119/6 119/20 122/1 125/19 125/23 125/25 126/9 126/15 126/19 135/16 135/19 137/6 138/6 138/9 144/3 145/6 145/13 145/16 146/1 146/13 146/15 147/4 147/7 147/23 147/25 150/3 152/24 153/1 153/4 154/5 154/11 154/12 155/18 155/20 155/21 155/23 156/4 156/6 157/6 157/9 157/19 157/20 160/16 161/15 161/17 163/22 163/23 163/24 164/1 164/4 165/10 165/13 172/22 173/6 173/8 173/9 173/13 173/15 174/16 174/19 175/8 175/10 175/21 178/13 180/6 180/7 180/8 180/12 180/25 181/3 181/8 181/11 181/13 181/15 182/12 182/16 182/20 182/23 183/1 183/5 183/10 183/13 183/19 183/20 185/20 185/23 186/1 186/12 196/6 196/15 199/4
attorneys [5] 117/3 127/14 127/25 128/4 128/9
attributed [2] 32/10 77/25
attributes [3] 58/13 179/25 181/25
audibly [1] 109/7
audio [28] 108/14 108/19 108/20 111/22 112/12 112/19 113/25 114/7 115/17 116/5 116/25 117/24 118/15 118/15 119/15 119/18 119/19 127/17 128/11 134/18 136/4 136/7 142/17 142/18 151/5 154/20 158/12 167/17
audios [1] 128/1
audiotape [2] 119/14 180/22
August [2] 184/17 184/17
August 22 [1] 184/17
August 29 [1] 184/17
Austin [2] 70/10 71/19
auth [1] 62/20
authored [1] 55/6
authoritative [2] 141/11 146/18
authors [1] 62/20
Auto [1] 104/5
automobile [3] 23/7 136/16 136/22

## A

autopsies [1] 76/21
autopsy [2] 64/6 73/24
AutoTrader [8] 6/19 7/3 7/9 7/17 164/22 184/3 184/6 184/9
AutoTrader-Magazine [1] 7/17
average [5] 29/17 29/24 30/8 30/23 140/8
Avery [74] 7/19 9/7 10/8 10/9 10/18 10/21 21/7 57/17 63/18 102/16 102/19 102/21 103/10 103/15 103/25 104/5 105/23 120/7 120/18 120/18 120/20 121/20 122/13 122/18 123/4 123/4 123/25 124/21 129/3 129/10 129/12 129/23 132/16 139/5 139/6 164/6 164/25 165/1 165/5 171/16 178/17 178/17 178/18 179/3 179/3 179/7 179/12 179/19 180/16 184/13 184/22 184/23 185/2 185/12 187/25 189/2 189/7 189/10 189/11 189/16 189/18 189/21 189/23 189/24 190/23 191/7 191/13 192/13 192/21 193/1 193/5 194/13 195/13 195/17
Avery's [10] 90/23 91/23 104/4 135/5 177/11 193/18 193/20 193/25 194/1 194/10
awaiting [1] 56/16
away [8] 7/4 7/18 27/9 46/6 48/15 92/1 137/10 192/2

## B

ba [1] 41/22
Bachelor's [2] 14/7 51/14
background [1] 51/9
backseat [4] 117/25 125/9 141/23 142/13
bad [3] 156/24 157/4 165/9
bag [1] 96/13
balance [1] 118/23
Baldwin [46] 103/2 107/1 107/13 109/2 112/7 120/3 121/5 126/25 128/16 128/17 128/20 131/1 137/12 137/22 138/13 143/7 143/11 150/9 150/12 150/16 151/12 151/15 151/18 152/5 152/7 152/10 155/6 155/10 157/24 158/17 159/1 159/5 160/19 161/1 161/5 161/19 162/16 165/23 167/12 168/24 169/15 169/23 170/6 178/8 189/9 191/4
Baldwin's [3] 142/14 153/2 177/9
ball [6] 20/10 20/11 24/6 24/17 41/22 65/21
ball-like [1] 65/21
Ballpark [1] 142/3
bang [3] 123/22 123/23 123/23
Barb [6] 8/17 8/19 9/2 10/7 10/15 178/18
barrel [3] 92/10 92/11 120/23
barrels [5] 27/17 92/4 98/6 98/8 98/13
Baumgartner [1] 192/5
beach [1] 36/18
bear [1] 165/14
beautiful [2] 150/14 150/20
bedroom [2] 193/20 193/24
beginnings [1] 65/15
behavior [2] 198/1 198/11
behind [7] 10/17 63/18 90/23 91/23 176/20 193/7 194/10
belabor [1] 48/12
believed [5] 19/18 80/4 144/22 144/24 157/24
believing [2] 161/2 161/25
belt [1] 31/18

belted [15] 24/11 24/25 25/2 27/25 31/17 31/24 32/5 32/5 32/11 36/25 41/23 42/18 42/21 42/24 42/25
belting [2] 25/9 32/13
belts [1] 31/22
bench [2] 114/2 115/10
benefit [4] 22/2 92/6 105/6 159/21
besides [2] 133/4 134/3
best [8] 18/8 22/23 60/9 116/4 138/9 154/9 158/14 200/13
beveled [2] 86/9 88/7
beveling [6] 80/9 80/18 94/3 94/10 94/16 97/1
big [1] 188/3
bill [2] 7/3 7/17
biological [2] 58/18 69/13
birthday [1] 193/15
bit [18] 12/24 14/4 18/11 20/4 22/16 31/16 51/9 57/22 60/6 72/4 92/7 103/17 107/15 176/13 191/14 195/10 195/18 197/3
black [1] 30/15
blackened [1] 20/14
blacktop [1] 23/3
blade [1] 92/12
bleed [1] 33/23
blood [4] 33/24 60/23 60/25 79/8
blows [1] 84/13
blue [4] 6/25 7/14 8/24 189/25
blunt [1] 69/23
board [14] 16/8 51/17 51/19 51/20 51/20 51/23 52/1 52/2 52/2 54/5 54/21 54/22 54/24 99/6
boards [1] 16/5
Bobby [6] 8/16 8/18 8/22 9/3 9/8 9/14
bodies [2] 33/16 65/8
body [33] 32/18 32/22 33/2 33/13 33/14 33/19 33/21 33/22 33/23 33/24 34/4 34/5 34/11 34/21 34/24 35/7 35/8 35/16 35/22 61/24 62/4 62/4 62/6 65/5 67/3 90/25 91/4 91/13 96/23 125/12 125/12 193/6 194/9
body's [1] 34/23
bond [1] 23/13
bonded [1] 23/4
bone [85] 19/19 20/3 20/17 25/19 26/15 41/2 41/18 52/8 52/20 52/21 52/22 58/7 58/8 58/9 58/11 59/19 60/16 60/18 60/20 60/21 61/2 61/3 61/3 61/3 61/4 61/4 61/22 67/24 68/1 68/18 69/4 69/23 70/1 70/5 72/20 73/5 77/15 77/16 79/16 79/18 79/19 79/20 79/22 80/11 80/13 80/13 81/17 82/4 83/4 83/21 83/25 84/2 84/3 84/3 84/8 84/12 84/21 85/4 86/5 86/6 86/7 87/8 87/17 88/5 88/11 88/18 89/14 90/5 90/6 90/25 91/9 91/13 92/4 92/8 92/11 92/13 92/23 92/25 93/11 94/3 94/11 94/17 94/18 95/18 99/15
bones [29] 60/8 63/17 65/24 66/1 66/4 68/4 68/6 68/11 69/7 70/2 70/4 70/24 72/2 73/4 78/18 78/19 78/20 79/18 81/2 83/14 86/18 91/5 92/15 92/16 92/16 93/13 95/25 96/5 96/11
bony [1] 84/1
bottom [10] 22/25 23/1 36/19 37/2 151/12 159/4 161/18 161/20 166/7 169/22
Bourbonnais [1] 53/6
box [16] 57/1 57/4 60/1 60/6 67/10 71/3 71/9 77/13 95/17 95/18 95/20 96/2 96/8 96/11 96/12 96/15
boy [1] 198/2
boyfriend [1] 10/7

boys [1] 131/3
BRANCH [2] 1/1 200/5
Brandt [1] 192/4
break [12] 78/21 85/10 85/14 85/16 110/14 113/11 118/23 157/13 157/14 170/2 199/6 199/8
breakdown [1] 38/16
BRENDAN [87] 1/6 1/23 5/3 5/10 8/18 8/20 10/8 10/20 104/25 105/1 106/23 106/25 107/3 107/8 107/14 107/23 109/5 121/9 122/6 122/12 125/1 126/21 129/9 130/6 130/8 130/17 130/23 132/16 133/6 133/7 133/14 133/22 134/3 138/14 139/2 145/5 147/2 148/8 148/20 149/14 149/23 150/8 155/10 155/11 155/24 157/24 158/18 158/24 159/5 160/21 161/17 162/17 163/3 163/6 165/24 167/18 169/3 169/11 169/15 170/12 171/1 171/17 174/3 174/6 178/17 179/21 189/21 190/2 190/2 190/5 190/6 190/8 190/15 190/18 190/19 191/8 191/15 191/20 192/10 193/6 193/13 193/17 193/22 194/4 194/8 196/20 197/20
bridge [3] 69/6 72/5 72/17
bright [5] 30/18 87/2 87/5 88/9 114/7
British [1] 29/14
broadcast [2] 114/6 116/1
broke [2] 193/11 195/7
broken [1] 25/7
brother [8] 8/17 105/17 123/6 124/24 138/17 161/12 161/19 161/22
brought [18] 22/11 152/2 152/8 152/10 152/11 153/10 153/14 155/4 158/1 158/2 158/6 158/7 166/4 172/6 172/8 172/12 172/18 173/20
Bryan [4] 104/24 107/3 107/5 123/7
BTU [3] 29/13 30/1 30/5
BTUs [3] 29/9 29/20 38/15
buildup [1] 72/20
bulk [1] 102/3
bullet [2] 94/4 94/12
bunch [1] 132/11
Bureau [8] 12/1 12/6 12/11 13/3 13/11 14/17 22/1 93/6
burglaries [1] 186/25
Burial [2] 50/7 52/18
burials [1] 54/2
burn [60] 10/17 17/17 18/2 18/4 18/12 18/21 21/8 21/16 21/18 22/21 23/2 23/11 23/15 24/10 24/24 27/1 27/17 28/21 29/2 29/6 32/23 33/5 33/11 35/5 35/16 35/19 36/17 37/1 38/22 39/8 39/16 39/17 39/18 39/20 40/5 42/2 42/3 42/6 42/18 45/9 47/2 47/16 47/24 48/1 48/7 48/17 48/19 59/9 78/5 90/23 91/23 92/1 92/4 92/10 92/10 98/6 98/6 98/8 98/13 120/23
burned [24] 19/24 25/3 26/20 26/24 27/9 28/6 28/16 43/5 44/1 45/25 45/25 58/7 58/8 58/11 60/17 62/14 66/18 77/24 78/2 83/13 91/17 92/11 92/23 92/24
burning [28] 23/7 28/20 30/10 30/16 30/25 31/9 31/10 38/13 45/6 45/7 45/8 45/20 46/5 53/17 61/22 62/8 64/8 73/3 77/1 78/3 78/7 89/24 90/5 93/13 94/18 96/23 97/9 97/11
burns [1] 29/10
bus [12] 133/16 134/6 134/20 134/20 134/24 150/6 150/14 150/19 151/1 153/19 165/4 171/21
business [2] 160/6 184/14

**B**

busy [1] 131/11

**C**

C-r-o-w [1] 61/18
cabin [5] 122/13 129/18 130/3 131/7 180/16
caddy [2] 108/23 142/21
cage [1] 141/20
calcined [4] 60/17 60/19 61/4 77/25
calling [2] 75/21 195/24
Calumet [10] 18/19 50/21 50/21 102/8 102/15 103/1 103/8 143/8 186/14 186/16
candle [1] 44/10
Candy [6] 189/11 191/4 192/19 193/1 197/8 197/17
cap [1] 65/16
capable [1] 16/17
capacity [4] 53/3 101/8 101/14 186/22
capillary [1] 38/21
capillary-type [1] 38/21
caption [3] 111/12 114/17 119/18
captioned [3] 117/1 119/13 119/16
captioning [2] 114/5 116/4
capturing [1] 109/25
car [21] 26/1 26/4 26/10 26/23 37/23 38/2 53/8 107/9 108/14 109/1 118/1 118/1 120/2 122/4 124/25 125/8 125/9 126/24 138/20 142/7 142/11
card [1] 177/24
cardboard [1] 57/1
care [1] 117/7
careful [1] 48/22
carefully [2] 51/22 200/8
Carol [1] 178/18
cart [1] 179/4
cartons [3] 48/1 48/3 48/4
case [42] 1/5 5/2 5/14 5/25 13/2 16/24 50/19 52/1 56/6 56/7 56/8 58/7 62/11 62/21 64/7 70/9 75/14 88/7 90/9 99/8 116/8 117/23 128/15 131/17 131/22 132/2 132/4 135/24 164/13 172/25 176/17 178/1 178/5 178/5 187/3 187/4 187/18 187/23 188/20 188/25 195/20 195/22
cases [9] 12/11 25/17 30/14 60/17 73/22 91/2 97/24 127/23 186/21
categories [2] 74/22 74/24
categorize [1] 61/13
category [3] 62/16 62/16 75/1
caught [1] 80/3
caused [4] 74/11 93/3 133/4 179/2
causing [2] 45/10 198/10
CD [7] 112/21 113/1 113/2 113/6 121/24 121/25 125/20
cell [2] 38/21 185/10
cemeteries [1] 54/2
center [2] 26/7 53/11
ceramic [1] 61/6
certification [4] 52/1 54/5 54/7 76/18
certified [11] 14/9 14/9 14/10 15/11 15/12 16/11 16/14 51/17 51/19 51/20 99/6
certify [1] 200/6
CF [2] 1/5 5/3
CFI [1] 16/14
chair [1] 16/11
chance [2] 134/15 151/5
channels [3] 79/13 79/14 79/14
characteristic [3] 94/4 94/12 97/25
characteristically [2] 69/15 69/17

characteristics [2] 22/23 64/9
characterization [3] 23/20 145/9 154/6
characterizations [1] 145/18
characterize [2] 161/10 169/7
Charles [2] 123/4 129/12
charred [9] 18/6 19/22 19/23 20/13 26/19 27/15 36/20 61/24 120/23
charring [1] 36/20
chase [1] 153/13
check [1] 111/17
checked [1] 164/9
checkpoint [1] 17/11
cheekbone [3] 68/13 68/18 68/19
chemical [1] 48/10
Chief [2] 52/15 99/5
child [2] 146/23 146/24
children [2] 197/8 197/17
Chilton [1] 18/19
choked [1] 125/3
chose [1] 124/5
circled [1] 88/2
CIRCUIT [3] 1/1 1/11 200/5
circumstances [1] 148/17
citizen [2] 6/10 6/14
clarification [1] 54/20
clarify [4] 54/13 121/7 175/12 175/13
clarifying [1] 175/10
clarity [1] 132/3
clavicle [1] 91/8
clear [5] 77/20 88/17 90/3 96/13 178/9
clearing [1] 17/12
clearly [2] 60/16 175/15
CLERK [2] 100/6 112/25
cli [1] 41/11
clock [1] 114/15
close [8] 9/1 21/2 22/12 31/4 31/12 45/10 85/9 162/13
closed [8] 96/2 111/12 114/4 114/17 117/1 119/13 119/16 119/18
closely [1] 26/4
closer [5] 12/24 19/22 25/18 92/2 103/18
closeup [1] 68/25
clothing [2] 48/16 48/17
co [1] 16/11
co-chair [1] 16/11
coast [1] 53/13
coatings [1] 27/8
cold [2] 34/19 34/19
collarbone [1] 91/8
colleague [1] 61/17
collected [5] 57/16 57/20 59/18 71/11 96/15
collecting [1] 53/25
color [8] 30/18 60/19 81/22 82/2 82/3 85/4 86/22 90/4
Colorado [1] 56/20
colored [3] 81/10 82/7 105/9
colorful [1] 147/8
columns [1] 44/13
com [2] 154/18 188/20
combustion [2] 45/23 47/8
comfortable [1] 42/23
comfortably [2] 28/8 28/9
coming [9] 31/2 43/11 44/13 44/22 72/12 90/23 102/22 127/10 194/1
comingled [1] 28/12
comma [1] 150/21
command [1] 17/12
comments [1] 153/2
Committee [1] 16/12
common [1] 176/16
commonly [3] 28/23 74/15 75/6

community [1] 6/11
compact [1] 80/11
compare [1] 154/19
compared [2] 34/16 158/12
competent [1] 146/9
complaint [3] 147/18 187/8 187/9
complaints [2] 186/25 187/1
complete [3] 68/10 68/11 68/12
completed [3] 103/11 104/1 122/12
completely [1] 112/2
completes [1] 9/17
complex [1] 41/11
composition [1] 48/10
compositions [1] 48/9
computer [6] 70/22 71/20 84/24 86/4 108/18 200/10
computer-assisted [1] 200/10
computer-generated [4] 70/22 71/20 84/24 86/4
computerized [1] 200/9
concealed [1] 164/17
concentric [2] 84/9 84/10
concept [5] 171/24 172/18 173/1 174/25 175/4
concepts [1] 73/12
concern [1] 115/20
concerned [2] 5/15 128/24
concerning [1] 160/13
conclude [6] 22/14 26/23 66/15 70/4 92/18 93/19
concluded [1] 67/1
conclusions [1] 63/16
concurrently [1] 119/16
condition [8] 20/6 26/22 36/10 60/7 61/13 62/11 64/11 181/23
conditions [2] 34/18 52/9
conducted [2] 46/14 75/14
conducting [2] 54/19 173/15
conference [4] 56/19 56/22 114/2 115/10
conferences [1] 14/20
conferred [1] 133/21
conferring [2] 120/4 120/6
confirm [1] 91/16
conflict [1] 124/9
confrontational [10] 147/2 147/3 148/5 148/23 149/2 149/7 149/12 149/15 149/16 149/23
confronted [6] 148/8 148/20 148/21 149/3 149/4 149/24
confused [3] 128/2 175/23 194/24
confusing [1] 121/15
conscious [1] 169/16
considerable [3] 53/17 60/24 72/20
consistency [1] 23/6
consists [1] 111/22
constantly [1] 195/19
construction [1] 32/12
construe [1] 168/16
consult [1] 75/25
consultant [2] 52/14 99/8
consultation [1] 99/12
consume [4] 32/18 33/18 33/19 34/11
consumed [3] 33/25 34/2 47/5
consumption [4] 32/8 34/5 35/10 35/21
contact [13] 34/24 82/15 126/22 130/10 130/13 132/5 132/6 140/1 157/2 174/3 182/6 182/7 192/15
contacted [3] 102/14 187/14 188/9
contain [3] 109/24 114/18 160/6
contained [2] 92/4 96/13
container [1] 56/16
containers [3] 77/13 77/19 95/22

