STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 3

---

STATE OF WISCONSIN,

     PLAINTIFF,   JURY TRIAL
            TRIAL DAY 5
vs.         Case No. 06 CF 88

BRENDAN R. DASSEY,

     DEFENDANT.

---

**DATE:**  APRIL 20, 2007

**BEFORE:** HON. JEROME L. FOX
     Circuit Court Judge

**APPEARANCES:**

    KENNETH R. KRATZ
    District Attorney
    On behalf of the State of Wisconsin.

    THOMAS J. FALLON
    Special Prosecutor
    On behalf of the State of Wisconsin.

    NORMAN A. GAHN
    Special Prosecutor
    On behalf of the State of Wisconsin.

    MARK R. FREMGEN
    Attorney at Law
    On behalf of the defendant.

    RAYMOND L. EDELSTEIN
    Attorney at Law
    On behalf of the defendant.

    BRENDAN R. DASSEY
    Defendant
    Appeared in person.

**COPY**

1

* * * * * * * *

**TRANSCRIPT OF PROCEEDINGS**

Reported by Jennifer K. Hau, RPR

Official Court Reporter


**I N D E X**

WITNESSES                                           PAGE


**MARK WIEGERT**

Direct Examination Cont'd by ATTORNEY FALLON    4-37

Cross-Examination by ATTORNEY EDELSTEIN         39-103

| EXHIBITS | MARKED | MOVED | ADMITTED |
|----------|--------|-------|----------|
| 206 | 16 | 37 | 38 |
| 207-213 | | 37 | 38 |
| 214 | | 94 | 94 |
| 215 | 67 | | |
| 216 | 98 | | |

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 2 of 115    Document 19-19

(Reconvened at 8:36 a.m.; jurors not present.)

THE COURT: Good morning, Counsel. Uh, I'm going to call the case. It's 06 CF 88, State of Wisconsin vs. Brendan Dassey. Appearances, please.

ATTORNEY FALLON: Good morning, Your Honor. May it please the Court, the State continues in its appearance by Special Prosecutors, Ken Kratz, Tom Fallon and Norm Gahn.

ATTORNEY FREMGEN: Attorney Mark Fremgen appears with Ray Edelstein. The, uh, defendant appears in person.

THE COURT: Uh, the Court is going to go on the record before the jury -- thanks -- before the jury comes in to -- to note that, uh, prior to coming in here, Counsel and I have had a discussion. I informed them that one of the jurors was having some health-related issues. Uh, after the discussion, she is going to be released. So, Counsel, is that correct?

ATTORNEY FALLON: Yes, Judge, that's our understanding, and we would agree with the Court's assessment to have, uh, her excused.

THE COURT: Defense?

ATTORNEY FREMGEN: That's correct.

THE COURT: All right. Bring the jury in.

3

ATTORNEY FALLON: Judge, are you going to read the instruction about the video as well?

THE COURT: I am.

ATTORNEY FALLON: Okay.

THE COURT: Once we get to it.

(Jurors in at 8:39 a.m.)

THE COURT: All right. Be seated. Is prosecution ready to proceed?

ATTORNEY FALLON: Yes. We would ask that the, uh -- Investigator Wiegert retake the stand.

**MARK WIEGERT,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name for the record.

THE WITNESS: Mark Wiegert, W-i-e-g-e-r-t.

**DIRECT EXAMINATION CONT'D**

BY ATTORNEY FALLON:

Q    Investigator Wiegert, I believe we left off yesterday afternoon, uh, regarding, uh, your intended interview of the defendant on February 27. Would you, um, first of all, tell us of your plans to interview the defendant on that day?

4

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 4 of 115    Document 19-19

A    Uh, yes.  Um, myself and Agent Fassbender had went to the Mishicot School System and, uh, that's where we met with Mr. Dassey that day.

Q    All right.  And the, um -- You, uh, gestured to, uh, Mr. Dassey.  Just, officially, and for the record, is the, uh, Brendan Dassey that you interviewed on that day and subsequent days present in court today?

A    He is.  He's seated at the -- to the left -- my left of his attorney.  He's wearing a blue shirt and glasses.

Q    Very well.

          ATTORNEY FALLON:  The record should, again, reflect that the, uh, witness has identified the defendant.

          THE COURT:  It will so reflect.

          ATTORNEY FALLON:  Thank you.

Q    (By Attorney Fallon) About what time did you arrive at the Mishicot High School on that day, February 27?

A    I believe it was about 12:30 or so in the afternoon when we first got to the school.

Q    Where did you meet with Mr., uh, Dassey, the defendant?

A    Uh, we met with Mr. Dassey in a conference room just

5

off of where the office for the, I believe it's the high school, would be located.

Q   Who else was present?

A   Uh, myself and Mr. Fassbender.

Q   Did you then, um, commence an interview of Mr., uh, Dassey that day?

A   We did.  We did about, um, hour, little over an hour, interview with Mr. Dassey at the school.

Q   All right.  And at the, um, conclusion -- Well, first of all, tell us, was that interview at all, um, memorialized in any fashion?

A   We did do an audiotape.  Unfortunately, all we had was one of the old cassette recorders, and we had that sitting on a, um, table between us, and it -- it didn't pick up very well.  The audio is very poor.

Q   All right.  At the conclusion of the interview, what did you do?

A   After the interview, we had contacted, um District Attorney Kratz to inform him of what we had learned from that interview.  Uh, Mr. Kratz requested that we memorial -- memorialize this interview in a -- in a better fashion.  So, um, at that point we decided -- we made arrangements to go to, uh, Two Rivers Police Department where there would be a videotaped, um, interview done.  So that's what we did.

6

Q   All right. What arrangements did you make in advance to conduct a videotaped interview?

A   We actually contacted, um, Brendan's mother and, uh, informed her what we wanted to do. Um --

Q   And how did she respond?

A   Barb actually responded to the school at that time, um, and she rode with myself, Agent Fassbender, and Brendan to Two Rivers Police Department all in the same car. We gave her a ride there.

Q   And, um, tell us approximately what time did you, um, interview the defendant at Two Rivers Police Department?

A   Um, it was somewhere between 3:20 and 3:30 in the afternoon when we started the interview at Two Rivers Police Department.

Q   And where was the, uh, defendant's mother, Barb Janda, at that time?

A   We had spoke to Barb prior to doing the interview, and indicated she had every right to be in the interview if she wished to be in. At that time she declined. She waited in a outer waiting area, um, of the police department while we conducted the interview.

Q   All right. And approximately how long did you, uh, speak with Mr., uh, Dassey, uh, this

7

afternoon?

A    I believe it was less than an hour that we did that interview.

Q    All right.  At the conclusion of the interview, uh, what was done between you and Special Agent Fassbender?

A    Obviously, we discussed the interview and discussed what we had learned in the interview.

Q    All right.  After, um, meeting and interviewing Mr. Dassey, uh, on this day, February 27, what was your thinking?

A    Well, at that time -- That's the first time Brendan places himself at the crime scene is during that interview.  Places himself at the fire.  So we decided that we needed to interview everybody else that lived on that property and we needed to do that right away to see what other people knew.  We didn't know if other people knew about this at that point or not.  So we decided that we needed to conduct a lot of interviews.

Q    Did you have any feeling as to whether or not the defendant had told you everything that he knew at that time?

A    My feeling was, no, he didn't.  That he knew more, because every time we would talk to him he'd give you

8

a little bit more, give you a little bit more. And, again, that's the first time he placed himself, basically, on that crime scene.

Q All right. Now, at that -- after those, um, two interviews, uh, that particular day, did you think that he was a suspect at that particular point?

A No. Uh, again, in my thinking at that point, he's still a witness -- a wis -- a witness to something horrific. Um, he tells us that he sees body parts in a fire. I mean, so we're thinking he is a witness to something at that point that...

Q All right. Now, um, earlier, we heard from Special Agent Fassbender that, um, the defendant and his mother, uh, were put up at the, um, Fox Hills, um, Hotel in Mishicot. How did that come to pass?

A Well, there are two reasons that we decided to do that that night. Um, the first reason, number one, first and foremost in any law enforcement's mind, is safety. I mean, our job is to protect people. That's the bottom line. Because of the information he told us, if there was somebody else that lived out there that would have found out and may have also been involved, we were worried for his safety, that

9

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 9 of 115    Document 19-19

they would somehow get to him and maybe harm him. So we thought, to be on the safe side, we needed to put him, um, somewhere off of that property.

Number two, as any law enforcement officer knows, integrity in an investigation is very important, and it can be tainted very easily by somebody going back and saying, this is what I told the cops. Cover this up. Do this. And we didn't want that to happen. We didn't want Brendan, or his mother for that matter, going back and telling anybody else on that property what they told us for fear of tainting that investigation. So there were two reasons that we did that.

Q All right. Now, um, Special Agent Fassbender told us about an interview he had with the defendant and his mother later that evening, the 27th. Did you and he discuss the results of his, um, interview that evening?

A We did. Um, Agent Fassbender informed me that he had learned from another family member that Mr. Dassey might have had more information about that, and also that there were some pants that, um, maybe had some bleach stains on it. Agent Fassbender informed me that he went back to Mr. Dassey and his mother later

10

on the 27th, that evening, and asked Mr. Dassey about the pants. And that's the first time Mr. Dassey, Brendan, ever told us about stains on his pants, cleaning up the garage floor. So now he puts himself further into it. Puts himself in that garage later on that night.

Q All right. So are you saying that in -- in either one of the previous interviews that day, he never mentioned anything about bleach, or cleaning up in the garage, or any of that?

A No. We never knew anything about that until Agent Fassbender learned it and went back and talked to Brendan later that night, on the 27th. That's when we learned that.

Q Um, as a result of that information, uh, what did you decide to do?

A Well, obviously, when you keep learning little bits and pieces, Brendan keeps telling us a little more here, a little more there, we realized it could probably be either saw more, knew more, something. We need to make arrangements to go back and talk to him again. That was obvious.

Q Now, during these interviews on the 27th, did he admit any involvement in any part -- any of this?

A No. Um, basically, he was telling us he was a

11

witness.

Q   All right.  Um, so then did you make arrangements to reinterview the defendant?

A   We did.  Yes.

Q   And tell us about the preparation of those plans?

A   Um, that would take us to March 1.  Um, at that point we contacted Brendan's mother again, told her that we would like to take Brendan to the Manitowoc Sheriff's Department so we could do a videotaped interview of Brendan to see what else he maybe had known, see what else maybe he saw.  It's obvious that he knew more than he was telling us.

So at that point, um, we did, again, talk to his mother, told her what we wanted to do, and she gave us permission to do that, and, um, Brendan agreed, also, and Brendan went with us to the Manitowoc Sheriff's Department.

Q   All right.  And then did you proceed to, um, interview Brendan Dassey on March 1?

A   We did.  Yes.

Q   And was that interview memorialized in any capacity?

A   That interview was videotaped.

Q   All right.  Now, um, before we, um, present the, uh, results of that interview, I'd like to talk

12

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 12 of 115   Document 19-19

to you a little bit first, about, um, some of the interview techniques that you employed during the course of your interrogation of, uh -- of, uh, the defendant?

A    Sure.

Q    During the, um, interview on March 1, did you and Special Agent Fassbender employ any deception during the course of, um, your interviewing him?

A    Absolutely.  Yes.

Q    All right.  And tell us why?

A    Well, one of the reasons that we say things that may be not be true, or use deceptive measures, is to see how suggestible he is.  I mean, if I would say something that's not true, and he agrees with everything I say that's not true, obviously that's a problem.  So we use techniques like that to see if he'll resist that.  And, in fact, he did.

He would bring up certain things that we knew not to be true, and he would say, that -- that's not true.  It's not true.  He'd stick to that.  So, yeah, it's very important, in my opinion and my experience as -- as doing interviews, you do have to do that.  Absolutely.

Q    Do you also engage in a technique on information that you suspect to be true, but may not know it

13

Q   true, to see if the person you're interviewing will tell you anything about it?

A   Sure.  I mean, it -- it works both ways.  I mean, you -- you may not know.  You may -- Again, like you said, you may suspect something, and you may say that, and he may, yeah, that's true.  And -- and that -- Again, that happens.  It goes both ways.

Q   All right.  Now, um, what other, um, interview techniques were, um, employed during your, um, uh, questioning of the defendant on March 1?

A   We would say things like, um, you're going to hear on the tape, that we already know, um, and they refer to it as having superior knowledge.  Um, and we used that technique in that interview as well.

Q   All right.  And tell us a little bit about that technique?  I mean, what is this superior knowledge?

A   Anybody you interview, no matter what type of incident it is, what type of crime it is, it's against your self-preservation instincts.  If you're involved in something, to come out and admit to it, nobody likes to admit to things.  I've been doing interviews a long time and very seldom does somebody come out on the first time you talk with them and admit things.

14

So when you use the quote, unquote, superior knowledge thing, it implies to them that you know more. That you can't fool me. We know all about it. You might as well just tell us. And that's the reason you use those type of things.

Q In-- in your, uh, experience as an investigator, how often has someone immediately acknowledged their involvement in a -- in an offense when you sit down and begin to question them?

A Almost never.

Q Um, is it unusual at all for people to minimize their involvement in offenses in the initial, um, interview?

A No. And if you look at interviews -- And, again, you take almost any crime from -- from a burglary, sexual assault, to a homicide, it's normal that people will minimize. Try to, yeah, I did a little bit, but I really didn't do it all. Things like that. And it's -- it's -- it's -- it equates to peeling an onion back. You take those layers off. Those defensive layers of people. And that's -- that's what you do in interviews. That's what we do.

Q And, um, were there any other, um, interview techniques employed, uh, during the questioning

15

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 15 of 115    Document 19-19

Q of the defendant that day?

A Um, yeah. We -- we would get friendly with him. Um, we would tell them that, you know, it's okay. Things are okay. Because you don't want somebody to -- You don't want somebody upset. You don't want somebody afraid of you. You want to be -- You know, different officers use different techniques. But I found the best way for anybody is going to be you -- you try to befriend them. You be nice to them. I'm not a "get in your face" type interviewer.

Q Is that a -- any, um, common technique that you employ?

A Absolutely. Yes.

Q All right. Um, prior to, um -- Prior to, um, questioning, uh, the defendant, did -- did you advise him of his constitutional rights?

A Yes. He was read his *Miranda* rights from our -- our rights form. Our warning and waiver of rights form. (Exhibit No. 206 marked for identification.)

Q Uh, you've been handed an exhibit. Tell us what it is?

A It's the Calumet County Sheriff's Department Warning and Waiver of Rights form.

Q What is our exhibit number on that form?

A Uh, 206.

16

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 16 of 115    Document 19-19

Q All right. And tell us a little bit about that form, if you would?

A Um, the *Miranda* rights are -- are -- You've probably all seen it on TV if you watch any cop shows. Um, the right to remain silent. Things like that. It was just a form that we use that spells it all out. The bottom two questions indicate, do you know and understand each of -- each of these rights that I've explained to you? And it's either a yes or a no. And understanding these rights, do you wish to make a statement? And it's either a yes or a no.

Q All right. Now, I also note that, uh, from my previous examination of the form, there's some writing on that form? Some, uh, handwriting as opposed to the printed form?

A Yes. What --

Q Tell us about that?

A What I do when I read the rights to people, I check them all off, first of all, to make sure I've covered them all. And then I have the person initial them. Take a look at what I read to them, and I have them initial them. Which I did in this case.

I also do that for the part of the waiver where I ask them if they understand these rights, and ask them if they want to speak with

17

me. Whether they say yes or no, I have them initial them to -- to show that they have at least looked at this form and read them.

And then there's a place for the, uh, person I'm interviewing to sign, and there's a place where I sign as a witness on the bottom.

Q All right. Now, in terms of presenting that information to the defendant, did you read the form to him or did he read it himself?

A I read the form to him. And, again, I showed him the form and have him initial what I read.

Q All right. At any point did he show any confusion, um, or misunderstanding of -- of the information on the form?

A No, not at all.

Q Did he show any hesitancy about, um, his willingness to speak with you and Agent Fassbender on March 1?

A No.

Q All right. Um, at any point, um, did you, uh, promise him, um, any inducements to -- in order to get him to speak with you that day?

A No.

Q All right. Um, and on March 1, who else was, um, present or around for this interview?

18

A Again, myself and Agent Fassbender conducted the interview. Um, Brendan's mother had presented herself at the Sheriff's Department sometime later during the interview.

Q All right. Um, I believe we're ready to --

(Discussion off the record.)

ATTORNEY FALLON: That's probably a good idea.

Q (By Attorney Fallon) Tell us about the, um -- the specific location where the interview took place?

A Sure. The interview that we conducted on March 1 was done, again, at the Manitowoc County Sheriff's Department, which -- I don't know if you guys had a chance to be outside, but right outside, the next building over. Um, that interview was conducted in the detective's portion of the Sheriff's Department, which is, I believe, second floor of the Sheriff's Department there.

Um, it's conducted in what we call a soft room. Um, it -- it's like a small living room, if you will. It's got a small couch, two small soft chairs, it's got lamps for lighting.

It's not like you see on TV. Again, you know, CSI, stuff like that, where it's this brick wall room and this hard table and you got the

19

light shining on them and things like that. It's a very, uh -- very comfortable room. And that's -- that's where he was interviewed.

Q  All right.

ATTORNEY FALLON:  I believe we're, um, ready.

THE COURT:  Is this going to be a closed caption video?

ATTORNEY FALLON:  Yes.

THE COURT:  I'm going to read the instruction then.

ATTORNEY FALLON:  Yeah, I think that would be good.

THE COURT:  All right. Uh, ladies and gentlemen, closed caption transcripts have been added to this videotape. If you, the jury, believe in watching the video concurrently while reading the closed caption words that there's a variation between videotape and the closed caption, you are to rely solely on the videotape, so...

Um, do you want the reporter to take this? I mean, there's a transcript of this as well. If I --

ATTORNEY FALLON:  We can provide a transcript, um, if necessary. We will be

20

introducing a DVD as, um, the actual evidence, uh, consistent, of course, with the law and the instruction you just read.

THE COURT: All right. I'll ask the defense, do you have any objection if -- if the reporter does not take this? Understanding that the trustworthiness of it is secured by a number of different things; a transcript, a CD.

ATTORNEY EDELSTEIN: Certainly as to the CD.

THE COURT: All right.

ATTORNEY EDELSTEIN: No, there's no objection if the reporter doesn't take it.

THE COURT: Okay. All right.

ATTORNEY FALLON: Um, if there's no objection, could, um, Investigator Wiegert resume a seat back here during the playing? Uh --

THE COURT: Do you have any objection?

ATTORNEY FALLON: We -- we will stop the tape at one point and re-call him to ex -- explain a few things that are occurring, but other than that, it will be about 2 hours and 20 minutes or so.

I guess we'll, uh, have Investigator, uh, maintain his current position just for

21

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 21 of 115   Document 19-19

facilitating the ease of talking about the -- a few of the points that we will stop the tape at.

THE COURT: All right.

(Wherein DVD is played.)

(Wherein DVD is stopped.)

ATTORNEY FALLON: Your Honor, I think we'll take our morning break at this time. The closed caption did not pan out for us this time around. And, secondly, we stopped the tape at approximately 1208.

THE COURT: All right. The record will reflect that. We'll recess until, uh, 10:35.

(Recess had at 10:17 a.m.)

(Reconvened at 10:38 a.m.)

THE COURT: Mr. Fallon, you may proceed.

ATTORNEY FALLON: Thank you, Judge. Um, I believe we have it cued up to the appropriate spot and we'll continue at this point. Apparently, the program does not have a particular pause button so it does have to be repeated.

THE COURT: Okay.

(Wherein playing of DVD continues.)

(Wherein DVD is stopped.)

ATTORNEY FALLON: Your Honor, we've

22

spoken with counsel and we're going to speed up through this break.

THE COURT: All right.

(Wherein playing of DVD continues.)

(Wherein playing of DVD is stopped.)

ATTORNEY FALLON: I think this would be a good time to take the break.

THE COURT: I think you're right. Uh, we will recess for the lunch hour. We'll -- we'll be back here at 1:05. I'll remind the jury, no talking about this or anything related to the case.

(Recess had at 11:59 a.m.)

(Reconvened at 1:32 p.m.)

THE COURT: Mr. Fallon, are you set to proceed?

ATTORNEY FALLON: We are.

THE COURT: You may do so.

(Wherein playing of DVD is continued.)

(Wherein playing of DVD is stopped.)

