STATE OF WISCONSIN : CIRCUIT COURT : MANITOWOC COUNTY
BRANCH 3

_____

STATE OF WISCONSIN,

             PLAINTIFF,      JURY TRIAL
                             TRIAL DAY 6
vs.                        Case No. 06 CF 88

BRENDAN R. DASSEY,

             DEFENDANT.

_____

**DATE:**    APRIL 21, 2007

**BEFORE:**  Hon. Jerome L. Fox
          Circuit Court Judge

**APPEARANCES:**

        KENNETH R. KRATZ
        Special Prosecutor
        On behalf of the State of Wisconsin.

        THOMAS J. FALLON
        Special Prosecutor
        On behalf of the State of Wisconsin.

        NORMAN A. GAHN
        Special Prosecutor
        On behalf of the State of Wisconsin.

        MARK R. FREMGEN
        Attorney at Law
        On behalf of the defendant.

        RAYMOND L. EDELSTEIN
        Attorney at Law
        On behalf of the defendant.

        BRENDAN R. DASSEY
        Defendant
        Appeared in person.

**COPY**

1

* * * * * * * *

**TRANSCRIPT OF PROCEEDINGS**

Reported by Jennifer K. Hau, RPR

Official Court Reporter

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 2 of 148    Document 19-20

**I N D E X**

| WITNESSES | PAGE |
|---|---|
| **MARK WIEGERT** | |
| Cross-Examination by ATTORNEY EDELSTEIN | 4-50 |
| Redirect Examination by ATTORNEY FALLON | 50-56 |
| Recross-Examination by ATTORNEY EDELSTEIN | 56-61 |
| **MOTION** | 64-70 |
| **KRIS SCHOENENBERGER-GROSS** | |
| Direct Examination by ATTORNEY FREMGEN | 70-84 |
| Cross-Examination by ATTORNEY KRATZ | 84-98 |
| Redirect Examination by ATTORNEY FREMGEN | 98-103 |
| **BLAINE DASSEY** | |
| Direct Examination by ATTORNEY FREMGEN | 104-113 |
| Cross-Examination by ATTORNEY KRATZ | 113-125 |
| Redirect Examination by ATTORNEY FREMGEN | 125-128 |
| **MICHAEL KORNELY** | |
| Direct Examination by ATTORNEY FREMGEN | 128-131 |
| Cross-Examination by ATTORNEY GAHN | 131-133 |
| Redirect Examination by ATTORNEY FREMGEN | 133-134 |

| WITNESSES | MARKED | MOVED | ADMITTED |
|---|---|---|---|
| 215 | | 62 | 62 |
| 216 | | 61 | 61 |
| 217-221 | | 104 | 104 |
| 223 | | 104 | 104 |
| 224 | 83 | 104 | 104 |

3

THE COURT: Morning, ladies and gentlemen, morning counsel. This is, for the record, State vs. Dassey, 06 CF 88. Appearances.

ATTORNEY FALLON: Morning, Your Honor. If it please the Court, the State continues in its appearance by Special Prosecutors Ken Kratz, Tom Fallon and Norm Gahn.

ATTORNEY FREMGEN: Attorney Mark Fremgen, Attorney Ray Edelstein appear with the defendant in person.

THE COURT: I believe, uh, we were crossing -- or -- or, uh, Mr. Edelstein was cross-examining Investigator Wiegert.

THE CLERK: You want him to be sworn?

THE COURT: Uh, we'll re-swear him, yeah.

**MARK WIEGERT**,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated.

THE COURT: All right. Proceed.

ATTORNEY EDELSTEIN: Thank you, Your Honor.

**CROSS-EXAMINATION CONT'D**

BY ATTORNEY EDELSTEIN:

4

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 4 of 148    Document 19-20

Q Morning, Detective.

A Morning.

Q You have before you up there by the witness stand a copy of the 3/1 transcript previously marked, and you'll have to help me out, what sticker number is on that?

A Uh, 216.

Q Very good. And that's the one that, uh, you've previously identified; correct?

A Yes.

Q All right. Directing your attention to page 572, please, just generally, Detective Wiegert, can you tell this jury how many times during the course of this some three-hour exchange between you and Fassbender and the defendant did one or the other of you, not speaking of Brendan, of course, suggest to him an answer? Do you know?

I don't know that you need to look at the transcripts to answer that one. How many times during the course of the exchange did you or Fassbender suggest an answer to Brendan?

A From this page?

Q No. During the three-hour interview.

A I don't know. I couldn't answer that.

Q Would you agree that it was certainly more than

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 5 of 148    Document 19-20

20?

A   No, I wouldn't agree with that unless I counted them up. I have no idea.

Q   Okay. So you haven't -- When's the last time you actually read through that?

A   Um, probably three days ago.

Q   Well, take a look, if you would, at page 572, fourth line down, you tell him, do you not, come on, be honest, you went in that back room. You told him that; didn't you?

A   Yes, I did.

Q   Okay. He didn't -- Or the next entry is, tell us now, Brendan. Correct? And that's by Fassbender?

A   Yes.

Q   And you followed up before he has any opportunity to say anything, we know you were back there. Correct?

A   That's part of that superior knowledge which we talked about yesterday.

Q   Well, is it superior knowledge or is it a flat out lie? Because we've talked about different techniques, lies being one and superior knowledge being another? Correct?

A   Yes.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 6 of 148    Document 19-20

Q   Truth of the matter is, when you talked to him on the 1st, you had, quote, no superior knowledge from a factual standpoint that he was ever even back there; true or false?

A   Part of Mr. -- That's true.  It's --

Q   All right.

A   -- telling Mr. Dassey -- or getting Mr. Dassey to think that we had superior knowledge like we talked about.

Q   Okay.  But it's a false statement to him; isn't it?

A   Yes.

Q   Okay.  Let's talk about that, because you apparently -- you're obviously wanting him to say, yes, I was back there.  Correct?

A   No.  I'd like him to tell us the truth whether he was back there or not.

Q   Well, within the -- the short frame of three lines, both you and Fassbender tell him that you believe he was back there.  Correct?

A   Yes.

Q   Okay.  During the course of this investigation -- and you're the -- one of the two lead investigators -- was the carpet from the back bedroom ever removed?

7

A   I know a portion of it was.  I don't know if it all was or not, but there was a portion of that carpet removed, yes.

Q   Well, you're the lead investigator.  It seems to me you would know what evidence has been submitted to your lab for analysis, wouldn't you?

A   I have a general knowledge of what went to the Crime Lab, yes.

Q   And what was the purpose of submitting that carpet to the Crime Lab?

A   Again, I don't know for sure if that carpet went to the Crime Lab or just one of our techs looked at it. I --

Q   All right.

A   -- I couldn't ans --

Q   Let me ask you this:  Given the questioning regarding the location of items in that back bedroom, would it have made any sense at all to you, as an investigator, to have taken the carpet to have it looked at to determine any sort of wear patterns that might be evident?

A   No, I don't think wear patterns would have told us anything.

Q   Pard me?

A   No, I don't think wear patterns would have told us

8

anything.

Q Well, you've got carpet in your house, I guess, somewhere, don't you?

A Yes, sir.

Q Okay. Carpet under a piece of furniture tends not to get worn out, whereas, areas immediately surrounding that type of furniture tends to show some sign of wear, doesn't it?

A That would be true.

Q Okay. So wouldn't it have made sense in your opinion as an investigator to pull that to determine -- in order to try to verify some of the things that Brendan said about the location of the furniture? Wouldn't that have made sense to you?

A No, that wouldn't have made sense. Mr. Avery only was in that trailer for maybe a year. It wouldn't have made a difference.

Q Okay. Well, again, as to the back bedroom, on March 1 Brendan told you, did he not, that he cut Teresa's throat?

A Yes.

Q All right. Yet there was absolutely no evidence of blood spatter or blood pooling in the bedroom; correct?

9

A You're talking about two different things. But there was no blood spatter and we didn't find any pooling, which I'm not surprised about at all.

Q Well, in the bedroom, was it a -- a mattress only? Was there a box spring?

A I believe there was a mattress and box spring.

Q Okay. Did you personally examine the mattress?

A I did not. Our evidence techs do that work.

Q And you discovered from the evidence techs that there was absolutely no evidence of blood on that mattress; correct?

A Not surprisingly. He's correct.

Q Was there any luminol sprayed in the back bedroom?

A Yes.

Q Nothing to indicate the presence of blood in the back bedroom; true?

A Not true.

Q Was there any on the bed? The bedding?

A The bedding was burned. There would be no way to tell.

Q Well, how do you know the bedding was burned?

A Brendan Dassey told us the bedding was burned in the fire after they killed Teresa.

Q Okay. And Brendan Dassey also told you that he

10

cut Teresa's hair, didn't he?

A    Yep.

Q    But the truth of the matter is throughout the course of this investigation you didn't find one single hair fiber that could be identified to Teresa Halbach; right?

A    That's true.

Q    All right.  So he told you that, but you -- What? You don't believe it or you do believe it?

A    No, I believe he cut their -- her hair.

Q    Okay.  This was a carpet cleaner; right?

A    That is true.

Q    You guys seized the vacuum, didn't you?

A    We did.

Q    You had somebody go through that vacuum to determine the presence of things like hair, didn't you?

A    Yes, we did.

Q    And you found none; true?

A    Not true.  We found lot of hair.

Q    Did you find any you could identify as Teresa's?

A    Doesn't work that way.

Q    Did you find any you could identify as Teresa's?

A    No.  But I'd like to explain if you'd like me to.

Q    I'll give you a chance.

11

A    Sure.

Q    Did you have, during the course of your opportunity to be involved in this case, the opportunity to get from Teresa's residence any hairbrushes?

A    We did.

Q    So you had samples of her hair; correct?

A    Yes.

Q    But none of what you found in the -- at the trailer was able to be matched up to any that came from any of her hairbrushes; right?

A    Again, not true.

Q    Well, is there -- did the lab provide you any sort of report indicating there was a match between the hair of what was found at the scene and what you believed to be Teresa's hair?

A    There was no hair attempted to match up.  And there's reasons for that.

Q    Well, I'm sure the State will give you a chance to explain that.  But I find it somewhat curious when you tell us that you believe some things but you don't necessarily believe the others that he told you?

ATTORNEY FALLON:  Objection. Argumentative.

12

THE COURT: Objection's sustained.

Q (By Attorney Edelstein) Detective, how many times during the course of this three-hour exchange did you or Fassbender tell Brendan, um, in an effort to have him tell you things, it's not your fault, Steve made you do it?

A Quite a few times as you guys saw yesterday.

Q Pard me?

A Quite a few times as the jury saw yesterday.

Q But you don't know how many?

A Didn't count them. No.

Q Okay. Directing your attention to page 580, please?

A Sure.

Q Toward the bottom, there, Detective, third entry -- ac -- actually fourth entry from the bottom, you stated to him, you helped to tie her up, though, didn't you, Brendan, because he couldn't tie her up alone. There's no way. Did you help him to tie her up? Right?

A That's what I said. Yep.

Q All right. Do you believe that that's a leading and suggestive question to him?

A I believe that's something that makes sense.

Q Do you believe it to be a leading and suggestive

13

question?

A No.

Q Okay. Going over to the next page -- Well, before we get there, during the course of this interview, Brendan told you that, um, there was a rope involved in the restraint; correct?

A That's true.

Q Okay. And you were present during the course of all the prior testimony, and you heard, and I can't recall his name real quickly, but the truth of the matter is there was absolutely no rope fibers that were recovered that would indi -- that would tend to verify what he told you about the restraint?

A I believe that's correct. There were no fibers found.

Q And there was no rope?

A There was a lot of rope found on that, uh -- in that area.

Q In the bedroom?

A Um, there was a lot of rope throughout. I don't know if there was any in the bedroom, specifically. There's a lot in the garage.

Q There wasn't any in the -- You have no memory of any being found in the --

14

A    I don't recall if there was specifically any in the bedroom or not.

Q    Well, given what he told you about that, I would -- would you expect that you would remember that? That being a fairly significant, uh, piece of physical evidence to corroborate something he's told you?

A    We took almost a thousand pieces of evidence. No. I don't recall if there was or not.

Q    He also told you that he helped in some fashion removing, um, the metal restraints that he claimed were used; right?

A    That's correct.

Q    Detective, we've got a number of metal handcuffs; right?

A    Yes, we do.

Q    They all have different exhibit numbers?

A    Yes, sir.

Q    The pink ones didn't have -- they didn't come from Steve Avery's place; right?

A    No. They came from Brendan Dassey's house.

Q    They came out of his mother's room?

A    They came from where Brendan Dassey --

Q    They --

A    -- lives.

15

Q  -- didn't come from -- Brendan lives with his mother?

A  That is correct.

Q  Who else lives with his mother?

A  Uh, he's got three other brothers.

Q  Who?

A  Bobby, Blaine and Bryan, is it, I believe, and Barb.

Q  All right.  So why didn't you just tell us that they came from Bobby's house?

A  They came from the Dassey residence.

Q  All right.  But they didn't come from Brendan's room?

A  In his room, specifically, no.

Q  Okay.  In any event, some other ones -- And I'm not attempting to befuddle you or the record, but I don't recall which exhibit number it was.  There were -- there was a pair of handcuffs and these longer ones taken from the Avery place; right?

A  Yes.

Q  Okay.  Brendan claims to have un -- undone some of these; right?

A  That's true.

Q  But you know from your involvement in this case there's no fingerprints of his, no DNA of his on

16

Q  there; right?

A  Not surprisingly, no.

Q  Not surprisingly?

A  That's correct.

Q  You can editorialize when they ask you. Just try to answer mine for me, would you please?

A  Sure. I'll do the best I can.

Q  Isn't it fair to say that you and Fassbender repeatedly, throughout the course of this in -- this interview, tried to get Brendan to say that Teresa had socks on while she was restrained on the bed?

A  No, I don't think that's true. I don't recall that. It might have been mentioned, but I don't think repeatedly that I'm aware of.

Q  On the 1st, if you know, how many times did either you or Fassbender tell Brendan, all right, Brendan, we're just going to start all over again? And you, essentially, would have him start from, what you believed to be the beginning, about when he got home from school?

A  I could estimate maybe three to four times, but, again, I didn't count how many times I said certain things.

Q  So if it was more in the nature of six or seven,

17

Q  you wouldn't debate that, necessarily?

A  I wouldn't debate it with you unless I counted.

Q  I believe you testified yesterday about some of the questions that you may have used to test the veracity or correctness of some of the things Brendan said; right?

A  Yes.

Q  Okay.  And you gave as an example of the statement -- Directing your attention, Officer, to page 662?

A  Yes.

Q  At the very bottom, that's the exchange that was had between the investigators and Brendan about the tattoo; right?

A  That's correct.

Q  And you used that as an example to the jury yesterday that that served as verification to you that he was being honest; right?

A  That was one of the things that we use.  It's one of the false things that we know is false that we put to him.

Q  Okay.  On 662, can you read the last entry?

A  Okay.  We know now that Teresa had a tattoo on her stomach.  Do you remember that?

Q  And on 663, his response?

18

A He shakes his head, no. Ugh-ugh.

Q All right. So by that he's indicating that he doesn't know whether Teresa had a tattoo on her stomach; right?

A I guess that'd be up to interpretation. That's not how I took it.

Q That's not how you took it?

A He -- Let me just re-read that real quick. Yeah, I guess you'd be accurate that he doesn't remember that. Um-hmm.

Q Well, and then Fassbender follows up on 663, do you disagree with me when I say that? Right?

A Right.

Q Brendan's response is, no, but I don't know where it -- where it was. Right?

A Exactly what he says.

Q Okay.

A Yes.

Q So when he's asked, do you disagree with me, he says, no. Correct?

A Yes.

Q Which would suggest, certainly by his response, that he's not taking issue with what claim is being presented to him? I.e., Teresa had a tattoo. Right?

19

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 19 of 148   Document 19-20

A    Are you asking for my interpretation of what he said?

Q    Well, isn't that what it meant to you?

A    It meant -- If you're asking what it meant to me, I'll tell you that.

Q    Well, let me ask you this:  You asked these questions to get answers for purposes of trying to determine the truth and veracity of what he's saying?

A    That is true.  Yes.

Q    All right.  When you asked these questions, you have to sit there and decide what does his answer mean in order to go onto the next question; right?

A    That is correct.  Yes.

Q    Am I correct in stating that he did not disagree with the assertion that was being put forth to him?

A    He's saying he doesn't disagree but he doesn't see a tattoo.  That's exactly the correct --

Q    That's right.

A    -- thing.  Yeah.

Q    So he is agreeing with the assertion, is he not?

A    He's saying he doesn't disagree, but he doesn't see a tattoo is what he's saying.

Q    Wouldn't that suggest to you that he is,

20

therefore, adopting and agreeing with the assertion?

A    No.  If he was adopting it, he would have said, yeah, I remember the tattoo.

Q    He told you he had no idea where it was; correct?

A    Correct.

Q    Does that not suggest to you that he is adopting it?  That I believe there was one, I just don't know where it was?

A    No, he doesn't say that.

Q    All right.  But you have to interpret what he says, as an investigator, do you not?

A    I do exactly what you're doing, yes.  We try to interpret.

Q    All right.  And that's what any human does when they speak with somebody?  They have to interpret and understand answers, don't they?

A    Yes.

Q    How many times did he change his answer after either you or Fassbender expressed displeasure by telling him things?  For example, Brendan, come on.  Or, Brendan, you're lying.  Or, Brendan, we know that's not true.  How many times did he change during the course of that three-hour --

ATTORNEY FALLON:  Objection.

21

Irrelevance as phrased.

THE COURT: Sustained.

Q (By Attorney Edelstein) Did he ever change his answer to any question that you asked of him, or Fassbender asked of him, when you exples -- expressed displeasure?

A Yes.

Q Happened how many -- Do -- do you know how many times?

A No.

Q Would you disagree with me that if I suggested it was more than 20?

A I can't agree or disagree unless I count.

Q During the course of that interview, Brendan told you that Teresa had been stabbed inside the back of the Rav 4; correct?

A Yeah, I believe that's correct. Yes.

Q Yet other than the evidence that's already been testified to regarding, uh, blood smears along the back or where the expert believed the hair may have been, that you would concede that there certainly wasn't any evidence of blood spatter; correct?

A I wouldn't expect evidence of blood spatter.

Q Would you explec -- expect blood spatter with a

22

stab wound?

A No.

Q It would -- But you're not an expert on blood spatter, are you?

A Not an expert, no.

Q Okay. During the course of that interview, Brendan told you that Teresa was moved about using what's been described as a creeper; true?

A True.

Q And you know that, as a result of that statement, the creeper was forensically examined; true?

A That's true.

Q No blood?

A Not surprising, no.

Q No DNA?

A Again, no.

Q So do you believe him when he says that?

A Absolutely.

Q But you have no physical evidence to back it up; correct?

A Not true.

Q Tell me what you have by way of the creeper?

A We have the creeper, which he said was in the garage.

Q How many times had that boy been in the garage before March 31?

23

A You'd have to ask him that.

Q Did you ask him that?

A No.

Q Don't you think he was familiar with what was in that garage?

A I don't know.

Q You didn't ask him, did you?

A No, I didn't.

Q Did it seem reasonable, given your experience as a human being, an investigator, that this young man may have been in that garage before March 1?

A He may have been. I don't know.

Q I'm going to hand you what's been marked as Exhibit 129. That's the, uh, .22 taken from Avery's bedroom; right?

A Yes, sir.

Q In connection with your occupation, I assume you've had some firearms training?

A I've had some. Yes.

Q Do you hunt?

A No.

Q Okay. But you do know the difference between a single shot rifle and an automatic or semi-automatic; right?

A Certainly.

24

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 24 of 148    Document 19-20

Q Okay. Do you know the difference between a bolt-action rifle, and a single shot, or an automatic?

A I do.

Q Do you know the difference between a lever-action rifle, and a single shot, and a bolt-action, and a semi-automatic?

A I do.

Q And what you're holding is what type?

A This would be -- I believe that they described it as a semi-automatic.

Q Very good. Um, now -- And it's -- So it's not a single shot; right?

A That's correct.

Q Okay. If you would -- I think it's on 650. On the 1st, when you had this interview -- And it's about three-quarters of the way down. Bren -- Brendan had previously been asked, um, what type of gun it was; right? And he had -- he responded that it was a single; correct?

A Yes.

Q Okay. And then immediately thereafter Fassbender says, it was a single shot, not a semi-automatic? Right?

A Correct.

25

Q Okay. Now, I realize that you didn't ask that particular question -- And answer it if you can. But do you know why semi-automatic was contained in that question, when, in fact, that you knew it was a semi-automatic that had been recovered, as opposed to the question being presented to him about a bolt- or a lever-action?

A I didn't ask the question.

Q So you don't know the answer?

A No.

Q You don't know why he said it that way?

A You'd have to ask him.

Q Okay. Is it fair to say that there really wasn't any sort of follow-up to determine why he believed it was a single shot as opposed to the semi-automatic, which, in fact, we know was true?

A Why there was a difference in his answer was your question?

Q My question is, can you explain to me why there was no follow-up on that issue in order to try to, in fact, get a correct answer because he was obviously wrong?

A We don't try to get correct answers. We try to get the truth.

Q Now, going into this interview, you were

26

well-aware of the forensic findings regarding the skull pieces and the, uh, gunshot wound entrances; correct?

A Um, I was aware of them. Yes.

Q All right. If you know, how many times was it suggested or said to Brendan that he shot Teresa?

A Several times. And, again, it's one of those things he resisted each time we asked him. He resisted.

Q All right. So on some occasions he said, no, you're wrong, I didn't do that?

A That's correct.

Q Despite the fact that he -- yourself and Fassbender repeatedly, uh, made statements suggesting that you knew that he had shot her; correct?

A Yep. That's correct.

Q But you didn't have anything at all to support that sort of conclusion, did you?

A Conclusion being --

Q That Brendan had shot Teresa?

A No. We asked him the question.

Q Did you ask him the question or -- You -- You agreed with me just a minute ago that statements were made to him, which the statements, in and of themselves, suggest that, yes, he actually shot

27

Teresa; right?

A    Yes.  We asked him several times.

Q    Okay.  Yet you had absolutely nothing to support
a belief that he had, in fact, done that?

A    Yes, we asked him several times whether or not he
shot her.  Again, he resisted each and every time.

Q    You suggested to him that his DNA would be on the
gun; right?

A    Yes, we did.  In which he said there --

Q    If you had nothing at all to support even a
conclusion or a guess, even a guess, that he may
have shot Teresa, why would you present him with
those type of questions?

A    I didn't know whether or not he shot Teresa or not at
that time.  He puts himself in the bedroom.  He puts
himself in the garage where she was killed.

Q    You expressed an opinion to him, certainly, that
he did, in fact, do it, did he -- did you not?

A    I certainly did, yes.

Q    All right.  Isn't it true, Detective, that the
first person, during the course of this exchange
with Brendan on the 1st, who even mentioned her
being shot in the head, was you?

A    That is true.  Yes.

Q    All right.  And, initially, he said, yes, he

28

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 28 of 148    Document 19-20

believed there were two shots in the head; right?

A   Which fits with the evidence that we have.  Two shots in the head, that's correct.

Q   All right.  All right.  So if that fits with the evidence that you have, I guess you would believe what he tells -- what he said was correct then; right?

A   I believe that there were two shots in the head, yes.

Q   You don't --

A   That we know of.  I mean, we don't have the whole skull, unfortunately.  Could there have been more? Certainly.

Q   Sure.  The fact of the matter is that after you go back and forth with this, he changes it several times, doesn't he, as far as the number?

A   When we get to the torso and things, yes.

Q   Okay.  I think the number runs all the way up to 10 or 11?

A   That is true.

Q   Exhibit 128.  It's a little box.  It's got the -- the shells casings -- .22 shell casings, CCI manufacturer, from the garage; right?

A   That's true.  Yes.

Q   You're the lead investigator; right?

A   Yes.  One of the --

29

Q Okay. You never asked anybody at the lab to examine these for DNA evidence; true or false?

A That's true. Lot of reasons for it.

Q You'll get your chance.

A I'm sure I will.

Q You never asked anybody at the lab to examine them for fingerprint evidence?

A Pretty difficult to get fingerprint evidence off of that.

Q You're not a fingerprint expert, are you?

A I didn't say I was. No.

Q These -- These are pretty smooth surfaces, aren't they?

A Pretty small smooth surfaces.

Q In order to load this gun, somebody has to touch those shells at some point, don't they?

A Probably not big enough to get a whole fingerprint on.

Q You're not a fingerprint expert, are you?

A No.

Q You've seen -- you have been involved in cases, have you not, where experts have testified and you relied on evidence utilizing portions of fingerprints; correct?

ATTORNEY FALLON: Your Honor, I'm going

30

object to the continued line of inquiry of the, uh, investigator. Said he wasn't a fingerprint analyst.

ATTORNEY EDELSTEIN: He's offering opinions about --

THE COURT: I -- I'll overrule the objection.

Q (By Attorney Edelstein) You know what a partial print is, don't you?

A I do.

Q And do you know investigators oftentimes rely on that; right?

A No, I don't know that.

Q Um, directing your attention to page 582, please?

A Sure.

Q I'm sorry, 587?

A Okay.

Q All right. That's -- Is -- is that fair to say that that's about the time during the course of this interview that the issue comes up as far as Teresa's head? It hadn't really come up much before that? Fair statement?

A It comes up here.

Q Okay. Um, and Fassbender states about halfway down, it's extremely, extremely important you

31

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 31 of 148    Document 19-20

Q  tell us this for us to believe you.  Do you see that?

A  True.

Q  Okay.  And immediately thereafter you say, come on Brendan, what else?  Right?

A  Very true.

Q  Okay.  Um, flip over, if you would, to 589?

A  Okay.

Q  Six lines down, when he's asked how many times Steve shot Teresa, what's his answer?

A  He says, twice, but I don't know if he's referring to the head or what, but he does say twice.

Q  Well, you didn't ask him what was being referred to, did you?

A  Well, he's just talked about the head prior to that.  So you asked me before to interpret and that would be my interpretation, but...

Q  Well, Detective, I hate to quibble, but I don't think it takes a lot of interpretation.  Look at the very first question on that page.  You asked him, where did you shoot her?  Right?

A  Where did you shoot her?  Right.

Q  Yes.

         Answer:  In the head.

A  That's correct.

32

Q    Who shot her?  What did he say?

A    He did.

Q    Talking about Steve; right?  Right?

A    I would assume.  Yes.

Q    Well, who else were you looking at?

A    He said, he did.  Yes, I assume he's talking about Steve.

Q    Um, little further down is it indicated anywhere else upon the person of Teresa where she may have been shot?

