IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

BRENDAN R. DASSEY,

      Petitioner,

      v.                       Case No. 14-cv-1310

BRIAN FOSTER,

      Respondent.

MEMORANDUM IN OPPOSITION TO PETITION FOR
WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

      Respondent Brian Foster, by undersigned counsel, pursuant to this court's November 12, 2014 order, files this brief in opposition to Petitioner Brendan R. Dassey's petition for a writ of habeas corpus under 28 U.S.C. § 2254.

      Dassey's memorandum in support of his petition accurately states the procedural history of his case in state court, and his narrative of the facts, while selective and partisan, is adequate to frame the issues on habeas review.  Dkt. 1-2:1-8.  Facts relevant to understanding Dassey's habeas claims are provided in the Argument section.

## STANDARD OF REVIEW

      Dassey does not dispute that both of the claims he raises in his habeas petition were decided on the merits by the Wisconsin Court of Appeals.

When, as here, the state court decides a petitioner's claims on the merits, federal habeas review of the state court's decision is strictly limited by 28 U.S.C. § 2254(d) of the Antiterrorism and Effective Death Penalty Act (AEDPA). Under § 2254(d), a federal court may not grant habeas relief on any claim decided on the merits by the state court "unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"If this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (explaining that federal habeas review under the AEDPA is a "'guard against extreme malfunctions in the state criminal justice system'") (citation omitted).

The issue of whether the state court's decision rests on "clearly established Federal law" under § 2254(d)(1) is a threshold inquiry, and can be dispositive. Brian R. Means, Federal Habeas Manual 258 § 3.28 (2014); *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006). The "clearly established" provision of "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established [by United States Supreme Court precedent] at the time the state [court] conviction became final." *Williams v. Taylor*, 529 U.S. 362, 380 (2000). In recent years, the United States Supreme Court has narrowed its view of what constitutes "clearly established" law under its precedents. *See Wright v. Van Patten*, 552 U.S. 120, 123-25 (2008);

*Musladin*, 549 U.S. at 76-77. The Ninth Circuit Court of Appeals summarized the Supreme Court's view as follows:

> [W]hen a Supreme Court decision does not 'squarely address[ ] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions, it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision.

*Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (*quoting Van Patten*, 552 U.S. at 125).

A state court decision is "contrary to" clearly established federal law only when "it applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

To be an "unreasonable application" of clearly established federal law, the state court's "holdings must be '"objectively unreasonable,"' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702, *reh'g denied*, 134 S. Ct. 2835 (2014) (citations omitted). For relief to be warranted, "a state court's application of Supreme Court precedent must be '"so erroneous as to be objectively unreasonable."'" *McManus v. Neal,* 779 F.3d 634, 649 (7th Cir. 2015) (citations omitted). Put differently, the petitioner proceeding under § 2254(d)(1) "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 103.

When reviewing a state court's determinations of fact under § 2254(d)(2), a federal habeas court "presume[s] that the state court's factual determinations are correct unless the petitioner can demonstrate by clear and convincing evidence that they were unreasonable." *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011). It is not enough to show that the state court's decision was erroneous. The petitioner must show that the decision was objectively unreasonable, "a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

If the state court's decision is "at least minimally consistent with the facts and circumstances of the case," this court must uphold the state court ruling, even if it is not well reasoned or fully reasoned, *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997). It is a state court's resolution of an issue, as opposed to its reasoning, that must be accorded deference. *See Hough v. Anderson*, 272 F.3d 878, 897 n.7 (7th Cir. 2001) (citing cases); *cf. Ritcher*, 562 U.S. at 98 (even summary decisions lacking any explanation for the state court's decision are due AEDPA deference).

## ARGUMENT

## GROUND ONE: *SULLIVAN* CLAIM

I.    **Dassey Is Not Entitled to Relief on *Ground One* Because the Wisconsin Court of Appeals' Decision on His *Sullivan* Claim Did Not Involve Clearly Established Federal Law, and the State Court's Decision Was Not Based On an Unreasonable Determination of the Facts.**

In his memorandum in support of his petition, Dassey challenges the Wisconsin Court of Appeals' adjudication of his claim of pretrial counsel disloyalty under *Cuyler v. Sullivan*, 446 U.S. 335 (1980) (**Ground One**) on three separate bases. First, Dassey argues under 28 U.S.C. § 2254(d)(1) that

- 4 -

the state court's decision was contrary to clearly established federal law because it actually decided his claim under *Harris v. New York*, 401 U.S. 222 (1971), instead of *Sullivan*. Dkt. 1-2:9-11. Second, Dassey contends, even if the court's decision was not contrary to clearly established law, it was an unreasonable application of *Sullivan*. Dkt. 1-2:11-17. Third, Dassey asserts under § 2254(d)(2) that the court based its decision on an unreasonable determination of the facts when it "found that the State had used the May 13 telephone call during trial only to cross-examine Brendan." Dkt. 1-2:17-18.

As developed below, Dassey is not entitled to relief on his arguments under 28 U.S.C. § 2254(d)(1) that the state court's decision was contrary to and an unreasonable application of *Sullivan* because *Sullivan* is not clearly established federal law with regard to conflict claims, like Dassey's, involving pretrial counsel where such counsel was replaced by conflict-free counsel months before trial. Further, because *Sullivan* is not clearly established law in this context, it would be inappropriate to grant relief upon Dassey's argument under § 2254(d)(2) that the state court's decision *on his Sullivan claim* was based on an unreasonable determination of the facts. Finally, even assuming that relief were available for an unreasonable determination of the facts for a claim not recognized in federal habeas, Dassey fails to show that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, this court should deny **Ground One** of his petition.

