# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRENDAN DASSEY,

                    Petitioner,

          v.                                    Case No. 14-CV-1310

MICHAEL A. DITTMANN,[1]

                    Respondent.

# DECISION AND ORDER

I.      **Facts and Procedural History**

        A.  **The Initial Investigation**

        Teresa Halbach, the oldest daughter of northeastern Wisconsin dairy farmers,

graduated summa cum laude from the University of Wisconsin – Green Bay in 2002. By

the time she was 25-years-old she was running her own photography business.

Halbach's family and friends became concerned in early November 2005 after she had

not been seen or heard from for a few days. Uncharacteristically she had not stopped by

---

[1] Records of the Wisconsin Department of Corrections state that petitioner Brendan Dassey is currently incarcerated at Columbia Correctional Institution, http://offender.doc.state.wi.us/lop/, and the warden of this institution is Michael A. Dittmann, http://doc.wi.gov/families-visitors/find-facility/columbia-correctional-institution (last visited August 12, 2016). Therefore, in accordance with Rule 2(a) of the Rules Governing Section 2254 Cases and Fed. R. Civ. P. 25(d), the caption is updated accordingly.

her photography studio and her voicemail was full. Family, friends, and law enforcement distributed thousands of missing person posters, scoured roadside ditches in case she had had an accident, and retraced her last known activities. Searchers learned that Halbach had been photographing vehicles for Auto Trader Magazine on October 31, 2005. After photographing vehicles at two residences that day, Halbach was scheduled to photograph a minivan that was for sale at the Avery Salvage Yard. Halbach had not been seen or heard from since.

On Saturday, November 5, 2005, volunteer searchers, with the permission of the owners of the property, undertook a search of the Avery Salvage Yard. The salvage yard property was expansive, spanning 40 acres and containing roughly 4,000 vehicles. Amidst the thousands of salvaged vehicles, partially covered by tree branches, fence posts, boxes, plywood, and auto parts, a pair of searchers found Halbach's 1999 Toyota RAV4.

As a result of this discovery, investigators obtained a search warrant for the entire salvage yard property, which encompassed roughly fifteen buildings and included residences of various members of the extended Avery family, garages, and other outbuildings. The search was extensive, involving many different agencies, dozens of law enforcement personnel, and dozens more volunteer firefighters, along with dive teams for the ponds and dogs trained to detect blood and human remains. The search lasted a week and covered not only all of the buildings but also each of the

4,000 salvaged vehicles, some of which had been crushed and required specialized equipment to inspect.

Steven Avery, a son of the owners of the salvage yard, lived in a residence on the property. Investigators recovered two firearms from a gun rack above Avery's bed and a key to Halbach's RAV4, found in Avery's bedroom. In a burn barrel and a roughly four-foot by six-foot burn pit near Avery's residence, investigators located charred human bone and tooth fragments. Also recovered from the burn areas were the burned remnants of electronics, a zipper, and rivets from a woman's jeans. In a vehicle in the salvage yard a searcher found the license plates that had been on Halbach's RAV4.

Subsequent investigation determined that the recovered human remains were those of an adult female who was no more than 30-years-old. Analysis of the skull fragments determined that she had been shot twice in the head. DNA testing of tissue remaining on one of the bone fragments was consistent with Halbach's DNA profile, with the chance that the DNA was from a source other than Halbach being one in a billion.

Additionally, investigators determined that the burned electronics were from a mobile phone, personal organizer, and digital camera of the same makes and models that Halbach was known to have owned. Halbach was seen wearing jeans shortly before she arrived at the Avery property on October 31, and the rivets recovered from the burn

area were from jeans of the same brand Halbach was known to own. Multiple witnesses reported seeing a large bonfire in the burn pit outside Avery's residence on October 31.

Forensic examination of Halbach's RAV4 revealed multiple blood stains. A roughly six-inch blood stain in the rear cargo area by the wheel well displayed a pattern consistent with having been the result of bloody hair. The DNA profile developed from this stain and others in the cargo area, including along the plastic threshold to the cargo area, the door to the cargo area, and a metal piece along the opening of the cargo area, was identified as being that of Halbach.

Other small blood stains in the passenger compartment of Halbach's RAV4, just to the right of the ignition, on a CD case, on a metal panel between the rear seats and the vehicle cargo area, on the driver's seat, on the front passenger's seat, and on the floor by the center console all matched Steven Avery's DNA. Avery's DNA was also detected on the hood latch of Halbach's RAV4 and on the key to the RAV4 that was found in Avery's bedroom.

Investigators learned that Halbach had taken photographs at the Avery property on five prior occasions. Avery called Auto Trader on the morning of October 31, 2005, and requested that "the same girl who had been out here before" come and take pictures of a vehicle that was for sale. Just before 2:30 p.m., Halbach contacted Auto Trader and said that she was on her way to the Avery property. At roughly 2:30 or 2:45 p.m., a neighbor of Avery's saw Halbach photographing a minivan and then go to

Avery's residence. The neighbor left home at about 3:00 p.m. and observed Halbach's RAV4 still outside Avery's residence but did not see Halbach. When he returned home at about 5:00 p.m. Halbach's RAV4 was no longer there.

Avery was arrested and charged with Halbach's murder.

**B. The Investigation of Brendan Dassey**

The investigation regarding Avery continued as he awaited trial. On February 20, 2006, investigators interviewed Kayla Avery, Steven Avery's teenage niece. Although the interview focused on information related to Steven Avery, at the end of the interview Kayla stated that her cousin, Brendan Dassey, had been "acting up lately." When asked to explain, Kayla stated that Dassey would stare into space and start crying uncontrollably, and that he had lost roughly 40 pounds recently.

Based on this information from Kayla, and because a witness reported seeing Dassey at the bonfire with Avery around 7:30 or 7:45 on the evening of October 31, investigators decided that they needed to re-interview Dassey. Dassey, like Avery's other relatives, had been questioned earlier in the investigation. Dassey was 16 years old and, aside from this investigation, had never had any contacts with law enforcement. (ECF Nos. 19-12 at 60; 19-13 at 4.) He was described as a "very shy boy" who "doesn't say too much." (ECF No. 19-12 at 67.) In school, he typically followed rules and did not get into trouble. (ECF No. 19-12 at 94.) He also suffered from certain intellectual deficits. His IQ was assessed as being in the low average to borderline

range. (ECF No. 19-22 at 46-49.) He was a "slow learner" with "really, really bad" grades. (ECF No. 19-12 at 66.) Specifically, he had difficulty understanding some aspects of language and expressing himself verbally. (ECF No. 19-12 at 90.) He also had difficulties in the "social aspects of communication" such as "understanding and using nonverbal cues, facial expressions, eye contact, body language, tone of voice." (ECF No. 19-12 at 91.) Testing also revealed that he was extreme when it came to social introversion, social alienation, and especially social avoidance. (ECF No. 19-22 at 34-35.) As a result, he received special education services at school. (ECF No. 19-13 at 3.)

Calumet County Sheriff's Investigator Mark Wiegert and Wisconsin Department of Justice Special Agent Tom Fassbender met with Dassey on February 27, 2006, in a conference room at Dassey's high school, where they spoke for about an hour. After the interview, Wiegert and Fassbender contacted the prosecuting attorney, who requested that they create a better record of the interview than the poor-quality audio cassette recording they had. They made arrangements to interview Dassey again later that same day at a local police station that was equipped with video recording equipment.

Wiegert and Fassbender contacted Dassey's mother, Barb Janda, who went to the school. She and Dassey then went with the officers to the police station. According to Wiegert and Fassbender, Janda declined their offer to be present for the interview and instead remained in the waiting area of the police station. (ECF No. 19-19 at 7.) According to Janda, the investigators discouraged her from joining Dassey for the

interview. (ECF No. 19-30 at 155.) During this second February 27 interview, which lasted less than an hour, Dassey acknowledged being present at the October 31, 2005 bonfire with Avery and that he saw body parts in the fire. (ECF No. 19-19 at 8-9.) Fassbender met with Dassey again in the evening on February 27. Dassey told Fassbender that he got bleach on his pants after helping Avery clean the floor of Avery's garage on October 31. (ECF No. 19-19 at 10-11.)

Believing that he knew more than what he had thus far told investigators, Wiegert and Fassbender obtained permission from Janda to speak to Dassey again two days later, on March 1, 2006. (ECF Nos. 19-19 at 12; 19-30 at 156.) According to Janda, the investigators never asked her if she wanted to be present for this interview. (ECF No. 19-30 at 156.) The investigators picked Dassey up at his high school in the morning on March 1. After they advised Dassey of his constitutional rights under *Miranda*, he agreed to speak with them. (ECF Nos. 19-19 at 16; 19-25 at 2.) Wiegert and Fassbender then went with Dassey to his house, located on the Avery family property near Avery's home, where Dassey gave them the bleach-stained jeans he previously mentioned. (ECF No. 19-25 at 3-7.) On the way to the sheriff's department Wiegert and Fassbender asked Dassey if he wanted anything to eat or drink. He declined. (ECF No. 19-25 at 8.)

The March 1, 2006, interview was the fourth time the police had questioned Dassey in 48 hours. The interview began shortly before 11 a.m. It was conducted in a "soft room"—a room in the Manitowoc County Sheriff's Department that contained a

small couch, two soft chairs, and lamps—rather than a brick-walled interrogation room with a hard table. (ECF No. 19-19 at 19-20.) The interview was video and audio recorded. No adult was present on Dassey's behalf.

The interview began with Fassbender acknowledging that one reason Dassey had said he did not come forward earlier was that he was scared that he would be implicated. (ECF No. 19-25 at 16.) Fassbender stated, "I want to assure you that Mark and I both are in your corner[.] We're on your side." (ECF No. 19-25 at 16.) Fassbender stated that it was best if Dassey told the whole truth and not leave anything out, even if the details might be against his own interests. (ECF No. 19-25 at 16.) Fassbender continued, stating, "[F]rom what I'm seeing … I'm thinking you're all right. OK, you don't have to worry about things." (ECF No. 19-25 at 16.) Wiegert commented, "Honesty here Brendan is the thing that's gonna help you. OK, no matter what you did, we can work through that. OK. We can't make any promises but we'll stand behind you no matter what you did. OK. Because you're being the good guy here." (ECF No. 19-25 at 17.) Wiegert continued, noting that being honest was the best way to help himself out and "[h]onesty is the only thing that will set you free. Right?" (ECF No. 19-25 at 17.) He then assured Dassey, "We pretty much know everything[.] [T]hat's why we're talking to you again today." (ECF No. 19-25 at 17.)

At the investigators' prompting, Dassey began to recount the events of October 31, 2005. (ECF No. 19-25 at 18.) Over the next approximately three hours (with a

roughly half-hour break), generally responding to the investigators' questions with answers of just a few hushed words, a story evolved whereby in its final iteration Dassey implicated himself in the rape, murder, and mutilation of Teresa Halbach.

In the first version that Dassey told investigators on March 1, he got off the school bus at about 3:45 p.m. on October 31, 2005. When he went to his home, he saw Avery and Halbach talking on Avery's porch. (ECF No. 19-25 at 18-19.) Dassey said he then went inside his home, cleaned his room, played videogames, ate dinner, and watched TV until Avery called him requesting help with a car. (ECF No. 19-25 at 18-22.)

At this point Fassbender stopped Dassey and said he did not believe what Dassey was saying. Wiegert interjected, reminding Dassey to be honest and again stating, "We already know what happened." (ECF No. 19-25 at 23.) "We're in your corner," Fassbender assured Dassey. (ECF No. 19-25 at 23.) "We already know what happened[.] [N]ow tell us exactly. Don't lie," Wiegert said. (ECF No. 19-25 at 23.) The investigators continued to encourage Dassey to tell the story. Fassbender asked, "Who's [sic] car was in the garage?" (ECF No. 19-25 at 24) and Wiegert followed, "We already know. Just tell us. It's OK." (ECF No. 19-25 at 24.)

Dassey responded, "Her jeep." (ECF No. 19-25 at 24.) "That's right," Fassbender confirmed. (ECF No. 19-25 at 24.) After some questions about Halbach's RAV4 and the garage, the investigators proceeded to ask Dassey about what Avery showed him. (ECF No. 19-25 at 26.) Dassey eventually said that Avery showed him "the knife and the

rope." (ECF No. 19-25 at 26.) Wiegert asked where Halbach was, continuing, "Come on, we know this already. Be honest." (ECF No. 19-25 at 26.) "In the back of the jeep," Dassey answered. (ECF No. 19-25 at 26.) Slowly, Dassey came to say that he first encountered Halbach when Avery showed him her body, deceased, bound with rope, and wearing a black shirt, a ripped t-shirt, and pants, in the back of her RAV4. (ECF No. 19-25 at 26, 31-32.) He said that Avery told him that he had stabbed her and raped her because she had upset him. (ECF No. 19-25 at 27, 30, 36.) The investigators pressed Dassey for more details, with Wiegert reminding him, "Remember we already know, but we need to hear it from you." (ECF No. 19-25 at 28.) Dassey told the investigators that he and Avery took Halbach out of the back of the RAV4 and put her in the fire pit where a bonfire was already burning. (ECF No. 19-25 at 32-33.)

With further prompting and assurances from the investigators that they already knew the details (ECF No. 19-25 at 30, 31, 36, 37), Dassey added details. He told them, for example, that he was outside riding his bike after school when he heard a woman screaming for help inside Avery's home. (ECF No. 19-25 at 37-38.) When Fassbender said he thought that Dassey went over to Avery's house, Dassey stated that he rode his bike to get the mail and, after noticing that there was mail for Avery, he went to Avery's house. (ECF No. 19-25 at 41.) Avery answered the door, Dassey gave him the mail, and he left. (ECF No. 19-25 at 41.)

Wiegert again challenged Dassey's story, stating, "It's OK Brendan. We already know," and soon thereafter, "You went inside, didn't you?" (ECF No. 19-25 at 41.) Dassey nodded yes. (ECF No. 19-25 at 41.) Dassey then said that he knocked three times before Avery finally came to the door, sweaty, and invited Dassey into the kitchen. (ECF No. 19-25 at 45.) Once inside Avery's home Dassey could see down the hallway to Avery's bedroom where Halbach was naked, handcuffed to Avery's bed, and screaming for help. (ECF No. 19-25 at 42-43.)

Dassey said that Avery asked him if he wanted a soda. Dassey accepted. (ECF No. 19-25 at 46.) As Dassey drank his soda, Avery said that he wanted to continue raping Halbach and asked Dassey if he wanted to as well. (ECF No. 19-25 at 46-48.) Dassey said he "wasn't aged," and, "I ain't old enough ta have a kid yet." (ECF No. 19-25 at 48, 99.) But Avery continued to pressure Dassey (ECF No. 19-25 at 99) and took him into the bedroom (ECF No. 19-25 at 48-49).

Dassey denied doing anything further. But Wiegert assured Dassey, "We know [what] happened. … We know what happened, it's OK." (ECF No. 19-25 at 50.) Dassey again denied doing anything. (ECF No. 19-25 at 50.) Wiegert continued, "It's not your fault, he makes you do it." (ECF No. 19-25 at 50.) Dassey responded, "He told me ta do her." (ECF No. 19-25 at 50.) Dassey eventually came to say he raped Halbach while Avery watched from the doorway. (ECF No. 19-25 at 51.) When it was over, Avery

congratulated Dassey, and the two went to watch TV in another room for about 15 minutes. (ECF No. 19-25 at 52-53, 101.)

The investigators asked Dassey what happened next. Dassey said he told Avery that he had to leave. (ECF No. 19-25 at 54.) Wiegert responded, "Brendan, be honest. You were there when she died and we know that. Don't start lying now. We know you were there. … We already know, don't lie to us now, OK, come on." (ECF No. 19-25 at 54.) Dassey said that Avery then stabbed Halbach once in the stomach. (ECF No. 19-25 at 54-55.) Wiegert continued to prompt Dassey, "He did something else, we know that." (ECF No. 19-25 at 54.) By this time the investigators knew from forensic examination of the recovered skull fragments that Halbach had been shot at least once in the head. (ECF Nos. 19-19 at 85; 19-20 at 27.) They would learn later that Halbach had been shot at least twice in the head. (ECF No. 19-20 at 52.)