## C

content [7] 47/18 47/20 60/21 60/22 60/22 61/2 89/14
contents [4] 56/12 59/25 60/7 60/8
context [7] 29/23 50/17 52/22 76/20 115/11 150/24 189/1
continue [6] 35/21 115/2 121/23 166/18 179/17 186/1
continued [2] 35/11 184/10
continues [5] 5/6 68/1 69/3 113/6 121/24
contrary [1] 124/4
contrast [1] 72/15
contributed [1] 98/2
contribution [1] 58/4
convene [1] 199/11
conversation [16] 107/19 107/22 114/25 116/9 116/15 123/15 140/13 140/16 140/18 141/12 142/5 149/23 151/21 157/3 192/25 193/2
converted [1] 23/15
conveyed [1] 160/7
cool [1] 162/10
cooperative [1] 179/15
coordinator [2] 50/6 52/17
copper [1] 82/7
copper-colored [1] 82/7
copy [10] 108/19 111/1 112/12 112/19 135/6 136/9 147/10 151/8 155/9 158/9
cording [1] 31/25
corner [1] 88/1
correction [1] 193/17
corrections [1] 126/12
corresponding [1] 79/21
cotton [1] 48/16
counsel [24] 5/12 7/23 9/19 9/23 49/11 49/16 85/8 95/7 98/16 111/5 112/8 112/17 116/21 116/22 118/13 126/2 126/7 156/4 157/18 174/15 174/20 177/8 178/24 180/19
Counsel's [2] 115/20 175/2
counselors [4] 191/18 191/25 192/3 192/15
country [3] 15/15 51/18 79/10
county [26] 1/1 6/15 7/21 12/10 18/19 50/21 50/21 76/6 99/5 101/4 101/6 101/18 102/8 102/15 102/18 102/22 103/1 103/8 127/21 131/21 143/8 147/12 186/14 186/17 188/1 200/2
County's [1] 198/18
couple [12] 21/14 21/15 24/4 36/1 45/18 48/14 119/23 130/15 142/4 150/25 157/12 193/21
course [39] 16/21 41/6 70/7 75/23 77/5 91/20 101/17 107/10 107/17 107/21 108/2 108/5 109/6 109/13 109/21 110/3 115/23 123/10 125/8 126/21 127/19 130/13 134/8 134/25 140/17 144/23 148/4 151/20 157/21 158/23 163/9 167/9 168/18 168/23 169/8 169/14 174/3 180/23 197/11
courtroom [3] 78/16 105/3 114/9
cousin [2] 190/1 193/13
covered [4] 18/6 18/8 39/23 167/17
covering [1] 38/4
cran [1] 90/21
cranial [4] 77/4 88/15 90/11 90/11
crash [1] 53/6
cratering [3] 80/18 84/14 86/24
crazy [1] 125/10
Crime [7] 82/11 82/21 83/6 87/9 89/13 93/4 93/15

criminal [5] 11/25 12/3 12/20 12/21 14/7
critically [1] 58/23
Crivitz [1] 122/7
cross [15] 3/7 3/11 3/16 39/1 39/2 95/10 95/12 95/13 112/8 119/1 126/6 126/17 126/18 157/11 175/13
cross-examination [7] 3/7 3/11 3/16 39/2 95/13 126/18 175/13
Crow [2] 61/18 61/19
Crow-Glassman [1] 61/18
cruiser [1] 141/16
crust [1] 23/19
crust-like [1] 23/19
crying [6] 190/7 193/12 195/7 197/25 198/3 198/25
cues [1] 109/12
currently [2] 50/5 101/8
curriculum [1] 55/21
cursor [1] 116/15
cushioning [1] 20/15
custodian [2] 19/6 19/12
custody [1] 19/7
cut [1] 110/21

## D

D-e-g-n-i-t-z [1] 137/4
D-M-O-R-T [1] 53/1
dad [1] 129/24
daily [3] 130/13 159/6 160/21
damage [3] 31/15 31/15 45/11
damaged [1] 16/18
dandy [1] 170/24
dark [2] 30/16 105/9
dark-colored [1] 105/9
darkened [1] 40/7
darkening [1] 37/9
DASSEY [49] 1/6 1/23 5/3 5/11 8/17 8/18 8/18 8/20 8/22 8/24 9/3 9/8 9/14 10/8 10/14 10/20 92/3 104/24 104/25 105/1 105/20 106/4 106/12 106/23 106/25 107/3 107/4 107/5 107/8 107/14 107/23 109/4 109/7 110/4 121/12 121/14 124/14 149/23 152/17 169/11 169/16 174/22 177/17 178/17 179/21 189/21 193/6 196/20 197/20
Dassey's [5] 105/7 106/17 123/9 123/14 180/21
Dassey/Janda [1] 92/3
date [4] 1/10 129/6 171/17 184/5
dated [2] 170/22 200/15
dates [1] 130/1
daughter [1] 187/11
Dawn [3] 184/5 184/20 185/8
day [32] 1/5 18/16 18/18 21/1 22/7 40/12 43/13 52/4 60/3 102/5 102/7 102/14 103/11 103/12 120/12 124/1 129/20 131/12 131/15 132/3 139/7 150/14 150/20 162/9 179/10 179/12 189/6 192/2 194/9 194/21 199/9 200/15
daylight [2] 22/9 150/20
days [6] 41/12 123/2 130/4 130/14 170/22 187/12
DCI [1] 130/11
deal [3] 46/19 167/3 167/5
dealing [5] 124/8 131/23 140/6 141/7 141/10
death [37] 16/2 51/5 59/4 59/6 59/7 73/13 73/17 73/19 73/21 74/1 74/2 74/5 74/8 74/10 74/11 74/16 74/19 74/21 74/23 74/24 75/1 75/5 75/15 77/11 77/22 89/8 94/24 96/16 96/19 96/21 97/20 98/2 99/9 99/16 99/20 99/21 187/1

Deb [1] 138/24
debris [2] 18/20 18/25
deceit [1] 160/9
December [3] 41/5 190/23 193/14
deception [2] 159/10 159/15
deceptive [5] 159/16 160/3 160/6 161/8 176/14
decide [2] 105/25 190/12
decided [4] 21/3 131/4 190/14 195/25
decision [1] 197/19
decline [1] 108/6
decomposed [1] 64/5
deemed [1] 133/5
deeply [1] 25/17
deer [1] 9/10
Def [1] 20/21
defect [14] 80/16 84/2 84/10 84/18 84/21 85/5 85/22 86/9 86/20 87/16 88/7 88/8 89/19 94/7
defects [2] 89/23 97/8
defendant [14] 1/7 1/20 1/22 1/24 8/18 10/8 105/17 107/7 107/23 121/12 145/17 145/23 146/11 181/24
defense [8] 6/1 8/5 9/23 10/24 100/1 116/22 182/19 185/21
defined [1] 5/16
definitely [3] 91/6 131/16 180/24
definition [5] 27/12 29/1 29/14 172/24 173/20
definitively [1] 91/6
degenerative [2] 65/7 65/11
Degnitz [2] 136/25 137/12
degree [12] 14/7 29/16 32/19 37/10 51/14 51/15 93/22 94/6 94/14 94/20 94/25 99/19
degrees [4] 14/6 51/12 61/11 146/17
dehydrate [1] 33/15
dehydrated [1] 34/1
demeanor [12] 123/9 123/14 124/6 140/25 145/17 149/3 149/13 171/7 171/12 180/21 180/23 181/23
denied [1] 154/24
dense [1] 26/17
dental [3] 19/20 41/2 59/19
dentists [1] 62/9
Denver [1] 56/20
deny [1] 154/14
depart [1] 121/4
department [38] 11/24 12/3 12/7 13/6 14/14 18/19 19/11 21/17 40/10 40/15 40/22 101/4 101/6 101/15 101/18 102/8 102/9 102/15 102/25 103/1 103/8 104/9 104/12 108/18 120/5 137/24 138/4 186/15 186/17 186/23 186/24 187/10 188/8 188/10 188/12 188/17 188/17 189/9
depend [1] 45/4
depending [2] 30/20 46/4
depicted [16] 25/25 26/4 57/13 57/23 59/15 71/17 71/18 83/17 86/1 88/19 90/13 91/3 96/1 178/14 178/16 181/23
depicting [3] 24/13 81/2 86/17
depiction [2] 70/20 179/24
depicts [1] 62/6
deployed [2] 53/4 53/20
depreciating [1] 118/9
depression [2] 18/5 18/12
depth [1] 46/24
depu [1] 21/24
deputies [2] 138/4 187/7
deputy [6] 12/9 19/11 20/21 136/25 137/24 187/13
describe [4] 17/24 20/2 24/4 79/4

# D

described [5] 32/10 70/25 111/23 171/7 194/9
describing [2] 23/18 60/9
descriptions [1] 70/23
desiccated [1] 92/25
designated [1] 39/11
desires [1] 126/2
despite [1] 167/10
destroy [1] 35/22
destroyed [1] 26/21
destruction [3] 61/12 62/4 62/19
destructive [1] 62/16
detached [1] 10/17
detailed [1] 41/10
details [3] 163/23 165/7 190/21
detective [45] 17/15 100/13 101/9 101/10 101/12 101/14 103/2 107/1 107/13 109/2 112/6 112/7 113/24 118/21 119/2 119/22 120/2 121/5 122/1 126/20 126/24 128/16 135/22 137/22 143/6 146/6 146/15 147/7 151/12 151/18 155/17 157/20 158/5 159/4 160/15 160/18 161/18 164/4 165/21 167/25 174/21 177/9 178/8 181/16 189/8
determ [1] 89/18
determination [14] 64/10 64/17 64/20 74/1 79/1 79/15 80/6 89/21 89/25 91/14 96/19 97/3 97/18 97/22
determine [14] 32/4 52/3 58/24 63/24 64/3 66/12 66/17 72/25 73/8 89/18 89/22 90/1 97/6 177/2
determined [3] 12/16 12/19 72/23
determining [2] 13/7 58/19
develop [1] 73/6
developed [2] 61/16 134/6
developing [1] 58/17
development [1] 69/23
develops [1] 84/14
device [2] 108/12 116/11
devoted [1] 15/3
diagnosis [1] 89/8
diagnostic [8] 58/12 58/17 58/25 63/5 66/16 69/12 77/16 91/15
die [4] 73/20 74/9 74/12 75/4
died [4] 51/7 53/24 75/20 76/25
difference [6] 74/4 76/10 76/12 159/14 172/14 175/24
difficult [6] 28/10 31/1 45/1 45/9 45/17 45/24
difficulty [1] 140/20
diffusion [3] 44/8 44/10 44/10
digital [3] 108/14 142/18 170/25
diplomate [1] 51/25
direct [14] 3/6 3/10 3/15 3/22 11/21 50/2 92/18 100/24 102/4 103/17 142/13 163/12 175/18 186/11
directed [3] 17/16 87/25 137/19
directing [9] 9/19 16/23 17/3 37/21 56/5 87/22 151/11 166/6 189/4
direction [3] 79/14 88/23 199/1
directly [2] 20/21 34/10
directors [1] 16/8
disagree [3] 157/22 169/13 172/21
disappears [1] 61/4
disappoint [1] 155/25
disappointed [1] 155/16
disaster [4] 52/24 52/25 53/2 53/13
discovered [1] 187/25
discrete [1] 96/21
discuss [3] 127/11 170/11 193/5

discussed [1] 127/14
discussion [6] 37/20 85/21 113/4 125/3 187/20 189/20
discussions [1] 84/17
disease [1] 65/12
disengaged [1] 123/17
disjunctive [1] 117/24
disk [2] 113/7 126/13
dismember [1] 33/21
dismembered [1] 32/23
display [2] 114/4 115/4
displayed [1] 57/9
displays [1] 37/23
displease [1] 159/13
displeased [1] 155/17
displeasure [5] 145/4 145/8 145/12 145/21 146/7
distance [1] 116/10
distillance [2] 23/5 23/11
distillant [2] 23/10 38/10
distinction [2] 74/14 76/8
distinctions [1] 71/25
distinguish [2] 77/15 82/3
distinguishable [1] 30/15
district [4] 5/25 108/19 191/17 191/19
Division [3] 11/25 12/3 147/13
DMORT [2] 53/1 54/9
DNA [5] 93/4 93/6 93/12 93/14 93/16
doctor [13] 50/18 56/5 63/15 70/7 72/23 78/10 83/12 85/20 89/11 93/19 95/4 95/15 97/23
Doctorate [1] 51/16
doctors [3] 76/14 76/15 76/16
doing [9] 16/21 18/18 19/12 41/10 112/16 118/2 162/23 173/2 195/21
dots [1] 81/10
dozen [1] 118/22
DR [3] 3/9 77/3 99/4
Dr. [6] 76/4 82/17 99/7 99/12 99/13 99/18
Dr. Jeffrey [1] 76/4
Dr. Jentzen [3] 99/7 99/12 99/18
Dr. Leslie [1] 99/13
Dr. Michael [1] 82/17
drafted [1] 117/14
drawn [1] 39/16
drew [1] 24/5
dried [1] 92/25
drive [2] 7/20 127/18
driven [1] 33/18
driver [6] 104/23 105/19 133/16 134/6 134/20 165/4
driver's [3] 109/2 122/4 142/21
driving [1] 141/17
dropped [2] 10/14 122/19
drove [2] 7/4 7/18
drowning [1] 77/1
dry [4] 47/21 47/22 47/23 61/1
duly [4] 11/13 49/21 100/18 186/4
duration [1] 114/16
duties [2] 14/13 184/6
dying [1] 14/3

# E

E-i-s-e-n-b-e-r-g [1] 50/1
ear [1] 68/20
Earl [5] 189/11 191/5 193/3 197/8 197/17
earlier [12] 71/9 72/4 95/19 98/25 103/11 136/1 151/25 156/23 188/15 194/13 195/11 195/12
earliest [1] 53/4
early [1] 178/25

easier [4] 24/19 24/20 46/1 116/7
easily [2] 13/13 37/16
east [2] 15/7 53/13
easy [1] 195/4
Edel [1] 118/25
EDELSTEIN [56] 1/21 3/16 3/18 5/10 106/7 111/18 112/18 113/3 113/20 113/22 115/9 117/12 118/25 126/9 126/19 135/19 137/6 138/9 144/3 145/13 145/16 146/1 146/13 146/15 147/4 147/7 147/25 150/3 153/1 153/4 154/11 154/12 155/20 155/23 156/4 156/6 157/10 157/19 157/20 160/16 161/15 161/17 163/23 164/1 164/4 165/13 173/8 173/13 173/15 175/8 180/6 180/8 181/3 181/13 181/15 182/12
edge [5] 69/22 72/8 72/15 72/21 78/22
edges [3] 90/4 90/6 90/7
edging [1] 37/11
educated [1] 97/21
education [1] 146/17
educational [4] 14/5 14/22 51/12 56/1
effect [7] 31/5 33/14 35/14 66/8 143/1 166/2 176/24
effects [1] 33/13
efficiency [1] 30/4
effort [2] 110/5 169/16
efforts [5] 88/15 120/11 121/4 177/9 177/9
eight [4] 11/4 13/13 87/24 101/24
EISENBERG [6] 3/9 49/18 49/20 49/25 95/5 99/14
Eith [1] 145/10
elaborate [1] 14/24
elapsed [1] 141/22
elected [2] 54/21 54/24
electronics [1] 120/24
element [1] 83/2
elemental [1] 87/12
elements [3] 18/7 27/10 77/16
ELMO [1] 181/9
else's [1] 114/23
emotion [1] 177/5
emotional [1] 169/10
emphasis [1] 114/21
employ [1] 12/2
employed [7] 50/5 50/8 101/3 101/5 101/8 186/13 186/16
employment [1] 184/10
en [1] 38/18
encounter [1] 195/13
encourage [1] 116/23
end [10] 12/17 22/12 103/21 103/22 110/14 169/6 184/24 185/4 185/11 189/24
ended [2] 21/2 172/15
ends [2] 121/25 122/2
energy [11] 29/7 29/10 29/11 29/15 29/20 30/6 38/19 46/19 46/23 47/6 47/10
enforcement [7] 12/8 12/21 13/5 43/11 50/22 52/21 56/24
engaged [4] 123/16 123/22 124/1 124/5
enormity [1] 195/22
enough [1] 102/4
entire [4] 21/21 91/5 192/25 193/2
entirely [1] 171/6
entirety [1] 185/14
entities [1] 14/21
entitled [2] 145/19 145/23
entrance [5] 80/20 81/7 82/8 94/4 94/13
entries [1] 121/3