ATTORNEY FALLON: Your Honor, I believe we've agreed that the remainder of the, um, discussion does not contain pertinent questioning of the defendant and I think we agreed to, um, stop the tape at this particular point.

23

THE COURT: And to the defense, is that true?

ATTORNEY EDELSTEIN: It is, Your Honor.

THE COURT: All right.

Q (By Attorney Fallon) Investigator Wiegert, I have a few, um, questions for you. Um, I think I'll take these more or less in reverse order from what we've just seen. Um, if you would, please, um, tell us why -- First of all, from your investigative efforts did, um, Teresa Halbach have a tattoo on her stomach?

A No. We knew she didn't have a tattoo.

Q And why was that question put to the defendant?

A It's one of those things I kind of explained to you guys before we started the, uh, interview. We -- we do say things that are intentionally false. Um, as you noticed, Brendan said, no, he didn't see a tattoo. So he answered that appropriately. So we give him false things to see if he'll just go along with it. And clearly he doesn't.

Q Um, your colleague, um, In -- uh, Investigator Fassbender, also asked certain anatomical questions related to, um, Teresa Halbach's, um, physical appearance and physical attributes. What is the purpose of those questions?

24

A When Brendan told us that he sexually assaulted her, that's the first time we knew that happened. Okay? And when you do interviews in reference to sexual assaults, one of the things that you ask the suspect is, uh, certain questions about the body. Um, it's to see if they can recollect, um, what they've seen to see if -- again, to see if they can just go along with it, see if they make things up. Um, and, again, in that case I believe he answered those questions appropriately. The color of the hair. Everything.

Q All right. Are those questions also asked to test whether or not he actually saw what he said he saw?

A Yes.

Q All right. Um, again, uh, there was a lengthy break, um, that we sped through. Um, my estimate was there was a break of almost about 28, 29 minutes, from 12:29 to 12:57. Could you tell us what was going on at that time?

A Yes. Actually, we had made a phone call to the prosecutor, Mr. Kratz. Um, Mr. Kratz, and there were some other investigators, who were starting to prepare a search warrant, um, based on some new information. If you heard me pick up the phone during that interview, and I said do not sign, do not

25

sign, um, do not serve. I don't remember if you remember hearing that. I was stopping them from the process of doing that search warrant, because we had learned new information by that time and we wanted to include that information in the search warrant.

So during that break, we were talking -- excuse me -- to the, uh, district attorney about getting the proper information in that search warrant.

Q All right. And, um, is this the interview, um, that contributed information leading to the search warrant which was executed at Steven Avery's trailer and garage on March 1 and 2 that we've heard earlier about in this trial?

A It is. This is an -- After this information was provided to us, when we gained that search warrant and signed by a judge, we went back and executed that search warrant on the 1st of March after this, and continued that into the 2nd of March. That's when we recovered the two bullets based on Brendan's information that she was shot in the garage, which is one of the bullets that contained the DNA of Teresa Halbach.

Q All right. Now, um, we also noted that there were some drawings that you requested that the

26

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 26 of 115    Document 19-19

defendant prepared?

A    Yes.

Q    Um, did you bring those with you today?

A    Yes.

Q    I'd like to ask you some questions about those drawings. Uh, first -- first one -- first one, I believe, is Exhibit 207?

A    That's correct.

Q    And what is depicted in Exhibit 207?

A    Uh, Exhibit 207 is the picture of the knife that Brendan drew for us.

Q    All right. And are there any writings or other markings other than the -- the depiction, itself?

A    Yes. Um, Brendan signed it, he dated it, and he put the time on there.

Q    All right. And, uh, the next exhibit?

A    Uh, 209.

Q    Yes. What is depicted in Exhibit 209?

A    Uh, this one depicts the garage. Um, Brendan drew out the garage, and he had the snowmobile, um, in the garage. He's got the vehicle in the garage. He's got the lawnmower labeled. He also put in where they laid Teresa, and where he and Steve are both standing. Again, he signed this one, dated it, and put the time on it.

27

Q All right. Exhibit 210?

A Yes.

Q What is depicted in Exhibit 210?

A This is a drawing he did of the burn pit area. Uh, included in this drawing is he's got the garage. He correctly drew out where the burn pit was. Uh, he put the doghouse in. He even drew her body laying in that depression, if you will, uh, where we found her bones. And, again, he signed this one, he dated it, and he put the time on it.

Q All right. And the last one, 208?

A Yes. This one is, um, a rendering of the -- Steve Avery's bedroom. Again, in this one, he's got the bed drawn in. He's got the dresser. He's got the nightstand. He's got the closet. He put on the wall the gun rack. Um, and he also drew Teresa's body on the bed.

Q All right. I'm going to ask that, uh, your colleague, Mr. Fassbender, take those exhibits and bring those to the ELMO for publication.

ATTORNEY FALLON: It would begin with 207. The reverse order that you have them. Two -- 207 first.

Q (By Attorney Fallon) Now, again, 207, this is the knife that he drew that we just saw on the,

28

um -- the videotaped interview?

A    It is. It's the one he said that they used to cut her throat and stab her.

Q    All right.

ATTORNEY FALLON: Um, 209, Mr. Fassbender, please? All right. You might have to zoom out a little on that. All right.

Q    (By Attorney Fallon) And 209, this is the depiction of the garage?

A    It is. And if I could elaborate a little bit about that one?

Q    Yeah. I have -- I have a few questions if I may?

A    Okay.

Q    Um, there seems to be, uh, depicted in there, um, a, uh, stick person. What is represented by that depiction?

A    That's where Brendan stated when they took her out of the back of the RAV 4, where they placed her on the ground, and that's where they shot her. The thing about that one is he places her -- If -- if you compare this drawing to things you might have seen earlier in the trial, where we believed that there was a luminol stain -- or the stain -- excuse me -- the luminol showed a stain which we believed to be bleach, which he later said he had cleaned up in the

29

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 29 of 115   Document 19-19

garage, is exactly where that luminol lit up.

Q All right. And I see initials. There's two X's with initials. One is B. R. D; what is that supposed to represent?

A I had Brendan label where he was standing. And I had him label where Steve was standing when, uh, he shot her.

Q All right. And is that the -- the, um -- the "X" which is depicted below the lettering B. R. D.?

A That is correct. Yes.

Q And that's supposed to be an S. A.? Is that what it -- that is?

A Yes.

Q All right. And, um, there is a little box, um, above three circles. There's three circles between the -- the stick person depiction, and then there's, uh, a box above that. What is that?

A That's where -- If you remember in the pictures, there was a -- I believe it's a John Deere lawnmower sitting.

Q All right. And what were the three circles that are sup -- uh, supposedly, uh, depicted between the stick person and the lawnmower?

A I believe that's where he's drawing the blood.

30

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 30 of 115    Document 19-19

Q All right. And, um, just so that we're clear, is that his handwriting which appears on the right-hand of the screen?

A It is.

Q All right. Next. We are now publishing 210. I believe you indicated this was, um, uh, the burn pit?

A Correct. If you see, he actually drew the mound in. And if you remember the actual pictures, there's a gravel and dirt mound built up there. And I believe that's what he was drawing there.

Q I'm going to have my colleague, Mr. Gahn, hand you a laser pointer?

A Sure.

Q And, uh, as I recall your testimony from a few moments ago, um, there is a, um -- a doghouse that was drawn in?

A Right. He's got the doghouse drawn in right here. And here's that mound I was talking about. If you remember back on the pictures, that was a gravel and dirt mound.

Q Right.

A And here was that dugout impression.

Q All right. And what is depicted in that depression?

31

A He drew in where they put Teresa. And that's exactly where the bones were found. It was within this area here.

Q All right.

ATTORNEY FALLON: Um, next one, Mr. Fassbender. Exhibit 208, I believe it is. If you'd zoom out just a bit. All right.

Q (By Attorney Fallon) What is depicted in Exhibit 208?

A That would be, uh, Steve Avery's bedroom, which he drew for us.

Q All right. And, um, there are a number of, uh, items. Specifically, um, there is a bed, which is depicted there?

A Yeah. He drew the bed in right here.

Q And -- And what is represented or depicted in the drawing on the bed?

A He actually drew Teresa in on the bed. And you can see the chains or handcuffs that are attached to her legs and her arms.

Q All right. Now, what was significant about the, um, layout of the bedroom, vis-a-vis, the, um, investigative, um, beliefs, initially, when this case broke, and, subsequently, what did you learn about it?

32

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 32 of 115    Document 19-19

A   Well, when we served the search warrants on the, uh, trailer, we found the bed right here. Okay? The gun rack is on the wall. There's actually pictures. If you remember that? You see the gun rack? And the bed was here. The door is actually here to the bedroom.

When we interviewed Brendan, he had stated that you could see now -- you could see Teresa from looking down that hallway. And we initially thought, well, how can that be? Because if the bed is here, there's no way you could see Teresa on that bed from looking down the hallway, when he says he just walks in the house and he looks down there.

Q   Let -- let -- let -- Let me stop you right there. Um, when you executed the search warrant on November 5, are you telling us the bed was under the gun rack?

A   Yes.

Q   All right. Continue.

A   The bed was under this gun rack when we executed the search warrant. So when Brendan tells us that the bed is over here -- Or, actually, Brendan told us he could see her. So we ask him, well, draw the bed in. So he draws it in here without any prompting or

33

telling him where anything was in that room.

When we eventually talked to Steve Avery's girlfriend, fiancé as she put it yesterday, she also puts the bed here. So, now -- Well, obviously, when you walk in that door to that trailer, and you look down that hallway in this doorway, he's right. You could see it.

Q All right. Now, um, there's been some, uh, testimony, uh, of assistance rendered to the investigation by a state trooper by the name of Timothy Austin. I think, um, there was a stipulation regarding some of his animation, and I believe Dr. Eisenberg, um, testified that he assisted her. Um, as a result of the information provided by Jodi Stachowski and, um, the defendant, Brendan Dassey, did you ask him to do anything?

A Yes. We asked, um, Trooper Austin to see if that was feasibly possible. If that bed would fit in that area. So he did that.

Q All right. I'm going to show you, um, a -- a photograph. I'm having my colleague show you what has been marked for identification as Exhibit 211?

34

A    Yes.

Q    Did you recognize that?

A    I do.

Q    What is Exhibit 211?

A    Two-eleven is a rendering, um, based off of information that we learned in this case of how a bedroom was the day that Teresa was -- that we believe that Teresa was in there.

Q    All right. Yes. I'm going to have my, uh, colleague hand that for publication. All right. Exhibit 211 is, uh, depicted, and, uh, tell us about that? Illustrate, first of all, where the doorway to the room is.

A    Sure. The door is right here. And here's that exit door to go outside, um, the one that Brendan talked about, and the cement steps was right there by the bedroom. Um, the garage would be, basically, right over here. And this is the bed drawn in here. Um, the little desk. I think it's like a two-file -- two-drawer file cabinet there that he had in the room. Uh, the bookcase. And you see on the wall here is the gun rack.

Q    All right. And, um, did you commission, uh, Trooper Austin to do one other animation -- animated still for your investigation?

35

A   Yes, we did.

Q   All right.  I'm showing you now what has been marked for identification as Exhibit 212.  What is depicted in, uh, Exhibit 212?

A   Again, this is, um, Steve's garage.  Um, as you can see, the big garage door here.  The small entry door of the garage.  Some of the important things in this rendering would be that John Deere lawnmower that we talked about that he had drawn in, which is right there.  And, if you remember, he got the, uh -- actually, the RAV 4 in here, too, backed in, which fits very well.

Q   All right.  Now, just so that we're clear, um, there appears to be, um, uh, significantly less clutter in the photo than in the original photograph of that garage; is that correct?

A   Yes.

Q   And was that, uh, specifically requested of Trooper Austin?

A   It was.

Q   And, uh, was that to just facilitate the general layout of the garage?

A   Yes.

Q   All right.  And, um, do you believe that to be a representative portrayal of the information

36

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 36 of 115    Document 19-19

provided by the defendant?

A Yes, I do.

Q All right. Um, Investigator Wiegert, um, for the record, then, what was the address of Steven Avery's trailer and garage?

A Um, 12932 Avery Road, Town of Gibson, Manitowoc County, Wisconsin.

Q And is that the location where the defendant attributed these events occurred?

A It is.

ATTORNEY FALLON: I have no further questions for this witness. Would move into evidence Exhibits, uh, 207, 208, 209, 210, 211, 212, and, uh, I've -- I've forgotten the exhibit number for the DVD of the, uh, interview, but we would move that in as well.

THE COURT: I don't think there is a number for it, but there is one for the waiver of rights. The 206.

ATTORNEY FALLON: And 206.

THE COURT: So we'll mark the DVD. That would be 213. You're asking that that be --

ATTORNEY FALLON: Yes.

THE COURT: You're offering it?

ATTORNEY FALLON: I would offer that as

37

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 37 of 115    Document 19-19

the official record.

THE COURT: All right. Mr. Fremgen, any objections to any of those?

ATTORNEY FREMGEN: No.

THE COURT: Then, uh, Exhibits, uh, 206 through, and including, 213, which is going to be marked right now, the CD, are received.

ATTORNEY FALLON: I think it's a DVD.

THE COURT: I -- I'm sorry. DVD. Yes.

ATTORNEY FALLON: You have that, Ms. Clerk?

THE CLERK: Not yet.

ATTORNEY FALLON: Not yet? All right.

THE CLERK: I just have a sticker for it.

ATTORNEY FALLON: All right. We'll -- we'll produce that before the end of the day. Uh, with receipt of those exhibits, we would tender the witness for, uh, cross-examination.

THE COURT: Cross?

ATTORNEY EDELSTEIN: Your Honor, prior to commencing cross, could we take our afternoon break? There's a number of exhibits I need to gather up.

THE COURT: All right. We'll break until

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 38 of 115    Document 19-19

quarter to three.

ATTORNEY FALLON: Very well. Thank you.

(Recess had at 2:26 p.m.)

(Reconvened at 2:47 p.m.)

THE COURT: Cross.

ATTORNEY EDELSTEIN: Thank you, Your
Honor.

**CROSS-EXAMINATION**

BY ATTORNEY EDELSTEIN:

Q   Officer Wiegert, you covered a lot of ground, so
bear with me if I jump around a little bit?

A   Yes, sir.

Q   You've been with Calumet for 14 years; right?

A   Yes.

Q   And you are now classified as an investigator I
believe you said?

A   That's correct.

Q   That any different than a detective?

A   Same thing. Different name.

Q   Than the -- So you're involved with more, shall
we say, investigative duties from events, as
opposed to day-to-day responding to calls, uh,
taking reports, things like that?

A   Yes. That's true.

Q   All right. Now, you established early on that

39

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 39 of 115   Document 19-19

Q yourself and Fassbender became what you've been characterizing as the lead investigators into the disappearance of Teresa Halbach; right?

A Yes.

Q Okay. Was there -- And I take it there was no particular hierarchy, even though he's a state employee and you're a county employee?

A Considered my partner.

Q All right. So the two of you are working together on this thing throughout -- from the beginning through today, basically?

A Yes.

Q Okay. If you got a piece of information, you shared it with him, and vice-versa?

A When I could.

Q What, if anything, would have prevented you from sharing the information?

A There's a lot of information in this case and I believe we shared as much as we could together.

Q Just in fairness, though, uh, you did your very best to make sure that he knew what you knew, and you knew what he did?

A We did our best.

Q All right. Now, I believe you began your testimony yesterday talking about, uh, Kayla;

40

Q right?

A Yes.

Q And you went to Kayla because you received some information that she might have known something about, um, Brendan losing some weight; right?

A Um, which time?

Q On the 20th? Well, let me ask it to you this way: What was the first date you talked to Kayla?

A Yes. February 20. That's not -- Let me answer your first question. That's not the reason we talked to Kayla, initially, no.

Q When you talked to Kayla on the 20th, I understood your testimony to -- to be based upon the fact that you'd received some information from someone, and you didn't say who, that you needed to talk to Kayla. That she had some information?

A We talked to Kayla -- She had information, um, about Steven Avery, not about Brendan losing weight, as you said.

Q But in any event, when you were there, you had spoke to her, and she -- uh, you testified she told you that he lost about 40 pounds; right?

A Yes.

41

Q   Okay.  Had you -- You had never met Brendan Dassey as of the 20th of February, had you?

A   No, I had not.

Q   You didn't know how old he was?

A   As of the 20th -- I -- I knew he was a teenager. I -- As to his exact age, no, I don't think I knew his exact age.

Q   You really didn't know -- Did you know where he went to school?

A   Well, I assumed where he went to school in Mishicot from where he lived.

Q   Okay.  But you hadn't check with the school to verify he was a student there?

A   On the 20th.  Um, I don't recall if I would have by then or not.  I don't think so.

Q   Okay.

A   But I'm not sure.

Q   I'm going to hand you for the record what has been admitted as 163?

A   Yes.

Q   And you're familiar with that; right?

A   I am.  Yes.

Q   And for the record and the benefit of the jury, what is it?

A   Um, it's the statement in which we talked about, I

42

believe, yesterday that, uh, Kayla Avery had wrote, on, uh, the 7th of March.

Q Okay. And that was after you had gone back to talk with her; right?

A That was after the school had contacted us.

Q Right. Okay. Now, the 7th of March, in relation to the lengthy interview that everybody just saw between you and Fassbender and Brendan, was six days later; right?

A Yes.

Q Okay. And isn't it a fact that on the 1st day of March, you, Fassbender, members of the prosecution team, held a widely publicized press conference?

A There was a press conference, yes.

Q And is it fair to characterize that as a press conference stating that Brendan Dassey has confessed to his involvement in the disappearance of Teresa Halbach?

A I believe that would be accurate.

Q I believe you testified on direct with respect to the interview of March 7, and correct me if this is not what you said, that after he saw Teresa Halbach pinned up in the bedroom, he heard screaming in the bedroom. Do you remember that

43

testimony?

A   After he?  After -- This is after Brendan, are you talking about?  I'm sorry.

Q   Right.  As related to you by -- by Kayla?

A   Um, I believe that's correct.

Q   You do not?

A   No.  I believe that's correct.

Q   Okay.  When you talked with Kayla, she led you to believe that there was a chair involved in some sort of restraint with Teresa; right?

A   According to Kayla, that Brendan had told Kayla that Teresa was pinned up in a chair.

Q   And when does she claim that Brendan told her that?

A   Um, according to my recollection, she claims it was in December of '05, because she remembers it because there was a birthday party at her house.

Q   Right.  And you got that information from her when?

A   We got that information in March.

Q   Well -- And that would be related in 163?

A   Yes.  That's correct.

Q   Okay.  So in March, about six days after this press conference, she's telling you that the defendant said Teresa was pinned up in a chair?

44

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 44 of 115    Document 19-19

A    After the school calls us and tells us that they had learned about information about this homicide --

Q    Officer --

ATTORNEY EDELSTEIN:  With the Court permission.

Q    (By Attorney Edelstein) I don't mean to quibble. I didn't ask about the school.  My question was, six days after the interview -- six days after the press conference, that's when Kayla tells you that the defendant claimed that Teresa had been pinned up in a chair; correct or not?

A    Yes.  That's correct.

Q    All right.  And it is true, is it not, that even through this lengthy video, at no time did Brendan ever claim that Teresa was pinned up in a chair; yes or no?

A    No.

Q    He did not?

A    In a chair, no.

Q    So that would be an inconsistency in his statements; correct?

ATTORNEY FALLON:  Objection.

THE COURT:  To foundation, uh, the objection is sustained.  Why don't you make that clearer, please?

45

Q The statement you got from Kayla reporting what Brendan told you, you got it from her? You didn't take that as a statement, so to speak, of Brendan?

A I took it as what Brendan told Kayla.

Q Exactly.

A His statement.

Q All right. But then based upon what he told you, as far as this pinning up business, that would not match; correct?

A No. I wouldn't agree with that.

Q Does it match to the extent that he described it pinning up in a chair?

A Um, the chair is different. Um, but she was pinned up.

Q Now, when you talk about the pinning up, I assume you're saying there's some consistency, uh, because of his statement to you in this 3/1 statement that he saw Teresa, um, tied up or restrained on the bed; right?

A Yes.

Q Okay. Let's talk about the bed real quick. For the record, I'm going to hand you what's been marked as 211, which is the Austin photograph, computer-generated depiction, of the bedroom of

46

Steve Avery; right?

A   Yes.

Q   And you testified that he prepared that based upon the drawing that, uh, Brendan provided to you during the course of the 3/1 interview; right?