A    Yes.  He's asked, do you shoot her elsewhere?

Q    Now, when you use the term "you" there's no way to know from this transcript or, quite frankly, from the video, who you're talking about?  Are you talking about he and Steve collectively?  Are you talking about him individually?  Would you agree with me that there's no way to discern to whom you reference that question?

A    Fassbender asked, do you shoot her elsewhere?  His answer:  In the stomach.

Q    Fassbender then asks a little further down, how many times do you shoot her when he handed you the gun?  Right?

A    Yep.

Q    You have nothing to support that suggestion, do

33

Q you?

A We certainly did. And the answer is zero. Which he continues to resist that. You're correct.

Q Well, when you say "resist" are you saying that he is lying?

A No, I didn't say that.

Q But do you agree that prior to that question being asked, you hadn't absolutely nothing to suggest that there was any truth to this statement that, when he handed you the gun?

A Not sure I understand your question.

Q When you did the interview on the 1st --

A Yes.

Q -- you had nothing to support the statement submitted to Brendan when he, making reference to Steve, handed you the gun. Is that true or false?

A That's true.

Q All right. But, nevertheless, that was presented to him as if it were a fact; correct?

A Absolutely it was.

Q All right. If you would flip over to page 591?

A Okay.

Q The last entry on the page, Detective, would you read that question?

34

A How many times did you shoot her? Tell me again how many times did you shoot her?

Q And you asked that question; right?

A Yes.

Q And the answer?

A He says, three. Which is not surprising.

Q And your next question on 592?

A And where -- where did he shoot her?

Q Talking again about Steve; right?

A Yes.

Q Okay. His answer: In the head, stomach, and heart.

A That's exactly what he said.

Q You then asked him, what side of the head; correct?

A Yep.

Q And he told you he had no idea. What he said was, no.

A That's correct.

Q Okay. How, if at all, do you account for --
Well, just let me put it this way: So when this questioning continues about where the shots may have occurred, it changes, does it not?

A It does.

Q And you knew that, from the forensics, there were

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 35 of 148    Document 19-20

Q    two pieces of skull, two holes; correct?

A    True.

Q    All right.  And I have to find my right page
here.  During the course of this exchange, you
had asked about some hooks or wires in the
garage; right?

A    Yes.

Q    Um, were those ever forensically examined?

A    Um, they were looked at by our evidence techs.

Q    And they found absolutely nothing of any
significance; correct?

A    True.

Q    If you know, how many times during the course of
the contact you had with Brendan on the 1st did
you personally ask him, or suggest to him, or
tell him that Steve made him do something?

A    I can't -- Excuse me.  I didn't go through and count
how many times I made any statement.  I don't know.

Q    Would you agree that it was multiple?

A    I'll agree it was more than one time.

Q    Would you agree it's more than ten?

A    No, I wouldn't agree with that unless I counted it.

Q    All right.  If you would, go to page 571, please?

A    Sure.  Okay.

Q    About in the middle of the page, little -- little

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 36 of 148    Document 19-20

past that, and this is when you're talking about whether or not Brendan engaged in any sort of sexual activity with Teresa. Is that a fair statement?

A Yeah, it looks like it. Yes.

Q All right. You make the statement to him, and this is a little past halfway down, okay, what happens next? Remember, we already know, but we need to hear it from you. You see that?

A I do.

Q And that's what you told him; right?

A That's true.

Q And in literally the same breath you said, it's not your fault. Right?

A You are right. Yes.

Q How many times did you tell him things like, it's not your fault?

A Quite a few. I haven't counted them, but...

Q How about --

A Many.

Q -- page -- Go to page 574, please. Again, about halfway down?

A Yes.

Q You said to him, it's not your fault. He makes you do it. Right?

37

A    Yes.

Q    And I take it you don't believe, as a trained investigator, dealing with Brendan Dassey, that phrasing things to him that way, where you suggest that if he did something, it's not his fault, is going to cause him to say he did, because you are telling him that it's okay and it's not his fault?

A    No.  I don't believe that at all.

Q    All right.

A    Clearly you saw on the tape what he said.

Q    Everybody saw what he says.

A    That's correct.

Q    But you would have to give me this, Detective, that it's not just the sterile words that people speak, but it's the meaning behind them; correct?

A    Correct.

Q    It's the intonation; correct?

A    Correct.

Q    It's the reaction between individuals; correct?

A    Absolutely.

Q    How many times during the course of this contact did you praise him?

A    Again, I haven't counted anything I've said in the interview.  I don't know how many times I said

38

anything in that interview.

Q Is it fair to say that it occurred on multiple occasions? It occurred more than once?

A I'll agree with you.

Q But you don't know how many times?

A No, I don't.

Q Okay. Um, if you would, go to page 595?

A Five ninety-five?

Q Yes.

A Okay.

Q You see about three quarters of the way down? The statement is made to him -- this is by Fassbender -- I think you're doing a real good job up to this point. Right?

A Yep.

Q Okay. And he goes on to say some other things; correct?

A Yeah, it's a pretty lengthy paragraph.

Q Okay. A little further down, he -- when we're talking about the garage, he claims to have knowledge about some things happening in the garage; right?

A Yes.

Q And he prefaces his request for Brendan to tell the truth by the following words: You need to

39

Q tell us about this so we know you're telling the truth. Right?

A Yes.

Q And in fairness, he said, I'm not going to tell you what to say. You need to tell us. Right?

A You're correct.

Q And you knew that this was being recorded, didn't you?

A Absolutely. So did he.

Q So if you wanted to get something on this video, you knew all you had to do was say it; right?

A It's nothing to do with the video.

Q Did you -- you knew it's being recorded?

A So did Brendan.

Q Okay. I'll grant you that. Think you're a little more sophisticated and intelligent than Brendan?

A I would hope so.

Q Do you think so? Not what you hope.

A I think so. Yeah, I think so.

Q So is Fassbender; isn't he?

A I think so.

Q In fact, he's been at this lot long -- about twice as long as you have, hasn't he?

A That's correct. Yes.

40

Q Just as the number of gunshots that you discussed with Brendan changed throughout the course of this contact, is it -- it is correct, is it not, that the times changed when talking about events, particularly when he gets home, when he goes over by Steve; right?

A Yes. Not surprisingly, they do.

Q Isn't it true, Detective, during the course of your contact on the 1st, that Brendan's told you flat out he was guessing at some of the questions that were asked of him?

A You'd have to be more specific. I don't know. I'm sure he may have said that once or twice, but...

Q For example, the knife. If you to page 645?

A Sure. Okay.

Q You asked him, now, quarter of the way down, what about the knife? Where is the knife? Be honest with me. Where's the knife? Right?

A Yes.

Q Okay. His answer: Probably in the drawer.

A That's what he says.

Q Okay. And you asked, which drawer? Right?

A Right.

Q If you would, just kind of read yourself the rest of that on that page.

41

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 41 of 148    Document 19-20

ATTORNEY FALLON:  I'm sorry, Counsel, what page was that again?

ATTORNEY EDELSTEIN:  Five -- I'm sorry. Six forty-five.

ATTORNEY FALLON:  Thank you.

THE WITNESS:  Yeah.  I'm ready.

Q  (By Attorney Edelstein)  Is it fair to say that even you concluded that he has no idea what happened to this knife?

A  That -- That's true, because he says, I think it is. Indicating he's really not sure where it went.

Q  So the insertion of the simple word "think" indicates to you that that, in and of itself, is not a complete affirmation of what's being said? Do I understand you correctly?

A  I'm saying is that he says, I think -- that's where I think it is.  And I take that to mean he's not really sure where it might be.

Q  So when he told you, for example, that he thought it was two shots, three shots, ten shots, are you -- are you then adopting the same interpretation that you're not even certain that he has any certainty to that -- that answer?

A  I'm thinking he knows she was shot, but he probably doesn't recall the exact number of times.  That's the

42

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 42 of 148    Document 19-20

way I took it. Which is not surprising.

Q When Brendan said things that you did not believe to be true, is it fair to say that you attempted him to correct his response?

A Yes, and several times he would resist that.

Q Well, when you say "resist", you're certainly not telling this jury that the mere fact that he did not change an answer, that you have any independent method to prove that his answer was false?

A It shows that he's not very suggestible to answers. That he answers what he knows. That's what it shows.

Q Now, you're not an ex -- an expert on suggestibility by any means, are you?

A You are correct. I'm not.

Q All right. But you conceded earlier that he did change his answers many times?

A Yes, he did.

Q But when you say he resists -- Let -- Let's go back to the hair.

A Um-hmm.

Q I guess you would conclude that he, uh -- he -- he clearly told you that he cut the hair; right?

A True.

Q You asked him where the hair went?

43

A    True.

Q    Okay.  Supposedly on what he described as the counter.  Later determined to be the nightstand or something in Steve's room; right?

A    No.  I believe what he said is on the dresser.

Q    He told you a counter.  You asked him.  Then he clarified that it was the dresser; correct?

A    I recall him saying dresser.  If he said counter first, I'll go along with that.

Q    Whatever.  We're talking about the back bedroom?

A    That is correct.

Q    He told you that; right?

A    Yes.

Q    You had nothing to sh -- You found no hairs of Teresa in the trailer; true or false?

A    We don't know.  So I'd have to --

Q    Well --

A    -- say false.

Q    -- what do you mean you don't know?  You're the lead investigator.  My question is this simple, did you find any hairs of Teresa Halbach in the trailer of Steven Avery?

A    We don't know.

Q    You looked, didn't you?

A    We recovered a lot of hair.

44

Q   Well, did you not ask anybody to check it to see whose it was?

A   It's not that simple.

Q   You're not an expert on hair comparison, are you?

A   You're right, I'm not.

Q   You had -- At any given time, what was the maximum number of people out there on the Avery property helping you with this case?

A   Any given time it could range from 15 to over a hundred.

Q   And not only that, you have the resources of the State Crime Lab; right?

A   Yes, we did.

Q   You had troopers out there helping you?

A   Helping us search.  That is correct.

Q   You had volunteers?

A   We had volunteer firefighters helping us go through the salvage yard.

Q   With all of these resources, there some reason that you did not -- Let me make sure I'm clear. Did you ever ask anybody involved in the forensic world to compare hairs found at Steven Avery's trailer with known samples from Teresa?

A   There were general discussions revolving --

Q   Did you or didn't you?  That's a simple question.

45

Yes or no?

A   There were --

Q   I'm just asking you the same way you asked Brendan many times. Yes or no?

A   There were general discussions. Yes.

Q   Did you ask -- So is the answer, yes? Did you ask somebody to do a comparison?

A   We had general discussions about hair. Specific -- Did I ask somebody, specifically, to do a comparison? No.

Q   And you agree that you could have done that, couldn't you?

A   No, I don't.

Q   All right. You were lead investigator? Co-lead investigator; right?

A   Yes, sir.

Q   What stopped you from asking either the Wisconsin State Crime Lab or another lab from doing a hair comparison?

A   Well, if you'd like me, I'll explain the whole thing about hair, if that's what you'd like.

Q   I don't want to know your spin on the value of doing the comparisons. I just want to know why you didn't ask somebody to do it?

ATTORNEY FALLON: Well, then, he's --

46

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 46 of 148   Document 19-20

then he's now entitled to answer that question.

THE COURT: I -- I think he is, Counsel. I think -- I think -- You -- you may characterize it, editorially, as a spin, but you've asked him, so go ahead and answer it.

THE WITNESS: Thank you.

Q   (By Attorney Edelstein)  Why didn't you do it?

A   Thank you.  Hair evidence -- First of all, we took a carpet cleaner, which you've all seen.  There's a vacuum cleaner that was taken as well.  Okay?  There is probably thousands and thousands and thousands of hairs both in there and in the vacuum cleaner. Number one.

Number two, we had to prioritize things on this case.  It was a huge case.  One of the biggest submissions of evidence ever done to the Wisconsin State Crime Lab.

Had we had somebody look through every piece of hair that we found, they'd still be doing it today, and probably still be doing it two years from now.  The Crime Lab is -- has only so many people, which you all know, which you've all seen.

We took the evidence that we thought best would solve this crime and bring the

47

murderer of Teresa Halbach to justice, and that's what we did.

Could we have spent two, three, four years going through every hair? Absolutely. Is it feasible? It's not feasible.

And if he's going to talk to me about DNA, which he's probably going to, on hair, almost impossible unless you have a root. He never cut any of the -- He never pulled the hair out. He said he cut it. Thus, there's no root there.

So there's a lot of reasons we didn't do hair analysis. Not to mention the Crime Lab does very limited hair analysis anymore to begin with.

DNA? Absolutely, if you have the root. Even if you have the root of that hair, and it went through that cleaner, you have to have skin follicles on that root. The odds of having skin follicles on the root of that hair when it goes through a cleaner like that are probably slim to none. Could we have done it in the next couple years? Certainly. That's the reason.

Q    So as a matter of -- of prioritizing things?

A    One of the reasons.

Q    Could have been done. You just chose not to;

48

Q  correct?

A  I'll go with you.  Sure.

Q  All right.  Okay.  Detective, let me ask you this, uh, going back to the interview again. Initially, I believe, Brendan said that he saw Teresa up on the porch talking with Steve; right?

A  True.

Q  Okay.  And then at some point in time he was confronted, um, and Fassbender -- and, I'm sorry, I can't find a page -- but if you have an independent memory -- Maybe do it this way.  Um, Fassbender told him that, quote, you couldn't have seen Teresa on the porch.  Right?

A  Very true.

Q  Okay.  And then Brendan agreed with that, and said, no, I didn't.  Right?

A  Correct, because Brendan didn't see her there.

Q  And that's another example of times that he changed based upon either a leading question or a negative response from one of you guys; right?

A  Because Brendan knew he was caught in a lie. Exactly.

Q  Well, you don't know what Brendan knew, did you? You -- Come on.

A  Brendan knew it wasn't true.  She wasn't there on the

49

porch at that time.  We know that.

Q   You have the ability to sit here and purport to tell this jury that you have the ability to know what he knows?

A   I know Teresa wasn't there on the porch at that time. So he couldn't have seen her.

Q   You're not a mind reader, are you?

A   She wasn't on the porch.

Q   Are you a mind reader?  Do you have that ability?

A   I'm not a mind reader.

ATTORNEY EDELSTEIN:  That's all.

THE COURT:  Redirect?

ATTORNEY FALLON:  Yes.  Thank you.

### REDIRECT EXAMINATION

BY ATTORNEY FALLON:

Q   Let's start with, um, guns.  Were any bolt-action or lever-action .22 caliber weapons seized from Steven Avery's trailer?

A   No.

Q   All right.  During your questioning of the defendant, did it appear to you that he had sufficient -- Or no.  Did it appear to you that he really knew much about guns?

A   No.  Matter of fact, he had talked about being afraid to shoot a cat, or watch somebody shoot a cat, for

50

fear he had hardly any knowledge of guns.

Q All right. Now, Counsel asked you -- I'm going to switch, now, to the SUV and this blood spatter question. You were asked a question on cross-examination about wouldn't you expect blood spatter in the SUV if a stabbing, for instance, had occurred there, and you said you would not. Tell us why?

A That's correct. When somebody's stabbed, there isn't this great amount of blood that goes flying out of a stab wound. Anybody that's in the medical field has knowledge of that.

Um, when you talk about blood spatter, it usually comes from something higher velocity. Stabbing a knife into somebody isn't going to cause all this blood to go anywhere. When you stab somebody in the area, from my limited medical knowledge -- Where is it he says he stabbed her? It's in the cavity. Even, free bleeding. It's going to bleed into that cavity. It's pretty simple. There isn't going to be this big blood spatter. It's not going to happen.

Q All right. So there's a difference between spatter and pooling of blood, for instance?

A Yes, sir.

51

Q All right. And just so that we're clear, we didn't see any pooling in the center of that cargo area upon forensic examination?

A No, I wouldn't expect it to.

Q All right. Now, did you learn that there were the pos -- that -- that it was at least two gunshot wounds to the head at the same time? Did you learn about both gunshot findings at the same time?

A No. Actually, um, we had learned about the first gunshot wound, I believe it was around November -- Correction. Let me -- Let me go back. I believe it was around, um, February 27. We learned much later than that, and I believe it was after this interview, about the second gunshot wound that they found. So, no, we did not know there were two suspected entrance wounds.

Q At least two?

A Two that we know of. Again, we don't have all of the skull.

Q Okay. Um, I just have a couple of final questions. The defendant was at, um, the Sheriff's Department for quite a while. But in terms of the actual interview of the defendant, how much interview time are we talking about

52

here?

A  Two hours and I believe it's 53 minutes, outside of breaks when we got him water, when we got him sodas, when we got him a sandwich, when we offered him to go to the bathroom. Outside of those breaks, there was about two hours -- just under three hours.

Q  Of questioning?

A  Of questioning.

Q  All right.

A  Yes.

Q  Now, um, yesterday, uh, when we ended, Counsel asked you about the absence of DNA and fingerprints that connect the defendant to the crime. Do you recall that?

A  I do.

Q  All right. Now, although there is no DNA profile of the defendant, or his fingerprints, is there scientific evidence that connects him to this crime in your opinion?

A  Absolutely.

Q  Let's take that in two parts. After receiving the statement that we witnessed yesterday, what did you do?

A  After receiving the statement, which you guys all saw yesterday, on March 1, we applied and obtained a

53

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 53 of 148    Document 19-20

search warrant, which was signed by a judge. We entered that garage, did a full search of that garage.

As you already know, we found two bullet fragments in that garage. Number one bullet fragment that came -- that we found underneath that air compressor, which you all saw, we retrieved, we sent it to the lab, and we found Teresa Halbach's DNA on that bullet that we discovered after Mr. Dassey told us she was shot in the garage.

That very bullet was analyzed by the weapons specialist, which you heard talk here. That bullet came from the .22 hanging in Steve Avery's bedroom, which Brendan told us. Brendan told us where we'd find that .22 and that's where we found it. To the exclusion of all other guns, that's where that bullet came from. That's information that Mr. Dassey told us during this interview that we did not know.

Q   All right. And while you were interviewing him, did you have a -- a fair command of the forensic evidence that you knew and that existed prior to this statement?

A   Yes, sir.

54

Q   All right. And in terms of the evidence that was
known to you at the time of the interview, what
scientific evidence did you -- do you believe
corroborates many of the details he provided?
Just to --

A   There's a lot of it. I -- I'll -- I'll give you a
few examples. The bleach, for example, corroborates
what he says about cleaning up in the garage. We
find the bleach bottle where he says we'd find the
bleach bottle. The bleach bottle's empty.

The rake and the shovel, which he says
they took out of the garage to help tend the
fire. Where did we find the rake and shovel?
Out by the fire.

His pants. He's the one who tells us
that there's bleach stains on the pants from
cleaning up blood in the garage. He turns over
the pants. You saw for yourself what's on the
pants.

He indicated that there were re --
restraints used. He's the one who told us they
were handcuffs. We find handcuffs.

He tells us they put Teresa, after they
kill her, in the back of her own vehicle. We
find Teresa's DNA, blood, in the back of that

55

vehicle.

He tells us that Steve's got a cut on his finger.  We find Steve's blood in Teresa's truck.  Just a few examples.

Q    Thank you.

ATTORNEY FALLON:  No further questions.

THE COURT:  Uh, any recross on these --

ATTORNEY EDELSTEIN:  Yes.

THE COURT:  -- points?

ATTORNEY EDELSTEIN:  Please, Your Honor.  Briefly.

### RECROSS-EXAMINATION

BY ATTORNEY EDELSTEIN:

Q    So if Steven Avery had told Brendan Dassey, when Brendan got over there, I shot Teresa in the garage.  You need to help me clean it up.  That's just -- that's -- that's certainly a possibility, isn't it?

A    Are you saying that's all he told him?

Q    No.  I'm just asking you.  You -- you said that in order to scientifically connect the defendant, you pointed to the bullet fragment with Teresa's DNA; right?

A    That is correct.  Yes.

Q    I'm not going to argue with you.  We know it has

56

her DNA --

A   Yes.

Q   -- right?  And that came from the gun; right?

A   Yes.

Q   You don't know how many times he was in that garage before he -- before the -- the, uh, 31st, do you?

A   How many times Brendan was in the garage?

Q   Right.

A   No, I don't.

Q   You don't know how many times he sat around watching Steve burn things in that pit, do you?

A   No.

Q   You don't know if he ever saw that rake and shovel that's been paraded around up here before the 31st, do you?

A   No.  He said he got them out of the garage.

Q   So he could have had preexisting knowledge of the rake and the shovel; right?

A   Sure.  He could have.

Q   He could have had preexisting knowledge about that gun hanging up there in that bedroom, couldn't he?

A   I'm assuming he could have.

Q   All right.  This all occurred Nov -- October 31;

57

Q right?

A Yes.

Q And he said that he told you that he helped Steve clean up this mess; right? In the garage?

A He said he helped do a lot of things. One of the things was help --

Q Listen --

A -- clean up the garage. Yes.

Q Okay. And he talked about using bleach; right?

A Yes.

Q So the fact that there's a bleach bottle that is discovered some four months later in Steve's trailer, you're telling this jury is scientific evidence to corroborate what he said?

A I'm telling you to put it all together, along with the gas cap --

Q Let them put it together.

A Absolutely.

Q Do you -- you just answer my question?

A Yes, I am.

Q That bleach bottle wasn't scientifically analyzed to determine whether it had Brendan's DNA on it, was it?

A No.

Q It wasn't scientifically analyzed to determine

58

Q  whether it had his fingerprints on it, was it?

A  Wouldn't expect it to.

Q  You don't know how long that thing had been sitting there, do you?

A  I don't.

Q  You told Mr. Fallon you had a pretty fair command of the, uh, forensic evidence, uh, by the time you conducted the interview; right?

A  I knew the majority of it.

Q  All right. Um, when, um, did you -- Well, let me ask you this way. Did -- did I understand you to say that it was February 27 was the first time that you had any knowledge about a gunshot wound being an issue in this case?

A  I can tell you that there was a report written by somebody at the Crime Lab on the 27th about a suspected gunshot wound, and we received it on the 28th. Um, there may have been conversations with, um, for example, Leslie Eisenberg, who you saw testify about the skull pieces, earlier than that. I didn't --

Q  Excuse me. What -- what was that about earlier than the 27th from Eisenberg?

A  I said there may have been discussions that she may have found one piece of skull earlier than that.

59

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 59 of 148   Document 19-20

Q  Let me ask you this.

A  But I don't know.

Q  Well, do you have a recollection of being told as early as November 15 of '05 from your lead co-investigator, Agent Fassbender, that he got information from Eisenberg that there was clear evidence of a gunshot wound?

A  Do I have an independent recollection of that?  No. But I believe that would be true that --

Q  All right.

A  I don't know that she could say it was a clear wound at that time.  She had a sus -- suspect that there was one at that time.

Q  Yeah.

A  That's probably true.

Q  All right.  So it certainly wasn't a revelation, uh, from Brendan that there was an issue of a gunshot wound; correct?

A  One gunshot wound.

Q  You already knew this going into this interview?

A  One gunshot wound.  Yes, I said that.  Yes.

Q  You also indicated in response to Counsel's question about corroborating what he said to you from a scientific standpoint that he told you Steven had a cut finger and you found some blood;

60

right?

A True.

Q If he was over there tending the fire and he saw Steve had a cut finger, does that surprise you?

A He even said Steve went in and got a bandaid to put on it when he was --

Q So what? If he sees a cut finger and he says he got a bandaid, how is that scientific?

A It's knowledge that he would have known and --

Q It's not --

A -- puts him -- again puts him there.

Q Okay. That's all.

THE COURT: All right. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Uh, any exhibits?

ATTORNEY EDELSTEIN: Your Honor, we haven't moved that, uh, exhibit that the witness has.

THE COURT: The transcript, 216, I think?

ATTORNEY EDELSTEIN: Right. Yes, 216.

THE COURT: All right.

ATTORNEY FALLON: No objection to that.

THE COURT: All right. That's received.

ATTORNEY FREMGEN: I think with the same conditions we've talked about.

61

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 61 of 148    Document 19-20

ATTORNEY EDELSTEIN: Right. For -- for purposes of the record.

THE COURT: Right. Any further witness -- I'm sorry.

THE CLERK: Two-fifteen hasn't been received yet.

THE COURT: And 215 is?

THE CLERK: Report and transcript of the 2/27 interview.

ATTORNEY EDELSTEIN: Same motion for the same purpose.

ATTORNEY FALLON: Um, that one I may want to think about. But let me just begin by saying for the purposes of which it was specifically identified and the specific questions referenced, I have no objection. But for any other purpose -- So, in other words, for those limited purposes, I have no objection.

THE COURT: All right. It's received --

ATTORNEY EDELSTEIN: All right.

THE COURT: -- for those limited --

ATTORNEY EDELSTEIN: And I'm going to --

THE COURT: -- purposes.

ATTORNEY EDELSTEIN: Your Honor, just so that we have cleanup, I think No. 214, which was

62

the --

THE COURT: Miranda rights form?

THE CLERK: That was received.

THE COURT: That was received.

ATTORNEY EDELSTEIN: Very good. Thank you.

THE COURT: All right.

ATTORNEY FALLON: Um, Madam Clerk, are there any other exhibits unaccounted for at this time that we need to address?

THE CLERK: No.

THE COURT: Well, any further witnesses from the State?

ATTORNEY FALLON: The State at this time would offer to the Court no further witnesses. We would rest our case and reserve our right to rebut argue -- or, rather, evidence presented by the defense.

THE COURT: All right. Is the defense prepared to proceed?

ATTORNEY FREMGEN: Judge, we should, uh -- We do have issues to deal with prior to proceeding.

THE COURT: All right. We'll deal with those issues. I'll excuse the jury.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 63 of 148    Document 19-20

ATTORNEY FALLON: Pretty close to the morning breaktime anyways.

THE COURT: It is.

(Jury out at 9:58 a.m.)

THE COURT: All right. Be seated. You have a motion, Mr. Fremgen?

ATTORNEY FREMGEN: Judge, yes. Before we start our portion of the trial, we would move -- and I believe it's Count 2, the, uh, sexual assault offense -- we would move that the Court consider at this time, uh, dismissal of that count. The evidence thus far that's been introduced this past week, in our opinion, does not independently support the first degree sexual assault charge as to any element of that offense absent the confession of the defendant.

Now, it supports -- general rule is that, uh, one may not be convicted solely upon their uncorroborated confession. But I -- I can cite cases, *Triplett v. State*, is the one that I have, 65 Wis. 2d 371, I believe *Holt v. State* is 17 Wis. 2d 468, more of the, uh -- the primary case in Wisconsin in regards to corroborated confessions.