### A. State court proceedings.

In state trial court, Dassey filed a postconviction motion under Wis. Stat. § 809.30 alleging, among other claims, that pretrial counsel, Len Kachinsky, and his agent, defense investigator Michael O'Kelly, were disloyal to Dassey, entitling him to a new trial under *Sullivan* and Wisconsin cases

adopting *Sullivan*.  Ex. 42:4-5, 7.  Kachinsky was appointed to represent Dassey shortly after Dassey confessed in a March 1, 2006 police interview to participating with his uncle, Steven Avery, in the rape, murder and corpse mutilation of Teresa Halbach. Exs. 24; 28:113; 42.

Dassey's postconviction motion alleged Kachinsky was disloyal for making comments to the media that seemed to imply some degree of criminal involvement by Dassey; for directing his investigator to find physical evidence to bolster the State's case against Avery, even if it might further implicate Dassey; and for emailing police and prosecutors about the location of a hidden murder weapon (it was never found) Exs. 25:236-38; 29:88; 38; 42:4-5.  But Dassey's primary complaint was that O'Kelly, at Kachinsky's direction, compelled Dassey to make admissions to O'Kelly on May 12, 2006, as a part of an effort to persuade Dassey to seek a plea agreement with prosecutors, and Kachinsky and O'Kelly then arranged to have Dassey make a second confession to police on May 13, 2006.  Exs. 37; 41:5.

Kachinsky was not present for the May 13 interview with police, in which Dassey provided an uncounselled second confession. Ex. 13:4, 8, 22.  Kachinsky's absence from the May 13 interview resulted in his removal from the case in August 2006. Ex. 13:4, 8, 22.

During the May 13 interview, Calumet County Investigator Mark Wiegert asked Dassey whether he planned to call his mother, Barbara Janda,[1] to tell her the truth of his involvement in the crimes, and suggested he do so at two different points in the interview.  Ex. 33:822-23, 861-63.  Wiegert did not instruct or order Dassey to call his mother, making clear at

---

[1] In the state court's decision, Dassey's mother's last name is Janda.  Dassey refers to his mother as Barb Tadych in his supporting memorandum.

one point that the decision to call "was up to [Dassey], that's your decision whether you want to do that or not. It's just a suggestion." Ex. 33:823.

Later that day, apparently outside of the presence of investigators, Dassey did call his mother on a jail phone. Exs. 34; 45. When his mother asked if Dassey "did all that to her [Halbach] too," Dassey responded, "Some of it." Exs. 34; 45. When she asked how he could have been involved in the crimes when he was at home at 5 p.m., Dassey admitted he had been at Avery's trailer earlier that afternoon. Exs. 34; 45.

Dassey's May 13, 2006 confession was never admitted at trial, and the State did not introduce the recording of Dassey's phone call to his mother in its case-in-chief. However, when Brendan Dassey testified at trial that he did not go over to Avery's property until 7 p.m.,[2] the State played the recording to refute this claim and to bolster the timeline Dassey had already provided in his March 1 confession. Ex. 20:50-52. The phone call also served to refute Dassey's claim that the March 1 confession was "made up." Ex. 20:53-54. Later at trial, the State briefly returned to the phone call in its cross-examination of defense expert Dr. Robert Gordon. Ex. 21:122-23. After Dr. Gordon testified that Dassey's score on a psychological test showed he was highly suggestible, the State asked whether Dassey's admissions in the call to his mother would be relevant in assessing Dassey's suggestibility, and Gordon said that they would be. Ex. 21:32-39; 122-23. Trial counsel raised no objection to the State's limited use of the phone call in cross examining its witnesses.

---

[2] Dassey testified he went over to Avery's at 7 p.m. to burn tires and debris on a bonfire that was already burning, and to bleach a substance off of Avery's garage floor that looked like "fluid from a car." Ex. 20:28-34.

Case 1:14-cv-01310-WED   Filed 05/04/15   Page 7 of 30   Document 20

Following a five-day hearing, the state trial court denied Dassey's *Sullivan* claim and his other postconviction claims in a 32-page written decision. Dkt. 42:4-13.

In a January 20, 2013 *per curiam* opinion, the Wisconsin Court of Appeals, District II, affirmed the trial court's order denying postconviction relief, and the judgment of conviction. Applying a *Sullivan* analysis, the appellate court concluded that Dassey had failed to demonstrate that Kachinsky's actions amounted to an "actual conflict" under *Sullivan*, or that "Kachinsky's advocacy was adversely affected" by the alleged conflict "such that it was detrimental to Dassey's interests," denying his request on appeal for a new trial or hearing. Dkt. 1-5:4-7. Dassey filed a petition for review, which the Wisconsin Supreme Court denied without dissent on August 1, 2013. Ex. 10.

> **B.    Under AEDPA review, Dassey cannot prevail on his *Sullivan* claim because *Sullivan* is not clearly established United States Supreme Court precedent for Dassey's conflict claim involving pretrial counsel, who was replaced by conflict-free counsel before trial.**

As a general rule, claims of ineffective assistance are reviewed under the well-established test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that counsel's performance was deficient, and the existence of prejudice—the reasonable probability that the result of the proceeding would have been different but for counsel's errors. *Strickland*, 466 U.S. at 689-91, 94.

However, in the state courts, Dassey elected to present his claim of ineffective assistance of pretrial counsel as a conflict-of-interest claim under

*Cuyler v. Sullivan*,[3] arguing that Kachinsky's alleged breaches of his duty of loyalty to Dassey in April and May 2006 constituted a conflict reviewable under *Sullivan*. Ex. 4:48-50. Unlike *Strickland*, *Sullivan* does not require a defendant to show prejudice. *Sullivan* only requires the demonstration of an "actual conflict of interest" that "adversely affected" the lawyer's performance. *Sullivan*, 446 U.S. at 348.