Dassey responded that Avery tied up Halbach. (ECF No. 19-25 at 54.) Wiegert continued, "We know he did something else to her, what else did he do to her?" (ECF No. 19-25 at 55.) Dassey responded that Avery choked Halbach until she went unconscious (ECF No. 19-25 at 55), at which point Dassey got the handcuff key, unlocked Halbach's hands, and helped Avery tie her up with rope. (ECF No. 19-25 at 56-57.) Dassey initially said that Halbach was unconscious when they tied her up. But then he said that as they bound her she was screaming for Avery to stop and that Avery told

her he would not, that she should shut her mouth, and that he was going to kill her. (ECF No. 19-25 at 56-58.)

Wiegert prompted Dassey: "What else did he do to her? We know something else was done. Tell us, and what else did you do? Come on. Something with the head, Brendan?" (ECF No. 19-25 at 60.) Dassey did not answer Wiegert's questions, leading to further questioning and prompting from Wiegert and Fassbender. (ECF No. 19-25 at 60.) Fassbender said, "What he made you do Brendan, we know he made you do somethin' else. … We have the evidence Brendan, we just need you ta, ta be honest with us." (ECF No. 19-25 at 60.) To this Dassey responded, "That he cut off her hair." (ECF No. 19-25 at 60.) After a few short questions about the hair, Fassbender moved on, "What else was done to her head." (ECF No. 19-25 at 61.) Dassey responded, "That he punched her." "What else? What else?" Wiegert prompted. (ECF No. 19-25 at 61.)

Fassbender continued, "He made you do something to her, didn't he? So he would feel better about not being the only person, right?" (ECF No. 19-25 at 61.) Dassey responded that he cut her on her throat. (ECF No. 19-25 at 62.) Again Wiegert continued, "What else happens to her in her head?" (ECF No. 19-25 at 63.) After a couple more prompts and a pause, Fassbender said, "We know, we just need you to tell us." (ECF No. 19-25 at 63.) Dassey said, "That's all I can remember." (ECF No. 19-25 at 63.) Wiegert responded, "All right, I'm just gonna come out and ask you. Who shot her in the head?" (ECF No. 19-25 at 63.) "He did," answered Dassey. (ECF No. 19-25 at 63.)

When asked why he did not say that, Dassey said he "couldn't think of it." (ECF No. 19-25 at 63.)

Dassey said that Avery shot Halbach with his .22 caliber rifle twice in her head after they had carried her outside and placed her on the side of the garage. (ECF No. 19-25 at 63-67, 103.) When asked again how many times Avery shot Halbach, Dassey said three, once each in the head, stomach, and heart. (ECF No. 19-25 at 67-68.) According to Dassey, as Avery was shooting Halbach, Avery said that they had to hurry up because he had people coming over. (ECF No. 19-25 at 69.) They then carried her and placed her in the fire, putting tires and branches on top of her. (ECF No. 19-25 at 68-69.)

Dassey denied that Halbach was ever in the garage. (ECF No. 19-25 at 68.) But Fassbender persisted. "[W]e know there's some, some things that you're, you're not tellin' us. We need to get the accuracy about the garage and stuff like that and the car." (ECF No. 19-25 at 69.) After some discussion about the fire, Fassbender returned to the subject of the garage, stating, "Again, we have, we know that some things happened in that garage, and in that car, we know that. You need to tell us about this so we know you're tellin' us the truth. I'm not gonna tell you what to say, you need to tell us." (ECF No. 19-25 at 71.) In response to this prompt Dassey said that Avery put Halbach in the back of the RAV4 and planned to throw her into a pond. (ECF No. 19-25 at 71-72.) But Avery then decided that burning Halbach would be better and would dispose of the

evidence faster, so they took her out of the RAV4 and placed her on the fire. (ECF No. 19-25 at 72, 105.)

Fassbender again asked Dassey where Halbach was when she was shot. (ECF No. 19-25 at 72.) This time Dassey answered, "In the garage." (ECF No. 19-25 at 72.) Wiegert asked whether Halbach was on the garage floor or in the back of the RAV4. Dassey said she was in the RAV4. Wiegert responded, "Ah huh, come on, now where was she shot? Be honest here." (ECF No. 19-25 at 73.) "In the garage," Dassey said. Changing his story yet again, Dassey now said that Halbach was shot *after* she was taken out of the RAV4. (ECF No. 19-25 at 73.) Fassbender asked Dassey again how many times Halbach was shot and added, "Remember [we] got a number of shell casings that we found in that garage. I'm not gonna tell ya how many but you need to tell me how many times, about, that she was shot." (ECF No. 19-25 at 73.) Dassey said that Avery shot Halbach "[a]bout ten" times while she was on the garage floor. (ECF No. 19-25 at 73.) Wiegert responded, "That makes sense. Now we believe you." (ECF No. 19-25 at 73.)

Dassey said that after they placed Halbach in the fire Avery drove the RAV4 into the salvage yard with Dassey as a passenger. (ECF No. 19-25 at 76-77.) The two of them then put branches and a vehicle hood on the RAV4. (ECF No. 19-25 at 77.) Avery said he was going to crush the car. (ECF No. 19-25 at 87.) Dassey initially said that he did not

know who took the license plates off the RAV4. But, when asked if Avery did so, Dassey responded in the affirmative. (ECF No. 19-25 at 77-78.)

Fassbender asked, "OK, what else did he do, he did somethin' else, you need to tell us what he did, after that car is parked there. It's extremely important. Before you guys leave that car." (ECF No. 19-25 at 79.) Dassey responded, "That he left the gun in the car." (ECF No. 19-25 at 79.) Fassbender continued, "That's not what I'm thinkin' about. He did something to that car. He took the plates and he, I believe he did something else in that car." (ECF No. 19-25 at 79.) "I don't know," said Dassey. (ECF No. 19-25 at 79.) Fassbender's prompts continued: "OK. Did he, did he, did he go and look at the engine, did he raise the hood at all or anything like that? To do something to that car?" (ECF No. 19-25 at 79.) Investigators knew that the battery in Halbach's RAV4 had been disconnected. (ECF No. 19-17 at 142.) Dassey agreed that Avery did raise the hood but could not say what he did under the hood. (ECF No. 19-25 at 79-80.)

Dassey said that when they got back to Avery's house Avery put the key to the RAV4 "under his dresser or something." But then he said Avery put the key in his dresser drawer—specifically, the second drawer from the top. (ECF No. 19-25 at 78-79.)

Dassey said that he and Avery then cleaned up the blood in the garage, at which time Dassey got bleach on his jeans. (ECF No. 19-25 at 82.) According to Dassey, there was a roughly two-foot square blood stain on the garage floor near where the back tire of the RAV4 had been. (ECF No. 19-25 at 85-86.) Around this time, about 9:30 p.m.,

Dassey said his mother called and told him to be home by 10:00 p.m. (ECF No. 19-25 at 82-83.) Avery took the bloody sheets from the bedroom and burned them. (ECF No. 19-25 at 83.) Avery then told Dassey to get Halbach's clothes from the garage and throw them on the fire. (ECF No. 19-25 at 84.)

After Dassey recounted all of this to Wiegert and Fassbender, the investigators took a break. They provided Dassey with a soda and sandwich, and Dassey asked Wiegert, "How long is this gonna take?" (ECF No. 19-25 at 89.) "It shouldn't take a whole lot longer," Wiegert answered. (ECF No. 19-25 at 89.) "Do you think I can get [back to school] before one twenty-nine?" Dassey asked. (ECF No. 19-25 at 89.) "Um, probably not." (ECF No. 19-25 at 89.) "Oh," Dassey said. (ECF No. 19-25 at 89.) "What's at one twenty-nine?" asked Wiegert. (ECF No. 19-25 at 89.) "Well, I have a project due in sixth hour," Dassey said. (ECF No. 19-25 at 89.) Wiegert responded, "OK. We'll worry about that later, OK?" (ECF No. 19-25 at 90.)

Following the break Wiegert and Fassbender explained to Dassey that they did not believe some of his story. (ECF No. 19-25 at 90-91.) In response to their challenges Dassey now denied seeing Avery and Halbach on Avery's porch when he got home from school. (ECF No. 19-25 at 91.) But he said he did see Halbach's RAV4 in Avery's garage. (ECF No. 19-25 at 92.) He now said that when he got home he watched television for about half an hour while his brother used the phone, after which he made a phone call and then went to get the mail. (ECF No. 19-25 at 91-92.)

When asked about Halbach's personal effects, Dassey denied seeing them or knowing that Avery put them in the burn barrel. (ECF No. 19-25 at 95-96.) In response to Dassey's denials, Wiegert said, "Brendan, it's OK to tell us OK. It's really important that you continue being honest with us. OK, don't start lying now. If you know what happened to a cell phone or a camera or her purse, you need to tell us. OK? The hard part's over. Do you know what happened to those items?" (ECF No. 19-25 at 96.) Dassey responded, "He burnt 'em," (ECF No. 19-25 at 96), adding that he knew this because he saw them in the burn barrel when he went over with the mail (ECF No. 19-25 at 97-98).

Dassey said that he later heard from Avery that Avery used a shovel to break up some of the bones that remained after the fire burned down and that he buried some of these fragments in spots around the fire and scattered others. (ECF No. 19-25 at 112-13.) At the investigators' request, Dassey drew various pictures detailing what he had described. In doing so, the investigators asked Dassey to label various things in the pictures, prompting Dassey to ask how to spell "rack" and "garage." (ECF No. 19-25 at 124, 128.)

Fassbender asked Dassey to describe Halbach, stating, "We know that Teresa had a tattoo on her stomach, do you remember that?" (ECF No. 19-25 at 138.) Dassey shook his head and said, "Uh uh." (ECF No. 19-25 at 139.) Fassbender followed up, "Do you disagree with me when I say that?" (ECF No. 19-25 at 139.) "No but I don't know where

it was," Dassey responded. (ECF No. 19-25 at 139.) In fact, the investigators knew that Halbach did not have any such tattoo. (ECF No. 19-12 at 45-46.) They posed the question in an effort to gauge whether Dassey was merely agreeing with details suggested by them. (ECF No. 19-12 at 45-46.)

When asked why he did what he did, Dassey said, "Cuz I wanted to see how [sex] felt." (ECF No. 19-25 at 140.) Dassey said he thought about stopping Avery but did not because he was afraid Avery would try to kill him. (ECF No. 19-25 at 140.) Dassey said that afterward Avery told him not to say anything. (ECF No. 19-285 at 141.)

When the investigators took another break, Dassey asked if he was going to be back at school before the end of the day. (ECF No. 19-25 at 143.) Fassbender responded, "Probably not." (ECF No. 19-25 at 143.)

After the break Fassbender told Dassey, "because of what you told us, we're gonna have to arrest you. … And so you're not gonna be able to go home tonight." (ECF No. 19-25 at 144.) "Does my mom know?" Dassey asked. (ECF No. 19-25 at 144.) The investigators told Dassey his mom did know, that in fact she was at the police station, and that she could come in to talk with him if he would like. (ECF No. 19-25 at 144.) Dassey asked if he would be in jail for just one day. Wiegert said he did not know. (ECF No. 19-25 at 144.)

Dassey and Janda were left alone in the room. Dassey asked his mother, "What'd happen if he says something his [sic] story's different? Wh-he says he, he admits to

doing it?" (ECF No. 19-25 at 148.) "What do you mean," asked Janda. (ECF No. 19-25 at 148.) "Like if his story's like different, like I never did nothin' or somethin'." (ECF No. 19-25 at 148.) "Did you? Huh?" Janda asked. (ECF No. 19-25 at 148.) "Not really," replied Dassey. (ECF No. 19-25 at 148.) "What do you mean not really?" asked Janda. (ECF No. 19-25 at 148.) "They got to my head," Dassey answered. Wiegert and Fassbender reentered the room (Ex. 43, Disc 3 at 3:19:32) and Dassey never explained what he meant by "not really." (ECF No. 19-25 at 148.)

"Were you pressuring him?" Janda asked the investigators. (ECF No. 19-25 at 148.) She later said that she asked that question because she believed that if Dassey was pressured he would say anything. (ECF No. 19-30 at 184-85.) Wiegert answered, "No we told him we needed to know the truth. We've been doing this job a long time Barb and we can tell when people aren't telling the truth." (ECF No. 19-25 at 149.)

Based upon the new information from Dassey investigators obtained another search warrant for the Avery property. (ECF No. 19-20 at 53-54.) Pursuant to the warrant investigators again searched the garage, finding two fired bullets. (ECF No. 19-20 at 54.) Halbach's DNA was found on one of the bullets, and investigators determined that it had been fired from the .22 caliber rifle recovered from above Avery's bed. (ECF No. 19-20 at 54.)

The state charged Dassey with first-degree intentional homicide, second-degree sexual assault, and mutilation of a corpse. (ECF No. 19-1.)

### C. Leonard Kachinsky, Pre-Trial Counsel for Brendan Dassey

#### 1. Media Interviews

On March 7, 2006, attorney Leonard Kachinsky was appointed to represent Dassey. (ECF No. 19-26 at 113.) Kachinsky was excited to be involved in Dassey's case because by then it had garnered significant local and national attention. (ECF No. 19-26 at 122-23.) Essentially immediately after his appointment Kachinsky began giving media interviews in which he discussed the case. (ECF No. 19-26 at 114-26.)

Kachinsky first met with Dassey on March 10, 2006. (ECF No. 19-26 at 123.) Dassey told Kachinsky that what was in the criminal complaint was not true and that he wanted to take a polygraph test to prove his innocence. (ECF No. 19-26 at 137-38.) After this initial meeting, local media reported Kachinsky as having described Dassey as sad, remorseful, and overwhelmed. (ECF No. 19-39 at 3, 9-10.) The media reported that Kachinsky blamed Avery for "leading [Dassey] down the criminal path" and said that he had not ruled out a plea deal. (ECF Nos. 19-26 at 134-35; 19-39 at 4, 10-11.) Kachinsky later said that one of his reasons for speaking to the media was to communicate to both Dassey and to his family so that he could get them "accustomed to the idea that Brendan might take a legal option that they don't like …." (ECF No. 19-26 at 136-37.)

Over the next few days nearly all of Kachinsky's work on Dassey's case involved communicating with local and national media outlets. (ECF No. 19-26 at 138-40.) On March 17 Kachinsky appeared on Nancy Grace's national television show. (ECF No. 19-

26 at 141-42.) During that appearance Kachinsky said that, if the recording of Dassey's statement was accurate and admissible, "there is, quite frankly, no defense." (ECF No. 19-26 at 142-43.) Kachinsky later said that he was merely "stating the obvious." (ECF No. 19-26 at 144.) However, Kachinsky had not yet watched the March 1 recorded interview. (ECF No. 19-26 at 145.) All he had seen was the criminal complaint. (ECF No. 19-26 at 145.)

In subsequent media interviews Kachinsky referred to the techniques the investigators used in questioning Dassey as "pretty standard" and "quite legitimate." (ECF No. 19-26 at 170.) One local news broadcast included Kachinsky's response to statements Avery had made to the media. Avery had said that he knew that Dassey's confession must have been coerced because there was no physical evidence to support what Dassey had said. (ECF No. 19-26 at 175.) Kachinsky responded that he had reviewed the recorded statement and it did not appear that the investigators were putting words in Dassey's mouth. (ECF No. 19-26 at 175-76.) Kachinsky also publicly refuted Avery's statement that Dassey was not very smart and that it would be easy for law enforcement to coerce him. (ECF No. 19-26 at 180.)