**E**

entry [7] 83/15 84/13 85/6 89/19 161/20 167/25 169/22
entwined [7] 24/17 25/16 25/20 25/23 26/15 28/10 41/24
environment [1] 38/12
episode [3] 77/1 89/24 94/18
equally [1] 116/18
equivalent [1] 30/9
escapes [2] 123/5 138/22
especially [4] 36/21 70/2 116/7 155/4
established [1] 21/15
estimate [9] 14/1 20/10 21/1 42/25 44/3 63/10 63/11 63/12 73/6
estimated [2] 42/14 190/9
Europe [1] 15/6
evaluate [3] 39/8 145/24 146/19
evaluation [3] 52/2 146/10 146/11
evaporated [1] 34/2
evening [4] 133/1 179/1 179/2 194/10
evenly [1] 27/5
event [2] 150/17 154/12
eventual [1] 33/20
everybody [6] 114/10 150/20 154/17 196/2 196/14 197/15
everyday [1] 153/15
everyone [2] 78/16 128/24
everything [1] 25/15
evidence [27] 5/16 5/16 5/17 5/18 5/21 19/5 19/12 19/13 21/16 57/2 63/19 71/2 71/7 71/8 77/21 78/25 91/21 95/4 95/24 96/3 96/21 97/14 99/1 126/1 126/5 154/9 183/24
evident [1] 145/4
evidentiary [6] 19/4 19/16 20/1 23/23 41/2 41/15
evinced [1] 146/6
ex [2] 90/16 155/5
exact [7] 13/12 13/25 32/21 38/16 48/10 97/21 187/6
exactly [6] 34/7 49/2 61/13 118/6 133/16 197/2
exaggerated [1] 63/12
examination [43] 3/6 3/7 3/10 3/11 3/15 3/16 3/17 3/18 3/22 11/21 18/20 19/9 19/22 21/3 23/22 25/14 28/2 39/2 40/16 41/4 41/10 50/2 52/4 52/5 52/6 52/7 57/25 60/2 63/17 73/1 75/13 77/10 89/19 90/20 91/21 95/13 100/24 126/18 174/18 175/12 175/13 181/14 186/11
examine [16] 26/3 26/13 41/8 52/20 53/15 56/14 56/25 57/24 60/3 62/12 62/14 63/25 65/14 68/12 81/14 82/22
examined [23] 11/14 40/25 41/16 49/22 51/4 51/6 62/22 63/23 64/18 64/21 71/4 71/12 75/16 75/20 77/12 81/2 83/1 83/6 90/3 90/10 97/24 100/19 186/5
examiner [3] 52/15 76/6 99/5
examining [4] 32/3 41/1 61/14 66/16
excellent [1] 28/19
except [2] 78/16 173/19
exception [1] 32/13
excess [2] 14/1 28/8
exchange [3] 150/15 155/5 176/4
excuse [11] 20/22 21/24 44/9 69/2 75/12 115/13 184/16 187/14 191/1 192/10 195/12
executed [1] 104/15
execution [2] 104/10 135/9
exhibit [89] 7/25 8/2 8/8 8/8 8/9 8/10 10/1 10/2 11/2 11/3 24/12 24/14 25/25 26/2 26/5 26/6 26/8 36/3 36/5 36/6 36/7

36/11 36/11 37/5 37/6 37/21 37/24 37/25 39/21 55/17 57/9 57/13 59/13 59/15 59/21 59/25 66/21 68/21 70/17 70/19 71/13 71/14 78/12 78/14 80/21 80/21 80/24 83/9 83/11 83/17 84/16 84/18 85/23 85/24 86/1 86/11 86/13 86/15 87/11 87/19 87/23 89/1 89/2 89/2 90/14 92/17 92/19 92/22 95/6 100/4 100/5 100/7 112/10 112/15 112/24 125/23 126/1 126/5 148/11 178/12 179/21 181/1 181/2 181/5 181/9 182/15 185/15 185/17 194/14
exhibits [6] 4/3 36/1 69/9 70/13 95/4 95/5
exist [1] 89/23
existed [1] 89/23
exit [2] 9/5 105/22
exited [1] 193/24
exits [1] 121/4
expand [1] 44/19
expect [3] 30/12 83/3 87/17
expected [1] 29/20
experience [19] 12/8 14/5 15/17 16/17 24/9 28/6 28/14 31/8 45/6 46/12 51/12 56/1 75/11 75/13 80/7 97/24 102/1 124/7 125/16
expert [2] 99/8 99/19
expertise [2] 13/6 97/19
explain [12] 33/1 51/1 64/23 74/5 90/17 120/3 148/25 148/25 149/4 163/13 175/23 186/7
explained [2] 81/9 195/6
explaining [1] 66/25
explanation [3] 109/17 154/7 156/22
explicit [1] 74/8
explore [1] 166/21
explosion [1] 13/7
explosions [1] 12/14
Explosives [1] 14/18
exposed [9] 26/24 33/4 36/21 37/3 37/8 53/17 60/24 90/7 90/8
exposing [2] 35/6 35/9
exposure [4] 32/24 35/12 37/14 84/10
extended [3] 197/7 197/13 197/16
extent [2] 93/12 182/7
extra [2] 26/12 48/14
extraordinary [1] 35/17
extreme [3] 34/19 73/3 96/22
extremity [1] 37/9
eye [16] 67/24 67/25 67/25 68/3 68/8 68/15 69/2 69/19 69/24 70/3 71/23 72/4 72/8 72/17 72/19 72/21
eyes [2] 125/7 170/7

**F**

fabric [2] 38/4 48/16
face [4] 64/14 67/18 67/20 67/20
facial [4] 70/2 70/4 70/24 72/2
factor [1] 34/15
faculty [1] 15/23
Fahrenheit [1] 29/16
failure [1] 156/22
fairly [6] 52/19 58/1 69/12 69/21 74/8 181/23
fake [1] 76/14
fall [1] 75/2
fallen [1] 62/15
FALLON [93] 1/15 3/6 3/10 3/15 3/17 3/22 5/5 5/8 11/10 11/22 38/24 43/19 45/13 49/12 49/17 50/3 85/12 85/20 95/3 95/9 98/17 98/21 99/25 100/9 100/12 100/25 105/12 105/15 106/10 106/13 106/16 110/8 110/16 110/19

110/22 111/11 112/1 112/3 112/14 113/8 115/8 115/18 115/19 118/19 119/6 119/20 122/1 125/19 125/23 125/25 126/15 135/16 138/6 140/25 145/6 147/23 152/24 154/5 155/18 155/21 158/6 163/13 163/22 163/24 165/10 172/22 173/6 173/9 173/19 174/16 174/19 175/10 175/21 178/13 180/7 180/12 180/25 181/8 181/11 181/22 182/16 182/20 182/23 183/1 183/5 183/10 183/13 183/20 185/20 186/1 186/12 196/15 199/4
falls [1] 73/25
family [16] 10/9 62/1 102/16 102/17 102/20 120/18 122/6 122/23 133/12 133/13 139/6 195/17 197/1 197/7 197/14 197/16
far [11] 48/20 97/15 124/19 131/2 134/24 146/25 153/23 159/17 163/2 171/16 197/16
fashion [5] 44/19 152/16 161/11 172/20 175/20
Fassbender [7] 17/14 187/21 188/14 188/19 190/19 192/1 196/5
faster [1] 32/23
fat [1] 60/22
fatal [2] 13/20 13/22
fatalities [2] 14/2 53/7
fatality [1] 13/18
father [4] 123/4 191/4 192/23 193/2
fatty [1] 60/25
FBI [2] 14/18 93/12
fear [1] 167/5
February [8] 189/5 190/20 190/25 191/1 191/16 195/12 197/20 197/24
February 20 [3] 189/5 191/1 195/12
February 27 [2] 190/20 197/20
February 28 [1] 191/16
federal [3] 52/24 52/25 93/6
feel [4] 42/22 83/19 169/24 170/7
feeling [3] 31/14 169/10 169/17
feelings [1] 145/22
feet [7] 30/23 31/7 43/23 44/2 45/2 45/18 46/10
felt [6] 19/23 124/6 196/4 196/11 197/6 198/13
female [12] 66/19 67/1 69/11 69/15 70/6 71/21 72/5 72/12 91/12 91/18 93/21 189/8
females [1] 69/20
few [9] 27/23 68/10 89/4 91/19 95/15 118/24 174/16 190/22 193/10
field [15] 15/3 15/18 16/3 16/13 52/12 54/6 54/15 55/2 55/8 55/21 58/18 64/25 74/3 76/18 97/19
fields [1] 55/12
fifth [2] 75/8 169/22
fifty [2] 30/5 47/23
figure [2] 30/1 141/11
file [1] 108/19
filed [1] 135/22
files [2] 108/20 136/8
final [1] 42/11
finally [2] 7/19 94/23
findings [4] 51/1 63/16 87/10 90/17
finds [1] 118/7
fine [7] 100/15 112/20 126/15 154/11 162/12 164/2 181/3
finish [3] 100/10 149/10 149/11
fire [81] 10/17 10/21 13/5 13/7 13/9 13/19 13/21 13/22 14/10 14/16 14/23 15/3 15/12 15/19 15/22 16/1 16/2 16/7 16/11 16/15 16/19 19/24 22/22 26/21

**F**

fire... [57]  26/24 27/4 27/7 27/11 27/13 28/7 28/25 29/1 29/2 30/11 30/14 30/17 31/5 32/18 33/2 33/4 33/8 33/14 33/18 34/4 34/6 34/11 35/3 35/4 35/7 35/13 35/18 35/23 36/22 37/3 37/8 37/14 37/16 38/6 38/8 42/14 44/12 44/17 45/3 45/4 45/16 45/21 46/3 46/5 46/7 46/10 46/21 46/22 47/11 49/3 49/4 53/8 90/8 193/7 194/4 194/6 194/10
fire-related [1]  16/1
Firearms [1]  14/17
firefighter [1]  14/10
fires [1]  12/13
firewood [1]  34/17
firmly [1]  177/21
fit [4]  52/3 66/1 198/21 198/24
fits [1]  78/21
five [21]  12/6 14/3 18/12 28/8 30/11 31/6 42/15 42/23 46/16 46/22 61/20 61/20 62/3 62/6 62/17 92/23 127/2 127/7 170/22 184/14 186/20
five-by-six [1]  18/12
five-level [1]  61/20
five-stage [1]  61/20
flame [10]  30/18 30/19 30/22 44/8 44/9 44/10 44/10 44/11 44/11 44/15
flames [3]  43/22 44/2 44/14
flat [3]  30/21 57/1 158/3
flatbed [1]  104/6
flecks [3]  87/3 87/4 89/6
flip [2]  81/1 81/5
flow [2]  23/13 23/14
foam [2]  38/5 38/6
focus [4]  24/1 50/15 188/23 189/20
focused [1]  55/14
focusing [2]  86/5 114/23
folder [1]  136/9
follow [5]  111/13 112/6 114/13 116/7 152/5
follow-along [1]  111/13
follow-up [2]  112/6 152/5
following [5]  18/16 40/12 60/3 99/2 192/2
follows [12]  6/5 6/9 8/15 10/5 11/14 49/22 100/19 115/15 116/15 169/23 184/1 186/5
foot [1]  18/13
force [1]  84/12
Ford [1]  141/18
foregoing [2]  200/7 200/7
forehead [2]  68/2 69/4
foremost [1]  115/22
forensic [44]  50/8 50/10 50/11 51/17 51/20 51/24 52/12 54/6 54/15 54/22 55/2 55/9 55/10 55/13 56/2 58/2 58/4 61/9 61/12 61/16 62/8 62/9 64/2 64/25 65/10 69/12 73/11 73/21 73/25 74/3 74/7 74/15 74/17 76/5 76/8 76/9 76/11 76/14 76/16 76/18 82/15 87/13 99/6 99/13
form [3]  28/24 29/5 155/21
formed [1]  23/2
forth [3]  127/24 134/21 153/13
Forty [1]  169/21
forward [1]  173/20
found [7]  36/16 41/24 56/14 81/19 120/20 120/24 164/5
foundation [2]  173/4 173/6
four [14]  14/2 30/11 31/5 31/11 46/9 54/7 74/21 86/20 92/4 98/6 98/13 130/15 166/7 185/7

fourth [2]  36/19 75/6
FOX [1]  1/11
fracture [2]  78/21 97/2
fragment [18]  41/8 68/5 78/21 80/2 80/3 83/18 84/2 86/19 87/24 87/25 88/1 88/4 88/4 88/5 88/5 91/1 92/14 93/3
fragmentary [9]  52/9 53/15 67/24 68/17 72/2 73/23 73/24 83/13 91/17
fragmentation [5]  62/8 64/8 73/3 73/10 96/22
fragmented [2]  66/18 90/7
fragments [69]  19/18 19/19 25/18 26/15 27/15 41/2 41/3 58/14 58/17 58/25 59/9 59/10 59/19 60/9 60/15 60/16 62/12 62/13 62/15 62/21 62/23 62/25 63/4 63/6 63/9 65/19 65/20 66/16 67/18 67/19 68/7 77/4 77/12 77/18 77/20 77/24 78/17 78/23 78/25 81/14 81/15 81/20 81/24 81/25 82/2 82/4 82/13 82/19 82/24 82/24 87/24 90/3 90/6 91/2 91/5 91/14 92/5 92/8 92/12 92/15 92/25 92/25 93/5 93/8 93/10 93/17 95/19 97/2 99/15
frame [1]  41/16
framing [1]  146/4
frankly [1]  35/2
free [5]  45/8 106/6 107/18 165/25 168/10
freelance [1]  164/20
freely [2]  45/8 124/16
FREMGEN [23]  1/19 3/7 3/11 5/9 5/9 8/6 9/25 11/1 39/3 49/10 95/8 95/14 100/2 111/8 112/20 112/22 117/10 117/14 117/18 157/6 157/9 185/23 196/6
frequently [5]  15/20 15/21 27/3 38/5 73/15
front [8]  66/21 88/22 109/1 109/3 118/1 142/14 151/8 198/6
frontal [1]  69/4
fuel [29]  28/15 28/18 28/19 29/3 31/19 31/20 33/3 33/5 33/19 34/14 34/16 34/21 35/4 35/4 35/12 35/12 35/17 35/20 37/20 38/7 38/13 43/24 43/25 45/22 46/4 47/4 47/5 47/7 48/21
fuels [1]  49/8
fulfill [1]  103/7
full [4]  31/5 45/8 45/23 150/24
fully [2]  42/19 45/24
functions [1]  16/1
furnace [3]  29/24 30/2 30/6
furnishings [1]  180/18
further [12]  9/8 10/19 12/21 17/23 76/17 82/13 82/22 167/13 180/25 184/12 185/2 185/8
fused [1]  66/5

**G**

G-l-a-s-s-m-a-n [1]  61/19
GAHN [2]  1/17 5/8
gain [2]  16/14 176/19
gained [2]  16/22 159/21
gaining [1]  163/2
gallon [2]  48/3 48/5
game [2]  131/2 141/4
garage [6]  10/18 63/18 90/24 91/23 141/19 193/7
gasoline [1]  38/9
gather [1]  166/22
general [6]  20/11 70/1 74/21 76/16 81/21 101/25
generally [11]  12/13 13/4 18/1 30/22 47/14 74/7 76/7 123/1 123/9 124/12

186/21
generate [2]  29/20 38/15
generated [5]  70/22 71/20 84/24 86/4 194/17
generators [1]  22/10
gentleman's [1]  198/17
gentlemen [7]  11/5 98/24 113/13 119/11 152/25 183/23 199/9
gets [1]  169/4
girl [14]  132/7 143/2 150/13 151/13 152/12 152/18 152/21 153/3 153/6 153/24 154/25 155/2 169/25 184/23
girl's [2]  128/23 151/22
glass [3]  31/24 32/5 42/25
glass-belted [3]  31/24 32/5 42/25
glasses [2]  105/9 170/2
Glassman [3]  61/18 61/19 61/20
goal [1]  166/22
golf [2]  20/10 179/4
Government [2]  113/25 134/13
gracileness [1]  72/14
grade [3]  139/23 139/24 140/2
Grand [1]  104/4
grandfather [1]  129/14
Grandma [1]  129/16
grandmother [1]  123/6
grandpa [1]  123/6
graphic [5]  69/1 70/20 70/23 91/3 114/14
grassy [1]  21/18
great [3]  28/22 29/6 30/17
greater [3]  29/3 38/22 48/24
green [2]  8/25 34/17
grocery [1]  48/6
ground [4]  34/25 34/25 54/2 54/3
groups [1]  54/17
guesstimate [1]  97/21
guest [1]  15/25
guilt [2]  169/10 169/18
guilty [2]  169/24 170/12
gunshot [15]  80/20 81/7 83/15 85/6 87/18 89/15 94/4 94/8 94/12 96/17 96/22 96/25 97/17 97/25 99/21
gunshots [1]  98/3
guys [3]  142/13 147/23 167/15