A   No, that's not true.

Q   It's not?

A   No.

Q   Okay.  What is 208?

A   Two-0-eight is Brendan's drawing.

Q   Okay.  And that's how he claims the bedroom was on October 31; right?

A   Yes.

Q   Well, help me out then.  Two-eleven, that Austin prepared, what is this based on?  Is this not based on what Brendan was telling you?

A   I believe what I testified to is that it was based on statements by Brendan and, uh, Steve Avery's fiancé, Jodi Stachowski.

Q   Okay.  But it was supposed to depict the condition of the Steve Avery bedroom as of October 31; correct?

A   That is correct.

Q   All right.  Now, I'm going to leave you this one.

47

A    Sure.

Q    All right.  You see on the exhibit, and it's No. 208, that's up on the ELMO, it shows where the closet is in that bedroom; right?

A    Yep.

Q    Okay.  Now, this Austin one also shows the closet; correct?

A    Yes.

Q    Okay.  As I'm holding it, oriented up, so to speak, for the benefit of the record, just like in this one with the closet, or in the up portion; correct?

A    Sure.

Q    This should be the same; right?

A    This should be the same --

Q    Well, the Austin rendition, and what Brendan drew, because you believe that to be the configuration on the 31st, should be the same?

A    That's -- As I stated before, that's based on, not only Brendan, but from Jodi Stachowski.

Q    I understand that.  But they, in any event, should be the same; right?

A    No.  That's based on two people's statements.

Q    Well, if we look at the Austin rendition, you have the bed in the furthest possible corner -- I

48

don't know if that's north, south, east, or west. Where's your laser pointer?

A   Right here.

Q   On the Austin rendition, this bed is actually up against this wall; right?

A   That's true.  Um-hmm.

Q   Okay.  And in Brendan's, the bed is not up against the wall; correct?

A   Right.  It's moved out a few feet.

Q   Okay.

A   On the same wall.

Q   On the same wall as to the head side, so to speak?

A   Yes.

Q   But not the left side; right?

A   That's correct.  Um-hmm.

Q   Okay.  And on Brendan's -- I don't want to get the clerk -- And on Brendan's, he has some furniture off to the left side of the bed; right?

A   That is true.

Q   But when you had Austin prepare this one, you have that furniture off on this side?

A   Again, that's a culmination of Jodi Stachowski's and Brendan's statements are represented there.

Q   I understand that.  But when you testified

49

Q earlier, you bel -- you based -- you asked Austin to prepare this based upon what both of them told you?

A That is true.

Q Are there inconsistencies between Exhibit 208, as prepared for you at your request by Brendan Dassey on the 1st, and Exhibit 211 that you asked Austin to prepare?

A Sure. Yeah.

Q When, and if you can, give me a date, did Brendan Dassey become a suspect in a criminal offense in your mind?

A Well, there were a lot of suspects. I mean, Brendan Dassey --

Q Detective, again, I don't mean to quibble with you. I didn't ask about a lot of other suspects. I don't care about other suspects. I want to know, in your mind, when Brendan Dassey became a suspect in a criminal offense?

A Probably in March.

Q What day in March?

A The day that he told us that he killed, raped, and mutilated Teresa Halbach.

Q Okay. And that was?

A That was March 1.

50

Q   All right.  You had talked earlier on direct, for the benefit of, uh, educating those folks who are not familiar with the criminal investigation process, about the differences, a little bit, between, I think you called it an interview, and an interrogation; right?

A   I talked earlier about that?

Q   I believe you did.  Maybe not today.  I think it might have been yesterday.

A   I don't recall talking about it today.  That's why I'm asking.  But I'll take your word for it.

Q   Well, even if it wasn't yesterday?

A   Sure.

Q   There is a difference; right?

A   Sure.

Q   All right.  You -- you interview, um, witnesses, you interrogate suspects; right?

A   Not necessarily.  But there's -- there's not a fine line.  You're -- you're looking to draw a fine line. There's really not that fine line.

Q   Well, you knew, as one of the lead investigators, that Skorlinski, Baldwin, and O'Neill had already spoken with Brendan up in Marinette County; right?

A   That's true.  Yes.

51

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 51 of 115   Document 19-19

Q And, certainly, by the 1st of March, you had received, uh, fairly detailed information from them, perhaps including a transcript made from the little recording device up in O'Neill's car; right?

A I did not receive the transcript by March 1, but I did have a chance to review reports.

Q Okay. So you had, basically, a summary of what it was about?

A Sure.

Q And if I'm guessing correctly, you talked with Skorlinski, or maybe Fassbender did, and you got the same information?

A I did not talk to Skorlinski.

Q Did Fassbender, to your knowledge?

A You'd have to ask him that.

Q Okay. We can do that.

A Sure.

Q You also testified about that you and Agent Fassbender had spoken with Brendan on the 27th of March? I'm sorry. February?

A Yes.

Q And that occurred on, actually, two different locations? Three different locations on the 27th? Am I correct?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 52 of 115    Document 19-19

A Yes.

ATTORNEY FALLON: Excuse me, Your Honor, um, may Counsel and I approach?

THE COURT: You may.

(Discussion off the record.)

THE COURT: We'll excuse the jury at this point for a few minutes.

(Jurors out at 3:09 p.m.)

THE COURT: All right. Be seated. Uh, Mr. Fallon, you're anticipating, apparently, some questions that you may or may not find objectionable. Can we -- Can we ask you what it is that you, perhaps, will find objectionable and see, indeed, if those are going to be asked?

ATTORNEY FALLON: Yes. Thank you, Judge, for this, uh, consideration. Um, our concern is simply this, um, we would object to any attempt by the defense to introduce other, um, statements, arguably exculpatory, uh, given by the client, because the law is quite clear that only the party opponent may offer a statement of the opposing party, and, as such, we would object as being hearsay to the introduction of those statements.

Now, having said that, we recognized we

53

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 53 of 115    Document 19-19

at least alerted everyone, and the jury, so that they would have a better understanding of the March 1 statement, that the officers had, in fact, talked to Mr. Dassey on three occasions on February 27. Um, only one of those interviews was fully disclosed and testified to by Agent Fassbender.

So we don't have any objection to the defense asking general questions about you -- you talked to him on this day, and -- and things of that matter. That's certainly fair game. But any attempts to actually introduce the statements or the responses, uh, is hearsay, because it's not offered by a party opponent.

THE COURT: Mr. Fremgen or Mr. Edelstein, your response?

ATTORNEY FREMGEN: Judge, essentially, what we're, um, attempting to do is respond to what's already been somewhat opened by the State in their direct. The State referenced speaking -- or the witness reference -- referenced speaking with the defendant at Mishicot High School on the 27th of February. I believe he actually testified that, uh, he took an audiotaped in -- statement, not unlike the

54

November 5 interview in Marinette, and that he even referenced the videotaped statement at Two Rivers Police Station.

Um, the witness was asked if he felt that Mr. Dassey had said everything he knew, and the witness said, no. And it -- Let me, I don't know, give a couple more examples and I'll, essentially, wrap it up.

Um, as -- The inference by the testimony to the officer is that Mr. Dassey was not truthful to them on the previous, uh, attempts to interview him or left things out.

For instance, the officer, specifically, testified that the defendant denied being involved in the offense on February 27. The officer indicated that he was con -- Well, I don't know if he said he was confident, but I think his testimony was, essentially, I didn't believe him. I think he was more involved than he was leading on.

In the May -- or the March 1 statement, or the video statement, there's references to specific questions or specific answers from the previous interviewers. For instance, um -- I believe the two pages I wrote down were page 556

55

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 55 of 115    Document 19-19

of the transcript, and page 5 -- or page 604.
One dealing with, um, the clothing, the color of
the clothing, and the other, for -- I believe the
officer said, well, on Monday you didn't say
anything about threats from Steven.

So, essentially, what -- on direct, and
through the March 1 video, the State has offered
the fact that there had been two prior, more
formalized, statements, other than the one that,
uh -- that, uh, Agent Fassbender testified about
at the Fox River's Resort, um, later in the
evening, and there's been reference that these
statements were not entirely accurate, raising
the question of whether or not Mr. Dassey was
truthful with them.

And I think what -- what it does is,
essentially, leaves the jury with the -- with
questions about the February 27 statements. I
believe that we should be entitled to explore
this avenue, sin -- since the State has opened
the door, to offer a full explanation about the
February 27 statement and why they were further
discussing with the March 1.

Otherwise, it's left -- Well,
essentially, what's left is the State's been

56

allowed to let the officer explain his role, the prior taped statements, or questioning, and offer his opinion about the prior taped statements, even though the best evidence is the actual statements, themselves.

So I -- I think we should be allowed to explore that, uh, for lack of a better argument, or back of a letter term, excuse me, that the State's opened that avenue or opened the door to those questions.

THE COURT: Well, other than the -- the, uh, remarks that you cite on page 556 and 604, are you suggesting that there are other statements that you wish to discuss?

ATTORNEY FREMGEN: Well, the general tone of the March 1 is that you weren't telling us the truth before. That was the testimony of the officer on direct. We weren't getting the truth from Mr. Dassey. He wasn't telling us everything. He was leaving things out. But the -- In essence, he's saying now, March 1 is the truth. Well, I think we should be allowed to explore those prior statements. What was left out? Why do you have the impression that something was missing? And I think part of

57

that's going to be there were different stories or different, uh, answers to the same types of questions on March 1.

THE COURT: Mr. Fallon?

ATTORNEY EDELSTEIN: Your Honor, if I might add, just for the record, additionally, there was testimony -- uh, this jury was led to believe by the testimony that there were no promises made to Brendan. Now, I believe we're entitled to question whether or not there were promises made to him at any other interviews, including the 27th of March.

ATTORNEY FREMGEN: February.

ATTORNEY EDELSTEIN: Or, I'm sorry, February.

ATTORNEY FALLON: All right. I have now -- Now I have even more responses to make, both legally and practically. Let's start with the, um -- the trees, and then we'll move to the forest.

First, as, um, the March 1 interview revealed, the actual questions we previously referred to are identified and discussed in the interview, and this officer can be questioned about those specific responses on March 1. So

58

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 58 of 115    Document 19-19

that's one.

All right. Number two, um, when it comes to admissibility of statements, whether they're custodial or otherwise, the statements are taken at face value at the time and place in which they are given.

I'll give you an example. There's a case out of Racine called **State v. Pischke**, P-i-s-c-h-k-e, that deals with, um, um, re-interrogation of a custodial suspect. I cite that case just for one distinct proposition, because if the proposition holds in that circumstance, it clearly applies in this circumstance.

And in **Pischke** there was a series of custodial interrogations. The defense objected because on the last interrogation the defendant, um, confessed. The defendants floated the idea that the State was the grand initiator of all those previous discussions the two days beforehand. And the Court said, that's a great theory, but it doesn't hold water, because it's just about the statement which resulted in the inculpatory events or rendition.

I bring that up because that was a

59

gentleman who was in custody, and it was a series of discussions over a two- or three-day period. There might have been -- There were several. And the Court said it was only who initiated the discussion at the time that led to the inculpatory statement in making the determination as to whether this was a proper re-interrogation, and since the defendant in that case had initiated it, it was a proper.

I bring that up by analogy here, because we have a two-day time lapse. The March 1 statement must be, and should be, analyzed individually as to the events of that day and the circumstances surrounding the giving of that statement.

So on that regard, I -- I don't accept, as a proposition offered by the defense, that what occurred on February 27 has much, if anything, to do with any inducements or promises with respect to what occurred on March 1.

Now, for the big picture. The forest. The reason behind the rule is to prohibit a -- a, uh, party from getting in an aversion of the events without having to take the stand. And that's why the rule is crafted and structured

60

around.  It's an admission by a party opponent. And only the opponent can offer the statements. Thank you.

THE COURT:  Defense, do you -- do you suggest that Mr. Fallon's characterization of the rule is incorrect?

ATTORNEY FREMGEN:  I -- I would say that the analogy is incorrect as far as this case is concerned.  That -- that *Pischke* analogy that Mr. Fallon presents, essentially, would leave, uh, the State with every opportunity to make one attempt after another to interview an individual until they get what they want, and then just introduce that one statement without any reference to the past, even though, especially in this case, February 27 was certainly a primer to the March 1 statement.  In particular, many of the questions, not all, but many of the questions were similar but with different answers.

THE COURT:  Well, here, I -- we could probably discuss this well into -- well into the night.  My understanding of the rule -- And -- And one of you cited a case a couple of days ago called *State vs. Pepin* at 110 Wis. 2d 431. And -- And here, in this case, let's be clear,

61

we're not talking about a custodial interrogation on February 27. If I recall, the parties -- And this is -- this predated your involvement, Counsel, in the case. But the parties, uh, stipulated that it was not a custodial interrogation.

But, anyway, **Pepin** says that in instances, such as were faced here, that the State has a right to use the inculpatory statements under 9-0-8-0-1 (4b1), I believe is -- is the statute, admission by party opponents. But that the -- but that the defense does not have the right to use any exculpatory matter that may appear there unless the exculpatory matter is so entwined with the inculpatory matter that it bears the same trustworthiness or same guarantees.

I can't say that in this case. I -- I don't think that -- I don't think that situation, the trustworthiness of the exculpatory statements here, uh, stands out.

Thus, I'm going to -- I'm going to grant, uh, uh, the prosecution's motion here. With the exception, I believe, those were the matters on pages 556 and 604, you can go into

62

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 62 of 115    Document 19-19

those if you wish.

ATTORNEY EDELSTEIN: Your Honor, uh, if I could just -- before we bring the jury back, I want to make it quite clear that while I don't necessarily agree with the ruling, I can abide to it, uh, as to -- as to answers. But I fully intend to ask this officer about questions he asked this young man on that date. I'll stay away from the answers. I want him to tell this jury whether he asked him certain questions and the manner in which they were asked.

This defense -- We are entitled to present our defense. We have raised this as a matter of suggestibility. There -- This interview of the 27th is replete with conscious efforts, I believe, and it's ultimately up to this jury to decide whether or not these officers manipulated and suggested answers to the defendant.

Now, maybe they didn't get them on the 27th. Maybe they got them later on. But they have to decide that. And I can cite instance af -- And they weren't just generally speaking. They were very specific. Did you have anything to do with Teresa Halbach's um, death? Um, some

63

of the other statements they made. The promises. They've led this jury to believe there's no promises.

THE COURT: Well, here -- I --

ATTORNEY EDELSTEIN: (Unintelligible.)

THE COURT: I -- I get it. I get it. And we'll cross that bridge when we come to it. I've made a ruling. Let's get the jury back in here and let's move on.

(Jurors in at 3:24 p.m.)

THE COURT: Be seated. Counsel, you may resume.

ATTORNEY EDELSTEIN: Thank you.

Q (By Attorney Edelstein) Detective Wiegert, on direct you described for the benefit of -- of the State and the jury different techniques, um, that are a common time, oftentimes, employed in the interview of individuals; correct?

A Yes.

Q All right. One of those you described as the superior knowledge tactic; right?

A That's true.

Q And one you, um, described in an effort to ultimate -- the goal being to, quote, take defensive layers off; right?

64

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 64 of 115    Document 19-19

A That's true.

Q And I believe you used the -- the phrase, to befriend the, uh, interviewee?

A Yes.

Q All right. So in connection with that, uh, it wouldn't be unusual for you to say or -- say things intended to, uh, have this individual like you?

A Yeah. That's the goal.

Q And it wouldn't be unusual to say things to have the individual believe you; right?

A That's true.

Q Okay. Now, again, um, going back to the 27th --
Well, before we get to the exhibit, is it fair to say that as part of this process, and I'm speaking of the 27th, that you and your partner utilized a technique by directly appealing to the emotions of Brendan Dassey?

A I think that would be fair.

Q And you did that how many times, if you know, on the 27th?

A I'd have no idea.

Q On the 27th, um, there were very distinct lies told to the defendant, were there not?

A We'd have told the defendant many untruths. Yes.

65

Q    Any idea how many?

A    No.

Q    Now, as of November 15, 2005, you knew from Eisenberg, the forensic pathologist, that there were gunshot wounds to the head of Teresa Halbach; correct?

A    I can't comment on the date without seeing a report with the date on.  It was in that time frame.  I know that.  But the exact date, I don't know.

ATTORNEY FALLON:  Excuse me.  Did -- Did you say two thousand -- November 15, 2005 or 2006?

ATTORNEY EDELSTEIN:  I believe five.

THE WITNESS:  Well, that would be incorrect, then.

Q    (By Attorney Edelstein)  Prior to speaking with Brendan on the 27th -- Well, let me ask you this: Were you present when the statement was made to Brendan?  And it might help you, uh -- I haven't marked this quite yet, but could you take a look at this?  And, if you can, tell me if you know what it is?  And mark it with whatever the next number is?

A    Sure.  It's a, um, report of the interview from February 27, '06 of Brendan Dassey.

66

Q   Okay.  Does it also contain a transcript of the reported conversation between yourself, Fassbender, and Brendan?

A   It does.

Q   Okay.  And, for the record, we'll mark that as 215.

A   Sure.

(Exhibit No. 215 marked for identification.)

Q   And that's, uh, something, I take it, you've had an opportunity to review before?

A   Yes.

Q   Directing your attention almost to the bottom of the middle paragraph, if you will, you were --
First of all, you were present throughout this entire, um, conversation we'll call it?

A   Yes.

Q   Okay.  Does it not reflect the statement made in your presence by Agent Fassbender directed toward Brendan Dassey, quote, truthfully, I don't believe Steven intended to kill her.  Do you see that?  About three lines up from the large middle paragraph?

A   Sure.  Yes.

Q   Okay.  And that was said to him, wasn't it?

A   Yes, it was.

67

Q Is it fair to say that that was said in connection with an attempt to persuade him that, uh, it was important for him to give you information, and that you and Agent Fassbender didn't really think he did anything wrong, but that some other people might have believed that he did?

A I don't really follow your question.

Q If you looked a little bit further up there --

A Okay.

Q -- do you think you -- Just take a little bit here and read that one paragraph so I can ask you my next question. I understand you've had a lot of interviews. It's hard to remember everything. Did you get a chance to look that over?

A Sure. Yep. Good.

Q Would it be a fair characterization, then, in the early portion of the contact with Brendan that day, that there was an -- an effort on the part of yourself and your partner to convey to him that the two of you didn't necessarily think he'd done anything wrong, but there were some other people talking like he was and you didn't necessarily agree with that?

A Is that what we're trying to convey? Yes.

68

Q    Yes.  All right.

A    In this paragraph?  Sure.

Q    Yes.  In an attempt to gain his trust?

A    That's what we do at interviewers.  Yes.

Q    And confidence?

A    That's what we do as interviewers.  Yes.

Q    He was told -- And I'm -- On page 443, about
halfway down, you were present when he was told,
quote, you have to tell the truth.  You have no
choice in that.  Correct?

A    That's what it says.  Yes.

Q    All right.  In fact, as part of that particular
discourse, Agent Fassbender went so far as to
say, quote, there's nothing more I'd like to come
over and give you a hug because I know you're
hurting.  Remember that?

A    Yes.  And I think he meant that.

Q    The very last line in that exchange, it contains
a promise, doesn't it?

A    There's many promises made.  Yes.

Q    So the truth of the matter is, Investigator
Wiegert, that on the 1st, when you went to see
Brendan, that that was somewhat of a follow-up to
the events of the 27th; correct?

A    Every successive interview that you do, you build off

69

Q All right. And it's not just information, but it's techniques? The techniques vary from interview to interview; correct?

A I don't think the techniques varied at all in these interviews. No.

Q Well, let me ask you this: Do you rec -- You watched this video with us today; right?

A Yes, sir.

Q At different times, uh, placement of yourself and Fassbender changes, doesn't it?

A No. That's not true. I move over to the couch by Brendan to have some pictures drawn. That's the only time any placement is moved.

Q Okay. That's the only reason you went over there by the couch by him?

A Yeah. So he could draw pictures.

Q Didn't you go over there so you could kind of cozy up to him and give him this? A pat on the back like we saw on the video?

A I don't know how I'd have him draw pictures from across the room. I had to go over there and hand him the things.

70

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 70 of 115   Document 19-19

Q  Okay. Isn't it true that, as a technique of interrogation, that, uh, you want this subject, so to speak, to be comfortable in your presence?

A  Certainly is. Yes.

Q  And that's somewhat of a test when you move in a little bit closer to somebody, isn't it?