But in that regard, I believe it was in

64

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 64 of 148    Document 19-20

*State v. Verhasselt*, 83 Wis. 2d 647, Wisconsin Supreme Court case. Supreme Court stated that, quote, as to the need for corroborating evidence, all of the cri -- elements of the crime do not have to be proved independently of an accused's confession. Essentially, it's enough that, quote, some corroboration, unquote, of that confession be necessary in order to sustain a conviction. That's the Supreme Court in *Verhasselt*.

In this case, there are three crimes. There are three distinct and separate offenses. Each has distinct and separate elements of the offenses. Now, certainly, we -- not taking issue that there has been independent evidence that supports at least an element of the other two offenses, intentional -- first degree intentional homicide and mutilation of a corpse.

In this case, there's been no independent evidence to support the confession by the defendant that first degree intentional -- or excuse me -- first degree sexual assault occurred. There's no independent evidence outside the statement -- the videotaped statement provided yesterday to the Court. No scientific

65

evidence that ties the defendant to any sexual assault, no physical evidence that even suggests that a sexual assault occurred.

Nothing connects this defendant with Teresa Halbach in regards to any indication of a sex crime. For example, no DNA of Teresa Halbach on the leg irons or handcuffs. Items that might be indicative of a sex crime.

No indication of bodily fluids indicative of a sex crime such as semen. Nothing on -- on any bedding, on any carpeting. No body fluids at all suggestive of a sexual assault.

So we'd ask that the Court dismiss that count in regards to the uncorroborated -- uncorroborated detail of any element of that crime.

THE COURT: Response?

ATTORNEY KRATZ: Thank you, Judge. This motion is brought, uh, not surprisingly, at the, uh, conclusion of the State's case where the standard the Court is to apply, uh, is whether a view of the evidence in the light most favorable to the State could sustain a conviction.

Mr., uh, Fremgen's argument, I believe, is misplaced, uh, especially given the, uh,

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 66 of 148   Document 19-20

postmortem, um, mutilation of the evidence and the destruction, uh, of what we might expect to find as, uh, other corroborative, uh, physical evidence.

In this case, uh, the fact that the body, uh, is, uh, totally consumed by fire, the fact that the bedding and the clothes, which may have at one point contained DNA, are, by the defendant's own, uh, instrumentality, burned, uh, do not, uh, aver to the, uh, benefit of the, uh -- of the defendant, himself.

Uh, the term "corroboration", Your Honor, uh, requires or suggests this Court, uh, include and consider all of the evidence, uh, that has been, uh, presented. There is certainly corroboration as to, uh, restraints, as to, uh, weaponry, and as to other, um, items that have been seized when viewed in light, uh, most favorable, uh, to the State, uh, would, in fact, uh, be, uh, considered, or can be considered, corroborative.

But the bottom line, and the underlying principle, is, uh, when viewed in light most favorable to the State, uh, whether or not the, uh, jury could, in fact, convict, we certainly

67

have met that burden. We ask that the defendant's, uh, motion be dismissed. Or, excuse me, denied at this time.

THE COURT: Response?

ATTORNEY FREMGEN: Just one quick response, Judge. The -- the case that I cited, and I think it's cited numerous times and -- and without -- well, somewhat ad nauseam in the case law, says the elements of the crime, not any element of any crime. I think if the Supreme Court wanted to say any element of any crime charged, they would have done that.

So in this case, there isn't any evidence suggestive of any sexual assault. And despite the fact that there might be evidence that the State suggests had been destroyed, once again, that comes from the confession of the defendant. There's nothing to corroborate that there was bedding in -- in -- in the fire, no evidence has been suggested that they found remnants of bedding in the fire.

So, once again, our -- I understand the State's position, but the case law's pretty clear there has to be something other than the confession. Not just, well, it's not fair that

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 68 of 148    Document 19-20

he can confess to something, destroy all of the evidence, and then we can't go any further with the case because we can't corroborate the confession. That's the law.

THE COURT: I think -- and I don't have any cases in front of me right now -- but most recently there was a case called **State v. Bannister.** It's at 2006, uh, Wisconsin Appellate something or other, uh, and that stated, once again, what I think, essentially, both defense and prosecution agree, that an uncorroborated confession cannot stand alone to sustain a conviction.

What I believe the, uh -- the general rule is, that there has to be some material fact that corroborates, in one way or another, the confession. Uh, the State, uh, is correct in saying that at this stage in the proceeding there need be shown here a prima facie case to, uh, allow the Court to conclude, under the best of all circumstances, at least at viewed -- as viewed from the prosecution standpoint, that a case has been entered that could convict a defendant on a particular charge.

The -- In this particular instance, the -- the -- the State finds some of the

69

implements described in the statement of this defendant, and introduced, uh, uh, by way of the videotape, uh, and the implements, themselves, introduced here as pieces of evidence, to be sufficient material corroborating evidence to -- to at least, uh, move this beyond this stage in the proceedings, and I'll respectfully deny your motion.

ATTORNEY KRATZ:  When would you like us back, Judge?

THE COURT:  Uh, 10:25.

(Recess had at 10:07 a.m.)

(Reconvened at 10:27 a.m.)

THE COURT:  Mr. Fremgen?

ATTORNEY FREMGEN:  Thank you, Judge. We'd call, first, Kris Schoenenberger-Gross.

THE CLERK:  Please raise your right hand.

**KRIS SCHOENENBERGER-GROSS,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  Kris Schoenenberger-Gross, S-c-h-o-e-n-e-n-b-e-r-g-e-r, hyphen, G-r-o-s-s.

**DIRECT EXAMINATION**

70

BY ATTORNEY FREMGEN:

Q Um, Ms. Gross, if you could just pull the microphone a little closer to you. Thank you. Where do you work?

A Mishicot School District.

Q And how long have you been with the Mishicot School District?

A This is my ninth year.

Q In what capacity do you work at the, uh, Mishicot School District?

A I'm the school psychologist and the coordinator of alternative services, which includes the special education coordinator responsibilities.

Q In the capacity as the school counselor, are you familiar with Brendan Dassey?

A Yes.

Q Now, how -- First of all, without going into specifics, how do you know Brendan Dassey?

A I know him as a student at Mishicot High School and as a student whom I evaluated.

Q Generally, in the -- the course of your responsibilities with the Mishicot School District, do you maintain or compile records pertaining to each student?

A Yes.

71

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 71 of 148    Document 19-20

Q	And not -- not just students that maybe you're involved with, all the students in the Mishicot School District; correct?

A	Correct.

Q	And those are maintained at the School District, itself?

A	Yes.

Q	And these type of records would include, for instance, class schedules, grades, uh, evaluations, IEPs?

A	Correct.

Q	Among other things possibly?

A	Correct.

Q	In your, um, capacity as the school counselor, do you have access to these records?

A	Yes.

Q	And you have an opportunity at times to review the records?

A	Yes.

Q	Now, in your capacity and in your position as school counselor with the -- the Mishicot School District, had you, in fact, had access to the records of Brendan Dassey?

A	Yes.

Q	I'm going to show you what's been marked as an

72

exhibit.  Does it indicate that that's been marked as an Exhibit 217?

A    Yes.

Q    And can you tell us what that is?

A    Um, this is a compilation of Brendan's records.

Q    And you brought that to court today; correct?

A    Correct.

Q    So do you believe that that's a, uh, true and accurate copy of the records from the Mishicot School District that you've had access to?

A    Yes.

Q    I'm going to show you what's been marked as Exhibit 218.  I'll leave this here in case you need to --

A    Okay.

Q    -- refer to it.  It is -- Again, this -- this is marked as Exhibit 218; correct?

A    Correct.

Q    Now, did this appear to be a record, for instance, that we've been talking about?  Records kept in the normal course of the School District activities?

A    Yes.

Q    And, specifically, this is a record of Brendan Dassey; correct?

73

A   Correct.

Q   Can you tell us what -- what this is?

A   This is a copy of, um, Brendan's most recent IEP, Individualized Education Program, which contains, um, the goals that he was working on, services that were provided through his special education programming.

Q   I want to ask you, if you could, if you could refer to page -- I believe it's listed as -- either it's 1.11 or I-11?  And do you -- do you see that?

A   Um-hmm.

Q   You have to --

A   Yes.

Q   -- answer yes.

A   Yes.

Q   And this is part of that first, um, IEP; correct?

A   Correct.

Q   And -- and I shouldn't say, first.  It's actually dated September 29, 2005; correct?

A   Correct.

Q   Could you refer to the last paragraph on that page?  Do you see where it starts, present level of education performance?  And there seems to be an un-highlighted or bold section and a bold section; correct?

74

A   Correct.

Q   Now, the other -- the section that's not bold, is that just the standard form, itself?

A   Correct.

Q   And then the bold section is added to it by an evaluator or someone else from the school; correct?

A   Correct.

Q   And if you could just look down to where it starts, speech -- uh, speech, slash, language? You see where that is?

A   Yes.

Q   Could you read from that?

A   He exhibits difficulty responding clearly and concisely to others.  Paragraph comprehension, defining vocabulary, and understanding age-appropriate vocabulary terms remains challenging.
    Brendan will occasionally ask questions when he is unsure.  However, eye contact and participation during discussions with adults and peers is limited.  Brendan's memory, specifically, is affecting all areas of language.

Q   And -- and, actually, just to be clear, the word "discussion" is actually misspelled; correct?

A   Correct.

75

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 75 of 148    Document 19-20

Q Okay. And, again, that's just simply a summary of present level of educational performance? Or part of the summary?

A Correct.

Q Okay. I'm now going to show you what's been marked as Exhibit 219. And, again, can you -- do you recognize that document?

A Yes.

Q A -- again, is that something that's from the full record before you in Exhibit 217?

A Yes, it is.

Q That's just one item taken from that larger group of documents; correct?

A Correct.

Q Again, kept at the School District?

A Correct.

Q And can you tell us what this -- this, uh, Exhibit 219 is?

A This is, um, the evaluation summary pages from the re -- or -- re-evaluation which was conducted in September of 2005.

Q So this is one report used to generate the progress report that we've just discussed? The IEP?

A Correct.

76

Q    And ask you to refer to -- I believe it's under -- it's on the first page, par -- page 1.5? Do you see that?

A    Yes.

Q    Okay.  And under -- There's some handwritten notes under the section -- looks like the -- a form section.  It says, to guide this analysis? You see that?

A    Yes.

Q    Okay.  Can you read the handwriting?  I know -- I -- I don't --

A    Yes.

Q    -- know if you -- Okay.  Can -- can you, uh, read what that states?

A    Brendan continues to demonstrate delays in his basic reading, reading comprehension, and language skills, both receptively and expressively.  Brendan needs specialized instruction which the regular education environment alone does not provide.

      He needs special education services and supports to help him be successful in school and to help meet his needs.

Q    Thank you.  Can -- and if I ask you to refer, then, to page -- again I don't know if it's 1.3 or I.3 -- of that same exhibit, Exhibit 219?  Do

77

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 77 of 148    Document 19-20

Q you see that?

A Yes.

Q And under, E -- Again, this is part of that same evaluation report; is that correct?

A Correct.

Q And, again, there's some handwriting on this form as well?

A Correct.

Q And under, E, where it indicates, observations by teachers or related service providers?

A Um-hmm. Yes.

Q Could you read the handwritten comments?

A Uses minimal eye contact, gestures, and a variation of pitch in conversations in therapy and in the classroom. Willingly participates in speech and language therapy sessions.

Q I'm now going to show you what's been previously marked as Exhibit 220, and do you recognize this document?

A Yes.

Q Again, is this from that larger compilation of school records?

A Yes.

Q And what is this, uh, specific document?

A This is an evaluation report that was completed by

78

the speech and language pathologist.

Q So this is specifically in regards to speech and language; correct?

A Correct.

Q If I can ask you to refer to page three of that document? And before I do so, I'm sorry, if I can have you go back to the first page, it's not actually dated with a specific date, is it?

A No. There are two dates.

Q Two dates. So the evaluation went from September 22 and 27th of '05?

A Correct.

Q And, again, back to page three, under paragraph six, discussion and summary, there appears to be -- well, appears to be the summary of the evaluation; correct?

A Correct.

Q Could you read that, please?

A Overall, Brendan demonstrates significantly delayed receptive and expressive language skills, memory, short-term memory, immediate memory, and working memory, vocabulary, sentence comprehension, pragmatics, and areas of abstract language. For example, idioms.

Brendan's language standard scores range

from 58 to 83 with an overall language score of 66. Brendan's strengths are in his willingness to participate in speech therapy, knowledge of familiar sequences and his articulation skills. This information will be shared with the IEP team.

Q And, again, these are all records that are normally kept in the -- at the School District?

A Correct.

Q And you have access to?

A Yes.

Q And have reviewed as well at times?

A Yes.

Q I'm now going to show you Exhibit 221, and though the questioning may sound repetitive, again, this is -- also appears to be a separate document from that compilation you -- exhibit before you?

A Correct.

Q Can you, uh, indicate what that -- what that document is?

A This is the IEP document dated October 12, 2004.

Q Similar to the one that you described in Exhibit 218 from September 29, 2005?

A Similar to. It does not include evaluation --

Q Okay.

80

A    -- results.

Q    And, again, if I could ask you to refer to whether it's page I-11 or 1.11?

ATTORNEY KRATZ: Judge, if -- if -- if I may interpose an objection, we've heard about Brendan's, um, educational programming, um, close to this event. That is, in the fall of 2005. I don't know how going back several years is at all relevant to any, uh, material fact that this jury has to decide. That is, uh, how Brendan may have done in school in ninth grade, or eighth grade, or fourth grade, uh, I don't think really has any relevance to this case.

THE COURT: I think this is from October 1 of 2004?

ATTORNEY KRATZ: Yes.

THE COURT: So that would be, uh, a year prior; correct?

ATTORNEY KRATZ: It looks like they're going backwards.

THE COURT: Well, I -- I'm -- I'm cognizant of moving backwards here. Are -- are we going back -- are you proposing to go back further than this?

ATTORNEY FREMGEN: I have two more.

81

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 81 of 148    Document 19-20

I -- I guess, given the historical background --

Uh, and if State wants to agree that the information will be similar to what the information is from Exhibit 218, 219 and 220, I have no problem, uh, ending at this point.

THE COURT: Any response?

ATTORNEY KRATZ: I want to know how it is --

THE COURT: Well --

ATTORNEY KRATZ: -- relevant to or material issue of this case, Judge.

THE COURT: Well, I think -- I think it -- it certainly has some relevance. I'll -- I'll overrule your objection. I'll permit the testimony with respect to -- to 2004. Beyond that, I think we do, uh -- I -- I think we're simply going to be replicating what has already been testified to. So, with that said, you may go ahead.

ATTORNEY FREMGEN: Okay.

Q (By Attorney Fremgen) An -- and, again, I'm referring to you on page I.11 or 1.11?

A Yes.

Q Uh, there is, um, a handwritten note on the form as well?

A Correct.

82

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 82 of 148    Document 19-20

Q   Okay. Bear with me. I just lost my place. The last sentence of that, uh, handwritten paragraph, starting with, Brendan will occasionally, can you read from there?

A   Brendan will occasionally ask questions when he is unsure. However, eye contact and participation during discussions with adults and peers is limited.

Q   So, again, pretty similar to the previous -- or the September, '05, IEP?

A   Correct.

Q   I just have one more exhibit.

    (Exhibit No. 224 marked for identification.)

Q   I'm going to show you what's been marked as Exhibit 2 --

            ATTORNEY KRATZ: Just a minute. Could you --

Q   (By Attorney Fremgen)  -- what's been marked as Exhibit 224. And, again, would that al -- also appear to be one of the pages or documents that is kept in that compilation exhibit before you?

A   Correct.

Q   And this is from September 16, '05?

A   Correct.

Q   These are -- What -- what, specifically, is this document?

83

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 83 of 148    Document 19-20

A   This is a document that one of Brendan's regular education teachers completed, um, to provide observations about how he performs in the classroom, how he processes information based on that person's observations.

Q   Can you turn to the second page of that document? And if you could read from that highlighted section?

A   Brendan is expressionless, no facial expression, seemingly blank stare, possibly indicating daydreaming.

Q   Thank you.

ATTORNEY FREMGEN:  Thank you, Judge.  I have no other questions.

THE COURT:  Cross?

### CROSS-EXAMINATION

BY ATTORNEY KRATZ:

Q   Uh, Ms. Schoenenberger-Gross, uh, as a school psych -- Oh, I'm sorry.  As a school psychologist, um, are you educated to the point where you have a Ph.D?

A   No.

ATTORNEY FREMGEN:  Judge, can we approach?

THE COURT:  Sure.

84

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 84 of 148    Document 19-20

ATTORNEY FREMGEN: Before I --

(Discussion off the record.)

Q   (By Attorney Kratz)  I think we left off with your educational background.  Could you just tell us what that is, please?

A   I have a Master's of Science in education in the area of school psychology.

Q   All right.  And, usually, when we hear the term "psychologist", um, aren't we normally hearing from people with, um, a more advanced degree?  A Doctorate?  A Ph.D?  Or something like that?

A   Correct.

Q   How is it, then, that you have obtained the title psychologist?

A   Well, school psychologists, specifically, um, which, um, I'm able to obtain with a Master's Degree, but my position and training is in evaluating students, um, interpreting evaluation results, conducting observations, interviews, um, you know, through the special education progress programs and trying to help determine appropriate programming for students.

Q   And it's within that academic arena that you're able not only to review just records, uh, but you're able to form some opinions?  And, in fact, you've been asked to do this in the past in this

85

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 85 of 148   Document 19-20

very case, haven't you?

A Correct.

Q Mr. Fremgen provided you a very large binder of materials, Exhibit 217. Uh, those are the school records. Have you had the opportunity in, uh, a rather detailed way to review Brendan's prior school records?

A Yes, I have.

Q And not only have you reviewed those records, but you have, yourself, that is, as the school psychologist, uh, performed some testing, performed some examinations, and certainly interviewed Brendan in the past; isn't that right?

A Correct.

Q When determining the appropriate programming for any student, especially students who are at least under the, uh, broad umbrella of special education, uh, it falls upon you to do that testing; is that right?

A Correct.

Q Let's talk about Brendan's educational program. First of all, it's true, is it not, that Brendan was in regular classes at Mishicot?

A Yes.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 86 of 148    Document 19-20

Q So he wasn't the kind of student that, uh, you would consider to be, uh, cognitively disabled? You know what I mean by that term, don't you?

A Yes.

Q Was he the kind of student that your, um, school district considered cognitively disabled?

A No.

Q And although getting some special classes in speech or language, Brendan pretty much, um, was a normal kid? That is, uh, went through normal classes in Mishicot; is that right?

A Yes.

Q During your examinations of Brendan, do you recall providing Brendan with, uh, various tests that are tests that you could, uh, assess Brendan's general IQ level?

A Yes.

Q And within his IQ tests, and understanding IQ's kind of a broad, uh, range, but there are also abilities that psychologists and, in fact, you have, to assess, um, where Brendan may have some strengths and where he may have some weaknesses, at least cognitively or, uh, his ability to understand, or to think, or to achieve; isn't that true?

87

A    Yes.

Q    Are you familiar with the Woodcock-Johnson test?

A    Yes.

Q    Could you just briefly tell the jury what that is, please?

A    Um, Woodcock-Johnson, Third Edition, has tests of cognitive abilities and achievements.  Um, the cognitive test looks at, um, measure of intelligence, looking at his overall intellectual ability.

Q    All right.  And some of those areas that you look at, uh, some of those sub-areas that we talked about, included, uh, his, um, verbal abilities; isn't that right?

A    Yes.

Q    And his ability to think?  That is, what's called, uh, the thinking scores, or the thinking range; isn't that true?

A    Yes.

Q    Now, are there, um, norms?  In other words, are there numbers or averages that, uh, when a test like that is scored, they're put into?

A    Yes.

Q    Now, the Woodcock-Johnson, uh, test, uh, could you tell us what the average score is?  Or if there's a range of being average?

88

A    The average range would be approximately 90 to 109.

Q    All right.  Now, one of the things you tested Brendan for was something called the thinking? That is, the ability to problem-solve or to process information; isn't that true?

A    Yes.

Q    And are you familiar, Ms., uh, Schoenenberger-Gross, with what Brendan's scores were on his thinking ability?  That is, his ability to process information or to problem-solve?

A    Yes.

Q    What is that score?

A    A 93.

Q    Ninety-three?

A    Ninety-three.

Q    That place, uh, Brendan in the average range of, uh, his thinking ability?

A    Yes.

Q    Other things that you test for in, um, students, not just Brendan, but in other students, are their ability to achieve academically?  That is, how well they're able to, or at least predictive, that is, how -- how you can predict they're going to do, with, I guess, what we used to call book

89

Q learning; isn't that right?

A Yes.

Q And, again, those tests that are performed, um, are broken down into various -- especially with academic scores -- various disciplines? Academic disciplines like reading, or math, or reasoning, or things like that; isn't that true?

A Um-hmm. Yes.

Q And did you perform those tests and are you aware of the results of those tests for Brendan?

A Uh, I did not personally perform an academic achievement test on Brendan, but there was one conducted in 2002, and I am aware of those results.

Q All right. Now, as you mentioned before, Brendan has some, um, deficits, or at least he needed some extra tutoring or help, uh, in the area of speech or, uh, language, or even in reading; isn't that true?

A Yes.

Q Uh, are you aware of the results for Brendan, let's say, in the area of math? His math skills and achievement levels?

A Yes.

Q Can you tell us what that number was, please?

A In 2002, he scored within the average range. I would

90

Q   need to refer to the report to give the exact number.

Q   Are you able to find that quickly?

A   I -- I certainly can.

Q   Why don't you look at Exhibit 217 and find that for us, please. His math score was what?

A   Uh, math reasoning was a 102. Math calculation skills, 100.

Q   Okay. And is that scored on the same, um, basic score? That is, anywhere between 90 and 110 is considered average?

A   Correct.

Q   Now, what's the difference between math and math reasoning?

A   Um, math calculation would be where he's required to, um, do some possibly adding, subtracting, multiplying, dividing. Just solving the basic problems that are in the book. Reasoning, he needs to apply the skills he has, which may include some story problems that he would need to figure out how to set up and solve.

Q   And it's within that test, that is, when provided with a story problem, or when given a set of facts that he has to apply, uh, Brendan actually achieved, if we're going to be technical about it, over and above average? A 102; isn't that

91

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 91 of 148    Document 19-20

true?

A    Average. A 102 would be solid average range.

Q    All right.

A    Um-hmm.

Q    So these results, that is, that is either 93 in processing or problem-solving, or the 102, or the 100 results, supported your conclusion that Brendan does not have any cognitive disabilities; isn't that true?

A    Correct.

Q    As a school psychologist, are you also called upon on occasion to assess and to make recommendations about some behavioral problems?

A    Yes.

Q    Now, behavioral programming, at least within a school district, and Mishicot's no different than other school districts, can include some specialized classes? In fact, can include segregation of students from what's called the general population; isn't that true?

A    Correct.

Q    Now, was Brendan a behavioral problem at Mishicot?

A    No.

Q    Did Brendan exhibit any difficulties with, um,

92

Q  acting out at school or, uh, in a, uh -- or demonstrating an inability to follow direction?

A  No.  And "direction" meaning regarding behavior, specifically.

Q  I'm talking about behavior --

A  Yes.

Q  -- at this point.  If Brendan would have been unable, for whatever reason, an inability to, um, conform or, uh, would -- would exhibit a -- a -- a propensity to act out in school, uh, would it be likely that he would have been removed from general classes?

A  Over time, we would try intervention first, but -- but if that is not working, then we would look at other programming options.

Q  In fact, those programming options are called ED or, uh, possibly, uh, emotionally disturbed classes for -- for children; is that correct?

A  Correct.

Q  That wasn't Brendan?

A  No.

Q  When you go through all these, um, what are called IEP, the Individual Education Programs, and for Brendan it was for speech and -- and language, uh, was Brendan's mother involved in

93

those programming meetings?

A   Yes.

Q   And to your knowledge, and in, uh, reflection of the Exhibit, uh, 217, did Brendan's mother ever express any particular concerns, uh, that, uh -- that she had with Brendan?  Let's talk behaviorally first, okay?

A   Behaviorally?  Can I refer to if she -- if it was documented?

Q   Yeah, why don't you do that?

A   Okay.  Did you say -- 217 in the binder.  Okay.  Are you referring to the last IEP meeting, can I ask?  Or --

Q   And that's the most relevant.  In the fall of --

A   Okay.

Q   -- uh, 2005.  Are there any behavioral notes that --

A   Okay.

Q   -- are included?

A   Um, in the IEP, it was indicated that she would like him to continue to main an -- an assignment notebook.

Q   Okay.  So other than mom would like him to keep a -- an assignment notebook, there were no other problems that were noted at home?  Behaviorally.

A   Behaviorally?  No.  Not that I recall.

94

Q Okay. Let's talk about memory just a -- a -- a little bit, because I know that, you know, one of the notes that Mr. Fremgen had you read, it talks a little bit about memory; isn't that -- isn't that right?

A Correct.

Q Are you familiar with different kinds of memory?

A Yes.

Q Are you familiar that there is a difference between something that is called, uh, event memory, that is, when somebody actually goes through an event and they remember it when they've lived through something, that they remember that differently than, say, when a teacher reads them a story, or when they learn something in class? You know there's a difference in those two kinds of memory?

A Yes.

Q Now, from an academic standpoint, the memory that you're most concerned about, and the memory that Mr. Fremgen had you read about, uh, is that second kind. That is, the memory that, uh, has to do with learning or what he can remember from a classroom setting; isn't that true?

A Correct.

95

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 95 of 148     Document 19-20

Q You didn't test for -- and I assume you don't have an opinion -- as to Brendan's ability to recall or remember things that he's actually lived through? That's true; isn't it?

A True.

Q Do you still have Exhibit 224 with you?

A Yes.

Q Mr. Fremgen asked you to read something. I think it was on the second page. He highlighted something for you to read. Do you see that?

A Yes.

Q I'm going to ask you to read the line just before what Mr. Fremgen asked you to read. Could you do that for me, please?

A He will respond when called on by teacher if he knows the answer. If not, he shrugs his shoulders.

Q So from an educational classroom standpoint, when Brendan, um, was called on in class and he didn't know the answer, that note reflects he just shrugged his shoulders; isn't that right?

A Correct.

Q Nothing in that note that's says when Brendan didn't know an answer, he just made something up? He just made up some false statement? Note doesn't say that, does it?

96

A    It does not.

Q    The final area of questions that I have for you, Ms. Schoenenberger-Gross, comes in the area of suggestibility. Are there some students within the Mishicot School District that you identify, and, in fact, your staff, uh, expresses concerns about, being overly suggestible?