In its court of appeals brief, the State prefaced its response to Dassey's argument by asserting that "Dassey's invitation to extend *Sullivan* to his case raises some serious issues." Ex. 6:36-37. The State noted that the United States Supreme Court in *Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002), had expressed doubt that *Sullivan* applies to conflicts, like those alleged in Dassey's case, involving counsel's personal interests. Ex. 6:37. The State then noted that no published Wisconsin case "has considered a claim that a conflict of interest required a new proceeding despite newly appointed conflict-free counsel," and that only five cases in all of the state and federal courts had addressed such claims. Ex. 6:38-39. Nonetheless, the State asserted that the Wisconsin Court of Appeals "need not wrestle with the more complex and difficult question of whether Kachinsky's personal interest triggers a *Sullivan* analysis" because, even applying *Sullivan* instead of the more demanding *Strickland* standard, Dassey still could not prove that Kachinsky's alleged conflict "actually affected" the performance of Dassey's lawyers. Ex. 6:38-39.

Dassey succeeded in the Wisconsin Court of Appeals in obtaining review of his ineffective assistance claim under the more forgiving *Sullivan*

---

[3] Dassey also relied on two Wisconsin cases that have applied *Sullivan*. *State v. Kaye*, 106 Wis. 2d 1, 315 N.W.2d 337 (1982) (adopting *Sullivan* standard in a case where counsel represented multiple defendants); *State v. Love*, 227 Wis. 2d 60, 594 N.W.2d 806 (1999) (extending *Sullivan* and *Kaye* to a case of serial representation).

standard, despite the novelty of his claim. However, this strategic choice effectively forecloses federal habeas review of Dassey's ineffective assistance of pretrial counsel claim. As explained below, Dassey is not entitled to federal habeas relief on **Ground One** for any alleged error in the state court's decision on his *Sullivan* claim because *Sullivan* is not clearly established United States Supreme Court precedent for conflict-of-interest claims such as Dassey's. *See Van Patten*, 552 U.S. at 125-26; *Musladin*, 549 U.S. at 76-77; *see also Means*, Federal Habeas Manual 258 § 3.28 ("Without clearly established federal law, a federal habeas court need not determine whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law.").

In *Sullivan*, defense counsel represented three defendants who were tried separately. *Sullivan*, 446 U.S. at 337-38. Neither Sullivan nor counsel objected to the multiple representations. *Id.* The Supreme Court rejected Sullivan's challenge for his failure to show an actual conflict. *Id.* at 350. The Court then stated that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict adversely affected his lawyer's performance." *Id.* at 348. A review of *Sullivan* and the cases discussed in the *Sullivan* decision shows that the only type of conflict contemplated therein was that arising from multiple representation. *See Sullivan*, 446 U.S. at 348-49.

Four years later, the Supreme Court decided *Strickland v. Washington*. There, the Court briefly noted that the *Sullivan* case had adopted a "limited[] presumption of prejudice" applicable "when counsel is burdened by an actual conflict of interest." *Strickland*, 466 U.S. at 692. Addressing why such a presumption was appropriate in conflict-of-interest cases, the court stated: "In those circumstances, counsel breaches a duty of loyalty, perhaps the most

basic of counsel's duties." *Id.* In state court, Dassey cited this passage to suggest that *Strickland* held that *all* attorney breaches of the duty of loyalty are reviewed under *Sullivan*.[4] Dkt. 4:50. But this brief discussion of *Sullivan* in *Strickland* cannot reasonably be read to dramatically expand *Sullivan*'s reach to all attorney conflicts.

Nothing in *Sullivan* or *Strickland* clearly extends the legal principle set forth in *Sullivan*—that a defendant seeking to show a Sixth Amendment violation arising from multiple representation need only demonstrate the existence of an actual conflict that adversely affected his lawyer's performance—to all other alleged attorney conflicts regardless whether the specific conflict involves representation of multiple defendants.[5] *Moses*, 555 F.3d at 754 (*citing Van Patten*, 552 U.S. at 125) (summarizing standard for determining whether there is "clearly established" Supreme Court precedent under § 2254(d) on the issue decided by the state court).

In his supporting memorandum, Dassey addressed the issue of *Sullivan*'s reach as follows:

---

[4] Dassey did so in the following cite and explanatory parenthetical: "*Strickland*, 466 U.S. at 692 (when defense counsel 'breached the duty of loyalty,' he 'operates under a conflict of interest' governed by *Cuyler* [*v. Sullivan*])."

[5] It is unclear why *Strickland* would be insufficient to protect the Sixth Amendment rights of persons, like Dassey, who alleged pretrial counsel had a conflict when such counsel was replaced by conflict-free counsel eight months before trial. Such a circumstance begs a prejudice analysis: If counsel was replaced by conflict-free counsel, what harm, if any, did the defendant suffer in the proceedings as a result of prior counsel's conflict?

Further, the *Sullivan* test itself appears to be ill-suited to conflict claims like Dassey's without at least some clarification. When determining whether pretrial counsel's actual conflict "adversely affected the lawyer's performance," which lawyer's performance should be considered? Pretrial counsel's, replacement counsel's, or both?

- 11 -

While *Sullivan* is most often applied to cases in which an attorney represented multiple co-defendants, it also governs cases involving attorneys who breach the duty of loyalty. *See, e.g. Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763, at *31 (E.D. Mich. Mar. 30, 2001) (an 'obvious' conflict of interest arises when a defense attorney 'abandons his or her duty of loyalty to the client and joins the prosecution in an effort to obtain a conviction') (citing *Dixson v. Quarles*, 627 F.Supp. 50, 53 (E.D. Mich. 1985) (discussing *Sullivan* standard)).

Dkt. 1-2:10. Dassey's reliance on an unpublished federal district court decision to assert that *Sullivan* "governs" in all cases alleging an attorney's breach of the duty of loyalty speaks volumes on the issue of whether *Sullivan* is clearly established Federal law for purposes of habeas review under § 2254(d). *See Hall v. Zenk*, 692 F.3d 793, 799 (7th Cir. 2012) (habeas court may consider only the holdings of the United States Supreme Court in assessing whether clearly established Federal law exists).