In another interview Kachinsky said that, although he believed Dassey had some intellectual deficits, he also believed Dassey had a reasonably good ability to recall the events he participated in. (ECF No. 19-26 at 182-83.) Over the roughly three weeks

following his appointment Kachinsky spent about one hour with Dassey and at least 10 hours communicating with the press. (ECF No. 19-26 at 183.)

Kachinsky met with Dassey again on April 3, at which time Dassey again professed his innocence and asked to take a polygraph examination. (ECF No. 19-26 at 186.) Kachinsky hired Michael O'Kelly, with whom he was not familiar, to conduct a polygraph exam. (ECF No. 19-26 at 187-88.) O'Kelly held himself out as a private investigator and polygraph examiner. (ECF No. 19-33 at 3.) Kachinsky informed Dassey of the upcoming polygraph examination in a letter, stating, "the videotape is pretty convincing that you were being truthful on March 1," and encouraging Dassey not to cover up for Avery. (ECF No. 19-26 at 190.) Shortly before the polygraph examination, the prosecutor sent an email to Kachinsky expressing concern about the pretrial publicity that Kachinsky was engaging in and referring him to the relevant rule of attorney ethics governing such publicity. (ECF No. 19-26 at 28, 201.)

## 2. Defense Investigator Michael O'Kelly

O'Kelly conducted a polygraph examination of Dassey, the results of which were inconclusive. (ECF No. 19-26 at 212.) Nonetheless, O'Kelly described Dassey to Kachinsky as "a kid without a conscience" or something similar. (ECF No. 19-26 at 212.) Notwithstanding O'Kelly's opinion of Dassey, Kachinsky hired him as the defense investigator in the case. (ECF No. 19-26 at 213.)

Despite Dassey's claims of innocence, both O'Kelly and Kachinsky proceeded on the assumption that Dassey would cooperate with the prosecution and become the key witness against Avery. (ECF No. 19-29 at 46-47.) O'Kelly's primary goal was to uncover information that would bolster the prosecution's case. (ECF No. 19-29 at 47, 53.) To this end he purportedly developed information as to the possible location of certain evidence. (ECF No. 19-29 at 42-44.) Kachinsky provided this information to the prosecutor and a lead investigator and informed them that they may wish to speak to O'Kelly. (ECF No. 19-26 at 236-37.) Although the information led to a search warrant being issued, the search warrant did not yield any additional evidence against Dassey. (ECF No. 1-5, ¶ 12.)

Kachinsky decided that he wanted O'Kelly to re-interview Dassey to get him once again to admit to his involvement in the rape, murder, and mutilation of Halbach. (ECF Nos. 19-26 at 243-48; 19-29 at 83.) Kachinsky wanted to make it clear to Dassey that, based upon the evidence, a jury was going to find him guilty. (ECF No. 19-27 at 17.) Toward that end, he chose May 12 as the date for O'Kelly to interview Dassey—the date a decision on Dassey's motion to suppress his March 1 confession was scheduled to be rendered. (ECF No. 19-26 at 243-44.) Kachinsky expected to lose the motion to suppress and believed that the effect of losing such a crucial motion would leave Dassey vulnerable. (ECF No. 19-26 at 244.)

Shortly before meeting with Dassey, in an email to Kachinsky O'Kelly expressed contempt for the Avery family. (ECF No. 19-33 at 1-2; *see also* ECF No. 19-29 at 93.) He referred to the Avery family as "criminals" and asserted that family members engaged in incestuous sexual conduct and had a history of stalking women. (ECF No. 19-33 at 1.) He continued, "This is truly where the devil resides in comfort. I can find no good in any member. These people are pure evil." (ECF No. 19-33 at 1.) O'Kelly quoted a friend as having said, "This is a one branch family tree. Cut this tree down. We need to end the gene pool here." (ECF No. 19-33 at 1.) O'Kelly thought that Dassey's denial of his confession was an "unrealistic" "fantasy" that was influenced by his family. (ECF Nos. 19-33 at 1; 19-29 at 86-88.) On O'Kelly's recommendation, Kachinsky canceled a planned visit with Dassey because Dassey "needs to be alone." (ECF No. 19-26 at 248-49.) O'Kelly said, "He needs to trust me and the direction that I steer him into." (ECF No. 19-33 at 1.)

As predicted, on May 12 the court denied Dassey's motion to suppress his March 1 confession. (ECF No. 19-13.) Afterwards O'Kelly interviewed Dassey in a room at the Sheboygan County Juvenile Detention Center where Dassey was being held. (Ex 44; *see also* ECF No. 19-38 at 16.) O'Kelly videotaped the interview. He laid out on a table before Dassey numerous photographs: snapshots of a smiling Teresa Halbach, a missing person poster for Halbach, a "Dead End" road sign on the Avery property, pictures of the Avery property and of the inside of Avery's house, pictures of Halbach's RAV4 as it

was initially found, a photograph of Halbach's church, and a photograph of a blue ribbon tied to a post on a roadside. (Ex. 44; ECF No. 19-38 at 1-2.) O'Kelly even had a local shop make a blue ribbon like the one shown in the photograph and placed it on the table as well. (ECF No. 19-29 at 75.) O'Kelly believed that presenting the images would help him get an admission from Dassey. (ECF No. 19-29 at 115.)

O'Kelly began by pointing to what he said were Dassey's polygraph examination results on a laptop computer screen and asked Dassey if he could read them. (ECF No. 19-38 at 1.) Despite having previously told Kachinsky that the results of the polygraph examination were inconclusive (ECF No. 19-26 at 210), O'Kelly told Dassey that the polygraph indicated deception and that the probability of deception was 98 percent (ECF No. 19-38 at 1). When Dassey asked what that meant, O'Kelly asked what he thought it meant. (ECF No. 19-38 at 1.) Dassey responded, "That I passed it?" (ECF No. 19-38 at 1.) "It says deception indicated," O'Kelly responded, emphasizing "deception." (ECF No. 19-38 at 1; Ex. 44.) After a long pause, Dassey asked, "That I failed it[?]" (ECF No. 19-38 at 1.)

O'Kelly proceeded to discuss the photographs that he had laid out on the table. When he got to the "Dead End" sign, he said, "This is the last thing that Teresa saw. … It's pretty prophetic, isn't it?" (ECF No. 19-38 at 1.) In a confrontational and adversarial tone, O'Kelly proceeded to question Dassey. (ECF No. 44.) O'Kelly said, "The two things I don't know is, are you sorry for what you did and will you promise not to do it

again. Those are the two things I don't know. I know everything else that I need to about this case except for those two things. … Are you sorry?" (ECF No. 19-38 at 2.) "I don't know, because I didn't do anything," Dassey answered. (ECF No. 19-38 at 2.)

O'Kelly said, "If you're not sorry, I can't help you. … Do you want to spend the rest of your life in prison? You did a very bad thing." (ECF No. 19-38 at 2.) "Yeah, but I was only there for the fire though," Dassey responded. (ECF No. 19-38 at 2.)

O'Kelly encouraged Dassey to say he was sorry for what he did. Dassey persisted in professing his innocence, saying that he did not really feel sorry because he did not do anything; he was only at the fire. (ECF No. 19-38 at 3-4.) Dassey told O'Kelly that his prior statement to the police was false and that he had either simply agreed with what the investigators said or guessed at the answers. (ECF No. 19-38 at 4-5.) O'Kelly told Dassey that he was not being truthful, and if he was not truthful Dassey would spend the rest of his life in prison. O'Kelly would help Dassey only if he was truthful. (ECF No. 19-38 at 2-4.)

Eventually Dassey's story changed and he recounted for O'Kelly a story largely similar to that which Dassey had told the investigators on March 1. (ECF No. 19-38 at 5.) This time he said he first went over to Avery's at about 8:00 p.m. and that Halbach was conscious when Avery brought her outside to the garage where he stabbed her and shot her five times. (ECF No. 19-38 at 7-9, 15.)

After the interview was concluded, Kachinsky understood from O'Kelly that Dassey was now "on board with cooperating in the Avery prosecution and, ultimately, entering a plea agreement." (ECF No. 19-27 at 45.) However, Kachinsky had not watched O'Kelly's interview of Dassey. (ECF No. 19-27 at 35.) Nevertheless, he approved of O'Kelly communicating the substance of his taped interview of Dassey to the prosecution's investigating agents. (ECF No. 19-27 at 31.)

### 3. May 13, 2006 Interrogation

Following the O'Kelly interview, Kachinsky arranged for the state's investigators to interrogate Dassey again. (ECF No. 19-27 at 35-36.) Kachinsky did not attend the interrogation. The state had not made any offer of immunity or prosecutorial consideration. (ECF No. 19-27 at 36-38; *see also* ECF No. 19-34 at 1.) Kachinsky did not prepare Dassey for the interrogation, trusting O'Kelly to do so. (ECF No. 19-27 at 43.) The plan was to have O'Kelly watch Dassey's interrogation from a separate monitoring room. (ECF No. 19-29 at 157.) Kachinsky instructed O'Kelly not to interrupt unless Dassey asked to speak with Kachinsky or otherwise asked to stop. (ECF No. 19-29 at 155-56.)

The interrogation took place on the morning of May 13, 2006, at the Sheboygan County Juvenile Detention Center. (ECF No. 19-34 at 1.) Wiegert and Fassbender re-advised Dassey of his *Miranda* rights and confirmed that he wanted to speak with them

and that no one had made any promises. Dassey then recounted a version of the events of October 31, 2005. (ECF No. 19-34 at 2-6.)

The version of events that Dassey now told differed in certain significant respects from the version he recounted on March 1. Dassey denied ever seeing Halbach's RAV4, riding his bike to get the mail, hearing any screaming coming from Avery's home, cutting Halbach's throat (ECF No. 19-34 at 6-7, 25), or seeing Avery ever punch Halbach (ECF No. 19-34 at 50). Dassey said he did not go over to Avery's until about 7:00 p.m. after Avery twice called inviting him to the bonfire. (ECF No. 19-34 at 9.)

At numerous points throughout the May 13 interrogation the agents stated that they were giving Dassey a final chance to tell the truth. They said that they did not have to come back to listen to him and that they would leave if he did not tell the truth. (ECF No. 19-34 at 10, 21, 29, 34, 75.) At one point Wiegert told Dassey that they knew Halbach had been in the back of the RAV4 while she was bleeding. (ECF No. 19-34 at 21.) Despite previously denying having seen the RAV4, Dassey now said that the RAV4 was backed into Avery's garage and that, after Halbach was stabbed, Avery put her into the RAV4 before deciding to burn her. (ECF No. 19-34 at 22, 53.) According to Dassey, Avery's plan had been to crush the RAV4, with Halbach in it, before anyone noticed. (ECF No. 19-34 at 31.)

Dassey then said that Avery drove the RAV4 into the salvage yard but that he did not go with him. (ECF No. 19-34 at 33-34.) Wiegert challenged him: "How did your

DNA get in the truck?" (ECF No. 19-34 at 34.) "It ain't," responded Dassey. (ECF No. 19-34 at 34.) "And how do you know that?" asked Wiegert? (ECF No. 19-34 at 34.) Dassey responded, "Cuz I never went in it." (ECF No. 19-34 at 34.) Fassbender confronted Dassey with the version of events he had provided on March 1 where he said that he accompanied Avery in the RAV4 and described certain events that occurred there. (ECF No. 19-34 at 34.) "What did you just grab that out of the air? How do you know those things?" (ECF No. 19-34 at 34.) "Just guessing," Dassey responded. (ECF No. 19-34 at 34.) However, later in the interrogation on May 13 Dassey said (as he had on March 1) that he *had* accompanied Avery to the salvage yard in the RAV4. (ECF No. 19-34 at 89.)

Dassey's May 13 statement contained numerous internal contradictions. For example, initially he said Halbach was shot after she was taken out of the RAV4. (ECF No. 19-34 at 22.) But later he said she was shot before Avery put her in the RAV4. (ECF No. 19-34 at 31.) Dassey initially said that Halbach was screaming when he stabbed her. (ECF No. 19-34 at 22-23.) Immediately thereafter he said that she was not moving or breathing. (ECF No. 19-34 at 25-26.) Dassey said he cut Halbach's hair with the knife in the bedroom. But when the investigators pointed out that Dassey had just said that Avery got the knife from the garage, Dassey denied ever cutting Halbach's hair. (ECF No. 19-34 at 37.) When Fassbender asked Dassey why he had said that he had cut Halbach's hair, Dassey responded, "I don't know." (ECF No. 19-34 at 37.) When later

asked how he came up with the story about cutting Halbach's hair, Dassey responded, "I don't know, I was just guessing." (ECF No. 19-34 at 98.)

Wiegert told Dassey, "Your mom told me you'd be honest with me. … I haven't called her yet to tell her that you lied to me, but I will do that, what do you think she's gonna say to you? She's gonna be mad." (ECF No. 19-34 at 39.) Wiegert asked Dassey if he was going to tell his mom about their discussion. Dassey said he probably would the next time he saw her. (ECF No. 19-34 at 68.) Wiegert asked, "Don't you think you should call her?" (ECF No. 19-34 at 68.) Wiegert knew that calls from the jail were recorded. (ECF No. 19-30 at 110.) Dassey responded, "Yeah." (ECF No. 19-34 at 68.) "When you gonna do that?" asked Wiegert. (ECF No. 19-34 at 69.) "Probably tonight," said Dassey. (ECF No. 19-34 at 69.) "Yeah. I think she'd like to hear it coming from you rather than from me," said Wiegert. (ECF No. 19-34 at 69.) "And if she has any questions cuz I'm seeing her tomorrow," Dassey responded. (ECF No. 19-34 at 69.) "Oh. She's coming here tomorrow?" Wiegert asked. (ECF No. 19-34 at 69.) "Mm huh," mumbled Dassey. (ECF No. 19-34 at 69.) Wiegert continued, "Then maybe it [sic] be a good idea to call her before she gets here tonight. That's what I'd do. Cuz, otherwise she's going to be really mad tomorrow. Better on the phone, isn't it?" (ECF No. 19-34 at 69.) "Mm huh," agreed Dassey. (ECF No. 19-34 at 69.)

### 4. Dassey's Recorded Phone Call to his Mother

Later that day Dassey called his mother from jail. (ECF No. 19-35; Ex. 45.) Like all calls from jail inmates, the phone call was recorded. (ECF Nos. 19-35; 19-30 at 110.) Dassey's first question to his mother was, "Did you talk to anybody?" (ECF No. 19-35 at 1.) When his mother said she did not and asked him what he meant, Dassey explained, "Cause Mark and Fassbender are gonna talk to you." (ECF No. 19-35 at 1.) Janda asked Dassey to explain what he meant. (ECF No. 19-35 at 1.) "Well, I guess yesterday that Mike [O'Kelly] guy came up here and talked to me about my results." (ECF No. 19-35 at 1.)

Dassey asked, "Do you feel bad if I say it today?" (ECF No. 19-35 at 1.) "You don't even have to say it Brendan," she responded. (ECF No. 19-35 at 1.) When Dassey asked why, Janda responded, "Because just by the way you are acting I know what it is." (ECF No. 19-35 at 1-2.) Dassey then made clear that they were talking "[a]bout what [m]e and Steven did that day." (ECF No. 19-35 at 2.) "What about it?" asked Janda. (ECF No. 19-35 at 2.) "Well, Mike and Mark and Matt came up one day and took another interview with me and said because they think I was lying but so, they said if I come (sic) out with it that I would have to go to jail for 90 years. … But if I came out with it would probably get I dunno about like 20 or less. After the interview they told me if I wanted to say something to her family and said that I was sorry for what I did." (ECF No. 19-35 at 2.) "Then Steven did do it[!]" Janda exclaimed. (ECF No. 19-35 at 2; Ex. 45.)

"Ya," Dassey agreed. (ECF No. 19-35 at 2.) Dassey expressed concern to Janda about being able to face Avery in court and what might happen if Avery were to become angry. (ECF No. 19-35 at 3.) Janda told Dassey that he had to worry about himself. (ECF No. 19-35 at 3.)