**H**

Hal [1]  191/22
Halbach [31]  6/18 6/21 7/2 7/7 7/10 7/16 9/5 9/12 99/10 99/16 99/20 102/10 102/21 120/17 121/1 121/20 123/25 124/20 128/24 133/8 164/19 171/15 184/8 184/13 185/5 185/9 185/10 187/9 191/22 193/20 193/23
Halbach's [2]  120/20 164/10
half [10]  21/1 30/9 68/3 68/5 69/5 69/7 110/16 113/8 118/22 137/9
halfway [2]  113/9 174/6
hallmark [1]  72/11
Halloween [2]  194/5 194/6
hand [6]  49/19 83/20 88/1 91/9 92/13 117/9
handed [2]  20/21 188/18
handle [1]  188/8
handled [1]  37/7
hands [1]  52/6
hands-on [1]  52/6
handy [1]  170/24
happen [2]  168/4 168/13
happened [13]  105/15 123/25 133/1 133/4 138/17 162/19 162/19 163/8 166/23 166/23 172/9 177/18 187/5
happening [1]  128/5

## H

happens [2] 27/3 65/8
happy [1] 81/13
hard [4] 28/22 80/10 131/19 149/20
hard-pressed [1] 28/22
harvest [1] 20/25
hasten [1] 34/5
hastening [1] 35/10
Hau [3] 2/3 200/4 200/19
hazard [1] 31/3
He'll [1] 183/6
head [4] 75/3 90/18 99/22 124/3
heading [1] 78/9
headquarters [1] 184/4
hearing [2] 121/9 191/19
heart [3] 74/18 74/19 74/25
heat [19] 29/16 30/7 31/2 38/11 44/20
  44/21 44/25 45/10 45/17 46/9 46/15
  47/6 47/13 48/20 48/23 49/2 49/4 60/24
  60/24
heater [1] 162/14
heavier [1] 180/5
heavily [5] 20/13 24/7 24/24 26/18
  60/17
heavy [2] 34/19 69/23
height [3] 30/19 44/16 182/2
held [4] 52/11 54/5 91/15 186/19
here's [2] 72/16 87/2
hereby [1] 200/6
herein [4] 11/13 49/21 100/18 186/4
hiding [1] 124/9
high [2] 19/1 22/10
higher [2] 32/23 44/5
highlight [1] 71/24
highlighted [2] 114/7 114/18
highlighter [5] 115/11 116/15 117/21
  118/4 118/5
highlighting [4] 114/5 115/3 115/25
  148/17
himself [1] 196/8
hip [1] 66/1
hired [1] 184/9
Historical [2] 50/5 52/18
history [1] 55/22
hit [1] 75/3
hold [9] 14/6 51/13 51/14 93/21 94/5
  94/13 94/20 94/25 153/9
Holstein [1] 6/11
hom [1] 80/6
home [8] 29/25 30/3 30/4 30/7 171/2
  176/8 192/20 194/23
homicidal [12] 75/21 75/22 77/8 78/1
  78/9 79/1 79/25 80/6 89/9 94/24 96/17
  96/20
homicide [8] 75/7 75/20 99/21 101/19
  101/22 121/19 187/2 191/23
HON [1] 1/11
honeycomb [3] 80/13 84/5 84/11
honeycomb-looking [1] 80/13
Honor [16] 5/5 49/14 110/8 111/18
  113/22 125/19 126/10 145/6 145/13
  147/5 175/9 180/6 181/4 182/12 183/4
  199/4
hoops [1] 51/22
hope [3] 72/6 72/18 176/19
horizontal [1] 44/19
Hospital [1] 82/16
host [1] 34/9
hours [6] 22/8 32/21 35/22 41/6 133/2
  133/5
house [3] 35/18 171/22 193/16
human [42] 16/18 30/25 32/18 33/14

50/14 50/17 50/23 52/20 53/15 54/1
55/14 55/15 57/4 57/19 58/7 58/7 58/11
59/18 60/16 62/15 62/23 63/5 63/6 63/8
63/19 77/15 77/16 77/16 78/24 79/7
83/4 84/24 87/14 90/9 91/21 92/4 92/8
92/11 92/11 92/23 92/24 93/1
hundred [6] 13/13 14/1 29/22 30/5 30/5
  100/6
hunting [1] 9/10
hurricane [3] 53/21 53/22 53/25
hyphen [1] 61/18
hypothetical [1] 43/19
hypothetically [2] 46/8 47/15

## I

I'd [14] 22/16 36/17 37/19 77/7 101/24
  102/4 126/23 128/9 134/12 135/6
  136/17 150/24 160/19 188/23
I'll [8] 101/2 113/13 119/4 154/9 156/10
  161/15 175/24 199/10
I'm [82] 6/6 8/1 9/19 11/24 14/9 14/10
  16/8 16/8 23/25 24/22 28/22 31/10
  33/15 34/22 35/24 37/20 38/16 38/17
  41/16 42/22 48/9 48/12 49/1 55/16 57/5
  66/20 85/8 89/3 92/17 92/18 99/2 114/2
  114/8 123/18 125/13 127/22 132/18
  132/20 133/10 136/23 138/7 139/14
  139/25 142/6 142/12 144/2 144/14
  144/14 145/6 146/8 146/8 146/22
  147/10 147/20 149/17 149/20 151/2
  152/9 153/12 156/4 156/13 156/18
  159/7 159/22 159/25 160/2 160/10
  160/10 167/4 169/25 170/5 172/22
  173/17 175/17 175/22 177/25 178/10
  181/24 182/21 182/23 186/14 191/1
I've [14] 12/5 14/14 16/12 16/20 16/21
  19/24 24/9 28/16 48/13 55/7 81/6
  119/11 124/7 125/15
i.e [2] 172/19 197/7
IAAI [4] 14/18 15/1 15/12 16/1
idea [15] 110/12 116/3 121/15 140/6
  140/11 140/14 141/3 141/6 141/9
  143/19 160/12 166/4 168/2 176/20
  177/1
identifiable [2] 60/16 63/5
identification [9] 8/10 10/2 11/3 55/15
  61/10 65/1 100/5 178/12 185/17
identified [18] 25/12 25/19 26/2 62/14
  70/25 80/19 81/7 81/15 83/14 85/3 85/6
  89/13 90/22 91/6 92/10 95/4 95/24
  105/13
identifier [2] 71/6 71/9
identify [13] 9/5 19/3 52/20 53/14 53/23
  57/3 63/3 63/21 72/12 91/4 93/9 106/7
  106/11
identifying [2] 53/25 69/10
identity [1] 78/6
ignited [1] 38/11
ignore [1] 147/8
ill [1] 159/21
Illinois [1] 53/6
illit [1] 71/10
illustrate [1] 24/14
image [6] 67/2 67/18 84/24 88/21 88/23
  88/24
imagine [2] 23/3 53/18
immediate [1] 197/13
immediately [4] 43/10 53/11 80/4 156/9
impact [1] 34/10
impeded [1] 44/22
impenetrable [1] 89/6
implement [1] 31/10
implored [1] 161/5

importance [1] 133/14
impossible [1] 45/2
impression [1] 26/20
impressions [2] 79/8 79/8
in-ground [1] 54/2
inability [1] 156/22
inch [1] 33/7
inches [1] 24/7
incident [1] 17/6
including [3] 58/25 130/25 184/15
incongruence [1] 117/6
incorrect [1] 153/5
increase [2] 169/10 169/17
increased [1] 47/11
increasing [1] 61/21
increasingly [1] 62/3
indentation [1] 79/23
independent [1] 138/3
indicate [5] 6/21 7/10 10/19 118/20
  136/14
indicates [2] 97/16 151/15
individually [2] 96/7 96/10
individuals [5] 53/24 76/25 132/6 134/23
  178/20
inducements [2] 174/20 174/22
informed [2] 17/19 192/16
initial [12] 20/25 85/5 86/19 120/15
  152/15 152/17 152/17 152/20 153/2
  153/5 155/9 187/14
initially [8] 56/8 60/1 60/3 71/10 71/11
  81/13 81/18 179/19
injured [1] 177/3
injury [3] 33/22 75/4 94/9
inner [3] 84/7 124/2 124/8
inquire [2] 132/15 145/20
inquired [1] 167/12
inquiries [1] 143/13
inquiry [2] 145/9 152/19
inside [16] 8/23 25/17 25/17 79/7 79/12
  80/9 80/11 80/15 80/19 81/2 84/5 84/8
  86/25 88/18 120/24 151/17
inspected [1] 19/2
inspection [1] 19/13
instance [7] 29/24 47/17 47/25 48/17
  73/16 74/14 176/7
instruct [2] 15/18 119/4
instruction [10] 5/24 115/5 116/20
  116/23 117/2 117/9 117/13 117/15
  118/16 119/12
instructions [1] 5/15
intend [1] 112/1
intensified [1] 47/12
intensity [22] 19/1 22/10 28/22 29/3
  29/6 30/17 38/22 43/21 44/17 44/25
  45/4 45/21 46/7 46/15 47/16 47/24 48/1
  48/8 48/18 48/20 48/25 49/1
intensive [2] 46/8 46/21
intentionally [1] 160/7
interaction [2] 124/21 171/1
interactions [1] 171/17
interest [2] 83/24 89/16
interior [1] 59/25
intermediate [1] 84/11
internal [6] 78/18 80/8 80/17 94/2 94/10
  94/16
internally [2] 86/9 88/6
International [5] 14/11 14/19 14/25 15/1
  16/9
interpose [1] 145/7
interpretation [1] 52/8
interpreted [1] 26/11
interrupt [1] 85/8
interrupted [1] 154/3

## I

interval [4] 59/3 59/4 59/4 59/7
interview [58] 101/13 105/25 106/21
 106/25 107/7 107/17 107/22 108/2
 108/6 108/9 108/16 109/13 110/4
 110/10 114/1 118/24 119/21 119/25
 120/4 121/23 122/11 123/10 123/13
 124/10 124/17 124/23 131/15 134/17
 146/25 158/24 168/19 169/6 169/8
 170/17 172/1 173/16 176/7 177/15
 179/19 180/1 180/23 189/1 189/7
 189/11 189/17 189/20 189/22 189/25
 190/23 191/25 193/4 194/23 195/13
 196/2 198/7 198/16 198/17 198/18
interviewed [9] 106/23 107/5 133/23
 189/15 190/19 191/9 192/6 192/22
 197/9
interviewee [1] 173/17
interviewing [5] 107/2 107/13 149/13
 192/8 192/14
interviews [4] 103/12 168/24 190/14
 198/16
intoxicated [1] 179/3
intro [1] 105/18
introduced [2] 26/2 105/18
introducing [1] 142/8
investigate [3] 12/13 12/15 186/22
investigation [34] 11/25 12/4 12/22
 13/17 13/21 15/3 15/19 16/2 16/7 17/5
 17/20 17/23 18/15 32/16 38/8 58/5
 75/24 77/5 93/6 99/17 102/9 121/6
 122/22 123/3 128/14 179/10 179/18
 182/9 188/2 188/18 188/24 195/14
 196/1 196/13
investigations [11] 13/10 13/16 13/23
 16/22 17/5 101/19 101/21 101/22 102/2
 187/2 187/2
investigative [4] 101/25 120/11 147/12
 196/19
investigator [14] 14/11 16/11 16/15
 22/22 29/2 35/25 55/16 57/5 120/5
 144/3 183/14 186/2 186/14 186/19
investigators [18] 14/12 14/20 14/23
 14/25 15/2 15/11 15/12 16/10 17/14
 18/21 57/15 59/17 159/11 187/22
 188/19 191/3 195/15 195/19
invited [1] 192/19
involvement [2] 12/18 163/14
involves [2] 52/5 58/6
issue [3] 137/13 166/20 167/24
it'll [2] 43/24 158/4
item [1] 36/7
items [15] 19/4 19/7 19/14 19/25 24/2
 40/11 41/2 41/13 41/14 56/25 57/3
 61/14 95/17 96/14 96/14

## J

jacket [2] 6/24 7/14
jail [5] 166/3 166/5 168/3 168/8 168/12
Janda [10] 8/17 8/19 8/24 9/2 10/7
 10/14 10/15 92/3 92/3 185/4
Janda/Dassey [1] 8/24
jeans [2] 6/25 7/14
Jeffrey [4] 76/1 76/3 76/4 99/4
Jennifer [3] 2/3 200/4 200/19
Jentzen [8] 76/1 76/3 76/4 77/3 99/4
 99/7 99/12 99/18
JEROME [1] 1/11
job [1] 102/3
JoEllen [2] 6/14 7/6
John [1] 100/22
joi [1] 65/23

joining [1] 12/7
joint [5] 65/12 65/13 65/25 66/1 118/13
jointly [1] 55/6
joints [1] 65/25
joules [1] 47/14
journal [2] 55/8 55/9
Judging [1] 43/2
judgment [1] 115/23
jugs [2] 48/3 48/5
jumped [1] 51/21
jumping [1] 170/5
June [2] 184/15 184/17
June 20 [2] 184/15 184/17
juror [1] 147/24
jurors [4] 5/13 113/17 118/14 119/8
jury [21] 1/4 5/13 72/10 92/7 98/25
 105/6 113/19 114/10 114/23 116/24
 117/4 118/8 118/18 119/3 127/13
 132/13 145/23 149/1 158/16 158/22
 181/17
justice [12] 11/25 12/3 12/7 14/7 14/14
 102/9 103/1 103/8 104/12 120/6 188/10
 188/13

## K

Karen [1] 187/9
Katrina [1] 53/22
Kayla [34] 189/2 189/7 189/12 189/15
 189/17 189/23 189/25 190/4 190/5
 190/23 190/24 191/2 191/4 191/7 191/9
 191/13 192/11 192/13 192/17 192/20
 192/22 193/2 193/4 193/10 193/16
 193/17 194/3 194/8 194/13 194/18
 195/13 197/7 197/10 197/23
Kayla's [6] 191/2 192/15 192/18 192/19
 193/16 194/23
Ken [1] 5/7
KENNETH [2] 1/13 83/6
key [2] 52/10 69/17
kidnapping [1] 121/19
Kim [1] 104/13
kinds [2] 5/18 12/11
kitchen [2] 161/12 181/24
knock [1] 61/6
knowing [1] 48/10
known [3] 61/18 76/4 165/8
KRATZ [13] 1/13 5/7 7/24 8/4 8/12 9/22
 10/23 11/8 110/25 111/4 111/6 111/17
 183/19

## L

Lab [7] 82/21 83/6 87/9 89/13 93/4
 93/12 93/15
Laboratory [1] 82/11
lack [1] 198/5
ladder [1] 75/3
ladies [6] 11/5 98/24 113/12 119/10
 183/22 199/9
laid [1] 131/1
landmarks [2] 67/21 73/7
language [2] 125/12 140/15
lapse [1] 133/5
large [3] 10/17 18/4 40/2
larger [2] 67/12 84/13
laser [1] 67/7
late [2] 103/6 183/6
lately [2] 190/3 190/5
later [4] 5/24 9/4 170/22 194/9
latest [2] 7/2 7/16
lavender [1] 85/4
law [10] 1/20 1/22 12/8 12/20 13/4
 43/10 50/21 52/21 56/24 117/4
lawyers [1] 5/21

layer [1] 23/2
laying [1] 35/1
lead [7] 17/13 87/12 89/13 173/16
 187/22 188/1 188/19
leading [10] 172/15 172/20 172/24
 173/23 174/1 174/7 174/8 174/10
 175/11 180/9
leads [2] 70/3 195/23
learn [3] 121/5 133/16 133/20
learned [4] 134/4 136/14 193/13 193/14
learning [1] 134/3
leather [1] 38/4
leather-type [1] 38/4
leave [10] 27/20 32/8 89/3 106/6 107/24
 165/25 168/10 171/3 176/10 179/2
leaving [5] 7/1 7/16 166/10 178/25
 193/25
led [1] 26/23
left-hand [1] 88/1
leg [1] 92/16
legal [3] 50/17 76/19 172/24
length [3] 6/24 7/13 20/17
lengthy [1] 183/7
LESLIE [5] 3/9 49/18 49/20 49/25 99/13
less [8] 33/24 33/25 42/13 46/21 63/13
 63/14 73/20 93/21
lesser [1] 37/10
level [12] 43/21 46/14 47/3 48/18 61/20
 61/23 62/2 62/3 62/5 62/11 62/16 62/19
levels [2] 61/11 61/22
lick [1] 44/14
lie [6] 159/15 159/16 159/19 159/25
 160/1 161/8
lied [2] 160/18 160/19
lies [2] 158/24 159/2
lighting [2] 19/1 22/10
Likewise [2] 8/5 73/7
limitations [1] 140/9
line [7] 86/11 114/5 116/1 116/4 116/14
 145/9 198/6
lines [3] 65/20 166/7 170/5
liquid [1] 23/16
liquids [1] 23/12
listened [1] 127/17
listener [1] 118/6
listening [2] 119/14 119/15
literally [1] 41/5
little [31] 12/24 14/4 18/11 20/4 22/16
 27/14 31/16 41/8 51/9 57/22 60/6 68/14
 72/3 92/7 103/10 103/17 103/19 107/15
 115/11 133/3 146/14 155/5 170/24
 175/22 176/13 180/4 188/7 191/14
 195/10 195/18 197/3
live [1] 131/20
lived [5] 8/19 196/3 196/14 197/6
 197/15
living [5] 6/10 6/14 10/9 11/23 33/17
local [1] 12/20
locate [4] 62/23 63/1 176/21 187/16
located [2] 103/15 180/16
location [7] 27/1 81/16 81/18 81/22 85/5
 92/1 180/13
locations [2] 69/18 81/21
long [22] 12/2 27/18 31/9 32/17 34/10
 41/7 54/4 73/4 92/15 101/5 101/10
 105/8 107/12 110/15 111/21 113/23
 124/16 124/23 124/25 153/12 186/16
 186/19
long-sleeved [1] 105/8
longer [2] 9/16 110/11
looks [5] 50/13 60/18 80/17 123/11
 154/3
loose [2] 22/24 40/6