A  Uh, it's not a test. It's a technique that we use, and when we move in on somebody, what that does, it takes them out of their comfort zone. If you saw me in that interview, I got a little closer to him. I put my knee on -- or, excuse me -- hand on his knee. What that does is breaks down barriers, because he's got a barrier up against us.

Q  Okay.

A  And when you walk over, and you get close to them, that's what you're doing. That's what you're attempting to do. But that was not -- Pard me. That was not my attempt when I sat on the couch. Earlier, it was, when you saw me go over and put my hand on his knee. Absolutely.

Q  Well, in addition to his knee, you acknowledge that you patted him on the back; right?

A  Sure.

Q  Okay. Before you talked with him on the 27th, did you know anything about his IQ?

71

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 71 of 115   Document 19-19

A   What I knew about Brendan Dassey was that he was in --

Q   Did you know anything about his IQ --

A   (Unintelligible.)

THE COURT:  Here.  One at a time.  Reask the question, please.

Q   (By Attorney Edelstein)  Did you know anything about his IQ as of February 27 when you first spoke with him; yes or no?

A   About his IQ?  No.

Q   Did you know anything about his memory?  Whether it was good?  Bad?  Poor?  You didn't, did you?

A   No.

Q   Would you agree with me that throughout the course of the contacts you've had with Brendan, that, oftentimes, he would be asked more than one question at a single time before he was allowed to answer?

A   In the March interview are you referring to?

Q   Generally, as to March and February.

A   I can't give you any specifics.  I mean, everybody saw the interview.  I'm sure there were those occasions.  Sure.

Q   Directing your attention, um, on page 446.  During the course of the contact on the 27th, and

72

Q I'm looking at the very bottom paragraph --

A Um-hmm.

Q -- you told him, in part, this will bug you 'til the day you die unless you're honest about it. Right?

A Yes. And I still believe that.

Q Now, if you would, take a look at from the beginning of where you begin to speak, at the bottom of 446, over to page 447, about halfway down where you see the first entry where it says, Brendan?

A Yes.

Q All right. Immediately above the reference where it says, Brendan, about halfway down on 447, it is stated to him, I think you're being -- starting to be honest with us about some things right now. Correct?

A Yes.

Q Okay. Okay. From the bottom of 446, where you begin to speak, all the way through the middle of 447 when that statement is made, he hasn't said a single word to you, has he?

A I think you're taking it a bit out of context. But 146, can't question, no, um, he hasn't, but before that, yeah, he has.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 73 of 115    Document 19-19

Q    Well, it's fair to say that you guys -- you and Fassbender are doing a lot of talking. He's not saying much; right?

A    I'd have to review the stuff prior to this. I can't say that right now without reading this over. If you'd like me to, I would.

Q    No, you don't need to.

A    Okay.

Q    Page 448. Do you think it is a promise -- On the first entry by your name, Detective, do you think it's a promise to him when you say, we'll go to bat for you, but you have to be honest with us?

A    That's absolutely a promise, and I absolutely meant that at the time.

Q    And you -- Additionally, I take it you would -- your answer would be the same, about halfway down on that page, when it is stated to him in your presence by, uh, Agent Fassbender, I promise you, I'll not let you hang out there alone, but we got to have the truth. Right?

A    My same answer. You bet.

Q    Okay. On page 451, please? You told him, it's not your fault. Remember that. Correct?

A    Yes, I did.

Q    Okay. And up -- And he really hasn't said

74

anything to you at that point, significant, has he?

A   Again, I won't comment on that unless you want me to read what he said prior to that.

Q   No, that's fine.

A   Okay.

Q   But you acknowledge making that statement, it's not your fault.  Right?

A   I certainly did.

Q   And then immediately thereafter, Fassbender, uh, follows up without any sort of response from Brendan, yeah, it's not your fault.  Like I said, Mark and I are not going to leave you high and dry.  Right?

A   Again, I said it, and I meant it.

Q   Well, did you -- You didn't say it, Fassbender said it?

A   Things before when I said, it's not your fault.  If I said it, I meant it.

Q   Right.  And you acknowledge that prior to Brendan even responding in any way, shape, or form, or being asked for a response, it's -- your statement is immediately followed up by Fassbender reiterating that very thought, that it's not his fault.  That he hasn't done anything

75

wrong. Right?

A Are you saying that's what he says after me? Yeah, that's what he says after.

Q Okay.

A Certainly.

Q And further down, is it not, the -- the question is given to him, quote, what other parts did you see? Right?

A Yep.

Q And isn't it true that at no time, prior to that statement being made to him, did he acknowledge seeing any parts?

A Again, I won't comment on them unless you want me to read everything prior to this. But right after that, he says, toes. He saw toes.

ATTORNEY EDELSTEIN: Begging the Court's indulgence, in order to have the witness answer my question, I would ask that he be given an opportunity to review this in order to answer that question.

THE COURT: Review what?

ATTORNEY EDELSTEIN: Pard me?

THE COURT: Review what?

ATTORNEY EDELSTEIN: The witness indicated he would like an opportunity to re --

review the portion of the exhibit before him, prior to that statement being made to him on page 450 -- to my client on 451, in order to answer the question. The question being: He had not, prior to you making that statement, indicated he saw any parts?

THE COURT: So you want him to read the 12 pages before that?

ATTORNEY EDELSTEIN: If that's the only way he can answer the question.

ATTORNEY FALLON: Your Honor, uh, if I may, I guess I'm going to object. It's not that I have any objection to the officer reviewing the report, or whatever. I'm going to go back to the -- to an earlier point and -- and I fail to see the relevance of -- of the events two days before as it pertains to this particular, um, cross-examination, uh, vis-a-vis, the inculpatory statement obtained on March 1. I mean, that's two days earlier. It's of marginal relevance. That's my concern. I don't have any -- The officer can read it if he wishes. That's fine.

THE COURT: Yeah. Well --

ATTORNEY FALLON: It seems cumulative.

THE COURT: And it may well be cumulative.

77

I think -- I think it passes the relevance test, and -- and I'm going to overrule your objection. I -- I don't want to be in a position where every time an answer is given that we're going back and rereading things because we're going to be here all night. I'm going to suggest, Counsel, you just proceed. Get the answers that the officer gives and we'll move on from there.

ATTORNEY EDELSTEIN: Well, if it's going to assist him to answer the question, he has the materials available, I think, uh, he can refresh his memory with that in order to answer the question.

THE WITNESS: I'll do the best I can.

THE COURT: Just ask.

Q (By Attorney Edelstein) Isn't it true, and I'm making reference to page 451, that Agent Fassbender, in your presence on the 27th, suggested by asking Brendan Dassey as follows: Okay. A human body. Dot, dot, dot. Isn't it true that prior to that phrase, "a human body", being uttered by Agent Fassbender, that Brendan Dassey never said anything about seeing a human body?

A Well, you can't tell from the transcript, because

78

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 78 of 115    Document 19-19

that was the -- looks like the inaudible part of the transcript. So -- I mean, you know as much as what Brendan said as I do. It says, I seen, dot, dot, dot.

Q   Nowhere does it say, prior to Fassbender making that suggestion in that form of a question, that there was a human body; correct?

A   He says he sees toes.

Q   He said he saw toes prior to that, but he did not say he saw a human body; correct?

A   Again, I can't answer that, because it's -- it's not here. It's on the inaudible part, I believe. I'm assuming it's --

Q   Do you believe it's on the inaudible part? Do you have a distinct recollection of that? Or is that just a --

A   Well --

Q   -- convenience of testimony today?

THE COURT: Here. Let him finish the question before you start answering.

ATTORNEY FALLON: I -- That's argumentative. I ask that it --

THE COURT: Well, it's --

ATTORNEY FALLON: -- be stricken.

THE COURT: I'm going to let the question

79

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 79 of 115    Document 19-19

stand.  Answer it if you can.

THE WITNESS:  If it's prior to the videotape statement, which I believe it is, which I indicated, when we talked about that statement, that's why we went to Two Rivers, it's an inaudible part, and I believe that's what's meant by the dot, dot, dot.

Q  But you don't know what's in -- contained in the inaudible part, do you?

A  No.  That's why we did the next videotape statement.

Q  Well, you're certainly not suggesting that there are significant portions of this statement that we are presently discussing that are inaudible, are you?

A  Yeah, I am.

Q  Going to page 453?

A  Yes.

Q  Keeping in mind that -- Well, let me ask you this:  By the time you got to this part in your contact with Brendan, didn't it occur to you that he had some cognitive limitations?

A  No.  He was a mainstream student at Mishicot High School.  He was in Driver's Ed.  He could answer questions.  He could understand.  No.  And I think it's evident from watching the prior video --

80

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 80 of 115    Document 19-19

Q Okay.

A -- that he can understand.

Q I didn't ask you what was evident to you.

A I'm not an expert in cognitive abilities, if that's what you're asking.

Q I didn't ask you if you were an expert. I just asked you if you believed he had cognitive deficits?

A My answer was no.

Q All right. On page 453, you asked him, am I correct, would you say yes or no for me, Brendan? You see that?

A Uh, just give me -- Yes, I do see that. Yes, sir.

Q And without giving the response, is it fair to say that he did exactly what you requested of him? I.e., say yes or no.

A No. I asked him a question and he answered the --

Q You asked him -- Go ahead.

A I asked him, would you say yes or no -- yes or no for me, Brendan? And he says, yes.

Q All right. So he did exactly what you asked him to do?

A He answered --

Q Say yes or no?

A -- my question. He answered my question.

81

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 81 of 115    Document 19-19

Q  The question was: Would you say yes or no for me, Brendan? Right?

A  He answers, yes.

Q  And that's how he answered?

A  That's how he answered my question.

Q  Go a little further down there, Detective. Um, the statement was made to him on the 27th -- for -- for your convenience, about four lines up -- a portion of it, uh, did you help him put that body in the fire? If you did, it's okay. You acknowledge you made that statement to him?

A  I did make that statement to him. Yes.

Q  Were you attempting to persuade him that if, in fact, he did such a thing, i.e. putting a body in a fire, that it was all right?

A  What you do in an interview, is people --

Q  I'm not asking for an explanation --

A  (Unintelligible) -- minimize.

Q  -- I'm asking for an answer. My question is --

A  I think I'd have to expound on that answer.

ATTORNEY EDELSTEIN: Your Honor, I'm just -- He's entitled to be rehabilitated by --

THE COURT: Yeah. Just answer the question, please.

THE WITNESS: Could you just ask it

82

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 82 of 115    Document 19-19

again?  How you'd like to --

ATTORNEY EDELSTEIN:  I'm sorry.  Could you read it back, please?

(Question read back by the reporter.)

A  Was I attempting to persuade him?  Yes.

Q  (By Attorney Edelstein)  All right.  Were you attempting to persuade him that what he did was, as you put it, okay?

A  Yes.

Q  All right.  Now, as a trained investigator with 14 is it?  15?  I can't --

A  About 14.

Q  All right.  Fourteen years.  You know that's not true; right?  Somebody puts a body in a fire, it's not okay?

A  Right.  It's not okay.

Q  So you acknowledge that that -- you called it deception, I call it a lie.  We call it whatever we want.  But it's not true, is it?

A  It's not okay to put a body in a fire.  That's true.

Q  And the statement that you made to him was -- I guess you would characterize it as a deception?

A  You can call it a lie if you wish.

Q  I -- I certainly will.

A  That is true.

83

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 83 of 115    Document 19-19

Q Thank you. Detective Wiegert, uh, as a result of you being lead investigator, along with Agent Fassbender, in this case, you've had an opportunity to be present throughout the proceedings; correct?

A Yes.

Q Okay. So you've had the benefit of being able to hear what all the other witness of this -- witnesses have said prior to your opportunity to testify?

A That's correct. I've been here the whole time.

Q And you heard Nick Stahlke testify; right?

A I did.

Q Okay. He's our blood spatter man?

A Yes.

Q Okay. Had -- Had -- Prior to this case, had you ever been involved in any cases that, uh, might have utilized blood -- blood spatter evidence?

A Blood spatter evidence? No.

Q Brendan was asked, was he not, on the 27th -- And I'm making reference at 459?

A I'm there.

Q Okay. About the middle of the page. Question: Did he say anything about shooting her? You asked him that; right?

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 84 of 115    Document 19-19

A  Yes.

Q  Okay. And you knew by the time you conducted this interview, interrogation, whatever you want to call it, that there was evidence of a gunshot wound to Teresa Halbach; isn't that true?

A  That is correct. Yes.

Q  Is it fair to say that you did not follow up with that particular question, um, and I'm making reference to the shooting her question, anytime soon following the time it was first proposed to him during the course of this interview?

ATTORNEY FALLON: Objection. Vague. Indefinite.

THE COURT: Well, I have a -- a relevance concern about that. Uh, what -- what --

ATTORNEY EDELSTEIN: Well, let me -- That was poorly phrased, Your Honor. Let me try it a different way.

THE COURT: I agree.

Q  (By Attorney Edelstein) You knew, based upon your role as one of the co-lead investigators, there was evidence of a gunshot wound on that day when you did the interview?

A  We learned about it right in that time frame that there was possible gunshot wounds. That's correct.

85

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 85 of 115    Document 19-19

Q   All right.  Um, but if you would, take a look at 459, then?

A   Yes, sir.

Q   Just on that page alone, is it correct that there are five questions given to him after your question to him, quote, did he say anything about shooting her?

A   That would be accurate.  Yes.

Q   Okay.  None of them are a follow-up as to having anything to do with a shooting; correct?

A   That's correct.

Q   Okay.  Page 463, please?

A   Okay.

Q   Top third -- I guess everything prior to the first entry for Fassbender.  You stated to him, you didn't see it.  Did he tell you about it? Correct?

A   That's the question.  Yes.

Q   All right.  Apparently there's no response; right?

A   Yeah, there's nothing there.

Q   And then the next entry?  Again, it's you speaking to Brendan.  No.  As in a question.  No? Say yes or no.  Is that what it says?  And is that what you said to him?

86

A    That's what it says. A lot of times he would use head yes or no's. That's why that might not be there. But, uh, you're correct in saying that's what I say next, yes.

Q    And -- and, again, he did exactly what you told him to do, and that is say yes or no, as his next response?

A    He answered the question I asked, yes.

Q    Well, it really wasn't a question. It was a command, wasn't it? Say yes or no. That's not a question, is it?

A    Call it a statement. Sure.

Q    Pard me?

A    It's a statement.

Q    Well, you're telling him to do something, are you not?

A    Yes.

Q    And he does, does he not?

A    He does.

Q    Okay. On page 463 --

        ATTORNEY EDELSTEIN: Can you drop down a little bit?

Q    (By Attorney Edelstein) The question was put to him, did he say where he cut himself? And Agent Fassbender's making reference to Steven Avery;

87

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 87 of 115    Document 19-19

right?

A    Yes.

Q    Okay.  And then there's no response; right?

A    That's true.

Q    Fassbender then suggests --

A    I need to just back up a little bit.  I can't say there's no response.  There may be inaudibles.  There may have been a response.  But there's nothing in the text.  You're --

Q    All right.

A    -- correct on that.

Q    Okay.  And then Fassbender follows up immediately with -- on the knife that he used to kill her, yes or no.  Correct?

A    Yeah.  That's what he says.

Q    Okay.  The next entry being, yeah?

A    That's correct.

Q    Do you know whether or not, and can you tell this jury whether or not, the response, yeah, from Brendan was in answer to the Fassbender inquiry, did he say he cut himself?  Or whether it was a response to the statement Fassbender makes, on the knife that he used to kill her, yes or no?

A    I think by reading the transcript you would take away that -- the second question, on the knife that he

88

used to kill her, yes or no. Because directly after that, he says, yeah.

Q But that's your interpretation of the transcript where there's no answer by Brendan; right?

A I would disagree. I think that's the way the transcript reads.

Q Okay. Directing your attention to page 464, please?

A Sure.

Q About three-quarters of the way down?

A Yes.

Q Do you see where the question is asked of him, did he say he had a gun with dot, dot, dot?

A Um-hmm.

Q Okay. Is it correct that there are actually three questions asked of him before he's even given an opportunity to respond?

A You mean in that one sentence?

Q Not in that one sentence, in the next -- in the next three sentences? The next three entries? Before there's any response? And there is no blank space where you're anticipating a response; right?

A That doesn't mean we're not anticipating a response. There's sometimes long pauses. Again, if I could

89

refer back to the statement you saw in there, sometimes it takes him awhile to answer for whatever reason. He's thinking of an answer. And that's not accurately reflected in here.

Q    Okay. But you don't know what -- whether there was a pause?

A    I don't know, but I would suspect there was. But I don't know. You're correct.

Q    Okay. It's not an uncommon technique to pepper an individual with questions? And that -- by that I mean, ask them in rapid succession by the various investigators involved?

A    It's not a technique that I use.

Q    On page 466?

A    Yes, sir.

Q    You ask the question, did he threaten you? Correct?

A    Yes.

Q    Okay. And there is a response irregardless of what it is; correct?

A    Yes.

Q    That little exchange, if we confine that to the threats in this particular interview, is it fair to say that the subject is changed by you during the discussion of this issue of threats, and you

90

Q simply say, go back to the clothes. And that occurs within a matter of three or four questions?

A Yes, but he answers the question, so we changed subjects.

Q Okay. Well, in regard to that, you never asked him, um -- The question was asked of him, what did he say? Right?

A Yes.

Q Okay. Um, nobody asked him when that was said; correct?

A No.

Q Nobody asked him where it was said; correct?

A That's correct.

Q Were you not interested in knowing that if -- if someone has, in fact, threatened somebody, that it would be important to know when that statement was made?

A Well, I think, again, you're taking it out of context. If you see the other interview as well, we asked him that. Where did it happen? What did he say? And even in here --

Q I'm talking about this interview.

A You're talking about this portion of the interview.

Q I'm talking about the interview as a whole.

91

A    I think we probably asked him a few times about that. That would be my guess. That's in here. But you're correct. When it says -- He -- he does answer that question and then we move on.

Q    Is it fair to say that there was not a effort to fully develop that as information, um, at this point in the interview of the 27th?

A    At this point in the interview, that is fair to say.

Q    You were more interested in going back to other things that might be more directly related to the disappearance and death of Teresa; correct?

A    We do move around in the interview. That is correct.

Q    All right. Well, is that, in fact, the reason that you shifted back to --

ATTORNEY FALLON: Your -- Your Honor, I'm going to interpose an objection at this point and ask that we approach.

THE COURT: Okay.

(Discussion off the record.)

THE COURT: You may resume your cross-examination.

ATTORNEY EDELSTEIN: Your Honor, if I could have just a -- a minute? I may move onto the, uh, March 1 -- I guess I'm not quite ready to get to March 1, but we're close.

92

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 92 of 115    Document 19-19

Q  (By Attorney Edelstein)  Later in the day on the 27th, I think you said on direct, because there was problems with -- or what you perceived to be problems with the audiotape of the interview at the school, you took him down to, uh, Two Rivers Police Department; right?

A  That's correct.  Yes.

Q  Can you identify what's been marked as 214, please?

A  Certainly.  That's a, uh -- another **Miranda** Rights form like I explained during the last interview.  Uh, this is just another copy of that.  Not the same one. This is one that we read to him prior to doing that audio -- excuse me -- videotape statement in Two Rivers.

Q  All right.  Um, this is what you use when you have a criminal suspect, don't you?

A  Not necessarily true.

Q  If you had a criminal suspect at a police department, and you're going to question him, are you telling us you're not going to read him this **Miranda** warning?

A  No.  That's not what I said.  Yes, I would, if I had a suspect there.

Q  Okay.

93

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 93 of 115    Document 19-19

A    That I intended -- that -- There's some variations, as -- as you know, that go into when you have to read them their **Miranda** and when you don't have to read them the **Miranda**.  In this case, if I could explain real quickly, the district attorney requested that we Mirandize him prior to taking that statement.  So that's why that was done.

Q    And the district attorney is your legal adviser; right?

A    That is true.

Q    Okay.

ATTORNEY EDELSTEIN:  Your Honor, I move, uh, 214, please, into --

THE COURT:  Any -- It's offered.  Any objection?

ATTORNEY FALLON:  No.

THE COURT:  Received.

Q    (By Attorney Edelstein)  When you went over there to Two Rivers, your intention was pretty much to try to memorialize the type of things that you discussed up at the school?

A    Yes.

Q    Okay.  Without going into the tedi -- the tedium of, um, question and answers, uh, that may have -- or questions that may have been asked of

94

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 94 of 115    Document 19-19

Q Brendan at that interview, is it fair to say that it was you, Fassbender, and Brendan?