A    We -- we wouldn't probably use the term "suggestible" but we would, perhaps, use the term, "easily influenced". Um, and, yes, there are.

Q    All right. And if there's a student in Mishicot, uh -- in the Mishicot School District that you've observed as being easily influenced, or easily led, uh, is that something that would be addressed either through programming or discussions with teachers or discussion with parents?

A    Yes.

Q    And that's happened before at Mishicot, hasn't it?

A    Yes.

Q    Now, last question I have for you is, did the Mishicot School District ever, ever identify that Brendan Dassey was easily influenced, or easily led, or suggestible, such that you addressed with

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 97 of 148    Document 19-20

either a teacher or a parent that particular observation?

A   There's nothing in the records to indicate that that was an area of concern.

Q   That's fine.  Thank you for coming.

ATTORNEY KRATZ:  That's all I have, Judge.

THE COURT:  Redirect?

ATTORNEY FREMGEN:  Yes, please.

**REDIRECT EXAMINATION**

BY ATTORNEY FREMGEN:

Q   I'm going to show you what's been marked as, uh, Exhibit 223.  Do you recognize that document?

A   Yes.

Q   During some of the questions by Mr. Kratz, you were referring to test results.  Um, I believe one, specifically, was the Woodcock-Johnson?

A   Yes.

Q   And --

THE COURT:  Excuse me.  Could you have her identify the document?

ATTORNEY FREMGEN:  I'm sorry.

Q   (By Attorney Fremgen)  What is -- What is that document?

A   This is a copy of my report from the testing that I

98

did in October of -- of 2002.

Q And is -- is this where you were testifying to as far as, um, some of the numbers in regards to the Woodcock -- Wood -- for instance, the Woodcock-Johnson?

A Yes.

Q Okay. And so this would be, um, the actual report where you -- where some of the questions came from Mr. Kratz in regards to, for instance, that one test and some other tests in regards to cognitive abilities; correct?

A Correct.

Q Now, the actual test result of the Woodcock-Johnson General Intellectual Ability was what score?

A Seventy-eight.

Q And is that average? Below average? Or what -- what -- what would you, uh -- how would you describe that?

A That would be a borderline to below average range.

Q Referring to that same exhibit on page two under your observations and discussion?

A Yes.

Q Can you read the second sentence under that -- your observations and discussion of assessment

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 99 of 148    Document 19-20

results?

A   In the first paragraph?

Q   Uh, the first paragraph under that subsection. Correct.

A   Okay.  He guessed on the items that he was not sure about at times.

Q   So at times when he didn't know answers, you're saying he guessed at them?

A   Yes.

Q   Now, the -- the attachment to that, uh -- to your report in -- indicates actual test score results and his percentile ranking; correct?

A   Yes.

Q   And under the observations and discussion setting -- uh, section of your report, you actually reference, um -- For instance, if you can go down, oh, that second full paragraph, probably three quarters of the way down, where it indicates Brendan -- uh, Brendan obtained a cognitive efficiency standard score of 73?

A   Yes.

Q   Okay.  And the percentile ranking is what?

A   Four.

Q   What is the significance of that?  What does that mean?

100

A   That means that on that particular area Brendan scored as well as, or better than, four out of one hundred students his age.

Q   So if I'm -- Just to make sure I'm clear, 96 people would have scored better than -- out of a hundred would have scored better than him in regards to the cognitive efficiency test?

A   As well as or better than him.

Q   As well as or better?

A   Um-hmm.

Q   And right after that, you comment about his short-term memory abilities?  Can you read that line?

A   Brendan's short-term memory abilities are within the well-below average to borderline range.

Q   Now, you testified on cross that -- that is -- that -- that, generally, Brendan was in mainstream, uh, classes at Mishicot; correct?

A   Correct.

Q   And -- but you would agree that, based on -- if you need to review the IEPs -- his fourth grade reading lev -- or, excuse me -- his reading level was at a fourth grade level?  Or do you recall what level he was listed at reading?

ATTORNEY KRATZ:  I'm going to --

101

A    Uh --

ATTORNEY KRATZ:  Judge, if I may interpose an objection, I'm not sure that this jury, um, needs to, um, consider anything about Brendan's reading level.  I didn't hear any testimony about any reading ability.

ATTORNEY FREMGEN:  The State that -- talked about math level.  I think I can go --

THE COURT:  We -- we --

ATTORNEY FREMGEN:  -- into that.

THE COURT:  Yeah.  Uh, I'm going to overrule the objection.  We've -- we've heard a lot, and the State put some of it in.  Well, I'll overrule the objection and she can answer the question.

ATTORNEY KRATZ:  Thank you.

Q    (By Attorney Fremgen)  And -- and if you need to refresh --

A    I --

Q    -- your recollection --

A    -- would need to refer to --

Q    I believe --

A    -- something.

Q    -- it would be the first -- Well, let me get the number for you.  You should have the exhibit up

102

there.  It's a separate exhibit from 217.  I believe it's the, uh -- the September 29, 2005, IEP.  I believe that is Exhibit 218?

A   Yes.

Q   Okay.  And I believe if you refer, again, to page I.11?

A   Yes.

Q   Okay.  Does it indicate what his reading level was?

A   Brendan is currently reading at the end of fourth grade level.

Q   And what grade level was he in at that time?

A   Tenth grade.

ATTORNEY FREMGEN:  I have nothing else.

THE COURT:  Any recross?

ATTORNEY KRATZ:  That's all I have. Thank you, Judge.

THE COURT:  You may step down.  Thank you. Your next witness, Counsel?

ATTORNEY FREMGEN:  Yes, Judge.  We'll call Blaine Dassey.

THE COURT:  I showed this witness testified with respect to Exhibits 217 to 221, 223 and 224. Was there a 222?

DEFENDANT'S ATTORNEY:  I would withdraw --

103

Well, I didn't actually offer 222.  No, that was another exhibit.

THE COURT:  All right.  Are you offering these at this time?

ATTORNEY FREMGEN:  Yes, I -- we would offer those exhibits at this time.

THE COURT:  Any objection?

ATTORNEY KRATZ:  For the reasons they were used, no, Judge.

THE COURT:  Okay.  And they're received for that.  Come on up here and just remain standing.  You're going to be sworn in as a witness.

THE CLERK:  Please raise your right hand.

**BLAINE DASSEY,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  Blaine Dassey, D-a-s-s-e-y.

**DIRECT EXAMINATION**

BY ATTORNEY FREMGEN:

Q    Blaine, how old are you?

A    Eighteen.

Q    And are you currently in school?

104

A    Yes.

Q    What school do you go to?

A    Mishicot High School.

Q    Who do you live with right now?

A    Um, my mom, Barb.

Q    Anyone else live in the house with you?

A    Yeah.  Scott Tadych.

Q    And who's Scott?

A    He's my step-dad.

Q    Now, do you recall who was living with you on October 31, 2005?

A    Yes.

Q    Can you tell us who was all living there?

A    Um, my mom, uh, Tom -- Tom Janda, and me, Brendan, Bobby and Bryan.

Q    Now, you've mentioned Brendan.  Do you recognize Brendan?

A    Yes.

Q    Right here?  That's your brother; right?

A    Yes.

Q    Okay.  He's a year younger than you?

A    Yes.

Q    Do you recall -- Again, I asked if you recalled where you lived on October 31, 2005, but do you recall the events of that day?

105

A Yes.

Q And I'm going to have you think about that day and answer some questions; all right?

A Yeah. Okay.

Q Were you in school that day?

A Yes.

Q Now, normally, how -- what time do you get home from school?

A Three forty-five.

Q What time did you get home on that day?

A Three forty-five.

Q Was this a normal day for you then?

A Yes.

Q Did you come home with anyone in particular?

A No.

Q Does anyone else ride the bus with you?

A No.

Q No one else on the school bus?

A Except for Brendan.

Q Except for Brendan? Okay. And did Brendan come home with you that day as well?

A Yes.

Q What did you guys do when you got off the bus?

A We walked down the -- the long road.

Q The long road?

106

A   Yeah.

Q   Okay.  So --

A   The --

Q   I'm sorry.

A   The road that our house is on.

Q   Okay.  So you -- does the bus -- doesn't drop you off in front of your house?

A   No.

Q   Drops you off about how far away?

A   About a half a mile.

Q   How long does it take you to get from your house to where they drop you off?

A   About four minutes.  Three minutes.

Q   On that day, did you take about three or four minutes to get home that day?

A   Yes.

Q   As you were walking with Brendan, did you notice anything?

A   No.

Q   Did you guys talk about anything on the way from the bus stop to -- to the house?

A   Um, yes.

Q   What did you talk about?

A   About using the phone or computer.

Q   Why did you guys talk about using the phone or

107

Q the computer?

A I don't know. Because that's all we do.

Q Something to talk about?

A Yeah.

Q Do you have just one phone and one computer?

A Yes.

Q Can't both be on at the same time?

A No.

Q When you got into the house, do you -- who got to use the phone?

A I did.

Q What did you do?

A I called my friend, Jason.

Q And why did you call Jason?

A Because we were going to go trick or treating.

Q So this was Halloween; right?

A Yes.

Q So did Brendan plan on going trick or treating with you?

A No.

Q Was anyone else home when you got home? You -- when you and Brendan got home?

A No.

Q Now, you said that you have a brother at that time that lived with you as well?

108

A    Yes.

Q    And that was?

A    Bobby.

Q    Bobby.  Bobby was not home?

A    No.

Q    But did Bobby get home at anytime that afternoon when you were there?

A    I don't remember.  No.  I don't think he was.

Q    You don't think so?

A    He wasn't -- He wasn't there.

Q    So after you got done talking to Jason on the phone, what did you do?

A    Uh, went on the computer.

Q    And how long were you on the computer?

A    Um, about 30 minutes.

Q    Now, do you know where Brendan was during this time period?

A    Yes.  He was playing with the video games.

Q    So you have a -- a separate -- do you have separate rooms or are you in the same room?

A    We're in the same room.

Q    So the computer is the same room as the TV room or the video room?

A    Yes.

Q    Did Brendan ever leave?

109

A    No.

Q    At what time did you actually leave, then, to meet Jason?

A    About 5:20.

Q    Did you have supper?

A    No.  Yeah.

Q    You did have supper?

A    Yes.

Q    Who made supper for you?

A    Um, me and Brendan made it.

Q    Between 3:45, when you left at 5:20, did you ever see Brendan leave the house?

A    No.

Q    Were you watching him all the time?

A    Yes.

Q    You -- you keep track of your brother that way?

A    Yeah.

Q    You do?  Okay.  Now, you -- are you guys close? Would you say you're close?

A    Yes.

Q    Did you notice, from about October 31, 2005 until March of '06, whether Brendan was losing weight?

A    Yes.

Q    Did you guys talk about that?

A    Yes.

110

Q Do you know why he was losing weight?

A Because, um, everybody he knew would make fun of him because he's fat and stuff.

Q So he wanted to lose weight so no one would make fun of him?

A Yes.

Q Did -- That same period of time, did he seem to be overly emotional? Do you know what that means?

A Yeah.

Q Do you -- Would you -- Did he appear to be overly emotional?

A Yes.

Q He did? Did he cry a lot?

A Not really. He was just sad and stuff.

Q Okay. Now, was -- is that normally Brendan's character? To be a little sad?

A I don't know. He was shy. He wouldn't -- He doesn't talk a lot.

Q To other people?

A Yeah.

Q What about to you?

A I don't think he -- I don't know.

Q Now, I -- I asked you earlier if you ever saw Brendan go leave the house until you left to go

111

meet Jason at 5:20?

A    Yeah.

Q    Did you ever leave the house?

A    No.

Q    Never went outside at all?

A    No.

Q    At anytime did you guys look out the window?

A    No.

Q    Do you know if Brendan looked out the window?

A    No.

Q    You me -- you mean you don't know if he did or he didn't look out the window?

A    No, he didn't.  He was playing his video games.

Q    Did, uh, Steven Avery -- You know who Steven Avery is; right?

A    Yes.

Q    And who is he?

A    He's my uncle.

Q    And how far away does he live from you?

A    He's our neighbor.  Like right across --

Q    Pretty close or --

A    Yeah.

Q    -- miles?

A    Pretty close.  Pretty close.

Q    Couple hundred feet maybe?

112

A  Yeah.

Q  Did he ever come over to your house?

A  Yeah.

Q  Between 3:45 and --

A  No.

Q  -- 5:20 that day --

A  No.

Q  You -- Did anyone come over to the house at that --

A  No.

Q  -- that day?  Now, what time did you get home that night?

A  About 11.

Q  About 11?

A  Yeah.

Q  Did you see Brendan when you got in?

A  Yes.

Q  Where was he?

A  He was in his bed.

Q  Thank you, Blaine.  I have nothing else.

THE COURT:  Cross.

### CROSS-EXAMINATION

BY ATTORNEY KRATZ:

Q  Blaine, do you remember testifying in the trial of Steven Avery?

113

A   Yes.

Q   Do you remember in that trial being asked the
    question, when you got home at 11 or 11:30, if
    you saw Brendan in your bedroom?

A   Yes.

Q   Do you remember being asked that question?

A   Yes.

Q   What did you tell the jury at that time?

A   That I didn't see him.

Q   That you didn't see him; right?

A   (No verbal response.)

Q   Now, in the last four weeks has your memory
    gotten better?

A   Yeah.

Q   It's gotten better in the last --

A   I --

Q   -- four weeks?

A   I -- I can remember.

Q   You can remember better now?

A   Yeah.

Q   I'm sorry?

A   Yes.

Q   Okay.  Has nothing to do with your brother being
    on trial this time, does it?

A   No.

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 114 of 148     Document 19-20

Q You said that you went trick or treating on the 31st. How old are you?

A Eighteen. Eighteen.

THE COURT: Could you pull that microphone a little closer, please?

THE WITNESS: Yes.

Q (By Attorney Kratz) Thank you, Blaine. On October 31, 2005, how old were you?

A Um, 17.

Q And who, at age 17, were you going trick or treating with?

A My friend, Jason, and his little brothers.

Q Where were you going trick or treating?

A Two Rivers. Manitowoc.

Q Now, in that community, that is, in Two Rivers, um, trick or treating is on, actually, Halloween Day; is that right?

A Yes.

Q Are you familiar with, uh, communities that have trick or treating perhaps the day earlier? On Sunday the day before?

A Yes.

Q And do you know around, um, the Mishicot area if there were any communities, as you think back, that had trick or treating on that Sunday?

115

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 115 of 148    Document 19-20

A    I don't remember.

Q    Did you go trick or treating on that Sunday? That is, the day before?

A    No.

Q    All right. You told Mr. Fremgen that as you walked home, or as you walked down the -- the -- the path, and I'm going to show you what has been received as Exhibit No. 71, as you walked down this path, this road actually goes, uh, all the way up towards your grandmother's house; is --

A    Yes.

Q    -- that right? You have to wait until I --

A    Okay.

Q    -- I -- I finish asking the question; all right? But as you walked down towards your house, you told Mr. Fremgen that you didn't see anything, or that you didn't see anything unusual. You remember saying that today?

A    Yes.

Q    As you think back now, uh, do you now remember something that you saw before you went into the house?

A    Yeah.

Q    Why don't you tell the jury what you saw?

A    I seen Steven Avery walking to the burn barrel with a

116

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 116 of 148    Document 19-20

plastic bag in his hand and he dropped it in there.

Q   And Steven Avery's your uncle; is that right?

A   Yes.

Q   Now, when Steven Avery you said was walking, um, towards a burn barrel, I'm going to, again, have you look at Exhibit No. 71, Blaine, and show you, uh, what is, um, just kind of a -- uh, to the center and to the right of that exhibit, uh, what looks like a burn barrel.  Is that the burn barrel that you're talking about?

A   Yes.

Q   When you saw your Uncle Steven taking something and putting it in that burn barrel, did you notice if that burn barrel was burning?  That is, uh --

A   Yes.

Q   -- was it on fire?

A   Yes.

Q   Yes, it was already burning?

A   Yes.

Q   And when you told this jury that you saw him walking towards that burn barrel, did you see him walking from his trailer towards that burn barrel?

A   Yes.

117

Q You said that you saw him put something in it. After putting something in that burning barrel, where did your Uncle Steve go?

A I think he went back to his house.

Q Did you see him turn around and go back to his trailer?

A Yes.

Q All right. Now, you told this jury today that you left at about 5:20 to go to your friend, Jason's; is that right?

A Yes.

Q How did you get to Jason's that day?

A His mom, Carmen Wiensch.

Q His mother's name is Carmen?

A Yeah.

Q And her last name is Wiensch; is that --

A Yes.

Q -- right? W-i-e-n-s-c-h?

A Yes.

Q Is that right? Okay. Now, where did she pick you up?

A At the end of -- where the bus drops us off.

Q So you had to walk a ways from your trailer, which is on Exhibit No. 71 here, back up that road for Mrs. Wiensch to pick you up; is that --

118

A   Yes.

Q   -- right?  You have to wait until I'm done asking the question, okay?

A   Okay.

Q   Now, did she pick you up at 5:20 or did you leave your house at 5:20?

A   She picked me up at 5:20.

Q   So is it fair to say that you left your house sometime before that?

A   Yeah.

Q   Now, you're telling us today that you got home at about what time?

A   Eleven.

Q   When you got home at about 11:00, why don't you tell the jury what you saw before you walked into your trailer?

A   I seen a person standing out by the -- or, uh -- bonfire.

Q   Now, up until now, we haven't heard about you seeing a bonfire.  Why don't you tell us about that?

A   Say that question over?

Q   Sure.  Why don't you tell the jury about the bonfire that you saw?

A   Um, it was about five-foot high.

119

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 119 of 148    Document 19-20

Q   All right.  Can you tell the jury where you saw that bonfire?

A   Behind Steven's garage.

Q   All right.  I'm going to have you look at Exhibit No. 71 again, and this, uh, dark area right to the left of the screen, uh, is that the area that you saw that fire?

A   Yes.

Q   Now, when you came walking into your house, um, were there any obstructions to your view of that bonfire?  In other words, was there anything that blocked your view between you and that fire?

A   No.

Q   You're telling this jury that you saw somebody standing by that bonfire; is that --

A   Yes.

Q   -- right?  You have to wait until I'm done asking the question.  Were you able at that time to identify who it was who was standing by that bonfire?

A   Yeah.  It was a bigger guy.

Q   A bigger --

A   Steven --

Q   -- guy?

A   -- Steven's size.

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 120 of 148    Document 19-20

Q    Steven's size?

A    Yeah.

Q    All right.  Again, do you remember about four weeks ago being asked that same question?

A    Yes.

Q    What did you tell the jury about four weeks ago?

A    That I said that I don't know who was standing out there.

Q    All right.  But after talking to Mr. Fremgen, and after being called in your brother's case, you now think that it was a bigger guy.  Somebody like Steven; is that --

A    Yes.

Q    -- right?

         ATTORNEY FREMGEN:  Objection to the question.  There is no evidence that this witness talked about --

         THE COURT:  I -- I --

         ATTORNEY KRATZ:  I can ask it a -- a different way.

         THE COURT:  Please do.  I -- and, uh, I direct that the jury not take notice of that question.

         ATTORNEY KRATZ:  That's fine.

Q    (By Attorney Kratz)  Let me ask you this, Blaine,

121

between that hearing, the Steven Avery trial, and today, did you, in fact, talk to Mr. Fremgen?

A   No.

Q   You haven't talked to Mr. Fremgen or Mr. Edelstein?

A   No.

Q   Uh, so there hasn't been any conversation at all between -- between you and them; is that right?

A   No.

Q   All right.  Between that hearing, though, and today, you agree that your testimony's different; is that true?  I'll be more specific if you want me to be.

A   Yeah.

Q   About the person that you saw out by the fire that night?  Yes?

A   Yes.

Q   And your testimony's different as to whether or not your brother, Brendan, was home.  That's different than it was four weeks ago; right?

A   Yes.

Q   You said that you ate at home that night.  That is, in your trailer.  Is that your testimony?

A   Yes.

Q   Do you remember on the 7th of November, that's

122

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 122 of 148    Document 19-20

like a year-and-a-half ago, being interviewed by two agents of the Division of Criminal Investigation?

A   Yes.

Q   Do you remember telling or being asked by those agents where you ate dinner that night?

A   Yes.

Q   Do you remember what you told those agents that night?

A   No, I don't remember.

Q   Remember telling them that you had dinner at your friend, Jason's, house that night?

A   No.

Q   No?  You don't remember telling them that?

A   No.

Q   Okay.  Now, your Uncle Steve had a vehicle, which was called a Suzuki Samurai.  Do you know what I'm talking about?

A   Yes.

Q   Let me just get to that exhibit number.  I'm showing you Exhibit No. 117.  Do you recognize that vehicle?

A   Yes.

Q   What is that?

A   That's his Suzuki.

123

Q   And, uh, you knew that to be your Uncle Steve's Suzuki?

A   No.  It's my grandpa's.

Q   Okay.  I'm sorry.  But you recognize it in this photo, at least, to be in your Uncle Steve's garage; is that right?

A   Yes.

Q   Now, on the 31st, that is, on Halloween, do you know where that Suzuki was parked?

A   Yes.

Q   Can you tell the jury, please, where on the 17th that was parked?

A   It was on the outside on the left side of the garage.

Q   All right.  I'm going to show you what's been received as Exhibit No. 67.  And although -- In that photo we see it backed into the garage.  The 31st, that is, on the Halloween when you got home, you remember seeing that Suzuki outside of the garage, uh, to the left, or what would be to the east, of your Uncle Steve's garage; isn't that right?

A   Yes.

Q   Now, do you know how that Suzuki Samurai got put into your Uncle Steve's garage and when that happened?

124

A   No.

Q   You know that it was just sometime after Halloween?  That is, after the 31st --

A   Yes.

Q   -- is that right?  Okay.  When you left at, uh, 5:00, Blaine -- I'm sorry, uh, sometime before 5:20.  I guess you didn't say 5, you said sometime before 5:20.  Remember seeing a fire behind Steve's garage even then?  Even a little after 5:00?

A   No.

Q   Did you look?  In other words, do know if there was fire or did you just not see it?

A   No, I didn't look.  I didn't see it.

Q   That -- It's two different answers.  Did you look?

A   No.

Q   Okay.

        ATTORNEY KRATZ:  If I could have just a moment, Judge?  I have no further questions, Judge.  Thank you.

        THE COURT:  Any redirect?

        ATTORNEY FREMGEN:  Please.

## REDIRECT EXAMINATION

BY ATTORNEY FREMGEN:

125

Q When Mr. Kratz was asking you some questions, you said that, uh, you had seen Steven, your Uncle Steven, dropping a bag into a burn barrel; correct?

A Yes.

Q And he showed you the picture, and you agree that that was the burn barrel; correct?

A Yes.

Q Now, the -- When was this? When did you see him throwing -- dropping the bag into the burn barrel?

A When we were walking down the -- the driveway.

Q And by "we" who are you -- who do you mean?

A Me and Brendan.

Q So you and Brendan were walking down back from the school bus?

A Yes.

Q Sometime after 3:45?

A Yes.

Q You indicated that Jason's mom picked you up about 5:20?

A Yes.

Q But that would have been down by where the bus drops you off and picks you up?

A Yes.

126

Q  And you said it takes about how long to get down that road?

A  Three or four minutes.

Q  So you would have left sometime three or four minutes before 5:20?

A  Yes.

Q  Mr. Kratz was asking you if you recalled speaking to, uh, law enforcement on November 7; correct? Of --

A  Yes.

Q  -- 2005; correct?

A  Yes.

Q  I know that's a long time ago.  But you in -- he indicated to you that your answers seemed to be different from now from back then; correct?

A  Yes.

Q  And do you agree that some of your answers are different?

A  Yes.

Q  Do you recall telling law enforcement back then that you actually got home between 9:30 and 10 that night?

A  No.

Q  You don't recall saying that?  Do you recall saying you actually saw Brendan when you came

127

home that night?

A   Yes.

Q   Okay.  And that was on November 7?  To law enforcement?

A   Yes.

Q   Okay.  Thank you.

ATTORNEY FREMGEN:  Nothing else, Judge.

ATTORNEY KRATZ:  I have nothing.  Thank you, Judge.

THE COURT:  You may step down.

ATTORNEY FREMGEN:  I do have one more witness if, uh -- It should be very short.

THE COURT:  Very good.  You may call that witness.

THE CLERK:  Please raise your right hand.

**MICHAEL KORNELY,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please be seated.  Please state your name and spell your last name for the record.

THE WITNESS:  It's, um, Michael, or Mike, Kornely, K-o-r-n-e-l-y.

**DIRECT EXAMINATION**

BY ATTORNEY FREMGEN:

Q   Mike, what do you do for a living?

128

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 128 of 148   Document 19-20

A   Uh, I work as a sales manager for a company out of Milwaukee, and I also do some yard work as an extra job.

Q   And do you generally live in the Manitowoc/Two Rivers area?

A   Yes, I live in Francis Creek.

Q   Are you familiar with, uh, Brendan Dassey?

A   Yes.

Q   And how do you know Brendan?

A   Um, Brendan is, uh -- Blaine, he works for me currently, and, uh, Blaine's brother, and Brendan worked for me for a period of time.

Q   And how -- how long have you known Brendan?

A   About three-and-a-half years.

Q   Would you be able to -- Well, for instance, hypothetically, you would have called him on the phone, would you be able to recognize his voice?

A   Yes.

Q   Now, do you know -- do you recall where you were on October 31, 2005?

A   I was in Birmingham, Alabama.

Q   On that -- at -- on that night, or at some point in -- on October 31, 2005, did you contact the Dassey residence?

A   Yes, I did.

129

Q    By that I mean did you call them?

A    Yes.  I -- I called to talk to -- to Blaine to see if he was going to come to work on the following weekend, because he hadn't worked, uh, with me the weeks before -- the two weeks before.  Um, said that he was putting on a roof on one of his uncle's cottages up north and it was working with Steven.

Q    And do you recall what time it was that you called?

A    It was around 6:00.  I think it probably was about -- between quarter to six and maybe ten to six.  I think it was before six.

Q    Did you speak with Blaine?

A    No.  I, uh, spoke with Brendan and asked him if Blaine was there, and, uh, he said, no, that he went trick or treating.  And I kind of was taken aback.  I said, well, he can't be trick or treating, he's 17.  And then he told me that he had taken his friend, Jason, uh, two brothers, and they went trick or treating together.

Q    How long did the conversation between you and Brendan take place?

A    Somewhere around probably five minutes.

Q    And do you recognize that voice on the other line as Brendan?