Finally, if there were any doubt regarding whether *Sullivan* is clearly established in conflict cases other than multiple representation cases, the United States Supreme Court put the issue to rest in *Mickens v. Taylor*, 535 U.S. 162, 175 (2002). There, the parties in a § 2254 habeas case assumed that *Sullivan* was clearly established law for purposes of federal habeas review in a case in which defense counsel simultaneously represented both Mickens and, in a separate criminal proceeding, Mickens' victim. *Mickens*, 535 U.S. at 164-65. After deciding the narrow issue presented on review— "the effect of a trial court's failure to inquire into a potential conflict upon the *Sullivan* rule that deficient performance of counsel must be shown," *id.* at 174—the *Mickens* Court joined the Fifth Circuit in criticizing other courts of appeals' extension of *Sullivan* to many different types of attorney conflicts, and indicated *Sullivan* was clearly established law only for multiple

representation claims. The Court explained that the parties' assumption that *Sullivan* applied

> was not unreasonable in light of the holdings of Courts of Appeals, which have applied *Sullivan* "unblinkingly" to "all kinds of alleged attorney ethical conflicts," *Beets v. Scott*, 65 F.3d 1258, 1266 (C.A.5 1995) (en banc). They have invoked the *Sullivan* standard not only when (as here) there is a conflict rooted in counsel's obligations to former clients, but even when representation of the defendant somehow implicates counsel's personal or financial interests, including a book deal... the teaching of classes to Internal Revenue Service agents, a romantic "entanglement" with the prosecutor, or fear of antagonizing the trial judge.
>
> It must be said, however, that the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application. "[U]ntil," it said, "a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S., at 350, 100 S.Ct. 1708 (emphasis added). Both *Sullivan* itself, *see id.*, at 348–349, 100 S.Ct. 1708, and *Holloway*, see 435 U.S., at 490–491, 98 S.Ct. 1173, stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. Not all attorney conflicts present comparable difficulties....
>
> ...The purpose of our *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland* ... is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel. In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question.

*Mickens*, 535 U.S. at 174-76 (citations and footnotes omitted). Respondent submits that *Mickens* precludes § 2254(d) habeas review of any state decision applying *Sullivan* to conflict claims other than multiple representation claims.

Based on the foregoing, Dassey is not entitled to relief on **Ground One** of his arguments under § 2254(d)(1) that the state court decision was contrary to, or an unreasonable application of, *Sullivan* because *Sullivan* is not clearly established law for pretrial counsel conflict claims where such counsel was replaced by conflict-free counsel before trial. And although Dassey has not yet requested it, review of his ineffective assistance of pretrial counsel claim under the clearly established *Strickland* standard—where the state court did not review Dassey's claim under *Strickland because of how Dassey argued the claim* —would be plainly contrary to § 2254(d) and basic principles of federal habeas review. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) ("[R]eview under § 2254(d)(1) focuses on what a state court knew and did.").[6]

Because *Sullivan* is not clearly established law for attorney conflict claims like Dassey's, it would be strange for Dassey to be entitled to habeas relief on his argument under § 2254(d)(2) that the state court made an unreasonable determination of the facts *in deciding his Sullivan claim*. The absence of clearly established law should preclude relief under § 2254(d)(2) even if the state court's determination of the facts was unreasonable so long as the factual determination informs the not-clearly-established claim. *See Rhodes v. Dittmann*, No. 14-1741, 2015 WL 1637623, at 6 (7th Cir. Apr. 14, 2015) ("Section 2254(d) focuses on the ultimate decision of the state court, not on parts of a written opinion that might in isolation appear to be misguided but that in the end are not necessary to the outcome."). Respondent has found no cases granting federal habeas relief for an unreasonable determination of the facts where the habeas court also concluded that the

---

[6] And any claim under *Strickland* would also be procedurally defaulted for lack of fair presentment in the state courts. *See Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001).

state court's decision rejecting the petitioner's claim was not based on clearly established federal law.

But even if habeas relief were available for a state court's unreasonable determination of the facts when the underlying claim is not grounded in clearly established Federal law, Dassey has not shown that the Wisconsin Court of Appeals' decision on his *Sullivan* claim was based on an unreasonable determination of the facts. As noted, Dassey argues that the state court "found that the State had used the May 13 telephone call during trial only to cross-examine Brendan, when the transcript plainly indicates that State used the call at least three times, including during closing argument to neutralize Brendan's alibi" in assessing whether the alleged conflict "actually affected" his attorneys' representation in a way that was detrimental to Dassey's interests. Dkt. 1-2:17.

However, the state court did not find that the call was "used" only once. It stated that the State "*introduced* [the call] only to rebut Dassey's testimony on direct that the acts to which he had admitted 'didn't really happen' and that his confession was 'made up.'" Dkt. 1-5:6 (emphasis added). This statement is not inconsistent with the record, which shows the State introduced the call into evidence during Dassey's cross-examination, and, once introduced, referenced the call briefly during Dr. Gordon's cross-examination, and briefly during closing argument. Ex. 21:122-23; 22:56-57. Applying AEDPA deference to this determination, Dassey fails to show that the state court was mistaken about how many times the phone call was "used" at trial.

Even assuming for purposes of argument only that the court was mistaken, Dassey fails to demonstrate that the court's decision in this case was "based on" this mistake under § 2254(d)(2). The phone call was but one

part of the court's discussion of whether any alleged conflict "adversely effected" the representation of Dassey's attorneys. Further, the call was used to greatest effect at trial in cross-examining Dassey, and given the limited nature of the State's use of the call in cross-examining Dr. Gordon and in closing argument, consideration of these two instances would not have undermined the court's basic point: That the phone call's impact at trial was insufficient to show that pretrial counsel's alleged conflict "actually affected" the attorneys' representation of Dassey. Thus, even assuming the alleged mistake of fact, Dassey cannot show that, in the absence of the alleged mistake, the state court likely would have granted his *Sullivan* claim.