Janda asked Dassey how he was able to answer the phone when his brother's boss called. (ECF No. 19-35 at 5.) Dassey responded, "They told me that they looked at the records and that he didn't call." (ECF No. 19-35 at 5.) "What about when I got home at 5:00 you were here[?]" Janda asked. (ECF No. 19-35 at 5.) "I went over there earlier and then came home before you did," Dassey responded. (ECF No. 19-35 at 5.) When Janda asked Dassey why he did not say anything to her then, Dassey responded, "I dunno, I was scared." (ECF No. 19-35 at 5.) "So in those statements you did all that to her too?" Janda asked. (ECF No. 19-35 at 5.) "Some of it," Dassey responded. (ECF No. 19-35 at 5.)

"Was your attorney there when Mark and those guys were?" Janda asked. When Dassey said he was not, Janda responded, "Don't talk to them no more. … They are putting you in places where you're not. … You know the reason they're talking to you is to get more information out of you and what your attorney should be doing is putting an order on all of them that they cannot interfere with you or your family members unless your attorney is present. … Cause they're all investigators for the Halbach case. … Not the Dassey case, it's the Halbach case. … Cause the only thing that they're

putting out there is bad stuff about you and if you weren't there at the time if you didn't slice her throat. You did not have sexual contact with her." (ECF No. 19-35 at 7.) "No," Dassey responded. (ECF No. 19-35 at 7.)

"So if I was in the garage cleaning up that stuff on the floor, how much time will I get though for that?" Dassey asked. (ECF No. 19-35 at 8.) "What was it?" Janda inquired. "I don't know. It was this reddish-black stuff." Dassey answered. (ECF No. 19-35 at 8.) "So did you see the body in the fire?" asked Janda. (ECF No. 19-35 at 9.) "No," replied Dassey. (ECF No. 19-35 at 9.) "You know if he killed her[?]" Janda asked. (ECF No. 19-35 at 9.) "Not that I know of," Dassey responded. (ECF No. 19-35 at 9.) Janda asked Dassey why he lost so much weight and Dassey responded that he "was trying to impress a girl." (ECF No. 19-35 at 11.) The call ended when an automated voice broke in and cut off the call. (Ex. 45 at 15:27.)

### 5. Court Removes Kachinsky as Counsel

At a hearing on August 25, 2006, the trial court discussed a letter it had received from the State Public Defender stating that Kachinsky allowing law enforcement to interview Dassey without counsel present was "indefensible." (ECF No. 19-14 at 4.) It said that it had decertified Kachinsky from being appointed in Class A through Class D felony matters. (ECF No. 19-14 at 4, 22.) The decertification was prospective only and thus did not directly apply to Kachinsky's representation of Dassey. (ECF No. 19-14 at

22.) Nevertheless, Kachinsky moved to withdraw as Dassey's counsel. (ECF No. 19-14 at 5-6.)

Dassey confirmed that he wished to have a new attorney appointed to represent him. (ECF No. 19-14 at 15.) The prosecution suggested the need for an evidentiary hearing to determine, in part, the admissibility of the statement obtained without Kachinsky's presence. (ECF No. 19-14 at 17-18.) The court disagreed that an evidentiary hearing was necessary, noting the "institutional interest in ensuring that criminal trials are conducted within the ethical standards of the profession," "that legal proceedings appear fair to all who observe them," and "that the court's judgments remain intact on appeal." (ECF No. 19-14 at 19-20.) The court concluded that, particularly in light of Dassey's age and record of intellectual deficits, "Kachinsky's failure to be present while his client gave a statement to investigators" "constituted deficient performance on Attorney Kachinsky's part." (ECF No. 19-14 at 22-23.) It further stated that "Kachinsky's withdrawal is necessary to assure the entire proceeding be viewed as fair and trying to ensure that we can maintain public confidence in the administration of justice and the fair administration of justice." (ECF No. 19-14 at 24.) "If this case has to be tried, I want to do my level best to make sure that it is tried only once. The prosecution, the defense, the families involved, the system deserve no less. Accordingly, I -- as I have said, I'm going to grant Mr. Kachinsky's motion to withdraw." (ECF No. 19-14 at 24.)

### D. Trial

Successor counsel was appointed to represent Dassey, and on April 16, 2007, a jury trial commenced. (ECF No. 19-15.) Over the course of the next roughly six days the prosecution presented its case against Dassey. (ECF Nos. 19-15; 19-16; 19-17; 19-18; 19-19; 19-20 at 1-63.) The centerpiece of the prosecution's case was Dassey's March 1 confession to Wiegert and Fassbender (ECF No. 19-23 at 50-85 (prosecution's closing argument)). The prosecution played the recorded interview for the jury at trial. (ECF No. 19-19 at 23.) The May 13 interrogation by Wiegert and Fassbender was not discussed at trial.

Dassey's defense was that the statements he made on March 1 were not true. Dassey presented his academic records that showed that, although he was in regular high school classes (ECF Nos. 19-20 at 86-87; 19-21 at 47-48), he also received special education assistance (ECF No. 19-20 at 77) due to various cognitive difficulties (*see, e.g.*, ECF No. 19-20 at 75, 79) and had overall borderline to below average intellectual ability (ECF No. 19-20 at 99). Dassey's brother testified that he was at home with Dassey on October 31, 2005, until about 5:20 p.m. when he left, leaving Dassey alone at home. (ECF No. 19-20 at 109-10.) Dassey's brother's boss also testified that he called the Dassey residence on October 31, 2005 at about 6:00 p.m. and spoke with Dassey. (ECF No. 19-20 at 129-31.)

Dassey testified on his own behalf. He said that after he got off the school bus with his brother at about 3:45 p.m. he played video games until he made himself dinner at about 5:00 p.m. (ECF No. 19-21 at 17-20.) Dassey's mother came home around that time and, after he was done eating, he spoke with her briefly. (ECF No. 19-21 at 20-22.) Dassey's brother left at about 5:20 p.m. and his mother left at about 5:30 p.m. (ECF No. 19-21 at 21-22.)

After his brother and mother left, Dassey watched television until about 6:00 p.m., when he received a call from his brother's boss. (ECF No. 19-21 at 24.) After a brief conversation, Dassey returned to watching television until about 7:00 p.m., when Avery called. (ECF No. 19-21 at 25-26.) Avery invited Dassey over to the bonfire, so Dassey changed clothes. (ECF No. 19-21 at 27-28.) Avery called again and Dassey told him he was on his way. (ECF No. 19-21 at 28.)

Dassey went to the fire pit by Avery's house, where Avery was burning some branches and tires. (ECF No. 19-21 at 29.) Avery told Dassey that he wanted to pick up the yard, so they drove around in a golf cart for about 45 minutes picking up things that they could burn – wood, tires, an old cabinet, and a van seat. (ECF No. 19-21 at 29-32.) Avery then asked Dassey to help him clean up something in the garage. (ECF No. 19-21 at 32.) Dassey described it as looking like fluid from a car. They used gasoline, paint thinner, and bleach, along with his brothers' old clothes to clean it up. (ECF No. 19-21 at 33.) When done they threw the clothes on the bonfire. (ECF No. 19-21 at 34.) Dassey

never asked Avery what it was they were cleaning up. (ECF No. 19-21 at 35.) After about 15 minutes of cleaning, Dassey and Avery returned to the bonfire and added some of the debris they gathered from the yard. (ECF No. 19-21 at 37.) They watched the fire until Dassey went home around 10:00 p.m. (ECF No. 19-21 at 37-39.)

Dassey explained that he subsequently lost about five or ten pounds because people had been calling him fat and he thought his girlfriend broke up with him because of his weight. (ECF No. 19-21 at 40.)

Dassey denied ever seeing Halbach on October 31, 2005, and said he did not see her picture or hear her name until after she was reported missing and his mother called him and told him to turn on the news. (ECF No. 19-21 at 40-41.) Asked why he told Wiegert and Fassbender that he participated in the rape and murder of Halbach, Dassey responded, "I don't know." (ECF No. 19-21 at 42.) When the investigators during the March 1 interview told him that it was not his fault, Dassey understood that to mean that he would not be taken away from his family and put in jail regardless of what he said. (ECF No. 19-21 at 77.)

On cross-examination, the state played portions of Dassey's May 13 phone call to his mother. (ECF No. 19-21 at 50, 53.) The prosecutor noted that Dassey told his mother in that call that he had been over at Avery's house *before* he saw his mother at about 5:00 p.m. (ECF No. 19-21 at 50-51, 54.) Dassey said that was not true and acknowledged that

he had lied to his mother. (ECF No. 19-21 at 54-55.) Dassey said he did not know why he lied to her. (ECF No. 19-21 at 56.)

The prosecutor also replayed portions of Dassey's March 1 confession to Fassbender and Wiegert. Dassey said he made up the details that he recounted in the confession. (ECF No. 19-21 at 53-54, 68-69.) Dassey said he did not know why he had made various inculpatory statements. (ECF No. 19-21 at 58, 60, 62, 69-70, 74.) Dassey speculated that the details he provided to investigators might have been gleaned from books, perhaps one called *Kiss the Girls*. (ECF No. 19-21 at 65, 67.) Dassey also acknowledged lying to a detective earlier when he said that during the week after Halbach was last seen that Avery did not have a fire. (ECF No. 19-21 at 56.) When asked why he lied, Dassey explained, "I'm just like my family. I don't like cops." (ECF No. 19-21 at 56.)

The defense presented the testimony of forensic psychologist Dr. Robert H. Gordon, who examined Dassey. (ECF No. 19-22 at 4-76.) Dr. Gordon testified that certain factors could make a person more suggestible. (ECF No. 19-22 at 18-19, 30, 35, 37-38.) With respect to some of these characteristics, Dassey tested in extreme percentiles. For example, when it came to social avoidance, Dassey tested in the first percentile, meaning 99 out of 100 people would grade as more socially outgoing than Dassey. (ECF No. 19-22 at 34.) As for social introversion and social alienation, Dassey was in the 2.3 and 1.5 percentiles, respectively. (ECF No. 19-22 at 35-36.) Dassey also

tested on the low end of the scales for accommodation and deference, and was also found to be passive and subdued, all characteristics Dr. Gordon opined were consistent with suggestibility. (ECF No. 19-22 at 37-39.) Intelligence testing indicated that Dassey's intelligence was in the low average to borderline range, at the 10th to 13th percentile (ECF No. 19-22 at 46-49). Dr. Gordon also noted that minors, even older minors such as 15 or 16-year-olds, have a greater likelihood of suggestibility, especially when they have low intellectual functioning (ECF No. 19-22 at 71), as do people who have had minimal or no contact with the criminal justice system (ECF No. 19-22 at 72).

Dr. Gordon also assessed Dassey using a test developed specifically to measure suggestibility in the context of interrogations. (ECF No. 19-22 at 51-52.) He noted that certain police interrogation techniques could make a person more vulnerable to suggestibility in an interrogation. Such techniques include making promises, telling the subject that he is sure to be convicted, referencing inculpatory information that does not exist, minimizing the seriousness of the offense or the suspect's role in the offense, noting that the suspect did not mean to do it, questioning the suspect about what he would do if he could do it over again, and stating how the suspect's family could be spared if he confessed. (ECF No. 19-22 at 62.)

Dr. Gordon explained how various segments of the March 1 interrogation exhibited suggestibility. (ECF No. 19-22 at 64-71.) The test used by Dr. Gordon measured two types of suggestibility. By one measure, Dassey was in the 3rd percentile.

(ECF No. 19-22 at 54-55.) By the second measure, he was in the 20th percentile. (ECF No. 19-22 at 54-55.) Dr. Gordon acknowledged instances where Dassey resisted certain suggestions. (ECF No. 19-22 at 161.) Overall, Dassey tested in the 5th percentile with respect to suggestibility—meaning, again, he was more suggestible than 95 percent of the population. (ECF No. 19-22 at 55.) It was Dr. Gordon's conclusion that Dassey was "highly suggestible … when being interrogated." (ECF No. 19-22 at 56.)

On cross-examination, the prosecutor again referred to and quoted from Dassey's May 13, 2006 phone call to his mother, asking Dr. Gordon whether the statements were relevant to an assessment of Dassey's suggestibility. (ECF No. 19-22 at 122-24.) Dr. Gordon agreed that the information was relevant but stated it did not change his conclusion that Dassey was vulnerable to suggestibility. (ECF No. 19-22 at 123-24.)

In closing argument, Dassey's attorney highlighted the complete absence of any DNA evidence connecting Dassey to the crimes despite extensive testing and much evidence connecting Avery to the offenses. (ECF No. 19-23 at 88-95.) He also noted the absence of other evidence that he argued would have been found if the offense had occurred as Dassey said (and the state alleged) it did. (ECF No. 19-23 at 95-106.) For example, Halbach's blood was not found in Avery's bedroom as would be expected if Halbach had been stabbed and had her throat been cut there as Dassey said had happened. (ECF No. 19-23 at 96-97.)

Defense counsel also focused on evidence showing that the March 1 statements were untrue. (ECF No. 19-23 at 107-37.) He noted Dassey's poor academic performance and intellectual deficits (ECF No. 19-23 at 108-11, 116) and highlighted how the investigators used techniques that are susceptible to producing a false confession (ECF No. 19-23 at 116-26). As for Dassey's May 13 phone call to his mother, counsel noted that Dassey never told her that he did the things he was charged with doing. All he said was that he did "some of it," which could mean he stood around the fire and picked up debris in the yard. (ECF No. 19-23 at 133-34.)

In rebuttal the state asserted that an innocent person would not confess. (ECF No. 19-23 at 144.) It noted how aspects of Dassey's confession were consistent with the physical evidence. (ECF No. 19-23 at 145-48.) It further noted instances where Dassey resisted suggestions from the investigators. (ECF No. 19-23 at 148-50.) The state was also dismissive of the defense expert's testimony regarding suggestibility. (ECF No. 19-23 at 150-51.)

After roughly five-and-a-half hours of deliberation the jury found Dassey guilty on all counts. (ECF No. 19-23 at 158-60; ECF No. 19-1.) The court sentenced Dassey to life in prison for first-degree intentional homicide, not eligible for release to extended supervision until November 1, 2048. (ECF No. 19-1 at 2.) The court further sentenced Dassey to six years of imprisonment for mutilating a corpse and 14 years imprisonment

for second-degree sexual assault, both to be served concurrent to the murder sentence. (ECF No. 19-1 at 1.)

### E. Post-Conviction Proceedings

Dassey moved for post-conviction relief. A hearing was held over five days beginning on January 15, 2010. (ECF Nos. 19-26; 19-27; 19-28; 19-29; 19-30.) The hearing included testimony of one of Dassey's trial attorneys, the prosecutor, a social psychologist, Kachinsky, O'Kelly, and Richard Leo, an expert in false confessions. The circuit court denied Dassey post-conviction relief on December 13, 2010. (ECF No. 19-43.) Dassey appealed, and on January 30, 2013, in an unpublished per curiam decision the Wisconsin Court of Appeals affirmed his conviction. (ECF No. 1-5); *see also State v. Dassey*, 2013 WI App 30, 346 Wis. 2d 278, 827 N.W.2d 928, 2013 Wisc. App. LEXIS 85 (unpublished). The Wisconsin Supreme Court denied Dassey's petition for review on April 1, 2013. (ECF Nos. 1-6; 19-11.)

Dassey filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on October 20, 2014. (ECF No. 1.) After Dassey consented to have a magistrate judge resolve his petition (ECF No. 5), the court reviewed the petition in accordance with Rule 4 of the Rules Governing Section 2254 Cases and ordered the respondent to answer the petition (ECF No. 6). The respondent likewise consented to have this court resolve the petition. (ECF No. 9.) Therefore, in accordance with 28 U.S.C. § 636(c),

having received the consent of all parties, this court may order the entry of judgment in this case. Briefing is concluded and the matter is ready for resolution.