**L**

lose [1] 198/3
losing [1] 198/24
loss [2] 197/24 198/11
lost [2] 60/21 190/8
lot [14] 13/15 14/15 15/20 27/7 29/7
 33/16 46/19 48/8 51/22 123/13 123/18
 125/9 126/23 198/15
lots [1] 65/9
lower [3] 37/9 68/15 86/6
luminescence [1] 44/13
lunch [1] 113/12

**M**

machine [1] 200/10
Madison [3] 17/3 56/18 82/16
Magazine [6] 6/20 7/3 7/9 7/17 164/23
 184/3
mail [1] 193/18
maintain [1] 19/6
maintained [1] 179/7
maintains [1] 102/17
major [1] 58/4
majority [2] 25/10 109/9
male [4] 69/17 69/22 71/22 72/16
man [1] 141/1
manager [1] 184/3
MANITOWOC [10] 1/1 6/12 6/15 7/21
 17/4 21/17 102/22 120/7 188/1 200/2
manner [24] 51/5 73/12 73/17 73/19
 74/2 74/5 74/10 74/19 74/20 74/23 75/1
 75/5 75/15 77/11 89/8 94/23 96/16
 96/19 96/21 97/20 99/9 99/20 115/14
 173/7
Marathon [1] 12/9
March [3] 191/10 191/10 194/21
March 7 [2] 191/10 194/21
Marinette [11] 101/4 101/6 101/18
 102/18 104/9 127/21 127/22 128/5
 147/12 198/18 198/23
mark [9] 1/19 3/21 5/9 81/17 81/19
 112/11 186/2 186/3 186/9
marked [21] 4/3 7/25 8/1 8/7 8/10 10/1
 10/2 11/2 11/3 26/5 57/8 78/11 100/3
 100/5 125/20 148/10 158/8 178/11
 178/12 185/15 185/17
Marking [1] 112/19
marks [1] 147/8
maroon [2] 9/1 9/6
marrow [1] 61/1
mass [8] 24/6 24/16 24/23 25/11 25/13
 25/16 26/8 41/25
masses [1] 19/21
massive [1] 188/4
Master's [1] 51/15
material [19] 18/24 19/22 20/8 20/20
 23/24 25/19 26/19 28/23 28/24 32/13
 38/5 57/16 57/18 57/25 59/17 60/15
 71/10 71/11 98/12
materials [3] 39/14 46/20 99/15
matter [9] 12/22 82/12 115/16 117/7
 131/6 163/14 166/1 200/7 200/13
matters [3] 70/8 113/21 127/20
mausoleums [1] 54/3
mean [25] 23/9 35/12 49/2 49/6 51/19
 65/2 120/14 121/14 124/14 125/7
 125/14 129/22 129/25 131/19 143/23
 150/21 167/8 175/4 176/2 176/19 195/6
 198/1 198/11 198/13 198/18
meant [2] 175/6 190/4
measure [2] 47/14 73/6
mechanism [2] 73/20 74/11

medical [9] 52/15 76/6 76/13 97/23 99/5
 99/7 99/19 176/15 176/21
medication [1] 176/25
medications [1] 160/13
medicine [3] 159/6 160/21 161/10
medicines [1] 159/6
meet [1] 75/25
meetings [1] 195/19
megawatts [1] 47/14
member [3] 15/22 52/24 54/21
members [10] 5/13 10/9 15/5 51/23
 62/1 104/9 133/13 139/6 195/16 197/1
memberships [2] 54/13 54/17
Memorial [1] 82/16
memorialize [1] 114/3
memory [7] 22/13 136/3 138/3 140/12
 156/24 157/4 171/7
mentioned [5] 34/9 121/18 125/6 128/9
 194/4
message [2] 56/9 56/12
met [6] 130/16 130/21 137/12 138/22
 139/1 192/3
metacarpal [1] 92/14
metacarpals [1] 91/9
metal [4] 24/2 27/3 27/8 27/13
metallurgic [1] 82/14
methods [1] 44/21
Michael [2] 82/17 103/3
microphone [2] 12/24 103/17
mid [1] 17/8
mid-afternoon [1] 17/8
middle [2] 15/7 114/11
Middleton [1] 82/16
midline [1] 94/12
mike [1] 147/24
mile [1] 137/10
miles [1] 6/12
milk [2] 48/1 48/3
Milwaukee [3] 76/6 99/5 184/4
mince [1] 143/25
mind [6] 48/13 89/7 149/2 169/11
 169/17 175/1
mine [1] 173/21
minimal [3] 120/13 163/15 165/9
minimum [2] 88/8 132/1
minute [6] 7/20 74/17 84/15 85/16
 124/10 182/5
minutes [19] 6/23 7/13 85/13 123/12
 124/22 126/21 127/2 134/9 135/1 142/4
 144/24 147/1 148/5 157/21 158/23
 162/6 163/10 167/10 169/14
mirror [1] 79/21
Mishicot [2] 191/17 191/19
misrepresentation [1] 161/9
missed [1] 21/20
missing [15] 56/19 102/10 102/23 121/2
 121/21 132/1 132/4 168/21 176/17
 177/23 177/25 178/5 187/1 187/8
 187/11
Mississippi [1] 53/21
mistake [1] 169/1
mistaken [1] 38/18
mistakes [1] 153/9
mix [1] 35/4
moisture [8] 33/16 33/17 34/1 47/18
 47/20 60/21 60/22 60/25
mom [1] 129/24
moment [13] 38/25 57/10 60/5 71/24
 80/10 85/9 89/4 100/14 111/8 116/2
 149/9 157/6 188/22
momentary [1] 116/14
moments [1] 27/23
Monday [1] 143/2

monitors [1] 114/9
month [1] 178/1
months [1] 171/9
morning [10] 5/5 5/12 5/12 40/14 52/5
 99/1 103/6 130/21 157/2 192/3
morphology [2] 69/16 70/1
Mortuary [1] 53/2
mother [9] 9/2 191/4 192/16 192/19
 192/19 192/23 192/24 193/1 194/6
motionless [1] 124/3
mound [1] 21/23
mouth [1] 103/18
moves [1] 115/12
Mr [1] 105/19
Mr. [34] 11/11 16/23 39/4 87/9 105/7
 105/20 106/4 106/12 109/4 109/7 110/4
 112/1 113/20 115/9 115/18 117/12
 118/25 121/12 121/14 123/9 123/14
 124/14 140/25 157/10 158/6 163/13
 173/19 174/22 177/17 179/3 179/12
 180/21 181/22 196/5
Mr. Avery [2] 179/3 179/12
Mr. Dassey [11] 105/20 106/4 106/12
 109/4 109/7 110/4 121/12 121/14
 124/14 174/22 177/17
Mr. Dassey's [4] 105/7 123/9 123/14
 180/21
Mr. Edel [1] 118/25
Mr. Edelstein [4] 113/20 115/9 117/12
 157/10
Mr. Fallon [7] 112/1 115/18 140/25
 158/6 163/13 173/19 181/22
Mr. Fassbender [1] 196/5
Mr. Olson [1] 87/9
Mr. Pevytoe [2] 16/23 39/4
Mr. Rod [1] 11/11
Mrs [1] 192/5
Mrs. [2] 178/18 192/4
Mrs. Avery [1] 178/18
Mrs. Brandt [1] 192/4
Ms [1] 185/10
much [20] 20/23 22/5 30/6 40/4 52/9
 61/7 63/8 66/6 72/22 107/12 109/9
 109/22 112/5 114/11 120/9 120/12
 124/15 141/22 142/2 166/22
muffled [1] 124/4
multiple [10] 14/2 27/25 30/25 35/22
 40/25 41/17 41/24 45/7 150/5 163/8
multitude [2] 24/8 25/2
muscle [2] 19/23 93/1
myself [15] 59/16 78/17 103/2 105/19
 126/24 127/18 127/24 137/21 142/8
 152/7 188/18 189/8 190/19 191/3 192/1

**N**

nail [2] 81/22 82/2
name [22] 11/17 11/18 11/19 49/24
 49/24 49/25 76/1 100/21 100/21 106/18
 128/23 137/3 138/21 138/24 163/20
 163/24 185/3 186/7 186/7 189/2 189/9
 190/2
named [1] 188/19
names [1] 123/5
nape [1] 83/20
nasal [3] 68/4 68/6 69/7
national [3] 14/16 15/22 56/19
natural [2] 74/24 83/2
naturally [3] 87/13 87/16 89/12
nature [3] 78/4 175/16 180/9
near [2] 12/10 59/6
necessarily [1] 115/25
necessary [3] 81/17 111/19 111/20
neck [1] 83/21

**N**

need [8] 13/6 126/4 132/24 160/13 165/14 176/15 176/21 199/2
needed [11] 31/9 105/21 190/15 192/10 192/17 195/25 196/1 196/12 196/13 198/7 198/7
needs [5] 17/22 39/13 159/6 160/21 177/1
neither [1] 161/1
nephew [1] 139/21
network [1] 79/10
never [9] 87/17 89/14 121/17 139/1 141/1 154/24 167/12 167/15 167/15
new [3] 6/11 27/18 52/15
newspapers [3] 33/8 33/9 33/10
nickname [1] 38/8
night [5] 22/13 130/20 131/24 194/5 194/7
nine [5] 30/23 43/23 44/2 87/20 87/21
ninety [4] 8/11 8/12 10/3 11/4
ninety-eight [1] 11/4
ninety-seven [1] 10/3
ninety-six [2] 8/11 8/12
nip [1] 62/10
nobody's [1] 153/8
non [2] 83/2 89/12
non-natural [1] 83/2
non-naturally [1] 89/12
nonbiological [1] 24/1
None [1] 112/18
nonhuman [3] 53/15 58/9 77/15
nonverbal [5] 109/9 109/11 109/18 109/20 110/1
nonverbal-type [1] 109/18
noon [5] 21/2 102/6 103/6 119/25 137/5
Norm [1] 5/8
normal [1] 198/2
normally [1] 38/2
NORMAN [1] 1/17
North [2] 15/7 15/15
Nos [1] 182/15
nose [5] 68/4 69/5 69/7 72/5 72/17
notably [2] 51/2 52/14
notation [1] 71/2
note [1] 65/13
noted [1] 126/8
notes [10] 128/11 136/2 136/6 136/10 136/14 136/18 136/19 170/16 171/1 200/9
noteworthy [1] 54/11
noticed [3] 25/16 81/8 125/11
notion [2] 171/24 172/10
November [24] 17/1 39/5 50/23 56/9 56/18 60/2 60/4 86/17 88/14 102/6 114/1 119/24 120/9 125/8 126/22 127/5 140/1 162/8 178/22 178/22 180/2 187/5 187/6 187/24
November 10 [1] 60/4
November 17 [2] 86/17 88/14
November 3 [1] 187/6
November 5 [2] 178/22 187/24
November 6 [4] 119/24 127/5 178/22 180/2
November 9 [5] 17/1 39/5 56/9 56/18 60/2
nuance [1] 118/9
nuances [1] 118/10
number [26] 8/9 8/16 8/21 10/6 10/11 13/12 13/25 32/2 32/21 36/3 42/16 43/20 55/11 68/4 93/8 99/4 99/11 130/3 134/23 163/20 163/25 175/15 184/2 184/7 184/19 185/7

numbers [1] 147/17
numerous [1] 14/18

**O**

O' [1] 100/23
O'-N-e-i-l-l [1] 100/23
O'NEILL [10] 3/14 100/13 100/17 100/22 112/7 113/24 118/21 122/1 126/20 157/20
O-c-c-i-p-i-t-a-l [1] 83/22
oak [1] 47/19
oath [1] 100/16
ob [1] 94/10
object [8] 83/2 104/3 114/20 115/2 145/8 154/5 172/22 180/8
objected [1] 115/1
objecting [2] 173/3 173/4
objection [21] 95/7 111/2 112/16 114/4 115/3 115/10 126/7 126/13 135/16 138/6 138/8 145/7 154/10 155/18 163/22 165/10 173/11 181/2 182/14 182/22 196/6
objective [1] 57/18
objects [2] 27/13 57/19
obscure [1] 78/6
observation [1] 18/14
observations [2] 22/17 43/16
observed [16] 8/24 9/4 9/11 9/13 9/16 10/16 10/20 17/20 22/18 37/1 84/22 94/3 94/11 94/16 96/4 193/19
observing [1] 123/18
obstruction [1] 44/23
obtain [5] 93/14 93/15 93/16 120/16 124/14
obtained [3] 91/22 135/4 136/15
obvious [1] 134/17
obviously [9] 33/10 40/18 135/22 145/22 183/1 195/6 197/24 198/4 198/25
occasion [8] 52/19 53/14 53/20 70/9 77/6 98/11 102/7 177/15
occasions [5] 53/4 98/11 130/5 163/9 184/14
occipital [10] 83/21 83/25 84/2 84/8 86/7 88/5 88/18 89/20 94/11 94/17
occupants [3] 104/18 104/21 105/25
occupation [1] 50/4
occur [1] 12/14
occurred [7] 59/2 94/18 97/8 97/11 135/8 187/23 197/21
occurring [3] 87/14 87/16 89/12
October [16] 6/17 7/6 8/16 8/23 10/6 10/13 165/2 165/5 184/2 184/10 184/11 184/15 184/16 184/16 184/18 184/21
October 10 [1] 184/18
October 22 [1] 184/16
October 31 [9] 6/17 8/16 8/23 10/6 10/13 184/2 184/11 184/15 184/21
odor [1] 23/5
offer [2] 156/21 181/1
offered [2] 99/8 182/19
office [5] 17/3 52/14 56/16 102/14 147/12
officer [6] 14/9 125/11 141/13 170/5 171/16 172/6
officers [4] 103/4 128/13 137/21 198/23
official [5] 2/4 112/12 147/11 200/4 200/19
oftentimes [1] 173/16
oil [1] 27/9
oils [1] 23/14
old [2] 139/10 198/2
older [4] 52/22 64/21 65/17 66/6

Olson [2] 83/6 87/9
one [109] 5/15 8/11 8/12 8/16 10/3 10/6 11/4 15/24 20/16 27/2 29/8 29/16 29/16 29/19 30/7 30/10 31/6 31/10 33/13 34/13 35/19 39/10 42/1 42/8 44/21 46/16 46/21 46/22 47/16 48/3 48/5 48/18 51/17 52/1 53/12 56/20 61/23 62/2 63/10 67/2 68/10 69/17 71/20 71/21 74/23 77/6 77/13 77/18 78/24 81/10 83/13 86/11 86/16 86/23 87/2 87/3 87/4 87/20 87/20 87/21 91/1 91/4 92/3 92/17 92/23 93/5 98/13 99/4 105/25 106/21 108/15 110/14 110/15 110/21 111/8 112/4 116/8 116/25 117/25 121/10 130/8 135/3 136/21 137/19 137/21 137/23 138/3 138/23 142/19 144/1 147/20 149/25 150/5 150/8 152/2 152/15 153/10 157/6 157/21 158/12 165/9 165/9 177/14 180/19 184/2 187/6 187/22 196/25 197/2
one-degree [1] 29/16
One-five-zero [1] 92/23
one-gallon [2] 48/3 48/5
ongoing [1] 17/5
open [8] 26/16 35/16 35/19 35/23 38/21 44/12 68/20 172/15
open-ended [1] 172/15
opened [2] 71/9 96/4
opening [2] 68/20 82/8
openings [1] 66/3
openness [1] 125/14
Operational [1] 53/2
opinion [27] 37/15 51/5 62/13 75/14 75/18 75/19 77/8 77/25 79/25 90/2 93/20 93/22 94/2 94/5 94/10 94/13 94/16 94/20 94/23 94/25 96/24 97/4 98/1 99/9 99/19 155/13 156/25
opinions [3] 51/2 73/16 73/19
opportunities [1] 14/22
opportunity [13] 18/25 26/3 26/13 60/3 65/18 68/12 75/24 77/14 122/22 127/11 131/5 131/7 189/6
opposed [1] 114/21
orange [1] 30/18
order [16] 16/13 17/23 19/6 25/21 30/7 33/18 35/16 35/20 35/22 51/24 114/12 133/14 170/13 174/22 195/25 196/12
ordinarily [2] 124/15 136/11
organic [1] 61/2
organization [1] 15/2
orient [1] 67/21
orientation [2] 34/21 43/24
oriented [1] 30/20
origin [4] 12/16 57/4 91/7 93/10
originated [1] 98/12
oth [1] 34/12
otherwise [2] 56/3 126/4
our [31] 12/17 16/3 16/13 17/3 22/2 33/16 37/19 65/5 65/8 65/23 79/20 79/22 102/14 102/19 108/17 112/11 120/15 140/13 140/16 141/12 147/24 157/3 183/6 186/24 187/7 187/10 188/8 188/17 189/9 189/13 189/16
outbuildings [1] 188/6
outer [1] 81/4
outside [11] 8/25 9/12 80/14 88/18 109/16 120/19 121/1 128/6 133/22 148/17 165/25
outward [2] 44/19 44/22
overemphasis [1] 116/17
overemphasizes [2] 115/25 116/13
overruled [2] 135/17 180/10