A Yes.

Q Okay. And is it also fair to say that some of the same techniques that were employed earlier at, uh, the high school, were utilized, as well, at Two Rivers?

A Yes.

Q And that would include lies?

A Yes.

Q And that would include attempts to appeal to his emotions?

A Absolutely.

Q And it would include attempts to have him give responses based upon leading questions containing facts you believed to be true?

A There were some leading questions.

Q You can't tell us how many --

A No.

Q -- with -- without counting them up, I guess.

A That would be true.

Q Now, at the conclusion of that, is it fair to say that you were still of the opinion that Brendan had not been totally honest with you?

A I would say that's a fair statement.

95

Q And I believe you, during the course of that conversation, um, made him understand from time to time that you didn't think he was telling you everything there was to tell?

A Yes.

Q Ultimately, he, and his mom, and, I believe, uh, was it a brother -- you made arrangements -- you and Fassbender made some arrangements for them to stay up at Fox Hills?

A Yes. We had talked about that earlier. We certainly did.

Q Okay. And that's a resort in Mishicot?

A That's correct.

Q Okay. And I believe your testimony was you wanted him to stay up there for, um, con -- You were concerned about his welfare?

A There were two reasons, which I had stated, and that was one of the reasons. Yes.

Q Okay. And what were your two reasons?

A His safety and the integrity of that investigation.

Q And isn't it true, Investigator Wiegen, (sic) that another reason was that you were attempting to befriend him and his family?

A Had nothing to do with it.

Q Okay. Wasn't it true that another reason you

96

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 96 of 115    Document 19-19

Q wanted him up there was to isolate him?

A No. If I wanted to isolate him, his mother and his brother wouldn't be there. No, that was not true.

Q The last contact you have with investigators on the 27th was in -- initiated at approximately 10:50 p.m. at night; right?

A That is true. Yes.

Q And what time was the first contact at the school? I think you said about 12:30?

A Um, I think it was 12:30, but, uh, we weren't with him the whole time. I mean, we were gone a long time and we came back. Actually, Agent Fassbender came back in the evening.

Q When you interviewed Brendan on the 1st, where did that take place?

A Uh, as I indicated before, that took place across the courtyard here at Manitowoc County Sheriff's Department.

Q Do you know how many times either you or Agent Fassbender, during the course of the interview on March 1, the video one that we all watched here today, suggested to Brendan or told Brendan that he was a liar?

A No, I don't know how many times.

Q Do you know how many times, after he was told

97

that he was a liar, that he changed his answer in response to that sort of accusation?

A  No, I don't know how many times.

Q  But you acknowledge he did?

A  Um, I would acknowledge that we said that we didn't believe he was telling the truth at certain times. Yeah, I would acknowledge that. Absolutely.

Q  Well, was he not told --

(Exhibit No. 216 marked for identification.)

Q  (By Attorney Edelstein)  Detective, let me hand you what's been marked for identification as 216. Do you recognize that as a transcript of the video interview that you and Agent Fassbender had with Brendan on the 1st?

A  Yes.

Q  Same one that we saw earlier; right?

A  Uh, with a little bit of additional on the front here?

Q  Yes.

A  Same one.

Q  Well, if you would -- Directing your attention to page 540 --

A  Yes.

Q  -- do you agree that that's, uh, pretty early in the contact?

98

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 98 of 115    Document 19-19

A    Yes.

Q    Okay. Brendan, on the 1st, in your mind and the mind of Fassbender, is, in fact, a suspect, isn't he? When you conduct this interview, he is a suspect in your mind; yes or no?

A    No.

Q    Is that why, on page 540, it was said to him by Fassbender in your presence, I want to assure you that Mark and I are both in your corner. We're on your side?

A    I'm not sure of the question, but we did say that, yes.

Q    Okay. Take a look at that middle paragraph. Would it -- Is it a fair characterization and interpretation of what Fassbender says that he is encouraging Brendan to say things that might make Brendan look a little bad in order for him to be believed?

A    He tells him to tell the whole truth. Don't leave anything out. Don't make anything up.

Q    We've already had an opportunity to see it. What I'm asking you, is it a fair characterization that the intent of that is to have him say things which implicate himself, and only by doing so would then you and Fassbender believe him?

99

A   The intent of an interview, as in this interview, is to get him to tell the truth. That's the intent.

Q   But it was trick -- It was, in fact, said to him that, and I'm about halfway in the middle of that particular statement to him, even if those statements are against your own interest, you know what I mean, that -- then that makes you might -- it might make you look a little bad, or make you look like you were more involved than you want to be. Uh, it's hard to do, but it's good from the vantage point to say, hey, there's no doubt you're telling the truth.

A   Yes, that's what was said. Part of breaking down those barriers.

Q   And isn't the purpose of -- But doesn't that encourage him to say something irregardless of whether it's true or not?

A   No.

Q   Because someone in a position of authority is telling him that, if you say something that doesn't help you, then we might believe you.

A   No, I wouldn't characterize it that way.

Q   On that same page, he was encouraged once again, quote, okay, you don't have to worry about things. Any idea how many times he was told that

100

during the course of that interview?

A No idea.

Q Would it surprise you if I were to suggest that it was in excess of 75 times during the course of the interview on the 1st that either you or Fassbender, in one form or another, said something to him suggesting, or directly stating to him, that he was a liar?

A I have no idea how many times. And several times we told him we did not believe what he was telling us. Yes.

Q Well, directing your attention to page 587?

A Five eighty-seven?

Q Five eighty-seven.

A Yes, sir, I'm there.

Q Okay. About middle way down?

A Okay.

Q Fassbender: It's extremely, extremely important you tell us this for us to believe you. That statement was made to Brendan; right?

A Yes.

Q He didn't respond. And you immediately said, come on, Brendan, what else? Right?

A Yes.

Q Okay. Immediately before Fassbender makes the

101

statement how extremely important it is, you're questioning him about her head; correct?

A   Yes.

Q   All right.  You accused him, during the course of this interview, of shooting Teresa; correct?

A   Yep.  And which he was able to resist every time we accused him.

Q   Well, the truth of the matter is, you don't know if it's right and you don't know if it's wrong, do you?

A   Whether or not he shot Teresa?

Q   Correct.

A   I know he was there when she was shot.  Whether he -- I don't --

Q   Let me stop you there.  You know he was there because he told you that; right?

A   And because of the evidence.

Q   Well, these are the bleached jeans, Exhibit 58; right?

A   Uh, that's true.  Yes.

Q   Okay.  You got them out of his house?

A   That's true.  Yes.

Q   He told you they were there?

A   He did.

Q   He willingly gave them to you?

102

A   Absolutely.

Q   And he told you that he got bleach on there because he cleaned up some stuff, at Steve's request, in the garage?

A   That's true.

THE COURT:  Counsel, why don't you approach, please?

ATTORNEY EDELSTEIN:  Your Honor, I -- I know it's almost 4:30.  I guess I would just have -- I could wrap up for today just real quickly.

THE COURT:  By 4:30?

ATTORNEY EDELSTEIN:  By 4:30.

THE COURT:  Go.

Q   (By Attorney Edelstein)  These jeans, the cuffs, the bullets, the shells, the shovels, the seat, everything that the Government's paraded in here, other than these, which contain what are believed to be bleach spots, which Brendan told you about, none of these items have fingerprints, DNA, or any other scientific evidence connecting Brendan Dassey to the death of Teresa Halbach; yes or no?

A   That's correct.  They had five days to clean up.

ATTORNEY EDELSTEIN:  No other questions for today, Your Honor.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 103 of 115    Document 19-19

THE COURT: Is this the -- Are -- Can -- You concluded your cross-examination?

ATTORNEY EDELSTEIN: I doubt it.

THE COURT: Are you asking to adjourn today and reconvene tomorrow and continue the cross-examination?

ATTORNEY EDELSTEIN: I am, Your Honor. I -- I'll have an opportunity to review tonight, and I should be able to, hopefully, not take as long tomorrow.

THE COURT: All right. All right. We will, then, adjourn for today, ladies and gentlemen. We're going to reconvene tomorrow at 8:30, run until noon. I'll give you the same admonition I did before. Please don't speak about this case amongst yourselves, or to anyone else, or anything connected with it. Thank you.

(Court stands adjourned at 4:26 p.m.)

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 104 of 115    Document 19-19

STATE OF WISCONSIN   )
                     )SS.
COUNTY OF MANITOWOC  )

I, Jennifer K. Hau, Official Court Reporter for Circuit Court Branch 3 and the State of Wisconsin, do hereby certify that I reported the foregoing matter and that the foregoing transcript has been carefully prepared by me with my computerized stenographic notes as taken by me in machine shorthand, and by computer-assisted transcription thereafter transcribed, and that it is a true and correct transcript of the proceedings had in said matter to the best of my knowledge and ability.

Dated this 11th day of December, 2007.

*Jennifer K. Hau*
Jennifer K. Hau, RPR
Official Court Reporter

105

'

**0**

06 [2] 1/5 3/3

**1**

'05 [1] 44/16
'06 [1] 66/25
'til [1] 73/3

103 [1] 2/12
10:17 [1] 22/13
10:35 [1] 22/12
10:38 [1] 22/14
10:50 p.m [1] 97/6
110 [1] 61/24
11:59 [1] 23/13
12 [1] 77/8
1208 [1] 22/10
12932 [1] 37/6
12:29 to [1] 25/18
12:30 [2] 97/9 97/10
12:30 or [1] 5/21
12:57 [1] 25/18
14 [3] 39/13 83/11 83/12
146 [1] 73/24
15 [3] 66/3 66/11 83/11
16 [1] 2/15
163 [2] 42/19 44/21
1:05 [1] 23/10
1:32 [1] 23/14
1st [9] 26/18 43/11 50/7 52/1 69/22
 97/14 98/14 99/2 101/5

**2**

20 [3] 1/10 21/22 41/10
2005 [2] 66/3 66/11
2006 [1] 66/12
2007 [2] 1/10 105/15
206 [6] 2/15 16/19 16/25 37/19 37/20
 38/5
207 [7] 27/7 27/9 27/10 28/22 28/23
 28/24 37/13
207-213 [1] 2/16
208 [7] 28/11 32/6 32/9 37/13 47/10
 48/3 50/5
209 [5] 27/17 27/18 29/5 29/8 37/13
20th [5] 41/7 41/13 42/2 42/5 42/14
210 [4] 28/1 28/3 31/5 37/13
211 [6] 34/25 35/4 35/11 37/13 46/24
 50/7
212 [3] 36/3 36/4 37/14
213 [3] 2/16 37/22 38/6
214 [3] 2/17 93/8 94/13
215 [3] 2/18 67/6 67/8
216 [3] 2/19 98/9 98/11
27 [12] 4/23 5/20 8/10 54/5 55/15 56/18
 56/22 60/18 61/16 62/2 66/25 72/8
27th [24] 10/18 11/1 11/13 11/23 52/20
 52/25 54/23 58/12 63/15 63/21 65/13
 65/16 65/21 65/23 66/17 69/24 71/24
 72/25 78/18 82/7 84/20 92/7 93/2 97/5
28 [1] 25/17
29 [1] 25/17
2:26 [1] 39/3
2:47 [1] 39/4
2d [1] 61/24
2nd [1] 26/19

**3**

3/1 [2] 46/18 47/5
31 [2] 47/13 47/23
31st [1] 48/18

37 [3] 2/11 2/15 2/16
38 [2] 2/15 2/16
39-103 [1] 2/12
3:09 [1] 53/8
3:20 and [1] 7/13
3:24 p.m [1] 64/10
3:30 in [1] 7/13

**4**

4-37 [1] 2/11
40 [1] 41/24
431 [1] 61/24
443 [1] 69/7
446 [3] 72/24 73/9 73/19
447 [3] 73/9 73/14 73/21
448 [1] 74/9
450 [1] 77/3
451 [3] 74/22 77/3 78/17
453 [2] 80/16 81/10
459 [2] 84/21 86/2
463 [2] 86/12 87/20
464 [1] 89/7
466 [1] 90/14
4:26 [1] 104/18
4:30 [3] 103/9 103/12 103/13
4b1 [1] 62/10

**5**

540 [2] 98/22 99/7
556 [3] 55/25 57/12 62/25
58 [1] 102/18
587 [1] 101/12

**6**

604 [3] 56/1 57/12 62/25
67 [1] 2/18

**7**

75 [1] 101/4
7th [2] 43/2 43/6

**8**

88 [2] 1/5 3/3
8:30 [1] 104/13
8:36 [1] 3/1
8:39 [1] 4/6

**9**

9-0-8-0-1 [1] 62/10
94 [2] 2/17 2/17
98 [1] 2/19

**A**

a.m [5] 3/1 4/6 22/13 22/14 23/13
abide [1] 63/5
above [3] 30/15 30/17 73/13
accurately [1] 90/4
accusation [1] 98/2
accused [2] 102/4 102/7
acknowledge [9] 71/21 75/7 75/20
 76/11 82/11 83/17 98/4 98/5 98/7
acknowledged [1] 15/8
across [2] 70/24 97/16
added [1] 20/16
additional [1] 98/17
additionally [2] 58/6 74/15
address [1] 37/4
adjourn [2] 104/4 104/12
adjourned [1] 104/18
admissibility [1] 59/3
admission [2] 61/1 62/11
admit [4] 11/24 14/21 14/22 14/25
admitted [2] 2/14 42/19

admonition [1] 104/14
advance [1] 7/2
advise [1] 16/16
adviser [1] 94/8
af [1] 63/23
afraid [1] 16/6
afternoon [5] 4/21 5/21 7/14 8/1 38/22
age [2] 42/6 42/7
Agent [25] 5/1 7/7 8/5 9/14 10/15 10/20
 10/24 11/11 13/7 18/17 19/1 52/19 54/6
 56/10 67/18 68/4 69/13 74/18 78/17
 78/22 84/2 87/24 97/12 97/19 98/13
agree [7] 3/21 46/11 63/5 68/24 72/14
 85/19 98/24
agrees [1] 13/14
ahead [1] 81/18
alerted [1] 54/1
allowed [4] 57/1 57/6 57/22 72/17
almost [5] 15/11 15/16 25/17 67/12
 103/9
alone [2] 74/19 86/4
along [3] 24/19 25/7 84/2
amongst [1] 104/15
analogy [3] 60/10 61/8 61/9
analyzed [1] 60/12
anatomical [1] 24/22
animated [1] 35/25
animation [2] 34/13 35/24
anticipating [3] 53/10 89/22 89/24
anybody [3] 10/11 14/18 16/8
anyone [1] 104/16
anytime [1] 85/9
anyway [1] 62/7
apparently [3] 22/19 53/10 86/19
appeal [1] 95/11
appealing [1] 65/17
appear [1] 62/14
appearance [2] 3/7 24/24
APPEARANCES [2] 1/12 3/4
Appeared [1] 1/24
appears [4] 3/10 3/11 31/2 36/14
applies [1] 59/13
approach [3] 53/3 92/17 103/7
appropriate [1] 22/17
appropriately [2] 24/18 25/10
approximately [4] 7/10 7/24 22/10 97/5
APRIL [1] 1/10
arguably [1] 53/19
argument [1] 57/7
argumentative [1] 79/22
arms [1] 32/20
arrangements [6] 6/23 7/1 11/21 12/2
 96/7 96/8
arrive [1] 5/19
assault [1] 15/17
assaulted [1] 25/1
assaults [1] 25/4
assessment [1] 3/22
assist [1] 78/10
assistance [1] 34/10
assisted [2] 34/15 105/10
assume [1] 46/16
assumed [1] 42/10
assuming [1] 79/13
assure [1] 99/8
attached [1] 32/19
attempt [5] 53/18 61/12 68/2 69/3 71/18
attempting [6] 54/18 71/17 82/13 83/5
 83/7 96/22
attempts [4] 54/12 55/11 95/11 95/14
attention [5] 67/12 72/24 89/7 98/21
 101/12
attorney [110]

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 106 of 115    Document 19-19

## A

attributed [1] 37/9
attributes [1] 24/24
audio [2] 6/15 93/14
audiotape [2] 6/12 93/4
audiotaped [1] 54/25
Austin [13] 34/12 34/19 35/24 36/19 46/24 47/15 48/6 48/16 48/24 49/4 49/21 50/1 50/8
authority [1] 100/19
avenue [2] 56/20 57/9
aversion [1] 60/23
Avery [6] 37/6 41/20 43/1 47/1 47/22 87/25
Avery's [6] 26/13 28/13 32/10 34/3 37/5 47/19
away [3] 8/17 63/9 88/24
awhile [1] 90/2

## B

backed [1] 36/11
bad [3] 72/12 99/17 100/8
Baldwin [1] 51/22
Barb [3] 7/6 7/16 7/18
barrier [1] 71/13
barriers [2] 71/12 100/14
bat [1] 74/12
bear [1] 39/11
bears [1] 62/16
bed [23] 28/14 28/17 32/13 32/15 32/17 32/18 33/2 33/5 33/11 33/12 33/17 33/21 33/23 33/24 34/4 34/20 35/18 46/20 46/22 48/25 49/4 49/7 49/19
bedroom [12] 28/13 32/10 32/22 33/6 35/7 35/17 43/24 43/25 46/25 47/12 47/22 48/4
beforehand [1] 59/21
befriend [3] 16/9 65/3 96/23
Begging [1] 76/16
behind [1] 60/22
bel [1] 50/1
beliefs [1] 32/23
believed [7] 29/22 29/24 68/6 81/7 95/16 99/18 103/18
benefit [5] 42/23 48/10 51/2 64/15 84/7
best [6] 16/8 40/21 40/23 57/4 78/14 105/13
bet [1] 74/21
big [2] 36/6 60/21
birthday [1] 44/17
bit [17] 9/1 9/1 13/1 14/15 15/18 17/1 29/10 32/7 39/11 51/4 68/9 68/11 71/6 73/23 87/22 88/6 98/17
bits [1] 11/17
blank [1] 89/22
bleach [5] 10/24 11/9 29/25 103/2 103/19
bleached [1] 102/18
blood [5] 30/25 84/14 84/18 84/18 84/19
blue [1] 5/10
body [13] 9/10 25/5 28/7 28/16 78/20 78/21 78/24 79/7 79/10 82/10 82/14 83/14 83/20
bones [2] 28/9 32/2
bookcase [1] 35/21
bottom [7] 9/22 17/7 18/6 67/12 73/1 73/9 73/19
box [2] 30/14 30/17
BRANCH [2] 1/1 105/5
break [8] 22/7 23/2 23/7 25/16 25/17 26/6 38/23 38/25
breaking [1] 100/13

breaks [1] 71/12
BRENDAN [91] 1/6 1/23 3/4 5/6 7/8 8/12 10/10 11/3 11/13 11/18 12/8 12/10 12/16 12/16 12/19 24/17 25/1 27/11 27/14 27/19 29/17 30/5 33/7 33/22 33/23 34/17 35/15 41/5 41/20 42/1 43/8 43/17 44/2 44/11 44/13 45/15 46/2 46/4 46/5 47/4 47/17 47/19 48/16 48/20 50/6 50/10 50/13 50/18 51/23 52/20 58/9 65/18 66/17 66/19 66/25 67/3 67/19 68/18 69/23 70/15 72/1 72/15 73/11 73/14 75/12 75/20 78/19 78/22 79/3 80/20 81/11 81/20 82/2 84/20 86/23 88/20 89/4 95/1 95/2 95/23 97/14 97/22 97/22 98/14 99/2 99/16 99/17 101/20 101/23 103/19 103/21
Brendan's [9] 7/3 12/7 19/2 26/20 47/11 49/7 49/17 49/18 49/24
brick [1] 19/24
bridge [1] 64/7
broke [1] 32/24
brother [2] 96/7 97/3
bug [1] 73/3
build [2] 69/25 70/2
building [1] 19/15
built [1] 31/10
bullets [3] 26/20 26/22 103/16
burglary [1] 15/16
burn [3] 28/4 28/6 31/6
business [1] 46/9
button [1] 22/20