130

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 130 of 148    Document 19-20

A    Oh, yes.  Yes.

ATTORNEY FREMGEN:  I have nothing else
for this witness.

THE COURT:  Cross.

**CROSS-EXAMINATION**

BY ATTORNEY GAHN:

Q    Good morning, sir.

A    Good morning.

Q    How long, Rick, (sic) had you been in Birmingham,
Alabama?

A    I got there on, uh, Monday, and I was there until
Thursday.

Q    And, um, did you call from -- I'm sorry.  Were
you staying, like, at a hotel or something?

A    Yes.  I was staying at the Sheraton.  The Marriott
Court Yard.

Q    And did you call from the hotel phone or did you
have a cell phone or what?

A    I don't exactly remember that.  I'm quite sure it was
my cell phone.

Q    And at anytime since, uh, the day that you made
that call, did anyone ask you to check your cell
phone records for the exact time of that call?

A    Yes, I think, um, Brendan's first attorney asked me
if I had a record for it.

131

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 131 of 148    Document 19-20

Q  And, um, do you have a record for the time that you made that call, sir?

A  I -- I didn't find that telephone call on my Sprint record, which means I could have made it through the hotel operator. Sometimes my phone goes dead at the end of the day. And I could have made it through the hotel. I -- I honestly wish I could recall. I just can't.

Q  Do you recall, um, on November 7 of 2005, which would have been shortly after, um -- what, seven days after October 31?

A  Um-hmm.

Q  Where two agents did come to your home to talk to Blaine?

A  Yes.

Q  And do you recall telling those agents that you thought the call may have been around 5:30?

A  You know, I -- I -- I don't remember that. That is possible. I thought it was 5:30, but I got back to the hotel, and I made the call, and it could have been between 5:30 and 6:00.

Q  And for that fact, could have been between 5:15 and 6:15? I -- I'm just asking you, sir.

A  Yes, it could have been, because my day usually ends sometimes around there, and by the time I get back to

132

the hotel it might be after five.

Q So you -- sometime after -- You know it was sometime after five, though, is that fair to say?

A Yes. Um, I -- I thought Brendan told me that he left about 5:10 or something, so I would have already missed Blaine then. So, you know, because Blaine wasn't there for me to talk to him.

Q So the call could have been at 5:15 for all you -- as you recall? Is that fair to say?

A Um, yeah, it's possible.

Q Okay.

A It is possible.

Q All right. I thank you, sir. Thank you for coming today.

ATTORNEY GAHN: That's all I have, Your Honor.

THE COURT: Any redirect?

**REDIRECT EXAMINATION**

BY ATTORNEY FREMGEN:

Q I just have one question in follow-up to, um -- Mr. Gahn asked you about meeting with law enforcement as to that time frame when you made that phone call; correct? You had --

A Yes.

Q Remember that --

133

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 133 of 148    Document 19-20

A   Yes.

Q   -- conversation?  And you said -- Or the question was asked of you, do you recall telling them it was 5:30?  And you said, maybe?

A   Yeah.  It seemed closer to six because, you know, I would end my day probably around five.  I -- I -- I wish I could recall and I don't.  But I thought it was closer to six, because what Brendan had said to me is, well, Blaine had already left by about ten after five or so, and so this seemed like, you know, it was a while, like he was gone almost an hour already.

Q   So it was sometime after Blaine had left as far as you recall from the conversation?

A   Yes.

Q   And do you recall telling law enforcement it was 5:30 or 5:45?  That that was the time frame you gave to them originally?

A   It's possible I could have told them that.  I -- I could be off like that.

Q   Okay.  Thank you, very much.

        THE COURT:  Any recross?

        ATTORNEY GAHN:  No, Your Honor.

        THE COURT:  You may step down.

        THE WITNESS:  Thank you.

134

ATTORNEY FREMGEN:  That's the last witness for today that we have available.

THE COURT:  All right.  Then we will adjourn until Monday morning at 8:30.  Ladies and gentlemen, once again, don't talk about this amongst yourselves or anything about this case, or to anyone else.  Thank you.  Have a nice weekend.  We'll see you Monday.

(Court stands adjourned at 11:44 a.m.)

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 135 of 148    Document 19-20

STATE OF WISCONSIN   )
                     )SS.
COUNTY OF MANITOWOC  )


            I, Jennifer K. Hau, Official Court

Reporter for Circuit Court Branch 3 and the State

of Wisconsin, do hereby certify that I reported

the foregoing matter and that the foregoing

transcript has been carefully prepared by me with

my computerized stenographic notes as taken by me

in machine shorthand, and by computer-assisted

transcription thereafter transcribed, and that it

is a true and correct transcript of the

proceedings had in said matter to the best of my

knowledge and ability.

            Dated this 11th day of December 2007.


                    _____
                    Jennifer K. Hau, RPR
                    Official Court Reporter

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 136 of 148    Document 19-20

**'**

'05 [4]  60/4 79/11 83/9 83/22
'06 [1]  110/22

**.**

.22 [5]  24/14 29/21 50/17 54/14 54/16
.22 caliber [1]  50/17

**0**

06 [2]  1/5 4/3

**1**

1.11 [3]  74/9 81/3 82/21
1.3 [1]  77/24
1.5 [1]  77/2
10 [2]  29/18 127/21
100 [2]  91/7 92/7
102 [4]  91/6 91/25 92/2 92/6
103 [1]  3/11
104 [6]  3/24 3/24 3/24 3/24 3/25 3/25
104-113 [1]  3/14
109 [1]  89/1
10:07 a.m [1]  70/12
10:25 [1]  70/11
10:27 [1]  70/13
11 [6]  29/18 74/9 81/3 113/13 113/14 114/3
110 [1]  91/9
113 [1]  3/14
113-125 [1]  3/15
117 [1]  123/21
11:00 [1]  119/14
11:30 [1]  114/3
11:44 [1]  135/9
12 [1]  80/21
125 [1]  3/15
125-128 [1]  3/16
128 [2]  3/16 29/20
128-131 [1]  3/18
129 [1]  24/14
131 [1]  3/18
131-133 [1]  3/19
133 [1]  3/19
133-134 [1]  3/20
134 [1]  3/20
15 [2]  45/9 60/4
16 [1]  83/22
17 [4]  64/22 115/9 115/10 130/17
17th [1]  124/11
1st [7]  7/2 17/16 25/16 28/22 34/12 36/14
 41/9

**2**

2/27 [1]  62/9
20 [2]  6/1 22/12
2002 [3]  90/13 90/25 99/1
2004 [3]  80/21 81/15 82/15
2005 [14]  74/19 76/21 80/23 81/7 94/16
 103/2 105/11 105/24 110/21 115/8 127/11
 129/20 129/23 132/9
2006 [1]  69/8
2007 [2]  1/10 136/15
21 [1]  1/10
214 [1]  62/25
215 [2]  3/23 62/7
216 [4]  3/23 5/7 61/19 61/20
217 [8]  73/2 76/10 86/4 91/4 94/4 94/11
 103/1 103/23
217-221 [1]  3/24
218 [5]  73/13 73/17 80/23 82/4 103/3
219 [4]  76/6 76/18 77/25 82/4
22 [1]  79/11
220 [2]  78/18 82/4

221 [3]  3/24 80/14 103/23
222 [2]  103/24 104/1
223 [3]  3/24 98/13 103/23
224 [5]  3/25 83/12 83/18 96/6 103/23
27 [3]  52/13 59/12 62/9
27th [3]  59/16 59/23 79/11
28th [1]  59/18
29 [3]  74/19 80/23 103/2
2d [3]  64/21 64/22 65/1

**3**

3/1 [1]  5/4
30 [1]  109/15
31 [9]  23/25 57/25 105/11 105/24 110/21
 115/8 129/20 129/23 132/11
31st [6]  57/6 57/16 115/2 124/8 124/17 125/3
371 [1]  64/21
3:45 [3]  110/11 113/4 126/18

**4**

4-50 [1]  3/4
468 [1]  64/22

**5**

50 [1]  3/4
50-56 [1]  3/5
53 [1]  53/2
56 [1]  3/5
56-61 [1]  3/6
571 [1]  36/23
572 [2]  5/11 6/7
574 [1]  37/21
58 [1]  80/1
580 [1]  13/12
582 [1]  31/14
587 [1]  31/16
589 [1]  32/7
591 [1]  34/22
592 [1]  35/7
595 [1]  39/7
5:00 [2]  125/6 125/10
5:10 or [1]  133/5
5:15 [2]  132/22 133/8
5:20 [11]  110/4 110/11 112/1 113/6 119/5
 119/6 119/7 125/7 125/8 126/21 127/5
5:20 to [1]  118/9
5:30 [4]  132/17 132/19 132/21 134/4
5:30 or [1]  134/17
5:45 [1]  134/17

**6**

61 [3]  3/6 3/23 3/23
62 [2]  3/23 3/23
64-70 [1]  3/7
645 [1]  41/14
647 [1]  65/1
65 [1]  64/21
650 [1]  25/15
66 [1]  80/2
662 [2]  18/10 18/22
663 [2]  18/25 19/11
67 [1]  124/15
6:00 [2]  130/10 132/21
6:15 [1]  132/23

**7**

70 [1]  3/7
70-84 [1]  3/9
71 [4]  116/8 117/6 118/24 120/5
73 [1]  100/20
7th [1]  122/25

**8**

83 [3]  3/25 65/1 80/1
84 [1]  3/9
84-98 [1]  3/10
88 [2]  1/5 4/3
8:30 [1]  135/4

**9**

90 [2]  89/1 91/9
93 [2]  89/14 92/5
96 [1]  101/4
98 [1]  3/10
98-103 [1]  3/11
9:30 [1]  127/21
9:58 a.m [1]  64/4

**A**

a.m [4]  64/4 70/12 70/13 135/9
aback [1]  130/16
abilities [6]  87/20 88/7 88/12 99/11 101/12
 101/14
ability [15]  50/2 50/3 50/9 87/23 88/9 88/15
 89/4 89/9 89/10 89/18 89/22 96/2 99/14
 102/6 136/14
able [9]  12/10 85/16 85/23 85/24 89/23 91/2
 120/18 129/15 129/17
above [1]  91/25
absence [1]  53/12
absent [1]  64/16
absolutely [14]  9/23 10/10 14/11 23/18 28/3
 34/8 34/21 36/10 38/21 40/9 48/4 48/15
 53/20 58/18
abstract [1]  79/23
ac [1]  13/16
academic [5]  85/22 90/5 90/5 90/11 95/19
academically [1]  89/22
access [4]  72/15 72/22 73/10 80/10
account [1]  35/20
accurate [2]  19/9 73/9
accused's [1]  65/5
achieve [2]  87/24 89/22
achieved [1]  91/24
achievement [2]  90/12 90/22
achievements [1]  88/7
across [1]  112/20
act [1]  93/10
acting [1]  93/1
action [6]  25/2 25/5 25/6 26/7 50/16 50/17
activities [1]  73/22
activity [1]  37/3
ad [1]  68/8
added [1]  75/5
adding [1]  91/15
address [1]  63/10
addressed [2]  97/15 97/25
adjourn [1]  135/4
adjourned [1]  135/9
ADMITTED [1]  3/22
adopting [4]  21/1 21/3 21/7 42/21
adults [2]  75/20 83/7
advanced [1]  85/10
affecting [1]  75/22
affirmation [1]  42/14
afraid [1]  50/24
afternoon [1]  109/6
age [3]  75/17 101/3 115/10
age-appropriate [1]  75/17
Agent [1]  60/5
agents [5]  123/2 123/6 123/8 132/13 132/16
ago [7]  6/6 27/23 121/4 121/6 122/20 123/1
 127/13
agree [17]  5/25 6/2 22/13 33/17 34/7 36/19

# A

agree... [11] 36/20 36/21 36/22 39/4 46/11 69/10 82/2 101/20 122/11 126/6 127/17
agreed [2] 27/23 49/15
agreeing [2] 20/22 21/1
ahead [2] 47/5 82/18
air [1] 54/7
al [1] 83/18
Alabama [2] 129/21 131/10
allow [1] 69/19
almost [3] 15/8 48/8 134/11
alone [3] 13/19 69/11 77/19
along [3] 22/19 44/9 58/15
already [9] 22/18 37/8 54/4 60/20 82/17 117/19 133/5 134/9 134/12
alternative [1] 71/12
although [3] 53/16 87/8 124/15
Among [1] 72/12
amongst [1] 135/5
amount [1] 51/10
analysis [4] 8/6 48/13 48/14 77/7
analyst [1] 31/3
analyzed [3] 54/12 58/21 58/25
ans [1] 8/15
answer [32] 5/17 5/19 5/21 5/24 17/6 20/11 21/19 22/4 26/2 26/9 26/17 26/21 32/10 32/24 33/20 34/2 35/5 35/11 41/20 42/23 43/8 43/9 46/6 47/1 47/5 58/19 74/14 96/16 96/19 96/23 102/14 106/3
answers [10] 20/6 21/17 26/23 43/11 43/12 43/17 100/7 125/15 127/14 127/17
anybody [5] 30/1 30/6 45/1 45/21 51/11
anymore [1] 48/14
anyone [7] 105/6 106/14 106/16 108/21 113/8 131/22 135/6
anytime [3] 109/6 112/7 131/21
anyways [1] 64/2
anywhere [3] 33/8 51/16 91/9
apparently [1] 7/14
appear [6] 4/9 50/21 50/22 73/19 83/19 111/11
appearance [1] 4/6
APPEARANCES [2] 1/12 4/3
Appeared [1] 1/24
appears [3] 79/14 79/15 80/16
Appellate [1] 69/8
applied [1] 53/25
apply [3] 66/21 91/18 91/23
approach [1] 84/24
appropriate [3] 75/17 85/21 86/16
approximately [1] 89/1
APRIL [1] 1/10
area [14] 14/19 51/17 52/3 85/6 90/16 90/21 97/2 97/3 98/4 101/1 115/23 120/5 120/6 129/5
areas [5] 9/6 75/22 79/23 88/10 88/11
aren't [2] 30/12 85/9
arena [1] 85/22
argue [2] 56/25 63/17
argument [1] 66/24
Argumentative [1] 12/25
around [11] 52/11 52/13 57/11 57/15 115/23 118/5 130/10 130/23 132/17 132/25 134/6
articulation [1] 80/4
asks [1] 33/21
assault [7] 64/10 64/15 65/22 66/2 66/3 66/12 68/14
assertion [3] 20/16 20/22 21/2
assess [3] 87/15 87/21 92/12
assessment [1] 99/25
assignment [2] 94/21 94/23
assisted [1] 136/10

assume [4] 24/17 33/4 33/6 96/1
assuming [1] 57/24
ate [2] 122/22 123/6
attachment [1] 100/10
attempted [2] 12/17 43/3
attempting [1] 16/15
attention [4] 5/11 13/12 18/9 31/14
attorney [113] 1/20 1/22 3/4 3/5 3/6 3/9 3/10 3/11 3/14 3/15 3/16 3/18 3/19 3/20 4/4 4/8 4/8 4/9 4/22 4/25 12/24 13/2 21/25 22/3 30/25 31/4 31/8 42/1 42/3 42/5 42/7 46/25 47/7 50/11 50/13 50/15 56/6 56/8 56/10 56/13 61/16 61/20 61/22 61/24 62/1 62/10 62/12 62/20 62/22 62/24 63/5 63/8 63/14 63/21 64/1 64/7 66/18 68/5 70/9 70/15 71/1 81/4 81/16 81/19 81/25 82/7 82/10 82/19 82/20 83/15 83/17 84/13 84/17 84/23 85/1 85/3 98/6 98/9 98/11 98/22 98/23 101/25 102/2 102/7 102/10 102/16 102/17 103/14 103/16 103/20 104/5 104/8 104/22 113/23 115/7 121/15 121/19 121/24 121/25 125/19 125/23 125/25 128/7 128/8 128/11 128/24 131/2 131/6 131/24 133/15 133/19 134/23 135/1
automatic [9] 24/23 24/24 25/3 25/7 25/11 25/23 26/3 26/5 26/16
available [1] 135/2
aver [1] 67/10
average [13] 88/24 88/25 89/1 89/17 90/25 91/10 91/25 92/2 92/2 99/17 99/17 99/20 101/15
averages [1] 88/20
Avery [11] 9/16 16/18 44/22 45/7 56/14 112/14 112/15 113/25 116/25 117/4 122/1
Avery's [6] 15/20 24/15 45/22 50/18 54/15 117/2
aware [6] 17/15 27/1 27/4 90/9 90/13 90/20
away [2] 107/9 112/19

# B

back [37] 6/9 6/17 7/4 7/15 7/17 7/20 7/24 8/17 9/19 10/13 10/17 22/15 22/20 23/19 29/14 43/20 44/10 49/4 52/12 55/24 55/25 70/10 79/7 79/13 81/8 81/23 81/23 115/24 116/20 118/4 118/5 118/24 126/15 127/15 127/20 132/19 132/25
backed [1] 124/16
background [2] 82/1 85/4
backwards [2] 81/20 81/22
bag [3] 117/1 126/3 126/10
bandaid [2] 61/5 61/8
Bannister [1] 69/7
Barb [2] 16/7 105/5
barrel [12] 116/25 117/5 117/9 117/10 117/13 117/14 117/22 117/24 118/2 126/3 126/7 126/11
based [3] 49/19 84/4 101/20
basic [3] 77/15 91/8 91/16
bathroom [1] 53/5
Bear [1] 83/1
bed [3] 10/19 17/12 113/19
bedding [8] 10/19 10/20 10/22 10/23 66/11 67/7 68/19 68/21
bedroom [16] 7/25 8/18 9/19 9/24 10/4 10/14 10/17 14/20 14/22 15/2 24/15 28/15 44/10 54/15 57/22 114/4
befuddle [1] 16/15
begin [2] 48/14 62/13
beginning [1] 17/21
behalf [5] 1/14 1/16 1/18 1/20 1/22
behavior [2] 93/3 93/5
behavioral [4] 92/13 92/15 92/22 94/16
behaviorally [4] 94/7 94/8 94/24 94/25

behind [3] 38/16 120/3 125/9
believed [5] 12/16 17/20 22/20 26/15 29/1
below [3] 99/17 99/20 101/15
benefit [1] 67/10
best [4] 17/7 47/25 69/19 136/13
better [8] 101/2 101/5 101/6 101/8 101/9 114/13 114/15 114/19
between [23] 5/14 12/15 18/13 24/22 25/1 25/5 38/20 51/23 91/9 91/12 95/10 110/11 113/4 120/12 122/1 122/8 122/8 122/10 127/21 130/11 130/21 132/21 132/22
beyond [2] 70/6 82/15
big [2] 30/17 51/22
bigger [3] 120/21 120/22 121/11
biggest [1] 47/16
binder [2] 86/3 94/11
Birmingham [2] 129/21 131/9
bit [2] 95/2 95/4
BLAINE [21] 3/13 16/7 103/21 104/14 104/19 104/23 113/20 113/24 115/7 117/6 121/25 125/6 129/10 130/2 130/13 130/15 132/14 133/6 133/6 134/9 134/13
Blaine's [1] 129/11
blank [1] 84/10
bleach [8] 55/7 55/9 55/10 55/10 55/16 58/9 58/11 58/21
bleed [1] 51/20
bleeding [1] 51/20
blocked [1] 120/12
blood [22] 9/24 9/24 10/2 10/10 10/16 22/19 22/22 22/24 22/25 23/3 23/13 51/3 51/5 51/10 51/13 51/16 51/22 51/24 55/17 55/25 56/3 60/25
Bobby [6] 16/7 105/15 109/3 109/4 109/4 109/6
Bobby's [1] 16/9
bodily [1] 66/9
body [2] 66/11 67/6
bold [4] 74/24 74/24 75/2 75/5
bolt [4] 25/2 25/6 26/7 50/16
bolt-action [3] 25/2 25/6 50/16
bonfire [7] 119/18 119/20 119/24 120/2 120/11 120/15 120/20
book [2] 89/25 91/17
borderline [2] 99/20 101/15
both [6] 7/19 47/12 52/8 69/10 77/17 108/7
bottle [4] 55/9 55/10 58/11 58/21
bottle's [1] 55/10
bottom [4] 13/15 13/17 18/12 67/22
box [3] 10/5 10/6 29/20
boy [1] 23/24
BRANCH [2] 1/1 136/5
breaks [2] 53/3 53/5
breaktime [1] 64/2
breath [1] 37/13
Bren [1] 25/17
BRENDAN [126] 1/6 1/23 5/16 5/21 6/13 9/13 9/20 10/23 10/25 13/4 13/18 14/5 15/21 15/23 16/1 16/21 17/10 17/17 17/18 18/6 18/13 21/21 21/22 21/22 22/14 23/7 25/18 27/6 27/20 28/22 32/5 34/15 36/14 37/2 38/3 39/24 40/14 40/17 41/2 43/2 46/4 49/5 49/15 49/17 49/21 49/23 49/25 54/15 54/15 56/14 56/15 57/8 60/17 71/15 71/18 72/23 73/24 75/18 77/15 77/17 79/19 81/10 83/3 83/5 84/9 86/13 86/23 87/9 87/13 87/14 87/21 89/3 89/17 89/21 90/10 90/12 90/14 90/20 91/23 92/8 92/22 92/25 93/7 93/20 93/24 94/6 96/18 96/22 97/24 100/19 100/19 101/1 101/17 103/10 105/14 105/16 105/17 106/19 106/20 106/20 107/17 108/18 108/22 109/16 109/25 110/10 110/12 110/22 111/25 112/9 113/16 114/4 122/19 126/14 126/15 127/25

**B**

BRENDAN... [10] 129/7 129/9 129/10 129/11 129/13 130/14 130/22 130/25 133/4 134/8
Brendan's [22] 16/11 19/14 41/9 58/22 73/5 74/3 75/21 79/25 80/2 81/6 84/1 86/6 86/22 87/16 89/8 93/25 94/4 96/2 101/14 102/5 111/16 131/24
briefly [2] 56/11 88/4
bring [1] 47/25
broad [2] 86/18 87/19
broken [1] 90/4
brother [6] 105/19 108/24 110/16 114/23 122/19 129/11
brother's [1] 121/10
brothers [3] 16/5 115/12 130/19
brought [2] 66/19 73/6
Bryan [2] 16/7 105/15
bullet [7] 54/4 54/5 54/9 54/12 54/14 54/18 56/22
burden [1] 68/1
burn [12] 57/12 116/25 117/5 117/9 117/9 117/13 117/14 117/22 117/23 126/3 126/7 126/10
burned [4] 10/20 10/22 10/23 67/9
burning [3] 117/14 117/19 118/2
bus [8] 106/16 106/18 106/23 107/6 107/21 118/22 126/16 126/23

**C**

calculation [2] 91/6 91/14
caliber [1] 50/17
call [16] 70/16 89/25 103/21 108/14 128/13 130/1 131/13 131/17 131/22 131/23 132/2 132/3 132/17 132/20 133/8 133/23
called [20] 4/18 69/7 70/19 88/16 89/3 92/11 92/19 93/16 93/23 95/10 96/15 96/18 104/15 108/13 121/10 123/17 128/17 129/16 130/2 130/9
cannot [1] 69/11
cap [1] 58/16
capacity [4] 71/9 71/14 72/14 72/20
carefully [1] 136/8
cargo [1] 52/3
Carmen [2] 118/13 118/14
carpet [9] 7/24 8/2 8/10 8/11 8/19 9/2 9/5 11/11 47/9
carpeting [1] 66/11
case [28] 1/5 12/3 16/24 45/8 47/15 47/15 59/14 63/16 64/23 65/2 65/11 65/19 66/20 67/5 68/6 68/8 68/13 68/23 69/3 69/7 69/18 69/22 73/13 81/13 82/11 86/1 121/10 135/6
cases [3] 30/21 64/20 69/6
casings [2] 29/21 29/21
cat [2] 50/25 50/25
caught [1] 49/21
cause [2] 38/6 51/16
cavity [2] 51/19 51/20
CCI [1] 29/21
cell [3] 131/18 131/20 131/22
center [2] 52/2 117/8
certain [2] 17/23 42/22
certainly [18] 5/25 19/22 22/22 24/25 28/17 28/19 29/12 34/2 43/6 48/22 56/17 60/16 65/14 67/15 67/25 82/13 86/12 91/3
certainty [1] 42/23
certify [1] 136/6
CF [2] 1/5 4/3
challenging [1] 75/17
chance [3] 11/25 12/19 30/4
change [5] 21/19 21/24 22/3 43/8 43/17
changed [3] 41/2 41/4 49/19

changes [2] 29/14 35/23
character [1] 111/17
characterize [1] 47/3
charge [2] 64/15 69/23
charged [1] 68/12
check [2] 45/1 131/22
children [1] 93/18
chose [1] 48/25
CIRCUIT [3] 1/1 1/11 136/5
circumstances [1] 69/20
cite [1] 64/20
cited [2] 68/6 68/7
claim [1] 19/23
claimed [1] 15/12
claims [2] 16/21 39/20
clarified [1] 44/7
class [3] 72/9 95/16 96/18
classes [7] 86/24 87/8 87/11 92/18 93/12 93/18 101/18
classroom [4] 78/15 84/3 95/24 96/17
clean [3] 56/16 58/4 58/8
cleaner [6] 11/11 47/9 47/10 47/12 48/17 48/20
cleaning [2] 55/8 55/17
cleanup [1] 62/25
clear [7] 45/20 52/1 60/6 60/11 68/23 75/23 101/4
clearly [3] 38/11 43/23 75/14
CLERK [4] 4/14 62/5 63/3 63/8
close [7] 64/1 81/6 110/18 110/19 112/21 112/24 112/24
closer [4] 71/3 115/5 134/5 134/8
clothes [1] 67/7
co [2] 46/14 60/4
Co-lead [1] 46/14
cognitive [6] 88/7 88/8 92/8 99/11 100/20 101/7
cognitively [3] 87/2 87/6 87/23
cognizant [1] 81/21
collectively [1] 33/15
comes [5] 31/20 31/23 51/14 68/17 97/3
coming [2] 98/5 133/14
command [2] 54/22 59/6
comment [1] 101/11
comments [1] 78/12
communities [2] 115/19 115/24
community [1] 115/15
company [1] 129/1
compare [1] 45/22
comparison [4] 45/4 46/7 46/9 46/19
comparisons [1] 46/23
compilation [4] 73/5 78/21 80/17 83/20
compile [1] 71/23
complete [1] 42/14
completed [2] 78/25 84/2
comprehension [3] 75/15 77/16 79/22
compressor [1] 54/7
computer [7] 107/24 108/1 108/5 109/13 109/14 109/22 136/10
computer-assisted [1] 136/10
computerized [1] 136/9
concede [1] 22/21
conceded [1] 43/16
concern [1] 98/4
concerned [1] 95/20
concerns [2] 94/5 97/6
concisely [1] 75/15
conclude [2] 43/22 69/19
concluded [1] 42/8
conclusion [5] 27/18 27/19 28/11 66/20 92/7
conditions [1] 61/25
conducted [3] 59/8 76/20 90/13
conducting [1] 85/18

confess [1] 69/1
confession [10] 64/16 64/19 65/6 65/8 65/20 68/17 68/25 69/4 69/11 69/16
confessions [1] 64/24
conform [1] 93/9
confronted [1] 49/9
connect [2] 53/13 56/21
connection [1] 24/17
connects [2] 53/18 66/4
consider [4] 64/11 67/14 87/2 102/4
considered [4] 67/20 67/20 87/6 91/10
consumed [1] 67/6
CONT'D [1] 4/24
contact [8] 36/14 38/22 41/3 41/9 75/19 78/13 83/6 129/23
contained [2] 26/3 67/8
contains [1] 74/4
continue [1] 94/21
continued [1] 31/1
continues [4] 4/5 34/3 35/22 77/15
conversation [4] 122/7 130/21 134/2 134/14
conversations [2] 59/18 78/14
convict [2] 67/25 69/22
convicted [1] 64/18
conviction [3] 65/9 66/23 69/12
coordinator [2] 71/11 71/13
copy [4] 5/4 73/9 74/3 98/25
corpse [1] 65/18
Correction [1] 52/12
correctly [1] 42/15
correctness [1] 18/5
corroborate [4] 15/6 58/14 68/18 69/3
corroborated [1] 64/23
corroborates [3] 55/4 55/7 69/15
corroborating [3] 60/23 65/3 70/5
corroboration [3] 65/7 67/12 67/16
corroborative [2] 67/3 67/21
cottages [1] 130/7
counsel [6] 4/2 42/1 47/2 51/2 53/11 103/19
Counsel's [1] 60/22
counselor [3] 71/14 72/14 72/21
count [7] 13/11 17/23 22/13 36/17 64/9 64/12 66/14
counted [5] 6/2 18/2 36/22 37/18 38/24
counter [3] 44/3 44/6 44/8
COUNTY [2] 1/1 136/2
couple [3] 48/21 52/21 112/25
course [22] 5/14 5/17 5/20 7/22 11/4 12/2 13/3 14/4 14/8 17/9 21/24 22/14 23/6 28/21 31/19 36/4 36/13 38/22 41/2 41/8 71/21 73/21
court [35] 1/1 1/11 2/4 4/5 4/15 4/21 56/9 62/7 62/21 62/23 63/2 63/12 63/15 64/11 65/2 65/2 65/9 65/25 66/13 66/21 67/13 68/11 69/19 73/6 82/9 102/9 115/4 121/18 131/4 131/16 134/24 135/9 136/4 136/5 136/19
Creek [1] 129/6
creeper [4] 23/8 23/11 23/22 23/23
cri [1] 65/4
crime [20] 8/7 8/10 8/12 45/12 46/18 47/17 47/21 47/25 48/13 53/14 53/19 59/16 65/4 66/6 66/8 66/10 66/16 68/9 68/10 68/11
crimes [1] 65/11
Criminal [1] 123/2
cross [14] 3/4 3/10 3/15 3/19 4/13 4/24 51/5 84/15 84/16 101/16 113/21 113/22 131/4 131/5
cross-examination [9] 3/4 3/10 3/15 3/19 4/24 51/5 84/16 113/22 131/5
cross-examining [1] 4/13
crossing [1] 4/12
cry [1] 111/14