Relief would be inappropriate on Dassey's § 2254(d)(2) argument for two additional reasons. First, the court did not explicitly state whether Dassey's phone call to his mother was even a product of Kachinsky's alleged conflict, and the state court record indicates it was not. To show a sufficient link between Kachinsky's alleged conflict and Dassey's post-interview phone call to his mother, Dassey must show that his decision to call his mother was coerced by the investigators and not voluntary. On this point, Dassey asserts, without citation to the record, that "police directed Brendan to admit guilt to his mother over the recorded prison telephones" during the interview. Dkt. 1-2:5. While the investigators suggested that Dassey call his mother and encouraged him to do so at two different points in the interview, Dassey's unsupported claim that they "directed" him to do so is contrary to the interview transcript. Ex. 33. Rather, Investigator Wiegert told Dassey that the decision to call "was up to [Dassey], that's your decision whether you want to do that or not. It's just a suggestion." Ex. 33:823. And the fact that Dassey called after the interview was over and apparently outside of the presence of the investigators belies any claim of police coercion.

Second, Dassey's argument about the alleged mistake concerning the State's use of the call at trial ignores another critical determination that was at least as important to the court's decision:  "Dassey has not convinced us that Kachinsky's actions amounted to an actual conflict …"  Dkt. 1-5:7.  Because the court also concluded that Kachinsky had no actual conflict, it is difficult to see how any alleged mistake regarding how the phone call was used in the court's discussion of whether any (nonexistent) conflict "adversely affected" his attorneys' representation would have changed the court's decision.  In light of the court's "no-actual-conflict" determination, Dassey cannot show that the state court's decision was "based on" the alleged mistake regarding the State's use of the phone call.

For the foregoing reasons, this court should deny Dassey relief on **Ground One** of his habeas petition.


## GROUND TWO:  VOLUNTARINESS CLAIM

**II.**    **Dassey is Not Entitled to Habeas Relief on *Ground Two* Because the Wisconsin Court of Appeals' Decision on His Voluntariness Claim Was Not Based On an Unreasonable Determination of the Facts, and Was Not Contrary To, or an Unreasonable Application Of, Clearly Established Supreme Court Precedent.**

Dassey challenges the Wisconsin Court of Appeals' adjudication of his claim that his March 1, 2006 confession was involuntary (**Ground Two**) on three bases.  First, he argues under 28 U.S.C. § 2254(d)(2) that the state court's implicit finding that investigators professed to know facts that they did not have in questioning Dassey represents an unreasonable determination of fact.  Dkt. 1-2:18-21.  Second, he argues the state court

made a second unreasonable determination of fact when it stated that the officers did not make promises of leniency to him during the March 1 interview but rather exhorted Dassey to be truthful and tried to establish rapport with him. Dkt. 1-2:21-23. Third, he argues under § 2254(d)(1) that the state court's decision was either contrary to, or an unreasonable application of, clearly established Federal law because it failed to account for Dassey's age in concluding his March 1 confession was voluntary. Dkt. 1-2:23-29.

As developed below, Dassey's two arguments that the Wisconsin Court Appeals' decision was based on an unreasonable determination of the facts are contrary to the record. Further, Dassey's argument challenging the court's conclusion that his March 1 confession was voluntary appears to be an attempt to relitigate the issue in this court. The state court properly took into account all of Dassey's personal characteristics, and concluded his confession was voluntary where the transcript and video record did not show police coercion. Its decision was neither contrary to, nor an unreasonable application of, clearly established Federal law. Accordingly, Dassey is not entitled to relief on **Ground Two** of his petition.

### A. The Wisconsin Court of Appeals' decision on Dassey's voluntariness claim.

#### *Voluntariness of Confession*

¶ 3 On February 27, 2006, law enforcement officers conducted a witness interview of Dassey at his high school and a second videotaped interview at the Two Rivers Police Department. Dassey's mother, Barbara Janda, agreed to the second interview but declined the offer to accompany Dassey. On March 1, again with Janda's permission, officers retrieved Dassey from school for a videotaped interview. During the ride to the Manitowoc County Sheriff's Department, Dassey was read his *Miranda* rights and signed a waiver. Upon arriving, Dassey acknowledged that he remembered the advisories and still

wanted to talk to the interviewers. Dassey made several inculpatory statements over the course of the three-hour interview, such that he now was viewed as a suspect. He was charged two days later.

¶ 4 Dassey contends that his March 1 confession was involuntary and should have been suppressed. He claims that law enforcement used psychological interrogation tactics like fact feeding and suggestions of leniency that overbore his will and exceeded his personal ability to resist due to his age, intellectual limitations and high suggestibility.

¶ 5 In assessing voluntariness, "the essential inquiry is whether the confession was procured via coercive means or whether it was the product of improper pressures exercised by the police." *State v. Clappes*, 136 Wis.2d 222, 235–36, 401 N.W.2d 759 (1987). A prerequisite for a finding of involuntariness is coercive or improper police conduct. *Id.* at 239, 401 N.W.2d 759. We evaluate a confession's voluntariness on the totality of the circumstances. *Id.* at 236, 401 N.W.2d 759. Our analysis involves a balancing of the defendant's personal characteristics against the police pressures used to induce the statements. *State v. Jerrell C.J.*, 2005 WI 105, ¶ 20, 283 Wis.2d 145, 699 N.W.2d 110. "This court will not upset a trial court's determination that a confession was voluntary unless it appears that the finding was clearly erroneous," nor will we substitute our judgment for that of the trial court as to the credibility of disputed factual testimony. *State v. Echols*, 175 Wis.2d 653, 671, 499 N.W.2d 631 (1993). Whether the facts as found constitute coercion is a question of law that we review independently. *See Clappes*, 136 Wis.2d at 235, 401 N.W.2d 759.