## II.     Standard of Review

With the passage of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), Congress dramatically changed the federal courts' role in reviewing the judgments of state criminal courts. *Rhines v. Weber*, 544 U.S. 269, 274 (2005). "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). Under § 2254, a federal court may grant a writ of habeas corpus only when the state court's adjudication of the petitioner's claim on the merits:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court decision is contrary to clearly established federal law "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the United States Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *see also Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004)

("[A] state court decision is 'contrary to' federal law if the state court either incorrectly laid out governing Supreme Court precedent, or, having identified the correct rule of law, decided a case differently than a materially factually indistinguishable Supreme Court case.") (citing *Williams v. Taylor*, 529 U.S. 362, 405-06, 412-13 (2000)). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court's holding must provide a clear answer in the petitioner's favor; novel arguments for the expansion of constitutional rights or arguments dependent upon the decisions of any court other than the United States Supreme Court do not merit federal habeas relief. *See Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015); *Lopez v. Smith*, 135 S. Ct. 1, 1-4 (2014) (per curiam)); *Renico v. Lett*, 559 U.S. 766, 779 (2010); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008). Moreover, a court may rely upon only the Supreme Court's holdings, not its dicta. *Woods*, 135 S. Ct. at 1376 (citing *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)).

Under § 2254(d)(2), a state court's "decision 'involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence.'" *Bailey v. Lemke*, 735 F.3d 945, 949-50 (7th Cir. 2013) (quoting *Goudy v. Basinger*, 604 F.3d 394, 399-400 (7th Cir. 2010)).

If the state court adjudicated the petitioner's claim on its merits, a federal court cannot grant a petitioner habeas relief merely because the federal court disagrees, or even strongly disagrees, with the state court's decision. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015). A federal court is required to afford substantial deference to the findings and decisions of the state court. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Ayala*, 135 S. Ct. at 2198 (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); 28 U.S.C. § 2254(d). For a federal court to grant habeas relief, a state court's decision must be not merely wrong but so wrong that no reasonable judge could have reached that decision. *Woods*, 135 S. Ct. at 1376. More specifically, to grant relief under § 2254(d)(2), the petitioner must meet the "demanding but not insatiable" standard, *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), of showing any reasonable factfinder would reach a conclusion other than that reached in the state court, *Rice v. Collins*, 546 U.S. 333, 341 (2006).

This substantial restraint upon the authority of federal courts is intended to "further the principles of comity, finality, and federalism." *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007) (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 337 (2003)). The limitations are "designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). Moreover, the Supreme Court has said that "[s]tate courts are adequate forums for the vindication of federal rights." *Titlow*, 134 S. Ct. at 15. State judges, like federal judges, have the "the solemn

responsibility … to safeguard constitutional rights," *id.* (quoting *Trainor v. Hernandez*,

431 U.S. 434, 443 (1977)), and "there is no intrinsic reason why the fact that a man is a

federal judge should make him more competent, or conscientious, or learned … than

his neighbor in the state courthouse." *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 494, n. 35

(1976)). "Federal habeas review thus exists as 'a guard against extreme malfunctions in

the state criminal justice systems, not a substitute for ordinary error correction through

appeal.'" *Id.* (quoting *Richter*, 562 U.S. at 102-03).

### III.    Dassey's Claims

Dassey's petition for a writ of habeas corpus contains two claims for relief. First,

Dassey claims that he was denied his Sixth Amendment right to the effective assistance

of counsel. (ECF No. 1-2 at 9-18.) Second, Dassey claims that his March 1, 2006

confession was obtained in violation of the Fifth Amendment. (ECF No. 1-2 at 18-29.)

#### A.  Ineffective Assistance of Counsel

"In all criminal prosecutions, the accused shall enjoy the right … to have the

assistance of counsel for his defense." U.S. Const. Amend. VI. This includes the right for

a defendant to retain an attorney of his own choice, *Johnson v. Zerbst*, 304 U.S. 458, 468

(1938), to have an attorney appointed to represent him if he cannot afford an attorney,

*Gideon v. Wainwright*, 372 U.S. 335, 344 (1963), to be represented by an attorney whose

actions are not impacted by a conflict of interest, *Cuyler v. Sullivan*, 446 U.S. 335, 348-49

(1980), and to receive the effective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

When a convicted defendant alleges that his Sixth Amendment right to counsel was violated due to the conduct of his attorney, the claim most commonly alleges that counsel was ineffective under *Strickland*. Under *Strickland*, a defendant must demonstrate both that his attorney's performance was deficient, *id.* at 687, and that the deficient performance prejudiced the defendant, *id.* at 687, 691-92. *Strickland* encompasses a wide variety of attorney errors and misconduct.

In its decision granting Kachinsky's motion to withdraw from the case, the trial court found that Kachinsky's performance was deficient under *Strickland* when he allowed investigators to interrogate Dassey without an attorney present. (ECF No. 19-14 at 23; *see also* ECF No. 19-43 at 2, 9.) On appeal to the Wisconsin Court of Appeals, however, rather than seeking relief under *Strickland*, Dassey sought relief under the more forgiving *Sullivan* standard, arguing that Kachinsky acted under a conflict of interest when he assisted the prosecution in obtaining evidence against Dassey. (ECF No. 19-4 at 62 (all citations reflect the ECF pagination).) Dassey argued that Kachinsky's conflict of interest adversely affected him because it led to Kachinsky's failure to attend the May 13, 2006 interrogation. That uncounseled interrogation led to Dassey's recorded phone call with his mother, which was used to his detriment at trial.

The Wisconsin Court of Appeals found that Dassey failed to show that Kachinsky had a conflict of interest. (ECF No. 1-5, ¶ 13.) It also concluded that Dassey had failed to draw a "viable link between Kachinsky's actions and any demonstrable detriment to him." (ECF No. 1-5, ¶ 11.) It stated that there was no indication that Kachinsky's alleged conflict had any adverse effect at the suppression hearing. (ECF No. 1-5, ¶ 11.) Nor did the search warrant obtained pursuant to the information Kachinsky provided to the prosecution yield any evidence. (ECF No. 1-5, ¶ 12.) It did acknowledge that "[t]he jury did view a brief video [sic] clip of Dassey's post-interview telephone conversation with his mother." (ECF No. 1-5, ¶ 12.) "Significantly, though, the State properly introduced it only to rebut Dassey's testimony on direct that the acts to which he had admitted 'didn't really happen' and that his confession was 'made up.'" (ECF No. 1-5, ¶ 12.) The court of appeals concluded that "[v]oluntary statements obtained even without proper *Miranda* warnings are available to the State for the limited purposes of impeachment and rebuttal." (ECF No. 1-5, ¶ 12 (citing *State v. Knapp*, 2003 WI 121, ¶ 114, 265 Wis. 2d 278, 666 N.W.2d 881, *vacated and remanded by* 542 U.S. 952 (2004), *reinstated in material part by* 2005 WI 127, ¶ 2 n.3, 285 Wis. 2d 86,700 N.W.2d 899).)

Dassey sets forth three arguments regarding the Wisconsin Court of Appeals' decision regarding his ineffective assistance of counsel claim. First, he argues that the court's conclusion that Kachinsky did not labor under an actual conflict and that any

conflict did not adversely affect the trial was an unreasonable application of clearly established federal law. (ECF No. 1-2 at 11-17.) Second, he argues that the court of appeals made an unreasonable finding of fact when it found that the State had used the May 13 telephone call between Dassey and his mother only to cross-examine Dassey, when in fact the State used the call at least three times, including during closing argument to neutralize Dassey's alibi. (ECF No. 1-2 at 17-18.) Third, Dassey argues that the decision applied the wrong rule of law—the Fifth Amendment *Miranda* impeachment rule—to assess his Sixth Amendment ineffective assistance of counsel claim. (ECF No. 1-2 at 9-11.)

### 1. Conflict of Interest

Although it probably does not need to be stated, it will be: Kachinsky's conduct was inexcusable both tactically and ethically. It is one thing for an attorney to point out to a client how deep of a hole the client is in. But to assist the prosecution in digging that hole deeper is an affront to the principles of justice that underlie a defense attorney's vital role in the adversarial system. That said, Dassey's attempt to characterize Kachinsky's misconduct as a conflict of interest under *Sullivan* is misplaced.

In *Sullivan*, two attorneys jointly represented three co-defendants, all at separate trials. The Supreme Court concluded that, if the defendant did not object to the joint representation at trial, he may prevail on a claim that his right under the Sixth

Amendment to the effective assistance of counsel was violated only if he demonstrates "that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. That requires a showing that "his counsel actively represented conflicting interests." *Id.* at 350. However, unlike a claim under *Strickland*, no showing of prejudice is required.

Some federal courts of appeals interpreted *Sullivan* as applying to various types of conflicts other than those involving the representation of multiple clients. *See, e.g., Summerlin v. Stewart*, 267 F.3d 926, 935-41 (9th Cir. 2001) (romantic "entanglement" with the prosecutor); *Perillo v. Johnson*, 205 F.3d 775, 797-99 (5th Cir. 2001) (obligation to former client); *Freund v. Butterworth*, 165 F.3d 839, 858-60 (11th Cir. 1999) (same); *Garcia v. Bunnell*, 33 F.3d 1193, 1194-95, 1198, n. 4 (9th Cir. 1994) (job with the prosecutor's office); *United States v. Sayan*, 968 F.2d 55, 64-65 (D.C. Cir. 1992) (fear of antagonizing the trial judge); *United States v. Michaud*, 925 F.2d 37, 40-42 (1st Cir. 1991) (teaching classes to IRS agents); *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir. 1988) (obligation to former client); *United States v. Young*, 644 F.2d 1008, 1013 (4th Cir. 1981) (same); *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980) (book deal).

However, in *Mickens v. Taylor*, 535 U.S. 162 (2002), the Supreme Court stated that "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." *Mickens*, 535 U.S. at 175. As stated in *Mickens*, *Sullivan* stressed the high probability of prejudice arising from the concurrent representation of multiple

clients and the difficulty of proving that prejudice. 535 U.S. at 175. "Not all attorney conflicts present comparable difficulties." *Id.* The purpose of the *Sullivan* exception to the ordinary requirements of *Strickland* is "to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." 535 U.S. at 176.

In his argument to this court, Dassey asserts that "there can be no doubt that Kachinsky labored under an 'actual conflict'" (ECF No. 1-2 at 12), but he never explicitly identifies the nature of Kachinsky's alleged conflict. The closest Dassey comes is when he asserts, "the problem is that [Kachinsky] actively and concurrently worked for two masters: the prosecutor and (or, often, at the expense of) his own sixteen-year-old client." (ECF No. 22 at 8.) Dassey never identifies any sort of relationship that Kachinsky had with the prosecutor that establishes a conflict of interest in the sense that the term is generally used. *See, e.g.,* Wis. SCR 20:1.7, 20:1.8 (attorney ethical rules regarding conflicts of interest). Kachinsky was not concurrently employed by the prosecutor's office, did not have any personal relationship with the prosecutor's office, nor did he have any financial (or other) interest in the work of the prosecutor's office. *Cf. Blankenship v. Johnson*, 118 F.3d 312, 318 (5th Cir. 1997) (finding conflict of interest when defendant's appellate counsel was concurrently a county attorney).

The case upon which Dassey primarily relies is an unpublished district court decision from the Eastern District of Michigan that does not even refer to *Sullivan*. (ECF

No. 1-2 at 10; ECF No. 22 at 6-7 (citing *Thomas v. McLemore*, 2001 U.S. Dist. LEXIS 6763 (E.D. Mich. Mar. 30, 2001).) In that case, while entertaining the premise of the petitioner's argument that a defense attorney who chooses to assist the prosecution has a conflict of interest, the court quickly rejected its merits. *Thomas*, 2001 U.S. Dist. LEXIS 6763, 30-32. Thus, in addition to being non-precedential, *Thomas* cannot be read as endorsing an expansion of *Sullivan* in the manner Dassey suggests.

In *Osborn v. Shillinger*, 861 F.2d 612, 629 (10th Cir. 1988), cited in *Thomas*, the defendant pled guilty to various crimes and was sentenced to death. *Id.* at 614. The Court of Appeals for the Tenth Circuit affirmed the district court's decision to grant Osborn's petition for a writ of habeas corpus. *Id.* at 630. The court said, "A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest." *Id.* at 629. The court continued, "In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." *Id.* at 629.

These statements would seem to strongly support Dassey's position that an attorney who works to facilitate his client's conviction acts under a conflict of interest. However, *Osborn* not only predates AEDPA, but also *Mickens*, where the Supreme Court

made it clear that *Sullivan* was clearly established federal law only with respect to conflicts of interest resulting from the concurrent representation of multiple clients. 535 U.S. at 175. Finally, *Osborn* was not strictly a *Sullivan* conflict of interest case. The court relied upon the general rules set forth in *Sullivan*, *Strickland*, and *United States v. Cronic*, 466 U.S. 648, 655 (1984), to conclude that Osborn's rights under the Sixth Amendment were violated. Specifically, the court stated, "We base our conclusion that Osborn did not receive effective assistance of counsel on the clear evidence that the process by which he pled and was sentenced to death was not adversarial, and therefore was unreliable." *Osborn*, 861 F.2d at 629. That principle is taken from *Strickland.* 466 U.S. at 696. Thus, it appears that *Osborn* was more accurately a *Strickland* case and statements that might be seen as emerging from *Sullivan* were merely corroborative to the decision.

The Supreme Court has never held that the *Sullivan* standard applies to the sort of purported conflict Dassey identifies here. In fact, the Court in *Mickens* expressly stated that it is *not* "clearly establish[ed]" that *Sullivan* applies in any context other than conflicts resulting from the concurrent representation of multiple clients. Thus, *Sullivan* is inapplicable here. Because Dassey may obtain relief under § 2254(d)(1) only when the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" the Supreme Court's statements in *Mickens* make it clear that this court is

prohibited from granting Dassey the relief he seeks now. Relief under the Sixth Amendment may be found, if at all, only under *Strickland*.

Thus, the court considers whether it might be appropriate to re-construe Dassey's ineffective assistance of counsel claim as arising under *Strickland*. The respondent argues that it is not. (ECF No. 20 at 14.) Although in both the court of appeals (ECF Nos. 19-4 at 12, 59, 60, 61, 73; 19-8 at 8) and in his petition for review to the Wisconsin Supreme Court (ECF No. 19-9 at 14) Dassey repeatedly referred to his claim regarding Kachinsky's misconduct as one of "ineffective assistance of counsel," he never actually made a *Strickland* argument. Dassey's only discussion of *Strickland* in the Wisconsin Court of Appeals in the context of Kachinsky's actions was when he asserted, "[e]ven *Strickland* itself establishes that when defense counsel 'breaches the duty of loyalty' – as Kachinsky unquestionably did here – then he 'operates under a conflict of interest' governed by [*Sullivan*]." (ECF No. 19-4 at 65; *see also* ECF No. 19-4 at 61.) What the Court actually said in *Strickland* was the inverse – that if a defense attorney operates under a conflict of interest, he breaches the duty of loyalty to his client. *Strickland*, 466 U.S. at 692.

Although a claim of "ineffective assistance of counsel" is often synonymous with a *Strickland* claim, courts have used the term to describe both *Strickland* and *Sullivan* claims. *See, e.g., Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013); *Stoia v. United States*, 22 F.3d 766, 770 (7th Cir. 1994). But the claims are distinct. Naturally one might

wonder what difference it makes if an argument for relief for a violation of the Sixth Amendment is under *Sullivan* or *Strickland*. Why not just view the matter broadly, as the court arguably did in *Osborn*, 861 F.2d at 629, and focus on the general Sixth Amendment consideration of whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process"? *Strickland*, 466 U.S. at 696.