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 212 of 219    Document 19-18

**O**

oversee [1]  42/11
oxidation [2]  27/12 37/11
oxidized [4]  24/7 24/24 26/18 27/5
oxidizer [1]  29/4
oxidizes [1]  27/4

**P**

P-a-r-i-e-t-a-l [1]  79/19
p-e-r-i-m-o-r-t-e-m [1]  59/5
P-e-v-y-t-o-e [1]  11/20
p.m [12]  6/22 7/12 8/23 9/10 9/16 10/13
113/17 119/8 157/16 157/17 185/9
199/13
packaged [2]  96/7 96/10
packaging [1]  38/1
padding [1]  38/5
page [13]  3/2 147/20 148/1 151/11
152/24 156/5 159/3 161/14 161/17
166/6 167/25 169/20 174/6
pages [2]  147/9 147/10
paint [1]  27/9
pair [2]  105/8 105/9
pants [1]  105/9
paper [1]  48/4
par [1]  38/14
paragraph [1]  148/1
Pard [3]  132/19 173/22 181/20
paren [1]  138/24
parietal [13]  79/19 79/20 79/21 84/3
84/17 84/21 85/4 85/22 86/5 86/18
89/20 94/3 94/17
parked [1]  9/11
Parkway [1]  137/13
partial [1]  84/9
partially [1]  45/25
participants [3]  107/19 116/8 117/25
participated [3]  42/13 101/19 106/24
participation [1]  182/8
particles [3]  86/21 88/9 89/12
particularly [7]  54/18 54/25 103/5 115/4
120/18 178/4 179/20
parties [2]  6/7 115/6
partner [2]  107/6 138/21
parts [5]  65/12 91/10 110/13 193/7
194/9
party [1]  193/15
pass [4]  38/25 87/6 88/12 108/13
passenger [7]  29/17 29/19 104/24 105/1
109/3 109/5 142/14
passengers [1]  105/16
passing [1]  133/17
past [2]  131/20 168/1
pathologist [6]  73/22 74/17 76/8 76/11
82/15 99/7
pathologists [1]  76/16
pathology [3]  76/17 76/19 76/19
patrol [4]  70/10 103/3 187/7 187/13
penetrate [1]  87/6
perceive [1]  140/15
perceived [1]  144/15
percent [1]  47/23
perception [1]  173/23
perfect [3]  44/11 118/2 153/8
perform [1]  76/21
performed [2]  184/5 184/13
performing [1]  52/13
perhaps [12]  63/11 73/17 85/10 112/7
126/12 139/5 139/16 139/19 155/15
156/15 156/23 177/10
perimortem [1]  59/4
period [1]  41/12

permitted [1]  175/14
personal [1]  31/8
personally [2]  130/16 154/19
personnel [1]  39/13
persons [5]  56/20 132/1 176/17 177/23
187/1
perspective [1]  119/23
pertinent [1]  54/18
petroleum [3]  38/10 46/18 47/16
petroleum-based [2]  46/18 47/16
petroleums [1]  23/14
PEVYTOE [6]  3/5 11/11 11/12 11/19
16/23 39/4
Ph.D [2]  51/15 76/15
phenomenon [1]  87/14
phone [4]  184/21 185/10 187/7 192/15
phonetic [2]  19/8 103/3
photo [6]  6/19 7/8 59/16 68/14 96/12
184/13
photograph [16]  57/8 57/23 59/12 59/21
60/13 66/21 66/25 70/16 78/11 83/8
143/3 143/5 178/11 178/14 178/16
180/5
photographer [2]  164/20 184/9
photographs [3]  57/6 99/14 150/10
photos [2]  9/6 184/25
phrase [2]  90/17 160/3
phrased [1]  156/16
physical [3]  50/13 179/25 181/25
physically [4]  25/21 122/3 124/2 125/6
physician [1]  75/25
pick [1]  65/10
picture [14]  37/22 79/24 95/20 95/25
150/13 156/3 177/22 177/23 178/2
178/6 179/21 180/13 181/17 181/18
pictures [12]  151/22 151/24 152/12
152/18 152/21 153/3 153/6 153/16
153/23 153/24 155/1 155/3
piece [8]  19/2 19/2 33/3 41/6 41/6 61/5
61/7 163/19
pieces [7]  20/2 20/2 20/8 25/7 41/21
41/24 120/24
pinned [2]  193/20 193/23
pit [47]  17/17 18/2 18/4 18/12 18/21
20/25 21/8 21/16 21/19 21/22 22/6
22/19 22/21 22/25 23/2 23/22 23/25
25/6 27/1 28/2 35/16 35/19 36/17 37/1
39/9 39/17 39/18 39/20 40/5 40/7 40/17
42/2 42/3 42/6 42/12 42/18 43/3 43/6
43/9 43/11 43/15 43/21 63/17 78/5
90/23 91/23 92/1
place [3]  107/8 114/22 129/3
placed [2]  82/10 108/24
placement [2]  68/13 84/21
places [3]  66/3 114/20 145/19
PLAINTIFF [1]  1/4
plan [2]  131/2 196/16
plans [1]  195/15
plastic [2]  48/3 96/13
plastics [1]  47/25
plateau [1]  18/5
play [6]  109/24 110/9 112/2 112/4
116/25 118/23
played [1]  113/1
playing [8]  110/20 113/6 113/25 114/16
121/24 121/25 141/4 180/21
pleased [1]  143/12
pleases [1]  144/10
pleasure [3]  144/14 145/3 145/8
Pliszka [5]  184/5 184/20 185/2 185/4
185/8
pocket [1]  108/15
pointed [1]  26/9

pointer [3]  67/7 79/4 83/23
pointing [2]  72/3 82/7
points [3]  127/15 144/23 199/1
police [8]  14/9 21/17 107/9 134/4
141/13 141/16 171/16 172/6
polish [2]  81/22 82/2
polyurethane [2]  38/5 38/6
Pontiac [8]  104/4 130/22 131/12 135/5
136/16 136/22 137/17 137/20
porcelain [2]  61/5 61/8
portion [16]  37/2 39/25 68/15 68/17
68/18 69/1 69/3 81/4 84/11 84/11 92/23
111/21 114/18 114/20 115/17 151/13
portions [1]  117/23
position [2]  52/17 108/16
positioning [1]  79/13
positions [1]  52/11
possible [4]  43/12 58/22 92/13 116/5
postcranial [4]  64/15 90/17 90/18 90/22
poster [2]  177/24 178/2
posterior [1]  88/22
postmortem [1]  59/6
posture [1]  125/12
potential [2]  28/15 168/20
potentially [2]  43/22 44/25
pound [4]  29/9 29/16 38/19 38/19
pounds [2]  29/18 190/10
practical [3]  45/6 52/6 115/21
practically [1]  198/12
practice [5]  159/10 160/6 161/8 176/14
176/16
practices [3]  159/15 159/16 160/3
pre [1]  34/4
pre-fire [1]  34/4
precedes [1]  152/22
preceding [1]  43/10
preeminent [1]  55/8
preference [1]  112/11
preliminary [7]  5/15 18/20 21/3 40/15
41/4 89/5 101/2
premises [1]  104/17
preparation [1]  103/13
prepare [3]  55/23 136/12 171/4
prepared [4]  127/12 135/22 147/13
200/8
preparing [1]  70/8
presence [8]  59/1 59/18 83/2 86/20 89/5
149/2 165/24 192/23
present [22]  15/9 24/17 34/19 43/2
43/25 64/10 65/14 73/9 98/5 98/7
104/10 105/2 113/18 122/17 139/18
150/7 150/12 165/22 190/24 191/2
192/24 193/1
presentation [1]  121/23
presented [3]  57/25 66/17 158/18
Preservation [2]  50/7 52/18
pressed [1]  28/22
Presumably [2]  117/8 117/16
presumed [1]  164/12
presumptive [1]  164/11
pretended [1]  74/16
pretty [10]  26/16 29/10 30/8 30/15 31/1
112/5 114/10 131/11 131/17 134/17
previous [7]  40/17 69/1 71/1 84/3
102/14 102/22 185/12
previously [4]  26/2 32/10 71/4 126/8
primarily [4]  53/7 62/7 78/5 103/2
primary [1]  39/10
printed [2]  114/21 115/12
prior [13]  12/7 89/23 97/11 98/3 128/20
129/9 130/6 130/22 139/25 141/12
184/14 198/16 198/18
private [1]  14/21

## P

privately [1] 50/8
pro [1] 19/17
probative [2] 176/18 176/23
probative-type [1] 176/18
probe [1] 169/3
Probing [1] 177/7
proceed [5] 11/9 85/19 113/5 119/5 119/10
proceedings [2] 2/2 200/13
process [19] 19/17 22/11 27/11 34/16 35/10 35/21 41/9 41/11 44/8 47/8 57/22 57/24 58/1 58/1 58/10 58/16 96/23 97/9 97/12
processed [1] 42/8
processing [3] 22/19 42/6 42/11
produced [2] 136/20 170/19
product [1] 48/21
products [1] 48/24
professional [1] 56/1
profile [1] 58/18
program [4] 50/6 50/7 52/17 52/19
progress [1] 163/2
projected [1] 85/23
promise [5] 110/4 168/7 168/16 175/1 176/1
promised [1] 176/7
promises [12] 165/16 165/19 165/24 167/24 174/20 174/22 175/2 175/5 175/5 175/7 176/4 176/6
promising [1] 168/7
promoted [1] 171/24
property [40] 6/18 7/4 7/8 7/18 10/10 10/14 17/18 21/7 57/17 57/21 92/3 102/17 102/20 102/21 103/10 103/15 103/25 104/7 105/23 121/21 122/13 122/18 130/3 132/17 164/6 165/1 165/2 165/5 178/25 179/5 179/7 184/25 185/12 187/25 188/6 189/10 189/11 196/3 196/14 197/15
prosecution [1] 99/23
prosecutor [5] 1/14 1/16 1/18 6/1 9/20
Prosecutors [1] 5/7
protect [1] 18/7
protected [3] 34/25 35/2 35/6
protecting [1] 27/10
protective [1] 27/8
protrude [1] 69/21
providing [1] 112/9
proximity [1] 9/1
psychological [1] 173/1
psychologist [4] 146/21 146/22 146/23 146/24
publications [3] 55/2 55/6 55/12
publish [1] 181/8
published [1] 183/17
pull [3] 12/23 25/21 28/10
purple [1] 85/3
purportedly [1] 114/6
purpose [4] 133/24 134/1 189/13 189/16
purposes [2] 27/17 136/3
purview [1] 73/21

## Q

qualifications [1] 95/16
qualify [2] 93/24 98/10
quantity [1] 43/3
quarter [1] 63/12
quicker [3] 33/11 33/25 37/17
quickly [3] 27/4 27/13 27/19
quite [5] 15/20 35/2 80/5 193/10 198/20

quote [11] 155/24 159/5 160/21 168/12 184/23 184/24 185/3 185/4 185/11 185/12 190/2

## R

racial [1] 73/8
racket [1] 20/11
radial [12] 24/11 24/25 25/3 27/25 31/17 31/18 31/24 32/5 32/6 32/11 36/25 42/24
radial-belted [1] 32/5
radiant [8] 31/2 44/21 44/25 45/10 45/16 46/9 46/15 49/2
radiological [1] 82/14
radiology [1] 88/21
radiopaque [3] 86/21 88/11 89/6
raise [1] 49/19
raised [1] 115/10
rake [8] 31/13 36/2 36/11 36/16 36/18 36/22 37/2 37/10
Rakes [1] 67/15
range [4] 32/17 48/19 64/24 162/11
rank [3] 163/20 163/24 186/19
raped [1] 121/16
rapid [1] 27/12
rate [3] 47/13 48/23 49/4
rather [2] 117/5 134/12
RAV [3] 8/25 9/11 9/16
ray [4] 5/10 82/1 82/5 82/25
rayed [3] 81/24 82/19 82/20
RAYMOND [1] 1/21
rays [4] 86/16 87/6 88/11 99/15
re [2] 110/24 137/8
reaching [1] 146/3
react [1] 146/20
reacted [2] 145/23 146/5
reactions [1] 145/19
read-along [1] 111/13
reading [1] 119/16
reads [1] 183/25
ready [1] 52/4
reaffirming [1] 151/1
real [3] 28/21 70/21 76/13
realistic [1] 29/4
realized [2] 188/3 188/7
rear [2] 26/12 37/23
reask [1] 160/15
reason [9] 79/6 115/1 156/14 156/21 166/13 166/21 175/25 191/12 197/21
reasonable [6] 93/22 94/5 94/14 94/20 94/25 99/19
reasons [1] 168/20
recast [1] 146/12
receive [5] 14/14 19/13 51/24 96/10 109/19
received [19] 17/2 54/7 54/10 56/17 57/2 82/2 95/11 95/20 95/23 96/1 96/2 97/2 126/16 143/12 181/6 183/2 184/21 185/24 191/16
receives [1] 13/3
receiving [4] 109/12 121/8 182/14 197/23
recently [2] 53/19 136/13
receptionist [1] 184/6
receptive [1] 179/13
Recess [3] 85/17 113/16 157/16
recites [1] 161/22
recognition [2] 58/6 78/3
recognizable [5] 61/25 62/7 64/11 76/23 76/24
recognize [8] 55/19 57/11 72/12 86/13 92/20 105/2 178/13 180/13
recognized [1] 75/6

recognizing [2] 16/18 110/10
recollecting [1] 180/22
recollection [2] 138/10 197/9
recommendation [2] 82/23 83/1
reconstruct [1] 73/4
Reconvened [4] 5/1 85/18 113/17 157/17
record [14] 8/3 11/18 49/24 100/21 105/12 108/16 112/12 113/4 113/21 114/2 117/21 147/17 148/10 186/8
recorded [2] 108/10 108/17
recorder [5] 108/14 108/22 142/18 142/18 170/25
recording [4] 108/12 109/23 114/16 116/11
recordings [4] 117/1 127/17 128/12 136/4
records [1] 127/25
recovered [11] 19/17 19/25 28/5 32/20 50/23 63/17 66/13 70/25 72/3 92/8 92/24
recross [3] 3/18 181/12 181/14
Recross-Examination [2] 3/18 181/14
redirect [8] 3/17 49/11 49/12 98/16 98/17 174/15 174/18 175/12
reduce [1] 33/19
reexamination [2] 21/10 21/13
reexamine [1] 98/12
ref [1] 88/15
refer [3] 69/6 82/13 106/17
reference [7] 81/18 102/2 147/17 147/20 174/5 189/17 191/22
referenced [1] 71/3
Referencing [1] 36/6
referred [5] 17/17 55/20 62/18 92/2 138/23
referring [4] 48/25 49/1 115/12 131/22
refers [1] 123/5
refit [4] 59/10 77/18 78/20 88/15
reflect [2] 105/12 105/14
reflected [1] 28/5
reflective [1] 37/14
refresh [2] 127/24 136/2
refuse [1] 108/6
regional [1] 52/24
registration [1] 164/9
regular [4] 31/18 32/5 37/7 52/19
reinforcement [1] 31/19
reinterview [3] 192/13 197/12 197/20
reinterviewed [3] 191/7 197/1 197/18
reinterviewing [1] 191/13
relate [1] 29/25
related [4] 16/1 16/3 139/4 150/5
relationship [1] 189/23
relative [7] 63/22 63/24 72/13 72/23 84/20 190/22 195/16
relatively [1] 20/9
release [8] 29/7 38/12 46/20 47/6 47/13 48/20 48/23 49/4
released [4] 38/19 46/24 47/10 49/3
releases [1] 29/9
Relevance [3] 135/16 138/6 155/18
relevant [1] 145/12
reluctant [1] 48/9
rely [3] 117/4 119/18 171/6
remain [2] 46/25 100/16
remainder [1] 87/7
remaining [2] 25/4 43/3
remains [61] 16/18 18/6 19/20 24/25 25/6 27/15 27/25 28/5 32/19 33/20 40/8 43/7 50/17 50/23 51/3 51/6 53/16 53/16 53/23 54/1 55/14 55/15 56/13 56/15 57/19 58/15 59/1 59/19 61/11 63/19