## C

cabinet [1] 35/20
calls [2] 39/22 45/1
Calumet [2] 16/22 39/13
capacity [1] 12/22
caption [5] 20/8 20/15 20/18 20/19 22/8
car [2] 7/9 52/4
care [1] 50/17
carefully [1] 105/8
case [21] 1/5 3/3 17/22 23/12 25/9 32/24 35/6 40/18 59/8 59/11 60/8 61/8 61/16 61/23 61/25 62/4 62/18 84/3 84/16 94/4 104/15
cases [1] 84/17
cassette [1] 6/13
CD [3] 21/8 21/10 38/7
cement [1] 35/16
certify [1] 105/6
CF [2] 1/5 3/3
chains [1] 32/19
chair [8] 44/9 44/12 44/25 45/11 45/16 45/19 46/13 46/14
chairs [1] 19/22
chance [3] 19/14 52/7 68/15
changed [3] 90/24 91/4 98/1
characterization [4] 61/5 68/17 99/14 99/22
characterize [3] 43/16 83/22 100/22
characterizing [1] 40/2
check [2] 17/18 42/12
choice [1] 69/10
circles [3] 30/15 30/15 30/22
CIRCUIT [3] 1/1 1/11 105/5
circumstance [2] 59/13 59/14
circumstances [1] 60/14
cite [3] 57/12 59/10 63/22
cited [1] 61/23
claim [2] 44/13 45/15
claimed [1] 45/10
claims [2] 44/15 47/12
classified [1] 39/15

clean [1] 103/23
cleaned [2] 29/25 103/3
cleaning [2] 11/4 11/10
clear [5] 31/1 36/13 53/20 61/25 63/4
clearer [1] 45/25
clearly [2] 24/20 59/13
clerk [3] 38/11 38/14 49/18
client [2] 53/20 77/3
close [2] 71/15 92/25
closed [5] 20/7 20/15 20/18 20/19 22/8
closer [2] 71/6 71/10
closet [4] 28/15 48/4 48/7 48/11
clothes [1] 91/1
clothing [2] 56/2 56/3
clutter [1] 36/15
co [1] 85/21
co-lead [1] 85/21
cognitive [3] 80/21 81/4 81/7
colleague [5] 24/21 28/19 31/12 34/23 35/10
color [2] 25/10 56/2
comfort [1] 71/9
comfortable [2] 20/2 71/3
coming [1] 3/15
command [1] 87/10
commence [1] 6/5
commencing [1] 38/22
comment [3] 66/7 75/3 76/13
commission [1] 35/23
common [2] 16/11 64/17
compare [1] 29/21
computer [2] 46/25 105/10
computer-assisted [1] 105/10
computer-generated [1] 46/25
computerized [1] 105/9
con [2] 55/16 96/15
concern [3] 53/17 77/21 85/15
concerned [2] 61/9 96/16
concluded [1] 104/2
concurrently [1] 20/17
condition [1] 47/22
conduct [3] 7/2 8/19 99/4
conducted [6] 7/22 19/1 19/11 19/15 19/19 85/2
conference [6] 5/25 43/14 43/15 43/17 44/24 45/9
confessed [2] 43/18 59/18
confidence [1] 69/5
confident [1] 55/17
configuration [1] 48/18
confine [1] 90/22
confusion [1] 18/13
connected [1] 104/16
connecting [1] 103/21
connection [2] 65/5 68/2
conscious [1] 63/15
consistency [1] 46/17
constitutional [1] 16/16
Cont'd [2] 2/11 4/18
contact [6] 68/18 72/25 80/20 97/4 97/8 98/25
contacted [4] 6/18 7/3 12/7 43/5
contacts [1] 72/15
contain [3] 23/23 67/1 103/18
contained [2] 26/22 80/8
containing [1] 95/15
contains [1] 69/18
context [2] 73/23 91/20
continue [3] 22/18 33/20 104/5
continued [1] 26/19
continues [4] 3/7 22/23 23/4 23/19
contributed [1] 26/11
convenience [2] 79/18 82/8

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 107 of 115    Document 19-19

**C**

conversation [3] 67/2 67/15 96/2
convey [2] 68/20 68/25
cop [1] 17/4
cops [1] 10/8
copy [1] 93/12
corner [2] 48/25 99/9
correctly [2] 28/6 52/11
couch [4] 19/21 70/14 70/18 71/18
counsel [9] 3/2 3/15 3/19 23/1 53/3 62/4 64/11 78/6 103/6
counting [1] 95/20
county [8] 1/1 16/22 19/12 37/7 40/7 51/23 97/17 105/2
couple [2] 55/7 61/23
course [12] 13/3 13/8 21/2 47/5 72/15 72/25 85/11 96/1 97/20 101/1 101/4 102/4
Court's [2] 3/22 76/16
courtyard [1] 97/17
Cover [1] 10/8
covered [2] 17/19 39/10
cozy [1] 70/21
crafted [1] 60/25
crime [4] 8/13 9/3 14/19 15/16
criminal [5] 50/11 50/19 51/3 93/17 93/19
cross [11] 2/12 38/19 38/20 38/22 39/5 39/8 64/7 77/18 92/21 104/2 104/6
cross-examination [7] 2/12 38/19 39/8 77/18 92/21 104/2 104/6
CSI [1] 19/24
cued [1] 22/17
cuffs [1] 103/15
culmination [1] 49/23
cumulative [2] 77/24 77/25
current [1] 21/25
custodial [5] 59/4 59/10 59/16 62/1 62/5
custody [1] 60/1
cut [3] 29/2 87/24 88/21

**D**

DASSEY [36] 1/6 1/23 3/4 5/3 5/5 5/6 5/23 5/25 6/6 6/8 7/25 8/10 10/21 10/25 11/1 11/2 12/19 34/17 42/2 43/17 50/7 50/11 50/14 50/18 54/4 55/5 55/10 56/14 57/19 65/18 66/25 67/19 72/1 78/19 78/23 103/22
date [7] 1/10 41/8 50/10 63/8 66/7 66/8 66/9
dated [4] 27/14 27/24 28/9 105/15
day [27] 1/5 4/25 5/3 5/7 5/19 6/6 8/10 9/5 11/8 16/1 18/22 35/7 38/17 39/22 39/22 43/11 50/21 50/22 54/10 60/2 60/11 60/13 68/19 73/4 85/22 93/1 105/15
day-to-day [1] 39/22
days [10] 5/7 43/9 44/23 45/8 45/8 59/20 61/23 77/16 77/20 103/23
dealing [1] 56/2
deals [1] 59/9
death [3] 63/25 92/11 103/22
December [1] 44/16
deception [3] 13/7 83/18 83/22
deceptive [1] 13/12
decide [3] 11/16 63/17 63/22
decided [4] 6/22 8/15 8/19 9/18
declined [1] 7/21
Deere [2] 30/20 36/8
defendant [34] 1/7 1/20 1/22 1/24 3/10 4/22 4/24 5/15 5/24 7/11 8/22 9/14 10/17 12/3 13/4 14/10 16/1 16/15 18/8

23/24 24/13 27/1 34/17 37/1 37/8 44/25 45/10 54/22 55/14 59/17 60/8 63/19 65/24 65/25
defendant's [1] 7/16
defendants [1] 59/18
defense [11] 3/23 21/5 24/1 53/18 54/9 59/16 60/17 61/4 62/12 63/12 63/13
defensive [2] 15/22 64/25
deficits [1] 81/8
denied [1] 55/14
department [15] 6/24 7/8 7/12 7/15 7/22 12/9 12/17 16/22 19/3 19/13 19/16 19/18 93/6 93/20 97/18
depict [1] 47/21
depicted [12] 27/9 27/18 28/3 29/14 30/9 30/23 31/24 32/8 32/14 32/16 35/11 36/4
depiction [5] 27/13 29/9 29/16 30/16 46/25
depicts [1] 27/19
depression [2] 28/8 31/25
described [4] 46/12 64/15 64/20 64/23
desk [1] 35/19
detailed [1] 52/2
detective [7] 39/18 50/15 64/14 74/10 82/6 84/1 98/10
detective's [1] 19/16
determination [1] 60/6
develop [1] 92/6
device [1] 52/4
die [1] 73/4
difference [1] 51/14
differences [1] 51/4
direct [9] 2/11 4/18 43/21 51/1 54/20 56/6 57/18 64/15 93/2
directed [1] 67/18
directing [5] 67/12 72/24 89/7 98/21 101/12
directly [4] 65/17 89/1 92/10 101/7
dirt [2] 31/10 31/21
disagree [1] 89/5
disappearance [3] 40/3 43/18 92/11
disclosed [1] 54/6
discourse [1] 69/13
discuss [3] 10/18 57/14 61/21
discussed [4] 8/7 8/7 58/23 94/21
discussing [2] 56/23 80/13
discussion [8] 3/15 3/18 19/6 23/23 53/5 60/5 90/25 92/19
discussions [2] 59/20 60/2
distinct [3] 59/11 65/23 79/15
district [5] 1/14 6/18 26/7 94/5 94/8
DNA [2] 26/22 103/20
doghouse [3] 28/7 31/16 31/18
doing [8] 7/18 13/22 14/22 26/3 71/16 74/2 93/13 99/24
door [8] 33/5 34/6 35/14 35/15 36/6 36/6 56/21 57/9
doorway [2] 34/7 35/13
dot [12] 78/20 78/20 78/20 79/3 79/3 79/4 80/7 80/7 80/7 89/13 89/13 89/13
doubt [2] 100/12 104/3
Dr. [1] 34/14
Dr. Eisenberg [1] 34/14
draw [4] 33/24 51/19 70/19 70/23
drawer [1] 35/20
drawing [8] 28/4 28/5 29/21 30/25 31/11 32/17 47/4 47/11
drawings [2] 26/25 27/6
drawn [6] 28/14 31/17 31/18 35/18 36/9 70/15
draws [1] 33/25
dresser [1] 28/14

drew [12] 27/11 27/19 28/6 28/7 28/16 28/25 31/8 32/1 32/11 32/15 32/18 48/17
Driver's [1] 80/23
drop [1] 87/21
dry [1] 75/14
dugout [1] 31/23
duly [1] 4/13
duties [1] 39/21
DVD [13] 21/1 22/4 22/5 22/23 22/24 23/4 23/5 23/19 23/20 37/15 37/21 38/8 38/9

**E**

earlier [12] 9/13 26/14 29/22 50/1 51/1 51/7 71/18 77/15 77/20 95/5 96/10 98/16
early [3] 39/25 68/18 98/24
ease [1] 22/1
easily [1] 10/6
east [1] 49/1
Ed [1] 80/23
EDELSTEIN [45] 1/21 2/12 3/10 21/9 21/12 24/3 38/21 39/6 39/9 45/4 45/6 54/15 58/5 58/14 63/2 64/5 64/13 64/14 66/13 66/16 72/7 76/16 76/22 76/24 77/9 78/9 78/16 82/21 83/2 83/6 85/16 85/20 87/21 87/23 92/22 93/1 94/12 94/18 98/10 103/8 103/13 103/15 103/24 104/3 104/7
educating [1] 51/2
effort [3] 64/23 68/19 92/5
efforts [2] 24/10 63/16
eight [1] 47/11
eighty [2] 101/13 101/14
eighty-seven [2] 101/13 101/14
Eisenberg [2] 34/14 66/4
elaborate [1] 29/10
eleven [2] 35/5 47/15
ELMO [2] 28/20 48/3
emotions [2] 65/18 95/12
employ [2] 13/7 16/12
employed [5] 13/2 14/9 15/25 64/17 95/5
employee [2] 40/7 40/7
encourage [1] 100/16
encouraged [1] 100/23
encouraging [1] 99/16
end [1] 38/17
enforcement [1] 10/4
enforcement's [1] 9/20
engage [1] 13/24
entire [1] 67/15
entirely [1] 56/13
entitled [4] 56/19 58/10 63/12 82/22
entries [1] 89/20
entry [6] 36/6 73/10 74/10 86/15 86/22 88/16
entwined [1] 62/15
equates [1] 15/20
especially [1] 61/15
essence [1] 57/21
essentially [7] 54/17 55/8 55/18 56/6 56/17 56/25 61/10
established [1] 39/25
estimate [1] 25/16
evening [5] 10/17 10/19 11/1 56/12 97/13
event [2] 41/22 48/21
events [7] 37/9 39/21 59/24 60/13 60/24 69/24 77/16
eventually [1] 34/2
everybody [3] 8/15 43/7 72/21

## E

everyone [1] 54/1
everything [10] 8/22 13/15 25/10 55/5 57/20 68/14 76/14 86/14 96/4 103/17
evidence [9] 21/1 37/13 57/4 84/18 84/19 85/4 85/22 102/17 103/21
evident [2] 80/25 81/3
ex [1] 21/20
exact [3] 42/6 42/7 66/9
exactly [6] 30/1 32/1 46/6 81/15 81/21 87/5
examination [10] 2/11 2/12 4/18 17/13 38/19 39/8 77/18 92/21 104/2 104/6
examined [1] 4/14
examples [1] 55/7
exception [1] 62/24
excess [1] 101/4
exchange [2] 69/18 90/22
exculpatory [4] 53/19 62/13 62/14 62/20
excuse [8] 26/7 29/23 53/2 53/6 57/8 66/10 71/11 93/14
excused [1] 3/22
executed [4] 26/12 26/17 33/16 33/21
exhibit [26] 16/19 16/20 16/24 27/7 27/9 27/10 27/16 27/18 28/1 28/3 32/6 32/8 34/25 35/4 35/11 36/3 36/4 37/14 48/2 50/5 50/7 65/14 67/8 77/1 98/9 102/18
exhibits [6] 2/14 28/19 37/13 38/5 38/18 38/23
exit [1] 35/14
experience [2] 13/22 15/7
expert [2] 81/4 81/6
explain [3] 21/21 57/1 94/4
explained [3] 17/9 24/14 93/11
explanation [2] 56/21 82/17
explore [3] 56/19 57/7 57/23
expound [1] 82/20
extent [1] 46/12
extremely [3] 101/18 101/18 102/1

## F

face [2] 16/10 59/5
faced [1] 62/8
facilitate [1] 36/21
facilitating [1] 22/1
fail [1] 77/15
fairly [1] 52/2
fairness [1] 40/20
FALLON [59] 1/15 2/11 3/5 3/8 3/20 4/1 4/4 4/9 4/19 5/13 5/17 5/18 19/7 19/9 20/5 20/9 20/12 20/24 21/15 21/19 22/6 22/15 22/16 22/25 23/6 23/15 23/17 23/21 24/5 28/21 28/24 29/5 29/8 32/5 32/8 37/11 37/20 37/23 37/25 38/8 38/10 38/13 38/16 39/2 45/22 53/2 53/10 53/15 58/4 58/16 61/10 66/10 77/11 77/24 79/21 79/24 85/12 92/15 94/16
Fallon's [1] 61/5
family [2] 10/21 96/23
far [3] 46/9 61/8 69/13
fashion [2] 6/11 6/22
Fassbender [55] 5/1 6/4 7/7 8/6 9/14 10/15 10/20 10/24 11/12 13/7 18/18 19/1 24/22 28/19 29/6 32/6 40/1 43/8 43/12 52/12 52/15 52/20 54/7 56/10 67/3 67/18 68/4 69/13 70/13 74/2 74/18 75/10 75/16 75/24 78/18 78/22 79/5 84/3 86/15 88/5 88/12 88/20 88/22 95/2 96/8 97/12 97/20 98/13 99/3 99/8 99/15 99/25 101/6 101/18 101/25
Fassbender's [1] 87/25

fault [5] 74/23 75/8 75/12 75/18 75/25
fear [1] 10/12
feasibly [1] 34/20
February [19] 4/23 5/20 8/10 41/10 42/2 52/21 54/5 54/23 55/15 56/18 56/22 58/13 58/15 60/18 61/16 62/2 66/25 72/8 72/20
February 20 [1] 41/10
February 27 [12] 4/23 5/20 8/10 54/5 55/15 56/18 56/22 60/18 61/16 62/2 66/25 72/8
feeling [2] 8/21 8/24
feet [1] 49/9
felt [1] 55/4
few [8] 21/21 22/2 24/6 29/12 31/15 49/9 53/7 92/1
fiancé [2] 34/3 47/19
file [2] 35/19 35/20
fine [5] 51/18 51/19 51/20 75/5 77/22
fingerprints [1] 103/20
finish [1] 79/19
fire [6] 8/14 9/11 82/10 82/15 83/14 83/20
fit [1] 34/20
fits [1] 36/12
five [5] 66/13 86/5 101/13 101/14 103/23
floated [1] 59/18
floor [2] 11/4 19/17
folks [1] 51/2
follow [4] 68/8 69/23 85/7 86/9
follow-up [2] 69/23 86/9
followed [1] 75/23
following [1] 85/10
follows [4] 4/14 75/11 78/19 88/12
fool [1] 15/3
foregoing [2] 105/7 105/7
foremost [1] 9/20
forensic [1] 66/4
forest [2] 58/20 60/21
forgotten [1] 37/14
form [18] 16/18 16/18 16/23 16/24 17/2 17/6 17/13 17/14 17/15 18/3 18/9 18/10 18/11 18/14 75/21 79/6 93/11 101/6
formalized [1] 56/9
found [5] 9/24 16/7 28/8 32/2 33/2
foundation [1] 45/23
four [2] 82/8 91/2
Fourteen [1] 83/13
FOX [4] 1/11 9/15 56/11 96/9
frame [2] 66/8 85/24
FREMGEN [11] 1/19 3/9 3/9 3/24 38/2 38/4 54/15 54/17 57/15 58/13 61/7
friendly [1] 16/2
front [1] 98/17
full [1] 56/21
fully [3] 54/6 63/6 92/6
furniture [2] 49/19 49/22
further [6] 11/5 37/11 56/22 68/9 76/6 82/6
furthest [1] 48/25

## G

GAHN [3] 1/17 3/8 31/12
gain [1] 69/3
gained [1] 26/16
game [1] 54/11
garage [20] 11/4 11/5 11/10 26/13 26/21 27/19 27/20 27/21 27/21 28/5 29/9 30/1 35/17 36/5 36/6 36/7 36/16 36/22 37/5 103/4
gather [1] 38/24
general [3] 36/21 54/9 57/15

generally [2] 63/23 72/20
generated [1] 46/25
gentleman [1] 60/1
gentlemen [2] 20/15 104/12
gestured [1] 5/4
Gibson [1] 37/6
girlfriend [1] 34/3
glasses [1] 5/11
goal [2] 64/24 65/9
gone [2] 43/3 97/11
Government's [1] 103/17
grand [1] 59/19
grant [1] 62/23
gravel [2] 31/10 31/20
great [1] 59/21
ground [2] 29/19 39/10
guarantees [1] 62/17
guessing [1] 52/11
gun [7] 28/16 33/2 33/4 33/18 33/21 35/22 89/13
gunshot [4] 66/5 85/4 85/22 85/25
guys [3] 19/13 24/15 74/1

## H

hadn't [1] 42/12
hair [1] 25/10
Halbach [9] 24/11 26/23 40/3 43/19 43/24 50/23 66/6 85/5 103/22
Halbach's [2] 24/23 63/25
halfway [5] 69/8 73/9 73/14 74/16 100/4
hallway [3] 33/9 33/13 34/7
hand [9] 31/3 31/12 35/10 42/18 46/23 70/24 71/11 71/19 98/10
handcuffs [1] 32/19
handed [1] 16/20
handwriting [2] 17/14 31/2
hang [1] 74/19
happen [2] 10/9 91/21
happened [1] 25/2
happens [1] 14/7
hard [3] 19/25 68/14 100/10
harm [1] 10/1
hasn't [4] 73/21 73/24 74/25 75/25
Hau [3] 2/3 105/4 105/19
he'll [2] 13/17 24/19
head [4] 49/12 66/5 87/2 102/2
health [1] 3/17
health-related [1] 3/17
hearing [1] 26/2
hearsay [2] 53/23 54/13
held [1] 43/13
here's [2] 31/19 35/14
hereby [1] 105/6
herein [1] 4/13
herself [1] 19/3
hesitancy [1] 18/16
hey [1] 100/11
hierarchy [1] 40/6
high [6] 5/19 6/2 54/23 75/13 80/22 95/6
Hills [2] 9/16 96/9
himself [9] 8/13 8/14 9/2 11/4 11/5 18/9 87/24 88/21 99/24
hold [1] 59/22
holding [1] 48/9
holds [1] 59/12
homicide [2] 15/17 45/2
HON [1] 1/11
honest [4] 73/4 73/16 74/12 95/24
Honor [19] 3/6 22/6 22/25 23/21 24/3 38/21 39/7 53/2 58/5 63/2 77/11 82/21 85/17 92/15 92/22 94/12 103/8 103/25 104/7
hopefully [1] 104/9