Case 1:14-cv-01310-WED    Filed 05/04/15    Page 139 of 148    Document 19-20

**C**

curious [1] 12/20
currently [3] 103/10 104/25 129/11
cut [10] 9/20 11/1 11/10 43/23 48/9 48/10 56/2 60/25 61/4 61/7

**D**

D-a-s-s-e-y [1] 104/20
dad [1] 105/9
dark [1] 120/5
DASSEY [24] 1/6 1/23 3/13 4/3 7/7 7/7 10/23 10/25 15/23 16/10 38/3 54/10 54/19 56/14 71/15 71/18 72/23 73/25 97/24 103/21 104/14 104/19 129/7 129/24
Dassey's [1] 15/21
date [2] 1/10 79/8
dated [4] 74/19 79/8 80/21 136/15
dates [2] 79/9 79/10
day [21] 1/5 105/25 106/2 106/5 106/10 106/12 106/21 107/14 107/15 113/6 113/11 115/17 115/20 115/21 116/3 118/12 131/21 132/6 132/24 134/6 136/15
daydreaming [1] 84/11
days [2] 6/6 132/11
dead [1] 132/5
deal [2] 63/22 63/24
dealing [1] 38/3
debate [2] 18/1 18/2
decide [2] 20/11 81/10
defendant [20] 1/7 1/20 1/22 1/24 4/10 5/15 50/21 52/22 52/24 53/13 53/17 56/21 64/16 65/21 66/1 66/4 67/11 68/18 69/23 70/2
defendant's [2] 67/9 68/2
defense [3] 63/18 63/19 69/10
deficits [1] 90/15
defining [1] 75/16
degree [6] 64/14 65/17 65/21 65/22 85/10 85/16
delayed [1] 79/19
delays [1] 77/15
demonstrate [1] 77/15
demonstrates [1] 79/19
demonstrating [1] 93/2
denied [1] 68/3
deny [1] 70/7
Department [1] 52/23
describe [1] 99/19
described [5] 23/8 25/10 44/2 70/1 80/22
despite [2] 27/12 68/15
destroy [1] 69/1
destroyed [1] 68/16
destruction [1] 67/2
detail [1] 66/15
detailed [1] 86/6
details [1] 55/4
Detective [11] 5/1 5/12 13/2 13/15 15/14 28/20 32/18 34/24 38/14 41/8 49/3
determine [8] 8/20 9/12 11/16 20/7 26/14 58/22 58/25 85/21
determined [1] 44/3
determining [1] 86/16
difference [9] 9/18 24/22 25/1 25/5 26/17 51/23 91/12 95/9 95/17
different [12] 6/22 10/1 15/17 92/16 95/7 121/20 122/11 122/18 122/20 125/15 127/15 127/18
differently [1] 95/14
difficult [1] 30/8
difficulties [1] 92/25
difficulty [1] 75/14
dinner [2] 123/6 123/11
direct [7] 3/9 3/14 3/18 70/25 104/21 121/22

128/23
directing [4] 5/11 13/12 18/9 31/14
direction [2] 93/2 93/3
disabilities [1] 92/8
disabled [2] 87/2 87/6
disagree [7] 19/12 19/19 20/15 20/18 20/23 22/11 22/13
discern [1] 33/17
disciplines [2] 90/5 90/6
discovered [3] 10/9 54/10 58/12
discussed [2] 41/1 76/23
discussion [7] 75/24 79/14 85/2 97/16 99/22 99/25 100/14
discussions [7] 45/24 46/5 46/8 59/24 75/20 83/7 97/16
dismiss [1] 66/13
dismissal [1] 64/11
dismissed [1] 68/2
displeasure [2] 21/20 22/6
distinct [2] 65/12 65/13
district [16] 71/5 71/7 71/10 71/23 72/3 72/5 72/22 73/10 73/21 76/15 80/8 87/6 92/16 97/5 97/12 97/23
districts [1] 92/17
disturbed [1] 93/17
dividing [1] 91/16
Division [1] 123/2
DNA [15] 16/25 23/15 28/7 30/2 48/7 48/15 53/12 53/16 54/9 55/25 56/23 57/1 58/22 66/6 67/8
Doctorate [1] 85/11
document [13] 76/7 78/19 78/24 79/6 80/16 80/20 80/21 83/25 84/1 84/6 98/13 98/21 98/24
documented [1] 94/9
documents [2] 76/13 83/19
doing [6] 21/13 39/13 46/18 46/23 47/20 47/20
down [27] 6/8 25/17 31/25 32/9 33/8 33/21 37/7 37/22 39/11 39/19 41/16 61/13 75/9 90/4 100/17 100/18 103/18 106/24 116/6 116/8 116/15 126/12 126/15 126/23 127/1 128/10 134/24
drawer [2] 41/20 41/22
dresser [3] 44/5 44/7 44/8
driveway [1] 126/12
drop [2] 107/6 107/12
dropped [1] 117/1
dropping [2] 126/3 126/10
drops [3] 107/9 118/22 126/24
duly [4] 4/18 70/19 104/15 128/17

**E**

each [4] 27/8 28/6 65/13 71/24
earlier [6] 43/16 59/20 59/22 59/25 111/24 115/20
early [1] 60/4
easily [5] 97/9 97/13 97/13 97/24 97/24
east [1] 124/20
ED [1] 93/16
EDELSTEIN [27] 1/21 3/4 3/6 4/9 4/12 4/22 4/25 13/2 22/3 31/4 31/8 42/3 42/7 47/7 50/11 56/8 56/10 56/13 61/16 61/20 62/1 62/10 62/20 62/22 62/24 63/5 122/5
Edition [1] 88/6
editorialize [1] 17/5
editorially [1] 47/4
educated [1] 84/20
education [11] 71/13 74/4 74/6 74/23 77/18 77/20 84/2 85/6 85/20 86/19 93/23
educational [5] 76/2 81/6 85/4 86/22 96/17
efficiency [2] 100/20 101/7
effort [1] 13/5

eight [1] 99/16
Eighteen [3] 104/24 115/3 115/3
eighth [1] 81/11
Eisenberg [3] 59/19 59/23 60/6
either [8] 17/17 21/20 46/17 49/19 74/9 92/5 97/15 98/1
element [5] 64/15 65/16 66/15 68/10 68/11
elements [3] 65/4 65/13 68/9
Eleven [1] 119/13
else [14] 16/4 32/5 33/5 33/9 75/6 103/14 105/6 106/16 106/18 108/21 113/20 128/7 131/2 135/7
elsewhere [2] 33/11 33/19
emotional [2] 111/8 111/12
emotionally [1] 93/17
empty [1] 55/10
end [4] 103/10 118/22 132/6 134/6
ended [1] 53/11
ending [1] 82/5
ends [1] 132/24
enforcement [5] 127/8 127/20 128/4 133/22 134/16
engaged [1] 37/2
enough [2] 30/17 65/6
entered [2] 54/2 69/22
entitled [1] 47/1
entrance [1] 52/16
entrances [1] 27/3
entry [5] 6/12 13/16 13/16 18/22 34/24
environment [1] 77/19
especially [3] 66/25 86/17 90/4
essentially [3] 17/19 65/6 69/10
estimate [1] 17/22
evaluated [1] 71/20
evaluating [1] 85/17
evaluation [8] 76/19 76/20 78/4 78/25 79/10 79/16 80/24 85/18
evaluations [1] 72/10
evaluator [1] 75/6
event [4] 16/14 81/7 95/10 95/12
events [2] 41/4 105/25
everybody [2] 38/12 111/2
evidence [47] 8/5 9/23 10/8 10/9 10/10 15/6 15/8 22/18 22/22 22/24 23/19 29/2 29/5 30/2 30/7 30/8 30/23 36/9 47/8 47/16 47/24 53/18 54/23 55/1 55/3 58/14 59/7 60/7 63/17 64/12 65/3 65/15 65/20 65/23 66/1 66/2 66/22 67/1 67/4 67/14 68/14 68/15 68/20 69/2 70/4 70/5 121/16
evident [1] 8/21
ex [1] 43/13
exact [3] 42/25 91/1 131/23
exactly [6] 19/16 20/19 21/13 35/13 49/22 131/19
examination [26] 3/4 3/5 3/6 3/9 3/10 3/11 3/14 3/15 3/16 3/18 3/19 3/20 4/24 50/14 51/5 52/3 56/12 70/25 84/16 98/10 104/21 113/22 125/24 128/23 131/5 133/18
examinations [2] 86/12 87/13
examine [3] 10/7 30/2 30/6
examined [6] 4/19 23/11 36/8 70/20 104/16 128/18
examining [1] 4/13
example [10] 18/8 18/16 21/21 41/14 42/19 49/18 55/7 59/19 66/6 79/24
examples [2] 55/7 56/4
Except [2] 106/19 106/20
exchange [6] 5/14 5/20 13/4 18/12 28/21 36/4
exclusion [1] 54/17
excuse [7] 36/17 59/22 63/25 65/22 68/2 98/20 101/22
exhibit [44] 15/17 16/16 24/14 29/20 61/17

## E

exhibit... [39] 73/1 73/2 73/13 73/17 76/6 76/10 76/18 77/25 77/25 78/18 80/14 80/17 80/22 82/4 83/11 83/12 83/14 83/18 83/20 86/4 91/4 92/25 93/9 94/4 96/6 98/13 99/21 102/25 103/1 103/3 104/2 116/8 117/6 117/8 118/24 120/4 123/20 123/21 124/15
exhibits [5] 61/15 63/9 75/14 103/23 104/6
existed [1] 54/23
expect [7] 15/4 22/24 22/25 51/5 52/4 59/2 67/2
experience [1] 24/9
expert [7] 22/20 23/3 23/5 30/10 30/19 43/13 45/4
experts [1] 30/22
explain [4] 11/24 12/20 26/19 46/20
explec [1] 22/25
exples [1] 22/5
express [1] 94/5
expressed [3] 21/20 22/6 28/17
expresses [1] 97/6
expression [1] 84/9
expressionless [1] 84/9
expressive [1] 79/20
expressively [1] 77/17
extra [2] 90/16 129/2
extremely [2] 31/25 31/25
eye [3] 75/19 78/13 83/6

## F

facial [1] 84/9
facie [1] 69/18
facts [1] 91/23
factual [1] 7/3
fair [14] 17/8 26/13 31/18 31/22 37/3 39/2 42/7 43/3 54/22 59/6 68/25 119/8 133/3 133/9
fairly [1] 15/5
fairness [1] 40/4
fall [2] 81/7 94/14
FALLON [19] 1/15 3/5 4/4 4/7 12/24 21/25 30/25 42/1 42/5 46/25 50/13 50/15 56/6 59/6 61/22 62/12 63/8 63/14 64/1
falls [1] 86/19
false [10] 7/4 7/10 18/20 18/20 30/2 34/17 43/10 44/15 44/18 96/24
familiar [9] 24/4 71/15 80/4 88/2 89/7 95/7 95/9 115/19 129/7
far [7] 29/15 31/20 64/12 99/3 107/9 112/19 134/13
fashion [1] 15/10
Fassbender [20] 5/15 5/21 6/14 7/19 13/4 17/8 17/17 19/11 21/20 22/5 25/22 27/13 31/24 33/19 33/21 39/13 40/21 49/9 49/12 60/5
fat [1] 111/3
fault [6] 13/6 37/14 37/17 37/24 38/6 38/8
favorable [3] 66/22 67/19 67/24
fear [1] 51/1
feasible [2] 48/5 48/5
February [2] 52/13 59/12
February 27 [2] 52/13 59/12
feet [1] 112/25
few [5] 13/7 13/9 37/18 55/7 56/4
fiber [1] 11/5
fibers [2] 14/12 14/15
field [1] 51/11
fifteen [1] 62/5
figure [1] 91/19
final [2] 52/21 97/2
find [19] 10/2 11/4 11/21 11/23 12/20 36/3 44/21 49/10 54/16 55/9 55/9 55/13 55/22

55/25 56/3 67/3 91/2 91/4 132/3
findings [2] 27/1 52/8
finds [1] 69/25
fine [2] 98/5 121/24
finger [4] 56/3 60/25 61/4 61/7
fingerprint [6] 30/7 30/8 30/10 30/17 30/19 31/2
fingerprints [5] 16/25 30/24 53/13 53/17 59/1
finish [1] 116/14
fire [13] 10/24 55/13 55/14 61/3 67/6 68/19 68/21 117/17 120/7 120/12 122/15 125/8 125/13
firearms [1] 24/18
firefighters [1] 45/17
first [27] 4/18 28/21 32/20 44/9 47/8 52/10 59/12 64/14 65/17 65/21 65/22 70/16 70/19 71/17 74/16 74/18 77/2 79/7 86/23 93/13 94/7 100/2 100/3 102/24 104/15 128/17 131/24
fits [2] 29/2 29/4
five [12] 39/8 39/8 42/3 42/4 106/9 106/11 119/25 130/23 133/1 133/3 134/6 134/10
five-foot [1] 119/25
flat [2] 6/21 41/10
flip [2] 32/7 34/22
fluids [2] 66/9 66/12
flying [1] 51/10
follicles [2] 48/18 48/19
follow [4] 26/14 26/20 93/2 133/20
follow-up [3] 26/14 26/20 133/20
followed [1] 6/16
following [2] 39/25 130/3
follows [5] 4/19 19/11 70/20 104/16 128/18
foot [1] 119/25
foregoing [2] 136/7 136/7
forensic [5] 27/1 45/21 52/3 54/22 59/7
forensically [2] 23/11 36/8
forensics [1] 35/25
form [6] 63/2 75/3 77/7 78/6 82/23 85/24
forth [2] 20/16 29/14
forty [3] 42/4 106/9 106/11
forty-five [3] 42/4 106/9 106/11
found [19] 11/19 11/20 12/9 12/15 14/16 14/18 14/25 36/10 44/14 45/22 47/19 52/15 54/4 54/6 54/8 54/17 59/25 60/25 68/20
four [14] 17/22 48/3 58/12 100/23 101/2 107/13 107/14 114/12 114/17 121/3 121/6 122/20 127/3 127/4
fourth [6] 6/8 13/16 81/12 101/21 101/23 103/10
Fox [1] 1/11
fragment [2] 54/6 56/22
fragments [1] 54/5
frame [3] 7/18 133/22 134/17
Francis [1] 129/6
frankly [1] 33/13
free [1] 51/19
FREMGEN [54] 1/19 3/9 3/11 3/14 3/16 3/18 3/20 4/8 4/9 61/24 63/21 64/6 64/7 68/5 70/14 70/15 71/1 81/25 82/19 82/20 83/17 84/13 84/23 85/1 86/3 95/3 95/21 96/8 96/13 98/9 98/11 98/22 98/23 102/7 102/10 102/17 103/14 103/20 104/5 104/22 116/5 116/16 121/9 121/15 122/2 122/4 125/23 125/25 128/7 128/11 128/24 131/2 133/19 135/1
Fremgen's [1] 66/24
friend [5] 108/13 115/12 118/9 123/12 130/18
front [2] 69/6 107/7
full [3] 54/2 76/10 100/17
fun [2] 111/2 111/5
furniture [3] 9/5 9/7 9/14

further [10] 33/8 33/21 39/19 56/6 62/3 63/12 63/15 69/2 81/23 125/20

## G

G-r-o-s-s [1] 70/24
GAHN [7] 1/17 3/19 4/7 131/6 133/15 133/21 134/23
games [2] 109/18 112/13
garage [31] 14/23 23/23 23/24 24/5 24/11 28/16 29/22 36/6 39/20 39/22 54/2 54/3 54/5 54/11 55/8 55/12 55/17 56/16 57/6 57/8 57/17 58/4 58/8 120/3 124/6 124/13 124/16 124/19 124/20 124/24 125/9
gas [1] 58/16
gave [2] 18/8 134/18
general [10] 8/7 45/24 46/5 46/8 64/17 69/13 87/16 92/20 93/12 99/14
generally [4] 5/12 71/21 101/17 129/4
generate [1] 76/22
gentlemen [2] 4/1 135/5
gestures [1] 78/13
gets [1] 41/5
getting [2] 7/7 87/8
given [8] 8/16 15/3 24/9 45/6 45/9 66/25 82/1 91/22
goals [1] 74/5
goes [7] 39/16 41/5 48/19 51/10 95/11 116/9 132/5
gone [1] 134/11
good [7] 5/8 25/12 39/13 63/5 128/13 131/7 131/8
gotten [2] 114/13 114/15
grade [8] 81/11 81/11 81/12 101/21 101/23 103/11 103/12 103/13
grades [1] 72/9
grandmother's [1] 116/10
grandpa's [1] 124/3
grant [1] 40/15
great [1] 51/10
GROSS [8] 3/8 70/16 70/18 70/23 71/2 84/18 89/8 97/3
group [1] 76/12
guess [10] 9/2 19/5 19/9 28/11 28/11 29/5 43/22 82/1 89/25 125/7
guessed [2] 100/5 100/8
guessing [1] 41/10
guide [1] 77/7
gun [8] 25/19 28/8 30/15 33/23 34/10 34/16 57/3 57/22
guns [4] 50/16 50/23 51/1 54/17
gunshot [11] 27/2 52/7 52/8 52/11 52/15 59/13 59/17 60/7 60/18 60/19 60/21
gunshots [1] 41/1
guy [3] 120/21 120/24 121/11
guys [10] 11/13 13/7 49/20 53/24 106/23 107/20 107/25 110/18 110/24 112/7

## H

hair [27] 11/1 11/5 11/10 11/16 11/20 12/7 12/15 12/16 12/17 22/20 43/20 43/23 43/25 44/25 45/4 46/8 46/18 46/21 47/8 47/19 48/4 48/7 48/9 48/13 48/14 48/16 48/19
hairbrushes [2] 12/5 12/11
hairs [4] 44/14 44/21 45/22 47/12
Halbach [5] 11/6 44/21 48/1 66/5 66/6
Halbach's [1] 54/9
half [3] 107/10 123/1 129/14
halfway [3] 31/24 37/7 37/22
Halloween [5] 108/16 115/16 124/8 124/17 125/3
hand [5] 24/13 70/17 104/13 117/1 128/15
handcuffs [5] 15/14 16/17 55/22 55/22 66/7
handed [3] 33/22 34/10 34/16

## H

handwriting [2] 77/10 78/6
handwritten [4] 77/5 78/12 82/23 83/2
hanging [2] 54/14 57/22
happen [1] 51/22
happened [4] 22/8 42/9 97/19 124/25
happening [1] 39/21
happens [1] 37/8
hardly [1] 51/1
hate [1] 32/18
Hau [3] 2/3 136/4 136/19
having [5] 4/18 48/18 70/19 104/15 128/17
head [12] 19/1 28/23 29/1 29/3 29/8 31/21
32/12 32/15 32/24 35/11 35/14 52/7
heard [5] 14/9 54/13 81/5 102/12 119/19
hearing [3] 85/9 122/1 122/10
heart [1] 35/12
help [9] 5/5 13/20 55/12 56/16 58/6 77/21
77/22 85/21 90/16
helped [4] 13/17 15/10 58/3 58/5
helping [4] 45/8 45/14 45/15 45/17
hereby [1] 136/6
herein [4] 4/18 70/19 104/15 128/17
high [3] 71/19 105/3 119/25
higher [1] 51/14
highlighted [3] 74/24 84/7 96/9
himself [3] 28/15 28/16 67/11
historical [1] 82/1
hmm [8] 19/10 43/21 74/11 78/11 90/8 92/4
101/10 132/12
holding [1] 25/9
holes [1] 36/1
Holt [1] 64/21
home [24] 17/21 41/5 94/24 106/7 106/10
106/14 106/21 107/15 108/21 108/21 108/22
109/4 109/6 113/11 114/3 116/6 119/11
119/14 122/19 122/22 124/18 127/21 128/1
132/13
homicide [1] 65/18
Hon [1] 1/11
honest [3] 6/9 18/18 41/17
honestly [1] 132/7
Honor [10] 4/4 4/23 30/25 56/10 61/14
61/16 62/24 67/13 133/16 134/23
hooks [1] 36/5
hope [2] 40/18 40/19
hotel [6] 131/14 131/17 132/5 132/7 132/20
133/1
hour [5] 5/14 5/23 13/3 21/24 134/11
hours [3] 53/2 53/6 53/6
house [22] 9/2 15/21 16/9 105/6 107/5 107/7
107/11 107/21 108/9 110/12 111/25 112/3
113/2 113/8 116/10 116/15 116/22 118/4
119/6 119/8 120/9 123/12
huge [1] 47/15
human [2] 21/15 24/10
hundred [4] 45/10 101/3 101/6 112/25
hunt [1] 24/20
hyphen [1] 70/24
hypothetically [1] 129/16

## I

I'd [3] 7/16 11/24 44/16
I'll [20] 11/25 17/7 20/4 31/6 36/20 39/4
40/15 44/9 46/20 49/2 55/6 55/6 63/25 70/7
73/13 82/13 82/13 82/14 102/13 122/12
I'm [66] 10/3 12/19 16/14 17/15 24/13 30/5
30/25 31/16 40/4 41/12 42/1 42/3 42/6 42/16
42/24 43/15 45/5 45/20 46/3 49/9 50/10 51/2
56/20 56/25 57/24 58/15 62/4 62/22 71/11
72/25 73/12 76/5 78/17 79/6 80/14 81/21
81/21 82/20 83/13 84/19 85/16 93/5 96/12
98/12 98/22 101/4 101/4 101/25 102/3
102/11 106/2 107/4 114/21 116/7 117/5
119/2 120/4 120/17 123/18 123/20 124/4
124/14 125/6 131/13 131/19 132/23
I've [2] 24/19 38/24
I-11 [2] 74/9 81/3
I.11 [2] 82/21 103/6
I.3 [1] 77/25
I.e [1] 19/24
idea [4] 6/3 21/5 35/17 42/8
identification [1] 83/12
identified [3] 5/9 11/5 62/15
identify [6] 11/21 11/23 97/5 97/23 98/21
120/19
idioms [1] 79/24
IEP [10] 74/3 74/16 76/24 80/5 80/21 83/9
93/23 94/12 94/20 103/3
IEPs [2] 72/10 101/21
immediate [1] 79/21
immediately [3] 9/6 25/22 32/4
implements [2] 70/1 70/3
important [1] 31/25
impossible [1] 48/8
inability [2] 93/2 93/8
include [6] 67/14 72/8 80/24 91/18 92/17
92/18
included [2] 88/12 94/19
includes [1] 71/12
independent [6] 43/9 49/11 60/8 65/15 65/20
65/23
independently [2] 64/14 65/5
indi [1] 14/12
indicate [5] 10/16 73/1 80/19 98/3 103/8
indicated [6] 33/8 55/20 60/22 94/20 126/20
127/14
indicates [4] 42/13 78/9 100/11 100/19
indicating [4] 12/14 19/2 42/11 84/10
indication [2] 66/5 66/9
indicative [2] 66/8 66/10
Individual [1] 93/23
Individualized [1] 74/4
individually [1] 33/16
individuals [1] 38/20
influenced [3] 97/10 97/13 97/24
information [8] 54/19 60/6 80/5 82/3 82/4
84/4 89/5 89/10
initially [2] 28/25 49/5
inquiry [1] 31/1
insertion [1] 42/12
inside [1] 22/15
instance [9] 51/6 51/24 69/24 72/9 73/20
99/4 99/9 100/16 129/15
instruction [1] 77/18
instrumentality [1] 67/9
intellectual [2] 88/9 99/14
intelligence [1] 88/8
intelligent [1] 40/16
intentional [3] 65/17 65/17 65/21
interpose [2] 81/5 102/3
interpret [4] 21/11 21/14 21/16 32/16
interpretation [5] 19/5 20/1 32/17 32/19
42/22
interpreting [1] 85/18
intervention [1] 93/13
interview [20] 5/23 14/5 17/10 22/14 23/6
25/16 26/25 31/20 34/12 38/25 39/1 49/4
52/14 52/24 52/25 54/20 55/2 59/8 60/20
62/9
interviewed [2] 86/13 123/1
interviewing [1] 54/21
interviews [1] 85/19
intonation [1] 38/18
introduced [3] 64/13 70/2 70/4