¶ 6 The trial court heard the testimony of Dassey's mother, his school psychologist and a police interviewer, and had the benefit of listening to the audiotapes and viewing the videotaped interviews. The trial court found that Dassey had a "low average to borderline" IQ but was in mostly regular-track high school classes; was interviewed while seated on an upholstered couch, never was physically restrained and was offered food, beverages and restroom breaks; was properly Mirandized; and did not appear to be agitated or intimidated at any point in the questioning. The court also found that the investigators used normal speaking tones, with no hectoring, threats or promises of leniency; prodded him to be honest as a reminder of his moral duty to tell the truth; and told him they were "in [his] corner" and would "go to bat" for him to try to achieve a rapport with Dassey and to convince him that being truthful would be in his best interest. The court concluded that Dassey's confession was voluntary and admissible.

¶ 7 The court's findings are not clearly erroneous. Based on those findings, we also conclude that Dassey has not shown coercion. As long as investigators' statements merely encourage honesty and do not promise leniency, telling a defendant that cooperating would be to his or her benefit is not coercive conduct. *State v. Berggren*, 2009 WI App 82, ¶ 31, 320 Wis.2d 209, 769 N.W.2d 110. Nor is professing to know facts they actually did not have. *See State v. Triggs*, 2003 WI App 91, ¶¶ 15, 17, 264 Wis.2d 861, 663 N.W.2d 396 (the use of deceptive tactic like exaggerating strength of evidence against suspect does not necessarily make confession involuntary but instead is factor to consider in totality of circumstances). The truth of the confession remained for the jury to determine.

Dkt. 1-5:2-4.

**B.  Based on the transcript and video recording of Dassey's March 1 confession, the state court's implicit finding that police "professed to know facts that they did not have" in questioning Dassey is true.**

Dassey contends that the court of appeals "made an unreasonable determination of fact under § 2254(d)(2) when it found that during Brendan's March 1, 2006 interrogation, the officers were merely 'professing to know facts that they actually did not have,' when the video shows the officers repeatedly feeding Brendan facts about the crime that they knew were true." Dkt. 1-2:18.  Later, Dassey adds that there is "absolutely no basis in the record … to find that the officers were merely 'professing to know facts they actually did not have.'"  Dkt. 1-2:21.  Respectfully, this argument misstates the court's decision, and is demonstrably false.

The court did not implicitly find that the officers *"merely"* professed to know facts that they actually did not have.  The court only implicitly found that officers used the tactic of professing to know facts unknown to them: "… telling a defendant that cooperating would be to his or her benefit is not

coercive conduct. Nor is professing to know facts they actually did not have." Dkt. 1-5:4 (case cite omitted).  The court said nothing about "merely" using this tactic and not another.  That construction is entirely Dassey's on review.

And the record shows that officers did use the tactic of professing to know facts unknown to them, as Dassey appears to acknowledge later in his brief.  *See* Dkt. 1-2:26-27.  In fact, the most damaging admissions Dassey made in his interview—that he overheard Halbach screaming from Avery's home, that he knocked on the door and went into the trailer, that he saw Halbach handcuffed naked to the bed, that he had intercourse with Halbach after Avery told him "ta do her," that he helped Avery tie Halbach up, and that he cut Halbach's throat—were all made as investigators encouraged Dassey to tell the truth because they "already knew" what had happened. Exs. 24:561-588; 43 (Disc 1).  These admissions were not a product of "fact-feeding"; investigators knew nothing about Dassey's involvement in a rape or the murder until he made his confession.  Ex. 11:15-19.

The state court was silent on Dassey's specific assertion that investigators' feeding of certain facts to Dassey (after Dassey had made his most damaging admissions) constituted police coercion that overbore Dassey's will.  This silence is not grounds for relief, however, and Dassey does not argue that it is.  On habeas review, all that can be reasonably inferred from the court's silence is that the court considered and rejected this argument.  *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) (even when a state court fails to address a particular claim on the record, a rebuttable presumption exists that the claim was nonetheless adjudicated on the merits by the state court).

## C. The state court's determination that officers made no promises of leniency was not an unreasonable determination of the facts.

Dassey next argues that the Wisconsin Court of Appeals made an unreasonable determination of the facts in upholding the trial court's finding that investigators made no "promises of leniency" to Dassey, but rather "prodded him to be honest as a reminder of his moral duty to tell the truth; and told him they were 'in [his] corner' and would 'go to bat' for him to try to achieve a rapport with Dassey and to convince him that being truthful would be in his best interest." Dkts. 1-2:21; 1-5:4.

In his brief, Dassey asserts that police made "no fewer than twenty-one" promises of leniency during the March 1 interview, but focuses on only three statements made by the investigators early in the interview. Dkt. 4-2:21. Dassey fails to meet the high burden of showing that the state courts' determination that officers made no promises of leniency was an objectively unreasonable determination that no reasonable court could reach.

Courts have found that exhortations to be honest, and statements that cooperating and telling the truth are in the suspect's best interest do not constitute promises of leniency. *Rachlin v. United States*, 723 F.2d 1373, 1378 (8th Cir.1983) (no implied promise of leniency when agents communicated to defendant that it would be in his best interest to cooperate); *State v. Deets*, 187 Wis. 2d 630, 645, 523 N.W.2d 180 (Ct. App. 1994).

The state courts' determination that the investigators' statements did not constitute promises of leniency was not unreasonable. In his brief, Dassey presents each of the three cited statements out of context. When Investigator Wiegert told Dassey that "by you talking to us, it's, it's helping you," he was merely contrasting Dassey's willingness to talk with Avery's

silence, and explaining how cooperation was in his best interest. Ex. 24:541. Immediately thereafter, Investigator Wiegert states, "Honesty is the only thing that will set you free." Ex. 24:541. It was not unreasonable for the court to determine that a person in Dassey's position would not construe this phrase—which is commonly understood to have a spiritual or psychological meaning[7]—to literally mean that he would not be imprisoned if he told the truth, no matter what the truth might be.