The answer lies in AEDPA and doctrines set forth in case law that restrain a federal court's authority to correct errors in state criminal proceedings. It is not only presumed that state courts are capable of protecting constitutional rights but also that state judges will adhere to that "solemn responsibility." *Titlow*, 134 S. Ct. at 15. Federal courts are bound to respect the decisions of state courts and the finality of their judgments. *See Martinez*, 132 S. Ct. at 1316; *Panetti*, 551 U.S. at 945. As part of the policy of ensuring that federal intervention occurs only as a last resort, the prisoner must have given the state courts "a 'meaningful opportunity to pass upon the substance of the claims later presented in federal court.'" *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004) (quoting *Chambers v. McCaughtry*, 264 F.3d 732, 737-38 (7th Cir. 2001)). That requires that "he articulates both the operative facts and the controlling legal principles on which his claim is based." *Perruquet v. Briley*, 390 F.3d 505, 519 (7th Cir. 2004).

There is certainly commonality between the *Sullivan* claim Dassey made and the *Strickland* claim he could have made. *See Blake*, 723 F.3d at 880 (noting that a conflict of

interest claim may be presented under both *Strickland* and *Sullivan*). As noted above, each constitutes a violation of the Sixth Amendment that can be referred to generally as ineffective assistance of counsel. The argument Dassey made in the state courts calls to mind the same Sixth Amendment right implicated under *Strickland*. Each requires proof of a harm, varying only in the *amount* of harm (adverse effect versus prejudice) that the petitioner must prove. *See Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004) ("Proceeding under *Sullivan* places a 'lighter burden' on the defendant than *Strickland* because demonstrating an 'adverse effect' is significantly easier than showing 'prejudice'.") Dassey's *Sullivan* claim and his plausible *Strickland* claim are also based on the same facts.

However, the court finds that it need not consider whether it may, consistent with the rules regarding exhaustion and fair presentment, re-construe Dassey's *Sullivan* claim as a *Strickland* claim. Crucially, Dassey never asked this court to consider whether Kachinsky rendered ineffective assistance under *Strickland*. Indeed, he acknowledges a distinction between a *Sullivan* and a *Strickland* claim when he emphasizes that "'demonstrating an adverse effect under *Sullivan* is significantly easier than showing prejudice' under *Strickland v. Washington*." (ECF No. 1-2 at 13 (quoting *Hall*, 371 F.3d at 973).) Even after the respondent noted that *Sullivan* was not clearly established federal law for the claim Dassey presented, Dassey made no argument that his claim ought to

be alternatively construed under *Strickland*. Dassey's argument has been consistently and exclusively under *Sullivan*.

In the absence of any request from Dassey, the court finds it inappropriate to re-construe his *Sullivan* claim as a *Strickland* claim. Such extraordinary action would be outside the permissible bounds of judicial action, especially given the policies that circumscribe the role of federal courts in reviewing state court convictions.

In short, the Supreme Court has never recognized misconduct such as Kachinsky's as a conflict of interest under *Sullivan*. Therefore, federal law prohibits the court from granting Dassey habeas relief on this claim. Although Kachinsky's misconduct might support a claim for relief under *Strickland*, Dassey never made this argument to the state courts or to this court. Consequently, federal law likewise prohibits the court from considering whether Dassey would be entitled to habeas relief on this alternative basis.

### 2. Introduction of the Phone Call at Trial

When discussing the significance of Dassey's May 13 phone call to his mother, the court of appeals said, "Significantly, though, the State properly introduced it only to rebut Dassey's testimony on direct that the acts to which he had admitted "didn't really happen" and that his confession was 'made up.'" (ECF No. 1-5, ¶ 12.)

Dassey argues that the court of appeals "found, as a factual matter, that the May 13 telephone call was only used to cross-examine Brendan[.]" (ECF No. 1-2 at 18.) He

points out that the trial transcript is clear that his phone call to his mother was referenced by the prosecution at least three times at trial: during its cross-examination of Dassey; during its cross-examination of Dassey's expert; and during its closing argument. (ECF No. 1-2 at 17-18.)

But the court of appeals never said that Dassey's phone call to his mother was "used" only to cross-examine Dassey. It said it was "introduced" for only one purpose, which was to rebut Dassey's testimony on direct that the acts to which he had admitted "didn't really happen" and that his confession was "made up." Evidence *introduced* for only one purpose might be *used* multiple times, in various ways, and with many different witnesses. What the court of appeals said was accurate and not unreasonable.

### 3. The Legal Standard Applied by the Court of Appeals

Regarding the admission of Dassey's phone call to his mother, the court of appeals also said, "Voluntary statements obtained even without proper *Miranda* warnings are available to the State for the limited purposes of impeachment and rebuttal. *See State v. Knapp*, 2003 WI 121, ¶ 114, 265 Wis. 2d 278, 666 N.W.2d 881." (ECF No. 1-5, ¶ 12.) Dassey argues that the court of appeals acted contrary to clearly established federal law by applying the wrong legal standard to his claim. (ECF No. 1-2 at 11.)

The court acknowledges that the court of appeals' statement that "[v]oluntary statements obtained even without proper *Miranda* warnings are available to the State for

the limited purposes of impeachment and rebuttal" is confusing given the context of this case. Dassey never claimed that his call to his mother should have been excluded because it was made without the benefit of his *Miranda* warnings. The court suspects that the court of appeals was merely attempting to analogize the admission of a statement obtained in violation of *Sullivan* to the admission of a statement obtained in violation of *Miranda*. Whether such a comparison is sound is a question this court need not determine. The court of appeals' decision is clear that this was not the basis for its rejection of Dassey's claim. The statement was extraneous and immaterial. *See Rhodes v. Dittmann*, 783 F.3d 669, 675 (7th Cir. 2015) ("Section 2254(d) focuses on the ultimate decision of the state court, not on parts of a written opinion that might in isolation appear to be misguided but that in the end are not necessary to the outcome."). Thus, the court cannot conclude that Dassey has shown that the court of appeals' decision denying him relief on his *Sullivan* claim was contrary to clearly established federal law or based upon an unreasonable determination of facts.

### B. Voluntariness of Dassey's March 1, 2006 Confession

The United States Supreme Court "has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985) (citing *Mincey v. Arizona*, 437 U.S. 385 (1978); *Haynes v. Washington*, 373

U.S. 503 (1963); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944); *Chambers v. Florida*, 309 U.S. 227, 235-238 (1940); *Brown v. Mississippi*, 297 U.S. 278 (1936)). This includes the sorts of means that are "revolting to the sense of justice," such as "beatings and other forms of physical and psychological torture." *Id.* (quoting and citing *Brown*, 297 U.S. at 286). But the Constitution prohibits far more than barbaric and torturous conduct. Indeed, more subtle police pressures such as a false promise of leniency may render a confession involuntary. *See United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009). If a confession is the product of "deceptive interrogation tactics that have overcome the defendant's free will," the confession is involuntary. *Id.* (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)).

"In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "[T]he voluntariness of juvenile confessions must be evaluated with 'special care.'" *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (quoting *Haley*, 332 U.S. at 599; citing *In re Gault*, 387 U.S. 1, 45 (1967)). Relevant factors include "the length of the interrogation, *Ashcraft v. Tennessee*, 322 U.S. 143, 153-154 (1944); its location, *see Reck v. Pate*, 367 U.S. 433, 441 (1961); its continuity, *Leyra v. Denno*, 347 U.S. 556, 561 (1954); the defendant's maturity, *Haley v. Ohio*, 332 U.S. 596, 599-601 (1948) (opinion of Douglas, J.); education, *Clewis v. Texas*, 386 U.S. 707, 712, (1967);

physical condition, *Greenwald v. Wisconsin*, 390 U.S. 519, 520-21 (1968) (per curiam); and

mental health, *Fikes v. Alabama*, 352 U.S. 191, 196 (1957)." *Withrow v. Williams*, 507 U.S.

680, 693 (1993). "[C]oercive police activity is a necessary predicate to the finding that a

confession is not 'voluntary' within the meaning of the Due Process Clause of the

Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). A confession is

not involuntary merely because the actions of the police caused the person to confess.

*Johnson v. Trigg*, 28 F.3d 639, 641 (7th Cir. 1994). And a suspect's "deficient mental

condition," standing alone, will not sustain a finding of involuntariness. *Connelly*, 479

U.S. at 164-65. Whether a statement was voluntary is a question of law. *Miller*, 474 U.S.

at 115-16.

"Though the voluntariness of a confession is an issue of law, the factors

underlying that determination are issues of fact to which § 2254(e)(1)'s presumption of

correctness applies." *United States ex rel. Weems v. Williams*, 2014 U.S. Dist. LEXIS 151281,

9 (N.D. Ill. Oct. 21, 2014) (citing *Miller*, 474 U.S. at 110-17; *see also Everett v. Barnett*, 162

F.3d 498, 501 (7th Cir. 1998). "[D]eterminations of factual issues made by the state court

are presumed correct in federal habeas corpus proceedings, unless the petitioner rebuts

that presumption by clear and convincing evidence." *Ward v. Sternes*, 334 F.3d 696, 703

(7th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). "The presumption of correctness also

applies to factual findings made by a state court of review based on the trial record."

*Morgan v. Hardy*, 662 F.3d 790, 797-98 (7th Cir. 2011) (citing *Sumner v. Mata*, 449 U.S. 539,

546-47 (1981); *Rodriguez v. Peters*, 63 F.3d 546, 554 (7th Cir. 1995)). Thus, a decision involves an unreasonable determination of facts under 2254(d)(2) "if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy*, 604 F.3d at 399-400 (citing *Ward*, 334 F.3d at 704).

As recounted by the court of appeals, the state trial court found the following facts regarding Dassey's March 1 confession:

> Dassey had a 'low average to borderline' IQ but was in mostly regular-track high school classes; was interviewed while seated on an upholstered couch, never was physically restrained and was offered food, beverages and restroom breaks; was properly Mirandized; and did not appear to be agitated or intimidated at any point in the questioning. … [I]nvestigators used normal speaking tones, with no hectoring, threats or promises of leniency; prodded him to be honest as a reminder of his moral duty to tell the truth; and told him they were 'in [his] corner' and would 'go to bat' for him to try to achieve a rapport with Dassey and to convince him that being truthful would be in his best interest.

(ECF No. 1-5, ¶ 6.) The court of appeals held that these findings of fact were not clearly erroneous. (ECF No. 1-5, ¶ 7.) It noted that investigators are permitted to make statements that encourage honesty and do not promise leniency. (ECF No. 1-5, ¶ 7 (citing *State v. Berggren*, 2009 WI App 82, ¶ 31, 320 Wis. 2d 209, 769 N.W.2d 110).) Moreover, investigators may assert that they know facts of which they do not actually have knowledge. (ECF No. 1-5, ¶ 7 (citing *State v. Triggs*, 2003 WI App 91, ¶¶ 15, 17, 264 Wis. 2d 861, 663 N.W.2d 396).) "The truth of the confession remained for the jury to determine." (ECF No. 1-5, ¶ 7.)

### 1. Similar Cases

In a number of post-AEDPA cases the Court of Appeals for the Seventh Circuit addressed the question of whether a state court unreasonably concluded that a juvenile's confession was voluntary. Some of these cases deal with sufficiently analogous circumstances such that the court finds it helpful to look to them in guiding the present decision.

In *Carter v. Thompson*, 690 F.3d 837, 840-41 (7th Cir. 2012), the court denied habeas relief to a 16-year-old girl who was kept in the police station for 55 hours, never told she was free to leave, never afforded the opportunity to shower or given a change of clothes, a pillow, or a blanket, and who had to sleep on a bench in the interview room. She was repeatedly subjected to questioning. *Id.* at 840. No parent or other adult protecting her interests was present until after she had confessed. *Id.* at 839, 841. While referring to the circumstances as "unsettling," the court ultimately concluded that the state court's decision, holding that her confession was voluntary, was not objectively unreasonable. *Id.* at 844.

In *Etherly v. Davis*, 619 F.3d 654 (7th Cir. 2010), Etherly was 15 years old, illiterate, enrolled in special education classes, and had "borderline intellectual functioning" when police officers went to his home at about 5:30 a.m. and took him to the police station for questioning about his involvement in a murder. *Id.* at 657-58. He had no prior involvement in the criminal justice system, and no parent was present during the

interview. *Id.* at 659. Two hours after arriving at the station, detectives undertook a brief, unproductive interview of him. *Id.* at 658. After a uniformed officer took Etherly to the restroom, "Etherly informed the detectives that the uniformed officer had told him that he had an obligation to tell the truth, and that 'it would go better for him in court' if he helped the police to locate the guns." *Id.* A detective responded that they could not make any promises but said they would inform the court of his assistance. *Id.* Etherly then provided an inculpatory statement. *Id.* The court of appeals determined that the state court was not unreasonable in finding that Etherly's statement was voluntary. *Id.* at 663-64.

In *Hardaway v. Young*, 302 F.3d 757, 759 (7th Cir. 2002), the suspect was just 14 years old when he was questioned about murdering an 11-year-old gang member. Detectives roused Hardaway from sleep at his home at about 8:00 a.m. and took him to the police station, where they questioned him briefly before he spent most of the next eight hours alone in an interview room. *Id.* at 760. At 4:30 p.m., two new detectives advised Hardaway of his *Miranda* rights and proceeded to question him. *Id.* Hardaway confessed. *Id.* Given Hardaway's "extreme youth," the court of appeals carefully scrutinized the circumstances of his confession, including the fact that "there was no friendly adult presence to guard against undue police influence." *Id.* at 765-67. But the court noted other facts that tended to support a finding that the confession was voluntary. "The police used no particularly coercive or heavy-handed interview

techniques, such as making Hardaway strip and wear jail clothes or handcuffs, questioning him for lengthy periods without a break, misrepresenting evidence, or showing graphic pictures of the murder scene." *Id.* at 766 (discussing cases where these techniques were used). Hardaway was experienced with the criminal justice system, having been arrested 19 times in the preceding two years. *Id.* at 767. He appeared to understand his *Miranda* rights in that he was able to explain them in his own words. *Id.* There was no indication that Hardaway "had mental incapacities or other infirmities that would make him incapable of understanding his rights." *Id.* His "test scores showed an IQ of 95 and the educational performance of an average sixth-grader." *Id.* Despite "the gravest misgivings," the court of appeals "reluctantly conclude[d]" that, given the deferential standard set forth under AEDPA, it was "compelled to defer to the findings and the conclusion of the state courts" because "reasonable minds could differ." *Id.* at 759, 767-68.

Conversely, in *A.M. v. Butler*, 360 F.3d 787 (7th Cir. 2004), the court affirmed the district court's grant of the writ to a petitioner who, at 11-years-old, confessed to the brutal murder (committed when he was 10 years old) of his 83-year-old neighbor. *Id.* at 789, 792, 802. Initially regarded as a witness, the youth was questioned numerous times and told various versions of the relevant events, eventually repeatedly admitting to the murder. *Id.* at 792-93. However, once his mother was located and joined him in the interrogation room, he recanted. *Id.* at 793. Later, he purportedly admitted the murder

to his mother, a point disputed by his mother at trial. *Id.* at 793-94. According to the petitioner, a detective "pounded on his knees, told him his fingerprints were on the murder weapon, and said that if he confessed, God and the police would forgive him and he could go home in time for his brother's birthday party." *Id.* at 794. The court emphasized that the petitioner "was not a seasoned juvenile delinquent. In fact, he had no prior experience with the criminal justice system when he was questioned for almost 2 hours in a closed interrogation room with no parent, guardian, lawyer, or anyone at his side." *Id.* at 797, 800. A detective "continually challenged [the petitioner's] statement and accused him of lying, a technique which could easily lead a young boy to 'confess' to anything." *Id.* at 800. The court affirmed the district court's decision to grant the writ. *Id.* at 802.

In dissent, Judge Easterbrook accused the majority of continuing to apply the pre-AEDPA standard of review. *Id.* at 805. In his view, affording the state court decision the significant deference required under AEDPA, the court was required to deny the writ. *Id.* at 805. He noted that the detective did not attempt to overbear the petitioner's will, treat him poorly, or hold him for extended periods, and the petitioner repeated his confession many times after the relevant interview. *Id.* at 805.