## R

remains... [31]  63/22 63/25 64/4 64/12 64/15 64/15 64/18 64/20 66/9 66/13 66/17 66/18 67/1 69/11 73/1 73/23 75/16 75/19 76/22 78/2 78/5 89/19 90/9 90/21 90/22 91/11 91/17 91/17 91/22 93/20 93/25
remember [20]  44/2 45/19 80/9 137/23 143/2 150/13 150/17 151/13 151/16 152/12 153/25 155/25 156/2 156/10 162/8 162/11 162/16 163/16 166/5 167/19
remembered [1]  150/10
remind [3]  98/25 113/13 199/10
reminded [1]  183/23
remove [2]  40/18 41/8
removed [8]  18/21 26/12 39/25 40/4 40/6 40/11 40/16 42/1
removing [1]  35/5
render [3]  51/2 73/16 73/18
rendering [1]  51/4
rendition [1]  115/4
rep [1]  111/19
repeat [4]  151/23 159/22 159/23 169/12
Rephrase [1]  164/3
report [17]  93/25 136/9 136/18 136/19 137/11 138/23 147/11 148/2 148/15 148/19 150/6 170/19 171/4 171/12 177/24 187/10 193/5
reported [8]  2/3 102/23 129/5 133/7 133/17 165/4 191/21 200/6
reporter [10]  2/4 22/3 110/24 111/6 111/21 137/2 149/17 149/19 200/5 200/19
reporting [2]  12/17 163/1
reports [5]  52/2 99/14 135/23 136/12 136/17
repre [1]  63/9
represent [1]  65/2
representative [1]  25/9
represented [2]  63/9 91/1
representing [2]  56/21 151/17
represents [4]  59/25 60/20 67/23 71/21
request [3]  13/4 118/13 120/15
requested [7]  22/9 50/20 50/20 184/23 187/15 188/1 188/10
requests [1]  108/1
required [1]  29/15
requirement [1]  35/15
research [3]  28/14 44/1 48/11
reserve [1]  12/9
residence [19]  6/22 7/11 7/21 8/19 8/24 9/1 9/9 9/12 9/15 120/8 122/7 192/20 192/22 193/19 193/19 193/24 193/25 194/2 194/11
residences [1]  188/5
residue [1]  32/9
resisted [1]  177/20
respect [9]  18/2 37/25 69/8 80/5 83/25 103/6 164/17 179/20 189/1
respected [1]  76/5
respond [5]  53/13 109/7 145/14 188/16 191/24
responded [1]  188/12
responder [1]  109/10
response [8]  53/2 115/7 156/18 164/14 166/14 171/20 175/1 180/20
responses [7]  109/11 109/16 109/18 109/20 110/1 115/21 159/17
responsibilities [1]  52/11
rest [1]  90/5
restructure [1]  175/17

result [7]  16/16 53/7 74/25 75/20 76/25 94/8 135/23
resume [1]  157/18
resumed [1]  179/9
resuming [1]  118/20
resumé [1]  55/20
return [4]  37/19 56/16 77/7 122/9
returned [2]  9/15 122/6
Returning [1]  195/11
review [5]  18/23 136/17 151/5 198/16 198/19
reviewed [3]  99/14 128/11 136/1
reviewing [2]  70/8 190/14
revisit [1]  27/22
revisiting [1]  191/13
ride [1]  105/23
ridge [1]  69/20
riding [1]  179/3
Riemer [3]  19/11 20/21 20/22
rim [2]  69/20 72/7
Rindt [1]  21/25
Rita [1]  53/22
road [2]  79/10 179/8
roadside [2]  122/8 122/9
Roberta [1]  125/20
Rod [1]  11/11
RODNEY [3]  3/5 11/12 11/19
role [2]  103/7 187/22
room [2]  18/10 38/12
rough [5]  18/13 28/3 63/10 63/11 115/15
roughly [4]  15/13 29/21 133/17 157/22
round [1]  20/12
rounded [1]  72/22
roundedness [1]  72/7
rows [1]  159/13
RPR [2]  2/3 200/19
rub [1]  83/20
run [2]  74/15 79/11
running [1]  60/23
runs [2]  23/17 68/18
rural [1]  6/15
rust [2]  27/19 37/17
rusted [1]  26/8
rusting [1]  27/13
rusts [1]  27/4

## S

S-i-e-h-e-l-e-r [1]  22/4
S-t-i-e-r [1]  82/17
sadly [1]  13/20
safety [1]  31/2
sale [4]  7/3 7/17 9/2 185/1
salvage [11]  7/20 10/9 17/18 104/6 120/8 120/20 129/3 184/14 187/25 188/4 188/5
sandwiched [1]  80/14
sandy [3]  18/4 18/10 21/23
sar [1]  36/21
Sarinske [1]  172/25
sat [4]  108/25 109/2 109/5 161/22
Saturday [14]  120/21 120/22 130/20 131/15 131/24 132/9 132/12 132/15 132/22 133/1 133/18 178/21 179/1 179/2
save [2]  146/14 156/13
Scales [1]  61/18
scapula [1]  92/13
scared [15]  156/16 156/17 156/20 166/11 166/15 166/16 166/20 167/2 167/6 167/7 167/11 167/13 167/14 167/14 168/1
scene [10]  17/7 17/24 21/4 21/5 25/10

25/14 32/4 34/23 39/5 40/17
scenes [2]  16/7 28/7
scheduled [1]  165/1
scheme [2]  61/16 61/21
Schmitz [6]  6/10 6/17 6/18 6/21 7/1 7/2
school [9]  76/13 140/4 150/6 191/17 191/19 191/25 192/2 192/17 192/21
Schuster [3]  184/3 184/8 184/12
Sciences [1]  55/10
scientific [5]  93/22 94/6 94/14 94/21 95/1
scope [1]  146/2
Scott [2]  10/6 10/12
screaming [1]  194/1
screen [12]  24/21 37/22 57/10 60/14 66/24 67/12 89/4 90/14 114/14 115/13 118/5 181/17
scrutinized [1]  51/23
sealed [3]  56/15 57/1 96/3
search [14]  21/20 103/14 104/1 104/3 104/15 104/19 105/20 134/1 135/4 135/6 135/9 135/12 136/15 138/5
searched [2]  21/15 39/12
seat [17]  26/1 26/4 26/10 26/11 26/12 26/13 26/23 27/5 37/23 38/2 40/1 41/19 42/2 109/1 109/2 109/5 118/1
seated [9]  11/15 37/18 49/23 100/20 105/6 105/7 119/9 122/4 186/6
seating [1]  38/2
second [10]  8/14 9/17 25/24 75/1 86/8 92/1 98/6 165/14 167/22 167/24
Secondly [1]  116/18
secretary [1]  54/24
security [2]  17/11 17/12
seem [4]  27/18 44/11 81/9 198/23
seemed [1]  18/10
seemingly [1]  117/24
seems [4]  13/14 15/24 120/1 146/4
seen [13]  16/20 19/24 23/6 24/9 28/20 36/7 77/13 89/14 120/17 125/15 129/3 193/6 194/6
segregated [1]  96/14
seized [2]  104/15 104/20
seizure [3]  104/4 104/22 135/11
sense [3]  31/23 109/14 177/5
sent [2]  93/11 108/18
separate [3]  28/11 98/11 111/15
separating [1]  33/9
September [3]  53/12 53/19 184/18
September 11 [1]  53/12
September 19 [1]  184/18
Sergeant [1]  103/3
serial [2]  163/20 163/24
series [1]  57/6
serves [1]  22/13
set [7]  61/20 82/17 100/14 114/9 119/9 188/21 192/18
setting [2]  33/8 101/1
seven [1]  10/3
several [17]  22/8 26/25 30/13 39/18 41/13 44/20 45/2 45/22 51/2 53/4 56/21 64/13 77/4 167/11 167/17 187/12 188/16
sex [5]  51/3 58/20 66/12 72/24 91/14
sexual [1]  121/18
shape [4]  20/12 20/13 70/1 72/21
shapes [2]  69/14 69/16
sharp [1]  69/21
sharpness [2]  72/7 72/14
sheriff [3]  12/9 103/1 103/9
Sheriff's [16]  18/18 19/11 40/9 40/15 40/22 101/4 101/6 101/15 101/18 102/8 102/15 104/9 147/12 186/14 186/17

**S**

Sheriff's... [1] 186/23
shirt [2] 6/24 105/8
shoot [1] 179/5
shoots [1] 184/13
shorthand [1] 200/10
shortly [4] 102/6 137/9 191/8 191/14
shoulder [2] 65/25 92/12
shovel [1] 37/7
shovels [1] 67/15
show [7] 55/16 71/8 84/20 87/5 92/17
 97/25 152/22
showed [8] 77/17 77/20 81/25 82/4
 82/24 86/19 143/3 145/21
shower [1] 9/9
showing [3] 65/6 84/18 114/15
shown [3] 29/8 178/11 194/14
shows [4] 24/12 39/22 78/25 88/6
shy [1] 169/4
sic [1] 107/6
side [19] 36/21 78/18 78/24 79/16 79/17
 79/20 79/22 81/1 81/6 81/6 82/9 84/4
 85/1 85/2 86/6 109/5 122/4 142/15
 142/21
Siegert [1] 103/3
Sielehr [2] 21/25 22/3
sift [3] 40/20 40/24 41/14
sifting [2] 20/24 98/8
signature [2] 84/1 93/14
signatures [3] 82/25 83/1 97/25
significance [6] 19/16 23/24 25/13 57/20
 79/25 83/24
significant [4] 25/1 59/20 80/5 157/11
signs [5] 65/6 65/10 77/17 82/4 197/25
similar [4] 31/19 32/9 90/4 161/11
simply [7] 39/8 44/18 45/12 59/5 81/22
 90/18 112/11
simultaneously [1] 47/6
sit [5] 16/4 52/4 79/12 109/4 124/2
site [1] 53/5
Sites [2] 50/7 52/18
sitting [4] 125/7 125/13 181/24 198/17
six [7] 8/11 8/12 18/12 30/22 43/22 44/1
 54/23
six-year [1] 54/23
sixth [1] 75/9
sizable [1] 29/10
size [7] 18/9 20/10 20/11 24/6 30/2 30/3
 30/8
skeletal [1] 33/20
skeleton [9] 65/12 69/15 72/6 72/13
 72/16 84/24 84/25 85/1 86/4
skeletonized [2] 54/1 64/5
skeletons [1] 71/20
skewer [1] 41/7
skill [1] 16/22
skills [1] 140/12
Skim [1] 107/5
skin [3] 31/14 31/15 45/11
Skorlinski [29] 104/13 107/6 120/5
 125/1 127/1 130/14 130/17 133/21
 134/5 135/3 135/14 136/15 137/22
 138/18 138/20 138/21 150/9 157/23
 158/17 158/25 161/5 162/20 162/24
 163/1 165/23 167/12 168/24 169/15
 170/10
skull [53] 62/23 63/7 63/8 64/14 64/16
 65/19 65/21 70/21 70/22 70/24 72/2
 77/19 78/17 78/18 78/19 78/24 79/7
 79/12 79/17 79/17 79/21 79/22 80/10
 80/11 80/14 80/15 80/16 80/19 81/3
 81/4 81/23 82/4 82/9 82/18 83/13 83/17

83/19 83/19 84/4 84/6 84/12 85/2 86/3
 86/6 86/7 87/1 87/14 88/6 88/19 90/19
 94/8 97/2 97/8
skulls [2] 65/23 69/22
slash [2] 8/25 10/14
sleeping [1] 53/8
sleeved [1] 105/8
slide [1] 71/6
slides [1] 71/1
slightly [1] 38/18
sloped [1] 30/21
slow [1] 149/19
small [7] 19/18 19/21 20/9 41/1 41/21
 86/21 108/15
smaller [2] 18/11 92/24
smoke [1] 30/16
smoothness [1] 72/15
sneakers [1] 105/10
snowmobile [1] 31/23
Society [1] 50/6
Society's [1] 52/18
socket [13] 67/24 67/25 68/3 68/9 68/16
 69/3 69/19 70/3 72/4 72/8 72/17 72/19
 72/21
sockets [2] 69/24 71/24
sod [1] 22/18
soft [1] 116/9
soft-spoken [1] 116/9
soil [6] 22/17 23/4 23/13 36/17 37/7
 40/4
solely [2] 111/22 119/19
solid [4] 23/14 28/24 29/5 38/9
somebody's [1] 153/15
someone's [1] 64/3
sometime [1] 170/20
sometimes [12] 13/5 23/17 62/18 65/11
 75/8 75/9 76/24 109/14 140/20 144/12
 163/4 169/4
somewhat [1] 171/25
somewhere [1] 79/10
son [1] 8/17
sor [1] 158/18
sort [7] 33/22 38/3 77/14 125/4 146/17
 163/1 165/16
sorted [2] 58/11 71/12
sorting [2] 57/15 58/6
sound [1] 61/7
source [6] 28/15 28/18 28/19 31/19
 31/20 45/22
sources [1] 37/20
South [1] 15/6
space [1] 190/6
spade [2] 37/5 37/12
span [1] 55/12
speak [11] 31/25 79/1 122/23 128/13
 154/7 163/20 174/23 185/9 196/4 196/8
 196/9
speaker [1] 15/25
speaking [7] 12/13 102/16 124/12 129/9
 195/16 196/6 198/12
speaks [1] 74/10
special [15] 1/14 1/16 1/18 5/7 6/1 9/20
 11/24 17/14 19/10 21/23 21/25 21/25
 104/12 120/5 187/21
specialize [1] 76/17
specie [1] 47/18
specifics [1] 123/24
speed [3] 34/16 127/19 158/5
spell [6] 11/18 22/3 49/24 100/21 137/2
 186/7
spend [4] 20/24 22/6 107/12 107/13
spent [3] 22/8 126/20 169/15
sphere [1] 65/22

sphere-like [1] 65/22
spider [1] 79/9
spinal [1] 75/4
spine [2] 91/10 92/12
split [1] 114/11
spoke [12] 17/13 84/14 128/9 128/16
 129/23 129/24 129/25 130/15 130/17
 133/13 133/13 178/21
spoken [7] 114/22 115/16 116/2 116/9
 117/5 118/11 129/9
spontaneous [1] 131/4
sporadic [1] 130/12
squeezed [1] 20/15
SS [1] 200/1
stack [1] 33/7
staff [1] 82/10
stage [2] 23/17 61/20
stand [6] 11/11 36/12 36/14 46/9 103/25
 113/24
standard [4] 47/19 159/10 159/14
 159/15
standing [5] 10/21 30/21 46/2 100/16
 156/3
standpoint [1] 38/6
stands [2] 53/1 199/13
stare [1] 190/6
start [10] 32/25 36/2 100/10 100/11
 110/20 133/10 183/6 183/8 184/17
 190/7
started [10] 18/17 19/3 22/8 22/11
 25/15 81/19 103/12 113/25 163/13
 189/22
starting [1] 111/24
starts [2] 62/2 65/5
statement [16] 140/9 146/21 149/14
 153/14 159/5 160/20 160/22 161/2
 162/2 162/4 170/4 176/14 194/13
 194/17 194/18 194/20
states [1] 15/24
stature [3] 58/21 72/25 73/6
status [1] 54/10
stay [2] 27/18 46/6
steel [15] 24/11 24/25 25/2 25/9 27/25
 31/17 31/18 31/21 31/25 32/11 36/25
 41/23 42/18 42/21 42/24
steel-belt [1] 31/18
steel-belted [11] 24/11 24/25 25/2 27/25
 31/17 32/11 36/25 41/23 42/18 42/21
 42/24
steel-belting [1] 25/9
stenographic [1] 200/9
step [8] 18/15 39/8 49/13 58/10 58/16
 64/24 98/18 183/3
Stephenson [3] 102/17 104/7 180/17
Steve [12] 10/8 135/5 171/16 189/16
 189/18 189/21 189/22 189/24 193/20
 193/25 194/1 194/10
Steven [24] 6/10 6/16 9/7 10/18 10/20
 57/17 63/18 90/23 91/23 104/4 120/18
 123/4 123/25 124/21 129/10 129/23
 139/5 139/17 139/20 177/10 178/17
 179/19 184/22 193/18
Steven's [1] 193/7
Stier [1] 82/17
still [9] 9/11 23/1 37/22 40/7 42/5 122/7
 122/9 152/24 157/10
stipulated [2] 5/22 6/2
stipulation [19] 3/12 5/20 7/22 8/3 8/14
 9/21 9/24 10/4 10/22 10/25 98/22 98/24
 99/3 99/24 183/17 183/25 185/15
 185/19 185/22
stipulations [8] 3/3 3/19 6/7 6/8 9/18
 11/6 99/1 183/24