## H

horrific [1] 9/10
Hotel [1] 9/16
hours [1] 21/22
house [3] 33/14 44/17 102/21
hug [1] 69/15
human [5] 78/20 78/21 78/23 79/7 79/10
hurting [1] 69/16

## I

I'd [7] 12/25 27/5 65/22 69/14 70/23 74/4 82/20
I'll [11] 21/4 23/10 24/7 51/11 55/7 59/7 63/8 74/19 78/14 104/8 104/14
I'm [50] 3/2 16/9 18/5 20/10 28/18 31/12 34/22 34/23 35/9 36/2 38/9 42/17 42/18 44/3 46/23 47/25 48/9 51/11 52/11 52/21 58/14 62/22 62/22 65/15 69/7 72/22 73/1 77/12 77/14 78/2 78/6 78/16 79/12 79/25 81/4 82/17 82/19 82/21 83/2 84/21 84/22 85/8 91/23 91/25 92/16 92/24 99/11 99/22 100/4 101/15
I've [7] 14/22 17/8 17/19 37/14 37/14 64/8 84/11
i.e [2] 81/16 82/14
idea [7] 19/8 59/18 65/22 66/1 100/25 101/2 101/9
identification [6] 16/19 34/24 36/3 67/8 98/9 98/11
identified [2] 5/15 58/23
identify [1] 93/8
Illustrate [1] 35/12
immediately [7] 15/8 73/13 75/10 75/23 88/12 101/22 101/25
implicate [1] 99/24
implies [1] 15/2
impression [2] 31/23 57/24
inaudible [6] 79/1 79/12 79/14 80/6 80/9 80/13
inaudibles [1] 88/7
incident [1] 14/19
including [3] 38/6 52/3 58/12
inconsistencies [1] 50/5
inconsistency [1] 45/20
incorrect [3] 61/6 61/8 66/15
inculpatory [5] 59/24 60/6 62/9 62/15 77/18
indeed [1] 53/14
Indefinite [1] 85/13
indicate [1] 17/7
individually [1] 60/13
individuals [1] 64/18
inducements [2] 18/21 60/19
indulgence [1] 76/17
inference [1] 55/9
inform [1] 6/19
informed [4] 3/16 7/4 10/20 10/24
initial [5] 15/13 17/20 17/22 18/2 18/11
initially [3] 32/23 33/10 41/12
initials [2] 30/2 30/3
initiated [3] 60/4 60/9 97/5
initiator [1] 59/19
inquiry [1] 88/20
instance [3] 55/13 55/24 63/22
instances [1] 62/8
instincts [1] 14/20
instruction [3] 4/2 20/11 21/3
integrity [2] 10/5 96/20
intend [1] 63/7
intended [4] 4/22 65/7 67/20 94/1
intent [3] 99/23 100/1 100/2

intention [1] 94/19
intentionally [1] 24/16
interest [1] 100/6
interested [2] 91/15 92/9
interpose [1] 92/16
interpretation [2] 89/3 99/15
interrogate [1] 51/17
interrogation [9] 13/3 51/6 59/10 59/17 60/7 62/1 62/6 71/2 85/3
interrogations [1] 59/16
interview [90] 4/22 4/24 6/5 6/8 6/10 6/16 6/18 6/20 6/21 6/25 7/2 7/11 7/14 7/18 7/20 7/23 8/3 8/4 8/7 8/8 8/14 8/15 10/16 10/19 12/9 12/19 12/21 12/23 12/25 13/2 13/6 14/8 14/14 14/18 15/14 15/24 18/25 19/2 19/4 19/10 19/11 19/15 24/15 25/25 26/10 29/1 37/15 43/7 43/22 45/8 47/5 51/5 51/16 55/1 55/12 58/21 58/24 61/12 63/15 64/18 66/24 69/25 70/6 70/6 71/10 72/19 72/22 82/16 85/3 85/11 85/23 90/23 91/20 91/23 91/24 91/25 92/7 92/8 92/12 93/4 93/11 95/1 97/20 98/13 99/4 100/1 100/1 101/1 101/5 102/5
interviewed [4] 5/7 20/3 33/7 97/14
interviewee [1] 65/3
interviewer [1] 16/10
interviewers [3] 55/24 69/4 69/6
interviewing [4] 8/9 13/8 14/1 18/5
interviews [13] 8/20 9/5 11/8 11/23 13/23 14/23 15/15 15/23 25/3 54/5 58/11 68/14 70/8
introduce [3] 53/18 54/12 61/14
introducing [1] 21/1
introduction [1] 53/23
investigation [6] 10/5 10/13 34/11 35/25 51/3 96/20
investigative [3] 24/10 32/23 39/21
investigator [13] 4/10 4/20 15/7 21/16 21/24 24/5 24/21 37/3 39/15 69/21 83/10 84/2 96/21
investigators [6] 25/22 40/2 51/21 85/21 90/12 97/4
involvement [5] 11/24 15/9 15/13 43/18 62/3
IQ [4] 71/25 72/3 72/8 72/10
irregardless [2] 90/19 100/16
isolate [2] 97/1 97/2
issue [1] 90/25
issues [1] 3/17
items [2] 32/13 103/20

## J

Janda [1] 7/17
jeans [2] 102/18 103/15
Jennifer [3] 2/3 105/4 105/19
JEROME [1] 1/11
job [1] 9/21
Jodi [4] 34/16 47/20 48/20 49/23
jump [1] 39/11
jurors [5] 3/1 3/16 4/6 53/8 64/10
jury [18] 1/4 3/13 3/14 3/25 20/16 23/11 42/23 53/6 54/1 56/17 58/7 63/3 63/10 63/17 64/2 64/8 64/16 88/19

## K

Kayla [15] 40/25 41/3 41/9 41/12 41/13 41/17 41/19 43/1 44/4 44/8 44/11 44/11 45/9 46/1 46/5
keep [1] 11/17
Keeping [1] 80/18
keeps [1] 11/18

Ken [1] 3/8
KENNETH [1] 1/13
kill [4] 67/20 88/13 88/23 89/1
killed [1] 50/22
knee [4] 71/11 71/11 71/20 71/21
knife [5] 27/10 28/25 88/13 88/23 88/25
knowing [1] 91/15
known [2] 12/10 41/4
KRATZ [6] 1/13 3/8 6/19 6/20 25/21 25/21

## L

label [2] 30/5 30/6
labeled [1] 27/22
lack [1] 57/7
ladies [2] 20/14 104/12
laid [1] 27/23
lamps [1] 19/22
lapse [1] 60/11
large [1] 67/21
laser [2] 31/13 49/2
later [10] 10/17 10/25 11/5 11/13 19/3 29/25 43/9 56/11 63/21 93/1
law [6] 1/20 1/22 9/20 10/4 21/2 53/20
lawnmower [4] 27/22 30/20 30/24 36/8
layers [3] 15/21 15/22 64/25
laying [1] 28/7
layout [2] 32/22 36/22
lead [4] 40/2 51/21 84/2 85/21
leading [4] 26/11 55/20 95/15 95/17
learn [1] 32/24
learned [10] 6/19 8/8 10/21 11/12 11/14 26/4 35/6 45/2 70/1 85/24
learning [1] 11/17
leave [4] 47/25 61/10 75/13 99/19
leaves [1] 56/17
leaving [1] 57/20
led [4] 44/8 58/7 60/5 64/2
legal [1] 94/8
legally [1] 58/18
legs [1] 32/20
lengthy [3] 25/15 43/7 45/14
less [3] 8/2 24/7 36/14
letter [1] 57/8
lettering [1] 30/9
liar [3] 97/23 98/1 101/8
lie [2] 83/18 83/23
lies [2] 65/23 95/9
light [1] 20/1
lighting [1] 19/22
likes [1] 14/22
limitations [1] 80/21
line [5] 9/22 51/19 51/19 51/20 69/18
lines [2] 67/21 82/8
lit [1] 30/1
little [28] 6/7 9/1 9/1 11/17 11/18 11/19 13/1 14/15 15/18 17/1 29/7 29/10 30/14 35/19 39/11 51/4 52/4 68/9 68/11 71/6 71/10 82/6 87/22 88/6 90/22 98/17 99/17 100/8
lived [3] 8/16 9/23 42/11
living [1] 19/20
located [1] 6/2
location [2] 19/10 37/8
locations [2] 52/24 52/24
long [5] 7/24 14/23 89/25 97/11 104/10
looks [2] 33/14 79/1
losing [2] 41/5 41/20
lost [1] 41/24
lot [8] 8/19 39/10 40/18 50/13 50/16 68/13 74/2 87/1
luminol [3] 29/23 29/24 30/1
lunch [1] 23/9

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 110 of 115    Document 19-19

**M**

machine [1] 105/10
mainstream [1] 80/22
maintain [1] 21/25
man [2] 63/8 84/14
manipulated [1] 63/18
MANITOWOC [7] 1/1 12/8 12/17 19/12
37/6 97/17 105/2
manner [1] 63/11
March [41] 12/6 12/19 13/6 14/10 18/18
18/24 19/11 26/13 26/18 26/19 43/2
43/6 43/12 43/22 44/20 44/23 50/20
50/21 50/25 52/1 52/6 52/21 54/3 55/21
56/7 56/23 57/16 57/21 58/3 58/12
58/21 58/25 60/11 60/20 61/17 72/19
72/20 77/19 92/24 92/25 97/21
March 1 [24] 12/6 12/19 13/6 14/10
18/18 18/24 19/11 50/25 52/6 54/3
55/21 56/7 56/23 57/16 57/21 58/3
58/21 58/25 60/11 60/20 61/17 77/19
92/24 97/21
March 7 [1] 43/22
marginal [1] 77/20
Marinette [2] 51/23 55/1
mark [10] 1/19 2/10 3/9 4/12 4/17 37/21
66/22 67/5 75/13 99/9
marked [11] 2/14 16/19 34/24 36/3 38/7
46/24 66/20 67/8 93/8 98/9 98/11
markings [1] 27/13
match [2] 46/10 46/12
materials [1] 78/11
matter [12] 10/10 14/18 54/11 62/13
62/14 62/15 63/14 69/21 91/2 102/8
105/7 105/13
matters [1] 62/25
mean [18] 9/11 9/21 13/13 14/3 14/3
14/16 20/22 45/6 50/13 50/15 72/21
77/19 79/2 89/18 89/24 90/11 97/11
100/7
meant [5] 69/17 74/13 75/15 75/19 80/6
measures [1] 13/12
meet [1] 5/23
meeting [1] 8/9
member [1] 10/21
members [1] 43/12
memorial [1] 6/21
memorialize [2] 6/21 94/20
memorialized [2] 6/11 12/21
memory [2] 72/11 78/12
mentioned [1] 11/9
met [3] 5/3 5/25 42/1
middle [7] 67/13 67/21 73/20 84/23
99/13 100/4 101/16
mind [7] 9/20 50/12 50/18 80/18 99/2
99/3 99/5
minimize [3] 15/12 15/18 82/18
minute [1] 92/23
minutes [3] 21/23 25/18 53/7
Miranda [6] 16/17 17/3 93/10 93/22 94/3
94/4
Mirandize [1] 94/6
Mishicot [7] 5/2 5/19 9/16 42/10 54/23
80/22 96/12
missing [1] 57/25
misunderstanding [1] 18/13
mom [1] 96/6
moments [1] 31/16
Monday [1] 56/4
morning [3] 3/2 3/5 22/7
mother [10] 7/3 7/16 9/15 10/10 10/17
10/25 12/7 12/14 19/2 97/2
motion [1] 62/23

mound [4] 31/8 31/10 31/19 31/21
Mr [3] 5/23 6/5 7/25
Mr. [31] 5/3 5/5 5/25 6/4 6/8 6/20 8/10
10/21 10/25 11/1 11/2 22/15 23/15
25/21 25/21 28/19 29/6 31/12 32/6 38/2
53/10 54/4 54/15 54/15 55/5 55/10
56/14 57/19 58/4 61/5 61/10
Mr. Dassey [14] 5/3 5/5 5/25 6/8 8/10
10/21 10/25 11/1 11/2 54/4 55/5 55/10
56/14 57/19
Mr. Edelstein [1] 54/15
Mr. Fallon [5] 22/15 23/15 53/10 58/4
61/10
Mr. Fallon's [1] 61/5
Mr. Fassbender [4] 6/4 28/19 29/6 32/6
Mr. Fremgen [2] 38/2 54/15
Mr. Gahn [1] 31/12
Mr. Kratz [3] 6/20 25/21 25/21
Ms [1] 38/10
much [5] 40/19 60/18 74/3 79/2 94/19
mutilated [1] 50/23
myself [4] 5/1 6/4 7/7 19/1

**N**

name [5] 4/16 4/16 34/11 39/19 74/10
necessarily [5] 51/18 63/5 68/21 68/24
93/18
necessary [1] 20/25
need [4] 11/21 38/23 74/7 88/6
needed [5] 8/15 8/16 8/19 10/2 41/17
never [6] 11/9 11/11 15/11 42/1 78/23
91/6
new [2] 25/23 26/4
nice [1] 16/9
Nick [1] 84/12
night [6] 9/19 11/6 11/13 61/22 78/6
97/6
nightstand [1] 28/15
no's [1] 87/2
nobody [3] 14/22 91/10 91/13
none [2] 86/9 103/20
noon [1] 104/14
Norm [1] 3/8
normal [1] 15/17
NORMAN [1] 1/17
north [1] 49/1
note [2] 3/14 17/12
noted [1] 26/24
notes [1] 105/9
noticed [1] 24/17
November [4] 33/17 55/1 66/3 66/11
November 15 [1] 66/3
November 5 [2] 33/17 55/1
Nowhere [1] 79/5
number [10] 9/19 10/4 16/24 21/7 32/12
37/15 37/17 38/23 59/2 66/23

**O**

O'Neill [1] 51/22
O'Neill's [1] 52/4
object [3] 53/17 53/23 77/12
objected [1] 59/16
objection [12] 21/5 21/13 21/16 21/18
45/22 45/24 54/8 77/13 78/2 85/12
92/16 94/15
objectionable [2] 53/12 53/13
objections [1] 38/3
obtained [1] 77/19
obvious [2] 11/22 12/11
obviously [4] 8/7 11/17 13/15 34/5
occasions [2] 54/4 72/23
occur [1] 80/20
occurred [4] 37/9 52/23 60/18 60/20

occurring [1] 21/21
occurs [1] 91/2
October [2] 47/13 47/23
October 31 [2] 47/13 47/23
offense [4] 15/9 50/11 50/19 55/15
offenses [1] 15/13
offer [5] 37/25 53/21 56/21 57/2 61/2
offered [4] 54/14 56/7 60/17 94/14
offering [1] 37/24
office [1] 6/1
officer [14] 10/5 39/10 45/3 55/10 55/13
55/16 56/4 57/1 57/18 58/24 63/7 77/13
77/22 78/7
officers [3] 16/7 54/3 63/17
official [4] 2/4 38/1 105/4 105/19
officially [1] 5/5
oftentimes [2] 64/17 72/16
old [2] 6/13 42/4
one [55] 3/16 6/13 9/19 11/8 13/11
21/20 24/14 25/4 26/22 27/6 27/6 27/19
27/24 28/9 28/11 28/12 28/13 29/2
29/11 29/20 30/3 32/5 35/15 35/24
37/18 47/25 48/6 48/11 49/21 51/21
54/5 56/2 56/9 59/1 59/11 61/11 61/14
61/23 64/20 64/23 68/12 70/1 70/2 72/5
72/16 85/21 89/18 89/19 93/12 93/13
96/18 97/21 98/16 98/20 101/6
onion [1] 15/21
opened [4] 54/19 56/20 57/9 57/9
opinion [3] 13/22 57/3 95/23
opponent [4] 53/21 54/14 61/1 61/2
opponents [1] 62/11
opportunity [9] 61/11 67/10 76/19 76/25
84/4 84/9 89/17 99/21 104/8
opposed [2] 17/15 39/22
opposing [1] 53/22
order [8] 18/21 24/7 28/22 76/17 76/19
77/3 78/12 99/17
oriented [1] 48/9
original [1] 36/15
otherwise [2] 56/24 59/4
our [12] 3/20 9/21 16/17 16/17 16/18
16/24 22/7 38/22 40/23 53/16 63/13
84/14
outer [1] 7/21
outside [3] 19/14 19/14 35/15
overrule [1] 78/2

**P**

P-i-s-c-h-k-e [1] 59/9
p.m [7] 23/14 39/3 39/4 53/8 64/10 97/6
104/18
page [25] 2/9 55/25 56/1 56/1 57/12
69/7 72/24 73/9 74/9 74/17 74/22 77/2
78/17 80/16 81/10 84/23 86/4 86/12
87/20 89/7 90/14 98/22 99/7 100/23
101/12
pages [3] 55/25 62/25 77/8
pages 556 [1] 62/25
pan [1] 22/8
pants [3] 10/23 11/2 11/3
paraded [1] 103/17
paragraph [6] 67/13 67/22 68/12 69/2
73/1 99/13
Pard [3] 71/17 76/22 87/13
parties [2] 62/2 62/4
partner [3] 40/8 65/16 68/20
parts [4] 9/10 76/7 76/12 77/6
party [7] 44/17 53/21 53/22 54/14 60/23
61/1 62/11
pass [1] 9/17
passes [1] 78/1
past [1] 61/15

## P

pat [1] 70/21
pathologist [1] 66/4
patted [1] 71/22
pause [2] 22/20 90/6
pauses [1] 89/25
peeling [1] 15/20
people's [1] 48/23
Pepin [2] 61/24 62/7
pepper [1] 90/9
perceived [1] 93/3
perhaps [2] 52/3 53/13
period [1] 60/2
permission [2] 12/15 45/5
persuade [4] 68/2 82/13 83/5 83/7
pertains [1] 77/17
pertinent [1] 23/23
phone [2] 25/20 25/24
photo [1] 36/15
photograph [3] 34/23 36/16 46/24
phrase [2] 65/2 78/21
phrased [1] 85/17
physical [2] 24/24 24/24
pick [2] 6/15 25/24
picture [2] 27/10 60/21
pictures [7] 30/19 31/9 31/20 33/3 70/15 70/19 70/23
piece [1] 40/13
pieces [1] 11/18
pinned [6] 43/24 44/12 44/25 45/11 45/15 46/14
pinning [3] 46/9 46/13 46/16
Pischke [3] 59/8 59/15 61/9
pit [3] 28/4 28/6 31/7
place [6] 18/4 18/6 19/10 59/5 97/15 97/16
placed [2] 9/2 29/18
placement [2] 70/12 70/16
places [3] 8/13 8/14 29/20
PLAINTIFF [1] 1/4
plans [2] 4/24 12/5
played [1] 22/4
playing [6] 21/17 22/23 23/4 23/5 23/19 23/20
pointer [2] 31/13 49/2
points [1] 22/2
police [8] 6/23 7/8 7/11 7/15 7/22 55/3 93/6 93/19
poor [2] 6/15 72/12
poorly [1] 85/17
portion [6] 19/16 48/12 68/18 77/1 82/9 91/24
portions [1] 80/12
portrayal [1] 36/25
position [3] 21/25 78/3 100/19
possible [3] 34/20 48/25 85/25
pounds [1] 41/24
practically [1] 58/18
predated [1] 62/3
preparation [1] 12/5
prepare [4] 25/23 49/21 50/2 50/8
prepared [5] 27/1 47/3 47/16 50/6 105/8
presence [5] 67/18 71/3 74/18 78/18 99/8
present [10] 3/1 5/8 6/3 12/24 18/25 63/13 66/18 67/14 69/8 84/4
presented [1] 19/2
presenting [1] 18/7
presently [1] 80/13
presents [1] 61/10
preservation [1] 14/20
press [5] 43/13 43/15 43/16 44/24 45/9

pretty [2] 94/19 98/24
prevented [1] 40/16
previous [6] 11/8 17/13 55/11 55/24 59/20 70/1
previously [1] 58/22
primer [1] 61/16
printed [1] 17/15
prior [27] 3/14 7/18 16/14 16/14 38/21 56/8 57/2 57/3 57/23 66/16 74/4 75/4 75/20 76/10 76/14 77/2 77/5 78/21 79/5 79/9 80/2 80/25 84/9 84/16 86/14 93/13 94/6
proceed [5] 4/8 12/18 22/15 23/16 78/7
proceedings [3] 2/2 84/5 105/13
process [3] 26/3 51/4 65/15
produce [1] 38/17
program [1] 22/19
prohibit [1] 60/22
promise [6] 18/21 69/19 74/9 74/11 74/13 74/18
promises [6] 58/9 58/11 60/19 64/1 64/3 69/20
prompting [1] 33/25
proper [3] 26/8 60/7 60/9
property [3] 8/16 10/3 10/11
proposed [1] 85/10
proposition [3] 59/11 59/12 60/17
prosecution [2] 4/8 43/13
prosecution's [1] 62/23
prosecutor [3] 1/16 1/18 25/21
Prosecutors [1] 3/8
protect [1] 9/21
publication [2] 28/20 35/10
publicized [1] 43/13
publishing [1] 31/5
purpose [2] 24/25 100/15
puts [4] 11/4 11/5 34/4 83/14
putting [1] 82/14