## investigation

investigation [3] 7/22 11/4 123/3
investigator [13] 4/13 8/4 8/19 9/11 21/12
24/10 29/24 31/2 38/3 44/20 46/14 46/15
60/5
investigators [3] 7/24 18/13 31/11
involved [6] 12/3 14/6 30/21 45/21 72/2
93/25
involvement [1] 16/24
IQ [2] 87/16 87/18
IQ's [1] 87/18
irons [1] 66/7
Irrelevance [1] 22/1
issue [7] 19/23 26/20 31/20 59/14 60/17
65/14 82/11
issues [2] 63/22 63/25
item [1] 76/12
items [4] 8/17 66/7 67/17 100/5
itself [3] 42/13 72/6 75/3

## J

Janda [1] 105/14
Jason [7] 108/13 108/14 109/11 110/3 112/1
115/12 130/19
Jason's [4] 118/10 118/12 123/12 126/20
Jennifer [3] 2/3 136/4 136/19
Jerome [1] 1/11
job [2] 39/14 129/3
Johnson [6] 88/2 88/6 88/23 98/17 99/5
99/14
judge [21] 1/11 54/1 63/21 64/7 66/18 68/6
70/10 70/15 81/4 82/11 84/13 84/23 98/7
102/2 103/17 103/20 104/9 125/20 125/21
128/7 128/9
jury [24] 1/4 5/13 13/9 18/16 43/7 50/3
58/13 63/25 64/4 67/25 81/9 88/4 102/4
114/8 116/24 117/21 118/8 119/15 119/23
120/1 120/14 121/6 121/22 124/11
justice [1] 48/1

## K

K-o-r-n-e-l-y [1] 128/22
keep [2] 94/22 110/16
Ken [1] 4/6
KENNETH [1] 1/13
kept [4] 73/21 76/15 80/8 83/20
kid [1] 87/10
kill [1] 55/24
killed [2] 10/24 28/16
kind [7] 41/24 87/1 87/5 87/19 95/22 117/7
130/16
kinds [2] 95/7 95/17
knew [15] 26/4 27/14 35/25 40/7 40/11
40/13 49/21 49/23 49/25 50/23 54/23 59/9
60/20 111/2 124/1
knife [6] 41/14 41/17 41/17 41/18 42/9 51/15
knowledge [17] 6/19 6/21 6/23 7/2 7/8 8/7
39/21 51/1 51/12 51/18 57/18 57/21 59/13
61/9 80/3 94/3 136/14
known [4] 45/23 55/2 61/9 129/13
knows [4] 42/24 43/12 50/4 96/15
KORNELY [3] 3/17 128/16 128/22
KRATZ [31] 1/13 3/10 3/15 4/6 66/18 70/9
81/4 81/16 81/19 82/7 82/10 83/15 84/17
85/3 98/6 98/15 99/9 101/25 102/2 102/16
103/16 104/8 113/23 115/7 121/19 121/24
121/25 125/19 126/1 127/7 128/8
KRIS [4] 3/8 70/16 70/18 70/23

## L

lab [15] 8/6 8/8 8/10 8/12 12/13 30/1 30/6
45/12 46/18 46/18 47/17 47/21 48/13 54/8
59/16
ladies [2] 4/1 135/4

## L

language [13] 75/10 75/22 77/16 78/16 79/1 79/3 79/20 79/23 79/25 80/1 87/9 90/17 93/25
large [1] 86/3
larger [2] 76/12 78/21
last [14] 6/4 18/22 34/24 70/22 74/21 83/2 94/12 97/22 104/18 114/12 114/15 118/16 128/20 135/1
later [3] 44/3 52/13 58/12
law [9] 1/20 1/22 68/9 69/4 127/8 127/20 128/3 133/21 134/16
law's [1] 68/23
lead [7] 7/23 8/4 29/24 44/20 46/14 46/14 60/4
leading [3] 13/22 13/25 49/19
learn [3] 52/5 52/8 95/15
learned [2] 52/10 52/13
learning [2] 90/1 95/23
leave [7] 73/13 109/25 110/2 110/12 111/25 112/3 119/5
led [2] 97/14 97/25
left [13] 85/3 110/11 111/25 118/9 119/8 120/6 124/13 124/19 125/5 127/4 133/4 134/9 134/13
leg [1] 66/7
lengthy [1] 39/18
Leslie [1] 59/19
lev [1] 101/22
level [11] 74/22 76/2 87/16 101/22 101/23 101/24 102/5 102/8 103/8 103/11 103/12
levels [1] 90/22
lever [3] 25/5 26/7 50/17
lever-action [3] 25/5 26/7 50/17
lie [2] 6/22 49/21
lies [1] 6/23
light [3] 66/22 67/18 67/23
limited [6] 48/14 51/17 62/18 62/21 75/21 83/7
line [6] 6/8 31/1 67/22 96/12 101/13 130/24
lines [2] 7/19 32/9
listed [2] 74/8 101/24
Listen [1] 58/7
literally [1] 37/13
little [15] 29/20 33/8 33/21 36/25 36/25 37/7 39/19 40/16 71/3 95/2 95/4 111/17 115/5 115/12 125/9
lived [4] 95/13 96/4 105/24 108/25
lives [3] 15/25 16/1 16/4
living [3] 105/10 105/13 128/25
load [1] 30/15
location [2] 8/17 9/13
long [13] 40/23 40/24 59/3 71/6 106/24 106/25 107/11 109/14 127/1 127/13 129/13 130/21 131/9
longer [1] 16/18
look [15] 5/18 6/7 32/19 47/18 75/9 88/10 91/4 93/14 112/7 112/12 117/6 120/4 125/12 125/14 125/16
looked [5] 8/12 8/20 36/9 44/24 112/9
looking [2] 33/5 88/9
looks [5] 37/5 77/6 81/19 88/8 117/9
lose [1] 111/4
losing [2] 110/22 111/1
lost [1] 83/1
lot [14] 11/20 14/18 14/21 14/23 30/3 32/19 40/23 44/25 48/12 55/6 58/5 102/12 111/14 111/19
luminol [1] 10/13
lying [2] 21/22 34/5

## M

machine [1] 136/10
Madam [1] 63/8
main [1] 94/21
mainstream [1] 101/18
maintain [1] 71/23
maintained [1] 72/5
majority [1] 59/9
makes [2] 13/24 37/24
making [1] 34/15
man [1] 24/11
manager [1] 129/1
MANITOWOC [4] 1/1 115/14 129/4 136/2
Manitowoc/Two [1] 129/4
manufacturer [1] 29/22
March [5] 9/20 23/25 24/11 53/25 110/22
March 1 [3] 9/20 24/11 53/25
March 31 [1] 23/25
MARK [4] 1/19 3/3 4/8 4/17
marked [13] 3/22 5/4 24/13 72/25 73/2 73/12 73/17 76/6 78/18 83/12 83/13 83/17 98/12
Marriott [1] 131/15
Master's [2] 85/6 85/16
match [2] 12/14 12/17
matched [1] 12/10
material [4] 69/14 70/5 81/9 82/11
materials [1] 86/4
math [10] 90/6 90/21 90/21 91/5 91/6 91/6 91/12 91/12 91/14 102/8
matter [8] 7/1 11/3 14/11 29/13 48/23 50/24 136/7 136/13
mattress [4] 10/4 10/6 10/7 10/11
maximum [1] 45/7
meaning [2] 38/16 93/3
means [4] 43/14 101/1 111/9 132/4
meant [3] 20/2 20/3 20/3
measure [1] 88/8
medical [2] 51/11 51/18
meet [3] 77/22 110/3 112/1
meeting [2] 94/12 133/21
meetings [1] 94/1
memory [18] 14/24 49/11 75/21 79/20 79/21 79/21 79/22 95/1 95/4 95/7 95/11 95/17 95/19 95/20 95/22 101/12 101/14 114/12
mention [1] 48/13
mentioned [4] 17/14 28/22 90/14 105/16
mere [1] 43/7
mess [1] 58/4
met [1] 68/1
metal [2] 15/11 15/14
method [1] 43/9
MICHAEL [3] 3/17 128/16 128/21
microphone [2] 71/3 115/5
middle [1] 36/25
Mike [2] 128/21 128/25
mile [1] 107/10
miles [1] 112/23
Milwaukee [1] 129/2
mind [3] 50/7 50/9 50/10
minimal [1] 78/13
minute [2] 27/23 83/15
minutes [8] 53/2 107/13 107/13 107/15 109/15 127/3 127/5 130/23
Miranda [1] 63/2
Mishicot [19] 71/5 71/6 71/9 71/19 71/22 72/2 72/21 73/9 86/24 87/11 92/23 97/5 97/11 97/12 97/19 97/23 101/18 105/3 115/23
Mishicot's [1] 92/16
misplaced [1] 66/25
missed [1] 133/6

misspelled [1] 75/24
mom [5] 94/22 105/5 105/14 118/13 126/20
moment [1] 125/20
Monday [3] 131/11 135/4 135/8
months [1] 58/12
morning [9] 4/1 4/2 4/4 5/1 5/2 64/2 131/7 131/8 135/4
most [7] 66/22 67/18 67/23 69/6 74/3 94/14 95/20
mother [4] 16/2 16/4 93/25 94/4
mother's [2] 15/22 118/14
motion [6] 3/7 62/10 64/6 66/19 68/2 70/8
moved [3] 3/22 23/7 61/17
moving [1] 81/22
Mr [4] 4/12 7/5 9/16 66/24
Mr. [23] 7/7 7/7 54/10 54/19 59/6 64/6 70/14 86/3 95/3 95/21 96/8 96/13 98/15 99/9 116/5 116/16 121/9 122/2 122/4 122/5 126/1 127/7 133/21
Mr. Dassey [4] 7/7 7/7 54/10 54/19
Mr. Edelstein [1] 122/5
Mr. Fallon [1] 59/6
Mr. Fremgen [12] 64/6 70/14 86/3 95/3 95/21 96/8 96/13 116/5 116/16 121/9 122/2 122/4
Mr. Gahn [1] 133/21
Mr. Kratz [4] 98/15 99/9 126/1 127/7
Mrs. [1] 118/25
Mrs. Wiensch [1] 118/25
Ms [4] 71/2 84/18 89/7 97/3
much [6] 31/21 50/23 52/13 52/25 87/9 134/21
multiple [2] 36/19 39/2
multiplying [1] 91/16
murderer [1] 48/1
mutilation [2] 65/18 67/1

## N

name [9] 14/10 70/22 70/22 104/18 104/18 118/14 118/16 128/20 128/20
nature [1] 17/25
nauseam [1] 68/8
necessarily [2] 12/22 18/1
necessary [1] 65/8
need [14] 5/18 37/9 39/25 40/5 56/16 63/10 65/3 69/18 73/14 91/1 91/19 101/21 102/17 102/21
needed [1] 90/15
needs [5] 77/17 77/20 77/22 91/17 102/4
negative [1] 49/20
neighbor [1] 112/20
never [5] 30/1 30/6 48/9 48/9 112/5
nevertheless [1] 34/19
next [7] 6/12 14/3 20/12 35/7 37/8 48/21 103/19
nice [1] 135/7
night [9] 113/12 122/16 122/22 123/6 123/9 123/12 127/22 128/1 129/22
nightstand [1] 44/3
ninety [3] 39/8 89/15 89/16
ninety-five [1] 39/8
Ninety-three [2] 89/15 89/16
ninth [2] 71/8 81/11
none [3] 11/19 12/9 48/21
Norm [1] 4/7
normal [4] 73/21 87/10 87/10 106/12
normally [4] 80/8 85/9 106/7 111/16
NORMAN [1] 1/17
norms [1] 88/19
north [1] 130/7
note [4] 82/23 96/19 96/22 96/24
notebook [2] 94/21 94/23
noted [1] 94/24

## N

**notes [4]** 77/6 94/16 95/3 136/9
**nothing [20]** 10/16 28/3 28/10 33/25 34/8 34/14 36/10 40/12 44/14 66/4 66/10 68/18 96/22 98/3 103/14 113/20 114/23 128/7 128/8 131/2
**notice [4]** 107/17 110/21 117/14 121/22
**Nov [1]** 57/25
**November [6]** 52/11 60/4 122/25 127/8 128/3 132/9
**November 15 [1]** 60/4
**November 7 [3]** 127/8 128/3 132/9
**number [15]** 5/6 15/14 16/16 29/15 29/17 41/1 42/25 45/7 47/13 47/14 54/5 90/24 91/1 102/25 123/20
**numbers [3]** 15/17 88/20 99/3
**numerous [1]** 68/7

## O

**object [1]** 31/1
**objection [13]** 12/24 21/25 31/7 61/22 62/16 62/18 81/5 82/14 102/3 102/12 102/14 104/7 121/15
**Objection's [1]** 13/1
**observation [1]** 98/2
**observations [7]** 78/9 84/3 84/5 85/19 99/22 99/25 100/14
**observed [1]** 97/13
**obstructions [1]** 120/10
**obtain [1]** 85/16
**obtained [3]** 53/25 85/13 100/19
**obviously [2]** 7/14 26/22
**occasion [1]** 92/12
**occasionally [3]** 75/18 83/3 83/5
**occasions [2]** 27/9 39/3
**occupation [1]** 24/17
**occurred [7]** 35/23 39/2 39/3 51/7 57/25 65/23 66/3
**October [11]** 57/25 80/21 81/14 99/1 105/11 105/24 110/21 115/8 129/20 129/23 132/11
**October 1 [1]** 81/14
**October 12 [1]** 80/21
**October 31 [6]** 57/25 105/11 105/24 110/21 129/20 132/11
**odds [1]** 48/18
**offense [2]** 64/10 64/15
**offenses [3]** 65/12 65/14 65/17
**offer [3]** 63/15 104/1 104/6
**offered [1]** 53/4
**offering [2]** 31/4 104/3
**Officer [1]** 18/9
**Official [3]** 2/4 136/4 136/19
**oftentimes [1]** 31/14
**oh [3]** 84/19 100/17 131/1
**old [3]** 104/23 115/2 115/8
**once [6]** 39/3 41/13 68/16 68/22 69/9 135/5
**one [50]** 5/8 5/15 5/19 6/23 7/23 8/12 11/4 18/19 18/19 21/8 27/7 29/25 36/20 47/13 47/15 48/24 49/20 54/5 55/15 55/21 58/5 59/25 60/13 60/19 60/21 62/12 64/18 64/20 67/8 68/5 69/15 76/12 76/22 80/22 83/11 83/19 84/1 89/2 90/12 95/2 98/17 99/10 101/2 106/18 108/5 108/5 111/4 128/11 130/6 133/20
**ones [3]** 15/19 16/14 16/18
**only [6]** 9/16 10/5 45/11 47/21 85/23 86/9
**operator [1]** 132/5
**opinion [5]** 9/11 28/17 53/19 64/13 96/2
**opinions [2]** 31/5 85/24
**opportunity [5]** 6/16 12/3 12/4 72/17 86/5
**opposed [2]** 26/6 26/15
**options [2]** 93/15 93/16

## P

**order [6]** 9/12 20/12 26/20 30/15 56/21 65/8
**originally [1]** 134/18
**outside [6]** 53/2 53/5 65/24 112/5 124/13 124/18
**overall [3]** 79/19 80/1 88/9
**overrule [4]** 31/6 82/14 102/12 102/14
**own [2]** 55/24 67/9

## P

**page [35]** 3/2 5/11 5/22 6/7 13/12 14/3 18/10 31/14 32/20 34/22 34/24 36/3 36/23 36/25 37/21 37/21 39/7 41/14 41/25 42/2 49/10 74/8 74/22 77/2 77/2 77/24 79/5 79/7 79/13 81/3 82/21 84/6 96/9 99/21 103/5
**pages [2]** 76/19 83/19
**pair [1]** 16/17
**pants [4]** 55/15 55/16 55/18 55/19
**par [1]** 77/2
**paraded [1]** 57/15
**paragraph [8]** 39/18 74/21 75/15 79/13 83/2 100/2 100/3 100/17
**Pard [2]** 8/24 13/8
**parent [1]** 98/1
**parents [1]** 97/17
**parked [2]** 124/9 124/12
**part [5]** 6/19 7/5 74/16 76/3 78/3
**partial [1]** 31/8
**participate [1]** 80/3
**participates [1]** 78/15
**participation [2]** 75/20 83/6
**particular [7]** 26/2 69/23 69/24 94/5 98/1 101/1 106/14
**particularly [1]** 41/5
**parts [1]** 53/21
**past [5]** 37/1 37/7 64/13 85/25 86/13
**path [2]** 116/7 116/9
**pathologist [1]** 79/1
**patterns [3]** 8/21 8/22 8/25
**peers [2]** 75/21 83/7
**people [6]** 38/15 45/7 47/22 85/10 101/5 111/20
**percentile [2]** 100/12 100/22
**perform [2]** 90/9 90/11
**performance [2]** 74/23 76/2
**performed [3]** 86/11 86/12 90/3
**performs [1]** 84/3
**perhaps [2]** 97/9 115/20
**period [3]** 109/17 111/7 129/12
**permit [1]** 82/14
**person [6]** 1/24 4/10 28/21 33/9 119/17 122/15
**person's [1]** 84/4
**personally [3]** 10/7 36/15 90/11
**pertaining [1]** 71/24
**Ph.D [2]** 84/21 85/11
**phone [12]** 107/24 107/25 108/5 108/10 109/12 129/17 131/17 131/18 131/20 131/23 132/5 133/23
**photo [2]** 124/5 124/16
**phrased [1]** 22/1
**phrasing [1]** 38/4
**physical [4]** 15/6 23/19 66/2 67/3
**pick [3]** 118/20 118/25 119/5
**picked [2]** 119/7 126/20
**picks [1]** 126/24
**picture [1]** 126/6
**piece [4]** 9/5 15/5 47/19 59/25
**pieces [5]** 15/8 27/2 36/1 59/20 70/4
**pink [1]** 15/19
**pit [1]** 57/12
**pitch [1]** 78/14
**place [5]** 15/20 16/18 83/1 89/17 130/22
**PLAINTIFF [1]** 1/4

**plan [1]** 108/18
**plastic [1]** 117/1
**playing [2]** 109/18 112/13
**point [8]** 30/16 39/14 49/8 67/8 82/5 84/20 93/7 129/22
**pointed [1]** 56/22
**points [1]** 56/9
**pooling [4]** 9/24 10/2 51/24 52/2
**population [1]** 92/20
**porch [5]** 49/6 49/13 50/1 50/5 50/8
**portion [3]** 8/1 8/2 64/8
**portions [1]** 30/23
**pos [1]** 52/6
**position [3]** 68/23 72/20 85/17
**possibility [1]** 56/17
**possible [4]** 132/19 133/10 133/12 134/19
**possibly [4]** 72/12 84/10 91/15 93/17
**postmortem [1]** 67/1
**pragmatics [1]** 79/23
**praise [1]** 38/23
**predict [1]** 89/24
**predictive [1]** 89/23
**preexisting [2]** 57/18 57/21
**prefaces [1]** 39/24
**prepared [2]** 63/20 136/8
**presence [2]** 10/16 11/16
**present [4]** 14/8 28/12 74/22 76/2
**presented [5]** 19/24 26/6 34/19 63/17 67/15
**pretty [13]** 30/8 30/12 30/14 39/18 51/21 59/6 64/1 68/23 83/8 87/9 112/21 112/24 112/24
**previous [1]** 83/8
**previously [4]** 5/4 5/9 25/18 78/17
**prima [1]** 69/18
**primary [1]** 64/22
**principle [1]** 67/23
**print [1]** 31/9
**prior [7]** 14/9 32/15 34/7 54/23 63/22 81/18 86/6
**prioritize [1]** 47/14
**prioritizing [1]** 48/23
**probably [14]** 6/6 30/17 41/20 42/24 47/11 47/20 48/7 48/20 60/15 97/8 100/18 130/10 130/23 134/6
**problem [6]** 82/5 89/4 89/11 91/22 92/6 92/22
**problem-solve [2]** 89/4 89/11
**problem-solving [1]** 92/6
**problems [4]** 91/17 91/19 92/13 94/24
**proceed [2]** 4/21 63/20
**proceeding [2]** 63/23 69/17
**proceedings [3]** 2/2 70/7 136/13
**process [2]** 89/5 89/10
**processes [1]** 84/4
**processing [1]** 92/6
**profile [1]** 53/16
**program [2]** 74/4 86/22
**programming [9]** 74/6 81/6 85/21 86/16 92/15 93/15 93/16 94/1 97/15
**programs [2]** 85/20 93/23
**progress [2]** 76/23 85/20
**propensity [1]** 93/10
**property [1]** 45/8
**proposing [1]** 81/23
**prosecution [2]** 69/10 69/21
**Prosecutor [3]** 1/14 1/16 1/18
**Prosecutors [1]** 4/6
**prove [1]** 43/9
**proved [1]** 65/5
**provide [3]** 12/13 77/19 84/2
**provided [5]** 55/4 65/25 74/6 86/3 91/21
**providers [1]** 78/10
**providing [1]** 87/14

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 144 of 148     Document 19-20

## P

psych [1] 84/19
psychologist [6] 71/11 84/20 85/9 85/14 86/11 92/11
psychologists [2] 85/15 87/20
psychology [1] 85/7
pull [3] 9/11 71/2 115/4
pulled [1] 48/9
purport [1] 50/2
purpose [3] 8/9 62/11 62/17
purposes [5] 20/6 62/2 62/14 62/18 62/23
puts [4] 28/15 28/15 61/11 61/11
putting [3] 117/13 118/2 130/6

## Q

quarter [2] 41/16 130/11
quarters [3] 25/17 39/11 100/18
question [40] 13/23 14/1 20/12 22/4 26/2 26/4 26/6 26/8 26/18 26/19 27/21 27/22 32/20 33/18 34/7 34/11 34/25 35/3 35/7 44/20 45/25 47/1 49/19 51/4 51/4 58/19 60/23 97/22 102/15 114/3 114/6 116/14 119/3 119/22 120/18 121/4 121/16 121/23 133/20 134/2
questioning [6] 8/16 35/22 50/20 53/7 53/8 80/15
questions [17] 18/4 20/6 20/10 28/13 41/10 52/22 56/6 62/16 75/18 83/5 84/14 97/2 98/15 99/8 106/3 125/20 126/1
quibble [1] 32/18
quick [2] 19/8 68/5
quickly [2] 14/10 91/2
quite [6] 13/7 13/9 33/13 37/18 52/23 131/19
quote [4] 7/2 49/12 65/3 65/7

## R

raise [3] 70/17 104/13 128/15
rake [4] 55/11 55/13 57/14 57/19
range [11] 45/9 79/25 87/19 88/17 88/25 89/1 89/17 90/25 92/2 99/20 101/15
ranking [2] 100/12 100/22
rather [2] 63/17 86/6
Rav [1] 22/16
Ray [1] 4/9
RAYMOND [1] 1/21
re [5] 4/15 19/8 55/20 76/20 76/20
re-evaluation [1] 76/20
re-read [1] 19/8
re-swear [1] 4/15
reaction [1] 38/20
read [20] 6/5 18/22 19/8 34/25 41/24 75/13 77/10 77/13 78/12 79/18 83/4 84/7 95/3 95/21 96/8 96/10 96/12 96/13 99/24 101/12
reader [3] 50/7 50/9 50/10
reading [11] 77/16 77/16 90/6 90/17 101/22 101/22 101/24 102/5 102/6 103/8 103/10
reads [1] 95/15
ready [1] 42/6
real [3] 14/10 19/8 39/13
realize [1] 26/1
reason [3] 45/19 48/22 93/8
reasonable [1] 24/9
reasoning [4] 90/6 91/6 91/13 91/17
reasons [5] 12/18 30/3 48/12 48/24 104/8
rebut [1] 63/17
recall [28] 14/10 15/1 15/9 16/16 17/13 42/25 44/8 53/14 87/14 94/25 96/3 101/23 105/10 105/23 105/25 127/20 127/24 127/24 129/19 130/8 132/7 132/9 132/16 133/9 134/3 134/7 134/14 134/16
recalled [2] 105/23 127/7
received [9] 59/17 61/23 62/6 62/19 63/3