Dassey also takes Agent Fassbender's reference to "statements … against interest" out of context. Dkt. 1-2:21. The agent used this phrase in a plea to Dassey to tell the whole truth; the agent encourages Dassey to admit even things that "might make you look a little bad" because he will appear to be taking full responsibility. Ex. 24:540. At least *175 words* separate this phrase from the set of phrases that Dassey tries to link it to in his brief. Ex. 24:540.

Agent Fassbender's later statements that Dassey would be "all right" and he would not have "have to worry about things" are likewise presented out of context. There, the agent refers specifically to "some places where some things were left out" by Dassey in prior interviews "or maybe just changed a bit … to protect yourself a little," and that, "from what I'm seeing" if *these places* were "filled … in, I'm thinking you're all right. Ok, you don't have to worry about things." Ex. 24:540. The agent's statement that he believed Dassey would "be alright" and didn't "have to worry" was based on "what [the agent was] seeing" at the time: that Dassey had "maybe just changed" his story "a bit" and merely needed to "fill[] in" a "some things [that] were left out." Again, at the beginning of the March 1 interview, Dassey was

---

[7] "And ye shall know the truth, and the truth shall make you free." John 8:32 (King James Version).

not a suspect in the murder, or in a rape. Dkts. 1-5:2-3; 11:15-19. In context, no reasonable person would view the agent's statements to be a promise of leniency to a confession to rape and murder.

Finally, even if a person in Dassey's position might have viewed any of these statements to be an implicit promise of leniency, he would have been disabused of this notion when Investigator Wiegert made clear in the middle of these statements, "We can't make any promises ..." Dkt. 24:541. Accordingly, the state court did not base its decision on an unreasonable determination of the facts when it upheld the trial court's finding that investigators made no promises of leniency to Dassey.

> **D.** **The state court's decision that Dassey's March 1, 2006 confession was voluntary was not contrary to, or an unreasonable application of, clearly established Federal law**.

Here, Dassey does not present a developed argument that the state court's decision was "contrary to" clearly established Federal law as determined by the United States Supreme Court. He argues that the state court "acted contrary to" established Federal law, but neither argues that it applied a rule that plainly contradicts the governing law as set forth by the United States Supreme Court, nor identifies a particular Supreme Court decision with materially indistinguishable facts that dictates the result in his case. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000) (O'Connor, J. concurring but writing for a majority of the court). The Respondent therefore addresses this claim for relief under the "unreasonable application" prong of 28 U.S.C. § 2254(d)(1). *Williams*, 529 U.S. at 406 ("run-of-the-mill" state-court decisions applying the correct legal rule to the facts of a prisoner's case are decided under the "unreasonable application" clause).

In his memorandum, Dassey acknowledges, as he must, that the Wisconsin Court of Appeals applied the appropriate totality of the circumstances test in concluding that his confession was voluntary. Dkt. 1-5:3. However, he argues that he is entitled to habeas relief under § 2254(d)(1) because the state court failed to consider Dassey's youthfulness, asserting that the court's omission of Dassey's age in its voluntariness analysis by itself mandates habeas relief; the state court failed to mention or apply "the *Haley-Gallegos-Gault* standard"[8] in deciding his case; neither his mother nor any other interested adult was in the interview room; "false assurances" that officers "already knew" what had happened led Dassey to make his "most damning admissions"; and, somewhat inconsistently, "Brendan's admissions themselves … were frequently the result of coaching and fact-feeding." Dkt. 1-2:23-29. Dassey is mistaken on all counts for the reasons provided below, and the state court's decision was not an unreasonable application of clearly established Federal law.

First, the court's omission of Dassey's age "in the voluntariness analysis" (the court noted Dassey's age, sixteen, at the beginning of its decision, Dkt. 1-5:2) does not automatically entitle Dassey to habeas relief under § 2254(d)(1). The state appellate court appropriately considered on the record Dassey's personal characteristics, including his youthfulness, noting that Dassey was in high school, and was in mostly regular-track classes, as well as the fact that he had a "low average to borderline" IQ, in assessing whether the confession was voluntary. Dkt. 1-5:3-4. Further, the state appellate court adopted the circuit court's findings, which contained a detailed consideration of Dassey's personal characteristics, including

_____

[8] *Haley v. Ohio*, 332 U.S. 596 (1948); *Gallegos v. Colorado*, 370 U.S. 49 (1962); *In re Gault*, 387 U.S. 1 (1967). A WestlawNext search of all federal cases for "*Haley Gallegos Gault*" and "*Haley-Gallegos-Gault* standard" yielded no results.

Dassey's age and intelligence. Ex. 12:3-4. These factual findings included that Dassey had no emotional disorder that might render him "unusually susceptible or vulnerable to police pressures." Ex. 12:3-4. The record shows that the state courts properly considered Dassey's personal characteristics as required by established Federal law. *See Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (courts in juvenile cases must consider "the juvenile's age, experience, education, background, and intelligence" in addition to the circumstances regarding the confession).

Second, the fact that the state court relied on state court decisions adopting the applicable clearly established Federal principles, *State v. Clappes*, 136 Wis. 2d 222, 401 N.W.2d 759 (1987) (adult confession case), and *State v. Jerrell C.J.*, 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110 (juvenile confession case), and did not cite *Haley, Gallegos* and *Gault* or other United States Supreme Court cases is wholly unremarkable, and not grounds for relief under § 2254(d)(1). *Mitchell v. Esparza,* 540 U.S. 12, 16 (2003) ("[A] state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them."); *see also Rhodes*, No. 14-1741, 2015 WL 1637623, at 6. ("As we often have noted, we review judgments, not opinions."). More importantly, the record shows that the state court properly took into account Dassey's personal characteristics, including his age, when determining whether his confession was voluntary. The court's failure to cite United States Supreme Court decisions or to use the term the "special caution" in its decision is not grounds for reversal on habeas review where the record plainly establishes that the state court properly considered Dassey's personal characteristics, including his age and intelligence, when determining whether his confession was

voluntary. And any complaint about the *weight* the state court assigned to Dassey's age in balancing his personal characteristics against the pressures used to induce his confession does not provide grounds for reversal under the AEDPA's deferential review standards.