### 2.  Reliability as a Factor Under the Totality of the Circumstances

Dassey argues that during the March 1 interrogation the investigators repeatedly fed him facts, including facts that were not publicly known. Such fact feeding could

suggest that Dassey's confession was not reliable. Thus, as a preliminary question the court considers whether the reliability of Dassey's confession is a factor that the court should take into account when assessing whether Dassey's confession was voluntary under the totality of the circumstances.

Intuitively, one would not expect Dassey to provide the level of detail he did on March 1 had he not been involved in the events he described. The prosecution emphasized as much in its closing argument: "People who are innocent don't confess in the detail provided to the extent this defendant provided it. They don't do that." (ECF No. 19-23 at 144.) Research, however, shows that some people *do* make detailed confessions to crimes they did not commit. (ECF No. 19-27 at 202-08); *see also* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 933-43 (2004) (documenting 125 "proven false" confessions) (presented as an exhibit by the state in its cross-examination of Leo at Dassey's post-conviction hearing and discussed at length (*see, e.g.,* ECF No. 19-27 at 273-81)); Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1062-66 (2009-10) (examining multiple cases where individuals confessed to crimes for which they were later exonerated by DNA testing, noting that many of the false confessions included details about how the crime had occurred) (study relied upon by Leo in his testimony at Dassey's post-conviction hearing) (*see, e.g.,* ECF No. 19-27 at 202-03, 208-09)). Moreover, false confessions are especially likely among juveniles and persons with low IQs. (ECF

No. 19-27 at 140, 165); *see also* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 919 (2004). Other traits such as low self-esteem, aversion to conflict, and poor memory tend to make a person more susceptible to false confessions. (ECF No. 19-27 at 140-41.)

One explanation for the level of detail in false confessions is that the suspect learned the details through the media, family, friends, or from investigators as part of the questioning process. *See generally* Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051 (2009-10); (*see also* ECF No. 19-30 at 149-53 (Janda's testimony regarding Dassey's exposure to media coverage and family discussions of the case).) The investigation and prosecution of Avery garnered significant media attention in Wisconsin and nationally. *See, e.g.*, Kevin Braley, *Halbach Case Draws Media Crowd*, Herald Times Reporter (Manitowoc, WI), Nov. 23, 2005, p. 1A.

The prosecution emphasized that details Dassey provided were corroborated by other evidence. However, the details that Dassey provided were predominantly either matters that had been publicly disclosed or could be readily surmised from those facts. For example, long before Dassey's March 1 confession, it had been reported in the media that Halbach's RAV4 was found in the salvage yard partially concealed by branches and a car hood; that her remains were found in Avery's burn pit along with remnants of clothing; that Avery burned tires on the night Halbach was last seen; that 11 rifle casings were found in Avery's garage; that two rifles were recovered from Avery's

bedroom; that a key to Halbach's RAV4 was found in Avery's bedroom; that the key had Avery's DNA on it; that Avery's blood was found in Halbach's RAV4; and that Halbach's blood was found in the cargo area of the RAV4. *See, e.g.*, Kevin Braley, *Avery Bound Over for Trial*, Herald Times Reporter (Manitowoc, WI), Dec. 7, 2005, p. 1A; Kevin Braley, *Homicide Charge Filed*, Herald Times Reporter (Manitowoc, WI), Nov. 16, 2005, p. 1A.

Certain other details, such as the fact that Halbach had been shot in the head and that the battery to the RAV4 had been disconnected, apparently had *not* been publicly disclosed as of March 1, 2006. However, how Dassey came to say that Avery shot Halbach in the head offers perhaps the strongest indication that Dassey was, as he later would claim, at times guessing at the answers in an attempt to provide the investigators with the information they said they already knew. (*See* ECF Nos. 19-34 at 34, 98; 19-38 at 4-5.)

The investigators knew that Halbach had been shot in the head and repeatedly told Dassey that they knew "something else was done. … Something with the head." (ECF No. 19-25 at 60-63.) Dassey first said that Avery "cut off her hair," his inflection suggesting more a question than a statement. (ECF No. 19-25 at 60; Ex. 43, Disc 1 at 11:57:45 AM.) After more prompting from the investigators, he then said that Avery "punched her." (ECF No. 19-25 at 61.) Yet more prompting led to Dassey saying that, at Avery's direction, he cut Halbach's throat. (ECF No. 19-25 at 62.) Despite more

prompting, eventually Dassey stated, "That's all I can remember." (ECF No. 19-25 at 63.) Having unsuccessfully gotten Dassey to tell them that Halbach had been shot in the head, much less who had shot her, Wiegert finally said, "All right, I'm just gonna come out and ask you. Who shot her in the head?" (ECF No. 19-25 at 63.) "He did," Dassey replied. (ECF No. 19-25 at 63.) When asked why he did not say so earlier, Dassey said, "Cuz I couldn't think of it." (ECF No. 19-25 at 63.)

Thereafter, the details of the shooting emerged, or perhaps evolved, in a similarly protracted fashion. Initially, Dassey told the investigators that Avery shot Halbach twice. (ECF No. 19-25 at 65.) Then it was three times. (ECF No. 19-25 at 67.) Later, after Fassbender said, "Remember [we] got a number of shell casings that we found in that garage" (ECF No. 19-25 at 73), Dassey said that Avery shot Halbach "about ten" times while she was on the garage floor. (ECF No. 19-25 at 73.) Wiegert responded, "That makes sense. Now we believe you." (ECF No. 19-25 at 73.)

Dassey's description of where the shooting took place was also an evolution. He first told the investigators that the shooting occurred outdoors and that Halbach was never in the garage. (ECF No. 19-25 at 67-68.) Then he told them that the shooting occurred in the garage. (ECF No. 19-25 at 72.) Specifically, Dassey said Halbach was in the back of her RAV4 when shot. (ECF No. 19-25 at 73.) But immediately thereafter he said that she was on the garage floor when she was shot. (ECF No. 19-25 at 73.)

Finally, only after Fassbender's highly leading questions did Dassey acknowledge that Avery went under the hood of Halbach's RAV4. When Fassbender asked Dassey what else he and Avery did to the RAV4, he could not muster the answer Fassbender was looking for until Fassbender asked, "[D]id he go and look at the engine, did he raise the hood at all or anything like that?" (ECF No. 19-25 at 79.) Dassey responded affirmatively, but when pressed for additional details he could offer none. (ECF No. 19-25 at 79.) Instead, all he could say was, "I don't know what he did, but I know he went under." (ECF No. 19-25 at 79.)

The investigators' use of leading questions and disclosure of non-public facts makes it difficult to evaluate whether Dassey really knew the facts or was simply agreeing with the investigators. *Cf.* Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1066-67 (2009-10) (discussed in Leo's testimony (ECF No. 19-27 at 202-08)) (noting that police training materials emphasize that, to enable later evaluation of whether a statement was true, interrogators should not provide the suspect with non-public details or ask leading questions on crucial points).

Based on its review of the record, the court acknowledges significant doubts as to the reliability of Dassey's confession. Crucial details evolved through repeated leading and suggestive questioning and generally stopped changing only after the investigators, in some manner, indicated to Dassey that he finally gave the answer they were looking for. (*See* ECF No. 19-27 at 210-32.) Purportedly corroborative details could have been the

product of contamination from other sources, including the investigators' own statements and questioning, or simply logical guesses, rather than actual knowledge of the crime. (*See* ECF No. 19-27 at 210-32.)

Courts have long excluded involuntary confessions on the basis that they are inherently unreliable. *Dickerson v. United States*, 530 U.S. 428, 434 (2000). The Court of Appeals for the Seventh Circuit in *Conner v. McBride*, 375 F.3d 643, 652 (7th Cir. 2004), stated that the fact that the petitioner's confession was found to be reliable tended to support the conclusion that the statement was voluntary. The present case presents the flip side of the *Connor* coin — whether *doubts* as to the reliability of Dassey's confession would tend to support a finding that the confession was *in*voluntary.

The Supreme Court long ago detached the admissibility of a confession from its reliability and made voluntariness alone the benchmark of admissibility. *See Culombe v. Connecticut*, 367 U.S. 568, 583-84 n. 25 (1961) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941). "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." *Connelly*, 479 U.S. at 167 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). Thus, voluntariness is "a question to be answered with complete disregard of whether or not petitioner in fact spoke truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Accordingly, from a constitutional perspective, if a person voluntarily but falsely confesses, it is the jury, not the court, that serves as the check against an innocent person being convicted of a crime he did not commit. (*See* ECF No. 19-12 at 4 ("The motion that's before the Court today is not directly concerned with the truthfulness or the falsity of the statements given, but, rather, their voluntariness.").) By returning verdicts of guilty, the court presumes the jury found Dassey's confession reliable. This court's doubts as to the reliability of Dassey's confession are not relevant considerations in the assessment of whether Dassey's confession was constitutionally voluntary.

### 3. Analysis of Dassey's Confession

The court must look to all relevant facts to determine whether Dassey's March 1 confession was voluntary. The interview occurred mid-day rather than in the early morning hours, *see Etherly v. Davis*, 619 F.3d 654, 657 (7th Cir. 2010), or at a time when Dassey might expect to be asleep, *see Hardaway v. Young*, 302 F.3d 757, 766 (7th Cir. 2002). The questioning was not particularly prolonged. Although Dassey was in the interview room from about 11:00 a.m. until 4:00 p.m., the relevant questioning spanned less than three hours. (Ex. 43.) Dassey was left alone for less than two hours, the longest single stretch being about 50 minutes. He was offered food and beverages. Although the interview occurred in a police station, it was in a "soft interview room," with carpeting and upholstered furniture as opposed to a room with an uncarpeted floor, a hard table, and chairs. Wiegert advised Dassey of his rights under *Miranda*, including the right to

not answer questions, to stop the questioning, and to have an attorney appointed for him and present during any questioning. (ECF No. 19-25 at 2.) Dassey exhibited no signs of agitation or distress throughout the interview (he sobbed only after being told he was under arrest). The investigators maintained calm tones, never using aggressive or confrontational tactics. If these were the only relevant facts, they would tend to support a finding that the March 1 confession was voluntary. But when assessed against all of the circumstances of Dassey's interrogation, these facts are overshadowed by far more consequential facts.

For starters, Dassey was a juvenile – only 16 years old – at the time of his confession. *See, e.g., J. D. B. v. North Carolina*, 564 U.S. 261, 280 (2011); *Gallegos v. Colorado*, 370 U.S. 49, 52 (1962); *Haley v. Ohio*, 332 U.S. 596, 599-600 (1948). Also significant is the fact that investigators questioned Dassey without the presence of a parent or other adult looking out for his interests. *Cf. Gilbert*, 488 F.3d at 792. It is true that neither federal law nor the United States Constitution requires that the police even inform a juvenile's parents that the juvenile is being questioned or honor a juvenile's request that a parent or other adult (other than a lawyer) be present during questioning. *Hardaway*, 302 F.3d at 765. However, because "[i]t is easier to overbear the will of a juvenile than of a parent or attorney, … in marginal cases–when it appears the officer or agent has attempted to take advantage of the suspect's youth or mental shortcomings–lack of parental or legal advice could tip the balance against admission." *United States v.*

*Bruce*, 550 F.3d 668, 673 (7th Cir. 2008) (quoting *United States v. Wilderness*, 160 F.3d 1173, 1176 (7th Cir. 1998)).

Not only did Dassey not have the benefit of an adult present to look out for his interests, the investigators exploited the absence of such an adult by repeatedly suggesting that *they* were looking out for his interests: "I wanna assure you that Mark and I both are in your corner, we're on your side …" (ECF No. 19-25 at 16), and "… I'm your friend right now, but I … gotta believe in you and if I don't believe in you, I can't go to bat for you." (ECF No. 19-25 at 23.) In the interview just two days earlier, on February 27, 2006, where Dassey was also unaccompanied by an adult, Fassbender went even further:

> I've got … kids somewhat your age, I'm lookin' at you and I see you in him and I see him in you, I really do, and I know how that would hurt me too. … Mark and I, yeah we're cops, we're investigators and stuff like that, but I'm not right now. I'm a father that has a kid your age too. I wanna be here for you. There's nothing I'd like more than to come over and give you a hug cuz I know you're hurtin'.

(ECF No. 19-24 at 5.)

Consistent with this paternalistic approach, Wiegert repeatedly touched Dassey's knee in a compassionate and encouraging manner during the March 1 interview. (*See, e.g.*, Ex. 43, Disc 1 at 11:20:28 a.m., 11:29:04 a.m., 11:37:32 a.m., 11:41:09 a.m.) In one instance, Wiegert put his hand on Dassey's knee, leaned forward, and said reassuringly and encouragingly, "We already know Brendan. We already know. Come on. Be honest with us. Be honest with us. We already know, it's, OK? We gonna help you through this,

alright?" (Ex. 43, Disc 1 at 11:29:04 AM; ECF No. 19-25 at 37.) He later did this again while saying, "Brendan, I already know. You know we know. OK. Come on buddy. Let's get this out, OK?" (Ex. 43, Disc 1 at 11:37:32 AM; ECF No. 19-25 at 44.)

Moreover, Dassey's borderline to below average intellectual ability likely made him more susceptible to coercive pressures than a peer of higher intellect. *See Henderson,* 97 F.3d at 948 ("Henderson's purportedly low I.Q. and limited reading and comprehension capabilities obviously call for caution in assessing the uncounseled waiver of his constitutional rights."); *see also Ruvalcaba v. Chandler*, 416 F.3d 555, 561 (7th Cir. 2005) (noting as a factor in denying habeas petition the absence of "evidence that he was of abnormally low intelligence or otherwise was highly vulnerable"). Although he attended regular education classes, Dassey received special education support services. (ECF No. 19-12 at 93-94.) Ten years earlier, his IQ was assessed at an overall score of 74. (ECF No. 19-12 at 86-87.) Testing over time yielded similar results. (ECF No. 19-12 at 87-90.) In addition, prior to the Halbach investigation Dassey had had no contact with law enforcement. *Cf. Hardaway*, 302 F.3d at 767 (noting petitioner "had 19 previous arrests for charges including robbery, attempted criminal sexual assault, unauthorized use of a weapon, and delivery of a controlled substance").

Crucial in the voluntariness analysis is what the investigators told Dassey at the beginning of the interrogation. Fassbender assured Dassey, "from what I'm seeing … I'm thinking you're all right. OK, you don't have to worry about things." (ECF No. 19-

25 at 16.) In isolation, such a statement would not be a problem. Based on what the investigators actually knew at that time, they very possibly believed Dassey to be merely a witness. However, less than two minutes later, Wiegert assured Dassey, "We pretty much know everything[.] [T]hat's why we're talking to you again today." (ECF No. 19-25 at 17.) The combination of these statements, that the investigators already "pretty much know everything" and that Dassey did not "have to worry about things," is an entirely different matter. The investigators were not merely telling Dassey, "Based upon what you have told us *so far*, we don't think you have anything to worry about." Rather, what they told Dassey was, "We already know what happened and you don't have anything to worry about."

The investigators' assertions that they already knew what happened and assurances that Dassey did not have anything to worry about were not confined to an isolated instance at the beginning but rather persisted throughout the interrogation. Early on, before Dassey had said anything incriminating, Wiegert again told Dassey, "[N]ow remember this is very important cuz we already know what happened that day." (ECF No. 19-25 at 19; *see also* ECF No. 19-25 at 23 ("We already know what happened[.]").) Fassbender assured Dassey, "I'm your friend right now, but I gotta believe in you and if I don't believe in you, I can't go to bat for you." (ECF No. 19-25 at 23.) Fassbender continued, "We're in your corner," and Wiegert added, "We already

know what happened, now tell us exactly." (ECF No. 19-25 at 23.) Less than a minute later Wiegert again said, "We already know. Just tell us. It's OK." (ECF No. 19-25 at 24.)