**S**

stir [1] 35/3
stop [8] 8/25 32/25 60/5 137/15 137/19 138/4 141/23 166/19
stopped [8] 104/18 105/16 113/2 131/12 132/21 136/22 137/17 138/10
stopping [2] 111/23 130/22
stops [1] 80/11
store [1] 48/6
straighten [1] 103/22
struck [1] 23/23
structure [3] 38/21 65/22 65/22
structures [1] 59/19
struggle [2] 124/2 124/8
stuck [1] 142/18
studies [3] 29/8 46/13 46/19
study [1] 50/16
Sturdivant [2] 19/10 20/24
subfield [1] 50/13
subject [1] 126/11
subjected [2] 89/15 89/24
subjective [1] 145/18
subjects [2] 16/1 16/2
submit [1] 52/1
subsequent [1] 93/7
subsequently [3] 83/5 104/18 108/18
substance [3] 46/17 46/18 88/10
substantial [1] 72/22
substantive [1] 146/10
suggest [9] 32/20 125/17 149/13 150/22 155/11 157/3 168/19 171/15 177/10
suggested [6] 43/20 154/25 156/14 161/11 168/25 173/20
suggesting [2] 34/3 176/20
suggestion [1] 177/20
suggestive [3] 27/1 172/20 175/9
suggests [2] 151/21 173/25
suicide [1] 75/5
summarizes [1] 115/9
summary [1] 55/25
Sunday [19] 102/6 120/22 129/23 129/24 129/24 130/21 131/13 132/23 132/25 133/1 133/15 133/21 133/25 135/11 135/20 140/1 165/6 178/21 179/18
sunset [4] 131/16 131/20 132/13 179/1
supervise [1] 42/11
supplement [1] 170/19
supplemental [1] 147/11
supportive [1] 89/7
supposed [1] 143/20
surface [6] 25/22 27/2 32/24 33/5 33/10 35/1
surfaces [3] 27/6 35/9 65/14
surrounded [1] 188/6
surrounding [3] 35/23 88/11 99/16
suspect [7] 143/15 143/17 145/11 145/11 196/21 196/22 196/24
suspected [3] 19/4 19/20 20/3
suspects [1] 101/14
suspicion [1] 198/10
sustain [3] 75/3 138/7 154/9
sustained [6] 59/2 87/18 155/19 165/12 173/12 196/9
suture [1] 65/20
sutures [1] 66/4
SUV [3] 7/4 7/18 26/10
sweating [2] 125/4 125/10
sworn [5] 11/14 49/22 100/19 183/16 186/5
sync [1] 116/5
synthetic [1] 38/10

systematic [1] 58/1

**T**

table [3] 61/7 84/8 180/18
tact [1] 177/14
Tadych [4] 10/7 10/12 10/16 10/19
tag [4] 71/3 71/7 71/8 95/24
taken [12] 23/25 81/24 86/17 88/13 110/24 122/12 124/17 124/22 145/21 177/14 187/13 200/9
talking [20] 29/1 33/12 35/19 48/23 54/13 71/25 111/9 123/21 128/3 130/6 130/22 132/21 139/14 142/6 148/15 159/7 162/20 169/4 169/25 189/23
talks [1] 61/21
tall [1] 58/21
tape [7] 57/2 96/3 115/17 122/2 123/11 154/6 154/8
tarp [3] 18/7 39/23 39/24
tasks [1] 56/23
Taurus [2] 141/18 141/24
teach [3] 15/20 15/21 16/1
teacher [1] 141/7
team [3] 52/24 52/25 53/2
teams [1] 53/12
technician [1] 88/21
technicians [1] 21/17
techniques [1] 64/2
teenager [2] 140/8 140/8
teeth [1] 66/2
telephone [2] 17/2 56/9
television [1] 28/21
telling [14] 36/25 58/12 66/8 69/12 132/12 138/3 139/17 150/1 155/25 163/6 165/25 194/25 195/8 198/14
tells [1] 90/5
temperature [6] 46/25 47/1 47/3 47/9 48/19 162/9
temporal [1] 94/7
temporary [1] 23/16
ten [8] 6/23 7/12 7/20 54/7 86/16 88/8 124/10 124/22
ten-minute [2] 7/20 124/10
tend [2] 33/23 37/17
tender [3] 95/9 112/8 126/5
tending [1] 35/13
tends [2] 35/4 38/21
tenure [1] 13/11
Teresa [31] 6/18 7/7 9/5 9/12 99/10 99/16 99/20 102/10 102/20 120/17 120/19 121/1 121/20 123/25 124/20 128/24 133/8 164/10 164/19 168/20 171/15 177/10 184/8 184/12 185/5 185/9 187/16 191/22 191/22 193/20 193/23
Teresa's [1] 185/10
terms [18] 23/22 32/8 32/15 38/15 48/22 61/9 63/8 64/25 70/1 71/23 90/20 96/19 101/25 120/10 122/2 122/21 124/12 197/19
terrible [1] 170/7
testifies [1] 183/15
testifying [2] 128/20 136/3
testimony [8] 42/21 44/24 45/13 95/19 97/7 127/12 163/16 183/9
Texas [1] 61/17
text [1] 115/12
thefts [1] 186/25
theme [1] 171/25
themselves [2] 12/12 145/24
there'll [2] 33/25 118/24
thereafter [2] 156/9 200/11
thermal [3] 29/14 31/15 45/11

thigh [1] 73/5
thinking [1] 85/13
third [9] 5/19 5/20 10/4 36/19 37/2 75/5 78/21 134/16 161/20
thirds [1] 18/9
thirty [2] 87/20 87/21
thirty-nine [2] 87/20 87/21
this [216]
THOMAS [1] 1/15
thorough [2] 196/1 196/12
thou [1] 181/6
though [2] 36/14 167/23
thought [9] 19/15 81/16 136/5 136/5 145/11 151/14 182/24 192/9 197/7
thousand [7] 13/14 15/13 15/16 29/9 29/22 30/5 127/7
three [19] 5/17 6/6 29/22 30/11 31/7 31/11 46/9 54/23 78/19 78/23 79/18 81/2 125/7 147/10 147/20 158/20 169/9 184/19 195/11
through [36] 13/24 17/11 19/3 20/18 20/25 23/16 40/20 40/24 41/5 41/9 41/13 41/14 51/21 53/23 54/21 56/8 57/16 57/18 58/2 59/17 60/23 71/12 71/18 77/14 78/7 87/7 88/12 95/6 95/21 95/23 112/5 113/9 114/6 165/22 172/12 184/11
throughout [3] 15/23 171/25 182/8
thus [4] 109/23 116/6 179/9 179/17
Tim [2] 70/10 71/19
timer [1] 114/15
times [19] 13/20 16/20 27/7 40/25 41/13 41/17 43/10 44/4 130/3 130/15 130/16 150/25 158/16 158/20 158/22 163/5 167/11 167/17 169/9
timing [1] 118/2
tip [1] 103/18
tire [15] 23/11 24/7 28/18 28/19 29/17 29/19 30/9 32/11 38/9 41/23 46/17 46/21 47/17 48/2 48/18
tire-type [1] 46/17
tires [46] 23/7 23/7 24/11 24/25 25/2 25/3 28/1 28/4 28/7 28/11 28/15 29/5 29/9 30/11 30/16 30/20 30/25 31/6 31/9 31/10 31/17 31/18 31/21 31/22 31/24 32/2 32/5 32/6 34/15 38/14 42/15 42/17 42/20 42/24 43/1 43/5 43/20 44/1 45/7 45/7 45/15 45/20 45/22 45/24 46/16 46/22
tissue [5] 20/3 20/8 61/1 87/14 93/1
title [1] 51/25
Tobacco [1] 14/17
today [11] 50/25 51/1 51/2 105/3 123/18 125/13 127/10 128/7 128/9 128/21 180/7
Todd [2] 103/2 107/1
together [7] 28/12 65/24 66/1 66/4 78/20 116/5 128/18
told [30] 27/24 98/25 106/5 124/18 124/18 141/13 151/4 155/23 157/24 157/25 158/3 158/4 158/20 158/25 163/6 168/2 168/4 168/9 179/4 190/1 190/6 190/8 193/6 193/10 193/17 193/22 193/22 194/5 198/19 198/23
Tom [3] 5/8 19/10 188/14
tomorrow [1] 199/12
too [5] 46/24 64/4 73/23 150/21 183/6
top [10] 7/13 67/23 67/25 68/3 69/2 69/19 72/8 72/17 72/21 79/24
total [2] 123/12 182/7
totality [2] 124/18 126/24
totally [2] 124/4 125/14
toward [2] 9/7 159/3

**T**

towards [2] 36/22 85/1
towing [1] 104/6
town [3] 102/17 104/7 180/16
Toyota [1] 8/25
traces [2] 65/15 87/12
track [1] 175/25
Trade [1] 53/11
traditional [2] 64/5 73/24
trailer [9] 9/7 31/22 31/23 31/23 171/16 172/11 172/19 174/7 177/11
train [2] 53/6 53/9
training [15] 14/5 14/15 16/6 16/16 28/13 43/16 46/12 50/12 51/10 56/1 75/11 75/12 76/18 124/7 146/17
traits [2] 58/13 64/9
trans [1] 111/15
transcribed [2] 111/16 200/11
transcript [18] 2/2 111/10 112/10 126/3 126/10 126/11 136/4 136/7 151/3 151/5 151/9 151/18 152/23 154/15 158/9 165/15 200/8 200/12
transcription [2] 114/24 200/11
transcripts [3] 119/13 127/15 127/16
transfer [1] 44/20
transferred [2] 93/3 93/5
transit [1] 56/18
transition [1] 27/22
transportation [1] 122/15
trauma [5] 53/17 59/1 77/17 77/22 89/15
travel [1] 15/23
treated [1] 183/24
tref [1] 7/5
tremendous [2] 38/7 38/11
trial [13] 1/4 1/5 3/3 3/12 3/19 6/8 8/14 98/22 98/24 99/2 183/16 183/23 183/25
trickery [1] 160/9
tried [2] 39/12 127/18
trier [2] 117/23 118/8
trip [1] 156/13
tripartite [1] 5/19
Trooper [1] 71/19
trouble [1] 168/3
trust [1] 117/5
truth [5] 131/6 161/6 163/6 166/9 166/23
truthful [4] 144/7 144/8 144/16 144/18
try [9] 22/4 30/2 77/17 114/12 116/4 127/24 146/13 170/13 175/24
trying [12] 17/22 48/12 59/9 120/16 133/10 144/4 160/2 175/22 175/23 176/21 177/2 177/25
tuberculosis [1] 74/18
turbulent [1] 44/9
turn [1] 159/3
turned [4] 19/5 19/25 162/16 162/17
twenty [16] 12/6 29/18 123/12 126/21 134/9 135/1 144/24 147/1 148/5 157/21 158/23 162/6 163/10 167/10 169/14 182/5
Twenty-five [1] 12/6
twenty-minute [1] 182/5
Twice [1] 130/18
two [55] 8/21 10/11 17/13 18/9 19/21 20/8 21/23 30/10 31/7 31/10 68/4 69/7 69/8 71/19 77/19 78/17 78/18 78/20 86/17 87/3 96/21 96/25 97/1 97/17 98/11 99/11 100/6 103/14 104/18 105/16 106/16 108/20 110/13 115/21 118/1 119/21 127/7 127/18 130/4 130/5 130/14 130/25 134/10 147/9 148/1

158/19 170/5 175/15 181/6 184/7 191/3 191/18 192/3 192/14 195/12
two-hour [1] 127/18
two-thirds [1] 18/9
Two-thousand [1] 127/7
type [20] 24/23 26/10 28/17 32/9 34/14 34/18 35/3 38/1 38/4 38/21 39/13 46/17 77/2 83/16 109/11 109/18 121/18 140/8 176/18 198/3
typed [1] 112/9
types [5] 14/22 34/17 49/8 76/22 186/21
typical [1] 72/16
typically [8] 13/1 13/3 31/22 36/18 66/5 73/5 76/21 140/7

**U**

ugh [2] 109/15 109/15
ugh-ugh [1] 109/15
ultimate [1] 62/19
umbrella [1] 78/8
unable [2] 43/16 93/9
unbone [1] 58/8
unburned [1] 58/8
uncertain [1] 175/16
uncomfortable [1] 31/14
uncontrollable [2] 197/25 198/25
uncontrollably [2] 190/7 198/3
undertake [1] 118/15
undertook [1] 59/9
undetermined [1] 75/10
undisturbed [1] 34/23
undue [1] 114/21
unexpected [1] 82/1
unexplained [2] 75/8 75/9
unfortunately [1] 13/12
unit [2] 12/1 29/15
University [1] 14/8
unless [2] 35/17 44/22
unmarked [2] 107/9 141/17
unnatural [4] 80/16 84/1 86/19 94/7
unquestionable [1] 77/21
unrecognizable [3] 62/5 64/4 78/16
unsure [2] 138/24 194/24
untruthful [2] 144/11 144/25
unusual [6] 20/13 22/20 22/22 82/1 82/4 82/24
upper [2] 40/5 88/1
upset [3] 195/2 195/3 195/8
utility [2] 31/23 42/25
utilize [3] 61/13 112/10 159/17

**V**

vague [2] 163/25 172/23
value [4] 19/4 20/1 41/15 118/9
van [9] 9/1 9/6 37/23 40/1 41/19 42/2 150/10 153/16 184/25
vapor [1] 23/16
variable [1] 45/19
variables [4] 32/22 34/8 34/9 34/12
variation [3] 44/15 50/14 119/17
variety [2] 122/23 186/24
various [5] 14/22 46/20 129/25 133/12 169/9
varying [1] 61/11
vehicle [38] 6/19 7/8 9/5 26/10 26/11 104/6 104/16 104/17 104/19 104/20 104/22 104/23 105/16 105/18 105/21 105/22 106/1 106/5 108/22 120/20 121/4 122/5 133/22 134/4 134/18 135/11 138/4 138/10 138/14 138/15 138/19 162/5 162/14 162/18 164/5 164/8 164/16 187/24
vehicles [3] 103/14 134/2 135/13

venue [1] 177/7
verbal [1] 164/14
versus [5] 33/8 46/16 46/16 97/21 178/5
vertebrae [1] 91/10
vertical [1] 44/18
vessel [2] 79/7 79/8
vessels [2] 79/11 86/25
Veterans [1] 82/16
victims [1] 19/24
video [2] 141/4 154/17
view [3] 79/9 95/18 196/20
VIN [1] 164/9
vinyl [1] 38/3
violence [11] 75/22 77/8 78/1 78/9 79/2 80/1 80/6 89/9 94/24 96/17 96/20
Virtually [1] 90/25
visible [2] 44/13 142/22
visibly [1] 195/8
visited [1] 139/6
visor [6] 108/23 108/23 142/19 142/21 142/21 170/25
visual [3] 18/14 114/4 118/15
visually [3] 44/5 61/25 76/24
vitae [1] 55/21
voicemail [2] 56/12 185/5

**W**

W-i-e-g-e-r-t [1] 186/10
wad [2] 40/2 41/22
waist [3] 6/24 6/24 7/13
waist-length [2] 6/24 7/13
wait [1] 71/7
waited [1] 192/20
walk [1] 9/6
warrant [12] 103/14 104/1 104/11 104/15 104/19 105/21 135/4 135/6 135/9 135/15 136/15 138/5
warrants [1] 134/1
washed [1] 54/1
water [1] 29/16
watering [1] 125/7
Wausau [1] 12/10
wax [1] 48/4
wear [2] 65/6 65/6
wearing [3] 6/23 7/13 105/8
weather [3] 34/18 34/19 34/20
webs [1] 79/9
website [1] 178/1
Wednesday [2] 17/1 17/25
week [3] 131/12 188/15 194/13
weeks [2] 195/11 195/12
weight [6] 29/17 182/2 197/24 198/4 198/11 198/24
welcome [3] 49/15 98/20 119/7
well-known [1] 76/4
well-respected [1] 76/5
Wendy [2] 189/9 191/3
west [1] 6/12
whenever [2] 80/15 81/25
whereabouts [1] 132/16
Wherein [5] 113/1 113/2 113/6 121/24 121/25
wherever [1] 171/3
white [10] 6/24 7/13 25/18 60/18 71/9 86/21 87/2 87/5 88/9 105/8
whole [4] 13/15 18/10 116/3 173/1
wide [1] 186/24
WIEGERT [9] 3/21 17/15 35/25 55/16 57/5 183/14 186/2 186/3 186/9
wife [1] 178/18
window [2] 161/12 161/23
winds [1] 34/19
wire [14] 24/7 24/16 24/17 24/23 24/23

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 218 of 219    Document 19-18

## W

wire... [9]  25/1 25/7 25/11 25/13 25/16 25/17 25/21 26/17 41/25
wires [5]  24/8 24/9 25/23 36/24 36/25
wiring [5]  40/2 40/2 41/23 42/2 42/18
WISCONSIN [29]  1/1 1/3 1/14 1/16 1/18 5/3 6/11 6/13 6/15 11/24 12/10 12/15 14/8 50/5 52/16 52/17 56/22 70/10 76/6 82/11 82/21 93/16 99/6 102/9 178/1 184/4 188/9 200/1 200/6
Wisconsin's [1]  50/7
wish [2]  113/21 183/11
withdrawn [1]  124/3
withholding [1]  155/11
without [5]  31/12 31/13 46/24 48/9 118/8
witness [30]  6/4 11/13 38/25 49/16 49/21 67/10 95/10 98/19 100/8 100/18 105/13 111/23 111/24 113/23 126/6 135/18 137/4 144/2 145/16 145/20 146/9 149/12 149/22 175/15 183/6 183/7 186/4 186/9 196/7 196/11
witnesses [3]  3/4 101/13 120/16
woman [2]  9/4 189/2
wonder [1]  119/22
wood [5]  34/17 46/16 47/15 47/18 47/19
wooden [2]  37/7 41/7
wooden-handled [1]  37/7
word [6]  114/21 114/22 116/6 117/5 117/6 198/5
words [9]  65/7 74/9 116/6 118/10 119/17 143/25 167/19 179/1 180/4
work [12]  12/1 12/20 17/2 51/22 52/13 53/14 54/19 67/13 70/9 71/18 74/15 131/20
worked [5]  16/12 55/7 164/19 164/22 178/6
working [3]  22/6 131/24 187/5
world [3]  15/14 15/16 53/11
worldwide [1]  15/4
wound [7]  80/20 81/7 82/9 85/6 87/18 94/5 94/13
wounds [6]  34/4 96/22 97/1 97/17 98/1 99/22
write [1]  148/8
written [7]  52/5 116/6 116/21 117/5 126/2 154/15 194/21
wrote [2]  148/19 194/18

## X

x-ray [3]  82/1 82/5 82/25
x-rayed [3]  81/24 82/19 82/20
x-rays [4]  86/16 87/6 88/11 99/15

## Y

yanked [1]  178/2
yard [8]  7/20 17/18 120/8 120/20 129/4 187/25 188/4 188/5
year [4]  54/23 65/4 127/6 198/2
years [14]  12/5 12/6 13/24 16/21 54/7 54/23 64/22 65/17 93/21 94/1 101/7 124/7 186/18 186/20
yellow [10]  114/7 114/18 114/19 115/2 115/11 116/4 116/14 117/21 118/4 118/4
Yep [3]  103/21 125/24 181/7
York [1]  52/15
young [3]  9/4 141/1 189/2
younger [1]  94/1
yourselves [2]  113/14 199/11

## Z

zero [1]  92/23
zipper [1]  66/2
Zipperer [6]  6/14 7/6 7/7 7/10 7/15 7/19
zoomed [1]  72/9