## Q

quarter [1] 39/1
quarters [1] 89/10
quibble [2] 45/6 50/15
quick [1] 46/22
quickly [2] 94/5 103/11
quite [4] 53/20 63/4 66/20 92/24
quote [8] 15/1 64/24 67/19 69/9 69/14 76/7 86/6 100/24

## R

Racine [1] 59/8
rack [6] 28/16 33/3 33/4 33/18 33/21 35/22
raised [1] 63/13
raising [1] 56/13
raped [1] 50/22
rapid [1] 90/11
RAV [2] 29/18 36/11
Ray [1] 3/10
RAYMOND [1] 1/21
re [4] 21/20 59/10 60/7 76/25
re-call [1] 21/20
re-interrogation [2] 59/10 60/7
reading [3] 20/17 74/5 88/24
reads [1] 89/6
ready [4] 4/8 19/5 20/6 92/24
real [3] 46/22 94/5 103/10
realized [1] 11/19
Reask [1] 72/5
reason [9] 9/19 15/5 41/11 60/22 70/17 90/3 92/13 96/22 96/25
reasons [6] 9/18 10/13 13/11 96/17 96/18 96/19

rec [1] 70/9
receipt [1] 38/18
receive [1] 52/6
received [5] 38/7 41/3 41/15 52/2 94/17
recess [5] 22/12 22/13 23/9 23/13 39/3
recognize [2] 35/2 98/12
recognized [1] 53/25
recollect [1] 25/6
recollection [2] 44/15 79/15
reconvene [2] 104/5 104/13
Reconvened [4] 3/1 22/14 23/14 39/4
record [16] 3/13 4/16 5/6 5/13 19/6 22/11 37/4 38/1 42/18 42/23 46/23 48/10 53/5 58/6 67/5 92/19
recorders [1] 6/13
recording [1] 52/4
recovered [1] 26/20
refer [2] 14/12 90/1
reference [9] 25/3 54/21 56/12 61/15 73/13 78/17 84/21 85/9 87/25
referenced [3] 54/20 54/22 55/2
references [1] 55/22
referred [1] 58/23
referring [1] 72/19
reflect [4] 5/14 5/16 22/12 67/17
reflected [1] 90/4
refresh [1] 78/11
rehabilitated [1] 82/22
reinterview [1] 12/3
reiterating [1] 75/24
related [6] 3/17 23/11 24/23 44/4 44/21 92/10
relation [1] 43/6
released [1] 3/18
relevance [4] 77/16 77/20 78/1 85/14
rely [1] 20/20
remain [1] 17/5
remainder [1] 23/22
remarks [1] 57/12
remember [11] 26/1 26/2 30/19 31/9 31/20 33/4 36/10 43/25 68/14 69/16 74/23
remembers [1] 44/16
remind [1] 23/10
rendered [1] 34/10
rendering [3] 28/12 35/5 36/8
rendition [4] 48/16 48/24 49/4 59/24
repeated [1] 22/21
replete [1] 63/15
report [3] 66/7 66/24 77/14
reported [3] 2/3 67/2 105/6
reporter [7] 2/4 20/21 21/6 21/13 83/4 105/5 105/19
reporting [1] 46/1
reports [2] 39/23 52/7
represent [1] 30/4
representative [1] 36/25
represented [3] 29/15 32/16 49/24
request [2] 50/6 103/4
requested [5] 6/20 26/25 36/18 81/15 94/5
rereading [1] 78/5
resist [2] 13/17 102/6
resort [2] 56/11 96/12
respect [2] 43/21 60/20
respond [4] 7/5 54/18 89/17 101/22
responded [1] 7/6
responding [2] 39/22 75/21
response [16] 54/16 75/11 75/22 81/14 86/19 87/7 88/3 88/7 88/8 88/19 88/22 89/21 89/22 89/24 90/19 98/2
responses [4] 54/13 58/17 58/25 95/15
restrained [1] 46/20

**R**

restraint [1]  44/10
result [3]  11/15 34/15 84/1
resulted [1]  59/23
results [2]  10/18 12/25
resume [3]  21/16 64/12 92/20
retake [1]  4/10
revealed [1]  58/22
reverse [2]  24/7 28/22
review [8]  52/7 67/10 74/4 76/19 76/21 76/23 77/1 104/8
reviewing [1]  77/13
ride [1]  7/9
right-hand [1]  31/3
rights [12]  16/16 16/17 16/18 16/18 16/23 17/3 17/8 17/10 17/18 17/25 37/18 93/10
River's [1]  56/11
Rivers [10]  6/23 7/8 7/11 7/14 55/3 80/5 93/5 93/15 94/19 95/7
Road [1]  37/6
rode [1]  7/7
role [2]  57/1 85/21
room [9]  5/25 19/20 19/21 19/25 20/2 34/1 35/13 35/21 70/24
RPR [2]  2/3 105/19
rule [4]  60/22 60/25 61/6 61/22
ruling [2]  63/5 64/8
run [1]  104/13

**S**

safe [1]  10/2
safety [3]  9/21 9/25 96/20
sat [1]  71/18
scene [2]  8/13 9/3
school [18]  5/2 5/19 5/22 6/2 6/8 7/6 42/9 42/10 42/12 43/5 45/1 45/7 54/23 80/23 93/5 94/21 95/6 97/9
scientific [1]  103/21
screaming [1]  43/25
screen [1]  31/3
search [10]  25/23 26/3 26/5 26/8 26/12 26/16 26/18 33/1 33/16 33/22
seat [2]  21/17 103/16
seated [5]  4/7 4/15 5/9 53/9 64/11
second [2]  19/17 88/25
secondly [1]  22/9
secured [1]  21/7
seems [2]  29/14 77/24
seen [5]  17/4 24/8 25/6 29/21 79/3
seldom [1]  14/23
self [1]  14/20
self-preservation [1]  14/20
sentence [2]  89/18 89/19
sentences [1]  89/20
series [2]  59/15 60/1
serve [1]  26/1
served [1]  33/1
set [1]  23/15
seven [2]  101/13 101/14
several [2]  60/3 101/9
sexual [2]  15/16 25/3
sexually [1]  25/1
shape [1]  75/21
shared [2]  40/14 40/19
sharing [1]  40/17
shells [1]  103/16
Sheriff's [8]  12/8 12/17 16/22 19/3 19/12 19/16 19/17 97/17
shifted [1]  92/14
shining [1]  20/1
shirt [1]  5/10

shooting [5]  84/24 85/9 86/7 86/10 102/5
shorthand [1]  105/10
shot [5]  26/21 29/19 30/6 102/11 102/13
shovels [1]  103/16
show [5]  18/2 18/12 18/16 34/22 34/23
showed [2]  18/10 29/24
showing [1]  36/2
shows [3]  17/4 48/3 48/6
sic [1]  96/21
side [6]  10/2 49/12 49/15 49/19 49/22 99/10
sign [4]  18/5 18/6 25/25 26/1
signed [4]  26/17 27/14 27/24 28/9
significant [3]  32/21 75/1 80/12
significantly [1]  36/14
silent [1]  17/5
similar [1]  61/19
simply [2]  53/17 91/1
sin [1]  56/20
single [2]  72/17 73/22
sit [1]  15/10
sitting [2]  6/14 30/21
situation [1]  62/19
six [4]  43/8 44/23 45/8 45/8
Skorlinski [3]  51/22 52/12 52/14
small [4]  19/20 19/21 19/22 36/6
snowmobile [1]  27/20
soft [2]  19/20 19/22
solely [1]  20/20
somehow [1]  10/1
sometime [1]  19/3
sometimes [2]  89/25 90/2
somewhat [3]  54/19 69/23 71/5
somewhere [2]  7/13 10/3
soon [1]  85/10
sort [3]  44/10 75/11 98/2
south [1]  49/1
space [1]  89/22
spatter [3]  84/14 84/18 84/19
speak [11]  7/25 17/25 18/17 18/22 46/3 48/10 49/13 71/3 73/8 73/20 104/15
speaking [6]  54/21 54/22 63/23 65/16 66/16 86/23
Special [7]  1/16 1/18 3/7 8/5 9/14 10/15 13/7
specifics [1]  72/21
sped [1]  25/16
speed [1]  23/1
spell [1]  4/16
spells [1]  17/6
spoke [3]  7/18 41/23 72/9
spoken [3]  23/1 51/23 52/20
spot [1]  22/18
spots [1]  103/19
SS [1]  105/1
stab [1]  29/3
Stachowski [3]  34/16 47/20 48/20
Stachowski's [1]  49/23
Stahlke [1]  84/12
stain [3]  29/23 29/23 29/24
stains [2]  10/24 11/3
stand [3]  4/11 60/24 80/1
standing [3]  27/24 30/5 30/6
stands [2]  62/21 104/18
start [2]  58/18 79/20
started [2]  7/14 24/15
starting [2]  25/22 73/16
State's [2]  56/25 57/9
statement [48]  17/11 42/25 46/1 46/3 46/7 46/18 46/19 53/22 54/3 54/25 55/2 55/21 55/22 56/22 59/23 60/6 60/12 60/15 61/14 61/17 66/18 67/17 73/21

75/7 75/23 76/11 77/2 77/5 77/19 80/3 80/4 80/10 80/12 82/7 82/11 82/12 83/21 87/12 87/14 88/22 90/1 91/17 93/14 94/6 95/25 100/5 101/20 102/1
statements [22]  45/21 47/19 48/23 49/24 53/19 53/24 54/12 56/9 56/13 56/18 57/2 57/3 57/5 57/13 57/23 59/3 59/4 61/2 62/10 62/20 64/1 100/6
Station [1]  55/3
statute [1]  62/11
stay [3]  63/8 96/9 96/15
stenographic [1]  105/9
steps [1]  35/16
Steve [8]  27/23 28/12 30/6 32/10 34/2 47/1 47/19 47/22
Steve's [2]  36/5 103/3
Steven [6]  26/12 37/4 41/20 56/5 67/20 87/25
stick [4]  13/20 29/15 30/16 30/24
sticker [1]  38/14
still [4]  9/9 35/25 73/6 95/23
stipulated [1]  62/5
stipulation [1]  34/13
stomach [1]  24/11
stop [5]  21/19 22/2 23/25 33/15 102/15
stopped [5]  22/5 22/9 22/24 23/5 23/20
stopping [1]  26/2
stories [1]  58/1
stricken [1]  79/24
structured [1]  60/25
student [2]  42/13 80/22
stuff [3]  19/24 74/4 103/3
subject [2]  71/2 90/24
subjects [1]  91/5
subsequent [1]  5/7
subsequently [1]  32/24
succession [1]  90/11
successive [1]  69/25
suggest [3]  61/5 78/6 101/3
suggested [3]  63/18 78/19 97/22
suggestibility [1]  63/14
suggestible [1]  13/13
suggesting [3]  57/13 80/11 101/7
suggestion [1]  79/6
suggests [1]  88/5
summary [1]  52/8
sup [1]  30/23
superior [4]  14/13 14/16 15/2 64/21
supposed [3]  30/4 30/11 47/21
supposedly [1]  30/23
surprise [1]  101/3
surrounding [1]  60/14
suspect [13]  9/6 13/25 14/5 25/4 50/11 50/19 59/10 90/7 93/17 93/19 93/24 99/3 99/5
suspects [4]  50/13 50/16 50/17 51/17
sustained [1]  45/24
sworn [1]  4/14
System [1]  5/2

**T**

table [2]  6/14 19/25
tactic [1]  64/21
tainted [1]  10/6
tainting [1]  10/12
taken [2]  59/5 105/9
takes [2]  71/9 90/2
talking [13]  22/1 23/11 26/6 31/19 40/25 44/3 51/10 62/1 68/23 74/2 91/23 91/24 91/25
tape [5]  14/12 21/20 22/2 22/9 23/25
taped [2]  57/2 57/3
tattoo [3]  24/11 24/12 24/18

**T**

team [1] 43/13
technique [9] 13/24 14/14 14/16 16/11 65/17 71/1 71/7 90/9 90/13
techniques [10] 13/2 13/16 14/9 15/25 16/7 64/16 70/5 70/5 70/7 95/5
tedi [1] 94/23
tedium [1] 94/23
teenager [1] 42/5
telling [17] 10/11 11/18 11/25 12/12 33/17 34/1 44/24 47/17 57/16 57/19 87/15 93/21 96/3 98/6 100/12 100/20 101/10
tells [5] 9/10 33/22 45/1 45/9 99/19
tender [1] 38/19
Teresa [27] 24/10 24/23 26/22 27/23 32/1 32/18 33/9 33/12 35/7 35/8 40/3 43/19 43/23 44/10 44/12 44/25 45/10 45/15 46/19 50/23 63/25 66/5 85/5 92/11 102/5 102/11 103/22
Teresa's [1] 28/16
term [1] 57/8
terms [1] 18/7
test [4] 25/12 71/5 71/7 78/1
testimony [12] 31/15 34/10 40/25 41/14 44/1 55/9 55/18 57/17 58/7 58/8 79/18 96/14
text [1] 88/9
thanks [1] 3/13
themselves [1] 57/5
theory [1] 59/22
thereafter [2] 75/10 105/11
thinking [4] 8/11 9/8 9/11 90/3
third [1] 86/14
this [142]
THOMAS [1] 1/15
though [4] 40/6 40/20 57/4 61/15
thought [3] 10/2 33/10 75/24
thousand [1] 66/11
threaten [1] 90/16
threatened [1] 91/16
threats [3] 56/5 90/23 90/25
three [13] 30/15 30/15 30/22 39/1 52/24 54/4 60/2 67/21 89/10 89/16 89/20 89/20 91/2
three-day [1] 60/2
three-quarters [1] 89/10
throat [1] 29/3
through [7] 23/2 25/16 38/6 40/11 45/14 56/7 73/20
throughout [4] 40/10 67/14 72/14 84/4
Thus [1] 62/22
tied [1] 46/19
times [13] 65/20 70/12 87/1 92/1 97/19 97/24 97/25 98/3 98/6 100/25 101/4 101/9 101/9
Timothy [1] 34/12
today [12] 5/8 27/3 40/11 51/8 51/10 70/10 79/18 97/22 103/10 103/25 104/4 104/12
toes [4] 76/15 76/15 79/8 79/9
together [2] 40/10 40/19
told [34] 8/22 9/23 10/8 10/12 10/16 11/3 12/7 12/14 25/1 33/23 41/24 44/11 44/13 46/2 46/5 46/8 50/2 50/22 65/24 65/25 69/7 69/8 73/3 74/22 87/5 97/22 97/25 98/8 100/25 101/10 102/16 102/23 103/2 103/19
Tom [1] 3/8
tomorrow [3] 104/5 104/10 104/13
tone [1] 57/16
tonight [1] 104/8

too [1] 36/11
Top [1] 86/14
totally [1] 95/24
toward [1] 67/18
Town [1] 37/6
trailer [4] 26/13 33/2 34/6 37/5
trained [1] 83/10
transcribed [1] 105/11
transcript [16] 2/2 20/22 20/25 21/8 52/3 52/6 56/1 67/1 78/25 79/2 88/24 89/3 89/6 98/12 105/8 105/12
transcription [1] 105/11
transcripts [1] 20/15
trees [1] 58/19
trial [4] 1/4 1/5 26/14 29/22
trick [1] 100/3
trooper [4] 34/11 34/19 35/24 36/19
trust [1] 69/3
trustworthiness [3] 21/7 62/16 62/20
truth [11] 57/17 57/19 57/22 69/9 69/21 74/20 98/6 99/19 100/2 100/12 102/8
truthful [2] 55/11 56/15
truthfully [1] 67/19
try [4] 15/18 16/8 85/17 94/20
trying [1] 68/25
TV [2] 17/4 19/23
two [39] 6/23 7/8 7/11 7/14 9/4 9/18 10/4 10/13 17/7 19/21 26/20 28/23 30/2 35/5 35/19 35/20 40/9 47/11 47/15 48/23 52/23 55/2 55/25 56/8 59/2 59/20 60/2 60/11 66/11 68/21 77/16 77/20 80/5 93/5 93/14 94/19 95/7 96/17 96/19
Two-0-eight [1] 47/11
two-day [1] 60/11
two-drawer [1] 35/20
Two-eleven [2] 35/5 47/15
two-file [1] 35/19
type [5] 14/18 14/19 15/5 16/10 94/20
types [1] 58/2

**U**

ultimate [1] 64/24
ultimately [2] 63/16 96/6
uncommon [1] 90/9
Unfortunately [1] 6/12
Unintelligible [3] 64/5 72/4 82/18
unless [4] 62/14 73/4 75/3 76/13
unlike [1] 54/25
unquote [1] 15/1
untruths [1] 65/25
unusual [3] 15/12 65/6 65/10
upset [1] 16/5
utilized [3] 65/17 84/18 95/6
uttered [1] 78/22

**V**

Vague [1] 85/12
value [1] 59/5
vantage [1] 100/11
variation [1] 20/18
variations [1] 94/1
varied [1] 70/7
various [1] 90/12
vehicle [1] 27/21
verify [1] 42/13
versa [1] 40/14
vice [1] 40/14
vice-versa [1] 40/14
video [11] 4/2 20/8 20/17 45/14 55/22 56/7 70/10 70/22 80/25 97/21 98/13
videotape [6] 20/16 20/19 20/20 80/3 80/10 93/14
videotaped [6] 6/24 7/2 12/9 12/23 29/1

55/2
vis [4] 32/22 32/22 77/18 77/18
vis-a-vis [2] 32/22 77/18

**W**

W-i-e-g-e-r-t [1] 4/17
waited [1] 7/21
waiting [1] 7/21
waiver [4] 16/18 16/23 17/24 37/18
walk [2] 34/5 71/15
walks [1] 33/13
wall [8] 19/25 28/15 33/3 35/21 49/5 49/8 49/11 49/12
warning [3] 16/18 16/22 93/22
warrant [9] 25/23 26/3 26/5 26/9 26/12 26/16 26/18 33/16 33/22
warrants [1] 33/1
watch [1] 17/4
watched [2] 70/10 97/21
watching [2] 20/17 80/25
water [1] 59/22
ways [2] 14/3 14/7
wearing [1] 5/10
weight [2] 41/5 41/20
welfare [1] 96/16
west [1] 49/1
Where's [1] 49/2
Wherein [8] 22/4 22/5 22/23 22/24 23/4 23/5 23/19 23/20
whole [4] 84/11 91/25 97/11 99/19
widely [1] 43/13
Wiegen [1] 96/21
WIEGERT [12] 2/10 4/10 4/12 4/17 4/20 21/16 24/5 37/3 39/10 64/14 69/22 84/1
willingly [1] 102/25
willingness [1] 18/17
wis [2] 9/9 61/24
WISCONSIN [9] 1/1 1/3 1/14 1/16 1/18 3/4 37/7 105/1 105/6
wish [4] 17/10 57/14 63/1 83/23
wished [1] 7/20
wishes [1] 77/22
without [9] 33/25 60/24 61/14 66/7 74/5 75/11 81/14 94/23 95/20
witness [18] 4/13 5/14 9/9 9/9 9/11 12/1 18/6 37/12 38/19 54/21 55/4 55/6 66/14 76/17 76/24 80/2 82/25 84/8
witnesses [3] 2/9 51/16 84/9
word [2] 51/11 73/22
words [1] 20/18
working [1] 40/9
works [1] 14/3
worried [1] 9/25
worry [1] 100/24
wound [2] 85/5 85/22
wounds [2] 66/5 85/25
wrap [2] 55/8 103/10
writing [1] 17/14
writings [1] 27/12
wrote [2] 43/1 55/25

**X**

X's [1] 30/2

**Y**

years [2] 39/13 83/13
Yep [4] 48/5 68/16 76/9 102/6
yesterday [6] 4/21 34/4 40/25 43/1 51/9 51/12
young [1] 63/8
yourselves [1] 104/16

Z