63/4 104/10 116/8 124/15
receiving [2] 53/21 53/24
recent [1] 74/3
recently [1] 69/6
receptive [1] 79/20
receptively [1] 77/17
Recess [1] 70/12
recognize [8] 76/7 78/18 98/13 105/16 123/21 124/4 129/17 130/24
recollection [3] 60/3 60/8 102/20
recommendations [1] 92/13
Reconvened [1] 70/13
record [13] 4/2 16/15 62/2 70/22 73/19 73/24 76/10 85/2 104/18 128/20 131/25 132/1 132/4
recorded [2] 40/7 40/13
records [16] 71/23 72/8 72/15 72/18 72/23 73/5 73/9 73/20 78/22 80/7 85/23 86/5 86/7 86/9 98/3 131/23
recovered [3] 14/12 26/5 44/25
recross [5] 3/6 56/7 56/12 103/15 134/22
Recross-Examination [2] 3/6 56/12
redirect [12] 3/5 3/11 3/16 3/20 50/12 50/14 98/8 98/10 125/22 125/24 133/17 133/18
refer [11] 73/16 74/8 74/21 77/1 77/23 79/5 81/2 91/1 94/8 102/21 103/5
reference [3] 33/18 34/15 100/16
referenced [1] 62/16
referred [1] 32/13
referring [5] 32/11 82/21 94/12 98/16 99/21
reflection [1] 94/3
reflects [1] 96/19
refresh [1] 102/18
regard [1] 64/25
regarding [4] 8/17 22/19 27/1 93/3
regards [8] 64/23 66/5 66/14 79/2 99/3 99/9 99/10 101/7
regular [3] 77/18 84/1 86/24
related [1] 78/10
relevance [2] 81/13 82/13
relevant [3] 81/9 82/10 94/14
relied [1] 30/23
rely [1] 31/11
remain [1] 104/11
remains [1] 75/17
remember [30] 15/4 18/24 19/9 21/4 37/8 95/12 95/14 95/23 96/3 109/8 113/24 114/2 114/6 114/18 114/19 116/1 116/18 116/20 121/3 122/25 123/5 123/8 123/10 123/11 123/14 124/18 125/8 131/19 132/18 133/25
remnants [1] 68/21
removed [3] 7/25 8/3 93/11
removing [1] 15/11
repeatedly [3] 17/9 17/15 27/13
repetitive [1] 80/15
replicating [1] 82/17
report [12] 12/14 59/15 62/8 76/22 76/23 78/4 78/25 91/1 98/25 99/8 100/11 100/15
reported [2] 2/3 136/6
Reporter [3] 2/4 136/5 136/19
request [1] 39/24
required [1] 91/14
requires [1] 67/13
reserve [1] 63/16
residence [3] 12/4 16/10 129/24
resist [4] 34/3 34/4 43/5 43/6
resisted [3] 27/8 27/8 28/6
resists [1] 43/19
resources [2] 45/11 45/19
respect [2] 82/15 103/23
respectfully [1] 70/7
respond [1] 96/15
responded [1] 25/19

responding [1] 75/14
response [11] 18/25 19/14 19/22 43/4 49/20 60/22 66/17 68/4 68/6 82/6 114/11
responsibilities [2] 71/13 71/22
rest [2] 41/24 63/16
restrained [1] 17/11
restraint [2] 14/6 14/14
restraints [3] 15/11 55/21 67/16
result [2] 23/10 99/13
results [10] 81/1 85/18 90/10 90/13 90/20 92/5 92/7 98/16 100/1 100/11
retrieved [1] 54/8
revelation [1] 60/16
review [4] 72/17 85/23 86/6 101/21
reviewed [2] 80/12 86/9
revolving [1] 45/24
Rick [1] 131/9
ride [1] 106/16
rifle [3] 24/23 25/2 25/6
rights [1] 63/2
Rivers [3] 115/14 115/15 129/5
road [6] 106/24 106/25 107/5 116/9 118/25 127/2
roof [1] 130/6
room [10] 6/9 15/22 16/12 16/13 44/4 109/20 109/21 109/22 109/22 109/23
rooms [1] 109/20
root [6] 48/8 48/10 48/15 48/16 48/18 48/19
rope [5] 14/6 14/11 14/17 14/18 14/21
RPR [2] 2/3 136/19
rule [2] 64/17 69/14
runs [1] 29/17

## S

S-c-h-o-e-n-e-n-b-e-r-g-e-r [1] 70/24
sad [2] 111/15 111/17
sales [1] 129/1
salvage [1] 45/18
same [18] 37/13 42/21 46/3 52/7 52/8 61/24 62/10 62/11 77/25 78/3 91/8 99/21 108/7 109/20 109/21 109/22 111/7 121/4
samples [2] 12/7 45/23
Samurai [2] 123/17 124/23
sandwich [1] 53/4
sat [1] 57/11
saying [14] 20/8 20/18 20/23 20/24 34/4 42/16 44/8 56/19 62/14 69/17 100/8 116/18 127/24 127/25
says [19] 19/16 19/20 21/12 23/17 25/23 32/11 35/6 38/12 41/21 42/10 42/16 51/18 55/8 55/9 55/11 61/7 68/9 77/7 96/22
scene [1] 12/15
schedules [1] 72/9
SCHOENENBERGER [7] 3/8 70/16 70/18 70/23 84/18 89/8 97/3
SCHOENENBERGER-GROSS [7] 3/8 70/16 70/18 70/23 84/18 89/8 97/3
school [44] 17/21 71/5 71/7 71/10 71/11 71/14 71/19 71/22 72/3 72/5 72/14 72/21 72/21 73/10 73/21 75/6 76/15 77/21 78/22 80/8 81/11 84/18 84/19 85/7 85/15 86/4 86/7 86/10 87/5 92/11 92/16 92/17 93/1 93/10 97/5 97/12 97/23 104/25 105/2 105/3 106/5 106/8 106/18 126/16
Science [1] 85/6
scientific [6] 53/18 55/3 58/13 60/24 61/8 65/25
scientifically [3] 56/21 58/21 58/25
score [8] 80/1 88/24 89/13 91/5 91/9 99/15 100/11 100/20
scored [6] 88/21 90/25 91/8 101/2 101/5 101/6
scores [4] 79/25 88/16 89/8 90/5

## S

Scott [2] 105/7 105/8
screen [1] 120/6
search [3] 45/15 54/1 54/2
seated [5] 4/20 64/5 70/21 104/17 128/19
second [6] 52/15 84/6 95/22 96/9 99/24 100/17
section [8] 74/24 74/25 75/2 75/5 77/6 77/7 84/8 100/15
seem [2] 24/9 111/7
seemed [3] 127/14 134/5 134/10
seemingly [1] 84/10
seems [2] 8/4 74/23
seen [8] 30/21 47/9 47/23 49/13 50/6 116/25 119/17 126/2
segregation [1] 92/19
seized [3] 11/13 50/17 67/18
semen [1] 66/10
semi [7] 24/24 25/7 25/11 25/23 26/3 26/5 26/16
semi-automatic [7] 24/24 25/7 25/11 25/23 26/3 26/5 26/16
sense [5] 8/18 9/10 9/14 9/16 13/24
sent [1] 54/8
sentence [3] 79/22 83/2 99/24
separate [6] 65/12 65/13 80/16 103/1 109/19 109/20
September [7] 74/19 76/21 79/11 80/23 83/9 83/22 103/2
September 16 [1] 83/22
September 22 [1] 79/11
September 29 [2] 74/19 80/23
sequences [1] 80/4
served [1] 18/17
service [1] 78/10
services [3] 71/12 74/5 77/20
sessions [1] 78/16
set [2] 91/20 91/22
setting [2] 95/24 100/15
seven [2] 17/25 132/10
Seventy [1] 99/16
Seventy-eight [1] 99/16
several [6] 27/7 28/2 28/5 29/15 43/5 81/8
sex [3] 66/6 66/8 66/10
sexual [8] 37/3 64/10 64/14 65/22 66/1 66/3 66/12 68/14
sh [1] 44/14
shakes [1] 19/1
shared [1] 80/5
shell [1] 29/21
shells [2] 29/21 30/16
Sheraton [1] 131/15
Sheriff's [1] 52/23
shoot [10] 32/21 32/22 33/11 33/19 33/22 35/1 35/2 35/8 50/25 50/25
short [5] 7/18 79/21 101/12 101/14 128/12
short-term [3] 79/21 101/12 101/14
shorthand [1] 136/10
shortly [1] 132/10
shot [20] 24/23 25/2 25/6 25/13 25/23 26/15 27/6 27/14 27/20 27/25 28/6 28/12 28/14 28/23 32/10 33/1 33/10 42/24 54/10 56/15
shots [7] 29/1 29/2 29/8 35/22 42/20 42/20 42/20
shoulders [2] 96/16 96/20
shovel [4] 55/11 55/13 57/15 57/19
show [11] 9/7 72/25 73/12 76/5 78/17 80/14 83/13 98/12 116/7 117/6 124/14
showed [2] 103/22 126/6
showing [1] 123/21
shown [1] 69/18
shows [2] 43/11 43/12

shrugged [1] 96/20
shrugs [1] 96/16
shy [1] 111/18
sic [1] 131/9
side [2] 35/14 124/13
sign [1] 9/8
signed [1] 54/1
significance [2] 36/11 100/24
significant [1] 15/5
significantly [1] 79/19
similar [4] 80/22 80/24 82/3 83/8
simple [5] 42/12 44/20 45/3 45/25 51/21
simply [2] 76/1 82/16
since [1] 131/21
single [8] 11/5 24/23 25/2 25/6 25/13 25/20 25/23 26/15
sir [10] 9/4 15/18 24/16 46/16 51/25 54/25 131/7 132/2 132/23 133/13
sit [2] 20/11 50/2
sitting [1] 59/4
six [9] 17/25 32/9 42/4 79/14 130/11 130/11 130/12 134/5 134/8
size [2] 120/25 121/1
skills [6] 77/16 79/20 80/4 90/21 91/7 91/18
skin [2] 48/17 48/18
skull [6] 27/2 29/11 36/1 52/20 59/20 59/25
slash [1] 75/10
slim [1] 48/20
small [1] 30/14
smears [1] 22/19
smooth [2] 30/12 30/14
socks [1] 17/11
sodas [1] 53/3
solely [1] 64/18
solid [1] 92/2
solve [4] 47/25 89/4 89/11 91/20
solving [2] 91/16 92/6
somebody [14] 11/15 21/16 30/15 46/7 46/9 46/24 47/18 50/25 51/15 51/17 59/16 95/11 120/14 121/11
somebody's [1] 51/9
someone [1] 75/6
sometime [9] 119/9 125/2 125/6 125/8 126/18 127/4 133/2 133/3 134/13
sometimes [2] 132/5 132/25
somewhat [2] 12/20 68/8
somewhere [2] 9/3 130/23
sophisticated [1] 40/16
sorry [13] 31/16 42/1 42/3 49/9 62/4 79/6 84/19 98/22 107/4 114/21 124/4 125/6 131/13
sort [5] 8/20 12/14 26/14 27/18 37/2
sound [1] 80/15
spatter [11] 9/24 10/2 22/22 22/24 22/25 23/4 51/3 51/6 51/13 51/22 51/24
speak [3] 21/16 38/16 130/13
speaking [2] 5/16 127/7
special [10] 1/14 1/16 1/18 4/6 71/12 74/6 77/20 85/20 86/18 87/8
specialist [1] 54/13
specialized [2] 77/18 92/18
specific [6] 41/12 46/8 62/15 78/24 79/8 122/12
specifically [12] 14/22 15/1 16/13 46/9 62/15 73/24 75/22 79/2 83/24 85/15 93/4 98/17
specifics [1] 71/18
speech [9] 75/10 75/10 78/15 79/1 79/2 80/3 87/9 90/17 93/24
spell [3] 70/22 104/18 128/20
spent [1] 48/3
spin [2] 46/22 47/4
spoke [1] 130/14
sprayed [1] 10/13

spring [2] 10/5 10/6
Sprint [1] 132/3
SS [1] 136/1
stab [3] 23/1 51/11 51/17
stabbed [3] 22/15 51/9 51/19
stabbing [2] 51/6 51/15
staff [1] 97/6
stage [2] 69/17 70/6
stains [1] 55/16
stand [2] 5/3 69/11
standard [4] 66/21 75/3 79/25 100/20
standing [5] 104/11 119/17 120/15 120/19 121/7
standpoint [5] 7/3 60/24 69/21 95/19 96/17
stands [1] 135/9
stare [1] 84/10
start [4] 17/18 17/20 50/16 64/8
starting [1] 83/3
starts [2] 74/22 75/10
state [31] 1/1 1/3 1/14 1/16 1/18 4/2 4/5 12/19 45/12 46/18 47/17 63/13 63/14 64/20 64/21 65/1 66/23 67/19 67/24 68/16 69/7 69/16 69/25 70/21 82/2 102/7 102/13 104/17 128/19 136/1 136/5
State's [2] 66/20 68/23
stated [3] 13/17 65/2 69/9
statement [17] 7/10 18/9 23/10 31/22 34/10 34/14 36/18 37/4 37/6 39/12 53/22 53/24 54/24 65/24 65/24 70/1 96/24
statements [3] 27/13 27/23 27/24
states [2] 31/24 77/14
stating [1] 20/15
staying [2] 131/14 131/15
stenographic [1] 136/9
step [5] 61/13 103/18 105/9 128/10 134/24
step-dad [1] 105/9
sterile [1] 38/15
Steve [18] 13/6 15/20 32/10 33/3 33/7 33/15 34/16 35/9 36/16 41/6 49/6 54/14 57/12 58/3 61/4 61/5 118/3 123/16
Steve's [9] 44/4 56/2 56/3 58/12 124/1 124/5 124/20 124/24 125/9
Steven [18] 44/22 45/22 50/18 56/14 60/25 112/14 112/14 113/25 116/25 117/2 117/4 117/12 120/23 121/12 122/1 126/2 126/3 130/7
Steven's [3] 120/3 120/25 121/1
sticker [1] 5/5
still [3] 47/19 47/20 96/6
stomach [4] 18/24 19/4 33/20 35/11
stop [1] 107/21
stopped [1] 46/17
story [3] 91/19 91/22 95/15
strengths [2] 80/2 87/22
student [7] 71/19 71/20 71/24 86/17 87/1 87/5 97/11
students [10] 72/1 72/2 85/17 85/21 86/17 89/20 89/21 92/19 97/4 101/3
stuff [2] 111/3 111/15
sub [1] 88/11
sub-areas [1] 88/11
submissions [1] 47/16
submitted [2] 8/6 34/15
submitting [1] 8/9
subsection [1] 100/3
subtracting [1] 91/15
successful [1] 77/21
such [2] 66/10 97/25
sufficient [2] 50/22 70/5
suggest [9] 5/17 5/21 19/22 20/25 21/7 27/25 34/9 36/15 38/5
suggested [4] 22/11 27/6 28/7 68/20
suggestibility [2] 43/14 97/4

## S

suggestible [4]  43/11 97/7 97/8 97/25
suggesting [1]  27/14
suggestion [1]  33/25
suggestive [4]  13/23 13/25 66/12 68/14
suggests [3]  66/2 67/13 68/16
summary [5]  76/1 76/3 76/19 79/14 79/15
Sunday [3]  115/21 115/25 116/2
superior [5]  6/19 6/21 6/23 7/2 7/8
supper [3]  110/5 110/7 110/9
support [7]  27/17 28/3 28/10 33/25 34/14 64/14 65/20
supported [1]  92/7
supports [3]  64/17 65/16 77/21
Supposedly [1]  44/2
Supreme [4]  65/2 65/2 65/9 68/10
surfaces [2]  30/12 30/14
surprise [1]  61/4
surprised [1]  10/3
surprising [3]  23/14 35/6 43/1
surprisingly [5]  10/12 17/2 17/3 41/7 66/19
surrounding [1]  9/7
sus [1]  60/12
suspect [1]  60/12
suspected [2]  52/16 59/17
sustain [3]  65/8 66/23 69/12
sustained [2]  13/1 22/2
SUV [2]  51/3 51/6
Suzuki [6]  123/17 123/25 124/2 124/9 124/18 124/23
swear [1]  4/15
switch [1]  51/3
sworn [6]  4/14 4/19 70/20 104/12 104/16 128/18

## T

Tadych [1]  105/7
take [8]  6/7 38/2 42/17 53/21 107/11 107/14 121/22 130/22
taken [8]  8/19 16/18 24/14 47/10 76/12 130/16 130/18 136/9
takes [2]  32/19 127/1
taking [3]  19/23 65/14 117/12
talk [18]  7/13 48/6 51/13 54/13 86/22 94/6 95/1 107/20 107/23 107/25 108/3 110/24 111/19 122/2 130/2 132/13 133/7 135/5
talked [12]  6/20 6/22 7/1 7/8 32/15 50/24 58/9 61/25 88/11 102/8 121/17 122/4
talking [19]  10/1 33/3 33/6 33/14 33/15 33/16 35/9 37/1 39/20 41/4 44/10 49/6 52/25 73/20 93/5 109/11 117/10 121/9 123/18
talks [1]  95/3
tape [1]  38/11
tattoo [7]  18/14 18/23 19/3 19/25 20/19 20/24 21/4
teacher [3]  95/15 96/15 98/1
teachers [3]  78/10 84/2 97/16
team [1]  80/6
technical [1]  91/24
techniques [1]  6/23
techs [4]  8/12 10/8 10/9 36/9
telephone [1]  132/3
ten [4]  36/21 42/20 130/11 134/9
tend [2]  14/13 55/12
tending [1]  61/3
tends [2]  9/5 9/7
Tenth [1]  103/13
Teresa [28]  10/24 11/6 17/11 18/23 19/3 19/24 22/15 23/7 27/6 27/20 28/1 28/12 28/14 32/10 33/9 37/3 44/15 44/21 45/23 48/1 49/6 49/13 50/5 54/9 55/23 56/15 66/5 66/6

Teresa's [10]  9/21 11/1 11/21 11/23 12/4 12/16 31/21 55/25 56/3 56/22
term [9]  33/12 67/12 79/21 85/8 87/3 97/8 97/9 101/12 101/14
terms [3]  52/24 55/1 75/17
test [14]  18/4 88/2 88/8 88/20 88/23 89/20 90/12 91/21 96/1 98/16 99/10 99/13 100/11 101/7
tested [1]  89/2
testified [10]  4/19 18/3 22/19 30/22 70/20 82/17 101/16 103/22 104/16 128/18
testify [1]  59/20
testifying [2]  99/2 113/24
testimony [4]  14/9 82/14 102/6 122/23
testimony's [2]  122/11 122/18
testing [3]  86/11 86/20 98/25
tests [8]  87/14 87/15 87/18 88/6 90/3 90/9 90/10 99/10
thank [28]  4/22 42/5 47/6 47/8 50/13 56/5 61/14 63/5 66/18 70/15 71/3 77/23 84/12 84/13 98/5 102/16 103/17 103/18 113/20 115/7 125/21 128/6 128/8 133/13 133/13 134/21 134/25 135/7
that'd [1]  19/5
themselves [2]  27/25 70/3
therapy [3]  78/14 78/16 80/3
thereafter [3]  25/22 32/4 136/11
therefore [1]  21/1
they'd [1]  47/19
thinking [6]  42/24 88/16 88/16 89/3 89/9 89/18
third [2]  13/15 88/6
THOMAS [1]  1/15
though [4]  13/18 80/14 122/10 133/3
thought [6]  42/19 47/24 132/17 132/19 133/4 134/7
thousand [1]  15/8
thousands [3]  47/11 47/11 47/11
three [28]  5/14 5/23 6/6 7/18 13/3 16/5 17/22 21/24 25/17 35/6 39/11 42/20 48/3 53/6 65/11 65/12 79/5 79/13 89/15 89/16 100/18 106/9 106/11 107/13 107/14 127/3 127/4 129/14
three-and-a-half [1]  129/14
three-hour [4]  5/14 5/23 13/3 21/24
three-quarters [1]  25/17
throat [1]  9/21
through [18]  6/5 11/15 36/17 45/17 47/18 48/4 48/17 48/20 74/6 85/19 87/10 93/22 95/12 95/13 96/4 97/15 132/4 132/6
throughout [4]  11/3 14/21 17/9 41/2
throwing [1]  126/10
Thursday [1]  131/12
thus [2]  48/10 64/12
tie [3]  13/17 13/19 13/20
ties [1]  66/1
title [1]  85/13
today [9]  47/20 73/6 116/18 118/8 119/11 122/2 122/11 133/14 135/2
together [3]  58/15 58/17 130/20
Tom [3]  4/7 105/14 105/14
took [7]  15/8 19/6 19/7 43/1 47/8 47/24 55/12
torso [1]  29/16
totally [1]  67/6
touch [1]  30/15
Toward [1]  13/15
towards [5]  116/10 116/15 117/5 117/22 117/23
track [1]  110/16
trailer [12]  9/17 12/10 44/15 44/22 45/23 50/18 58/13 117/23 118/6 118/23 119/16 122/23

trained [1]  38/2
training [2]  24/18 85/17
transcribed [1]  136/11
transcript [7]  2/2 5/4 33/13 61/19 62/8 136/8 136/12
transcription [1]  136/11
transcripts [1]  5/19
treating [12]  108/15 108/18 115/1 115/11 115/13 115/16 115/20 115/25 116/2 130/16 130/17 130/20
trial [7]  1/4 1/5 64/8 113/24 114/2 114/24 122/1
trick [12]  108/15 108/18 115/1 115/10 115/13 115/16 115/20 115/25 116/2 130/16 130/17 130/19
tried [1]  17/10
Triplett [1]  64/20
troopers [1]  45/14
truck [1]  56/4
truth [9]  7/1 7/16 11/3 14/10 20/7 26/24 34/9 39/25 40/2
try [7]  9/12 17/5 21/13 26/20 26/23 26/23 93/13
trying [2]  20/6 85/20
turn [2]  84/6 118/5
turns [1]  55/17
tutoring [1]  90/16
TV [1]  109/22
twice [4]  32/11 32/12 40/24 41/13
two [34]  7/23 10/1 29/1 29/2 29/8 36/1 36/1 42/20 47/14 47/21 48/3 52/6 52/16 52/18 52/19 53/2 53/6 53/21 54/4 62/5 65/16 79/9 79/10 81/25 95/17 99/21 115/14 115/15 123/2 125/15 129/4 130/5 130/19 132/13
Two-fifteen [1]  62/5
type [5]  9/7 25/9 25/18 28/13 72/8

## U

ugh [2]  19/1 19/1
Ugh-ugh [1]  19/1
Um-hmm [8]  19/10 43/21 74/11 78/11 90/8 92/4 101/10 132/12
umbrella [1]  86/18
un [2]  16/21 74/24
un-highlighted [1]  74/24
unable [1]  93/8
unaccounted [1]  63/9
uncle [10]  112/18 117/2 117/12 118/3 123/16 124/1 124/5 124/20 124/24 126/2
uncle's [1]  130/6
uncorroborated [4]  64/19 66/14 66/15 69/11
underlying [1]  67/22
underneath [1]  54/6
understand [6]  21/17 34/11 42/15 59/11 68/22 87/24
understanding [2]  75/16 87/18
undone [1]  16/21
unfortunately [1]  29/11
unless [5]  6/2 18/2 22/13 36/22 48/8
unquote [1]  65/7
unsure [2]  75/19 83/6
until [8]  110/21 111/25 116/12 119/2 119/19 120/17 131/11 135/4
unusual [1]  116/17
upon [6]  33/9 49/19 52/3 64/18 86/19 92/12
used [7]  15/12 18/4 18/16 55/21 76/22 89/25 104/9
Uses [1]  78/13
using [4]  23/8 58/9 107/24 107/25
usually [3]  51/14 85/8 132/24
utilizing [1]  30/23

Case 1:14-cv-01310-WED     Filed 05/04/15     Page 147 of 148     Document 19-20

## V

value [1] 46/22
variation [1] 78/13
various [3] 87/14 90/4 90/5
vehicle [4] 55/24 56/1 123/16 123/22
velocity [1] 51/14
veracity [2] 18/5 20/7
verbal [2] 88/12 114/11
Verhasselt [2] 65/1 65/10
verification [1] 18/17
verify [2] 9/12 14/13
very [15] 5/8 18/12 25/12 32/6 32/20 43/11 48/14 49/14 54/12 63/5 86/1 86/3 128/12 128/13 134/21
video [6] 33/14 40/10 40/12 109/18 109/23 112/13
videotape [1] 70/3
videotaped [1] 65/24
view [3] 66/22 120/10 120/12
viewed [4] 67/18 67/23 69/20 69/21
vocabulary [3] 75/16 75/17 79/22
voice [2] 129/17 130/24
volunteer [1] 45/17
volunteers [1] 45/16

## W

W-i-e-n-s-c-h [1] 118/18
wait [3] 116/12 119/2 120/17
walk [1] 118/23
walked [6] 106/24 116/6 116/6 116/8 116/15 119/15
walking [8] 107/17 116/25 117/4 117/22 117/23 120/9 126/12 126/15
wanting [1] 7/14
warrant [1] 54/1
watch [1] 50/25
watching [2] 57/12 110/14
water [1] 53/3
ways [1] 118/23
weaknesses [1] 87/22
weaponry [1] 67/17
weapons [2] 50/17 54/13
wear [4] 8/21 8/22 8/25 9/8
week [1] 64/13
weekend [2] 130/4 135/7
weeks [7] 114/12 114/17 121/4 121/6 122/20 130/5 130/5
weight [3] 110/22 111/1 111/4
well-aware [1] 27/1
well-below [1] 101/15
whatever [2] 44/10 93/8
When's [1] 6/4
Where's [1] 41/18
whereas [1] 9/6
who's [1] 105/8
whole [3] 29/10 30/17 46/20
whom [2] 33/18 71/20
whose [1] 45/2
WIEGERT [4] 3/3 4/13 4/17 5/12
Wiensch [3] 118/13 118/16 118/25
Willingly [1] 78/15
willingness [1] 80/2
window [3] 112/7 112/9 112/12
wires [1] 36/5
Wis [3] 64/21 64/22 65/1
WISCONSIN [12] 1/1 1/3 1/14 1/16 1/18 46/17 47/17 64/23 65/1 69/8 136/1 136/6
wish [2] 132/7 134/7
withdraw [1] 103/25
within [8] 7/18 85/22 87/18 90/25 91/21 92/15 97/4 101/14
without [2] 68/8 71/17

witness [21] 4/18 5/3 42/6 47/6 61/14 61/17 62/3 70/19 70/23 103/19 103/22 104/12 104/15 104/19 115/6 121/16 128/12 128/14 128/17 131/3 135/2
witnessed [1] 53/22
witnesses [4] 3/2 3/22 63/12 63/15
Wood [1] 99/4
Woodcock [7] 88/2 88/6 88/23 98/17 99/4 99/5 99/14
Woodcock-Johnson [6] 88/2 88/6 88/23 98/17 99/5 99/14
word [2] 42/12 75/23
words [6] 38/15 39/25 62/17 88/19 120/11 125/12
work [7] 10/8 11/22 71/4 71/9 129/1 129/2 130/3
worked [2] 129/12 130/4
working [4] 74/5 79/21 93/14 130/7
works [1] 129/10
world [1] 45/22
worn [1] 9/6
wound [12] 23/1 27/2 51/11 52/11 52/15 59/13 59/17 60/7 60/11 60/18 60/19 60/21
wounds [2] 52/7 52/17
written [1] 59/15
wrong [2] 26/22 27/10

## Y

yard [3] 45/18 129/2 131/16
year [5] 9/17 71/8 81/17 105/21 123/1
year-and-a-half [1] 123/1
years [5] 47/21 48/4 48/22 81/8 129/14
Yep [6] 11/2 13/21 27/16 33/24 35/16 39/15
yesterday [9] 6/20 13/7 13/9 18/3 18/17 53/11 53/22 53/25 65/25
yet [4] 9/23 22/18 28/3 62/6
young [1] 24/10
younger [1] 105/21
yourself [4] 27/12 41/24 55/18 86/10
yourselves [1] 135/6

## Z

zero [1] 34/2