Third, while Dassey's mother, Barbara Janda, was not present in the interview room on March 1, Dassey was plainly not isolated from adult support on March 1, or on February 27, when Dassey was interviewed twice. After Dassey's February 27 interview at Mishicot High School, Dassey returned to his eighth hour class. Ex. 12:5. Later that day, Janda rode with Dassey to the Two Rivers Police Department, and the investigators offered to allow Janda to sit in on that interview but she declined, and Dassey said he did not care if Janda was present or not. Ex. 12:5. Dassey spent the day and night of February 28 at home. Ex. 20:46. Investigators sought and received Janda's permission to interview Dassey on March 1, 2006. Ex. 18:12. Investigators did not view Dassey as a suspect until mid-way through the March 1, 2006 interview. Dkts. 1-5:2-3; 11:15-19.[9]

Finally, the state court's decision rested in large part on a determination that Dassey's confession was not obtained by police coercion. Dkt. 1-5:3-4. The United States Supreme Court has held that "coercive police

---

[9] Given this sequence of events, the 48 hours immediately preceding Dassey's March 1, 2006 interview were not, as Dassey claims, "a prolonged ordeal that surely left [Dassey] wondering 'if and when the inquisition would ever cease.' *Woods v. Clusen*, 794 F.2d 293, 298 (7th Cir. 1986)." Dkt. 1-2: Woods, unlike Dassey, was the prime suspect in a murder. Police took the sixteen-year-old Woods from his home in handcuffs, and drove him to the police station where he was fingerprinted, photographed, and made to wear jail overalls. *Woods*, 794 F.2d at 294-95. Then, without obtaining Woods' consent or reading *Miranda* warnings, officers interrogated Woods, showing him disturbing pictures of the murder scene. Woods became "visibly emotional" but refused to answer the officers' questions. Nonetheless, officers continued the interrogation, and ultimately obtained a confession. *Id.* at 295-96.

activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The reasonableness of the state court's decision is demonstrated by *United States v. Rutledge*, 900 F.2d 1127 (7th Cir. 1990). There, the Seventh Circuit Court of Appeals, discussing the *Connelly* decision, explained: "[A] confession which is not a product of the defendant's free choice—maybe he was so crazy, retarded, high on drugs, or intoxicated that he did not even know he was being interrogated—is admissible so long as whatever it was that destroyed the defendant's power of choice was not police conduct." *Rutledge*, 900 F.2d at 1129; *see Price v. Vincent*, 538 U.S. 634, 643 n.2 (2003) (authorities other than United States Supreme Court precedents may be used to assist a federal habeas court in assessing the reasonableness of the state court's decision).

A review of the transcript and the video of the March 1, 2006 interview shows that police pressures in this case were, at most, minimal. Exs. 24, 43. The record shows, consistent with the state courts' findings, that Dassey was properly *Mirandized*; was interviewed while seated on an upholstered couch; was never physically restrained and was offered food, beverages and restroom breaks; and did not appear to be agitated or intimidated at any point in the questioning. Dkt. 1-5:4; Exs. 24, 43. The investigators used normal speaking tones, and did not hector or threaten Dassey. *Id.*

Perhaps Dassey's primary complaint about the tactics used by police is that they engaged in fact-feeding—for example, revealing to Dassey that they knew that Halbach had been shot in the head; Dassey said Avery fired the shots once this information was provided. Ex. 24:586-87; *see* Dkt. 1-2:27, 28. But this tactic was used primarily *after* Dassey admitted to his involvement in the rape and murder of Halbach.

The "most damning admissions"—as Dassey finally acknowledges, Dkt. 1-2:26—were made merely upon the officers stating in general terms that they "already knew" what had happened. Exs. 24:561-588; 43 (Disc 1). They did not accuse him of rape or murder and then say that they "already knew" he did it. They merely stated, in calm tones, that they "already knew" what happened, and allowed Dassey to confess that he had raped Halbach, and was involved in her murder. Exs. 24:561-588; 43 (Disc 1). Dassey's confession was not coerced, and the state court's decision on Dassey's voluntariness claim did not involve an unreasonable application of clearly established Federal law. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) ("A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is."); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) ("Of the numerous varieties of police trickery, however, a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary."). Accordingly, this court should deny **Ground Two** of Dassey's petition.

## CONCLUSION

For the foregoing reasons, this court should deny **Grounds One** and **Two** for relief, and dismiss Dassey's habeas petition. Because Dassey fails to meet his burden on either **Ground** of showing under 28 U.S.C. § 2254(d) that the state court's decision was contrary to, or an unreasonable application of, clearly established Federal law, or was based on an unreasonable determination of the facts, Dassey is not entitled to de novo review under 28 U.S.C. § 2254(a). *See Mosely v. Atchinson*, 689 F.3d 838, 853 (7th Cir. 2012).

The Respondent respectfully submits that none of Dassey's claims are particularly close under the AEDPA's deferential standards of review. According, this court should also deny a certificate of appealability.

Dated this 4th day of May, 2015, in Madison, Wisconsin.

Respectfully submitted,

BRAD D. SCHIMEL
Attorney General

*/s/ Jacob J. Wittwer*
JACOB J. WITTWER
Assistant Attorney General
State Bar #1041288

Attorneys for Respondent

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1606
(608) 266-9594 (Fax)
wittwerjj@doj.state.wi.us