The investigators went on to repeat that they already knew what happened at least 24 additional times throughout the interrogation. (*See, e.g.*, ECF No. 19-25 at 26 (Wiegert: "Come on we know this already. Be honest."); 28 (Wiegert: "Remember we already know, but we need to hear it from you."); 30 (Wiegert: "So just be honest. We already know."); 31 (Wiegert: "We already know."); 36 (Wiegert: "We already know, be honest."); 37 (Wiegert: "We already know Brendan. We already know. Come on. Be honest with us. Be honest with us. We already know, it's, OK? We're gonna help you through this, alright?"); 41 (Wiegert: "It's OK Brendan. We already know."); 44 (Fassbender: "Cuz, we, we know but we need it in your words. I can't, I can't say it."); 44 (Wiegert: "Brendan, I already know. You know we know. OK. Come on buddy. Let's get this out, OK?"); 47 (Wiegert: "Remember, we already know, but we need to hear it from you, it's OK. It's not your fault."); 47 (Fassbender: "We know."); 48 (Wiegert: "We know you were back there. Let's get it all out today and this will be all over with."); 50 (Wiegert: "We know happened." [sic]); 50 (Wiegert: "We know what happened, it's OK."); 54 (Wiegert: "You were there when she died and we know that. Don't start lying now. We know you were there."); 54 (Wiegert: "We already know, don't lie to us now, OK, come on."); 54 (Wiegert: "He did something else, we know that."); 55 (Wiegert: "We know he did something else to her, what else did he do to her?"); 60 (Wiegert: "We

know something else was done. Tell us, and what else did you do?"); 60 (Fassbender: "[W]e know he made you do somethin' else."); 63 (Fassbender: "We know, we just need you to tell us."); 69 (Fassbender: "[W]e know there's some, some things that you're, you're not tellin' us."); 71 (Fassbender: "[W]e know that some things happened in that garage, and in that car, we know that."); 73 (Wiegert: ("We know you shot her too.").)

The record indicates that these false assertions had a powerful effect upon Dassey. Even the respondent acknowledges that "the most damaging admissions Dassey made in his interview… were all made as investigators encouraged Dassey to tell the truth because they 'already knew' what had happened." (ECF No. 20 at 21 (citing 19-25 at 37-64); *see also* ECF No. 20 at 29.)

At the same time the investigators were telling Dassey that they already knew what happened, they frequently reassured him that he did not have anything to worry about. After Fassbender assured Dassey that, "from what I'm seeing … I'm thinking you're all right. OK, you don't have to worry about things," (ECF No. 19-25 at 16), at least four separate times, Wiegert returned to this theme when he told Dassey, "It's OK," while saying they already knew the details Dassey was not telling them. (ECF No. 19-25 at 24, 37, 41, 47.)

Many other times, removed from assertions that the investigators already knew what happened, the investigators repeatedly suggested to Dassey that he had nothing to worry about. (*See, e.g.*, ECF No. 19-25 at 17 (Wiegert: "[N]o matter what you did, we

can work through that."); 17 (Wiegert: "It's OK. As long as you can, as long as you be honest with us, it's OK[. I]f you lie about it that's gonna be problems. OK."); 28 (Wiegert: "It's OK."); 46 (Wiegert: "It's OK, tell us what happened.") 51 (Wiegert: "It's OK."); 76 ("It's OK, what'd you do with it?"); 96 (Wiegert: "Brendan, it's OK to tell us OK."); 121 (Wiegert: "What about the knife, where is the knife, be honest with me, where's the knife? It's OK, we need to get that OK? Help us out, where's the knife?").) In one instance, when asking Dassey if he helped Avery put Halbach in the back of her RAV4, Wiegert explicitly assured Dassey, "If you helped him, it's OK, because he was telling you to do it." (ECF No. 19-25 at 28.) Similarly, just before Dassey stated he cut Halbach's throat, Wiegert prompted Dassey by telling him, "It's OK, what did he make you do?" (ECF No. 19-25 at 62.) In another instance, Wiegert told Dassey not only that "it's OK," he assured Dassey, "It's not your fault." (ECF No. 19-25 at 47.) Wiegert separately assured Dassey that, once he told them everything that they already purportedly knew, "this will all be over with." (ECF No. 19-25 at 48.)

Wiegert also told Dassey that "honesty is the only thing that will set you free." (ECF No. 19-25 at 17). Granted, that statement is just an idiom, *see John* 8:32 ("… and you will know the truth, and the truth will make you free"), and routinely understood not to be taken literally, *see, e.g., People v. Thompson*, 2013 Cal. App. Unpub. LEXIS 4324 (Cal. App. 2d Dist. June 20, 2013) ("With respect to possible coercion, the court found the detective's comment, 'the truth will set you free' was a general statement about

relieving one's conscience rather than a promise of freedom."); *State v. Osborne*, 2002 Me. Super. LEXIS 266 (Me. Super. Ct. Sept. 25, 2002) ("The court interprets [the truth will set you free] to mean that telling the truth will ease the Defendant's conscience."); *Edwards v. State*, 793 So. 2d 1044, 1048 (Fla. Dist. Ct. App. 4th Dist. 2001) ("the 'truth shall set you free' statement, although questionable, amounts to nothing more than encouragement to tell the truth. Surely, Edwards did not think the truth would literally set him free. The investigators simply were appealing to Edwards' religious background in encouraging him not to lie."). However, some courts have criticized its use by interrogators. *See, e.g.*, *Morgan v. State*, 681 So. 2d 82, 88, 96-97 (Miss. 1996). And, especially relevant here, testing revealed that idioms were an aspect of abstract language that Dassey had difficulty understanding. (ECF No. 19-20 at 79.)

Dassey's conduct during the interrogation and his reaction to being told he was under arrest clearly indicate that he really did believe that, if he told the investigators what they professed to already know, he would not be arrested for what he said. *Cf. Sharp v. Rohling*, 793 F.3d 1216, 1235 (10th Cir. 2015) ("Ms. Sharp's surprised and angry reaction when Detective Wheeles arrested her at the end of the interview indicated her incriminating statements were not the product of free will because they were given on the false premise she would not go to jail."). After admitting to committing exceptionally serious crimes, Dassey twice expressed his expectation that he would be allowed to return to school that day. (ECF No. 19-25 at 89, 143.) And at the end of the

interrogation, when asked what he thought should happen, there is absolutely no indication that Dassey anticipated that he would be arrested. (ECF No. 19-25 at 144.) Even after being told he was under arrest, he did not seem to grasp the seriousness of the matter, asking, "Is it only for one day?" (ECF No. 19-25 at 144.)

The investigators' statements were not merely ambiguous promises to Dassey that cooperating would lead to a better deal or that the investigators would "stand behind" him or "go to bat" for him, *see Villalpando*, 588 F.3d at 1130, although they said those things as well (*see, e.g.*, ECF No. 19-25 at 17, 23). Rather, the investigators' collective statements throughout the interrogation clearly led Dassey to believe that he would not be punished for telling them the incriminating details they professed to already know. While at one point Wiegert did rotely say, "We can't make any promises ..." this single, isolated statement was drowned out by the host of assurances that they already knew what happened and that Dassey had nothing to worry about.

Thus, the state courts' finding that there were no "promises of leniency" (ECF No. 1-5, ¶ 6) was "against the clear and convincing weight of the evidence," *Ward*, 334 F.3d at 704. Concluding that the investigators never made any such promises was no minor error but rather a fact that was central to the court's voluntariness finding. *See O'Quinn v. Spiller*, 806 F.3d 974, 978 (7th Cir. 2015) (holding that minor factual errors do not merit habeas relief unless the petitioner can show that the state court's decision was "based on" that factual error) (quoting 28 U.S.C. § 2254(d)(2)). Given the other facts that

tend to support the conclusion that Dassey's confession was involuntary, as discussed above, this unreasonable determination of fact was undoubtedly crucial in the courts' ultimate decision that Dassey's confession was voluntary. "A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." *Id.* (quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997)).

"Because the trial court based its decision on an unreasonable factual determination, the substantive merits of [the petitioner's] claim are analyzed under the pre-AEDPA standard – that is, de novo – because there is no state court analysis to apply AEDPA standards to." *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008). As discussed below, the court finds that the court of appeals' decision was not merely incorrect; it was unreasonable. Thus, Dassey satisfies the lower de novo review standard required for relief under 28 U.S.C. § 2254(d)(2). Consequently, Dassey is entitled to relief by way of 28 U.S.C. § 2254(d)(2). *See Sharp*, 793 F.3d at 1230-33 (granting petition for writ of habeas corpus under 28 U.S.C. § 2254(d)(2) because state court unreasonably found that interrogators did not make any promises of leniency to the petitioner).

The court also finds that, independent of the state courts' unreasonable factual determination and Dassey's entitlement to relief under the de novo standard of review

by way of 28 U.S.C. § 2254(d)(2), Dassey is separately entitled to relief under 28 U.S.C. § 2254(d)(1). The court of appeals' factual error is itself relevant in assessing the reasonableness of its ultimate conclusion. *See Pole v. Randolph*, 570 F.3d 922, 936 (7th Cir. 2009) (discussing *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). More than merely disagreeing with the court of appeals' decision or concluding that it would have reached a different decision if it had been the state court, the court finds that the state court's decision was an unreasonable application of clearly established federal law as set forth in many decisions of the United States Supreme Court, including *Miller v. Fenton*, 474 U.S. 104, 109-10 (1985) (reiterating that the Supreme Court has long held that involuntary statements are not admissible) and *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (holding, in part, that psychological pressures may render a confession involuntary).

The primary error in the court of appeals' terse decision was its focus on facts in isolation and its failure to assess voluntariness under the totality of circumstances. Although the court of appeals correctly noted the totality of the circumstances standard (ECF No. 1-5, ¶ 5), its decision does not reflect its application. For example, omitted from its discussion is any consideration of how the absence of a parent or allied adult affected the voluntariness of Dassey's confession. Nor does the court of appeals' decision reflect any consideration of how the investigators overcame Dassey's resistance by deliberately exploiting the absence of his mother, feigning paternalistic concern for

his best interests and by statements such as, "Your mom said you'd be honest with us." (ECF No. 19-25 at 23.) *See Bruce*, 550 F.3d at 673 (quoting *Wilderness*, 160 F.3d at 1176).

Granted, "state courts are not required to address every jot and tittle of proof suggested to them, nor need they 'make detailed findings addressing all the evidence before [them].'" *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003)); *see also Gray v. Zook*, 806 F.3d 783, 791 (4th Cir. 2015) (citing *Moore v. Hardee*, 723 F.3d 488, 499 (4th Cir. 2013)). However, if the overlooked fact was "highly probative and central to the petitioner's claim," the state court's omission will "fatally undermine [its] fact finding process, and render the resulting finding unreasonable." *Taylor*, 366 F.3d at 1001. The absence of Dassey's mother, especially when considered in conjunction with evidence of how the investigators deliberately exploited her absence, is a fact highly probative of Dassey's claim such that its absence from the court of appeals' analysis undermines its conclusion.

Most significantly, however, the court of appeals erred when it focused on the statements of the investigators in isolation to conclude that they did not make any promises of leniency. True, no single statement by the investigators, if viewed in isolation, rendered Dassey's statement involuntary. But when assessed collectively and cumulatively, as voluntariness must be assessed, it is clear how the investigators' actions amounted to deceptive interrogation tactics that overbore Dassey's free will.

The Supreme Court has long recognized that a false promise is a powerful force in overcoming a person's free will. *See Bram v. United States*, 168 U.S. 532, 542-43 (1897) ("[A] confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.") (quoting 3 H. Smith & A. Keep, Russell on Crimes and Misdemeanors 478 (6th ed. 1896)). Consequently, "[a] false promise of lenience is 'an example of forbidden [interrogation] tactics, for it would impede the suspect in making an informed choice as to whether he was better off confessing or clamming up.'" *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012) (quoting *United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir. 1995)).

More than merely assuring Dassey that he would *not* be punished if he admitted participating in the offenses, the investigators suggested to Dassey that he *would* be punished if he did not tell "the truth." (*See, e.g.*, ECF No. 19-25 at 17, 23, 54, 102.) However, because the investigators' assertions that they already knew what happened were often false, "the truth" to the investigators was often merely whichever of Dassey's version of events they eventually accepted. Thus, as long as Dassey told a version the investigators accepted as "the truth," he was led to believe he had no fear of negative consequences. But if the investigators did not accept as true the story Dassey told them, he was told there would be repercussions.

Especially when the investigators' promises, assurances, and threats of negative consequences are assessed in conjunction with Dassey's age, intellectual deficits, lack of experience in dealing with the police, the absence of a parent, and other relevant personal characteristics, the free will of a reasonable person in Dassey's position would have been overborne. Once considered in this proper light, the conclusion that Dassey's statement was involuntary under the totality of the circumstances is not one about which "fairminded jurists could disagree." *See Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Consequently, the court finds that the confession Dassey gave to the police on March 1, 2006 was so clearly involuntary in a constitutional sense that the court of appeals' decision to the contrary was an unreasonable application of clearly established federal law.

The court does not reach this conclusion lightly. The present decision is made in full appreciation of the limited nature of the habeas remedy under AEDPA and mindful of the principles of comity and federalism that restrain federal intervention in this arena. *See, e.g., id.* at 15. However, the high standard imposed by AEDPA is not a complete bar to relief. *Cockrell*, 537 U.S. at 340. While the circumstances for relief may be rare, even extraordinary, it is the conclusion of the court that this case represents the sort of "extreme malfunction[] in the state criminal justice system[]" that federal habeas corpus relief exists to correct. *Richter*, 562 U.S. at 102. That said, the court does not ascribe any ill motive to the investigators. Rather than an intentional and concerted

effort to trick Dassey into confessing, what occurred here may have been the product of the investigators failing to appreciate how combining statements that they already "knew everything that happened" with assurances that Dassey was "OK" and had nothing to worry about collectively resulted in constitutionally impermissible promises.

Thus, the court turns to the final obstacle to obtaining habeas relief – whether the admission of the involuntary confession was harmless. Specifically, the court must decide whether the admission of a confession obtained in violation of Dassey's constitutional rights "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Ayala*, 135 S. Ct. at 2197.

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Fulminante*, 499 U.S. at 296 (quoting *Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J. dissenting)). A confession can be so decisive and "so profoundly prejudicial" in the adversarial process as to "make[] the other aspects of a trial in court superfluous." *Connelly*, 479 U.S. at 182 (Brennan, J., dissenting). Having thoroughly reviewed the trial transcript, the court has no difficulty concluding that the admission of Dassey's confession was not a harmless error. Dassey's confession was, as a practical matter, the entirety of the case against him on each of the three counts.

## IV.    Conclusion

Although Kachinsky's misconduct was indefensible, the United States Supreme Court has never accepted arguments such as those Dassey makes here as a basis for relief under *Sullivan*. Therefore, federal law prohibits the court from granting Dassey habeas relief on the first claim he presented to this court.

However, the state courts unreasonably found that the investigators never made Dassey any promises during the March 1, 2006 interrogation. The investigators repeatedly claimed to already know what happened on October 31 and assured Dassey that he had nothing to worry about. These repeated false promises, when considered in conjunction with all relevant factors, most especially Dassey's age, intellectual deficits, and the absence of a supportive adult, rendered Dassey's confession involuntary under the Fifth and Fourteenth Amendments. The Wisconsin Court of Appeals' decision to the contrary was an unreasonable application of clearly established federal law.

**IT IS THEREFORE ORDERED** that Brendan Dassey's petition for a writ of habeas corpus is **GRANTED.** The respondent shall release Dassey from custody unless, within 90 days of the date of this decision, the State initiates proceedings to retry him. *See Jensen v. Schwochert*, 2013 U.S. Dist. LEXIS 177420, 55 (E.D. Wis. Dec. 18, 2013). The Clerk shall enter judgment accordingly.

In the event the respondent files a timely notice of appeal, the judgment will be stayed pending disposition of that appeal. *See id*.

Dated at Milwaukee, Wisconsin this 12th day of August, 2016.

WILLIAM E. DUFFIN
U.S. Magistrate Judge